# No. 23-3

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

*ROBERT SAMPSON,*

*Plaintiff-Appellee,*

*v.*

*NATIONAL BOARD OF MEDICAL EXAMINERS,*

*Defendant-Appellant.*

On Appeal from the United States District Court for the
Eastern District of New York, Case No. 22-CV-05120-JMA

**BRIEF OF DEFENDANT-APPELLANT
NATIONAL BOARD OF MEDICAL EXAMINERS**

Robert A. Burgoyne
Caroline M. Mew
PERKINS COIE LLP
700 13th St. N.W., Ste. 800
Washington, DC 20005-3960
Telephone: 202.654.1744

Attorneys for
Defendant-Appellant
NATIONAL BOARD OF
MEDICAL EXAMINERS

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Defendant National Board of Medical Examiners states that it is a nonprofit corporation. It has no parent corporation, and no publicly traded corporation owns ten percent or more of its stock. There is no publicly owned corporation with a financial interest in the outcome of the proceeding.

# TABLE OF CONTENTS

**PAGE**

STATEMENT OF JURISDICTION ........................................1

INTRODUCTION....................................................................2

STATEMENT OF ISSUES PRESENTED FOR REVIEW .....7

STATEMENT OF THE CASE .................................................8

    A.    NBME and the USMLE........................................9

    B.    Robert Sampson ...................................................10

        1.    Plaintiff's academic history......................10

        2.    Plaintiff's standardized testing history...13

        3.    Plaintiff's psychological evaluations........15

    C.    Plaintiff's Requests for Step 1
        Accommodations .................................................24

    D.    Plaintiff's Status in Medical School ...................27

    E.    Plaintiff's Lawsuit Against Stony Brook ...........29

SUMMARY OF ARGUMENT.................................................30

STANDARD OF REVIEW ....................................................31

ARGUMENT..........................................................................32

I.    The district court erred in concluding that
    Plaintiff made a strong showing of irreparable
    harm..........................................................................34

# TABLE OF CONTENTS
## (Continued)

PAGE

II.   The district court erred in concluding that
      Plaintiff showed a substantial likelihood of
      success on the merits. ....................................41

      A.    The ADA requires substantial limitation. ..........41

      B.    The district court did not properly apply the
            statutory substantial limitation
            requirement.........................................44

            1.    The evidence did not demonstrate
                  an ADA disability. ...................................45

            2.    The district court improperly dismissed
                  the opinions of NBME's experts. .............57

                  a.    The district court improperly
                        relied on informal agency
                        guidance in deferring to
                        Plaintiff's evaluator.................58

                  b.    The district court gave
                        undue weight to Plaintiff's
                        evaluator.........................62

III.  NBME and other test-takers will be harmed by
      the  preliminary injunction..........................................68

IV.   Injunctive relief would disserve the public. ................70

CONCLUSION ....................................................................71

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*B.C. v. Mount Vernon Sch. Dist.*,
    837 F.3d 152 (2d Cir. 2016) .................................42, 43, 54

*Bach v. Law Sch. Admission Council*,
    No. 13-888, 2014 U.S. Dist. LEXIS 124632
    (M.D.N.C. 2014) .........................................................37, 70

*Baer v. NBME*,
    392 F. Supp. 2d 42 (D. Mass. 2005) ...........................37, 40

*Bartlett v. N.Y. State Bd. of Law Exam'rs*,
    226 F.3d 69 (2d Cir. 2000) .................................................32

*Bartlett v. N.Y. State Bd. of Law Exam'rs*,
    970 F. Supp. 1094 (S.D.N.Y. 1997), *aff'd in*
    *part, vacated in part, and remanded*, 156 F.3d
    321 (2d Cir. 1998) .............................................................63

*Benisek v. Lamone*,
    138 S. Ct. 1942 (2018).................................................38, 39

*Black & Decker Disability Plan v. Nord*,
    538 U.S. 822 (2003).....................................................63, 67

*Black v. NBME*,
    281 F. Supp. 3d 1247 (M.D. Fla. 2017) ...........................45

*Campbell v. Lamar Inst. of Tech.*,
    842 F.3d 375 (5th Cir. 2016).............................................70

*D.S. by and through M.S. v. Trumball Bd. of*
    *Educ.*,
    975 F.3d 152 (2d Cir. 2020) .............................................60

# TABLE OF AUTHORITIES
## (Continued)

PAGE(S)

*Doe v. NBME,*
    199 F.3d 146 (3rd Cir. 1999) .............................................. 41

*Doherty v. NBME,*
    791 F. App'x 462 (5th Cir. 2019) ................................ 44, 49

*Faiveley Transp. Malmo AB v. Wabtec Corp.,*
    559 F.3d 110 (2d Cir. 2009) ................................................ 34

*Fernandez v. Zoni Language Centers, Inc.,*
    858 F.3d 45 (2d Cir. 2017) ................................................. 59

*Grand River Enterprise Six Nations, Ltd. v. Pryor,*
    481 F.3d 60 (2d Cir. 2007) ................................................. 34

*Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs,*
    870 F. Supp. 2d 607 (S.D. Ind. 2012) ......................... 46, 56

*JLM Couture, Inc. v. Gutman,*
    24 F.4th 785 (2d Cir. 2011) ................................................ 31

*Kamerling v. Massanari,*
    295 F.3d 206 (2d Cir. 2002) ............................................... 38

*Kisor v. Wilkie,*
    139 S. Ct. 2400 (2019) ........................................................ 59

*Love v. Law Sch. Admission Council,*
    513 F. Supp.2d 206 (E.D. Pa. 2007) ................................. 21

*Mann v. La. High Sch. Athletic Assoc.,*
    535 F. App'x. 405 (5th Cir. 2013) ...................................... 32

# TABLE OF AUTHORITIES
## (Continued)

PAGE(S)

*Mazurek v. Armstrong*,
520 U.S. 968 (1997)..............................................................32

*Monowise Ltd. Corp. v. Ozy Media, Inc.*,
No. 17-8028, 2018 WL 2089342
(S.D.N.Y. 2018) ....................................................................38

*Moore v. Consol. Edison Co. of N.Y.*,
409 F.3d 506 (2d Cir. 2005) .................................................32

*N. Am. Soccer League v. U.S. Soccer Fed'n*,
883 F.3d 32 (2d Cir. 2018) ...................................................32

*Neely v. PSEG Tex., Ltd. P'ship*,
735 F.3d 242 (5th Cir. 2013).................................................43

*New York ex rel. Schneiderman v. Actavis PLC*,
787 F.3d 638 (2d Cir. 2015) .................................................33

*Pazer v. N.Y. State Bd. of Law Exam'rs*,
849 F. Supp. 284 (S.D.N.Y. 1994) ......................................40

*Perez v. Mortgage Bankers Ass'n*,
575 U.S. 92 (2015)................................................................58

*Powell v. Nat'l Bd. of Med. Exam'rs*,
364 F.3d 79 (2d Cir. 2004) .............3, 4, 6, 10, 66, 69, 70, 71

*Ramsay v. Nat'l Bd. of Med. Exam'rs*,
968 F.3d 251 (3d Cir. 2020) ................................3, 56, 62, 64

*Rawdin v. Am. Bd. of Pediatrics*,
985 F. Supp. 2d 636 (E.D. Pa. 2013), *aff'd on
other grounds*, 582 F. App'x 114 (3d Cir. 2014)................44

# TABLE OF AUTHORITIES
## (Continued)

PAGE(S)

*Rothberg v. Law Sch. Admission Council,*
102 F. App'x 122 (10th Cir. 2004) ................................... 69

*Sampson v. Stony Brook Univ.,*
No. 2:22-cv-4490 (E.D.N.Y.) ...................................... 29, 35

*Singh v. George Wash. Univ.,*
508 F.3d 1097 (D.C. Cir. 2007) ........................................ 44

*Tom Doherty Assocs. v. Saban Entm't, Inc.,*
60 F.3d 27 (2d Cir. 1995) ........................................... 33, 38

*Valles v. ACT, Inc.,*
2022 WL 2789900 (E.D. Tex. 2022) ................................ 46

*WarnerVision Entm't Inc. v. Empire of Carolina, Inc.,*
101 F.3d 259 (2d Cir. 1996) ............................................. 33

*Winter v. NDRC,*
555 U.S. 7 (2008) ............................................................ 32

*Wright v. NBME,*
No. 21-2319, 2021 WL 5028463
(D. Colo. 2021) ........................................ 40, 46, 50, 60, 66

**STATUTES**

42 U.S.C. § 12101(b)(2) ............................................... 61

42 U.S.C. § 12102(1)(A) ...................................... 41, 42, 43, 60

42 U.S.C. § 12102(4)(A) ............................................... 42

42 U.S.C. § 12182(a) ................................................... 41

## TABLE OF AUTHORITIES
### (Continued)

PAGE(S)

42 U.S.C. § 12189 ...........................................................41, 58

**REGULATIONS**

28 C.F.R. § 36.101(b) ...............................................................68

28 C.F.R. § 36.105 ...................................................................42

28 C.F.R. § 36.105(d)(1)(v) ...........................42, 44, 56, 60, 68

28 C.F.R. § 36.105(d)(1)(vi) ...................................................63

28 C.F.R. § 36.309 ...................................................................61

28 C.F.R. § 36.309(a) ..............................................................50

28 C.F.R. § 36.309(b)(1)(v) .....................................................49

75 Fed. Reg. 56,236 (Sept. 15, 2010) ...............................58, 62

81 Fed. Reg. 53,204 (Aug. 11, 2016) ................................61, 62

**OTHER AUTHORITIES**

Statement of the Managers, 154 Cong. Rec. S8840
     (Sept. 16, 2008) ................................................................43

A. Harrison, *Accommodation Decision-Making for
     Postsecondary Students with ADHD: Treating
     the Able as Disabled*, Psychological Injury &
     Law (2022)..................................................................49, 64

A. Harrison, *Attention Deficit Disorders, Learning
     Disorders, and Other Incentivized Diagnoses—
     A Special Issue for Psychologists*, Psychological
     Injury & Law (2022) .........................................................65

# TABLE OF AUTHORITIES
## (Continued)

PAGE(S)

A. Harrison & R. Sparks, *Disability Diagnoses: Seven Sins of Clinicians*, Psychological Injury & Law (2022).......................................................64

Black's Law Dictionary (11th ed. 2019) ...............................38

L. Binder *et al.*, *To Err is Human: "Abnormal" Neuropsychological Scores and Variability are Common in Healthy Adults*, Archives of Clinical Psychology (2008)................................................56

R. Mapou, *Have We Loosened the Definition of Disability? The Effects of Changes in the Law and Its Interpretation on Clinical Practice*, Psychological Injury & Law (2022) ...................................55

R. Weiss *et al., College Students' Access to Academic Accommodations Over Time: Evidence of a Matthew Effect in Higher Education*, Psychological Injury & Law (2021)................65

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331 because this action arises under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* and the Rehabilitation Act, 29 U.S.C. § 791 *et seq.* This Court has jurisdiction under 28 U.S.C. § 1292(a)(1) because this is an appeal from the grant of a preliminary injunction. SPA1-SPA41.[1] The National Board of Medical Examiners ("NBME") timely filed its notice of appeal on December 30, 2022. A1159.

