# No. 23-3

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

*ROBERT SAMPSON,*

> *Plaintiff-Appellee,*

*v.*

*NATIONAL BOARD OF MEDICAL EXAMINERS,*

> *Defendant-Appellant.*

On Appeal from the U.S. District Court for the Eastern
District of New York, Civil Action No. 22-CV-5120 (JMA)

## SPECIAL APPENDIX

Robert A. Burgoyne
Caroline M. Mew
PERKINS COIE LLP
700 Thirteenth Street N.W.,
Suite 800
Washington, DC 20005-3960
Telephone: 202.654.1744

Attorneys for
Defendant-Appellant
NATIONAL BOARD OF
MEDICAL EXAMINERS

# TABLE OF CONTENTS

**Page**

Memorandum and Order (Dec. 2, 2022) .................... SPA1

42 U.S.C. § 12102 ........................................................ SPA42

42 U.S.C. § 12182 ........................................................ SPA45

42 U.S.C. § 12186 ........................................................ SPA49

42 U.S.C. § 12189 ........................................................ SPA52

42 U.S.C. § 12205a ...................................................... SPA53

42 U.S.C. § 12206 ........................................................ SPA54

28 C.F.R. § 36.101 ....................................................... SPA57

28 C.F.R. § 36.105 ....................................................... SPA58

28 C.F.R. § 36.309 ....................................................... SPA65

75 Fed. Reg. 56,236, 56,296–56,298
(Sept. 15, 2010) (excerpts) ....................................... SPA68

76 Fed. Reg. 16,978, 17,009 (March 25, 2011)
(excerpts) ................................................................... SPA77

81 Fed. Reg. 53,204, 53,230, 53,236–53,237
(Aug. 11, 2016) (excerpts) ........................................ SPA82

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
ROBERT SAMPSON,

                                      **MEMORANDUM &**
                                      **ORDER**

                    Plaintiff,         22-CV-05120 (JMA) (AYS)


                    -against-

NATIONAL BOARD OF MEDICAL EXAMINERS,

                    Defendant.
--------------------------------------------------------------------X

**AZRACK, United States District Judge:**

       Plaintiff Robert Sampson ("Sampson") claims that Defendant National Board of Medical Examiners ("NBME") has denied him testing accommodations on Step 1 of the United States Medical Licensing Examination ("USMLE") in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq.[1]  Now before the Court, following a three-day evidentiary hearing, is Sampson's motion for a preliminary injunction (ECF No. 16).  Based on the following findings of fact and conclusions of law, the motion is GRANTED.

## I.    FINDINGS OF FACT

### A.  **The Parties**

       Sampson is a medical student at Stony Brook University's Renaissance School of Medicine ("Stony Brook").  He has wanted to become a doctor for his entire life.  (Tr.[2] 36:24–37:9.)

---

[1]      Sampson also brings a claim under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.  (See Compl. ¶¶ 115–22, ECF No. 1.)  However, neither party addresses the Rehabilitation Act claim here, and therefore the Court will address Sampson's ADA claim only.

[2]      Citations to "Tr." refer to the corresponding pages and lines of the transcript of the preliminary injunction hearing held from October 11 to October 13, 2022.  Citations to "PX" refer to exhibits offered by Sampson and admitted into evidence during the hearing.

Sampson is also enrolled in a Master of Business Administration ("MBA") program at the Stony Brook College of Business. (Tr. 36:20–22, 37:22–24, 38:6–7; Decl. of Robert Sampson ("R. Sampson Decl.") ¶ 3 and Ex. 6, ECF No. 16-3.)

NBME is a non-profit organization that develops and administers examinations, including the USMLE. (Decl. of Lucia McGeehan ("McGeehan Decl.") ¶¶ 3–4, ECF No. 21.) The USMLE is used by medical licensing authorities to evaluate the qualifications of individuals seeking their initial medical license. (Id. ¶ 5.) The USMLE is comprised of three "Step" exams: Step 1, Step 2 Clinical Knowledge ("CK"), and Step 3. (Id. ¶ 6.)

Sampson is approximately 40 weeks away from completing his medical degree. (Tr. 36:20–22, 37:22–24, 38:6–7.) However, before he can begin his final 40 weeks of medical school, Stony Brook requires that he take and pass Step 1. (Tr. 38:16–17.)

**B. <u>Sampson's Educational History</u>**

Despite his evident aptitude, Sampson has struggled with learning since his early childhood. By the time he was four years old, he had been diagnosed with severe stuttering that required intervention therapy. As part of this intervention therapy, Sampson's speech pathologist instructed his family to slow their speech to afford him more processing time. (Tr. 156:3–156:25, Tr. 158:14-159:5, 196:4–12.)

Sampson's early academic records from elementary school reflect difficulties with attention, focus, organization, and timely completion of assignments. (Tr. 91:22–93:6; Decl. of Dr. Shelley Sampson ("S. Sampson Decl.") ¶ 14, ECF No. 32-1; PX 20; PX 21.) For example, Sampson's first grade teacher noted his early struggles with focus and organization, stating, "[w]e will also be working on having Robert stay more focused on a task, so he may complete the task faster and stay more organized." (PX 20 at 1.) In fifth grade, Sampson's teacher highlighted that

he "appear[ed] at times to be confused with directions or questions that are presented during class." (Id. at 2.)  And in sixth grade, Sampson's teachers commented that he was "easily distracted" and that "distractions during work time . . . have interfered with his performance and completion of his work."  (Id.)

Additionally, although Sampson's early academic records describe him as, among other things, "a good independent reader," (PX 21), Sampson read slowly and had difficulty focusing while reading.  (Tr. 159:6–18.)  Indeed, reading was "painful" for him, and while attempting to read, he "felt like [he] was being lobotomized." (Tr. 43:12–22.)  Sampson disliked reading aloud in school because the material would "go[ ] in one ear and out the other," (Tr. 45:18–24), and he could not answer his teachers' questions about the material because he "would have no idea what [he] just read." (Tr. 46:2–3.)  Similarly, when a "teacher would speak and she would write on the blackboard or white board," for Sampson "there was no learning method taking place during those lectures or classrooms." (Tr. 39:18–24.)  As a result, he was forced to repeat entire lessons at home with parents as tutors.  (Tr. 39:18–40:2.)  Sampson also had trouble reading outside of school.  For example, when he struggled to read music, his cello teacher "asked [him] if [he] was stupid on multiple occasions," and "asked [him] if [he] had dyslexia . . . [and] a learning disability." (Tr. 50:20–51:1.)

Sampson also struggled to complete timed exams within the time allotted.  He was almost always the last student to complete an exam, regardless of subject area.  (Tr. 41:11–17.)  He sometimes was allowed extra time to finish timed exams during lunch or after school, while other students finished the same exam within the allotted time in class.  (Tr. 41:18–42:2.)  Even with additional time, however, he still was unable to finish the exams.  (Id.)

To compensate for his difficulties with speech, attention, and reading, Sampson relied on

mitigating measures and informal accommodations throughout his childhood.  In addition to working with a speech pathologist, at the urging of one of his teachers, Sampson began seeing a reading specialist in fourth or fifth grade, and he again saw a reading specialist while in high school.  (Tr. 162:7–21; S. Sampson Decl. ¶ 4.)  Because Sampson did not read material assigned in class, he instead relied on audiobooks and recordings of classroom material.  (Tr. Tr. 43:12–44:6; R. Sampson Decl. ¶ 8.)  He also made use of "an army of tutors" outside of school.  (Tr. 39:16–17; PX 19.)  In addition, his mother and other tutors read written material aloud to him and devised games designed to help him learn through repetition.  (R. Sampson Decl. ¶ 8.)  In high school, Sampson required as much as 15 hours of tutoring per week for a single class.  (Tr. 44:20–45:8.)  All told, he worked with more than twenty tutors throughout elementary school, junior high, high school, and college.  (PX 19.)

After graduating from high school, Sampson went on to attend the University of Virginia ("UVA"), where "he flourished socially and intellectually," and maintained a 3.43 GPA.  (PX 3 at 2.)  At UVA, Sampson employed strategies to mitigate his continued struggles with attention and reading.  Because he "simply did not read text books or other books," he would avoid classes with substantial reading and writing requirements.  (R. Sampson Decl. ¶ 9.)  He would also record lectures using a Livescribe pen, which synced lecture audio with his own notes, allowing him to later "refer back to what was said at that moment and repeat it many times."  (Tr. 52:3–22.)  He still was almost always the last student to complete exams and frequently failed to finish exams within the allotted time.  (Tr. 53:16–18.)  However, at least one professor granted him an informal accommodation by allowing him to take an exam in a separate area.  (Tr. 53:23–54:11.)

As a result of his hard work and use of mitigating measures, Sampson progressed through elementary school, junior high, high school, and college without being diagnosed with any learning

**SPA4**

disorder, Attention Deficit-Hyperactivity Disorder ("ADHD"), or other mental impairment.  He had no IEP or Section 504 plan while in school.  (Tr. 126:8–10.)  He did not receive formal accommodations in elementary school, junior high school, or high school.  (McGeehan Decl. Ex. 16 at 5; PX 2.)

## C.  Sampson's Performance on Standardized Tests

Sampson worked with multiple SAT and ACT tutors over the course of years.  (Tr. 128:18–24; PX 19 at 2.)  He also developed test-taking strategies to mitigate his difficulty with reading.  For example, on the SAT and ACT sections that required answering questions about passages, Sampson would "read the question prompt and then the answer choices and attempted to answer questions without reading the material preceding the question prompt if at all possible."  (R. Sampson Decl. ¶ 11.)  Sometimes, he would read only the topic sentences of a passage.  (Tr. 130:5–1317, 133:10–15.)  As a result of those efforts, he performed well on the SAT and ACT exams taken without accommodations under standard test conditions, including standard time.  On the ACT exam, he scored in the 89th percentile overall compared to other recent high school graduates, including in the 90th percentile on English and the 74th percentile on Reading.  (PX 12.)  Sampson took the SAT three times in high school, and he received scores on the Critical Reading section in the 74th, 84th, and 93rd percentiles.  (PX 14.)

After graduating from UVA, Sampson began preparing to apply to medical school.  As part of this process, he was required to take the Medical College Admission Test ("MCAT"), a standardized entrance exam.  (Tr. 54:13–21.)  Although Sampson sought accommodations on the MCAT, his request was denied.  (Tr. 62:20–23.)  Instead, he relied on extensive tutoring by his father, a surgeon, and a classmate, Dr. Andrew Lam, among others.  (Tr. 15:23–16:2, 63:1–10; PX 19.)  Dr. Lam alone tutored Sampson for approximately 200 hours.  (Tr. 16:3–4.)  Working with

**SPA5**

Dr. Lam, Sampson was again able to develop and implement test-taking strategies to mitigate his difficulties with attention and reading. These strategies included writing brief notes summarizing sentences in exam questions, reading only topic sentences and specific portions of the text relevant to a particular question, and double-checking copied sentences and calculations. (Tr. 21:15–22:16, 57:25–59:1.) Armed with these mitigating strategies, Sampson's first MCAT score—which placed him in the 67th percentile overall—still was not high enough to earn admission to any medical school. (Tr. 59:4–8; PX 11.) After a second year of preparation, his score improved by only one point, placing him in the 73rd percentile overall. (Tr. 59:9–17; PX 11.) He subsequently applied to more than sixty medical schools, but he was admitted only to Stony Brook. (Tr. 59:10–11, 63:25–64:1.)

After observing Sampson struggle—more than any other student he had tutored—with slow reading, writing, comprehension, and recall, Dr. Lam encouraged Sampson to undergo comprehensive educational testing to evaluate whether Sampson had learning disabilities. (Tr. 20:11–21:14, 60:19–61:14.)

**D. 2013 Evaluations for Learning Disabilities**

In August 2013, Suzanne Michels, Ph.D. performed a psychological evaluation of Sampson. (PX 3.) Dr. Michels personally interviewed Sampson, obtained and reviewed his relevant medical and academic history, and administered a battery of assessments. (Id.)

In her evaluation, Dr. Michels noted that Sampson's "[r]eading and writing skills appear to be somewhat variable, and testing scores were an unusual mix." (PX 3 at 9.) Although Sampson exhibited "very strong" verbal reasoning abilities, his visual/spatial problem solving was "significantly weaker," a difference that occurs in less than one percent of the population. (Id.) Based on her interview of Sampson, his medical and academic history, and the assessment results,

6

**SPA6**

Dr. Michels diagnosed Sampson with a Learning Disorder, Not Otherwise Specified. (Id.) The diagnosis was based at least in part on the "disparity" between Sampson's verbal and visual/spatial reasoning abilities, which was "likely to underlie the unevenness evident in his academic profile, both in current achievement testing and his school record." (Id.) Dr. Michels found it "likely that [Sampson's] strong drive and very conscientious approach to his studies has allowed him to do well in school and perhaps hidden the magnitude of the relative weaknesses uncovered in this testing." (Id.) She did not evaluate him for ADHD. (Id.) Dr. Michels recommended that Sampson receive accommodations in the form of time-and-a-half on "reading comprehension tasks . . . as well as those involving significant visual/spatial components." (Id.) She also noted that he would "benefit from extended time on [applied] math tasks, as well." (Id.)

In December 2013, Allison Anderson, Ph.D. conducted a supplemental evaluation of Sampson, in part for ADHD. (PX 2.) Based on her personal observations of Sampson, her review of Dr. Michels' report, and evaluation of the results of a battery of assessments, Dr. Anderson diagnosed Sampson with Unspecified Neurodevelopmental Disorder, visuospatial processing, and Specific Learning Disorder, with impairment in reading (dyslexia). (Id.) Notably, Dr. Anderson did not diagnose Sampson with ADHD. She acknowledged that he "appear[ed] to be experiencing attention problems," but nonetheless determined that "his testing results and history supply little evidence that [his attention] problems are the result of ADHD," and that while he may be "slightly 'out on the continuum' in terms of distractibility, . . . [he] does not appear to have the consistent and severe pattern of impulsivity, social problems, marked inattentiveness, or physical restlessness that support an ADHD diagnosis." (Id. at 7.) However, like Dr. Michels, Dr. Anderson concluded that Sampson required accommodations on exams, including 50% additional time on the MCAT and any medical school exams. (Id. at 8.)

**SPA7**

### E.  **Sampson's Medical School History**

Sampson began his studies at Stony Brook in August 2015.  (R. Sampson Decl. ¶ 16.)  Although Dr. Michels and Dr. Anderson had recommended that he receive accommodations due to his diagnosed learning disabilities, he did not initially request accommodations from Stony Brook.  Instead, he again turned to the stable of mitigating strategies that he had already deployed in other academic settings, such as the Livescribe pen, lecture playbacks, tutoring sessions, and supplemental supportive programs.  (Tr. 65:2–67:9; R. Sampson Decl. ¶¶ 16–19.)  Several of his professors informally permitted him extra time on some exams.  (Tr. 67:10–16.)

Although Sampson passed all his first-year classes, his grades were negatively impacted because he failed some of his end-of-course "shelf" exams.  (R. Sampson Decl. ¶ 16; PX 6, 10A; Tr. 67:17–68:14.)  Shelf exams are subject-specific exams comprised of retired USMLE questions.  (Tr. 72:7–73:2.)  Under standard conditions—without extended time or other accommodations—Sampson could not complete the shelf exams within the allotted time.  (Tr. 67:10–16, 68:7–8, 73:24–74:10.)  His struggles on the shelf exams culminated in a warning of marginal performance in November 2016, during his second year of medical school.  (PX 37 at 7.)

Sampson then submitted a request for formal accommodations to Stony Brook's Disability Support Services ("DSS").  (Tr. 69:3–20; R. Sampson Decl. ¶ 22.)  DSS reviewed the results of the evaluations conducted by Dr. Michels and Dr. Anderson and personally interviewed Sampson.  (Tr. 69:18–70:3; PX 6.)  Based on its review of the evaluations and its interview of Sampson, DSS granted his request for accommodations.  (PX 6.)  Specifically, DSS determined that

> [Sampson]'s Dyslexia learning disability is a mental impairment that substantially limits his reading ability and reading speed on a daily basis when he is compared to an average individual in the general population.  His learning disability is the reason he routinely runs out of time on exams and generally takes longer to think through ideas presented to him both on exams and outside the classroom.

(PX 6.)  Accordingly, DSS found that it was appropriate to permit Sampson 50% additional time

on all time-based exams—including shelf exams—as well as provide note-taking services and a separate testing area. (Tr. 70:4–25.) Once he was afforded 50% additional time on shelf exams, he was able to read the questions and complete the exams, with scores ranging from the 74th to 95th percentiles. (Tr. 198:23–200:10; PX 37 at 7.)

Ultimately, Stony Brook informed Sampson that due to his purportedly marginal performance during his first year, he would have to either repeat the first three semesters of his studies or take and pass Step 1—far earlier than his peers, who did not have to take Step 1 until after their third year of medical school. (Tr. 71:21–72:6, 145:1–5.)

## F.  **Sampson's Requests for Accommodations on Step 1**

In response to Stony Brook's directive, Sampson decided to take Step 1 early. (Tr. 74:16– 23.) Examinees take the USMLE under uniform conditions, including standard testing time. (McGeehan Decl. ¶ 7.) However, NBME provides accommodations to examinees who have a disability within the meaning of the ADA and need accommodations. (Id. ¶¶ 7–8.) So, in April 2017, Sampson sought accommodations from NBME for Step 1. He requested 50% additional time (time and a half) on the exam—the same accommodation that he recently received from Stony Brook for shelf exams. (Tr. 74:24–75:6; PX 1.) In support of his application, Sampson submitted the supporting documents required by NBME. (Tr. 75:14–86:12; PX 1–15.) These included, among other materials: a personal statement describing the impact of his learning disabilities on his life; a letter from DSS attesting to Sampson's need for accommodations due to his learning disabilities; a letter from Linda DeMotta, a learning specialist at Stony Brook, who had personally observed Sampson's struggles with reading; and the evaluations conducted by Dr. Michels and Dr. Anderson. (PX 2–4, 6–7.) Sampson also submitted a letter from his treating psychiatrist, Dr. Thomas Aronson. (PX 5.) In his letter, Dr. Aronson noted that he had been treating Sampson

9

**SPA9**

since November 2015 for "Learning Disabilities and mild ADD," and had prescribed him Dexedrine to treat his symptoms.  (Id.)  Dr. Aronson further explained that Sampson's diagnosed learning disorders "substantially limit major life activities in and out of the classroom," and make it "painful and agonizingly slow to read."  (Id.)

NBME sought a recommendation from an outside expert, Benjamin Lovett, Ph.D. (McGeehan Decl. ¶ 13.)  Dr. Lovett is a licensed psychologist and the director of the Ph.D. program in school psychology at Teachers College, Columbia University, where he serves as an Associate Professor of Psychology and Education.  (Decl. of Benjamin Lovett, Ph.D. ("Lovett Decl.") ¶ 2, ECF No. 22.)  After reviewing Sampson's request and supporting documentation, Dr. Lovett concluded that Sampson had not demonstrated that he has a mental impairment that substantially limits his ability to perform any major life activities that are relevant to taking the Step 1.  (Lovett Decl. Ex. 2.)  Upon considering Sampson's application and Dr. Lovett's recommendation, NBME determined that Sampson's "documentation does not demonstrate a substantial limitation in a major life activity as compared to most people or that the requested accommodations are an appropriate modification of [the] USMLE Step 1 test administration."  (McGeehan Decl. Ex. 3 at 2.)  Accordingly, NBME denied Sampson's request by letter dated June 13, 2017.  (Id. ¶¶ 13–14, Exs. 2–3.)

Undeterred, Sampson appealed NBME's decision.  On June 22, 2017, he submitted a letter from Jan Serrantino, a disability expert at the University of California-Irvine, supporting his request for accommodations; a letter from his parents describing their observations of his learning disabilities throughout his life, and providing a list of his tutors and reading specialists; and early academic records.  (Tr. 89:1–93:8; PX 17–21.)  NBME provided Sampson's appeal to Dr. Lovett, who recommended that NBME reject the appeal.  (McGeehan Decl. Ex. 4.)  Based on Dr. Lovett's

recommendation and its review of Sampson's documentation, NBME denied his appeal by letter dated August 1, 2017.  (Id. ¶ 18, Ex. 5.)

Sampson appealed again in November 2017.  He submitted new letters from Dr. Aronson, Serrantino, and Dr. Anderson.  (Tr. 93:25–96:11; PX 23–26.)  Dr. Aronson explained that Sampson met the DSM-IV criteria[3] for ADHD, based on his personal observations of Sampson over nearly two years.  (PX 25 at 1–2.)  NBME again provided Sampson's appeal file to Dr. Lovett, who again recommended that NBME reject the appeal.  (McGeehan Decl. Ex. 6.)  Based on Dr. Lovett's recommendation and its review of Sampson's documentation, NBME denied his appeal by letter dated January 12, 2018.  (Id. ¶ 21, Ex. 7.)

Sampson again appealed NBME's denial on February 22, 2018.  (PX 28.)  In support of his request for accommodations, he submitted a second letter from DeMotta, the Stony Brook learning specialist.  (Tr. 97:11–98:12; PX 29.)  In her letter, DeMotta stated that Sampson "meets the criteria, through our disabilities services office and according [to] the guidelines of the ADA, for appropriate testing accommodations."  (PX 29.)  DeMotta objected to NBME's characterization of Sampson's standardized test results as reflecting "unimpaired performances," when in fact, "[t]he records show that sometime prior to medical school, Robert, after studying and practicing well beyond the average time for most students, figured out a way to perform adequately enough under standard testing conditions on two entrance exams that test broad knowledge and aptitude."  (Id.)  DeMotta further explained that NBME had erred in relying heavily on Sampson's SAT and ACT results because "[n]ot all standardized exams are equal and the USMLE Step exams in particular require reading skills, interpretation, synthesis, integration and pattern recognition well beyond any skills required on the college entrance exams."  (Id.)

---

[3]     The "DSM" is the Diagnostic and Statistical Manual of Mental Disorders.  "DSM-IV" refers to the Fourth Edition; "DSM-V" refers to the Fifth Edition.

Nevertheless, NBME denied Sampson's appeal by letter dated March 6, 2018. (Tr. 98:17–23; PX 30.)

Sampson then retained an attorney, Jo Anne Simon, to appeal NBME's latest denial of his request for accommodations. (Tr. 98:24–99:3.) Simon submitted an appeal on June 29, 2018, which included a new letter from Dr. Aronson in further support of his application. (Tr. 99:4–25; PX 31–31-A.) Dr. Aronson's letter explained that Sampson's dyslexia and ADHD "do in fact limit him (for example, reading, concentrating, writing, test taking)" when compared to "most people in the general population." (PX 31-A at 1–2.) NBME provided Sampson's latest appeal to Dr. Lovett for review, and Dr. Lovett again recommended that NBME reject Sampson's appeal. (McGeehan Decl. ¶ 25, Ex. 9.) Based on Dr. Lovett's recommendation and its review of Sampson's file, NBME denied his appeal by letter dated September 7, 2018. (Id. Ex. 11.)

Simon submitted another appeal on Sampson's behalf in November 2018. (Tr. 100:11–22; PX 33.) NBME provided Sampson's latest appeal, as well as all the materials that he had previously submitted to NBME to date, to two new external, independent consultants, Samuel Ortiz, Ph.D. and Kevin Murphy, Ph.D. (McGeehan Decl. ¶ 28, Exs. 12 and 13.) Dr. Ortiz is a Professor of Psychology and Director of the Graduate Programs in School Psychology at St. John's University. (Decl. of Samuel O. Ortiz, Ph.D. ("Ortiz Decl.") ¶ 2, ECF No. 24.) Dr. Murphy has over thirty-five years of professional experience in the field of psychology and has conducted approximately 4,000 ADHD evaluations over the course of his career. (Decl. of Kevin Murphy, Ph.D. ("Murphy Decl.") ¶¶ 4–5, ECF No. 23.) Based on the recommendations of Dr. Ortiz and Dr. Murphy and its review of Sampson's appeal, NBME denied his appeal by letter dated January 4, 2019. (McGeehan Decl. Ex. 14; Tr. 100:23–101:7.)

