# No. 23-3

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

*ROBERT SAMPSON,*

*Plaintiff-Appellee,*

*v.*

*NATIONAL BOARD OF MEDICAL EXAMINERS,*

*Defendant-Appellant.*

On Appeal from the U.S. District Court for the Eastern
District of New York, Civil Action No. 22-CV-5120 (JMA)

**JOINT APPENDIX**
**VOLUME I OF V (A1 – A267)**

Robert A. Burgoyne
Caroline M. Mew
PERKINS COIE LLP
700 Thirteenth Street N.W.,
Suite 800
Washington, DC 20005-3960
Telephone: 202.654.1744

Attorneys for
Defendant-Appellant
NATIONAL BOARD OF
MEDICAL EXAMINERS

**VOLUME I: A1 – A267**

Page

District Court Docket Sheet............................................. A1

Complaint (Aug. 29, 2022) .............................................. A5

Declaration of Robert Sampson (Ex. 1 to
Preliminary Injunction Motion).................................... A29

Preceptor's Comments (Ex. 1A to Preliminary
Injunction Motion)........................................................ A39

Declaration of Jeanette Wasserstein (Ex. 2 to
Preliminary Injunction Motion) (SEALED)................. A43

2020 Wasserstein Evaluation (Ex. 2B to
Preliminary Injunction Motion) (SEALED)................. A44

2013 Michels Evaluation (Ex. 3 to Preliminary
Injunction Motion) (SEALED) ..................................... A45

2013 Anderson Evaluation (Ex. 4 to Preliminary
Injunction Motion) (SEALED) ..................................... A46

Stony Brook University Unofficial Transcript
(Ex. 5 to Preliminary Injunction Motion).................... A47

Course History (Ex. 6 to Preliminary Injunction
Motion) ........................................................................... A52

2017 Heedles Letter (Ex. 7 to Preliminary
Injunction Motion)........................................................ A54

2017 DeMotta Letter (Ex. 8 to Preliminary
Injunction Motion)........................................................ A56

2018 DeMotta Letter (Ex. 9 to Preliminary
Injunction Motion)......................................................... A59

Sept. 2017 Aronson Letter (Ex. 10 to Preliminary
Injunction Motion)......................................................... A61

June 2022 NBME Letter (Ex. 11 to Preliminary
Injunction Motion)......................................................... A65

Declaration of Lucia McGeehan in Opposition to
Plaintiff's Motion for Preliminary Injunction.............. A68

2017 Sampson Accommodation Request Form
(Ex. 1 to McGeehan Declaration) ................................. A79

April 2017 Lovett Report (Ex. 2 to McGeehan
Declaration) .................................................................... A87

June 2017 NBME Letter (Ex. 3 to McGeehan
Declaration) .................................................................... A91

July 2017 Lovett Report (Ex. 4 to McGeehan
Declaration) .................................................................... A94

Aug. 2017 NBME Letter (Ex. 5 to McGeehan
Declaration) .................................................................... A98

Dec. 2017 Lovett Report (Ex. 6 to McGeehan
Declaration) .................................................................. A101

Jan. 2018 NBME Letter (Ex. 7 to McGeehan
Declaration) .................................................................. A106

March 2018 NBME Letter (Ex. 8 to McGeehan
Declaration) .................................................................. A108

July 2018 Lovett Report (Ex. 9 to McGeehan
Declaration) .................................................................. A113

2018 Sampson Accommodation Request Form
(Ex. 10 to McGeehan Declaration) ............................ A118

Sept. 2018 NBME Letter (Ex. 11 to McGeehan
Declaration) .................................................................... A125

2018 Ortiz Report (Ex. 12 to McGeehan
Declaration) ................................................................... A136

2018 Murphy Report (Ex. 13 to McGeehan
Declaration) ................................................................... A150

Jan. 2019 NBME Letter (Ex. 14 to McGeehan
Declaration) ................................................................... A155

Sampson Step 1 Score Report (Ex. 15 to
McGeehan Declaration) ............................................... A158

2022 Sampson Accommodation Request Form
(Ex. 16 to McGeehan Declaration) ............................ A163

2022 Murphy Report (Ex. 17 to McGeehan
Declaration) ................................................................... A170

June 2022 NBME Letter (Ex. 18 to McGeehan
Declaration) ................................................................... A175

Sampson School Records (Ex. 19 to McGeehan
Declaration) ................................................................... A178

1999 Sampson OLSAT Score Report (Ex. 20 to
McGeehan Declaration) ............................................... A188

2005 Sampson PSAT Score Report (Ex. 21 to
McGeehan Declaration) ............................................... A191

2007 Sampson PSAT Score Report (Ex. 22 to
McGeehan Declaration) ............................................... A193

2008 Sampson ACT Score Report (Ex. 23 to
McGeehan Declaration) .............................................. A195

June 2008 Sampson SAT Score Report (Ex. 24 to
McGeehan Declaration) .............................................. A197

Oct. 2008 Sampson SAT Score Report (Ex. 25 to
McGeehan Declaration) .............................................. A199

Nov. 2008 Sampson SAT Score Report (Ex. 26 to
McGeehan Declaration) .............................................. A201

Sampson MCAT Score Report (Ex. 27 to McGeehan
Declaration) .............................................................. A203

Declaration of Benjamin J. Lovett in Opposition
to Plaintiff's Motion for Preliminary Injunction ........ A205

Lovett Curriculum Vitae (Ex. 1 to Lovett
Declaration) .............................................................. A224

April 2017 Lovett Report (Ex. 2 to Lovett
Declaration) .............................................................. A248

July 2017 Lovett Report (Ex. 3 to Lovett
Declaration) .............................................................. A252

Dec. 2017 Lovett Report (Ex. 4 to Lovett
Declaration) .............................................................. A256

July 2018 Lovett Report (Ex. 5 to Lovett
Declaration) .............................................................. A261

Figure from Rey Complex Figure Test (Ex. 6 to
Lovett Declaration) .................................................... A266

## VOLUME II: A268 – A494

Declaration of Kevin Murphy in Opposition
to Plaintiff's Motion for Preliminary Injunction..........A268

2018 Murphy Report (Ex. 1 to Murphy
Declaration) ...................................................................A289

2022 Murphy Report (Ex. 2 to Murphy
Declaration) ...................................................................A294

Murphy Curriculum Vitae (Ex. 3 to Murphy
Declaration) ...................................................................A299

Declaration of Samuel O. Ortiz in Opposition
to Plaintiff's Motion for Preliminary Injunction..........A314

Ortiz Curriculum Vitae (Ex. 1 to Ortiz
Declaration) ...................................................................A323

Nov. 2018 Ortiz Report (Ex. 2 to Ortiz
Declaration) ...................................................................A390

Declaration of Joseph E. Bernier in Opposition
to Plaintiff's Motion for Preliminary Injunction..........A404

Bernier Curriculum Vitae (Ex. 1 to Bernier
Declaration) ...................................................................A425

Declaration of Dawn P. Flanagan in Opposition
to Plaintiff's Motion for Preliminary Injunction..........A428

Flanagan Curriculum Vitae (Ex. 1 to Flanagan
Declaration) ...................................................................A436

## VOLUME III: A495 – A730

Declaration of Adam R. Mandelsberg in Opposition
to Plaintiff's Motion for Preliminary Injunction..........A495

Excerpts from the MCAT Essentials (2014-15)
(Ex. A to Mandelsberg Declaration)............................A497

Excerpts from Second Edition of Official Guide to
MCAT Exam (Ex. B to Mandelsberg Declaration) ......A507

MCAT Release Form, New York (administered
Jan. 23, 2015) (Ex. C to Mandelsberg Declaration).....A521

"The ACT - Preparing for the ACT" Booklet
(2008-09 ed.) (Ex. D to Mandelsberg Declaration) ......A601

Official SAT Practice Test 2007-08 (Ex. E to
Mandelsberg Declaration).............................................A682

## VOLUME IV: A731 – A969

Step 1 Sample Test Questions (Ex. F to Mandelsberg
Declaration, USMLE).....................................................A731

Declaration of Shelley Sampson in Support of
Plaintiff's Motion for Preliminary Injunction..............A788

Declaration of Andrew Lam in Support of
Plaintiff's Motion for Preliminary Injunction..............A793

2020 Stein & Vargas Letter (NBME Additional
Ex. 6) .............................................................................A796

2022 Letter from SUNY to Vargas (NBME
Additional Ex. 7)............................................................A801

2017 Sampson Accommodation Request Form
(Plaintiff Hearing Ex. 1).................................................A802

2013 Anderson Evaluation (Plaintiff Hearing
Ex. 2) (SEALED)............................................................A809

2013 Michels Evaluation (Plaintiff Hearing Ex. 3)
(SEALED) ......................................................................A810

2017 Sampson Personal Statement (Plaintiff
Hearing Ex. 4)................................................................A811

March 2017 Aronson Letter (Plaintiff Hearing
Ex. 5) .............................................................................A820

2017 Heedles Letter (Plaintiff Hearing Ex. 6).............A821

2017 DeMotta Letter (Plaintiff Hearing Ex. 7) ...........A822

2017 Certificate of Prior Test Accommodations
(Plaintiff Hearing Ex. 8)................................................A824

2017 Lam Letter (Plaintiff Hearing Ex. 9) ..................A825

2016 Wackett Letter (Plaintiff Hearing Ex. 10) ..........A826

Sampson Shelf Exam Score Report (Plaintiff
Hearing Ex. 10A)............................................................A827

Sampson MCAT Score Report (Plaintiff Hearing
Ex. 11) ...........................................................................A828

Sampson ACT Score Report (Plaintiff Hearing
Ex. 12) ...........................................................................A829

2007 Sampson PSAT Score Report (Plaintiff
Hearing Ex.13)...............................................................A830

Sampson SAT Score Report (Plaintiff Hearing Ex. 14)..............................................................A831

1999 Sampson OLSAT Score Report (Plaintiff Hearing Ex. 15)..........................................................A835

June 2017 NBME Letter (Plaintiff Hearing Ex. 16) .................................................................A837

2017 Sampson Letter (Plaintiff Hearing Ex. 17) .......................................................................A839

June 2017 Serrantino Letter (Plaintiff Hearing Ex. 18) .......................................................................A840

2017 Steve & Shelley Sampson Letter (Plaintiff Hearing Ex. 19) .............................................................A848

Quotes from School Record (Plaintiff Hearing Ex. 20) .......................................................................A850

Sampson Early School Records (Plaintiff Hearing Ex. 21) .......................................................................A852

Aug. 2017 NBME Letter (Plaintiff Hearing Ex. 22) .......................................................................A868

Sampson Letter (Plaintiff Hearing Ex. 23).................A870

Oct. 2017 Serrantino Letter (Plaintiff Hearing Ex. 24) .......................................................................A871

Sept. 2017 Aronson Letter (Plaintiff Hearing Ex. 25) .......................................................................A877

2017 Anderson Letter (Plaintiff Hearing Ex. 26) .......................................................................A880

Jan. 2018 NBME Letter (Plaintiff Hearing
Ex. 27) ...........................................................A882

Feb. 2018 Sampson Letter (Plaintiff Hearing
Ex. 28) ...........................................................A883

2018 DeMotta Letter (Plaintiff Hearing
Ex. 29) ...........................................................A897

March 2018 NBME Letter (Plaintiff Hearing
Ex. 30) ...........................................................A898

June 2018 Simon Letter (Plaintiff Hearing
Ex. 31) ...........................................................A902

June 2018 Aronson Letter (Plaintiff Hearing
Ex. 31A)..........................................................A918

Sept. 2018 NBME Letter (Plaintiff Hearing
Ex. 32) ...........................................................A920

Nov. 2018 Simon Letter (Plaintiff Hearing
Ex. 33) ...........................................................A922

Jan. 2019 NBME Letter (Plaintiff Hearing
Ex. 34) ...........................................................A927

2022 Sampson Accommodation Request Form
(Plaintiff Hearing Ex. 35)............................A929

2022 Sampson Personal Statement (Plaintiff
Hearing Ex. 36).............................................A935

2020 Wasserstein Evaluation (Plaintiff Hearing
Ex. 37) (SEALED)........................................A939

June 2022 NBME Letter (Plaintiff Hearing
Ex. 38) ...........................................................A940

DSM-V, Learning Disorder (Plaintiff Hearing
Ex. 49) ...........................................................A942

DSM-V, ADHD (Plaintiff Hearing Ex. 50)...................A951

Wasserstein Curriculum Vitae (Plaintiff Hearing
Ex.55) ...........................................................A959

## VOLUME V: A970 – A1161

Hearing Transcript, Oct. 11, 2022................................A970

Hearing Transcript, Oct. 12, 2022..............................A1036

Hearing Transcript, Oct. 13, 2022..............................A1135

Notice of Appeal.............................................A1159

Eastern District of New York, LIVE database (revision 1.7.1.1)

APPEAL,ACO

**U.S. District Court**
**Eastern District of New York (Central Islip)**
**CIVIL DOCKET FOR CASE #: 2:22-cv-05120-JMA-AYS**

Sampson v. National Board of Medical Examiners
Assigned to: Judge Joan M. Azrack
Referred to: Magistrate Judge Anne Y. Shields
Cause: 42:1201 Civil Rights (Disability)

Date Filed: 08/29/2022
Jury Demand: Plaintiff
Nature of Suit: 446 Civil Rights: Americans with Disabilities - Other
Jurisdiction: Federal Question

**Plaintiff**

**Robert Sampson**

represented by **Charles Weiner**
Law Office of Charles Weiner
99 Lantern Drive
Suite 202
Doylestown, PA 18901
267-685-6311
Email: charles@charlesweinerlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael S. Stein**
Stein & Vargas, LLP
10 G Street NE
Suite 600
Washington, DC 20002
202-248-5092
Fax: 888-778-4620
Email: michael.stein@steinvargas.com
*ATTORNEY TO BE NOTICED*

**Mary Caroline Vargas**
Stein & Vargas LLP
10 G Street NE
Suite 600
Washington, DC 20002
202-248-5092
Fax: 888-778-4620
Email: mary.vargas@steinvargas.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**National Board of Medical Examiners**

represented by **Adam Ross Mandelsberg**
Perkins Coie LLP
1155 Avenue of the Americas
22nd Floor
New York, NY 10036
212-261-6867
Email: AMandelsberg@perkinscoie.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Caroline M. Mew**
Perkins Coie LLP
700 13th Street, NW
Suite 800
Washington, DC 20005-3960
202-654-1767
Fax: 202-654-6211
Email: cmew@perkinscoie.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/29/2022 | 1 | COMPLAINT against National Board of Medical Examiners filing fee $ 402, receipt number ANYEDC-15887153 Was the Disclosure Statement on Civil Cover Sheet completed -YES,, filed by Robert Sampson. (Attachments: # 1 Civil Cover Sheet, # 2 Proposed Summons) (Vargas, Mary) (Entered: 08/29/2022) |
| 08/30/2022 | 2 | Civil Cover Sheet.. by Robert Sampson (Vargas, Mary) (Entered: 08/30/2022) |
| 08/30/2022 | | This attorney case opening filing has been checked for quality control. See the attachment for corrections that were made. (Landow, Concetta) (Entered: 08/30/2022) |
| 08/30/2022 | | Case Assigned to Judge Eric N. Vitaliano and Magistrate Judge Arlene R. Lindsay. Please download and review the Individual Practices of the assigned Judges, located on our website. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. |

**A1**

| | | |
|---|---|---|
| | | (Landow, Concetta) (Entered: 08/30/2022) |
| 08/30/2022 | 3 | In accordance with Rule 73 of the Federal Rules of Civil Procedure and Local Rule 73.1, the parties are notified that *if* all parties consent a United States magistrate judge of this court is available to conduct all proceedings in this civil action including a (jury or nonjury) trial and to order the entry of a final judgment. Attached to the Notice is a blank copy of the consent form that should be filled out, signed and filed electronically **only if all** parties wish to consent. The form may also be accessed at the following link: http://www.uscourts.gov/uscourts/FormsAndFees/Forms/AO085.pdf. **You may withhold your consent without adverse substantive consequences. Do NOT return or file the consent unless all parties have signed the consent.** (Landow, Concetta) (Entered: 08/30/2022) |
| 08/30/2022 | 4 | Notice of Related Case: **The Civil Cover Sheet filed in this civil action indicates a related case.** (Landow, Concetta) (Entered: 08/30/2022) |
| 08/30/2022 | 5 | Summons Issued as to National Board of Medical Examiners. (Landow, Concetta) (Entered: 08/30/2022) |
| 08/30/2022 | 6 | NOTICE of Appearance by Charles Weiner on behalf of Robert Sampson (aty to be noticed) (Attachments: # 1 Certificate of Service) (Weiner, Charles) (Entered: 08/30/2022) |
| 09/06/2022 | 7 | SUMMONS Returned Executed by Robert Sampson. National Board of Medical Examiners served on 8/31/2022, answer due 9/21/2022. (Vargas, Mary) (Entered: 09/06/2022) |
| 09/06/2022 | 8 | Letter MOTION for pre motion conference by Robert Sampson. (Vargas, Mary) (Entered: 09/06/2022) |
| 09/06/2022 | | ORDER REASSIGNING CASE. Case reassigned to Judge Joan M. Azrack and Magistrate Judge Anne Y. Shields for all further proceedings. Judge Eric N. Vitaliano, Magistrate Judge Arlene R. Lindsay no longer assigned to case Please download and review the Individual Practices of the assigned Judges, located on our website. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Ordered by Chief Judge Margo K. Brodie on 9/6/2022. (Bowens, Priscilla) (Entered: 09/07/2022) |
| 09/08/2022 | | ORDER terminating 8 Motion for Pre Motion Conference. The Court waives its pre-motion conference requirement and grants Plaintiff's request to move for a preliminary injunction. In light of the schedule set for preliminary injunction proceedings in the related case (22-cv-4490), the Court sets the following briefing schedule for Plaintiff's motion: Plaintiff shall file his opening brief by 9/19/2022; Defendant shall file its opposition by 9/29/2022; Plaintiff shall file his reply, if any, by 10/4/2022. Because Defendant has not yet appeared in this action, Plaintiff is directed to serve a copy of this order on Defendant's counsel and file proof of service via ECF. Ordered by Judge Joan M. Azrack on 9/8/2022. (Patterson, Samuel) (Entered: 09/08/2022) |
| 09/08/2022 | 9 | NOTICE by Robert Sampson (Vargas, Mary) (Entered: 09/08/2022) |
| 09/08/2022 | | SCHEDULING ORDER: A telephone conference is set for September 12, 2022 at 9:00 AM before Judge Joan M. Azrack. Counsel shall dial 1-877-873-8017 and enter access code 4785432 at the prompt. Because Defendant has not yet appeared in this action, Plaintiff is directed to serve a copy of this order on Defendant's counsel and file proof of service via ECF. Ordered by Judge Joan M. Azrack on 9/8/2022. (Patterson, Samuel) (Entered: 09/08/2022) |
| 09/09/2022 | 10 | NOTICE by Robert Sampson (Vargas, Mary) (Entered: 09/09/2022) |
| 09/09/2022 | 11 | NOTICE of Appearance by Adam Ross Mandelsberg on behalf of National Board of Medical Examiners (aty to be noticed) (Mandelsberg, Adam) (Entered: 09/09/2022) |
| 09/12/2022 | 12 | MINUTE ENTRY for proceedings held before Judge Joan M. Azrack: Civil Cause for STATUS CONFERENCE (Tel) held on 9/12/2022. Counsel for Plaintiff: Charles Weiner, Mary Vargas. Counsel for Defendants: Adam Mandelsberg, Carolyn Mew. Case called. Counsel present for all sides. A hearing on the preliminary injunction motion is scheduled for 10/11/2022 at 10:00 AM before Judge Azrack in Courtroom 920 of the Long Island Courthouse. (Coleman, Laurie) (Entered: 09/12/2022) |
| 09/16/2022 | 13 | Letter MOTION for Extension of Time to File Answer re 1 Complaint, by National Board of Medical Examiners. (Mandelsberg, Adam) (Entered: 09/16/2022) |
| 09/19/2022 | | ORDER granting 13 Motion for Extension of Time to Answer: The Court grants the request despite Plaintiff's objections. National Board of Medical Examiners answer due 10/21/2022. So Ordered by Magistrate Judge Anne Y. Shields on 9/19/2022. (Minerva, Deanna) (Entered: 09/19/2022) |
| 09/19/2022 | 14 | MOTION for Leave to Electronically File Document under Seal by Robert Sampson. (Vargas, Mary) (Entered: 09/19/2022) |
| 09/19/2022 | 15 | Letter *re Motion for Preliminary Injunction* by Robert Sampson (Vargas, Mary) (Entered: 09/19/2022) |
| 09/20/2022 | | ORDER granting 14 Motion for Leave to Electronically File Document under Seal. Counsel is directed to file the original document(s) under seal as a separate entry. Instructions on filing sealed documents on ECF are located at www.nyed.uscourts.gov.<br><br>The parties should not bundle the briefing for Plaintiff's motion for a preliminary injunction. Plaintiff is directed to file his opening brief via ECF by September 21, 2022. The Court's September 8, 2022 Scheduling Order otherwise remains in effect. Ordered by Judge Joan M. Azrack on 9/20/2022. (Patterson, Samuel) (Entered: 09/20/2022) |
| 09/20/2022 | 16 | MOTION for Preliminary Injunction by Robert Sampson. (Attachments: # 1 Memorandum in Support of Motion for Preliminary Injunction, # 2 Proposed Order, # 3 Exhibit 1 Declaration of Robert Sampson, # 4 Exhibit 5 Unofficial Transcript, # 5 Exhibit 6 Course History, # 6 Exhibit 7 Heedles Letter, # 7 Exhibit 8 DeMotta Letter 2017, # 8 Exhibit 9 DeMotta Letter 2018, # 9 Exhibit 10 Aronson Letter, # 10 Exhibit 11 NBME Denial Letter June 2022) (Vargas, Mary) (Entered: 09/20/2022) |
| 09/29/2022 | 18 | NOTICE of Appearance by Michael S. Stein on behalf of Robert Sampson (aty to be noticed) (Stein, Michael) (Entered: 09/29/2022) |
| 09/29/2022 | 19 | Corporate Disclosure Statement by National Board of Medical Examiners (Mandelsberg, Adam) (Entered: 09/29/2022) |
| 09/29/2022 | 20 | MEMORANDUM in Opposition re 16 MOTION for Preliminary Injunction filed by National Board of Medical Examiners. (Mandelsberg, Adam) (Entered: 09/29/2022) |
| 09/29/2022 | 21 | AFFIDAVIT/DECLARATION in Opposition re 16 MOTION for Preliminary Injunction / *Declaration of Lucia McGeehan, Ph.D* filed by National Board of Medical Examiners. (Attachments: # 1 Exhibits 1-27 to the Declaration of Lucia McGeehan) (Mandelsberg, Adam) (Entered: 09/29/2022) |
| 09/29/2022 | 22 | AFFIDAVIT/DECLARATION in Opposition re 16 MOTION for Preliminary Injunction / *Declaration of Benjamin J. Lovett, Ph.D* filed by National Board of Medical Examiners. (Attachments: # 1 Exhibits 1-6 to the Declaration of Benjamin J. Lovett) (Mandelsberg, Adam) (Entered: 09/29/2022) |
| 09/29/2022 | 23 | AFFIDAVIT/DECLARATION in Opposition re 16 MOTION for Preliminary Injunction / *Declaration of Kevin Murphy, Ph.D* filed by National Board of Medical Examiners. (Attachments: # 1 Exhibit 1-3 to the Declaration of Kevin Murphy) (Mandelsberg, Adam) (Entered: 09/29/2022) |
| 09/29/2022 | 24 | AFFIDAVIT/DECLARATION in Opposition re 16 MOTION for Preliminary Injunction / *Declaration of Samuel O. Ortiz, Ph.D* filed by National Board of Medical Examiners. (Attachments: # 1 Exhibits 1-2 to the Declaration of Samuel O. Ortiz) (Mandelsberg, Adam) (Entered: 09/29/2022) |
| 09/29/2022 | 25 | AFFIDAVIT/DECLARATION in Opposition re 16 MOTION for Preliminary Injunction / *Declaration of Joseph E. Bernier, Ph.D* filed by National Board of Medical Examiners. (Attachments: # 1 Exhibit 1 to the Declaration of Joseph E. Bernier) (Mandelsberg, Adam) (Entered: 09/29/2022) |

**A2**

| | | |
|---|---|---|
| 09/29/2022 | 26 | AFFIDAVIT/DECLARATION in Opposition re 16 MOTION for Preliminary Injunction / *Declaration of Dawn P. Flanagan, Ph.D* filed by National Board of Medical Examiners. (Attachments: # 1 Exhibit 1 to the Declaration of Dawn P. Flanagan) (Mandelsberg, Adam) (Entered: 09/29/2022) |
| 09/29/2022 | 27 | AFFIDAVIT/DECLARATION in Opposition re 16 MOTION for Preliminary Injunction / *Declaration of Adam R. Mandelsberg* filed by National Board of Medical Examiners. (Attachments: # 1 Exhibits A-F to the Declaration of Adam R. Mandelsberg) (Mandelsberg, Adam) (Entered: 09/29/2022) |
| 09/30/2022 | 28 | Letter *from Adam R. Mandelsberg to the Hon. Joan M. Azrack dated September 30,2022 regarding clarification on issues related to the upcoming hearing scheduled for October 11, 2022 at 10:00 a.m.* by National Board of Medical Examiners. (Mandelsberg, Adam) (Entered: 09/30/2022) |
| 09/30/2022 | | SCHEDULING ORDER: A Telephone Conference is set for 10/4/2022 at 1:00 PM before Judge Joan M. Azrack. Counsel shall dial 1-877-873-8017 and enter access code 4785432 at the prompt. Ordered by Judge Joan M. Azrack on 9/30/2022. (Patterson, Samuel) (Entered: 09/30/2022) |
| 10/03/2022 | 29 | MOTION to Appear Pro Hac Vice *of Caroline Mew* Filing fee $ 150, receipt number ANYEDC-15998526. by National Board of Medical Examiners. (Attachments: # 1 Affidavit in Support with Attached Certificates of Good Standing) (Mew, Caroline) (Entered: 10/03/2022) |
| 10/04/2022 | | ORDER granting 29 Motion for Leave to Appear Pro Hac Vice. The attorney shall register for ECF, registration is available online at www.pacer.gov. Once registered, the attorney shall file a notice of appearance and ensure that she receives electronic notification of activity in this case. So Ordered by Magistrate Judge Anne Y. Shields on 10/4/2022. (DM) (Entered: 10/04/2022) |
| 10/04/2022 | 30 | NOTICE of Appearance by Caroline M. Mew on behalf of National Board of Medical Examiners (notification declined or already on case) (Mew, Caroline) (Entered: 10/04/2022) |
| 10/04/2022 | 31 | MINUTE ENTRY for proceedings held before Judge Joan M. Azrack: Civil Cause for STATUS CONFERENCE (Tel) held on 10/4/2022. Counsel for Plaintiff: Mary Vargas, Charles Weiner. Counsel for Defendants: Carolyn Mew, Adam Mandelsberg. Case called. Counsel present for all sides. (LC) (Entered: 10/04/2022) |
| 10/04/2022 | 32 | REPLY in Support re 16 MOTION for Preliminary Injunction filed by Robert Sampson. (Attachments: # 1 Exhibit 1 Declaration of Shelley Sampson, # 2 Exhibit 2 Declaration of Andrew Lam, M.D.) (Vargas, Mary) (Entered: 10/04/2022) |
| 10/04/2022 | 33 | REPLY in Support (*Correction to ECF No. 32 )* re 16 MOTION for Preliminary Injunction filed by Robert Sampson. (Attachments: # 1 Exhibit 1 Declaration of Shelley Sampson, # 2 Exhibit 2 Declaration of Andrew Lam and Attached Letter) (Vargas, Mary) Modified on 10/5/2022 at the request of counsel to more clearly reflect the document filed herein is a correction to the 32 Reply and contains a page that was inadvertently omitted from 32 -2 (LC). (Entered: 10/04/2022) |
| 10/05/2022 | 34 | Witness List by Robert Sampson (Vargas, Mary) (Entered: 10/05/2022) |
| 10/05/2022 | 35 | Exhibit List by Robert Sampson. (Vargas, Mary) (Entered: 10/05/2022) |
| 10/05/2022 | 36 | Exhibit List *and Witness List* by National Board of Medical Examiners. (Mew, Caroline) (Entered: 10/05/2022) |
| 10/11/2022 | 37 | MINUTE ENTRY for proceedings held before Judge Joan M. Azrack: Civil Cause for PRELIMINARY INJUNCTION HEARING held on 10/11/2022 re 16 MOTION for Preliminary Injunction. Counsel for Plaintiff: Mary Vargas, Charles Weiner. Counsel for Defendants: Caroline Mew, Adam Mandelsberg. Case called. Counsel present for all sides. Opening statements of plaintiff and defendant heard. Witnesses sworn, exhibits entered into evidence. Hearing continued to 10/12/2022 at 9:30 AM. (LC) (Entered: 10/11/2022) |
| 10/12/2022 | 38 | MINUTE ENTRY for proceedings held before Judge Joan M. Azrack: Civil Cause for PRELIMINARY INJUNCTION HEARING held on 10/12/2022 re 16 MOTION for Preliminary Injunction. APPEARANCES: For Plaintiff: Mary Vargas, Charles WeinerFor Defendants: Caroline Mew, Adam Mandelsberg Case called. Counsel present for all sides. Witnesses sworn, exhibits entered into evidence. Hearing continued to 10/13/2022 at 9:00 AM. (LC) (Entered: 10/13/2022) |
| 10/13/2022 | 40 | Exhibit List by National Board of Medical Examiners, Robert Sampson.; Witness List by National Board of Medical Examiners, Robert Sampson. (LC) (Entered: 10/13/2022) |
| 10/13/2022 | | Incorrect Entry Information: The 39 Minute Entry has been deleted and re-entered for statistical purposes. (LC) (Entered: 11/03/2022) |
| 10/13/2022 | 39 | MINUTE ENTRY for proceedings held before Judge Joan M. Azrack: Civil Cause for PRELIMINARY INJUNCTION HEARING re 16 MOTION for Preliminary Injunction. APPEARANCES: For Plaintiff: Mary Vargas, Charles Weiner; For Defendants: Caroline Mew, Adam Mandelsberg. Case called. Counsel present for all sides. Witness continued. Exhibits entered into evidence. Hearing concluded. Decision reserved. Other: Findings of fact and conclusions of law due by close of business on 10/31/2022. Court Reporter Lisa Schmid. (LC) Modified on 11/3/2022 to change number to 39 (LC). (Entered: 11/03/2022) |
| 10/18/2022 | 41 | Letter MOTION for Extension of Time to File *a Response to the Complaint* by National Board of Medical Examiners. (Mandelsberg, Adam) (Entered: 10/18/2022) |
| 10/20/2022 | | ORDER granting 41 Motion for Extension of Time to File: Defendant shall answer or otherwise respond to Plaintiff's Complaint on or before November 14, 2022. So Ordered by Magistrate Judge Anne Y. Shields on 10/20/2022. (DM) (Entered: 10/20/2022) |
| 10/31/2022 | 42 | Proposed Findings of Fact by Robert Sampson (Vargas, Mary) (Entered: 10/31/2022) |
| 10/31/2022 | 43 | Proposed Findings of Fact by National Board of Medical Examiners (Mew, Caroline) (Entered: 10/31/2022) |
| 11/14/2022 | 44 | Letter */ Joint Letter from the Parties to the Hon. Joan M. Azrack regarding the Transcript of the Preliminary Injuction hearing held in this matter on October 11-13, 2022* by National Board of Medical Examiners (Attachments: # 1 Exhibit - Errata to Transcript of Sampson v. NBME Preliminary Injunction Hearing) (Mew, Caroline) (Entered: 11/14/2022) |
| 11/14/2022 | 45 | ANSWER to 1 Complaint, by National Board of Medical Examiners. (Mew, Caroline) (Entered: 11/14/2022) |
| 11/15/2022 | | ORDER: The parties' joint motion (ECF No. 44) is GRANTED. The court reporters are directed to review and correct the transcription record in this matter based upon the information provided in the errata sheets (ECF No. 44-1.) Ordered by Judge Joan M. Azrack on 11/15/2022. (SP) (Entered: 11/15/2022) |
| 12/02/2022 | 46 | ORDER granting 16 Motion for Preliminary Injunction. For the reasons set forth in the attached Memorandum and Order, Plaintiff's 16 motion for a preliminary injunction is granted. See attached order for details. Ordered by Judge Joan M. Azrack on 12/2/2022. (SP) (Entered: 12/02/2022) |
| 12/30/2022 | 47 | NOTICE OF INTERLOCUTORY APPEAL as to 46 Order on Motion for Preliminary Injunction, by National Board of Medical Examiners. (CL) (Entered: 01/04/2023) |
| 12/30/2022 | | USCA Appeal Fees received $ 505 receipt number ANYEDC-16268012 re 47 Notice of Interlocutory Appeal filed by National Board of Medical Examiners (CL) (Entered: 01/04/2023) |
| 01/04/2023 | | Electronic Index to Record on Appeal sent to US Court of Appeals. 47 Notice of Interlocutory Appeal; The original Index that was sent over did not have the correct event for the Appeal. Documents are available via Pacer. For docket entries without a hyperlink or for documents under seal, contact the court and we'll arrange for the document(s) to be made available to you. (CL) Modified on 1/5/2023 (CL) (Entered: 01/04/2023) |

## A3

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 01/25/2023 12:03:11 | | | |
| PACER Login: | Perkins1201SEA | Client Code: | 009901.0001 |
| Description: | Docket Report | Search Criteria: | 2:22-ev-05120-JMA-AYS |
| Billable Pages: | 6 | Cost: | 0.60 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ROBERT SAMPSON, | : | |
| | : | |
| Plaintiff | : | |
| | : | CIVIL ACTION NO. |
| v. | : | |
| | : | JURY TRIAL DEMANDED |
| NATIONAL BOARD OF MEDICAL | : | |
| EXAMINERS, | : | |
| | : | |
| Defendant | : | |

## **COMPLAINT**

Plaintiff Robert Sampson ("Sampson") is a gifted student who has worked hard to overcome his reading and attentional disabilities. The medical school that he attends---Stony Brook University—provides Sampson with double time on medical school examinations. Stony Brook University made this determination based on neuropsychological evaluations of Sampson, and has urged the National Board of Medical Examiners ("NBME") to similarly provide Sampson with double time so that his testing scores reflect the extent of his knowledge of medicine rather than the extent of his disability. NBME, however, has repeatedly refused to provide Sampson with testing accommodations, leaving Sampson unable to progress. Such accommodations, which are neither expensive nor difficult to provide, allow individuals with learning disabilities and other cognitive impairments, like Sampson, to demonstrate their aptitude and skill level. Sampson accordingly brings this lawsuit seeking preliminary and permanent injunctive relief requiring NBME to provide him with the testing accommodations to ensure that the NBME examinations measure Sampson's knowledge of medicine rather than the extent of his disabilities. Sampson also seeks declaratory relief, compensatory damages, and reasonable attorneys' fees and costs.

**A5**

**Jurisdiction, Parties and Venue**

1.      Sampson is a citizen of the state of New York and is a joint-degree student in medicine and business administration at Stony Brook University.

2.      The NBME is a District of Columbia not-for-profit organization headquartered at 3750 Market Street, Philadelphia, Pennsylvania. NBME administers the United States Medical Licensing Examination ("USMLE"), a three-step examination, the successful completion of which is required for medical licensure in the United States. NBME is a private entity that offers examinations related to the application and credentialing for professional purposes and as such is subject to the non-discrimination and appropriate accommodations requirements of the Americans with Disabilities Act ("ADA").

3.      The NBME administers the USMLE throughout the country, including in the Eastern District of New York.

4.      NBME engages in business in New York and this judicial district and this action arises from those business activities.

5.      Upon information and belief, NBME is a recipient of Federal financial assistance, including but not limited to funds from the United States Department of Defense, the United States Veterans Administration, and the Uniformed Services University of Health Sciences, as well as federal funds that pass through the Federation of State Medical Boards. The NBME also benefits from the service of federal officials who serve on its committees and otherwise further its mission on the federal fisc. The NBME is therefore subject to section 504 of the Rehabilitation Act.

**A6**

6.      This action arises under the laws of the United States, specifically the ADA, 42 U.S.C. § 12101 *et. seq.* and section 504, 29 U.S.C. § 794.  Therefore, this Court has subject matter jurisdiction based on a federal question pursuant to 28 U.S.C. §1331 and 1343.

7.      Venue is proper in this Court pursuant to 28 U.S.C. §1391, as the NBME is doing business in this judicial district by virtue of administering the USMLE Step 1 in this district and has sufficient contacts for personal jurisdiction.  Alternatively, and cumulatively, venue is proper in this Court pursuant to 28 U.S.C. § 1391 in that acts of discrimination have taken place in this District and Sampson resides in this District.

8.      This action is related to another action pending in this District, specifically, *Sampson v. Stony Brook University*, 2:22-cv-04490 (JMA)(AYS).

## FACTUAL ALLEGATIONS

9.      Robert Sampson has successfully completed three out of four years of medical education.

10.     Although his education was interrupted as the result of his disability and need for accommodations, he is approximately 42 weeks away from completing his medical education.

11.     Sampson is a student in good standing.

12.     Sampson is a joint degree student who is currently enrolled at both Stony Brook's Renaissance School of Medicine ("Stony Brook") and its College of Business.

13.     Sampson is a gifted student. His grade point average in his business school classes to date is a straight 4.0.

14.     Sampson is likewise a gifted medical student who shows promise of being a well-prepared and compassionate doctor. In his third-year clinical rotations, just recently completed in 2021, Stony Brook's medical faculty and preceptors penned glowing evaluations of Sampson,

3

**A7**

saying Sampson was an "excellent student" who is "highly compassionate", "looked for ways to help", showed "great enthusiasm", and was "an asset to our team". They further described Sampson as "extremely dedicated to his patients", "thoughtful," and a "pleasure to work with".

15. In his recent surgical rotation, preceptors wrote that even when cases ran late and Sampson could have left, he "insisted on staying and finishing with the team." They reported that Sampson "exhibits an advanced understanding of surgery for his level and consistently portrays a natural sense of curiosity, which is apparent in his thoughtful questions."

16. Of his readiness to move into his 4th and final year of medical school, Stony Brook faculty and preceptors said that Sampson's performed "above expected for the level of training".

17. In addition to and separate from his dedication to his studies, Sampson on his own invented not one but two medical systems for which he received two patents from the United States Patent and Trademark Office.

18. All of Sampson's accomplishments were achieved as an individual with a disability.

19. Sampson is substantially impaired by a Specific Learning Disorder with impairments in reading and attention deficit hyperactivity disorder (ADHD). These conditions individually and collectively substantially limit the major life activities of reading, thinking, learning, cognitive processing and taking timed examinations.

20. Sampson has spent a lifetime requiring accommodation and/or mitigating measures to overcome these challenges.

4

**A8**

21.     Despite repeated requests, NBME has denied and continues to deny Sampson,

appropriate accommodations including 100% extended time over two days and additional breaks

for the USMLE Step 1.

22.     If Sampson does not receive necessary accommodations on the USMLE Step 1,

his examination results will not reflect his aptitude and achievement level as required by law.

Moreover, without the necessary accommodations, Sampson is at imminent risk of failing the

examination due to the inability to complete the examination if given insufficient time to access

and answer the questions.

23.     Sampson's situation is further exacerbated by the fact Stony Brook's Renaissance

School of Medicine will expel Sampson if he does not take and pass the USMLE Step 1. Absent

accommodation for his disabilities, Sampson's medical career will end despite all the promise his

educators have seen in him.

## **Sampson's Disabilities**

24.     Throughout his education, Sampson has struggled with reading, concentrating and

processing information.

25.     He began years of speech and language therapy at the age of four. In grammar

school, though bright, his mother read assignments to him because he struggled with reading

comprehension and likewise struggled to focus and read for meaning.

26.     His educational record is notable each year as far back as kindergarten for

difficulties in focus, attention, comprehension, and timely completion of tasks. For example, his

second-grade teacher noted that Sampson's difficulty focusing caused him to struggle with

comprehension. Likewise, his fifth-grade teacher noted that his grades were impacted by his

5

**A9**

inability to complete assignments. Sixth grade teachers also noted that his distraction interfered with assignment completion.

27.    During elementary school he required both tutors and a reading specialist. In fact, Sampson relied heavily on tutors throughout his education and worked hard – harder than his peers – to learn and demonstrate that knowledge.

28.    In college, Sampson avoided classes with heavy reading and his grades varied widely because of the impact of his disabilities.

29.    Educational testing confirms the reports of Sampson's teachers all the way back to elementary school and his own experiences.

30.    For example, neurocognitive testing in 2013 documented that when faced with a complex reading task, Sampson was only able to complete half of the test in the allotted time as compared to the general population.

31.    Contrary to popular, cultural misperceptions, students with ADHD can be significantly impaired, facing real, disability-based barriers to demonstrating their knowledge. This is true for gifted students who are twice exceptional insofar as they are both gifted and a student with a disability.

32.    Likewise, students with learning disability face significant and real disability-based barriers that can require accommodation.

33.    Students with both ADHD and learning disabilities often find the interplay of these two disabilities to be devastating – reading is more difficult and labored requiring focus that the student does not have because of ADHD.

**A10**

34.     As the result of supportive parents, a host of tutors, dedication, work ethic, mitigating measures, and a bright mind, Sampson earned admission to and matriculated at Stony Brook's Renaissance School of Medicine.

35.     When Sampson entered medical school on August 12, 2015, he hoped that the mitigating measures he had relied on for a lifetime would be sufficient to overcome the challenges imposed by his ADHD and learning disabilities, but this was not the case.

36.     Although Sampson passed all of his medical school classes, he did not have time to finish reading all of the questions on the examinations and therefore was not able to demonstrate the fullest extent of his knowledge of medicine.

37.     Due to the difficulty that Sampson experienced completing his exams due to his disabilities, during Sampson's second year of medical school, he submitted a request for accommodations with Stony Brook's Disability Support Services and furnished the requisite documentation.

38.     Stony Brook Disability Support Services initially concluded based upon review of Sampson's neurocognitive evaluations that Sampson did have disabilities that required accommodations and approved him to begin receiving time and half (50% additional time) on all testing.

39.     However, subsequent expert evaluation concluded that 50% additional time was not sufficient and on the basis of new documentation, Stony Brook approved Sampson for 100% additional time.

7

**A11**

**The USMLE Step 1**

40.     The United States Medical Licensing Examination ("USMLE") is a three-step test administered by the NBME. A physician must pass each of the three steps, named Step 1, Step 2 Clinical Knowledge (CK) and Step 3.

41.     The USMLE Step 1 examination purports that it "assesses the examinee's understanding of and ability to apply important concepts of the basic sciences to the practice of medicine, with special emphasis on principles and mechanisms underlying health, disease, and modes of therapy."

42.     Under standard conditions, the Step 1 examination is a computer-based examination, which consists of questions presented in standard multiple-choice formats.  Step 1 has approximately 280 multiple choice test items, divided into seven 60-minute blocks, administered in one eight-hour testing session.

43.     The NBME develops and administers the USMLE Step 1 at various Prometric test centers and on various dates throughout the United States. The results of each student's scores are reported to that student's medical school.

44.     Sampson must pass the USMLE Step 1 in order to maintain his eligibility to remain in medical school.  Furthermore, passing the USMLE Step 1 is required to graduate medical school, to enter into a residency program, to be eligible to take the USMLE Step 2 and 3 examinations and to ultimately obtain medical licensure.

45.     At Sampson's medical school, 98% of medical students pass the USMLE which is higher than the 97% national pass rate.

A12

**The NBME's Request for Accommodation Process**

46.     Unlike medical students without disabilities who are able to register for and almost immediately take the USMLE, students with disabilities must prepare and submit voluminous and time-consuming applications for accommodations.

47.     These applications for accommodations take months to prepare and for the NBME to process.

48.     Each application for accommodation to the NBME can also require significant financial resources to complete because each time a student requests accommodations, they must register for the USMLE and pay significant fees to the NBME.

49.     The NBME has a long history of denying medical students' well-documented requests for accommodation. For example, in *Ramsay v. NBME*, a court entered a preliminary injunction requiring the NBME to provide the medical student with her needed accommodations. *Ramsay v. Nat'l Bd. of Med. Exam'rs,* 968 F.3d 251 (3d Cir. 2020).  Likewise in *Berger v. Nat'l Bd. of Med. Exam'rs*, the Court entered a preliminary injunction requiring the NBME to provide accommodations to a student with ADHD and learning disabilities. Case No. 1:19-cv-99, 2019 U.S. Dist. LEXIS 145666 (S.D. Ohio August 27, 2019).

50.     The NBME denies more than half of the requests for accommodation filed by medical students with disabilities.

51.     The NBME profits financially from denying disability accommodations requests for a few reasons.

52.     First, students must register each time they apply for accommodations and for each registration for the USMLE Step 1 or Step 2, medical students must pay the NBME $640.

9

**A13**

53. Second, students with disabilities who are denied accommodations fail the USMLE at a much higher rate than students without disabilities. Therefore, those students must re-register paying an additional fee to the NBME of another $640 with each registration.

54. While the NBME profits from denying requests for accommodations, medical students with disabilities face enormous costs and consequences as the result of denials of accommodations requests.

55. For example, students with disabilities fail the USMLE at far higher rates than students without disabilities.

56. Students who fail any part of the USMLE often face delays in their medical education, reduced opportunities in the residency match process, financial consequences related to the need to repeatedly pay hefty registration fees to the NBME, costs related to additional and unnecessary educational testing the NBME requires students to submit, as well as delayed earnings and diminished lifetime earning potential.

57. Unfortunately, in some cases, students with disabilities face total loss of career as the result of the NBME's denial of their requests for accommodation.

58. Upon information and belief, students who request additional time as the result of ADHD and/learning disabilities are denied accommodations at a rate higher than students seeking accommodations as the result of other disabilities.

59. The NBME requires that students, even students with disabilities that are fixed and unchanging, submit results of testing administered within the prior three years documenting their disability. Such testing can cost a medical student many thousands of dollars.

60. Comprehensive psychoeducational testing of the kind required by the NBME is expensive and typically is not covered by health insurance. Additionally, obtaining such testing

10

**A14**

can be time consuming, and has been particularly difficult and time consuming to obtain as the result of COVID-19.

61.     In addition to recent testing (defined by the NBME as testing every three years) proving disability and need for accommodations, the NBME requires medical students with disabilities to submit personal statements, proof of past testing accommodations, educational records sometimes spanning many years and institutions, and certification from the student's medical school that they receive the accommodations being requested.

62.     A recent survey of United States medical schools documented that some medical schools devote as many as 40 hours and $10,000 per student requesting accommodation while other medical schools do not devote resources to assisting students in seeking accommodations from the NBME.

**Denials of Sampson's Request for accommodations**

63.     On or about April 1, 2017, Sampson filed his first request for accommodation to the NBME seeking extended time and extra breaks.

64.     Sampson submitted all of the elements required by the NBME with his application for accommodation including comprehensive psychoeducational evaluation and certification from his medical school that he needed and was receiving the accommodations requested.

65.     The documentation provided to the NBME complied with the documentation required by the NBME for requesting accommodations for the USMLE Step 1.

66.     By letter dated June 13, 2017, NBME informed Sampson that his request for accommodations for the USMLE Step 1 was denied and that no accommodations were approved.

**A15**

67. On or about June 23, 2017, Sampson re-applied for accommodations submitting additional documentation to support his request.

68. By letter dated August 1, 2017, NBME informed Sampson that his request for accommodations for the USMLE Step 1 was denied for the second time.

69. On or about November 20, 2017, Sampson again applied for accommodations for the USMLE Step 1 and furnished NBME with additional documentation to support his request for accommodations.

70. By letter dated January 12, 2018, NBME informed Sampson that his request for accommodations for the USMLE Step 1 was denied for the third time.

71. On February 22, 2018, Sampson again applied for accommodations for the USMLE Step 1.

72. By letter dated March 6, 2018, NBME informed Sampson that his request for accommodations for the USMLE Step 1 was denied for the fourth time.

73. On or about June 29, 2018, Sampson applied for accommodations and furnished additional documentation supporting his request for accommodations.

74. By letter dated September 7, 2018, NBME informed Sampson that his request for accommodations for the USMLE Step 1 was denied for the fifth time.

75. On or about November 14, 2018, Sampson applied for accommodations for the sixth time.

76. NBME communicated a sixth denial in a letter dated January 4, 2019.

77. In an effort to comply with his medical school's mandate that he take and pass Step 1 before continuing with his education, Sampson took Step 1 of the USMLE in January of 2020, without the accommodations he needed.

**A16**

78.     Without the extended time he needed because of disability, Sampson was unable to substantively complete significant portions of the exam and resorted to guessing vastly as the clock ran out. He failed the USMLE Step 1 exam.

79.     In order to again request accommodation and because of the NBME's requirement that testing be recent even if a disability is life-long and unchanging, Sampson needed new, comprehensive and costly educational testing.

80.     Sampson submitted himself for comprehensive testing by Dr. Jeannette Wasserstein, a clinical neuropsychiatrist and assistant clinical professor of psychiatry at Mt. Sinai Medical School.

81.     As had prior evaluations, this new evaluation underscored Sampson's very real and significant need for extended testing time. Dr. Wasserstein administered a battery of tests and concluded that Sampson had both very significant ADHD and learning disabilities. The results were consistent with prior testing. She described Sampson has having "significant handicaps on tasks that rely on perceptual reasoning and working memory, such as reading comprehension." Tests showed both his reading rate and reading fluency as being significantly deficient. His reading rate on difficult material was at the 1st percentile. When answering questions within the normal time limit on one inventory, for example, he was able to answer only 12 of 38 questions in the time allotted with the result that he scored. With double time he answered 37 of 38 questions correctly.

82.     Dr. Wasserstein found severely impaired sustained visual attention, which would be expected to impact performance on lengthy standardized exams. She also found significant difficulty with tasks that rely on visual processing and would be even more pronounced under timed testing conditions.

**A17**

83.     Dr. Wasserstein diagnosed significant reading comprehension issues resulting from the combination of diagnoses including complex reading disorder with dysgraphia with impaired visual processing and other memory and learning deficits. She found clear deficits in sustained attention, executive function, memory and learning ability and visual-motor integration. These deficits were not just between Sampson's Superior/Very Superior intellect and test performance but were also absolute deficits as compared to the general population.

84.     Dr. Wasserstein strongly advised that double time was needed as an accommodation in testing as well as extended breaks between test segments.

85.     Stony Brook Disability Support Services reviewed the test results and granted Sampson double time on testing following Sampson's submission of Wasserstein's report.

86.     Sampson submitted yet another application for accommodation with the results of this new testing and in June 2022, the NBME denied Sampson's request for accommodations for the seventh time.

87.     Over the course of Sampson's multiple requests for accommodations, he submitted extensive documentation to the NBME, which included reports of evaluations by neuropsychologists, letters from physicians and advocates, documentation of the accommodations he received in medical school from officials at Stony Brook, and historical documents reporting a lifetime of tutoring and reports dating back to his early childhood. In addition to multiple applications for accommodations submitted between 2017 and 2022, personal statements, and communication from counsel, Sampson submitted the following to the NBME:

        a.  Report of Suzanne Michels, Ph.D.;
        b.  Report of Thomas Aronson, M.D.;
        c.  Letter from Andrew Lam, M.D.;
        d.  Letter from Stony Brook Learning Specialist;

14

**A18**

    e.  Letter from Christopher Heedles, LMSW, Supportive Education
        Counselor at Stony Brook Disability Student Services;
    f.   Certificate of Prior Test Accommodations dated March 27, 2017 and
        signed by Stony Brook;
    g.  Report of NBME Shelf Exam scores from Stony Brook University;
    h.  MCAT score report of January 1, 2015;
    i.   ACT Score Report from June 2008;
    j.   PSAT score report from 2007;
    k.  SAT Score Reports from 2005 and 2008;
    l.   Report of Administration of the Otis-Lennon School Ability Test
        (OLSAT) dated May 28, 1999
    m. Letter from Jan Serrantino, Ed.D, dated June 2017.;
    n.  Letter from Shelley and Steven Sampson;
    o.  Letter from Jan Serrantino, Ed.D. dated October 9, 2017;
    p.  Letter from Thomas Aronson, M.D. dated September 6, 2017;
    q.  Letter from Allison Anderson dated August 10, 2017;
    r.   Letter from Stony Brook Learning Specialist, Linda De Motta, dated
        February 2018
    s.   Letter from Thomas Aronson, M.D. dated June 12, 2018; and
    t.   Report of Jeanette Wasserstein, Ph.D., MBPP.

88.    The documentation furnished to NBME provided current and historical

evaluations, which established that Sampson has a well-documented history of a learning

disability and ADHD that impact his reading, learning, thinking and concentration as compared

to most people.

89.    In spite of never having met Sampson, never having tested him or never having

evaluated him, NBME ignored highly qualified professionals who observed and evaluated

Sampson and also ignored his history of receiving accommodations in at his school and on

similar exams.

90.    The NBME profited financially off of its denials of Sampson's requests for

accommodation as with each new application for accommodations, the NBME required Sampson

to again pay its registration fee.

**A19**

91.    Sampson has an indisputable disability that substantially limits the major life activities of thinking, learning, reading, concentrating, studying, processing of information and taking standardized examinations in the same condition and manner as most people.

92.    The requested accommodations are necessary to appropriately accommodate the condition and manner of Sampson's limitations. Without these accommodations, Sampson will be unable to demonstrate his actual knowledge, skill and abilities on the USMLE Step 1.

93.    As a direct and proximate result of NBME's violations of the ADA and section 504, Sampson will be unable to complete his medical school education if he does not successfully complete the USMLE Step 1. He is at risk of imminent dismissal from medical school despite being a student in good standing because he must take and pass Step 1 before completing his education.

94.    Moreover, he will and has been placed at a distinct disadvantage of competing for quality residency positions if he must take the examination without appropriate accommodations for his disability.

95.    He will be and has been irreparably harmed because he has a clear risk of failing the USMLE Step 1 and his medical school and the NBME both limit the number of attempts he is permitted to pass Step 1. Moreover, he will be prevented from competing on a level playing field with other students in medical school.

96.    Because Sampson has been unable to obtain the requested accommodations and has failed the USMLE Step 1 without accommodations, Stony Brook has indicated that he will be terminated from medical school.

97.    Sampson has paid significant additional costs as a proximate result of NBME's discriminatory conduct.

**A20**

98. Sampson has paid significant funds to the NBME as well as having been forced to obtain educational testing which the NBME then disregarded.

99. Sampson requires the requested accommodations on the USMLE Step 1 not to gain an advantage, but to attempt to level the playing field because his functional limitations impact his ability to take the examination in a way that non-disabled test takers do not experience.

100. Sampson through counsel has notified NBME of its violations of the ADA and section 504 and requested that it remedy this matter by providing the requested accommodations. NBME failed to correct its violations and failed to provide appropriate accommodations.

## COUNT I – VIOLATION OF THE ADA

101. Sampson incorporates by reference the foregoing paragraphs as if set forth fully herein.

102. Sampson is an individual with a disability within the meaning of the ADA, 42 U.S.C. § 12101 *et. seq*. Accordingly, Sampson is a qualified individual within the meaning of the ADA in that she meets all the eligibility criteria for taking the USMLE Step 1.

103. Sampson requires appropriate accommodations to participate in a fair, full, and equal basis on the USMLE Step 1. The modifications that Sampson needs, namely extended time, extra breaks, and testing over two days, would not impose a fundamental alteration, but would attempt to level the field and allow his aptitude and abilities to be fairly and accurately measured.

104. Title III of the ADA, which is enforced by the U.S. Department of Justice, states in pertinent part, "It is discriminatory to fail to make reasonable modifications to policies,

practices, and procedures when necessary to provide goods and services to a person with a disability." 42 U.S.C. § 12182(b)(2)(A)(ii).

105.    NBME administers the USMLE examinations, which are examinations related to applications and credentialing for postsecondary education, professional, and trade purposes, within the meaning of the ADA, 42 U.S.C. § 12189.

106.    The ADA requires NBME to offer these examinations in a manner accessible to persons with disabilities.

107.    The Department of Justice regulations mandate that a private entity offering such examinations ensure that that the examination is administered so as to "best ensure" that "the examination results accurately reflect the individual's aptitude or achievement level or whatever other fact the examination purports to measure," rather than measuring the extent of the individual's disability.  28 C.F.R. § 36.309(b).

108.    The Department of Justice (DOJ) regulations require that when considering requests for modifications, accommodations, or auxiliary aids or services, the entity gives considerable weight to documentation of past modifications, accommodations, or auxiliary aids or services received in similar testing situations, as well as such modifications, accommodations, or related aids and services provided in response to a plan describing services. 28 C.F.R. §36.309(b)(1)(v).

109.    The DOJ's ADA guidance further provides, "[r]eports from experts who have personal familiarity with the candidates should take precedence over those from, for example, reviewers for testing agencies, who have never personally met the candidate or conducted the requisite assessments for diagnosis and treatment." 28 C.F.R. pt. 36, app. A, at 796.

110.    NBME has discriminated and continues to discriminate against Sampson on the basis of his disability by denying him an equal opportunity to demonstrate his aptitude and achievement level on the USMLE examinations in violation of the ADA, including 42 U.S.C. §§ 12182, 12189 and 28 C.F.R. § 36.309.

111.    NBME's discriminatory policies and practices violate Sampson 's rights under the ADA and the regulations promulgated thereunder. NBME's discriminatory policies and practices include but are not limited to:

a.    Failure to grant accommodations when Sampson submitted the requisite documentation and provided documentation of a history of comparable accommodations on standardized examinations and other academic examinations.

b.    Failure to give considerable weight to Sampson's evaluators.

c.    Failure to offer examination in a place and manner that is accessible to individuals with disabilities and best ensures that the examination accurately reflects Sampson's aptitude, achievement level, or whatever other factor the examination purports to measure.

d.    Failure to engage in good faith in the interactive process to consider and implement effective accommodations to Sampson's disability.

e.    Failure to give considerable weight to Sampson's prior approval and use of accommodations in school and on standardized examinations.

f.    Failure to consider Sampson's request for accommodations without regard to the ameliorative effects of mitigating measures.

g.    Failure to conduct a proper review and apply appropriate legal standards to Sampson's request for appropriate accommodations.

h.    Placing an extreme burden of proof, beyond what is required by the ADA, to establish Sampson's disability or need for accommodations.

i.    Failing to respond in a timely manner to Sampson's requests for testing accommodations.

j.    Forcing Sampson to pay registration costs far in excess of the costs paid by non-disabled students.

**A23**

112. Sampson will be irreparably harmed if the NBME continues its unlawful refusal to provide him the appropriate test accommodations as requested and unless this Court grants injunctive relief prohibiting the continued violation of Sampson's ADA rights and compelling the NBME to provide the requested accommodation, in that:

  a. Sampson's medical school career will be terminated since a passing score on the USMLE is a prerequisite to continuing his medical school education.

  b. Extended time is necessary to ensure that the USMLE measures Sampson's knowledge of medicine rather than the extent of his disability.

  c. Sampson's opportunity to engage in his career of choice is effectively on extinguished unless the NBME is compelled to comply with the ADA.

  d. Requiring Sampson to take the USMLE Step 1 without the extended time accommodation puts him at a distinct disadvantage given his disability.

  e. Reduced performance on the USMLE Step 1 as a result of not receiving his requested accommodation significantly reduces Sampson's future residency and professional career options.

  f. Sampson faces expulsion proceedings under his school's policy if he takes and fails to pass the USMLE Step 1.

113. As a result of the NBME's violation of the ADA, Sampson has suffered or will suffer great injury, including, but not limited to, lost employment opportunities, out-of-pocket pecuniary losses, and severe emotional distress and anguish.

114. NBME's conduct constitutes an ongoing and continuous violation of the ADA. Unless enjoined from doing so, NBME will continue to violate said law. Said conduct, unless enjoined, will continue to inflict injuries for which Sampson has no adequate remedy at law. Consequently, Sampson is entitled to injunctive relief under the ADA, 42 U.S.C. § 12188.

A24

## COUNT II – VIOLATION OF THE REHABILITATION ACT

115.    Sampson incorporates by reference the foregoing paragraphs as if set forth fully herein.

116.    Section 504 of the Rehabilitation Act mandates that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

117.    NBME receives federal grants, contracts, and other financial assistance, thereby subjecting itself to the requirements of Section 504.

118.    Sampson is a qualified individual with a disability under section 504.

119.    NBME has, solely by reason of Sampson's disability, excluded Sampson from participation in, denied him the benefits of, and otherwise discriminated against him in its services, programs, or activities.

120.    NBME's actions, set forth more fully above, and incorporated herein, constitute intentional discrimination on the basis of disability in violation of Section 504.

121.    The actions by NBME were done intentionally or with deliberate indifference to the protected rights of Sampson.

122.    As a proximate cause of NBME's discrimination, Sampson suffers and continues to suffer harm including but not limited to economic and non-economic harms, actual monetary loss, future monetary losses, and other injuries and monetary losses including denial of equal treatment and access.

### RELIEF REQUESTED

1.    An order compelling the NBME, or those acting as agents for or in concert with it, to immediately cease and desist from its refusal to accommodate Sampson's request for

necessary accommodations on the USMLE examinations and ordering that the NBME immediately comply with the ADA and section 504 by providing Sampson the requested appropriate accommodation on the USMLE, which shall include 100% extended time over two days, extra breaks and reporting the results of said examination. Said accommodation shall also be made applicable to all Steps of the USMLE examinations.

2.      Make the above order permanent and that such order be made applicable to all future examinations administered by NBME and taken by Sampson.

3.      An order granting such other injunctive relief as may be appropriate including but not limited to testing accommodations and expungement of Sampson's Step 1 score obtained under discriminatory conditions.

4.      An order granting declaratory relief.

5.      An order awarding compensatory and/or nominal monetary damages and any other available damages.

6.      An award for attorney fees, costs, and expenses of suit incurred herein.

7.      Award for such other and further relief as the Court may deem just and proper.

**A26**

Respectfully submitted,


s/Charles Weiner
Charles Weiner
LAW OFFICE OF CHARLES WEINER
Cambria Corporate Center
501 Cambria Avenue
Bensalem, PA 19020
Tel. (267) 685-6311
Fax (215) 604-1507
charles@charlesweinerlaw.com

Mary C. Vargas
Michael Steven Stein
mary.vargas@steinvargas.com
michael.stein@steinvargas.com
STEIN & VARGAS LLP
10 G Street NE, Suite 600
Washington, DC  20002
Tel. (240) 793-3185
Fax (888) 778-4620

*Attorneys for Plaintiff*

23

**A27**

**Demand for Jury Trial**

Plaintiff demands a trial by jury with respect to all issues triable of right by jury.

/s/ Mary C. Vargas   
    Mary C. Vargas

    Attorney for Plaintiff

**A28**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ROBERT SAMPSON, | : | |
| | : | |
| | : | CIVIL ACTION NO. 2:22-cv-05120-JMA |
| v. | : | |
| | : | |
| NATIONAL BOARD OF MEDICAL | : | |
| EXAMINERS, | : | |
| | : | |

**DECLARATION OF ROBERT SAMPSON**

I, Robert D. Sampson, make the following declaration upon personal knowledge:

**FACTS**

1.      I have successfully completed three out of four years of medical education at Stony Brook's Renaissance School of Medicine, and I am approximately 40 weeks away from completing medical school.

2.      In July 2021, I completed third-year clinical rotations.  My preceptors spoke positively of my clinical performance.  My preceptor's comments are attached as Exhibit 1-A.

3.      I am also student in good standing in Stony Brook's College of Business where I have a 4.0 GPA.

4.      I have achieved these accomplishments as an individual with Attention Deficit Hyperactivity Disorder ("ADHD") and learning disabilities that have required a lifetime of accommodations and mitigating measures so that I could be where I am today.

5.      I have always had to work harder than my peers without disabilities but I am driven by the example of my grandfather who was an inventor, my father who is a surgeon, and my mother who is a dentist. I admire them all greatly and want them to be proud of me.

**A29**

6.      Due to speech articulation problems, I began years of speech and language therapy at the age of four.  In elementary school, my mother read assignments to me because reading comprehension and focus were already challenging for me at that age.

7.      My teachers consistently noted my struggles with attention, focus, and reading. For example, my first-grade teacher documented and worked with me on difficulty focusing, completing tasks, following written instructions, and writing equations correctly. My second-grade teacher noted that my difficulty in focusing caused me to struggle with comprehension. Likewise, my fifth-grade teacher noted that my grades were impacted by my inability to complete assignments.  My sixth-grade teachers also noted that my susceptibility to distraction interfered with my ability to complete assignments.

8.      During my K-12 education, I needed both tutors and a reading specialist and by the time of my graduation from high school, I had worked with no less than 24 different tutors. I needed these tutors because my learning was not happening in the classroom. It was not unusual to devote more than ten hours a week to tutoring in order to mitigate my disabilities. During high school, I sometimes met with as many as three separate tutors in a single afternoon. Critically, tutors and my parents taught me through verbal interaction because neither reading nor lecture formats were accessible for me. I did not read text books. Instead, my mother read me school texts and I relied on audio recordings of material.  Whenever possible my mother created games to help me learn through significant repetition. It was through an airplane game my mother invented that I learned spelling and multiplication tables because I was not able to learn by reading and studying as did my peers

9.      In college, I avoided classes with heavy reading and my grades varied widely because the impact of my disabilities presented more of a barrier in classes that required timed

performance and significant reading and writing. I simply did not read text books or other books. I learned through tutors who engaged with me in discussions about material, through videos, audio recordings, Cliff Notes, Spark Notes, and repetition. I also avoided large lecture-hall style classes that had timed multiple-choice exams. Throughout my education, I was typically the last student left in any exam room. When required to take multiple-choice exams, I routinely ran out of time and scored poorly. I therefore sought out classes that assessed performance based on projects and essays, rather than on timed assessments. At University of Virginia, to fulfill a non-western perspectives requirement, I opted to take an African dance course, even though dancing was far outside my comfort zone, in order to avoid the other options to fulfill the requirement that requirement significant reading and writing.

10. In college, I began using a live scribe pen with which I took lecture notes on special paper and the live scribe pen would audio record lectures and link the recordings to the timing of my notes. In this way I was able to re-listen to audio material repetitively. I continued to work extensively with tutors who relied on extensive Socratic interaction, talking me verbally through material that other students were learning by reading or listening to lectures. A tutor who recognized that I knew the material but struggled to show what I knew when tested recommended I receive formal testing because of what he saw as clear learning differences and challenges that made reading laborious and slower than my peers.

11. In test taking I have experimented with multiple strategies to get around my inability to read and comprehend quickly enough. First, I have always devoted far beyond normal time for test preparation. I relied on extensive test preparation with multiple modalities and multiple test preparation companies. I completed what to my peers was an excessive amount of practice tests, again far beyond what my peers completed. I also utilized a system where I read

3

**A31**

the question prompt and then the answer choices and attempted to answer questions without reading the material preceding the question prompt if at all possible. While this strategy often worked on standardized tests, this strategy simply does not work on NBME tests.

12.     In my daily life I have a host of work arounds or mitigation strategies to compensate for my disabilities. I rely on extensive calendars that chunk tasks into smaller pieces. I rely on siri and related voice-to-text applications to dictate both texts and emails. I have never read for pleasure and will avoid reading unless there is no way around it. On any given day, I take in most of my information by video or audio. When I am required to read, I read and reread in order to derive meaning and maintain a working memory of the main idea of sentences and paragraphs. When I need to learn, I do so by multimodal interaction and repetition.

13.     In 2013, I underwent neurocognitive testing that showed the disabilities I had been trying to mitigate my whole life.

14.     For me, the diagnoses offered an explanation as to why I learned and performed differently than my peers. At first, my diagnoses felt like weakness; a feeling I now regret. I had not had any role models with disabilities and I worried that people would look down on me because of my disabilities. I was harsh on myself for what I viewed as my personal failures to overcome and perform. I hoped that despite my disabilities I could succeed in pursuing my dreams.  Since I have had no choice but to acknowledge my disabilities, my family has begun to speak more openly about disabilities, including a family history that is strongly suggestive of many close family members with dyslexia.

15.     As the result of supportive parents, a host of tutors, exhaustive preparation, heavy repetition, dedication, work ethic, and mitigating measures, I nonetheless earned admission to and matriculated at Stony Brook's Renaissance School of Medicine.

4

**A32**

16.     When I began medical school on August 12, 2015, I hoped that the mitigating measures I had relied on for a lifetime would be sufficient to overcome the challenges caused by my ADHD and learning disabilities. While I passed all of my classes, I was unable to demonstrate my knowledge of the material without accommodations.

17.     During orientation, my classmates and I were advised that the only requirement for progressing from year to year and successfully completing medical school, was passing all of our classes.  The Power Point presentations at orientation stated that the classes in the medical school were Pass/Fail.

18.     To date, I have passed all of my medical school classes. While many of my peers used study groups to prepare for tests and learn material, I simply was not able to benefit from study groups because I could not keep up with the speed of progression that was routine for my classmates. Instead, my father who is himself a doctor and to whom I owe extraordinary gratitude tirelessly devoted countless hours to talking me through material so that I could learn through interaction, discussion, and repetition.

19.     Although I have passed all of my classes, I did so despite not having the time to finish reading all of the questions on the examinations and not being able to demonstrate the true extent of my knowledge of medicine.  The mitigating measures that I relied upon and utilized throughout my education did not ameliorate the impact of my impairments to sufficient degree to allow me to demonstrate on exams the full extent of my skill and knowledge. For medical school exams and later the United States Medical Licensing Examination ("USMLE"), I tried reading the question prompts and then the answer options, but my reading and reading comprehension were simply not fast enough and the information in the question vignettes could not be skipped. I

**A33**

then tried reading the question prompt and guessing the answer before reading the answer choices but for the same reasons, this strategy also did not work.

20.     After I passed all of my first-year classes, Stony Brook approved me to continue on to my second year of medical school.

21.     The USMLE is a three-step test administered by an outside entity called the National Board of Medical Examiners ("NBME"). Although all allopathic physicians must pass each step of the USMLE to gain licensure, when and even if medical students need to take each part of the three-step test varies from medical school to medical school. Stony Brook, for example, requires that its medical students pass Step 1 and Step 2 Clinical Knowledge to be conferred a medical degree.

22.     I applied for testing and other accommodations from Stony Brook's Disability Support Services which is now called Student Accessibility Support Center during my second year of medical school.

23.     Stony Brook's Student Accessibility Support Center received my paperwork, conducted an interview and concluded that I require accommodations and approved me to begin receiving time and half (50% additional time) on all testing.

24.     Following the implementation of extended time in medical school, I was able to read and answer more questions on examinations with the result that I received improved scores that more accurately reflected my working knowledge of the material.

25.     Due to requirements placed on me by my medical school, I registered to take the USMLE Step 1 earlier than my classmates.

26.     On or about April 1, 2017, I filed a request for accommodation with the NBME and had no choice, unlike my classmates, but to wait for the NBME's accommodation decision.

A34

In the meantime, I was not permitted to continue with medical school classes and was forced to take a leave of absence.

27.     I furnished the NBME with substantial documentation supporting my need for accommodations, which included two neuropsychological evaluation reports, a medical report from my psychiatrists, documentation of my prior accommodations in educational settings, standardized testing score reports, and educational records.

28.     The NBME rejected my first request for accommodations on June 13, 2017.

29.     Thereafter, I submitted numerous requests for accommodations and appeals, but NBME repeatedly denied my requests for accommodations.

30.     From 2017 through 2019, the NBME rejected my requests for accommodations six times despite the documentation of my disability and the fact that Stony Brook itself stated that I needed the testing accommodations I requested for the USMLE Step 1 exam.

31.     Submitting each request for accommodation was an enormous task that felt like baring my greatest weaknesses to strangers and each rejection from the NBME was both terrifying and humiliating – to finally have the courage to disclose my disability and ask for the help I needed only to be turned away left me emotionally struggling, depressed, anxious, and hopeless. I persisted because I want so much to be a doctor.

32.     Studying for the USMLE required enormous time and emotional commitment, far beyond the time required for my peers. I studied as much as 16 hours a day. In order to go over just a forty-question practice exam, would often take me more than ten hours. I had tutoring and one-on-one support. I enlisted help from friends and family. It felt during the times I was studying like I lived in a different world than friends, family and even other medical students, like I was a zombie. The extraordinary hours of study far beyond what was required for others,

resulted in me developing back pain that required special cushions, wrist injuries requiring special devices and treatment, and neuropathy. None of this sheer commitment and effort could overcome my disabilities.

33.    In January 2020, to comply with Stony Brook's demands after the NBME rejected my requests for accommodations on the USMLE, I took Step 1 of the USMLE without the accommodations I needed. I did not have the opportunity to read and understand all of the questions. Consequently, I was unable to substantively complete a significant portion of the exam and, as the clock ran out, resorted to filling in multiple-choice bubbles without having read the questions. I failed the exam.

34.    In August 2020, I underwent additional comprehensive testing by Dr. Jeannette Wasserstein, a clinical neuropsychiatrist and assistant clinical professor of psychiatry at Mt. Sinai Medical School.

35.    This new evaluation underscored my need for extended testing time. Dr. Wasserstein administered a battery of tests and concluded that I have ADHD and learning disabilities that require accommodation. The tests showed both my reading rate and reading fluency as being significantly deficient. My reading rate on difficult material was at the lowest percentile. When answering questions within the normal time limit on one inventory, for example, I was able to answer only 12 of 38 questions in the time allotted. With double time, I was able to answer all questions, and answered all but one question correctly.

36.    Dr. Wasserstein found that I have severely impaired sustained visual attention which would be expected to impact performance on lengthy standardized exams. She also found that I have significant difficulty with tasks that rely on visual processing and would be even more pronounced under timed testing conditions.

8

**A36**

37.     Dr. Wasserstein diagnosed me with significant reading comprehension issues resulting from the combination of diagnoses including complex reading disorder with dysgraphia with impaired visual processing and other memory and learning deficits. She found clear deficits in sustained attention, executive function, memory and learning ability and visual-motor integration. These were absolute deficits as compared to the general population.

38.     Dr. Wasserstein strongly advised that double time was needed as an accommodation in testing as well as extended breaks between test segments.

39.     Stony Brook's Student Accessibility Support Center discussed my test results with Dr. Wasserstein and granted me double time on testing.

40.     In April 2022, I applied to the NBME for accommodations on the USMLE Step 1. The accommodations I requested included 100% extended time over two days of testing and additional break time. Annexed to my request for accommodations was Dr. Wasserstein's neuropsychological evaluation report. With this request, coupled with my prior requests, I have submitted the following documents supporting my request for accommodations:

a. Report of Suzanne Michels, Ph.D.;
b. Report of Thomas Aronson, M.D.;
c. Letter from Andrew Lam, M.D.;
d. Letter from Stony Brook Learning Specialist;
e. Letter from Christopher Heedles, LMSW, Supportive Education Counselor at Stony Brook Disability Student Services;
f.  Certificate of Prior Test Accommodations dated March 27, 2017, and signed by Stony Brook;
g. Report of NBME Shelf Exam scores from Stony Brook University;
h. MCAT score report of January 1, 2015;
i. ACT Score Report from June 2008;
j. PSAT score report from 2007;
k. SAT Score Reports from 2005 and 2008;
l. Report of Administration of the Otis-Lennon School Ability Test (OLSAT) dated May 28, 1999
m. Letter from Jan Serrantino, Ed.D, dated June 2017.;
n. Letter from Shelley and Steven Sampson including list of tutors;
o. Letter from Jan Serrantino, Ed.D. dated October 9, 2017;

9

**A37**

     p.    Letter from Thomas Aronson, M.D. dated September 6, 2017;
     q.    Letter from Allison Anderson dated August 10, 2017;
     r.    Letter from Stony Brook Learning Specialist, Linda De Motta, dated
            February 2018:
     s.    Letter from Thomas Aronson, M.D. dated June 12, 2018;
     t.    Report of Jeanette Wasserstein, Ph.D., MBPP.

41.     In a letter dated June 1, 2022, the NBME denied my most recent request for accommodations.

42.     The USMLE Step 1, is a significantly more reading intensive examination than either the MCAT or SAT. The USMLE requires reading lengthy reading passages, often referred to as "vignettes," which are longer and more complex reading passages than found on the MCAT or SAT. It is impossible to pass Step 1 without reading the vignettes, the question prompts, and the answer options. Because of this, the mitigation and compensatory strategies I utilized on prior tests such as the SAT and MCAT were not effective for Step 1.

43.     I am at imminent risk of dismissal from medical school because of my inability to obtain accommodations and take and pass Step 1. Once dismissed from medical school, I will no longer be eligible to take the USMLEs at all and despite years of work and sacrifice, my career in medicine will be over.

44.     I am about to lose everything I have dreamed of and worked for.

45.     I declare under the penalties of perjury that the foregoing is true and correct.

DATED:

_____
Robert Sampson

10

**A38**

# EX. 1-A

Course Name: "Introduction to Clinical Medicine - Odd Year"

Robert had an excellent performance in the ICM course. During his clinical bedside experiences, he demonstrated an excellent ability to gather relevant patient information and develop a differential diagnosis and work up plan. His medical knowledge and ability to assimilate this knowledge was impressive for his level of training and he always attempts to incorporate his classroom learning to the care of his patients. Finally, his communication skills were polished, his write ups were stellar and he was always professional. He had an excellent performance in small group, consistently contributing positively to the group discussion. His performance on the end of course OSCE was also excellent. Robert will transition well into his clerkship year.

Course Name: "Medicine"

## NARRATIVE DESCRIPTION OF CLINICAL PERFORMANCE:

Robert Sampson completed his medicine clerkship at Stony Brook University Medical Center. Robert had an overall very good clinical performance during the clerkship. The faculty and house staff noted that Rob had a solid fund of knowledge and generated good differential diagnosis—often thinking outside the box. Faculty and house staff consistently noted that Robert asked intelligent questions. He demonstrated great enthusiasm for learning and improving clinical knowledge and patient care skills; to this end, he read the medical literature and shared new knowledge with team members. He was a very active member of the patient care team, and with his strong communication skills, he was able to work well in coordinating patient care with consultants.

In the small group preceptor sessions, the preceptor noted that Robert was very thorough and well thought out in his discussion of cases. He volunteered to do extra presentations, demonstrating his enthusiasm for learning and teamwork. He got along with team members very well and was very professional. He continued to show improvement in his presentations throughout the clerkship period.

Robert satisfactorily completed all the required elements for the clerkship. He passed the Final Essay exam and the NBME subject exam.

At the end of the clerkship, Robert was performing at the level of an interpreter for the Internal Medicine core conditions.

### Attending verbatim:

Robert demonstrated enthusiasm for learning Medicine. He took care of a very complicated patient where he was very helpful in getting all the outside records, executing the plan from multiple sub specialty recommendations and doing a very good job at analyzing all the data to come up with a very good differential diagnosis and plan of care. He had good bedside manners, good communication skills, wrote good notes, asked very smart questions on rounds.

Exceptional ability to question clinical routines to engage himself and others in EBM.

He is a very motived student. Keep working on integrate the basic medical knowledge with real clinical practice.

### Resident verbatim:

Rob is very proactive in his learning, readily and frequently reads up on his patients, looks up medical literature and shares new knowledge with the team. He has a good handle on his sick patients and has a solid knowledge base which allows him to formulate solid assessment and plans. He is also very engaged in the rest of the team's patients and frequently asks intelligent and great questions, and is always willing to help out.

Wow he has good differentials and is thinking outside the box.

**A40**

**Intern verbatim:**

High intellectual curiosity- continue to keep asking questions. For differentials, always address biggest issues first, zebras second, For presentations, keep it focused and hit the main points, then at the end can bring up additional thoughts. High fund of knowledge for current level, continue reading!

Robert did a great job during this rotation. He was very active in the care of his patients, checking in on them often and gathering thorough histories. He demonstrated significant dedication to his patients and was always asking great questions. He was always willing to help out the team and offer his assistance.

**Patient care:** very good
**Medical knowledge:** very good
**Practice-based learning:** very good - excellent
**Communication skills:** very good
**Professionalism:** very good
**System based learning:** very good

## NARRATIVE DESCRIPTION OF PRACTICAL (H&P) EXAM PERFORMANCE:

Robert had an overall excellent performance on his observed bedside history and physical examination. He was very respectful of the patient, expressed empathy where appropriate and needed. Hid data gathering was very organized and followed the appropriate sequence, and was sufficiently detailed. The physical exam was also very thorough and mostly accurate and elevated subtle findings. Robert's final formulation of differential diagnosis and management plan was very 'impressive"- it was appropriately broad, and the management plan was above expected for the level of training

**Interview Style and Communications Skills:** excellent
**Data Gathering Ability:** excellent
**Physical Exam:** excellent
**Formulation and Write Up:** outstanding

Course Name: "Primary Care"

Robert is an engaged medical student who shows significant motivation to learn and improve. He has a professional appearance and shows good history taking and physical exam skills. He continued to progress over the weeks in his learning and knowledge levels, especially for conditions frequently seen in a primary care setting. He used cases seen in clinic to review diagnoses, clinical guidelines and evidence-based treatment plans. He also began to engage in more critical thinking, planning and documenting involved in medical decision making as the rotation progressed. He would create differential diagnoses for presenting symptoms and use critical thinking to narrow the most likely diagnoses. He was reliable and willing to help with patient care. He will need to continue to get clinical exposure and experience for continued improvement and honing of his skills. Overall, he is functioning at the interpreter level.

Course Name: "Surgery"

Robert is a mature student who has drive and uses every opportunity as a chance to learn something. He is engaged, enthusiastic and interested. He is thoughtful and actively sought out ways to contribute to the team. Without being directed, he met patients in preop, ensured consents were filled out appropriately, and updated the team with patients' progress to the OR. In the OR, Robert looked for ways to help. When cases ran late, he insisted on staying and finishing with the team. He routinely demonstrated great preparation and breadth of reading. He exhibits an advanced understanding of surgery for his level and consistently portrays a natural sense of curiosity, which is apparent in his thoughtful questions. He completed thorough histories and physicals, and performed comprehensive yet succinct presentations with complete plans of treatment. He is able to synthesize information at a higher level than many of his peers. He would make a strong general surgery resident if that is the path he ultimately chooses.

Course Name: "Anesthesiology"

Robert was an excellent student and did a great job on his anesthesia rotation. He showed upon time and was always eager to learn. He is inquisitive – asks relevant and high-level questions, active listening, and has a strong knowledge base. Robert pays attention to detail, and was an important part of the anesthesia team. He will do well in whatever field he chooses to pursue. Good job, and continue to learn!

**A41**

Course Name: "Emergency Medicine"

This course is graded pass/fail only. During the two-week rotation, Robert saw a variety of patients and was involved with performing several procedures. In procedure lab, he was able to demonstrate proper techniques in laceration repair, bag mask ventilation, and endotracheal intubation.
During his two-week rotation, Robert was super inquisitive. He asked great questions and incorporated feedback. He also took the initiative to look up information on interesting cases. Robert was very eagar to see patients and was very helpful with their families and was very good with follow-up as well. Overall Robert was a pleasure to work with; he will be an outstanding resident in whatever field he chooses.

Course Name: "Neurology"

Robert did a good job on Neurology. Smart, good knowledge base. Great advocate for his patients, goes the extra mile. Spent a lot of time with his patients. Would often text the team later after leaving the hospital when he thought more about a patient or to share more ideas. Helpful to team (e.g. called a German translator without being asked).Thinks outside the box.
Recommendations: Learn ideal times to ask questions. Try to focus on the big picture - at times would focus on aspects of the patient (could be imaging or psychosocial issues) that were not the most important issues to the case, but clinical judgment will likely come with more experience. Continue to be more receptive to feedback.
Submitted write-ups were brief.
Write-up #1 8.25/10.
Write-up #2 8.25/10.
Clinical 37.25/50
NBME 77%
OSCE 76.7%
Final Clerkship Score 76/100 Pass

Course Name: "Radiology"

Mr. Robert Sampson has successfully completed his rotation in the Department of Radiology at Stony Brook Medicine University Hospital.

Despite the challenges that COVID 19 has presented, Robert submitted a well-illustrated power point presentation on Gallstone Pancreatitis including a discussion of cholelithiasis, acute cholecystitis and secondary pancreatits with imaging examples on radiography and US.

His interesting case of Tracheoesophageal Fistula on radiographs including illustrations of its types and a table of the findings of VACTERL.

In lieu of a final exam, Robert submitted a thorough paper on Pulmonary Embolism Radiology and Management, which included the Modified Wells Criteria with excellent representative abnormalities on chest radiography with classic signs, and findings on V/Q scan and pulmonary CTA.

Course Name: "Psychiatry"

Robert Simson completed this rotation at Nassau University Medical Center (NUMC). He completed all the assignments and questions. As per his preceptor in the inpatient unit, it was evident that he was very dedicated in the field of medicine. He was a highly motivated and compassionate student. He illustrated himself in his desire to assure he was exposed to as much clinical situation as possible. He demonstrated good basic psychiatric knowledge. By the end of this rotation, he demonstrated competency in history taking, mental status examination, evaluation of suicide risk and alcohol and drug use. Overall, Robert had good clinical performance during this rotation.

Course Name: "Ob/Gyn"

Punctual, conscientious, attentive, professional. Team player, showed interest in cases, asked questions about interesting cases. Seemed selfless and empathetic. Researched his answers. Patient care skills were strong, demonstrating complete plans, thorough differentials and well organized notes. His behavior modeled reliability, collegiality and integrity. He consistently sought out and accepted responsibility.

Course Name: "Pediatrics"

Mr. Robert Sampson was a clinical clerk in the Department of Pediatrics from May 31- July 11, 2021. The following comments were provided in response to request for evaluation of Mr. Sampson by supervising faculty and residents: (1) "Great rotation in the newborn nursery! Very intellectually curious. Asks great questions. Reads about patients' issues and problems in more depth to increase his fund of knowledge". (2) "Robert consistently took the initiative to seek out tasks and additional learning opportunities, at times going above and beyond expectations. Examples include following up on radiology results, which resulted in early identification of a venous sinus thrombosis in a patient that was later transferred to the ICU. Always thinking of a broad differential for patients and actively participating at evening signout". (3) "Robert was an asset to our inpatient team. He is extremely dedicated to his patients and went above and beyond in securing a much needed intervention for one patient in particular. He demonstrates a high level of intellectual curiosity and his case presentations were consistently reflective of a comprehensive thought process".

Mr. Sampson's written and oral case discussions reflected evidence of his ability to use scientific literature effectively to enhance his medical knowledge. His overall clinical score was 35.4/50, reflecting his ability to function as an "Interpreter/Manager" in patient care. He has earned a grade of "Pass" in the Clerkship in Pediatrics with a total score of 76.9 out of 100 possible points.

**A42**

# SEALED

Declaration of Jeanette Wasserstein,
Ex. 2 to Preliminary Injunction Motion

# SEALED

## 2020 Wasserstein Evaluation,
## Ex. 2B to Preliminary Injunction Motion

SEALED

2013 Michels Evaluation,

Ex. 3 to Preliminary Injunction Motion,

SEALED

2013 Anderson Evaluation,
Ex. 4 to Preliminary Injunction Motion

# EXHIBIT 5

## Report Results

Return

**Unofficial Transcript**

State University of New York

Stony Brook University

Stony Brook, NY 11794

United States

Print Date  :  2022-07-05

Name    :  Robert Sampson

Student ID:  ▮▮▮▮▮▮

Birthdate :  ▮▮▮▮▮▮

Address   :  ▮▮▮▮▮▮▮
            ▮▮▮▮▮▮▮▮▮

            United States

- - - - -   **Beginning of Graduate Record**   - - - - -

**Summer 2021**

Program  : Master Business Administration

Plan     : Health Care Management Plan

**Session  : Summer II - D  (2021-07-05 to 2021-08-14)**

| MBA | 511 | Technological Innovations | 3.00 | 3.00 A | 12.000 |

      Course Attr  : SUNY Applied Learning: Entrepreneurship

| MBA | 592 | Organizational Behavior | 3.00 | 3.00 A | 12.000 |

|      TERM GPA : | 4.000 | TERM TOTALS : | 6.00 | 6.00 | 24.000 |

|      CUM  GPA : | 4.000 | CUM  TOTALS : | 6.00 | 6.00 | 24.000 |

**Fall 2021**

Program  : Master Business Administration

Plan     : Health Care Management Plan

**Session  : Full Fall Semester Session  (2021-08-23 to 2021-12-16)**

| MBA | 502 | Finance | 3.00 | 3.00 A | 12.000 |
| MBA | 503 | Data Analysis & Decision Makng | 3.00 | 3.00 A | 12.000 |
| MBA | 504 | Financial Accounting | 3.00 | 3.00 A | 12.000 |
| MBA | 507 | Ethics in Management | 3.00 | 3.00 A | 12.000 |
| MBA | 540 | Data Mining | 3.00 | 3.00 A | 12.000 |
| MBA | 574 | Project Management | 3.00 | 3.00 A | 12.000 |

|      TERM GPA : | 4.000 | TERM TOTALS : | 18.00 | 18.00 | 72.000 |

|      CUM  GPA : | 4.000 | CUM  TOTALS : | 24.00 | 24.00 | 72.000 |

**A48**

```
Program  : Master Business Administration

Plan     : Health Care Management Plan
```

**Session : Full Spring Semester Session  (2022-01-24 to 2022-05-18)**

```
MBA      505       Marketing                  3.00    3.00 A     12.000

MBA      543       Business Analytics         3.00    3.00 A     12.000

         TERM GPA :   4.000    TERM TOTALS :  6.00    6.00       24.000


         CUM  GPA :   4.000    CUM  TOTALS : 30.00   30.00      120.000
```

**Graduate Career Totals**

```
         CUM  GPA :   4.000    CUM  TOTALS : 30.00   30.00      120.000
```

**Unofficial Transcript**

State University of New York

Stony Brook University

Stony Brook, NY 11794

United States

Print Date  :  2022-07-05

Name     :  Robert Sampson

Student ID:  ███████

Birthdate :  ███████

Address  :  ████████

          ████████████

          United States

- - - - -  **Beginning of Medical School Record**  - - - - -

**Fall 2015**

```
Program  : Doctor of Medicine

Plan     : Medicine Plan
```

**Session : MedHM5A  (2015-08-12 to 2016-03-11)**

```
HM       500       FIRST YEAR MEDICINE                 0.00 P

         TERM GPA :   0.000    TERM TOTALS :  0.00    0.00       0.000


         CUM  GPA :   0.000    CUM  TOTALS :  0.00    0.00       0.000
```

**Spring 2016**

```
Program  : Doctor of Medicine

Plan     : Medicine Plan
```

**Session : MedHM5B  (2016-03-21 to 2016-06-15)**

```
HM       501       First Year Medicine                 0.00 P

         TERM GPA :   0.000    TERM TOTALS :  0.00    0.00       0.000


         CUM  GPA :   0.000    CUM  TOTALS :  0.00    0.00       0.000
```

**Fall 2016**

**A49**

Program : Doctor of Medicine

Plan    : Medicine Plan

**Session : MedHM6A  (2016-08-15 to 2016-12-23)**

HM      600     Second Year Medicine (Fall)            0.00 P

       TERM GPA :    0.000     TERM TOTALS :   0.00   0.00        0.000

       CUM  GPA :    0.000     CUM  TOTALS :   0.00   0.00        0.000

**Spring 2017**

Program : Doctor of Medicine

Plan    : Medicine Plan

**Session : Spring HSC (Y)  (2017-01-02 to 2017-06-30)**

HM      910     Continuation of Studies                0.00 P

       TERM GPA :    0.000     TERM TOTALS :   0.00   0.00        0.000

       CUM  GPA :    0.000     CUM  TOTALS :   0.00   0.00        0.000

**Fall 2018**

Program : Doctor of Medicine

Plan    : Medicine Plan

**Session : MedHM8A  (2018-07-02 to 2018-12-28)**

HM      910     Continuation of Studies                0.00 P

       TERM GPA :    0.000     TERM TOTALS :   0.00   0.00        0.000

       CUM  GPA :    0.000     CUM  TOTALS :   0.00   0.00        0.000

**Fall 2019**

Program : Doctor of Medicine

Plan    : Medicine Plan

**Session : MedHM8A  (2019-07-01 to 2019-12-31)**

HM      910     Continuation of Studies                0.00 P

       TERM GPA :    0.000     TERM TOTALS :   0.00   0.00        0.000

       CUM  GPA :    0.000     CUM  TOTALS :   0.00   0.00        0.000

**Fall 2020**

Program : Doctor of Medicine

Plan    : Medicine Plan

**Session : MedHM7A  (2020-07-01 to 2020-12-31)**

HM      700     Third Year Medicine (Fall)             0.00 P

       TERM GPA :    0.000     TERM TOTALS :   0.00   0.00        0.000

       CUM  GPA :    0.000     CUM  TOTALS :   0.00   0.00        0.000

**Spring 2021**

**A50**

Program : Doctor of Medicine

Plan    : Medicine Plan

Session : MedHM7B  (2021-01-04 to 2021-06-30)

| HM | 701 | Third Year Medicine (Spring) | | 0.00 P | |

| TERM GPA : | 0.000 | TERM TOTALS : | 0.00 | 0.00 | 0.000 |

| CUM  GPA : | 0.000 | CUM  TOTALS : | 0.00 | 0.00 | 0.000 |

### Fall 2021

Program : Doctor of Medicine

Plan    : Medicine Plan

Session : MedHM8A  (2021-07-01 to 2021-12-31)

| HM | 910 | Continuation of Studies | | 0.00 P | |

| TERM GPA : | 0.000 | TERM TOTALS : | 0.00 | 0.00 | 0.000 |

| CUM  GPA : | 0.000 | CUM  TOTALS : | 0.00 | 0.00 | 0.000 |

### Spring 2022

Program : Doctor of Medicine

Plan    : Medicine Plan

Session : Spring HSC (Y)  (2022-01-03 to 2022-06-30)

| HM | 910 | Continuation of Studies | | 0.00 I | |

| TERM GPA : | 0.000 | TERM TOTALS : | 0.00 | 0.00 | 0.000 |

| CUM  GPA : | 0.000 | CUM  TOTALS : | 0.00 | 0.00 | 0.000 |

**A51**

# EXHIBIT 6

Favorites     Main Menu     Self Service     Student Records & Registration     Academic Records     My Course History

Home     Add to Favorites     Sign Out

Robert Sampson

go to ...

Search     Plan     Enroll     **My Academics**

## My Course History

| Select Display Option | Sort results by |
|---|---|
| ● Hide courses from My Planner | Then by |
| ○ Show courses from My Planner | Sort |

✔ Taken          ⬅ Transferred          ◆ In Progress

| Course | Description | Term | Grade | Units | Status |
|---|---|---|---|---|---|
| HM 500 | FIRST YEAR MEDICINE | Fall 2015 | P | 0.00 | ✔ |
| HM 501 | First Year Medicine | Spring 2016 | P | 0.00 | ✔ |
| HM 600 | Second Year Medicine (Fall) | Fall 2016 | P | 0.00 | ✔ |
| HM 700 | Third Year Medicine (Fall) | Fall 2020 | P | 0.00 | ✔ |
| HM 701 | Third Year Medicine (Spring) | Spring 2021 | P | 0.00 | ✔ |
| HM 910 | Continuation of Studies | Spring 2017 | P | 0.00 | ✔ |
| HM 910 | Continuation of Studies | Fall 2018 | P | 0.00 | ✔ |
| HM 910 | Continuation of Studies | Fall 2019 | P | 0.00 | ✔ |
| HM 910 | Continuation of Studies | Fall 2021 | P | 0.00 | ✔ |
| HM 910 | Continuation of Studies | Spring 2022 | I | 0.00 | ✔ |
| MBA 502 | Finance | Fall 2021 | A | 3.00 | ✔ |
| MBA 503 | Data Analysis & Decision Makng | Fall 2021 | A | 3.00 | ✔ |
| MBA 504 | Financial Accounting | Fall 2021 | A | 3.00 | ✔ |
| MBA 505 | Marketing | Spring 2022 | A | 3.00 | ✔ |
| MBA 507 | Ethics in Management | Fall 2021 | A | 3.00 | ✔ |
| MBA 511 | Technological Innovations | Summer 2021 | A | 3.00 | ✔ |
| MBA 540 | Data Mining | Fall 2021 | A | 3.00 | ✔ |
| MBA 543 | Business Analytics | Spring 2022 | A | 3.00 | ✔ |
| MBA 544 | Supply Chain Management & Anal | Fall 2022 | | 3.00 | ◆ |
| MBA 574 | Project Management | Fall 2021 | A | 3.00 | ✔ |
| MBA 589 | Operations Management | Fall 2022 | | 3.00 | ◆ |
| MBA 592 | Organizational Behavior | Summer 2021 | A | 3.00 | ✔ |
| MKT 565 | Consumer Insights | Fall 2022 | | 3.00 | ◆ |
| MKT 567 | Integrated Marketing Managemen | Fall 2022 | | 3.00 | ◆ |

⬆ Go to top

**A53**

# EXHIBIT 7



Case 23-3, Document 34, 01/27/2023, 3460360, Page66 of 278

Date:3/27/2017

Dear National Board of Medical Examiners Disability Services,

Robert Drew Sampson, is a medical student at Stony Brook University, School of Medicine. Robert received his learning disability diagnosis of Dyslexia in December 2013. Robert reached out to Disability Support Services upon receiving a warning of marginal performance in medical school, in November 2016. Prior to receiving testing accommodations, Robert reported he was unable to complete his NBME Shelf exams within the standard amount of allotted time, and often had to guess on many questions due to time constraints.

Robert's Dyslexia learning disability is a mental impairment that substantially limits his reading ability and reading speed on a daily basis when he is compared to an average individual in the general population. His learning disability is the reason he routinely runs out of time on exams and generally takes longer to think through ideas presented to him both on exams and outside of the classroom. He did not realize he was denying himself fair access that he qualified for on timed exams for someone with his learning disability until he received an academic warning from his medical school and decided to address his impairments properly.

Due to the fact that the School of Medicine gives students significant room to pass their pre-clinical curriculum before any intervening action is taken, unfortunately, he was encouraged by his professors that he simply had to "pass." He received a formal notice approximately 1.5 years into his medical education that he was performing marginally and was in danger of failing medical school. Despite doing generally well on non-time-based assessments in his classes, his failing to borderline marginal performance on timed NBME shelf exams taken without accommodations were causing him to fail.

We received his learning evaluations administered by Dr. Anderson, and Dr. Michels, and determined it was appropriate to give him the accommodation listed below, starting in November 2016, and continuing through to this current date:

- Extended Time and Half (1.5)

Once he began receiving accommodations, the student reported that he was finally able to finish exams, which indicated to us, that his extended time and a half was an appropriate accommodation. It is for this reason that it is imperative for Robert to receive the same accommodation of extended time and a half on his USMLE Step 1 Exam to protect his equal access to your exam through the accommodations granted.

I thoroughly enjoyed my time working with Robert and came to know him as a truly dedicated and hard-working student. He is honest, dependable, and incredibly willful to complete what is asked of him in the highest quality possible, when properly accommodated. Please feel free to contact me, should you like to discuss Robert's qualifications and experience further. I'd be happy to expand on my recommendation.

Sincerely,
Christopher Heedles, LMSW   *Christopher Heedles LMSW*
Supportive Education Counselor of Stony Brook Disability Support Services.
128 Educational Communication Center
Stony Brook University, NY 11794
Phone: 631-632-6748

# EXHIBIT 8



March 29, 2017

To Whom It May Concern,

I am the Learning Specialist at Stony Brook Medical School. I hold a NYS license in both regular and special education, and I have more than 30 years of teaching experience in both fields. My Master's degree and all subsequent teacher and training experiences have focused on learning disabilities, cognition and the teaching-learning relationship. For the past 10 years, I have been working with medical students at Stony Brook Medical School and Hofstra Northwell Medical School as well as private clients from hospitals and medical schools from around the United States and the Caribbean who have struggled to pass their specialty board exams.

I now write in support of Robert Sampson's request for accommodations for the USMLE Step 1 exam. Robert has been working with me on his study skills for the past year and half. He has a learning disability, specifically dyslexia, as well as Attention Deficit Disorder, that substantially limits his academic learning skills. For example, Robert has a slow reading rate and poor visuospatial processing such that he will avoid reading because the reading process is both exhausting and painful. His dyslexia intrudes upon his ability to complete his exams on time, and this time management problem extends to other academic tasks, such as writing papers or completing dissections in the anatomy lab. Robert struggled to learn from his textbooks, so we worked on finding other resources--videos, hands-on interactions, discussions, drawings—that were most appropriate and least restrictive for Robert's needs as a student with a learning disability.

To his credit, Robert worked hard to overcome his disability by developing his new learning skills, and for a while, his efforts seemed to be fruitful in that he felt he was learning the material on his terms, even though he was taking significantly longer than his classmates to complete his work. His exam results, however, demonstrated that he had not overcome his disability enough to accurately reflect all he had learned. Once he began failing, despite redoubling his efforts, he became increasingly embarrassed and started to shut down a bit. I have seen this happen so many times in my long career, so I knew Robert needed some space to come to terms with his next step—requesting the accommodations he needed. I encouraged him to apply for accommodations through our Disability Support Services office (DSS). Once he secured the appropriate time accommodations, coupled with the learning skills we had been developing and practicing, Robert was able to demonstrate his knowledge on his exams. His NBME shelf exam scores jumped from a failing average of 66% on unaccommodated exams to a passing average of 83% on accommodated exams.

In my field of teaching, we always refer to accommodations as leveling the playing field. It is an apt turn of phrase because, once a student is no longer being tested on his disability and can compete without a handicapping interference, then we can witness the real nature of his abilities.



Accommodations, as originally mandated in 1975 by P.L. 94-42 and reiterated in our current ADA, are available to provide students with disabilities *access* to education. Once they gain that access on a level playing field, they are responsible for achieving success. Accommodations for dyslexia are necessary to provide Robert the access he needs to demonstrate his abilities without being unfairly tested on his disability. Robert's dyslexia substantially impairs his reading skills, test taking skills, time management skills, and memory. He has done quite a bit in a short time to improve his absorption of knowledge under circumstances of time, task and location over which he has control. But he cannot control the circumstances of time, task and location during an exam. As noted, Robert emerged from a failing status to a passing student in good standing because the accommodations authorized by DSS achieved the intended goal. With accommodations, Robert had the time he needed to decode the text of the questions, to process and organize his thoughts, to analyze any accompanying imaging or sound files and to do so at a pace at which his learning disability poses minimal intrusion. He needs accommodations—1.5 time on his exams, a quiet location for his exams free from distractions, perhaps even an auditory version of his exams—to give him the control he needs to free him from his disability during exams.

Should you have any questions about my work with Robert, please email me at linda.demotta@stonybrook.edu or call me at 516-662-1612.

Sincerely,

Linda De Motta
Learning Specialist
Stony Brook University School of Medicine

**A58**

# EXHIBIT 9



February 15, 2018

To Whom It May Concern:

I am disappointed that the NBME review committee has once again denied accommodations for Robert Sampson for his sitting of the USMLE Step 1 exam. As I had noted in my previous letter dated March 29, 2017, I am professionally trained and qualified to comment on my observations of the manifestations of Robert's disabilities in reading, writing, managing time, memory organization and other academic and life activities. Robert meets the criteria, through our disabilities services office and according the guidelines of the ADA, for appropriate testing accommodations.

Dr. Jan Serrantino has been working with Robert because of her expertise in advocating with your organization on behalf of students requesting accommodations. She has advised Robert as he compiled the accompanying detailed document addressing the points you have made in denying Robert his accommodations.

I will reiterate one more point of my own:

In her letter dated January 12, 2018, Catherine Farmer, Psy. D., wrote: "The records provided reveal a consistent history of unimpaired performances on timed standardized tests when compared to national normative samples." However, the records do not show this at all. The records show that sometime prior to medical school, Robert, after studying and practicing well beyond the average time for most students, figured out a way to perform adequately enough under standard testing conditions on two entrance exams that test broad knowledge and aptitude. In medical school, that is not what the record shows at all. The medical school record of his standardized exams consistently shows failing exam scores under standard testing conditions and passing scores under accommodated testing conditions. Clearly Robert requires the time extension to gain access to the exam. Not all standardized exams are equal and the USMLE Step exams in particular require reading skills, interpretation, synthesis, integration and pattern recognition well beyond any skills required on the college entrance exams. Moreover, USMLE Step exams will require Robert to interpret images from histology and gross pathology as well as graphs and charts, all of which will test his disabilities directly.

As the Learning Specialist at Stony Brook Medical School, I fully support the accompanying document and I support another appeal from Robert for his accommodations.

Sincerely,

Linda De Motta
Learning Specialist
Stony Brook School of Medicine

# EXHIBIT 10

**Thomas A. Aronson, M.D.**
**2 Brooksite Drive Suite 220**
**Smithtown, New York 11787**
**Phone: 265-0909**
**Fax: 265-0757**

September 6, 2017

Re: Robert Sampson
DOB: ▉▉▉▉

To Whom It May Concern:

This letter is in response to a denial of accommodations and equal access to the USMLE Step 1 for my patient Robert Sampson. Robert has been under my consistent psychiatric care since November 4, 2015. He is severely impacted by his learning disabilities (specifically his reading speed and comprehension) and ADHD that when coupled with the reading comprehension significantly impacts his overall functioning.

I noted significant improvement in my letter dated March 29, 2017; however, this improvement was predicated on his access to reasonable accommodations. The Stony Brook University Medical School appropriately accommodates Robert. Without these accommodations, he would not be improved in his ability to process information and would remain impaired (more than the average person) when attempting to read, process and interpret information presented in long dense passages (like the Step 1 exam) under time constraints.

## Mr.Sampson meets the DSM IV criteria for ADHD:

His symptoms have persisted for at least 6 months to a degree that is inconsistent with developmental lever and that negatively impacts directly on social and academic/occupational activities:

He often has difficulty sustaining attention in tasks (e.g., has difficulty remaining focused during lectures, conversations, or lengthy reading).

He often does not follow through on instructions and fails to finish schoolwork, chores, or duties in the workplace (e.g., starts tasks but quickly loses focus and is easily sidetracked).

He often has difficulty organizing tasks and activities (e.g., difficulty managing sequential tasks; difficulty keeping materials and belongings in order; messy, disorganized work; has poor time management; fails to meet deadlines.

He often avoids, dislikes, or is reluctant to engage in tasks that require sustained mental effort (e.g., schoolwork, for older adolescents and adults, preparing reports, completing forms, reviewing lengthy papers).

He is often easily distracted by extraneous stimuli (for older adolescents and adults, may include unrelated thoughts).

**A62**

Mr. Sampson's attention, concentration, processing speed, and recall/retention are severely impaired both in reading and visual comprehension. In everyday like Mr. Sampson finds that he needs to read and re-read the same material numerous times in order to comprehend new material, slowing his ability to learn.

Robert is, and remains, substantially limited in major life activities of everyday life. His ADHD is just one of the factors contributing to his impairment and to the barrier to the Step 1 exam. When a student presents with a learning disability and ADHD, the result is exponential impairment from the cumulative effects of the co-morbidities. Decreased neurocognitive performance in individuals with Attention Deficit Hyperactivity Disorder and learning disability is well documented in the research literature and can have significant impacts on performance.

For Example:

Robert has difficulty fully accessing examinations and reading materials due to a highly impaired reading speed so he reads at a slower rate. The slow rate is interrupted by intrusive thoughts or gaps in attention caused by the ADHD. Now Robert is not only reading more slowly, there are significant gaps in processing the information he is able to read as a result of his inattention. Not only is he going slowly, he is missing key pieces along the way. Historically he has addressed these academic disabilities by taking extra time in reading and preparation and by approaching learning differently, for example learning to play the cello by ear vs. by reading music.

My diagnosis was developed through direct clinical assessment over several visits. I am an MD and I specialize in the treatment of individuals with ADHD. ADHD is a clinical diagnosis made over several visits triangulating patient self-reported symptoms and impact with key data points from a multitude of sources.

Moreover, Mr. Sampson experiences loss of educational access when he must read for content and visually process and recall information seen or read under timed and untimed conditions. His ADHD exacerbates and compounds these learning disabilities.

Mr. Sampson requires accommodations to fully access the NBME step exam. Given his learning disability, with associated concentration impairment, as well as very slow processing speed highlight the need for multiple breaks to provide opportunities for cognitive re-focus. I am strongly endorsing an appropriate accommodations of time and one half on the NBME exam with additional breaks over a period of two days.

Taken together, the aforementioned impairment require self-monitoring, and cognitive breaks. Therefore, I endorse the use of extra breaks to allow Robert to access these mitigating strategies.

By allowing Mr. Sampson extra time, over two days you remove the barrier caused by a timed exam and allow time to compensate for his reduced processing and concentration that result from the anxiety, ADHD and his learning disability.

It is my professional opinion that my patient, Mr. Sampson, is currently and profoundly disabled in that cannot concentrate and read efficiently. Mr. Sampson meets the requirements of a person with a disability covered un the ADA and Section 504 of the Rehabilitation Act. The only way to mitigate the barriers of your exam is to provide extended time and extra breaks over two days.

I fully support Mr.Sampson's appeal for accommodations and hope that the NBME will consider his

**A63**

case with the same level of care Mr. Sampson has shown in addressing these concerns.

Sincerely,

Thomas A. Aronson, MD
Associate Professor Clinical Psychiatry,
SUNY at Stony Brook

TAA:ts

**A64**

EXHIBIT 11



Highly Confidential

June 1, 2022

Robert D. Sampson
████████████████
████████████████

RE: USMLE Step 1                              USMLE ID#: ███████████

Dear Robert D. Sampson:

We have thoroughly reviewed the documentation you provided in support of your request for test accommodations on the United States Medical Licensing Examination (USMLE) Step 1. We conducted an individualized review of your request in accordance with the guidelines set forth in the amended Americans with Disabilities Act (ADA).

You have requested 100% additional test time (double time) and additional break time on the basis of Specific Learning Disorder with impairment in reading (dyslexia), reading fluency, word reading accuracy, spelling, and Unspecified Neurodevelopmental Disorder, visuospatial memory, visuospatial processing diagnosed in 2013; Attention-Deficit/Hyperactivity Disorder, predominantly inattentive (ADHD) diagnosed in 2015; and Specific Learning Disorder with impairment in written expression diagnosed in 2020. You previously submitted initial and reconsideration requests for accommodations for Step 1 on the basis of these disorders and in our June 13, 2017, August 1, 2017, January 12, 2018, March 6, 2018, September 7, 2018, and January 4, 2019 letters addressed to you, we explained that your documentation did not demonstrate a substantial limitation in a major life activity as compared to most people or that the requested accommodations were an appropriate modification of your test administration.

You write in your April 13, 2022 Personal Statement for Accommodations, "*New testing concluded, as had past testing, that I require extended time in order to have access to examinations. Based on this new testing, my medical school which had previously been providing 1.5x, began providing double time for all examinations, including shelf exams…Because the USMLE Step 1 is a vignette based mul*tiple choice exam, this style of exam *exacerbates the impacts of both my low reading speed and my slow processing speed forcing me to leave large sections of the exam either unanswered, or guessed on. I need at 2X additional time, hence my request for 2X additional time on the Step 1 exam.*" We note the accommodations your medical school has elected to provide to you. While NBME gives considerable weight to documentation of past and present accommodations, the fact that you have previously received a particular accommodation in other contexts is not, in itself, a sufficient demonstration of your need for accommodations on the USMLE.

Received in support of your current request was an August 2020 report of Neuropsychological Evaluation by Jeanette Wasserstein, Ph.D. and Kim Miller, Ph.D. who write, "*Robert Sampson is a 3rd year medical student at Renaissance School of Medicine at Stony Brook University with a history of having received time accommodations throughout medical school, including on the NBME shelf exams. Mr. Sampson is currently requesting an updated neuropsychological evaluation as part of his appeal to the National Board of Medical Examiners' (NBME) regarding their past decisions to deny him accommodations on the USMLE Step Exams. Mr. Sampson's initial application was denied in June 2017. Thereafter he appealed this decision multiple time and received his 4th denial letter in March 2018…Given his significant reading comprehension difficulties, he meets criteria for a DSM-5 diagnosis of Specific Learning Disorder with impairment in reading (reading fluency*

*and reading comprehension), as well as impairment in written expression (spelling and handwriting). Based on current test results and prior history and diagnosis, Mr. Sampson also meets criteria for Attention Deficit/Hyperactivity Disorder, Combined Presentation."* Your evaluators provide recommendations writing, *"For testing, standardized or in class, extended time is warranted. Currently, double time is strongly advised because of his significantly slowed reading fluency and because he has found even with time and half [sic] he is often not able to finish Step exams."*

We carefully reviewed and considered the information and recommendations presented by your evaluators, as well as the entirety of your submission for accommodations. Regardless of the assigned diagnoses, there is insufficient evidence to support a need for accommodations to access the USMLE. Your most recent 2020 performances on a range of relevant cognitive and academic achievement tasks, including Processing Speed, Working Memory, Logical Memory, Perceptual Reasoning, Executive Functions, Spelling , Essay Composition, Sentence Composition, Sentence Writing Fluency, Word Reading, Pseudoword Decoding, Reading Comprehension, Oral Reading Fluency, Oral Reading Accuracy, Oral Reading Rate, and Sentence Reading Fluency, are all largely within the Average to Superior range of functioning (under timed and untimed conditions) and not indicative of an impairment that substantially limits you in comparison to most people in the general population. While we note your reported below average scores on two select reading related tasks (Reading Rate and Reading Comprehension) on the *Nelson-Denny Reading Test,* these scores are inconsistent with your prior performance on your 2013 evaluation as well as your history of unimpaired performances on real-world high stakes standardized tests taken without accommodations. You report that you did not receive accommodations in any academic setting, up to medical school, or for any standardized testing including the PSAT, SAT, ACT, and MCAT. Taken altogether, your documentation does not demonstrate that standard test timing is a barrier to your access to the USMLE.

Accommodations are intended to ensure that individuals with a documented disability as defined by the Americans with Disabilities Act (ADA) can take the USMLE exams in an accessible place and manner. A diagnostic label, in and of itself, does not establish coverage under the ADA, nor does prior receipt of accommodations for a particular activity guarantee that identical accommodations are indicated or will be available in all future settings and circumstances. The ADA defines disability as a physical or mental impairment **that substantially limits a person's ability to perform one or more major life activities, as compared to most** people in the general population. Therefore, not every impairment will constitute a disability.

Your documentation does not demonstrate that the requested accommodations are an appropriate modification of your USMLE Step 1 test administration. Therefore, after a thorough review of all of your documentation, I must inform you that we are unable to provide you with the requested accommodations. We will process your USMLE Step 1 exam application without test accommodations at this time. You may inquire at usmlereg@nbme.org or call Applicant Services directly at (215) 590-9700 with any questions about your scheduling permit.

Please monitor the Prometric website at www.prometric.com/corona-virus-update for up-to-date information and test center procedures related to the impact of the coronavirus (COVID-19) pandemic.

Sincerely,

Disability Services

**A67**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROBERT SAMPSON,          ) | |
|                      ) | |
|      Plaintiff,        ) | |
|                      ) | |
|     v.                ) | Civil Action No. 2:22-CV-05120-JMA-AYS |
|                      ) | |
| NATIONAL BOARD OF MEDICAL   ) | |
| EXAMINERS,            ) | |
|                      ) | |
|      Defendant.     ) | |
|                      ) | |

## <u>DECLARATION OF LUCIA MCGEEHAN, PH.D.</u>

I, Lucia McGeehan, declare as follows:

1.     I am over eighteen (18) years of age and, unless indicated otherwise, I have personal knowledge of the facts stated below based on my employment at the National Board of Medical Examiners ("NBME") and/or my review of NBME records maintained in the ordinary course of business.

2.     I am the Manager of Examinee Accommodations in NBME's Disability Services group. I have a Ph.D. in Educational Psychology with a focus in School Psychology. I have been certified as a School Psychologist by the Pennsylvania Department of Education. I am certified as a Nationally Certified School Psychologist by the National Association of School Psychologists. I am a licensed psychologist in the State of Pennsylvania.

3.     The NBME is a not-for-profit organization located in Philadelphia, Pennsylvania that provides assessment services for physicians and other the health professions. Its mission is to help protect the health of the public by developing and administering state-of-the-art assessments for evaluating the knowledge and skills of health professionals.

**A68**

4. Together with the Federation of State Medical Boards, the NBME sponsors the United States Medical Licensing Examination ("USMLE"), which is a standardized examination used to evaluate applicants' competence for medical licensure in the United States and its territories. The USMLE is designed to assess a physician's ability to apply knowledge, concepts, and principles, and to demonstrate fundamental patient-centered skills, that constitute the basis of safe and effective patient care.

5. Medical licensing authorities across the country rely upon the USMLE as part of their licensure process for ensuring the qualifications of prospective physicians.

6. There are three "Steps" to the USMLE, all of which must be passed before an individual with a medical degree is eligible to apply for an unrestricted license to practice medicine in the United States. Step 1 is a one-day, computer-based multiple-choice examination that assesses understanding and application of basic science concepts important to the practice of medicine. Step 2 Clinical Knowledge (Step 2 CK) is a one-day, computer-based multiple-choice examination that assesses the application of medical knowledge, skills, and understanding of clinical science for the provision of patient care under supervision. Step 3 is a two-day, computer-based examination that assesses whether examinees can apply medical knowledge and understanding of biomedical and clinical science essential for the unsupervised practice of medicine.

7. The USMLE is administered under standard conditions. Examinees take the USMLE Step examinations under the same testing conditions, including standard testing time, and NBME has policies and procedures in place that are intended to help ensure that no examinee or group of examinees receives unfair advantage on the examination. There is an exception to this

policy, however, for individuals with documented disabilities who demonstrate that they need accommodations to access the examination(s).

8.      Testing accommodations are available on the USMLE for examinees with a disability, as defined under the Americans with Disabilities Act ("ADA").  All requests for accommodations are individually reviewed and, when warranted (*i.e.*, when the examinee demonstrates that he or she is disabled within the meaning of the ADA and needs accommodations to take the examination in an accessible manner), appropriate accommodations are provided.

9.      Accommodations are denied when the submitted documentation fails to demonstrate that the examinee has a disability within the meaning of the ADA.  NBME denies requests for extra testing time or other accommodations that have not been shown to be warranted to ensure that its testing program is fair for all examinees, and to protect the reliability of USMLE scores.

10.      NBME routinely seeks input from independent professionals with expertise in the relevant disability when evaluating an accommodation request. When it does so, NBME asks the external professional to review all the supporting documentation submitted by the candidate and provide a written report on whether the documentation demonstrates the presence of a physical or mental impairment (as identified by the candidate); if so, whether the impairment substantially limits the candidate's ability to perform one or more major life activities that are relevant to taking the USMLE; and, if so, to make a recommendation on whether the requested accommodations are appropriate and reasonable.

11.      On or about April 3, 2017, NBME received a request for testing accommodations from Robert Sampson.  Mr. Sampson sought 50% additional test time (time and 1/2) on the USMLE Step 1 exam, which would be administered over two days (instead of one).  A true and

correct copy of Mr. Sampson's accommodation request form dated April 1, 2017, is attached at Exhibit 1.

12.  Mr. Sampson included the following documents with his April 2017 request:

- Personal Statement for Accommodations to the NBME Office of Disability Services

- Certification of Prior Test Accommodations from Christopher Heedles, Stony Brook University School of Medicine

- Supplemental Testing Report from Allison Anderson, Ph.D. (date of testing December 16, 2013)

- Psychological Evaluation from Suzanne Michels, Ph.D. (date of testing August 26, 2013)

- March 27, 2017 letter from Christopher Heedles, Stony Brook University

- March 29, 2017 letter from Andrew Lam, M.D. Candidate University of Virginia School of Medicine

- March 29, 2017 letter from Linda De Motta, Stony Brook University School of Medicine

- March 29, 2017 letter from Thomas Aronson, MD

- November 28, 2016 letter to Robert Sampson from Andrew Wackett, M.D., Stony Brook Medicine

- MCAT score report

- Stony Brook Medicine test score report generated on 3/28/17

- May 2005 SAT score report

- June 2008 SAT score report

- November 2008 SAT score report

- October 2008 SAT score report

- June 2008 ACT score report

- 2007 PSAT score report

- 4 -

**A71**

- 1999 OLSAT score report

13.　　NBME thoroughly reviewed all documents submitted by Mr. Sampson.  It also provided Mr. Sampson's file to an external reviewer, Ben Lovett, Ph.D., for review and recommendation.  A true and correct copy of Dr. Lovett's April 25, 2017 report is attached at Exhibit 2.

14.　　Following NBME's individualized review of Mr. Sampson's request, and based on that review and Dr. Lovett's recommendation, NBME concluded that Mr. Sampson's documentation did not demonstrate a substantial limitation in a major life activity compared to most people or that the requested accommodations are an appropriate modification of his USMLE Step 1 test administration.  NBME therefore denied Mr. Sampson's request.   A true and correct copy of NBME's June 13, 2017 decision letter to Mr. Sampson is attached at Ex. 3.

15.　　By letter dated June 22, 2017, Mr. Sampson sought reconsideration of NBME's decision.  At that time, he submitted the following additional documents to NBME:

- June 22, 2017 letter from Jan Serrantino, Ed.D., University of California Irvine, Director of Disability Services

- June 17, 2017 Letter from Steven and Shelley Sampson

- Quoted teacher comments and parent letters from grades 1-6

- Original teacher comments with report cards from grades 1-6

16.　　On June 26, 2017, NBME emailed Mr. Sampson noting that "a few pages of the handwritten notes by Shelley Sampson are dark and illegible," and requesting legible copies if Mr. Sampson wanted the documents included in his file.  Mr. Sampson sent new scans but they remained illegible.

17. NBME thoroughly reviewed Mr. Sampson's request for reconsideration. It also provided Mr. Sampson's additional documentation to Dr. Lovett for review. A true and correct copy of Dr. Lovett's July 16, 2017 report is attached at Exhibit 4.

18. Based on Dr. Lovett's recommendation and NBME's independent review of the file, NBME concluded that the documentation submitted did not alter its original decision. As explained in an August 1, 2017 letter to Mr. Sampson, "the documentation submitted to date reveals consistent evidence of intact cognitive and academic functioning relative to most people, and does not demonstrate that standard testing time is a barrier to your access to the USMLE." A true and correct copy of NBME's August 1, 2017 letter is attached at Exhibit 5.

19. Mr. Sampson again sought reconsideration of NBME's decision, by letter received on or about November 30, 2017. At this time, Mr. Sampson submitted:

- An October 9, 2017 letter from Jan Serrantino, Ed.D.

- A September 6, 2017 letter from Thomas Aronson, M.D.

- An August 10, 2017 letter from Allison Anderson, Ph.D.

20. NBME thoroughly reviewed Mr. Sampson's second request for reconsideration, and also provided Mr. Sampson's new documentation to Dr. Lovett for review. A true and correct copy of Dr. Lovett's December 18, 2017 report is attached at Exhibit 6.

21. Based on Dr. Lovett's recommendation and NBME's independent review of the file, NBME concluded that the supplemental documentation did not alter its decision communicated in its June 13 and August 1, 2017 letters. NBME notified Mr. Sampson of its decision by letter dated January 12, 2018. A true and correct copy of this January 12, 2018 letter is attached at Exhibit 7.

22.     On February 22, 2018, Mr. Sampson sent a letter to NBME requesting "an explanation as to why [he is] not being granted disability related accommodations on the USMLE Step 1 exam." In support of this request, Mr. Sampson submitted:

- A February 15, 2018 letter from Linda De Motta, Learning Specialist, Stony Brook School of Medicine

23.     NBME responded to Mr. Sampson's February 22, 2018 letter by letter dated March 6, 2018, with additional explanation for its decisions. A true and correct copy of NBME's March 6, 2018 letter is attached at Exhibit 8.

24.     On June 29, 2018, Jo Anne Simon wrote a letter to NBME indicating that her law firm represented Mr. Sampson and seeking a "reversal of the NBME's discriminatory decision." (She sent a "corrected" letter later that same day.) Attached to this letter was a June 12, 2018 letter from Dr. Aronson.

25.     NBME provided a copy of the letter from Mr. Sampson's lawyer and the attached letter from Dr. Aronson to Dr. Lovett for review. In order to provide Dr. Lovett with all of the information that had been submitted to NBME by Mr. Sampson to date, NBME also provided Dr. Lovett with the documents from Mr. Sampson's February 2018 submission. Dr. Lovett provided a new report addressing this information. A true and correct copy of Dr. Lovett's July 12, 2018 report is attached at Exhibit 9.Then, on or around August 5, 2018, Mr. Sampson, through Jo Anne Simon, submitted a new accommodation request form and personal statement to NBME. On this form, he again sought 50% additional time (time and 1/2), with testing over two days instead of one. A true and correct copy of Mr. Sampson's accommodation request form dated August 2, 2018 is attached at Exhibit 10.

26.     NBME thoroughly reviewed all of the documentation provided by Mr. Sampson in June and August 2018.  Based on NBME's review of the file and Dr. Lovett's July 2018 recommendations, NBME again concluded that Mr. Sampson's documentation did not demonstrate a substantial limitation in a major life activity compared to most people or that the requested accommodation are an appropriate modification of his USMLE Step 1 test administration.  NBME notified Mr. Sampson of its decision by letter dated September 7, 2018.  A true and correct copy of this letter is attached at Exhibit 11.

27.     On November 14, 2018, NBME received another letter from Mr. Sampson's lawyer, Jo Anne Simon, requesting "a reversal of the NBME's latest discriminatory decision."

28.     NBME provided Ms. Simon's letter and all the documentation that had been submitted by Mr. Sampson to NBME to date to two new external experts, Samuel Ortiz, Ph.D., and Kevin Murphy, Ph.D.  A true and correct copy of Dr. Ortiz's November 26, 2018 report to NBME is attached at Exhibit 12.  A true and correct copy of Dr. Murphy's November 26, 2018 report to NBME is attached at Exhibit 13.

29.     Following thorough review of Mr. Sampson's request for reconsideration, and based on Dr. Ortiz's and Dr. Murphy's recommendations and NBME's independent review of the file, NBME again concluded that Mr. Sampson's documentation does not demonstrate a substantial limitation in a major life activity as compared to most people or that additional testing time is an appropriate modification of his USMLE Step 1 test administration.  NBME informed Mr. Sampson of its decision by letter dated January 4, 2019, a true and correct copy of which is attached at Exhibit 14.

30.     Mr. Sampson took the Step 1 examination on January 23, 2020 under standard time conditions, and he did not pass.  A true and correct copy of Mr. Sampson's Step 1 Score Report is attached at Exhibit 15.

31.     On April 15, 2022, Mr. Sampson sent a new testing accommodation request to NBME.  This time, he requested extra break time and 100% additional testing time (double time). A true and correct copy of Mr. Sampson's April 2022 accommodation request form is attached at Exhibit 16.  He also included with this request:

- A new Personal Statement for Accommodations

- A December 2020 neuropsychological evaluation by Jeannette Wasserstein, Ph.D. and Kim Miller, Ph.D.

32.     NBME thoroughly reviewed the documentation provided by Mr. Sampson in support of his April 2022 request.  It also provided Mr. Sampson's additional materials to Dr. Murphy for an external review.  A true and correct copy of Dr. Murphy's May 9, 2022 report to NBME is attached at Exhibit 17.

33.     Following review of Mr. Sampson's request, and based on Dr. Murphy's recommendation and NBME's independent review of the file, NBME concluded that Mr. Sampson's documentation does not demonstrate that the requested accommodations are an appropriate modification of his USMLE Step 1 test administration.  NBME informed Mr. Sampson that his request for testing accommodations was denied by letter dated June 1, 2022.  A true and correct copy of this letter is attached at Exhibit 18.

34.     As stated in the USMLE Bulletin of Information, to be eligible to take Step 1 (and Step 2 CK) of the USMLE, for U.S.-based medical students pursuing an MD degree, an individual must be a medical student officially enrolled in, or a graduate of, a US or Canadian medical school

program leading to the MD degree that is accredited by the Liaison Committee on Medical Education (LCME) at the time he or she applies to test and on the day of his or her examination.

35.     As also explained in the USMLE Bulletin of Information, examinees may attempt a Step exam four times.

36.     Mr. Sampson is not currently registered to take the Step 1 examination.

37.     It is my understanding from information in our test development department that the average word court for questions on the Step 1 exam is 132 words.

38.     A true and correct copy of school records submitted by Mr. Sampson to NBME is attached at Exhibit 19.

39.     A true and correct copy of Mr. Sampson's 1999 OLSAT score report as submitted to NBME is attached at Exhibit 20.

40.     A true and correct copy of Mr. Sampson's May 2005 SAT score report as submitted to NBME is attached at Exhibit 21.

41.     A true and correct copy of Mr. Sampson's 2007 PSAT score report as submitted to NBME is attached at Exhibit 22.

42.     A true and correct copy of Mr. Sampson's June 2008 ACT score report as submitted to NBME is attached at Exhibit 23.

43.     A true and correct copy of Mr. Sampson's June 2008 SAT score report as submitted to NBME is attached at Exhibit 24.

44.     A true and correct copy of Mr. Sampson's October 2008 SAT score report as submitted to NBME is attached at Exhibit 25.

45.     A true and correct copy of Mr. Sampson's November 2008 SAT score report as submitted to NBME is attached at Exhibit 26.

46.     A true and correct copy of Mr. Sampson's score report for the MCAT exams that he took on August 16, 2103 and September 18, 2014 is attached at Exhibit 27.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on September 29, 2022.

*Lucia McGeehan*

_____

Lucia McGeehan, Ph.D.

- 11 -

**A78**

# EXHIBIT 1

1112098       5-385-624-1
Step 1 Request Form

# United States Medical Licensing Examination® (USMLE®)

## REQUEST FOR TEST ACCOMMODATIONS

*Use this form if you are requesting accommodations on USMLE for the first time*

---

**The National Board of Medical Examiners® (NBME®) processes requests for test accommodations on behalf of the USMLE program**

If you have a documented disability covered under the Americans with Disabilities Act (ADA), you must notify the USMLE in writing <u>each time</u> you apply for a Step examination for which you require test accommodations. Submitting this form constitutes your official notification.

- Review the USMLE Guidelines for Test Accommodations at www.usmle.org for a detailed description of how to document a need for accommodation.

- Complete all sections of this request form and submit it together with all required documentation at the same time you submit your Step exam application.

- Incomplete, illegible, or unsigned request forms and/or insufficient supporting documentation will delay processing of your request.

- Do not send originals. Please retain the originals of all documentation that you submit as we are unable to return submissions or provide duplicate copies to third parties.

- Submitting duplicate and/or bound documentation may delay processing of your request.

- NBME will acknowledge receipt of your request by e-mail and audit your submission for completeness. If you do not receive an e-mail acknowledgement within a few days of submitting your request, please contact Disability Services at 215-590-9700.  You may be asked to submit additional documentation to complete your request.

- Requests are processed in the order in which they are received. Allow at least 60 days for processing of your request.  Processing cannot begin until sufficient information is received by NBME and your Step exam registration is complete.

- The outcome of our review will not be released via telephone.  All official communications regarding your request will be made in writing.  If you wish to modify or withdraw a request for test accommodations, contact Disability Services by e-mail at disabilityservices@nbme.org or by telephone at 215-590-9700.

---

**You MUST provide supporting documentation verifying your current functional impairment.**

In order to document your need for accommodation, <u>**submit**</u> the following with this form:

✓ A **personal statement** describing your disability and its impact on your daily life and educational functioning.

✓ **Supporting documentation** such as psychoeducational evaluations; medical records; copies of report cards, academic and score transcripts; faculty or supervisor feedback; job performance evaluations; clerkship/clinical course evaluations; verification of prior academic/test accommodations; etc.

✓ A **complete and comprehensive evaluation**.  Reports from qualified professionals must be typewritten on letterhead, signed and include the professional's qualifications.

RECEIVED

APR 0 3 2017

Disability Services

USMLE® Request for Test Accommodations

## Section A: Exam Information

Place a check next to the examination(s) for which you are currently registered and requesting test accommodations: (Check all that apply)

- ☑ Step 1
- ❑ Step 2 CK (Clinical Knowledge)
- ❑ Step 2 CS (Clinical Skills)
- ❑ Step 3

## Section B: Biographical Information
**Please type or print.**

**B1.** Name:   <u>Sampson</u>                  <u>Robert</u>                  <u>D</u>
                      Last                              First                    Middle Initial

**B2.** Gender:   ☑ Male      ❑ Female

**B3.** Date of Birth:   ████████

**B4.** USMLE #  <u>5</u> - <u>3</u> <u>8</u> <u>5</u> - <u>6</u> <u>2</u> <u>4</u> - <u>1</u>  (required)

**B5.** Address:
<u>11 Whitford Rd</u>
Street

<u>Stony Brook</u>                    <u>NY</u>                  <u>11790</u>
City                                State/Province            Zip/Postal Code

<u>USA</u>
Country

<u>631-833-4418</u>
Daytime Telephone Number

_____
Alternate Telephone Number

<u>rds911@gmail.com</u>
E-mail address

**B6.** Medical School Name: <u>Stony Brook University School of Medicine</u>

Country of Medical School: <u>USA</u>          Date of Medical School Graduation: <u>05/19</u>

**A81**

**USMLE® Request for Test Accommodations**

## Section C: Accommodations Information

**C1**. Do you require wheelchair access at the examination facility? ❑ Yes ☑ No
If yes, and you require an adjustable height computer table, indicate the number of inches required from the bottom of the table to the floor: _____

**C2.** Describe the accommodation(s) you are requesting. Accommodations must be appropriate to the impairment within the context of the examination task and setting:

_____

50% additional test time (time and 1/2) on the USMLE Step 1 exam.

**C3.** Check **ONLY ONE** box for the exam(s) for which you are registered.

**STEP 1:**

**Additional Break Time**
❑ Additional break time over 1 day
❑ Additional break time over 2 days

**Additional Testing Time**
❑ 25% Additional test time (Time and 1/4) over 2 days
☑ 50% Additional test time (Time and 1/2) over 2 days
❑ 100% Additional test time (Double time) over 2 days

❑ Additional break time <u>and</u> 50% Additional test time (Time and 1/2) over 2 days

**STEP 2 CK:**

**Additional Break Time**
❑ Additional break time over 2 days

**Additional Testing Time**
❑ 25% Additional test time (Time and 1/4) over 2 days
❑ 50% Additional test time (Time and 1/2) over 2 days
❑ 100% Additional test time (Double time) over 2 days

❑ Additional break time <u>and</u> 50% Additional test time (Time and 1/2) over 2 days

**STEP 3:**

**Additional Break Time**
❑ Additional break time over 4 days

**Additional Testing Time**
❑ 25% Additional test time (Time and 1/4) over 3 days
❑ 50% Additional test time (Time and 1/2) over 4 days
❑ 100% Additional test time (Double time) over 5 days

❑ Additional break time <u>and</u> 50% Additional test time (Time and 1/2) over 4 days

**STEP 2 CS:**
Describe the accommodations you are requesting for each section of Step 2 CS (i.e., patient encounter, patient note). If you are requesting additional time, state the **<u>amount</u>** of additional time you require in **<u>minutes per encounter/note</u>**.

❑ Patient Encounter:_____
❑ Patient Note:_____

**A82**

USMLE® Request for Test Accommodations

## Section D: Information About Your Impairment

**D1.** Check the box that best describes the **nature of your impairment** and list the **year** it was first diagnosed by a qualified professional. Check only those for which you are requesting accommodations.

**Sensory**                                    **Year first diagnosed**
- ☐ Hearing
- ☐ Vision
- ☐ Other (specify): _____

**Learning**
- ☑ Reading — 2013
- ☐ Writing
- ☐ Mathematics
- ☑ Other (specify): Dyslexia — 2013

**Language**
- ☐ Expressive
- ☐ Receptive
- ☐ Other (specify): _____

**Physical**
- ☐ Mobility/motor
- ☐ Endocrine
- ☐ Neurological
- ☐ Other (specify): _____

**Psychiatric**
- ☐ Anxiety Disorder
- ☐ Depression/Mood Disorder
- ☑ Attention Deficit/Hyperactivity Disorder — 2015
- ☐ Other (specify): _____

**Other Impairment** (specify) _____

**D2.** List your **current** DSM/ICD diagnosis/diagnoses for which you are requesting accommodations:

Specific Learning Disorder with impairment in reading (dyslexia), reading fluency, word reading accuracy, spelling (315.00)

Unspecified Neurodevelopmental Disorder, visuospatial memory, visuospatial processing (315.9)

Attention deficit hyperactivity dissorder, predominantly inattentive (F90.2)

**D3. Personal Statement**

✎ **Attach a signed and dated personal statement describing your impairments(s) and their impact on daily life.** Narratives should **not** be confined to standardized test performance. The personal statement is your opportunity to tell us how your physical or mental impairment(s) substantially limit your current functioning in a major life activity. In your own words, discuss how your impairment(s) would interfere with your access to the relevant USMLE Step and how the specific accommodation(s) you are requesting will alleviate this impact.

**A83**

USMLE® Request for Test Accommodations

## Section E: Accommodation History

### STANDARDIZED EXAMINATIONS

**E1.** List accommodations you received for all standardized examinations such as college, graduate and professional school admissions tests and professional licensure and certification examinations. If no accommodations were provided, write NONE.

- ✍ **Attach copies of official documentation from each testing agency confirming the test accommodations they provided.**
- ✍ **Attached a copy of your official examination score report(s).**

| | DATE(S) ADMINISTERED | ACCOMMODATION(S) PROVIDED |
|---|---|---|
| ☐ SAT®, ACT® PSAT | Fall '07 (PSAT), 5/05, 6/08, 6/08, 10/08, 11/08 | NONE |
| ☐ MCAT® | 8/13, 9/14 | NONE |
| ☐ GRE® | | |
| ☐ GMAT® | | |
| ☐ LSAT® | | |
| ☐ DAT® | | |
| ☐ COMLEX® | | |
| ☐ Bar Examination(s) | | |
| ☒ Other(s) NBME Shelf Exams (also attached and below in E2) | | Time and 1/2 on NBME shelf exams: 12/8/16, 12/16/16, 1/13/17, all others previously (since 10/6/16) under standard time conditions. |
| OLSAT | May 1999 | NONE |

### POSTSECONDARY EDUCATION

**E2.** List each school and all formal accommodations you receive/received, and the dates accommodations were provided:

- ✍ **Attach copies of official records from the school(s) listed confirming the accommodations they provided.**

| | SCHOOL | ACCOMMODATIONS PROVIDED | DATES PROVIDED |
|---|---|---|---|
| Medical/Graduate/ Professional School | Stony Brook University School of Medicine | 1.5 Time on exams | November '16-->Current (specifically received on 12/8/16, 12/16/16, 1/13/17) |
| Undergraduate School | University of Virginia | NONE | |

### E3. Certification of Prior Test Accommodations

- ✍ If you receive/received accommodations in medical school and/or residency, the appropriate official at your medical school/residency must complete and submit the **Certification of Prior Test Accommodations** form available at **www.usmle.org**.

**A84**

USMLE® Request for Test Accommodations

## PRIMARY AND SECONDARY SCHOOL

**E4.** List each school and all formal accommodations you received, and the dates accommodations were provided:

> **Attach copies of official records from the school(s) listed confirming the accommodations they provided.**

| | SCHOOL | ACCOMMODATIONS PROVIDED | DATES PROVIDED |
|---|---|---|---|
| **High School** | Ward Melville High School | NONE | |
| **Middle School** | Paul J Gelinas JHS | NONE | |
| **Elementary School** | Minnesauke Elementary School | NONE | |

## Section F: Certification and Authorization

To the best of my knowledge and belief, the information recorded on this request form is true and accurate. I understand that my request for accommodations, including this form and all supporting documentation, must be received by the NBME sufficiently in advance of my anticipated test date in order to provide adequate time to evaluate and process my request.

I acknowledge and agree that any information submitted by me or on my behalf may be used by the USMLE program for the following purposes:
- Evaluating my eligibility for accommodations. When appropriate, my information may be disclosed to qualified independent reviewers for this purpose.
- Conducting research. Any disclosure of my information by the USMLE program will not contain information that could be used to identify me individually; information that is presented in research publications will be reported only in the aggregate.

I authorize the National Board of Medical Examiners (NBME) to contact the entities identified in this request form, and the professionals identified in the documentation I am submitting in connection with it, to obtain further information. I authorize such entities and professionals to provide NBME with all requested further information.

I further understand that the USMLE reserves the right to take action, as described in the Bulletin of Information (see "Indeterminate Scores and Irregular Behavior"), if it determines that false information or false statements have been presented on this request form or in connection with my request for test accommodations.

Name (print): Robert Drew Sampson

Signature: *[signature]*                Date: 4/1/17

**A85**

USMLE® Request for Test Accommodations

## What to Submit

✓ Legible copies of all documents, not originals
✓ Typewritten and signed letters and reports from professionals on their letterhead
✓ Complete reports with all pages including test scores
✓ All documents in English. You are responsible for providing certified English translations of all non-English documentation
✓ Childhood records - if your request is based on a developmental disorder (e.g., LD, dyslexia, ADHD)
✓ Official transcripts and standardized test score reports
✓ Documentation beyond self-report of your functional impairment
✓ Documentation of your functional impairment in activities other than test-taking

## What NOT to Submit

✗ Original documents
✗ Handwritten or unsigned letters from physicians or evaluators
✗ Copies of reports with redactions or missing pages
✗ Multiple copies of documentation (i.e., faxed and mailed copies of a document)
✗ Duplicate documentation previously submitted to Disability Services
✗ Previous correspondence from Disability Services
✗ Research articles, your résumé or curriculum vita
✗ Staples, binders, page protectors, folders, or similar items

**Mail, fax or e-mail (as a pdf) your completed request form and supporting documents to the address below at the same time you submit your Step examination application.**

**Disability Services**
**National Board of Medical Examiners**
**3750 Market Street**
**Philadelphia, PA 19104-3190**
**Telephone: (215) 590-9700**
**Facsimile: (215) 590-9422**
**E-mail: disabilityservices@nbme.org**

**A86**

# EXHIBIT 2

Case 2:22-cv-05120-JMA-AYS Document 121-7 Filed 09/29/22 Page 99 of 126 PageID #: 238

## Review of Accommodation Request

**Applicant Name:** Robert Sampson
**Date of Birth:** ▮▮▮▮▮▮
**Date of Review:** April 25, 2017
**Reviewer**: Benjamin J. Lovett, Ph.D.

This review concerns Robert Sampson, who has requested extended time testing accommodations (50% additional time) on Step 1 of the USMLE. He reports diagnoses of ADHD and learning disabilities, as well as a recent history of accommodations in medical school. In a personal statement, Mr. Sampson describes a long history of problems acquiring academic skills and says that he did well until medical school because he worked so hard.

In support of his request, Mr. Sampson has submitted the following documents:
- A record of performance on Shelf exams in medical school
- A record of performance on a group-administered IQ test (the OLSAT) in second grade
- Score reports from the PSAT, SAT, ACT, and MCAT
- The reports from diagnostic evaluations completed in 2013
- Supportive letters from a disability services office administrator, a tutor, a learning specialist, and a treating psychiatrist
- Confirmation of eligibility for accommodations in medical school
- Evidence of being called before a committee in medical school to explain marginal performance there

This review has three purposes: to evaluate the evidence for the reported disability conditions, to determine if the conditions (if present) cause a substantial limitation in any major life activities, and to determine if the requested accommodations are appropriate for Mr. Sampson.

Evidence of ADHD
There is clearly insufficient evidence to support a diagnosis of ADHD. Indeed, Mr. Sampson's diagnosis is one of the most irresponsible that I have ever seen. There is very substantial evidence *against* the presence of ADHD.

In August 2013, Mr. Sampson completed his first diagnostic evaluation, and at that time, based on his concerns, the evaluator did not even assess for ADHD; it appears that there were no concerns related to ADHD, and the evaluator noted that Mr. Sampson "was very focused throughout the testing sessions." In December 2013, Mr. Sampson nonetheless completed a second evaluation with a different evaluator, and this time he "wondered whether" ADHD "might explain attentional difficulties he is having." The evaluator obtained standardized ratings of Mr. Sampson's current and childhood ADHD symptoms from Mr. Sampson himself as well as from various informants (his mother, his father, his girlfriend, and a friend/tutor). With regard to childhood symptoms, only Mr. Sampson endorsed clinically significant levels; neither of his parents did. With regard to current symptoms, *neither Mr. Sampson nor any third-party informants endorsed clinically significant symptom levels*. This is very strong evidence *against* ADHD, and the evaluator did not make that diagnosis. Nonetheless, the evaluator claimed that Mr. Sampson "does appear to be experiencing attention problems," perhaps based on a small

number of below-average scores on highly artificial neuropsychological tasks.

At some point in 2015, Mr. Sampson was reportedly diagnosed with ADHD; indeed, his psychiatrist reports the diagnosis, but there is no record of what evidence was used to make the diagnosis, and as I discussed above, there is very clearly substantial evidence against the diagnosis.

Evidence of Learning Disabilities

The current official diagnostic criteria for learning disabilities require that someone's "academic skills are substantially and quantifiably below those expected for the individual's chronological age."[1] Every time that Mr. Sampson's academic skills have been measured against age peers on diagnostic tests, the skills have been in the average range or above.[2] Similarly, on real-world academic tests taken by the general population (ACT, PSAT, SAT) and even by medical school applicants (MCAT), his scores have always been in the average range or above, compared to his peers.[3] This is very strong evidence *against* the presence of any learning disabilities.

In August 2013, Mr. Sampson received a diagnosis of Learning Disorder Not Otherwise Specified (LD-NOS). However, the evaluator explicitly acknowledged that this was not based on any academic skill weaknesses, but on a discrepancy between Mr. Sampson's "verbal and visual/spatial reasoning abilities," neither of which were found to be below-average either. LD-NOS is an old diagnostic term (outdated even in August 2013) that was used to refer to problems that did *not* meet the full criteria for any well-understood learning disabilities. Even if LD-NOS is a valid diagnostic category generally, learning disabilities clearly concern academic skill weaknesses, and so the LD-NOS term was misapplied.

In December 2013, Mr. Sampson was diagnosed with a learning disability "with impairment in reading (dyslexia), reading fluency, word reading accuracy, spelling," but again there is no evidence that he has ever performed below the average range compared to age peers on measures of any of those skills. The diagnosis was made in the face of clear evidence to the contrary; it was a remarkably unsupported diagnosis.

Evidence of Other Disabilities

Finally, Mr. Sampson was diagnosed in December 2013 with "Unspecified Neurodevelopmental Disorder." There are no detailed diagnostic criteria for such a disorder; the term is used when someone does *not* meet the criteria for any of the known disorders. Therefore, there is no way to determine if the term was applied correctly; instead, we should ask (as I do below) whether Mr. Sampson meets the standard for being disabled, and whether he needs any accommodations.

---

[1] See page 67 of the *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition* (DSM-5; American Psychiatric Association, 2013).

[2] In August 2013, Mr. Sampson's academic skills were measured by the Woodcock-Johnson Tests of Achievement, and all of his scores were in the average range or above, when compared to age peers. In December 2013, he was given the reading comprehension measure from the Scholastic Abilities Test for Adults, and again, his score was in the average range (without any extended time) compared to age peers.

[3] Mr. Sampson took the SAT several times, including once very early (at the age of 14) as part of the requirements for entrance into a special non-college program, and so his scores from that administration, which compared him to college-bound high school seniors, cannot be taken as evidence of his own age- or grade-level abilities. His scores on all *other* administrations of the SAT were in the average range or above.

Evidence of Functional Limitations and Accommodations Needs

There is simply no credible evidence that, compared to most people in the general population, Mr. Sampson is substantially limited in any major life activities. He has not always done well on tests in medical school, but obviously, most people are not expected to do well in medical school, and so performance problems there are not strong evidence of a disability. In addition, he has occasionally obtained below average scores on highly artificial neuropsychological tasks, but variability in performance on such measures is typical and expected, and his lowest scores are not buttressed by credible, *real-world* evidence of deficits compared to most people in the general population.

Finally, there is clearly insufficient evidence that Mr. Sampson requires any accommodations at all to access Step 1 of the USMLE. In the past, when he has taken tests that most people in the general population take, he does well without any accommodations. His SAT scores were in the average range or above, without any accommodations. His ACT scores were similarly in the average range or above, without any accommodations. Even his MCAT scores were better than those of most medical school applicants, without accommodations. Admittedly, some of his Shelf exam scores have not been very high, but if the only setting where someone experiences functional impairment is on medical school exams, this would not rise, in my opinion, to the level of a true disability.

Benjamin J. Lovett, Ph.D.

# EXHIBIT 3



National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104-3102

215-590-9500 phone
www.nbme.org

1114461      5-385-624-1
Denial-Decision Letter (a

**Confidential**

June 13, 2017

Robert D. Sampson
11 Whitford Rd.
Stony Brook, NY 11790

RE: USMLE Step 1                    USMLE ID#: 5-385-624-1

Dear Mr. Sampson:

We have thoroughly reviewed the documentation provided in support of your request for test accommodations for the United States Medical Licensing Examination (USMLE) Step 1. We conducted an individualized review of your request in accordance with the guidelines set forth in the amended Americans with Disabilities Act (ADA).

You report the basis of your request to be "*Specific Learning Disorder with Impairment in reading (dyslexia)*," diagnosed in 2013, "*Unspecified Neurodevelopmental Disorder*," and "*Attention deficit hyperactivity disorder, predominantly inattentive*" diagnosed in 2015. In your personal statement, you report a childhood history of stuttering and difficulties with reading and learning. You write, "*Throughout my entire life, especially most recently in my medical education, I have significantly struggled with my reading speed and ability, especially on timed exams, even though I have otherwise proven in the rest of the course that I learned the material well.*" You report that it was not until 2013 when you were preparing for the MCAT that you decided to seek professional guidance and pursue an evaluation, which resulted in a learning disability diagnosis in August 2013. According to your request, however, you did not receive academic or test-taking accommodations until 2016 when you were already in medical school. You report that your performance on medical school "*NBME shelf exams*" improved with 50% additional time and have requested the same accommodation for Step 1.

Included with your request was an August 26, 2013 Confidential Report of Psychological Evaluation in which Suzanne Michels, Ph.D. concludes that variation in your test scores "*indicate the presence of a Learning Disorder Not Otherwise Specified*" (LD-NOS) and states, "*Robert's significant personal weakness on tasks requiring visual/spatial skills has negatively affected aspects of his academic performance.*" She recommends 150% "*extra time on reading comprehension tasks*" and "*those involving significant visual/spatial components.*" In a December 16, 2013 Supplemental Testing Report, Allison Anderson, Ph.D. writes that you were interested in further testing "*to explore learning issues more thoroughly.*" She writes, "*He also wondered whether Attention Deficit/Hyperactivity Disorder (ADHD) might explain attentional difficulties he is having.*" Dr. Anderson rules out a diagnosis of ADHD but concludes that you meet criteria for an "*Unspecified Neurodevelopmental Disorder*" and a "*Specific Learning Disorder with impairment in reading (dyslexia)*" and makes recommendations including 50% extended time for exams.

In a March 29, 2017 letter, Thomas A. Aronson, M.D. writes that you have been under his psychiatric care since November 2015 for "*Learning Disabilities and mild ADD*" and that your performance in medical school has significantly improved since he began prescribing Dexedrine and accommodations were approved for exams. He references your 2013 evaluations and reports that Learning Disorder and ADD substantially impact your major life activities in and out of the classroom, "*e.g., avoid reading, difficulty finishing tests on time, difficulty completing tasks.*" However, no further detail was provided about your functioning and no information at all was provided about how the diagnosis of "*ADD*" was made in 2015, how you meet key diagnostic criteria for ADHD, or why your evaluators did not reach the same diagnostic conclusion during their assessments in 2013. In additional letters

**A92**

dated March 29, 2017, your former MCAT tutor, Andrew Lam, and Stony Brook University Learning Specialist, Linda De Motta, also report that you have difficulties with reading skills and reading speed that impact your ability to complete exams within standard time limits.

Despite these statements and the diagnostic conclusions of your evaluators, your 2013 performances on a range of cognitive and academic tasks, including reading/passage comprehension, reading fluency, spelling, perceptual reasoning, visual-spatial thinking and processing speed were all well within the range of average functioning or above relative to national samples of same-aged peers. For example, Dr. Michels notes that although your visual/spatial problem-solving abilities (as measured by the *Wechsler Adult Intelligence Scale, Fourth Edition*) were "*weaker*" than your "*exceptional*" cognitive abilities in other areas, they still "*fall solidly within the average range.*" On the *Woodcock-Johnson Tests of Achievement-Third Edition (WJ-III)*, your Reading Fluency performance was better than 80% of a national sample of same age peers. Although Dr. Michels emphasizes your performance on the *Nelson-Denny Reading Test* (NDRT), a screening measure of reading, the NDRT Reading Rate is not considered by experts to be a reliable measure of reading efficiency because it is determined on the basis of a single, one-minute sample of words-per-minute.

According to the *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5)*, specific learning disorder and ADHD are both neurodevelopmental disorders that first manifest in childhood. Even if not formally diagnosed until later in life, each is characterized by persistent and impairing difficulties that that interfere with functioning or development over a long period of time. The documentation you provided does not show a record of chronic and pervasive problems managing daily demands for attention, organization, behavioral regulation, or executive functioning during your development or currently, nor does it demonstrate a developmental history of problems with reading or learning that impacted your academic functioning or limited a major life activity. As best one can tell, you successfully progressed throughout your education with an academic record and scores on timed standardized tests sufficient to gain admission to both college and medical school, without formal accommodations. Regarding your performance on timed standardized tests, your records show that on multiple administrations of the SAT under standard conditions in 2008, you obtained scores in the 74th to 96th percentile range compared to a national sample of college-bound seniors. In November 2008, your Critical Reading score on the SAT was better than 93% of a national sample of peers. Additionally, under standard conditions on the MCAT in 2013 and 2014, your Total Scores were better than 67% and 73% of a highly select sample of medical school applicants (respectively). Overall, these data do not demonstrate impaired functioning relative to most people or suggest that standard testing conditions are a barrier to your access to the USMLE.

Accommodations are intended to provide access to the USMLE testing program for individuals with a documented disability as defined by the ADA. A diagnostic label, in and of itself, does not establish coverage under the ADA, nor does prior receipt of accommodations for a particular activity guarantee that identical accommodations are indicated or will be available in all future settings and circumstances. The ADA defines disability as a physical or mental impairment that substantially limits one or more major life activities as compared to most people. Your documentation does not demonstrate a substantial limitation in a major life activity as compared to most people or that the requested accommodations are an appropriate modification of your USMLE Step 1 test administration. Therefore, after a thorough review of all of your documentation, I must inform you that we are unable to provide you with the requested accommodations.

We will advise Applicant Services to process your exam application without test accommodations. You may inquire at usmlereg@nbme.org or call Applicant Services directly at (215) 590-9700 with any questions about your scheduling permit.

Sincerely,

Michelle M. Goldberg, Ph.D.
Manager, Disability Services

# EXHIBIT 4

## Review of Accommodation Request

**Applicant Name:** Robert Sampson (reconsideration)
**Date of Birth:** ▮▮▮▮▮▮
**Date of Review:** July 16, 2017
**Reviewer**: Benjamin J. Lovett, Ph.D.

This review concerns Robert Sampson, who has requested extended time testing accommodations (50% additional time) on Step 1 of the USMLE. He reports diagnoses of ADHD and learning disabilities, as well as a recent history of accommodations in medical school.

I first reviewed Mr. Sampson's request in April 2017. At that time, in support of his request, he had submitted the following documents:

- A record of performance on Shelf exams in medical school
- A record of performance on a group-administered IQ test (the OLSAT) in second grade
- Score reports from the PSAT, SAT, ACT, and MCAT
- The reports from diagnostic evaluations completed in 2013
- Supportive letters from a disability services office administrator, a tutor, a learning specialist, and a treating psychiatrist
- Confirmation of eligibility for accommodations in medical school
- Evidence of being called before a committee in medical school to explain marginal performance there

Based on the documentation described above, I concluded that there was clearly insufficient evidence to support Mr. Sampson's request. Although he had been diagnosed with ADHD, the only current evidence of his core ADHD symptoms (as rated by himself and by others who knew him well) showed that none of the ratings were above clinical thresholds. Although he had been diagnosed with a learning disability affecting reading and spelling skills, diagnostic tests measuring those skills found them to be in the average range or above. Finally, on standardized, high-stakes tests such as the ACT, SAT, and even the MCAT, Mr. Sampson had repeatedly performed in the average range or above without any accommodations. Please see my report, dated April 25, 2017, for more details.

The NBME denied Mr. Sampson's request, and he has now appealed. In addition to reviewing the documents listed above, I have now also reviewed the following documents:

- An appeal letter from Mr. Sampson
- Supportive letters from his parents, and from a disability services office administrator at his university
- Various documents from Mr. Sampson's elementary school years, including report cards and letters, along with a summary of chosen quotations from those documents
- Additional correspondence

Unfortunately, there is still clearly insufficient evidence to support Mr. Sampson's request, and there is a great deal of evidence that argues *against* his request. Below I summarize the new documentation:

- The letter from Mr. Sampson's parents asserts that they overlooked their son's early educational problems due to his good performance in school. The parents also report that their son benefited from extensive tutoring, especially in high school, and the letter lists the names of many tutors. They do not mention what was noted by Mr. Sampson's August 2013 evaluator, that his high school classes "were typically honors or AP level" and that "he earned A's in most classes."
- The letter from the disability services office administrator contains many legal claims but does not provide any unique, relevant information about Mr. Sampson's case. The administrator also makes clear that she determines accommodations needs by comparing Mr. Sampson's diagnostic test scores to each other (even when all scores were average or above) and by comparing Mr. Sampson's skills to what would be needed in medical school. She clearly does *not* use a general population, average person comparison standard.
- The documents from Mr. Sampson's elementary school years do not contain any clear evidence that ever would have met the criteria for ADHD or learning disabilities. Admittedly, not all of the documents are entirely legible, but the summary of quotes from those documents appears to show "sour cherry picking"—that is, the choosing of unrepresentative comments that, in context, would paint a very different picture of Mr. Sampson. Certainly, there is no evidence that Mr. Sampson's behavior or performance in school was substantially below that of most of his peers. Of course, even if there were credible evidence of significant childhood problems (and there is no such evidence), this would not mean that Mr. Sampson is *currently* impaired.

The essential state of the evidence, then, has not changed. The one comprehensive assessment of ADHD symptoms failed to find adequate evidence to support such a diagnosis (since no one, including Mr. Sampson himself, rated him as having current clinical levels of symptoms). The diagnostic evaluations of his academic skills have failed to find any below-average skills compared to his age peers or to most people in the general population. And on high-stakes tests when he is compared to general population peers (e.g., on the SAT and ACT), and even when he was compared to medical school applicants (on the MCAT), his scores have been in the average range or above without accommodations.

One of the skills needed to access Step 1 of the USMLE is reading fluency—that is, the ability to decode and understand text under a time limit. Every time that Mr. Sampson's ability to do this has been compared to age peers or to general population standards, his skills have been in the average range or above:

- His SAT and ACT scores were consistently in the average range or above, except the one time that he took the test several years early (and so was not compared to peers).
- In August 2013, his score on the Woodcock-Johnson Tests of Achievement (WJ-Ach) reading fluency task (where he needed to silently read and demonstrate understanding of sentences as quickly as possible) was better than 80% of his age peers.
- In August 2013, his score on the timed reading comprehension task from the Nelson-Denny Reading Test (NDRT) was in the average range for a general population proxy group (first-year college students). Although the evaluator reports a score at the 16th percentile, this was based on a comparison to graduating college seniors, not a relevant comparison group.

- In December 2013, his score on the standard-timed version of the reading comprehension task from the Scholastic Abilities Test for Adults (SATA) was in the average range for his age peers.

Finally, let me again note that even on the MCAT, when Mr. Sampson was compared to a very high performing group of individuals (i.e., medical school applicants), all of his scores were consistently in the average range or above without any accommodations.

This is not a "gray area" or "borderline" case; there is clearly insufficient evidence to support Mr. Sampson's request, and instead there is credible, consistent evidence suggesting that he does *not* have relevant substantial limitations compared to most people in the general population.

Benjamin J. Lovett, Ph.D.

# EXHIBIT 5

 **NBME**



National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104-3102

215-590-9500 phone
www.nbme.org

<u>**Confidential**</u>

August 1, 2017

Robert D. Sampson
11 Whitford Rd.
Stony Brook, NY 11790

RE: USMLE Step 1                    USMLE ID#: 5-385-624-1

Dear Mr. Sampson:

We have thoroughly reviewed your request for reconsideration of our decision regarding test accommodations for the United States Medical Licensing Examination (USMLE) Step 1. We conducted an individualized review of your request and supporting documentation in accordance with the guidelines set forth in the Americans with Disabilities Act (ADA).

NBME carefully considers all evidence in determining whether an individual is substantially limited within the meaning of the ADA, including information contained in the individual's personal statement; professional evaluation reports; letters from advocates; and objective documentation such as school records and scores obtained on standardized tests taken with and without accommodations. Supporting documentation submitted from qualified professionals is a necessary part of any request for accommodations and is thoroughly reviewed by the NBME. Though not required to defer to the conclusions or recommendations of an applicant's supporting professional(s), we give considerable weight to the recommendation of qualified professionals made in accordance with generally accepted diagnostic criteria and supported by reasonable documentation.

Included with your current submission is a June 22, 2017 letter from Jan D. Serrantino, Ed.D., Director of the Disability Services Center at UC Irvine, which you state "*should serve as the unifying document of my appeal.*" Dr. Serrantino writes that you contacted her for advice and support with your appeal, and refers to your originally submitted documentation as well as the supplemental information supplied with your reconsideration request. She recommends 50% extended time on all USMLE Step exams on the basis of reading and neurodevelopmental disabilities. Dr. Serrantino states that although you are able to read at the level of an average person, reading "*as well as the 'average person' is not congruent with* [your] *overall ability… and the level of reading ability required to obtain the medical knowledge needed to become a physician.*" She references your "*Verbal IQ of 141*" and states, "*The discrepancy between his ability and reading (and writing) achievement clearly necessitates the need for accommodation.*"

Her conclusions and recommendations notwithstanding, currently validated theories and empirical research do not support using a discrepancy model as the basis of a diagnosis or rationale for accommodations. Average range academic skills, no matter how discrepant from one's IQ or other

**A99**

scores, are Average nonetheless and do not demonstrate impaired functioning that limits a major life activity. Overall, the documentation submitted to date reveals consistent evidence of intact cognitive and academic functioning relative to most people, and does not demonstrate that standard testing time is a barrier to your access to the USMLE.

The ADA defines disability as a physical or mental impairment that substantially limits one or more major life activities as compared to most people in the general population. Accommodations are provided when there is clear documentation of functional impairment as compared to most people and a rationale to demonstrate that the requested accommodation is appropriate to the setting and circumstance.

Our thorough review of all of your documentation found no new substantive information or evidence that alters our original decision communicated in my June 13, 2017 letter. Therefore, I must inform you that we are unable to provide you with the requested accommodations.

Sincerely,

Michelle M. Goldberg

Michelle M. Goldberg, Ph.D.
Manager, Disability Services

**A100**

# EXHIBIT 6

# Review of Accommodation Request

**Applicant Name:** Robert Sampson (<u>second</u> reconsideration)
**Date of Birth:** ▮▮▮▮▮▮
**Date of Review:** December 18, 2017
**Reviewer**: Benjamin J. Lovett, Ph.D.

This review concerns Robert Sampson, who has requested extended time testing accommodations (50% additional time) on Step 1 of the USMLE. He reports diagnoses of ADHD and learning disabilities, as well as a recent history of accommodations in medical school.

I first reviewed Mr. Sampson's request in April 2017. At that time, in support of his request, he had submitted the following documents:

- A record of performance on Shelf exams in medical school
- A record of performance on a group-administered IQ test (the OLSAT) in second grade
- Score reports from the PSAT, SAT, ACT, and MCAT
- The reports from diagnostic evaluations completed in 2013
- Supportive letters from a disability services office administrator, a tutor, a learning specialist, and a treating psychiatrist
- Confirmation of eligibility for accommodations in medical school
- Evidence of being called before a committee in medical school to explain marginal performance there

Based on the documentation described above, I concluded that there was clearly insufficient evidence to support Mr. Sampson's request. Although he had been diagnosed with ADHD, the only current evidence of his core ADHD symptoms (as rated by himself and by others who knew him well) showed that none of the ratings were above clinical thresholds. Although he had been diagnosed with a learning disability affecting reading and spelling skills, diagnostic tests measuring those skills found them to be in the average range or above. Finally, on standardized, high-stakes tests such as the ACT, SAT, and even the MCAT, Mr. Sampson had repeatedly performed in the average range or above without any accommodations. Please see my report, dated April 25, 2017, for more details.

The NBME denied Mr. Sampson's request, and he appealed, submitting the following additional documents:

- An appeal letter from Mr. Sampson
- Supportive letters from his parents, and from a disability services office administrator
- Various documents from Mr. Sampson's elementary school years, including report cards and letters, along with a summary of chosen quotations from those documents
- Additional correspondence

Unfortunately, there was still clearly insufficient evidence to support Mr. Sampson's request. The letter from Mr. Sampson's parents noted that their son received extensive tutoring in school, but given that Mr. Sampson was receiving A grades in honors and advanced placement courses, such tutoring would not be evidence of a disability. Meanwhile, the disability services office

administrator made clear in her letter that she believes that (a) discrepancies between different test scores and (b) low performance relative to other medical students are sufficient evidence of a disability. Finally, the documents from Mr. Sampson's elementary school years did not clearly show evidence of atypical levels of attention/behavior problems or poor academic performance beyond what most students experience at times. The new documentation also failed to address the substantial evidence *against* the request (noted above). Therefore, I had to again conclude that there was insufficient evidence to support the request. Please see my report, dated July 16, 2017, for more details.

The NBME denied Mr. Sampson's appeal, and he has again requested reconsideration. In addition to his own brief letter, he has submitted three new supportive letters from the following individuals:
- Dr. Allison Anderson, a psychologist who evaluated Mr. Sampson in December 2013
- Dr. Thomas Aronson, a psychiatrist who has been treating Mr. Sampson since November 2015
- Dr. Jan Serrantino, an "educational consultant" who had written earlier supportive letters as the disability services office administrator mentioned above

Unfortunately, this new documentation provides no new evidence relevant to Mr. Sampson's case. Moreover, the arguments presented in these letters are based on either irrelevant or inaccurate information. Finally, and most remarkably, none of the letters attempt to address the very considerable evidence that argues against Mr. Sampson's request. Let me respond to the major claims in these letters:

1. Dr. Anderson claims that Mr. Sampson is below average in relevant areas. But as support for this claim, she only cites irrelevant facts:
   - Mr. Sampson scored at the 16th percentile on the Nelson-Denny Reading Test (NDRT) timed reading comprehension task compared to *graduating college seniors*, not compared to age peers or to the general population (indeed, fewer than half of adults in the United States have a college degree). Compared to the general population proxy group of first-year college students, his score was well within the average range.
   - Mr. Sampson scored at the 25th percentile on a timed version of the reading comprehension task from the Scholastic Abilities Test for Adults. This score is in the average range. Dr. Anderson points out that any test score has a range of uncertainty around it (the "standard error of measurement"), but this is irrelevant, since as she notes, that uncertainty extends in both directions from the score, and so if tested on a different day, Mr. Sampson's score might have been somewhat lower than the 25th percentile, but *it might just as likely have been higher*.
   - Mr. Sampson scored below the average range on artificial neuropsychological tests that are not at all like Step 1 of the USMLE, such as a test where he needed to draw a complex figure from memory.

   Worse still, Dr. Anderson does not even mention the evidence from real-world tests such as the SAT, ACT, and MCAT that show much better performance than the diagnostic tests that she chooses to discuss.

2. Dr. Anderson repeatedly bases her accommodations recommendations on facts that *do not show below-average functioning*. For instance, she notes that Mr. Sampson improved his performance on time-pressured tests when given more time (as many nondisabled people do). Similarly, she notes that Mr. Sampson's reading scores were lower *compared to some of his other test scores*. Facts like these are irrelevant to a disability determination even if true.

3. Dr. Aronson firmly asserts that Mr. Sampson meets the diagnostic criteria for ADHD, but never states the evidence that he used to make that judgment. The closest that Dr. Aronson comes to doing so is when he says that "ADHD is a clinical diagnosis made over several visits triangulating patient self-reported symptoms and impact with key data points from a multitude of sources." But Dr. Aronson never acknowledges that in December 2013, when Mr. Sampson's self-reported symptoms were combined with reports about his symptoms from a multitude of other sources (his mother, his father, his girlfriend, and his friend/tutor), *none* of these sources (including Mr. Sampson himself) described Mr. Sampson as having ADHD symptoms in the clinical range. Therefore, the only direct evidence of core ADHD symptoms on validated diagnostic measures undermines Dr. Aronson's assertion, *even when using assessment methods that Dr. Aronson appears to endorse*.

4. Dr. Aronson makes other assertions that are directly contradicted by objective evidence. For instance, he refers to Mr. Sampson's information processing speed as "very slow." But when Mr. Sampson's processing speed has been measured directly, it has been at least in the average range, and usually far above that range. For instance, in 2013, his processing speed score on the Wechsler Adult Intelligence Scale was better than 93% of people his age.

5. Dr. Serrantino notes that in one of the denial letters, the NBME cited research showing that students with *and without* disabilities both benefit from extended time accommodations. Rather than attempting to criticize this research, she proceeds to note that the cited research study used the NDRT, and she argues that the NBME has elsewhere criticized the NDRT. The NBME's point about students without disabilities benefiting from extended time stands (apparently without disagreement from Dr. Serrantino), and it is highly relevant to Mr. Sampson's case.

6. Dr. Serrantino appears to argue in favor of "discrepancy" models in the diagnosis of learning disabilities. What counts as a discrepancy model varies from one reference to another, but in general, Dr. Serrantino appears to be arguing that even if all of someone's diagnostic test scores are in the average range or above, discrepancies between those scores can be evidence of a learning disability. Such a claim is admittedly debated within the field, with different scholars coming down on different sides of the issue. However, even if we grant that a learning disability could be diagnosed using these kinds of discrepancies, this would clearly not meet the *legal* definition of disability, which requires substantial limitations compared to most people in the general population (not just compared to the person's other skills). Moreover, the official diagnostic criteria for learning disabilities in the *Diagnostic and Statistical Manual for Mental Disorders*

clearly require that someone's academic skills be at least 1 standard deviation below the mean for the person's age group (among other requirements).

7. Finally, Dr. Serrantino makes a variety of legal claims, as she has in the past, but some of those claims appear to me to be at best misleading or else misapplied to Mr. Sampson's case. For instance, she reports that someone can be substantially limited in reading if they take longer to read. But as I have noted, there is no credible evidence that Mr. Sampson's *timed* reading skills are below the average range compared to the general population. She also reports that evidence of past student success cannot be used when making accommodations decisions. But as she no doubt knows, educational performance in real-world settings is core evidence of a learning disability (or the lack thereof), even mentioned in the *Diagnostic and Statistical Manual of Mental Disorders*. She is right that past success does not automatically mean that someone does not have a disability, but she extends this point beyond all reasonable application.

As I noted in an earlier report, Mr. Sampson's case is not in a "gray area." Not only is there insufficient evidence supporting his disability diagnoses and accommodation needs, but there is a tremendous amount of consistent evidence *against* those diagnoses and needs. He and his advocates have passionately argued in support of his case, but they never even acknowledge the very clear evidence undermining their claims.

Benjamin J. Lovett, Ph.D.

# EXHIBIT 7



1121197      5-385-624-1
Reconsid. Denial-Decision

National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104-3102

215-590-9500 phone
www.nbme.org

**Confidential**

January 12, 2018

Robert D. Sampson
11 Whitford Rd.
Stony Brook, NY 11790

RE: USMLE Step 1                    USMLE ID#: 5-385-624-1

Dear Mr. Sampson:

We have thoroughly reviewed your recent request for reconsideration of our decision regarding test accommodations for the United States Medical Licensing Examination (USMLE) Step 1. We conducted an individualized review of your request and all submitted supporting documentation in accordance with the guidelines set forth in the Americans with Disabilities Act (ADA).

The NBME provides reasonable and appropriate test accommodations to examinees who provide supporting documentation that shows that they have a disability within the meaning of the ADA.
The ADA defines disability as a physical or mental impairment that substantially limits one or more major life activities as compared to most people in the general population. A diagnostic label, in and of itself, does not establish coverage under the ADA, nor does prior receipt of accommodations for a particular activity guarantee that identical accommodations are indicated or will be available in all future settings and circumstances.

Though not required to defer to the conclusions or recommendations of an applicant's supporting professional(s), we carefully consider the recommendation of qualified professionals made in accordance with generally accepted diagnostic criteria and supported by reasonable documentation.
Accommodations are provided when there is clear documentation of functional impairment and a rationale to demonstrate that the requested accommodation is appropriate to the setting and circumstance. Your documentation does not demonstrate that standard testing time is a barrier to your access to the USMLE. The records provided reveal a consistent history of unimpaired performances on timed standardized tests when compared to appropriate national normative samples.

Our thorough review of the supplemental documentation provided found no new substantive information or evidence that alters our decision communicated in our June 13 and August 1, 2017 letters. Therefore, after a thorough review of all of your documentation, I must inform you that we are unable to provide you with the requested accommodations.

Sincerely,

Catherine Farmer, Psy.D.
Director, Disability Services
ADA Compliance Officer, Testing Programs

**A107**

# EXHIBIT 8

 **NBME**®

1123493     5-385-624-1
**Reconsideration-Denial-De**

National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104-3102

215-590-9500 phone
www.nbme.org

<u>**Confidential**</u>

March 6, 2018

Robert D. Sampson
11 Whitford Rd
Stony Brook, NY 11790

RE: USMLE Step 1                    USMLE ID#: 5-385-624-1

Dear Mr. Sampson:

We are in receipt of your recent request for an explanation as to why you are not being granted disability related accommodations on the USMLE Step 1. You write in you February 22, 2018 letter addressed To Whom It May Concern, *"My school, health care professionals and I have provided NBME with overly burdensome, yet comprehensive documentation that complies with the guidelines posted on the USMLE website. I also have provided supplemental letters from my health care providers and evaluators and the former director of Disability Services from the University of California, Irvine…on January 12, 2018, I received a vague emailed letter from Catherine Farmer, Psy [sic]…Ms. Farmer did not acknowledge or respond to any of the evidence of my disability. She states, that the qualified professionals who spent numerous hours evaluating me, and the Stony Brook staff who are constantly observe me '…did not demonstrate that standard testing time is a barrier to your access to USMLE.'* **Ms. Farmer's vague denial is troublesome and I believe that USMLE is creating a barrier to me and all individuals with disabilities, creating burdensome processes and denying equal access for a student, me, who has a clear and obvious disability to STEP 1 and, as a result, hindering my educational program** (emphasis original). *I have provided clear evidence of my long history of disability that is documented in line with your requirements. You have been provided counter points to each of your reasons for denial. Stoney Brook is also providing an additional letter that I am attaching with my letter. I am requesting reconsideration of your decision. I am requesting 50% extended time, extra breaks, testing over two days in a private room.*

Please be assured that each and every document submitted in support of your April 3, 2017 request for accommodations, and subsequent requests for reconsideration received on June 26, 2017 and November 30, 2017, have been thoroughly reviewed. We endeavor to communicate our decisions as clearly and thoroughly as possible. I regret that you found my January 12, 2018 communication to be vague or that you expected a point by point, document by document response. Dr. Goldberg's June and August 2017 letters are quite detailed and complete with regard to how your documentation does not support the diagnostic conclusions of Drs. Michels, Anderson, and Aronson or demonstrate the presence of a disabling condition within the meaning of the ADA.

In a September 6, 2017 letter written in support of your appeal for accommodations, Dr. Aronson asserts that you are "severely impacted" by learning disabilities (specifically reading speed and

**A109**

comprehension) and ADHD.  He writes, *"My diagnosis was developed through direct clinical assessment over several visits...ADHD is a clinical diagnosis made over several visits triangulating patient self-reported symptoms and impact with key data points from a multitude of sources."*  Dr. Aronson does not acknowledge that your August 2013 evaluation did not identify any concerns about attention, concentration, impulsivity, hyperactivity, or executive functioning.  To the contrary, Dr. Michels states in her 2013 report that you gave a high level of effort and focus during the assessment and observed, *"When stressed, his style can become somewhat obsessive, and he appears prone to overthinking minute details...Robert is likely to experience more anxiety than is necessary in some situations.  During testing, Robert put forth a high level of effort on all tasks, even asking to review all of his responses on some untimed tasks.  He did not necessarily work more slowly than is typical, but his need to check his responses led to longer than average testing times."*

Dr. Aronson does not address Dr. Anderson's December 2013 evaluation report in which she describes your responses to standardized ratings of current and childhood ADHD symptoms, as well as the responses of various informants.  While you endorsed clinically significant levels of childhood symptoms, neither of your parents did.  Regarding current symptoms, Dr. Anderson writes, *"...Robert did not rate himself as having significant levels of inattentiveness compared to responses typical of individuals with ADHD.  Nor did he see himself has having problems with impulse control, or physical restlessness compared to others his age...Similarly, neither Robert's friend and tutor, nor his girlfriend rated him as having significant levels of problems in any area typically associated with ADHD...Robert does appear to be experiencing attention problems, but his testing results and history supply little evidence that these problems are the result of ADHD."*

Dr. Aronson makes other assertions that are directly contradicted by objective evidence. For instance, he refers to your information processing speed as 'very slow.'  When measured directly, your processing speed is not slow or even below average range. In 2013, your Processing Speed Index on the *Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-IV)* is Above Average range, better than 93% of national sample of same age peers.  Furthermore, your Cognitive Fluency Index and Broad Reading are Above Average range, better than 75-80% of a national sample of same age peers.

In her August 10, 2017 letter, Dr. Anderson writes, *"Mr. Sampson's Nelson Denny Reading Test Comprehension score under standard time limits was in the low-below average range at the 16th percentile. Mr. Sampson's score on the Reading Comprehension subtest of the Scholastic Abilities Test for Adults (SATA) was in the low average range...With both the NDRT and SATA reading comprehension scores, Mr. Sampson showed marked improvement to the average-above average range when given extended time...Both Dr. Michels and I agree that there is a clear record of consistent academic struggles experienced by Mr. Sampson, beginning in elementary school years through the present time."*

Dr. Anderson's conclusions notwithstanding, the *Nelson-Denny Reading Test (NDRT)* percentile scores reported by your evaluator compare your performance to a select group of about 500 college educated individuals. *NDRT* scale scores are derived from the pooled standardization sample of approximately 8000 individuals, a group whose aggregate characteristics more closely resemble the average person from the general population, the appropriate frame-of-reference when assessing disability under the ADA. Your *NDRT* comprehension scale score of 208 obtained under standard time conditions is Average range compared to the pooled standardization sample, where the mean is 200 and the standard deviation is 25.  Although Dr. Anderson characterizes your *Scholastic Abilities Test for Adults (SATA)* Reading Comprehension score as 'low average range,' you reportedly earned

a standard score of 8 under standard time conditions. According to the *SATA Examiner's Manual* (1991), standard scores of 8-12 are described as Average range. Furthermore, the *SATA Examiner's Manual* (1991) states *"...two subtests impose time limits even when testing individually. Examinees are given 15 minutes to complete as many items as thy can in Reading Comprehension. They are also limited to 15 minutes for Writing Comprehension."* There is no extended time administration for the *SATA* and the validity of any inferences drawn from such a nonstandard administration are unclear. Most importantly, there is a body of research which shows that many people, with and without disabilities, score higher on tasks when given more time.

Dr. Serrantino's October 9, 2017 advocacy letter cites test data from your 2013 evaluations but offers no new performance data or information to support her opinions. She repeats and restates many of the same conclusions made by Drs. Michels, Anderson, and Aronson which have been addressed elsewhere in this and prior letters. While she and Dr. Anderson cite below average range performances on a few isolated subtests as evidence of "severe impairment" on the recall of visual images, these tests are not at all like Step 1. When viewed within the context of your history of Average to Above Average range performances on academic achievement tasks that require visual memory, impaired range scores on the *Rey Complex Figure Test* are largely irrelevant with respect to your real-world functioning. For example, under standard conditions you earned SAT scores of Verbal 680, Math 720, and Writing 680 in November 2008, better than 93-96% of a national sample of college-bound seniors. In 2013 and 2014, you earned MCAT Total Scores of 28 and 29 under standard conditions, better than 67-73% of a highly select group of medical school applicants. These data provide substantial evidence *against* a conclusion that standard time conditions present a barrier to your access to Step 1.

In a February 5, 2018 letter addressed To Whom It May Concern, Linda De Motta Learning Specialist at Stoney Brook School of Medicine writes, *"I am professionally trained and qualified to comment on my observations of the manifestations of Robert's disabilities in reading, writing, managing time, memory organization and other academic and life activities. Robert meets the criteria, through our disabilities services office and according [sic] the guidelines of the ADA, for appropriate testing accommodations...the records show that sometime prior to medical school, Robert, after studying and practicing well beyond the average time for most students, figured out a way to perform adequately enough under standard testing conditions on two entrance exams that test broad knowledge and aptitude. In medical school that is not what the record shows at all. The medical school record of his standardized exams consistently shows failing exam scores under standard testing conditions and passing scores under accommodated testing conditions. Clearly Robert requires the time extension to gain access to the exam."*

Ms. De Motta's advocacy letter, while well-intentioned, is inconsistent with the medical school records that you provided to us in April, 2017. According to a document entitled *NBME Shelf Exam Score Report for Robert Sampson Generated on 3/28/17*, you obtained a passing score (65% or higher) on 11 exams taken under standard conditions from October 2015 through November 2016, and failed seven (7) exams taken under standard conditions during that time period.

Accommodations are intended to provide access to the USMLE testing program for individuals with a documented disability as defined by the ADA. A diagnostic label, in and of itself, does not establish coverage under the ADA, nor does prior receipt of accommodations for a particular activity guarantee that identical accommodations are indicated or will be available in all future settings and

circumstances. The ADA defines disability as a physical or mental impairment that substantially limits one or more major life activities as compared to most people in the general population.

Your documentation does not demonstrate that you are currently substantially limited in a major life activity as compared to most people. It does, however, provide considerable compelling evidence against a conclusion that you are disabled within the meaning of the ADA and that standard testing time is a barrier to your access to the USMLE.

Your recent submission found no new substantive information or evidence that alters our decision communicated in my January 12, 2018 letter. Therefore, after a thorough review of all of your documentation, I must inform you that we are unable to provide you with the requested accommodations.

Sincerely,

Catherine Farmer, Psy.D.
Director, Disability Services
ADA Compliance Officer, Testing Programs

# EXHIBIT 9

**Review of Accommodation Request**

**Applicant Name:** Robert Sampson (<u>third</u> reconsideration)
**Date of Birth:** ███████
**Date of Review:** July 12, 2018
**Reviewer**: Benjamin J. Lovett, Ph.D.

This review concerns Robert Sampson, who has requested testing accommodations (50% additional testing time, and possibly other accommodations as well now) on Step 1 of the USMLE. He has diagnoses of neurodevelopmental disorders including ADHD and learning disabilities, as well as a recent history of accommodations in medical school.

I have reviewed Mr. Sampson's request and accompanying documentation three times in the past. Each time, the evidence has clearly failed to support his request. Mr. Sampson's case is rather unusual in my experience, in that he has submitted very clear, consistent evidence that argues *against* his request. He has consistently performed in the average range and above on diagnostic tests of academic skills that compared him to age peers. He has consistently performed in the average range and above on real-world standardized tests of academic skills taken without accommodations. And he and several other people who know him well have described him, on standardized rating scales, as having ADHD symptom levels that are in the normal (rather than the clinical) range. It is hard to think of what would be more consistent evidence against the presence of ADHD and learning disabilities. Please see my prior reports, dated April 25, 2017, July 16, 2017, and December 18, 2017, for more details, along with complete listings of all documents that I have reviewed in the past.

Since my last review of his file, Mr. Sampson has submitted additional documents:
- A new appeal letter
- A letter from an attorney representing him, Ms. Jo Anne Simon
- A letter from a psychiatrist, Dr. Thomas Aronson
- A letter from a learning specialist, Ms. Linda De Motta

The new documents do not contain any new evidence bearing on the questions in this case. The substantial evidence against the request is never addressed adequately (the strongest evidence against the ADHD diagnosis is not addressed at all), and the evidence and arguments made in support of the diagnoses and request continue to be irrelevant or inaccurate. In the present report, my goal is to address several issues where there may be genuine misunderstandings or where clarification can otherwise help.

1. In her letter, Ms. Simon claims that "here the record clearly demonstrates that Mr. Sampson's impairments significantly and, often severely, restrict his ability to read, comprehend, learn, concentrate, process information, write, sleep, work, and take tests." As I discussed above and in my past reports, the "impairments" (learning disabilities and ADHD) are actually not supported by the evidence, but let me put that to one side. Even if I assume for the moment that Mr. Sampson has one or more relevant "impairments," there is clearly insufficient evidence to show that Mr. Sampson is substantially limited in any major life activities (including the ones that Ms. Simon lists) *relative to most people*

**A114**

*in the general population.* That final clause might be a key source of the misunderstanding and disagreement here; I have used a general population comparison whereas it is clear that at times, Mr. Sampson's advocates have not. Instead, they have compared him to graduating college seniors, to other medical students, and to his own highest skills.[1]

The comparison to medical students and to medical school standards requires more discussion. Both Dr. Aronson and Ms. De Motta note that Mr. Sampson has had trouble performing in medical school. They argue that medical school and the USMLE are more difficult than prior academic tasks that Mr. Sampson has faced. Ms. Simon also makes similar comments comparing the USMLE to the MCAT. But if someone is able to get to medical school without accommodations, and to perform well on standardized measures of academic skills without accommodations for the purposes of admission to college and medical school, it is (at the very least) highly unlikely that they are limited in their ability to access tests, relative to most people in the general population.

2.  Ms. Simon notes that someone can be substantially limited in the manner in which they perform a major life activity. She then claims that "[i]n order to accurately read, comprehend written material, and write, Mr. Sampson must work slower and more carefully than most people. He must reread several times and contend with external and internal distractions that most people will never face." Claims like these are why it is so important to inspect Mr. Sampson's performance on timed, standardized tests taken in typical settings without accommodations, and his record of performance shows average and better scores, arguing against Ms. Simon's contentions. Her speculations (and Mr. Sampson's) that he is unusual in his manner of reading and writing are severely undermined by the actual evidence of his performance under constrained conditions.

3.  There has also been discussion recently of the Nelson-Denny Reading Test (NDRT). As with most published tests, the NDRT has advantages and disadvantages, and must be interpreted carefully and properly to be useful. In my professional opinion, the NDRT comprehension task can be a valid measure of a student's timed reading comprehension skills, and such skills are a key foundation for being able to access Step 1 of the USMLE under standard time limits. One disadvantage of the NDRT is that it has no age norms, only grade norms. Compared to graduating college seniors, Mr. Sampson's NDRT comprehension score was at the 16th percentile, in what is often referred to as the "low average" range. But graduating college seniors are not representative of the general population; indeed, most United States adults do not have a college degree. Therefore, many evaluators use first-year college students as a proxy group to represent the general population; this is obviously not optimal, but it is the best we can do without age norms. Compared to such a group, Mr. Sampson's timed reading comprehension performance was clearly in the average range. Ms. Simon and Mr. Sampson both cite the 16th percentile score, but given the comparison group, this is not a valid technique.

---

[1] Dr. Aronson does also seem to claim that Mr. Sampson is limited relative to most people in the general population. But he supports his claim only with irrelevancies (e.g., discrepancies between different cognitive scores), inaccuracies (e.g., his claim that most high school students finish the Nelson-Denny Reading Test within the standard time), or statements so subjective that they cannot be evaluated.

The NDRT also has a kind of supplemental score, the reading *rate* score. Mr. Sampson's rate score was at the 24th percentile, also in the "low average" range, compared to graduating college seniors. If he were compared to the general population proxy group, the score would again be in the average range, but the rate score is highly problematic, such that it should never be used, in my opinion, either in favor or against an accommodations request. The NDRT manual shows the score to have low reliability (reliability below generally accepted standards for psychoeducational tests), and it involves only 1 minute of silent reading with no check on comprehension. Therefore, it is essentially a meaningless score anyway; the fact that, compared to a general population proxy group, Mr. Sampson's score was in the average range does not actually argue against his request, and if his score were far lower, it would not argue in favor of his request; absolutely no valid conclusions follow from this score.

Before leaving the issue of the NDRT, I should note that, even if Mr. Sampson's NDRT comprehension score were low, it is just one piece of evidence, and when we examine his SATA diagnostic reading comprehension score, his Woodcock-Johnson reading fluency score, his scores on the reading comprehension sections of the SAT, ACT, and MCAT, etc., and all of these show average and better skills (even compared to other medical students), the evidence for his good timed reading comprehension is consistent and converges across many sources of information.

4. The recently submitted documents involve discussion of a 2013 study published in the *Journal of Psychoeducational Assessment* examining the effect of time extensions on the scores of college students with and without learning disabilities.[2] Ms. Simon and Dr. Aronson both criticize the study, although Ms. Simon admits that the study's authors were open about its limitations. I am a co-author of the study and would like to note how I see its relevance here. The study is part of a large body of literature examining the effects of time extensions on the test performance of students with and without disabilities, and that literature, *taken as a whole*, has shown that on time-pressured tests, students without disabilities tend to benefit from the time extensions. I am aware of three systematic reviews of that literature,[3] and all three drew that conclusion. Any individual study has expected limitations, but that body of research literature, taken as a whole, is relevant to this case insofar as it shows that benefiting from extended time is not a valid indicator of a disability. So when Mr. Sampson and his advocates report—and even provide evidence suggesting—that he does better on tests with additional time, this is not evidence of a disability, since many nondisabled students will improve their performance when given additional time.

[2] Lewandowski, L., Cohen, J., & Lovett, B. J. (2013). Effects of extended time allotments on reading comprehension performance of college students with and without learning disabilities. *Journal of Psychoeducational Assessment*, *31*(3), 326-336.

[3] Cahan, S., Nirel, R., & Alkoby, M. (2016). The Extra-Examination Time Granting Policy: A Reconceptualization. *Journal of Psychoeducational Assessment*, *34*(5), 461-472.

Lovett, B. J. (2010). Extended time testing accommodations for students with disabilities: Answers to five fundamental questions. *Review of Educational Research*, *80*(4), 611-638.

Sireci, S. G., Scarpati, S. E., & Li, S. (2005). Test accommodations for students with disabilities: An analysis of the interaction hypothesis. *Review of Educational Research*, *75*(4), 457-490.

5. Mr. Sampson's advocates claim that the discrepancy model of diagnosing learning disabilities is valid. As I noted in an earlier report, there are many different ways of using discrepancies, and there is not a single clear referent that the "discrepancy model" corresponds to. There are some scholars who argue that discrepancies between test scores can be a useful source of evidence. However, what is key is that (a) the official criteria for diagnosing learning disabilities, found in the *Diagnostic and Statistical Manual of Mental Disorders*, require substantially below-average academic skills compared to age peers, and (b) the legal disability threshold would require substantial limitations, compared to most people in the general population, in academic skills or other major life activities.

6. Mr. Sampson's advocates have argued that he has below-average visual processing skills, and that this will require accommodations on Step 1 of the USMLE, since a portion of that test's items have visual figures. However, the evidence that has been cited for Mr. Sampson's purported deficits in visual processing comes from highly artificial tasks unlike Step 1 of the USMLE in key ways. For instance, the Rey Complex Figure Test (RCFT) involves copying an unusual figure, then redrawing it from memory, and then needing to recognize (from memory) whether various drawings show parts of that figure. On the Step 1 exam, it is my understanding that any figures will be available for reference as many times as Mr. Sampson wishes to view them, and he will not need to copy, redraw, or memorize elements of a figure for delayed retrieval. Similarly, on the Woodcock-Johnson Picture Recognition test, Mr. Sampson was shown one set of pictures and then asked to identify which pictures of a second set he had already seen. The Step 1 exam will not require such skills.

7. Mr. Sampson and his advocates cite a number of self-reported statements about various subjective/speculative phenomena (e.g., needing to work harder and longer than others) and other purportedly atypical behaviors (e.g., playing a musical instrument without learning to read music). These comments are difficult to evaluate, but in any case they are irrelevant to the request. On core measures of ADHD symptoms and academic skills, Mr. Sampson has consistently obtained evidence against ADHD and any learning disabilities, and his real-world test performance parallels this.

I have no reason to doubt that Mr. Sampson's request is in good faith, and I understand that professionals have told him that he has disability conditions. But their own evidence contradicts these diagnoses. If a physician diagnosed a patient with paralysis of both legs but also reported that the patient was an excellent long distance runner without any accommodations or assistive technologies, I would be skeptical of the diagnosis. Mr. Sampson's case is analogous to this; his evaluators have ignored strong, consistent evidence that they themselves report or are otherwise aware of.

Benjamin J. Lovett, Ph.D.

# EXHIBIT 10

United States Medical Licensing Examination® (USMLE®)

## REQUEST FOR TEST ACCOMMODATIONS
*Use this form if you are requesting accommodations on USMLE for the first time*

---

### The National Board of Medical Examiners® (NBME®) processes requests for test accommodations on behalf of the USMLE program

If you have a documented disability covered under the Americans with Disabilities Act (ADA), you must notify the USMLE in writing <u>each time</u> you apply for a Step examination for which you require test accommodations. Submitting this form constitutes your official notification.

- Review the USMLE Guidelines for Test Accommodations at www.usmle.org for a detailed description of how to document a need for accommodations.

- Complete all sections of this request form; submit the form and all required documentation to Disability Services once you have submitted your Step exam application to your registration entity.

- NBME will acknowledge receipt of your request by e-mail and audit your submission for completeness. If you do not receive an e-mail acknowledgement within two business days of submitting your request, please contact Disability Services at 215-590-9700 or disabilityservices@nbme.org. You may be asked to submit additional documentation to complete your request.

- Requests are processed in the order in which they are received. Processing cannot begin until sufficient information is received by NBME **and** your Step exam registration is complete. Please allow at least 60 days for processing of your request.

- The outcome of our review will not be released via telephone. All official communications regarding your request will be made in writing. If you wish to modify or withdraw a request for test accommodations, contact Disability Services by e-mail at disabilityservices@nbme.org or by telephone at 215-590-9700.

---

**As explained in the Guidelines to Request Test Accommodations (www.usmle.org), you MUST provide supporting documentation verifying your current functional impairment.**

**Submit** the following with this form:

✓ A **personal statement** describing your disability and its impact on your daily life and educational functioning.

✓ A **complete and comprehensive evaluation** from a qualified professional documenting your disability.

✓ **Supporting documentation** such as academic records; score transcripts for previous standardized exams; verification of prior academic/test accommodations; relevant medical records; previous psycho-educational evaluations; faculty or supervisor feedback; job performance evaluations; clerkship/clinical course evaluations; etc.

**Please be sure to review the Guidelines for more detailed information regarding supporting documentation.**

---

**A119**

USMLE® Request for Test Accommodations

## Section A: Exam Information

Place a check next to the examination(s) for which you are **currently registered** *and* requesting test accommodations: (Check all that apply)

☑ Step 1

☐ Step 2 CK (Clinical Knowledge)

☐ Step 2 CS (Clinical Skills)

☐ Step 3*

*Please be aware that additional test time for Step 3 may involve 3 to 5 days of testing, depending on the requested accommodation (See Section C1).

## Section B: Biographical Information
Please type or print.

**B1.** Name: Sampson                    Robert                    D

           Last                          First                    Middle Initial

**B2.** Gender:     ☑ Male          ☐ Female

**B3.** Date of Birth: ▮▮▮▮▮

**B4.** USMLE # 5 - 3 8 5 - 6 2 4 - 1 (required)

**B5.** Address:
11 Whitford Rd
Street

Stony Brook                          NY                    11790
City                          State/Province          Zip/Postal Code

USA
Country

631-833-4418
Preferred Telephone Number

rds911@gmail.com
E-mail address

**B6.** Medical School Name:   Stony Brook University School of Medicine

Country of Medical School:  USA                    Date of Medical School Graduation:  05/20

**A120**

USMLE® Request for Test Accommodations

## Section C: Accommodations Information

### C1.    Step 1, Step 2 CK, or Step 3 (computer-based examinations)

Check the appropriate box to indicate the accommodations you are requesting. Check **ONLY ONE** box for the exam(s) for which you are currently registered:

**STEP 1:**

**Additional Break Time**
❑ Additional break time over 1 day

❑ Additional break time over 2 days

**Additional Testing Time**
❑ 25% Additional test time (Time and 1/4) over 2 days

☑ 50% Additional test time (Time and 1/2) over 2 days

❑ 100% Additional test time (Double time) over 2 days

❑ Additional break time and 50% Additional test time (Time and 1/2) over 2 days

**STEP 2 CK:**

**Additional Break Time**
❑ Additional break time over 2 days

**Additional Testing Time**
❑ 25% Additional test time (Time and 1/4) over 2 days

❑ 50% Additional test time (Time and 1/2) over 2 days

❑ 100% Additional test time (Double time) over 2 days

❑ Additional break time and 50% Additional test time (Time and 1/2) over 2 days

**STEP 3:**

**Additional Break Time**
❑ Additional break time over 4 days

**Additional Testing Time**
❑ 25% Additional test time (Time and 1/4) over 3 days

❑ 50% Additional test time (Time and 1/2) over 4 days

❑ 100% Additional test time (Double time) over 5 days

❑ Additional break time and 50% Additional test time (Time and 1/2) over 4 days

**Describe** any other accommodation(s) you are requesting for **Step 1, Step 2 CK, or Step 3**.

_____

_____

### C2.    STEP 2 CS (Clinical Skills)

Review the Step 2 CS Onsite Orientation video and Step 2 CS Content Description and General Information Booklet at www.usmle.org for detailed information about the format and delivery of the Step 2 CS examination.

Describe the accommodations you are requesting for each section of Step 2 CS (i.e., patient encounter, patient note). If you are requesting additional time, state the **amount** of additional time you require in **minutes per encounter or note**.

❑  Patient Encounter:_____

❑  Patient Note:_____

**A121**

USMLE® Request for Test Accommodations

**C3.** Do you require wheelchair access at the examination facility? ☐ Yes ☒ No
If yes, please indicate the number of inches required from the bottom of the table to the floor: _____

## Section D: Information About Your Impairment

**D1.** List the **specific DSM/ICD diagnostic code(s) and disability** for which you are requesting accommodations and report the year that it was **first** diagnosed.

| DIAGNOSTIC CODE | DISABILITY | YEAR DIAGNOSED |
|---|---|---|
| 315.00 | Specific Learning Disorder with impairment in reading (dyslexia), reading fluency, word reading accuracy, spelling. | 2013 |
| 315.9 | Unspecified Neurodevelopmental Disorder, visuospatial memory, visuospatial processing. | 2013 |
| F90.2 | Attention Deficit hyperactivity dissorder, predominantly inattentive. | 2015 |

**D2. Personal Statement**

✎ **Attach a signed and dated personal statement describing your impairment(s) and how a major life activity is substantially limited.** The personal statement is your opportunity to tell us how your physical or mental impairment(s) substantially limits your current functioning in a major life activity and how the standard examination conditions are insufficient for your needs. In your own words, describe the impact of your disability on your daily life (do not confine your statement to standardized test performance) and provide a rationale for why the specific accommodation(s) you are requesting are necessary in the context of this examination.

**Section E: Accommodation History**

> Relevant copies were
> previously provided to NBME

**E1. Standardized Examinations**

✎ **Attach copies of your score report(s) for any previous standardized examination taken.**

✎ **If accommodations were provided, attach official documentation from each testing agency confirming the test accommodations they provided.**

List the accommodations received for previous standardized examinations such as college, graduate, or professional school admissions tests and professional licensure or certification examinations (if no accommodations were provided, write NONE).

| | DATE(S) ADMINISTERED | ACCOMMODATION(S) PROVIDED |
|---|---|---|
| ☐ SAT®, ACT® PSAT | Fall '07 (PSAT), 5/05, 6/08, 6/08, 10/08, 11/08 | NONE |
| ☐ MCAT® | 8/13, 9/14 | NONE |
| ☐ GRE® | | |
| ☐ GMAT® | | |
| ☐ LSAT® | | |
| ☐ DAT® | | |
| ☐ COMLEX® | | Time and ½ on NBME shelf exams: 12/8/16, 12/16/16, 1/13/17, all others previously (since 10/6/16) under standard time conditions. |
| ☒ Other (specify) | NBME Shelf Exams (previously provided to NBME) | |
| OLSAT | May 1999 | NONE |

USMLE® Request for Test Accommodations

**E2. Postsecondary Education** | Relevant copies were previously provided to NBME |

List each school and all formal accommodations you receive/received, and the dates accommodations were provided:

- ✎ **Attach copies of official records from each school(s) confirming the accommodations they provided.**
- ✎ **If you receive/received accommodations in <u>medical school and/or residency,</u> have the appropriate official at your medical school/residency complete and submit the <u>USMLE Certification of Prior Test Accommodations</u> form available at <u>www.usmle.org.</u>**

| | SCHOOL | ACCOMMODATIONS PROVIDED | DATES PROVIDED |
|---|---|---|---|
| **Medical/Graduate/ Professional School** | Stony Brook University School of Medicine | 1.5 Time on exams | November '16—>Current |
| | | | (specifically received on 12/8/16, 12/16/16, 1/13/17) |
| | | | |
| **Undergraduate School** | University of Virginia | NONE | |

**E3. Primary and Secondary School** | Relevant copies were previously provided to NBME |

List each school and all formal accommodations you received, and the dates accommodations were provided:

- ✎ **Attach copies of official records from each school listed confirming the accommodations they provided.**

| | SCHOOL | ACCOMMODATIONS PROVIDED | DATES PROVIDED |
|---|---|---|---|
| **High School** | Ward Melville High School | NONE | |
| **Middle School** | Paul J Gelinas JHS | NONE | |
| **Elementary School** | Minnesauke Elementary School | NONE | |

**A123**

USMLE® Request for Test Accommodations

## Section F: Certification and Authorization

To the best of my knowledge and belief, the information recorded on this request form is true and accurate. I understand that my request for accommodations, including this form and all supporting documentation, must be received by the NBME sufficiently in advance of my anticipated test date in order to provide adequate time to evaluate and process my request.

I acknowledge and agree that any information submitted by me or on my behalf may be used by the USMLE program for the following purposes:

- Evaluating my eligibility for accommodations. When appropriate, my information may be disclosed to qualified independent reviewers for this purpose.
- Conducting research. Any disclosure of my information by the USMLE program will not contain information that could be used to identify me individually; information that is presented in research publications will be reported only in the aggregate.

I authorize the National Board of Medical Examiners (NBME) to contact the entities identified in this request form, and the professionals identified in the documentation I am submitting in connection with it, to obtain further information. I authorize such entities and professionals to provide NBME with all requested further information.

I further understand that the USMLE reserves the right to take action, as described in the Bulletin of Information, if it determines that false information or false statements have been presented on this request form or in connection with my request for test accommodations.

Name (print): Robert Sampson

Signature: _Robert Sampson_          Date: 8/2/18

**E-mail (as a pdf), fax or mail your completed request form and supporting documents to the address below at the same time you submit your Step examination application.**

**Disability Services**
**National Board of Medical Examiners**
**3750 Market Street**
**Philadelphia, PA 19104-3190**
**Telephone: (215) 590-9700**
**Facsimile: (215) 590-9422**
**E-mail: disabilityservices@nbme.org**

**A124**

# EXHIBIT 11



1129519          5-385-624-1
Denial- 9/7/18-Decision L

National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104-3102

215-590-9500 phone
www.nbme.org

**Confidential**

September 7, 2018

**Via E-mail to rds911@gmail.com**
Robert D. Sampson
11 Whitford Rd
Stony Brook, NY 11790

RE: USMLE Step 1                    USMLE ID#: 5-385-624-1

Dear Mr. Sampson:

We have thoroughly reviewed the documentation provided in support of your request for test accommodations for the United States Medical Licensing Examination (USMLE) Step 1. We conducted an individualized review of your request in accordance with the guidelines set forth in the amended Americans with Disabilities Act (ADA).

You report the basis of your request to be Specific Learning Disorder with impairment in reading (dyslexia), reading fluency, word reading accuracy, spelling and Unspecified Neurodevelopmental Disorder, visuospatial memory, visuospatial processing diagnosed in 2013 and Attention Deficit/Hyperactivity Disorder (ADHD) diagnosed in 2015. In your personal statement you report having early speech problems, difficulty reading, poor handwriting, and difficulty spelling. You write, *"I welcomed 4th year level undergraduate course work and masters level classes routinely because not only did I enjoy them more, but the exams were easier for me even though the level of detail and rigor of the material was far greater. The assessments were often project based, not timed, an instead of recalling factoids, they required either creative thought, or the synthesis of ideas...Until medical school, I attempted to continue to do it on my own without accommodations. But medical school exams were even longer in both length of words themselves and the length of the questions and answer choices than I had encountered before. These long vignettes took considerably longer for me to read and exacerbated my weaknesses; I would always run out of time on tests, often being the last person in the exam room when time was called...When my school confronted me about my scores on timed NBME shelf exams (despite doing very well in the rest of the course), I finally realized that 'trying my best' was not enough. I needed to use the testing accommodations that were granted to me. With accommodations, I was finally able to finish tests, and the result was immediate: I wasn't failing my exams anymore."*

In a February 15, 2018 letter addressed To Whom It May Concern, Linda De Motta, Learning Specialist, Stony Brook School of Medicine writes, *"The records show that sometime prior to medical school, Robert, after studying and practicing well beyond the average time for most students, figured out a way to perform adequately enough under standard testing conditions on two entrance exams that test broad knowledge and aptitude. In medical school, that is not what the record shows at all. The medical school record of his standardized exams consistently shows failing exam scores under standard testing conditions and passing scores under accommodated testing conditions."* Attempts to understate your performances on standardized tests notwithstanding, the records provided show that your performances on every administration of the PSAT, SAT, ACT, and MCAT that you took under standard conditions

**A126**

are well within the Average range compared to the appropriate reference group. These data do not demonstrate impairments that limit any major life activity.

In a June 2018 letter addressed to the NBME, Thomas A. Aronson, M.D. writes, *"As a medical student, he is now dealing with an altogether different level of cognitive demands than the subjects in the mentioned body of research…He floundered during his first year of medical school. As Linda De Motta argued, 'the medical school record of his standardized exams consistently shows failing exam scores under standard testing conditions and passing scores under accommodated testing conditions…' The issue here is that his cognitive deficits do in fact limit him (for example, reading, concentrating, writing, test taking) in his pursuit of a medical degree as substantiated by several properly qualified, credentialed clinicians who conducted individualized assessments of Mr. Sampson…The amount of material to read and master in medical school is at another level. It was first in medical school that he began to academically fail due to his 'disabilities,' where his time-consuming compensatory strategies met their match — he simply ran out of hours in the day."*

The documentation provided to date shows that on standardized rating scales, you and other raters describe levels of ADHD symptom that are in the normal range, rather than the clinical range. Furthermore, you have consistently performed in the average range and above on standardized tests of academic skills taken without accommodations. These data do not demonstrate cognitive deficits or impaired reading, concentrating, writing, or even test taking.

Accommodations are intended to provide access to the USMLE testing program for individuals with a documented disability as defined by the ADA. A diagnostic label, in and of itself, does not establish coverage under the ADA, nor does prior receipt of accommodations for a particular activity guarantee that identical accommodations are indicated or will be available in all future settings and circumstances. The ADA defines disability as a physical or mental impairment that substantially limits one or more major life activities compared to most people in the general population.

Accommodations are provided when there is clear documentation of functional impairment and a rationale to demonstrate that the requested accommodation is appropriate to the setting and circumstance. Your documentation does not demonstrate a substantial limitation in a major life activity as compared to most people or that the requested accommodations are an appropriate modification of your USMLE Step 1 test administration. Therefore, after a thorough review of all of your documentation, I must inform you that we are unable to provide you with the requested accommodations.

We will advise Applicant Services to process your exam application without test accommodations. You may inquire at usmlereg@nbme.org or call Applicant Services directly at (215) 590-9700 with any questions about your scheduling permit.

Sincerely,

Catherine Farmer, Psy.D.
Director, Disability Services
ADA Compliance Officer, Testing Programs

C: Jo Anne Simon, Esquire to JoAnne@joannesimon.com

**A127**

1129507      5-385-624-1
Simon, J. 11/14/18-E-mail

**Catherine Farmer**

| | |
|---|---|
| **From:** | Jo Anne Simon <JoAnne@joannesimon.com> |
| **Sent:** | Wednesday, November 14, 2018 2:12 AM |
| **To:** | Catherine Farmer; disabilityservices |
| **Cc:** | Nabina Sinha (Nabina.Sinha@usdoj.gov) |
| **Subject:** | Sampson/NBME |
| **Attachments:** | Letter to NBME - RDSampson 11-14-18 .pdf |

Dear Dr. Farmer:

Enclosed please find my letter appealing the NBME's most recent rejection of Mr. Sampson's application for testing accommodations.

Very truly yours,

Jo Anne Simon, Esq.
**Jo Anne Simon, P.C.**
356 Fulton Street, 3rd Floor
Brooklyn, NY 11201
Phone: 718 852-3528 | Fax: 718 875-5728
Web: www.joannesimon.com
E-mail: JoAnne@JoAnneSimon.com

**CONFIDENTIALITY NOTICE:** The information contained in and accompanying this electronic transmission is or may be confidential and/or is legally privileged or otherwise protected by law from disclosure.  The information is intended for the use of the individual or entity named as the recipient above.  If you are not the intended recipient you are prohibited from reading this transmission and any disclosure, using, copying, distribution, dissemination or retention of any part of this message is strictly prohibited.  If you have received this transmission in error, please immediately contact the sender by telephone 718 852-3528 and delete this message and all attachments from your electronic storage files.



## JO ANNE SIMON, P.C.
356 Fulton Street, 3rd Floor
Brooklyn, New York 11201
www.joannesimon.com

(718) 852-3528 (V/TTY)
(718) 875-5728 (FAX)

Admitted NY & NJ Bars

November 14, 2018

**Via e-mail to cfarmer@nbme.org and disabilityservices@nbme.org**

Catherine Farmer, Psy.D.
Director of Disability Services
National Board of Medical Examiners
3750 Market Street
Philadelphia, Pennsylvania 19104-3102

**Re:    Robert Sampson/ USMLE ID#: 5-385-624-1**
**Disability Accommodations for USMLE STEP 1**

Dear Dr. Farmer:

We are in receipt of your letter dated September 7, 2018 denying once again Robert Sampson's request for testing accommodations on the Step 1 of the United States Medical Licensing Exam (USMLE) in violation od the Americans with Disabilities Act, as amended, 42 U.S.C. §12101, *et seq*. (hereinafter "ADA"), and the New York State Human Rights Law, N.Y. Exec. L. § 290, *et seq*. (hereinafter "NYSHRL"). We request a reversal of the NBME's latest discriminatory decision.

As noted previously, the documentation submitted in support of Mr. Sampson's requests for accommodations was more than sufficient to demonstrate disability, protection by the aforementioned civil rights laws, and his present and continuing need for, and entitlement to, the extended test time that he requested.  The record clearly demonstrates that Mr. Sampson's prior requests for extended time accommodations should have been approved. Nevertheless, by letter dated June 28 we enclosed additional documentation and requested a review of the entire record and a decision to provide 50% extended time accommodation that is needed to best ensure that his scores accurately reflect his knowledge of the subject matter being tested, *his right under the applicable laws.*

An individual has a disability within the meaning of the ADA if that individual suffers a physical or mental impairment that substantially limits one or more of the individual's major life activities or major bodily functions.  42 U.S.C. §12102(2)(A). Major life activities include activities such as reading, writing, concentrating, thinking, learning, processing information, sleeping, working, and test-taking,[1] and major bodily functions include the operation of the brain.

---

[1] *See* 29 C.F.R. § 1630.2 (i).

**A129**

The legislative history confirms that the protections of the ADA are to be construed liberally.[2] Case law and regulations are consistent with this liberal construction, including case law prior to the 2008 amendments.[3]

Your response indicates not an analysis of the clinical information submitted by his clinicians in accordance with the NBME's extensive documentation requirements, but rather generalized suspicion and a deliberate attempt to paint Mr. Sampson as illegitimately seeking accommodations. For example, you quote Mr. Sampson's description of 4th year undergraduate exams being easier as they were "often project based, not timed" and "required. . . creative thought or synthesis of ideas" as if this were inconsistent with his having disabilities, when his description clearly goes to the issue of time. Further, after quoting the medical school's learning specialist discussing Mr. Sampson's compensatory strategies for managing his disabilities by over-preparing for basic admissions exams and confirming his having failed standardized medical school tests taken under timed conditions, but passing those same tests when provided with 50% extended time, you state, "Attempts to understate your performances on standardized tests notwithstanding, the records provided show that your performances on every administration of the PSAT, SAT, ACT, and MCAT that you took under standard conditions are well within the Average range compared to the appropriate reference group. These data do not demonstrate impairments that limit any major life activity."

That however, is not the standard under the law. Major life activities include activities such as reading, writing, concentrating, thinking, learning, processing information, sleeping, working, and test-taking,[4] and major bodily functions include the operation of the brain. Mr. Sampson has demonstrated substantial limitations in several major life activities. Throughout his education, he has used many tutors and specialists to assist him in extensive preparation – all consistent with the nature and extent of his disabilities. *Moreover, despite your not-so-veiled assertions otherwise, nothing that Mr. Sampson or his clinicians has said regarding his disabilities is inconsistent with his having said disabilities, or his need for the extended time he has requested on the USMLE.*[5] Quite the opposite, the evidence all points to his need for the accommodations he has requested on the USMLE, the only test for which the NBME is responsible for providing

---

[2] *See* 42 U.S.C. § 12102(a)(4).

[3] 2 Cong. Rec. H8291 (Sept.17, 2008) *see also* <u>Bartlett v. N.Y. Bd. of Law Examiners</u>, 2001 WL 930792 (S.D.N.Y. Aug 15, 2001) (hereinafter <u>Bartlett VI</u>); <u>Root v. Ga. Bd. of Veterinary Medicine</u> 114 F.Supp.2d 1324 (N.D. Ga. 2000) *rev'd on other grounds*, No. 00-14751 (11th Cir. 2001); <u>Heiko v. Colombo Savings Bank</u>, 434 F.3d 249 (4th Cir. 2006); <u>Capobianco v. City of N.Y. & NYC Department of Sanitation</u>, 422 F.3d 47 (2d Cir. 2005); <u>Lawson v. CSX Transp., Inc.</u>, 245 F.3d 916 (7th Cir. 2001); <u>Fraser v. Goodale</u>, 342 F.3d 1032 (9th Cir. 2004).

[4] *See* 29 C.F.R. § 1630.2 (i).

[5] The NBME appears not to have engaged in the required individualized analysis of Mr. Sampson's request for accommodations, but rather appears to have taken pains to substitute its own view of disability and accessibility, notably failing to explicitly refute the multiple examples of substantial limitations to major life activities that Mr. Sampson has described in his personal statement, and further described by his clinicians. The NBME has only made disconcertingly vague statements calling into question Mr. Sampson's disabilities, and further fails to rebut Mr. Sampson's claim. The NBME's continual failure to specify any specific reason for disqualifying Mr. Sampson's (and his experts') multiple examples of substantial limitations in major life activities just adds hardship and stress, exacerbating Mr. Sampson's documented disabilities.

accommodations.[6] Indeed, even while misstating the legal standard, your letter nevertheless states that accommodations are to be provided "appropriate to the setting and the circumstance," and that is all that Mr. Sampson has requested: accommodations for the USMLE – a test like no other he has taken – so that he can take it under conditions that best ensure his ability to demonstrate his knowledge of the material being tested – his right under the law.

The NBME's reliance on outdated statutory interpretations rejected by Congress in the 2008 Amendments to the ADA in order to buttress its decision is particularly disingenuous given that the NBME was the successful defendant in two of the cases Congress later unequivocally rejected as inconsistent with the ADA's intent: Price v. Board of Medical Examiners, 966 F.Supp. 419 (S.D. W.Va. 1997) and Gonzalez v. National Board of Medical Examiners, 225 F.3d 620 (6th Cir. 2000). See 2 Cong. Rec. H 8286, 8291 (Sept. 17, 2008). The NBME knows that what it is doing here is a violation of the law. It must reverse course now and provide Mr. Sampson with the accommodations he has requested, accommodations similar to those the NBME has provided for other similarly situated and similarly disabled test takers.

The regulatory language and the seminal case in this area indicate quite clearly that average scores or grades do not obviate the presence of disability or the legitimate need for accommodations.[7] See also "Dear Colleague Letter", dated January 19, 2012, http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201109.html.[8] Moreover, Mr. Sampson has a longstanding history of disability, including an Individualized Education Plan (IEP) provided under federal and state special education laws and years of additional tutoring to assist him in his studies and the development of compensatory techniques. Like many young people with dyslexia, his parents read his assignments to him because he would never have been able to read them fluently enough to get through his homework – classic evidence of the presence of a learning disability. Evidence of each of these facts was provided previously. Your correspondence indicates a dismissiveness of the evidence which you try to support by the cherry picking of scores, and a substitution of NBME's unqualified judgment that he does not have a disability. The NBME is not entitled to ignore the clinical reports and diagnostic impressions of his psychiatrist and psychologists who have personally examined him numerous times.

The record amply demonstrates that Mr. Sampson's constellation of impairments continues to impose substantial limitations on his ability to perform the aforementioned major life activities under standard time constraints and conditions. Mr. Sampson is undoubtedly

---

[6] Your characterization of scores being average is not true. Scores in the 16th or 12th or 4th percentile are hardly within the average range, let alone "well within" the average range, as you have stated. Nor is Mr. Sampson's 16th percentile performance on the Nelson Denny Reading Test belied by the below average range reading speed calculation at the 24th percentile.

[7] See Appendix to Part 1630—Interpretive Guidance on Title I, 29 CFR Part 1630) ("This does not mean that disability cannot be shown where an impairment, such as a learning disability, is clinically diagnosed based in part on a disparity between an individual's aptitude and that individual's actual versus expected achievement, taking into account the person's chronological age, measured intelligence, and age-appropriate education.")

[8] See, "Questions and Answers on the ADA Amendments Act of 2008 for Students with Disabilities Attending Public Elementary and Secondary Schools," http://www2.ed.gov/about/offices/list/ocr/docs/dcl-504faq-201109.html.

protected by the ADA and state laws protecting him from disability discrimination;[9] he is entitled to the 50% extended time and a separate room that he has requested from the NBME.

**As stated previously, the record is clear and so is the law:** "[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." 29 C.F.R. §1630.2(j)(1)(ii). However, here the record clearly demonstrates that Mr. Sampson's impairments significantly and, often severely, restrict his ability to read, comprehend, learn, concentrate, process information, write, sleep, work, and take tests. Pursuant to 29 C.F.R. § 1630.2(j)(4)(iii) "... the focus is on how a major life activity is substantially limited, and not on what outcomes an individual can achieve." (Emphasis added). Federal guidance clarifies further, stating that:

> [c]ondition, manner, or duration may also suggest the amount of time or effort[10] an individual has to expend when performing a major life activity because of the effects of an impairment, *even if the individual is able to achieve the same or similar result as someone without the impairment.*

Appendix to Part 1630—Interpretive Guidance on Title I, 29 C.F.R. Part 1630) (emphasis added).[11]

Additionally, it is irrational and improper for the NBME to use Mr. Sampson's performance on prior standardized exams taken in high school and/or college to dismiss his current need for extended time accommodations for Step 1, let alone insinuate that those performances would somehow be more relevant to whether accommodations are needed on the USMLE than medical school exams, including the NBME-created shelf exams, of which Mr.

---

[9] As Dr. Aronson stated in his letter submitted on June 28, 2018, "The proper clinical basis of comparison for his disability is the reading behaviors of most people in the general population. Most people do not have widely discrepant cognitive profiles (VCI = 141; PRI = 102), let alone a 2½ standard deviation discrepancy. Most people read with automaticity. Most people don't get exhausted from reading. Most high school students can complete a NDRT within standard time; Mr. Sampson completed only half of the items, and even with 50% extended time, only completed ⅔ of the items, suggesting that double time might be more efficacious. His LD and ADD affect his ability to read, reading speed, writing, concentration, and test taking."

[10] In Bartlett VI at 51, Justice Sotomayor, ruling under the narrower pre-ADA Amendments Act standard articulated in Sutton v United Airlines, 527 U.S. 471 (1999), held of a plaintiff who was not formally diagnosed until the age of 40:

> I find that plaintiff is an individual with a disability as defined by the ADA and Section 504. With respect to the specific questions before me on remand, I find that when considering both the positive and negative effects of the mitigating measures which plaintiff employs, plaintiff is substantially limited in the major life activity of reading when compared to most people by her slow reading rate and by the fatigue caused by her lack of automaticity.

Similarly, Mr. Sampson has consistently reflected on the exhaustion caused by his reading disability, and that evidence is entirely in keeping with the law.

[11] *See* also "Dear Colleague Letter", dated January 19, 2012, http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201109.html.

4

**A132**

Sampson failed seven (7) taken before securing accommodations from his school – only passing them after 50% extended time was provided by his medical school.

The NBME's refusal to defer to the informed observations and recommendations of Mr. Sampson's highly competent clinicians is a clear violation of the law.[12] The federal enforcement guidance states: "Testing entities should defer to documentation from a qualified professional who has made an individualized assessment of the candidate that supports the need for the requested testing accommodations. . . Reports from qualified professionals who have evaluated the candidate should take precedence over reports from testing entity reviewers who have never conducted the requisite assessment of the candidate for diagnosis and treatment.[13] (*Emphasis added.*)

In Argenyi v. Creighton University, Nos. 11–3336, 11–3461, 2013 WL 149803 (C.A.8. Jan 15, 2013), the United States Court of Appeals for the 8th Circuit found that Plaintiff Argenyi's allegations of disability discrimination against his school were supported where his school refused to grant his requests for accommodation, and pointed to Argenyi's clinicians, and urged the school "to consider Argenyi's specific requests, explaining that Argenyi 'is the best person to judge what [assistance may be necessary] since no one else can really understand'" the impact of his disabilities. Id. at 4.[14] Indeed, the same is true for Mr. Sampson and his clinicians.

## CONCLUSION

Mr. Sampson's accommodation request is entirely reasonable given the current impacts of his longstanding learning and attention deficits. The extended time accommodations that Mr. Sampson seeks would not fundamentally alter the USMLE. There can be no other legally acceptable reason for denial of accommodations. We urge you to re-address this matter and provide the requested accommodations forthwith.

Very truly yours,

Jo Anne Simon

cc:    Robert Sampson
       U.S. Department of Justice,
           Disability Rights Section

---

[12] Courts have found that entities such as the NBME are not entitled to deference in determining whether an applicant is disabled or what accommodations are necessary to provide equal access. The NBME has no inherent expertise in this regard, and thus its determination is entitled to little, if any, weight. As the Second Circuit in Bartlett IV stated, "where deference is due . . . it is not because of the fact finder's status . . . but because of [its] inherent expertise on 'technical matters foreign to the experience of most courts.'" 156 F.3d at 327 (quoting N.Y. Ass'n for Retarded Children v. Carey, 612 F.2d 644, 650 (2d Cir. 1979)).

[13] http://www.ada.gov/regs2014/testing_accommodations.html (Emphasis in original).

[14] Remanded for trial, a jury found that Creighton had violated Argenyi's civil rights.

5

**A133**



National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104-3102

215-590-9500 phone
www.nbme.org

**<u>Confidential</u>**

January 4, 2019

**<u>Via E-mail to</u> <u>rds911@gmail.com</u>**
Robert D. Sampson
11 Whitford Rd
Stony Brook, NY 11790

RE: USMLE Step 1                  USMLE ID#: 5-385-624-1

Dear Mr. Sampson:

We have thoroughly reviewed your request for reconsideration of our decision regarding test accommodations for the United States Medical Licensing Examination (USMLE) Step 1. We conducted an individualized review of your request and supporting documentation in accordance with the guidelines set forth in the Americans with Disabilities Act (ADA).

In a November 14, 2018 letter, your attorney, Ms. Jo Anne Simon, writes, *"Mr. Sampson's accommodation request is entirely reasonable given the current impacts of his longstanding learning and attention deficits. The extended time accommodations that Mr. Sampson seeks would not fundamentally alter the USMLE. There can be no other legally acceptable reason for denial of accommodations."*

Accommodations are intended to provide access to the USMLE testing program for individuals with a documented disability as defined by the ADA. The ADA defines disability as a physical or mental impairment that substantially limits one or more major life activities compared to most people in the general population.

The NBME carefully considers all evidence in determining whether an individual is substantially limited within the meaning of the ADA and what, if any, accommodations are appropriate to the particular Step exam context. Submitted documentation including the individual's personal statements; letters from advocates; reports of evaluations; and objective information such as school records and scores obtained on high stakes tests taken with and without accommodations are thoroughly reviewed.

Supporting documentation submitted from qualified professionals is a necessary part of any request for accommodations and is carefully reviewed by the NBME. Though not required to defer to the conclusions or recommendations of an applicant's supporting professional, we carefully consider the recommendation of qualified professionals made in accordance with generally accepted diagnostic criteria and supported by reasonable documentation.

**A134**

According to the *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5)*, the hallmark of a learning disability is difficulty in the development and acquisition of basic academic skills particularly during the period of time in which these skills are first taught in early elementary school. Developmental reading difficulties were not reported by your evaluators and there is no indication that you struggled in your efforts to learn to read during the time in which you were taught to read. The complete absence of reading difficulties in elementary school strongly belies the presence of a learning disorder in the area of reading.

Likewise, it is necessary to establish a childhood onset of developmentally deviant symptoms/impairment to receive the ADHD diagnosis as an adult. Beyond self/parent report and testimonials, your documentation provides no objective evidence of clinically significant real world functional impairment in academic, work, social, daily adaptive, or executive functioning relative to most people in the general population.

Ms. Simon's November 14, 2018 letter requesting reconsideration provided no new substantive information or evidence that alters our decision communicated in my letters dated September 7, 2018 and March 6, 2018. Once again, our thorough review found that your documentation does not demonstrate a substantial limitation in a major life activity as compared to most people or that additional testing time is an appropriate modification of your USMLE Step 1 test administration.

Sincerely,

Catherine Farmer, Psy.D.
Director, Disability Services
ADA Compliance Officer, Testing Programs

C: Jo Anne Simon JoAnne@joannesimon.com

# EXHIBIT 12

Date: 26 November 2018

To: Catherine Farmer, Manager, Disabilities Services and ADA Compliance Officer

From: Samuel O. Ortiz

Re: Consultation Evaluation

    This review concerns Robert Sampson who is appealing a denial of a previous request for reconsideration by the NBME which followed a prior request for reconsideration that stemmed from an initial denial of his application for accommodation on Step 1 of the USMLE. His initial request appears to have been denied in June of 2017 after which, he requested an initial reconsideration that was also later denied by the NBME in August of 2017. Following the second denial and additional correspondence clarifying the grounds for the denial by the NBME dated January 12, 2018, March 6, 2018, and September7, 2018, Mr. Sampson appears to have once again requested a reconsideration. Mr. Sampson's application is being made on the basis of a "Learning" impairment, specifically listed as "Reading" and "Other (specify): Dyslexia" both of which are indicated as having first been diagnosed in 2013 at the age of 22. Mr. Sampson has also indicated a "Psychiatric" impairment "Attention Deficit/Hyperactivity Disorder" that was subsequently diagnosed in 2015 as an additional consideration in support of his request for accommodation which is noted as "50% Additional test time (Time and ½) over 2 days." In addition to his application requesting accommodations, Mr. Sampson has submitted various supporting documentation which includes:

  Step 1 Request Form
  Step 1 Request Form - Req/Personal Statement
  Personal Statement
  School Records - Teacher Comments/Parent Ltrs Grade 1-6
  Test Scores (MCAT, GRE, SAT, etc.) - NBME Shelf Exam Score Report
  Test Scores (MCAT, GRE, SAT, etc.) - Minnesauke Elementary School OLSAT
  Test Scores (MCAT, GRE, SAT, etc.) - PSAT/NMSQT
  Test Scores (MCAT, GRE, SAT, etc.) - ACT
  Test Scores (MCAT, GRE, SAT, etc.) - SAT
  Evaluations - Supplemental Testing Report 12/16/13
  Evaluations - Psychological Eval. 8/26/13
  Attorney Letter - Simon, J. 6/29/18
  Attorney Letter - Simon, J. 11.14.18
  Attorney Letter - Corrected- Simon, J.
  E-mail - Sampson, R. 6/26/17
  E-mail - Simon, J. 11/14/18
  Testing Accommodation Records - Stony Brook Univ.
  Testing Accommodation Records - CPTA
  Testing Accommodation Records - MCAT
  Letters from Individuals and other supporting doc. - Lam, A. 3/29/17
  Letters from Individuals and other supporting doc. - Exhibit A- Aronson, T. 6/12/18
  Letters from Individuals and other supporting doc. - De Motta, L. 2.15.18

**A137**

Letters from Individuals and other supporting doc. - Sampson, R. 2.22.18
Letters from Individuals and other supporting doc. - Anderson, A. 8/10/17
Letters from Individuals and other supporting doc. - Aronson, T. 9/6/17
Letters from Individuals and other supporting doc. - Serrantino, J. 10/9/17
Letters from Individuals and other supporting doc. - Steven & Shelley Sampson 6/17/17
Letters from Individuals and other supporting doc. - Serrantino, J. 6/22/17
Letters from Individuals and other supporting doc. - Sampson, S. (Handwritten)
Letters from Individuals and other supporting doc. - De Motta, L. 3/29/17
Letters from Individuals and other supporting doc. - Aronson, T. 3/29/17
Letters from Individuals and other supporting doc. - De Motta, L. 3/28/16
Reconsideration Request Letter - Sampson, R.
Reconsideration Request Letter - Sampson, R.
Decision Letter (approval and denial) - Denial
Decision Letter (approval and denial) - Reconsideration-Denial
Decision Letter (approval and denial) - Reconsid. Denial
Decision Letter (approval and denial) - Reconsideration-Denial
Decision Letter (approval and denial) - Denial- 9/7/18

Although Mr. Sampson's request for accommodation is based, at least in part, on a psychiatric impairment listed as "Attention Deficit/Hyperactivity Disorder," the focus of the current review will be based on whether the evidence supports the provision of accommodations solely on the basis of his listed learning impairment in the area of reading. That is, the purpose of this review is determine whether the submitted documentation supports Mr. Sampson's claim regarding a learning disability in the area of reading, and, if so, whether the requested accommodations are reasonable and appropriate. Therefore, the analysis, conclusions, and recommendations provided in this review are presented only from this perspective and should not be construed as having any direct bearing on the merit of his request for accommodations with respect to the additional psychiatric impairment he has indicated.

The documentation in this case is varied and numerous and the relative merits of Mr. Sampson's request for accommodations, at least as far as the purposes of this review are concerned, hinge on a relatively straightforward determination—that is, to what extent does the documentation fully support the claimed learning impairment in reading indicated in his application. Should the documentation be compelling in this regard then perhaps the only question becomes that of what the appropriate accommodations should be. But should the documentation fail in this regard, then the NBME is faced with a decision regarding whether accommodations under the auspices of ADA are appropriately warranted. After all, it is presumed that the purpose of ADA is to protect those with a disability that limits a major life activity and not to provide those protections to those who are not disabled. In the present case, Mr. Sampson has retained an attorney with considerable experience in these matters whose three letters demanding the provision of accommodations under ADA by the NBME are replete with opinion, commentary, and legal citations that seem unassailable and would likely pressure most organizations to simply capitulate to the request. Ms. Simon has even provided an argument stemming from federal enforcement guidance that claims that the NBME cannot even deny the request by Mr. Sampson for a variety of reasons, one of which includes the idea that "testing entities should defer to documentation from a qualified professional who has made an

**A138**

individualized assessment of the candidate that supports the need for the requested testing accommodations." In other words, if any individual with a degree and a license says that someone is disabled, then it must be accepted as truth. Of course, were the NBME to follow this recommendation, there would be little point to this or any other review. Putting aside the concept and practice of second opinions in medicine, accepting as valid on its face, any report submitted by anyone with sufficient resources to obtain an evaluation that documents and asserts a diagnosis of their choosing, would likely mean that the entire concept and definition of disability loses all semblance of meaning. It cannot be disputed that there are "qualified" professionals who are not experts in every arena of disability who routinely keep up with the literature and maintain competency in current methods, techniques, and research. Clinicians are often subconsciously inclined to please the client who will be paying them by providing whatever documentation may be necessary in this regard. This is not to say, of course, that this is what has occurred in Mr. Sampson's case or that the evaluation reports provided are based on such factors. Rather, it is only mentioned here to counter the notion that one is unquestionably disabled merely because someone else has said so. Whether Mr. Sampson has a learning impairment or not is not a simple matter to discern and there is always the possibility that prior evaluators have indeed gotten things wrong. And while Ms. Simon further quotes federal enforcement guidance in asserting that "reports from qualified professionals who have evaluated the candidate should take precedence over report from testing entity reviewers who have never conducted the requisite assessment of the candidate" the follow up conclusion that "this is especially important for individuals with learning disabilities because fact-to-face interaction is a critical component of an accurate evaluation, diagnosis, and determination of appropriate testing accommodations" is inaccurate and grossly distorted. Whereas this claim may be true with respect to various psychiatric impairments that depend on aspects of interpersonal functioning, it is not true when it comes to a learning disability that can be plainly determined by a host of current measures, combined with prior information. According to DSM-V, the diagnostic criteria for a Specific Learning Disorder "are to be met based on a clinical synthesis of the individual's history (developmental, medical, family, educational), school reports, and psychoeducational assessment." In essence, current testing or evaluation is insufficient for rendering such a diagnosis and instead an abundance of documentation is required regarding the acquisition of reading, writing, and mathematics skills. The reason a learning disability is a learning disability is precisely because it is evident in the observable and documentable process of development and education in reading, writing, or mathematics. For these reasons, face-to-face interaction reveals very little information useful for diagnostic purposes in the case of learning disorders, especially in comparison to a careful and considered examination of an individual's academic performance during the period of time in elementary school when such skills are first formed and developed.

Because this case has been reviewed at least twice prior, it is unlikely that a third opinion centering primarily on the current test data would prove persuasive in any way on the matter. The prior reviewers have no doubt commented on what the specific test data from the evaluations conducted in 2013 reveal and, as noted by comments the NBME provided in the letters denying Mr. Sampson's request for accommodations, has likely already concluded that the current test data do not support the presence of a reading disorder. To cover the same ground here would be somewhat redundant and pointless and only lead to further debate regarding their meaning. Instead, it may be more fruitful for this review to examine more closely the qualitative data and information available regarding Mr. Sampson's early educational history and their

**A139**

relationship to the various criteria necessary for establishing a learning disability in reading. Perhaps from this angle, new information may be generated and the documentation may be seen in a different light that could prove to be far more instructive and beneficial in arriving at a reasonable conclusion regarding whether or not Mr. Sampson exhibits a learning disorder in the area of reading or not. This approach does not overlook current test results or their meaning per se, but instead of trying to further the debate as to whether current scores are or are not consistent with a learning impairment, the primary focus will be on whether the evidence supports the fundamental criteria regarding a learning disorder that specify the basic characteristics of the disorder—notably, the impact on learning to read.

According to DSM-V, "one essential feature of specific learning disorder is persistent difficulties learning keystone academic skills (Criterion A), with onset during the years of formal schooling (i.e., the developmental period)." Beyond this feature, DSM-V highlights the fact that academic skills are learned via specific instruction and not acquired merely as a function of maturation. The Diagnostic Features section of DSM-V adds that "Specific learning disorder disrupts the normal pattern of learning academic skills…The learning difficulties manifest as a range of observable descriptive behaviors or symptoms (as listed in Criteria A1-A6)" and they are "persistent, not transitory." Further delineation of the core features of Specific Learning Disorder are noted by observation "that the learning difficulties are readily apparent in the early school years in most individuals (Criterion C). However, in other, the learning difficulties may not manifest fully until later school years, by which time learning demands have increased and exceed the individual's limited capacities." I believe this specification is often misinterpreted to mean that one can succeed in school without displaying any learning difficulties at all and that a learning disorder only becomes obvious when the curricular expectations rise above what one can do, such as high school subject matter, college requirements, or medical school reading loads. However, this cannot be the proper interpretation since it would mean that everyone would become learning disabled upon reaching the point in which school suddenly becomes "hard." The reality is that school does not become any harder at any age or grade and that expectations of academic performance always remain appropriate to the developmental level of the individual. What is expected academically for a college junior to be able to manage is no more or less difficult than what is expected academically of a kindergarten student. The very reason elementary school students are not required to learn calculus is precisely because it is known that such an expectations is developmentally appropriate. The other misinterpretation of this specification is the idea that a learning disability can go completely unnoticed when in fact, the specification states that it "may not manifest fully" until sometime later. The key word here is "fully" and indicates that the learning problems are indeed observable and noticeable but that they may not rise to a level that constitutes impairment or qualifies as a disability. It might be claimed that perhaps Mr. Sampson exhibits a pattern called "gifted LD" which are described in DSM-V as individuals who "may be able to sustain apparently adequate academic functioning by using compensatory strategies, extraordinarily high effort, or support, until the learning demands or assessment procedures (e.g., timed tests) pose barriers to their demonstrating their learning or accomplishing required tasks." This specification also seems to suffer from the misconception that "timed tests" are things that only happen in college or medical school, such as when taking the NBME. The educational system today is characterized largely by accountability standards that are evaluated via standardized test data obtained from testing students with just such "timed tests." Moreover, there is often an accompanying belief that students are given all the time in the

world while in elementary or high school and that it is not until later that constraints are placed on academic requirements. This is false and even when in elementary school, a teacher must retain certain expectations regarding the completion and submission of assignments and tests and should a student exhibit difficulties in managing these constraints at any age or grade, it would be readily documented. In summary, when coupled with the initial specification regarding problems in "learning keystone academic skills," DSM-V clearly indicates that learning problems, even those that do not seem to represent significant impairment, are still manifest, evident, and discernable during the period of time in which these skills are being taught and learned.

Based on the essential features outlined in DSM-V, it cannot be debated that the hallmark of a learning disability is difficulty in the development and acquisition of basic academic skills particularly during the period of time in which these skills are first taught—early elementary school. Therefore, to support any diagnosis of learning disability, especially one that was first rendered at the age of 22, requires a clear indication that in fact, "learning" to read was a manifest and observable characteristic of Mr. Sampson's early education. In general, however, the documentation provided in this regard do not appear to provide any significant support that Mr. Sampson did indeed struggle to learn to read. What comments are made about this period of time are mostly in connection with potential ADHD issues, such as "comments from early report cards portray ADHD criteria" and "difficulty with executive functioning skills." It was also noted that he had "exceptional ability" and that because of it, his "difficulties were often viewed as a child's lack of effort or interference because of behavioral problems." Not content with their son's education, Mr. Sampson's parents sought and paid for "years of individualized speech therapy and regular tutoring" although it is not clear why only speech therapy was being provided when the learning concerns appeared to be more ADHD related. More importantly, however, references to reading difficulties during this time are vague and nonspecific at best, for example "difficulty" in executive functioning skills are connected to presumed "reading and writing" problems, but no details are provided. Likewise, there is no mention regarding how speech-language therapy was related to learning to read in any way and in one case, the letter by Dr. Serrantino suggests that the parents could have sought SLP services within the school but provides no mention of what aspect of language was problematic or how it possibly related to reading, which, in any event, would not have been the concern of a speech-language therapist. Most likely the therapy was for articulation, as indicated in the letter from Mr. Sampson's parents wherein a speech-language pathologist is listed as providing services for "stuttering" and from a "myofunctional oral therapist" neither of which are a necessary or predictive component of learning to read. Dr. Serrantino later asserts that because the parents provided "increased" tutoring support in middle and high school that this attests to him having a disability. Mr. Sampson's parents indicate that a "reading specialist" was sought in 4th and 5yh grade, but by this point in time, either Mr. Sampson had already learned to read or he had not. If he indeed required any reading intervention, it would have been evident and necessary beginning in 1st grade, not 4th or 5th. In fact, from the 5th grade forward, all of the tutoring that is listed is content based—that is, based on school subject matter, and none of it is related to remediation of basic reading skills. Extra tutoring in subject areas would not have affected or changed the development of his reading skills and the additional instruction provided in a tutoring environment is not evidence that he either needed it to support his reading development or that it was provided because his reading development was poor. There is simply no indication that Mr.

Sampson struggled in his efforts to learn to read during the time in which he was taught to read. This conclusion is reinforced by the fact that reading difficulties are not even reported in the background sections of the evaluations that were conducted. For example, in her "background" section, Dr. Michels' report of evaluation notes that "as a young child, he was a severe stutterer, but this issue resolved in his early elementary school years." She adds that "Spelling" was "relatively poor" (which is false when compared to teacher comments) and the only mention of reading problems comes while in high school where Dr. Michels' notes that "he struggled with reading comprehension" and that "he has typically read to learn, not for pleasure, so he rarely reads fiction." No other mention of reading problems are noted and no reading issues were presented in elementary school. Yet, at the very end of her report, Dr. Michels offers a diagnosis of "Learning Disorder, Not Otherwise Specified." Certainly, one might understand Dr. Michels' use of an NOS diagnosis in this case given the relative lack of any developmental issues in the acquisition of basic academic skills. Even the problems in "writing" are motoric and related to hand writing more than they are to basic writing skills or written expression. But the complete absence of reading difficulties in elementary school strongly belie the presence of a learning disorder in the area of reading, even though Dr. Michels did not actually provide such a diagnosis. The same pattern of the absence of reported or observed manifest problems in learning to read is evident in Dr. Anderson's report of evaluation where she states that "he was described as a severe stutterer, but this was corrected through speech therapy in elementary school." She adds that "Robert has no history of diagnosed learning disorders" and that "his mother provided extra help with reading." No other reference to any type of reading problem is mentioned in the report, until the end where a diagnosis of "315.00 Specific Learning Disorder with impairment in reading (dyslexia), reading fluency, word reading accuracy, spelling" is provided without ever having established a foundation of early reading problems. Whereas Dr. Anderson may have felt that current test results suggested a reading problem (an issue that has already been examined and disputed by the NBME), it has been noted that a diagnosis of Specific Learning Disorder cannot be rendered in the absence of developmental and educational indicators of early reading problems. Thus, current difficulties in reading cannot not be viewed as automatically attributable to a learning disability. Without any evidence of developmental problems in learning to read, Dr. Anderson's diagnosis is effectively invalidated. The resulting diagnosis in this case appears to have evolved over time by building on perceptions of problems that were never actually reported and a failure to gather actual developmental and educational data of learning difficulties in service of unquestioned explanations related to learning disorder that eventually had to settle on reading given Mr. Sampson's absolutely stellar performance in the area of mathematics. Yet, for such conclusions to be reasonable there must be some evidence that Mr. Sampson displayed some type of difficulty in learning to read—evidence that does not appear to exist, particularly as illustrated in the teacher's comments and grade reports from Ms. Sampson's elementary school years.

The documentation contains copies of some comments made by his elementary school teachers on official grade reports. Some are hand written, some are typed, and some are illegible for which Mr. Sampson has attempted to provide transcriptions of the commentary. Unfortunately, the transcriptions appear to have been done somewhat selectively so as to emphasize negative observations while minimizing positive ones. For example, in quoting his 4th grade teacher, Ms. Eugene, Mr. Sampson writes only that she believed he "needs to put more effort into written assignments because he needs to improve the quality of his work." However,

the actual hand written comments, as discerned from the original report card read, "Robert is a very capable fourth grader. He is inquisitive and well-informed. He especially likes math and science activities. Robert is especially pleased about being a math team captain because he is very good at math. He enjoyed our trip to the pond and studying pond water under the microscope. Robert's test averages for this quarter are as follows: reading 83%, math 95%, spelling 97%, social studies 91% and science 95%. He needs to put more effort into written assignments…" When placed in context, the comment about improving his writing becomes a very minor concern in light of his scores which indicate very superior functioning including in the one area in which he presumably had a learning disability—reading—where his test average was *only* "83%." A review of his marks on a scale from 1 to 5 where 1 is unsatisfactory, 3 is satisfactory, and 5 is outstanding, it can be seen that his reading his abilities related to "reads and understands grade-appropriate material" (4), "reads silently for sustained periods" (4), "selects appropriate books independently" (4), uses reading strategies to construct meaning" (3), "is developing an awareness of genres and authors" (3), and attempts to acquire, interpret, evaluate, and apply information" (3) were all at a satisfactory level or higher. His writing skills are similar in that he was marked as "3" in all areas of writing. These comments and marks do not in any way suggest that Mr. Sampson was having any troubles in learning to read at this point in his education and at a point where they would have been supremely evident. Moreover, in examining his earlier development in reading, an even more positive indication of reading acquisition is noted. For example, in Mrs. Feinberg's class (appears to be 1st grade, according to Mr. Sampson's notes), he was marked in Reading at the second, third, and fourth marking periods as "5," "5", and "5+" as well as all "5" in writing and she noted that he "continues to build upon his good sight vocabulary and use of strategies." This shows clear and steady improvement from a "4" in reading and writing in the first marking period. Mrs. Feinberg's specific comments related to reading are again not transcribed fully by Mr. Sampson perhaps because they are not consistent with notions of a reading disorder. Although difficult to make out, the comments by Mrs. Feinberg in the first marking period appear to indicate that "In reading, Robert enjoys reading books, has a good sight vocabulary and uses a number of strategies to figure out new words. We will be working on having Robert say "blank" and coming back to harder words, as well as breaking up larger words into parts." By the 3rd and 4th marking periods, her comments are "In reading, Robert continues to grow as a reader. He has developed a strong sight vocabulary and has good phonetic sense. Very good job, Robert!" and "Welcome to the 'life long reader's club', Robert! Please make sure you continue to practice your reading and writing over the summer." When coupled with additional comments to the effect that "Next quarter we will be working on Robert's fluency and expression when reading aloud," and "we will continue to work on improving Robert's fluency and expression, building on his knowledge of vowel sounds (long and short) and consonant blends" the enthusiastic exhortation regarding his reading achievement noted in the last marking period comments can only be viewed as a clear and strong indication that Mr. Sampson was quite successful in learning to read and was developing reading skills at the exact level that was required of him at that age and grade and that he possessed this skill at a satisfactory level well into the end of his elementary education.

The preponderance of evidence which indicates Mr. Sampson developed and acquired reading skills in a manner comparable to age and grade level expectations cannot be discounted. There simply are no indications that Mr. Sampson had any type of difficulty in reading

development and that he learned to read and became a solid reader precisely at the time he was expected to do so. His teachers were in the proper and prime position to observe even the slightest of difficulty he may have had in learning to read and yet, there were no comments to this effect noted by any of them. Despite what is compelling evidence, in his personal statement, Mr. Sampson attempts to provide his own argument that this was not the case. He claims that "the roots of my learning disability began in early childhood. I was diagnosed as a severe stutterer at the age of four. This language disability significantly affected my verbal communication, and tended to isolate me from peers." Mr. Sampson seems unaware of the difference between oral language that encompasses verbal communication and symbolic language which is the process of decoding language written in abstract symbols. Having a speech-language impairment in articulation does not prevent an individual from being able to learn to read normally or fluently. They are simply not the same thing. Indeed, Mr. Sampson extends the notion of stuttering to account for oral language issues, not reading issues, as evidenced by his comments that "I experienced anxiety and frustration when I had no idea how long it would take to relay a simple thought. At times, my speech was so disrupted that people around me did not have the patience to wait." Clearly, Mr. Sampson is describing problems in oral language and articulation, not in reading development. Mr. Sampson also seems to feel that there was some relationship between his stuttering and other academic functioning based on his claim that "my stuttering was evidenced by a substantial discrepancy between my verbal processing skills and my excellence in math and science." It is not clear where Mr. Sampson developed the notion that stuttering was diagnosable via a discrepancy between verbal processing skills and math/science but he is nonetheless, significantly mistaken. This connection appears to be drawn, perhaps, from the desire to connect a discrepancy to a learning disability as he states that "the educational resources in my public school were not well suited for learning disabilities" and "when my parents realized I was not growing out of my stuttering problem, they sought outside professional speech pathology treatment, which continued for years." That he received speech-language therapy for articulation difficulties has no direct relationship to reading problems or the presence of any discrepancy between his verbal abilities and other subject areas. These comments represent a conflation of elements that do not belong together and seem to have been connected only in the attempt to justify the presence of a learning disability that could not, based on the documentation, implicate reading problems. In fact, Mr. Sampson alludes to the fact that his *ability* in reading was what he used to overcome his stuttering problem. He notes that "the way I overcame my stuttering was not through silent reading, but with verbal expression of sound and deliberate vocalization." Thus, rather than having a learning disability which was believed to have been caused by a stuttering issue, Mr. Sampson ameliorated his stuttering via his solid reading ability.

These comments by Mr. Sampson, along with the data contained in the documentation appear to make a very compelling case that he had no real difficulties in learning to read or in becoming a fluent reader as compared to the average person in the general population. Where he displayed any difficulties in reading at all was only in terms of having to read out loud where, in his own words, "when we read aloud in class, I used to shun begin called on to read aloud (even though I otherwise enjoyed participating in my classes) because on top of some lingering stuttering, I was quite scared that I would mispronounce or see a word that my classmates would all know, but I did not." The nature of the anxiety that Mr. Sampson must have felt in attempting to pronounce words that might not be familiar to him is very understandable and entirely natural

for someone with a stuttering problem. But again, these comments reflect that reading itself was not the problem, only his stuttering was. When not faced with the prospect of having to enunciate publicly, Mr. Sampson performed quite well and adequately as indicated by the comments and marks he received in elementary school. This is an important point in the sense that there is no evidence of developmental problems in reading but it does not mean that he should or must enjoy reading or that he should be better or faster at it. Because of the presence of his stuttering issues and the anxiety it engendered in him, it is not surprising that as he continued in his education he found reading a less than enjoyable exercise. For example, he notes that "when I got to junior high school and high school, I continued to avoid reading books for enjoyment" and that "I did not read for pleasure." These are not essential elements of a reading disorder but instead, in this case are a normal and reasonable reaction to his anxiety that was borne from situations in which he was asked to engage in an activity that was potentially embarrassing to him and which made him feel that his classmates thought he was "stupid." But his avoidance of reading, whatever the cause, has a predictable effect in that those who read more become better readers and those who read less lose ground to those who do. The result can be viewed primarily as an issue of advanced reading fluency and Mr. Sampson's avoidance of reading did not serve him well, but the fact that he did not continue to improve or excel in reading is also not an indication of a disability. According to DSM-V, "difficulties mastering these key academic skills may also impede learning in other academic subjects (e.g., history, science, social studies), but those problems are attributable to difficulties learning the underlying academic skills." In Mr. Sampson's case, this is precisely the opposite of what is being claimed. Mr. Sampson had problems with stuttering, not reading, and it was his stuttering that affected his love of reading and induced him to avoid it, not the other way around. Mr. Sampson also appears to try and make a connection between difficulties in reading music and basic reading. Given that reading music and reading words are not comparable abilities, there is no need to pursue any discussion of the matter and it is pointed out here primarily as an example regarding how this observation is not evidence of any manifest problems in learning to read words. By the time Mr. Sampson reaches college he seems to feel that a book on famous individuals with dyslexia are characteristic of his own experiences as a child and begins to believe he may have a learning disability. He cites issues such as "I always knew I had to work infinitely harder than my contemporaries to achieve academic success" and "I had difficulty remembering names of people and places, a childhood history of reading and spelling difficulties, slow reading abilities, inability to comprehend while reading aloud, and suffered extreme fatigue when reading even short periods of time no matter what the subject matter." It is likely that just about any student, including those who have and have not achieved much academic success, would relate to these experiences just as well. In most cases, including Mr. Sampson's, working hard is simply the nature of the beast for getting good grades. The idea that success comes to the many without effort is a convenient fallacy. Not remembering people's names or places is not a reading issue. Mr. Sampson already described his inability to remember what he was reading due to anxiety, not a learning problem. And according to the documentation, there was in fact, no "childhood history of reading and spelling difficulties" a claim that was also noted in the "background" section of the report of evaluation conducted by Dr. Michels. According to his report card, in the first marking period, Mr. Sampson's 5th grade teacher, Ms. Eugene, gave him a "3" (satisfactory) in Spelling and then added a hand written notation for "Formal Spelling" in which she gave him a "5" (outstanding). Mr. Sampson's recollections and Dr. Anderson's claims in this regard are simply in error and factually incorrect. Mr. Sampson also claims that his "first extensive external

**A145**

tutoring" began during junior high school but according to the letter submitted by his parents, he was provided tutoring beginning in 5th grade (general academic tutoring), followed by Math Enrichment in 6th grade as well. One might wish to see one's difficulties through the lens of a disability as it offers a very easy and palatable explanation for a life of perceived struggles. But such desire cannot obscure the facts in this case which are consistent and powerful in illustrating that Mr. Sampson did not display or evidence any of the necessary characteristics regarding learning problems that are required for meeting criteria related to the diagnosis of a learning disability in the area of reading. And when Mr. Sampson's performance for his "private MCAT tutor" did not reach expectations, whatever the causes of it could not and still cannot be ascribed to a learning disability. In her letter dated June 29, 2018, Ms. Simon also references the tutor's concerns as evidence of a learning disorder where she states "Dr. Andrew Lam, his MCAT tutor, observed his struggles and advised him to have an evaluation for learning disabilities" but no details are provided regarding what these struggles were and at that age, such observations do not serve to bolster learning problems in the early developmental period. Whatever concerns Dr. Lam had regarding Ms. Sampson's work or efforts, Mr. Sampson would have already had to have demonstrated some history of reading difficulties. That he never did and that the documentation supports the fact that he learned to read normally and without any incident or issue indicates that whatever struggles they were, they were not rooted in some type of learning disability in reading.

The letter from Ms. De Motta of Stony Brook University claims support for a disability by stating that it is "a mental impairment that substantially limits his reading ability and reading speed on a daily basis." Yet, the only complaint seen in the documentation and the one pointed to in the letter is "his failing to borderline marginal performance on timed NBME shelf exams taken without accommodations were causing him to fail." It appears that the argument here is that Mr. Sampson is "failing" in medical school only because he can't pass the NBME exams with better than marginal performance but that he is quite able to perform daily life activities that require reading without any real issue. Indeed, this is the first point that Mr. Sampson's attorney, Ms. Simon, raises in her letter dated Jun 29, 2018 where in quoting a decision from Bartlett v N.Y. State Board of Law Examiners, she asserts that the opinion is that taking tests constitutes an example of a major life activity. Ms. Simon further emphasizes this point in a follow up letter on the same matter dated November 14, 2018 where she notes that "An individual has a disability within the meaning of ADA if that individual suffers a physical or mental impairment that substantially limits one or more of the individual's major life activities or major bodily functions." The point here, however, is not whether taking a test is or isn't a major life activity, but more that if an individual is impaired to the point that it interferes with a major life activity, one would expect, by definition, that interference to involve any aspect of daily living in which the activity is required. Because, for the purposes of this review, Mr. Sampson is claiming that his impairment is in the area of reading, it stands to reason that he would and should have problems in any daily life activity that requires reading—including taking timed tests. But this is not what the documentation demonstrates. In contrast, and as noted specifically in the letter from Ms. De Motta of Stony Brook University, Mr. Sampson does not have problems in any daily life activity that requires reading, he apparently has difficulty only in taking time tests, which is a condition that would belie the presence of a learning disability and hence, any subsequent impairment in daily activities. The nature of learning disabilities, in particular, are specific only to their manifestation, not their application in that while reading may be affected without

**A146**

concomitant impairment in writing or math, the impairment would not be evident only in taking timed tests and then be absent when say, reading a restaurant menu. Reading is reading, and if Mr. Sampson has impairment that is substantial, as compared to the average person in the general population, he cannot pick and choose in which way it will or will not affect his daily life. And yet, he describes his learning disability not as an impairment in daily functioning but specifically as related to taking the NBME exams mostly because his school defines it that way. He states that, "my school defines a student to have marginal performance when a student has either failed or come very close to failing multiple NBME subject exams, or the courses themselves on their first attempt." In essence, Mr. Sampson is allowing his disability to be defined by a school that will not accept passing as the standard by which success is defined and only something better than passing is allowed. He further asserts that "the point of this administrative label is to identify students who are substantially underperforming the academic expectations of the school and who are in need of an intervention to fix a major learning or education issue." Here Mr. Sampson makes a very flawed and large leap in logic—because the school expects better than just passing performance, failure to do so must be an indication of "a major learning or education issue." Mr. Sampson would prefer of course that the matter relate to the former (a major learning issue) as it supports his contention of learning disability but the documentation available only support the latter—an education or instructional issue that is unrelated to any reading impairment. This sentiment seems to consolidate Mr. Sampson's view of his experiences as he notes later in his personal statement, "hours of intensive preparation spread over years with multiple tutors and multiple external resources were used to help assist me with my reading and learning disability…I now know that I had to work much harder than my peers and I am 100% confident that without these extreme efforts of preparation to compensate for my disability, I would not have passed them." Mr. Sampson may be forgiven for recognizing that millions of students took these very same exams without the benefit of the extensive and extreme preparations that were accorded to him, but he is incorrect in believing that without such "help" he would not have passed. Not only did Mr. Sampson pass the SAT, he obtained Critical Reading scores of 580 (74th percentile rank), 620 (84th percentile rank), and 680 (93rd percentile rank), all of which are well beyond "passing" and indicate exceptional performance on a test of reading accomplished without accommodation. Of course, in her letters, Ms. Simon admonishes the NBME that "average scores or grades do not obviate the presence of disability or the legitimate need for accommodations." Of course, a legitimate need for accommodations is in fact predicated on the presence of a disability and in this case, Mr. Sampson's performance was not merely "average" but far above that—far enough to suggest the presence of ability, not disability. That is, were Mr. Sampson actually impaired in the area of reading, taking a timed, standardized test like the SAT would have been a difficult task and yet his performance was more than merely adequate, it was rather exceptional. Again, Ms. Simon argues that "[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." Again, such a statement opens the door for identification of learning impairments in any individual but she clarifies and suggests that "Mr. Sampson's impairments significantly and, often severely, restrict his ability to read, comprehend, learn, concentrate, process information, write, sleep, work and take tests." Whereas the issues of concentration, sleeping, and working are beyond the scope of this review, reading, comprehension, learning, and writing are not and to that extent, Ms. Simon is incorrect in believing that his "record clearly demonstrates" anything other than

normal learning and ability, in particular during the period of time in which such difficulties
should have been most manifest and clearly evident.

Ms. Simon also attempts to clarify her point that "the focus is on how a major life activity
is substantially limited, and not on what outcomes an individual can achieve." While this may
well be a highly debatable proposition, it cannot be argued that the basis of the limitation,
however it is being manifested, must be from the presence of a disability." If that which causes
the limitation in a major life activity is other than a disability, then ADA would not appear to
apply given its emphasis on protecting individuals with disabilities. The same can be said for a
specific learning disability in that learning problems that stem from external factors such as "lack
of educational opportunity, consistently poor instruction, learning in a second language" cannot
be used as the basis for identification of a learning disability. In furthering her arguments that
Mr. Sampson has a learning disability, Ms. Simon points to the fact that federal guidance
indicates that "[c]ondition, manner, or duration may also suggest the amount of time or effort an
individual has to expend when performing a major life activity because of the effects of an
impairment, even if the individual is able to achievement the same or similar result as someone
without the impairment." It has been documented and discussed already that Mr. Sampson's
progress in elementary school, apart from stuttering, was unremarkable. According to his
teachers, Mr. Sampson displayed no difficulties or struggles whatsoever during his elementary
education and that by the end of 1st grade, he was rated as having reading skills that exceeded the
highest ranking of "5" as indicated by his teacher's rating of "5+." Moreover, not only are there
no comments or observations regarding the presence of reading difficulties, of all the statements
transcribed by Mr. Sampson that cannot be read from the originals concerning 5th and 6th grade,
there is not a single mention of any issue related to reading. Were Mr. Sampson displaying any
type of struggle that could be characterized by "condition, manner, or duration" that exceeds that
of the average child in elementary school, it was neither reported nor documented in the report
cards and comments contained in the documentation. Mr. Sampson provides a considerable
amount of current anecdotal evidence in his personal statement as well in some of the various
documents submitted in support of his request. Unfortunately, none of it points to what is
required to form the basis for a developmental problem in reading. This is not to say that Mr.
Sampson has not or is not experiencing any of the difficulties that he is currently be reporting but
rather, suggests that whatever the cause of the current difficulties, they are highly unlikely to be
rooted in any intrinsic disorder that could be construed as a learning disability in the area of
reading. One can imagine that it must be difficult for Mr. Sampson to accept that he likely does
not have a learning disability in the area of reading. Such a conclusion does not bear upon the
presence of any other disability or the impact that his other listed impairments may have on
reading or any other major life activity. Mr. Sampson may well feel that he must work harder
than most, read more slowly than many, need to review material more carefully, and require
more time than average and these may all be quite true. But at this time, based on the
documentation submitted by Mr. Sampson, there is simply no evidence that any of these
conditions are due to the presence of a learning disability in the area of reading. One simply
cannot develop a reading disability while in college or medical school, and one's current
struggles cannot change the nature of one's original development in which there are no reports,
no observations, and no data to support difficulties in the acquisition or development of reading
skills.

**A148**

In summary, a review of the documentation submitted in support of his appeal of the denial of Mr. Sampson's reconsideration request provides only one reasonable conclusion that can be reached—that he cannot have a learning disability in the area of reading precisely because he has never demonstrated any problems in learning to read. By definition, a learning disorder is characterized by difficulties in the early acquisition period, that is, elementary school, where basic academic skills are first taught and first learned. It matters not whether there is any formal evaluation or diagnosis rendered at that time or even whether any difficulties rise to the level of substantial impairment. What is required and what does matter is that there is some evidence that the acquisition and development of a basic skill, such as reading, did not proceed in the manner that is typically expected for a given age or grade. And while there are a variety of academic concerns sprinkled throughout his early education, none of them implicate or suggest that reading was of any concern. Without a clear history of reading difficulties during this period, it is inappropriate to assign a diagnosis of learning disability as it is an essential criterion for doing so. This is an important point in this review because it is not predicated on any debate regarding the meaning of current or previous test scores or their interpretation regarding impairment. Arguments that suggest that Mr. Sampson developed a reading disability because he stuttered are specious and unsupportable, and any references regarding a "history of reading difficulties" is merely speculation and uncorroborated by the documentation. In addition, improvements in performance when given extra time cannot change the fact that there is a conspicuous absence of any reports or observations of early reading difficulties. Whatever debate may ensue from examination of recent evaluations does not alter the one most important consideration necessary for supporting a learning disability in reading—evidence of impairment in early reading acquisition. That there is none can only suggest one thing—that Mr. Sampson's current reading issues, and their relation to his taking a timed test, are not attributable to a reading disorder. Thus, whatever difficulties he may have in completing timed tests or reading assignments in comparison to his medical school peers cannot be attributed to the presence of a learning impairment in reading. Instead, the available data in this case argue quite strongly and convincingly that Mr. Sampson learned to read comparably to his same-grade peers in early and late elementary school and that while he may find reading or taking timed tests more challenging within the context of a rigorous medical school curriculum and in the presence of the most academically successful student body in education, it still does not render him disabled by history or by comparison. Therefore, on the basis of all of the documentation submitted in this case, it is my opinion that a diagnosis of learning impairment in reading is wholly unsupported and that his appeal regarding denial of his reconsideration of accommodation remains unwarranted and should therefore be denied.

**A149**

# EXHIBIT 13

November 26, 2018

Catherine Farmer, Psy.D.
Manager, Disability Services and ADA Compliance Officer, Testing Programs
National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104

RE:   Application of Robert Sampson for Step 1 exam accommodations (ID # 12391)

Dear Dr. Farmer:

Thank you for forwarding the materials on Mr. Sampson for review.  He is again requesting the accommodations of extended time (time and one-half over 2 days), extra breaks, and a private testing room based on diagnoses of Attention Deficit Hyperactivity Disorder Predominantly Inattentive Type, Specific Learning Disorder with Impairment in Reading (Dyslexia), Reading Fluency, Word Reading Accuracy, and Spelling, and Unspecified Neurodevelopmental Disorder; Visuospatial Memory and Visuospatial Processing.  Several previous requests for these accommodations have been denied by the NBME.  Mr. Sampson has appealed these denials and has provided additional documentation each time in an effort to support his request for these accommodations and explain from his perspective why he believes they are necessary.  I have not been involved in this case until now.  You have asked me to provide another opinion on his accommodation requests primarily with respect to the ADHD diagnosis as another Consultant will also be reviewing this documentation on the basis of the Specific Learning Disorder and Unspecified Neurodevelopmental Disorder diagnoses.  I have carefully reviewed **all** of the voluminous documentation he has provided.

In my opinion, the documentation provided does not adequately substantiate an ADHD diagnosis, a history or magnitude of chronic and pervasive real world impairment consistent with ADHD, or the existence of an ADHD-related disability and is therefore insufficient to warrant granting his requested accommodations on the basis of ADHD.  My reasons for this opinion are as follows:

1.    Mr. Sampson's difficulties seem to be largely contiguous with his entrance into the medical school environment.  ADHD is a developmental disability with a *childhood* onset that typically results in a chronic and pervasive pattern of developmentally deviant functional impairment in academic, social, and vocational arenas, and also in daily adaptive functioning.  Research shows that ADHD is a serious disorder that significantly disrupts functioning in multiple life domains including school, social, vocational, and daily adaptive domains, executive functioning, planning ahead, completing tasks, organization, and time management to name just a few.  For someone who truly suffers from this disorder at the magnitude of a clinical diagnosis or a disability, life is characterized by disrupted interpersonal relationships, underperformance in school and jobs, trouble managing the routine tasks of daily life, and generally inadequate adjustment.  People with bona fide ADHD struggle to succeed in life and typically leave a paper trail in their wake

**A151**

that is a testament to their longstanding history of developmentally deviant functional impairment. Examples of the paper trail are things like negative teacher comments relating to poor self control, poor or inconsistent academic achievement, report cards/transcripts that show inconsistent/variable grades and/or low ratings in effort, citizenship, and behavior, special education records, 504 Plans, negative job performance reviews, and the like. Indeed, ADHD is a seriously impairing disorder that leaves its mark on a wide swath of an individual's life. Mr. Sampson's documentation and overall history does not reflect a magnitude of symptoms or pervasive impairment that is consistent with ADHD or a disability, in my opinion.

2.     More specifically, despite his reported history of longstanding ADHD-like symptoms, he had no history of any early interventions or treatment for ADHD-like problems, had no documented history of behavioral/self control problems, was not diagnosed with ADHD until 2015 during medical school, reportedly had no history of seeking or receiving any formal accommodations prior to medical school Shelf Exams, scored in the Above Average to Superior ranges on the SAT and the ACT on several occasions without accommodations, scored at the 67th percentile and the 73rd percentile on the MCAT on two occasions without accommodations, reportedly earned A's in most of his high school classes which were typically Honors or Advanced Placement classes, reportedly "flourished socially and intellectually" in college at University of Virginia earning a GPA of 3.43 without accommodations, had no history of seeking or needing any mental health treatment prior to medical school, did not appear to have experienced any vocational impairment in his past work experiences including as a rescue squad volunteer or while in Korea doing immunology research, and he provided no convincing hard evidence that showed any history of significant ADHD-like impairment in his social, daily adaptive, or executive functioning. This is not the typical profile of someone struggling with ADHD at the magnitude of a clinical diagnosis or a disability.

3.     It is necessary to establish a childhood onset of developmentally deviant symptoms/impairment to receive the ADHD diagnosis as an adult. It is not clear that Mr. Sampson was experiencing a magnitude of developmentally deviant symptoms or behavior in childhood that would be consistent with a clinical diagnosis of ADHD, in my opinion. Although there were a few teacher comments on his early report cards relating to distractibility, disorganization, listening, impulsivity, and following directions, these seemed to be few and far between, did not appear to significantly interfere in his progress, and did not appear to have persisted over time or interfere significantly in his adult functioning. In fact, there were a number of "positive" teacher comments as well such as "organizational skills continue to improve", "he continues to grow as a reader", "it is a pleasure to be his teacher", "he is more organized in the classroom and now keeps an immaculate desk", "appropriate behavior has increased and I feel this will continue", "pleased with his progress", and "writing is consistently improving". Further, there were no ratings of 1 or 2 ("unsatisfactory" or "inconsistent") on items relating to Work Habits or Citizenship on his report cards. One other teacher comment from a fourth quarter report stated "I am pleased by Robert's progress this year both academically and socially, he has developed better work habits, organizational skills, and a commitment to improving his academic performance". Overall, the trend was toward improvement and his later grades and behavior as he got older seemed to be quite impressive (mostly A's in Honors and AP classes) with no extraordinary interventions beyond tutoring and hard work; and no objective evidence of developmentally deviant real world functional impairment relative to same aged peers. Hence, it is not clear that he would have met criteria for ADHD as a child.

4.     It is difficult to see where the history of developmentally deviant pervasive impairment is that would support an ADHD diagnosis or a disabling condition, in my opinion. There is little

objective documentation beyond self/parent report and testimonials to validate that he experienced a magnitude of clinically significant real world impairment over the course of his life in academics, work, social, daily adaptive, or executive functioning. By all objective measures, Mr. Sampson seems to have performed quite well in his life with respect to grades (mostly A's and B's), behavior, social functioning, daily adaptive functioning, high SAT, ACT, and MCAT test scores, and no history of formal treatment for ADHD (or any other psychological condition) prior to medical school other than tutoring. All of this is not indicative of impaired functioning or the presence of a disorder that would require a need for extra time, in my opinion. Where is the paper trail of records that reflect a struggle with ADHD over the course of his life? It seems Mr. Sampson's case for viewing himself as impaired is based mostly on areas that are very difficult to measure or quantify. For example, he sees himself as impaired because he reports he has to re-read material for understanding, had a parent read aloud to him when he was a child, feared being called upon to read in class, reportedly does not read for pleasure, used Cliff notes because reading was so painful, has difficulty remembering names of people and places, gets extremely fatigued when reading, and had to play music by ear because he was unable to read music. These examples of impairment strike me as being fairly ubiquitous and impossible to quantify; and is not the kind of impairment or magnitude of impairment that rises to the level of a disability, in my opinion. Moreover, if someone can compensate so effectively for their symptoms and for so long (up until medical school) without any formal accommodations or extraordinary interventions beyond tutoring and concerted effort, that person is not likely to be considered disabled under the ADA's definition.

5.    Further, on the face of it, it is difficult to label someone with a Reading Disorder (Dyslexia) who earned almost all A's and B's throughout his school history, had no history of treatment or assessment for reading problems, scored at the 80th percentile on Reading Fluency, had a Critical Reading score on the SAT in November 2008 at the 93rd percentile, had ACT scores of 30 (superior range) in Reading and English, had a Woodcock Johnson Broad Reading score at the 80th percentile, and had a SATA reading score in the Average range (25th percentile). His testing scores, past standardized test scores, history of stellar academic achievement, and absence of formal treatment strongly argue against his having a true reading disability. Low Average or Below Average scores at one snapshot in time on tests such as the Nelson Denny Reading test are not enough to substantiate a Reading Disability. Moreover, it was not entirely clear to me that he *required* tutoring in order to remediate something that was deficient or whether he chose to pursue tutoring to optimize his already unimpaired functioning. For example, Dr. Michels' report indicated he "needed significant tutoring to remain in the highest math classes". Again, this is not evidence of impaired functioning. In short, his documentation fails to adequately substantiate the pervasive developmentally deviant impairment over time and across situations that typically characterizes ADHD, in my opinion.

6.    The ADHD diagnosis was not adequately substantiated, in my opinion. First, there seems to be a lack of consensus on the ADHD diagnosis amongst Mr. Sampson's diagnosticians. For example, Dr. Suzanne Michels did not make an ADHD diagnosis in 2013 and Dr. Allison Anderson concluded in 2013 that "his testing results and history supply little evidence that his problems are the result of ADHD". Dr. Allison's report also indicated that ADHD Rating Scales (Barkley RS) were administered to Mr. Sampson, his girlfriend, both of his parents, and his tutor and **all** of their ratings were entirely normal and not supportive of ADHD. Dr. Anderson further concluded "he does not appear to have the consistent and severe pattern of impulsivity, social problems, marked inattention, or physical restlessness that supports an ADHD diagnosis". I agree that his overall history is not supportive of an ADHD diagnosis. Dr. Aronson's ADHD diagnosis was based mostly on self report over several visits and the "impact of key data points from a

multitude of sources". I am not sure what this means. Dr. Aronson stated he had slow Processing Speed despite his history of excellent grades, excellent scores on past standardized tests, consistently high real world achievement, and a WAIS IV Processing Speed Index score of 122 (Superior range). Dr. Aronson also stated Mr. Sampson was "profoundly disabled currently" and that he "cannot concentrate and read efficiently". I saw no convincing evidence to support these statements. Further, test scores and/or statistical discrepancies are not diagnostic of ADHD. Almost all of his test scores were within at least the Average range (and many were in the Above Average to Superior ranges) suggesting no neurological dysfunction. A Processing Speed Index score of 122 on the WAIS-IV is in the Superior range, is not deficient, is not supportive of slow cognitive speed or a need for extra time, is not diagnostic of ADHD, and is not evidence of impaired functioning. Scores that are "only Average" in the context of an overall Superior Verbal IQ are not diagnostic of ADHD or evidence of impaired functioning. Relative weaknesses that still fall within the Average range are not diagnostic of ADHD and are not evidence of impaired functioning. Low Average or Below Average scores on the Rey, Trails B, Picture Recognition, and Stroop Interference at one snapshot in time is also not diagnostic of ADHD or evidence of a disability. Dr. Aronson tended to over emphasize self report, test scores, and statistical discrepancies as the major bases for the ADHD diagnosis rather than building a case for the ADHD diagnosis by showing a magnitude of chronic and pervasive developmentally deviant real world impairment consistent with this diagnosis, in my opinion. Mr. Sampson's statement that "he has to work infinitely harder" than his peers to succeed is difficult to quantify, and even if true is not necessarily evidence of impaired functioning. It is also possible that other factors besides ADHD could account for his difficulty finishing medical school tests such as having a deliberate or obsessive test taking style/preference.

7.  In summary, Mr. Sampson's documentation fails to build a credible case for the existence of ADHD and fails to show that having ADHD is responsible for his reported difficulties with reading and finishing tests in medical school. His documentation also fails to adequately show that he has a disability within the meaning of the ADA, in my opinion. The fact that he may benefit from accommodations including extra time is not unusual and is not the issue. Most people would. However, to qualify for a disability under the American's with Disabilities Act, one must have a physical or mental impairment that substantially limits one or more major life activities. He has not shown that he is substantially limited in any major life activity relative to the average person, in my opinion. Earning all A's and B's throughout his school history and his very strong test scores and overall functional ability is not supportive of a disability, in my opinion. The purpose of accommodations is not to optimize one's test scores, accommodate a personal test taking style/preference that may be slow or deliberate, or to guarantee that one finishes an exam. The fact that he received accommodations in medical school and on Shelf Exams is not a guarantee he will qualify for accommodations on the Step 1 exam. Because there is insufficient evidence of an ADHD diagnosis or an ADHD-related disability, I do not believe that granting his requested accommodations is warranted on the basis of ADHD in this case.

Sincerely,

_____
Kevin Murphy, Ph.D.

# EXHIBIT 14



National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104-3102

215-590-9500 phone
www.nbme.org

<u>**Confidential**</u>

January 4, 2019

<u>**Via E-mail to rds911@gmail.com**</u>
Robert D. Sampson
11 Whitford Rd
Stony Brook, NY 11790

RE: USMLE Step 1                    USMLE ID#: 5-385-624-1

Dear Mr. Sampson:

We have thoroughly reviewed your request for reconsideration of our decision regarding test accommodations for the United States Medical Licensing Examination (USMLE) Step 1. We conducted an individualized review of your request and supporting documentation in accordance with the guidelines set forth in the Americans with Disabilities Act (ADA).

In a November 14, 2018 letter, your attorney, Ms. Jo Anne Simon, writes, *"Mr. Sampson's accommodation request is entirely reasonable given the current impacts of his longstanding learning and attention deficits. The extended time accommodations that Mr. Sampson seeks would not fundamentally alter the USMLE. There can be no other legally acceptable reason for denial of accommodations."*

Accommodations are intended to provide access to the USMLE testing program for individuals with a documented disability as defined by the ADA. The ADA defines disability as a physical or mental impairment that substantially limits one or more major life activities compared to most people in the general population.

The NBME carefully considers all evidence in determining whether an individual is substantially limited within the meaning of the ADA and what, if any, accommodations are appropriate to the particular Step exam context. Submitted documentation including the individual's personal statements; letters from advocates; reports of evaluations; and objective information such as school records and scores obtained on high stakes tests taken with and without accommodations are thoroughly reviewed.

Supporting documentation submitted from qualified professionals is a necessary part of any request for accommodations and is carefully reviewed by the NBME. Though not required to defer to the conclusions or recommendations of an applicant's supporting professional, we carefully consider the recommendation of qualified professionals made in accordance with generally accepted diagnostic criteria and supported by reasonable documentation.

**A156**

According to the *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5)*, the hallmark of a learning disability is difficulty in the development and acquisition of basic academic skills particularly during the period of time in which these skills are first taught in early elementary school. Developmental reading difficulties were not reported by your evaluators and there is no indication that you struggled in your efforts to learn to read during the time in which you were taught to read. The complete absence of reading difficulties in elementary school strongly belies the presence of a learning disorder in the area of reading.

Likewise, it is necessary to establish a childhood onset of developmentally deviant symptoms/impairment to receive the ADHD diagnosis as an adult. Beyond self/parent report and testimonials, your documentation provides no objective evidence of clinically significant real world functional impairment in academic, work, social, daily adaptive, or executive functioning relative to most people in the general population.

Ms. Simon's November 14, 2018 letter requesting reconsideration provided no new substantive information or evidence that alters our decision communicated in my letters dated September 7, 2018 and March 6, 2018. Once again, our thorough review found that your documentation does not demonstrate a substantial limitation in a major life activity as compared to most people or that additional testing time is an appropriate modification of your USMLE Step 1 test administration.

Sincerely,

Catherine Farmer, Psy.D.
Director, Disability Services
ADA Compliance Officer, Testing Programs

C: Jo Anne Simon JoAnne@joannesimon.com

**A157**

# EXHIBIT 15



# United States Medical Licensing Examination®

## Step 1 Score Report

FOR EXAMINEE USE ONLY. THIRD-PARTY USERS OF USMLE SCORES SHOULD RELY SOLELY ON OFFICIAL TRANSCRIPTS RECEIVED DIRECTLY FROM THE EXAMINEE'S USMLE REGISTRATION ENTITY.

**NAME:** Sampson, Robert Drew

**USMLE ID:** 5-385-624-1

**TEST DATE:** January 23, 2020

## Your Performance

| Test Result | Test Score |
|---|---|
| **FAIL** | **177** |

## Your Performance Compared to Other Examinees

The chart below represents the distribution of scores for examinees from US and Canadian medical schools taking Step 1 for the first time between January 1, 2018 and December 31, 2018. Reported scores range from 1-300 with a mean of 231 and a standard deviation of 20.



If you tested repeatedly under the same conditions on a different set of items covering the same content, without learning or forgetting, your score would fall within one standard error of the estimate (SEE) of your current score two-thirds of the time. The SEE on this exam is 8 points.

*Your score +/- SEE: 169 – 185*

# United States Medical Licensing Examination

# Step 1 Score Report

FOR EXAMINEE USE ONLY. THIRD-PARTY USERS OF USMLE SCORES SHOULD RELY SOLELY
ON OFFICIAL TRANSCRIPTS RECEIVED DIRECTLY FROM THE EXAMINEE'S USMLE REGISTRATION ENTITY.

**NAME:** Sampson, Robert Drew

**USMLE ID:** 5-385-624-1                                              **TEST DATE:** January 23, 2020

## Your Relative Strengths and Weaknesses

The boxes below indicate areas of relatively lower or higher performance in each content area within the Step 1 examination. A box in the "Higher" column indicates that your performance in that area was higher than your overall Step 1 performance shown on page 1. A box in the "Same" column indicates that your performance in that area was similar to or the same as your overall Step 1 performance. A box in the "Lower" column indicates that your performance in that area was lower than your overall Step 1 performance. The percentage range of items from each content area on the Step 1 examination is indicated below.

This information can be used to identify areas of strength and weakness to guide future study. Because the exam is highly integrative, USMLE recommends reviewing all content areas if retaking the test.

### Performance by Physician Task Relative to Your Overall Step 1 Performance

| | (% Items Per Test) | Lower | Same | Higher |
|---|---|---|---|---|
| **MK: Applying Foundational Science Concepts** | (52 - 62%) | | ▮ | |
| **PC: Diagnosis** | (20 - 30%) | | ▮ | |
| **PC: Management** | (7 - 12%) | | ▮ | |
| **PBLI: Evidence-Based Medicine** | (5 - 7%) | | | ▮ |

Abbreviations: MK, Medical Knowledge; PC, Patient Care; PBLI, Practice-based Learning and Improvement.

# United States Medical Licensing Examination

# Step 1 Score Report

**FOR EXAMINEE USE ONLY. THIRD-PARTY USERS OF USMLE SCORES SHOULD RELY SOLELY ON OFFICIAL TRANSCRIPTS RECEIVED DIRECTLY FROM THE EXAMINEE'S USMLE REGISTRATION ENTITY.**

**NAME:** Sampson, Robert Drew

**USMLE ID:** 5-385-624-1        **TEST DATE:** January 23, 2020

## Performance by System Relative to Your Overall Step 1 Performance

| | (% Items Per Test) | Lower | Same | Higher |
|---|---|---|---|---|
| General Principles | (13 - 17%) | | | ■ |
| Behavioral Health & Nervous Systems/Special Senses | (9 - 13%) | | ■ | |
| Reproductive & Endocrine Systems | (9 - 13%) | | ■ | |
| Respiratory & Renal/Urinary Systems | (9 - 13%) | | ■ | |
| Blood & Lymphoreticular/Immune Systems | (7 - 11%) | | ■ | |
| Multisystem Processes & Disorders | (7 - 11%) | | ■ | |
| Cardiovascular System | (6 - 10%) | | ■ | |
| Musculoskeletal, Skin & Subcutaneous Tissue | (6 - 10%) | | ■ | |
| Gastrointestinal System | (5 - 9%) | | ■ | |
| Biostatistics & Epidemiology/Population Health | (5 - 7%) | | | ■ |

## Performance by Discipline Relative to Your Overall Step 1 Performance

| | (% Items Per Test) | Lower | Same | Higher |
|---|---|---|---|---|
| Pathology | (45 - 52%) | | ■ | |
| Physiology | (26 - 34%) | | ■ | |
| Pharmacology | (16 - 23%) | | ■ | |
| Biochemistry & Nutrition | (12 - 15%) | | ■ | |
| Gross Anatomy & Embryology | (11 - 15%) | | ■ | |
| Microbiology | (11 - 15%) | | ■ | |
| Histology & Cell Biology | (9 - 13%) | | ■ | |
| Behavioral Sciences | (8 - 12%) | | ■ | |
| Immunology | (7 - 11%) | | ■ | |
| Genetics | (5 - 9%) | | ■ | |

# United States Medical Licensing Examination
# Step 1 Score Report

## Supplemental Information: Understanding the Content Areas

The information below is a visual representation of the content weighting on this examination that may be informative in guiding remediation. Descriptions of the topics covered in these content areas, as well as other topics covered on USMLE Step 1, can be found in the information materials on the USMLE website (https://www.usmle.org). Please use the contact form on the USMLE website (https://www.usmle.org/contact/) if you have additional questions.

| Physician Task | (% Items Per Test) | |
|---|---|---|
| MK: Applying Foundational Science Concepts | (52 - 62%) | |
| PC: Diagnosis | (20 - 30%) | |
| PC: Management | (7 - 12%) | |
| PBLI: Evidence-Based Medicine | (5 - 7%) | |



Abbreviations: MK, Medical Knowledge; PC, Patient Care; PBLI, Practice-based Learning and Improvement.

| System | (% Items Per Test) | |
|---|---|---|
| General Principles | (13 - 17%) | |
| Behavioral Health & Nervous Systems/Special Senses | (9 - 13%) | |
| Reproductive & Endocrine Systems | (9 - 13%) | |
| Respiratory & Renal/Urinary Systems | (9 - 13%) | |
| Blood & Lymphoreticular/Immune Systems | (7 - 11%) | |
| Multisystem Processes & Disorders | (7 - 11%) | |
| Cardiovascular System | (6 - 10%) | |
| Musculoskeletal, Skin & Subcutaneous Tissue | (6 - 10%) | |
| Gastrointestinal System | (5 - 9%) | |
| Biostatistics & Epidemiology/Population Health | (5 - 7%) | |

| Discipline | (% Items Per Test) | |
|---|---|---|
| Pathology | (45 - 52%) | |
| Physiology | (26 - 34%) | |
| Pharmacology | (16 - 23%) | |
| Biochemistry & Nutrition | (12 - 15%) | |
| Gross Anatomy & Embryology | (11 - 15%) | |
| Microbiology | (11 - 15%) | |
| Histology & Cell Biology | (9 - 13%) | |
| Behavioral Sciences | (8 - 12%) | |
| Immunology | (7 - 11%) | |
| Genetics | (5 - 9%) | |



# EXHIBIT 16

**United States Medical Licensing Examination® (USMLE®)**

## REQUEST FOR TEST ACCOMMODATIONS
*Use this form if you are requesting accommodations on the USMLE for the first time.*

---

**The National Board of Medical Examiners® (NBME®) processes requests for test accommodations on behalf of the USMLE program**

If you have a documented disability covered under the Americans with Disabilities Act (ADA), you must notify the USMLE in writing <u>each time</u> you apply for a Step examination for which you require test accommodations. Submitting this form constitutes your official notification.

• Review the USMLE Guidelines for Test Accommodations at www.usmle.org/test-accommodations/ for a detailed description of how to document a need for accommodations.

• Complete all sections of this request form; submit the form and all required documentation to Disability Services. In order to begin processing your request, you must have a completed registration for the USMLE Step exam for which you are requesting accommodations.

• NBME will acknowledge receipt of your request by e-mail and audit your submission for completeness. If you do not receive an e-mail acknowledgement within two business days of submitting your request, please contact Disability Services at 215-590-9700 or disabilityservices@nbme.org. You may be asked to submit additional documentation to complete your request.

• **Requests are processed in the order in which they are received. Processing cannot begin until sufficient information is received by NBME and your Step exam registration is complete. Allow at least 60 business days for processing of your request.**

• The outcome of our review will not be released via telephone. All official communications regarding your request will be made in writing. If you wish to modify or withdraw a request for test accommodations, contact Disability Services by e-mail at disabilityservices@nbme.org or by telephone at 215-590-9700.

---

As explained in the Guidelines to Request Test Accommodations (www.usmle.org/test-accommodations/), you MUST provide supporting documentation verifying your current functional impairment.

<u>Submit</u> the following with this form:

✓ A **personal statement** describing your disability and its impact on your daily life and educational functioning.
✓ A completed **Certification of Prior Test Accommodations** form if you received test accommodations in medical school/residency.
✓ A **complete and comprehensive evaluation** from a qualified professional documenting your disability.

✓ **Supporting documentation** such as academic records; score transcripts for previous standardized exams; verification of prior academic/test accommodations; relevant medical records; previous psycho-educational evaluations; faculty or supervisor feedback; job performance evaluations; clerkship/clinical course evaluations; etc.

---

USMLE® Request for Test Accommodations

## Section A: Exam Information

Place a check next to the examination(s) for which you are **currently registered** *and* requesting test accommodations: (Check all that apply)

☑ Step 1

☐ Step 2 CK (Clinical Knowledge)

☐ Step 3*

*Please be aware that additional test time for Step 3 may involve 3 to 5 days of testing, depending on the requested accommodation (See Section C2).

## Section B: Biographical Information
**Please type or print.**

**B1.** Name: Sampson      Robert      D

          Last           First           Middle Initial

**B2.** Date of Birth: █████████

**B3.** USMLE # 5 - 3 8 5 - 6 2 4 - 1 (required)

**B4.** Address:

4118 43rd St Apt 2B

Street

Sunnyside           NY           11104

City           State/Province           Zip/Postal Code

USA

Country

631-833-4418

Preferred Telephone Number

rds911@gmail.com

E-mail address

**B5.** Medical School Name: Stony Brook University School of Medicine

Country of Medical School: USA           Date of Medical School Graduation: 05/23

**USMLE® Request for Test Accommodations**

## Section C: Accommodations Information

**C1**. Do you require wheelchair access at the examination facility? ☐ Yes ☑ No
If yes, please indicate the number of inches required from the bottom of the table to the floor: _____

**C2.** <u>Step 1, Step 2 CK, or Step 3</u> **(computer-based examinations)**

Check the appropriate box to indicate the accommodations you are requesting for the exam(s) for which you are currently registered:

<u>**STEP 1:** Check **ONLY ONE** box</u>

**Additional Break Time**

☐ Additional break time **over 1 day**

☐ Additional break time **over 2 days**

**Additional Testing Time**

☐ 25% Additional test time (Time and 1/4) **over 2 days**

☐ 50% Additional test time (Time and 1/2) **over 2 days**

☐ 100% Additional test time (Double time) **over 2 days**

☐ Additional break time <u>and</u> 50% Additional test time (Time and 1/2) **over 2 days**

<u>**STEP 2 CK:** Check **ONLY ONE** box</u>

**Additional Break Time**

☐ Additional break time **over 2 days**

**Additional Testing Time**

☐ 25% Additional test time (Time and 1/4) **over 2 days**

☐ 50% Additional test time (Time and 1/2) **over 2 days**

☐ 100% Additional test time (Double time) **over 2 days**

☐ Additional break time <u>and</u> 50% Additional test time (Time and 1/2) **over 2 days**

<u>**STEP 3:** Check **ONLY ONE** box</u>

**Additional Break Time**

☐ Additional break time **over 4 days**

**Additional Testing Time**

☐ 25% Additional test time (Time and 1/4) **over 3 days**

☐ 50% Additional test time (Time and 1/2) **over 4 days**

☐ 100% Additional test time (Double time) **over 5 days**

☐ Additional break time <u>and</u> 50% Additional test time (Time and 1/2) **over 4 days**

**Describe** any other accommodation(s) you are requesting for **Step 1**, **Step 2 CK**, or **Step 3**.
Additional break time and 100% Additional test time (Double time)

_____

_____

_____

USMLE® Request for Test Accommodations

## Section D: Information About Your Impairment

**D1.** List the **specific DSM/ICD diagnostic code(s) and disability** for which you are requesting accommodations and report the year that it was **first** diagnosed.

| DIAGNOSTIC CODE | DISABILITY | YEAR DIAGNOSED |
|---|---|---|
| 315.00 | Specific Learning Disorder with impairment in reading (dyslexia), reading fluency, word reading accuracy, spelling. | 2013 |
| 315.9 | Unspecified Neurodevelopmental Disorder, visuospatial memory, visuospatial processing. | 2013 |
| F90.2 | Attention Deficit hyperactivity dissorder, predominantly inattentive. | 2015 |
| 315.2 | Specific Learning Disorder with impairment in written expression (spelling and handwriting) | 2020 |
| | | |

**D2. Personal Statement**

 **Attach a signed and dated personal statement describing your impairment(s) and how a major life activity is substantially limited.** The personal statement is your opportunity to tell us how your physical or mental impairment(s) substantially limits your current functioning in a major life activity and how the standard examination conditions are insufficient for your needs. In your own words, describe the impact of your disability on your daily life (do not confine your statement to standardized test performance) and provide a rationale for why the specific accommodation(s) you are requesting are necessary in the context of this examination.

## Section E: Accommodation History

> Relevant copies were previously provided to NBME

**E1. Standardized Examinations**

 **Attach copies of your score report(s) for any previous standardized examination taken.**

 **If accommodations were provided, attach official documentation from each testing agency confirming the test accommodations they provided.**

List the accommodations received for previous standardized examinations such as college, graduate, or professional school admissions tests and professional licensure or certification examinations (if no accommodations were provided, write NONE).

| | DATE(S) ADMINISTERED | ACCOMMODATION(S) PROVIDED |
|---|---|---|
| ☐ SAT®, ACT® | PSAT   Fall '07 (PSAT), 5/05, 6/08, 6/08, 10/08, 11/08 | NONE |
| ☐ MCAT® | 8/13, 9/14 | NONE |
| ☐ GRE® | _____ | _____ |
| ☐ GMAT® | _____ | _____ |
| ☐ LSAT® | _____ | _____ |
| ☐ DAT® | _____ | _____ |
| ☐ COMLEX® | _____ | _____ |
| ✓ Other (specify) | 2X time on NBME shelf exams: 10/15/20, 10/16/20, 1/8/21, 2/26/21, 4/9/21, 5/28/21, 7/9/21 1.5X time on NBME shelf exams: 12/8/16, 12/16/16, 1/13/17, all others previously (since 10/6/16) under standard time conditions. | |

**USMLE® Request for Test Accommodations**

**E2**. **Postsecondary Education**

> Relevant copies were previously
> provided to NBME

List each school and all formal accommodations you receive/received, and the dates accommodations were provided:

✎ **Attach copies of official records from each school(s) confirming the accommodations they provided.**

✎ **If you receive/received accommodations in _medical school and/or residency_, have the appropriate official at your medical school/residency complete the _USMLE Certification of Prior Test Accommodations_ form available at www.usmle.org/test-accommodations/forms.html.**

| SCHOOL | ACCOMMODATIONS PROVIDED | DATES PROVIDED |
|---|---|---|
| **Medical/Graduate/** Stony Brook University School of Medicine | 2X Time on exams | Oct '20—>Current |
| **Professional School** | 1.5X Time on exams | Nov '16—>Oct '20 |
| Stony Brook University College of Business | 2X Time on exams | July '21—>Current |
| | | |
| | | |
| **Undergraduate** University of Virginia | NONE | |
| **School** | | |
| | | |

**E3. Primary and Secondary School**

> Relevant copies were
> previously provided to NBME

List each school and all formal accommodations you received, and the dates accommodations were provided:

✎ **Attach copies of official records from each school listed confirming the accommodations they provided.**

| SCHOOL | ACCOMMODATIONS PROVIDED | DATES PROVIDED |
|---|---|---|
| **High School** Ward Melville High School | NONE | |
| | | |
| **Middle School** Paul J Gelinas JHS | NONE | |
| | | |
| **Elementary School** Minnesauke Elementary School | NONE | |
| | | |

USMLE® Request for Test Accommodations

## Section F: Certification and Authorization

To the best of my knowledge and belief, the information recorded on this request form is true and accurate. I understand that my request for accommodations, including this form and all supporting documentation, must be received by the NBME sufficiently in advance of my anticipated test date in order to provide adequate time to evaluate and process my request.

I acknowledge and agree that any information submitted by me or on my behalf may be used by the USMLE program for the following purposes:

- Evaluating my eligibility for accommodations. When appropriate, my information may be disclosed to qualified independent reviewers for this purpose.
- Conducting research. Any disclosure of my information by the USMLE program will not contain information that could be used to identify me individually; information that is presented in research publications will be reported only in the aggregate.

I authorize the National Board of Medical Examiners (NBME) to contact the entities identified in this request form, and the professionals identified in the documentation I am submitting in connection with it, to obtain further information. I authorize such entities and professionals to provide NBME with all requested further information.

I further understand that the USMLE reserves the right to take action, as described in the Bulletin of Information, if it determines that false information or false statements have been presented on this request form or in connection with my request for test accommodations.

Name (print): _____Robert Sampson_____

Signature: _____  Date: ____4/13/22_____

### Submitting Your Completed Request Form and Supporting Documentation:
**(Do Not Send duplicate documents and Do Not Send by multiple methods as this will delay processing)**

- **Due to business restrictions in Philadelphia because of COVID-19 please submit your request form and supporting documentation via E-mail or Fax.**
- **Requests sent to us via mail may be delayed.**
- **E-mail: Maximum file size is 15 MB (including text in body of email, headers and all attachments). Files larger than 15 MB may require separate emails. All attachments must be in PDF format. Please scan your documents into as few PDF's as possible. Photographs of Personal Items may be in digital format such as JPEGs/JPGs. We are not able to access embedded links.**
- **Fax or Mail: Submit your completed request form and supporting documents to the address below once you register for your exam.**
- **DO NOT bind, staple, paper clip, or tab documents as this may delay processing.**

**Disability Services**
**NBME**
**3750 Market Street**
**Philadelphia, PA 19104-3190**
**Telephone: (215) 590-9700**
**Facsimile: (215) 590-9422**
**E-mail: disabilityservices@nbme.org**

**A169**

# EXHIBIT 17

May 9, 2022

Disability Services
National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104

RE:   Fifth Appeal of Robert Sampson for Step 1 exam accommodations

Dear Disability Services:

Thank you for forwarding the additional materials on Mr. Sampson for review.  He is again requesting the accommodations of extended time (double time over 2 days) and additional break time based on diagnoses of Attention Deficit Hyperactivity Disorder Predominantly Inattentive Type, Specific Learning Disorder with Impairment in Reading (Reading Fluency, Word Reading Accuracy, and Spelling), Unspecified Neurodevelopmental Disorder in Visuospatial Memory and Visuospatial Processing, and a new diagnosis of Specific Learning Disorder with Impairment in Written Expression.  Four previous requests for these accommodations have been denied by the NBME.  Mr. Sampson has submitted some new documentation in support of his current request for Reconsideration.  The new documentation included an updated Personal Statement and a new Neuropsychological Evaluation report from Dr. Jeanette Wasserstein and Dr. Kim Miller. I have carefully reviewed all of the new documentation and the voluminous documentation he has previously provided.

In my opinion, the new documentation does not adequately substantiate any of his reported diagnoses, a history or magnitude of chronic and pervasive real world impairment consistent with ADHD/LD, or the existence of a disability and is therefore still insufficient to warrant granting his requested accommodations.  My reasons for this opinion are as follows:

1.   The new report from Dr. Wasserstein and Dr. Miller does not adequately substantiate any of the reported diagnoses with hard evidence of real world functional impairment, in my opinion.  Their ADHD diagnosis was based on self report, symptom endorsement on self-administered ADHD rating scales (CAARS, CAADID), a review of past evaluations and support letters from Mr. Sampson's teachers, parents, and tutors that I reviewed in my previous report, and test scores/statistical discrepancies that are not diagnostic of ADHD or a disabling condition.  Symptom endorsement on self-administered ADHD rating scales is not sufficient to establish an ADHD diagnosis, especially in the absence of any documented or credible evidence of real world functional impairment that would rise to the level of a disability.  Almost all of his test scores in this evaluation were within the Average range or better (and many were in the Above Average to Superior ranges) suggesting no neurological dysfunction.   A Processing Speed Index score of 122 on the WAIS-IV is in the Superior range, is not deficient, is not supportive of slow cognitive speed or a need for extra time, is not diagnostic of ADHD, and is not evidence of impaired functioning.  Continuous Performance Tests (such as the IVA Plus) have not been shown to be

particularly useful in either confirming or disconfirming an ADHD diagnosis due to their high false positive and false negative rates. Low Average or below Average scores at one snapshot in time on Trails B, the Stroop Interference subtest, the Rey, and the Nelson Denny Reading Test are not diagnostic of ADHD or LD and is not evidence of impaired functioning. The fact that Mr. Sampson performed better on the Nelson Denny when given "unlimited time" is not unusual and is not diagnostic of ADHD, LD, or a disability.

2.  Dr. Wasserstein and Dr. Miller seem to be making the argument that test scores that are "only Average" in the context of an overall Superior Verbal IQ is evidence of impaired functioning and a disability. They are not. More specifically, they indicated that his PSAT Reading score was "only at the 52nd percentile", his ACT Reading scores were "relatively weaker" than his other scores falling in the Average range between the 69th to 79th percentiles, and that his SAT Critical Reading score was "only Average" (74th percentile) while his other scores were Superior. Relative weaknesses that still fall within the Average range are not diagnostic of ADHD or LD and are not evidence of impaired functioning. Low Average or Below Average scores on the Rey, Trails B, Picture Recognition, and Stroop Interference at one snapshot in time is also not diagnostic of ADHD or evidence of a disability. Dr. Wasserstein also stated Mr. Sampson's nonverbal reasoning ability (Perceptual Reasoning Index on the WAIS-IV) *albeit in the High Average range* was significantly weaker than other cognitive domains. She then says that by virtue of his *High Average* Perceptual Reasoning Index score that he therefore has a "metaphorical limp between his various thinking skills, the extent of which creates significant handicaps on tasks that rely on perceptual reasoning and working memory, such as reading comprehension". She further states that "such variability in scores (from the lower end of Average to Very Superior) indicates disruption in underlying neurocognitive abilities, even with normal range scores". I respectfully disagree with these statements. Average or High Average scores in the context of a Superior Verbal IQ are not reflective of significant handicaps and are not evidence of impaired functioning or a disability.

3.  Dr. Wasserstein also does not seem to acknowledge that the metric that is relevant here with respect to the ADA is the Average Person Standard. The argument that Mr. Sampson's "only Average" scores represent a significant impairment flies in the face of the Average Person Standard. This is a major theme in this new documentation and trying to make the argument that he is impaired because he is "only Average" in some areas while Superior in most is not persuasive or accurate. Further, his WIAT Written Expression scores were almost all in the Superior range, his WIAT Spelling score was at the 63rd percentile (which is not consistent with what Dr. Wasserstein and Dr. Miller called "poor spelling"), the fact that he was "commended" by his professors for his great write ups of clinical cases, and the fact that he has no history of developmentally deviant problems with written expression are all inconsistent with his new diagnosis of Specific Learning Disorder with Impairment in Written Expression. I see no basis to justify this new diagnosis. In addition, the fact that he sought out help with numerous tutors over the years does not necessarily mean he had deficiencies relative to same aged peers. For example, he always had very strong math skills and had Superior Math scores on the SAT, ACT, and the WIAT so why did he need tutoring in Math? Dr. Michels' report indicated he "needed significant tutoring to remain in the highest math classes". This is not evidence of impaired functioning. It was not at all clear to me that he required tutoring in order to remediate something that was deficient as opposed to choosing to pursue tutoring to help optimize his already unimpaired functioning. Further, although Mr. Sampson had WIAT scores in the "Very Superior" range (99th percentile) in Math Problem Solving and in the Superior range (97th percentile) in Numerical Operations, Dr. Wasserstein nevertheless indicated he exhibited "visual misperceptions" and "sometimes misinterpreted "+" as "x" suggesting vulnerable visual

**A172**

processing and/or inattention". Suggesting that someone is impaired by visual misperceptions when they score at the 97th and 99th percentiles is not appropriate and is obviously not evidence of impaired functioning or a disability.

4.     Moreover, Mr. Sampson's statements that everyday tasks are harder for him than others and that he is slower in reading and processing information than others is difficult to quantify, and even if true is not evidence of impaired functioning. Earning a C+ grade in Organic Chemistry and a C- grade in Genetics and Molecular Biology is not unusual and is not evidence of a disability. Failing Shelf Exams in a medical school curriculum is not a symptom of ADHD/LD and is not evidence of a disability. Dr. Wasserstein and Dr. Miller also in my opinion did not adequately rule out other possible alternative explanations for his difficulties in medical school besides ADHD and Learning/neurological disorders. For example, anxiety or having a personal test taking style/preference that is slow, deliberate, or too obsessive are other possibilities that have not been adequately ruled out. Based on the totality of his documentation, consistently high grades and test scores, not seeking or needing any assessments or treatments until his adult life when studying for the MCAT, lack of a history of behavioral/self control problems, and no hard or convincing evidence of real world functional impairment in other non-academic life domains, I just do not see a history that substantiates diagnoses of ADHD or LD, or that shows he meets the ADA's definition of disability.

5.     To provide further justification for my opinion that he does not meet the ADA's definition of disabled, I would like to list a number of facts from Mr. Sampson's history (most of which were described in my previous report dated 11/26/18) that argue against his qualifying as a person with a disability: (a) his difficulties seem largely contiguous with his entrance into the medical school environment (b) he had no history of any early interventions or treatment for any ADHD-like or LD problems (c) he had no documented behavioral problems, was not diagnosed with ADHD until medical school, and had no history of seeking or needing any formal accommodations prior to encountering medical school Shelf exams (d) he scored in the Above Average to Superior ranges on the SAT and ACT on several occasions without accommodations (e) he scored at the 67th and the 73rd percentile on the MCAT on two occasions without accommodations (f) he reportedly earned A's in most of his high school classes which were typically Honors or Advanced Placement classes (g) he reportedly "flourished socially and intellectually" in college at University of Virginia earning a GPA of 3.43 without accommodations (h) he had no history of seeking or needing any mental health treatment prior to medical school (i) he did not appear to have experienced any significant ADHD-like vocational impairment in past work experiences as an EMT or rescue squad volunteer (j) he provided no convincing hard evidence that showed any history of significant ADHD-like impairment in his social, daily adaptive, or executive functioning and (k) the "negative" teacher comments from his early report cards seemed to be few and far between, did not appear to significantly interfere in his progress, and did not appear to have persisted over time or significantly interfere in his adult functioning, in my opinion. In fact, all of the weaknesses I pointed out in my first report are still valid and were not adequately addressed with the new documentation he submitted.

6.     In summary, Mr. Sampson's new documentation fails to build a credible case for the existence of ADHD/LD and fails to show that having ADHD/LD is responsible for his reported difficulties with reading and finishing tests in medical school. His documentation also still fails to adequately show that he has a disability within the meaning of the ADA, in my opinion. The fact that he may benefit from accommodations including extra time is not unusual and is not the issue. Most people would. However, to qualify for a disability under the American's with Disabilities Act, one must have a physical or mental impairment that substantially limits one or more major

4

life activities. He has not shown that he is substantially limited in any major life activity relative to the Average person, in my opinion. Earning essentially all A's and B's throughout his school history and his very strong test scores and overall functional ability is not supportive of a disability, in my opinion. The purpose of accommodations is not to optimize one's test scores, accommodate a personal test taking style/preference that may be slow or deliberate, or to guarantee that one finishes an exam. The fact that he received accommodations in medical school and on Shelf Exams is not a guarantee he will qualify for accommodations on the Step 1 exam. Because there is insufficient evidence of an ADHD/LD diagnosis or disability, I must continue to recommend denial of his requested accommodations.

Sincerely,

_____
Kevin Murphy, Ph.D.

**A174**

# EXHIBIT 18



Highly Confidential

June 1, 2022

Robert D. Sampson
4118 43rd St., Apt 2 B
Sunnyside, NY 11104

RE: USMLE Step 1                         USMLE ID#: 5-385-624-1

Dear Robert D. Sampson:

We have thoroughly reviewed the documentation you provided in support of your request for test accommodations on the United States Medical Licensing Examination (USMLE) Step 1. We conducted an individualized review of your request in accordance with the guidelines set forth in the amended Americans with Disabilities Act (ADA).

You have requested 100% additional test time (double time) and additional break time on the basis of Specific Learning Disorder with impairment in reading (dyslexia), reading fluency, word reading accuracy, spelling, and Unspecified Neurodevelopmental Disorder, visuospatial memory, visuospatial processing diagnosed in 2013; Attention-Deficit/Hyperactivity Disorder, predominantly inattentive (ADHD) diagnosed in 2015; and Specific Learning Disorder with impairment in written expression diagnosed in 2020. You previously submitted initial and reconsideration requests for accommodations for Step 1 on the basis of these disorders and in our June 13, 2017, August 1, 2017, January 12, 2018, March 6, 2018, September 7, 2018, and January 4, 2019 letters addressed to you, we explained that your documentation did not demonstrate a substantial limitation in a major life activity as compared to most people or that the requested accommodations were an appropriate modification of your test administration.

You write in your April 13, 2022 Personal Statement for Accommodations, "*New testing concluded, as had past testing, that I require extended time in order to have access to examinations. Based on this new testing, my medical school which had previously been providing 1.5x, began providing double time for all examinations, including shelf exams…Because the USMLE Step 1 is a vignette based multiple choice exam, this style of exam exacerbates the impacts of both my low reading speed and my slow processing speed forcing me to leave large sections of the exam either unanswered, or guessed on. I need at 2X additional time, hence my request for 2X additional time on the Step 1 exam.*" We note the accommodations your medical school has elected to provide to you. While NBME gives considerable weight to documentation of past and present accommodations, the fact that you have previously received a particular accommodation in other contexts is not, in itself, a sufficient demonstration of your need for accommodations on the USMLE.

Received in support of your current request was an August 2020 report of Neuropsychological Evaluation by Jeanette Wasserstein, Ph.D. and Kim Miller, Ph.D. who write, "*Robert Sampson is a 3rd year medical student at Renaissance School of Medicine at Stony Brook University with a history of having received time accommodations throughout medical school, including on the NBME shelf exams. Mr. Sampson is currently requesting an updated neuropsychological evaluation as part of his appeal to the National Board of Medical Examiners' (NBME) regarding their past decisions to deny him accommodations on the USMLE Step Exams. Mr. Sampson's initial application was denied in June 2017. Thereafter he appealed this decision multiple time and received his 4th denial letter in March 2018…Given his significant reading comprehension difficulties, he meets criteria for a DSM-5 diagnosis of Specific Learning Disorder with impairment in reading (reading fluency*

*and reading comprehension), as well as impairment in written expression (spelling and handwriting). Based on current test results and prior history and diagnosis, Mr. Sampson also meets criteria for Attention Deficit/Hyperactivity Disorder, Combined Presentation."* Your evaluators provide recommendations writing, *"For testing, standardized or in class, extended time is warranted. Currently, double time is strongly advised because of his significantly slowed reading fluency and because he has found even with time and half [sic] he is often not able to finish Step exams."*

We carefully reviewed and considered the information and recommendations presented by your evaluators, as well as the entirety of your submission for accommodations. Regardless of the assigned diagnoses, there is insufficient evidence to support a need for accommodations to access the USMLE. Your most recent 2020 performances on a range of relevant cognitive and academic achievement tasks, including Processing Speed, Working Memory, Logical Memory, Perceptual Reasoning, Executive Functions, Spelling , Essay Composition, Sentence Composition, Sentence Writing Fluency, Word Reading, Pseudoword Decoding, Reading Comprehension, Oral Reading Fluency, Oral Reading Accuracy, Oral Reading Rate, and Sentence Reading Fluency, are all largely within the Average to Superior range of functioning (under timed and untimed conditions) and not indicative of an impairment that substantially limits you in comparison to most people in the general population. While we note your reported below average scores on two select reading related tasks (Reading Rate and Reading Comprehension) on the *Nelson-Denny Reading Test*, these scores are inconsistent with your prior performance on your 2013 evaluation as well as your history of unimpaired performances on real-world high stakes standardized tests taken without accommodations. You report that you did not receive accommodations in any academic setting, up to medical school, or for any standardized testing including the PSAT, SAT, ACT, and MCAT. Taken altogether, your documentation does not demonstrate that standard test timing is a barrier to your access to the USMLE.

Accommodations are intended to ensure that individuals with a documented disability as defined by the Americans with Disabilities Act (ADA) can take the USMLE exams in an accessible place and manner. A diagnostic label, in and of itself, does not establish coverage under the ADA, nor does prior receipt of accommodations for a particular activity guarantee that identical accommodations are indicated or will be available in all future settings and circumstances. The ADA defines disability as a physical or mental impairment that substantially limits a person's ability to perform one or more major life activities, as compared to most people in the general population. Therefore, not every impairment will constitute a disability.

Your documentation does not demonstrate that the requested accommodations are an appropriate modification of your USMLE Step 1 test administration. Therefore, after a thorough review of all of your documentation, I must inform you that we are unable to provide you with the requested accommodations. We will process your USMLE Step 1 exam application without test accommodations at this time. You may inquire at usmlereg@nbme.org or call Applicant Services directly at (215) 590-9700 with any questions about your scheduling permit.

Please monitor the Prometric website at www.prometric.com/corona-virus-update for up-to-date information and test center procedures related to the impact of the coronavirus (COVID-19) pandemic.

Sincerely,

Disability Services

# EXHIBIT 19

| School | Minnesauke |
|--------|------------|
| Teacher | Mrs. Feinberg |

**Dear Parents,**

This report card summarizes information about your child's progress. Individual development levels create unique patterns of growth for children in the primary grades.

**KEY**

M = Most of the time     P = Part of the time

R = Requires extra support     N = Not yet

| PERSONAL GROWTH AND WORK HABITS | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Is considerate of others | M | | | |
| Shares with others | M | | | |
| Listens when others speak | P | | | |
| Follows directions | P | | | |
| Obeys rules | M | | | |
| Works cooperatively | M | | | |
| Demonstrates self control | M | | | |
| Accepts personal responsibility | P | | | |
| Seeks help when needed | M | | | |
| Uses learning materials appropriately | M | | | |
| Accepts suggestions for improvement | P | | | |
| Completes tasks in a reasonable time | P | | | |
| Demonstrates organizational skills | R | | | |
| Demonstrates gross motor coordination | M | | | |
| Demonstrates fine motor coordination | M | | | |

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| activities | M | | | |

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Reading | | | | |
| Writing | | | | |
| Listening | 2 | | | |
| Speaking | 2 | | | |

| MATH | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Participates in activities | M | | | |
| Works well with manipulatives | M | | | |
| Writes and identifies numerals | M | | | |
| Computes addition problems | M | | | |
| Understands and applies concepts | M | | | |
| Uses problem solving strategies | P | | | |
| Computes subtraction problems | | | | |

**3rd Report Comments**

**1st Report Comments**

Robert has made a good adjustment to his new school and our first grade class. He is friendly, cooperative and helpful much of the time. We are presently working on making sure Robert listens to and follows directions the first time they are given. We will also be working on having Robert pay more focused on a task, so he may become more organized.

In reading, Robert enjoys reading books, has a good sight vocabulary and uses a number of strategies to figure out new words. We will be working in having Robert say "blank" and coming back to understand as well as figuring up larger words into smaller ones.

**4th Report Comments**

Parent/Teacher Conference: Date ___ Nov 5, 1997

Parent's Signature

| ATTENDANCE | 1 | 2 |
|---|---|---|
| Absent | 5 | |

A179

: **Robert Sampson**

**Minnesauke Elementary**

**Mrs. Feinberg**

nts,

rt card summarizes information about yo
ress. Individual development levels cre
erns of growth for children in the primary

time    **P = Part of the time**

tra support    **N = Not yet**

| WTH AND WORK HABITS | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| | | M | P | M |
| | | M | M | M |
| s speak | | M | M | M |
| | | P | M | M |
| | | M | M | M |
| / | | M | M | M |
| ontrol | | M | M | M |
| sponsibility | | M | M | M |
| ded | | M | M | M |
| us appropriately | | M | M | M |
| or improvement | | M | M | M |
| asonable time | | P | M | M |
| | | | | |
| | | | | |
| | | | | |

(see explanation of levels on reverse)

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Reading | | 5 | 5 | 5+ |
| Writing | | 5 | 5 | 5 |
| Listening | | 2 | 3 | 3 |
| Speaking | | 2 | 3 | 3 |

| MATH | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Participates in activities | | M | M | M |
| Works well with manipulatives | | M | M | M |
| Writes and identifies numerals | | M | M | M |
| Computes addition problems | | M | M | M |
| Understands and applies concepts | | M | M | M |
| Uses problem solving strategies | | P | M | M |
| Computes subtraction problems | | M | M | M |

**1st Report Comments**



Conference: Date

**and Report Comments**

Robert is usually a **responsible** member of our class who tries to set e **good example** for others. I am happy to see that Robert is **following directions** more readily and is a bit **more organized.** Keep it up, Robert! Next quarter we will continue to work on these important behaviors.

In reading, Robert continues to build upon his good sight vocabulary and use of strategies. Next quarter, we will be working on Robert's fluency and expression when reading aloud,

In math, we have been working with adding, subtracting, fact families, counting by 1's, 5's and 10's to 100, place value, time to the hour, graphing, more and fewer, and money. Next quarter we will be working on having Robert looks at the sign when he is adding and subtracting to improve his accuracy. We will also be working on having Robert write number equations vertically, making sure Robert follows written directions more carefully and having Robert focus on the process and strategies(instead of only the answer).

**3rd Report Comments**

Robert's organizational skills have continued to improve. He also continues to do a good job of following directions more often. Keep it up Robert. Presently, we are working on making sure Robert chooses his words more carefully when he speaks to others, so we don't have hurt feelings.

In reading, Robert continues to grow as a reader. He has developed a strong sight vocabulary and has good phonetic sense. Very good job, Robert! Next quarter, we will continue to work on improving Robert's fluency and expression, building on his knowledge of vowel sounds(long and short)and consonant blends, and building upon Robert's higher level thinking skills.

In math, I am happy to see Robert thinking about the process and strategies of solving problems more often.

**4th Report Comments**

Welcome to the "life long reader's club", Robert! Please make sure you continue to practice your reading and writing over the summer.

In math, this quarter we have worked with fractions, geometry, number families, adding and subtracting above 10 and adding and subtracting two-digit numbers. When doing number equations, Robert must remember to go back and check his answers to improve upon his accuracy .

It has been a pleasure to be Robert's teacher this year! Hav a wonderful summer and please come and visit me in Sept.,

| ATTENDANCE | 1 | 2 | 3 | 4 | TOTAL |
|---|---|---|---|---|---|
| | | | | | |

Three Village School District Pupil Progress Report
September ? - June ? ? ?

Student

School

Teacher

Dear Parents,
This report card highlights information about your child's progress in second grade. Use the reverse side of the report card to interpret the language arts level.

**LANGUAGE ARTS LEVELS**
(See explanation of levels on the reverse side)

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Reading | | | | |
| Writing | | | | |
| Listening | | | | |
| | | | | |

**KEY**

Always — 5
Most of the Time — 4
Part of the Time — 3
With Support — 2
Not Able to do This — 1

**MATH**

| | | | | |
|---|---|---|---|---|
| Participates in activities | | | | |
| Demonstrates accurate recall of basic facts | | | | |
| Computes accurately | | | | |
| Displays an understanding of math concepts | | | | |
| Applies a variety of problem solving strategies | | | | |

**SCIENCE**

| | | | | |
|---|---|---|---|---|
| Participates in activities | | | | |

**LANGUAGE ARTS**

The language arts curriculum is comprised of four areas: reading, writing, listening and speaking. Listed below are the expected behaviors in reading and writing for second graders.

**READING**

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Shows an interest in reading | | | | |
| Reads silently for sustained periods | | | | |
| Applies a variety of strategies | | | | |
| Demonstrates a strong sight vocabulary | | | | |
| Reads aloud with fluency and expression | | | | |
| Summarizes stories/retells | | | | |
| Comprehends grade level reading materials | | | | |

**WRITING**

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Expresses ideas in an organized manner | | | | |
| Uses appropriate vocabulary | | | | |
| Demonstrates sentence variety | | | | |
| Applies knowledge of sentence mechanics | | | | |
| Learns assigned spelling words | | | | |
| Uses correct spelling in writing | | | | |

**SOCIAL STUDIES**

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Participates in activities | | | | |

**ATTENDANCE**

**SOCIAL AND WORK HABITS**

| | 1 | 2 | 3 | 4 | 2nd Report Comments |
|---|---|---|---|---|---|
| Follows oral directions | 3 | 3 | 3 | | |
| Follows written directions | 3 | 3 | 3 | | |
| Uses time wisely | | | | | |
| Works properly | 4 | | 4 | | |
| Listens | | | | | |
| Works cooperatively with peers | | | | | |
| Works cooperatively | | | | | |
| Works independently | | | | | |
| Pays attention | | | | | |
| Stays on task | | | | | |
| Completes classwork | | | | | |
| Shares activities | | | | | |
| Completes homework | | | | | |
| Respects the rights | | | | | |
| Comes prepared | | | | | |

Student Robert Sampson

School Minnesauke

Teacher Diane Eugene

Circle

The language arts curriculum is comprised of four areas: reading, writing, listening, and speaking. Listed below are the expected behaviors for students in grades four and five. For your reference, a more comprehensive list of the language arts achievement levels can be found on the back of the report card.

| Social and Work Habits | | Achievement |
|---|---|---|
| Always | | |
| Most of the Time | 5 | Outstanding |
| Part of the Time | 4 | Very Good |
| With Support | 3 | Satisfactory |
| Not Observed Yet | 2 | Inconsistent |
| | 1 | Unsatisfactory |

| Grading for Special Areas | |
|---|---|
| E | = Excellent |
| VG | = Very Good |
| G | = Good |
| S | = Satisfactory |
| NI | = Needs Improvement |

2nd Repo

## READING

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Reads and understands grade-appropriate material | | | | |
| Reads silently for sustained periods | | 4 | | |
| Selects appropriate books independently | | | | |
| Uses reading strategies to construct meaning | | 4 | | |
| Is developing an awareness of genres and authors | 3 | | | |
| Attempts to acquire, interpret, evaluate, and apply information | 3 | | | |

## RIAL AND WORK HABITS

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| rs organizational skills | | | 4 | |
| ges time constructively | | | 4 | |
| etes homework | | | 4 | |
| e and legible work | | 3 | | |
| n dently | | | | |
| es class activities | | | 4 | |
| written directions | | | 4 | |
| school prepared | | | 4 | |
| peratively | | | 4 | |
| sideration for others | | | 4 | |
| ggestions for improvement | | | 4 | |
| fflicts with peers | | | 4 | |
| nority | | | 4 | |
| erty | | | 4 | |

## WRITING

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Expresses ideas in an organized manner | 3 | | | |
| Expresses ideas coherently | 3 | | | |
| Uses appropriate vocabulary | 3 | | | |
| Demonstrates sentence variety | 3 | | | |
| Applies knowledge of punctuation and capitalization | 3 | | | |
| Spelling | 3 | | | |
| Formal Spelling | 5 | | | |

## SPEAKING AND LISTENING

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Participates in class activities | | | 4 | |
| Expresses ideas clearly | | | 4 | |
| Responds appropriately with class activities | | | 4 | |
| Follows directions | | | 4 | |

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| ately | | | 5 | |
| rstanding of math concepts | | | | |
| of problem solving strategies | | | | |

## SOCIAL STUDIES

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Displays knowledge of content | | | 4 | |
| Demonstrates understanding of concepts | | | 4 | |

RESEARCH

## ART
| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Effort | | | | |
| Achievement | | | | |

## MUSIC
| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Effort | | | | |
| Achievement | | | | |

3rd Report

## HEALTH
| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Effort | | | | |
| Achievement | | | | |

1st Report Comments Robert is a very capable fourth grader. He is inquisitive and well informed. Especially likes math and science activities. Robert is especially pleased about being a math team captain because he is very good at math. He 4th Report enjoyed our trip to the pond and studying pond water under the microscope.

Robert's test averages for this quarter are as follows: reading 83%, math 95%, spelling 87%, social studies 91% and science 95%. He needs to put more written responses because the quality of his work. He should writing on every written assignm

Parent/Teacher



**HEALTH**

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Effort | | | | |
| Achievement | | | | |

**1st Report Comments** Robert is a very capable fourth grader. He is inquisitive and well-informed. He especially likes math and science activities. Robert is especially pleased about being a math team captain because he is very good at math. He enjoyed our trip to the pond and studying pond water under the microscope.

Robert's test averages for this quarter are as follows: reading 83%, math 95%, spelling 97%, social studies 91% and science 95%. He needs to put more effort into written assignments because he needs to improve the quality of his work. He should also use cursive writing on every written assignment.

**4th Report Comments**

**Parent/Teacher Conference Date** 11-13-00

**Parent's Signature**

**ATTENDANCE**

| | 1 | 2 | 3 | 4 | TOTAL |
|---|---|---|---|---|---|
| Absent | 0 | | | | |
| Late | 2 | | | | |

## Robert Sampson

### First Quarter Report

Robert is adjusting to the many responsibilities and organizational aspects associated with being a fifth grade student. He is making new friends and shows interests and displays knowledge in a variety of subject areas.

Robert exhibits academic strength in many areas, and displays this through his participation in all class discussions. His input is valuable and comes from a unique perspective. Although he is always an active participant, he frequently fails to listen to directions the first time, and needs them to be repeated. Robert can also act impulsively on occasions, drawing attention to himself in ways that are not positive.

Among the areas to work on this year are his organizational skills and his writing skills. Robert often generates a product that is hard to decipher, because of his handwriting and the lack in organization. In the upcoming months, we will be focusing on these topics, as well as his behavior. Robert has the potential to be an outstanding student, and I feel confident he will accomplish these goals this year.

### Second Quarter Report

Robert is showing improvement in many areas. He is becoming more organized in the classroom and now keeps an immaculate desk. He continues to participate in all discussions and is beginning to use his listening skills to his advantage. The frequency of his appropriate behaviors has increased and I feel that these improvements will continue.

Robert has also tried to improve his handwriting and in most cases it is more legible than on previous occasions. Although Robert's handwriting is improving he still needs to organize how he writes more effectively. His writing at times lacks organization which makes it difficult for him to understand what he has written. As Robert learns more note-taking and summarizing skills, he will learn to use methods to help him document information and his own thoughts more effectively. This will be an area of focus for Robert in the upcoming months. I am pleased with Robert's progress and I look forward to seeing how these improvements will enable him to demonstrate his true potential.

### Third Quarter Report

Robert continues to excel in many academic areas, especially in mathematics. I am pleased with his desire to complete extra work. He has a particular talent for the study of fractions. Robert's writing is consistently improving as he is taking his time and organizing his thoughts before he begins a draft.

I would like for Robert to continue developing his listening skills. He appears at times to be confused with directions or questions that are presented during class. This will allow him to interact more effectively with his classmates. I predict these

**A184**

improvements would allow him to feel more confident in his social interactions with peers.

## Fourth Quarter Report

I am pleased by Robert's progress this year, both academically and socially. He has demonstrated a commitment to improving his academic performance and has developed better work habits and organizational skills. I encourage Robert to continue concentrating on his organizational skills as they are necessary for his future academic success.



cial Areas

vment

**2nd Report Comments**

Robert is an intelligent sixth grader. H
during class instruction, collaborative per
group discussions. His reasoning ability ..
..ledge enable him to interact with under
...ce. However, he is less self assured and product
...cendent work periods. He consistently seeks
... before self-initiating a task or asking for peer
...ly distracted and often does not begin
...have to encourage Robert to
...in attentive behavior. He is
...handling writing assignments
Robert is good-nature and
his outstanding computer

his work
following
demonstrating inde...
at the Computer lab.
helpfulness. He is com

VG
VG

...bert's lowered grades in Social Studies and
Language Arts are a result of his incompletion of
required assignments particularly the Greek Study
Review packet and his memoir book, Through the
Grades. His distractions during work time at the
Technology Center have interfered with his
performance and completion of his work. I believe it
would be in Robert's best interest if he planned his
work schedule, utilized his time productively and
avoided peer interruptions. I look forward to hearing of
Robert's future achievements.

in all subject
weekly tests
assignments

2  3  4

# EXHIBIT 20

Telephone (516) 474-7590
FAX: (516) 474-7591



**MINNESAUKE ELEMENTARY SCHOOL**

21 High Gate Drive
East Setauket, New York 11733-1876

**WRITER'S DIRECT DIAL NUMBER**

**DEBORAH L. BLAIR**
*Principal*

1112093      5-385-624-1
Minnesauke Elementary Sch

**THOMAS ELIAS SUGAR**
*Assistant Principal*

May 28, 1999

Dear Parents:

Please find below your second graders' OLSAT(Otis-Lennon Ability Test) results. These are normally attached to the CAT(California Achievement Test) results but are presented here for your information.  We apologize for any confusion that this omission may have caused.

**OTIS-LENNON SCHOOL ABILITY TEST, Seventh Edition**

Sincerely,

*Thomas Elias Sugar*

Thomas Elias Sugar
Assistant Principal

| SAMPSON, ROBERT D GRADE: 02 GENDER: M AGE: 7 YRS 10 MOS STUDENT NO: 0009301207 | | TOTAL | VERBAL | NON-VERBAL |
|---|---|---|---|---|
| 1995 NORMS MIDYEAR NATIONAL | RS/NP | 37/60 | 25/30 | 12/30 |
| | SAI | 104 | 124 | 88 |
| LEVEL/FORM: C/3 | AGE NCE | 55.3 | 81.1 | 34.4 |
| TEST DATE: 01/99    NAT'L GRADE NCE | | 55.9 | 79.6 | 33.7 |

## INTERPRETING YOUR CHILD'S TEST SCORES:

The Otis-Lennon School Ability Test (OLSAT) is designed to measure abstract thinking and reasoning ability.  It is used to assess examinee's ability to cope with learning tasks to suggest their possible placement for school learning functions and to evaluate their achievement in relation to the talents they bring to school learning situations.

Raw Score (RS)   -   The number of questions the student answered correctly. Interpret only in relation to the set of questions from which the score was obtained.

Number of Problems - Total number of questions asked.
(NP)

School Ability Index -   An index of the student's ability in comparison with students of similar
(SAI)   chronological age.  Range is 50-150.

Age or Grade   -   A direct conversion from percentiles rank, this type of standard score results
Normal Curve   from the division of the normal curve into 99 equal units.
Equivalent (NCE)

RECEIVED

APR 0 3 2017

Disability Services

RECEIVED
Disability Services

## Scope and Sequence

| Cluster/Item Type | A (Kindergarten) | B (Grade 1) | C (Grade 2) | D (Grade 3) | E (Grades 4-5) | F (Grades 6-8) | G (Grades 9-12) |
|---|---|---|---|---|---|---|---|
| | | | | TEST LEVEL | | | |
| **VERBAL** | | | | | | | |
| **Verbal Comprehension** | | | | | | | |
| Following Directions | ● | ● | ● | | | | |
| Antonyms | | | | ● | ● | ● | ● |
| Sentence Completion | | | | ● | ● | ● | ● |
| Sentence Arrangement | | | | ● | ● | ● | ● |
| **Verbal Reasoning** | | | | | | | |
| Aural Reasoning | ● | ● | ● | | | | |
| Arithmetic Reasoning | ● | ● | ● | ● | ● | ● | ● |
| Logical Selection | | | | ● | ● | ● | ● |
| Word/Letter Matrix | | | | ● | ● | ● | ● |
| Verbal Analogies | | | | ● | ● | ● | ● |
| Verbal Classification | | | | ● | ● | ● | ● |
| Inference | | | | ● | ● | ● | ● |
| **NONVERBAL** | | | | | | | |
| **Pictorial Reasoning** | | | | | | | |
| Picture Classification | ● | ● | ● | | | | |
| Picture Analogies | ● | ● | ● | | | | |
| Picture Series | ● | | | | | | |
| **Figural Reasoning** | | | | | | | |
| Figural Classification | ● | ● | ● | ● | | | |
| Figural Analogies | ● | ● | ● | ● | ● | ● | ● |
| Pattern Matrix | ● | ● | ● | ● | ● | ● | ● |
| Figural Series | ● | ● | ● | ● | | | |
| **Quantitative Reasoning** | | | | | | | |
| Number Series | | | | ● | ● | ● | ● |
| Numeric Inference | | | | ● | ● | ● | ● |
| Number Matrix | | | | ● | ● | ● | ● |

# EXHIBIT 21

Case 23-3, Document 34, 01/27/2023, 3460360, Page203 of 278

 **CollegeBoard** SAT

# STUDENT SCORE REPORT
### REPORT DATE: 5/21/05

## YOUR SCORES

**Test Date:**   **MAY 2005**

| SAT | Score | Score Range | Percentiles College-bound Seniors National | State |
|-----|-------|-------------|------------|-------|
| Critical Reading | 410 | 380-440 | 18 | 21 |
| Math | 500 | 470-530 | 43 | 45 |
| Writing | 490 | 450-530 | * | * |
| Multiple Choice | 47 | | | |
| Essay | 08 | | | |

**Seq#**       0335305

ROBERT D SAMPSON
11 WHITFORD ROAD
STONY BROOK NY 11790

**WHAT DOES YOUR SCORE RANGE MEAN?**
Your performance is best represented by the score ranges above. To consider one score better than another, there must be a difference of 60 points between your critical reading and math scores, 80 points between your critical reading and writing scores, and 80 points between your math and writing scores.

**HOW DO YOU COMPARE WITH COLLEGE-BOUND SENIORS?**
The national percentile for your critical reading score of 410 is 18, indicating that you did better than 18% of the national group of college-bound seniors. The national percentile for your math score of 500 is 43, indicating you did better than 43% of the national group of college-bound seniors. *

*\* Percentile, average score, and score change information for the writing section are not available. The test must be given to students for a full year before this information can be provided.*

See reverse side for additional score details.

**WHAT ARE THE AVERAGE SCORES?**
For college-bound seniors in the class of 2004, the average critical reading score was 508 and the average math score was 518. *

**WILL YOUR SCORES CHANGE IF YOU TAKE THE TEST AGAIN?**
Among students with critical reading scores of 410, 64% score higher on a second testing, 28% score lower, and 8% receive the same score. On average, a person with a critical reading score of 410 gains 20 point(s) on a second testing.

Among students with math scores of 500, 59% score higher on a second testing, 32% score lower, and 9% receive the same score. On average, a person with a math score of 500 gains 15 point(s) on a second testing. *

**ADDITIONAL SCORE INFORMATION**
Visit **www.collegeboard.com** for detailed information about your scores and to view your essay.

**ADDITIONAL SCORE REPORT INFORMATION**
To learn more about colleges, universities, and scholarship programs and to send additional score reports, visit **www.collegeboard.com**.

**A192**

# EXHIBIT 22

Case 23-3, Document 34, 01/27/2023, 3460890, Page116 of 278



**Name:** SAMPSON, ROBERT D    **Year:** 2007   **Grade:** 11   **School Code:** 331740   **Optional Code:**    **School Copy**   D56570035S

## Your Scores

| Critical Reading | Mathematics | Writing Skills | PSAT/NMSQT |
|---|---|---|---|
| 48 | 59 | 59 | National Merit Scholarship Corporation (NMSC) Programs |

Scores within these ranges can be considered similar to yours:

**Ranges**
20 — 44 52 — 80 20 — 55 63 — 80 20 — 55 63 — 80

**Selection Index** 166

**Percentiles**
You scored higher than **52%** of juniors.   You scored higher than **80%** of juniors.   You scored higher than **86%** of juniors.

**Percentile** compares your performance with college-bound juniors **78**

High school students: Get a personalized SAT study plan at www.collegeboard.com/quickstart.
- Check your projected SAT scores online. Did you know you can add a "0" to the end of each PSAT/NMSQT score to find the equivalent SAT score?
- See how your performance compares to that of students in your state. Did you know two-thirds of U.S. students begin college in their home state?

D56570035S

The Selection Index (S.I.) is the sum of your critical reading, mathematics, and writing skills scores. NMSC uses the S.I. as an initial screen of over 1.4 million students who enter its scholarship programs (see reverse).

### Review Your Answers

Ask for your test book back so you can see the questions.

**Key**
✓ Correct
o Omitted
u Unscorable
e Easy
m Medium
h Hard

Alg Algebra & Functions
Data Data Analysis, Statistics & Probability
Geom Geometry & Measurement
Num Number & Operations

**SECTION 1**

**Sentence Completions**

| Question | Correct Answer | Your Answer | Difficulty |
|---|---|---|---|
| 1 | D | ✓ | e |
| 2 | E | ✓ | e |
| 3 | A | ✓ | e |
| 4 | E | ✓ | h |
| 5 | D | E | h |
| 6 | E | B | h |
| 7 | E | B | h |
| 8 | B | A | h |

**Passage-Based Reading**

| 9 | A | ✓ | e |
| 10 | B | D | h |
| 11 | B | ✓ | m |
| 12 | C | ✓ | e |
| 13 | A | D | m |
| 14 | E | ✓ | m |
| 15 | E | ✓ | h |
| 16 | E | ✓ | m |
| 17 | D | ✓ | h |
| 18 | B | ✓ | m |
| 19 | B | ✓ | m |
| 20 | C | o | m |
| 21 | E | o | m |
| 22 | E | ✓ | e |
| 23 | E | ✓ | h |
| 24 | E | E | m |

**Sentence Completions**

| 25 | A | ✓ | e |
| 26 | A | ✓ | e |
| 27 | B | ✓ | m |
| 28 | C | ✓ | h |

**Passage-Based Reading**

| 29 | A | ✓ | e |
| 30 | E | ✓ | m |
| 31 | D | A | m |
| 32 | D | ✓ | m |
| 33 | A | ✓ | m |
| 34 | E | ✓ | h |
| 35 | D | C | h |
| 36 | E | ✓ | m |

**SECTION 2**

**Multiple-Choice**

| Question | Correct Answer | Your Answer | Difficulty | Content |
|---|---|---|---|---|
| 1 | A | ✓ | e | Num |
| 2 | E | ✓ | e | Alg |
| 3 | A | ✓ | e | Num |
| 4 | C | ✓ | e | Num |
| 5 | A | E | m | Alg |
| 6 | E | ✓ | e | Geom |
| 7 | C | ✓ | m | Num |
| 8 | A | ✓ | m | Alg |
| 9 | E | ✓ | m | Geom |
| 10 | A | ✓ | m | Alg |
| 11 | D | ✓ | m | Geom |
| 12 | D | o | m | Data |
| 13 | A | ✓ | m | Data |
| 14 | A | ✓ | m | Alg |
| 15 | C | ✓ | m | Alg |
| 16 | E | ✓ | h | Geom |
| 17 | D | ✓ | h | Geom |
| 18 | B | ✓ | h | Num |
| 19 | B | o | h | Alg |
| 20 | B | A | h | Alg |

**Multiple-Choice**

| 21 | E | ✓ | e | Alg |
| 22 | A | ✓ | e | Data |
| 23 | A | ✓ | e | Data |
| 24 | C | ✓ | m | Geom |
| 25 | D | ✓ | m | Num |
| 26 | B | ✓ | m | Num |
| 27 | C | o | m | Alg |
| 28 | A | D | h | Num |

**SECTION 4**

**Student-Produced Responses**

| Question | Correct Answer(s) | Your Answer | Difficulty | Content |
|---|---|---|---|---|
| 29 | 1010 | | ✓ | e | Num |
| 30 | 800 | | | m | Alg |
| 31 | 98 | | | | Geom |

**SECTION 5**

**Improving Sentences**

| Question | Correct Answer | Your Answer | Difficulty |
|---|---|---|---|
| 1 | B | ✓ | e |
| 2 | C | ✓ | e |
| 3 | E | ✓ | e |
| 4 | C | ✓ | e |
| 5 | E | ✓ | e |
| 6 | E | ✓ | e |
| 7 | B | ✓ | m |
| 8 | E | ✓ | m |
| 9 | E | ✓ | m |
| 10 | A | B | m |
| 11 | A | ✓ | m |
| 12 | E | ✓ | m |
| 13 | B | ✓ | m |
| 14 | C | ✓ | m |
| 15 | C | ✓ | m |
| 16 | C | A | m |
| 17 | C | A | m |
| 18 | C | ✓ | m |
| 19 | E | ✓ | h |
| 20 | A | B | h |

**Identifying Sentence Errors**

| 21 | † See note below | | |
| 22 | B | ✓ | m |
| 23 | C | ✓ | m |
| 24 | A | ✓ | m |
| 25 | B | ✓ | m |
| 26 | C | ✓ | m |
| 27 | D | ✓ | e |
| 28 | C | E | m |
| 29 | C | ✓ | m |
| 30 | D | ✓ | m |
| 31 | E | D | m |
| 32 | C | ✓ | h |
| 33 | C | ✓ | h |
| 34 | D | ✓ | h |
| 35 | B | o | e |
| 36 | D | o | e |

**Improving Paragraphs**

RECEIVED APR 03 2017 Disability Service

**Entry Requirements**
Below is information you provided on your answer sheet.

Full-time high school student: **YES**

Year to complete high school and enroll full time in college: **2008**

Years to be spent in grades 9–12: **4**

U.S. citizenship: **YES**

If your Selection Index places you among the 55,000 high scorers who qualify for program recognition, you will be notified next September.

**Your Educational Plans**

Grade Average   **A**
College Major   **No Response**

A194

# EXHIBIT 23

Case 23-3, Document 34, 01/27/2023, 3460360, Page207 of 278

000006475

ROBERT D SAMPSON
11 WHITFORD RD
STONY BROOK NY   11790-1835

Detach upper portion at dashed line after
receipt and discard.

N7239004-000006475

# The ACT ® Plus Writing
## Student Report

| | |
|---|---|
| **STUDENT'S NAME:** ROBERT D SAMPSON | **ACT ID:** -14670034 |
| **HIGH SCHOOL NAME:** YOU REQUESTED NO REPORT TO HS | **SSN:** XXX-XX-4331 |
| **HIGH SCHOOL CODE:** 331-740 | **TEST DATE & TYPE:** JUN 2008 NATIONAL |



## Your ACT Scores

Rank: Approximate percent of ACT-tested students at or below your score

| | | In Your State | In the U.S. |
|---|---|---|---|
| **Composite Score** | **27** | 84% | 89% |
| **ENGLISH** | 28 | | 90% |
| Usage/Mechanics | 15 | | 90% |
| Rhetorical Skills | 14 | | 88% |
| **MATHEMATICS** | 32 | | 98% |
| Pre-Algebra/Elem. Algebra | 17 | | 97% |
| Algebra/Coord. Geometry | 15 | | 96% |
| Plane Geometry/Trig. | 16 | | 98% |
| **READING** | 25 | | 74% |
| Social Studies/Sciences | 12 | | 69% |
| Arts/Literature | 14 | | 79% |
| **SCIENCE** | 23 | | 73% |
| **COMBINED ENGLISH/WRITING** | 27 | | 86% |
| Writing (score range 2 to 12) | 09 | | 89% |

- ACT® test scores and the Composite score range from 1 to 36; subscores range from 1 to 18.

- Your Composite score is the average of your scores on the four subject area tests. Subscores do not necessarily add up to your score for a subject area test.

- Your ranks tell you the approximate percentages of recent high school graduates in the U.S. and your state who took the ACT and received scores that are the same as or lower than yours. A rank of 70, for example, means that 70% of students received scores that are the same as or lower than your score.

- Your test scores are only estimates, not precise measures, of your educational development. You will find more information about interpreting your scores in the booklet you received with this report and at www.actstudent.org.

The Combined English/Writing score ranges from 1 to 36 and is a combined measure of the Writing and English tests. The Writing score ranges from 2 to 12. Your ranks for these two scores are based on recent ACT-tested students who took the Writing test.

COMMENTS ON YOUR ESSAY: YOUR ESSAY SHOWED RECOGNITION OF THE COMPLEXITY OF THE ISSUE BY PARTIALLY EVALUATING ITS IMPLICATIONS.  GENERAL STATEMENTS IN YOUR ESSAY WERE WELL SUPPORTED WITH SPECIFIC REASONS, EXAMPLES AND DETAILS.



Looking for more
information about your
individual strengths and

A196

RECEIVED
APR 03 /04/
Disability Services

1112091
ACT-Test Scores (MCAT, GR
5-385-624-1

# EXHIBIT 24

Case 23-3, Document 34, 01/27/2023, 3460360, Page209 of 278

**CollegeBoard** SAT

www.collegeboard.com

## STUDENT SCORE REPORT
### REPORT DATE: 6/24/08

## YOUR SCORES

**Test Date:**   **JUNE 2008**

| SAT | Score | Score Range | Percentiles College-bound Seniors National | State |
|---|---|---|---|---|
| Critical Reading | 580 | 550-610 | 74 | 77 |
| Math | 680 | 650-710 | 91 | 92 |
| Writing | 670 | 630-710 | 93 | 93 |
| Multiple Choice | 66 | | | |
| Essay | 09 | | | |

**Seq#**      0410417  OT

ROBERT D SAMPSON
11 WHITFORD RD
STONY BROOK NY 11790

**WHAT DOES YOUR SCORE RANGE MEAN?**
Your performance is best represented by the score ranges above instead of one single score. The score range is an estimate of how your scores might vary if you were tested at different times within a short time period. Most of the time, your score would vary slightly within your score range, but it would likely fall within the range given. Colleges know this, and they receive the score ranges along with the scores.

**HOW DO YOU COMPARE WITH COLLEGE-BOUND SENIORS?**
Percentiles compare your scores to those of other students who took the test. The percentile for your critical reading score of 580 is 74 , indicating that you scored higher than 74 % of last year's group of college-bound seniors. The percentile for your math score of 680 is 91 , indicating you scored higher than  91 % of last year's group of college-bound seniors. The percentile for your writing score of 670 is 93 , indicating you scored higher than  93 % of last year's group of college-bound seniors.

**WHAT ARE THE AVERAGE SCORES?**
For college-bound seniors in the class of 2007, the average critical reading score was 502, the average math score was 515, and the average writing score was 494.

**WILL YOUR SCORES CHANGE IF YOU TAKE THE TEST AGAIN?**
Among students with critical reading scores of 580, 52% score higher on a second testing, 39% score lower, and 9% receive the same score. On average, a person with a critical reading score of 580 gains  8 point(s) on a second testing.

Among students with math scores of 680, 43% score higher on a second testing, 48% score lower, and 9% receive the same score. On average, a person with a math score of 680 loses  2 point(s) on a second testing.

Among students with writing scores of 670, 41% score higher on a second testing, 52% score lower, and 7% receive the same score. On average, a person with a writing score of 670 loses  7 point(s) on a second testing.

*Register now for next year via our website at www.collegeb*

1112090
SAT-Test Scores (NCRT, GR
5-385-624-1

**MORE SCORE INFORMATION**
Visit **www.collegeboard.com** for detailed information about your scores and to view your essay.

**SENDING ADDITIONAL SCORE REPORTS**
To send more score reports to colleges, universities, and other institutions, visit **www.collegeboard.com**.

**A198**

# EXHIBIT 25

Case 23-3, Document 34, 01/27/2023, 3460360, Page211 of 278


**CollegeBoard** SAT

**STUDENT SCORE REPORT**
REPORT DATE: 11/07/08

## YOUR SCORES

**Test Date:** OCTOBER 2008

| SAT | Score | Score Range | Percentiles Nationally | Percentiles State |
|---|---|---|---|---|
| Critical Reading | 620 | 590-650 | 84 | 86 |
| Math | 680 | 650-710 | 91 | 92 |
| Writing | 660 | 620-700 | 92 | 92 |
| Multiple Choice | 64 | | | |
| Essay | 10 | | | |

SEQ#   0001615   TR

ROBERT D SAMPSON
11 WHITFORD RD
STONY BROOK NY 11790

**WHAT DOES YOUR SCORE RANGE MEAN?**
Your performance is best represented by the score ranges above instead of one single score. The score range is an estimate of how your scores might vary if you were tested at different times within a short time period. Most of the time, your score would vary slightly within your score range, but it would likely fall within the range given. Colleges know this, and they receive the score ranges along with your scores.

**HOW DO YOU COMPARE WITH COLLEGE-BOUND SENIORS?**
Percentiles compare your scores to those of other students who took the test. The percentile for your critical reading score of 620 is 84 , indicating that you scored higher than 84 % of last year's group of college-bound seniors. The percentile for your math score of 680 is 91 , indicating you scored higher than 91 % of last year's group of college-bound seniors. The percentile for your writing score of 660 is 92 , indicating you scored higher than 92 % of last year's group of college-bound seniors.

**WHAT ARE THE AVERAGE SCORES?**
For college-bound seniors in the class of 2008, the average critical reading score was 502, the average math score was 515, and the average writing score was 494.

**WILL YOUR SCORES CHANGE IF YOU TAKE THE TEST AGAIN?**
Among students with critical reading scores of 620, 53% score higher on a second testing, 38% score lower, and 9% receive the same score. On average, a person with a critical reading score of 620 gains 10 point(s) on a second testing.

Among students with math scores of 680, 44% score higher on a second testing, 47% score lower, and 9% receive the same score.

Among students with writing scores of 660, 42% score higher on a second testing, 50% score lower, and 7% receive the same score. On average, a person with a writing score of 660 loses 4 point(s) on a second testing.

**MORE SCORE INFORMATION**
Visit **www.collegeboard.com** for detailed information about your scores and to view your essay.

**SENDING ADDITIONAL SCORE REPORTS**
To send more score reports to colleges, universities, and other institutions, visit **www.collegeboard.com**.

Visit **www.collegeboard.com** or refer to the *SAT Program Hand*

**A200**

# EXHIBIT 26

Case 23-3, Document 34, 01/27/2023, 3460360, Page213 of 278


# CollegeBoard SAT

## STUDENT SCORE REPORT
### REPORT DATE: 11/18/08

### YOUR SCORES

**Test Date:** NOVEMBER 2008

| SAT | Your Score | Score Range | Percentiles College-Bound Seniors National | State |
|---|---|---|---|---|
| Critical Reading | 680 | 650-710 | 93 | 94 |
| Math | 720 | 690-750 | 96 | 97 |
| Writing | 680 | 640-720 | 94 | 94 |
| Multiple Choice | 64 | | | |
| Essay | 10 | | | |

SEQ#    0230361    OT

ROBERT D SAMPSON
11 WHITFORD RD
STONY BROOK NY 11790

## WHAT DOES YOUR SCORE RANGE MEAN?
Your performance is best represented by the score ranges above instead of one single score. The score range is an estimate of how your scores might vary if you were tested at different times within a short time period. Most of the time, your score would vary slightly within your score range, but it would likely fall within the range given. Colleges know this, and they receive the score ranges along with your scores.

## HOW DO YOU COMPARE WITH COLLEGE-BOUND SENIORS?
Percentiles compare your scores to those of other students who took the test. The percentile for your critical reading score of 680 is 93, indicating that you scored higher than 93% of last year's group of college-bound seniors. The percentile for your math score of 720 is 96, indicating you scored higher than 96% of last year's group of college-bound seniors. The percentile for your writing score of 680 is 94, indicating you scored higher than 94% of last year's group of college-bound seniors.

## WHAT ARE THE AVERAGE SCORES?
For college-bound seniors in the class of 2008, the average critical reading score was 502, the average math score was 515, and the average writing score was 494.

## WILL YOUR SCORES CHANGE IF YOU TAKE THE TEST AGAIN?
Among students with critical reading scores of 680, 47% score higher on a second testing, 45% score lower, and 8% receive the same score. On average, a person with a critical reading score of 680 gains   2 point(s) on a second testing.

Among students with math scores of 720, 41% score higher on a second testing, 51% score lower, and 8% receive the same score. On average, a person with a math score of 720 loses   6 point(s) on a second testing.

Among students with writing scores of 680, 40% score higher on a second testing, 54% score lower, and 7% receive the same score. On average, a person with a writing score of 680 loses   9 point(s) on a second testing.

## MORE SCORE INFORMATION
Visit **www.collegeboard.com** for detailed information about your scores and to view your essay.

## SENDING ADDITIONAL SCORE REPORTS
To send more score reports to colleges, universities, and other institutions, visit **www.collegeboard.com**.

**SUMMARY OF SCORES**

Visit **www.collegeboard.com** or refer to the *SAT Program Handb*

**A202**

# EXHIBIT 27

5-385-624-1
Accomodatio
MCAT-Testing
1112089
Page215 of 278

RECEIVED
APR 0 3
Disability Services

Case 23-3, Document 34, 01/27/2023, 3460360, Page215 of 278

# MCAT Score Report

**Name** ROBERT DREW SAMPSON
**Verification Code** JR2H-TP4U-KD8R-AGCT

**AAMC ID** 13629947
**Date of Birth** ▮▮▮▮▮

**URL \*** https://apps.aamc.org/score-reporting-web/#/report/verify
*\* This report will no longer be able to be verified after 06/27/2017*

In order to verify these scores, you will be directed to create a user name and password. When visiting this page, select "Register for an AAMC Account" to begin this process.

## MCAT Scores

### For exams taken after January 31, 2015

No Scores Available

## MCAT Scores

### For exams taken before January 31, 2015

| | MCAT Total | | | Physical Sciences | | Verbal Reasoning | | Writing Sample | | Biological Sciences | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Exam Date | Total Score | Confidence Band [1] | Percentile Rank of Score [2] | Score | Percentile Rank of Score [2] | Score | Percentile Rank of Score [2] | Score | Percentile Rank of Score [2] | Score | Percentile Rank of Score [2] |
| 09/18/2014 | 29 | 27 to 31 | 73% | 10 | 79% | 09 | 67% | | | 10 | 76% |
| 08/16/2013 | 28 | 26 to 30 | 67% | 09 | 67% | 10 | 84% | | | 09 | 56% |

## Notes

[1] Test scores, just like measurements, are not exact values. The confidence bands that are shown for the total score account for the variance associated with actual scores (precision) relative to observed confidence bands for each section score, subtract two points from the section score or add two to the section score. In the case of the Writing section, subtract one letter.



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROBERT SAMPSON,           ) <br>         ) <br>    Plaintiff,     ) <br>         ) <br>    v.        ) <br>         ) <br> NATIONAL BOARD OF MEDICAL  ) <br> EXAMINERS,     ) <br>         ) <br>    Defendant.    ) <br>         ) | Civil Action No. 2:22-CV-05120-JMA-AYS |

**DECLARATION OF BENJAMIN J. LOVETT, PH.D.**

I, Benjamin J. Lovett, declare as follows:

1.     I am over 18 years of age and, unless otherwise stated, this declaration is based on my personal knowledge.

2.     I am a licensed psychologist in New York State and the director of the Ph.D. program in school psychology at Teachers College, Columbia University, where I serve as an Associate Professor of Psychology and Education. I teach courses on psychological assessment and on the legal and ethical framework for school psychology practice. A true and correct copy of my curriculum vitae is attached at Exhibit 1.

3.     I earned my B.A. in Psychology from the Pennsylvania State University, followed by an M.S. in Psychology and a Ph.D. in School Psychology from Syracuse University.

4.     My professional expertise is in the diagnosis and management of neurodevelopmental conditions, particularly learning disorders (LD) and Attention Deficit/ Hyperactivity Disorder (ADHD), and I regularly write and speak on these topics. As part of my work, I assess young adults who have diagnoses of learning and attention problems, and I measure

**A205**

both their self-reported symptoms and their objective performance on various tests of cognitive, academic, and behavioral functioning.

5. In my courses on psychological assessment, I train graduate students to use evidence-based techniques to diagnose LD, ADHD, and related disorders. I also supervise students on assessment cases in our on-campus clinic, advising them on cases that address these disorders.

6. Much of my research involves testing accommodations for students with disabilities, and in 2015, the American Psychological Association published a book that I co-authored on that topic, Testing Accommodations for Students with Disabilities: Research-Based Practice. I have published two other books as well as over 100 papers on disability diagnosis, testing accommodations, and other topics in psychology and education.

7. In addition to my teaching and research responsibilities, I have served as an independent reviewer for numerous organizations that administer or rely upon standardized tests, including the New York State Board of Law Examiners, the National Board of Medical Examiners (NBME), and the National Board of Osteopathic Medical Examiners (NBOME).

8. I was asked by NBME to review Robert Sampson's request for extended time testing accommodations on Step 1 of the USMLE in April 2017 (at that time, he had requested 50% additional time). I also reviewed Mr. Sampson's requests for reconsideration submitted in June 2017, November 2017, and June 2018 (again seeking 50% additional time on Step 1), and the supplemental documentation that was submitted with those requests. True and correct copies of my evaluation reports dated April 25, 2017, July 16, 2017, December 18, 2017, and July 12, 2018, are attached at Exhibits 2, 3, 4, and 5, respectively. The documents that I reviewed are listed on the first page of each report. I have reviewed these reports and reaffirm my conclusions in each report.

9.     It is my understanding that Mr. Sampson sent additional requests for accommodations to NBME following my July 2018 review. I have reviewed these later requests, including the following additional material:

      a.   A new application and personal statement from August 2018

      b.   A denial letter dated September 7, 2018

      c.   A November 14, 2018 letter from Ms. JoAnne Simon, Mr. Sampson's attorney

      d.   A denial letter dated January 4, 2019

      e.   A new application and personal statement from April 2022

      f.   The report from a 2020 neuropsychological evaluation

      g.   A denial letter dated June 1, 2022

10.     I have also reviewed the Declaration of Robert Sampson and the Declaration of Jeannette Wasserstein, Ph.D., ABPP, along with the attachments to each declaration, which I understand were filed in this case.

11.     Based on my review of this material, it is my opinion that there is insufficient evidence that Mr. Sampson has any disabling conditions or is substantially limited in any major life activities relevant to taking the USMLE Step 1 exam. The documentation shows that Mr. Sampson's "test access" skills—that is, his skills that are needed to access tests under standard conditions—are not substantially limited relative to most people in the general population, and extra time or other modifications to the standard test administration are not warranted in this case.

**Diagnostic Evaluations**

12.     Psychological evaluations for learning and attention problems typically consist of a battery of formal psychological tests as well as a review of historical documents (e.g., childhood records such as report cards and medical clinic notes), interviews, completion of questionnaires

and rating scales, and clinical observations. Frequently, the professional writing the evaluation report is not the person who administers the psychological tests and records the individual's behavior during testing. This task is often delegated to a trained technician.

13.     Generally, identifying disorders and disabilities requires consistent findings across multiple diagnostic measures as well as data from real-world settings. Scattered "abnormal" scores across lengthy batteries of diagnostic tests or occasional indications of difficulties in real-world settings are *not* indicative of a disorder or disability. Indeed, research has repeatedly found that almost all healthy (nondisabled) people show areas of strength and weakness in different areas of cognition.[1] If isolated difficulties were sufficient to show disability, virtually everyone would meet this criterion. Because diagnostic and real-world data are commonly quite voluminous (as they are in Mr. Sampson's case), it is not enough to have just some evidence that points for or against a diagnosis or disability determination. Instead, we must look for where *most* of the available evidence points.

14.     Identifying disorders or disabilities requires consistent findings of deficits relative to most other people, not relative to the individual's own skills in other domains. This is particularly important in the case of individuals like Mr. Sampson who have very high ability levels in some areas. When someone has very high abilities in one or more domains, it is almost impossible for them to match this level of accomplishment in every other domain. For instance, research has found that most people with a high IQ will have achievement in at least one academic

---

[1] This is the case even in high-functioning people. For instance, in one recent study, 92% of graduate students who completed a neuropsychological battery were found to have at least one score that was at least one standard deviation below average (equivalent to a score at the 16th percentile or below for the population). See Jeffay, E., Binder, L. M., & Zakzanis, K. K. (2021). Marked intraindividual cognitive variability in a sample of healthy graduate students. *Psychological Injury and Law*, *14*(3), 171-183.

area that is substantially lower than their IQ, but still at least average relative to most other people.[2] In the same way that a champion runner with only average upper body strength would not be identified as disabled, a person with very high cognitive or academic skills in one domain but only average skills in another domain should not be, either.

**Mr. Sampson's Learning Disorder Diagnoses**

15.     From the records I reviewed, Mr. Sampson has received the following learning disorder diagnoses:

> a.  Learning Disorder, Not Otherwise Specified (Dr. Suzanne Michels, August 2013)
>
> b.  Specific Learning Disorder with impairment in reading (dyslexia), reading fluency, word reading accuracy, spelling (Dr. Allison Anderson, December 2013)
>
> c.  Specific Learning Disorder with impairment in reading (reading fluency and reading comprehension) and impairment in written expression (spelling and handwriting) (Dr. Jeannette Wasserstein/Dr. Kim Miller, December 2020)

16.     The current official diagnostic criteria for LD require that someone's "academic skills are substantially and quantifiably below those expected for the individual's chronological age."[3]

17.     Every time that Mr. Sampson's academic skills have been measured against age peers on diagnostic tests, his skills have been in the average range or above:

---

[2] Maddocks, D. L. (2018). The identification of students who are gifted and have a learning disability: A comparison of different diagnostic criteria. *Gifted Child Quarterly*, *62(2)*, 175-192.

[3] *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition* (DSM-5), American Psychiatric Association, 2013, at p. 67.

 a. In August 2013, as part of an evaluation by Dr. Suzanne Michels, Mr. Sampson completed academic skills measures from the Woodcock-Johnson Tests of Achievement. On all such measures, his scores were in the average range or above, even on the measures that were timed. According to Dr. Michels, he obtained "a Broad Reading Score within the High Average range." His timed writing skills were also measured with the Test of Written Language, and both of his scores from this test were in the above average range.

 b. In December 2013, as part of an evaluation by Dr. Allison Anderson, Mr. Sampson's timed reading comprehension skills were measured with the Scholastic Abilities Test for Adults, and his score was in the average range without any additional time.[4]

 c. In August 2020, as part of an evaluation by Dr. Jeanette Wasserstein and Dr. Kim Miller, Mr. Sampson's academic skills were measured with the Wechsler Individual Achievement Test. On all parts of this battery, his scores were in the average range or above. In addition, his timed academic skills were measured with the Woodcock-Johnson Tests of Achievement, and here, all of his scores were in the above-average range.

Thus, based upon the results obtained by his own supporting professionals, Mr. Sampson's academic skills have not been "substantially and quantifiably below those expected" for his chronological age.

---

[4] In her declaration, Dr. Wasserstein asserts that during Dr. Anderson's evaluation, Mr. Sampson "showed absolute weaknesses" in reading "compared to same age peers under regularly timed conditions" (p. 23). But there was only a single reading score in that evaluation (i.e., the score from the Scholastic Abilities Test for Adults), and Mr. Sampson's SATA score was in the average range compared to same-age peers.

18.     Mr. Sampson's timed reading skills were also measured using the Nelson-Denny Reading Test (NDRT) in two evaluations (Dr. Michels in 2013 and Drs. Wasserstein and Miller in 2020). In my opinion, an advantage of using the NDRT as part of a clinical assessment is that it has timed reading passages followed by multiple-choice questions, similar in general format to high-stakes reading-based tests. However, the NDRT has a number of limitations that require careful attention. One limitation is that the version of the NDRT given to Mr. Sampson in 2013 and in 2020 compares people to *educational* peers rather than *age* peers. Mr. Sampson was compared to graduating college seniors in the 2013 and 2020 evaluations, thus leading to scores that underestimate his actual reading skill levels under timed conditions relative to most people in the general population.

19.     Mr. Sampson first took the NDRT in 2013, when he was evaluated by Dr. Michels. At that time, his performance on the NDRT timed reading comprehension task was at the 16th percentile for graduating college seniors (which was in the "low average" range). However, when compared to first-year college students (who are more representative of the general adult population), his score would be well within the average range.

20.     Mr. Sampson was readministered the NDRT timed reading comprehension task in 2020 as part of the Wasserstein/Miller evaluation, and this time, Mr. Sampson worked much more slowly. Indeed, his comprehension score after 20 minutes plummeted to the level of a typical child starting the seventh grade. No mention or explanation was made in the evaluation report of this substantial change in Mr. Sampson's performance on the same reading test.

21.     Drs. Wasserstein and Miller have emphasized that Mr. Sampson's timed reading comprehension score on the NDRT improved with extra time, but it is very common for NDRT comprehension scores to improve with additional time.

22.     A second limitation of the NDRT is that it offers a "Reading Rate" score based on how far a client gets in reading the test's first passage in one minute. Unfortunately, this score is unreliable; the test's own manual shows its reliability to be below the minimal standards for any diagnostic test. It therefore cannot be used for diagnostic purposes. Nevertheless, I should note that Mr. Sampson's 2013 NDRT Reading Rate score was in the average range for a general population proxy group (i.e., first-year college students), whereas in 2020, he worked much more slowly and his one-minute reading rate score was so low that I cannot even estimate the approximate grade level. Again, Dr. Wasserstein and Dr. Miller did not comment in their report on this sharp decline in Mr. Sampson's performance on the same test between 2013 and 2020.

23.     The report from the Wasserstein/Miller evaluation states that the evaluation of Mr. Sampson took about 15 hours, "almost twice as long as usual for this type of evaluation," which "resulted from Mr. Sampson's extremely slow rate of reading and his deliberate and slow work style" (p. 14 of report). Similarly, in her declaration, Dr. Wasserstein states that the evaluation took "more than twice as long as such testing typically requires, demonstrating the real world impact of [Mr. Sampson's] disabilities" (¶12 of declaration). It is widely understood, however, that behavior during a clinical evaluation is not "real world" behavior.[5] Dr. Wasserstein's comment also ignores that on all timed measures of academic skills except the NDRT, Mr. Sampson performed well without any additional time. That is, when he needed to work under time constraints, he did so and generally performed well. He did exhibit very slow behavior when taking the NDRT, but this was inconsistent with his behavior on the same test in 2013. And a "deliberate and slow work style" in and of itself is not indicative of an impairment or a disability, particularly

---

[5] Sbordone, R. J. (2008). Ecological validity of neuropsychological testing: Critical issues. In A. M. Horton & D. Wedding (Eds.), The neuropsychology handbook (3rd ed., pp. 367–394). New York: Springer.

when someone can effectively increase working speed when necessary, as Mr. Sampson has demonstrated he can do.

24.     The official diagnostic criteria for LD require that academic skill deficits "cause significant interference with academic or occupational performance, or with activities of daily living," relative to age expectations.[6] An individual's performance on standardized tests such as the ACT or SAT is appropriately considered as evidence of real-world academic functioning.

25.     Mr. Sampson took the PSAT, SAT, and ACT without any accommodations (and thus under standard time conditions) while he was in high school. **All** of his scores on all sections of these tests were in the average range or above.[7] On the ACT, his composite score was in the 89th percentile, which means that he performed better than the vast majority of students nationwide who took the ACT exam in the same year. Similarly, on the SAT, his timed reading section scores on the three test administrations were in the 74th, 84th, and 93rd percentiles, meaning that he performed better than the vast majority of students nationwide who took the SAT in the same year. Both the ACT and SAT require examinees to read test questions under timed conditions, including questions that contain lengthy reading passages.

26.     Although the ACT and SAT were not designed for diagnostic purposes, they are critical and appropriate pieces of evidence demonstrating Mr. Sampson's real-world functioning. Mr. Sampson's performance on the PSAT, SAT, and ACT is strong and consistent evidence

---

[6] *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition* (DSM-5), American Psychiatric Association, 2013, at p. 67.

[7] Mr. Sampson took the SAT four times. Three of those times were in 2008, close to his applications to college. He did once take the SAT in 2005 as part of a special program requirement, and I am not counting that administration, since it compared him to high school seniors when he appeared to be in eighth or ninth grade.

**A213**

*against* LD. A student with LD would be expected to show deficits on such tests, particularly when taken without accommodations.

27.     Mr. Sampson took the MCAT twice, both times without any accommodations. Each time, all of his scores on all sections were in the average range or above. This includes his scores on the Verbal Reasoning section, which is essentially a timed reading comprehension measure where Mr. Sampson read passages and answered multiple-choice questions about the passages to show his comprehension and ability to reason about what he had read. On this section, his scores were at the 67th and 84th percentiles, better than most test-takers. All of his scores on all MCAT sections were actually above the 50th percentile, and so better than most test-takers. Importantly, these comparisons were made to other medical school applicants rather than to the general population. Therefore, on the MCAT, even relative to a highly select group, he performed well without any accommodations.

28.     In documentation that I reviewed, Mr. Sampson and his advocates argued that he prepared considerably for standardized admissions tests, at least for some of the administrations. However, this does not in any way invalidate the resulting scores as measures of Mr. Sampson's unaccommodated academic skills. Not only is preparation for admissions tests common, but its effects are typically modest. Even when the preparation is sufficiently extensive that it actually improves the student's genuine academic skills, the admissions tests remain valid measures of such skills.  Moreover, the fact that Mr. Sampson may have spent considerable time preparing to take the SAT, ACT, or MCAT does not negate the fact that, on the actual test day, he needed to read, concentrate, focus, and otherwise demonstrate the functional abilities that are required to do well on those tests. Mr. Sampson's test results show that his functional abilities in those areas are not substantially limited compared to most people in the general population.

- 10 -

**A214**

29.     It is my understanding that Mr. Sampson failed several exams administered by his medical school (exams measuring his knowledge of different preclinical medical subjects) and I understand that Mr. Sampson failed Step 1 of the USMLE in 2020. Although this was deficient performance relative to medical school standards, it is not evidence of LD. Most people of Mr. Sampson's age in the general population are not expected to perform at all in medical school, and so poor performance there is not indicative of functional limitations in academic skills relative to age peers.

30.     Both in 2013 and 2020, Mr. Sampson obtained a few scores on picture-based memory tasks that were at least a bit below the average range, such as on the Woodcock-Johnson Picture Recognition test and the Rey Complex Figure Test (a.k.a. the Rey-Osterrieth). However, the argument connecting these scores to Step 1 accommodation needs fails for several reasons. First, on the vast majority of visual-spatial diagnostic tasks that Mr. Sampson has taken, his scores have actually been in the average range or above. Second, diagnostic tasks of visual-spatial skills are highly artificial, in the sense that they do not resemble the requirements of real-world exams such as the Step 1 exam. For instance, Mr. Sampson occasionally showed deficits on tasks requiring that he draw a complex figure from memory or match pictures—things that he does not need to do on the Step 1 exam.[8]  Finally, if Mr. Sampson actually had visual-spatial skill deficits that impact his real-world test performance, this impact should be seen on the science sections of the MCAT, which also have graphs and figures. But as I discussed above, Mr. Sampson took the MCAT twice, both times without any accommodations, and his scores on all sections of the test,

---

[8] For reference, a figure used in past administrations of the Rey Complex Figure Test is included at Exhibit 6. The individual is asked to copy the picture and then draw it from memory at two time points, typically immediately after first copying it and then again approximately 30 minutes later (after engaging in other activities), and then is asked to say whether various pictures show parts of the figure.

including the science sections, were consistently in the average range or above, even compared to other medical school applicants (a very high-achieving group to begin with, relative to the general population).

31.     In 2020, Mr. Sampson was first diagnosed with a learning disability in *writing*. His writing skills had been assessed thoroughly in each of his three diagnostic evaluations, and each time, all of his scores were in the average range or above, even when his writing was assessed under timed conditions. Relatedly, Dr. Wasserstein's declaration states that Mr. Sampson has a learning disability affecting "written expression (spelling and handwriting)." But her own evaluation of Mr. Sampson found average-range spelling performance, and handwriting is not an area of learning disability. Moreover, the SAT and ACT both have writing sections, and on these tests, Mr. Sampson consistently scored in the average range or above (while handwriting, incidentally). There is clearly insufficient evidence of a learning disability in writing. (There also is no writing component on the Step 1 exam.)

32.     Mr. Sampson reportedly stuttered as a child and received speech therapy. In my experience, this is a common occurrence, particularly in boys, and many children receive speech services without further need for any special education or related supports from their school. Mr. Sampson appears to be one such case.

33.     Dr. Wasserstein asserts that Mr. Sampson's profile of abilities shows a "metaphorical limp," because his verbal reasoning performance was noticeably stronger than his nonverbal reasoning performance. The comparison of verbal and nonverbal scores is correct, but there is nothing pathological about this. Dr. Wasserstein may be correct that the gap between scores is larger than what most people have, but what is key is that both scores show at least average skill levels. In Dr. Wasserstein's diagnostic evaluation, Mr. Sampson's performance on the nonverbal

reasoning part of an IQ test (the Wechsler Adult Intelligence Scale's Perceptual Reasoning Index) was well within the average range, and better than more than half of his same-age peers. Discrepancies between verbal and nonverbal reasoning skills are not a reliable or valid indicator of LD anyway, as much research has shown.[9] The official diagnostic criteria for learning disabilities certainly do not consider discrepancies between reasoning ability areas.

34.     Finally, LD-related deficits are typically observed first in childhood, at least when formal, standardized testing of academic skills is conducted. It appears that Mr. Sampson completed such testing at age 10 and in fifth grade, as mentioned at page 2 of the Michels evaluation report. Mr. Sampson reportedly completed several subtests from the Woodcock Reading Mastery Test (a diagnostic reading test) at age 10, and all of his scores appear to have been in the average range. In fifth grade, he completed the Terra Nova test (a group-administered standardized achievement test), and both of the reported scores (for "Reading" and "Language") were in the average range. These scores from childhood are further evidence against the presence of LD.

**Mr. Sampson's ADHD Diagnoses**

35.     One of Mr. Sampson's evaluators correctly concluded that Mr. Sampson does **not** meet the diagnostic criteria for ADHD.  As discussed further below, Dr. Anderson concluded that Mr. Sampson does not have ADHD after administering "a number of measures designed to thoroughly evaluate this possibility."  (Anderson Rep., pp. 4-7).

---

[9] See, for instance, D'Angiulli, A., & Siegel, L. S. (2003). Cognitive functioning as measured by the WISC-R: Do children with learning disabilities have distinctive patterns of performance? *Journal of Learning Disabilities*, *36*(1), 48-58.

36.     One of Mr. Sampson's evaluators (Dr. Michels) did not evaluate Mr. Sampson at all for ADHD, and it appears that there were not even concerns about possible attention problems at that time. Dr. Michels did note that Mr. Sampson was "very focused throughout the testing sessions."

37.     His other supporting professionals, however, have assigned an ADHD diagnosis to Mr. Sampson -- Dr. Wasserstein and Dr. Aronson. I believe that there is insufficient evidence supporting their diagnosis, and considerable evidence *against* their diagnosis.

38.     The current official diagnostic criteria for ADHD require that someone have unusually high levels of symptoms of inattention and/or hyperactivity/impulsiveness that begin in childhood (by age 12), occur across settings, and interfere with real-world functioning.  In addition, the symptoms should not be better explained by a different disorder (e.g., an anxiety disorder). Typically, young adults with valid ADHD diagnoses can point to evidence of their disorder that includes ratings of their symptoms by other parties who know them well (e.g., parents, friends, significant others), documented problems in school (e.g., low grades, problem behavior, or difficulty completing tasks and complying with teacher requests), and significant difficulties with current everyday life responsibilities that most people in the general population can successfully perform.

39.     As discussed above, Mr. Sampson completed his first diagnostic evaluation with Dr. Michels in 2013. At that time, based on Mr. Sampson's reported concerns, Dr. Michels did not even assess for ADHD, and she noted that Mr. Sampson "was very focused throughout the testing sessions."

40.     In December 2013, Mr. Sampson completed a second evaluation, this time with Dr. Anderson, and at that time Mr. Sampson "wondered whether" ADHD "might explain attentional

difficulties he is having." Dr. Anderson obtained standardized ratings of Mr. Sampson's current and childhood ADHD symptoms from Mr. Sampson as well as from various informants (his mother, his father, his girlfriend, and a friend/tutor). With regard to *childhood* symptoms, only Mr. Sampson endorsed clinically significant levels; neither of his parents did. With regard to *current* symptoms, neither Mr. Sampson nor any third-party informants endorsed clinically significant symptom levels. This is very strong evidence *against* ADHD, and Dr. Anderson did not make that diagnosis. To the contrary, she concluded that "his testing results and history supply little evidence that [his attention] problems are the result of ADHD," and that he "does not appear to have the consistent and severe pattern of impulsivity, social problems, marked inattentiveness or physical restlessness that supports an ADHD diagnosis." (Report, p. 7).

41. According to Mr. Sampson's psychiatrist, Dr. Aronson, Mr. Sampson was diagnosed with "mild ADD" at some point in 2015. In a September 2017 letter, Dr. Aronson listed five symptoms of ADHD and made a partial review of the criteria for the disorder.[10] However, he did not provide the evidence showing that Mr. Sampson met those criteria, or say what evidence was used to determine that he met the criteria. Dr. Aronson also claimed that Mr. Sampson has "very slow processing speed." In fact, both before and after Dr. Aronson's letter, cognitive ability testing has consistently shown Mr. Sampson's processing speed scores to be above the average range.

42. In 2020, Dr. Wasserstein diagnosed Mr. Sampson with ADHD. Among the evidence that she cited was Mr. Sampson's reports of symptoms during a standardized interview and on a rating scale. The rating scale showed that in all domains of official ADHD symptoms,

---

[10] Dr. Aronson cites the "DSM-IV" criteria but I assume that Dr. Aronson meant to cite the DSM-5 criteria, which went into operation in 2013, four years prior to his 2017 letter.

- 15 -

**A219**

Mr. Sampson reported extreme levels of symptoms; his scores placed his self-reported symptom levels in the top 1% of the population (the 1% having the most severe symptoms). However, in 2013, he had not even reported *mild* current clinical symptoms. And, in 2013, other people who knew Mr. Sampson well also denied that he had clinically significant ADHD symptom levels. In 2020, Dr. Wasserstein and Dr. Miller did not obtain symptom ratings from third-party informants, a significant omission in their evaluation.[11]

43.     Another important piece of evidence when diagnosing adults with ADHD is a clear childhood history. As I noted above, in 2013, both of Mr. Sampson's parents had denied that he had significant ADHD symptoms in childhood, although Mr. Sampson believes that he did. In addition, his advocates have listed selected comments from elementary school teachers regarding inattention and related behaviors. Unfortunately, it is difficult to know whether these comments are representative, since complete, legible copies of the actual childhood records (including the records showing these comments) have not been submitted for review. Regardless, although ADHD symptoms must start in childhood, they must persist into adulthood for someone to continue to merit the diagnosis, and as I have noted, in his first diagnostic evaluation, neither Mr. Sampson nor others who knew him well described him as having any clinically significant symptoms in adulthood.

---

[11] Research has shown third-party informants to be exceptionally important when assessing ADHD in young adults. See, for instance, Sibley, M. H., et al. (2012). When diagnosing ADHD in young adults emphasize informant reports, DSM items, and impairment. *Journal of Consulting and Clinical Psychology*, *80*(6), 1052-1061. Elsewhere, Dr. Wasserstein has acknowledged that third-party informant reports are helpful. See Wasserstein, J. (2005). Diagnostic issues for adolescents and adults with ADHD. *Journal of Clinical Psychology*, *61*(5), 535547 at 538 ("Sometimes people overreport because they are motivated to get the diagnosis in order to secure academic accommodations, provide an explanation for their dysfunction, or generally be symptom magnifiers....  It is helpful to have additional input from a collateral reporter, such as a spouse or parent (who can be given the same scales), and 539 ("Again, outside reporters are essential when poor self-awareness exists or is suspected.  Work evaluations can also be very helpful.").

44.     Finally, ADHD symptoms lead to noticeable impairment in real-world settings, but there is no evidence of clinically significant impairment in Mr. Sampson's case, at least relative to what most people are expected to be able to do. Even in his clinical rotations during medical school, there is ample evidence of traits and behavior that are *the opposite of active ADHD symptoms*. Mr. Sampson has attached rotation evaluations to his declaration, and they include repeated comments about his "very thorough and well thought out" work and his "mature" and "very professional" demeanor. Preceptors commented that he "pays attention to detail," his "data gathering was very organized" and he "performed comprehensive yet succinct presentations." One preceptor summed up Mr. Sampson's behavior thus: "punctual, conscientious, attentive, professional." Mr. Sampson has argued that he must simply work harder than everyone else, but the essence of ADHD is an *inability* to work hard enough to change basic traits such as these through willpower. At the very least, these evaluations of his work would suggest that he is not substantially limited by his ADHD symptoms, even in a highly demanding real-world setting.

**Evidence of Substantial Limitation and Accommodation Needs**

45.     Based on the same evidence reviewed above, it is even clearer that Mr. Sampson has not demonstrated a substantial limitation in a major life activity relative to most people in the general population. In both diagnostic and real-world contexts, his documentation shows average or above average performance again and again on relevant measures. There are virtually no objective data even suggesting a substantial limitation, and there is a great deal of objective data showing a lack of any such limitation.

46.     To be clear, Mr. Sampson has apparently exhibited difficulties in medical school, and I understand that he failed the Step 1 exam without accommodations. However, this is not evidence of disability. Most people in the general population are not expected to perform at all in

medical school or on medical licensure exams. Mr. Sampson's performance history without accommodations—that is, all A- and B-range grades in high school, above average scores on college admissions tests, good performance in college (GPA of 3.43 with all satisfactory grades), average and above average scores on a medical school admissions test—is very strong evidence of no substantial limitation. That Mr. Sampson encountered difficulties in performing academically in the unusually intense and challenging setting of medical school is undoubtedly disappointing and unfortunate, but it is not evidence of disability.

47.     Nor does the fact that Mr. Sampson's documentation shows substantial variability across various data sources show that he is disabled. This is not indicative of disorder or disability; it is the type of profile of performance that virtually everyone has (at least in some domains), particularly those people with high abilities. In just the 2020 evaluation by Drs. Wasserstein and Miller, over 100 different scores were generated by the lengthy battery of tests and scales that the evaluators chose to use; that Mr. Sampson obtained occasional, scattered low scores is to be expected, and in his case, the scores are either on measures that are irrelevant to his Step 1 exam accommodation needs (e.g., scores on the California Verbal Learning Test, where he needed to repeat lists of words that he heard) or else on the Nelson-Denny, where his score fell so far below his average-range performance on that same test several years earlier.

48.     I understand that Mr. Sampson began receiving accommodations at some point after his first year in medical school. I have considered this fact in forming my opinions. But difficulties encountered in medical school (which first prompted the accommodations) are not indicative of substantial limitations relative to most people in the general population.

49.     Mr. Sampson might well benefit from having more time than other examinees to take the Step 1 exam, but research shows that most people, with or without disabilities, benefit

- 18 -

**A222**

from extended time on time-pressured exams. Doing better with extra testing time does not establish that someone has an impairment, or that they are substantially limited in performing any major life activities that are relevant when taking a standardized licensing exam.

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 29, 2022.

DocuSigned by:

*Benjamin J. Lovett* _____

469520212D654E9...

Benjamin J. Lovett, Ph.D.

# EXHIBIT 1

# Benjamin J. Lovett, Ph.D.
BL2799@tc.columbia.edu

**Work Address:**
School Psychology Program
Box 120
Teachers College, Columbia University
525 W. 120th Street
New York, NY 10027
212-678-8346 (office)

**Current Appointments:**
- Associate Professor of Psychology and Education (with tenure)
  Teachers College, Columbia University
- Director of Clinical Training (DCT), Ph.D. Program in School Psychology
- Research Scientist, TC Education for Persistence and Innovation Center (EPIC)
- Dissertation Sponsor, Columbia University Graduate School of Arts and Sciences

**Licensure:**
Psychologist (New York State) – License #020865

**Education:**
Ph.D. in School Psychology, 2007
Syracuse University, Syracuse, NY
(APA-Accredited Program)

M.S. in Psychology, 2005
Syracuse University, Syracuse, NY

B.A. in Psychology, 2002, *summa cum laude*, with honors in psychology
Minor in Educational Policy Studies
Pennsylvania State University, University Park, PA
Induction into Phi Beta Kappa, May 2002

**Previous Academic and Clinical Appointments (selected):**
*August 2014 – August 2019*
Associate Professor of Psychology, State University of New York at Cortland
(Assistant Professor of Psychology from August 2014 to August 2016)

*August 2010 – August 2019*
Adjunct Professor of Psychology, Syracuse University

*July 2007 – June 2014*
Associate Professor of Psychology, Elmira College, Elmira, NY
(Assistant Professor of Psychology from July 2007 to June 2013)

*August 2006 – June 2007*
      School Psychology Intern, Jamesville-DeWitt Schools
      Psychological Evaluator, Elmcrest Children's Center

*September 2005 – June 2006*
      Psychology Extern, Jamesville-Dewitt Middle School

*September 2003 – December 2005*
      Senior Research Analyst, Dept. of Psychiatry, SUNY Upstate Medical University
      (ADHD Clinic Coordinator, from 2003 to 2004)

*Summers 2000 - 2003*
      Instructional Staff, Center for Talented Youth, Johns Hopkins University
      (Instructor for 2003; Teaching Assistant from 2000 to 2002)

## Publications – total $N$ = 107, and as of 9/6/22, an $h$ index of 32 (4002 total citations)

### Publications: Books ($n$ = 3)

1. **Lovett, B. J.** (in press). *Practical psychometrics: A guide for test users*. Guilford Press.

2. Hothersall, D., & **Lovett, B. J.** (2022). *History of psychology*. (5th ed.). Cambridge University Press.

3. **Lovett, B. J.,** & Lewandowski, L. J. (2015). *Testing accommodations for students with disabilities: Research-based practice*. American Psychological Association Press.

### Publications: Peer-Reviewed Journal Articles ($n$ = 72)

4. **Lovett, B. J.** (in press). Objectivity or advocacy? The ethics of the scout mindset in psychoeducational assessment. *Psychological Injury and Law*.

5. Witmer, S. E., **Lovett, B. J.,** & Buzick, H. (in press). Extended time accommodations on the 2017 National Assessment of Educational Progress (NAEP) Grade 8 mathematics test: Eligibility, use, and benefit. *Journal of Psychoeducational Assessment*.

6. **Lovett, B. J.,** Spenceley, L. M., & Lewandowski, L. J. (2022). Response validity in psychoeducational assessment: A primer for school psychologists. *Contemporary School Psychology*, *26*, 279-289.

7. **Lovett, B. J.,** Spenceley, L. M., Schaberg, T. M., & Best, H. (in press). Response validity in psychoeducational evaluations: Results from a national survey of school psychologists. *Psychology in the Schools.*

8. Potts, H. E., Lewandowski, L. J., & **Lovett, B. J.** (in press). Identifying feigned ADHD

in college students: Comparing the Multidimensional ADHD Rating Scale to established validity measures. *Journal of Attention Disorders*.

9. **Lovett, B. J.,** Harrison, A. G., & Armstrong, I. T. (2022). Processing speed and timed academic skills in children with learning problems. *Applied Neuropsychology: Child*, *11*(3), 320-327.

10. Spenceley, L. M., Wood, W. L. M., & **Lovett, B. J.** (2022). Using the Woodcock-Johnson IV Tests of Cognitive Abilities to detect feigned ADHD. *Applied Neuropsychology: Adult*, *29*(3), 324-332.

11. **Lovett, B. J.** (2021). Educational accommodations for students with disabilities: Two equity-related concerns. *Frontiers in Education*, *6*, 795266. https://www.frontiersin.org/articles/10.3389/feduc.2021.795266/full

12. **Lovett, B. J.,** Ferrier, D. E., Wang, X., & Jordan, A. H. (2021). ASRS screener ratings in college students: Concurrent validity and test-retest reliability. *Journal of Psychoeducational Assessment*, *39*(8), 1015-1019.

13. **Lovett, B. J.,** & Harrison, A. G. (2021). Assessing adult ADHD: New research and perspectives. *Journal of Clinical and Experimental Neuropsychology*, *43*, 333-339.

14. Wai, J., & **Lovett, B. J.** (2021). Improving gifted talent development can help solve multiple consequential real-world problems. *Journal of Intelligence*, *9*, article 31.

15. Potts, H. E., Lewandowski, L. J., & **Lovett, B. J.** (2021). The Multidimensional ADHD rating scale: A measure of symptoms, impairment, and symptom validity. *Journal of Clinical and Experimental Neuropsychology*, *43*, 426-436.

16. **Lovett, B. J.,** & Lindstrom, W. (2021). The AHEAD Documentation Guidance at 10 Years: Continuing Concerns. *Learning Disabilities: A Multidisciplinary Journal, 26*(2), 22-33.

17. **Lovett, B. J.,** & Harrison, A. G. (2021). De-implementing inappropriate accommodations practices. *Canadian Journal of School Psychology*, *36*, 115-126.

18. **Lovett, B. J.,** Wood, W. L. M., & Lewandowski, L. J. (2021). Differential diagnosis of sluggish cognitive tempo symptoms in college students. *Journal of Attention Disorders*, *25*, 1251-1259.

19. Harrison, A. G., **Lovett, B. J.,** Keiser, S., & Armstrong, I. (2021). Learning disability documentation submitted by osteopathic medical students. *Applied Neuropsychology: Adult, 28*, 245-256.

20. **Lovett, B. J.,** & Nelson, J. M. (2021). Systematic review: Educational accommodations for children and adolescents with ADHD. *Journal of the American Academy of Child and*

*Adolescent Psychiatry*, *60*, 448-457.

21. Wood, W. L. M., Lewandowski, L. J., & **Lovett, B. J.** (2021). Profiles of diagnosed and undiagnosed college students meeting ADHD symptom criteria. *Journal of Attention Disorders*, *25*, 646-656.

22. Wood, W. L. M., Lewandowski, L. J., **Lovett, B. J.,** & Antshel, K. M. (2020). Sluggish cognitive tempo and impairment: The role of lifestyle factors. *Psychology in the Schools, 57*, 1171-1188.

23. **Lovett, B. J.** (2020). Disability identification and educational accommodations: Lessons from the 2019 admissions scandal. *Educational Researcher*, *49*, 125-129.

24. **Lovett, B. J.,** & Bizub, A. L. (2019). Pinpointing disability accommodation needs: Which evidence is most relevant? *Psychological Injury and Law*, *12*, 42-51.

25. **Lovett, B. J.,** & Jordan, A. H. (2019). Are ADHD screeners safe to use? *Journal of Attention Disorders*, *23*, 1210-1216.

26. **Lovett, B. J.,** Lewandowski, L. J., & Carter, L. (2019). Separate room testing accommodations for students with and without ADHD. *Journal of Psychoeducational Assessment, 37*(7), 852-862.

27. Nelson, J. M., & **Lovett, B. J.** (2019). Assessing ADHD in college students: Integrating multiple evidence sources with symptom and performance validity data. *Psychological Assessment*, *31*, 793-804.

28. **Lovett, B. J.,** & Nelson, J. M. (2018). Assessing adults for ADHD: A systematic, evidence-based protocol. *Journal of Health Service Psychology*, *44*, 48-52.

29. **Lovett, B. J.** (2017). For balance in the historiography of psychology. *History of Psychology*, *20*, 218-224.

30. **Lovett, B. J.,** & Davis, K. M. (2017). Adult ADHD assessment: An integrated clinical-forensic perspective. *Professional Psychology: Research & Practice*, *48*, 438-444.

31. **Lovett, B. J.,** & Nelson, J. M. (2017). Test anxiety and the Americans with Disabilities Act. *Journal of Disability Policy Studies*, *28*, 99-108.

32. **Lovett, B. J.,** Lewandowski, L. J., & Potts, H. E. (2017). Test-taking speed: Predictors and implications. *Journal of Psychoeducational Assessment*, *35*, 351-360.

33. Wood, W. L. M., Lewandowski, L. J., **Lovett, B. J.,** & Antshel, K. M. (2017). Executive dysfunction and functional impairment associated with sluggish cognitive tempo in college students. *Journal of Attention Disorders*, *21*, 691-700.

34. Wood, W. L. M., Potts, H. E., Lewandowski, L., & **Lovett, B. J.** (2017). Sluggish cognitive tempo and speed of performance. *Journal of Attention Disorders*, *21*, 684-690.

35. Lewandowski, L. J., Berger, C., **Lovett, B. J.,** & Gordon, M. (2016). Test-taking skills of high school students with and without learning disabilities. *Journal of Psychoeducational Assessment*, *34*, 566-576.

36. **Lovett, B. J.,** & Leja, A. M. (2015). ADHD symptoms and benefit from extended time testing accommodations. *Journal of Attention Disorders*, *19*, 167-172.

37. **Lovett, B. J.,** Nelson, J. M., & Lindstrom, W. (2015). Documenting hidden disabilities in higher education: Analysis of recent guidance from the Association on Higher Education and Disability (AHEAD). *Journal of Disability Policy Studies, 26,* 44-53.

38. Lewandowski, L. J., Lambert, T. L., **Lovett, B. J.,** Panahon, C., & Sytsma, M. (2014). College students' preferences for test accommodations. *Canadian Journal of School Psychology*, *29*, 116-126.

39. **Lovett, B. J.** (2014). Testing accommodations under the amended ADA: The voice of empirical research. *Journal of Disability Policy Studies*, *25*, 81-90.

40. Sparks, R. S., & **Lovett, B. J.** (2014). Learning disability documentation in higher education: What are students submitting? *Learning Disability Quarterly*, *37*, 54-62.

41. Harrison, A. G., **Lovett, B. J.,** & Gordon, M. (2013). Documenting disabilities in postsecondary settings: Diagnosticians' understanding of legal regulations and diagnostic standards. *Canadian Journal of School Psychology*, *28*, 303-322.

42. Lewandowski, L. J., Cohen, J., & **Lovett, B. J.** (2013). Effects of extended time allotments on reading comprehension performance of college students with and without learning disabilities. *Journal of Psychoeducational Assessment*, *31*, 326-336.

43. Lewandowski, L. J., Gathje, R. A., **Lovett, B. J.,** & Gordon, M. (2013). Test-taking skills in college students with and without ADHD. *Journal of Psychoeducational Assessment*, *31*, 41-52.

44. **Lovett, B. J.** (2013). The science and politics of gifted students with learning disabilities: A social inequality perspective. *Roeper Review*, *35*, 136-143.

45. **Lovett, B. J.**, & Leja, A. (2013). Students' perceptions of testing accommodations: What we know, what we need to know, and why it matters. *Journal of Applied School Psychology*, *29*, 72-89.

46. **Lovett, B. J.**, & Sparks, R. S. (2013). The identification and performance of gifted students with learning disabilities: A quantitative synthesis. *Journal of Learning Disabilities, 46*, 304-316.

47. Sparks, R. S., & **Lovett, B. J.** (2013). Applying objective diagnostic criteria to students in a college support program for learning disabilities. *Learning Disability Quarterly*, *36*, 231-241.

48. Jordan, A. H., **Lovett, B. J.,** & Sweeton, J. L. (2012). The social psychology of interracial interactions: Implications for culturally competent practice. *Journal of Multicultural Counseling and Development*, *40*, 132-143.

49. **Lovett, B. J.,** Jordan, A. H., & Wiltermuth, S. (2012). Individual differences in the moralization of everyday life. *Ethics and Behavior*, *22*, 248-257.

50. Jordan, A. H., Monin, B., Dweck, C. S., **Lovett, B. J.,** John, O. P., & Gross, J. J. (2011). Misery has more company than people think: Underestimating the prevalence of others' negative emotions. *Personality and Social Psychology Bulletin*, *37*, 120-135.

51. **Lovett, B. J.** (2011). Auditory processing disorder: School psychologist beware? *Psychology in the Schools*, *48*, 855-867.

52. **Lovett, B. J.** (2011). On the diagnosis of learning disabilities in gifted students. *Gifted Child Quarterly*, *55*, 149-151.

53. **Lovett, B. J.,** & Hood, S. B. (2011). Realism and operationism in psychiatric diagnosis. *Philosophical Psychology*, *24*, 207-222.

54. **Lovett, B. J.,** & Johnson, T. L. (2011). The impact of presentation level on SCAN-A test performance. *Contemporary Issues in Communication Sciences and Disorders*, *38*, 135-139.

55. Hood, S. B., & **Lovett, B. J.** (2010). Network models of psychopathology and comorbidity: Philosophical and practical considerations. *Behavioral and Brain Sciences*, *33*, 159-160.

56. **Lovett, B. J.** (2010). Extended time testing accommodations for students with disabilities: Answers to five fundamental questions. *Review of Educational Research*, *80*, 611-638.

57. **Lovett, B. J.,** & Jordan, A. H. (2010). Levels of moralization: An alternative conception of moral sensitivity. *Journal of Moral Education*, *39*, 175-189.

58. **Lovett, B. J.,** Lewandowski, L. J., Berger, C. A., & Gathje, R. A. (2010). Effects of response mode and time allotment on college students' writing. *Journal of College Reading and Learning*, *40*(2), 64-79.

59. **Lovett, B. J.,** & Sparks, R. S. (2010). Exploring the diagnosis of "Gifted/LD": Characterizing postsecondary students with learning disability diagnoses at different IQ

levels. *Journal of Psychoeducational Assessment*, *28*, 91-101.

60. **Lovett, B. J.,** & Eckert, T. L. (2009). Reinforcement sensitivity and responsiveness to performance feedback: A preliminary investigation. *Journal of Applied School Psychology*, *25*, 204-219.

61. Sparks, R. S., & **Lovett, B. J.** (2009). Objective criteria for classification of postsecondary students as learning disabled: Effects on prevalence rates and group characteristics. *Journal of Learning Disabilities*, *42*, 230-239.

62. Sparks, R. S., & **Lovett, B. J.** (2009). College students with learning disability diagnoses: Who are they, and how do they perform? *Journal of Learning Disabilities*, *42*, 494-510.

63. DiGennaro-Reed, F. D., & **Lovett, B. J.** (2008). Views on the efficacy and ethics of punishment: Results from a national survey. *International Journal of Behavioral Consultation and Therapy*, *4*(1), 61-67.

64. Lewandowski, L. J., **Lovett, B. J.,** Codding, R. S., & Gordon, M. (2008). Symptoms of ADHD and academic concerns in college students with and without ADHD diagnoses. *Journal of Attention Disorders*, *12*, 156-161.

65. Lewandowski, L. J., **Lovett, B. J.,** & Rogers, C. L. (2008). Extended time as a testing accommodation for students with reading disabilities: Does a rising tide lift all ships? *Journal of Psychoeducational Assessment*, *26*, 315-324.

66. Mogle, J. A., **Lovett, B. J.,** Stawski, R. S., & Sliwinski, M. J. (2008). What's so special about working memory? An examination of the relationships between working memory, secondary memory, and fluid intelligence. *Psychological Science*, *19*, 1071-1077.

67. Jordan, A. H., & **Lovett, B. J.** (2007). Stereotype threat and test performance: A primer for school psychologists. *Journal of School Psychology*, *45*, 45-59.

68. Lewandowski, L. J., **Lovett, B. J.,** Parolin, R. A., Gordon, M., & Codding, R. S. (2007). Extended time accommodations and the mathematics performance of students with and without ADHD. *Journal of Psychoeducational Assessment*, *25*, 17-28.

69. **Lovett, B. J.,** Eckert, T. L., Talge, N. M., & Akin-Little, K. A. (2007). Attachment intervention programs: Implications for school psychologists. *Journal of Early Child and Infant Psychology*, *3*, 25-43.

70. **Lovett, B. J.,** & Sheffield, R. (2007). Affective empathy deficits in aggressive children and adolescents: A critical review. *Clinical Psychology Review*, *27*, 1-13.

71. **Lovett, B. J.** (2006). The new history of psychology: A review and critique. *History of Psychology*, *9*, 17-37.

72. **Lovett, B. J.,** & Lewandowski, L. J. (2006). Gifted students with learning disabilities: Who are they? *Journal of Learning Disabilities*, *36*, 515-527.

73. **Lovett, B. J.** (2005). A defense of prudential moralism. *Journal of Applied Philosophy*, *22*, 159-168.

74. **Lovett, B. J.,** & Jordan, A. H. (2005). Moral values, moralism, and the 2004 presidential election. *Analyses of Social Issues and Public Policy*, *5*, 165-175.

75. Akin-Little, K. A., Eckert, T. L.**,** **Lovett, B. J.**, & Little, S. G. (2004). Extrinsic reinforcement in the classroom: Bribery or best practice? *School Psychology Review*, *33*, 343-361.

**Publications: Contributions to Edited Books (*n* = 18)**

76. **Lovett, B. J.** (2020). Extended time testing accommodations for students with disabilities: Impact on score meaning and construct representation. In M. J. Margolis & R. A. Feinberg (Eds.), *Integrating timing considerations to improve testing practices* (pp. 47-58). New York: Routledge.

77. **Lovett, B. J.,** & Nelson, J. M. (2020). Assessment in educational settings. In J. A. Suhr & M. Sellbom (Eds.), *Cambridge Handbook of Clinical Assessment and Diagnosis* (pp. 485-497). New York: Cambridge University Press.

78. **Lovett, B. J.,** & Kilpatrick, D. A. (2018). Differential diagnosis of SLD [Specific Learning Disability] versus other difficulties. In D. P. Flanagan & V. C. Alfonso (Eds.), *Essentials of specific learning disability assessment* (2nd ed., pp. 549-571). Hoboken, NJ: Wiley.

79. Lewandowski, L. J., **Lovett, B. J.**, & Gordon, M. (2016). Measurement of symptom severity and impairment. In S. Goldstein & J. A. Naglieri (Eds.), *Assessing impairment: From theory to practice* (2nd ed., pp. 229-245). New York: Springer.

80. **Lovett, B. J.,** Gordon, M., & Lewandowski, L. J. (2016). Legal conceptions of impairment: Implications for the assessment of psychiatric disabilities. In S. Goldstein & J. A. Naglieri (Eds.), *Assessing impairment: From theory to practice* (2nd ed., pp. 125-139). New York: Springer.

81. **Lovett, B. J.,** & Spenceley, L. A. (2016). Use of the Woodcock-Johnson IV in the diagnosis of specific learning disabilities in adulthood. In D. P. Flanagan & V. C. Alfonso (Eds.), *WJ-IV clinical use and interpretation: Scientist-practitioner perspectives* (pp. 253-270)*.* Cambridge, MA: Academic Press.

82. Gordon, M., Lewandowski, L. J., & **Lovett, B. J.** (2015). Assessment and management of ADHD in educational and workplace settings in the context of ADA accommodations. In R. A. Barkley (Ed.), *Attention-Deficit Hyperactivity Disorder: A handbook for*

*diagnosis and treatment* (4th ed., pp. 774-794). New York: Guilford.

83. Lewandowski, L. J., & **Lovett, B. J.** (2014). Learning disabilities. In E. J. Mash & R. A. Barkley (Eds.), *Child psychopathology* (3rd ed., pp. 625-669). New York: Guilford.

84. **Lovett, B. J.,** & Hood, S. B. (2014). Comorbidity in child psychiatric diagnosis: Conceptual complications. In C. Perring & L. Wells (Eds.), *Diagnostic dilemmas in child and adolescent psychiatry* (pp. 80-97). New York: Oxford University Press.

85. Eckert, T. L., & **Lovett, B. J.** (2013). Principles of behavioral assessment. In D. H. Saklofske, C. R. Reynolds, & V. L. Schwean (Eds.), *Oxford Handbook of Child Psychological Assessment* (pp. 366-384). New York: Oxford University Press.

86. Ferrier, D. E., **Lovett, B. J.**, & Jordan, A. H. (2011). Construct-irrelevant variance in achievement test scores: A social cognitive perspective. In L. E. Madsen (Ed.), *Achievement tests: Types, interpretations, and uses* (pp. 89-108). Hauppauge, NY: Nova Science.

87. Lewandowski, L. J., **Lovett, B. J.,** & Gordon, M. (2009). Measurement of symptom severity and impairment. In S. Goldstein & J. Naglieri (Eds.), *Assessment of impairment: From theory to practice* (pp. 5-14). New York: Springer.

88. **Lovett, B. J.** (2009). The science of cheating: A psychologist's perspective. In T. Twomey, H. White, & K. Sagendorf (Eds.), *Pedagogy, not policing: Positive approaches to academic integrity at the university* (pp. 43-48). Syracuse, NY: Syracuse University Press.

89. **Lovett, B. J.,** Gordon, M., & Lewandowski, L. J. (2009). Measuring impairment in disability evaluations: Legal and ethical issues. In S. Goldstein & J. Naglieri (Eds.), *Assessment of impairment: From theory to practice* (93-103). New York: Springer.

90. Jordan, A. H., & **Lovett, B. J.** (2008). Self-theories of intelligence: Implications for school psychology. In D. H. Molina (Ed.), *School psychology: 21st century issues and challenges* (pp. 345-355). Hauppauge, NY: Nova Science.

91. Lewandowski, L. J., & **Lovett, B. J.** (2008). Introduction to neuropathology and brain-behavior relationships. In L. C. Hartlage & R. C. D'Amato (Eds.), *Essentials of neuropsychological assessment: Treatment planning for rehabilitation*. (2nd ed., pp. 31-55).

92. Eckert, T. L., **Lovett, B. J.,** Rosenthal, B. D., Jiao, J., Ricci, L. J., & Truckenmiller, A. J. (2006). Class-wide instructional feedback: Improving children's academic skill development. In S. V. Randall (Ed.), *Learning disabilities: New research* (pp. 167-185). Hauppauge, NY: Nova Science Publishers.

93. Gordon, M., Barkley, R. A., & **Lovett, B. J.** (2006). Tests and observational measures. In

R. A. Barkley (Ed.), *Attention-Deficit Hyperactivity Disorder: A handbook for diagnosis and treatment*. (3rd ed., pp. 369-388). New York: Guilford.

**Publications: Articles in Newsletters & Magazines; Related Pieces (*n* = 14)**

94. Szczesniak, L. A., & **Lovett, B. J.** (2022). Addressing test anxiety in the COVID-19 pandemic and beyond. *NASP Communiqué*, *50*(6), 29-31.

95. **Lovett, B. J.** (2021). Accommodations on college admissions tests and in postsecondary settings. *New York School Psychologist*, *40*(1), 39-40.

96. **Lovett, B. J.,** & Lewandowski, L. J. (2020). Private room testing accommodations for students with ADHD. *ADHD Report*, *28*(8), 1-5.

97. **Lovett, B. J.,** & Harrison, A. G. (2019). Forensic thinking in disability assessment: An introduction to a special issue. *Psychological Injury and Law*, *12*, 1-6.

98. Spenceley. L. M., **Lovett, B. J.,** & Lewandowski, L. J. (2017). Assessing response validity: For SAT accommodation requests and beyond? *New York School Psychologist*, *35*, 41-43.

99. Lewandowski, L. J., Wood, W. L. M., & **Lovett, B. J.** (2016). Sluggish cognitive tempo in college students: Now you see it, now you don't. *ADHD Report*, *24*(1), 1-5.

100. Nelson, J. M., **Lovett, B. J.,** & Lindstrom, W. (2015). Assessing, documenting, and accommodating ADHD in college students. *ADHD Report*, *23*(6), 7-11.

101. Lewandowski, L. J., & **Lovett, B. J.** (2014). The new *Diagnostic and Statistical Manual of Mental Disorders, DSM-5*: Implications for accommodations requests. *Bar Examiner*, *83*(1), 42-54.

102. **Lovett, B. J.** (2013). Who needs more time (on tests)? *Better: Evidence-Based Education*, *5*(3), 14-15.

103. **Lovett, B. J.** (2011). The divorce of behavior analysis and psychology: Think of the children! *(APA) Division 25 Recorder*, *39*(1), 4-6.

104. **Lovett, B. J.** (2011). Extended time testing accommodations: What does the research say? *NASP Communiqué*, *39*(8), 1, 14-15.

105. **Lovett, B. J.,** Lewandowski, L. J., & Miller, L. (2010). Auditory processing disorder and ADHD: What's the relationship? *ADHD Report*, *18*(3), 7-11.

106. Lewandowski, L. J., **Lovett, B. J.,** Gordon, M., & Antshel, K. M. (2006). The case for clinical impairment in the DSM-V criteria for ADHD. *ADHD Report*, *14*(6), 8-16.

107. **Lovett, B. J.,** & Gordon, M. (2005). Test score discrepancies as a basis for the assessment of learning disabilities and ADHD. *ADHD Report*, *13*(3), 1-4.

**Book, Film, and Test Reviews (selected):**

**Lovett, B. J.** (2022). Review of the book *The quick fix: Why fad psychology can't cure our social ills*. *American Journal of Psychology*, *135*(1), 128-131.

**Lovett, B. J.** (2019). Review of the book *Learning disabilities: From identification to intervention*. *NASP Communiqué*, *47*(7), 38.

**Lovett, B. J.** (2017). Review of the book *Psychological and psychoeducational assessment of deaf and hard of hearing children*. *Journal of Psychoeducational Assessment, 35*, 807-810.

**Lovett, B. J.** (2013, January). Review of the film *The D Word*. *The School Psychologist*, *67*(1), 81-83.

**Lovett, B. J.** (2011, August 9). Review of the book *The Science of ADHD*. *Metapsychology Online Reviews, 15*(32).

**Lovett, B. J.,** & Johnson, T. L. (2010). Review of the test *SCAN-3*. *Journal of Psychoeducational Assessment*, *28*, 603-607.

**Lovett, B. J.** (2010, April 13). Review of the book *Treating ADHD and comorbid disorders*. *Metapsychology Online Reviews*, *14*(15).

**Lovett, B. J.** (2007, March 27). Review of the book *The Last normal child: Essays on the intersection of kids, culture, and psychiatric drugs*. *Metapsychology Online Reviews*, *11*(13).

**Lovett, B. J.** (2005). Review of the book *Assessment for intervention*. *NASP Communiqué*, *34*(4), 13

**Invited Talks (selected):**
**Lovett, B. J.** (2022, November). "Testing Accommodations: Enhancing Validity and Equity." Invited talk scheduled to the National Board of Medical Examiners, Philadelphia, PA.

**Lovett, B. J.** (2022, January). "Assessment for All Students: Design, Adjustment, and Preparation." Invited talk to the Opening All Doors Program, Detroit, MI.

**Lovett, B. J.** (2021, May). "Test anxiety and testing accommodations." Invited talk to the School Psychology Internship Program, New York City Department of Education.

**Lovett, B. J.** (2020, June). "Accommodations on the Bar Exam: Research-Based Decision Making." Invited talk to the California State Bar Association.

**Lovett, B. J.** (2020, January). "Diagnostic Evaluations 101: Interpreting Reports from Outside Evaluators." Invited talk given at the Chapin School, New York, NY.

**Lovett, B. J.** (2019, April). "Anxiety and Discomfort during Testing: A Cause for Accommodations?" Invited talk given at the Educational Testing Service, Princeton, NJ.

**Lovett, B. J.** (2018, May). "Testing Accommodations: From Research to Practice." Invited talk given at the Winsor School, Boston, MA.

**Lovett, B. J.** (2017, December). "Test Anxiety and the ADA." Invited talk given at the National Board of Medical Examiners, Philadelphia, PA.

**Lovett, B. J.** (2017, October). "Speededness: What is it Good For?" Invited talk given at the Time Limits and Testing Conference, Philadelphia, PA.

**Lovett, B. J.** (2017, April). "Testing Accommodations for Students with Disabilities: Myth, Reality, and Practice." Invited talk given to the New Jersey Principals and Supervisors Association, Monroe, NJ.

**Lovett, B. J.** (2017, March). "Test Anxiety: Assessment, Documentation, Accommodations?" Invited talk given at the High-Incidence Disabilities in Higher Education conference, Toronto, ON.

**Lovett, B. J.** (2016, October). "Psychoeducational Assessment: An Integrated Clinical-Forensic Perspective." Invited talk given at the Southern Ontario Regional Assessment and Resource Centre, Kingston, ON.

**Lovett, B. J.** (2016, May). "Testing Accommodations: From Research to Practice." Invited talk given at Academics West, New York, NY.

**Lovett, B. J.** (2016, May). "The Science and Ethics of Testing Accommodations." Invited talk given at the Masters School, Dobbs Ferry, NY.

**Lovett, B. J.** (2016, March). "Testing Accommodations for Students with Disabilities: Research-Based Practice." Invited talk, given with L. J. Lewandowski, at the Fayetteville-Manlius Central School District, Fayetteville, NY.

**Lovett, B. J.** (2016, March). "Developments in Testing Accommodations Research: A Year in Review." Invited talk given at the Association of American Medical Colleges, Washington, DC.

**Lovett, B. J.** (2015, November). "Putting the History of Psychology into Introductory Psychology." Invited talk given to Syracuse University Project Advance, New York, NY.

**Lovett, B. J.** (2015, October). "Testing Accommodations for Students with Disabilities: Research-Based Practice." Invited talk, given with L. J. Lewandowski, at the convention of the New York Association of School Psychologists, Verona, NY.

**Lovett, B. J.** (2015, October). "Testing Accommodations for People with Disabilities: Research-Based Practice." Clinician's Corner Webinar, given at the headquarters of the American Psychological Association, Washington, DC.

**Lovett, B. J.** (2015, August). "Testing Accommodations for People with Disabilities: Research-Based Practice." Continuing Education Workshop, with L. J. Lewandowski, given at the convention of the American Psychological Association, Toronto, ON.

**Lovett, B. J.** (2015, March). "Testing Accommodations for Students with High-Incidence Disabilities: Research Informing Practice." Invited talk given to the Department of Counseling and Educational Psychology, University at Albany, SUNY, Albany, NY.

**Lovett, B. J.** (2015, March). "Extended Time Requests on the MCAT: The Need for Rigorous Review." Invited talk given at the American Association of Medical Colleges, Washington, DC.

**Lovett, B. J.** (2014, August). "Testing Accommodations for Students with Disabilities: Research-Based Practice" Continuing Education Workshop, with L. J. Lewandowski, given at the convention of the American Psychological Association, Washington, DC.

**Lovett, B. J.** (2013, November). "Should Medical Licensure Exams Be Timed?" Invited talk given at the National Board of Medical Examiners, Philadelphia, PA.

**Lovett, B. J.** (2013, November). "The Advantages and Disadvantages of Timed Tests." Invited talk given at the Research Advisory Forum of the National Board of Osteopathic Medical Examiners, Conshohocken, PA.

**Lovett, B. J.** (2013, May). "Auditory Processing Disorders: From Research to Practice: The View from School Psychology." Invited talk given to the National Centre for Audiology, London, Ontario.

**Lovett, B. J.** (2013, April). "Learning Disabilities and the Use of Expert Consultants." Invited talk given (with Dr. Lawrence Lewandowski) to the National Conference of Bar Examiners, Boston, MA.

**Lovett, B. J.** (2012, October). "The Science of Testing Accommodations for Students with Disabilities." Invited talk given to the Psychology Department at Suffolk University, Boston, MA.

**Lovett, B. J.** (2012, August). "Testing Accommodations: From Research to Practice." Invited talk to be given at the meeting of the College Board's Office of Services for Students

with Disabilities, Seattle, WA.

**Lovett, B. J.** (2012, May). "Classroom Management: A Behavioral Perspective." Invited talk to student-teachers currently in school-based practica at Elmira College, Elmira, NY.

**Lovett, B. J.** (2012, May). "Testing Accommodations for Students with Disabilities: Research-Based Practice." Invited talk at the conference High-Incidence Disabilities in Higher Education: Current Issues and Best Practices, Toronto, ON.

**Lovett, B. J.** (2012, March). "The Psychology of Accomplishment." Invited talk given to the Elmira College Chapter of Phi Beta Kappa, Elmira, NY.

**Lovett, B. J.,** & Sparks, R. S. (2011, December). "Gifted Students with Learning Disabilities: Implications for Testing Accommodations." Invited talk given to the National Board of Medical Examiners, Philadelphia, PA.

**Lovett, B. J.** (2011, April). "The Science and Ethics of Accommodating Employees with Psychiatric Disabilities." Invited talk given at the Tuck School of Business, Dartmouth College, Hanover, NH.

**Lovett, B. J.** (2010, October). "Diagnosing Learning Disabilities in Postsecondary Students." Invited talk given to the Southern Ontario Regional Assessment and Resource Centre, Huntsville, Ontario.

**Lovett, B. J.,** & Sparks, R. S. (2009, November). "Gifted Students with Learning Disabilities: Current Concepts and Controversies." Invited talk at the Test Agencies Disability Forum, Educational Testing Service, Princeton, NJ.

**Lovett, B. J.**, & Johnson T. L. (2009, October). "Auditory Processing Disorder: An Applied Primer for School Psychologists." Invited talk to the Psychology Department, Syracuse University, Syracuse, NY.

**Lovett, B. J.** (2007, March). "Testing Accommodations for Students with Disabilities: Asking the Hard Questions." Presentation to the Jamesville-DeWitt School District, Jamesville, NY.

**Lovett, B. J.** (2005, November). "Putting Statistics into Introductory Psychology: Activities that Work." Presentation to Syracuse University's Project Advance, New York, NY.

**Lovett, B. J.** (2005, October). "Direct Observation: The Royal Road to Child Psychiatric Diagnosis?" Presentation at Child Psychiatry Grand Rounds, Department of Psychiatry, SUNY Upstate Medical University, Syracuse, NY.

**Refereed Conference Presentations (selected):**
Fitzgerald, K., Nazmiyal, A., & **Lovett, B. J.** (2022, March). Construct validity of subjective and

objective symptoms of ADHD in college students. Poster presented at the annual convention of the Eastern Psychological Association.

Simon, R. F., **Lovett, B. J.,** & Trapp, S. (2022, March). Teaching of the history and systems of psychology in APA-accredited doctoral programs. Poster presented at the annual convention of the Eastern Psychological Association.

**Lovett, B. J.,** Spenceley, L. M., Schaberg, T. M., & Best, H. (2022, February). How school psychologists assess effort during psychoeducational evaluations. Poster presented at the annual convention of the National Association of School Psychologists.

Sczcesniak, L. A., & **Lovett, B. J.** (2022, February). What processing speed scores can tell us. Poster presented at the annual convention of the National Association of School Psychologists.

**Lovett, B. J.** (2021, April). Anxiety and testing: Handling accommodation requests and supporting all test-takers. Presentation at the Innovations in Testing conference.

Wang, X., Sczcesniak, L., **Lovett, B. J.,** & Ferrier, D. E. (2021, March). The stability of the Adult ADHD Self-Report Scale (ASRS). Poster presented at the annual convention of the Eastern Psychological Association.

Spenceley, L. M., Wood, W. L. M., **Lovett, B. J.,** Maether, N., & Kramer, R. J. (2020, February). Using the WJ IV COG to Assess Performance Validity. Poster presented at the National Association of School Psychologists conference, Baltimore, MD.

Wood, W. L. M., Lewandowski, L. J., & **Lovett, B. J.** (2019, October). Investigating the clinical utility of Sluggish Cognitive Tempo. Poster presented at the New York Association of School Psychologists conference, Syracuse, NY.

Carter, L., & **Lovett, B. J.** (2019, March). Separate room testing accommodations for students with and without ADHD. Poster presented at the Eastern Psychological Association convention, New York, NY.

Johnson, T. L., **Lovett, B. J.,** & White, E. (2018, November). SLP hearing screening: Variability in accuracy and consistency. Poster presented at the convention of the American Speech-Language-Hearing Association, Boston, MA.

Nelson, J. M., & **Lovett, B. J.** (2018, August). Data discrepancies and poor symptom validity in ADHD evaluations of college students. Presented at the annual meeting of the American Psychological Association, San Francisco, CA.

**Lovett, B. J.,** Carter, L., & Porto, A. (2018, March). Predictors of timed test performance in students with disabilities. Poster presented at the Eastern Psychological Association convention, Philadelphia, PA.

Wood, W. L. M., Spenceley, L. A., Scott, M., Marshall, E., & **Lovett, B. J.** (2018, February). Assessment of effort: WJ IV COG clusters as embedded validity indicators. Poster presented at the convention of the National Association of School Psychologists, Chicago, IL.

Johnson, T., **Lovett, B. J.,** & Dillmuth-Miller, S. (2016, November). Attitudes towards noise exposure: CSD vs. non-CSD students. Poster presented at the convention of the American Speech-Language-Hearing Association, Philadelphia, PA.

**Lovett, B. J.,** & Nelson, J. M. (2016, June). Test anxiety: Assessment, Documentation, and Management. Paper presented at the University of Connecticut Center for Postsecondary Education and Disability Postsecondary Training Institute, Philadelphia, PA.

Wood, W., Lewandowski, L. J., & **Lovett, B. J.** (2016, February). Contrasting the impairment profiles of sluggish cognitive tempo and ADHD. Poster presented at the convention of the National Association of School Psychologists, New Orleans, LA.

**Lovett, B. J.,** Drymond, M., & Vita, L. (2015, March). Determinants of college students' time needed to complete a test. Poster presented at the convention of the Eastern Psychological Association, Philadelphia, PA.

Potts, H. E., Lewandowski, L. J., & **Lovett, B. J.** (2015, February). Can we predict time needed on a reading comprehension test? Poster presented at the convention of the National Association of School Psychologists, Orlando, FL.

Potts, H. E., Wood, W. L., Lewandowski, L. J., & **Lovett, B. J.** (2015, February). Does sluggish mean slower test performance? A pilot study. Poster presented at the convention of the National Association of School Psychologists, Orlando, FL.

Spielberger, S., Lewandowski, L. J., **Lovett, B. J.,** & Potts, H. E. (2015, February). Effects of expressive writing on test anxiety and classroom tests. Poster presented at the convention of the National Association of School Psychologists, Orlando, FL.

Wood, W. L., Lewandowski, L. J., & **Lovett, B. J.** (2014, February). Impairment and executive functioning associated with sluggish cognitive tempo. Poster presented at the convention of the National Association of School Psychologists, Washington, DC.

Sparks, R. S., & **Lovett, B. J.** (2013, November). Examining documentation and applying objective diagnostic criteria to college students in a learning disability support program. Paper presented at the Convention of the International Dyslexia Association, New Orleans, LA.

Leja, A. M., & **Lovett, B. J.** (2013, February). Extended time testing accommodations: Do ADHD symptoms matter? Poster presented at the convention of the National Association of School Psychologists, Seattle, WA.

Johnson, T. L., **Lovett, B. J.,** Widen, S., & Amsterdam, R. (2012, March). Attitudes towards hearing protection among U.S. college students. Poster presented at the convention of the Pennsylvania Speech-Language-Hearing Association, Lancaster, PA.

Lewandowski, L., **Lovett, B. J.,** Panahon, C. J., Lambert, T., & Systma, M. R. (2012, February). Test accommodation preferences in college students. Poster presented at the convention of the National Association of School Psychologists, Philadelphia, PA.

**Lovett, B. J.,** Fredericks, D., Leja, A., & Sparks, R. S. (2012, February). Gifted students with learning disabilities: A quantitative synthesis. Poster presented at the convention of the National Association of School Psychologists, Philadelphia, PA.

Sparks, R. S., & **Lovett, B. J.** (2011, November). The identification and performance of gifted students with learning disabilities: A quantitative synthesis. Poster presented at the convention of the International Dyslexia Association, Chicago, IL.

Johnson, T. L., **Lovett, B. J.,** Kingman, R., & Cronin, C. (2010, November). The measurement of auditory processing: Does presentation level affect performance? Poster presented at the convention of the American Speech-Language-Hearing Association, Philadelphia, PA.

**Lovett, B. J.,** & Johnson, T. L. (2010, March). Auditory processing disorder: A role for the school psychologist. Paper presented at the convention of the National Association of School Psychologists, Chicago, IL.

Cohen, J. A., Lewandowski. L. J., & **Lovett, B. J.** (2010, March). Differences between extended time allotments for learning disabled college students. Poster presented at the convention of the National Association of School Psychologists, Chicago, IL.

Hendricks, K., Lewandowski, L. J., & **Lovett, B. J.** (2010, March). The use of Testtracker for students with ADHD. Poster presented at the convention of the National Association of School Psychologists, Chicago, IL.

**Lovett, B. J.,** & Hood, S. B. (2009, November). Realism and operationism in psychiatric diagnosis. Paper presented at the convention of the Florida Philosophical Association, Gainesville, FL.

**Lovett, B. J.,** Ells, L., & Lewandowski, L. J. (2008, November). Why do you think you need extra time? Poster presented at the convention of the New York Association of School Psychologists, Rochester, NY.

Berger, C., Lewandowski, L. J., **Lovett, B. J.,** Gathje, R. A., & Cohen, J. A. (2008, February). Writing on a computer: No longer a testing accommodation. Poster presented at the convention of the National Association of School Psychologists, New Orleans, LA.

**Lovett, B. J.,** Lewandowski, L. J., Kleinmann, A. E., & Rogers. C. R. (2007, March). Testing

accommodations for students with disabilities. Symposium presented at the convention of the National Association of School Psychologists, New York, NY.

Berger, C., Gathje, R. A., Lewandowski, L. J., **Lovett, B. J.** (2007, March). Extended time and laptop format as accommodations for written language tests. Poster presented at the convention of the National Association of School Psychologists, New York, NY.

DiGennaro, F. D., & **Lovett, B. J.** (2006, May). Is punishment effective? Is it ethical? Views of ABA members. Poster presented at the convention of the Association for Behavior Analysis, Atlanta, GA.

Eckert, T. L., **Lovett, B. J.,** & Jiao, J. (2006, March). Does performance feedback serve as reinforcement? Poster presented at the convention of the National Association of School Psychologists, Anaheim, CA.

Lewandowski, L. J., Sheffield, R., & **Lovett, B. J.** (2006, March). "Symptomatic" versus "impaired": Which is more important in ADHD diagnosis? Paper presented at the convention of the National Association of School Psychologists, Anaheim, CA.

Lewandowski, L. J., Parolin, R., **Lovett, B. J.,** & Gordon, M. (2006, March). Effects of extended time on math performance for students with ADHD. Poster presented at the convention of the National Association of School Psychologists, Anaheim, CA.

**Lovett, B. J.,** & Lewandowski, L. J. (2005, March). The gifted/learning disabled child: A critique of current assessment practices. Poster presented at the convention of the National Association of School Psychologists, Atlanta, GA.

**Lovett, B. J.,** & Stawski, R. S. (2004, November). Ergodicity in psychoeducational assessment. Paper presented at the Gardner Conference on Measurement and Statistics, Auburn, NY.

**Lovett, B. J.,** & DiGennaro, F. D. (2004, May). Punishment and aversive interventions, 1980-2000: Change and continuity. Poster presented at the convention of the Association for Behavior Analysis, Boston, MA.

**Courses Taught:**

> *High School Level*
> Introductory Psychology
>
> *Undergraduate Level*
> Introductory Psychology
> Abnormal Psychology
> Child Psychopathology
> Personality Psychology
> Health Psychology

History and Systems of Psychology
Psychological Testing
Research Methods in Psychology
Educational Psychology
Psychology of Children with Exceptionalities
Assessment of Students with Disabilities
Psychology of Learning
Applied Behavior Analysis
Introduction to School Psychology
Psychology of Intelligence and Creativity
Seminar: The Psychology of Moral Judgment
Seminar: Great Experiments in Psychology
Seminar: Controversies in Child Psychopathology
Applying Research Methods in Psychology: ADHD
Supervised Research Experience in Psychology
Interdisciplinary Freshman Core Course: Order & Chaos

*Graduate Level*
Statistics in Educational Research
Applied Behavior Analysis
History and Systems of Psychology
Professional and Ethical Functions of School Psychologists (Law & Ethics)
Individual Psychological Testing I (Psychometrics and Cognitive Assessment)
Individual Psychological Testing II (Socioemotional Assessment)

**Guest Lectures at Teachers College**
- HBSK 5010 – Philosophic Foundations of Special Education (Fall 2019, Fall 2020, Fall 2021)
- HBSK 6480 – School Psychologist Internship (Spring 2020)

**Masters Thesis Committee Service:**
Kaitlin Hendricks (Syracuse University, 2010)
Justin Cohen (Syracuse University, 2010)
Whitney Wood (Syracuse University, 2013)
Stephanie Spielberger (Syracuse University, 2015)
Heather Potts (Syracuse University, 2016)

**Masters Creative Project Supervisor:**
Yi-Tzu Hao (Teachers College, Columbia University, 2020)

**Doctoral Dissertation Committee Service:**
Mara Jane Schutz (University of NewCastle, 2008)
Kaitlin Hendricks (Syracuse University, 2013)
Laura Miller (Syracuse University, 2014)
Whitney Wood (Syracuse University, 2015)

Jessica Horton (Teachers College, Columbia University, 2019 – Defense Reader)
Faheema Abdool-Ghani (Teachers College, Columbia University, 2020 – Defense Reader)
Victoria Verdun (Teachers College, Columbia University, 2020 – Defense Reader)
Kayleigh Kangas-Dick (Teachers College, Columbia University, 2019 – from Proposal stage)
Yifei Sun (Teachers College, Columbia University, 2021- Defense Reader)
Andrea Lira (Teachers College, Columbia University, 2021- Defense Reader)
Lauren Baldonado (Teachers College, Columbia University, 2021- Defense Reader)
Eleonora Guzmán Daireaux (Teachers College, Columbia University, 2021- Defense Reader)
Jeanette Parsons (Queen's University, 2021)
Laura Johanson (Teachers College, Columbia University, 2021- Defense Reader)
Scott Lu (Teachers College, Columbia University, 2021 – from Proposal stage)
Lisa Szczesniak (Teachers College, Columbia University – sponsor – defended August 2022)
Ji Young Kim (Teachers College, Columbia University – Defense Reader)
Katherine Garcia (Teachers College, Columbia University – Defense Reader)


**Editorial Review Work:**

Current editorial board member of:
       *Journal of Psychoeducational Assessment* (2007 - Present)
       *Journal of Attention Disorders* (2020 – Present)
       *Disabilities* (2020 – Present)

Special reviewer on assessment research for *Journal of School Psychology*
       (editorial board member, 2011 – 2014; ad-hoc reviewer, 2014 - Present)

Guest co-editor, special issue of *Psychological Injury and Law* (2019)

Guest co-editor, special issue of *Journal of Clinical and Experimental Neuropsychology* (2021)

Guest co-editor, special issue of *Assessment for Effective Intervention* (2022-2023)

Guest action editor, special issue of *Psychological Injury and Law* (2021-2022)

Ad-hoc reviewer for:
       *American Educational Research Journal*
       *American Journal on Intellectual and Developmental Disabilities*
       *Applied Neuropsychology: Child*
       *Assessment*
       *Assessment in Education: Principles, Policy & Practice*
       *British Journal of Educational Psychology*
       *Canadian Journal of School Psychology*
       *Clinical Psychology Review*
       *Educational Assessment*

*European Journal of Psychology of Education*
*Exceptionality*
*High Ability Studies*
*History of Psychology*
*Intelligence*
*Journal of Adolescence*
*Journal of Applied School Psychology*
*Journal of Attention Disorders*
*Journal of Behavioral Education*
*Journal of Business Ethics*
*Journal of Child and Family Studies*
*Journal of Clinical and Experimental Neuropsychology*
*Journal of Intelligence*
*Journal of Learning Disabilities*
*Journal of School Psychology*
*Journal of Social and Clinical Psychology*
*Neuropsychiatric Disease and Treatment*
*Neuropsychology*
*Psychological Injury and Law*
*Psychological Science*
*Research in Developmental Disabilities*
*Research in Social and Administrative Pharmacy*
*Roeper Review*
*School Psychology Review*
*Sociology Compass*

Textbook reviewer/consultant for:
McGraw-Hill Higher Education
Sage Publications
John Wiley Publishers
Worth Publishers
*Choice* (academic library acquisitions service)

**Other Service to the Profession:**
- Conference proposal reviewer, New York Association of School Psychologists (2006)
- Assessment Consultant, ARC of Chemung County, NY (2007 - 2014)
- Grant Reviewer, Netherlands Organisation for Scientific Research, (2014)
- Grant Reviewer, Michigan State University (2016)
- Grant Reviewer, Nuffield Foundation (UK) (2021)
- New York Association of School Psychologists – Working Group on Postsecondary Transition (member, 2021-2022)

**Institutional Service:**
<u>At Teachers College, Columbia University (2019 - )</u>

Psychology Faculty Coordinating Committee (2019 - ) (Director, 2020 - 2022)
Nutrition Search Committee (2020-2021)
School Psychology Search Committee (2021-2022; Chair)
Doctoral Dissertation Grant Selection Committee (2020-2021)
Research Methods Exam Committee (Fall 2020)
Internal Tenure Reviewer, Counseling and Clinical Psychology Dept. (2020)
Mentoring Committee for Matthew Zajic (2021 - )
Institutional Review Board (Alternate member, 2021 - )
Counseling Psychology Search Committee (2022-2023)
TC Fulbright Program, Faculty Review Committee (2022-2023)
Faculty Executive Committee (HBS Dept. Representative, 2022 - )

At SUNY Cortland (2014-2019)
Chair, Psychology Department Personnel Committee (2018 - 2019)
Chair, Committee on Teaching Effectiveness (2018 - 2019)
FDC Mentor to Haiyan Zhang (2017-2018)
Psychology Club Advisor (2016-2018)
Member, College Writing Committee (2017 - 2018)
Chair, Educational Psychology Faculty Search Committee (2017 - 2018)
Psychology Department Assessment Committee (2016 - 2017)
Sherlach Scholarship Award Committee (2016 - 2019)
Psychology Department Curriculum Committee (2014 - 2016)
Efficiencies Advisory Committee (2016)
FDC Mentor to Dr. Katherine Bonafide (2015-2016)
Psychology Department Writing-Intensive Course Committee (2015 - 2019)
Psychology of Children with Exceptionalities Committee (2014 -)
Chair, Clinical Psychology Faculty Search Committee (2014 - 2015)
Member, Applied Psychology Faculty Search Committee (2014)
Ad Hoc Committee on the 25th Anniversary of the ADA (2014 - 2015)

At Elmira College (2007-2014)
Co-Advisor, Elmira College Chapter of Psi Chi (2009 - 2010)
Co-Chair, Human Research Review Board, Elmira College (2008 - 2014)
Teacher Education Advisory Group, Elmira College (2007 - 2009)
Faculty Development Committee, Elmira College (2008 - 2010; Chair, 2009 - 2010)
Academic Assessment Committee, Elmira College (2008 - 2011)
Advising Committee, Elmira College (2012 – 2014)
Psychology Faculty Search Committee, Internal Member (2008 - 2009)
Nursing Faculty Search Committees, Outside Member (2010, 2012, 2013)
Criminal Justice Search Committee, Outside Member (2012)
Education (Literacy) Search Committee, Outside Member (2012)
Reviewer of Tenure-Track Faculty:
        2008-2009 – Dr. Megan Kennedy, 1st year review
        2009-2010 – Dr. Christopher Terry, 1st year review
        2010-2011 – Dr. Lauren Shaw, 3rd year review
        2013-2014 – Dr. Mark Pinter, 3rd year review

**Awards, Small Grants, and Honors:**
At SUNY Cortland (2014-)
Fine Teaching Development Award, 2017
Faculty Development Center Small Grant, 2014, 2016
Teaching Innovation Grant, 2015
College Assessment Committee Grant, 2015
UUP Individual Development Award Grant, 2016

At Elmira College (2007-2014)
Summer Faculty Development Research Grant, 2009, 2010, 2011, 2012
Honorary Inductee (student-elected), Phi Eta Sigma National Honor Society, 2009
Psi Chi Faculty Advisor Research Grant, 2010
Journal of School Psychology Editorial Appreciation Award, 2013
Joseph Stein Junior Faculty Prize, 2013

At Syracuse University (Ph.D. student, 2002-2007)
University Fellowship Award, 2002-2003 and 2005-2006
Psychology Department Allport Research Grant, 2004, 2005
College of Arts and Sciences Creative Project Award, 2005
Syracuse University Outstanding Teaching Award, 2005

At the Pennsylvania State University (undergraduate student, 1998-2002)
Induction into Psi Chi, National Honor Society for Psychology, 2000
3rd Place Prize, Social Science Division, Undergraduate Research Fair, 2001
Induction into Phi Beta Kappa, 2002

**Large Grants Sought:**
1. PI, "Remaking Home & Community After COVID-19" – National Science Foundation, $199,090 total costs (unfunded).
2. Co-PI, "Exploring Time Use and Timing Accommodations During NAEP Testing Among Students with Disabilities" – Institute for Education Sciences, $349,164 to TC (unfunded)

# EXHIBIT 2

## Review of Accommodation Request

**Applicant Name:** Robert Sampson
**Date of Birth:** █████████
**Date of Review:** April 25, 2017
**Reviewer**: Benjamin J. Lovett, Ph.D.

This review concerns Robert Sampson, who has requested extended time testing accommodations (50% additional time) on Step 1 of the USMLE. He reports diagnoses of ADHD and learning disabilities, as well as a recent history of accommodations in medical school. In a personal statement, Mr. Sampson describes a long history of problems acquiring academic skills and says that he did well until medical school because he worked so hard.

In support of his request, Mr. Sampson has submitted the following documents:

- A record of performance on Shelf exams in medical school
- A record of performance on a group-administered IQ test (the OLSAT) in second grade
- Score reports from the PSAT, SAT, ACT, and MCAT
- The reports from diagnostic evaluations completed in 2013
- Supportive letters from a disability services office administrator, a tutor, a learning specialist, and a treating psychiatrist
- Confirmation of eligibility for accommodations in medical school
- Evidence of being called before a committee in medical school to explain marginal performance there

This review has three purposes: to evaluate the evidence for the reported disability conditions, to determine if the conditions (if present) cause a substantial limitation in any major life activities, and to determine if the requested accommodations are appropriate for Mr. Sampson.

Evidence of ADHD
There is clearly insufficient evidence to support a diagnosis of ADHD. Indeed, Mr. Sampson's diagnosis is one of the most irresponsible that I have ever seen. There is very substantial evidence *against* the presence of ADHD.

In August 2013, Mr. Sampson completed his first diagnostic evaluation, and at that time, based on his concerns, the evaluator did not even assess for ADHD; it appears that there were no concerns related to ADHD, and the evaluator noted that Mr. Sampson "was very focused throughout the testing sessions." In December 2013, Mr. Sampson nonetheless completed a second evaluation with a different evaluator, and this time he "wondered whether" ADHD "might explain attentional difficulties he is having." The evaluator obtained standardized ratings of Mr. Sampson's current and childhood ADHD symptoms from Mr. Sampson himself as well as from various informants (his mother, his father, his girlfriend, and a friend/tutor). With regard to childhood symptoms, only Mr. Sampson endorsed clinically significant levels; neither of his parents did. With regard to current symptoms, *neither Mr. Sampson nor any third-party informants endorsed clinically significant symptom levels*. This is very strong evidence *against* ADHD, and the evaluator did not make that diagnosis. Nonetheless, the evaluator claimed that Mr. Sampson "does appear to be experiencing attention problems," perhaps based on a small

number of below-average scores on highly artificial neuropsychological tasks.

At some point in 2015, Mr. Sampson was reportedly diagnosed with ADHD; indeed, his psychiatrist reports the diagnosis, but there is no record of what evidence was used to make the diagnosis, and as I discussed above, there is very clearly substantial evidence against the diagnosis.

Evidence of Learning Disabilities

The current official diagnostic criteria for learning disabilities require that someone's "academic skills are substantially and quantifiably below those expected for the individual's chronological age."[1] Every time that Mr. Sampson's academic skills have been measured against age peers on diagnostic tests, the skills have been in the average range or above.[2] Similarly, on real-world academic tests taken by the general population (ACT, PSAT, SAT) and even by medical school applicants (MCAT), his scores have always been in the average range or above, compared to his peers.[3] This is very strong evidence *against* the presence of any learning disabilities.

In August 2013, Mr. Sampson received a diagnosis of Learning Disorder Not Otherwise Specified (LD-NOS). However, the evaluator explicitly acknowledged that this was not based on any academic skill weaknesses, but on a discrepancy between Mr. Sampson's "verbal and visual/spatial reasoning abilities," neither of which were found to be below-average either. LD-NOS is an old diagnostic term (outdated even in August 2013) that was used to refer to problems that did *not* meet the full criteria for any well-understood learning disabilities. Even if LD-NOS is a valid diagnostic category generally, learning disabilities clearly concern academic skill weaknesses, and so the LD-NOS term was misapplied.

In December 2013, Mr. Sampson was diagnosed with a learning disability "with impairment in reading (dyslexia), reading fluency, word reading accuracy, spelling," but again there is no evidence that he has ever performed below the average range compared to age peers on measures of any of those skills. The diagnosis was made in the face of clear evidence to the contrary; it was a remarkably unsupported diagnosis.

Evidence of Other Disabilities

Finally, Mr. Sampson was diagnosed in December 2013 with "Unspecified Neurodevelopmental Disorder." There are no detailed diagnostic criteria for such a disorder; the term is used when someone does *not* meet the criteria for any of the known disorders. Therefore, there is no way to determine if the term was applied correctly; instead, we should ask (as I do below) whether Mr. Sampson meets the standard for being disabled, and whether he needs any accommodations.

---

[1] See page 67 of the *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition* (DSM-5; American Psychiatric Association, 2013).

[2] In August 2013, Mr. Sampson's academic skills were measured by the Woodcock-Johnson Tests of Achievement, and all of his scores were in the average range or above, when compared to age peers. In December 2013, he was given the reading comprehension measure from the Scholastic Abilities Test for Adults, and again, his score was in the average range (without any extended time) compared to age peers.

[3] Mr. Sampson took the SAT several times, including once very early (at the age of 14) as part of the requirements for entrance into a special non-college program, and so his scores from that administration, which compared him to college-bound high school seniors, cannot be taken as evidence of his own age- or grade-level abilities. His scores on all *other* administrations of the SAT were in the average range or above.

<u>Evidence of Functional Limitations and Accommodations Needs</u>
There is simply no credible evidence that, compared to most people in the general population, Mr. Sampson is substantially limited in any major life activities. He has not always done well on tests in medical school, but obviously, most people are not expected to do well in medical school, and so performance problems there are not strong evidence of a disability. In addition, he has occasionally obtained below average scores on highly artificial neuropsychological tasks, but variability in performance on such measures is typical and expected, and his lowest scores are not buttressed by credible, *real-world* evidence of deficits compared to most people in the general population.

Finally, there is clearly insufficient evidence that Mr. Sampson requires any accommodations at all to access Step 1 of the USMLE. In the past, when he has taken tests that most people in the general population take, he does well without any accommodations. His SAT scores were in the average range or above, without any accommodations. His ACT scores were similarly in the average range or above, without any accommodations. Even his MCAT scores were better than those of most medical school applicants, without accommodations. Admittedly, some of his Shelf exam scores have not been very high, but if the only setting where someone experiences functional impairment is on medical school exams, this would not rise, in my opinion, to the level of a true disability.

Benjamin J. Lovett, Ph.D.

# EXHIBIT 3

## Review of Accommodation Request

**Applicant Name:** Robert Sampson (reconsideration)
**Date of Birth:** ▮▮▮▮▮▮
**Date of Review:** July 16, 2017
**Reviewer**: Benjamin J. Lovett, Ph.D.

This review concerns Robert Sampson, who has requested extended time testing accommodations (50% additional time) on Step 1 of the USMLE. He reports diagnoses of ADHD and learning disabilities, as well as a recent history of accommodations in medical school.

I first reviewed Mr. Sampson's request in April 2017. At that time, in support of his request, he had submitted the following documents:

- A record of performance on Shelf exams in medical school
- A record of performance on a group-administered IQ test (the OLSAT) in second grade
- Score reports from the PSAT, SAT, ACT, and MCAT
- The reports from diagnostic evaluations completed in 2013
- Supportive letters from a disability services office administrator, a tutor, a learning specialist, and a treating psychiatrist
- Confirmation of eligibility for accommodations in medical school
- Evidence of being called before a committee in medical school to explain marginal performance there

Based on the documentation described above, I concluded that there was clearly insufficient evidence to support Mr. Sampson's request. Although he had been diagnosed with ADHD, the only current evidence of his core ADHD symptoms (as rated by himself and by others who knew him well) showed that none of the ratings were above clinical thresholds. Although he had been diagnosed with a learning disability affecting reading and spelling skills, diagnostic tests measuring those skills found them to be in the average range or above. Finally, on standardized, high-stakes tests such as the ACT, SAT, and even the MCAT, Mr. Sampson had repeatedly performed in the average range or above without any accommodations. Please see my report, dated April 25, 2017, for more details.

The NBME denied Mr. Sampson's request, and he has now appealed. In addition to reviewing the documents listed above, I have now also reviewed the following documents:

- An appeal letter from Mr. Sampson
- Supportive letters from his parents, and from a disability services office administrator at his university
- Various documents from Mr. Sampson's elementary school years, including report cards and letters, along with a summary of chosen quotations from those documents
- Additional correspondence

Unfortunately, there is still clearly insufficient evidence to support Mr. Sampson's request, and there is a great deal of evidence that argues *against* his request. Below I summarize the new documentation:

- The letter from Mr. Sampson's parents asserts that they overlooked their son's early educational problems due to his good performance in school. The parents also report that their son benefited from extensive tutoring, especially in high school, and the letter lists the names of many tutors. They do not mention what was noted by Mr. Sampson's August 2013 evaluator, that his high school classes "were typically honors or AP level" and that "he earned A's in most classes."
- The letter from the disability services office administrator contains many legal claims but does not provide any unique, relevant information about Mr. Sampson's case. The administrator also makes clear that she determines accommodations needs by comparing Mr. Sampson's diagnostic test scores to each other (even when all scores were average or above) and by comparing Mr. Sampson's skills to what would be needed in medical school. She clearly does *not* use a general population, average person comparison standard.
- The documents from Mr. Sampson's elementary school years do not contain any clear evidence that ever would have met the criteria for ADHD or learning disabilities. Admittedly, not all of the documents are entirely legible, but the summary of quotes from those documents appears to show "sour cherry picking"—that is, the choosing of unrepresentative comments that, in context, would paint a very different picture of Mr. Sampson. Certainly, there is no evidence that Mr. Sampson's behavior or performance in school was substantially below that of most of his peers. Of course, even if there were credible evidence of significant childhood problems (and there is no such evidence), this would not mean that Mr. Sampson is *currently* impaired.

The essential state of the evidence, then, has not changed. The one comprehensive assessment of ADHD symptoms failed to find adequate evidence to support such a diagnosis (since no one, including Mr. Sampson himself, rated him as having current clinical levels of symptoms). The diagnostic evaluations of his academic skills have failed to find any below-average skills compared to his age peers or to most people in the general population. And on high-stakes tests when he is compared to general population peers (e.g., on the SAT and ACT), and even when he was compared to medical school applicants (on the MCAT), his scores have been in the average range or above without accommodations.

One of the skills needed to access Step 1 of the USMLE is reading fluency—that is, the ability to decode and understand text under a time limit. Every time that Mr. Sampson's ability to do this has been compared to age peers or to general population standards, his skills have been in the average range or above:

- His SAT and ACT scores were consistently in the average range or above, except the one time that he took the test several years early (and so was not compared to peers).
- In August 2013, his score on the Woodcock-Johnson Tests of Achievement (WJ-Ach) reading fluency task (where he needed to silently read and demonstrate understanding of sentences as quickly as possible) was better than 80% of his age peers.
- In August 2013, his score on the timed reading comprehension task from the Nelson-Denny Reading Test (NDRT) was in the average range for a general population proxy group (first-year college students). Although the evaluator reports a score at the 16th percentile, this was based on a comparison to graduating college seniors, not a relevant comparison group.

- In December 2013, his score on the standard-timed version of the reading comprehension task from the Scholastic Abilities Test for Adults (SATA) was in the average range for his age peers.

Finally, let me again note that even on the MCAT, when Mr. Sampson was compared to a very high performing group of individuals (i.e., medical school applicants), all of his scores were consistently in the average range or above without any accommodations.

This is not a "gray area" or "borderline" case; there is clearly insufficient evidence to support Mr. Sampson's request, and instead there is credible, consistent evidence suggesting that he does *not* have relevant substantial limitations compared to most people in the general population.

Benjamin J. Lovett, Ph.D.

# EXHIBIT 4

# Review of Accommodation Request

**Applicant Name:** Robert Sampson (<u>second</u> reconsideration)
**Date of Birth:** ███████
**Date of Review:** December 18, 2017
**Reviewer**: Benjamin J. Lovett, Ph.D.

This review concerns Robert Sampson, who has requested extended time testing accommodations (50% additional time) on Step 1 of the USMLE. He reports diagnoses of ADHD and learning disabilities, as well as a recent history of accommodations in medical school.

I first reviewed Mr. Sampson's request in April 2017. At that time, in support of his request, he had submitted the following documents:

- A record of performance on Shelf exams in medical school
- A record of performance on a group-administered IQ test (the OLSAT) in second grade
- Score reports from the PSAT, SAT, ACT, and MCAT
- The reports from diagnostic evaluations completed in 2013
- Supportive letters from a disability services office administrator, a tutor, a learning specialist, and a treating psychiatrist
- Confirmation of eligibility for accommodations in medical school
- Evidence of being called before a committee in medical school to explain marginal performance there

Based on the documentation described above, I concluded that there was clearly insufficient evidence to support Mr. Sampson's request. Although he had been diagnosed with ADHD, the only current evidence of his core ADHD symptoms (as rated by himself and by others who knew him well) showed that none of the ratings were above clinical thresholds. Although he had been diagnosed with a learning disability affecting reading and spelling skills, diagnostic tests measuring those skills found them to be in the average range or above. Finally, on standardized, high-stakes tests such as the ACT, SAT, and even the MCAT, Mr. Sampson had repeatedly performed in the average range or above without any accommodations. Please see my report, dated April 25, 2017, for more details.

The NBME denied Mr. Sampson's request, and he appealed, submitting the following additional documents:

- An appeal letter from Mr. Sampson
- Supportive letters from his parents, and from a disability services office administrator
- Various documents from Mr. Sampson's elementary school years, including report cards and letters, along with a summary of chosen quotations from those documents
- Additional correspondence

Unfortunately, there was still clearly insufficient evidence to support Mr. Sampson's request. The letter from Mr. Sampson's parents noted that their son received extensive tutoring in school, but given that Mr. Sampson was receiving A grades in honors and advanced placement courses, such tutoring would not be evidence of a disability. Meanwhile, the disability services office

administrator made clear in her letter that she believes that (a) discrepancies between different test scores and (b) low performance relative to other medical students are sufficient evidence of a disability. Finally, the documents from Mr. Sampson's elementary school years did not clearly show evidence of atypical levels of attention/behavior problems or poor academic performance beyond what most students experience at times. The new documentation also failed to address the substantial evidence *against* the request (noted above). Therefore, I had to again conclude that there was insufficient evidence to support the request. Please see my report, dated July 16, 2017, for more details.

The NBME denied Mr. Sampson's appeal, and he has again requested reconsideration. In addition to his own brief letter, he has submitted three new supportive letters from the following individuals:
- Dr. Allison Anderson, a psychologist who evaluated Mr. Sampson in December 2013
- Dr. Thomas Aronson, a psychiatrist who has been treating Mr. Sampson since November 2015
- Dr. Jan Serrantino, an "educational consultant" who had written earlier supportive letters as the disability services office administrator mentioned above

Unfortunately, this new documentation provides no new evidence relevant to Mr. Sampson's case. Moreover, the arguments presented in these letters are based on either irrelevant or inaccurate information. Finally, and most remarkably, none of the letters attempt to address the very considerable evidence that argues against Mr. Sampson's request. Let me respond to the major claims in these letters:

1. Dr. Anderson claims that Mr. Sampson is below average in relevant areas. But as support for this claim, she only cites irrelevant facts:
   - Mr. Sampson scored at the 16th percentile on the Nelson-Denny Reading Test (NDRT) timed reading comprehension task compared to *graduating college seniors*, not compared to age peers or to the general population (indeed, fewer than half of adults in the United States have a college degree). Compared to the general population proxy group of first-year college students, his score was well within the average range.
   - Mr. Sampson scored at the 25th percentile on a timed version of the reading comprehension task from the Scholastic Abilities Test for Adults. This score is in the average range. Dr. Anderson points out that any test score has a range of uncertainty around it (the "standard error of measurement"), but this is irrelevant, since as she notes, that uncertainty extends in both directions from the score, and so if tested on a different day, Mr. Sampson's score might have been somewhat lower than the 25th percentile, but *it might just as likely have been higher*.
   - Mr. Sampson scored below the average range on artificial neuropsychological tests that are not at all like Step 1 of the USMLE, such as a test where he needed to draw a complex figure from memory.

   Worse still, Dr. Anderson does not even mention the evidence from real-world tests such as the SAT, ACT, and MCAT that show much better performance than the diagnostic tests that she chooses to discuss.

2. Dr. Anderson repeatedly bases her accommodations recommendations on facts that *do not show below-average functioning*. For instance, she notes that Mr. Sampson improved his performance on time-pressured tests when given more time (as many nondisabled people do). Similarly, she notes that Mr. Sampson's reading scores were lower *compared to some of his other test scores*. Facts like these are irrelevant to a disability determination even if true.

3. Dr. Aronson firmly asserts that Mr. Sampson meets the diagnostic criteria for ADHD, but never states the evidence that he used to make that judgment. The closest that Dr. Aronson comes to doing so is when he says that "ADHD is a clinical diagnosis made over several visits triangulating patient self-reported symptoms and impact with key data points from a multitude of sources." But Dr. Aronson never acknowledges that in December 2013, when Mr. Sampson's self-reported symptoms were combined with reports about his symptoms from a multitude of other sources (his mother, his father, his girlfriend, and his friend/tutor), *none* of these sources (including Mr. Sampson himself) described Mr. Sampson as having ADHD symptoms in the clinical range. Therefore, the only direct evidence of core ADHD symptoms on validated diagnostic measures undermines Dr. Aronson's assertion, *even when using assessment methods that Dr. Aronson appears to endorse.*

4. Dr. Aronson makes other assertions that are directly contradicted by objective evidence. For instance, he refers to Mr. Sampson's information processing speed as "very slow." But when Mr. Sampson's processing speed has been measured directly, it has been at least in the average range, and usually far above that range. For instance, in 2013, his processing speed score on the Wechsler Adult Intelligence Scale was better than 93% of people his age.

5. Dr. Serrantino notes that in one of the denial letters, the NBME cited research showing that students with *and without* disabilities both benefit from extended time accommodations. Rather than attempting to criticize this research, she proceeds to note that the cited research study used the NDRT, and she argues that the NBME has elsewhere criticized the NDRT. The NBME's point about students without disabilities benefiting from extended time stands (apparently without disagreement from Dr. Serrantino), and it is highly relevant to Mr. Sampson's case.

6. Dr. Serrantino appears to argue in favor of "discrepancy" models in the diagnosis of learning disabilities. What counts as a discrepancy model varies from one reference to another, but in general, Dr. Serrantino appears to be arguing that even if all of someone's diagnostic test scores are in the average range or above, discrepancies between those scores can be evidence of a learning disability. Such a claim is admittedly debated within the field, with different scholars coming down on different sides of the issue. However, even if we grant that a learning disability could be diagnosed using these kinds of discrepancies, this would clearly not meet the *legal* definition of disability, which requires substantial limitations compared to most people in the general population (not just compared to the person's other skills). Moreover, the official diagnostic criteria for learning disabilities in the *Diagnostic and Statistical Manual for Mental Disorders*

clearly require that someone's academic skills be at least 1 standard deviation below the mean for the person's age group (among other requirements).

7. Finally, Dr. Serrantino makes a variety of legal claims, as she has in the past, but some of those claims appear to me to be at best misleading or else misapplied to Mr. Sampson's case. For instance, she reports that someone can be substantially limited in reading if they take longer to read. But as I have noted, there is no credible evidence that Mr. Sampson's *timed* reading skills are below the average range compared to the general population. She also reports that evidence of past student success cannot be used when making accommodations decisions. But as she no doubt knows, educational performance in real-world settings is core evidence of a learning disability (or the lack thereof), even mentioned in the *Diagnostic and Statistical Manual of Mental Disorders*. She is right that past success does not automatically mean that someone does not have a disability, but she extends this point beyond all reasonable application.

As I noted in an earlier report, Mr. Sampson's case is not in a "gray area." Not only is there insufficient evidence supporting his disability diagnoses and accommodation needs, but there is a tremendous amount of consistent evidence *against* those diagnoses and needs. He and his advocates have passionately argued in support of his case, but they never even acknowledge the very clear evidence undermining their claims.

Benjamin J. Lovett, Ph.D.

# EXHIBIT 5

**Review of Accommodation Request**

**Applicant Name:** Robert Sampson (<u>third</u> reconsideration)
**Date of Birth:** ███████
**Date of Review:** July 12, 2018
**Reviewer**: Benjamin J. Lovett, Ph.D.

This review concerns Robert Sampson, who has requested testing accommodations (50% additional testing time, and possibly other accommodations as well now) on Step 1 of the USMLE. He has diagnoses of neurodevelopmental disorders including ADHD and learning disabilities, as well as a recent history of accommodations in medical school.

I have reviewed Mr. Sampson's request and accompanying documentation three times in the past. Each time, the evidence has clearly failed to support his request. Mr. Sampson's case is rather unusual in my experience, in that he has submitted very clear, consistent evidence that argues *against* his request. He has consistently performed in the average range and above on diagnostic tests of academic skills that compared him to age peers. He has consistently performed in the average range and above on real-world standardized tests of academic skills taken without accommodations. And he and several other people who know him well have described him, on standardized rating scales, as having ADHD symptom levels that are in the normal (rather than the clinical) range. It is hard to think of what would be more consistent evidence against the presence of ADHD and learning disabilities. Please see my prior reports, dated April 25, 2017, July 16, 2017, and December 18, 2017, for more details, along with complete listings of all documents that I have reviewed in the past.

Since my last review of his file, Mr. Sampson has submitted additional documents:
- A new appeal letter
- A letter from an attorney representing him, Ms. Jo Anne Simon
- A letter from a psychiatrist, Dr. Thomas Aronson
- A letter from a learning specialist, Ms. Linda De Motta

The new documents do not contain any new evidence bearing on the questions in this case. The substantial evidence against the request is never addressed adequately (the strongest evidence against the ADHD diagnosis is not addressed at all), and the evidence and arguments made in support of the diagnoses and request continue to be irrelevant or inaccurate. In the present report, my goal is to address several issues where there may be genuine misunderstandings or where clarification can otherwise help.

1. In her letter, Ms. Simon claims that "here the record clearly demonstrates that Mr. Sampson's impairments significantly and, often severely, restrict his ability to read, comprehend, learn, concentrate, process information, write, sleep, work, and take tests." As I discussed above and in my past reports, the "impairments" (learning disabilities and ADHD) are actually not supported by the evidence, but let me put that to one side. Even if I assume for the moment that Mr. Sampson has one or more relevant "impairments," there is clearly insufficient evidence to show that Mr. Sampson is substantially limited in any major life activities (including the ones that Ms. Simon lists) *relative to most people*

*in the general population.* That final clause might be a key source of the misunderstanding and disagreement here; I have used a general population comparison whereas it is clear that at times, Mr. Sampson's advocates have not. Instead, they have compared him to graduating college seniors, to other medical students, and to his own highest skills.[1]

The comparison to medical students and to medical school standards requires more discussion. Both Dr. Aronson and Ms. De Motta note that Mr. Sampson has had trouble performing in medical school. They argue that medical school and the USMLE are more difficult than prior academic tasks that Mr. Sampson has faced. Ms. Simon also makes similar comments comparing the USMLE to the MCAT. But if someone is able to get to medical school without accommodations, and to perform well on standardized measures of academic skills without accommodations for the purposes of admission to college and medical school, it is (at the very least) highly unlikely that they are limited in their ability to access tests, relative to most people in the general population.

2. Ms. Simon notes that someone can be substantially limited in the manner in which they perform a major life activity. She then claims that "[i]n order to accurately read, comprehend written material, and write, Mr. Sampson must work slower and more carefully than most people. He must reread several times and contend with external and internal distractions that most people will never face." Claims like these are why it is so important to inspect Mr. Sampson's performance on timed, standardized tests taken in typical settings without accommodations, and his record of performance shows average and better scores, arguing against Ms. Simon's contentions. Her speculations (and Mr. Sampson's) that he is unusual in his manner of reading and writing are severely undermined by the actual evidence of his performance under constrained conditions.

3. There has also been discussion recently of the Nelson-Denny Reading Test (NDRT). As with most published tests, the NDRT has advantages and disadvantages, and must be interpreted carefully and properly to be useful. In my professional opinion, the NDRT comprehension task can be a valid measure of a student's timed reading comprehension skills, and such skills are a key foundation for being able to access Step 1 of the USMLE under standard time limits. One disadvantage of the NDRT is that it has no age norms, only grade norms. Compared to graduating college seniors, Mr. Sampson's NDRT comprehension score was at the 16th percentile, in what is often referred to as the "low average" range. But graduating college seniors are not representative of the general population; indeed, most United States adults do not have a college degree. Therefore, many evaluators use first-year college students as a proxy group to represent the general population; this is obviously not optimal, but it is the best we can do without age norms. Compared to such a group, Mr. Sampson's timed reading comprehension performance was clearly in the average range. Ms. Simon and Mr. Sampson both cite the 16th percentile score, but given the comparison group, this is not a valid technique.

---

[1] Dr. Aronson does also seem to claim that Mr. Sampson is limited relative to most people in the general population. But he supports his claim only with irrelevancies (e.g., discrepancies between different cognitive scores), inaccuracies (e.g., his claim that most high school students finish the Nelson-Denny Reading Test within the standard time), or statements so subjective that they cannot be evaluated.

The NDRT also has a kind of supplemental score, the reading *rate* score. Mr. Sampson's rate score was at the 24th percentile, also in the "low average" range, compared to graduating college seniors. If he were compared to the general population proxy group, the score would again be in the average range, but the rate score is highly problematic, such that it should never be used, in my opinion, either in favor or against an accommodations request. The NDRT manual shows the score to have low reliability (reliability below generally accepted standards for psychoeducational tests), and it involves only 1 minute of silent reading with no check on comprehension. Therefore, it is essentially a meaningless score anyway; the fact that, compared to a general population proxy group, Mr. Sampson's score was in the average range does not actually argue against his request, and if his score were far lower, it would not argue in favor of his request; absolutely no valid conclusions follow from this score.

Before leaving the issue of the NDRT, I should note that, even if Mr. Sampson's NDRT comprehension score were low, it is just one piece of evidence, and when we examine his SATA diagnostic reading comprehension score, his Woodcock-Johnson reading fluency score, his scores on the reading comprehension sections of the SAT, ACT, and MCAT, etc., and all of these show average and better skills (even compared to other medical students), the evidence for his good timed reading comprehension is consistent and converges across many sources of information.

4. The recently submitted documents involve discussion of a 2013 study published in the *Journal of Psychoeducational Assessment* examining the effect of time extensions on the scores of college students with and without learning disabilities.[2] Ms. Simon and Dr. Aronson both criticize the study, although Ms. Simon admits that the study's authors were open about its limitations. I am a co-author of the study and would like to note how I see its relevance here. The study is part of a large body of literature examining the effects of time extensions on the test performance of students with and without disabilities, and that literature, *taken as a whole*, has shown that on time-pressured tests, students without disabilities tend to benefit from the time extensions. I am aware of three systematic reviews of that literature,[3] and all three drew that conclusion. Any individual study has expected limitations, but that body of research literature, taken as a whole, is relevant to this case insofar as it shows that benefiting from extended time is not a valid indicator of a disability. So when Mr. Sampson and his advocates report—and even provide evidence suggesting—that he does better on tests with additional time, this is not evidence of a disability, since many nondisabled students will improve their performance when given additional time.

[2] Lewandowski, L., Cohen, J., & Lovett, B. J. (2013). Effects of extended time allotments on reading comprehension performance of college students with and without learning disabilities. *Journal of Psychoeducational Assessment*, *31*(3), 326-336.

[3] Cahan, S., Nirel, R., & Alkoby, M. (2016). The Extra-Examination Time Granting Policy: A Reconceptualization. *Journal of Psychoeducational Assessment*, *34*(5), 461-472.

Lovett, B. J. (2010). Extended time testing accommodations for students with disabilities: Answers to five fundamental questions. *Review of Educational Research*, *80*(4), 611-638.

Sireci, S. G., Scarpati, S. E., & Li, S. (2005). Test accommodations for students with disabilities: An analysis of the interaction hypothesis. *Review of Educational Research*, *75*(4), 457-490.

5. Mr. Sampson's advocates claim that the discrepancy model of diagnosing learning disabilities is valid. As I noted in an earlier report, there are many different ways of using discrepancies, and there is not a single clear referent that the "discrepancy model" corresponds to. There are some scholars who argue that discrepancies between test scores can be a useful source of evidence. However, what is key is that (a) the official criteria for diagnosing learning disabilities, found in the *Diagnostic and Statistical Manual of Mental Disorders*, require substantially below-average academic skills compared to age peers, and (b) the legal disability threshold would require substantial limitations, compared to most people in the general population, in academic skills or other major life activities.

6. Mr. Sampson's advocates have argued that he has below-average visual processing skills, and that this will require accommodations on Step 1 of the USMLE, since a portion of that test's items have visual figures. However, the evidence that has been cited for Mr. Sampson's purported deficits in visual processing comes from highly artificial tasks unlike Step 1 of the USMLE in key ways. For instance, the Rey Complex Figure Test (RCFT) involves copying an unusual figure, then redrawing it from memory, and then needing to recognize (from memory) whether various drawings show parts of that figure. On the Step 1 exam, it is my understanding that any figures will be available for reference as many times as Mr. Sampson wishes to view them, and he will not need to copy, redraw, or memorize elements of a figure for delayed retrieval. Similarly, on the Woodcock-Johnson Picture Recognition test, Mr. Sampson was shown one set of pictures and then asked to identify which pictures of a second set he had already seen. The Step 1 exam will not require such skills.

7. Mr. Sampson and his advocates cite a number of self-reported statements about various subjective/speculative phenomena (e.g., needing to work harder and longer than others) and other purportedly atypical behaviors (e.g., playing a musical instrument without learning to read music). These comments are difficult to evaluate, but in any case they are irrelevant to the request. On core measures of ADHD symptoms and academic skills, Mr. Sampson has consistently obtained evidence against ADHD and any learning disabilities, and his real-world test performance parallels this.

I have no reason to doubt that Mr. Sampson's request is in good faith, and I understand that professionals have told him that he has disability conditions. But their own evidence contradicts these diagnoses. If a physician diagnosed a patient with paralysis of both legs but also reported that the patient was an excellent long distance runner without any accommodations or assistive technologies, I would be skeptical of the diagnosis. Mr. Sampson's case is analogous to this; his evaluators have ignored strong, consistent evidence that they themselves report or are otherwise aware of.

Benjamin J. Lovett, Ph.D.

# EXHIBIT 6