---

[1] "SPA" cites are to the Special Appendix. "A" cites are to the Joint Appendix.

## INTRODUCTION

This appeal concerns the intersection of the ADA and high-stakes standardized testing. At issue is the ADA's substantial-limitation requirement as applied to students who claim to be entitled to extra testing time and other accommodations that would benefit all examinees, based on diagnosed learning or attention disorders—identified late in life by evaluators hired specifically to help secure testing accommodations—despite an academic and testing record revealing decades of above-average performance without accommodations.

It would seem reasonable that an individual scoring in the top percentiles of high-stakes national tests like the Medical College Admission Test (MCAT), ACT, or SAT without accommodations, and consistently receiving high grades in advanced high school classes and at an elite college, most likely is not substantially limited in the activities of reading and concentrating compared to most people in the general population—the applicable standard. Five well-qualified experts so concluded with regard to the plaintiff in this case, based not only on his academic and standardized test history but also the diagnostic assessments administered by Plaintiff's professionals and other information submitted by Plaintiff.

The court below, however, discounted the real-world evidence relating to Plaintiff's alleged functional limitations and accepted Plaintiff's largely unsupported assertions that he sometimes received "informal" accommodations in school and used special techniques that enabled him to do well on other time-constrained tests, unaccommodated, by just skimming the questions. The court also concluded, based upon informal agency guidance, that the opinions of Plaintiff's evaluator were entitled to greater weight than the opinions of NBME's independent professionals, because Plaintiff's evaluator conducted an in-person evaluation.

In so ruling, the court relied heavily upon *Ramsay v. Nat'l Bd. of Med. Exam'rs*, 968 F.3d 251 (3d Cir. 2020), while giving short shrift to this Court's decision in *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79 (2d Cir. 2004). As here, both decisions involved requests for extra testing time on the United States Medical Licensing Examination ("USMLE").

Plaintiff was first diagnosed with learning disorders and Attention-Deficit Hyperactivity Disorder (ADHD) as an adult, in anticipation of applying to medical school. In reviewing his requests for extra time on Step 1 of the USMLE, NBME

thoroughly reviewed his documentation and sought recommendations from external experts, all part of its process of ensuring that "individuals with *bona fide* disabilities receive accommodations, and that those without disabilities do not receive accommodations that they are not entitled to, and which could provide them with an unfair advantage." *Powell v. NBME,* 364 F.3d at 88-89. NBME denied Plaintiff's requests because his documentation did not demonstrate substantial limitation in any major life activity and did not show that accommodations were warranted.

Plaintiff sued NBME in August 2022, five years after NBME denied his initial request for accommodations. At the time, he was attending business school and had been on leave of absence from medical school for over a year. Plaintiff informed the district court that he wanted to file a preliminary injunction motion that would require NBME to allow him to test with his requested accommodations, and—before hearing from NBME—the court scheduled expedited briefing. It later scheduled an expedited, pre-discovery evidentiary hearing.

At the conclusion of those proceedings, the court awarded Plaintiff his requested mandatory injunction, giving him the

full relief he would otherwise receive only if he prevailed on the merits. It did so even though Plaintiff informed the Court at the conclusion of the hearing that he did not intend to take Step 1 for several months, thus belatedly revealing there was no urgency warranting expedited relief.

The district court acknowledged the heightened standard for mandatory preliminary injunctions but made numerous errors in finding that Plaintiff met that standard. In examining irreparable harm, the court speculated that Plaintiff would fail Step 1 without accommodations and concluded that any delay from holding a trial on the merits would deprive Plaintiff of his opportunity to pursue his chosen profession, notwithstanding Plaintiff's own five-year delay in seeking relief, his enrollment in business school, and his plan to wait many months before taking Step 1.

On the merits, the district court gave little weight to the extensive evidence of Plaintiff's unimpaired functioning in favor of Plaintiff's subjective perceptions of struggle. It also dismissed the testimony of the five experts offered by NBME and gave greater weight to the conclusions of Plaintiff's evaluator,

who evaluated Plaintiff solely for the purpose of his request for accommodations on the USMLE.

The district court's procedural approach and substantive analysis virtually guarantee a preliminary injunction win, and thus extra time on licensure examinations, to anyone who obtains a diagnosis and waits to the last minute to file a lawsuit, even if they do not meet the ADA standard for disability.

Receiving unwarranted extra time is unfair to other testtakers—including those who meet the ADA's definition of disability—and compromises the public's interest in reliable licensing exams. This Court emphasized these considerations in *Powell*, but the district court turned *Powell* on its head, focusing on Plaintiff's alleged plight (largely of his own creation) rather than the broad interests at stake when accommodations are requested on a high-stakes licensure exam.

Absent reversal of the ruling below, Plaintiff will take Step 1 with double the amount of testing time that other examinees receive and will undoubtedly ask NBME to report his scores to his medical school and potential residency programs. The fairness and integrity of the medical licensing examination (and similar exams) will be injured if the injunction stands.

**STATEMENT OF ISSUES PRESENTED FOR REVIEW**

Whether the district court abused its discretion by granting a mandatory preliminary injunction based on the erroneous conclusions that:

(1) Plaintiff made a strong showing of non-speculative and imminent irreparable harm, where Plaintiff waited five years to seek judicial relief after his request for accommodations was initially denied, offered only speculation that he cannot pass Step 1 without additional testing time, and will not even take Step 1 until many months after the hearing on his expedited motion, SPA20-SPA24;

(2) Plaintiff demonstrated a substantial likelihood of success on the merits by showing he is substantially limited in the major life activities of reading and concentrating as compared to most people in the general population, notwithstanding evidence showing a lifetime of academic and standardized testing success with no formal accommodations and testimony from five well-qualified experts that no such substantial limitation exists, SPA24-SPA39;

(3) The balance of harms favored Plaintiff, despite threats to the integrity of the medical licensing examination when unwarranted accommodations are provided, SPA39-SPA40; and

-7-

(4) The public interest favored relief, despite the public's interest in reliable USMLE results and a USMLE accommodation process that is fair to all examinees, including but not limited to individuals who seek accommodations, SPA40-SPA41.

## STATEMENT OF THE CASE

Plaintiff filed his Complaint raising claims under the ADA and Section 504 of the Rehabilitation Act on August 29, 2022. A5. He filed a letter request for a preliminary injunction pre-motion conference on September 6, 2022. A2 (ECF 8). By order dated September 8, 2022, and before hearing from NBME, the district court waived its pre-motion conference requirement and set an expedited briefing schedule that directed Plaintiff to file his motion by September 19, 2022; NBME to file its opposition by September 29; and Plaintiff to file his reply by October 4. A2.

The district court held an evidentiary hearing on Plaintiff's motion on October 11, 12, and 13, 2022. A3 (ECF 37, 38, 39). On December 2, 2022, the district court, Judge Joan Azrack, issued a Memorandum Opinion and Order granting Plaintiff's motion. SPA1-SPA41.

### A.  NBME and the USMLE

NBME is a nonprofit organization whose mission is to help protect the public health by developing and administering high-quality examinations for healthcare professionals. A68 ¶3. NBME sponsors the USMLE—a standardized test designed to assess the knowledge and skills that constitute the basis of safe and effective patient care. A69 ¶4. Medical licensing authorities across the country rely on USMLE scores as part of their professional licensure process. A69 ¶5.

The USMLE comprises three "Steps"—Step 1, Step 2 Clinical Knowledge ("CK"), and Step 3. A69 ¶6. This appeal concerns Step 1, which assesses whether the examinee can understand and apply basic science concepts that are important to practicing medicine. *Id.*

All examinees take the USMLE under the same conditions, including standard testing time, except for individuals who have a disability within the meaning of the ADA and need accommodations. A69-A70 ¶¶7-8. NBME thoroughly evaluates each request for accommodations, often (as here) with the assistance of independent, external experts, and it provides accommodations to examinees with documented disabilities. A70 ¶¶8, 10.

NBME's accommodation process protects the reliability and fairness of USMLE exams. A70 ¶9. "As administrator of the national exam used by a number of states for licensing medical doctors, the National board has a duty to ensure that its examination is fairly administered to all those taking it." *Powell v. NBME,* 364 F.3d at 88-89 (affirming summary judgment for NBME where, as here, NBME applied its standard procedures for evaluating accommodation requests).

### B.  Robert Sampson

#### 1.  Plaintiff's academic history

Plaintiff is a joint-degree medical and business school student at Stony Brook University's School of Medicine ("Stony Brook"). A6 ¶1. Plaintiff is a "gifted student" who, in his third-year clinical rotations in medical school, "performed 'above expected for the level of training'." A7-A8 ¶¶13, 16.

From the limited school records Plaintiff provided to NBME, he had no problems acquiring basic reading skills. A315-A322 ¶¶6-21. His reading scores ranged from 4 to 5+ in first grade (on a scale of 1-5, with 5 being the highest), from 4 to 5 in second grade, and from 3 to 4 in fourth grade. A852-A867. Testing conducted when he was ten showed Plaintiff

was reading at grade level (Woodcock Reading Mastery Test) and solidly in the average range (Terra Nova test). A810-2;[2] A217 ¶34.

Plaintiff went on to perform well academically in competitive environments. In junior high, he "excel[led] in math and science" and "obtain[ed] B+/A- grades in language arts." A810-2. He relied on a math tutor "to keep up with the accelerated pace of his classmates." *Id.* He earned A's in most of his high school classes, which were "typically honors or AP level." *Id.*; A1002 (127:18-128:2). His school was "extremely competitive, leading to widespread use of tutoring." A810-2.

Plaintiff had no IEP or Section 504 plan while in school. A1002 (126:8-10). He did not receive formal accommodations in elementary school, junior high, or high school. A168. He "had no formal interventions for academic difficulties, no special services, grade retentions, or behavior problems." A809-1.

Plaintiff attended the University of Virginia, "an academically competitive university," A809-1, where, with no

---

[2] Cites to sealed material note the applicable Joint Appendix slip sheet cite (A43, A809, A810, or A939) followed by a pinpoint page cite (e.g., A809-4, A810-2).

accommodations, "he flourished socially and intellectually" with a 3.43 GPA, A810-2.

Plaintiff decided to attend medical school. He requested accommodations on the Medical College Admission Test based upon evaluations he obtained from two professionals who diagnosed him with a learning disability (discussed below); his request was denied, A986 (62:20-25). He was admitted to medical school at Stony Brook University.