By this time, NBME had rejected six requests by Sampson for 50% extra time on Step 1.

12

**SPA12**

Because Sampson could not proceed in his medical studies without taking Step 1, he was left with little choice but to take Step 1 without accommodations. (Tr. 101:14–23; R. Sampson Decl. ¶ 33.) He sat for the exam in January 2020. (R. Sampson Decl. ¶ 33.) Despite years of preparation for Step 1, Sampson found that the test-taking strategies he previously employed on the MCAT, among other standardized tests, were ineffective on Step 1. (Tr. 102:8–106:25.) He was unable to read all the questions on the exam and, as a result, he failed Step 1. (Tr. 101:22–23, 103:8–10.)

Stony Brook subsequently advised Sampson it was expelling him because he had not passed Step 1. (Tr. 107:4–20.) Sampson then retained new counsel and submitted an appeal to the Dean of Stony Brook, arguing that his expulsion on this basis would be discriminatory. (Tr. 109:3–110:1.) Stony Brook ultimately permitted Sampson to proceed to his third year of medical school. (Tr. 110:8–15, 112:11–13.) However, Stony Brook allowed him to continue on the condition that he re-take and pass Step 1 at the end of his third year—now at the same time as his classmates. (Tr. 109:6–9, 110:8–14, 112:17–113:3.)

## G. Evaluation by Drs. Wasserstein and Miller

In August 2020, Sampson obtained additional comprehensive testing from Jeanette Wasserstein, Ph.D., with the assistance of Kim Miller, Ph.D.[4] (Tr. 113:22–114:2, 184:14–16; R. Sampson Decl. ¶ 20; Decl. of Jeanette Wasserstein ("Wasserstein Decl."), ECF No. 17; PX 37.) Sampson sought this evaluation in order to continue pursuing accommodations from NBME. (PX 37 at 1.) Dr. Wasserstein is a licensed psychologist and a board-certified neuropsychologist. She has been in private practice since 1981, and she has held a faculty position at The Mount Sinai

---

[4] Dr. Wasserstein personally interviewed Sampson to obtain a comprehensive history. Based on this interview, she identified issues for evaluation and designed a battery of tests, which she and Dr. Miller administered to Sampson (with Dr. Miller performing "most" of the testing). Based on her and Dr. Miller's observations of Sampson, the test scores, and relevant materials provided by Sampson, Dr. Wasserstein then prepared the evaluation report. (Tr. 184:14–186:22; Wasserstein Decl. ¶¶ 8–13; PX 37.)

School of Medicine since 1996.  (Tr. 172:2–173:2, 177:2–8; Wasserstein Decl. ¶¶ 1–2 and Ex. 2-A.)  Dr. Wasserstein specializes in the diagnosis and treatment of learning disabilities in adults, including ADHD.  She has evaluated thousands of individuals for learning disabilities in educational settings, including for the USMLE and other standardized exams.  (Tr. 175:2–177:25.)

As part of the evaluation, Dr. Wasserstein interviewed Sampson in person and obtained a developmental, medical, and educational history.  Dr. Wasserstein also reviewed the prior evaluation reports from Dr. Michels and Dr. Anderson, Sampson's educational records as far back as first grade, and other materials that Sampson had submitted to NBME in connection with his requests for accommodations.  (Tr. 189:4–10, 192:9–194:1; PX 37 at 2–7.)  Dr. Wasserstein noted that Sampson's difficulty discerning diction, which he experienced in high school when attempting to learn a foreign language, is common among individuals with dyslexia.  (Tr. 194:2–21; PX 37 at 2.)  She also highlighted that Sampson began years of speech therapy at a young age to ameliorate his severe stutter.  She explained that there is a strong association between stuttering and dyslexia.  (Tr. 194:22–195:8.)

Dr. Wasserstein found that Sampson had experienced difficulty with reading throughout his life.  She noted that he considered reading to be a "very draining and exhausting experience" and frequently had to read the same material multiple times.  (Tr. 195:4–25; PX 37 at 5.)  In reviewing his early academic records, she also found it significant that his teachers reported problems with maintaining focus and organization, symptoms associated with ADHD.  (Tr. 195:22–25; PX 37 p. 5.)  Although Sampson earned "normal range scores" on the PSAT, SAT, and ACT, his scores reflected "relative weaknesses in his reading compared to other academic areas."  (PX 37 at 6.)  Because of his reading difficulties and issues with maintaining attention, Sampson had a "long history of extensive tutoring."  (PX 37 at 6.)  Indeed, Dr. Wasserstein could

not recall evaluating or treating any other individual who had received the same amount of tutoring as Sampson, which indicated that he "needed a lot of help in order to perform and function as well as he did." (Tr. 197:22–198:22; PX 37 at 6.)

Dr. Wasserstein also reviewed the evaluation reports prepared by Dr. Michels and Dr. Anderson in 2013. (Tr. 200:11–16, 208:9–17; PX 37 at 7–9.) With respect to Dr. Michels' report, Dr. Wasserstein considered it notable that on the Wechsler Adult Intelligence Scale-4th ed. ("WAIS-IV"), an IQ test, Sampson received a score in the 99.7th percentile on the Verbal Comprehension Index ("VCI"), but on the Perceptual Reasoning Index ("PRI"), he scored only in the 55th percentile. (Tr. 200:17–202:3; PX 37 at 7–8.) Although Dr. Wasserstein acknowledged that some discrepancy between these scores is normal, the degree of discrepancy that Sampson exhibited is "extraordinarily rare" and occurs in less than one percent of the general population. (Tr. 202:8–18.) Furthermore, while Sampson's scores on the WAIS-IV were considered "Average" to "Very Superior," the degree of discrepancy between his VCI and PRI scores represents "an intellectual limp which disrupts unified functioning significantly." (Tr. 202:19–203:4; PX 37 at 8.) As a result of this "limp," Sampson must "use a lot of detours" to obtain an average score. (Tr. 203:8–13.) Dr. Wasserstein also focused on Sampson's results on the Nelson-Denny Reading Test ("NDRT"), which requires reading passages of several paragraphs and answering multiple-choice questions. Under the standard 20-minute administration, Sampson scored in the bottom 16th percentile compared to college seniors. (Tr. 204:8–206:16; PX 37 at 8; Lovett Decl. ¶ 18.) With 50% additional time, he scored in the 64th percentile. (Tr. 206:9–12.) Dr. Wasserstein again noted that the wide disparity in Sampson's scores—even though most fell within normal ranges—implies a learning disability related to reading. (Tr. 206:13–21; PX 37 at 8.)

With respect to Dr. Anderson's report, Dr. Wasserstein found significant Sampson's scores on the Scholastic Abilities Test for Adults ("SATA"), which is a timed reading exam based on age norms. (Tr. 208:18–210:3.) Under standard time conditions, Sampson only completed half of the questions—not uncommon for persons with dyslexia—scoring in the 25th percentile. (Tr. 210:9–25; PX 37 at 9.) Dr. Wasserstein also noted that other assessments administered by Dr. Anderson reflected "underlying neurocognitive deficits" that cause Sampson to, among other things, read "very, very slow[ly]." (Tr. 211:22–214:9; PX 37 at 9–10.)

Dr. Wasserstein also reviewed letters submitted in support of Sampson's requests for accommodations, as well as NBME's letters denying his requests. (PX 37 at 10–15.)

In addition to interviewing Sampson and reviewing relevant materials, Dr. Wasserstein and Dr. Miller administered a battery of assessments.[5] (Tr. 184:14–186:22, 189:4–190:17; PX 37 at 13.) Dr. Wasserstein administered the WAIS-IV and obtained a near-identical result to Dr. Michels' 2013 WAIS-IV administration. (Tr. 219:20–221:10; PX 37 at 14–15.) Dr. Wasserstein also administered the NDRT. Under standard time, Sampson was only able to attempt 12 of 38 questions. Although he answered those 12 questions correctly, he scored in the 1st percentile compared to college seniors.[6] (Tr. 225:8–24.) Dr. Wasserstein testified that this result "scream[s] dyslexia" and reflects an impairment of Sampson's reading ability. (Tr. 225:11–19.) Sampson performed remarkably better when allowed as much time as he needed, answering 37 of 38

---

[5]    As part of Sampson's evaluation, Dr. Wasserstein administered symptom validity tests to ensure data reliability. (Tr. 218:2–219:6; PX 37 at 13.) Sampson's results on these tests were valid on all measures, which confirmed that he was "trying hard" and exercising his "best efforts" during the evaluation. (Tr. 219:7–19; PX 37 at 13–14.)

[6]    This represented a significant decrease from Sampson's 2013 NDRT score, which placed him in the 16th percentile. (PX 37 at 8.) Dr. Wasserstein did not address this disparity in her evaluation report. (PX 37; Lovett Decl. ¶ 20.) However, in light of the results of Sampson's symptom validity testing, (Tr. 225:14–19), the Court has credited his 2020 NDRT score. In any event, the 2013 score alone suggests a substantial impairment of Sampson's reading ability.

questions correctly and scoring in the 99th percentile.  (Tr. 226:12–227:2; PX 37 at 16.)

Dr. Wasserstein also administered a series of neuropsychological assessments.  (Tr. 227:11–18.)  On the Wisconsin Card Sort Test ("WCST"), a neuropsychological exam measuring visual processing and executive functioning, Sampson's scores varied on different portions of the test, ranging from average to as low as the 21st percentile.  (Tr. 228:10–21; PX 37 at 19.)  Dr. Wasserstein testified this score reflects an impairment in his ability to use visual information rapidly and correctly.  (Tr. 228:22–229:7.)  Dr. Wasserstein also noted that the WCST is "considered a good, performance-based measure of ADD."  (Tr. 229:2–3.)  Dr. Wasserstein administered the California Verbal Learning Test ("CVLT").  (Tr. 229:8–24.)  Again, his scores varied on different components of the test, with some as low as the 7th percentile.  (PX 37 at 20.)  Dr. Wasserstein stated that the CVLT results indicate that Sampson "has both visual memory and learning problems."  (Tr. 229:20–21.)  These problems act as a "roadblock in his ability to retrieve information," which in turn causes him "to do things more slowly," which would impact his performance on the USMLE.  (Tr. 230:8–17.)  Dr. Wasserstein also administered the Rey-Osterreith Complex Figure Test ("RCFT").  (Tr. 230:18–22; PX 37 at 20–21.)  Sampson's scores were below average on each component of the RCFT, reflecting consistent impairment of skills required to retrieve complex information.  (Tr. 230:23–24; PX 37 at 20.)

Dr. Wasserstein also evaluated Sampson for ADHD.  She administered the Conners Adult ADHD Rating Scale ("CAARS"), which indicated clinically significant problems with inattention, memory, and hyperactivity.  (Tr. 232:8–233:15; PX 37 at 22.)  She also considered the prior evaluation reports prepared by Dr. Michels and Dr. Anderson, neither of whom diagnosed Sampson with ADHD; Dr. Aronson's diagnosis of ADHD; Sampson's academic records, including comments from his teachers; Sampson's academic performance; and her own and Dr.

Miller's observations of Sampson. (Tr. 234:4–235:5; PX 37 at 22–25.)

Based on the totality of this data, Dr. Wasserstein found that there was "more than sufficient evidence" that Sampson met the criteria for a DSM-V diagnosis of Specific Learning Disorder with impairment in reading (reading fluency and reading comprehension) and written expression (spelling and handwriting). (Tr. 187:1–25, 236:6–10; PX 37 at 24.) Dr. Wasserstein also diagnosed Sampson with ADHD in accordance with the DSM-V criteria. (Tr. 233:16–234:3.) She testified that Sampson has substantial impairments in reading, reflected in the "absurdly" slow rate at which he reads compared to most people. And because of his ADHD, he does not function efficiently compared to others. These impairments operate in concert with one another. (Tr. 236:22–237:25.)

Dr. Wasserstein recommended the following accommodations: double time on in-class and standardized exams, including Step 1; a separate testing room; and longer breaks.[7] (Tr. 238:1–16; PX 37 at 25.) After Stony Brook reviewed Dr. Wasserstein's report, it granted Sampson double time on examinations, a separate testing area, and extra breaks. It also provided note-taking services. (Tr. 114:24-115:20.)

With Dr. Wasserstein's evaluation in hand, Sampson submitted a seventh request for accommodations to NBME on April 13, 2022, seeking 100% additional time (double time) and additional breaks. (Tr. 117:3–5; PX 35–37; McGeehan Decl. ¶ 32 and Ex. 16.) NBME provided Sampson's appeal to Dr. Murphy for review. Based on Dr. Murphy's recommendation and its review of the file, NBME denied Sampson's request by letter dated June 1, 2022. (Tr. 119:14–15; McGeehan Decl. ¶ 33 and Ex. 18; Murphy Decl. ¶ 25 and Ex. 2.)

---

[7]        Shortly after evaluating Sampson, Dr. Wasserstein became seriously ill with COVID-19. (Tr. 118:7–18; 241:12–25.) Dr. Wasserstein's report was written in December 2020, but Sampson did not receive the final report until January 2022. (Tr. 116:17–18, 118:8–119:13, PX 37.) Some of this delay may have been attributable to Sampson, but his and Dr. Wasserstein's testimony on this point was inconclusive. (Tr. 118:13–119:4, 241:19–243:14.)

18

**SPA18**

During Sampson's attempts to obtain accommodations for Step 1, NBME's consultants never met, interviewed, or evaluated him in person. (Tr. 356:2–357:5, 423:21–424:13.)

## H. Sampson's Current Academic Status at Stony Brook

Sampson began his third year of medical school in August 2020, ending a three-and-a-half year leave of absence. (Tr. 112:11–16.) He received strong performance reviews during his third-year clinical rotations, which he completed in July 2021. (R. Sampson Decl. ¶ 2 and Ex. 1-A at 12–14.) Sampson also began taking business school classes at the same time he was completing his third year of medical school, in or around June or July of 2021. (Tr. 139:3–6, 140:18–141:5.) Since he finished his third-year clinical rotations, he has taken only business school classes. (Tr. 141:6–9.) He has maintained a 4.0 GPA in business school. (R. Sampson Decl. ¶ 3.)

On July 29, 2022, Sampson filed a complaint and motion for preliminary injunction against Stony Brook. See Sampson v. Stony Brook Univ., et al., No. 22-CV-4490 (E.D.N.Y.). He alleged that Stony Brook planned to dismiss him from medical school by August 12, 2022, because he did not complete his degree within seven years as required by school policy. (See Compl. ¶¶ 95–97, ECF No 1.) He sought injunctive relief prohibiting Stony Brook from dismissing him from medical school and requiring Stony Brook to allow him more than seven years to complete his degree. (ECF No. 2.) Action on Sampson's status is currently stayed. (ECF Nos. 7, 17–18.)

## I. The Preliminary Injunction Hearing

Sampson commenced this action on August 29, 2022. The Court held a three-day evidentiary hearing on Sampson's motion for a preliminary injunction from October 11 to October 13, 2022. Testifying as part of Sampson's case were Dr. Lam; Dr. Shelley Sampson, his mother; Dr. Wasserstein; and Sampson himself. Testifying on behalf of NBME were Marc Kroopnick, Ph.D., Director of MCAT Development and Psychometrics with the Association of American

19

**SPA19**

Medical Colleges (Tr. 249:20–22); Dr. Lovett; and Dr. Murphy.

## II.    CONCLUSIONS OF LAW

### A.  Preliminary Injunction Standard

A party seeking a preliminary injunction must show "(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest."  Raia v. Pompeo, 455 F. Supp. 3d 7, 11–12 (E.D.N.Y. 2020) (quoting N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc., 883 F.3d 32, 37 (2d Cir. 2018) (internal citation omitted)).  However, a more exacting standard applies to a party seeking mandatory relief:

> where the movant is seeking to modify the status quo by virtue of a mandatory preliminary injunction (as opposed to seeking a prohibitory preliminary injunction to maintain the status quo), or where the injunction being sought will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits, the movant must also: (1) make a strong showing of irreparable harm, and (2) demonstrate a clear or substantial likelihood of success on the merits.

Yang v. Kosinski, 960 F.3d 119, 127–28 (2d Cir. 2020) (internal quotation marks and citations omitted); Raia, 455 F. Supp. 3d at 12 (citing N. Am. Soccer League, 883 F.3d at 37).

Here, Sampson must meet this heightened standard.  He seeks an injunction that would require NBME to reverse its current position and provide him accommodations on Step 1.  This would constitute mandatory relief because, if granted, the injunction would alter "the parties' pre-controversy position vis-à-vis the other."  N. Am. Soccer League, 883 F.3d at 38.  Sampson also must meet this heightened standard because the injunction he seeks would "provide the [him] with substantially all the relief sought" prior to a trial on the merits.  Yang, 960 F.3d at 128.

### B.  Irreparable Harm

First, Sampson must establish "[t]he single most important prerequisite for the issuance of a preliminary injunction," that he would suffer irreparable harm in the absence of preliminary

20

**SPA20**

injunctive relief. Yang, 960 F.3d at 128 (quoting Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009)). "To satisfy the irreparable harm requirement, [Sampson] must demonstrate that absent a preliminary injunction [he] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007) (quoting Freedom Holdings, Inc. v. Spitzer, 408 F.3d 112, 114 (2d Cir. 2005)). Because he seeks mandatory relief, Sampson must "make a strong showing of irreparable harm." Yang, 960 F.3d at 128. The Court finds that he has made this showing.

In Ramsay v. National Board of Medical Examiners, the Third Circuit concluded that the plaintiff had demonstrated that she faced irreparable harm where evidence of her disability, together with her previous failures to pass Step 1 without accommodations, indicated that "she likely would fail again and be forced to leave medical school" which "could not later be redressed by a legal or an equitable remedy." 968 F.3d 251, 262 (3d Cir. 2020). Like the plaintiff in Ramsay, Sampson cannot continue his medical training until he passes Step 1. He faces injury that is neither remote nor speculative. Although he has not yet registered to take Step 1 following NBME's latest denial of his request for accommodations, (Tr. 435:22–436:14), he has already taken Step 1 without accommodations. He failed despite extensive preparation and use of the test-taking strategies that he had employed successfully on the MCAT, as he was unable to read all the questions on the exam. In light of his substantial impairments, it is likely that he will again fail Step 1 if he takes the exam without accommodations. Accordingly, he will not be able to progress to his final year of medical school unless he receives accommodations on Step 1.

Moreover, Stony Brook has informed Sampson that he faces termination because he has

not completed his studies within seven years.[8]  If Sampson is dismissed from medical school, he will be ineligible to take Step 1, as NBME requires examinees to be currently enrolled as medical students.  (McGeehan Decl. ¶ 34.)  Based on Sampson's MCAT scores and previous attempts to gain admission to medical school—which resulted in only one offer of admission—it is unlikely that he would win admission to other medical schools that, for example, do not condition graduation on passing Step 1.  Cf. Baer v. Nat'l Bd. of Med. Exam'rs, 392 F. Supp. 2d 42, 49 (D. Mass. 2005) (plaintiff failed to establish irreparable harm because "[t]he record indicates that she may plausibly seek admission to other medical schools that, unlike [her current medical school], do not condition matriculation on passing the Step 1 exam").  Thus, it is clear that unless Sampson is able to take Step 1 with accommodations, his "medical career will effectively end." Ramsay v. Nat'l Bd. of Med. Exam'rs, No. 19-CV-2002, 2019 WL 7372508, at *18 (E.D. Pa. Dec. 31, 2019), aff'd, 968 F.3d 251 (3d Cir. 2020).[9]

In addition, courts have repeatedly determined that "an examiner's refusal to provide accommodations can cause the exam-taker irreparable harm because doing so jeopardizes her 'opportunity to pursue her chosen profession.'"  Ramsay, 968 F.3d at 262–63 (quoting Enyart v. Nat'l Conf. of Bar Exam'rs, 630 F.3d 1153, 1166 (9th Cir. 2011)).  Because Sampson cannot proceed to his final year of medical school until he passes Step 1, any further delay pending a trial on the merits would continue to deprive Sampson of his opportunity to pursue his medical training.

---

[8]	NBME argues that Sampson has not shown irreparable harm because "taking the Step 1 exam will not alter the fact that he is subject to dismissal by Stony Brook because he failed to complete his medical degree within seven years." (NBME Opp'n at 7.)  However, even if Sampson were to prevail in his lawsuit against Stony Brook, he still could not proceed with his medical studies without taking and passing Step 1.

[9]	Moreover, Title III of the ADA does not provide for damages, so absent injunctive relief Sampson will be left without any remedy.  See 42 U.S.C. § 12188(a).  Even if damages were available, however, "[t]he lost opportunity to engage in one's preferred occupation goes beyond monetary deprivation." Berger v. Nat'l Bd. of Med. Exam'rs, No. 19-CV-99, 2019 WL 4040576, at *28 (S.D. Ohio Aug. 27, 2019) (quoting Bonnette v. District of Columbia Court of Appeals, 796 F. Supp. 2d 164, 186 (D.D.C. 2011)).

See Berger v. Nat'l Bd. of Med. Exam'rs, No. 19-CV-99, 2019 WL 4040576, at *28 (S.D. Ohio Aug. 27, 2019) (finding that "a delay in taking the Step 2 CK exam pending the resolution of this lawsuit would deprive [plaintiff] of the opportunity to practice his chosen profession of medicine"); Doe v. Samuel Merritt Univ., 921 F. Supp. 2d 958, 964 (N.D. Cal. 2013) (medical student was likely to suffer irreparable harm by inability to participate in clinical rotations and earn medical degree while lawsuit was pending, delaying her professional career); Bonnette v. D.C. Ct. of Appeals, 796 F. Supp. 2d 164, 186–87 (D.D.C. 2011) ("Because [plaintiff] cannot practice law until she successfully passes the D.C. Bar Examination, any delay in taking the MBE deprives her of time to practice her chosen profession."); Jones v. Nat'l Conf. of Bar Exam'rs, 801 F. Supp. 2d 270, 286–87 (D. Vt. 2011) ("[W]hile Plaintiff is losing opportunities to take the MPRE, there is no countervailing benefit she obtains through the passage of time. Indeed, the passage of time is likely to exacerbate her harm as it may delay completion of her law school education and may delay her entry into her chosen professional field.").

It is true, as NBME argues, (NBME Opp'n at 8–9, ECF No. 20), that Sampson's delay in seeking preliminary injunctive relief through this lawsuit weighs against finding irreparable harm. In particular, NBME points to the fact that it first denied Sampson's request for accommodations in 2017. (McGeehan Decl. ¶ 14.) However, NBME ignores that in 2020, Stony Brook allowed Sampson to proceed to his third year of medical school without first passing Step 1. (Tr. 109:3–110:14.) This obviated Sampson's immediate need to obtain accommodations from NBME. (Tr. 112:19–113:21.) As a result, the correct point of reference is not NBME's first denial in 2017, but rather NBME's denial of Sampson's most recent request for accommodations, which occurred only in June 2022. This slight delay does not defeat Sampson's showing of irreparable harm.

Accordingly, the Court concludes that Sampson has made a "strong showing," Yang, 960

F.3d at 128, that he will suffer irreparable harm absent preliminary injunctive relief.

## C. **Clear or Substantial Likelihood of Success on the Merits**

### 1. **ADA Framework**

Title III of the ADA prohibits discrimination "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation[.]" 42 U.S.C. § 12182(a). NBME does not dispute that it is subject to the ADA's antidiscrimination provisions. Indeed, the ADA specifically requires that testing entities like NBME "that offer[] examinations . . . related to applications, licensing, certification, or credentialing for . . . professional . . . purposes shall offer such . . . in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals." Id. § 12189. United States Department of Justice ("DOJ") regulations implementing this provision of the ADA require that

> [t]he examination is selected and administered so as to best ensure that, when the examination is administered to an individual with a disability that impairs sensory, manual, or speaking skills, the examination results accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual, or speaking skills (except where those skills are the factors that the examination purports to measure).