Plaintiff passed all his first-year classes but had some academic challenges. A33 ¶18; A826. He requested and began receiving accommodations in his second year of medical school. A34 ¶¶22-23.

In his third-year clinical rotations, Plaintiff's supervisors noted the following (among other positive comments):

- "Robert is very proactive in his learning, readily and frequently reads up on his patients, looks up medical literature and shares new knowledge with the team."

- "He routinely demonstrated great preparation and breadth of reading."

- "He showed up on time and … pays attention to detail…."

- "Punctual, conscientious, attentive, professional."

A40-A42.

## 2. Plaintiff's standardized testing history

Plaintiff has a history of average to well-above-average performance on high-stakes standardized tests taken *without* accommodations. A167. Overall, he scored better than 89% of all high school graduates nationwide who took the ACT when he did, including in the 90th percentile in English and the 74th percentile in Reading. A829. The ACT Reading Test consists of four lengthy "prose passages that are representative of the level and kinds of text commonly encountered in first-year college curricula," followed by several multiple-choice questions relating to each passage. A609; A635-A642. ACT advises examinees that, to do well on the Reading test, "before you begin answering a question, read the entire passage thoroughly. It is important that you read every sentence rather than skim the text." A609.

Plaintiff also took the SAT in high school, receiving scores in the 74th, 84th, and 93rd percentiles on Critical Reading, A831, A834, A833, meaning that, with his best performance,

he "scored higher than 93% of [the prior] year's group of college bound seniors[.]" A833.[3]

On his two administrations of the MCAT—again testing under standard conditions—Plaintiff achieved total scores in the 67th and 73rd percentiles and a Verbal Reasoning score in the 84th percentile—meaning that his Verbal Reasoning performance was in the top 16% of all the extremely capable and high-functioning individuals who took the MCAT when he did. A828. To do well on Verbal Reasoning (as Plaintiff did), examinees are advised to "read attentively and make reasonable inferences based on the information provided [in the passages]." A514.[4] The Director of MCAT Development and Psychometrics testified at the hearing "that a successful MCAT examinee could not answer MCAT Verbal Reasoning questions without fully reading and understanding the passages to which the questions relate," SPA19, SPA38, but the district court chose to "credit" Plaintiff's testimony that he did well on

---

[3] A sample SAT test is found at A683-A730.

[4] A sample MCAT test is found at A522-A600. The Verbal Reasoning section is found at A555-A572.

the MCAT by "deploy[ing]" special "test-taking strategies" that purportedly involved not reading all passages, SPA38.

### 3. Plaintiff's psychological evaluations

Plaintiff first sought a psychological evaluation when preparing for the MCAT. A810. His evaluator, Dr. Michels, diagnosed him with a Learning Disorder, Not Otherwise Specified, based on a disparity between his "Very Superior" verbal reasoning abilities and his "Average" visual/spatial reasoning abilities. A810-4, A810-9.[5] She did not diagnose Plaintiff with ADHD, and he apparently did not raise any attention-related concerns. A810. Nor did Dr. Michels diagnose Plaintiff with a reading-based learning disorder. Nevertheless, she recommended that he "receive extra time on reading comprehension tasks (150%)...." A810-9.

Just four months later, in December 2013, Plaintiff sought out a "Supplemental" evaluation from a different psychologist, Allison Anderson, Ph.D., this time seeking an evaluation

---

[5] "Learning disabilities not otherwise [specified] is an unusual category. There are no detailed diagnostic criteria for it. The not otherwise specified part means that the person does not meet the full criteria for any specific learning disorder. But the clinician, the diagnostician feels that there's a problem in that area." A1068 (297:13-18).

for ADHD. A809-1. Dr. Anderson did not diagnose Plaintiff with ADHD, however, because he "does not appear to have the consistent and severe pattern of impulsivity, social problems, marked inattentiveness, or physical restlessness that support an ADHD diagnosis." A809-7. Similar to Dr. Michels, Dr. Anderson diagnosed Plaintiff with an Unspecified Neurodevelopmental Disorder that "most prominently affect[s] visuospatial processing, visuospatial memory, and possibly some types of 'output' (e.g., drawing, writing) related to visual information." A809-7. Dr. Anderson "assigned" an "additional diagnosis" of Specific Learning Disorder with impairment in reading. A809-4.

Although Dr. Michels did not diagnose Plaintiff with ADHD and Dr. Anderson concluded that Plaintiff does not have ADHD, Plaintiff came under the care of a psychiatrist, Dr. Aronson, in November 2015 for what Dr. Aronson referred to as "mild ADD." A820.

As noted above, Plaintiff requested extra testing time on the MCAT, presumably based on the Michels and Anderson evaluations, but his request was denied by the entity that administers that test. A986 (62:20-25).

Plaintiff sought out yet another psychological evaluation in 2020, this time specifically for the purpose of pursuing accommodations from NBME after his initial requests had been denied. A939-1. Jeannette Wasserstein, Ph.D., concluded that Plaintiff met the criteria for a diagnosis of Specific Learning Disorder with impairment in reading (fluency and comprehension) and in written expression (spelling and handwriting). A939-24. The reading disorder diagnosis was based on one "absolutely low" score, which Plaintiff received on the Nelson Denny Reading Test,[6] and other "relatively low" scores which represented a "relative deficit." A1053 (236:7-22). Dr. Wasserstein also diagnosed Plaintiff with ADHD, Combined presentation. A939-24. She later testified that this diagnosis was an "error," and should have been limited to Inattentive type. A1041 (187:1-11).

Across all three of his psychological evaluations, "[c]linical evaluation of [Plaintiff's] intellectual functioning did not indicate substantially limited cognition when compared to the general population." A410 ¶19. To the contrary, his

---

[6] When Plaintiff took this same test in 2013 with Dr. Michels, he scored in the average range compared to a group more representative of the general population. A810-6; A211 ¶19.

intelligence testing reflects "superior functioning and superior overall facility for learning and reasoning." A411 ¶20. Likewise, "[e]very time that [Plaintiff's] academic skills have been measured against age peers on diagnostic tests, his skills have been in the average range or above, including on measures that were timed." A209-A210 ¶17; *see also* A412-A413 ¶23.

The following chart shows Plaintiff's performance on two reading achievement tests (where all scores were average or above-average):

| WIAT-III 2020 | *Percentile for age* | WJ-III 2013 | *Percentile for age* |
|---|---|---|---|
| Word Reading | 82nd | Word Reading | 78th |
| Pseudoword Decoding | 73rd | Word Attack | 86th |
| Reading Comprehension | 45th | Passage Comprehension | 53rd |
| Oral Reading Fluency | 42nd | Sentence Reading Fluency | 80th |
| Oral Reading Accuracy | 88th | Broad Reading | 80th |
| Oral Reading Rate | 37th | | |

A413 ¶23.[7] As Plaintiff's own evaluator acknowledged, his "timed reading scores on the WIAT-III fell within normal

---

[7] Plaintiff was administered the Wechsler Individual Achievement Test-III (WIAT-III) in 2020 as part of the Wasserstein

ranges," although she saw *relative* weaknesses because the scores fell "well below his exceptional verbal aptitude." A939-16. Similarly, on the WJ-III, "his scores were in the average range or above, even on measures that were timed." A210 ¶17.a. As his evaluator described it, Plaintiff's Broad Reading Score fell in the High Average range, while he had "relative weaknesses" on Passage Comprehension (where he nevertheless scored in the Average range). A810-6-7.

Plaintiff also took a timed reading comprehension subtest from the Scholastic Abilities Test for Adults in 2013 with Dr. Anderson and scored in the 25th percentile, an average/low average score reflecting "no normative impairment." A413 ¶23; A210 ¶17.b; A809-4.

Plaintiff took the Nelson Denny Reading Test two times, in 2013 and 2020. The Nelson Denny "has a number of limitations that require careful attention. One limitation is that the version of the [Nelson Denny] given to [Plaintiff] in 2013 and in 2020 compares people to *educational* peers rather than *age* peers. [Plaintiff] was compared to graduating college seniors

---

evaluation, A939-13, and was administered the Woodcock-Johnson Tests of Achievement-III (WJ-III) in 2013 as part of the Michels evaluation. A810-6.

in the 2013 and 2020 evaluations, thus leading to scores that underestimate his actual reading skill levels under timed conditions relative to most people in the general population." A211 ¶18; *see also* A416-A17 ¶ 26; A1067 (291:16-292:11).

In 2013, Plaintiff's reading comprehension score on the Nelson Denny fell at the 16th percentile when compared to graduating college seniors, A810-6; A415-16 ¶¶25-26, but when compared to first-year college freshman (who are more representative of but still higher functioning than the general adult population), "his score would be well within the average range." A211 ¶19. When Plaintiff took the Nelson Denny in 2020 while in medical school (with Dr. Wasserstein, to support accommodations on the USMLE), his performance on the reading comprehension test plummeted to the 1st percentile, placing his score at a 7th grade level. A939-16; A211 ¶20; A417 ¶27. Dr. Wasserstein did not offer any explanation for this change in scores. A939-16; A211 ¶20.

The Nelson Denny also has an "unusual" reading rate component, where "one minute into reading the first passage, the examinee is stopped and asked to say where they are at that moment." A1066-A1067 (290:22-291:2). The test manual

"shows that's a really unreliable way of measuring reading speed. So the reliability coefficient for the score that it generates is below accepted standards." A1067 (292:16-19). Dr. Wasserstein and Dr. Anderson, however, both relied on Plaintiff's performance on this one-minute "reading rate" test in making their diagnoses. A939-16 ("[H]is reading rate in this more difficult content was at the 1st%, falling in Deficient ranges."); A810-7 ("The number of words he read within one minute was compared to that of other students his age and fell at the 24th percentile."). And as with Plaintiff's reading comprehension score, his reading rate score dropped precipitously from 2013 to 2020, with no explanation provided. Unlike in 2013 (when he scored in the average range), Plaintiff scored at the first percentile for reading comprehension and reading rate in 2020. A939-16.[8]

---

[8] *See* A1073 (315:14-316:3) ("When someone drops in terms of their reading skills as much as Mr. Sampson did apparently on this one test between 2013 and 2020, … I would expect to see some explanation of that, something like a head injury or something else that would really reduce someone's cognitive abilities and their academic skills."). *Compare Love v. Law Sch. Admission Council*, 513 F. Supp. 2d 206, 222 (E.D. Pa. 2007) (expert testifying that "a psychologist would expect to see an individual with a severe brain injury given Plaintiff's [Nelson Denny] score[,]" which was "in the bottom one

When Dr. Anderson evaluated Plaintiff for ADHD in 2013, she had Plaintiff and his parents fill out Barkley Childhood Symptoms Scales addressing any symptoms he exhibited during childhood. Mr. Sampson's responses were significant for inattention, but his mother's and father's responses did not show significant levels of any ADHD-type symptoms. A809-9. Plaintiff, his girlfriend, and a friend also filled out Barkley scales to address his current condition, and none of them endorsed significant symptom levels. A809-9. "This is very strong evidence *against* ADHD, and Dr. Anderson did not make that diagnosis." A218-A219 ¶40.