28 C.F.R. § 36.309(b)(1)(i).[10] Accordingly, an entity offering such an examination, like NBME, must provide "appropriate auxiliary aids" for those with disabilities, such as additional time or an

---

[10]    The ADA authorizes DOJ to promulgate regulations implementing the ADA's public accommodation provisions. See 42 U.S.C. §§ 12186(b), 12205a; see also Reed v. 1-800-Flowers.com, Inc., 327 F. Supp. 3d 539, 544 (E.D.N.Y. 2018) ("When enacting the ADA, Congress charged [DOJ] with issuing regulations under Title III, 42 U.S.C. § 12186(b), rendering technical assistance, id. § 12206(c), and enforcing Title III in court, id. § 12188(b)."). Such regulations, issued following notice-and-comment rulemaking, have "the force and effect of law." Ramsay, 968 F.3d at 257 (quoting PDR Network, LLC v. Carlton & Harris Chiropractic, Inc., 139 S. Ct. 2051, 2055 (2019)). See also Hill v. Delaware N. Companies Sportservice, Inc., 838 F.3d 281, 290 (2d Cir. 2016) ("In general, there are two types of rules: legislative rules, which have the force of law, and interpretive rules, which inform the public of the agency's construction of the statutes it administers. . . . Interpretive rules lack the force of law because they need not undergo notice-and-comment rulemaking as legislative rules do. . . . For this reason, we defer to interpretive rules only to the extent that we find them persuasive.") (internal quotation marks and citations omitted).

alteration in "the manner in which the examination is given," unless the modification would "fundamentally alter the measurement of the skills or knowledge the examination is intended to test or would result in an undue burden." 28 C.F.R. §§ 36.309(b)(2), (3).

A person has a "disability" under the ADA if they have "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A). DOJ regulations provide that a "physical or mental impairment" includes ADHD and "dyslexia and other specific learning disabilities." 28 C.F.R. § 36.105(b)(2). "Major life activities" include, as relevant to Sampson's claim, reading and concentrating.[11] 42 U.S.C. § 12102(2)(A); 28 C.F.R. § 36.105(c)(1). Whether an impairment "substantially limits" a major life activity should be measured "as compared to most people in the general population." 28 C.F.R. § 36.105(d)(1)(v). As a result, "not every impairment will constitute a disability." Ramsay, 968 F.3d 251, 257 (quoting J.D. by Doherty v. Colonial Williamsburg Found., 925 F.3d 663, 670 (4th Cir. 2019)). See also B.C. v. Mount Vernon Sch. Dist., 837 F.3d 152, 160 (2d Cir. 2016) (explaining that "[n]ot every impairment that affects an individual's major life activities is a substantially limiting impairment") (citation omitted).

In determining whether Sampson has a disability, the Court must consider the ADA's legislative history. "The definition of 'disability' under the ADA was previously interpreted narrowly." Hamilton v. Westchester Cty., 3 F.4th 86, 92 (2d Cir. 2021) (citing Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 197–98 (2002)). However, in 2008, Congress enacted the ADA Amendments Act ("ADAAA"), Pub. L. No. 110-325, with the "principal purpose" of "overrul[ing] the Supreme Court's arguably narrow interpretation of what constitutes an ADA-

---

[11]     Sampson claims to be "substantially impair[ed]" in "the major life activities of reading, spelling, cognitive processing speed, attention [sic] concentration and taking standardized exams." (Sampson Mem. at 3, ECF No. 16-1.) However, for the purposes of this motion, the Court has considered only reading and concentration, which the Court finds are the only "major life activities" relevant to taking the USMLE Step 1.

25

**SPA25**

qualifying disability . . . and to make clear that the substantial-limitation requirement in the definition of 'disability' is not an exacting one." Hamilton, 3 F.4th at 92 (citation omitted). Accordingly, the ADAAA commands that "disability" should be "construed in favor of broad coverage[.]" 42 U.S.C. § 12102(4)(A). See also Hamilton, 3 F.4th at 92 (explaining that the ADAAA "broadened the definition of 'disability' under the ADA"); Ramsay, 968 F.3d at 257 ("We construe the term 'disability' broadly.") (citation omitted).

Likewise, DOJ regulations interpreting the ADAAA explain that

[t]he primary object of attention in cases brought under title III of the ADA should be whether public accommodations have complied with their obligations and whether discrimination has occurred, not the extent to which an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment substantially limits a major life activity should not demand extensive analysis.

28 C.F.R. § 36.105(d)(1)(ii). The regulations also state that "[t]he term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA," and "is not meant to be a demanding standard." 28 C.F.R. § 36.105(d)(1)(i). Therefore, "the 'substantially limits' inquiry 'should not demand extensive analysis,'" and "'[t]he comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical evidence.'" Ramsay, 968 F.3d at 258–59 (quoting 28 C.F.R. §§ 36.105(d)(1)(ii), (vii)). Additionally, in determining whether an individual has a disability, "the focus is on how a major life activity is substantially limited, and not on what outcomes an individual can achieve." 28 C.F.R. § 36.105(d)(3)(iii). As a result, DOJ's regulations caution against placing undue emphasis on scholastic achievement, as "someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in one or more major life activities . . . because of the additional time or effort he or she must spend to

26

**SPA26**

read, write, speak, or learn compared to most people in the general population." Id. Nevertheless, the Court notes that DOJ regulations and guidance "do[ ] not preclude the consideration of grades and outcomes; rather, they simply cannot be the only determining factor." Wright v. Nat'l Bd. of Med. Examiners, No. 21-CV-02319, 2021 WL 5028463, at *4 (D. Colo. Oct. 15, 2021).

Finally, DOJ regulations require that "[w]hen considering requests for modifications, accommodations, or auxiliary aids or services, the [testing] entity gives considerable weight to documentation of past modifications, accommodations, or auxiliary aids or services received in similar testing situations . . ." 28 C.F.R. § 36.309(b)(1)(v). This is because "a recent history of past accommodations is critical to an understanding of the applicant's disability and the appropriateness of testing accommodations." Ramsay, 968 F.3d at 259 (quoting Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities, 75 Fed. Reg. 56,236, 56,298 (Sept. 15, 2010)).

### 2. Sampson's Entitlement to Accommodations Under the ADA

Sampson has provided ample evidence that his learning disabilities and ADHD substantially limit his reading and concentration compared to most people in the general population.

As set forth in the Court's findings of fact, Sampson's parents, teachers, tutors, and psychological evaluators have all noted that, as a result of his impairments, he experiences more difficulty with reading and concentration as compared to most people in the general population.

In elementary school, Sampson's teacher recognized that he needed to work with a reading specialist. (S. Sampson Decl. ¶ 4; PX 19 at 2; Tr. 162:7–21.) Dr. Lam, Sampson's MCAT tutor, also recognized Sampson's substantial limitations in reading. For example, he observed Sampson "reverse letters and numbers, and otherwise miswrite numbers," and struggle with sentences with

<div align="center">27</div>

<div align="center">**SPA27**</div>

multiple clauses, only to forget the previous sentence as soon as he moved onto the next sentence. (Decl. of Dr. Andrew Lam ¶ 6, ECF No. 32-2.) Dr. Lam tutored hundreds of students in elementary school, middle school, high school, college, and medical school. (Tr. 16:3–4, 16:10–14.) Out of all the students with whom he worked, Dr. Lam stated that Sampson "by far . . . had the most difficulty . . . when it came to processing written text and reading." (Tr. 20:11–20.) Linda DeMotta, who also observed Sampson's struggles with reading firsthand, noted that Sampson "has a slow reading rate and poor visuospatial processing such that he will avoid reading because the reading process is both exhausting and painful." (PX 7 at 1.) Based on her observations of Sampson, DeMotta concluded that Sampson's "dyslexia substantially impairs his reading skills, test taking skills, time management skills, and memory." (Id. at 2.)

Sampson's use of strategies designed to mitigate the effects of his impairments is also well documented. He has relied on more than 20 tutors from elementary school through college, who have helped him learn material that he could not learn through reading. He has used a Livescribe pen to record lectures and sync the audio with his notes and has steered clear of classes with substantial reading components or timed exams. (Tr. 51:14–53:12.) On the SAT and ACT, he employed measures that allowed him to minimize the amount of reading required to answer questions. (R. Sampson Decl. ¶ 11; Tr. 130:5–1317, 133:10–15.) Similarly, in preparing for the MCAT, Dr. Lam helped him develop test-taking strategies that included writing brief notes summarizing sentences in exam questions, reading only topic sentences and specific portions of the text relevant to a particular question, and double-checking copied sentences and calculations. (Tr. 19:6–11, 21:15–22:16, 58:3–59:1.) Despite his impairments, by using these mitigating measures, Sampson generally has performed well in school and on standardized exams.

Sampson also has received formal and informal accommodations throughout his life. He

testified that when taking tests in school, he "was pretty much basically the very last person taking the test every single time . . . [a]nd this was in pretty much every subject area, whether it was Social Studies or Math or English, I would always need the most amount of time to finish answering the questions or writing an essay." (Tr. 41:11–17.)  As a result, some of his teachers granted him extra time to complete exams during lunch or after school—though even with extra time, Sampson was sometimes still unable to complete the exams.  (Tr. 41:23–42:2.)  Even before he sought formal accommodations as a medical student, several of Sampson's professors allowed him extra time for exams, though not for shelf exams.  (Tr. 66:4–67:16.)  In his second year of medical school, Stony Brook granted him formal accommodations, including 50% additional time on exams.  (PX 6.)  Once he received these accommodations, his shelf exam scores improved dramatically, climbing from a failing average of 66% on unaccommodated exams to a passing average of 83% on accommodated exams.  (PX 7.)  He later applied for additional accommodations after receiving ADHD diagnoses from Dr. Aronson and Dr. Wasserstein.  (PX 5, 37; Tr. 114:24–115:20.)  Stony Brook approved his request and allowed him 100% additional time on exams—including shelf exams comprised of retired USMLE questions.  (Tr. 115:11–15.)

Finally, Sampson's evaluation conducted by Dr. Wasserstein demonstrates that his reading abilities are substantially impaired compared to most individuals in the general population.  Dr. Wasserstein, with the assistance of Dr. Miller, spent 15 hours evaluating Sampson in person and prepared an exhaustive evaluation analyzing his psychometric scores, accounting for her and Dr. Miller's personal observations of Sampson, and reviewing his academic and medical records describing his substantial impairments.  (PX 37.)  Based on this entire body of evidence, Dr. Wasserstein found that Sampson met the criteria for a DSM-V diagnosis of Specific Learning Disorder with impairment in reading (reading fluency and reading comprehension) and written

29

**SPA29**

expression (spelling and handwriting). (Tr. 187:1–25, 236:6–10; PX 37 at 24.) Dr. Wasserstein concluded that, when compared to the general population, Sampson has a substantial impairment in reading in that he reads at a slow rate. (Tr. 236:22–237:10.) Likewise, his treating psychiatrist, Dr. Aronson, as well as Dr. Wasserstein, concluded based on clinical evaluations that his ADHD substantially impairs his concentration ability. (PX 5, 25, 31-A, 37.) These evaluators based their conclusions on "exactly the type of data DOJ contemplates as showing a learning disability that substantially limits an individual as compared to others in the general population." Ramsay, 968 F.3d at 258 (affirming district court's finding that plaintiff was disabled based on diagnostic assessments showing substantial limitation).

Nevertheless, NBME and its consultants argue that Sampson has failed to demonstrate that he is disabled. (See NBME Opp'n at 14–23; Lovett Decl. ¶¶ 3, 45–49; Murphy Decl. ¶ 43; Ortiz Decl.; Decl. of Joseph E. Bernier, Ph.D. ("Bernier Decl.") ¶¶ 8–34, 37, ECF No. 25; Declaration of Dawn P. Flanagan, Ph.D. ("Flanagan Decl.") ¶ 5, ECF No. 26.)[12]

NBME and its consultants attack Dr. Wasserstein's analysis of the psychometric testing that she conducted with Dr. Miller, as well as her interpretation of the evaluations prepared by Dr. Michels and Dr. Anderson.[13] For example, in reviewing Sampson's evaluations, Dr. Lovett found that "[e]very time that Mr. Sampson's academic skills have been measured against age peers on diagnostic tests, his skills have been in the average range or above, including on measures that were timed." (Lovett Decl. ¶ 17.) Dr. Lovett pointed to Sampson's scores on the Wechsler Individual Achievement Test and the Woodcock-Johnson Tests of Achievement, which were in

---

[12]     Dr. Bernier is a licensed psychologist in New York State. (Bernier Decl. ¶ 2.) Dr. Flanagan is a Professor of Psychology at St. John's University. (Flanagan Decl. ¶ 2.) Dr. Bernier and Dr. Flanagan did not serve as external reviewers for NBME at the time Sampson submitted his accommodation requests. (McGeehan Decl. ¶¶ 11–33.) They have provided expert opinions solely in connection with the preliminary injunction proceedings, although neither testified at the hearing.

[13]     They do not, however, challenge the evaluators' administration or scoring of the evaluations.

**SPA30**

the average range or above. (Id. ¶ 17(c); PX 37 at 15–16.) Similarly, Dr. Bernier reviewed Sampson's three evaluation reports for NBME and concluded that "[c]linical evaluation of Mr. Sampson's intellectual functioning did not indicate substantially limited cognition when compared to the general population." (Bernier Decl. ¶ 19.)

NBME and its consultants highlight specific diagnostic tests that purportedly undermine—or at least do not support—Sampson's claim. (NBME Opp'n at 14–16.) For example, Dr. Bernier asserts that Sampson's evaluators "overemphasize the NDRT findings and feature the results as a cornerstone of their conclusions that Mr. Sampson is an impaired reader who is consequently unable to access standardized examinations under normal time conditions," when in fact the NDRT "is not an appropriate measure of reading impairment because the test scores were compared to an inappropriate reference group, specifically to college graduates, not the general population using age norms." (Bernier Decl. ¶¶ 26–28.) Dr. Lovett similarly discounted Sampson's reliance on the NDRT. (Lovett Decl. ¶¶ 18–22.) NBME and its experts also argue that Sampson's scores on neuropsychological assessments are not probative of his reading or concentration skills. For example, Dr. Lovett critiqued Dr. Wasserstein's conclusion that Sampson's variable performance on measures of visual memory "likely contribute to his reading comprehension difficulties." (PX 37 at 20.) Specifically, Dr. Lovett testified that he does not "necessarily see a relationship between those visual memory scores" from tests involving drawing complex figures and reading comprehension. (Tr. 324:7–17; see also Lovett Decl. ¶ 30; Bernier Decl. ¶ 31; Murphy Decl. ¶ 29.)

NBME and its consultants also take issue with Dr. Wasserstein's conclusion, (Tr. 202:19–203:4, 206:13–21; PX 37 at 8), that extreme variability across some of Sampson's diagnostic test scores is evidence of a substantial impairment. Dr. Lovett testified that variability across test

**SPA31**

scores is not indicative of an impairment or a disability, as it is "the type of profile of performance that virtually everyone has (at least in some domains)." (Lovett Decl. ¶ 47; Tr. 328:4–23; see also Flanagan Decl. ¶ 6; Bernier Decl. ¶ 20.)

Ultimately, however, the Court finds Dr. Wasserstein's conclusions—as supported by the factual record—more persuasive and finds NBME's experts less persuasive.

First, NBME and its experts apply too exacting a standard in concluding that Sampson is not disabled. DOJ regulations implementing the ADAAA caution that "the threshold issue of whether an impairment substantially limits a major life activity should not demand extensive analysis," and "is not meant to be a demanding standard." 28 C.F.R. § 36.105(d)(1)(i), (ii). As set forth above and in the Court's findings of fact, Sampson has provided extensive evidence that his learning disabilities and ADHD substantially limit his reading and concentration abilities compared to most people in the general population.

NBME and its experts single out the results of specific psychometric tests for criticism, but Dr. Wasserstein relied on multiple measures in concluding that Sampson's reading and concentration abilities are substantially limited compared to most people in the general population. Aside from Sampson's NDRT scores, on the SATA he scored in only the 25th percentile, falling "in the below average range compared to same age peers." (PX 37 at 8–9, 12; Tr. 208:18–210:3, 210:9–25, 211:22–214:9.) Sampson also scored poorly on several neuropsychological assessments, including the WCST—a "good, performance-based measure of ADD" (Tr. 229:2–3)—the CVLT, and the RCFT. (PX 37 at 17–20.) Dr. Wasserstein noted that his low scores on these assessments reflect "impaired neuropsychological functions [that] greatly impact his ability to perform under rapid processing demands, especially where there is reading[.]" (PX 37 at 24.) She further testified that this would affect his performance on written examinations like Step 1.

**SPA32**

(Tr. 227:11–229:7, 229:8–231–7.)  Additionally, Dr. Wasserstein explained that the discrepancy between his VCI and PRI scores represents "an intellectual limp which disrupts unified functioning significantly," implying a learning disability relating to reading.[14]  (Tr. 202:19–203:4, 206:13–21; PX 37 at 8.)

Moreover, Sampson's evaluators—most notably, Dr. Wasserstein, but also Dr. Michels, Dr. Anderson, and his treating psychiatrist, Dr. Aronson—made their findings following hours of in-person observation of Sampson's behavior and symptoms.  On the other hand, NBME's experts have never met, interviewed, or evaluated Sampson in person.  DOJ's regulations "mandate that the determination of whether an impairment substantially limits a major life activity requires an individualized assessment.  Such assessments benefit from the reports of professionals who know or have personally examined the individual."  Ramsay, 968 F.3d at 260 (citing 28 C.F.R. § 36.105(d)(1)(vi)).  In-person assessments allow evaluating professionals to closely observe an individual's behavior and effort.  The preamble to DOJ's updated rule implementing the ADA explains that "[r]eports from experts who have personal familiarity with the candidate should take precedence over those from, for example, reviewers for testing agencies, who have never personally met the candidate or conducted the requisite assessments for diagnosis and treatment."  Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities, 75 Fed. Reg. 56,236, 56,297 (Sept. 15, 2010).[15]  Accordingly, "when testing entities receive documentation provided by a qualified professional who has made an individualized

---

[14]    NBME and its experts contend that "variability across test scores is not indicative of an impairment or a disability."  (NBME Opp'n at 16; see also Lovett Decl. ¶ 47; Murphy Decl. ¶ 30; Bernier Decl. ¶ 20.)  However, the Court finds persuasive DOJ regulatory guidance, cited in Ramsay, explaining that disparities between an individual's aptitude and actual achievement can be used—in part—to diagnose disability.  968 F.3d at 257–58.

[15]    In interpreting and applying an agency's regulation, courts may properly consider "the regulation's preamble . . . as well as the purpose of the regulation's authorizing statute."  Fernandez v. Zoni Language Centers, Inc., 858 F.3d 45, 50 (2d Cir. 2017) (quoting Halo v. Yale Health Plan, Dir. of Benefits & Records Yale Univ., 819 F.3d 42, 52 (2d Cir. 2016)).  See also Ramsay, 968 F.3d at 258 n.8.

33

**SPA33**

assessment of an applicant that supports the need for the modification, accommodation, or aid requested, they shall generally accept such documentation and provide the accommodation." <u>Id.</u>

It is certainly true, as NBME argues (NBME Opp'n at 22–23), that NBME was not required to conduct an in-person interview or evaluation of Sampson. Notably, however, other courts— having considered DOJ regulations and guidance—have decided to credit the testimony and findings of experts who have personally observed a plaintiff over the testimony and findings of experts who have not. <u>See</u> <u>Ramsay</u>, 968 F.3d at 260 (holding that district court's decision to weigh the plaintiff's experts more favorably than the NBME's experts, who had not personally observed the plaintiff, "was consistent with DOJ regulations"); <u>Berger</u>, 2019 WL 4040576, at *25–26 ("[T]he Court finds the strong weight of the evidence supports the findings and conclusions of [the plaintiff's expert], who personally administered multiple assessments to [the plaintiff] and clinically observed his performance and efforts on those assessments"). Here, after considering the DOJ regulations and guidance and all the evidence in the record, the Court finds that the weight of the evidence supports the conclusions of Dr. Wasserstein. Accordingly, the Court credits Dr. Wasserstein—whose evaluation and diagnoses of Sampson also benefited from in-person observation of his behavior and symptoms—over NBME's experts.

Second, NBME's arguments and its experts' opinions fail to adequately account for the evidence of accommodations—both formal and informal—that Sampson has received throughout his life. DOJ regulations require that "[w]hen considering requests for modifications, accommodations, or auxiliary aids or services" testing entities must "give[ ] considerable weight to documentation of past modifications, accommodations, or auxiliary aids or services received in similar testing situations . . ." 28 C.F.R. § 36.309(b)(1)(v).

Sampson has provided ample evidence of accommodations from childhood through the

present day, including his extensive use of tutors and learning specialists, as well as teachers who informally allowed him extra time to finish exams. Most importantly, however, Stony Brook has determined that as a result of his impairments, he should receive double time on shelf exams. NBME cannot seriously dispute that these exams—comprised of retired USMLE questions—represent a "similar testing situation," 28 C.F.R. § 36.309(b)(1)(v), as compared to Step 1. NBME offers no testimony or other evidence demonstrating that it gave "considerable weight" to this evidence in rejecting Sampson's requests for accommodations. In fact, NBME contends that it need not give any weight to Stony Brook's determination that Sampson is entitled to accommodations.[16] (NBME Opp'n at 23.) The Court disagrees and assigns "considerable weight" to Sampson's history of accommodations, especially Stony Brook's determination that he should receive double time on shelf exams. See Ramsay, 968 F.3d at 259 (holding that district court did not err in giving "considerable weight" to plaintiff's past accommodations in determining that plaintiff was disabled).

Third, NBME and its experts place too much emphasis on Sampson's academic and test-taking outcomes, without accounting for the mitigating measures he employed to achieve those outcomes. The ADA requires that the determination of whether a person has a disability should be made "without regard to the ameliorative effects of mitigating measures" such as "learned behavioral or adaptive neurological modifications." 42 U.S.C. § 12102(4)(E)(i)(IV). See also 28

---

[16] For this proposition, NBME cites Doherty v. National Board of Medical Examiners, in which the Fifth Circuit held that testing entities like NBME need only consider past accommodations "after a person establishes that they are disabled under the ADA." 791 F. App'x 462, 466 (5th Cir. 2019). The Third Circuit rejected this approach in Ramsay, 968 F.3d at 259 (citing 28 C.F.R. § 36.309(b)(1)(v)), consistent with other courts that have considered an applicant's history of accommodations in determining whether they are disabled. See, e.g., Bibber v. Nat'l Bd. of Osteopathic Med. Exam'r, Inc., No. 15-CV-4987, 2016 WL 1404157, at *7 (E.D. Pa. Apr. 11, 2016) (explaining that "[c]ourts across the country have considered," among other factors, "whether the individual has been afforded testing accommodations in the past"). Doherty is also factually distinguishable. There, the Fifth Circuit explained that "the record does not provide evidence of whether [plaintiff's medical school] gave [her] accommodations because it found that she met the definition of disability under the ADA[.]" 791 F. App'x at 466. Here, by contrast, Stony Brook explicitly told NBME that it had granted Sampson accommodations because it had determined that he met the definition of disability under the ADA and explained the bases for its decision. (See, e.g., PX 6–7, 29.)

C.F.R. § 36.105(d)(3)(iii) ("[T]he focus is on how a major life activity is substantially limited, and not on what outcomes an individual can achieve.").