Dr. Wasserstein agrees that it is helpful to obtain information from a collateral reporter, such as a spouse or parent, on ADHD symptom questionnaires because some people are motivated to obtain a diagnosis to secure academic accommodations. A1055 (244:4-21) When she evaluated Plaintiff, she asked him to provide questionnaires to his parents and other informants (similar to the Barkley scales that his parents,

_____

percentile"); *id.* at 226 (court giving "little credence to Plaintiff's scores on the [Nelson Denny]…. They are so low that they must be treated as outliers or worse.").

girlfriend, and friend filled out in 2013 for Dr. Anderson), but Plaintiff did not do so. A1042 (193:5-194:1).

In an interview that was part of the Wasserstein evaluation, Plaintiff "complained of broad symptoms of inattentive and hyperactivity ADHD as a child and … as an adult, albeit somewhat diminished." A939-3. This differed from his report to Dr. Anderson in 2013, as noted above.

Plaintiff's evaluators also administered various neuropsychological tests. "Both in 2013 and 2020, [Plaintiff] obtained a few scores on picture-based memory tasks that were at least a bit below the average range, such as on the Woodcock-Johnson Picture Recognition test and the Rey Complex Figure Test (a.k.a. the Rey-Osterrieth)." A215 ¶30; A267; *see also* A1070 (304:5-305:4) (describing test procedure). NBME's experts carefully considered Plaintiff's performance on these tasks as part of their analyses and explained: (1) on the vast majority of the tasks, Plaintiff's scores were in the average range or above; (2) "the diagnostic tasks of visual-spatial skills are highly artificial, in the sense that they do not resemble the requirements of real-world exams such as the Step 1 exam;" and (3) if Plaintiff actually had visual-spatial deficits that

impacted his real-world test performance, he would have been impacted on the science section of the MCAT, which has graphs and figures, but his MCAT scores were in the average range or above, even compared to other medical school applicants (a high-achieving group relative to the general population). A215-A216 ¶30.[9]

### C. Plaintiff's Requests for Step 1 Accommodations

Plaintiff first requested accommodations from NBME in April 2017, seeking 50% extra time. A70 ¶11; A80-A86. NBME thoroughly reviewed the documents he submitted and also sought a recommendation from Benjamin Lovett, Ph.D. A72 ¶13. Dr. Lovett is a licensed psychologist and director of the Ph.D. program in school psychology at Teachers College, Columbia University. A205 ¶2; A225-A247. Dr. Lovett

---

[9] *See also* A418 ¶31 ("The results from neuropsychological tests must be viewed within the larger context of the other cognitive and achievement testing scores included in the assessment batteries.... Generally speaking, global or total intelligence test scores are a better predictor of future performance, not highly specific or narrow ability test scores."); A431 ("Dr. Wasserstein provided many interpretations of [Plaintiff's] performance on a variety of psychological tests that were not substantiated. In fact, there was often an overwhelming amount of data that contradicted her interpretation.").

concluded that Plaintiff's documentation did not demonstrate a mental impairment that substantially limits his ability to perform any major life activities relevant to taking the Step 1 examination, and he recommended that Plaintiff's request be denied. A88-A90. After reviewing Plaintiff's documentation and considering Dr. Lovett's recommendation, A72 ¶¶13-14, NBME denied Plaintiff's April 2017 request. A92-93.

Plaintiff sought reconsideration. A72 ¶15. NBME obtained another recommendation from Dr. Lovett, A73 ¶¶17-18; A95-A97, and based on that recommendation and its own review, NBME concluded that Plaintiff's new documentation did not warrant altering NBME's original decision, A73 ¶18. NBME informed Plaintiff of its decision on August 1, 2017. A99-A100.

Plaintiff sent another reconsideration request in November 2017, and NBME undertook the same thorough evaluation before denying the request. A73 ¶¶19-21; A102-A105; A107; *see also* A74 ¶22; A109-A112.

By June 2018, Plaintiff was represented by counsel, who wrote to NBME requesting "reversal of the NBME's discriminatory decision." A74 ¶24. This request was reviewed by NBME and Dr. Lovett, and NBME again concluded that

Plaintiff's documentation did not demonstrate a substantial limitation in a major life activity compared to most people so as to warrant extra testing time. A74-75 ¶¶25-26; A114-A117. NBME informed Plaintiff on September 7, 2018. A126-A127.

At this point, NBME had denied multiple requests for reconsideration of its initial decision and Plaintiff was represented by counsel. Rather than seeking relief in court, however, Plaintiff sent yet another letter to NBME, with his lawyer again asserting that NBME's actions were "discriminatory." A75 ¶27.

NBME provided this letter and all the documentation Plaintiff had submitted to date to two new external experts, Samuel Ortiz, Ph.D. and Kevin Murphy, Ph.D. A75 ¶28; A137-A149; A151-A154. Dr. Ortiz is a Professor of Psychology and Director of the Graduate Programs in School Psychology at St. John's University. A314 ¶2; A324-A389. Dr. Murphy has over thirty-five years of professional experience in the field of psychology and has conducted approximately four thousand ADHD evaluations. A269 ¶¶4-5; A300-313. Based on the recommendations of Dr. Ortiz and Dr. Murphy and NBME's own review of the file, NBME concluded that

Plaintiff's documentation did not demonstrate a substantial limitation in a major life activity compared to most people or that additional testing time was warranted. A75 ¶29. NBME informed Plaintiff on January 4, 2019. A156-A157.

More than three years later, in April 2022, Plaintiff sent a new request to NBME, this time seeking (for the first time) 100% additional testing time and extra breaks. A76 ¶31; A164-A169. NBME asked Dr. Murphy to review Plaintiff's new request and supporting material. A171-A174. Based on Dr. Murphy's recommendation and its own review, NBME denied Plaintiff's request. A76 ¶33; A176-A177.

## D.  Plaintiff's Status in Medical School

Plaintiff began medical school in August 2015, but after exhibiting "academic marginality" he was required to take a leave of absence in December 2016. A33 ¶16; A826; A939-7. Stony Brook required Plaintiff to either retake his first three semesters or pass the Step 1 exam to continue in medical school. A1006 (145:1-5).

Plaintiff chose to take Step 1. He took the test earlier in his medical education than his classmates, who were not required to take Step 1 until after their third year of medical

school. A1006 (145:9-146:17). He tested in January 2020—after being on leave of absence from medical school for over three years (*id.*)—and he did not pass. A76 ¶30; A159.

Stony Brook nevertheless allowed Plaintiff to resume his medical school studies in the fall of 2020, A998 (112:11-13), and he completed his third-year clinical rotations in July 2021, A29 ¶2.

Although Stony Brook students are required to take Step 1 after completing their third year, Plaintiff did not re-take the test at that time. Instead, he began taking business school classes in July 2021. A1005 (139:3-6); A53. He was in business school at the time of the preliminary injunction hearing, and he has not taken a medical school class since July 2021. A1005 (140:18-21; 141:6-9); A53.

At the conclusion of the preliminary injunction hearing, Plaintiff announced for the first time, through counsel, that he did not intend to take Step 1 until approximately sixteen weeks after finishing business school in December 2022—which would have him testing in late April 2023 at the earliest. A1143 (435:5-436:14). This is more than seven months

after Plaintiff filed his preliminary injunction motion on the basis of allegedly imminent injury.

### E.   Plaintiff's Lawsuit Against Stony Brook

On July 29, 2022—one month before he sued NBME—Plaintiff sued his medical school. *Sampson v. Stony Brook Univ.*, No. 2:22-cv-4490 (E.D.N.Y.). That same day, Plaintiff sought a preliminary injunction restraining Stony Brook from dismissing him and requiring that he be given more than seven years to complete his medical degree. *Id.* at Dkt. 2 p. 2.

Stony Brook opposed that motion, arguing in part:

> Plaintiff seeks a preliminary injunction requiring [Stony Brook] to violate its own policies and dilute its standards by allowing Plaintiff—who has not completed his medical degree within the seven-year maximum time allotment applicable to all students, despite being provided accommodations—to remain enrolled as a student indefinitely while he belatedly pursues litigation against [NBME].... Since 2017 Plaintiff has been seeking a time-limit accommodation from the NBME for a national test he was required to pass before continuing his studies ... and he has known since at least May 2020 that he would need to seek judicial relief against the NBME, but he did not [do so] until August 29, 2022, even though his deadline to complete his [medical school] studies ...was August 12, 2022.

*Id.* at Dkt. 13 pp. 12-13 (9/9/22).

After briefing was complete on Plaintiff's preliminary injunction motion against Stony Brook, the district court held a status conference with the parties and asked Stony Brook whether it would consent to a further, 60-day stay on Plaintiff's medical school status. *Id.* at Dkt. 18. Stony Brook agreed to the stay through December 13, 2022. *Id.* at Dkt. 17.

Plaintiff's first-filed preliminary injunction motion against Stony Brook seeking to maintain the status quo was thus effectively stayed while his later-filed preliminary injunction motion against NBME seeking a mandatory preliminary injunction was decided on an expedited, pre-discovery basis.

## SUMMARY OF ARGUMENT

Plaintiff's father is a surgeon; his mother is a dentist. A29 ¶5. Following in their footsteps, Plaintiff would like to become a medical professional. The question presented is whether he is entitled to twice as much testing time on his medical licensing exam as other examinees—examinees who have also dreamed of becoming a doctor (SPA1) and have also worked hard pursuing that dream.

NBME concluded that Plaintiff is not entitled to extra testing time. It did so only after thoroughly reviewing his

supporting documentation and obtaining reports from experts who the district correctly described as "external, independent consults." SPA12. In negating NBME's decision by way of a preliminary injunction that gave Plaintiff the full relief he would otherwise receive only if he prevailed on the merits, the district court abused its discretion.

Plaintiff did not make a clear showing that he faced an imminent risk of non-speculative irreparable harm; he did not show a substantial likelihood of succeeding on his claim that he is substantially limited in his ability to read and concentrate as compared to the general population (an issue that this Court reviews *de novo*); and he did not demonstrate that the balance of harms and public interest support his requested relief. The Court should therefore vacate the preliminary injunction.