NBME argues that Sampson's success on standardized tests, set forth in the Court's findings of fact, "undermines any argument that he is substantially limited compared to most people in any major life activity relevant to taking the Step 1 exam." (NBME Opp'n at 17.) To be sure, the ADA nor DOJ regulations "preclude the consideration of grades and outcomes," Wright, 2021 WL 5028463, at *4, and the Court has considered them here. Likewise, it is true that some courts—including those cited in NBME's brief, (NBME Opp'n at 17–19)—have concluded that prior success in the classroom or on standardized exams does not support a finding of disability. However, those courts also relied on other factors beyond high test scores—factors that are absent here—in concluding that the plaintiffs were not disabled. See, e.g., Wright, 2021 WL 5028463, at *5–6 (plaintiff seeking accommodations on USMLE Step 3 had never received test-taking accommodations and had already taken and passed Step 1 and Step 2 CK without accommodations); Black v. Nat'l Bd. of Med. Exam'rs, 281 F. Supp. 3d 1247, 1249–52 (M.D. Fla. 2017) (plaintiff submitted "diagnoses" obtained from professionals who either did not opine on whether she was "substantially limited," or concluded that she was not "substantially limited"); Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs, 870 F. Supp. 2d 607, 620–22 (S.D. Ind. 2012) (plaintiff's evaluating psychologist testified that his reading skills were average, and plaintiff provided "no evidence of coping mechanisms undertaken to account for a substantially-limiting disorder").

As other courts have recognized, a "'definition of disability based on outcomes alone, particularly in the context of learning disabilities, would prevent a court from finding a disability in the case of any individual . . . who is extremely bright and hardworking, and who uses alternative

routes to achieve academic success,' a result that would be inconsistent with the goals of the ADA." Berger, 2019 WL 4040576, at *23 (quoting Bartlett v. New York State Bd. of Law Exam'rs, No. 93-CV-4986, 2001 WL 930792, at *37 (S.D.N.Y. Aug. 15, 2001) (Sotomayor, J.)). See also Peters v. Univ. of Cincinnati Coll. of Med., No. 10-CV-906, 2012 WL 3878601, at *6 (S.D. Ohio Sept. 6, 2012) ("Defendant's rationale—that anyone who has had some modicum of academic success cannot be found to have a disability that affects learning—flies in the face of Congress' directives and the relevant implementing regulations.").

Indeed, this view is consistent with DOJ regulations, which explain that "someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in one or more major life activities . . . because of the additional time or effort he or she must spend to read, write, speak, or learn compared to most people in the general population." 28 C.F.R. § 36.105(d)(3)(iii). See also Amendment of Americans With Disabilities Act Title II and Title III Regulations To Implement ADA Amendments Act of 2008, 81 Fed. Reg. 53,204, 53,230 (Aug. 11, 2016) ("concur[ring]" with Equal Employment Opportunity Commission's "view" that "[i]ndividuals diagnosed with dyslexia or other learning disabilities will typically be substantially limited in performing activities such as learning, reading, and thinking when compared to most people in the general population, particularly when the ameliorative effects of mitigating measures, including therapies, learned behavioral or adaptive neurological modifications, . . . studying longer, or receiving more time to take a test, are disregarded as required under the ADA Amendments Act.") (citing Regulations To Implement the Equal Employment Provisions of the Americans With Disabilities Act, as Amended, 76 Fed. Reg. 16978, 17,009 (Mar. 25, 2011)); Ramsay, 968 F.3d at 257–58.

Here, Sampson provided extensive evidence documenting the mitigating measures that he

**SPA37**

developed and applied in taking standardized tests such as the SAT, ACT, and MCAT, as well as in other academic settings throughout his life. Nevertheless, NBME contends that it is doubtful that, given the format of these exams, Sampson could have actually utilized these test-taking strategies to perform as well as he did. (NBME Opp'n 17–19.) At the hearing, Dr. Kroopnick testified that a successful MCAT examinee could not answer MCAT Verbal Reasoning questions without fully reading and understanding the passage to which the questions relate. (Tr. 258:20–260:7, 262:23–263:20.) Ultimately, however, the Court credits Sampson's testimony, which was corroborated by Dr. Lam's description of the test-taking strategies that he helped Sampson develop and deploy. (Tr. 21:15–22:16, 57:25–59:1.)

That Sampson was able to use these mitigating measures with some success does not, as NBME argues, undermine his claim that he is substantially limited in his ability to read and concentrate. Rather, his past success on standardized tests and in the classroom reflects that he compensated for his impaired reading and concentration abilities through learned behavioral modifications, such as test-taking strategies, and by studying longer than his peers. See Ramsay, 968 F.3d at 258 n.7 ("[I]n deciding whether [the plaintiff] was disabled, the Court could appropriately consider and discount that she compensated for her very weak reading and writing abilities by devoting more effort to her assignments than most students.") (citing 28 C.F.R. § 36.105(d)(3)(iii)); Berger, 2019 WL 4040576, at *23 (discussing the plaintiff's "compensatory strategies to speed up his reading for standardized examinations like the MCAT").

In sum, considering the entire factual record in this case, the Court concludes that Sampson has established that he is disabled within the meaning of the ADA, by virtue of his diagnosed Specific Learning Disorder with impairments in reading (reading fluency and reading comprehension) and written expression (spelling and handwriting), and ADHD. These

38

**SPA38**

impairments substantially limit his ability to read and concentrate as compared to most people in the general population.  Accordingly, he has demonstrated a substantial likelihood of success on the merits of his ADA claim.

## D.  Balance of Harms and Public Interest

Under the final injunction factor, the Court must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief, as well as the public consequences in employing the extraordinary remedy of injunction." Yang, 960 F.3d at 135–36 (internal quotations marks and citations omitted).

Sampson argues that the balance of harms weighs in his favor, as "NBME's denials of Sampson's accommodation request denies him the opportunity to take the USMLE Step 1 in a non-discriminatory manner and on equal footing with nondisabled test-takers," while "[e]xtended testing time is not logistically difficult to provide," and "it will cost NBME nothing to grant [his requested] accommodation[s]."  (Sampson Mem. at 22.)  NBME contends that Sampson's reasoning "misses the mark," as "[t]he harm here has nothing to do with logistics or cost, and everything to do with ensuring fairness to other examinees, preserving the integrity of the USMLE, and protecting the public welfare."  (NBME Opp'n at 24.)

This factor favors Sampson.  The Court recognizes that NBME's "procedures are designed to ensure that individuals with bona fide disabilities receive accommodations, and that those without disabilities do not receive accommodations that they are not entitled to, and which could provide them with an unfair advantage when taking the medical licensing examination." Powell v. Nat'l Bd. of Med. Examiners, 364 F.3d 79, 88 (2d Cir. 2004).  Nevertheless, it is equally true that, "[a]s administrator of the national exam used by a number of states for licensing medical doctors, [NBME] has a duty to ensure that its examination is fairly administered to all those taking

39

**SPA39**

it." Id. at 88–89 (emphasis added).  See also 28 C.F.R. § 36.309(b)(1)(i) (requiring testing entities to select and administer exams "so as to best ensure that, when the examination is administered to an individual with a disability . . . the examination results accurately reflect the individual's aptitude or achievement level . . . rather than reflecting the individual's impaired sensory, manual, or speaking skills").  As discussed above, Sampson has demonstrated that his requested accommodations are necessary to ensure that when he takes Step 1, he will be tested on his aptitude and knowledge of the subject matter—not on whether he can overcome his disability.  Without his requested accommodations, Sampson risks failing Step 1 and losing the opportunity to progress in his medical training.  Accordingly, the balance of harms weighs in favor of granting an injunction.

Next, Sampson argues that the public interest favors enforcing the ADA, increasing the number of physicians in the United States, and allowing qualified candidates with disabilities to pursue medical careers.  (Sampson Mem. at 23.)  NBME, on the other hand, contends that Sampson's position "is based on the mistaken premise that [he] has shown he is disabled under the ADA and has a clear likelihood of succeeding on the merits of his claim."  (NBME Opp'n at 24–25.)  Moreover, according to NBME, the public interest weighs against granting a preliminary injunction where accommodations may be unwarranted because "medical licensing authorities rely on the [USMLE] to assess the competency of potential doctors." [17]  (Id. at 25.)

This factor also favors Sampson.  It is NBME's position—not Sampson's—that is based on a mistaken premise.  "In enacting the ADA, Congress demonstrated its view that the public has an interest in ensuring the eradication of discrimination on the basis of disabilities."  Ramsay, 968

---

[17]     NBME also notes that even if, as Sampson says, "[m]any areas of the United States are under-served by physicians," (Sampson Mem. at 23), Sampson has not provided any evidence that he intends to practice medicine in an underserved area, and there is a "significant question whether he will ever be licensed to practice medicine anywhere . . . given his status in medical school and the fact that he is also pursuing a business degree."  (NBME Opp'n at 25.)  Although it is correct that Sampson has offered scant support for this line of argument, the Court finds—on other grounds—that this factor weighs in his favor.

40

F.3d at 263 (quoting <u>Enyart</u>, 630 F.3d at 1167).   Sampson has shown a substantial likelihood that he is entitled to accommodations under the ADA.  Accordingly, "[g]ranting injunctive relief would further the public interest by prohibiting discrimination by testing agencies, such as the NBME, on the basis of disability."  <u>Berger</u>, 2019 WL 4040576, at *29 (collecting cases).  And because Sampson has shown a substantial likelihood that he is entitled to accommodations, there is no reason that providing him the requested accommodations will "alter[ ] the substance of" Step 1. <u>Powell</u>, 364 F.3d at 89.  Rather, the resulting scores will simply "reflect each examinee's abilities accurately."  <u>Id.</u>  Thus, the public interest weighs in favor of granting preliminary injunctive relief.

### III.    CONCLUSION

For the reasons stated above, Sampson's motion for a preliminary injunction is GRANTED.  NBME is ORDERED to provide the following accommodations to Sampson on the USMLE Step 1 exam:  100% additional testing time (double time), a separate testing room, and extended breaks.

**SO ORDERED.**

Dated:  December 2, 2022
Central Islip, New York

_____/s/_____(JMA)_____
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE

**SPA41**

<div style="border:1px solid black">

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 126. Equal Opportunity for Individuals with Disabilities (Refs & Annos)

</div>

42 U.S.C.A. § 12102

§ 12102. Definition of disability

Effective: January 1, 2009

Currentness

As used in this chapter:

**(1) Disability**

The term "disability" means, with respect to an individual--

  **(A)** a physical or mental impairment that substantially limits one or more major life activities of such individual;

  **(B)** a record of such an impairment; or

  **(C)** being regarded as having such an impairment (as described in paragraph (3)).

**(2) Major life activities**

  **(A) In general**

  For purposes of paragraph (1), major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.

  **(B) Major bodily functions**

  For purposes of paragraph (1), a major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.

**(3) Regarded as having such an impairment**

For purposes of paragraph (1)(C):

**(A)** An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

**(B)** Paragraph (1)(C) shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less.

**(4) Rules of construction regarding the definition of disability**

The definition of "disability" in paragraph (1) shall be construed in accordance with the following:

**(A)** The definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter.

**(B)** The term "substantially limits" shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008.

**(C)** An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability.

**(D)** An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

**(E)(i)** The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as--

**(I)** medication, medical supplies, equipment, or appliances, low-vision devices (which do not include ordinary eyeglasses or contact lenses), prosthetics including limbs and devices, hearing aids and cochlear implants or other implantable hearing devices, mobility devices, or oxygen therapy equipment and supplies;

**(II)** use of assistive technology;

**(III)** reasonable accommodations or auxiliary aids or services; or

**(IV)** learned behavioral or adaptive neurological modifications.

**(ii)** The ameliorative effects of the mitigating measures of ordinary eyeglasses or contact lenses shall be considered in determining whether an impairment substantially limits a major life activity.

**(iii)** As used in this subparagraph--

**(I)** the term "ordinary eyeglasses or contact lenses" means lenses that are intended to fully correct visual acuity or eliminate refractive error; and

**(II)** the term "low-vision devices" means devices that magnify, enhance, or otherwise augment a visual image.

## CREDIT(S)

(Pub.L. 101-336, § 3, July 26, 1990, 104 Stat. 329; Pub.L. 110-325, § 4(a), Sept. 25, 2008, 122 Stat. 3555.)

42 U.S.C.A. § 12102, 42 USCA § 12102
Current through P.L. 117-262. Some statute sections may be more current, see credits for details.

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 126. Equal Opportunity for Individuals with Disabilities (Refs & Annos)
      Subchapter III. Public Accommodations and Services Operated by Private Entities (Refs & Annos)

42 U.S.C.A. § 12182

§ 12182. Prohibition of discrimination by public accommodations

Currentness

**(a) General rule**

No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

**(b) Construction**

**(1) General prohibition**

**(A) Activities**

**(i) Denial of participation**

It shall be discriminatory to subject an individual or class of individuals on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements, to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity.

**(ii) Participation in unequal benefit**

It shall be discriminatory to afford an individual or class of individuals, on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements with the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals.

**(iii) Separate benefit**

It shall be discriminatory to provide an individual or class of individuals, on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements with a good, service, facility, privilege, advantage, or accommodation that is different or separate from that provided to other individuals, unless such

SPA45

action is necessary to provide the individual or class of individuals with a good, service, facility, privilege, advantage, or accommodation, or other opportunity that is as effective as that provided to others.

**(iv) Individual or class of individuals**

For purposes of clauses (i) through (iii) of this subparagraph, the term "individual or class of individuals" refers to the clients or customers of the covered public accommodation that enters into the contractual, licensing or other arrangement.

**(B) Integrated settings**

Goods, services, facilities, privileges, advantages, and accommodations shall be afforded to an individual with a disability in the most integrated setting appropriate to the needs of the individual.

**(C) Opportunity to participate**

Notwithstanding the existence of separate or different programs or activities provided in accordance with this section, an individual with a disability shall not be denied the opportunity to participate in such programs or activities that are not separate or different.

**(D) Administrative methods**

An individual or entity shall not, directly or through contractual or other arrangements, utilize standards or criteria or methods of administration--

**(i)** that have the effect of discriminating on the basis of disability; or

**(ii)** that perpetuate the discrimination of others who are subject to common administrative control.

**(E) Association**

It shall be discriminatory to exclude or otherwise deny equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association.

**(2) Specific prohibitions**

**(A) Discrimination**

For purposes of subsection (a), discrimination includes--

**(i)** the imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any goods, services, facilities, privileges,

advantages, or accommodations, unless such criteria can be shown to be necessary for the provision of the goods, services, facilities, privileges, advantages, or accommodations being offered;

**(ii)** a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations;

**(iii)** a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden;

**(iv)** a failure to remove architectural barriers, and communication barriers that are structural in nature, in existing facilities, and transportation barriers in existing vehicles and rail passenger cars used by an establishment for transporting individuals (not including barriers that can only be removed through the retrofitting of vehicles or rail passenger cars by the installation of a hydraulic or other lift), where such removal is readily achievable; and

**(v)** where an entity can demonstrate that the removal of a barrier under clause (iv) is not readily achievable, a failure to make such goods, services, facilities, privileges, advantages, or accommodations available through alternative methods if such methods are readily achievable.

**(B) Fixed route system**

**(i) Accessibility**

It shall be considered discrimination for a private entity which operates a fixed route system and which is not subject to section 12184 of this title to purchase or lease a vehicle with a seating capacity in excess of 16 passengers (including the driver) for use on such system, for which a solicitation is made after the 30th day following the effective date of this subparagraph, that is not readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs.

**(ii) Equivalent service**

If a private entity which operates a fixed route system and which is not subject to section 12184 of this title purchases or leases a vehicle with a seating capacity of 16 passengers or less (including the driver) for use on such system after the effective date of this subparagraph that is not readily accessible to or usable by individuals with disabilities, it shall be considered discrimination for such entity to fail to operate such system so that, when viewed in its entirety, such system ensures a level of service to individuals with disabilities, including individuals who use wheelchairs, equivalent to the level of service provided to individuals without disabilities.

**(C) Demand responsive system**

For purposes of subsection (a), discrimination includes--

**(i)** a failure of a private entity which operates a demand responsive system and which is not subject to section 12184 of this title to operate such system so that, when viewed in its entirety, such system ensures a level of service to individuals with disabilities, including individuals who use wheelchairs, equivalent to the level of service provided to individuals without disabilities; and

**(ii)** the purchase or lease by such entity for use on such system of a vehicle with a seating capacity in excess of 16 passengers (including the driver), for which solicitations are made after the 30th day following the effective date of this subparagraph, that is not readily accessible to and usable by individuals with disabilities (including individuals who use wheelchairs) unless such entity can demonstrate that such system, when viewed in its entirety, provides a level of service to individuals with disabilities equivalent to that provided to individuals without disabilities.

**(D) Over-the-road buses**

**(i) Limitation on applicability**

Subparagraphs (B) and (C) do not apply to over-the-road buses.

**(ii) Accessibility requirements**

For purposes of subsection (a), discrimination includes (I) the purchase or lease of an over-the-road bus which does not comply with the regulations issued under section 12186(a)(2) of this title by a private entity which provides transportation of individuals and which is not primarily engaged in the business of transporting people, and (II) any other failure of such entity to comply with such regulations.

**(3) Specific construction**

Nothing in this subchapter shall require an entity to permit an individual to participate in or benefit from the goods, services, facilities, privileges, advantages and accommodations of such entity where such individual poses a direct threat to the health or safety of others. The term "direct threat" means a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services.

**CREDIT(S)**

(Pub.L. 101-336, Title III, § 302, July 26, 1990, 104 Stat. 355.)

42 U.S.C.A. § 12182, 42 USCA § 12182
Current through P.L. 117-262. Some statute sections may be more current, see credits for details.

United States Code Annotated
    Title 42. The Public Health and Welfare
        Chapter 126. Equal Opportunity for Individuals with Disabilities (Refs & Annos)
            Subchapter III. Public Accommodations and Services Operated by Private Entities (Refs & Annos)

42 U.S.C.A. § 12186

§ 12186. Regulations

Currentness

**(a) Transportation provisions**

**(1) General rule**

Not later than 1 year after July 26, 1990, the Secretary of Transportation shall issue regulations in an accessible format to carry out sections [1] 12182(b)(2)(B) and (C) of this title and to carry out section 12184 of this title (other than subsection (b)(4)).

**(2) Special rules for providing access to over-the-road buses**

**(A) Interim requirements**

**(i) Issuance**

Not later than 1 year after July 26, 1990, the Secretary of Transportation shall issue regulations in an accessible format to carry out sections 12184(b)(4) and 12182(b)(2)(D)(ii) of this title that require each private entity which uses an over-the-road bus to provide transportation of individuals to provide accessibility to such bus; except that such regulations shall not require any structural changes in over-the-road buses in order to provide access to individuals who use wheelchairs during the effective period of such regulations and shall not require the purchase of boarding assistance devices to provide access to such individuals.

**(ii) Effective period**

The regulations issued pursuant to this subparagraph shall be effective until the effective date of the regulations issued under subparagraph (B).

**(B) Final requirement**

**(i) Review of study and interim requirements**

The Secretary shall review the study submitted under section 12185 of this title and the regulations issued pursuant to subparagraph (A).

**(ii) Issuance**

Not later than 1 year after the date of the submission of the study under section 12185 of this title, the Secretary shall issue in an accessible format new regulations to carry out sections 12184(b)(4) and 12182(b)(2)(D)(ii) of this title that require, taking into account the purposes of the study under section 12185 of this title and any recommendations resulting from such study, each private entity which uses an over-the-road bus to provide transportation to individuals to provide accessibility to such bus to individuals with disabilities, including individuals who use wheelchairs.

**(iii) Effective period**

Subject to section 12185(d) of this title, the regulations issued pursuant to this subparagraph shall take effect--

**(I)** with respect to small providers of transportation (as defined by the Secretary), 3 years after the date of issuance of final regulations under clause (ii); and

**(II)** with respect to other providers of transportation, 2 years after the date of issuance of such final regulations.

**(C) Limitation on requiring installation of accessible restrooms**

The regulations issued pursuant to this paragraph shall not require the installation of accessible restrooms in over-the-road buses if such installation would result in a loss of seating capacity.

**(3) Standards**

The regulations issued pursuant to this subsection shall include standards applicable to facilities and vehicles covered by sections 12182(b)(2) and 12184 of this title.

**(b) Other provisions**

Not later than 1 year after July 26, 1990, the Attorney General shall issue regulations in an accessible format to carry out the provisions of this subchapter not referred to in subsection (a) that include standards applicable to facilities and vehicles covered under section 12182 of this title.

**(c) Consistency with ATBCB guidelines**

Standards included in regulations issued under subsections (a) and (b) shall be consistent with the minimum guidelines and requirements issued by the Architectural and Transportation Barriers Compliance Board in accordance with section 12204 of this title.

**(d) Interim accessibility standards**

**(1) Facilities**

If final regulations have not been issued pursuant to this section, for new construction or alterations for which a valid and appropriate State or local building permit is obtained prior to the issuance of final regulations under this section, and for which the construction or alteration authorized by such permit begins within one year of the receipt of such permit and is completed under the terms of such permit, compliance with the Uniform Federal Accessibility Standards in effect at the time the building permit is issued shall suffice to satisfy the requirement that facilities be readily accessible to and usable by persons with disabilities as required under section 12183 of this title, except that, if such final regulations have not been issued one year after the Architectural and Transportation Barriers Compliance Board has issued the supplemental minimum guidelines required under section 12204(a) of this title, compliance with such supplemental minimum guidelines shall be necessary to satisfy the requirement that facilities be readily accessible to and usable by persons with disabilities prior to issuance of the final regulations.

**(2) Vehicles and rail passenger cars**

If final regulations have not been issued pursuant to this section, a private entity shall be considered to have complied with the requirements of this subchapter, if any, that a vehicle or rail passenger car be readily accessible to and usable by individuals with disabilities, if the design for such vehicle or car complies with the laws and regulations (including the Minimum Guidelines and Requirements for Accessible Design and such supplemental minimum guidelines as are issued under section 12204(a) of this title) governing accessibility of such vehicles or cars, to the extent that such laws and regulations are not inconsistent with this subchapter and are in effect at the time such design is substantially completed.

**CREDIT(S)**

(Pub.L. 101-336, Title III, § 306, July 26, 1990, 104 Stat. 361; Pub.L. 104-59, Title III, § 341, Nov. 28, 1995, 109 Stat. 608.)

**Footnotes**

1        So in original. Probably should be "section".

42 U.S.C.A. § 12186, 42 USCA § 12186
Current through P.L. 117-262. Some statute sections may be more current, see credits for details.

**End of Document**                                           © 2023 Thomson Reuters. No claim to original U.S. Government Works.

SPA51

United States Code Annotated
    Title 42. The Public Health and Welfare
        Chapter 126. Equal Opportunity for Individuals with Disabilities (Refs & Annos)
            Subchapter III. Public Accommodations and Services Operated by Private Entities (Refs & Annos)

42 U.S.C.A. § 12189

§ 12189. Examinations and courses

Currentness

Any person that offers examinations or courses related to applications, licensing, certification, or credentialing for secondary or postsecondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals.

**CREDIT(S)**

(Pub.L. 101-336, Title III, § 309, July 26, 1990, 104 Stat. 365.)

42 U.S.C.A. § 12189, 42 USCA § 12189
Current through P.L. 117-262. Some statute sections may be more current, see credits for details.

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 126. Equal Opportunity for Individuals with Disabilities (Refs & Annos)
      Subchapter IV. Miscellaneous Provisions

42 U.S.C.A. § 12205a

§ 12205a. Rule of construction regarding regulatory authority

Effective: January 1, 2009

Currentness

The authority to issue regulations granted to the Equal Employment Opportunity Commission, the Attorney General, and the Secretary of Transportation under this chapter includes the authority to issue regulations implementing the definitions of disability in section 12102 of this title (including rules of construction) and the definitions in section 12103 of this title, consistent with the ADA Amendments Act of 2008.

**CREDIT(S)**

(Pub.L. 101-336, Title V, § 506, as added Pub.L. 110-325, § 6(a)(2), Sept. 25, 2008, 122 Stat. 3558.)

42 U.S.C.A. § 12205a, 42 USCA § 12205a
Current through P.L. 117-262. Some statute sections may be more current, see credits for details.