## STANDARD OF REVIEW

The Court reviews a preliminary injunction for abuse of discretion. *JLM Couture, Inc. v. Gutman*, 24 F.4th 785, 794 (2d Cir. 2011). A district court abuses its discretion if it bases its ruling on an erroneous view of the law or makes a clearly erroneous assessment of the evidence. *Id*. Factual findings are

reviewed for clear error and conclusions of law are reviewed *de novo. Id.*

Whether an individual is substantially limited with respect to a major life activity is a mixed question of law and fact; therefore, this aspect of the court's ruling is reviewed *de novo. Bartlett v. N.Y. State Bd. of Law Exam'rs*, 226 F.3d 69, 80 (2d Cir. 2000); *Mann v. La. High Sch. Athletic Assoc.*, 535 F. App'x. 405, 406, 409-10 (5th Cir. 2013) (reviewing disability determination *de novo* and reversing preliminary injunction).

## ARGUMENT

A preliminary injunction is an "'extraordinary and drastic remedy.'" *Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506, 510 (2d Cir. 2005) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)); *see also Winter v. NDRC*, 555 U.S. 7, 22 (2008).

If the requested injunction is prohibitory and intended to preserve the status quo, the movant "must show (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *N. Am. Soccer*

*League v. U.S. Soccer Fed'n*, 883 F.3d 32, 37 (2d Cir. 2018) (internal citation omitted).

A more demanding standard applies, however, when a party seeks *mandatory* preliminary relief. *Id.* A heightened standard also applies if the injunction would give the plaintiff "substantially 'all the relief that is sought.'" *Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995) (citations omitted); *see also WarnerVision Entm't Inc. v. Empire of Carolina, Inc.*, 101 F.3d 259, 262 (2d Cir. 1996) ("The purpose of a preliminary injunction is not to give the plaintiff the ultimate relief [he] seeks.").

In either of these situations (both apply here), the movant must meet "the higher standard of substantial, or clear showing of likelihood of success...." *Tom Doherty*, 60 F.3d at 34-35. The movant must also make a "strong showing" of irreparable harm and demonstrate that "the preliminary injunction is in the public interest." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015).

While the district court acknowledged these standards in its order, it erred in applying them and finding that Plaintiff was entitled to the extraordinary relief he requested.

## I. The district court erred in concluding that Plaintiff made a strong showing of irreparable harm.

Plaintiff's motion should have failed at the foundational step of demonstrating irreparable harm, which is "'the single most important prerequisite for the issuance of a preliminary injunction.'" *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (citations omitted). A plaintiff "must demonstrate that absent a preliminary injunction [he] will suffer 'an injury that is neither remote nor speculative, but actual and imminent' ...." *Grand River Enterprise Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)

Here, the evidence affirmatively showed there was *no* threat of imminent, non-speculative injury to justify the requested preliminary injunction.

Plaintiff claimed that preliminary injunctive relief was necessary because "[h]e needs to take and pass Step 1 of the [USMLE] before he can continue on in his education and complete his last 40 weeks towards his medical degree," and "[a]bsent such relief, [he] will be dismissed from medical school and his medical career will be over." ECF 16 at 1. This was a distortion of the facts.

When Plaintiff filed his lawsuit against NBME, he faced dismissal from medical school because he failed to complete his degree in seven years. *Sampson v. Stony Brook*, *supra*, ECF 1 ¶¶ 95-97; ECF 13 at 10. He had already sued Stony Brook and requested a preliminary injunction in that case, a month before suing NBME.

If the district court had resolved Plaintiff's preliminary injunction motion against Stony Brook first, it would have obviated the need for any preliminary injunctive relief in this case. The court either would have enjoined Plaintiff's dismissal (taking away his claimed emergency) or not (in which case Plaintiff would no longer be eligible to take the USMLE).

Instead, the district court had Stony Brook agree to an informal, temporary stay of its dismissal decision while it decided the later-filed NBME preliminary injunction motion first, on an expedited, pre-discovery basis. The court then relegated its discussion of Plaintiff's actual status in medical school to a footnote in its decision in this case. It based its irreparable harm analysis on the entirely speculative scenario that "even if Sampson were to prevail in his lawsuit against Stony Brook, he still could not proceed with his medical

studies without ... passing Step 1." SPA22 n.8. The court's conclusion that Plaintiff faced an end to his medical career based on the outcome of his preliminary motion *against NBME* (SPA22) is unsupported on the record.

Building further speculation into its analysis, the district court concluded—with no meaningful evidence—that Plaintiff would likely fail Step 1 if he tested without accommodations. SPA21. The court observed that Plaintiff failed the test the first time he took it without accommodations, purportedly "despite extensive preparation and the use of test-taking strategies that he had employed successfully on the MCAT." SPA2.

The court did not mention, however, that when Plaintiff first took Step 1 he had only completed three *semesters* of medical school, while his classmates took the test after completing three *years* of medical school. He also tested after being on leave of absence from medical school *for over three years*. A1006 (145:9-146:17). These facts could just as easily explain why he did not pass. The court also failed to account for Plaintiff's history of strong performance on other high-stakes tests taken under standard conditions, *see supra at* 13-14, referencing only the MCAT. SPA21.

There was thus no factual basis for the district court's conclusion that Plaintiff would fail the test without double testing time. *See Bach v. Law Sch. Admission Council*, No. 13-888, 2014 U.S. Dist. LEXIS 124632, *5-6 (M.D.N.C. 2014) (declining to assume that plaintiff's test scores would not reflect his true ability absent accommodations, where he had "successfully taken several standardized tests without accommodations"); *Baer v. NBME*, 392 F. Supp. 2d 42, 49 (D. Mass. 2005) ("[I]t is not certain that she will suffer the predicted harm; she may pass the test.").

The district court also erred by not attaching any significance to the fact that Plaintiff's claimed injury was not imminent. The court opined that "[b]ecause Sampson cannot proceed to his final year of medical school until he passes Step 1, any further delay pending a trial on the merits would continue to deprive Sampson of his opportunity to pursue his medical training." SPA23. But Plaintiff divulged at the conclusion of the preliminary injunction hearing that he was not planning to take Step 1 for *months*. A1143 (435:22-436:14). Plaintiff had been attending business school—not medical school— since July 2021, A29 ¶2; A1005 (141:6-9), and he informed the

court that he would need a twelve- to sixteen-week "study period" to prepare for Step 1 after completing his business school classes in December 2022 A1143 (435:22-436:14). Plaintiff will not be taking Step 1 until late April 2023 at the earliest—more than six months from the date of the hearing on his preliminary injunction motion and eight months from when he filed his lawsuit. "Imminent" means "threatening to occur immediately; dangerously impending," or "[a]bout to take place." Black's Law Dictionary (11th ed. 2019). There was no imminent risk of harm here. *See Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (threatened harm must be "actual and imminent, not remote or speculative").

The district court compounded its error by discounting Plaintiff's own egregious delay in seeking relief, which "defeats any possible showing of irreparable harm." *Monowise Ltd. Corp. v. Ozy Media, Inc.*, No. 17-8028, 2018 WL 2089342, *2 (S.D.N.Y. 2018); *Tom Doherty Assocs.*, 60 F.3d at 39. "[A] party requesting a preliminary injunction must generally show reasonable diligence," *Benisek v. Lamone,* 138 S. Ct. 1942, 1944 (2018), and Plaintiff did not do so here. NBME first denied Plaintiff's request for accommodations in 2017—more

than five years before he filed suit. A92-A93. Plaintiff made numerous requests for reconsideration in 2017 and 2018, each of which NBME unequivocally denied. A72-A76 ¶¶15-30; A99-A100; A107; A109-A112; A126-A127; A156-A157**.** As early as 2018, Plaintiff was represented by counsel who accused NBME of discriminatory conduct. A74-A75 ¶¶24, 28. At that time, Plaintiff knew he would have to pass Step 1, knew that NBME had repeatedly denied his accommodation requests, and was represented by counsel, yet he did not seek court relief until 2022. That delay alone warranted denial of his motion. *See Benisek*, 138 S. Ct. at 1944 (affirming denial of preliminary injunction based upon "plaintiffs' unnecessary, years-long delay in asking for preliminary injunctive relief," which "largely arose from a circumstance within plaintiffs' control; namely, their failure to plead the claims giving rise to their request for preliminary injunctive relief" when the claims first arose).

The district court excused this delay by noting that Plaintiff ultimately was allowed to proceed to his third year of medical school without first passing Step 1 in 2020, which the court concluded "obviated Sampson's immediate need to

obtain accommodations from NBME." SPA23. This misses the point. Although Plaintiff did not have an *immediate* "need" for accommodations to remain in medical school, he had a live dispute with NBME about his eligibility for accommodations on a test that he would have to take after completing his third year of medical school. By waiting to file suit until he was "on the precipice of expulsion," ECF 16-1 at 21, Plaintiff created his own emergency. His delay undercut his claimed need for a preliminary injunction. *See Wright v. NBME*, No. 21-2319, 2021 WL 5028463, *9 (D. Colo. 2021) ("Another problem is that the emergency nature of this litigation is at least in part due to Mr. Wright's own choices. He has taken the USMLE Step 3 three times since 2017 and requested accommodations twice but did not bring this case until August 27, 2021."); *Baer v. NBME*, 392 F. Supp. 2d at 49 ("If Baer believed her lifelong dream of becoming a doctor was about to come to an end, as she alleges..., then perhaps her pursuit of a judicial remedy should have been more expeditious. Her slowness in filing this action after receiving the NBME's denial letter is unexplained, and any consequent time binds she faces are self-inflicted."); *Pazer v. N.Y. State Bd. of Law Exam'rs*, 849 F. Supp.

-40-

284, 287 (S.D.N.Y. 1994) ("[A]ny so-called irreparable injury here is largely the result of Pazer's decision not to seek judicial relief sooner.").

## II. The district court erred in concluding that Plaintiff showed a substantial likelihood of success on the merits.

Plaintiff has not demonstrated he is substantially limited in his ability to read or concentrate compared to most people in the general population, and thus he did not show a substantial likelihood of success on his ADA claim.

### A. The ADA requires substantial limitation.

Under Title III of the ADA, NBME must offer the USMLE "in a place and manner accessible to persons with disabilities." 42 U.S.C. § 12189.[10]

A disability under the ADA is "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A).[11] Plaintiff has been

_____

[10] The district court introduced its discussion of the ADA framework with a cite to an inapplicable statute, 42 U.S.C. § 12182(a). SPA24. Because NBME is a "private entity" covered by Section 12189, Section 12182 does not apply. *Doe v. NBME,* 199 F.3d 146, 154-55 (3rd Cir. 1999).

[11] Plaintiff claimed to be "substantially limited" in a long list of purported major life activities, specifically "reading,

diagnosed with learning disorders and ADHD. While these impairments can rise to the level of a disability under the ADA, each is a disability only if *it substantially limits* a person's ability to perform major life activities *as compared to most people.* 42 U.S.C. § 12102(1)(A); 28 C.F.R. § 36.105(d)(1)(v). Having a diagnosed impairment is not the same as being disabled within the meaning of the ADA. "[N]ot every impairment will constitute a disability." 28 C.F.R. § 36.105.