**End of Document**                                        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 126. Equal Opportunity for Individuals with Disabilities (Refs & Annos)
      Subchapter IV. Miscellaneous Provisions

42 U.S.C.A. § 12206

§ 12206. Technical assistance

Effective: January 1, 2009

Currentness

**(a) Plan for assistance**

**(1) In general**

Not later than 180 days after July 26, 1990, the Attorney General, in consultation with the Chair of the Equal Employment Opportunity Commission, the Secretary of Transportation, the Chair of the Architectural and Transportation Barriers Compliance Board, and the Chairman of the Federal Communications Commission, shall develop a plan to assist entities covered under this chapter, and other Federal agencies, in understanding the responsibility of such entities and agencies under this chapter.

**(2) Publication of plan**

The Attorney General shall publish the plan referred to in paragraph (1) for public comment in accordance with subchapter II of chapter 5 of Title 5 (commonly known as the Administrative Procedure Act).

**(b) Agency and public assistance**

The Attorney General may obtain the assistance of other Federal agencies in carrying out subsection (a), including the National Council on Disability, the President's Committee on Employment of People with Disabilities, the Small Business Administration, and the Department of Commerce.

**(c) Implementation**

**(1) Rendering assistance**

Each Federal agency that has responsibility under paragraph (2) for implementing this chapter may render technical assistance to individuals and institutions that have rights or duties under the respective subchapter or subchapters of this chapter for which such agency has responsibility.

**(2) Implementation of subchapters**

**(A) Subchapter I**

The Equal Employment Opportunity Commission and the Attorney General shall implement the plan for assistance developed under subsection (a), for subchapter I.

**(B) Subchapter II**

**(i) Part A**

The Attorney General shall implement such plan for assistance for part A of subchapter II.

**(ii) Part B**

The Secretary of Transportation shall implement such plan for assistance for part B of subchapter II.

**(C) Subchapter III**

The Attorney General, in coordination with the Secretary of Transportation and the Chair of the Architectural Transportation Barriers Compliance Board, shall implement such plan for assistance for subchapter III, except for section 12184 of this title, the plan for assistance for which shall be implemented by the Secretary of Transportation.

**(D) Title IV**

The Chairman of the Federal Communications Commission, in coordination with the Attorney General, shall implement such plan for assistance for title IV.

**(3) Technical assistance manuals**

Each Federal agency that has responsibility under paragraph (2) for implementing this chapter shall, as part of its implementation responsibilities, ensure the availability and provision of appropriate technical assistance manuals to individuals or entities with rights or duties under this chapter no later than six months after applicable final regulations are published under subchapters I, II, and III and title IV.

**(d) Grants and contracts**

**(1) In general**

Each Federal agency that has responsibility under subsection (c)(2) for implementing this chapter may make grants or award contracts to effectuate the purposes of this section, subject to the availability of appropriations. Such grants and contracts may be awarded to individuals, institutions not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual (including educational institutions), and associations representing individuals who

Case 23-3, Document 33, 01/27/2023, 3460359, Page58 of 94

have rights or duties under this chapter. Contracts may be awarded to entities organized for profit, but such entities may not be the recipients or [1] grants described in this paragraph.

**(2) Dissemination of information**

Such grants and contracts, among other uses, may be designed to ensure wide dissemination of information about the rights and duties established by this chapter and to provide information and technical assistance about techniques for effective compliance with this chapter.

**(e) Failure to receive assistance**

An employer, public accommodation, or other entity covered under this chapter shall not be excused from compliance with the requirements of this chapter because of any failure to receive technical assistance under this section, including any failure in the development or dissemination of any technical assistance manual authorized by this section.

<div align="center">

**CREDIT(S)**

</div>

(Pub.L. 101-336, Title V, § 507, formerly § 506, July 26, 1990, 104 Stat. 371; renumbered § 507, Pub.L. 110-325, § 6(a) (2), Sept. 25, 2008, 122 Stat. 3558.)

<div align="center">

**Footnotes**

</div>

1    So in original. Probably should be "of".

42 U.S.C.A. § 12206, 42 USCA § 12206
Current through P.L. 117-262. Some statute sections may be more current, see credits for details.

End of Document                                                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

SPA56

Code of Federal Regulations
 Title 28. Judicial Administration
  Chapter I. Department of Justice
   Part 36. Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities (Refs & Annos)
    Subpart A. General

28 C.F.R. § 36.101

§ 36.101 Purpose and broad coverage.

Effective: October 11, 2016
Currentness

(a) Purpose. The purpose of this part is to implement subtitle A of title III of the Americans with Disabilities Act of 1990 (42 U.S.C. 12181–12189), as amended by the ADA Amendments Act of 2008 (ADA Amendments Act) (Pub.L. 110–325, 122 Stat. 3553 (2008)), which prohibits discrimination on the basis of disability by covered public accommodations and requires places of public accommodation and commercial facilities to be designed, constructed, and altered in compliance with the accessibility standards established by this part.

(b) Broad coverage. The primary purpose of the ADA Amendments Act is to make it easier for people with disabilities to obtain protection under the ADA. Consistent with the ADA Amendments Act's purpose of reinstating a broad scope of protection under the ADA, the definition of "disability" in this part shall be construed broadly in favor of expansive coverage to the maximum extent permitted by the terms of the ADA. The primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of "disability." The question of whether an individual meets the definition of "disability" under this part should not demand extensive analysis.

**Credits**
[Order No. 3702–2016, 81 FR 53240, Aug. 11, 2016]

SOURCE: 56 FR 35592, July 26, 1991; 58 FR 17522, April 5, 1993; 59 FR 2675, Jan. 18, 1994; 59 FR 17446, April 12, 1994; Order No. 2249–99, 64 FR 47103, Aug. 30, 1999; Order No. 3181–2010, 75 FR 56250, Sept. 15, 2010; Order No. 3702–2016, 81 FR 53240, Aug. 11, 2016; Order No. 3779–2016, 81 FR 87378, Dec. 2, 2016, unless otherwise noted.

AUTHORITY: 5 U.S.C. 301; 28 U.S.C. 509, 510; 42 U.S.C. 12186(b), 12205a.

Current through Jan. 23, 2023, 88 FR 3931. Some sections may be more current. See credits for details.

---

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 23-3, Document 33, 01/27/2023, 3460359, Page60 of 94

Code of Federal Regulations
Title 28. Judicial Administration
Chapter I. Department of Justice
Part 36. Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities (Refs & Annos)
Subpart A. General

28 C.F.R. § 36.105

§ 36.105 Definition of "disability."

Effective: October 11, 2016

Currentness

(a)(1) Disability means, with respect to an individual:

(i) A physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(ii) A record of such an impairment; or

(iii) Being regarded as having such an impairment as described in paragraph (f) of this section.

(2) Rules of construction.

(i) The definition of "disability" shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA.

(ii) An individual may establish coverage under any one or more of the three prongs of the definition of "disability" in paragraph (a)(1) of this section, the "actual disability" prong in paragraph (a)(1)(i) of this section, the "record of" prong in paragraph (a)(1)(ii) of this section, or the "regarded as" prong in paragraph (a)(1)(iii) of this section.

(iii) Where an individual is not challenging a public accommodation's failure to provide reasonable modifications under § 36.302, it is generally unnecessary to proceed under the "actual disability" or "record of" prongs, which require a showing of an impairment that substantially limits a major life activity or a record of such an impairment. In these cases, the evaluation of coverage can be made solely under the "regarded as" prong of the definition of "disability," which does not require a showing of an impairment that substantially limits a major life activity or a record of such an impairment. An individual may choose, however, to proceed under the "actual disability" or "record of" prong regardless of whether the individual is challenging a public accommodation's failure to provide reasonable modifications.

(b)(1) Physical or mental impairment means:

Case 23-3, Document 33, 01/27/2023, 3460359, Page61 of 94

(i) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as: Neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine; or

(ii) Any mental or psychological disorder such as intellectual disability, organic brain syndrome, emotional or mental illness, and specific learning disability.

(2) Physical or mental impairment includes, but is not limited to, contagious and noncontagious diseases and conditions such as the following: Orthopedic, visual, speech and hearing impairments, and cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, intellectual disability, emotional illness, dyslexia and other specific learning disabilities, Attention Deficit Hyperactivity Disorder, Human Immunodeficiency Virus infection (whether symptomatic or asymptomatic), tuberculosis, drug addiction, and alcoholism.

(3) Physical or mental impairment does not include homosexuality or bisexuality.

(c)(1) Major life activities include, but are not limited to:

(i) Caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, writing, communicating, interacting with others, and working; and

(ii) The operation of a major bodily function, such as the functions of the immune system, special sense organs and skin, normal cell growth, and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive systems. The operation of a major bodily function includes the operation of an individual organ within a body system.

(2) Rules of construction.

(i) In determining whether an impairment substantially limits a major life activity, the term major shall not be interpreted strictly to create a demanding standard.

(ii) Whether an activity is a major life activity is not determined by reference to whether it is of central importance to daily life.

(d) Substantially limits—

(1) Rules of construction. The following rules of construction apply when determining whether an impairment substantially limits an individual in a major life activity.

Case 23-3, Document 33, 01/27/2023, 3460359, Page62 of 94

(i) The term "substantially limits" shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. "Substantially limits" is not meant to be a demanding standard.

(ii) The primary object of attention in cases brought under title III of the ADA should be whether public accommodations have complied with their obligations and whether discrimination has occurred, not the extent to which an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment substantially limits a major life activity should not demand extensive analysis.

(iii) An impairment that substantially limits one major life activity does not need to limit other major life activities in order to be considered a substantially limiting impairment.

(iv) An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

(v) An impairment is a disability within the meaning of this part if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment does not need to prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.

(vi) The determination of whether an impairment substantially limits a major life activity requires an individualized assessment. However, in making this assessment, the term "substantially limits" shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for substantially limits applied prior to the ADA Amendments Act.

(vii) The comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical evidence. Nothing in this paragraph (d)(1) is intended, however, to prohibit or limit the presentation of scientific, medical, or statistical evidence in making such a comparison where appropriate.

(viii) The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures. However, the ameliorative effects of ordinary eyeglasses or contact lenses shall be considered in determining whether an impairment substantially limits a major life activity. Ordinary eyeglasses or contact lenses are lenses that are intended to fully correct visual acuity or to eliminate refractive error.

(ix) The six-month "transitory" part of the "transitory and minor" exception in paragraph (f)(2) of this section does not apply to the "actual disability" or "record of" prongs of the definition of "disability." The effects of an impairment lasting or expected to last less than six months can be substantially limiting within the meaning of this section for establishing an actual disability or a record of a disability.

(2) Predictable assessments.

(i) The principles set forth in the rules of construction in this section are intended to provide for more generous coverage and application of the ADA's prohibition on discrimination through a framework that is predictable, consistent, and workable for all individuals and entities with rights and responsibilities under the ADA.

(ii) Applying these principles, the individualized assessment of some types of impairments will, in virtually all cases, result in a determination of coverage under paragraph (a)(1)(i) of this section (the "actual disability" prong) or paragraph (a)(1)(ii) of this section (the "record of" prong). Given their inherent nature, these types of impairments will, as a factual matter, virtually always be found to impose a substantial limitation on a major life activity. Therefore, with respect to these types of impairments, the necessary individualized assessment should be particularly simple and straightforward.

(iii) For example, applying these principles it should easily be concluded that the types of impairments set forth in paragraphs (d)(2)(iii)(A) through (K) of this section will, at a minimum, substantially limit the major life activities indicated. The types of impairments described in this paragraph may substantially limit additional major life activities (including major bodily functions) not explicitly listed in paragraphs (d)(2)(iii)(A) through (K).

(A) Deafness substantially limits hearing;

(B) Blindness substantially limits seeing;

(C) Intellectual disability substantially limits brain function;

(D) Partially or completely missing limbs or mobility impairments requiring the use of a wheelchair substantially limit musculoskeletal function;

(E) Autism substantially limits brain function;

(F) Cancer substantially limits normal cell growth;

(G) Cerebral palsy substantially limits brain function;

(H) Diabetes substantially limits endocrine function;

(I) Epilepsy, muscular dystrophy, and multiple sclerosis each substantially limits neurological function;

(J) Human Immunodeficiency Virus (HIV) infection substantially limits immune function; and

(K) Major depressive disorder, bipolar disorder, post-traumatic stress disorder, traumatic brain injury, obsessive compulsive disorder, and schizophrenia each substantially limits brain function.

Case 23-3, Document 33, 01/27/2023, 3460359, Page64 of 94

(3) Condition, manner, or duration.

(i) At all times taking into account the principles set forth in the rules of construction, in determining whether an individual is substantially limited in a major life activity, it may be useful in appropriate cases to consider, as compared to most people in the general population, the conditions under which the individual performs the major life activity; the manner in which the individual performs the major life activity; or the duration of time it takes the individual to perform the major life activity, or for which the individual can perform the major life activity.

(ii) Consideration of facts such as condition, manner, or duration may include, among other things, consideration of the difficulty, effort or time required to perform a major life activity; pain experienced when performing a major life activity; the length of time a major life activity can be performed; or the way an impairment affects the operation of a major bodily function. In addition, the non-ameliorative effects of mitigating measures, such as negative side effects of medication or burdens associated with following a particular treatment regimen, may be considered when determining whether an individual's impairment substantially limits a major life activity.

(iii) In determining whether an individual has a disability under the "actual disability" or "record of" prongs of the definition of "disability," the focus is on how a major life activity is substantially limited, and not on what outcomes an individual can achieve. For example, someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in one or more major life activities, including, but not limited to, reading, writing, speaking, or learning because of the additional time or effort he or she must spend to read, write, speak, or learn compared to most people in the general population.

(iv) Given the rules of construction set forth in this section, it may often be unnecessary to conduct an analysis involving most or all of the facts related to condition, manner, or duration. This is particularly true with respect to impairments such as those described in paragraph (d)(2)(iii) of this section, which by their inherent nature should be easily found to impose a substantial limitation on a major life activity, and for which the individualized assessment should be particularly simple and straightforward.

(4) Mitigating measures include, but are not limited to:

(i) Medication, medical supplies, equipment, appliances, low-vision devices (defined as devices that magnify, enhance, or otherwise augment a visual image, but not including ordinary eyeglasses or contact lenses), prosthetics including limbs and devices, hearing aid(s) and cochlear implant(s) or other implantable hearing devices, mobility devices, and oxygen therapy equipment and supplies;

(ii) Use of assistive technology;

(iii) Reasonable modifications or auxiliary aids or services as defined in this regulation;

(iv) Learned behavioral or adaptive neurological modifications; or

Case 23-3, Document 33, 01/27/2023, 3460359, Page65 of 94

(v) Psychotherapy, behavioral therapy, or physical therapy.

(e) Has a record of such an impairment.

(1) An individual has a record of such an impairment if the individual has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.

(2) Broad construction. Whether an individual has a record of an impairment that substantially limited a major life activity shall be construed broadly to the maximum extent permitted by the ADA and should not demand extensive analysis. An individual will be considered to fall within this prong of the definition of "disability" if the individual has a history of an impairment that substantially limited one or more major life activities when compared to most people in the general population, or was misclassified as having had such an impairment. In determining whether an impairment substantially limited a major life activity, the principles articulated in paragraph (d)(1) of this section apply.

(3) Reasonable modification. An individual with a record of a substantially limiting impairment may be entitled to a reasonable modification if needed and related to the past disability.

(f) Is regarded as having such an impairment. The following principles apply under the "regarded as" prong of the definition of "disability" (paragraph (a)(1)(iii) of this section):

(1) Except as set forth in paragraph (f)(2) of this section, an individual is "regarded as having such an impairment" if the individual is subjected to a prohibited action because of an actual or perceived physical or mental impairment, whether or not that impairment substantially limits, or is perceived to substantially limit, a major life activity, even if the public accommodation asserts, or may or does ultimately establish, a defense to the action prohibited by the ADA.

(2) An individual is not "regarded as having such an impairment" if the public accommodation demonstrates that the impairment is, objectively, both "transitory" and "minor." A public accommodation may not defeat "regarded as" coverage of an individual simply by demonstrating that it subjectively believed the impairment was transitory and minor; rather, the public accommodation must demonstrate that the impairment is (in the case of an actual impairment) or would be (in the case of a perceived impairment), objectively, both "transitory" and "minor." For purposes of this section, "transitory" is defined as lasting or expected to last six months or less.

(3) Establishing that an individual is "regarded as having such an impairment" does not, by itself, establish liability. Liability is established under title III of the ADA only when an individual proves that a public accommodation discriminated on the basis of disability within the meaning of title III of the ADA, 42 U.S.C. 12181–12189.

(g) Exclusions. The term "disability" does not include—

(1) Transvestism, transsexualism, pedophilia, exhibitionism, voyeurism, gender identity disorders not resulting from physical impairments, or other sexual behavior disorders;

Case 23-3, Document 33, 01/27/2023, 3460359, Page66 of 94

(2) Compulsive gambling, kleptomania, or pyromania; or

(3) Psychoactive substance use disorders resulting from current illegal use of drugs.

**Credits**

[Order No. 3702–2016, 81 FR 53240, Aug. 11, 2016]

SOURCE: 56 FR 35592, July 26, 1991; 58 FR 17522, April 5, 1993; 59 FR 2675, Jan. 18, 1994; 59 FR 17446, April 12, 1994; Order No. 2249–99, 64 FR 47103, Aug. 30, 1999; Order No. 3181–2010, 75 FR 56250, Sept. 15, 2010; Order No. 3702–2016, 81 FR 53240, Aug. 11, 2016; Order No. 3779–2016, 81 FR 87378, Dec. 2, 2016, unless otherwise noted.

AUTHORITY: 5 U.S.C. 301; 28 U.S.C. 509, 510; 42 U.S.C. 12186(b), 12205a.

Current through Jan. 23, 2023, 88 FR 3931. Some sections may be more current. See credits for details.

---

**End of Document**                                      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 28. Judicial Administration
    Chapter I. Department of Justice
      Part 36. Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities (Refs & Annos)
        Subpart C. Specific Requirements

28 C.F.R. § 36.309

§ 36.309 Examinations and courses.

Effective: March 15, 2011
Currentness

(a) General. Any private entity that offers examinations or courses related to applications, licensing, certification, or credentialing for secondary or postsecondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals.

(b) Examinations.

(1) Any private entity offering an examination covered by this section must assure that—

(i) The examination is selected and administered so as to best ensure that, when the examination is administered to an individual with a disability that impairs sensory, manual, or speaking skills, the examination results accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual, or speaking skills (except where those skills are the factors that the examination purports to measure);

(ii) An examination that is designed for individuals with impaired sensory, manual, or speaking skills is offered at equally convenient locations, as often, and in as timely a manner as are other examinations; and

(iii) The examination is administered in facilities that are accessible to individuals with disabilities or alternative accessible arrangements are made.

(iv) Any request for documentation, if such documentation is required, is reasonable and limited to the need for the modification, accommodation, or auxiliary aid or service requested.

(v) When considering requests for modifications, accommodations, or auxiliary aids or services, the entity gives considerable weight to documentation of past modifications, accommodations, or auxiliary aids or services received in similar testing situations, as well as such modifications, accommodations, or related aids and services provided in response to an Individualized Education Program (IEP) provided under the Individuals with Disabilities Education Act or a plan

describing services provided pursuant to section 504 of the Rehabilitation Act of 1973, as amended (often referred to as a Section 504 Plan).

(vi) The entity responds in a timely manner to requests for modifications, accommodations, or aids to ensure equal opportunity for individuals with disabilities.

(2) Required modifications to an examination may include changes in the length of time permitted for completion of the examination and adaptation of the manner in which the examination is given.

(3) A private entity offering an examination covered by this section shall provide appropriate auxiliary aids for persons with impaired sensory, manual, or speaking skills, unless that private entity can demonstrate that offering a particular auxiliary aid would fundamentally alter the measurement of the skills or knowledge the examination is intended to test or would result in an undue burden. Auxiliary aids and services required by this section may include taped examinations, interpreters or other effective methods of making orally delivered materials available to individuals with hearing impairments, Brailled or large print examinations and answer sheets or qualified readers for individuals with visual impairments or learning disabilities, transcribers for individuals with manual impairments, and other similar services and actions.

(4) Alternative accessible arrangements may include, for example, provision of an examination at an individual's home with a proctor if accessible facilities or equipment are unavailable. Alternative arrangements must provide comparable conditions to those provided for nondisabled individuals.

(c) Courses.

(1) Any private entity that offers a course covered by this section must make such modifications to that course as are necessary to ensure that the place and manner in which the course is given are accessible to individuals with disabilities.

(2) Required modifications may include changes in the length of time permitted for the completion of the course, substitution of specific requirements, or adaptation of the manner in which the course is conducted or course materials are distributed.

(3) A private entity that offers a course covered by this section shall provide appropriate auxiliary aids and services for persons with impaired sensory, manual, or speaking skills, unless the private entity can demonstrate that offering a particular auxiliary aid or service would fundamentally alter the course or would result in an undue burden. Auxiliary aids and services required by this section may include taped texts, interpreters or other effective methods of making orally delivered materials available to individuals with hearing impairments, Brailled or large print texts or qualified readers for individuals with visual impairments and learning disabilities, classroom equipment adapted for use by individuals with manual impairments, and other similar services and actions.

(4) Courses must be administered in facilities that are accessible to individuals with disabilities or alternative accessible arrangements must be made.

(5) Alternative accessible arrangements may include, for example, provision of the course through videotape, cassettes, or prepared notes. Alternative arrangements must provide comparable conditions to those provided for nondisabled individuals.


**Credits**

[Order No. 3181–2010, 75 FR 56255, Sept. 15, 2010]


SOURCE: 56 FR 35592, July 26, 1991; 58 FR 17522, April 5, 1993; 59 FR 2675, Jan. 18, 1994; 59 FR 17446, April 12, 1994; Order No. 2249–99, 64 FR 47103, Aug. 30, 1999; Order No. 3181–2010, 75 FR 56250, Sept. 15, 2010; Order No. 3702–2016, 81 FR 53240, Aug. 11, 2016; Order No. 3779–2016, 81 FR 87378, Dec. 2, 2016, unless otherwise noted.


AUTHORITY: 5 U.S.C. 301; 28 U.S.C. 509, 510; 42 U.S.C. 12186(b), 12205a.


Current through Jan. 23, 2023, 88 FR 3931. Some sections may be more current. See credits for details.

---

**End of Document**
© 2023 Thomson Reuters. No claim to original U.S. Government Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

75 FR 56236-01, 2010 WL 3561890(F.R.)

RULES and REGULATIONS

DEPARTMENT OF JUSTICE

28 CFR Part 36

[CRT Docket No. 106; AG Order No. 3181-2010]

RIN 1190-AA44


Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities

Wednesday, September 15, 2010


AGENCY: Department of Justice, Civil Rights Division.


**\*56236**  ACTION: Final rule.

SUMMARY: This final rule revises the Department of Justice (Department) regulation that implements title III of the Americans with Disabilities Act  **\*56237**  (ADA), relating to nondiscrimination on the basis of disability by public accommodations and in commercial facilities. The Department is issuing this final rule in order to adopt enforceable accessibility standards under the Americans with Disabilities Act of 1990 (ADA) that are consistent with the minimum guidelines and requirements issued by the Architectural and Transportation Barriers Compliance Board, and to update or amend certain provisions of the title III regulation so that they comport with the Department's legal and practical experiences in enforcing the ADA since 1991. Concurrently with the publication of the final rule for title III, the Department is publishing a final rule amending its ADA title II regulation, which covers nondiscrimination on the basis of disability in State and local government services.

DATES: Effective Date: March 15, 2011.

FOR FURTHER INFORMATION CONTACT: Janet L. Blizard, Deputy Chief, or Christina Galindo-Walsh, Attorney Advisor, Disability Rights Section, Civil Rights Division, U.S. Department of Justice, at (202) 307-0663 (voice or TTY). This is not a toll-free number. Information may also be obtained from the Department's toll-free ADA Information Line at (800) 514-0301 (voice) or (800) 514-0383 (TTY).

This rule is also available in an accessible format on the ADA Home Page at http://www.ada.gov. You may obtain copies of this rule in large print or on computer disk by calling the ADA Information Line listed above.