Under the ADA Amendments Act ("ADAAA"), the definition of disability is to be construed in favor of broad coverage. This broadened coverage, however, does not extend beyond the terms of the statute. "Congress … retained the term 'substantially limits' in this amendment, while instructing that 'the definition of disability … shall be construed in favor of broad coverage … *to the maximum extent permitted by the terms of this chapter*[.]'" *B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 161 n.10 (2d Cir. 2016) (citing 42 U.S.C.

---

spelling, cognitive processing speed, attention [*sic*] concentration and taking standardized exams." ECF 16-1 at 3. The district court "considered only reading and concentration," which it found "were the only 'major life activities' relevant to taking the USMLE Step 1." SPA25 n.11.

§ 12102(4)(A) (emphasis added by court)). And the terms of the statute require a showing of substantial limitation, even after enactment of the ADAAA:

> By retaining the essential elements of the definition of disability including **the key term 'substantially limits'** we reaffirm that not every individual with a physical or mental impairment is covered by the … definition of disability in the ADA. An impairment that does not substantially limit a major life activity is not a disability[.] That will not change after enactment of the ADA Amendments Act[.]

Statement of the Managers, 154 Cong. Rec. S8840, S8841-42 (Sept. 16, 2008) (emphasis added); *see* 42 U.S.C. § 12102(1)(A). The ADAAA ... in no way eliminated the ... need to prove a disability on a claim of disability discrimination." *Neely v. PSEG Tex., Ltd. P'ship*, 735 F.3d 242, 245 (5th Cir. 2013).

"Mindful that '[n]ot every impairment that affects an individual's major life activities is a *substantially* limiting impairment,'" this Court has "'been careful to distinguish impairments which merely *affect* major life activities from those that *substantially limit* those activities[.]'" *B.C.,* 837 F.3d at 160 (original emphasis, internal quotations and citations omitted). Thus, in the *B.C.* case, the Court held it would be improper to automatically conclude that students who had been

diagnosed with impairments and received accommodations under the Individuals with Disabilities Education Act met the ADA's disability definition (even as broadened under the ADAAA). *Id.* at 159-61.

Importantly, the "substantial limitation" comparison must be made relative to "most people in the general population," 28 C.F.R. § 36.105(d)(1)(v), not relative to other medical students, *see Doherty v. NBME*, 791 F. App'x 462, 465 (5th Cir. 2019); *Singh v. George Wash. Univ.*, 508 F.3d 1097, 1103-04 (D.C. Cir. 2007), and not relative to someone's "own expected capabilities," *Rawdin v. Am. Bd. of Pediatrics*, 985 F. Supp. 2d 636, 651 (E.D. Pa. 2013), *aff'd on other grounds*, 582 F. App'x 114 (3d Cir. 2014).

## B.   The district court did not properly apply the statutory substantial limitation requirement.

The district court acknowledged the "substantial limitation" standard but disregarded facts showing that Plaintiff is not substantially limited compared to most people. The court also erred by relying on agency guidance to dismiss the opinions of NBME's five external experts and give greater weight to Plaintiff's one-time evaluator, who Plaintiff consulted specifically to obtain accommodations on the USMLE.

As noted above, the Court reviews the lower court's substantial limitation finding *de novo*.

### 1. The evidence did not demonstrate an ADA disability.

Incontrovertible facts show that Plaintiff is not substantially limited in his ability to read and concentrate compared to most people. Records show that Plaintiff performed very well in demanding classes and competitive academic environments, with no formal accommodations or interventions. *See supra* at 10-12. On high-stakes standardized tests requiring strong reading and concentration skills, Plaintiff performed as well as or better than national testing cohorts, including a cohort of exceptionally capable prospective medical school students, again with no accommodations. *See supra* at 13-14. And the results of Plaintiff's diagnostic testing do not support the conclusion that Plaintiff is substantially limited compared to most people in any major life activity relevant to taking the USMLE. *See supra* at 15-24.

Plaintiff does not have the record of an individual with a disability under the ADA. *Black v. NBME*, 281 F. Supp. 3d 1247, 1249-50 (M.D. Fla. 2017) ("Of course, average (or above average) performance presumptively establishes the absence

of a substantial limitation."); *see also Wright v. NBME, supra,* 2021 WL 5028463, *6 ("Mr. Wright has a history of proficient test scores. He has demonstrated an ability to do well in school, get through college, obtain a master's degree, and be admitted to and graduate from medical school. Every one of these accomplishments is something that most people do not do. It is difficult to argue that someone with those accomplishments, predominately achieved without accommodations, is disabled compared to the average person."); *Valles v. ACT, Inc.*, 2022 WL 2789900, *4 (E.D. Tex. 2022) ("Valles' long history of academic success weighs against a finding of disability[.]"); *Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 870 F. Supp. 2d 607, 621 (S.D. Ind. 2012) ("Matthew's above-average standardized testing scores, ACT scores, and SAT scores, during which he received no accommodation, … stand as testament to his ability to read, learn, think, and concentrate just as well, if not better, than the general population.").

The district court acknowledged that "grades and outcomes" can be considered in determining whether someone is substantially limited and professed to have "considered them here," SPA36, but that is not apparent from the court's

analysis, *id.* Instead, the court relied primarily on the subjective perceptions of Plaintiff and his advocates—not yet explored through discovery—who insisted that his lifetime of strong performance was the result of work-around strategies and alleged "mitigating measures." SPA27-SPA29.

With no record citations, the district court broadly but inaccurately proclaimed that "[Plaintiff's] parents, teachers, tutors, and psychological evaluators have all noted that, as a result of his impairments, he experiences more difficulty with reading and concentration as compared to most people in the general population." SPA27.

Putting aside whether all the people listed are even qualified to make such determinations, this is not what the record shows. The only tutor who testified is Plaintiff's college friend, Andrew Lam, who helped him prepare for the demanding MCAT exam when he was also a pre-med student. Not a single teacher in the limited school records Plaintiff provided to NBME in support of his accommodation requests indicated he had "more difficulty with reading and concentration as compared to most people...." A852-67. Even Plaintiff's psychological evaluators were silent on the decisive question whether

Plaintiff is "substantially limited" compared to most people. There is no explicit "substantial limitation" finding in *any* of their written reports. A809, A810, A939.[12] Dr. Wasserstein only offered this opinion after testifying on Plaintiff's behalf for purposes of the preliminary injunction motion. A43 ¶13.

Equally problematic is the district court's finding that Plaintiff "received formal and informal accommodations throughout his life." SPA28. This is an obvious factual error. It is uncontroverted that Plaintiff received **no** formal accommodations in elementary school, middle school, high school, or college, or on other standardized exams. A168. And Plaintiff's alleged "informal" accommodations—including the ubiquitous, unremarkable, and subjective belief that he was always the last person to finish a test (SPA29)—were shown solely through testimony from Plaintiff and lack any meaningful context, particularly pre-discovery. SPA29.[13]

_____

[12] This is in addition to no diagnosis of a reading impairment by Dr. Michels and no ADHD diagnosis by Dr. Michels or Dr. Anderson. *See supra* at 15, 16.

[13] The court did not account for the research-based testimony of one of NBME's experts that "[p]eople … tend to overestimate the amount of work that they put forth relative to others." A1080 (344:5-6) (discussing research showing college students misperceive that they are the only ones inside

Working from this shaky foundation, the district court committed legal and factual error in concluding that NBME failed to adequately account for "the evidence of accommodations—both formal and informal" that Plaintiff supposedly "received throughout his life," relying on a DOJ regulation requiring that "considerable weight" be given to documentation of past accommodations. SPA34 (citing 28 C.F.R. § 36.309(b)(1)(v).

The Fifth Circuit rejected a similar line of reasoning in vacating a preliminary injunction awarded to a prospective USMLE examinee. *See Doherty v. NBME,* 791 F. App'x at 466 (concluding the plaintiff had not shown she was disabled under the ADA, despite having learning disorder and ADHD diagnoses and receiving accommodations in medical school). Section 36.309(b)(1)(v), the Fifth Circuit explained, "applies only *after* a person establishes that they are disabled under

---

studying on a Friday night because they do not see other students who are doing the same); *see also* A284 ¶34; A. Harrison, *Accommodation Decision-Making for Postsecondary Students with ADHD: Treating the Able as Disabled*, Psychological Injury & Law 4 (Sept. 2022) ("Researchers have found limited evidence supporting the validity of retrospective accounts of childhood ADHD symptoms and academic problems.").

the ADA." *Id.* (citing § 36.309(a)) (emphasis added). Because the plaintiff had not established a disability within the meaning of the ADA, the court held that the regulation did not apply to her.

In any event, and contrary to the district's court's finding, SPA34-SPA35, the record shows that NBME gave "considerable weight to documentation of past and present accommodations," A176, and otherwise considered all information submitted by Plaintiff in support of his requests. A92-A93; A99-A100; A107; A109-A112; A126-A127; A156-A157.

Plaintiff's receipt of extra time for part of medical school is the only "documented" prior accommodation in the record and thus the only accommodation even implicated by the DOJ regulation. The *absence* of such accommodations over the entirety of Plaintiff's pre-medical school life says more about his alleged impairments and need for accommodations than his limited receipt of accommodations starting in his second year of medical school. *See Wright v. NBME,* 2021 WL 5028463, at *6 (noting that although plaintiff received accommodations in his master's program, his history of not receiving

accommodations in any other setting "cuts against his ability to show that he is likely to succeed on the merits").

Further compounding its errors, the district court misapplied the statutory standard in concluding that a handful of diagnostic test scores showed "substantial limitation." SPA32-SPA33. The court pointed to Plaintiff's "<u>below average</u>" SATA score and his supposedly "poor" performance on three neuropsychological tests of discrete skills from his 2020 evaluation:[14] the WCST,[15] the CVLT,[16] and the RCFT.[17] SPA32 (emphasis added).[18] Its analysis, however, reflects errors of law

---

[14] "In the most recent evaluation performed by Dr. Wasserstein (2020), most of the neuropsychological testing scores were in normal limits, with only a few exceptions." A417 ¶29.

[15] In the Wisconsin Card Sorting Test (WCST), "[t]he person has to sort cards" of different colors and shapes "according to a rule." A1074 (320:23-321:9).

[16] In the California Verbal Learning Test, Plaintiff "heard lists of words and had to show that he remembered the words from those lists." A1074 (322:21-23).

[17] On the Rey-Osterreith Complex Figure Test, examinees are asked to copy a complex figure from memory at various time intervals. A1070 (303:21-304:4); *see infra* at 53.