SUPPLEMENTARY INFORMATION:

### The Roles of the Access Board and the Department of Justice

The Access Board was established by section 502 of the Rehabilitation Act of 1973. 29 U.S.C. 792. The Board consists of 13 public members appointed by the President, the majority of whom must be individuals with disabilities, and the heads of 12 Federal departments and agencies specified by statute, including the heads of the Department of Justice and the Department of Transportation (DOT). Originally, the Access Board was established to develop and maintain accessibility guidelines for facilities designed, constructed, altered, or leased with Federal dollars under the Architectural Barriers Act of 1968 (ABA). 42 U.S.C. 4151 et seq. The passage of the ADA expanded the Access Board's responsibilities.

The ADA requires the Access Board to "issue minimum guidelines that shall supplement the existing Minimum Guidelines and Requirements for Accessible Design for purposes of subchapters II and III of this chapter \* \* \* to ensure that buildings, facilities, rail passenger cars, and vehicles are accessible, in terms of architecture and design, transportation, and communication, to individuals with disabilities." 42 U.S.C. 12204. The ADA requires the Department to issue regulations that include enforceable accessibility standards applicable to facilities subject to title II or title III that are consistent with the "minimum guidelines"



Because there was little to no support for the Department's proposed use of gross revenue and no workable alternatives are available at this time, the Department will not adopt a small business safe harbor in this final rule. Small business public accommodations are subject to the barrier removal requirements set out in § 36.304 of the final rule. In addition, the Department plans to provide small businesses with more detailed guidance on assessing and meeting their barrier removal obligations in a small business compliance guide.

### Section 36.308 *Seating in Assembly Areas*

In the 1991 rule, § 36.308 covered seating obligations for public accommodations in assembly areas. It was bifurcated into (a) existing facilities and (b) new construction and alterations. The new construction and alterations provision, § 36.308(b), merely stated that assembly areas should be built or altered in accordance with the applicable provisions in the 1991 Standards. Section 36.308(a), by contrast, provided detailed guidelines on what barrier removal was required.

The Department explained in the preamble to the 1991 rule that § 36.308 provided specific rules on assembly areas to ensure that wheelchair users, who typically were relegated to inferior seating in the back of assembly areas separate from their friends and family, would be provided access to seats that were integrated and equal in quality to those provided to the general public. Specific guidance on assembly areas was desirable because they are found in many different types of places of public accommodation, ranging from opera houses (places of exhibition or entertainment) to private university lecture halls (places of education), and include assembly areas that range in size from small movie theaters of 100 or fewer seats to 100,000-seat sports stadiums.

In the NPRM, the Department proposed to update § 36.308(a) by incorporating some of the applicable assembly area provisions from the 2010 Standards. Upon further review, however, the Department has determined that the need to provide special guidance for assembly areas in a separate section no longer exists, except for specialty seating areas, as discussed below. Since enactment of the ADA, the Department has interpreted the 1991 Standards as a guide for determining the existence of barriers. Courts have affirmed this interpretation. See, e.g., Colorado Cross Disability Coalition v. Too, Inc., 344 F. Supp. 2d 707 (D. Colo. 2004); Access Now, Inc. v. AMH CGH, Inc., 2001 WL 1005593 (S.D. Fla. 2001); Pascuiti v. New York Yankees, 87 F. Supp. 2d 221 (S.D.N.Y. 1999). The 2010 Standards now establish detailed guidance for newly constructed and altered assembly areas, which is provided in § 36.406(f), and these Standards will serve as a new guide for barrier removal. Accordingly, the former § 36.308(a) has been replaced in the final rule. Assembly areas will benefit from the same safe harbor provisions applicable to barrier removal in all places of public accommodations as provided in § 36.304(d)(2) of the final rule.

The Department has also decided to remove proposed § 36.308(c)(2) from the final rule. This provision would have required assembly areas with more than 5,000 seats to provide five wheelchair spaces with at least **\*56296** three designated companion seats for each of those five wheelchair spaces. The Department agrees with commenters who asserted that group seating already is addressed more appropriately in ticketing under § 36.302(f).

The Department has determined that proposed § 36.308(c)(1), addressing specialty seating in assembly areas, should remain as § 36.308 in the final rule with additional language. This paragraph is designed to ensure that individuals with disabilities have an opportunity to access specialty seating areas that entitle spectators to distinct services or amenities not generally available to others. This provision is not, as several commenters mistakenly thought, designed to cover luxury boxes and suites. Those areas have separate requirements outlined in section 221 of the 2010 Standards.

Section 36.308 requires only that accessible seating be provided in each area with distinct services or amenities. To the extent a covered entity provides multiple seating areas with the same services and amenities, each of those areas would not be distinct and thus all of them would not be required to be accessible. For example, if a facility has similar dining service in two areas, both areas would not need to be made accessible; however, if one dining service area is open to families, while the other is open only to individuals over the age of 21, both areas would need to be made accessible. Factors distinguishing specialty seating areas generally are dictated by the type of facility or event, but may include, for example, such distinct services and amenities as access to wait staff for in-seat food or beverage service; availability of catered food or beverages for pre-game, intermission,

Nondiscrimination on the Basis of Disability by Public..., 75 FR 56236-01

or post-game events; restricted access to lounges with special amenities, such as couches or flat-screen televisions; or access to team personnel or facilities for team-sponsored events (e.g., autograph sessions, sideline passes, or facility tours) not otherwise available to other spectators.

The NPRM required public accommodations to locate wheelchair seating spaces and companion seats in each specialty seating area within the assembly area. The Department has added language in the final rule stating that public accommodations that cannot place wheelchair seating spaces and companion seats in each specialty area because it is not readily achievable to do so may meet their obligation by providing specialty services or amenities to individuals with disabilities and their companions at other designated accessible locations at no additional cost. For example, if a theater that only has barrier removal obligations provides wait service to spectators in the mezzanine, and it is not readily achievable to place accessible seating there, it may meet its obligation by providing wait service to patrons with disabilities who use wheelchairs and their companions at other designated accessible locations at no additional cost. This provision does not obviate the obligation to comply with applicable requirements for new construction and alterations, including dispersion of accessible seating.

*Section 36.309* **Examinations and Courses**

Section 36.309(a) sets forth the general rule that any private entity that offers examinations or courses relating to applications, licensing, certification, or credentialing for secondary or postsecondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals. In the NPRM preamble and proposed regulatory amendment and in this final rule, the Department relied on its history of enforcement efforts, research, and body of knowledge of testing and modifications, accommodations, and aids in detailing steps testing entities should take to ensure that persons with disabilities receive appropriate modifications, accommodations, or auxiliary aids in examination and course settings as required by the ADA. The Department received comments from disability rights groups, organizations that administer tests, State governments, professional associations, and individuals on the language appearing in the NPRM preamble and amended regulation and has carefully considered these comments.

The Department initially set out the parameters of appropriate documentation requests relating to examinations and courses covered by this section in the 1991 preamble at 28 CFR part 36, stating that "requests for documentation must be reasonable and must be limited to the need for the modification or aid requested." See 28 CFR part 36, app. B at 735 (2009). Since that time, the Department, through its enforcement efforts pursuant to section 309, has addressed concerns that requests by testing entities for documentation regarding the existence of an individual's disability and need for a modification or auxiliary aid or service were often inappropriate and burdensome. The Department proposed language stating that while it may be appropriate for a testing entity to request that an applicant provide documentation supporting the existence of a disability and the need for a modification, accommodation, or auxiliary aid or service, the request by the testing entity for such documentation must be reasonable and limited. The NPRM proposed that testing entities should narrowly tailor requests for documentation, limiting those requests to materials that will allow the testing entities to ascertain the nature of the disability and the individual's need for the requested modification, accommodation, or auxiliary aid or service. This proposal codified the 1991 rule's preamble language regarding testing entities' requests for information supporting applicants' requests for testing modifications or accommodations.

Overall, most commenters supported this addition to the regulation. These commenters generally agreed that documentation sought by testing entities to support requests for modifications and testing accommodations should be reasonable and tailored. Commenters noted, for example, that the proposal to require reasonable and tailored documentation requests "is not objectionable. Indeed, it largely tracks DOJ's long-standing informal guidance that 'requests for documentation must be reasonable and limited to the need for the modification or aid requested.' "

Commenters including disability rights groups, State governments, professional associations, and individuals made it clear that, in addition to the proposed regulatory change, other significant problems remain for individuals with disabilities who seek necessary modifications to examinations and courses. These problems include detailed questions about the nature of documentation materials submitted by candidates, testing entities' questioning of documentation provided by qualified

professionals with expertise in the particular disability at issue, and lack of timeliness in determining whether to provide requested accommodations or modifications. Several commenters expressed enthusiasm for the preamble language addressing some of these issues, and some of these commenters recommended the incorporation of portions of this preamble language into the regulatory text. Some testing entities expressed concerns and uncertainty about the language in the preamble and sought clarifications about its meaning. These commenters focused most of their attention on the following language from the NPRM preamble:

Generally, a testing entity should accept without further inquiry documentation provided by a qualified professional who has made an individualized assessment of the applicant. Appropriate documentation may include a letter from a qualified professional or evidence of a prior diagnosis, or accommodation, or classification, such as eligibility for a special education program. When an applicant's documentation is recent and demonstrates a consistent history of a diagnosis, there is no need for further inquiry into the nature of the disability. A testing entity should consider an applicant's past use of a particular auxiliary aid or service.

73 FR 34508, 34539 (June 17, 2008).
Professional organizations, State governments, individuals, and disability rights groups fully supported the Department's preamble language and recommended further modification of the regulations to encompass the issues raised in the preamble. A disability rights group recommended that the Department incorporate the preamble language into the regulations to ensure that "documentation demands are strictly limited in scope and met per se when documentation of previously provided accommodations or aids is provided." One professional education organization noted that many testing corporations disregard the documented diagnoses of qualified professionals, and instead substitute their own, often unqualified diagnoses of individuals with disabilities. Commenters confirmed that testing entities sometimes ask for unreasonable information that is either impossible, or extremely onerous, to provide. A disability rights organization supported the Department's proposals and noted that private testing companies impose burdensome documentation requirements upon applicants with disabilities seeking accommodations and that complying with **\*56297** the documentation requests is frequently so difficult, and negotiations over the requests so prolonged, that test applicants ultimately forgo taking the test. Another disability rights group urged the Department to "expand the final regulatory language to ensure that regulations accurately provide guidance and support the comments made about reducing the burden of documenting the diagnosis and existence of a disability."

Testing entities, although generally supportive of the proposed regulatory amendment, expressed concern regarding the Department's proposed preamble language. The testing entities provided the Department with lengthy comments in which they suggested that the Department's rationale delineated in the preamble potentially could limit them from gathering meaningful and necessary documentation to determine whether, in any given circumstance, a disability is presented, whether modifications are warranted, and which modifications would be most appropriate. Some testing entities raised concerns about individuals skewing testing results by falsely claiming or feigning disabilities as an improper means of seeking advantage on an examination. Several testing entities raised concerns about and sought clarification regarding the Department's use of certain terms and concepts in the preamble, including "without further inquiry," "appropriate documentation," "qualified professional," "individualized assessment," and "consider." These entities discussed the preamble language at length, noting that testing entities need to be able to question some aspects of testing applicants' documentation or to request further documentation from some candidates when the initial documentation is unclear or incomplete. One testing entity expressed concern that the Department's preamble language would require the acceptance of a brief note on a doctor's prescription pad as adequate documentation of a disability and the need for an accommodation. One medical examination organization stated that the Department's preamble language would result in persons without disabilities receiving accommodations and passing examinations as part of a broad expansion of unwarranted accommodations, potentially endangering the health and welfare of the general public. Another medical board "strenuously objected" to the "without further inquiry" language. Several of the testing entities expressed concern that the Department's preamble language might require testing companies to accept documentation from persons with temporary or questionable disabilities, making test scores less reliable, harming persons with legitimate entitlements, and resulting in additional expense for testing companies to accommodate more test takers.

It remains the Department's view that, when testing entities receive documentation provided by a qualified professional who has made an individualized assessment of an applicant that supports the need for the modification, accommodation, or aid requested, they shall generally accept such documentation and provide the accommodation.

Several commenters sought clarifications on what types of documentation are acceptable to demonstrate the existence of a disability and the need for a requested modification, accommodation, or aid. The Department believes that appropriate documentation may vary depending on the nature of the disability and the specific modification or aid requested, and accordingly, testing entities should consider a variety of types of information submitted. Examples of types of information to consider include recommendations of qualified professionals familiar with the individual, results of psycho-educational or other professional evaluations, an applicant's history of diagnosis, participation in a special education program, observations by educators, or the applicant's past use of testing accommodations. If an applicant has been granted accommodations post-high school by a standardized testing agency, there is no need for reassessment for a subsequent examination.

Some commenters expressed concern regarding the use of the term "letter" in the proposed preamble sentence regarding appropriate documentation. The NPRM preamble language stated that "[a]ppropriate documentation may include a letter from a qualified professional or evidence of a prior diagnosis, accommodation, or classification, such as eligibility for a special education program." 73 FR 34508, 34539 (June 17, 2008). Some testing entities posited that the preamble language would require them to accept a brief letter from a doctor or even a doctor's note on a prescription pad indicating "I've been treating (student) for ADHD and he/she is entitled to extend time on the ACT." The Department's reference in the NPRM preamble to letters from physicians or other professionals was provided in order to offer examples of some types of acceptable documentation that may be considered by testing entities in evaluating the existence of an applicant's disability and the need for a certain modification, accommodation, or aid. No one piece of evidence may be dispositive in make a testing accommodation determination. The significance of a letter or other communication from a doctor or other qualified professional would depend on the professional's relationship with the candidate and the specific content of the communication, as well as how the letter fits in with the totality of the other factors used to determine testing accommodations under this rule. Similarly, an applicant's failure to provide results from a specific test or evaluation instrument should not of itself preclude approval of requests for modifications, accommodations, or aids if the documentation provided by the applicant, in its entirety, is sufficient to demonstrate that the individual has a disability and requires a requested modification, accommodation, or aid on the relevant examination. This issue is discussed in more detail below.

One disability rights organization noted that requiring a 25-year old who was diagnosed in junior high school with a learning disability and accommodated ever since "to produce elementary school report cards to demonstrate symptomology before the age of seven is unduly burdensome." The same organization commented that requiring an individual with a long and early history of disability to be assessed within three years of taking the test in question is similarly burdensome, stating that "[t]here is no scientific evidence that learning disabilities abate with time, nor that Attention Deficits abate with time * * *." This organization noted that there is no justification for repeatedly subjecting people to expensive testing regimens simply to satisfy a disbelieving industry. This is particularly true for adults with, for example, learning disabilities such as dyslexia, a persistent condition without the need for retesting once the diagnosis has been established and accepted by a standardized testing agency.

Some commenters from testing entities sought clarification regarding who may be considered a "qualified professional." Qualified professionals are licensed or otherwise properly credentialed and possess expertise in the disability for which modifications or accommodations are sought. For example, a podiatrist would not be considered to be a qualified professional to diagnose a learning disability or support a request for testing accommodations on that basis. Types of professionals who might possess the appropriate credentials and expertise are doctors (including psychiatrists), psychologists, nurses, physical therapists, occupational therapists, speech therapists, vocational rehabilitation specialists, school counselors, and licensed mental health professionals. Additionally, while testing applicants should present documentation from qualified professionals with expertise in the pertinent field, it also is critical that testing entities that review documentation submitted by prospective examinees in support of requests for testing modifications or accommodations ensure that their own reviews are conducted by qualified professionals with similarly relevant expertise.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Commenters also sought clarification of the term individualized assessment. The Department's intention in using this term is to ensure that documentation provided on behalf of a testing candidate is not only provided by a qualified professional, but also reflects that the qualified professional has individually and personally evaluated the candidate as opposed to simply considering scores from a review of documents. This is particularly important in the learning disabilities context, where proper diagnosis requires face-to-face evaluation. Reports from experts who have personal familiarity with the candidate should take precedence over those from, for example, reviewers for testing agencies, who have never personally met the candidate or conducted the requisite assessments for diagnosis and treatment.

Some testing entities objected to the NPRM preamble's use of the phrase "without further inquiry." The Department's intention here is to address the extent to which testing entities should accept documentation provided by an applicant when the testing entity is determining the need for modifications, accommodations, or auxiliary aids or services. The Department's view is that applicants who submit appropriate documentation, e.g., documentation that is **\*56298** based on the careful individual consideration of the candidate by a professional with expertise relating to the disability in question, should not be subjected to unreasonably burdensome requests for additional documentation. While some testing commenters objected to this standard, it reflects the Department's longstanding position. When an applicant's documentation demonstrates a consistent history of a diagnosis of a disability, and is prepared by a qualified professional who has made an individualized evaluation of the applicant, there is little need for further inquiry into the nature of the disability and generally testing entities should grant the requested modification, accommodation, or aid.

After a careful review of the comments, the Department has decided to maintain the proposed regulatory language on the scope of appropriate documentation in § 36.309(b)(1)(iv). The Department has also added new regulatory language at § 36.309(b)(1)(v) that provides that testing entities shall give considerable weight to documentation of past modifications, accommodations, or auxiliary aids or services received in similar testing situations as well as such modifications, accommodations, or related aids and services provided in response to an Individualized Education Program (IEP) provided under the Individuals with Disabilities Education Act (IDEA) or a plan providing services pursuant to section 504 of the Rehabilitation Act of 1973, as amended (often referred to as a Section 504 Plan). These additions to the regulation are necessary because the Department's position on the bounds of appropriate documentation contained in Appendix B, 28 CFR part 36, app. B (2009), has not been implemented consistently and fully by organizations that administer tests.

The new regulatory language clarifies that an applicant's past use of a particular modification, accommodation, or auxiliary aid or service in a similar testing setting or pursuant to an IEP or Section 504 Plan provides critical information in determining those examination modifications that would be applicable in a given circumstance. The addition of this language and the appropriate weight to be accorded it is seen as important by the Department because the types of accommodations provided in both these circumstances are typically granted in the context of individual consideration of a student's needs by a team of qualified and experienced professionals. Even though these accommodations decisions form a common sense and logical basis for testing entities to rely upon, they are often discounted and ignored by testing entities.

For example, considerable weight is warranted when a student with a Section 504 Plan in place since middle school that includes the accommodations of extra time and a quiet room for testing is seeking these same accommodations from a testing entity covered by section 309 of the Act. In this example, a testing entity receiving such documentation should clearly grant the request for accommodations. A history of test accommodations in secondary schools or in post-secondary institutions, particularly when determined through the rigors of a process required and detailed by Federal law, is as useful and instructive for determining whether a specific accommodation is required as accommodations provided in standardized testing situations.

It is important to note, however, that the inclusion of this weight does not suggest that individuals without IEPs or Section 504 Plans are not also entitled to receive testing accommodations. Indeed, it is recommended that testing entities must consider the entirety of an applicant's history to determine whether that history, even without the context of a IEP or Section 504 Plan, indicates a need for accommodations. In addition, many students with learning disabilities have made use of informal, but

effective accommodations. For example, such students often receive undocumented accommodations such as time to complete tests after school or at lunchtime, or being graded on content and not form or spelling of written work. Finally, testing entities shall also consider that because private schools are not subject to the IDEA, students at private schools may have a history of receiving accommodations in similar settings that are not pursuant to an IEP or Section 504 Plan.

Some testing entities sought clarification that they should only be required to consider particular use of past modifications, accommodations, auxiliary aids or services received by testing candidates for prior testing and examination settings. These commenters noted that it would be unhelpful to consider the classroom accommodations for a testing candidate, as those accommodations would not typically apply in a standardized test setting. The Department's history of enforcement in this area has demonstrated that a recent history of past accommodations is critical to an understanding of the applicant's disability and the appropriateness of testing accommodations.

The Department also incorporates the NPRM preamble's "timely manner" concept into the new regulatory language at § 36.309(b)(1)(vi). Under this provision, testing entities are required to respond in a timely manner to requests for testing accommodations in order to ensure equal opportunity for persons with disabilities. Testing entities are to ensure that their established process for securing testing accommodations provides applicants with a reasonable opportunity to supplement the testing entities' requests for additional information, if necessary, and still be able to take the test in the same testing cycle. A disability rights organization commented that testing entities should not subject applicants to unreasonable and intrusive requests for information in a process that should provide persons with disabilities effective modifications in a timely manner, fulfilling the core objective of title III to provide equal access. Echoing this perspective, several disability rights organizations and a State government commenter urged that testing entities should not make unreasonably burdensome demands for documentation, particularly where those demands create impediments to receiving accommodations in a timely manner. Access to examinations should be offered to persons with disabilities in as timely a manner as it is offered to persons without disabilities. Failure by a testing entity to act in a timely manner, coupled with seeking unnecessary documentation, could result in such an extended delay that it constitutes a denial of equal opportunity or equal treatment in an examination setting for persons with disabilities.

### *Section 36.311 Mobility Devices*

Section 36.311 of the NPRM clarified the scope and circumstances under which covered entities are legally obligated to accommodate various "mobility devices." Section 36.311 set forth specific requirements for the accommodation of mobility devices, including wheelchairs, manually-powered mobility aids, and other power-driven mobility devices.

In both the NPRM and the final rule, § 36.311(a) states the general rule that in any areas open to pedestrians, public accommodations shall permit individuals with mobility disabilities to use wheelchairs and manually-powered mobility aids, including walkers, crutches, canes, braces, or similar devices. Because mobility scooters satisfy the definition of "wheelchair" (i.e., "a manually-operated or power-driven device designed primarily for use by an individual with a mobility disability for the main purpose of indoor, or of both indoor and outdoor locomotion"), the reference to them in § 36.311(a) of the final rule has been omitted to avoid redundancy.

Most business commenters expressed concern that permitting the use of other power-driven mobility devices by individuals with mobility disabilities would make such devices akin to wheelchairs and would require them to make physical changes to their facilities to accommodate their use. This concern is misplaced. If a facility complies with the applicable design requirements in the 1991 Standards or the 2010 Standards, the public accommodation will not be required to exceed those standards to accommodate the use of wheelchairs or other power-driven mobility devices that exceed those requirements.

Legal standard for other power-driven mobility devices. The NPRM version of § 36.311(b) provided that a public accommodation "shall make reasonable modifications in its policies, practices, and procedures to permit the use of other power-driven mobility devices by individuals with disabilities, unless the public accommodation can demonstrate that the use of the device is not reasonable or that its use will result in a fundamental alteration in the nature of the public accommodation's goods, services, facilities, privileges, advantages, or accommodations." 73 FR 34508, 34556 (June 17, 2008). In other words, public

accommodations are by default required to permit the use of other power-driven mobility devices; the burden is on them to prove the existence of a valid exception.

Most commenters supported the notion of assessing whether the use of a particular device is reasonable in the context of a particular venue. Commenters, however, disagreed about the meaning of the word "reasonable" as it is used in § 36.311(b) of the **\*56299** NPRM. Virtually every business and industry commenter took the use of the word "reasonable" to mean that a general reasonableness standard would be applied in making such an assessment. Advocacy and nonprofit groups almost universally objected to the use of a general reasonableness standard with regard to the assessment of whether a particular device should be allowed at a particular venue. They argued that the assessment should be based on whether reasonable modifications could be made to allow a particular device at a particular venue, and that the only factors that should be part of the calculus that results in the exclusion of a particular device are undue burden, direct threat, and fundamental alteration.

A few commenters opposed the proposed provision requiring public accommodations to assess whether reasonable modifications can be made to allow other power-driven mobility devices, preferring instead that the Department issue guidance materials so that public accommodations would not have to incur the cost of such analyses. Another commenter noted a "fox guarding the hen house"-type of concern with regard to public accommodations developing and enforcing their own modification policy.