[18] It is not clear whether the district court relied on Plaintiff's performance on the Nelson Denny. *Compare* SPA32 (discussing measures "[a]side from Sampson's NDRT scores") *with* SPA31 (noting that NBME's experts did not place as much weight on Plaintiff's 2020 Nelson Denny scores). For the

and fact. In terms of the scores themselves, Plaintiff's SATA score was not "below average." A210 ¶17.b.[19] His scores on the WCST also were in the low average to average range or otherwise within normal limits. A939-19; A1074 (321:18-322:6). He had a mixture of scores on the CVLT, some average, some borderline, and only one deficient score. A939-20. Plaintiff did have borderline and deficient scores on the RCFT (the complex figure test), but on another test of visual memory (the Wechsler Memory Scale-IV), his scores were average or above average. *Id.* The district court criticized NBME's experts for "singl[ing] out the results of specific psychometric tests for criticism," SPA32, but it is the court—not NBME's experts—

---

reasons discussed above, Plaintiff's 1st percentile scores on the Nelson Denny in 2020 are not entitled to serious consideration. *See supra* at 20-21.

[19] The district court cites to Dr. Wasserstein's report and testimony, but Dr. Wasserstein did not describe this score as below average in her report. Pl. Ex. 37 at 8-9 (describing the SATA score as a "*relatively low*" 25th% score," and listing the score as "low average/average"). And at the hearing, Dr. Wasserstein did not describe the score as below average. A1047 (211:1-9) ("Q: On the reading comprehension score on standard time on the SATA, what was his score? A: 25th percentile, which is in lower average ranges. The bound of lower average and average.... So it's in the normal range, the low end of normal, but it is marginally weak.").

who relied on a handful of scores on discrete measures (some of which were in the average range) to erroneously conclude that plaintiff is disabled. SPA32.

External experts consulted by NBME carefully reviewed Plaintiff's diagnostic test scores, in addition to the real-world evidence of his performance in school and on other standardized tests, and explained their conclusions regarding all the documentation. (A206-A223; A269-A288; A404-A424). While they may not have found Mr. Sampson's struggle to recreate the following drawing from memory after 30 minutes to be probative of a substantial limitation relevant to taking the USMLE (unlike the district court, SPA32), this does not mean they applied "too demanding a standard" for determining substantial limitation:



A267.

In addition to misinterpreting the test results, the district court improperly embraced Dr. Wasserstein's analysis to mean that Plaintiff is disabled within the meaning of the ADA. The court focused on Dr. Wasserstein's conclusions that Plaintiff "experiences neuropsychological functions [that] greatly impact his ability to perform under rapid processing demands, especially when there is reading," SPA32, and that the "discrepancy" between Plaintiff's "Very Superior" VCI score and his "Average" PRI score, A939-14, represents "an intellectual limp[.]" SPA33. These findings may suggest that Plaintiff's alleged impairments *affect* his abilities, but they do not show that they *substantially limit* his ability to read and concentrate *as compared to most people*—the relevant legal standard. *See B.C. v. Mt. Vernon Sch. Dist.*, 837 F.3d at 160 (citation omitted). As one of NBME's experts explained:

> Dr. Wasserstein asserts that [Plaintiff's] profile of abilities shows a 'metaphorical limp,' because his verbal reasoning performance was noticeably stronger than his nonverbal reasoning performance. The comparison of verbal and nonverbal scores is correct, but there is nothing pathological about this. Dr. Wasserstein may be correct that the gap between scores is larger than what most people have, but what is key is that both scores show at least average skill levels.

A216-217 ¶33; *see also* A222 ¶ 47 ("[T]he fact that [Plaintiff's] documentation shows substantial variability across various data sources [does not] show that he is disabled. This is not indicative of disorder or disability; it is the type of profile of performance that virtually everyone has (at least in some domains), particularly those with high abilities.").

In advocating for her client, Dr. Wasserstein has done what other clinicians have frequently but inappropriately done: based their findings and recommendations on "relative weaknesses rather than deficits," even though "DSM-5 criteria for SLD and ADHD require clear evidence of impairment beyond symptoms and/or weaknesses found in an evaluation." R. Mapou, *Have We Loosened the Definition of Disability? The Effects of Changes in the Law and Its Interpretation on Clinical Practice*, Psychological Injury & Law 307, 312, 315 (2022) ("*[E]veryone* has strengths and weaknesses across different cognitive and life domains.... [W]e should stop recommending accommodations and medication for students who have relative weaknesses and are not truly disabled. Helping students without disabilities gain a competitive advantage is unfair to disabled students, especially those who have not had the

resources that more privileged students have had." (original emphasis)).[20]

The district court acknowledged it was relying on disparities between aptitude and achievement as part of its disability analysis. SPA33 n.14 ("[T]he Court finds persuasive DOJ regulatory guidance, cited in <u>Ramsay</u>, explaining that disparities between an individual's aptitude and achievement can be used—in part—to diagnose disability.")). This is legal error; the regulations require a comparison to most people. *See* 28 C.F.R. § 36.105(d)(1)(v); *Healy*, 870 F. Supp. 2d at 620 ("[A] person may exhibit statistically significant variation in test scores sufficient to support a clinical diagnosis, but this diagnosis is based on an internal referent. When the test scores are compared to an external referent as the ADA requires—

---

[20] *See also* L. Binder *et al.*, *To Err is Human: "Abnormal" Neuropsychological Scores and Variability are Common in Healthy Adults*, Archives of Clinical Psychology 1, 3, 15 (2008) ("Clearly, a high degree of variability across even a small battery of tests, such as the WAIS-R, is the rule. It would be a serious mistake to assume, for example, that high functioning adults with higher average or superior IQs should have uniformly high test scores across a comprehensive battery of tests.... [L]arge variability between the highest and lowest scores is psychometrically normal....").

that is, the general population—that person may nevertheless exhibit average abilities.").

Plaintiff largely controlled the record relating to his alleged impairments, given that the preliminary injunction proceedings were held before any discovery. Nevertheless, the evidence before the court not only failed to demonstrate a disability, it affirmatively showed that Plaintiff is *not* substantially limited in any major life activity relevant to taking the USMLE.

### 2. The district court improperly dismissed the opinions of NBME's experts.

Five extremely well-qualified external experts reviewed Plaintiff's documentation and concluded that he does not meet the standard set by the ADA for a covered disability. A205-A223; A268-A288; A314-A322; A404-A424; A428-A435. Indeed, none of them thought it was even a close question. The district court improperly discounted the opinions of these experts.

### a. The district court improperly relied on informal agency guidance in deferring to Plaintiff's evaluator

The district court committed legal error in relying on non-binding DOJ guidance calling for deference to the conclusions of Plaintiff's evaluator. SPA33.

The DOJ guidance relied on by the district court states that "[r]eports from experts who have personal familiarity with the candidate should take precedence over those from, for example, reviewers for testing agencies, who have never personally met the candidate or conducted the requisite assessments for diagnosis and treatment." SPA33 (citing 75 Fed. Reg. 56,236, 56,297 (Sept. 15, 2010)). DOJ goes on to state that "when testing entities receive documentation provided by a qualified professional who has made an individualized assessment of an applicant that supports the need for the ... accommodation ... requested, they shall generally accept such documentation and provide the accommodation." *Id.*

This guidance lacks the force or effect of law. *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96-97 (2015). It finds no support in the operative statutory provision, 42 U.S.C. § 12189, or in any regulation issued by DOJ following notice-and-

comment rulemaking. To justify relying on it, the district court cited a 2017 opinion of this Court stating that "[i]n interpreting and applying an agency's regulation, courts may properly consider 'the regulation's preamble … as well as the purpose of the regulation's authorizing statute.'" SPA33 n.15 (citing *Fernandez v. Zoni Language Centers, Inc.*, 858 F.3d 45, 50 (2d Cir. 2017)). *Fernandez*, however, pre-dates the U.S. Supreme Court decision in *Kisor v. Wilkie*, which reinforced the fundamental principle that deference to an agency interpretation of its own regulation is warranted "only if a regulation is genuinely ambiguous." 139 S. Ct. 2400, 2415 (2019) (citation omitted). Here, the district court did not identify any ambiguous regulation that required agency interpretation.

Nothing in the ADA or its implementing regulations requires NBME (or a court) to simply "defer" to the conclusions of an examinee's evaluating professional in determining whether an examinee is disabled, without independently assessing whether the examinee has an impairment that substantially limits a major life activity. Applying the DOJ guidance to require *de facto* disability findings based on the recommendations of an examinee's professional would add a

substantive requirement to the statute and conflict with the statute and DOJ's own regulations, which require a showing of substantial limitation and make clear that not every diagnosed impairment constitutes a disability. 42 U.S.C. § 12102(1)(A); 28 C.F.R. § 36.105(d)(1)(v); *see also Wright v. NBME*, 2021 WL 5028463, at *7 (in response to plaintiff's argument that the "ADA effectively mandates that the Board provide accommodations based on the recommendations from professionals … who [have] provided … in-person evaluations," noting: "It would certainly make courts' jobs easier if that were the case. But a professional evaluation is not the only piece of evidence a court should consider under the ADA. A diagnosis alone does not satisfy the ADA disability standard."). The guidance is entitled to no deference. *See D.S. by and through M.S. v. Trumball Bd. of Educ.*, 975 F.3d 152, 167 (2d Cir. 2020) ("The Department of Education's interpretation ignores the plain language of the statute and regulations, and therefore we owe it no deference." (citations omitted)).

Applying the agency guidance relied on by the district court to replace an independent substantial limitation analysis also would impose a different approach to disability

determinations solely on entities that administer certain standardized tests, and not on the myriad other entities that are also subject to the ADA (the guidance language is only applicable to entities regulated under 28 C.F.R. § 36.309). This conflicts with the single definition of disability under the ADA, Congress's desire to provide "clear, strong, ***consistent***, [and] enforceable standards" under the statute, 42 U.S.C. § 12101(b)(2) (emphasis added), and DOJ's own recognition that there should be consistency in the definition of disability across all regulated entities, 81 Fed. Reg. 53,204, 53,208 (Aug. 11, 2016).

Indeed, DOJ's guidance directed solely to standardized testing entities conflicts with other guidance it has provided to all entities subject to Titles II and III of the ADAAA. DOJ has advised:

> [I]ndividuals seeking coverage under the first or second prong of the definition of 'disability' should not be constrained from offering evidence needed to establish that their impairment is substantially limiting…. Such evidence may comprise facts related to condition, manner, or duration. **And, covered entities may defeat a showing of substantial limitation by refuting whatever evidence the individual seeking coverage has offered, or by offering evidence that shows that an**

**impairment does not impose a substantial limitation on a major life activity.**

81 Fed. Reg. 53,204, 53,237 (Aug. 11, 2016) (emphasis added). If NBME—like all covered entities—has the right to refute "whatever evidence the individual seeking coverage has offered" (and surely it does)—then it is not required to blindly defer to the conclusions or recommendations of an examinee's professional.[21]

**b.    The district court gave undue weight to Plaintiff's evaluator.**

Buoyed by the DOJ guidance, the district court erroneously "credit[ed] Dr. Wasserstein—whose evaluation and diagnoses of [Plaintiff] also benefited from in-person observation of his behavior and symptoms—over NBME's experts."[22]

---

[21] Even under the DOJ guidance relied on by the district court, deference is only required when the documentation of a qualified professional "supports the need for the requested testing accommodation." 75 Fed. Reg. at 56,297. If the report of a qualified professional does not demonstrate that an individual has an impairment that substantially limits a major life activity and/or that the requested accommodations are necessary and appropriate under applicable statutory and regulatory standards, then even DOJ guidance, by its terms, would not require deference to such documentation.