In response to comments received, the Department has revised § 36.311(b) to provide greater clarity regarding the development of legitimate safety requirements regarding other power-driven mobility devices. The Department has not retained the proposed NPRM language stating that an other power-driven mobility device can be excluded if a public accommodation can demonstrate that the use of the device is not reasonable or that its use fundamentally alters the nature of the goods, services, facilities, privileges, advantages, or accommodations offered by the public accommodation because the Department believes that these exceptions are covered by the general reasonable modification requirement contained in § 36.302.

Assessment factors. Section 36.311(c) of the NPRM required public accommodations to "establish policies to permit the use of other power-driven mobility devices" and articulated four factors upon which public accommodations must base decisions as to whether a modification is reasonable to allow the use of a class of other power-driven mobility devices by individuals with disabilities in specific venues (e.g., doctors' offices, parks, commercial buildings, etc.). 73 FR 34508, 34556 (June 17, 2008).

The Department has relocated and modified the NPRM text that appeared in § 36.311(c) to new paragraph § 36.311(b)(2) to clarify what factors the public accommodation shall use in determining whether a particular other power-driven mobility device can be allowed in a specific facility as a reasonable modification. Section 36.311(b)(2) now states that "[i]n determining whether a particular other power-driven mobility device can be allowed in a specific facility as a reasonable modification under (b) (1), a public accommodation shall consider" certain enumerated factors. The assessment factors are designed to assist public accommodations in determining whether allowing the use of a particular other power-driven mobility device in a specific facility is reasonable. Thus, the focus of the analysis must be on the appropriateness of the use of the device at a specific facility, rather than whether it is necessary for an individual to use a particular device.

The NPRM proposed the following specific assessment factors: (1) The dimensions, weight, and operating speed of the mobility device in relation to a wheelchair; (2) the potential risk of harm to others by the operation of the mobility device; (3) the risk of harm to the environment or natural or cultural resources or conflict with Federal land management laws and regulations; and (4) the ability of the public accommodation to stow the mobility device when not in use, if requested by the user.

Factor 1 was designed to help public accommodations assess whether a particular device was appropriate, given its particular physical features, for a particular location. Virtually all commenters said the physical features of the device affected their view of whether a particular device was appropriate for a particular location. For example, while many commenters supported the use of an other power-driven mobility device if the device were a Segway[supreg] PT, because of environmental and health concerns they did not offer the same level of support if the device were an off-highway vehicle, all-terrain vehicle (ATV), golf

76 FR 16978-01, 2011 WL 1060575(F.R.)

RULES and REGULATIONS

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

29 CFR Part 1630

RIN 3046-AA85

Regulations To Implement the Equal Employment Provisions of the Americans With Disabilities Act, as Amended

Friday, March 25, 2011

AGENCY: Equal Employment Opportunity Commission (EEOC).

**\*16978** ACTION: Final Rule.

SUMMARY: The Equal Employment Opportunity Commission (the Commission or the EEOC) issues its final revised Americans with Disabilities Act (ADA) regulations and accompanying interpretive guidance in order to implement the ADA Amendments Act of 2008. The Commission is responsible for enforcement of title I of the ADA, as amended, which prohibits employment discrimination on the basis of disability. Pursuant to the ADA Amendments Act of 2008, the EEOC is expressly granted the authority to amend these regulations, and is expected to do so.

DATES: Effective Date: These final regulations will become effective on May 24, 2011.

FOR FURTHER INFORMATION CONTACT: Christopher J. Kuczynski, Assistant Legal Counsel, or Jeanne Goldberg, Senior Attorney Advisor, Office of Legal Counsel, U.S. Equal Employment Opportunity Commission at (202) 663-4638 (voice) or (202) 663-7026 (TTY). These are not toll-free-telephone numbers. This document is also available in the following formats: Large print, Braille, audio tape, and electronic file on computer disk. Requests for this document in an alternative format should be made to the Office of Communications and Legislative Affairs at (202) 663-4191 (voice) or (202) 663-4494 (TTY) or to the Publications Information Center at 1-800-669-3362.

SUPPLEMENTARY INFORMATION:

**Introduction**

The ADA Amendments Act of 2008 (the Amendments Act) was signed into law by President George W. Bush on September 25, 2008, with a statutory effective date of January 1, 2009. Pursuant to the Amendments Act, the definition of disability under the ADA, 42 U.S.C. 12101, et seq., shall be construed in favor of broad coverage to the maximum extent permitted by the terms of the ADA as amended, and the determination of whether an individual has a disability should not demand extensive analysis. The Amendments Act makes important changes to the definition of the term "disability" by rejecting the holdings in several Supreme Court decisions and portions of the EEOC's ADA regulations. The effect of these changes is to make it easier for an individual seeking protection under the ADA to establish that he or she has a disability within the meaning of the ADA. Statement of the Managers to Accompany S. 3406, The Americans with Disabilities Act Amendments Act of 2008 (2008 Senate Statement of Managers); Committee on Education and Labor Report together with Minority Views (to accompany H.R. 3195), H.R. Rep. No. 110-730 part 1, 110th Cong., 2d Sess. (June 23, 2008) (2008 House Comm. on Educ. and Labor Report); Committee on the Judiciary Report together with Additional Views (to accompany H.R. 3195), H.R. Rep. No. 110-730 part 2, 110th Cong., 2d Sess. (June 23, 2008) (2008 House Judiciary Committee Report).

The Amendments Act retains the ADA's basic definition of "disability" as an impairment that substantially limits one or more major life activities, a record of such an impairment, or being regarded as having such an impairment. However, it changes the way that these statutory terms should be interpreted in several ways, therefore necessitating revision of the prior regulations



major life activity. See 2008 Senate Statement of Managers at 2, 6-8 & n.14; 2008 House Committee on Educ. and Labor Report at 9-10 ("While the limitation imposed by an impairment must be important, it need not rise to the level of severely restricting or significantly restricting the ability to perform a major life activity to qualify as a disability."); 2008 House Judiciary Committee Report at 16 (similarly requiring an "important" limitation). The level of limitation required is "substantial" as compared to most people in the general population, which does not require a significant or severe restriction. Multiple impairments that combine to substantially limit one or more of an individual's major life activities also constitute a disability. Nonetheless, not every impairment will constitute a "disability" within the meaning of this section. See 2008 Senate Statement of Managers at 4 ("We reaffirm that not every individual with a physical or mental impairment is covered by the first prong of the definition of disability in the ADA.")

### Section 1630.2(j)(1)(iii): Substantial Limitation Should Not Be Primary Object of Attention; Extensive Analysis Not Needed

Section 1630.2(j)(1)(iii) states: "The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations, not whether an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis."

**\*17009** Congress retained the term "substantially limits" in part because it was concerned that adoption of a new phrase—and the resulting need for further judicial scrutiny and construction—would not "help move the focus from the threshold issue of disability to the primary issue of discrimination." 2008 Senate Statement of Managers at 7.

This was the primary problem Congress sought to solve in enacting the ADAAA. It recognized that "clearing the initial [disability] threshold is critical, as individuals who are excluded from the definition 'never have the opportunity to have their condition evaluated in light of medical evidence and a determination made as to whether they [are] 'otherwise quali fied.' ' " 2008 House Judiciary Committee Report at 7; see also id. (expressing concern that "[a]n individual who does not qualify as disabled does not meet th[e] threshold question of coverage in the protected class and is therefore not permitted to attempt to prove his or her claim of discriminatory treatment"); 2008 Senate Statement of Managers at 4 (criticizing pre-ADAAA lower court cases that "too often turned solely on the question of whether the plaintiff is an individual with a disability rather than the merits of discrimination claims, such as whether adverse decisions were impermissibly made by the employer on the basis of disability, reasonable accommodations were denied, or qualification standards were unlawfully discriminatory").

Accordingly, the Amendments Act and the amended regulations make plain that the emphasis in ADA cases now should be squarely on the merits and not on the initial coverage question. The revised regulations therefore provide that an impairment is a disability if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population and deletes the language to which Congress objected. The Commission believes that this provides a useful framework in which to analyze whether an impairment satisfies the definition of disability. Further, this framework better reflects Congress's expressed intent in the ADA Amendments Act that the definition of the term "disability" shall be construed broadly, and is consistent with statements in the Amendments Act's legislative history. See 2008 Senate Statement of Managers at 7 (stating that "adopting a new, undefined term" and the "resulting need for further judicial scrutiny and construction will not help move the focus from the threshold issue of disability to the primary issue of discrimination," and finding that " 'substantially limits' as construed consistently with the findings and purposes of this legislation establishes an appropriate functionality test of determining whether an individual has a disability" and that "using the correct standard—one that is lower than the strict or demanding standard created by the Supreme Court in Toyota—will make the disability determination an appropriate threshold issue but not an onerous burden for those seeking accommodations or modifications").

Consequently, this rule of construction makes clear that the question of whether an impairment substantially limits a major life activity should not demand extensive analysis. As the legislative history explains, "[w]e expect that courts interpreting [the ADA] will not demand such an extensive analysis over whether a person's physical or mental impairment constitutes a

disability." Hoyer-Sensenbrenner Congressional Record Statement at H8295; see id. ("Our goal throughout this process has been to simplify that analysis.")

## Section 1630.2(j)(1)(iv): Individualized Assessment Required, But With Lower Standard Than Previously Applied

Section 1630.2(j)(1)(iv) states: "The determination of whether an impairment substantially limits a major life activity requires an individualized assessment. However, in making this assessment, the term 'substantially limits' shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for 'substantially limits' applied prior to the ADAAA."

By retaining the essential elements of the definition of disability including the key term "substantially limits," Congress reaffirmed that not every individual with a physical or mental impairment is covered by the first prong of the definition of disability in the ADA. See 2008 Senate Statement of Managers at 4. To be covered under the first prong of the definition, an individual must establish that an impairment substantially limits a major life activity. That has not changed—nor will the necessity of making this determination on an individual basis. Id. However, what the ADAAA changed is the standard required for making this determination. Id. at 4-5.

The Amendments Act and the EEOC's regulations explicitly reject the standard enunciated by the Supreme Court in Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184 (2002), and applied in the lower courts in numerous cases. See ADAAA Section 2(b)(4). That previous standard created "an inappropriately high level of limitation necessary to obtain coverage under the ADA." Id. at Section 2(b)(5). The Amendments Act and the EEOC's regulations reject the notion that "substantially limits" should be interpreted strictly to create a demanding standard for qualifying as disabled. Id. at Section 2(b)(4). Instead, the ADAAA and these regulations establish a degree of functional limitation required for an impairment to constitute a disability that is consistent with what Congress originally intended. 2008 Senate Statement of Managers at 7. This will make the disability determination an appropriate threshold issue but not an onerous burden for those seeking to prove discrimination under the ADA. Id.

## Section 1630.2(j)(1)(v): Scientific, Medical, or Statistical Analysis Not Required, But Permissible When Appropriate

Section 1630.2(j)(1)(v) states: "The comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical analysis. Nothing in this paragraph is intended, however, to prohibit the presentation of scientific, medical, or statistical evidence to make such a comparison where appropriate."

The term "average person in the general population," as the basis of comparison for determining whether an individual's impairment substantially limits a major life activity, has been changed to "most people in the general population." This revision is not a substantive change in the concept, but rather is intended to conform the language to the simpler and more straightforward terminology used in the legislative history to the Amendments Act. The comparison between the individual and "most people" need not be exacting, and usually will not require scientific, medical, or statistical analysis. Nothing in this subparagraph is intended, however, to prohibit the presentation of scientific, medical, or statistical evidence to make such a comparison where appropriate.

The comparison to most people in the general population continues to mean a comparison to other people in the general population, not a comparison to those similarly situated. For example, the ability of an individual with an amputated limb to perform a major life activity is compared to other people in the general population, not to other amputees. This does not mean that disability cannot be shown where an impairment, such as a learning disability, is clinically diagnosed based in part on a disparity between an individual's aptitude and that individual's actual versus expected achievement, taking into account the person's chronological age, measured intelligence, and age-appropriate education. Individuals diagnosed with dyslexia or other learning disabilities will typically be substantially limited in performing activities such as learning, reading, and thinking when compared to most people in the general population, particularly when the ameliorative effects of mitigating measures, including therapies, learned behavioral or adaptive neurological modifications, assistive devices (e.g., audio recordings, screen reading

devices, voice activated software), studying longer, or receiving more time to take a test, are disregarded as required under the ADA Amendments Act.

**Section 1630.2(j)(1)(vi): Mitigating Measures**

Section 1630.2(j)(1)(vi) states: "The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures. However, the ameliorative effects of ordinary eyeglasses or contact lenses shall be considered in determining whether an impairment substantially limits a major life activity."

The ameliorative effects of mitigating measures shall not be considered in whether an impairment substantially limits a major life activity. Thus, "[w]ith the exception of ordinary eyeglasses and contact lenses, impairments must be examined in their unmitigated state." See 2008 Senate Statement of Managers at 5.

This provision in the ADAAA and the EEOC's regulations "is intended to eliminate the catch-22 that exist[ed] * * * where individuals who are subjected to discrimination on the basis of their disabilities [we]re frequently unable to **\*17010** invoke the ADA's protections because they [we]re not considered people with disabilities when the effects of their medication, medical supplies, behavioral adaptations, or other interventions [we]re considered." Joint Hoyer-Sensenbrenner Statement at 2; see also 2008 Senate Statement of Managers at 9 ("This provision is intended to eliminate the situation created under [prior] law in which impairments that are mitigated [did] not constitute disabilities but [were the basis for discrimination].). To the extent cases pre-dating the 2008 Amendments Act reasoned otherwise, they are contrary to the law as amended. See 2008 House Judiciary Committee Report at 9 & nn.25, 20-21 (citing, e.g., McClure v. General Motors Corp., 75 F. App'x 983 (5th Cir. 2003) (court held that individual with muscular dystrophy who, with the mitigating measure of "adapting" how he performed manual tasks, had successfully learned to live and work with his disability was therefore not an individual with a disability); Orr v. Wal-Mart Stores, Inc., 297 F.3d 720 (8th Cir. 2002) (court held that Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999), required consideration of the ameliorative effects of plaintiff's careful regimen of medicine, exercise and diet, and declined to consider impact of uncontrolled diabetes on plaintiff's ability to see, speak, read, and walk); Gonzales v. National Bd. of Med. Examiners, 225 F.3d 620 (6th Cir. 2000) (where the court found that an individual with a diagnosed learning disability was not substantially limited after considering the impact of self-accommodations that allowed him to read and achieve academic success); McMullin v. Ashcroft, 337 F. Supp. 2d 1281 (D. Wyo. 2004) (individual fired because of clinical depression not protected because of the successful management of the condition with medication for fifteen years); Eckhaus v. Consol. Rail Corp., 2003 WL 23205042 (D.N.J. Dec. 24, 2003) (individual fired because of a hearing impairment was not protected because a hearing aid helped correct that impairment); Todd v. Academy Corp., 57 F. Supp. 2d 448, 452 (S.D. Tex. 1999) (court held that because medication reduced the frequency and intensity of plaintiff's seizures, he was not disabled)).

An individual who, because of the use of a mitigating measure, has experienced no limitations, or only minor limitations, related to the impairment may still be an individual with a disability, where there is evidence that in the absence of an effective mitigating measure the individual's impairment would be substantially limiting. For example, someone who began taking medication for hypertension before experiencing substantial limitations related to the impairment would still be an individual with a disability if, without the medication, he or she would now be substantially limited in functions of the cardiovascular or circulatory system.

Evidence showing that an impairment would be substantially limiting in the absence of the ameliorative effects of mitigating measures could include evidence of limitations that a person experienced prior to using a mitigating measure, evidence concerning the expected course of a particular disorder absent mitigating measures, or readily available and reliable information of other types. However, we expect that consistent with the Amendments Act's command (and the related rules of construction in the regulations) that the definition of disability "should not demand extensive analysis," covered entities and courts will in many instances be able to conclude that a substantial limitation has been shown without resort to such evidence.

The Amendments Act provides an "illustrative but non-comprehensive list of the types of mitigating measures that are not to be considered." See 2008 Senate Statement of Managers at 9. Section 1630.2(j)(5) of the regulations includes all of those mitigating

81 FR 53204-01, 2016 WL 4210327(F.R.)

RULES and REGULATIONS

DEPARTMENT OF JUSTICE

Office of the Attorney General

28 CFR Parts 35 and 36

[CRT Docket No. 124; AG Order No. 3702-2016]

RIN 1190-AA59

Amendment of Americans With Disabilities Act Title II and Title

III Regulations To Implement ADA Amendments Act of 2008

Thursday, August 11, 2016

AGENCY:Civil Rights Division, Department of Justice.

**\*53204**  ACTION:Final rule.

SUMMARY:The Department of Justice (Department) is issuing this final rule to amend its Americans with Disabilities Act (ADA) regulations in order to incorporate the statutory changes to the ADA set forth in the ADA Amendments Act of 2008 (ADA Amendments Act or the Act), which took effect on January 1, 2009. In response to earlier Supreme Court decisions that significantly narrowed the application of the definition of "disability" under the ADA, Congress enacted the ADA Amendments Act to restore the understanding that the definition of "disability" shall be broadly construed and applied without extensive analysis. Congress intended that the primary object of attention in cases brought under the ADA should be whether covered entities have complied with their statutory obligations not to discriminate based on disability. In this final rule, the Department is adding new sections to its title II and title III ADA regulations to set forth the proper meaning and interpretation of the definition of "disability" and to make related changes required by the ADA Amendments Act in other sections of the regulations.

DATES:This rule will take effect October 11, 2016.

FOR FURTHER INFORMATION CONTACT:Rebecca Bond, Section Chief, Disability Rights Section, Civil Rights Division, U.S. Department of Justice, at (202) 307-0663 (voice or TTY); this is not a toll-free number. Information may also be obtained from the Department's toll-free ADA Information Line at (800) 514-0301 (voice) or (800) 514-0383 (TTY).

You may obtain copies of this final rule in an alternative format by calling the ADA Information Line at (800) 514-0301 (voice) and (800) 514-0383 (TTY). This final rule is also available on the ADA Home Page atwww.ada.gov.

SUPPLEMENTARY INFORMATION:The meaning and interpretation of the definitions of "disability" in the title II and title III regulations are identical, and the preamble will discuss the revisions to both regulations concurrently. Because the ADA Amendments Act's revisions to the ADA have been codified into the U.S. Code, the final rule references the revised U.S. Code provisions except in those cases where the reference is to the Findings and Purposes of the ADA Amendments Act, in which case the citation is to section 2 of Public Law 110-325, September 25, 2008.[FN1]

This final rule was submitted to the Office of Management and Budget's (OMB) Office of Information and Regulatory Affairs for review prior to publication in theFederal Register.

## I. Executive Summary

### *Purpose*



mandate [of the ADA], Congress sought to protect anyone who is treated less favorably because of a current, past, or perceived disability. Congress did not intend for the threshold question of disability to be used as a means of excluding individuals from coverage. Nevertheless, as the courts began interpreting and applying the definition of disability strictly, individuals have been excluded from the protections that the ADA affords because they are unable to meet the demanding judicially imposed standard for qualifying as disabled."). H.R. Rep. No. 110-730, pt. 2, at 5 (2008) (House Committee on the Judiciary).

In keeping with Congress's intent and the language of the ADA Amendments Act, the rules of construction at proposed §§ 35.108(d)(1)(iii) and 36.105(d)(1)(iii) make clear that the primary object of attention in ADA cases should be whether public or other covered entities have complied with their obligations and whether discrimination has occurred, not the extent to which an individual's impairment substantially limits a major life activity. In particular, the threshold issue of whether an impairment substantially limits a major life activity should not demand extensive analysis.

A number of commenters expressed support for these rules of construction, noting that they reinforced Congress's intent in ensuring that the primary focus will be on compliance. Several commenters objected to the use of the word "cases" in these provisions, stating that it lacked clarity. The word "cases" tracks the language of the ADA Amendments Act and the Department declines to change the term.

A few commenters objected to these provisions because they believed that the language would be used to supersede or otherwise change the required analysis of requests for reasonable modifications or testing accommodations.See 28 CFR 35.130(b)(7), 36.302, 36.309. The Department disagrees with these commenters. These rules of construction relate only to the determination of coverage under the ADA. They do not change the analysis of whether a discriminatory act has taken place, including the determination as to whether an individual is entitled to a reasonable modification or testing accommodation.See discussion of §§ 35.108(d)(1)(vii) and 36.105(d)(1)(vii) below.

The Department retained the language of these rules of construction in the final rule except that in the title III regulatory text it has changed the reference from "covered entity" to "public accommodation." The Department also renumbered these provisions as §§ 35.108(d)(1)(ii) and 36.105(d)(1)(ii).

*Sections 35.108(d)(1)(iii) and 36.105(d)(1)(iii)—Impairment Need Not Substantially Limit More Than One Major Life Activity*

Proposed §§ 35.108(d)(1)(viii) and 36.105(d)(1)(viii) stated that "[a]n impairment that substantially limits one major life activity need not substantially limit other major life activities in order to be considered a substantially limiting impairment."See 42 U.S.C. 12102(4)(C). This language reflected the statutory intent to reject court decisions that had required individuals to show that an impairment substantially limits more than one major life activity.See 154 Cong. Rec. S8841-44 (daily ed. Sept. 16, 2008) (Statement of the Managers). Applying this principle, for example, an individual seeking to establish coverage under the ADA need not show a substantial limitation in the ability to learn if that individual is substantially limited in another major life activity, such as walking, or the functioning of the nervous or endocrine systems. The proposed rule was also intended to clarify that the ability to perform one or more particular tasks within a broad category of activities does not **\*53230** preclude coverage under the ADA.See H.R. Rep. No. 110-730, pt. 2, at 19 & n.52 (2008) (House Committee on the Judiciary). For instance, an individual with cerebral palsy could have a capacity to perform certain manual tasks yet nonetheless show a substantial limitation in the ability to perform a "broad range" of manual tasks.

The Department received one comment specifically supporting this provision and none opposing it. The Department is retaining this language in the final rule although it is renumbered and is found at §§ 35.108(d)(1)(iii) and 36.105(d)(1)(iii).

*Sections 35.108(d)(1)(iv) and 36.105(d)(1)(iv)—Impairments That Are Episodic or in Remission*

The ADA as amended provides that "an impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active."

42 U.S.C. 12102(4)(D). In the NPRM, the Department proposed §§ 35.108(d)(1)(vii) and 36.105(d)(1)(vii) to directly incorporate this language. These provisions are intended to reject the reasoning of court decisions concluding that certain individuals with certain conditions—such as epilepsy or post traumatic stress disorder—were not protected by the ADA because their conditions were episodic or intermittent. The legislative history provides that "[t]his . . . rule of construction thus rejects the reasoning of the courts in cases likeTodd v.Academy Corp.

[57 F. Supp. 2d 448, 453 (S.D. Tex. 1999)] where the court found that the plaintiff's epilepsy, which resulted in short seizures during which the plaintiff was unable to speak and experienced tremors, was not sufficiently limiting, at least in part because those seizures occurred episodically. It similarly rejects the results reached in cases [such asPimental v.Dartmouth-Hitchcock Clinic, 236 F. Supp. 2d 177, 182-83 (D.N.H. 2002)] where the courts have discounted the impact of an impairment [such as cancer] that may be in remission as too short-lived to be substantially limiting. It is thus expected that individuals with impairments that are episodic or in remission (e.g., epilepsy, multiple sclerosis, cancer) will be able to establish coverage if, when active, the impairment or the manner in which it manifests (e.g., seizures) substantially limits a major life activity." H.R. Rep. No. 110-730, pt. 2, at 19-20 (2008) (House Committee on the Judiciary).

Some examples of impairments that may be episodic include hypertension, diabetes, asthma, major depressive disorder, bipolar disorder, and schizophrenia. The fact that the periods during which an episodic impairment is active and substantially limits a major life activity may be brief or occur infrequently is no longer relevant to determining whether the impairment substantially limits a major life activity. For example, a person with post-traumatic stress disorder who experiences intermittent flashbacks to traumatic events is substantially limited in brain function and thinking.