[22] The district court cited the Third Circuit's decision in *Ramsay* for the proposition that "DOJ's regulations 'mandate that

Absent a statute or regulation requiring that extra weight be given to a treating physician, there is no basis to "accord special deference" to their opinions. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003); *see also Bartlett v. N.Y. State Bd. of Law Exam'rs*, 970 F. Supp. 1094, 1119-20 (S.D.N.Y. 1997) ("it is inappropriate to apply [the treating physician rule] as a presumption in ADA cases") (Sotomayor, J.), *aff'd in part, vacated in part, and remanded*, 156 F.3d 321 (2d Cir. 1998).

And Plaintiff's evaluating psychologists are not "treating physicians" in any event. They each saw Plaintiff on one occasion and solely for the purpose of evaluations that Plaintiff sought out in order to get extra time on the MCAT or the USMLE. Dr. Wasserstein acknowledged that she had no treating relationship with Plaintiff, before or after she prepared her

———————————

the determination of whether an impairment substantially limits a major life activity requires an individualized assessment. Such assessments benefit from the reports of professionals who know or have personally examined the individual.'" SPA33 (quoting *Ramsay*, 968 F.3d at 260 (citing 28 C.F.R. § 36.105(d)(1)(vi))). To be clear, the cited regulation says nothing about "[s]uch assessments benefit[ting] from the reports of professionals who know or have personally examined the individual."

evaluation. A1055 (243:16-21). And most of Plaintiff's 2020 testing was conducted not by Dr. Wasserstein, but by a different professional who did not provide a declaration or testify at the hearing. A1040 (185:13-14; 186:14-16).

There are also important practical reasons to reject DOJ's informal guidance, which was emphasized by the Third Circuit in *Ramsay,* 968 F.3d at 260, and clearly influenced the district court here, SPA33-SPA34. Extensive research has shown that, for a variety of reasons, clinicians frequently diagnose prospective examinees with learning disorders, ADHD, and other mental impairments in support of accommodations on high-stakes exams when the examinees do not meet the applicable diagnostic criteria much less the ADA's "substantial limitation" requirement.[23] As a result, there has been "a steep rise over the past decade in the number of young

---

[23] *See, e.g., Accommodation Decision-Making for Postsecondary Students with ADHD: Treating the Able as Disabled, supra*, at 3-14 ("[M]any postsecondary students have been given a diagnosis of ADHD even though they failed to meet diagnostic criteria ... and show no evidence of normative impairment"); A. Harrison & R. Sparks, *Disability Diagnoses: Seven Sins of Clinicians*, Psychological Injury & Law 2-14 (March 2022) ("In the absence of normative academic deficits, some clinicians will argue that a client had to 'work hard' or 'overcome personal adversity" to obtain good marks.").

adults with non-visible disabilities seeking accommodations on high-stakes tests and licensing exams," fueled "mainly by students from higher socio-economic backgrounds" and frequently based—as here—upon diagnoses that reflect "relative weaknesses" and "normal variability in skills" rather than actual disabling deficits.[24] This research significantly undermines DOJ's suggestion that testing entities should simply defer to prospective examinees' supporting professionals, even if real-world evidence refutes the need for accommodations and independent experts consulted by the testing entity confirm that accommodations are unwarranted.

Numerous courts have rejected the conclusions of an examinee's supporting professional who performed an in-person

---

[24] A. Harrison, *Attention Deficit Disorders, Learning Disorders, and Other Incentivized Diagnoses—A Special Issue for Psychologists*, Psychological Injury & Law at 2, 4 (Aug. 2022); *see also* R. Weiss *et al., College Students' Access to Academic Accommodations Over Time: Evidence of a Matthew Effect in Higher Education*, Psychological Injury & Law 10, 12 (Nov. 2021) (noting that "the highest percentage of students classified with disabilities and receiving accommodations can be found at America's most academically selective and expensive private schools," and that the "psychological documentation" submitted in support of such accommodations "often lacks evidence of either a valid diagnosis or substantial limitations in functioning." (citations omitted)).

assessment in analogous cases, oftentimes because they have focused on relative weaknesses rather than substantial limitations, like Plaintiff's experts here. In *Wright*, for example, the court responded to the same argument that his evaluator's opinions should be given more weight than NBME's experts, concluding: "While the Court agrees Dr. Lucero's assessments are likely sufficient to establish that Mr. Wright has a learning impairment and that the accommodations he seeks would improve his chances of passing the Step 3 exam, the Court cannot defer to her judgment that his condition substantially limits his ability to read, read under timed conditions, cognitively process, or concentrate in comparison to the population at large. The evidence to the contrary, in fact, is significant." 2021 WL 5028463, at *8; *see also Powell v. NBME*, 364 F.3d at 83 (affirming summary judgment for NBME, where it concluded that accommodations were not warranted even though a neuropsychologist had diagnosed plaintiff with a learning disorder and ADHD and recommended extra testing time).

Moreover, the facts of this case show why requiring deference to an applicant's supporting professional, simply because he or she personally evaluated an applicant, is illogical. *All*

*three of Plaintiff's diagnosing psychology professionals reached different diagnoses*. Dr. Michels did not diagnose Plaintiff with a learning disorder in reading or ADHD, A810-9; Dr. Anderson diagnosed Plaintiff with a neurodevelopmental disorder and tacked on a reading disorder diagnosis but declined to diagnose him with ADHD, A809-6-7; and Dr. Wasserstein identified different learning disorders than Dr. Michels and Dr. Anderson and also diagnosed Plaintiff with ADHD, A939-24—but admitted at the hearing that part of her ADHD diagnosis was "in error." A1041 (187: 8-11). Dr. Aronson did not prepare a diagnostic report on Plaintiff but nevertheless stated Plaintiff had "mild ADD" despite two preceding psychological evaluations that resulted in no ADHD diagnosis. A820.

In short, there is no proper support for giving greater weight to Plaintiff's professional, or the district court's criticism that "NBME and its experts apply too exacting a standard in concluding that [Plaintiff] is not disabled," SPA32, where NBME and its experts made a thorough, independent, individualized assessment of the documentation provided by Plaintiff. *Cf. Black & Decker Disability Plan,* 538 U.S. at 832

(holding, in a unanimous opinion, that ERISA plan administrators need not defer to a claimant's physician in determining whether a claimant has a qualifying disability and explaining that the treating physician might have only known the claimant briefly and might have an "incentive" to find the claimant disabled).

To the extent the inquiry at hand should "not demand extensive analysis," SPA32, the largely uncontradicted evidence of Plaintiff's lifetime of stellar academic achievement with no formal accommodations and strong standardized testing performance, also without accommodations, supports only one conclusion—Plaintiff is not substantially limited in any major activity compared to the average person. *See* 28 C.F.R. § 36.101(b); § 36.105(d)(1)(v).

## III. NBME and other test-takers will be harmed by the preliminary injunction.

The district court erred in finding the balance-of-harm factor favored Plaintiff. SPA39-SPA40. The court's analysis assumed its determination of disability was accurate, and thus found harm to Plaintiff if he were required to test without accommodations. SPA40. It did not assess the risk of its preliminary determination being incorrect and NBME reporting a

score that was inappropriately earned with extra time. *See Rothberg v. Law Sch. Admission Council*, 102 F. App'x 122, 126-27 (10th Cir. 2004) (vacating preliminary injunction that allowed plaintiff to take the LSAT with extra time and noting the test administrator would be irreparably harmed if the accommodated score was released prior to a decision on the merits).

The district court's analysis on this point distorted this Court's decision in *Powell*, which correctly noted that multiple interests are at stake when accommodations are requested. The district court focused on the highly speculative outcome of Plaintiff having to test without accommodations, when the Court's focus in *Powell* was on the overall integrity of the examination process and the unfairness to other examinees of awarding unwarranted accommodations. *See* 364 F.3d at 88.

The district court acknowledged, but brushed past, NBME's explanation that the harm here has nothing to do with logistics or cost, and everything to do with ensuring fairness to other examinees, preserving the integrity of the US-MLE, and protecting the public welfare. SPA39. *Those* are the

interests NBME seeks to protect, and they are important. The district court gave insufficient weight to these interests.

It would be easier and far less costly for NBME to abdicate its responsibility of ensuring that its accommodations process is fair for all examinees, by simply granting accommodations in cases such as this. NBME has chosen not to do so, precisely for the reasons noted in *Powell*.

## IV.    Injunctive relief would disserve the public.

Like NBME, "the public ... has an interest in the fair administration of standardized tests." *Bach v. Law Sch. Admission Council*, 2014 U.S. Dist. LEXIS 124632, at *8; *see also Campbell v. Lamar Inst. of Tech.*, 842 F.3d 375, 381 (5th Cir. 2016) (concern that the plaintiff "might obtain an unfair advantage over other students by having an extra two weeks to study" was a legitimate and "serious" reason for denying accommodations). That interest is particularly strong where, as here, the exam in question is a medical licensing exam.

If residency programs or other third parties rely on US-MLE scores earned with unwarranted accommodations, it will "alter[] the substance of the product because the resulting scores [will] not be guaranteed to reflect each examinee's

abilities accurately." *Powell v. NBME*, 364 F.3d at 89. That would unfairly advantage Plaintiff to the detriment of other examinees. Because that includes applicants who actually have disabilities under the ADA, the injunction harms the very population the ADA is meant to protect.

## CONCLUSION

The Court should vacate the preliminary injunction.

Respectfully submitted,

/s/ *Robert A. Burgoyne*
Robert A. Burgoyne, #366757
Caroline Mew, #467354
PERKINS COIE LLP
700 13th Street N.W., Ste. 800
Washington, DC 20005-3960
Telephone: 202.654.1744

*Counsel for Defendant-Appellant*

January 27, 2023

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Second Circuit Local Rule 32.1(a)(4) because it contains 11,731 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f). I further certify that the brief complies with the typeface and type-style requirements of Rule 32(a)(5)-(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook and Palatino Linotype fonts.

Dated: January 27, 2023

Washington, D.C.

/s/ *Robert A. Burgoyne*
Robert A. Burgoyne

## CERTIFICATE OF SERVICE

I certify that on January 27, 2023, I electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Second Circuit using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished through the CM/ECF system.

Date: January 27, 2023

Washington, D.C.

/s/ *Robert A. Burgoyne*
Robert A. Burgoyne