The Department received three comments in response to these provisions. Two commenters supported this provision and one commenter questioned about how school systems should provide reasonable modifications to students with disabilities that are episodic or in remission. As discussed elsewhere in this guidance, the determination of what is an appropriate modification is separate and distinct from the determination of whether an individual is covered by the ADA, and the Department will not modify its regulatory language in response to this comment.

### *Sections 35.108(d)(1)(v) and 36.105(d)(1)(v)—Comparisons to Most People in the Population, and Impairment Need Not Prevent or Significantly or Severely Restrict a Major Life Activity*

In the legislative history of the ADA Amendments Act, Congress explicitly recognized that it had always intended that determinations of whether an impairment substantially limits a major life activity should be based on a comparison to most people in the population. The Senate Managers Report approvingly referenced the discussion of this requirement in the committee report from 1989.See 154 Cong. Rec. S8842 (daily ed. Sept. 16, 2008) (Statement of the Managers) (citing S. Rep. No. 101-116, at 23 (1989)). The preamble to the Department's 1990 title II and title III regulations also referenced that the impact of an individual's impairment should be based on a comparison to most people.See 56 FR 35694, 35699 (July 26, 1991).

Consistent with its longstanding intent, Congress directed, in the ADA Amendments Act, that disability determinations "should not demand extensive analysis" and that impairments do not need to rise to the level of "prevent[ing] or severely restrict[ing] the individual from doing activities that are of central importance to most people's daily lives."See Public Law 110-325, sec. 2(b)(4)-(5). In giving this direction, Congress sought to correct the standard that courts were applying to determinations of disability afterToyota, which had created "a situation in which physical or mental impairments that would previously have been found to constitute disabilities are not considered disabilities under the Supreme Court's narrower standard." 154 Cong. Rec. S8840-8841 (daily ed. Sept. 16, 2008) (Statement of the Managers). The ADA Amendments Act thus abrogatesToyota's holding by mandating that "substantially limited" must no longer create "an inappropriately high level of limitation."See Public Law 110-325, sec. 2(b)(4)-(5) and 42 U.S.C. 12102(4)(B). For example, an individual with carpal tunnel syndrome, a physical impairment, can demonstrate that the impairment substantially limits the major life activity of writing even if the impairment does not prevent or severely restrict the individual from writing.

Accordingly, proposed §§ 35.108(d)(1)(ii) and 36.105(d)(1)(ii) state that an impairment is a disability if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. However, an impairment does not need to prevent, or significantly or severely restrict, an individual from performing a major life activity in order to be substantially limiting. The proposed language in the NPRM was rooted in the corrective nature of the ADA Amendments Act and its explicit rejection of the strict standards imposed under Toyota and its progeny. See Public Law 110-325, sec. 2(b)(4).

The Department received several comments on these provisions, none of which recommended modification of the regulatory language. A few commenters raised concerns that are further addressed in the "Condition, manner, or duration" section below, regarding the Department's inclusion in the NPRM preamble of a reference to possibly using similarly situated individuals as the basis of comparison. The Department has removed this discussion and clarified that it does not endorse reliance on similarly situated individuals to demonstrate substantial limitations. For example, the Department recognizes that when determining whether an elderly person is substantially limited in a major life activity, the proper comparison is most people in the general population, and not similarly situated elderly individuals. Similarly, someone with ADHD should be compared to most people in the general population, most of whom do not have ADHD. Other commenters expressed interest in the possibility that, in some cases, evidence to support an assertion that someone has an impairment might simultaneously be used to demonstrate that the impairment is substantially limiting. These commenters approvingly referenced the EEOC's interpretive guidance for its ADA Amendments Act regulation, which provided an example of an individual with a learning disability. See 76 FR 16978, 17009 (Mar. 25, 2011). In that example, evidence gathered to demonstrate the impairment of a learning disability showed a discrepancy between the person's age, measured intelligence, and education and that person's actual versus expected achievement. The EEOC noted that such individuals also likely would be able to demonstrate substantial limitations caused by that impairment to the major life activities of learning, reading, or thinking, when compared to most people in the general population, especially when the ameliorative effects of mitigating measures were set aside. The Department concurs with this view.

Finally, the Department added an explicit statement recognizing that not every impairment will constitute a disability within the meaning of the section. This language echoes the Senate Statement of Managers, which clarified that: "[N]ot every individual with a physical or mental impairment is covered by the first prong of the definition of disability in the ADA. An impairment that does not substantially limit a major life activity is not a disability under this prong." 154 Cong. Rec. S8841 (daily ed. Sept. 16, 2008) (Statement of the Managers).

### *Sections 35.108(d)(1)(vi) and 36.105(d)(1)(vi)—"Substantially Limits" Shall Be Interpreted To Require a Lesser Degree of Functional Limitation Than That Required Prior to the ADA Amendments Act*

In the NPRM, proposed §§ 35.108(d)(1)(iv) and 36.105(d)(1)(iv) state that determining **\*53231** whether an impairment substantially limits a major life activity requires an individualized assessment. But, the interpretation and application of the term "substantially limits" for this assessment requires a lower degree of functional limitation than the standard applied prior to the ADA Amendments Act.

These rules of construction reflect Congress's concern that prior to the adoption of the ADA Amendments Act, courts were using too high a standard to determine whether an impairment substantially limited a major life activity. See Public Law 110-325, sec. 2(b)(4)-(5); see also 154 Cong. Rec. S8841 (daily ed. Sept. 16, 2008) (Statement of the Managers) ("This bill lowers the standard for determining whether an impairment constitute[s] a disability and reaffirms the intent of Congress that the definition of disability in the ADA is to be interpreted broadly and inclusively.").

The Department received no comments on these provisions. The text of these provisions is unchanged in the final rule, although they have been renumbered as §§ 35.108(d)(1)(vi) and 36.105(d)(1)(vi).

### *Sections §§ 35.108(d)(1)(vii) and 36.105(d)(1)(vii)—Comparison of Individual's Performance of Major Life Activity Usually Will Not Require Scientific, Medical, or Statistical Analysis*



could prove extremely helpful to individuals asserting a need for testing accommodations, as evidence previously presented regarding these factors was deemed insufficient to demonstrate the existence of a disability. Some commenters requested the insertion of additional examples and explanation in the preamble about how condition, manner or duration principles could be applied under the new rules of construction. Another commenter sought guidance on the specific reference points that should be used when drawing comparisons with most people in the general population. The commenter offered the example of delays in developmental milestones as a possible referent in evaluating children with speech-language disorders, but noted a lack of guidance regarding comparable referents for adults. The commenter also noted that guidance is needed regarding what average or acceptable duration might be with respect to certain activities. An academic commenter expressed support for the Department's reference to individuals with learning impairments using certain self-mitigating measures, such as extra time to study or taking an examination in a different format, and the relevance of these measures to condition, manner, and duration.

The Department did not receive comments opposing the NPRM language on condition, manner, or duration in §§ 35.108(d) (3)(ii) and 36.105(d)(3)(ii) and is not making any changes to this language. The Department agrees that further explanation and examples as provided below regarding the concepts of condition, manner, or duration will help clarify how the ADA Amendments Act has expanded the definition of "disability." An impairment may substantially limit the "condition" or "manner" in which a major life activity can be performed in a number of different ways. For example, the condition or manner in which a major life activity can be performed may refer to how an individual performs a major life activity;e.g., the condition or manner under which a person with an amputated hand performs manual tasks will likely be more cumbersome than the way that most people in the general population would perform the same tasks. Condition or manner also may describe how performance of a major life activity affects an individual with an impairment. For example, an individual whose impairment causes pain or fatigue that most people would not experience when performing that major life activity may be substantially limited. Thus, the condition or manner under which someone with coronary artery disease performs the major life activity of walking would be substantially limited if the individual experiences shortness of breath and fatigue when walking distances that most people could walk without experiencing such effects. An individual with specific learning disabilities may need to approach reading or writing in a distinct manner or under different conditions than most people in the general population, possibly employing aids including verbalizing, visualizing, decoding or phonology, such that the effort required could support a determination that the individual is substantially limited in the major life activity of reading or writing.

Condition or manner may refer to the extent to which a major life activity, including a major bodily function, can be performed. In some cases, the condition or manner under which a major bodily function can be performed may be substantially limited when the impairment "causes the operation [of the bodily function] to over-produce or under-produce in some harmful fashion."See H.R. Rep. No. 110-730, pt. 2, at 17 (2008). For example, the endocrine system of a person with type I diabetes does not produce sufficient insulin. For that reason, compared to most people in the general population, the impairment of diabetes substantially limits the major bodily functions of endocrine function and digestion. Traumatic brain injury substantially limits the condition or manner in which an individual's brain functions by impeding memory and causing headaches, confusion, or fatigue—each of which could constitute a substantial limitation on the major bodily function of brain function.

"Duration" refers to the length of time an individual can perform a major life activity or the length of time it takes an individual to perform a major life activity, as compared to most people in the general population. For example, a person whose back or leg impairment precludes him or her from standing for more than two hours without significant pain would be substantially limited in standing, because most people can stand for more than two hours without significant pain. However, "[a] person who can walk for 10 miles continuously is not substantially limited in walking merely because on the eleventh mile, he or she **\*53236** begins to experience pain because most people would not be able to walk eleven miles without experiencing some discomfort."See 154 Cong. Rec. S8842 (daily ed. Sept. 16, 2008) (Statement of the Managers) (quoting S. Rep. No. 101-116, at 23 (1989)). Some impairments, such as ADHD, may have two different types of impact on duration considerations. ADHD frequently affects both an ability to sustain focus for an extended period of time and the speed with which someone can process information. Each of these duration-related concerns could demonstrate that someone with ADHD, as compared to most people in the general population, takes longer to complete major life activities such as reading, writing, concentrating, or learning.

The Department reiterates that, because the limitations created by certain impairments are readily apparent, it would not be necessary in such cases to assess the negative side effects of a mitigating measure in determining that a particular impairment substantially limits a major life activity. For example, there likely would be no need to consider the burden that dialysis treatment imposes for someone with end-stage renal disease because the impairment would allow a simple and straightforward determination that the individual is substantially limited in kidney function.

One commenter representing people with disabilities asked the Department to recognize that, particularly with respect to learning disabilities, on some occasions the facts related to condition, manner, or duration necessary to reach a diagnosis of a learning disability also are sufficient to establish that the affected individual has a disability under the ADA. The Department agrees that the facts gathered to establish a diagnosis of an impairment may simultaneously satisfy the requirements for demonstrating limitations on condition, manner, or duration sufficient to show that the impairment constitutes a disability.

### *Emphasis on Limitations Instead of Outcomes*

In passing the ADA Amendments Act, Congress clarified that courts had misinterpreted the ADA definition of "disability" by, among other things, inappropriately emphasizing the capabilities of people with disabilities to achieve certain outcomes.See 154 Cong. Rec. S8842 (daily ed. Sept. 16, 2008) (Statement of the Managers). For example, someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in one or more of the major life activities of reading, writing, speaking, or learning because of the additional time or effort he or she must spend to read, speak, write, or learn compared to most people in the general population. As the House Education and Labor Committee Report emphasized:

[S]ome courts have found that students who have reached a high level of academic achievement are not to be considered individuals with disabilities under the ADA, as such individuals may have difficulty demonstrating substantial limitation in the major life activities of learning or reading relative to "most people." When considering the condition, manner or duration in which an individual with a specific learning disability performs a major life activity, it is critical to reject the assumption that an individual who performs well academically or otherwise cannot be substantially limited in activities such as learning, reading, writing, thinking, or speaking. As such, the Committee rejects the findings inPrice v.National Board of Medical Examiners,Gonzales v.National Board of Medical Examiners, andWong v.Regents of University of California.

The Committee believes that the comparison of individuals with specific learning disabilities to "most people" is not problematic unto itself, but requires a careful analysis of the method and manner in which an individual's impairment limits a major life activity. For the majority of the population, the basic mechanics of reading and writing do not pose extraordinary lifelong challenges; rather, recognizing and forming letters and words are effortless, unconscious, automatic processes. Because specific learning disabilities are neurologically-based impairments, the process of reading for an individual with a reading disability (e.g., dyslexia) is word-by-word, and otherwise cumbersome, painful, deliberate and slow—throughout life. The Committee expects that individuals with specific learning disabilities that substantially limit a major life activity will be better protected under the amended Act.

H.R. Rep. No. 110-730 pt. 1, at 10-11 (2008).

Sections 35.108(d)(3)(iii) and 36.105(d)(3)(iii) of the proposed rule reflected congressional intent and made clear that the outcome an individual with a disability is able to achieve is not determinative of whether an individual is substantially limited in a major life activity. Instead, an individual can demonstrate the extent to which an impairment affects the condition, manner, or duration in which the individual performs a major life activity, such that it constitutes a substantial limitation. The ultimate outcome of an individual's efforts should not undermine a claim of disability, even if the individual ultimately is able to achieve the same or similar result as someone without the impairment.

The Department received several comments on these provisions, with disability organizations and individuals supporting the inclusion of these provisions and some testing entities and an organization representing educational institutions opposing them. The opponents argued that academic performance and testing outcomes are objective evidence that contradict findings of

disability and that covered entities must be able to focus on those outcomes in order to demonstrate whether an impairment has contributed to a substantial limitation. These commenters argued that the evidence frequently offered by those making claims of disability that demonstrate the time or effort required to achieve a result, such as evidence of self-mitigating measures, informal accommodations, or recently provided reasonable modifications, is inherently subjective and unreliable. The testing entities suggested that the Department had indicated support for their interest in focusing on outcomes over process-related obstacles in the NPRM preamble language where the Department had noted that covered entities "may defeat a showing of substantial limitation by refuting whatever evidence the individual seeking coverage has offered, or by offering evidence that shows that an impairment does not impose a substantial limitation on a major life activity." NPRM, 79 FR 4839, 4847-48 (Jan. 30, 2014). The commenters representing educational institutions and testing entities urged the removal of §§ 35.108(d)(3)(iii) and 36.105(d)(3)(iii) or, in the alternative, the insertion of language indicating that outcomes, such as grades and test scores indicating academic success, are relevant evidence that should be considered when making disability determinations.

In contrast, commenters representing persons with disabilities and individual commenters expressed strong support for these provisions, noting that what an individual can accomplish despite an impairment does not accurately reflect the obstacles an individual had to overcome because of the impairment. One organization representing persons with disabilities noted that while individuals with disabilities have achieved successes at work, in academia, and in other settings, their successes should not create obstacles to addressing what they can do "in spite of an impairment." Commenters also expressed concerns that testing entities and educational institutions had failed to comply with the rules of construction or to revise prior policies and practices to comport with the new standards under the ADA as amended. Some commenters asserted that testing entities improperly rejected accommodation requests because the testing entities focused on test scores and outcomes rather than on how individuals learn; required severe levels of impairment; failed to disregard the helpful effect of self-mitigating measures; referenced participation in extracurricular activities as evidence that individuals did not have disabilities; and argued that individuals diagnosed with specific learning disabilities or ADHD in adulthood cannot demonstrate that they have a disability because their diagnosis occurred too late.

Commenters representing persons with disabilities pointed to the discussion in the legislative history about restoring a focus on process rather than outcomes with respect to learning disabilities. They suggested that such a shift in focus also would be helpful in evaluating ADHD. One commenter asked the Department to include a reference to ADHD and to explain that persons with ADHD may achieve a high level of academic success but may nevertheless be substantially limited in one or more major life activities, such as reading, writing, speaking, concentrating, or learning. A private citizen requested the addition of examples demonstrating the application of these provisions because, in the commenter's view, there have been many problems with decisions regarding individuals with learning disabilities and an inappropriate focus on outcomes and test scores.

*53237 The Department declines the request to add a specific reference to ADHD in these provisions. The Department believes that the principles discussed above apply equally to persons with ADHD as well as individuals with other impairments. The provision already references an illustrative, but not exclusive, example of an individual with a learning disability. The Department believes that this example effectively illustrates the concern that has affected individuals with other impairments due to an inappropriate emphasis on outcomes rather than how a major life activity is limited.

Organizations representing testing and educational entities asked the Department to add regulatory language indicating that testing-related outcomes, such as grades and test scores, are relevant to disability determinations under the ADA. The Department has considered this proposal and declines to adopt it because it is inconsistent with congressional intent. As discussed earlier in this section, Congress specifically stated that the outcome an individual with a disability is able to achieve is not determinative of whether that individual has a physical or mental impairment that substantially limits a major life activity. The analysis of whether an individual with an impairment has a disability is a fact-driven analysis shaped by how an impairment has substantially limited one or more major life activities or major bodily functions, considering those specifically asserted by the individual as well as any others that may apply. For example, if an individual with ADHD seeking a reasonable modification or a testing accommodation asserts substantial limitations in the major life activities of concentrating and reading, then the analysis of whether or not that individual has a covered disability will necessarily focus on concentrating and reading. Relevant

considerations could include restrictions on the conditions, manner, or duration in which the individual concentrates or reads, such as a need for a non-stimulating environment or extensive time required to read. Even if an individual has asserted that an impairment creates substantial limitations on activities such as reading, writing, or concentrating, the individual's academic record or prior standardized testing results might not be relevant to the inquiry. Instead, the individual could show substantial limitations by providing evidence of condition, manner, or duration limitations, such as the need for a reader or additional time. The Department does not believe that the testing results or grades of an individual seeking reasonable modifications or testing accommodations always would be relevant to determinations of disability. While testing and educational entities may, of course, put forward any evidence that they deem pertinent to their response to an assertion of substantial limitation, testing results and grades may be of only limited relevance.

In addition, the Department does not agree with the assertions made by testing and educational entities that evidence of testing and grades is objective and, therefore, should be weighted more heavily, while evidence of self-mitigating measures, informal accommodations, or recently provided accommodations or modifications is inherently subjective and should be afforded less consideration. Congress's discussion of the relevance of testing outcomes and grades clearly indicates that it did not consider them definitive evidence of the existence or non-existence of a disability. While tests and grades typically are numerical measures of performance, the capacity to quantify them does not make them inherently more valuable with respect to proving or disproving disability. To the contrary, Congress's incorporation of rules of construction emphasizing broad coverage of disabilities to the maximum extent permitted, its direction that such determinations should neither contemplate ameliorative mitigating measures nor demand extensive analysis, and its recognition of learned and adaptive modifications all support its openness for individuals with impairments to put forward a wide range of evidence to demonstrate their disabilities.

The Department believes that Congress made its intention clear that the ADA's protections should encompass people for whom the nature of their impairment requires an assessment that focuses on how they engage in major life activities, rather than the ultimate outcome of those activities. Beyond directly addressing this concern in the debate over the ADA Amendments Act, Congress's incorporation of the far-reaching rules of construction, its explicit rejection of the consideration of ameliorative mitigating measures—including "learned behavioral or adaptive neurological modifications," 42 U.S.C. 12102(4)(E)(i)(IV), such as those often employed by individuals with learning disabilities or ADHD—and its stated intention to "reinstat[e] a broad scope of protection to be available under the ADA," Public Law 110-325, sec. 2(b)(1), all support the language initially proposed in these provisions. For these reasons, the Department determined that it will retain the language of these provisions as they were originally drafted.

*Analysis of Condition, Manner, or Duration Not Always Required*

As noted in the discussion above, the Department has added §§ 35.108(d)(3)(iv) and 36.105(d)(3)(iv) in the final rule to clarify that analysis of condition, manner, or duration will not always be necessary, particularly with respect to certain impairments that can easily be found to substantially limit a major life activity. This language is also found in the EEOC ADA title I regulation. See 29 CFR 1630(j)(4)(iv). As noted earlier, the inclusion of these provisions addresses several comments from organizations representing persons with disabilities. This language also responds to several commenters' concerns that the Department should clarify that, in some cases and particularly with respect to predictable assessments, no or only a very limited analysis of condition, manner, or duration is necessary.

At the same time, individuals seeking coverage under the first or second prong of the definition of "disability" should not be constrained from offering evidence needed to establish that their impairment is substantially limiting. See 154 Cong. Rec. S8842 (daily ed. Sept. 16, 2008) (Statement of the Managers). Such evidence may comprise facts related to condition, manner, or duration. And, covered entities may defeat a showing of substantial limitation by refuting whatever evidence the individual seeking coverage has offered, or by offering evidence that shows that an impairment does not impose a substantial limitation on a major life activity. However, a showing of substantial limitation is not defeated by facts unrelated to condition, manner, or duration that are not pertinent to the substantial limitation of a major life activity that the individual has proffered.

*Sections 35.108(d)(4) and 36.105(d)(4)*—*Examples of Mitigating Measures*

The rules of construction set forth at §§ 35.108(d)(1)(viii) and 36.105(d)(1)(viii) of the final rule make clear that the ameliorative effects of mitigating measures shall not be considered when determining whether an impairment substantially limits a major life activity. In the NPRM, proposed §§ 35.108(d)(4) and 36.105(d)(4) provided a non-inclusive list of mitigating measures, which includes medication, medical supplies, equipment, appliances, low-vision devices, prosthetics, hearing aids, cochlear implants and implantable hearing devices, mobility devices, oxygen therapy equipment, and assistive technology. In addition, the proposed regulation clarified that mitigating measures can include "learned behavioral or adaptive neurological modifications," psychotherapy, behavioral therapy, or physical therapy, and "reasonable modifications" or auxiliary aids and services.

The phrase "learned behavioral or adaptive neurological modifications," is intended to include strategies developed by an individual to lessen the impact of an impairment. The phrase "reasonable modifications" is intended to include informal or undocumented accommodations and modifications as well as those provided through a formal process.

The ADA as amended specifies one exception to the rule on mitigating measures, stating that the ameliorative effects of ordinary eyeglasses and contact lenses shall be considered in determining whether a person has an impairment that substantially limits a major life activity and thereby is a person with a disability. 42 U.S.C. 12102(4)(E)(ii). As discussed above, §§ 35.108(d)(4) (i) and 36.105(d)(4)(i) incorporate this exception by excluding ordinary eyeglasses and contact lenses from the definition of "low-vision devices," which are mitigating measures that may not be considered in determining whether an impairment is a substantial limitation.

The Department received a number of comments supporting the Department's language in these sections and its broad range of examples of what constitutes a mitigating measure. Commenters representing students with disabilities specifically supported the inclusion of "learned behavioral or adaptive neurological modifications," noting that the section "appropriately supports and highlights that students [and individuals in other settings] may have developed self- **\*53238** imposed ways to support their disability in order to perform major life activities required of daily life and that such measures cannot be used to find that the person is not substantially limited."

The Department notes that self-mitigating measures or undocumented modifications or accommodations for students who have impairments that substantially limit learning, reading, writing, speaking, or concentrating may include such measures as arranging to have multiple reminders for task completion; seeking help from others to provide reminders or to assist with the organization of tasks; selecting courses strategically (such as selecting courses that require papers instead of exams); devoting a far larger portion of the day, weekends, and holidays to study than students without disabilities; teaching oneself strategies to facilitate reading connected text or mnemonics to remember facts (including strategies such as highlighting and margin noting); being permitted extra time to complete tests; receiving modified homework assignments; or taking exams in a different format or in a less stressful or anxiety-provoking setting. Each of these mitigating measures, whether formal or informal, documented or undocumented, can improve the academic function of a student having to deal with a substantial limitation in a major life activity such as concentrating, reading, speaking, learning, or writing. However, when the determination of disability is made without considering the ameliorative effects of these measures, as required under the ADA as amended, these individuals still have a substantial limitation in major life activities and are covered by the ADA.See also discussion of §§ 35.108(d)(1) and 36.105(d)(1), above.

Some commenters argued that the Department's examples of mitigating measures inappropriately include normal learning strategies and asked that the Department withdraw or narrow its discussion of self-mitigating measures. The Department disagrees. Narrowing the discussion of self-mitigating measures to exclude normal or common strategies would not be consistent with the ADA Amendments Act. The Department construes learned behavioral or adaptive neurological modifications broadly to include strategies applied or utilized by an individual with a disability to lessen the effect of an impairment; whether the strategy applied is normal or common to students without disabilities is not relevant to whether an individual with a disability's application of the strategy lessens the effect of an impairment.