# No. 23-3

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

*ROBERT SAMPSON,*

*Plaintiff-Appellee,*

*v.*

*NATIONAL BOARD OF MEDICAL EXAMINERS,*

*Defendant-Appellant.*

On Appeal from the U.S. District Court for the Eastern
District of New York, Civil Action No. 22-CV-5120 (JMA)

**JOINT APPENDIX**
**VOLUME V OF V (A970 – A1161)**

Robert A. Burgoyne
Caroline M. Mew
PERKINS COIE LLP
700 Thirteenth Street N.W.,
Suite 800
Washington, DC 20005-3960
Telephone: 202.654.1744

Attorneys for
Defendant-Appellant
NATIONAL BOARD OF
MEDICAL EXAMINERS

# VOLUME I: A1 – A267

**Page**

District Court Docket Sheet............................................. A1

Complaint (Aug. 29, 2022) ............................................. A5

Declaration of Robert Sampson (Ex. 1 to
Preliminary Injunction Motion).................................... A29

Preceptor's Comments (Ex. 1A to Preliminary
Injunction Motion)........................................................ A39

Declaration of Jeanette Wasserstein (Ex. 2 to
Preliminary Injunction Motion) (SEALED)................. A43

2020 Wasserstein Evaluation (Ex. 2B to
Preliminary Injunction Motion) (SEALED)................. A44

2013 Michels Evaluation (Ex. 3 to Preliminary
Injunction Motion) (SEALED)..................................... A45

2013 Anderson Evaluation (Ex. 4 to Preliminary
Injunction Motion) (SEALED)..................................... A46

Stony Brook University Unofficial Transcript
(Ex. 5 to Preliminary Injunction Motion).................... A47

Course History (Ex. 6 to Preliminary Injunction
Motion) ......................................................................... A52

2017 Heedles Letter (Ex. 7 to Preliminary
Injunction Motion)........................................................ A54

2017 DeMotta Letter (Ex. 8 to Preliminary
Injunction Motion)........................................................ A56

2018 DeMotta Letter (Ex. 9 to Preliminary Injunction Motion)........................................................... A59

Sept. 2017 Aronson Letter (Ex. 10 to Preliminary Injunction Motion)........................................................... A61

June 2022 NBME Letter (Ex. 11 to Preliminary Injunction Motion)........................................................... A65

Declaration of Lucia McGeehan in Opposition to Plaintiff's Motion for Preliminary Injunction.............. A68

2017 Sampson Accommodation Request Form (Ex. 1 to McGeehan Declaration) ................................. A79

April 2017 Lovett Report (Ex. 2 to McGeehan Declaration) ................................................................... A87

June 2017 NBME Letter (Ex. 3 to McGeehan Declaration) ................................................................... A91

July 2017 Lovett Report (Ex. 4 to McGeehan Declaration) ................................................................... A94

Aug. 2017 NBME Letter (Ex. 5 to McGeehan Declaration) ................................................................... A98

Dec. 2017 Lovett Report (Ex. 6 to McGeehan Declaration) ................................................................. A101

Jan. 2018 NBME Letter (Ex. 7 to McGeehan Declaration) ................................................................. A106

March 2018 NBME Letter (Ex. 8 to McGeehan Declaration) ................................................................. A108

July 2018 Lovett Report (Ex. 9 to McGeehan Declaration) ................................................................. A113

2018 Sampson Accommodation Request Form
(Ex. 10 to McGeehan Declaration) ............................ A118

Sept. 2018 NBME Letter (Ex. 11 to McGeehan
Declaration) ................................................................. A125

2018 Ortiz Report (Ex. 12 to McGeehan
Declaration) ................................................................. A136

2018 Murphy Report (Ex. 13 to McGeehan
Declaration) ................................................................. A150

Jan. 2019 NBME Letter (Ex. 14 to McGeehan
Declaration) ................................................................. A155

Sampson Step 1 Score Report (Ex. 15 to
McGeehan Declaration) ............................................... A158

2022 Sampson Accommodation Request Form
(Ex. 16 to McGeehan Declaration) ............................ A163

2022 Murphy Report (Ex. 17 to McGeehan
Declaration) ................................................................. A170

June 2022 NBME Letter (Ex. 18 to McGeehan
Declaration) ................................................................. A175

Sampson School Records (Ex. 19 to McGeehan
Declaration) ................................................................. A178

1999 Sampson OLSAT Score Report (Ex. 20 to
McGeehan Declaration) ............................................... A188

2005 Sampson PSAT Score Report (Ex. 21 to
McGeehan Declaration) ............................................... A191

2007 Sampson PSAT Score Report (Ex. 22 to
McGeehan Declaration) ............................................... A193

2008 Sampson ACT Score Report (Ex. 23 to
McGeehan Declaration) ............................................... A195

June 2008 Sampson SAT Score Report (Ex. 24 to
McGeehan Declaration) ............................................... A197

Oct. 2008 Sampson SAT Score Report (Ex. 25 to
McGeehan Declaration) ............................................... A199

Nov. 2008 Sampson SAT Score Report (Ex. 26 to
McGeehan Declaration) ............................................... A201

Sampson MCAT Score Report (Ex. 27 to McGeehan
Declaration) ............................................................... A203

Declaration of Benjamin J. Lovett in Opposition
to Plaintiff's Motion for Preliminary Injunction ........ A205

Lovett Curriculum Vitae (Ex. 1 to Lovett
Declaration) ............................................................... A224

April 2017 Lovett Report (Ex. 2 to Lovett
Declaration) ............................................................... A248

July 2017 Lovett Report (Ex. 3 to Lovett
Declaration) ............................................................... A252

Dec. 2017 Lovett Report (Ex. 4 to Lovett
Declaration) ............................................................... A256

July 2018 Lovett Report (Ex. 5 to Lovett
Declaration) ............................................................... A261

Figure from Rey Complex Figure Test (Ex. 6 to
Lovett Declaration)..................................................... A266

## VOLUME II: A268 – A494

Declaration of Kevin Murphy in Opposition
to Plaintiff's Motion for Preliminary Injunction..........A268

2018 Murphy Report (Ex. 1 to Murphy
Declaration) ...................................................................A289

2022 Murphy Report (Ex. 2 to Murphy
Declaration) ...................................................................A294

Murphy Curriculum Vitae (Ex. 3 to Murphy
Declaration) ...................................................................A299

Declaration of Samuel O. Ortiz in Opposition
to Plaintiff's Motion for Preliminary Injunction..........A314

Ortiz Curriculum Vitae (Ex. 1 to Ortiz
Declaration) ...................................................................A323

Nov. 2018 Ortiz Report (Ex. 2 to Ortiz
Declaration) ...................................................................A390

Declaration of Joseph E. Bernier in Opposition
to Plaintiff's Motion for Preliminary Injunction..........A404

Bernier Curriculum Vitae (Ex. 1 to Bernier
Declaration) ...................................................................A425

Declaration of Dawn P. Flanagan in Opposition
to Plaintiff's Motion for Preliminary Injunction..........A428

Flanagan Curriculum Vitae (Ex. 1 to Flanagan
Declaration) ...................................................................A436

## VOLUME III: A495 – A730

Declaration of Adam R. Mandelsberg in Opposition
to Plaintiff's Motion for Preliminary Injunction..........A495

Excerpts from the MCAT Essentials (2014-15)
(Ex. A to Mandelsberg Declaration) ............................A497

Excerpts from Second Edition of Official Guide to
MCAT Exam (Ex. B to Mandelsberg Declaration) ......A507

MCAT Release Form, New York (administered
Jan. 23, 2015) (Ex. C to Mandelsberg Declaration).....A521

"The ACT - Preparing for the ACT" Booklet
(2008-09 ed.) (Ex. D to Mandelsberg Declaration) ......A601

Official SAT Practice Test 2007-08 (Ex. E to
Mandelsberg Declaration)............................................A682

## VOLUME IV: A731 – A969

Step 1 Sample Test Questions (Ex. F to Mandelsberg
Declaration, USMLE).....................................................A731

Declaration of Shelley Sampson in Support of
Plaintiff's Motion for Preliminary Injunction..............A788

Declaration of Andrew Lam in Support of
Plaintiff's Motion for Preliminary Injunction..............A793

2020 Stein & Vargas Letter (NBME Additional
Ex. 6) ...........................................................................A796

2022 Letter from SUNY to Vargas (NBME
Additional Ex. 7)..........................................................A801

2017 Sampson Accommodation Request Form
(Plaintiff Hearing Ex. 1).................................................A802

2013 Anderson Evaluation (Plaintiff Hearing
Ex. 2) (SEALED)............................................................A809

2013 Michels Evaluation (Plaintiff Hearing Ex. 3)
(SEALED) ......................................................................A810

2017 Sampson Personal Statement (Plaintiff
Hearing Ex. 4)................................................................A811

March 2017 Aronson Letter (Plaintiff Hearing
Ex. 5) ..............................................................................A820

2017 Heedles Letter (Plaintiff Hearing Ex. 6).............A821

2017 DeMotta Letter (Plaintiff Hearing Ex. 7) ...........A822

2017 Certificate of Prior Test Accommodations
(Plaintiff Hearing Ex. 8)................................................A824

2017 Lam Letter (Plaintiff Hearing Ex. 9) ..................A825

2016 Wackett Letter (Plaintiff Hearing Ex. 10) ..........A826

Sampson Shelf Exam Score Report (Plaintiff
Hearing Ex. 10A)...........................................................A827

Sampson MCAT Score Report (Plaintiff Hearing
Ex. 11) ............................................................................A828

Sampson ACT Score Report (Plaintiff Hearing
Ex. 12) ............................................................................A829

2007 Sampson PSAT Score Report (Plaintiff
Hearing Ex.13)...............................................................A830

Sampson SAT Score Report (Plaintiff Hearing Ex. 14)................................................A831

1999 Sampson OLSAT Score Report (Plaintiff Hearing Ex. 15)................................................A835

June 2017 NBME Letter (Plaintiff Hearing Ex. 16) ................................................A837

2017 Sampson Letter (Plaintiff Hearing Ex. 17) ................................................A839

June 2017 Serrantino Letter (Plaintiff Hearing Ex. 18) ................................................A840

2017 Steve & Shelley Sampson Letter (Plaintiff Hearing Ex. 19) ................................................A848

Quotes from School Record (Plaintiff Hearing Ex. 20) ................................................A850

Sampson Early School Records (Plaintiff Hearing Ex. 21) ................................................A852

Aug. 2017 NBME Letter (Plaintiff Hearing Ex. 22) ................................................A868

Sampson Letter (Plaintiff Hearing Ex. 23)................A870

Oct. 2017 Serrantino Letter (Plaintiff Hearing Ex. 24) ................................................A871

Sept. 2017 Aronson Letter (Plaintiff Hearing Ex. 25) ................................................A877

2017 Anderson Letter (Plaintiff Hearing Ex. 26) ................................................A880

Jan. 2018 NBME Letter (Plaintiff Hearing
Ex. 27) ...............................................................A882

Feb. 2018 Sampson Letter (Plaintiff Hearing
Ex. 28) ...............................................................A883

2018 DeMotta Letter (Plaintiff Hearing
Ex. 29) ...............................................................A897

March 2018 NBME Letter (Plaintiff Hearing
Ex. 30) ...............................................................A898

June 2018 Simon Letter (Plaintiff Hearing
Ex. 31) ...............................................................A902

June 2018 Aronson Letter (Plaintiff Hearing
Ex. 31A)..............................................................A918

Sept. 2018 NBME Letter (Plaintiff Hearing
Ex. 32) ...............................................................A920

Nov. 2018 Simon Letter (Plaintiff Hearing
Ex. 33) ...............................................................A922

Jan. 2019 NBME Letter (Plaintiff Hearing
Ex. 34) ...............................................................A927

2022 Sampson Accommodation Request Form
(Plaintiff Hearing Ex. 35)..............................A929

2022 Sampson Personal Statement (Plaintiff
Hearing Ex. 36)................................................A935

2020 Wasserstein Evaluation (Plaintiff Hearing
Ex. 37) (SEALED)...........................................A939

June 2022 NBME Letter (Plaintiff Hearing
Ex. 38) ...............................................................A940

DSM-V, Learning Disorder (Plaintiff Hearing
Ex. 49) ............................................................................A942

DSM-V, ADHD (Plaintiff Hearing Ex. 50) ...................A951

Wasserstein Curriculum Vitae (Plaintiff Hearing
Ex.55) ..............................................................................A959

## VOLUME V: A970 – A1161

Hearing Transcript, Oct. 11, 2022 ................................A970

Hearing Transcript, Oct. 12, 2022 ..............................A1036

Hearing Transcript, Oct. 13, 2022 ..............................A1135

Notice of Appeal ............................................................A1159

[Hearing Transcript pages 1-66]

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - -X
ROBERT SAMPSON,              : 22 CV 5120(JMA)
                             :
         Plaintiff,          :
                             :
     -against-              : United States Courthouse
                             : Central Islip, New York
                             :
                             :
                             :
NATIONAL BOARD OF MEDICAL   : October 11, 2022
EXAMINERS,                  : 9:30 AM
                             :
         Defendant.         :
                             :
- - - - - - - - - - - - - - -X
```

TRANSCRIPT OF CIVIL CAUSE FOR MOTION HEARING
BEFORE THE HONORABLE JOAN AZRACK
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S :

For the Plaintiff:      STEIN & VARGAS, LLP
                        10 G Street NE, Suite 600
                        Washington, DC 20002
                        BY: MARY VARGAS, ESQ.

                        CHARLES WEINER, ESQ.
                        99 Lantern Drive, Suite 202
                        Doylestown, PA 18901

For the Defendant:      PERKINS COIE, LLP
                        700 13th Street NW, Suite 800
                        Washington, DC 20005
                        BY:  CAROLINE MEW, ESQ.

                        PERKINS COIE, LLP
                        1155 Avenue of the Americas, 22nd Floor
                        New York, New York 10036
                        BY:  ADAM MANDELSBERG, ESQ.

Court Reporter:  Lisa Schmid, CCR, RMR

Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

LISA SCHMID, CCR, RMR

**A970**

2

1     COURTROOM DEPUTY:  Calling Civil Case 2022 5120,
2  Sampson versus National Board of Medical Examiners.
3     Counsel, state your appearances for the record.
4     MS. VARGAS:  Mary Vargas and Charles Weiner for
5  the plaintiff.
6     THE COURT:  Good morning.
7     MS. MEW:  Caroline Mew and Adam Mandelsberg for
8  defendants.
9     THE COURT:  Ready to proceed?
10     MS. VARGAS:  Yes, Your Honor.
11     THE COURT:  And you want to make a brief opening
12  statement, correct?
13     MS. MEW:  I'm sorry.  I apologize.  Can I -- may
14  I raise two housekeeping matters?  I appreciate it.
15     We happened to look at your calendar for the
16  next three days and get a sense of the time available for
17  the hearing, and it's my understanding that plaintiffs
18  might be taking longer to put on their case.
19     So we're just wondering how that were all might
20  play out, so that we can ensure that we'll have time to
21  put our case on.
22     THE COURT:  I think you will.  So let's just see
23  how today goes, and we can make adjustments as we need to.
24     MS. MEW:  Okay.
25     THE COURT:  But you are my priority.

3

1     MS. MEW:  Thank you.
2     And just one other housekeeping measure.  For
3  exhibits that are already in the record for the
4  Preliminary Injunction briefing, do we need to go through
5  the formal process of admitting those into evidence?
6     THE COURT:  As long as they're not objected to,
7  you do not have to.
8     MS. MEW:  Thank you.
9     THE COURT:  Okay?  Does that work?
10     MS. MEW:  Yes, thank you.
11     THE COURT:  And so you can make your opening
12  statement.
13     MS. VARGAS:  Can I make my opening statement
14  from this podium?
15     THE COURT:  Yes, ma'am.  Please use the
16  microphone.
17     MS. VARGAS:  Thank you, Your Honor.
18     THE COURT:  Thank you.
19     MS. VARGAS:  My name again is Mary Vargas, and I
20  along with Charles Weiner represent Robert Sampson.
21     Mr. Sampson is an extraordinarily gifted and
22  compassionate joint degree student in business and
23  medicine, and also is an individual with disabilities.
24     Every expert to evaluate Mr. Sampson has
25  concluded that because of his learning disabilities, he

4

1  needs additional testing time as an accommodation.
2     Sampson's educators and learning specialists
3  have noted his need for accommodations from the earliest
4  days of elementary school all the way through his
5  graduation from high school into college and medical
6  school; however, despite Mr. Sampson having provided the
7  National Board of Medical Examiners with reams of
8  documents documenting his disability, the NBME refuses to
9  provide him accommodations in order to take Step 1, which
10  is the first part of the United States Medical Licensing
11  Exam, and which he must take in order to progress to the
12  last 40 weeks of medical school.
13     He has been forced to seek a preliminary
14  injunction as a last resort, in order that he can
15  demonstrate his knowledge on Step 1 rather than the extent
16  of his disability.  Absent an injunction, Mr. Sampson's
17  medical career will be over.
18     The law is squarely behind Mr. Sampson in this
19  request.  In 2008, Congress amended the Americans with
20  Disabilities Act to prevent exactly what has happened to
21  Mr. Sampson, when it specified that the Americans with
22  Disabilities Act was being amended for the express purpose
23  of ensuring that the definition of disability is construed
24  in favor of broad coverage to the maximum extent
25  permitted, and that determining whether someone who is an

5

1  individual with a disability should not demand extensive
2  analysis such that the primary object of attention in
3  cases brought under the ADA should be whether covered
4  entities have complied with their obligations.
5     DOJ regulations are likewise crystal clear, and
6  direct that whether an individual has a disability is not
7  meant to be a demanding standard, and usually will not
8  require scientific, medical or statistical evidence.
9  Specifically, in the context of learning disabilities, the
10  ADA makes clear that the determination as to whether a
11  person has a disability should be made without regard to
12  the ameliorative effects of mitigating measures.
13     And of special relevance in this case in
14  amending the ADA, *The Congressional Record* reads, and I
15  quote, historically, certain individuals with learning
16  disabilities seeking accommodations in higher education,
17  including high stakes exams, have seen their access to
18  testing accommodations severely undercut by testing
19  companies not willing to consider and support that
20  learning disabilities are neurologically-based lifelong
21  disabilities that may exist in students with high academic
22  achievement, because the individual has been able to cope
23  and mitigate the negative impact while simultaneously
24  being substantially limited in one or more major life
25  activities.

**A-971**

6

1    Robert Sampson is just such a student.  While
2   his learning disabilities were not officially diagnosed
3   until 2013, he has been receiving special learning
4   supports and interventions and mitigating his disability
5   with extraordinary efforts since he was four years old.
6        There is no dispute that Robert is bright, even
7   brilliantly so, yet in the school, he struggled not so
8   much as judged by his grades, but if judged by the effort
9   and support it took to get those grades.
10       He could not complete tests during the time
11  allotted, such that he routinely finished tests during
12  lunch and after school.  Robert's report cards document
13  that he struggled to complete assignments and work
14  independently.  He struggled to understand and follow
15  instructions.  Littered through his childhood records are
16  references to challenges with focus, inability to work on
17  assignments independently, and difficulty completing
18  assignments.
19       It was in elementary school that his public
20  school teacher first referred him to a reading specialist,
21  and he worked with her through the summer, just as he
22  worked with a host of other tutors.
23       While children without learning disabilities
24  certainly have tutors, the kind and nature and volume of
25  tutoring Robert received was far outside the norm.

LISA SCHMID, CCR, RMR
Official Court Reporter

7

1    Robert was repeatedly sent to reading
2   specialists and tutors, more than 20 tutors during his
3   education, K through 12, because he could not learn in the
4   classroom or from reading like other children.  In high
5   school, he at times required as much as three hours a day,
6   five days a week of tutoring and that was in the single
7   subject for a class he ultimately had to withdraw from.
8        And just as Robert worked harder than other
9   children to learn, always his parents also worked harder.
10  His mother came home from her daytime job to spend hours
11  reteaching lessons that other children learned at school,
12  created endless games to make the significant repetition
13  Robert needed to retain information less painful, and when
14  he could not read school books fast enough, she read them
15  to him.  And the hallmarks of these learning differences
16  were everywhere.
17       As a child, Robert was an accomplished cellist.
18  He could perform, despite -- and eventually sat first
19  chair above children much older than him, but he could not
20  read the music.
21       And in a moment that was both painful and now
22  prescient, while in a lesson with his cello instructor,
23  his teacher lost patience with him and his inability to
24  see what the music said on the paper and to understand her
25  instructions and yelled at him:  What are you, stupid?

LISA SCHMID, CCR, RMR
Official Court Reporter

8

1   Are you dyslexic?
2        As is often the case with bright children who
3   are also learning disabled, it wasn't until later that
4   everything about Robert's reading challenges that was true
5   for a lifetime received a label.
6        Robert prepared intensely for the MCAT before
7   medical school.  Where classmates prepared for a few weeks
8   or a few months, Robert immersed himself and prepared for
9   two years with the help of his father, who is a surgeon.
10  He spent hundreds of the hours with multiple tutors,
11  trying to find ways to mitigate his inability to read the
12  questions fast enough.
13       Now, to be clear, the ADA instructs us to
14  determine whether someone has a disability without
15  considering these kinds of mitigating measures, like
16  excessive preparation and tutoring, and test-taking
17  strategies.
18       And we will hear this morning from one of
19  Robert's MCAT tutors, Dr. Lam, who has tutored more than a
20  hundred students of differing ages and capabilities and
21  saw some things different about Robert, and how he
22  interacted with reading and test questions.  And he told
23  Robert to get evaluated back in 2013, because he believed
24  Robert had a learning disability, and Robert did.
25       And since that time, every professional who has

LISA SCHMID, CCR, RMR
Official Court Reporter

9

1   examined Robert has concluded that his MCAT tutor was
2   right, and that what his parents always knew but didn't
3   have a name for was right:  Robert has learning
4   disabilities.
5        Robert's medical school has also concluded that
6   he has learning disabilities, and that he needs testing
7   accommodations on examinations, including on something
8   called shelf examinations, which are NBME-created tests
9   that are exactly like Step 1, and he received the
10  accommodations he's seeking here on those tests from his
11  medical school, based on their determination that it was
12  necessary for him.
13       You will hear from Dr. Jeanette Wasserstein, who
14  concluded after 15 hours of comprehensive testing that
15  Robert needs double time on tests.
16       And again, the law is clear what we need to do
17  with this information.  DOJ directs -- and I'm going to
18  read what DOJ says:  Reports from experts who have
19  personal familiarity with the candidate should take
20  precedence over those from reviewers for testing agencies
21  who have never personally met the candidate or conducted
22  the requisite assessments for diagnosis and treatment.
23  And that testing entities shall generally accept
24  documentation provided by qualified professionals, and
25  provide the accommodation.

LISA SCHMID, CCR, RMR
Official Court Reporter

**A972**

10

1    Yet, when Robert Sampson asked the NBME for the
2  extended testing time that he needs, the NBME disregarded
3  the law, and the regulations, and the technical assistance
4  from the Department of Justice, and instead rejected
5  Robert's extensive evidence of disability.
6    Over the course of his application seeking
7  accommodations from the NBME, he submitted an
8  extraordinary amount of documentation.  He submitted four
9  reports of examining experts, multiple letters from
10 examining and treating sources, letters from a learning
11 specialist at his medical school who worked closely with
12 him, and saw firsthand his need for the accommodations
13 he's seeking; a letter from the disability office at his
14 medical school supporting his need for accommodations, a
15 letter of support from Dr. Lam, his MCAT tutor who spent
16 hundreds of hours working with him and first put a name to
17 the troubles Robert had experienced his entire life;
18 childhood report cards, letters from an educational
19 consultant at another medical school, letters from an
20 advocate.
21   Standardized test stores, a letter from his
22 parents, describing the tutors he used, more than 20
23 tutors he used over the course of his education.  A
24 certification from his medical school provided -- that
25 provided -- testified that they provided exactly the

LISA SCHMID, CCR, RMR
Official Court Reporter

11

1  accommodations that he was requesting from the NBME, and
2  personal statements he wrote detailing in his own words
3  his learning challenges.
4    And in response to all of this, the NBME refused
5  to provide accommodations and notably during the call
6  with -- the first call with the Court, as you may recall
7  in this matter, counsel for the NBME termed all of his
8  painstakingly-gathered evidence, quote, no evidence of
9  disability.
10   Instead, the NBME now raises and uses his hard
11 work, his hard-won success against him, looking at the
12 grades and scores he got without considering all the
13 dedication and pain and persistence and support it took to
14 get those grades, as the ADA would say, without
15 considering the time manner and duration of how these
16 grades were accomplished.  I think they would say after
17 all, how could someone be both gifted and disabled?
18   ADA regulations require testing entities to
19 administer tests so as to best ensure that when the
20 examination is administered, the results accurately
21 reflect the individual's aptitude or achievement level
22 rather than reflecting the extent of the person's
23 disabilities.
24   That is all Robert Sampson seeks today, the
25 opportunity to demonstrate what he knows on Step 1 rather

LISA SCHMID, CCR, RMR
Official Court Reporter

12

1  than the extent of his disability, and in order to
2  demonstrate what he knows on Step 1, he needs extended
3  testing time to read the questions.  Thank you.
4    THE COURT:  Thank you.
5    All right.  Ms. Mew?
6    MS. MEW:  Thank you, Your Honor.
7    We recognize that this lawsuit is very important
8  to Mr. Sampson and his family.  It is also important to
9  NBME.  As recognized by Second Circuit in *Powell*, part of
10 NBME's duties is to ensure that the USMLE examination is
11 fairly administered to all examinees.
12   As Mr. Sampson has pointed out in his papers,
13 NBME does grant extra time and other testing
14 accommodations to examinees with disabilities, other
15 individuals who are in medical school, high achieving,
16 gifted individuals.  NBME gives due care to each
17 accommodation request to ensure that the provision of the
18 accommodation is warranted, and to protect the integrity
19 of the test and fairness of the process to all examinees.
20   In this case, Mr. Sampson did not demonstrate
21 that he is disabled within the meaning of the ADA.  He's
22 not entitled to accommodations on Step 1.
23   As Ms. Vargas referenced, there is a lot of
24 information and data in the record, and we'll be
25 discussing it at the hearing, discussing of Mr. Sampson's

LISA SCHMID, CCR, RMR
Official Court Reporter

13

1  history, his diagnostic evaluations, his academic history,
2  his test scores.  And it would make it seem like this is a
3  complicated case, but it is not.
4    The information that Mr. Sampson has provided,
5  his diagnostic test reports, some school records,
6  standardized test scores, the advocacy letters, the
7  personal statements, they do not demonstrate that he is
8  substantially limited in a major life activity compared to
9  most people in the general population.  The overwhelming
10 weight of the evidence is to the contrary.
11   Assessments that are taken in a psychologist's
12 office are relevant, as is evidence of real world
13 performance, including in school and other on standardized
14 tests taken without accommodations.
15   Mr. Sampson, we understand, has put in some
16 extraordinary effort, as he testified, and he has had
17 assistance from tutors that helped him pursue an
18 accelerated curriculum at a competitive high school, but
19 of course it takes hard work as well as focus,
20 concentration, and the ability to read and comprehend
21 advanced courses and exam content to succeed in AP
22 classes, to score in the top 15 percent of the
23 million-plus students who take the ACT or SAT every year
24 or to score in the top 25 percent of the enormously
25 talented individuals who apply to medical school.

LISA SCHMID, CCR, RMR
Official Court Reporter

A-973

14

1   What wasn't mentioned in Ms. Vargas's opening
2   statement that which we absolutely should not lose track
3   of is that we are here on an emergency motion for a
4   mandatory preliminary injunctive relief.
5       Mr. Sampson does not dispute that he is seeking
6   a preliminary injunction that would provide him with the
7   final relief he seeks in this case, before any discovery
8   has been conducted, and without a jury trial.  Mr. Sampson
9   has to meet a heightened burden of showing a clear
10  likelihood of success on the merits, and he has not and
11  cannot meet this standard.
12      Mr. Sampson also must establish irreparable
13  harm, but his own delay in pursuing relief defeats any
14  showing of such harm.  NBME pointed out this fatal defect
15  in his papers, but Mr. Sampson made little response to it.
16      Mr. Sampson will not be able to demonstrate
17  irreparable harm because he has failed to take the steps
18  necessary to maintain good standing in medical school,
19  even if he were to receive the relief he seeks from this
20  proceeding.
21      This isn't just an eleventh hour case.  The
22  clock has already struck midnight.  The Court should deny
23  Mr. Sampson's motion for preliminary injunctive relief.
24      THE COURT:  Okay.  All right.
25      All right.  Do you want to call your first

LISA SCHMID, CCR, RMR
Official Court Reporter

---

15

1   witness?
2       MS. VARGAS:  Thank you, Your Honor.  Plaintiff
3   calls Dr. Andrew Lam, who will be participating by zoom.
4   Great.
5       COURTROOM DEPUTY:  Please raise your right hand.
6       (Witness sworn.)
7       THE WITNESS:  I do.
8       COURTROOM DEPUTY:  Please state and spell your
9   name for the record.
10      THE WITNESS:  Andrew Lam, L-A-M.
11      THE COURT:  You may proceed.
12      MS. VARGAS:  Thank you.
13      ANDREW LAM, having been duly sworn, testified on
14  his oath as follows:
15  DIRECT EXAMINATION
16  BY MS. VARGAS:
17  Q.  Good morning.  Could you please state your name?
18  A.  Andrew Lam.
19  Q.  And what is your profession?
20  A.  I'm a family physician.
21  Q.  Do you know Robert Sampson?
22  A.  Yes.
23  Q.  How do you know Robert?
24  A.  We met as classmates at the University of Virginia,
25  and I ended up tutoring him one-on-one for the MCAT.

LISA SCHMID, CCR, RMR
Official Court Reporter

---

16

1   Q.  When did you first begin tutoring Robert?
2   A.  He hired me in February of 2013.
3   Q.  And how many hours did you spend tutoring Robert?
4   A.  I tutored him for about two hundred hours.
5   Q.  And was Robert the only student that you tutored?
6   A.  No.  I tutored ten other MCAT students, but I also
7   spent time tutoring hundreds of students from elementary
8   school through medical school.
9       (Court reporter seeks clarification.)
10  Q.  Sorry.  The court reporter couldn't hear that.  Would
11  you mind repeating what you just said, as best as you can?
12  A.  Yes.  I tutored ten other MCAT students, but I also
13  tutored hundreds of other students from elementary school
14  through medical school for a variety of other subjects.
15  Q.  Okay.  And in terms of the MCAT students that you
16  worked with, how much time did you spend working with
17  MCAT students other than Robert Sampson?
18  A.  Most of them only hired me for a few hours, but --
19      (Court reporter seeks clarification.)
20  Q.  Would you mind repeating that?
21  A.  Yes.  Most students only required a handful of hours,
22  but after Robert, the longest that I tutored any student
23  was 50 hours.
24  Q.  And --
25      THE COURT:  I'm sorry.  Robert was the longest

LISA SCHMID, CCR, RMR
Official Court Reporter

---

17

1   student?  I guess it's kind of cutting out at the crucial
2   parts.
3       All right.  Try that last sentence, the last
4   question again.
5   BY MS. VARGAS:
6   Q.  Would you mind repeating the last sentence probably
7   as loudly as you can comfortably do it?
8   A.  The longest I tutored any student after Robert was 50
9   hours.
10  Q.  And what was the reason that you spent so much more
11  time tutoring Robert than you did other MCAT students?
12  A.  The reason was that we found his practice test scores
13  were not improving despite the amount of time that we
14  spent, because the traditional program that I ran with my
15  students was only 48 hours.
16  Q.  Okay.  And how would you compare the amount of
17  preparation you saw Robert do for the MCAT as compared to
18  other students preparing for the MCAT?
19  A.  Most of my students were able to complete their
20  preparations within about three months at the most, but he
21  took six months with me and was still not ready to take
22  the MCAT right away.
23      His efforts were extraordinary during that time,
24  completing all the requested assignments.
25  Q.  Can you explain what you mean when you say his

LISA SCHMID, CCR, RMR
Official Court Reporter

A-974

18

1 efforts were extraordinary?

2 A. He spent hours every day doing the assignments that I

3 asked him to do, and he also had to figure out other

4 strategies to improve.

5 Q. During your tutoring sessions, did you have an

6 opportunity to observe Robert reading?

7 A. Yes.

8 Q. And how would you -- what did you observe about how

9 Robert read?

10 A. The section on reading comprehension was the most

11 revealing, where the questions are based on the passage of

12 several paragraphs, and each multiple choice question

13 would ask about a particular point or argument made in the

14 passage.

15 And Robert was having significant difficulty in

16 reading through passages, especially if there was a

17 sentence that had multiple clauses that would be

18 interconnecting in some way. He was having trouble

19 parsing them out, and he would spend more than a minute on

20 each sentence trying to figure out what exactly it was

21 saying, then he would move on to the next sentence and

22 after struggling with that one, he would have forgotten

23 what the previous sentence was trying to say.

24 Q. Did you have an opportunity to observe how Robert

25 comprehended what he read?

LISA SCHMID, CCR, RMR

Official Court Reporter

19

1 A. Yes. And overall, it just took a while for him to

2 process what he was reading. It took a while for him to

3 respond after reading through a sentence. It really took

4 him time to think about it, and more than the average

5 person would have.

6 Q. What, if anything, did you observe about what Robert

7 recalled of what he read?

8 A. Like I said, he often could not remember what he read

9 after moving on to another sentence, and he actually had

10 to start taking very brief notes after each sentence to

11 summarize what he had read.

12 Q. What did you observe about the amount of time Robert

13 spent reading questions?

14 A. It was very long, and he was not able to read through

15 a whole passage in time. So he often was running out of

16 time on tests, primarily because of him reading passages.

17 Q. What, if anything, did you observe about Robert's

18 writing during your tutoring sessions?

19 A. They were multiple times when he was spelling things

20 wrong, so he would try to copy an equation onto his draft

21 papers to do calculations. And he would often copy

22 numbers or letters in the wrong order. When he was going

23 from one step of the calculations to the next, he often

24 would copy it incorrectly there as well. So there were a

25 lot of spelling errors.

LISA SCHMID, CCR, RMR

Official Court Reporter

20

1 Q. What, if anything, did you observe about Robert's

2 processing in your tutoring sessions?

3 A. If by processing, we mean the amount of time it takes

4 for him to take in information, understand it, and respond

5 to it, it did take him longer. He would -- it usually was

6 longer for written material than for spoken material.

7 Spoken material, from what I could gather,

8 seemed after thinking for a few seconds, he was able to

9 respond, but for written material, it took him, like I

10 said, more than a minute to unravel the sentence.

11 Q. You testified that you tutored other students of

12 different abilities, including elementary school. During

13 your tutoring, had you ever encountered somebody who read

14 like Robert?

15 A. Robert by far was -- had the most difficulty out of

16 any of my students when it came to processing written text

17 and reading. I had some other students who may have had

18 similar issues, but they were more mild and they also

19 eventually were suspected or tested and found to have

20 learning disabilities.

21 Q. What -- did you have a reaction to these observations

22 that you've described, Robert's reading and comprehension

23 and writing?

24 A. In the beginning, it was primarily somewhat

25 frustrating and discouraging because I knew how hard he

LISA SCHMID, CCR, RMR

Official Court Reporter

21

1 was trying, and it was not getting the results that he

2 needed.

3 And especially when it came to non -- when it

4 came to a lot of the sections on the MCAT, where I knew

5 that he was able to do better than he was demonstrating on

6 the test, it was kind of baffling to me.

7 But eventually, when I went to medical school in

8 August of 2013, which was near the end of my time with

9 Robert, my dean was talking with us about learning

10 disabilities and specifically dyslexia, and that raised

11 the idea in my head that Robert was showing signs of that

12 and probably should be evaluated.

13 Q. And did you say anything to Robert about that?

14 A. I did. And I encouraged him to be evaluated for

15 dyslexia.

16 Q. Are you familiar with different compensatory

17 strategies that people use to be more efficient in

18 testing?

19 A. Yes.

20 Q. Can you explain what kinds of strategies you're

21 familiar with?

22 A. Yes. So some people like to read the question first

23 instead of reading the passage, and the question might

24 direct to the student to a particular part of the passage.

25 And we did employ that with Robert because he was not able

LISA SCHMID, CCR, RMR

Official Court Reporter

A975

22

1  to read through an entire passage.
2      So he started with the -- he started with the
3  question stem and then tried to read just the content
4  around that portion of the text.
5      Another way he dealt with the long time for
6  reading was instead of reading the whole passage, he would
7  just read the first topic sentence of every paragraph, and
8  work on decoding those and writing brief notes for those,
9  so that he could guess about the overall flow of the
10 passage.
11     And then lastly, he had to be very careful when
12 copying sentences or copying equations. He would instead
13 of going forward with the calculation right away, he would
14 write down the equation and then check it with the
15 question to make sure that he copied it correctly before
16 moving forward, and he would also do that at every step of
17 the calculations.
18 Q.  Have you taken the MCAT yourself?
19 A.  I have.
20 Q.  Have you taken the USMLE yourself?
21 A.  I have. I have.
22 Q.  And in your experience with these tests, do the
23 strategies that Robert used on the MCAT, do they work on
24 the USMLEs?
25 A.  For the USMLEs, perhaps copying an equation and

LISA SCHMID, CCR, RMR
Official Court Reporter

23

1  double-checking the calculations would work, but a lot of
2  the other reading comprehension strategies would not work
3  because the USMLE is not formatted in the same way with
4  multiple paragraphs.
5      Usually the background information in the
6  question is in --
7      (Court reporter seeks clarification.)
8  Q.  I'm sorry. Could you please repeat that last line?
9  A.  Usually the background information for a question on
10 the USMLE is organized in one long paragraph rather than
11 in multiple paragraphs, where he could look at the first
12 sentence of each paragraph.
13     There are also many more question choices or
14 answer choices for each question on the USMLE questions
15 than on the MCAT, which only has four answer choices with
16 a question.
17 Q.  And are there any other reasons why those -- why you
18 would testify that the strategies Robert used on the MCAT
19 would not work on the USMLE?
20 A.  The other thing is that the -- well, there are a
21 couple of other things.
22     One is that the questions on the USMLEs do not
23 usually point you to one particular location in the
24 paragraph to search for.
25     And then second, there is a lot of information

LISA SCHMID, CCR, RMR
Official Court Reporter

24

1  in the paragraph in the USMLE, some of which are -- some
2  details are really important to figuring out the diagnosis
3  or the answer, and some details are --
4      (Court reporter seeks clarification.)
5  Q.  Some details are what?
6  A.  Are red herrings and some details are really
7  important for finding the answer. And it can't -- it
8  takes a lot of verbal processing ability to gather all of
9  that information and sort it out.
10 Q.  Based on your personal observations of Robert, what
11 is your opinion about whether Robert needs extended
12 testing time to demonstrate his knowledge on exams?
13     MS. MEW: Objection, Your Honor.
14     THE COURT: Overruled.
15     You can answer.
16 A.  I believe that it was important for him to have
17 extended testing time, because like I said, I knew that he
18 knew the material from my time with him on the MCAT, and
19 he was not able to demonstrate it during the allotted
20 practice test times.
21 BY MS. VARGAS:
22 Q.  Have you shared this opinion with the NBME?
23 A.  Yes.
24 Q.  And I would like to show Tab 9 of plaintiff's exhibit
25 binder, which I understand will come up on your screen,

LISA SCHMID, CCR, RMR
Official Court Reporter

25

1  Dr. Lam. You're our first witness, so let's take a moment
2  to let the tech work.
3      COURTROOM DEPUTY: Ask him if he can see it.
4      MR. WEINER: I have it on my screen.
5      COURTROOM DEPUTY: Mr. Lam, can you see the
6  document?
7      THE WITNESS: I can see it. I cannot read it,
8  but I can see it, yes.
9      COURTROOM DEPUTY: Okay. Hold on.
10     Is that a little bigger?
11     THE WITNESS: It is. It's blurry, but it is
12 bigger. I think I know what it says.
13 BY MS. VARGAS:
14 Q.  Do you recognize this document?
15 A.  It is a letter I wrote to the NBME Disability
16 Services in support for Robert's request for
17 accommodations on the USMLE.
18 Q.  Did the NBME ever contact you for more information?
19 A.  No.
20 Q.  Did any NBME-hired consultant contact you to discuss
21 your personal observations of Robert?
22 A.  No.
23     MS. VARGAS: No further questions. Thank you.
24     THE COURT: Okay.
25     Cross-examination?

LISA SCHMID, CCR, RMR
Official Court Reporter

A-976

26

1  CROSS-EXAMINATION
2  BY MS. MEW:
3  Q.   Good morning, Dr. Lam.  I am Caroline Mew.  I'm an
4  attorney for the National Board of Medical Examiners.
5        So you explained when you were serving as an
6  MCAT tutor, you worked with perhaps ten other students who
7  helped -- used to help them prepare for the MCAT, is that
8  right?
9  A.   Correct.
10 Q.   Were all these students -- all of the individuals you
11 worked with students at the University of Virginia?
12 A.   Yes.
13 Q.   And were these students planning, I'm assuming, on
14 attending medical college and that's why they were
15 preparing for the MCAT?
16 A.   Yes.
17 Q.   So when you were comparing difficulty that Mr.
18 Sampson -- that you saw Mr. Sampson having with the test,
19 you were comparing him to ten other University of Virginia
20 college students who were planning to go to medical
21 school?
22        (Court reporter seeks clarification.)
23 Q.   So when you were comparing Mr. Sampson's abilities
24 and taking -- and preparing for the MCAT, you were
25 comparing him to ten other University of Virginia college

LISA SCHMID, CCR, RMR
Official Court Reporter

27

1  students who were preparing to attend medical school, is
2  that correct?
3  A.   Yes, in addition to public students, public school
4  students from K through 12 that I had worked with before.
5  Q.   Certainly, but -- and I don't mean to sound
6  facetious, but you were not working with the K through 12
7  students on preparing for the MCAT?
8  A.   No, not for them.
9  Q.   Thank you.
10       I think you mentioned -- and I just want to
11 clarify something.  I'm going to try just reading it, just
12 to cut down on the paper we're showing you, but I just
13 wanted to clarify, in your declaration, there is -- you
14 say that Mr. Sampson had a problem with reading passages.
15 He would have to parse long sentences and process blocks
16 of verbal text.
17       I just want to make sure, did you mean written
18 text?  And this is paragraph five of the declaration.
19 A.   Yes, written text.
20 Q.   So there are three sections of the MCAT, correct?
21 Physical sciences, verbal reasoning, and biological
22 sciences?
23 A.   Correct.
24 Q.   And the verbal reasoning section of the MCAT has the
25 longest blocks of written text, is that correct?

LISA SCHMID, CCR, RMR
Official Court Reporter

28

1  A.   Yes.
2  Q.   Okay.  And I think just so we can see this, we're
3  going to pull up Exhibit C to the Mandelsberg declaration
4  that we filed in this case.  We'll get this up on the
5  screen.
6        Okay.  So can you see what now looks like an
7  MCAT release form for the State of New York from
8  December 2017?
9  A.   Yes.
10 Q.   Okay.  So this is the first page of the document.
11 And then we're going to turn to page 36.
12       So this is the verbal reasoning section of the
13 test?  This might look familiar to you, since you helped
14 so many people prepare.
15       And then we'll turn to the next page.
16       MS. MEW:  Is there a way to get this on one
17 screen or do we just have to scroll?
18 BY MS. MEW:
19 Q.   You see like the page that --
20 A.   I see a passage.  I can't read it, but I can see it.
21 Q.   Okay.  We might have to scroll down to see the whole
22 thing.
23       But do you recognize this as sort of the typical
24 MCAT verbal reasoning passage?
25 A.   Yes.

LISA SCHMID, CCR, RMR
Official Court Reporter

29

1  Q.   And then if you turn to the next page, you read the
2  passage and then there are a series of questions relating
3  to the passage?
4  A.   Yes.
5  Q.   And there are a number of these passages with
6  following multiple choice questions on the verbal
7  reasoning section of the MCAT, correct?
8  A.   Correct.
9  Q.   That is what this section of the test is?
10 A.   Correct.
11 Q.   When Mr. Sampson took the MCAT on August 16th, 2013,
12 he scored in the 84th percentile on the verbal reasoning
13 section of this test, correct?
14 A.   I am not aware of his score actually.
15 Q.   Okay.  If we can look back at the letter that you
16 were was just discussing with Ms. Vargas, your letter to
17 NBME.  This is Plaintiff's Exhibit 9.  And if we can again
18 try to get this -- I'm going to look at the third
19 paragraph.
20       Mr. Lam, in the third paragraph, you explain,
21 after months of trying various strategies for passage
22 reading, we did come up with one that seemed to work for
23 Robert.  We discovered a drastic improvement in his
24 reading comprehension if I just allowed him a little extra
25 time to carefully read and record notes about the content

LISA SCHMID, CCR, RMR
Official Court Reporter

30

1  of each paragraph.  Do you see that language?

2  A.  I cannot see it, but I do recall it, yes.

3  Q.  Good.  Okay.  Well, but you do recall it, maybe to

4  save time, and that was something that you wrote to the

5  NBME?

6  A.  Yes.

7  Q.  Can you see it now?

8  A.  It's very blurry, so -- but I can kind of make it

9  out.

10  Q.  Okay.  Well, but you understand -- you understood

11  what I just said?  Do you remember writing that?  Okay.

12  A.  Yes.

13  Q.  Okay.  So you described in your 2017 letter one

14  strategy that worked on the MCAT, on the verbal reasoning

15  section, correct?

16  A.  Yes.

17  Q.  And this strategy consisted of him carefully reading

18  each passage, taking notes, and then having a little extra

19  time, is that correct?  That's what you described?

20  A.  Yes.

21  Q.  And so your strategy involved him actually reading

22  the questions, carefully reading the questions?

23  A.  Yes.

24  Q.  And then when he took the MCAT -- well, that's

25  presumably the strategy that he used -- that you

LISA SCHMID, CCR, RMR
Official Court Reporter

31

1  understand he used when he took the MCAT?

2  A.  I would presume so.

3  Q.  So your lawyer tomorrow testimony about just reading

4  part of the question and then trying to answer did not

5  apply to Mr. Sampson when he was taking the verbal

6  reasoning section of the MCAT?

7  MS. VARGAS:  Objection; mischaracterizes former

8  testimony.

9  THE COURT:  Overruled.

10  You can explain.

11  A.  Oh, Yes.  So that's not what I meant when I was

12  saying -- sorry.

13  When I was speaking earlier about reading only

14  part of the passage, I meant the passage, not the

15  question.  So he would read the whole question, but he

16  would not read the whole passage.

17  BY MS. MEW:

18  Q.  Okay.  I'd like to turn back to Plaintiff's Exhibit

19  9.  This is still up.  I'm sorry.  You still can't see it?

20  Okay.  Let me just read this to you again, Dr. Lam.  I'm

21  sorry.

22  "We discovered a drastic improvement in his

23  reading comprehension if I just allowed him a little extra

24  time to carefully read and record notes about the content

25  of each paragraph."

LISA SCHMID, CCR, RMR
Official Court Reporter

32

1  So he read each paragraph?

2  A.  He would read the -- he would not necessarily write

3  notes about the full content of each paragraph, but like I

4  said earlier, he would look at the first line of each

5  paragraph, and then write some notes about what he thinks

6  that paragraph probably is talking about.

7  Q.  And we looked at a sample verbal reasoning question

8  before.  And it's your testimony that he would be able to

9  successfully complete the verbal reasoning section of the

10  MCAT without reading the entire passage?

11  A.  He probably could.

12  (Court reporter seeks clarification.)

13  THE COURT:  Did you say couldn't or could?

14  THE WITNESS:  Oh.  He probably could get away

15  without reading the entire passage.

16  BY MS. MEW:

17  Q.  And score in the 84th percentile?

18  A.  If that's what he scored.

19  Q.  Just a couple more questions.

20  In 2013, did Mr. Sampson or anyone else ask you

21  to fill out any type of a rating scale or a questionnaire

22  about symptoms of ADHD?

23  A.  I'm sorry.  Can you repeat the question?

24  Q.  Yes.  In 2013, maybe around December of 2013, so

25  after you had finished tutoring him, did Mr. Sampson or

LISA SCHMID, CCR, RMR
Official Court Reporter

33

1  one of his evaluators, just any person ask you to fill out

2  something with a series of questions about Mr. Sampson,

3  either as a behavior rating scale or something like that?

4  Does that sound familiar to you?

5  A.  I do not remember doing that.

6  Q.  Okay.  If you don't mind, I'm going to show you

7  Plaintiff's Exhibit 2.  This is, I will tell you, a

8  testing report that Mr. Sampson submitted to NBME as part

9  of his accommodation request, and I just want to turn to

10  page nine.  Maybe number -- sorry.  And if you'll scroll

11  down.  Maybe -- I'm sorry.  Page 11.  I'm sorry.  Yes.

12  Keep scrolling.  I apologize.

13  Can you see in the middle of your screen, Dr.

14  Lam, where it says, scores, and then there is a list of

15  Barkley Childhood Symptom Scales?

16  A.  Yes, I can somewhat make out what it is saying there.

17  Q.  There is a line that says, Barkley Current Symptom

18  Scale Other Report Form.  Then it has in parens

19  "friend/tutor."

20  And I just -- does this remind you?  I'm just

21  trying to find out if you were the friend/tutor who filled

22  out this rating scale.

23  A.  I do not remember.

24  Q.  Were you and Mr. Sampson friends outside of your

25  tutoring?

LISA SCHMID, CCR, RMR
Official Court Reporter

**A-978**

34

1   A.   Yes.
2   Q.   You said had met him in a class?
3   A.   Uh-hum (affirmative response).
4   Q.   And -- was that a yes?
5   A.   Yes.
6   Q.   And did you -- did you hang out with him socially
7   outside of the MCAT tutoring?
8   A.   Sometimes.
9   Q.   Have you remained in touch the him through today?
10  A.   Very infrequently, like I think less than once every
11  five years.
12  Q.   Okay.  But you do consider yourselves friends?
13  A.   Yes.
14       MS. MEW:  Thank you, Dr. Lam.  I don't have any
15  further questions.
16       THE COURT:  Thank you.
17       Anything else, Ms. Vargas?
18       MS. VARGAS:  Quickly, yes.
19       THE COURT:  Okay.
20  REDIRECT EXAMINATION
21  BY MS. VARGAS:
22  Q.   In your experience, can a person get away with not
23  reading the entire passage on the USMLE?
24  A.   You can use -- I'm sorry.  On the USMLE?  No, you
25  cannot.

35

1   Q.   And Ms. Mew asked you about the other MCAT students
2   you tutored.  How would you compare Robert's reading to
3   the other public school students that you tutored?
4   A.   Yeah.  Like I said, I have not had any other students
5   who had such difficulty with reading as Robert did.
6        MS. VARGAS:  Thank you.  No further questions.
7        THE COURT:  Okay.  You are excused.  Thank you,
8   Dr. Lam.
9        THE WITNESS:  Thank you, Your Honor.
10       THE COURT:  Okay.  Who's next?
11       MS. VARGAS:  Plaintiff calls Robert Sampson.
12       Your Honor, would it be possible to take a
13  bathroom break before we start his testimony?
14       THE COURT:  Yes.  Okay.  We'll take ten minutes.
15       MS. VARGAS:  Thank you.
16       (Recess.)
17       (Continued on the next page.)
18
19
20
21
22
23
24
25

36

1        (Judge Azrack enters the courtroom.)
2        THE COURT:  Are we ready?
3        MS. VARGAS:  Yes, your Honor.
4        THE COURT:  All right.
5        Mr. Sampson.
6   R O B E R T   S A M P S O N,
7        called as a witness, having been first duly
8        sworn, testifies as follows:
9        THE COURT CLERK:  You can be seated.
10       Please speak directly into the microphone and
11  state and spell your name for the record.
12       THE WITNESS:  My name is Robert Sampson,
13  R-o-b-e-r-t.  My last name is S-a-m-p-s-o-n.
14       THE COURT:  Okay.
15  DIRECT EXAMINATION
16  BY MS. VARGAS:
17  Q    Will you please state your name?
18  A    Robert Sampson.
19  Q    What is your current occupation?
20  A    I'm a student, joint degree student.
21  Q    So, what are you studying?
22  A    Medicine and business.
23  Q    Why did you choose to go to medical school?
24  A    So I wanted to be a doctor my entire life.  I had a lot
25  of role models.  I took a book out, too, that gave me ideas

37

1   of what I wanted to do with my life.  Both my parents are
2   examples of role models that I looked up to.
3        My father is a surgeon and my mother is a dentist,
4   and they both have shown me life being able to help people
5   in the time of need, and that's something I would like to
6   do.  When you care for someone when they are sick, it is one
7   of the most wonderful times, and being able to provide that
8   service is an honor and privilege that I very much would
9   like to do for people in the future.
10  Q    What area of medical practice interests you?
11  A    So I just completed for medical school my third year of
12  clinical rotations, and I got to see some different fields
13  of medicine.  Right now I'm leaning towards orthopedics or
14  plastic surgery.
15  Q    What is it that you like about those particular areas
16  of practice?
17  A    I like using my hands.  I like being able to get
18  tangible results.  I like that I can make a difference for
19  someone.  I can see the problem and I can fix it.
20  Q    And how many years of medical school have you completed
21  so far?
22  A    I have completed three years of medical school.
23  Q    How much medical school do you have left to complete?
24  A    I have 40 weeks left, and then I also have to take
25  USMLE Step 1, which I can't do unless I receive

38

1 accommodations.
2 Q   What is your current status in medical school?
3 A   I'm a joint degree NBME/MBA student -- I'm sorry, can
4 repeat the question?
5 Q   What is your current status in medical school?
6 A   In medical school I have to go through my fourth year,
7 and I have to just complete 40 weeks of schooling left.
8 Q   Are you currently taking any medical classes?
9 A   Not at this moment.
10 Q   Why not?
11 A   Because I'm taking full-time MBA classes.
12 Q   Is there any other reason?
13 A   Any other reason?
14 Q   Any other reason why you are not taking medical classes
15 right now?
16 A   Well, I need to take and pass the USMLE Step 1 before I
17 cover medical school classes.
18 Q   You testified that you need accommodations to take the
19 USMLE.
20       Could you tell me what accommodations you need?
21 A   I need double time for the accommodations, as well as a
22 separate testing area, and extra breaks.
23 Q   And when did you first start needing those
24 accommodations that you just described?
25 A   So about -- I'm sorry, could you repeat the question.

*Frederick Guerino, CSR*
*Official Court Reporter*

39

1 Q   When did you first start needing the accommodations?
2 A   So I needed informal accommodations for my entire life,
3 all the way back to childhood.  But if you are asking formal
4 accommodations, the formal accommodations started maybe when
5 I entered medical school.
6 Q   We'll come back to medical school, but right now let's
7 talk about when you were in elementary school.
8       What was elementary school like for you?
9 A   In elementary school -- it is really a long time ago,
10 but I remember it was difficult to make friends for myself.
11 I had reading specialists to help me get better at reading
12 material.  My parents constantly had to advocate for me to
13 be able to get into some of the classes that I went to.  And
14 I had Kumon, which was a repetitious tutoring method to kind
15 of drill in me things that I was having trouble learning,
16 and I had an army of tutors and teachers to help me learn
17 things that I couldn't learn in school otherwise.
18 Q   Why couldn't you learn the information in school, in
19 elementary school?
20 A   So in the classroom I just felt like the teacher would
21 speak and she would write on the blackboard or white board
22 and most other students thought I was learning.  For me
23 there was no learning method taking place during those
24 lectures or classrooms.  It was as if the learning never
25 took place, and I needed to repeat the entire thing at home

*Frederick Guerino, CSR*
*Official Court Reporter*

40

1 with like my parents, who were tutors to an extensive
2 amount, and it wasn't retaught the same way.  It was
3 retaught using hands-on or active approaches.
4       For example, we would do hundreds of problems
5 together, my tutors and I.  They would have me read aloud
6 the questions.  There was one-on-one attention, instead of
7 one on 20 attention.
8 Q   You mentioned that you went to Kumon.
9       Can you explain what you did there?
10 A   Kumon is a creating and development education approach,
11 and you would get problems, that is, questions in different
12 subject areas.  I distinctly remember, for example,
13 multiplication and division and fraction problems that you
14 would do, for example fractions ad nauseum until you
15 basically weren't even doing the math.  It was a pattern
16 recognition.  And I would spend 25 percent of the time I was
17 there doing new questions, I would spend another
18 75 percent of the time going over the errors I made in the
19 last week to the point that it got painful how much time
20 that learning technique was taking because of all of the
21 repeating that needed to be done to learn the material.
22 Q   Were there other students at Kumon the same time that
23 you were there?
24 A   Yes.
25 Q   And how did the length of time those students would

*Frederick Guerino, CSR*
*Official Court Reporter*

41

1 spend at Kumon compare to the time that you were there?
2 A   I remember on many occasions being the last person
3 there.  It wasn't because I came at the end of the session.
4 I came many times at the beginning of the book time.  I
5 remember spending over two hours there, and it was just me
6 sometimes at the end doing questions.
7 Q   What about -- could you tell me what it was like taking
8 tests in K through 12 for you?
9 A   It depends on what type of test it was.  If it was -- I
10 mean, if it was a time-based test or -- actually, whether or
11 not time-based or not, I was pretty much basically the very
12 last person taking the test every single time to the point
13 that I felt self-conscious about it.  It was embarrassing to
14 be the last person.  And this was in pretty much every
15 subject area, whether it was Social Studies or Math or
16 English, I would always need the most amount of time to
17 finish answering the questions or writing an essay.
18 Q   Were you able to always finish the tests during the
19 classroom time?
20 A   No, I was not.
21 Q   So what did you do when you couldn't finish a test
22 during the classroom time?
23 A   So some teachers were inflexible and that would be it.
24 Some teachers were more accommodating and I would finish
25 after school or during lunch, and those teachers -- well,

*Frederick Guerino, CSR*
*Official Court Reporter*

A-980

**42**

1  some teachers would give me some extra time and I still
2  wouldn't finish, but it would be helpful.
3  Q   How did you do in K through 12 in school?
4  A   I mean, I would like to think I did well, but I
5  remember a royal struggle to be able to get through it.  The
6  memory of all of the tutors that I have had to work with, I
7  used to think was normal, but looking back, it's not at all.
8  None of my friends had that amount of tutors.  Some of them
9  had a tutor, not all of the ones that I had.  It was
10  draining and taxing to spend all of that time.  I spent a
11  lot of time with my parents, who also gave extra informal
12  tutoring.  There were ridiculous fun and games.  I used to
13  play with my parents to learn some of the material, and they
14  were really good at prioritizing my education and putting
15  everything into whether it was time or resources or money to
16  help me get the tutors that I needed to teach me material
17  that I couldn't learn in school, and they were extremely
18  supportive about that.
19  Q   So, did you receive accommodations, formal or informal,
20  in your K through 12 education?
21  A   Yes.  Informal accommodations started for as long as I
22  could remember.  I remember I struggled learning
23  multiplication tables, just as an example, and I remember
24  that my Mom had something called the airplane game.  And
25  part of our house there's a kind of a loop in one part of

*Frederick Guerino, CSR*
*Official Court Reporter*

**43**

1  the house where my Mom would ask me a question about like,
2  you know, three times three, or it wasn't even just
3  multiplication, it could have been learning Spanish, but I
4  would fly around the house, and if I got the question right,
5  once I came back to where she was, I would get like a
6  vegetable or like, you know, a carrot stick with like peanut
7  butter on it, and then on to the next question, and we would
8  continue doing this until I got parent recognition.
9       THE COURT:  You would get a vegetable for a snack?
10      THE WITNESS:  My mother is a dentist.
11      THE COURT:  I was struck by that, but go ahead.
12  A   So my parents would play a lot of games with me.  My
13  Dad started me Hooked on Phonics for reading.
14      In addition to that, I had countless number of
15  tutors.  I had the after school membership programs, some
16  summer camps that were geared for reading programs at the
17  library, and my parents -- my Mom would read to me to help
18  me get through reading assignments that were too painful for
19  me to read, and when I say painful, I could not read it and
20  it felt like I was being lobotomized.  It was painful to
21  focus and then I would fall asleep, not because I was tired,
22  but because I couldn't focus on the reading material.
23      I think SparkNotes and CliffNotes helped me
24  through English classes through junior high school and high
25  school; however, I could not read the books assigned and I

*Frederick Guerino, CSR*
*Official Court Reporter*

**44**

1  would read the SparkNotes or CliffNotes to get me through
2  it, and not because I was lazy and not because I didn't
3  care, but because I just couldn't read the book.
4       There were audio books that helped me listen,
5  which helped me a little bit, but it was difficult to listen
6  to all that was said for a long period of time.
7  Q   You mentioned a few minutes ago that in high school you
8  took some AP classes.
9       Could you tell me a little bit about that?
10  A   Could you repeat the question.
11  Q   You mentioned in high school you took some AP classes.
12      Could you tell me what you remember of your AP
13  class experiences?
14  A   Some of the AP classes were challenging to me.  One in
15  particular that comes to mind is my physics class.  I have
16  always been really driven to try to be the best I could
17  possibly be at all costs, and part of that is taking an AP
18  physics class that I just was not really cut out to do, but
19  I wanted to try my best to take that AP class.
20      In order to take that AP class for me to try to
21  understand what was in class, I remember in the beginning of
22  the school year when I started that AP class, that I would
23  have literally three different physics tutors come and try
24  to teach my material, because the learning didn't happen
25  in the classroom, and sometimes it was five days a week,

*Frederick Guerino, CSR*
*Official Court Reporter*

**45**

1  Monday through Friday, 15 hours of tutoring, and I would be
2  exhausted by the end of the night, but it wasn't my parents
3  telling me to get tutored, I chose to get tutored because I
4  wanted to be the best I could and I didn't want to give up.
5       Eventually, after weeks of going through that, I
6  could not do it any more, and I had to give up being in that
7  class, and I went down a level, because I just couldn't do
8  it.
9       THE COURT:  Where did you go to high school?
10      THE WITNESS:  Ward Mellville High School in Green
11  Village.
12      THE COURT:  Is that a public school?
13      THE WITNESS:  Yes.
14  BY MS. VARGAS:
15  Q   When you were in public school, did you ever have any
16  opportunity to read aloud in the classroom?
17  A   Sometimes we were needed to read aloud.
18  Q   How did you feel about that?
19  A   I actually always hated reading aloud because when I
20  read aloud, I would have no idea what I just read, which is
21  really bizarre to most people because reading something
22  aloud, you should recall what you read.  But for me
23  when I read aloud the word, it goes in one ear and out the
24  other.  It isn't because I wasn't paying attention, but I
25  would get nervous when a teacher would call me to read,

*Frederick Guerino, CSR*
*Official Court Reporter*

**A-981**

46

1 because the teacher might ask me what I thought about what I
2 just read at the end reading aloud and I would have no idea
3 what I just read, and that's embarrassing in a classroom of
4 20 to 30 kids.
5 Q   Does anyone else in your family have learning
6 disabilities?
7 A   No one else in my family has been tested for learning
8 disabilities, but during my journey of my learning testing,
9 you know, my family eventually started talking to me about
10 their learning issues that they had growing up.
11       My parents have spoken about it.  My brother has
12 spoken extensively about the struggles he's had.  He's very
13 quick to tell me that's exactly what he had growing up, too,
14 and he wasn't really tested and he wished he was, because he
15 thinks that that held him back from doing some of the things
16 that he may have wanted to do in his life that he didn't
17 have the opportunity to do because he didn't get the help he
18 needed.
19       Also, my grandfather mentioned he had had some
20 interesting idiosyncrasies that were probably learning
21 disabilities as well.
22 Q   What kind of idiosyncrasies?
23 A   So I talked to my grandfather.  Some of the
24 idiosyncrasies that he have were he had to do multiple things
25 at the same time, had multiple projects at the same time in

*Frederick Guerino, CSR*
*Official Court Reporter*

47

1 order to -- I don't know if I should say not get bored of a
2 project, but he needed multiple things to occupy his
3 attention.  He was a brilliant man.  He had over 40 patents
4 to his name.  He was a mechanical engineer who did a lot of
5 good things for this country with his work.  But a lot of
6 what he did was through hands-on experiences by doing -- he
7 did multiple projects at the same time to keep his attention
8 occupied.  Despite how sheer brilliant he was, he failed his
9 French class because he just could not bring himself to
10 remember the words.  I think he had poor language
11 acquisition.
12 Q   So what about college.  Did you have any accommodations
13 when you went to college?
14 A   I had several informal accommodations.
15 Q   Can you talk about those?
16 A   Yes.
17       So some of the informal accommodations I created
18 by eliminating some classes that would have been painful for
19 me to take.  For example, the University of Virginia had
20 certain requirements at the time for English heavy classes
21 that you had to take.  For example, certain requirements of
22 writing, wanted to satisfy requirements of, and reading, and
23 so the way to satisfy those requirements was pretty much
24 avoiding taking the English class.
25       For example, I took an African dance class in

*Frederick Guerino, CSR*
*Official Court Reporter*

48

1 which we would write very short things about the actual
2 dance we did, and just to make the point, I really don't
3 like dancing.  I find it uncomfortable.  I find it painful.
4 I don't enjoy dancing.  But I chose that class because I
5 could not bring myself to read a book or to write a long
6 paper and that uncomfortable thing dancing was easier for me
7 to do then just reading a book or writing a small paper,
8 that's why I took that class.
9       There was another English class, the only actual
10 English class that I took was a poetry class.  And the
11 reason I took the poetry class was because most poems are
12 pretty short, and it doesn't require extensive reading nor
13 writing, just a couple of lines to make a poem.  And for a
14 final project in the class we had to recite -- we had to
15 memorize a poem, and I think there were very stiff
16 requirements that it had to be at least 24 lines in length,
17 something like that, and memorizing something like that is
18 extremely hard for me.  And I was able to get through the
19 project to the point that I first tried to pick the easiest
20 poem, the one that just had 24 lines on it, not any more,
21 and one that rhymes, because I'm musically inclined to, and
22 I thought rhyming would help me remember the poem.  I think
23 the poem had some ridiculous rhyme like hickory dickory
24 hickory dill.  It is kind of a common rhyme, but the whole
25 poem was like that.  That was the only way I was getting

*Frederick Guerino, CSR*
*Official Court Reporter*

49

1 through the poem.  And even with all of that help, all of
2 that help, I asked the teacher, the professor, can you
3 please not make me do it in front of my classmates, because
4 I was afraid I wouldn't get through it.
5       So when someone else was in the class, she allowed
6 me to go to her office privately and I recited the poem to
7 her, had trouble getting through it, but I needed it after
8 several weeks of rehearsing that poem.
9 Q   You mentioned a moment ago that you are musically
10 inclined.
11       Did you play an instrument when you were a child?
12 A   I played a cello for over 20 years.
13 Q   What can you tell me about how you learned to play the
14 cello?
15 A   So I learned to play the cello not by reading notes.
16 For those of you who don't know, music is also a written
17 language, except instead of words that are on lines, there
18 are symbols and lines on a staff, and when you read a
19 certain symbol or note, you are supposed to play something
20 and that's the language of music.
21       So I didn't learn by reading any of those notes or
22 symbols, I listened.  I repeated.  I would listen to a
23 recording of a song and I would play it back.  So I would
24 match my finger on the cello to the sound, or I would have
25 my cello teacher demonstrate it to me, and that's how I made

*Frederick Guerino, CSR*
*Official Court Reporter*

**A-982**

50

1  the music, not by reading what was in front of me. I mean,
2  I have the technical thing going on in my head, yes. I was
3  looking at the music. I wasn't reading this is C sharp. I
4  would see the line of music went up, and that would trigger
5  my memory this is part the song that sounds up, and I
6  remembered what is supposed to come, and that was my
7  reading, so to speak.
8      But I had a terrible knowledge of music theory.
9  Music theory, for example, is the ground rule, so to speak,
10 of the music language, and I did extremely poorly in this
11 area. And I remember that when I finally got to high
12 school, I had a teacher by the name of Olga. She was a more
13 traditional teacher who would ask me to read the music,
14 that's how she taught, and she frequently had fits because
15 she didn't understand how I can make a good sound and have
16 no idea of what is on the piece of paper and not being able
17 to read music and have knowledge of music theory, which is
18 the rule that is written on the paper of how the music is
19 played?
20 Q   Do you recall anything of what was said during any of
21 those fits she had with you?
22 A   Yes. I recall crying at the end of several lessons
23 because of what she used to say to me. I remember that she
24 asked me if I was stupid on multiple occasions. She asked
25 me if I had dyslexia. She asked me if I had a learning

51

1  disability. And I had nothing to say to that because it is
2  embarrassing when someone says that to you, especially when
3  that label hasn't been put on me. And, you know, just to a
4  normal person for someone saying any of those words to you
5  is mortifying and uncomfortable, especially when it comes
6  from a teacher who was trying to help me, and she was trying
7  to help me. But she was shocked because I was the only
8  student she had that was like this that she ever taught in
9  her entire career.
10 Q   So we were talking a moment ago about college and what
11 if any formal or informal accommodations you had in college.
12     Were there any informal accommodations that you
13 haven't already mentioned during college?
14 A   In college, similar to earlier on, I would try to avoid
15 courses that had timed tests. I would opt for hands-on
16 projects. I would start each semester with research
17 credits, medical science research credits, to try to
18 decrease the amount of classes that had tests, still getting
19 academic credit. I would still be the last person in the
20 room for pretty much all of the exam. I was still not being
21 able to finish a lot of the exams, but I would definitely
22 skew my schedule towards courses that were less time-based,
23 compared to other classes.
24     I would fill my schedule with music and research.
25 Yeah, I still had to take still core classes, but, as I said

52

1  before, I tried to work around it, for example, like taking
2  an African dance class and poetry classes.
3  Q   Were you able to take notes in the college classes?
4  A   Yes. From the very beginning of college, I
5  experimented with a pen called a livescribe pen.
6  Q   Could you explain what that is?
7  A   The livescribe pen is a very specialized pen that not
8  only records the audio what you are doing, but it has a very
9  fancy way of recording your notes digitally on a piece of
10 paper that you're writing on, a special note, and comparing
11 the audio with that video at that moment.
12     For example, I could watch a replay on the
13 computer of what I'm writing and listen to the lecture at
14 that point that I write that specific letter on that spot in
15 the notebook, and doing that, as I said, I wasn't really
16 able to learn lectures, but as I write the notes, I would be
17 able to refer back to what was said at that moment and
18 repeat it many times in order to help me to rewind the
19 words, slow it down, speed it up. And this was really
20 important to me in the classes like Calculus, Chemistry, and
21 honestly without this tool, I wouldn't have been able to get
22 through these subjects.
23 Q   During college, did you have tutors?
24 A   Many.
25     THE COURT: Does the livescribe pen actually

53

1  record the entire lecture?
2      THE WITNESS: Yes.
3      THE COURT: Does it look like a pen?
4      THE WITNESS: Yes, it does. It is a kind of thick
5  pen with a little camera built in that just sits above the
6  pen tip. And the notebook paper, if you look very closely,
7  has like thousands of micro dots on it. As the pen with the
8  ink goes through almost the microscopic dots, the camera is
9  able to track your pen surface through those dots and record
10 at the right time your pen strokes at that moment.
11     THE COURT: Synced to the lecture?
12     THE WITNESS: Synced to the lecture.
13 BY MS. VARGAS:
14 Q   Did you have to take any timed exams during college?
15 A   Yes.
16 Q   How did that go for you?
17 A   I was always the last person taking those exams, and I
18 frequently couldn't finish. I remember professors some of
19 which didn't have time, but they would say, come on, Robert,
20 is there more time going to actually help you? And the
21 answer is yes, it would. But, you know, that response came
22 out of not seeing other students needing this type of time,
23 and it was in multiple subject areas, including in -- I took
24 a religion class, which was a Humanities requirement, and I
25 would actually take that -- I would actually take it in a

A-983

54

1  separate area for that class, because I asked for that, and
2  they allowed me to do that. And, you know, even Science
3  classes I would be the last person finishing the test as
4  well.
5  Q   Why did you ask to take the religion test in a separate
6  area?
7  A   I'm trying to recall. This was a long time ago. I
8  honestly don't remember. I just remember -- I think it has
9  something to do with needing the livescribe pen. I had
10  spoken to the professor. At this moment I am having trouble
11  recalling the exact reason for it.
12  Q   What is the MCAT?
13  A   I believe MCAT stands for Medical College Admissions
14  Test, something of that nature, and the test is to -- the
15  test is pretty much a requirement of my knowledge of every
16  United States based medical school. It is a test to take
17  that is standardized, a long test that is time-based that is
18  asking you to write on subject areas such as physics,
19  physical science, biological english, and you need to take
20  this test and submit it to medical schools to be able to
21  gain admission to a medical school program.
22  Q   Did you take the MCAT?
23  A   Yes, I did.
24  Q   How many times?
25  A   Twice.

Frederick Guerino, CSR
Official Court Reporter

55

1  Q   When did you take the MCAT?
2  A   The first time I took the test in 2013, and the second
3  time I took it in 2014.
4  Q   How did you prepare to take the MCAT?
5  A   I prepared for my MCAT over a series of years, not
6  months. I would -- I had libraries of books, and by
7  libraries I mean like I'm looking at a binder like this, and
8  maybe I have a hundred of these binders my Dad printed out
9  on the internet to try to teach me, and also had every
10  single practice book known to man, whether it was Princeton
11  Review, Barron's, whatever was needed, I have it in my
12  library, and I was using it and I was reading it.
13       I remember that one time that I was -- one time I
14  was in Virginia preparing, and one time my apartment was
15  full of books. I lived the next year in Richmond, Virginia,
16  and I distinctly remember that my apartment in Richmond had
17  a long hallway with -- it had shelves through maybe a
18  20-foot long hallway, and the entire shelf cover to cover
19  was MCAT books that my father had bought for me and I had
20  used, and I digested as much as I could possibly, even
21  though it was an overwhelming amount of information.
22       In addition to the sheer enormity of the amount of
23  book materials, I had multiple test MCAT tutors in all
24  subject areas, and I would meet with them multiple times a
25  week. It was also very expensive, very time consuming, and

Frederick Guerino, CSR
Official Court Reporter

56

1  this was a very stressful portion of my life to be able to
2  get through these experiences?
3       THE COURT:  When did you graduate from college?
4       THE WITNESS:  I graduated, your Honor, in 2013.
5  BY MS. VARGAS:
6  Q   Do you know any other students who took the MCAT?
7  A   Yes.
8  Q   And do you know how they prepared to take the MCAT?
9  A   So I don't know of any other student personally that
10  spent years preparing for the MCAT, and I don't just mean
11  took the classes, I mean actually dedicated study time I
12  don't know any of them who had the number of tutors I had.
13  I don't know any of them who spent much of them with tutors.
14  I don't know any of them whose parents spent money for
15  tutors to help, and I was very fortunate that my parents
16  funded the resources. My education was the most important
17  thing.
18  Q   In your work with Dr. Lam that we heard about this
19  morning, could you explain what you did with Dr. Lam in
20  preparing for the MCAT?
21  A   Dr. Lam and I spent hundreds of hours together, and,
22  you know, he actually even before the MCAT, he, you know,
23  actually tried to help me in other subject areas, I
24  remember, because we were both classmates. So sometimes he
25  tutored me in other things. He may have forgotten about

Frederick Guerino, CSR
Official Court Reporter

57

1  that because it was really a long time ago.
2       With the MCAT specifically, we would meet multiple
3  times a week, and we would go through -- you know, he would
4  give me an assigned material whether it was a practice test
5  or reading exercises, and we would go over the homework, of
6  course, and then we would do one-on-one in-person exercises
7  together. He tried to figure out why my scores weren't
8  rising, even after over a hundred hours of instruction, and
9  so we would go through an item, item by item on each subject
10  area and he tried to think, what is going on here?
11       He would ask me what is my knowledge of the
12  subject area and I would give it, and he would say, yes,
13  that's correct, so I would not get the question wrong. But
14  if it was because I was running out of time, or I
15  misinterpreted the question.
16       You know, when I read things sometimes, the first
17  time I read it I don't get the meaning out of it that a
18  normal person would get that meaning, and I would second
19  guess myself. I often second guessed myself, and I often
20  think outside of the box about, you know, about a simple
21  statement that doesn't seem simple to someone else. Could
22  they possibly mean this? And Dr. Lam would say, you know,
23  they are just asking you what's this and just answer to what
24  is exactly written and nothing else, and that was hard for
25  me.

Frederick Guerino, CSR
Official Court Reporter

A984

58

1    He would also go over various strategies to help
2  me increase my reading speed and to try to be able to finish
3  the exam as best as possible in my situation.
4  Q    Could you describe some of the strategies that you
5  used?
6  A    You know, each subject area is different, but, for
7  example, in like the reading area test, I mean, in some
8  sense the entire -- yes, in the reading area of the test,
9  you would have -- we recreate topic sentences.
10    For example, if there were multiple topics on a
11  reading passage, and the first sentence of a paragraph
12  within a reading passage we would label as the topic
13  sentence, and I would tell myself after reading the
14  sentence, okay, this is probably what the rest of the
15  paragraph is going to be about, and I would prime myself,
16  and I would also read the last sentence to get the crucial
17  part of it. If I tried to read the entire passage, there
18  was no chance I was actually going to finish that section of
19  the test that was going to come up, and my score was going
20  to be impacted and I would just be guessing for the section.
21  So these compensatory strategies were completely essential
22  for me to finish the exam.
23    We would write notes, what does the sentence mean
24  to you? And he would vigorously train me to try not to get
25  outside of the box, which is my fault. To try to answer

Frederick Guerino, CSR
Official Court Reporter

59

1  exactly to the merits of what that impact question is trying
2  to ask, to name a few examples.
3  Q    How did you perform on the MCAT?
4  A    I guess I think I received a 27.
5  Q    Okay.
6    And what did you think about that score?
7  A    To me that score was not good enough, and it was not
8  only not good enough, to me I couldn't get into a medical
9  school with that score.
10    The second year I believe I did one point better,
11  and that helped a little bit. But I applied to over 60
12  medical schools. It was a slew of medical schools that I
13  applied to, and they cited my past scores, the reason why I
14  didn't get an interview or didn't pass on to the next range
15  or the next round. But I tried to do as much as I could to
16  improve my score, because I wanted to be the best I could
17  possibly be, and I spent much time and energy and resources
18  to even try to get a higher score.
19  Q    How did the score compare to your actual knowledge of
20  the material?
21    THE COURT: Are we talking about the first time?
22  He took it twice.
23    THE WITNESS: Yes, your Honor. I believe the
24  score difference is --
25    THE COURT: The 28?

Frederick Guerino, CSR
Official Court Reporter

60

1    THE WITNESS: Yes.
2    THE COURT: It is on a scale of a hundred?
3    THE WITNESS: No, your Honor. I think it goes to
4  40.
5    THE COURT: Like the ATT?
6    THE WITNESS: Something like that.
7    I'm sorry, could you repeat the question?
8  BY MS. VARGAS:
9  Q    I was asking, how did your impact scores compare to
10  your knowledge of the material that is being tested?
11  A    So I was professionally frustrated with my scores
12  because I didn't have time to learn the material. I didn't
13  know the material. And I would always be disappointed by
14  you got this score, and I spent multiple years studying for
15  this exam, years of my life that I could have done anything
16  with, but I chose to do it for this exam, and I was
17  frustrated that I couldn't get the scores that I thought
18  would represent what I actually knew and also what my tutors
19  verified what I knew.
20  Q    At any point have you had educational testing?
21  A    Yes.
22  Q    How did that come to pass?
23  A    So the first person who I guess you could consider was
24  the catalyst for the reason I got testing was when Dr. Lam
25  tutored me and he noticed how I was struggling, despite the

Frederick Guerino, CSR
Official Court Reporter

61

1  time and resources that were being put in. He told me that
2  he had just heard of a lecture in the beginning of his
3  medical school. I believe it was from the Dean of Medicine
4  who was greeting students, and that Dean was unusual, at
5  least in my experience, in that he was -- he correctly said
6  that the most important thing for everyone -- he was telling
7  us you learn materials to the best of your ability, and if
8  any of you are having struggles with learning or testing,
9  that you absolutely should get learning tested because you
10  owe it to yourself and your patients to be able to
11  demonstrate what you know.
12    He told me that that lecture impressed him, and he
13  recalls all of the struggles I had from working with me.
14  He said, I think you should get the learning test to see if
15  that's the root cause of what is going on.
16  Q    And when you went to get that testing -- when did you
17  have that testing the first time?
18  A    It was in 2013. I think it was August 2013.
19  Q    Okay.
20    What were the results of that testing?
21  A    The results of the testing were that the educational
22  psychologist says I had a learning disability, and she made
23  different accommodations recommendations based on the
24  findings of her work.
25  Q    Did she recommend that you receive extended time?

Frederick Guerino, CSR
Official Court Reporter

A-985

**62**

1   A    She did.  She recommended at that time that I receive
2   time and a half.
3   Q    And after you got that evaluation, where in time did
4   you get that evaluation as compared to when you took the
5   MCAT?
6   A    So, I was not able to get tested in time for the first
7   MCAT, despite wanting to, and it was the first -- I mean,
8   this was the first week for me that I might need to be
9   tested because of what was going on.
10          I recall being extremely frustrated with what
11  seemed to be the bureaucracy.  There's not a lot of people
12  who do this type of testing.  First of all, it is expensive.
13  They don't have a lot of slots.  None of them -- it's hard
14  for me to fit into their schedule.
15          On top of that, the MCAT had their own various
16  deadlines and a multitude of forms that would overwhelm
17  anyone to get by.  And I tried to seek resources out to get
18  the testing I needed, but I wasn't able to get it in time.
19  I basically needed to take the exam, and I got what I got.
20  Q    And then what about the second time you took the MCAT,
21  did you request accommodations for the second time?
22  A    I did request accommodations for the second MCAT from
23  Administration, yes.
24  Q    What was the result of that request?
25  A    They denied my accommodations request.

**63**

1   Q    Did you receive any formal accommodations on the MCAT?
2   A    No.
3   Q    Did you have any informal accommodations on the MCAT?
4   A    Many.  As I said before, even with Dr. Lam, I spent
5   hundreds of hours.  It was not just with him, it was with
6   other tutors, and many conversations with my father,
7   especially, as I mentioned, he's a doctor, so we went over a
8   lot of science-based material all of the time together, and
9   over the phone as well.
10          I had some video tutor sessions, in-person tutor
11  sessions in every single subject area.  I had a library of
12  books.  It is a lot.
13  Q    So let's talk about medical school.
14          How many years does medical school take,
15  typically?
16  A    Medical school is typically four years long.
17  Q    What kind of classes do you take during the first two
18  years of medical school?
19  A    During the first two years of medical school, it's
20  typically regarded as premedical.  So it's a lot of book
21  studying, a lot of questions and textbooks, pretty much
22  notations, and it's largely lecture-based.
23  Q    You testified I think the word you used was a slew --
24  that you applied to a slew of medical schools.
25          How many medical schools accepted you?

**64**

1   A    The first time none.
2   Q    How many medical schools accepted you the second time?
3   A    One.
4   Q    So you just testified about the first few years of
5   medical school.
6          What happens in the second two years of medical
7   school?
8   A    So after the first two years, which are preclinical,
9   you begin the third year, which in my opinion is the year
10  where the magic happens.  It is the transformative year
11  where you begin clinical rotation.  In clinical rotations,
12  this is really the first time where you are introduced to
13  patients, and not just introduced to them, you are a part of
14  their treatment team, and that is a very special experience,
15  and that's what transforms.  It is the most formative year
16  that allows you to begin to transform into a doctor, and you
17  are right next to the patient.
18          You are sent into the room sometimes -- you are
19  sent into the room every day, actually, that's your
20  assignment, to speak to the patient, to learn how to gather
21  -- to focus or gather a medical history.  You are invited
22  into surgical rooms where surgeries are being performed, and
23  you are -- you observe, you're assisting the surgeon to some
24  extent.  So it is a beautiful part of the medical school,
25  and it really opened my eyes, and you think you have an idea

**65**

1   what medicine is like.  My parents are in medicine, but it
2   is completely different being able to interact with those
3   patients yourself?
4   Q    So when you started medical school, did you request
5   accommodations from your medical school?
6   A    No, I did not.
7   Q    Why not?
8   A    So I was embarrassed to say that I had a learning
9   disability, despite having the documentation that we did.  I
10  wanted to try to do it myself, and to prove myself to others
11  that I didn't need the accommodations, which was not the
12  case.  I did not want to be ridiculed for having the
13  disability.  I mean, the people wrongfully -- some people
14  already wrongfully make fun of people who have overt
15  disabilities.  For example, some people incorrectly think
16  that people who are in wheelchairs are weak and sometimes
17  they demean your character, and it's awful.  That's tangible
18  disability that you can see.
19          When you come to intangible disability, for
20  example, learning disability, a lot of people even have more
21  trouble wrapping their head around that.  They think you are
22  making it up and have no idea what struggle you are going
23  through because they can't relate.  They have no idea how
24  hard it was to get there and to do what you do on a daily
25  basis.  And because of all of that, I didn't submit learning

**A986**

66

1 accommodations. I didn't submit the psychiatric report?
2 Q How do you feel about that decision now?
3 A I definitely regret that. I wish I had submitted it
4 from the beginning, and I know that hindsight is 20/20, but
5 I wish I could have been tested at a much earlier age.
6 Q So did you have any informal accommodations in medical
7 school?
8 A In medical school there were informal accommodations as
9 well. Lectures were recorded in a multitude of ways,
10 whether on the school's own software or a student's
11 note-taking efforts, listening back on lectures, and I would
12 take advantage of those things.
13 I also supplemented my learning with multiple
14 video-based, audio-based, cartoon-based learning methods so
15 that I would normally slow down the lectures to like half
16 speed and listen slowly, take notes, rewind it and listen to
17 it again, and repeat multiple times.
18 When I was studying, I had a cool setup where I
19 have my laptop connected to an HDMI cable with a 55-inch
20 screen on my desk, which is like a second monitor, and have
21 the four textbooks at the same time right next to it, and I
22 would work my way through topics and compare what was on
23 there. And then I would have the industry sources that
24 medical school students called "first aid", it is regarded
25 as the Bible, so to speak, of medical school for the first

*Frederick Guerino, CSR*
*Official Court Reporter*

67

1 two years, and I would annotate my information, depending on
2 where the source came from, right into that corner book
3 Bible of medicine.
4 I would use a resource called Sketchy Micro, and
5 Sketchy Micro was a cartoon, an illustrated cartoon, for
6 example, microorganisms, bacteria, viruses, and they would
7 paint a story of all of the different salient features of
8 those microorganisms. That was to try to build a rich
9 memory, because you would be tested on these things not just
10 for school, but for USMLE Step 1. So these were examples of
11 some things that I would do.
12 In addition, after school I would always be the
13 last person taking an exam with or without accommodations.
14 I would be the last person in the room, and some teachers
15 are -- would be flexible in giving me more time. But of
16 course when it came to shelf exams, which were typically the
17 last exam you take in a class in medical school, of course
18 there's no flexibility on that one.
19 Q So in your first year of medical school when you didn't
20 have formal accommodations, how did you do?
21 A I didn't do that well. When I say I didn't do that
22 well, it is misperceiving. Let me explain what I mean by
23 that.
24 So in classes there's pretty much two components.
25 There's how you did with the rest of the class. For

*Frederick Guerino, CSR*
*Official Court Reporter*

68

1 example, maybe your teacher gives quizzes, projects,
2 different parts of the syllabus, and at the end of the class
3 you have a shelf exam and how you do on the NBME, National
4 Board of Medical Examiners, shelf exam. How you do on that
5 shelf exam to be cemented how you do in that class. Because
6 even though the NBME exam is not the biggest percentage of
7 the syllabus in that class, my school had a requirement for
8 need to have above a certain score on those examinations.
9 And when I would run out of time on those exams, I would not
10 do well on them, and that would cause me not to do well in
11 the classroom, otherwise I get very positive comments and I
12 do very well on the clinical part of the class.
13 Q During your first year of medical school, did you pass
14 all of your classes?
15 A Yes.
16 Q And then when you went into your second year of medical
17 school, what happened?
18 A So in my -- I was told to stop at the end of -- could
19 you repeat the question.
20 Q I was asking you about your second year of medical
21 school.
22 What happened during your second year of medical
23 school?
24 A During my second year of medical school, the struggles
25 of not being able to finish tests continued up until the

*Frederick Guerino, CSR*
*Official Court Reporter*

69

1 point that it became so bad that my school, you know, called
2 me into a hearing to figure out what was going on.
3 Q And what happened?
4 A So during that hearing that made it extremely apparent
5 to how I did poorly, that is because of the calculation that
6 I was struggling with NBME subject exam specifically, and I
7 could not simply do it anymore. It didn't matter whether I
8 came to medical school thinking I was going to do this,
9 trying the hardest at that point. That was a point of
10 absolute failure where I said I need to submit this
11 educational testing report to my school because I'm not able
12 to finish exams and that's why I'm not doing well in these
13 classes.
14 Q So, did you pass all of the classes in the first
15 semester of your second year?
16 A Yes.
17 Q And what did you do at this point with the evaluation
18 that you had not submitted previously?
19 A I submitted it to my school's university, Stony Brook
20 University, their accommodations center. I think at the
21 time it was called Disabilities Services.
22 Q Do you know what they did with your application for
23 accommodations?
24 A Yes. They reviewed the psychiatric testing that I
25 submitted to them, which was provided by my educational

*Frederick Guerino, CSR*
*Official Court Reporter*

A-987

70

1   testing psychologist and they interviewed me. They read
2   through the documentation, and between the interview and
3   documentation that was supplied, they agreed I had a
4   disability that needed to be accommodated for.
5   Q    What accommodate did you request?
6   A    I requested what the educational psychologist said in
7   the report which was at the time it was time and a half. It
8   was some, you know, note taking service help, and a separate
9   room, a separate area of testing.
10  Q    During that first year and a half of medical school,
11  did you use the livescribe pen?
12  A    Yes.
13  Q    After you requested those accommodations from Stony
14  Brook Disabilities Services Office what, if anything, did
15  they agree to provide you?
16  A    They provided me -- through all of those things, they
17  provided me with extra time. And it wasn't just on any
18  tests, it was all time-based tests.
19       I got access to special note-taking service where
20  I would record the lecture on my phone, then my school paid
21  for a service where you would get uploaded to a third-party
22  website, and some sort of the professional who has knowledge
23  in that subject area would transcribe the notes from that
24  recording so that I could have it: and teachers also,
25  because of the requests, if I needed, allowed me to take

71

1   exams in a separate area as well.
2   Q    Who is Linda Demotta?
3   A    Linda Demotta is the Stony Brook University School of
4   Medicine Learning Specialist.
5   Q    And did you have any interaction with her?
6   A    Multiple interactions.
7   Q    Could you describe it?
8   A    Yes.
9        I would meet with her. We would meet once a month
10  or so. She was very helpful in making herself available to
11  me with or speak with on the phone. She was very well
12  versed on the topic of learning disabilities, and she had a
13  lot of experience in both learning disabilities and special
14  education. She would try to design different strategies for
15  me, different study schedules. She would try to pair me up
16  with upper class mentors who had gone through medical school
17  to try to, you know, give me a mentor who could give me
18  ideas on how to do better in medical school. She knew I was
19  struggling, and we would meet and try to do a little better
20  each time.
21  Q    Okay.
22       And then you mentioned that you went to a hearing
23  because of performance.
24       What was the result of that hearing?
25  A    My school during the hearing said I needed to either

72

1   repeat the entirety of my medical school again or I had to
2   stop and immediately take Step 1.
3   Q    When do the students typically take Step 1 at your
4   school?
5   A    So students did not have to take Step 1 until after
6   their third year of clerkship. But in my case I was being
7   made to take it substantially earlier than that.
8   Q    You mentioned -- I will go back a little bit.
9        You mentioned shelf exams.
10       Could you explain what those are?
11  A    Yes. Shelf exams are a creation of the NBME, National
12  Board of Medical Examiners. They are retired exam questions
13  that were previously used on medical students to evaluate in
14  medical school. The actual NBME shelf specifically is for
15  example there's a surgical shelf. There's an internal
16  medicine shelf. It is an exam that you receive at the end
17  of a clerkship.
18       For example, internal medicine, you will take
19  essentially the final exam on the multiple choice questions
20  and that would be shelf. When I say shelf, I'm colloquially
21  referring to any NBME exam, and just a small technical
22  difference in the first year and a half when -- I'm talking
23  about NBME shelf exams. They are technically NBME
24  customized exams that your professor makes the questions,
25  but are confidential questions that you only see during that

73

1   setting. They are also from retired questions.
2   Q    Retired questions from what?
3   A    Retired NBME questions.
4   Q    So what accommodations did you receive for shelf exams
5   during medical school so far?
6   A    So --
7   Q    Let's go year by year.
8        What accommodations did you receive of shelf exams
9   during the first year?
10  A    On the first year of medical school I received no
11  accommodations.
12  Q    How was your performance on the shelf exams?
13  A    It ranged from failing the shelf exam, needing to
14  repeat it, to doing dismally. It was because I couldn't
15  finish the exam and very much of it.
16  Q    And what accommodations, if any, did you have on shelf
17  exams during the fall of your second year of medical school?
18  A    So during the fall of -- in the early part of the fall,
19  I still didn't have the accommodations; and in the later
20  part the fall, it was the first time I got accommodations on
21  a test, and it was like night and day between not having
22  accommodations and having accommodations, and it did help.
23  I was able to finish more of the test this time, but not all
24  of it, but it was a help.
25  Q    Did you observe whether the other students were able to

A-988

74

1  finish the exam?

2  A    Yes.  In fact, in my personal experience of seeing my

3  classmates, of which there were many, I was the only one who

4  was there until the end of each time.  They were not

5  time-pressured -- they were not time-pressured to be able to

6  finish the exam.  They were able to take multiple breaks

7  during a shelf exam.  They would have no problem finishing

8  it.  It feels like time was not a factor.  This wasn't a

9  couple of times.  This was my entire student body.  If you

10  were looking at them, you wouldn't realize that it was a

11  time-based test.

12      THE COURT:  Are the shelf exams do you mean just

13  at Stony Brook or all medical schools?

14      THE WITNESS:  Your Honor, pretty much every

15  medical school in the United States is using shelf exams.

16  BY MS. VARGAS:

17  Q    So then you testified that after the hearing you were

18  directed to either repeat the entirety of your first year or

19  take Step 1 early.  So what did you do?

20  A    I tried to prepare to take Step 1 early, which was a

21  very hard decision for me, but I felt like I was stuck

22  between a rock and a hard place and I could not fathom

23  needing to do an entire year and a half of material that I

24  already knew.

25  Q    So what did you do to take Step 1?

*Frederick Guerino, CSR*
*Official Court Reporter*

75

1  A    So I started preparing for Step 1 and I applied for

2  accommodations to the National Board to try to get the

3  accommodations that I needed.

4  Q    And what accommodations did you request for Step 1, the

5  first time you requested accommodations from NBME?

6  A    I believe the first time I requested time and a half,

7  extra breaks, and a separate room, I believe.

8  Q    At that time, did you think that time and a half was

9  enough for you?

10  A    No.

11  Q    Why not?

12  A    Because I was still not able to finish the exam.

13  Q    Even with time and a half?

14  A    Yes.

15  Q    So, you should have a black binder in front of you.  If

16  you could turn, please, to the first tab.

17      So that's a black binder.  It says Plaintiff's

18  Exhibit 1 on the front.

19      The Court should have a copy.

20      If you could please turn to Tab 1, the first piece

21  of it.

22      Do you recognize what this is?

23  A    Yes.

24  Q    What is it?

25  A    This is my first request for accommodations to the

*Frederick Guerino, CSR*
*Official Court Reporter*

76

1  USMLE Step 1.

2  Q    In addition to this application for accommodations, did

3  you submit additional documentation with this application?

4  A    A multitude of information, actually.

5  Q    So turning to Tab 2.

6      On the top it says Allison Anderson, Ph.D, and

7  then the heading is Supplemental Testing Report.

8      Do you recognize this document?

9  A    Yes.

10  Q    What is this document?

11  A    This is a psych evaluation from one of my educational

12  testing specialists.

13  Q    Did you submit this with your first request for

14  accommodations?

15  A    I did.

16  Q    And then turning to Tab 3.

17      The top says Suzanne E. Michaels, Ph.D, licensed

18  clinical psychologist, again Confidential Report

19  Psychological Evaluation.

20      Do you recognize this document?

21  A    I do.

22  Q    What is it?

23  A    This is another psychological evaluation written by a

24  separate educational psychologist.

25  Q    Did you submit this document to the NBME for your first

*Frederick Guerino, CSR*
*Official Court Reporter*

77

1  request for accommodations?

2  A    I did.

3  Q    Turning to Tab 4.

4      There's a date of March 25, '17, and the heading

5  is Personal Statement For Accommodations to the NBME Office

6  of Disability Services.

7      Do you recognize this document?

8  A    I do.

9  Q    What is it?

10  A    This is a letter that I wrote to the NBME, which they

11  required me to write it for the accommodations.  It is my

12  personal statement.

13  Q    Did you submit this personal statement with your first

14  request for accommodations?

15  A    I did.

16  Q    Then turning to Tab 5.

17      At the top it says Thomas Aronson, M.D., and To

18  Whom It May Concern.

19      Do you recognize this document?

20  A    Yes.  He's my treating psychiatrist.

21  Q    What does he treat you for?

22  A    He treats me for learning disabilities and ADHD.

23  Q    What treatment did Dr. Aronson provide to you?

24  A    Dr. Aronson provides some medication to treat ADHD.

25  Q    What kind of medication is that?

*Frederick Guerino, CSR*
*Official Court Reporter*

**A-989**

78

1   A   So it's Dexedrine, as well as Vyvanse.
2   Q   What was this?  Could you tell me about what this
3   letter was from Dr. Aronson?
4   A   Could you give me a moment?
5   Q   Yes.
6       (Pause)
7   A   It seems to give his account of what two diagnoses are.
8   For example, ADHD learning disorder, and it seems to show
9   what he prescribed to help with these things.
10  Q   And did you submit this document to the NBME with your
11  first request for accommodations?
12  A   Yes.
13  Q   And then turning to Tab 6.  The heading at the top says
14  Stony Brook University, dated 3/27/2017, Dear National Board
15  of Medical Examiner's Disability Services.
16      Do you recognize this document?
17  A   Yes.
18  Q   What is this?
19  A   This is a letter that Christopher Heedles, a licensed
20  social worker, wrote.  He was the person who did my intake
21  for Stony Brook University accommodations, and he was the
22  one who granted the accommodations at the University.
23  Q   And did you submit this letter with your first request
24  for accommodations to the NBME?
25  A   I did.

*Frederick Guerino, CSR*
*Official Court Reporter*

80

1   Q   Who is he again?
2   A   He was the school's university disability coordinator
3   who was assigned to my case.
4   Q   Did you submit this document with your first request
5   for accommodations?
6   A   I did.
7   Q   Turning to Tab 9.  It is on letterhead that says
8   University of Virginia School of Medicine, dated March 29,
9   2017, Dear NBME Services, and it's signed by Andrew Lam.
10      Do you recognize this document?
11  A   I do.
12  Q   What is this?
13  A   This is a letter that doctor -- now Dr. Andrew Lam sent
14  to the NBME based on his observations of working with me
15  extensively and tutoring me.
16  Q   Did you provide this document to the NBME with your
17  first request of accommodations?
18  A   Yes, I did.
19  Q   And turning to Tab 10.
20      At the top of Tab 10, it says Stony Brook School
21  of Medicine, dated November 28, 2016.  It says:  Dear Mr.
22  Sampson, and it's signed by Andrew Wackett, M.D.
23      Do you recognize this document?
24  A   I do.
25  Q   What is it?

*Frederick Guerino, CSR*
*Official Court Reporter*

79

1   Q   And turning to Tab 7.  It's dated March 29, 2017, To
2   Whom It May Concern.
3       On the second page it is signed by Linda Demotta.
4       Do you recognize this document?
5   A   I do.
6   Q   What is it?
7   A   This is a letter that is Linda Demotta's account of my
8   learning disability and what she believes my situation is.
9   Q   Did you submit this letter with your first request for
10  accommodations?
11  A   I did.
12  Q   Turning to Tab Eight.
13      At the top it says United States Medical Licensing
14  Examination USMLE Certification of Prior Test
15  Accommodations.
16      Do you recognize this document?
17  A   I do.
18  Q   What is it?
19  A   This document shows the different types of
20  accommodations that I received in Stony Brook University
21  School of Medicine.
22  Q   And do you see a signature at the bottom?
23  A   Yes.
24  Q   Who signed this document?
25  A   Christopher Heedles.

*Frederick Guerino, CSR*
*Official Court Reporter*

81

1   A   This is a document that is telling me to come to my
2   medical school committee because of the poor academic
3   performance I was having from not being able to finish my
4   shelf exams.
5   Q   Did you submit this letter with your first request for
6   accommodations to the NBME?
7   A   Yes.
8   Q   Why did you submit this letter?
9   A   Let me just take another glance at this one second.
10      (Pause)
11      I would imagine I sent this because it showcases
12  the struggles that I had been having in the documented form
13  that my school thought it was a big enough problem that I
14  needed to come to their promotions committee.
15  Q   There's a Tab A that follows this letter.
16      It's landscape printed and it says Stony Brook
17  Medicine.
18      Do you recognize that document?
19  A   Yes.
20  Q   What is that?
21  A   This document shows all of the different NBME shelf
22  exams that I took I guess from October of 2016 all the way
23  through January of 2017, and it shows the scores that I
24  received on those NBME shelf exams.  And the Xs box on the
25  top left show exams that I received accommodations on for

*Frederick Guerino, CSR*
*Official Court Reporter*

A-990

82

1  the first time, and it shows a wide range of scores on this
2  document.
3         (Continued on the next page.)

83

1  (Continuing.)
2  BY MS. VARGAS:
3  Q.  Okay.  So do you know approximately what date you
4  began receiving testing accommodations from Stony Brook
5  School of Medicine?
6  A.  So I'm looking at on this document.  I see an X next
7  to the GI nutrition 2016 exam, December 8th, 2016.  That
8  would be the first time I received accommodations at Stony
9  Brook.  That would be the first time I received formal
10  accommodations.
11  Q.  Okay.  What was the formal accommodation that you
12  received on that testing?
13  A.  Time and-a-half.
14  Q.  And did you submit this document to the NBME with
15  your first request for accommodations?
16  A.  I did.
17  Q.  Turning to Tab 11, it's another landscape-printed
18  document.  It says MCAT score report, name, Robert Drew
19  Sampson, and there's an AAMC ID number and some MCAT
20  scores.  Do you recognize this document?
21  A.  I do.
22  Q.  What is this?
23  A.  This is my MCAT score report, which shows my
24  performance on both MCAT administrations.
25  Q.  And looking at this document, can see what your

84

1  scores on the MCAT were, your total score?
2  A.  Yes.
3  Q.  What was your score in 2013?
4  A.  Twenty-eight.
5  Q.  And what was your score in 2014?
6  A.  Twenty-nine.
7  Q.  I think you testified earlier that your score was 27
8  and 28?
9  A.  Right.  I made a mistake on that.  It was 28 and 29
10  are the correct scores.
11  Q.  Okay.  And did you submit this document to the NBME
12  with your first request for testing accommodations?
13  A.  I did.
14  Q.  Turning to Tab 12, it says, Robert D. Sampson.  It
15  has an address.  And then it says the ACT Plus Writing
16  Student Report.  Do you recognize this document?
17  A.  Yes.
18  Q.  What is this?
19  A.  It's my ACT score for -- there's the 27.
20         (Court reporter seeks clarification.)
21  This is my ACT score report, and I said there's the
22  27.
23  Q.  And did you submit this document to the NBME with
24  your first request for accommodations?
25  A.  I did.

85

1  Q.  Turning to Tab 13, another landscape document, it
2  says name, Sampson, Robert, your scores, and on the far
3  right corner, it says, PSAT, NMSQT.  Do you recognize this
4  document?
5  A.  Yes.
6  Q.  What is it?
7  A.  This is my PSAT score report that I got from taking
8  the PSAT in 2007.
9  Q.  Did you submit this document to the NBME with your
10  first request for accommodations?
11  A.  Yes.
12  Q.  Turning to Tab 14, it has College Board SAT at the
13  top, Student Score Report for Robert Sampson.  Do you
14  recognize this document?
15  A.  Yes.
16  Q.  What is this?
17  A.  This is my SAT score report from May of 2005.
18  Q.  And did you submit this document to the NBME with
19  your first request for accommodations?
20  A.  Yes, I did.
21  Q.  Turning to Tab 15, it's a letterhead that says
22  Minnesauke Elementary School -- and forgive me if I
23  pronounce that wrong.  Minnesauke?
24  A.  Yes.  That's correct.
25  Q.  Sorry about that.

86

1    It says, "Dear parents." Do you recognize this
2 document?
3 A.    Just give me a second. It's from a long time ago.
4 Hold on. (Peruses document.)
5    Yes.
6 Q.    What is this?
7 A.    It says that these are second grade testing results
8 on the Otis-Lennon Ability Test. These are the results.
9 Q.    How did you get these test results? Did you submit
10 these to the NBME?
11 A.    I did. And how I got them, they were mailed to my
12 parents. And my mom kept all these results for years.
13    MS. VARGAS:  (Confers with Ms. Mew.)
14    THE COURT:  You know what? I think we're going
15 to take our lunch break now, and we'll come back at 1:30.
16    MS. VARGAS:  Thank you.
17    THE COURT:  Thank you.
18    (Lunch recess.)
19    (Continued on the next page.)
20
21
22
23
24
25

LISA SCHMID, CCR, RMR
Official Court Reporter

87

1    A F T E R N O O N   S E S S I O N
2    THE COURT:  Okay. Good afternoon.
3    MS. MEW:  Good afternoon.
4    MS. VARGAS:  Good afternoon.
5    THE COURT:  Put him back on the stand.
6    You're still under oath, Mr. Sampson.
7    Okay. Please be seated. Go ahead.
8    MS. VARGAS:  Thank you, Your Honor.
9 DIRECT EXAMINATION (CONTINUED)
10 BY MS. VARGAS:
11 Q.    Right before we took the lunch break, Ms. Mew had
12 pointed out that there was a page of Tab 14 or there were
13 a couple pages of Tab 14 that were score reports for
14 different years.
15    So if you could please take a look at those
16 score reports, and let me know if you recognize all of
17 them?
18 A.    (Peruses document.) Yes.
19 Q.    And did you submit all of them to the NBME, along
20 with all the other documents we discussed with your first
21 request for accommodations?
22 A.    Yes.
23 Q.    Okay. And then after you submitted all of these
24 materials to the NBME the first time, what happened?
25 A.    The accommodations request was denied.

LISA SCHMID, CCR, RMR
Official Court Reporter

88

1 Q.    Turning to Tab 16, there's a letter on NBME
2 letterhead, dated June 13th, 2017, addressed to you. What
3 is this document? Do you recognize it?
4 A.    I do.
5 Q.    What is it?
6 A.    This document is the first denial from the NBME for
7 the USMLE Step 1 exam.
8 Q.    How did you feel when you got this denial?
9 A.    Devastated. I mean, just asking for the
10 accommodations in the first place isn't really -- it's not
11 easy at all. It's painful for me to face my disability
12 head-on, to compile a pretty big stack of documents that
13 goes over, you know, what my trials and tribulations have
14 been. You know, it's not just the bureaucracy of it, but
15 it's the bureaucracy of assembling your weakness, and that
16 makes it particularly painful.
17    And then for you to submit -- for me to submit
18 that entire stack of -- I've lost count how many people
19 gave their opinion on me, to have that denied, you kind of
20 feel hopeless, and that things seem against you, and it's
21 devastating.
22 Q.    So what did you do next?
23 A.    After I got denied, I read what they wrote, and I
24 tried to figure out what might be missing that they needed
25 to see.

LISA SCHMID, CCR, RMR
Official Court Reporter

89

1 Q.    Okay. And turning to tab 17, there's a document
2 dated Thursday, June 22nd, 2017, with your name in the
3 upper right corner, addressed to the National Board of
4 Medical Examiners Disability Services. Do you recognize
5 this document?
6 A.    Yes.
7 Q.    And what is this?
8 A.    This is an appeal that I wrote to the NBME to request
9 accommodations with new information that wasn't supplied
10 the previous time.
11 Q.    Okay. And what new information did you provide this
12 time?
13 A.    So I submitted an appeal letter from Jan Serrantino,
14 and an appeal letter from my parents that also included a
15 long list of tutors that I've had over the years, and
16 teachers' comments from first to sixth grade, you know,
17 parent letters, report cards. Yes, I have submitted those
18 things.
19 Q.    Who is Jan Serrantino?
20 A.    Jan Serrantino was the Director of Disability
21 Services at the University of California-Irvine, and I
22 asked her to help me take on this task of compiling all
23 these documents because it was too difficult and painful
24 to do myself, and I'm just -- at the time, I was just a
25 medical student, and I am no expert on assembling these,

LISA SCHMID, CCR, RMR
Official Court Reporter

**A-992**

90

1    and I didn't know what to do next.

2    Q.   So turning to Tab 18.  The letterhead is from the

3    University of California at Irvine, dated June 22nd, 2017,

4    "To whom it may concern."  And it's a number of pages, at

5    the end, signed by Jan Serrantino.  Do you recognize this

6    document?

7    A.   Yes, I do.

8    Q.   What is this?

9    A.   This is the aforementioned letter from Dr. Jan

10   Serrantino, compiling my new information and trying to --

11   trying to show -- yeah, compiling the information.

12   Q.   And did you submit this letter with your first

13   appeal?

14   A.   My first appeal?

15   Q.   The first appeal you just testified about was the

16   previous tab 17, if that helps?

17   A.   (Peruses document) Yes.

18   Q.   Okay.  And then turning to Tab 19, it's dated

19   6-17-17, "Dear NBME Accommodations," and on the second

20   time, it's signed Steven Sampson and Shelley Sampson.  Do

21   you recognize this document?

22   A.   Yes.

23   Q.   What is this?

24   A.   This is a letter written by my parents, both of them,

25   to the National Board of Medical Examiners, giving their

LISA SCHMID, CCR, RMR

Official Court Reporter

91

1    perspective of me and what it was like growing up and the

2    difficulties I had in general, as well as with learning

3    and testing.

4    Q.   Why did you ask your parents to write this letter?

5    A.   Well, I kept them out of it the first time, but I

6    wanted -- I thought maybe their perspective could help

7    shed light on my disability as something the NBME, I

8    thought maybe they would care about, someone who's known

9    me my whole life and what they have to say about it.

10   Q.   Okay.  And turning to the second page, there's a list

11   of names.  Who are all of those people?

12   A.   These are all tutors or reading specialists or

13   experts in different subject areas who have provided

14   extensive amount of teaching and tutoring to me over the

15   many years.

16   Q.   Is this list complete?

17   A.   To the best of my knowledge, yes.  There might even

18   be a few people that I just can't keep track of after all

19   this time.  So there might even be more than this.

20   Q.   And you said that you sent this letter to the NBME?

21   A.   I did.

22   Q.   And turning to Tab 20, at the top it says, quoted

23   teacher comments and parent letters from grades one

24   through six.  Do you recognize this document?

25   A.   Yes.

LISA SCHMID, CCR, RMR

Official Court Reporter

92

1    Q.   The two pages?  What is this?

2    A.   These are typed copies from the originals to make it

3    easier to read for them, to make it easier for the NBME to

4    read of, you know, different comments that my teachers

5    have made, and other parent letters from grades one to

6    six.

7    Q.   Do you submit this with your appeal to the NBME?

8    A.   I did.

9    Q.   Why did you submit this document?

10   A.   Because, you know, this is early childhood, grades

11   one to six.  I believe -- I don't know if -- it is

12   probably the last letter where they probably said there

13   was insufficient evidence from early childhood.

14   Regardless.

15         I just thought it was an important perspective

16   to show of, you know, people who've been with me for

17   entire school years.  You know, you work really closely

18   with your school teachers and they know you.  And so I

19   thought it was useful to include their perspective.

20   Q.   Okay.  And then turning to tab 21, there's a fairly

21   thick stack of documents here.  The first page is

22   landscaped, and it's sort of greenish-yellow and it says,

23   School, Minnesauke, teacher, Mrs. Feinberg.  Do you

24   recognize this packet of documents?

25   A.   Yes.

LISA SCHMID, CCR, RMR

Official Court Reporter

93

1    Q.   What is this?

2    A.   So this page is a report card from my first grade

3    teacher, and I particularly remember this stack of papers

4    because there was a 25 megabyte file on that, on

5    submission to the NBME, and I sent them so much stuff that

6    I had to reduce the size of my file for it to be emailed.

7    Q.   So you sent this packet to the NBME with your appeal?

8    A.   I did.

9    Q.   And what happened after you submitted that new data

10   to -- these new documents to the NBME?

11   A.   They rejected my request for accommodations.

12   Q.   Turning to page 22, do you recognize that document?

13   It says NBME at the top, confidential, August 1st, 2017.

14   A.   I do.

15   Q.   And what is that document?

16   A.   It is a rejection for my request for accommodations

17   signed by Dr. Michelle Goldberg.

18   Q.   So then what did you do after the August 1st, 2017,

19   which I believe was the third denial by NBME?  Then what

20   did you do?

21   A.   I tried to understand why my request was -- why my

22   requests for accommodations was denied, and I tried to

23   gather what I thought would be necessary supporting

24   information to show them again to appeal.

25   Q.   Okay.  And turning to Tab 23.

LISA SCHMID, CCR, RMR

Official Court Reporter

**A-993**

94

1   A.   Yes.

2   Q.   This is a letter that starts at the top, Robert D.

3   Sampson, with an address and then on the left, National

4   Board of Medical Examiners, signed, "Regards, Robert

5   Sampson."  Do you recognize this document?

6   A.   I do.

7   Q.   What is this?

8   A.   This is a -- this is an appeal document with new

9   information that I sent to the NBME for a request for

10  accommodations, which included new evidence.

11  Q.   Okay.  And turning to -- well, what new evidence did

12  you submit with this appeal?

13  A.   So this has an updated appeal letter from Dr. Jan

14  Serrantino.  It has an updated letter from my treating

15  psychiatrist, Dr. Thomas Aronson.  And it also has an

16  updated appeal letter from Dr. Allison Anderson, who is

17  one of the educational psychologists that administered my

18  prior educational testing tests.

19  Q.   And turning to Tab 24 is a letter with a heading at

20  the top, Jan Serrantino, Ed. D., Educational Consultant,

21  addressed to the National Board of Medical Examiners.  Do

22  you recognize this document?

23  A.   I do.

24  Q.   And what is this?

25  A.   This is another compilation of new information that

LISA SCHMID, CCR, RMR

Official Court Reporter

95

1   Dr. Jan Serrantino assembled to help me apply for the

2   accommodations because it was too much for me to handle

3   myself to do all this.

4   Q.   And did you submit this document to the NBME with

5   your new appeal?

6   A.   I did.

7   Q.   And then turning to Tab 25, the letterhead at the top

8   says, "Thomas A. Aronson, MD," dated September 6th, 2017,

9   and it goes into a second page.  Actually, I'm sorry.  It

10  goes into a third page, and then it's signed by Dr.

11  Aronson.  Do you recognize this document?

12  A.   I do.

13  Q.   And what is it?

14  A.   Well, just reading the first line, it says that it's

15  a response to a denial of accommodations.

16       It says -- it seems like it reinforces his

17  diagnosis -- says in bold -- for ADHD.  It looks like he

18  gives multiple examples of my disabilities, of my learning

19  disability and ADHD in everyday life as well as testing

20  situations.  And it looks like an expansion of thoughts

21  for support to give me accommodation.

22  Q.   And did you submit this to the NBME with your new

23  appeal?

24  A.   I did.

25  Q.   And turning to Tab 26, at the top of the letterhead,

LISA SCHMID, CCR, RMR

Official Court Reporter

96

1   it says Allison Anderson Ph. D.  It's dated --

2   Psychological Testing Services, dated August 10th, 2017,

3   addressed to the National Board of Medical Examiners.  Do

4   you recognize this document?

5   A.   I do.

6   Q.   What is this?

7   A.   This is the aforementioned letter from Dr. Allison

8   Anderson, which provides an updated letter on her reason

9   why I should be accommodated by the NBME.

10  Q.   And did you submit this letter to the NBME?

11  A.   I did.

12  Q.   What happened after you submitted this new appeal to

13  the NBME?

14  A.   My request for accommodations was denied.

15  Q.   And turning to Tab 27, letterhead from the NBME,

16  dated January 12th, 2018, addressed to Robert Sampson.  Do

17  you recognize this document?

18  A.   This -- yes, I do.

19  Q.   What is this?

20  A.   This is the denial from the NBME for my request for

21  accommodations, signed by Dr. Farmer.

22  Q.   So at this point in time in January of 2018, what was

23  your status at school?

24  A.   (No response.)

25  Q.   At medical school?

LISA SCHMID, CCR, RMR

Official Court Reporter

97

1   A.   It was precarious.  It was very uncertain and scary,

2   and difficult.  I was -- technically, I was a student on

3   academic remediation at that point because of not having

4   taken the Step 1, because I did apply for -- I met -- I

5   wanted to take the test, and I needed accommodations in

6   order to demonstrate my knowledge.  And that put me

7   between a rock and a hard place because I needed to do

8   something that I couldn't.

9   Q.   Were you permitted to take classes at that time?

10  A.   No.

11  Q.   Turning to Tab 28, this is a letter on the top right

12  column.  It says, "Robert Sampson," with an address and on

13  the left, National Board of Medical Examiners, and it's

14  dated February 22nd, 2018.  Do you recognize this

15  document?

16  A.   Just give me a moment.  (Perusing document.)

17       Yes.

18  Q.   And what is this document?

19  A.   This document -- well, I write -- I'm writing to

20  request an explanation as to why I'm not being granted the

21  accommodations that I requested.  So this is an appeal.

22  Q.   And did you submit this appeal to the -- this appeal

23  document to the NBME in February of 2018?

24  A.   I did.

25  Q.   And turning to page 29.  I'm sorry, Tab 29.  There's

LISA SCHMID, CCR, RMR

Official Court Reporter

**A 994**

98

1 letterhead that says, Stony Brook Medicine. It's dated
2 February 15th, 2018, and it's signed by Linda DeMotta,
3 Learning Specialist, Stony Brook School of Medicine. Do
4 you recognize this document?
5 A. I do.
6 Q. What is this?
7 A. This is an included piece -- this is an included
8 letter that I submitted to the NBME, and it's written by
9 my school's learning specialist, written from the
10 perspective of my medical school that I have a disability,
11 and that she believes that I should be accommodated for
12 it, and it was sent to the NBME.
13 Q. Okay. And then what happened after you submitted
14 that appeal and additional document from Linda DeMotta to
15 the NBME?
16 A. My request for accommodations was denied.
17 Q. And turning to Tab 30, there's a letter on NBME
18 letterhead, dated March 6th, 2018. Do you recognize this
19 document?
20 A. Yes.
21 Q. And what is it?
22 A. This is the denial from the NBME in response to my
23 request for accommodations.
24 Q. Okay. Then turning to Tab 31, there's a letter on
25 letterhead from Jo Anne Simon. Who is Jo Anne Simon?

LISA SCHMID, CCR, RMR
Official Court Reporter

99

1 A. Jo Anne Simon is an attorney. She's an attorney.
2 Q. Okay. And who did she represent?
3 A. She represented me.
4 Q. Okay. And do you recognize this document as it
5 appears at Tab 31?
6 A. Yes.
7 Q. What is it?
8 A. This is an appeal for accommodations to the NBME.
9 Q. And do you know whether this was submitted to the
10 NBME?
11 A. This was submitted to the NBME, in particular to
12 Dr. Farmer.
13 Q. Okay. And turning to 31A, the next tab is an A. And
14 it's Thomas A. Aronson, MD, June 12th, 2018, to the
15 National Board of Medical Examiners. Do you recognize
16 this document?
17 A. I do.
18 Q. What is it?
19 A. This is another letter that my treating psychiatrist
20 wrote, where it appears that he's rebutting the NBME
21 claims for the denial and explaining why I need to be
22 accommodated.
23 Q. Okay. And do you know whether this document was
24 submitted to the NBME with the letter from Jo Anne Simon?
25 A. It was.

LISA SCHMID, CCR, RMR
Official Court Reporter

100

1 Q. And what happened after this appeal was submitted to
2 the NBME?
3 A. The appeal was denied by the NBME.
4 Q. And turning to Tab 32, there's more letterhead with
5 NBME, dated September 7th, 2018, to Robert Sampson. Do
6 you recognize this document?
7 A. I do.
8 Q. What is it?
9 A. This is the denial from the NBME stated in a letter
10 to my request for accommodations.
11 Q. Okay. So. Turning to Tab 33. Again, letterhead
12 from Jo Anne Simon to Catherine Farmer, Director of
13 Disability Services at National Board of Medical
14 Examiners, dated November 14th, 2018. Do you recognize
15 this document?
16 A. I do.
17 Q. And what is it?
18 A. This is an appeal written by Jo Anne Simon to the
19 NBME as a request for accommodations.
20 Q. Okay. And do you know whether this appeal was
21 submitted to the NBME?
22 A. It was submitted to the NBME.
23 Q. And what happened after this was submitted to the
24 NBME?
25 A. The request for accommodations was denied.

LISA SCHMID, CCR, RMR
Official Court Reporter

101

1 Q. Turning to Tab 34. More letterhead from the NBME,
2 dated January 4th, 2019, to Robert Sampson. Do you
3 recognize this document?
4 A. I do.
5 Q. What is it?
6 A. This is the response from the NBME, indicating that
7 my request for accommodations has been denied again.
8 Q. So at this point, it was January 2019. What did you
9 do?
10 A. You know, there's so many denials here that I need to
11 refresh my memory of what happened next. Give me a
12 moment. (Perusing document.)
13 I applied for accommodations again.
14 Q. At any point, did you take Step 1?
15 A. Yes.
16 Q. When did you take Step 1?
17 A. In January of -- I don't want to say the wrong year.
18 Can you give me a moment?
19 Q. Well, the question I really want to ask you is, did
20 you have accommodations when you took Step 1?
21 A. No.
22 Q. What was the result of your taking Step 1?
23 A. I failed the exam.
24 Q. Okay. So when you failed the exam, what happened
25 next?

LISA SCHMID, CCR, RMR
Official Court Reporter

**A-995**

---

**102**

1  A.  When I failed the exam, it was emotionally disturbing
2  and it was extremely hard because there was so much -- so
3  many hopes and dreams piled into taking that exam, despite
4  how futile the effort was because I failed the exam, and
5  because of the positioning that my school's CAPP Committee
6  pushed me into, I was told that I would be dismissed from
7  medical school.
8  Q.  So let's step back a moment.  When you took Step 1,
9  how did you prepare?
10  A.  I prepared for Step 1 for years.  I had -- I spent so
11  much time looking at thousands of practice questions over
12  and over, over different editions of testings from
13  different companies.
14       I did a variety of video lectures.  My dad and I
15  would spend hours upon hours kind of talking about
16  different medical topics, and I insisted that I try to
17  teach it back to him because I thought teach-back was an
18  effective way of helping me learn.
19       I tried to increase my speed on the test, to try
20  to give myself the best absolute shot of passing the test.
21  I would -- I had an elaborate system of timers.
22       In that -- on scratch paper or whiteboard that
23  you're given for USMLE Step 1, including my simulated
24  practice test, I had like a time scale that divided every
25  single section into eight fractions.  And so as the timer

LISA SCHMID, CCR, RMR
Official Court Reporter

---

**103**

1  would tick down on the electronic software, I would mark
2  off where I was in that section of test into the eight
3  pieces, to try to keep pace.
4       And as the test or the practice session would go
5  on and on, I'd keep losing pace and I tried to speed up.
6  I tried to skip through things, and it would not be enough
7  to finish.  Yeah.
8  Q.  Were you able to read all of the questions when you
9  took Step 1?
10  A.  No.  Not even close.
11  Q.  Do you know whether most medical students pass Step 1
12  the first time they take it?
13  A.  They do.  The extreme -- the extreme vast -- I'm
14  sorry.  The extreme vast majority of students pass Step 1
15  who take it.
16  Q.  You testified earlier that you used test-taking
17  strategies on the MCAT.  Did you use those strategies on
18  Step 1?
19  A.  I tried to use some of them, but they largely weren't
20  applicable.  The two tests are entirely different.
21       First of all, the USMLE Step 1 is several hours
22  longer than the MCAT.  It exacerbates my inattention,
23  exacerbates my focus.  It exacerbates my reading.  It's
24  painful for me to read that much, and exhausting.
25       The -- they call them vignettes on the USMLE

LISA SCHMID, CCR, RMR
Official Court Reporter

---

**104**

1  exam.  A vignette is basically a work block, a block of
2  multiple sentences, no paragraphs generally, just one
3  block of text, a lengthy block normally, that it might
4  describe something about a patient or something of that
5  nature, and you have to read it and then answer the
6  question.
7       In the MCAT exam, there's a lot of like testing
8  like tricks and shortcuts you can use to find your way to
9  the answer, kind of similar to like an ACT or SAT for the
10  MCAT, but those same strategies don't apply on the USMLE
11  Step 1.  They don't point you to lines like 23 to 24,
12  where you can just read that part.
13       They're entirely different tests.  I mean, I can
14  just speak from my own experience of testing that I
15  believe that the USMLE Step 1 is much more knowledge-based
16  than the MCAT exam.
17       The MCAT asks you to apply different things, but
18  it's not as much a test of your knowledge.  And the things
19  you learn from the MCAT, you have learned for many years,
20  whereas the things for the USMLE Step 1, you have learned
21  that year or maybe two years.  So it's not like you are
22  marinating in this information for years.  And the amount
23  of reading on the USMLE Step 1 is far more extensive than
24  on the MCAT exam.
25  Q.  Were you able to skip reading some parts of the Step

LISA SCHMID, CCR, RMR
Official Court Reporter

---

**105**

1  1 questions?
2  A.  No.  So that's another important difference.
3       So on the USMLE Step 1, there are -- I think Dr.
4  Lam described it as red herrings.  There obviously is some
5  very important information in the vignette that's written.
6  There are also distracters and things that have absolutely
7  nothing to do with getting the right answer.
8       And when you're reading something for the Step
9  1, you have to read it.  You have to understand it.  You
10  have to integrate it with the sentences before and after.
11  You have to, you know, either roll it into a bucket that
12  this is something that's important or this is something
13  that's not.
14       So you really have to carefully consider every
15  single word you're reading as to whether it's important or
16  not, whereas on the MCAT and SAT, ACT, you very much do
17  not have to read it all.  You can read topic sentences.
18  You can read intros and conclusions or just an intro and,
19  you know, maybe get most of them right.  But that is not
20  the case on the USMLE Step 1.
21       And another difference is that for the MCAT,
22  there might be a passage and then there will be several
23  questions, normally five, six questions on the one
24  passage.  So if you use your shortcuts to understand that
25  passage and you -- that information applies to all five or

LISA SCHMID, CCR, RMR
Official Court Reporter

---

**A-996**

**106**

1  six of those questions, whereas for USMLE Step 1, it is
2  one normally sizable block of text per question,
3  occasionally, two questions, but rarely.  And so when you
4  go to the next question, it's another long block of text
5  you have to read.  So that's a lot more reading.
6  **Q.**   I think there was testimony that both of these tests
7  are multiple choice, right?
8  **A.**   Yes.
9  **Q.**   So how do the multiple choice answers on the MCAT
10  compare to the multiple choice answers on Step 1?
11  **A.**   Well, on the MCAT, I can't remember if it was -- I
12  think it was a five choice test, like A through E or A
13  through D.  I can't remember, four or five.
14           But the USMLE, I think I remember seeing letter
15  choices A through K at some points.  There is a wide
16  variety of choices.  It's not your typical test.  It's
17  something that you've never seen before.  If you don't
18  know the answer, you're not going to get it right by
19  guessing.
20  **Q.**   What if any impact did these multiple answer options
21  on Step 1 have on you?
22  **A.**   So more answer choices means more reading.  More
23  reading for me means I need more time to read it.  So that
24  actually made it even harder than the MCAT.  At least with
25  the MCAT, there is only four or five choices to read it.

LISA SCHMID, CCR, RMR
Official Court Reporter

**107**

1  **Q.**   So did you take the -- did you take Step 1 in January
2  of 2020?
3  **A.**   Yes.
4  **Q.**   Okay.  So walk us through what happened in January or
5  spring of 2020 with regard to the CAPP Committee at Stony
6  Brook?
7  **A.**   I'm sorry.  Do you mean before or after I took the
8  test?
9  **Q.**   After you took the test.
10  **A.**   After I took the test, I failed it.  I --
11           THE COURT:  Let me just ask you a question.  Do
12  you find out right away whether you pass or fail?
13           THE WITNESS:  Your Honor, you don't find out
14  right away, despite it being a computerized exam.  You
15  find out normally four to eight weeks after the exam.
16           THE COURT:  Okay.  Go ahead.
17  **A.**   So after I failed the exam that I did not receive
18  accommodations for, the CAPP Committee told me that, you
19  know, because you failed your exam, you're going to be
20  expelled from medical school.
21  **Q.**   What how did that feel?
22  **A.**   Like your life is ending, like the thing that you
23  worked for your entire life, all the hopes and dreams you
24  had, forever, the one thing you really wanted to do in
25  your life is going away, and it feels earth shattering.

LISA SCHMID, CCR, RMR
Official Court Reporter

**108**

1           (Continued on the next page.)

LISA SCHMID, CCR, RMR
Official Court Reporter

**109**

1  DIRECT EXAMINATION (Cont'd.)
2  BY MS. VARGAS:
3  **Q**   What did you do?
4  **A**   I did the only thing I thought I could do at the time
5  which was to appeal to the Dean of Medicine at my school.
6  **Q**   And what was the outcome of that appeal?
7  **A**   So the Dean kept reconsidering my appeal, and he
8  reversed the judgment of the CAPP Committee because he found
9  it improper.
10  **Q**   Had you submitted any materials to the Dean?
11  **A**   Yes, I did.
12  **Q**   As part of that, what did you submit?
13  **A**   Well, I retained counsel and counsel submitted I guess
14  an appeal.
15  **Q**   How would you describe the primary thrust of the
16  arguments that counsel put forward in that appeal?
17  **A**   Well, I'm trying to go back to the time point.
18  **Q**   What was the basis of that appeal?
19  **A**   The basis for the appeal was that I pretty much got
20  forced into taking something earlier then all of the
21  classmates.  Had been forced to take the exam, and I had to
22  take it without the accommodations that I needed to be able
23  to show my knowledge on the exam.  Then predictably because
24  I didn't have the time that I needed, I failed it, and I
25  thought it was unfair to be the basis for being kicked out

Frederick Guerino, CSR
Official Court Reporter

**A-997**

110

1  from school for.
2  Q    As of that point had you passed all of your medical
3  school classes?
4  A    Yes.
5  Q    And to date, have you passed all of your medical school
6  classes?
7  A    Yes.
8  Q    What was the Dean's decision on that appeal?
9  A    The Dean's decision on the appeal was that he reversed
10 the CAPP Committee's decision, that had wrote to me from
11 school, and he reinstated me and he said that I could begin
12 my third year clerkship, which would begin my clinical
13 medicine training.  Even though that reversal, still
14 wouldn't allow me to graduate within seven years.
15 Q    And this was all happening within 2020.
16      What, if any, impact did covid have on this time
17 period?
18 A    So covid had profound impacts on everything in life: I
19 think we all knew this.  But specifically to my case, it led
20 to extensive delays in communication meetings, in committee
21 meetings with CAPP, for example, and the Dean's decision.
22 We were using virtual at this point with the Microsoft teams
23 and it exacerbated the amount of time it took to even reach
24 that point, and that was a large part why this even took so
25 long, too.

*Frederick Guerino, CSR*
*Official Court Reporter*

111

1  Q    Going back a moment.
2       Before the Dean reversed the decision of the CAPP
3  Committee, I think you testified there was a hearing.
4       What did you remember about that hearing?
5  A    I was -- I remember over zoom, and I remember there was
6  a professor from my school that was the Chair of that
7  committee and she said some very embarrassing and extremely
8  harsh things to me that made me feel like nothing.  She
9  basically told me like, you know, you should get over your
10 disability because other people are able get over a
11 disability, and you are not the only one with a disability
12 in the world.  You know, just to summarize talk about it,
13 get over it.  This can't be.  This is not an excuse, and
14 this is not going to -- this is not going to sway us to not
15 kick you out of medical school, and the only thing that we
16 see is that you failed your Step 1 exam that we told you you
17 had to take, and what is done is done.  You are out.
18 Q    Was anything said during that hearing about the NBME?
19 A    Yes.
20 Q    What was said?
21 A    They said something along the lines of the NBME does
22 not approve accommodations or they never have here, or it is
23 so rare to get them applied, so you should just give up.
24 Q    Why didn't you give up?
25 A    Because I'm someone who doesn't give up with anything.

*Frederick Guerino, CSR*
*Official Court Reporter*

112

1  It is kind of in my DNA.  It is in my family history.  It is
2  in my heritage from Jewish-American immigrants who were
3  persecuted from anywhere they come from, and not to give up,
4  and try your hardest, and this is your one life and you
5  should give it your all.  And some other parents have a
6  belief that you are in school - my family it was - do it for
7  yourself so that you don't disappoint yourself.  It is not
8  about us.  So I took that to heart, that's why I don't give
9  up.  I just try my best, whatever the cost or hardship it
10 takes, to get through it.
11 Q    So at what point did you return to medical school?
12 A    I returned to medical school in August of 2020 to third
13 year clinical rotations.
14 Q    And how long a point had you been out on leave trying
15 to obtain accommodations?
16 A    I believe it was three and a half years.
17 Q    And then you testified earlier about the clinical
18 rotations.
19      What did you do about Step 1?  Did you still need
20 to pass it?
21 A    Yes, I still needed to pass it.  However, part of the
22 Dean's reversal was that I didn't have to take Step 1 before
23 my classmates had to.  That would be after my clinical
24 rotations were finished.
25 Q    So if I'm understanding this correctly, was the Dean

*Frederick Guerino, CSR*
*Official Court Reporter*

113

1  allowing you to take Step 1 at the same time as everybody
2  else?
3  A    Yes.
4  Q    All right.
5       What, if anything, did you do about the need for
6  accommodations at that point?
7  A    So at that point, because I knew I would have to take
8  the USMLE Step 1, my previous accommodations that the NBME
9  provided were expired, even though I don't think it's
10 supposed to work that way, but --
11 Q    Could you explain what you just said?
12 A    Yes.  So, so far we have gone through I don't even know
13 how many patient reports, but apparently all those reports
14 were written by psychologists were no longer valid to apply
15 for accommodations because the NBME has a unique requirement
16 that the testing cannot be older than three years.  And at
17 this point the testing was older than three years.  So in
18 order to request accommodations again, in addition to paying
19 another application fee to the NBME, I also had to get brand
20 new educational testing, which is not easy to do.  It is
21 expensive and takes a lot out of you.
22 Q    At what point did you get that testing?
23 A    I got the testing in August of 2020.
24 Q    So was that during the covid pandemic?
25 A    Yes.

*Frederick Guerino, CSR*
*Official Court Reporter*

A-998

114

1    Q    So who provided that additional testing?
2    A    Dr. Janet Wasserstein.
3    Q    Do you know what kind of doctor she is?
4    A    She is a case specialist in educational psychology, I
5    believe, with a doctorate, a Ph.D.
6    Q    And do you know approximately how long that testing
7    took?
8    A    It was over -- it was 15 hours or more at that time.
9    Q    And after you took the test, what was your status in
10   school?  Where were you in school at this point?
11   A    So after I took -- after I worked with Dr. Janet
12   Wasserstein, I went through third year clinical rotations
13   and that's what I said earlier, is like a big milestone in
14   your medical education because it is the first time you are
15   working with patients and you are responsible insofar as you
16   should be in a routine.  You are speaking to loved ones.
17   There are other doctors that get the records.  You know, you
18   are actually a functioning part of the team.
19   Q    And was that full-time that you were a medical student?
20   A    It was very full-time.
21   Q    Okay.
22        What was Dr. Wasserstein's conclusions after those
23   15 hours of testing?
24   A    Dr. Wasserstein concluded that she believed I needed
25   double time for any time-based exam, a separate testing

Frederick Guerino, CSR
Official Court Reporter

115

1    area, as well as extra breaks, and I think there were
2    probably some, you know, mindfulness exercises and things of
3    that sort.
4    Q    Okay.
5         Did you communicate these new results to Stony
6    Brook?
7    A    Yes, I did.
8    Q    How did you do it?
9    A    So Dr. Wasserstein spoke with my disability officer and
10   communicated the results of that directly.
11   Q    What was the result of that communication?
12   A    They approved the double time, after speaking to Dr.
13   Wasserstein based on the results that she had, as well as
14   her other recommendations for like note-taking and a
15   separate testing area and breaks.
16   Q    So, since that time, what accommodations have you
17   received from Stony Brook?
18   A    From that point on I received double time and
19   notetaking services, you know, extra breaks in all of my
20   classes, both in medical school and business school.
21   Q    At what point did you add the joint degree from the
22   business school?
23   A    The joint degree took place -- my first business class
24   was either in June or July of 2021.
25   Q    How did you go about getting into the joint degree

Frederick Guerino, CSR
Official Court Reporter

116

1    program?
2    A    So my school sent an application to Stony Brook College
3    of Business, and I had spoken about this with an Associate
4    Dean of my medical school, Dr. Cohen.  After speaking with
5    Dr. Cohen, he advised me to put together the application and
6    have it sent directly to the College of Business, and he
7    assembled the application packet, and the College of
8    Business received it and accepted it as a joint degree
9    student.  At a certain point in time I was actually taking
10   classes at both schools concurrently.
11   Q    And what is your GPA in business school?
12   A    I have a 4.0 in the school.
13   Q    So then what happened next in terms of Step 1?
14   A    So then at the end of my third year -- then I applied
15   for accommodations with the NBME from the report of Dr.
16   Wasserstein.
17   Q    When did you receive the report from Dr. Wasserstein?
18   A    I received the report January 2022.
19   Q    And turning to Tab 35.
20        At the top it says United States Medical Licensing
21   Examination, USMLE, request for testing accommodations.
22        Do you recognize this document?
23   A    Yes.
24   Q    What is it?
25   A    This is a new request for accommodations to the USMLE

Frederick Guerino, CSR
Official Court Reporter

117

1    Step 1 exam.
2    Q    If you turn to the very last page of this document.
3         Are you able to tell me what date was this request
4    for accommodations submitted?
5    A    April 13, 2022.
6    Q    Okay.
7         And turning to Tab 36.
8         There's a document dated April 13, 2022.  It says
9    Personal Statement for Accommodations.
10        Do you recognize this document?
11   A    I do.
12   Q    What is this?
13   A    This is a personal statement that I wrote, which is a
14   requirement for the request for accommodations to the NBME
15   describing in fresh terms the difficulties that I have been
16   having.
17   Q    Was this a new personal statement?
18   A    It was.  In fact, every single time I applied to Stony
19   Brook was a personal statement.
20   Q    Did you submit this personal statement to the NBME
21   meeting with your April 2, 2022 request for accommodations?
22   A    I do.
23   Q    Turning to Tab 37.
24        There's a letterhead from Mt. Sinai.  It says
25   Neuropsychological Evaluation.  At the top right corner in

Frederick Guerino, CSR
Official Court Reporter

A-999

118

1 that box is Janet Wasserstein.

2      Do you recognize this document?

3 A   I do.

4 Q   What is this?

5 A   This is the psych evaluation, the educational testing

6 that Dr. Wasserstein did.

7 Q   Okay.

8      If you turn to the very last page of this

9 document. Look at the very last line where it says written

10 12/6/2020.

11      Did you receive the report in December of 2020?

12 A   No.

13 Q   Do you know why you didn't receive the report in

14 December of 2020?

15 A   There were several delays that happened between that

16 date and the January 2022 date. Some of the dates included

17 covid, in which I remember Dr. Wasserstein, she told me she

18 got deathly ill and she was hospitalized. Some of it was

19 just really being a medical student and, you know, that she

20 had sent me a draft report and she just faxed the factual

21 stuff.

22      And I remember there was something about in my

23 history about my umbilical cord being wrapped around my

24 neck. There were some non-substantive factual changes that

25 I noticed in her report, like the umbilical cord, that I

*Frederick Guerino, CSR*
*Official Court Reporter*

119

1 needed to be corrected. And so it was things like that

2 combined with being in medical school full-time, and covid

3 delayed everything until I finally received it in January of

4 2022.

5 Q   How did you receive it in January of 2022?

6 A   In her office.

7 Q   When you went to her office, did you meet with her?

8 A   Yes.

9 Q   And during that meeting she gave you the report?

10 A   Yes.

11 Q   And did you submit this report to the NBME with your

12 April 2022 request for accommodations?

13 A   I did.

14 Q   And what happened? How did the NBME respond?

15 A   The request for accommodations was denied again.

16 Q   And turning to Tab 38. Again on NBME letterhead dated

17 June 1, 2022 to Robert Sampson.

18      Do you recognize this document?

19 A   Yes.

20 Q   What is it?

21 A   This is the denial of my request for accommodations at

22 this time not signed by any one person.

23 Q   Switching gears for a moment.

24      During your third year of clinical training, what

25 if any reading requirements were there?

*Frederick Guerino, CSR*
*Official Court Reporter*

120

1 A   In the third year of clinical training, there's not

2 much reading requirement. It is pretty hands-on, seeing

3 what they say, how they act. It is absorbing what that

4 bedside manner is, how to be a team player. There's really

5 not that much reading involved, but a ton of practice

6 questions prepared.

7 Q   And what about patient charts, did you have to read

8 patient charts?

9 A   So there were patient charts, and I actually distinctly

10 remember that I was pretty much the slowest charter. When I

11 took my notes, it took me forever to make them. I couldn't

12 write them faster, and it would always take me a while to

13 actually read them. And sometimes actually many times it

14 would delay me from getting to a patient, because I needed

15 to read it first, and, you know, I needed to find out.

16 Q   What about was there any other kind of reading? Did

17 you read any research studies or anything like that?

18 A   Yes. Apart from being a good medical student and

19 informed healthcare practitioner, I should say, being able

20 to do research and reading up on what is occurring, if

21 that's a journal article from the Journal Of Medicine, or

22 some other periodical, something like CPI or Science Direct,

23 you know, I look at those things. I wouldn't have to read

24 the entire thing, but perhaps I can learn what I needed to

25 learn, what I needed to look at the abstract or summary or

*Frederick Guerino, CSR*
*Official Court Reporter*

121

1 googling part of that article.

2 Q   So, then, after you finished your third year and then

3 after the NBME denied your request for accommodations on

4 June 1st, 2022, what happened next?

5 A   I'm sorry, could you repeat the question.

6 Q   Okay.

7      After the NBME denied your request for

8 accommodations on June 1, 2022, what did you do?

9 A   I retained counsel and I had them try to reach the NBME

10 to see what is going on here.

11 Q   Was it the counsel that you had retained in the spring

12 of 2020 in relation to your appeal of your dismissal the

13 same counsel you retained in the summer of 2022?

14 A   Yes.

15 Q   Were the purposes the same or different?

16 A   They were absolutely different but related.

17 Q   Could you explain?

18 A   Yes. So, I mean, this time it was to -- it is kind of

19 hard to separate the two matters because on the one hand the

20 School of Medicine is telling me to take an exam by a

21 certain time by which I can't take or I failed it when I

22 took it because I didn't have accommodations to perform on

23 it. And, on the other hand, I had a testing agency that

24 wouldn't give me accommodations that I need to show my

25 knowledge that this entire binder of people who have seen me

*Frederick Guerino, CSR*
*Official Court Reporter*

**A1000**

**122**

1  says I need it and it feels like a catch 22. You know, I'm
2  just a medical and business student, but to me it feels like
3  I'm being forced between two sides and, you know, one says
4  you have to take the test and one says that, you know, we
5  are not going to accommodate you, so yeah.
6  Q  So, why didn't you file a lawsuit against the NBME any
7  sooner?
8  A  So, to me the lawsuit is the last thing I would ever
9  want to do, the absolute final option. I have been warned
10  from a variety of people that it is extremely expensive. It
11  is extremely time consuming, and it would delay my life.
12  And any one of these requests should be approved, would not
13  only have saved me time and money afterwards, and send me on
14  my way and not created the damage that happened to me by
15  having me suffer through all of this.
16      So, sure, if I had known in hindsight that if a
17  lawsuit would have brought relief, then sure I would have
18  done that, but I didn't know that, and there were
19  significant risks for doing so, which there still are.
20      A lot of this I still have to expose my entire
21  life on public record. It's not something I want to do.
22  It's not easy to talk about a psych evaluation. That pretty
23  much tells people how I tick. And I don't like to tell
24  people that I had the psych evaluation, because that's a
25  very sensitive topic. And of course that opens up a lot of

*Frederick Guerino, CSR*
*Official Court Reporter*

**123**

1  stress for future jobs that I have to get. This will be
2  public record. They can look up those things. And most
3  people don't need to deal with that, and I don't really
4  think it is fair that I need to be subjected to that, but
5  I'm doing this because there's no other choice.
6  Q  Why not take Step 1 again without accommodations?
7  A  I told you the first time without accommodations, after
8  my strives to pass a test, I do not see a way that I could
9  ever pass that test without the extra time that I need.
10  Q  What happens if you don't take and pass Step 1?
11  A  Sorry can you repeat the question again.
12  Q  What happens if you don't take and pass Step 1?
13  A  If I don't take and pass Step 1, then I will never be
14  able to achieve my being a doctor, and my entire medical
15  school and years of resources and time I put into it will be
16  over.
17  Q  What are you hoping for from this lawsuit?
18  A  I'm hoping that I will be able to take the Step 1 exam
19  with accommodations that demonstrate the knowledge that I
20  know, and by doing so be able to finish medical school,
21  which I'm pretty close to finishing, and become a doctor,
22  and treat patients and do what I set out to do from the
23  beginning.
24      MS. VARGAS: Thank you. No further questions.
25      THE COURT: Okay. We'll take a ten-minute break

*Frederick Guerino, CSR*
*Official Court Reporter*

**124**

1  for the witness before cross-examination. All right.
2      (A recess is taken at this time.)
3      (Continued on the next page.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

*Frederick Guerino, CSR*
*Official Court Reporter*

**125**

1  (Continuing.)
2      THE COURT: Okay. Cross-examination?
3      MS. MEW: Thank you, Your Honor.
4  CROSS-EXAMINATION
5  BY MS. MEW:
6  Q  Good afternoon, Mr. Sampson. We met earlier today.
7  I'm Caroline Mew. I'm one of the attorneys for the
8  National Board of Medical Examiners.
9  A  Good afternoon.
10  Q  We have heard your testimony today, and the struggles
11  and the effort that you put forward in school, beginning
12  as far back as elementary school, correct?
13  A  Before elementary school.
14  Q  Before elementary school.
15      And just to clarify, and I think you covered
16  this, but your parents never had you evaluated for any
17  learning disability similar to what you did later with
18  Dr. Michels and Dr. Anderson and Dr. Wasserstein?
19  A  Well, we did go to a reading specialist, but nothing
20  like that whole battery of tests.
21  Q  Right. You did not go to see an outside psychologist
22  to have an evaluation for a learning disability, correct?
23  A  Correct.
24  Q  And you didn't go to see a psychologist to have an
25  evaluation for ADHD, correct?

*LISA SCHMID, CCR, RMR*
*Official Court Reporter*

**A1001**

126

1   A.   I'm sorry.  I didn't hear the beginning of your
2   question.
3   Q.   As an elementary school student or a junior high
4   student or a high school student, you were not -- your
5   parents never took you to be evaluated for ADHD by any
6   psychologist, correct?
7   A.   Correct.
8   Q.   You had no IEP or Section 504 plan in school, is that
9   correct?
10  A.   Correct.
11  Q.   And you weren't given any formal accommodations in
12  school, correct?
13  A.   Not formal.
14  Q.   And when you sent in your accommodation request form
15  to NBME, there was a part of that form where would you
16  identify any accommodations that you had received in
17  school, and you said none for elementary school, junior
18  high and high school, correct?
19  A.   If you say so.  I don't recall.
20  Q.   Let's look for examples.  Do you have two notebooks
21  up there now?  You have your plaintiff's exhibits and
22  your -- okay.
23       If you can look in Plaintiff's Number 35?
24  A.   You said the plaintiff's binder, correct?
25  Q.   The plaintiff's exhibits, yes.

LISA SCHMID, CCR, RMR
Official Court Reporter

127

1   A.   (Perusing documents.)
2   Q.   Exhibit 35, page five.
3   A.   I'm sorry, Tab 5?
4   Q.   Tab 35, page five, at the bottom of the page, where
5   it lists primary and secondary school, and asks
6   accommodations provided.  It says, none, none, and none,
7   correct?
8   A.   Yes.
9   Q.   And this is just one of your accommodation requests
10  as an example, but that hasn't changed in any of your
11  other requests?
12  A.   (Nods head affirmatively.)
13  Q.   You're very driven, correct?  I think we've heard
14  that in your testimony, driven to succeed, driven to do
15  well?
16  A.   Yes.
17  Q.   Hard worker?
18       And you took an advanced course load in high
19  school, many AP and honors classes?
20  A.   Yes.
21  Q.   And it was a competitive high school?
22  A.   Yes.
23  Q.   And you earned A's and B's in your classes, correct?
24  A.   Sorry.  Can you repeat the question?
25  Q.   You earned A's and B's in high school, is that

LISA SCHMID, CCR, RMR
Official Court Reporter

128

1   correct?
2   A.   Yes.
3   Q.   And if we can look at -- again, we're in the
4   plaintiff's exhibit binder -- if you look at Exhibit 19,
5   this is the letter from your parents describing your
6   tutors, listing tutors that you used.
7        So page -- the second page of this exhibit looks
8   like -- it looks like you started SAT tutoring in tenth
9   grade, is that correct?
10  A.   No.
11  Q.   Okay.  When did you start SAT tutoring?
12  A.   I mean, I can't remember when it is, but there were
13  earlier SAT tests, for example, submitted I think in 2004
14  or 2005, which would be before tenth grade.
15  Q.   Uh-huh (affirmative response).
16  A.   And I remember working with my parents on the SAT
17  prep even before tenth grade.
18  Q.   Okay.  So you started prepping for the SAT perhaps in
19  junior high school even?
20  A.   Yes.
21  Q.   Okay.  And but on this list also that your parents
22  provided, they list SAT tutoring starting, just according
23  to this list, at least in tenth grade?
24  A.   According to this list, yes.
25  Q.   And the time that you took preparing for the SAT took

LISA SCHMID, CCR, RMR
Official Court Reporter

129

1   away time that you would otherwise be -- otherwise be
2   spending on your academic course work, right?
3   A.   Yes.
4   Q.   And you weren't tutored for the ACT specifically,
5   just the SAT?
6   A.   I was also tutored for ACT.
7   Q.   Okay.  It's just not listed on your parents' list
8   here at Tab 19.
9   A.   SAT can sometimes be considered colloquially
10  synonymous with ACT prep.
11  Q.   Okay.  That's fine.
12       I wanted to just clarify because you were asked
13  a question about your MCAT scores.  Can you please turn to
14  Plaintiff's Exhibit 11, so we can look at your MCAT score
15  report?
16  A.   (Complies.)
17  Q.   And when you were explaining your scores and you had
18  initially said 27, but then you see it was a 28 or 29,
19  those are the raw scores, correct?  That's not 27 or
20  28 percent out of one hundred.  That's your raw scores.
21       So your percentile-ranked scores are listed
22  further on the -- down the page.  So for example, your
23  physical science score was the 79th percentile on
24  September 18th of 2014?
25  A.   Yes.

LISA SCHMID, CCR, RMR
Official Court Reporter

**A1002**

130

1  Q.  So that was better than 79 percent of the other
2  individuals taking the MCAT at that administration,
3  correct?
4  A.  Yes.
5  Q.  Okay.  And Dr. Lam and you have testified to
6  different strategies that you used to help respond to the
7  questions on the ACT and the SAT and the MCAT, and I just
8  wanted to clarify.
9       So one of the strategies was in the longer
10  reading passages not reading the entire passage, perhaps
11  just reading a topic sentence or a concluding sentence and
12  then trying to answer the question from there.  Is that a
13  fair characterization of your strategy?
14  A.  Sorry.  Could you repeat the question, because he
15  only testified about the MCAT.
16  Q.  Okay.  Well, I guess that's my question.  Did you use
17  that similar strategy on the ACT?
18  A.  On the ACT and SAT?
19  Q.  Well, let's just start with the ACT.
20  A.  I'm sorry.  Could you repeat what you mean by that
21  strategy one more time?  I'm not capturing it.
22  Q.  Sure.  I could be asking the questions better.  I
23  think it's partly holding the microphone here.
24       When you took the ACT exam, for the reading
25  sections of those exams, did you use the strategy where

LISA SCHMID, CCR, RMR
Official Court Reporter

131

1  you would not read the entire passage to answer the
2  questions?
3  A.  Yes.
4  Q.  And when you took the SAT, would you use a strategy
5  where you would not read the entire passage in order to
6  answer the questions?
7  A.  Yes.
8  Q.  And when you took the MCAT, would you use a strategy
9  of not reading the entire passage in order to answer the
10  questions?
11  A.  Yes.
12  Q.  Let's do this.  If we can turn to -- and I hope this
13  isn't too confusing -- the other binder.  You'll see a tab
14  about halfway -- 60 percent of the way through to the name
15  "Adam Mandelsberg."  Can you find that?
16       THE COURT:  Is this in your exhibits?
17       MS. MEW:  Yes.  Do you have -- oh, sorry, Your
18  Honor.
19       THE COURT:  No, I have it.  It's number eight,
20  right?  Oh, Adam Mandelsberg's declaration?
21       MS. MEW:  Yes.
22       THE COURT:  I've got it.
23       MR. MANDLESBERG:  Your Honor, do you have all
24  the exhibits attached to that declaration as well?
25       THE COURT:  I guess I do.

LISA SCHMID, CCR, RMR
Official Court Reporter

132

1       MR. MANDLESBERG:  Okay.
2       THE COURT:  So where are you directing the
3  witness?
4       MS. MEW:  Exhibit E.
5  BY MS. MEW:
6  Q.  So this is a practice SAT exam from 2007, 2008, which
7  is the time that you were taking this test.  And if you
8  turn to -- if you look at the page numbers at the top of
9  the page, the sort of the court filing numbers, where it
10  says page, you know, 200 of 291.  I'm looking at page 213
11  of 291.
12       THE COURT:  Okay.  I'm lost.
13       MS. MEW:  Are you?
14       THE COURT:  I have no --
15       MS. MEW:  So we're in Exhibit E, and then if you
16  look at the ECF filing information at the top for the page
17  number.
18       THE COURT:  I need to find Exhibit E, because
19  it's not tabbed.
20       MR. MANDLESBERG:  Your Honor, may I approach?
21       THE COURT:  Sure.  If you have Exhibit E, you
22  can approach.
23       MR. MANDLESBERG:  I think this binder may be
24  more --
25       THE COURT:  This is the same thing with tabs?

LISA SCHMID, CCR, RMR
Official Court Reporter

133

1       MR. MANDLESBERG:  With tabs.
2       THE COURT:  Thank you.  Thank you.
3       MR. MANDLESBERG:  Of course.
4       THE COURT:  Okay.  I'm here.
5       MS. MEW:  Thank you, Your Honor.  Sorry about
6  that.
7       So now we're looking for page 213 of 291.  Is
8  everyone there?  Okay.
9  BY MS. MEW:
10  Q.  So this is a sample -- a sample question from the
11  SAT.  And so as I understand it, you used the strategy
12  where you would not read this entire passage.  You would
13  just read say topic sentences and then go and look at the
14  questions?
15  A.  Yes.
16  Q.  And then we're going to go back one tab to Tab D.
17  This is a sample ACT test from 2008, 2009, and from here,
18  if you would please look at page 139 as it's listed on
19  that top ECF?
20  A.  (Peruses document.)
21  Q.  Everyone there?
22       Okay.  So this is a sample reading test question
23  from the ACT.  And is it also your testimony that you were
24  able to answer questions about this passage without
25  reading it in its entirety?

LISA SCHMID, CCR, RMR
Official Court Reporter

**A1003**

134

1    A.    Yes.
2    Q.    And then we're going to go back one more tab to Tab
3    C.  This is a sample MCAT from December 2017.  We were
4    going to look at page 61.  You there?
5    A.    (Nods head affirmatively.)
6    Q.    So this is a sample verbal reasoning question from
7    the MCAT, and it's your testimony that you answered the
8    questions without reading this entire passage?
9    A.    Yes.
10         THE COURT:  This is page 61?
11         MS. MEW:  Yes, in Exhibit C.
12         THE COURT:  Okay.  Fine.
13   BY MS. MEW:
14   Q.    And we've spoken of -- you talked about the MCAT Step
15   1 -- I'm sorry.  The Step 1 exam and its vignettes.  Just
16   so we can have a reference, let's turn to Tab F in the
17   Mandelesberg declaration.
18   A.    (Peruses document.)
19   Q.    We can just start it at page 244, which is the
20   beginning of the test.  But these are -- this shows the
21   types of vignettes, the types of questions on the Step 1
22   exam.
23         And it's your testimony that there's more
24   reading involved here than what you had on the MCAT verbal
25   reasoning section?

LISA SCHMID, CCR, RMR
Official Court Reporter

135

1    A.    Yes.
2    Q.    All right.  We're through with the Mandelsberg
3    exhibits.
4          If we can just look back at the plaintiff's
5    exhibit binder, beginning with Plaintiff's Exhibit 12.
6    This is your ACT score report, correct?
7    A.    (Peruses document.)  Yes.
8    Q.    And here, you earned a composite score of 27, which
9    was at the 89th percentile for the United States, is that
10   correct?
11   A.    Yes.
12   Q.    And if you turn to Tab 13, which is your PSAT score
13   report.  And if you look on the right hand side of that
14   page, your percentile in comparison to the performance
15   with college-bound juniors was at the 78th percentile, is
16   that correct?
17   A.    Yes.
18   Q.    And if you can turn to Tab 14.  This is a collection
19   of SAT score reports.  In this first score report from
20   May 2005, what grade were you in when you took this SAT?
21   A.    Let me think for a second.
22   Q.    And I might be able to help.  What year did you
23   graduate from high school?
24   A.    I'm sorry.  I think it's 8th grade.  What was your
25   question?

LISA SCHMID, CCR, RMR
Official Court Reporter

136

1    Q.    Eighth grade?  Yeah.  Okay.  That's fine.  I thought
2    it would be 8th or 9th grade.
3          Here, it's showing percentile score rates, but
4    comparing you to college-bound seniors, correct, not
5    comparing you to other 8th graders?
6    A.    Where does it say that?  Sorry.
7    Q.    If you look under the test date, sort of where the
8    table is showing the scores, and it says, SAT score, score
9    range, and then it says, percentile, college-bound
10   seniors?
11   A.    Yes.
12   Q.    And then if you turn the page to your June 2008
13   scores, so now you're what, a junior -- a junior in high
14   school, perhaps?
15   A.    Close enough.
16   Q.    Close enough?  Maybe between your junior and senior
17   year?  Okay.
18         And here, your scores compared to other
19   college-bound seniors shows -- for the national range --
20   74th percent for critical reading, 91st percent for math,
21   and 93rd percent for writing, is that correct?
22   A.    Yes.
23   Q.    And then turning the page to your October 2008
24   scores, maybe this is the fall of your senior year.
25   Again, compared to college-bound seniors, your critical

LISA SCHMID, CCR, RMR
Official Court Reporter

137

1    reading score was the at the 84th percentile, your math
2    score was at the 91st percentile, and your writing score
3    was at the 92nd percentile, is that correct?
4    A.    Yes.
5    Q.    Then I think there's one more report if you turn the
6    page to November of 2008.  Here, again, compared to
7    college-bound seniors, you were at the 93rd percentile for
8    critical reading, 96 percentile for math, and 94th
9    percentile for writing?
10   A.    Correct.
11   Q.    Thank you.
12         Can we turn to Exhibit 10A in that same
13   notebook, the plaintiff's exhibits?
14   A.    (Peruses document.)
15   Q.    So you discussed -- this is a listing of what you are
16   referring to as Shelf Exams that you took during your
17   first and second years of medical school, correct?
18   A.    Yes.
19   Q.    And you testified that you -- at first, you were
20   taking these tests without any extra time, and then you
21   received 50 percent extra time on some of the tests,
22   correct?
23   A.    Yes.
24   Q.    And are you now receiving double time on -- well, let
25   me ask you this a different way.

LISA SCHMID, CCR, RMR
Official Court Reporter

**A1004**

138

1    Have you taken any other -- any subject matter
2  exams, NBME subject matter exams during your third year
3  clinical rotations, your third year of medical school?
4  A.   I'm assuming you're referring to Shelf Exams?
5  Q.   We're probably going to struggle to find a common
6  name, but have you taken similar exams to what's listed
7  here during your third year of medical school?
8  A.   Yes.
9  Q.   Okay.  And did you take those exams with double time?
10  A.   Yes.
11  Q.   Did you pass all of those exams?
12  A.   Yes.
13  Q.   You had mentioned your performance on some of
14  these -- what you're calling Shelf Exams, and you
15  described your performance I think as dismal or failing.
16  And I just want to look at some of your scores under
17  standard time.
18    So for example, on the Cardiology Unit Exam in
19  2016, which you took on April 18th, 2016, under standard
20  time conditions, you scored in the 80th percentile, is
21  that correct?
22  A.   No.
23  Q.   Okay.  What do you see?
24  A.   So that is the percent correct.  It is not the
25  percentile.

LISA SCHMID, CCR, RMR
Official Court Reporter

139

1  Q.   Okay.  Was that a passing score?
2  A.   Yes.
3  Q.   Can you remind me when you began business school
4  classes?
5  A.   It was either June or July.  I'm getting confused
6  with the J's.  I think it would be 2021.
7  Q.   And you're currently enrolled in business school, is
8  that correct?
9  A.   It is.
10  Q.   And how many more semesters of classes do you have of
11  business school?
12  A.   So I'm currently in a semester, and then I would have
13  technically one class remaining.
14    And the reason why I say technically is because
15  two of those classes are granted de facto through the
16  school of medicine by completing that program.
17  Q.   So when do you expect to graduate from the business
18  school program?
19  A.   So I would need to take the USMLE Step 1, and then I
20  would be able to answer that question, because I can't
21  graduate without taking that.
22  Q.   You cannot graduate from business school without
23  taking the Step 1 exam?
24  A.   Oh, I'm sorry.  I thought we were talking about
25  medical school.

LISA SCHMID, CCR, RMR
Official Court Reporter

140

1  Q.   Sorry.  No, we're just focusing on business school
2  right now.
3  A.   Okay.
4  Q.   So again, when are you -- what's your expected
5  graduation date for business school?
6  A.   So that depends on the timetable of when I take Step
7  1.  So I want to take Step 1 as soon as possible.  So that
8  would probably mean that I might delay that one class of
9  business school to go back to medical school.
10  Q.   Are you otherwise in good standing in medical school?
11  I mean, sorry.  Now I'm doing it.
12    Are you in good standing in business school
13  right now?
14  A.   Yes.
15  Q.   So you're on track to graduate pending completion of
16  this semester and then that other class you need to take?
17  A.   Yes.
18  Q.   Okay.  And I think you mentioned there was a period
19  of time when you were attending both business school
20  classes and medical school classes.  When was this?
21  A.   That was either June or July of 2021.
22  Q.   So I take it you were finishing your third year in
23  your clinical rotations, and you were also starting in
24  medical school at that time?  Is that what happened?
25  A.   Starting business school at that time.

LISA SCHMID, CCR, RMR
Official Court Reporter

141

1  Q.   Let me just -- again, so the record is clear.
2    You were completing your third year of clinical
3  rotation in medical school at the same time you were
4  starting your business school classes?  Is that accurate?
5  A.   Yes.
6  Q.   Okay.  So when is the last time you the took a
7  medical school class?
8  A.   At the end of -- during that overlap period in June
9  or July of 2021.
10  Q.   And what is your exact status in medical school at
11  this time?  Are you a student in good standing?
12  A.   I believe so.
13  Q.   One thing that you discussed in your papers but I
14  didn't hear you about talk about today are the medical
15  devices that you worked on and patented.  Can you tell me
16  what those were and when you worked on them?
17  A.   Sure.  It began all the way in 2013 and it's ongoing.
18  Q.   So what are they?  What are the devices?
19  A.   So these are -- you want me to explain the patent to
20  you?
21  Q.   Can you explain it in a way that you can just -- can
22  you explain what you're working on, what the devices are
23  intended to do?
24  A.   Sure.  The patents are designed to save people's
25  lives.

LISA SCHMID, CCR, RMR
Official Court Reporter

**A1005**

142

1    The idea came to me when I was on rescue squad
2  and there was a cardiac arrest, and I thought that there
3  should be a better way to intervene before someone
4  actually enters cardiac arrest.
5    And so it was a system that in order to
6  anticipate when someone might be getting close to having a
7  cardiac perimeter, the device would capture if there was a
8  significant detrimental change in physiological
9  perimeters, and attempt to early-warn the person who
10  either has the smart watch or another smart device that
11  there is an emergency situation.
12    (Court reporter seeks clarification.)
13  A.  Attempt to early-warn the person that they might be
14  having an emergency, and they should seek medical help by
15  either going to their doctor or emergency room in general.
16    THE COURT:  But it's off your smart watch?
17    THE WITNESS:  So it could be a smart watch.  It
18  could be another smart perimeter, yes.
19  BY MS. MEW:
20  Q.  Changing topics, how did you identify Dr. Wasserstein
21  to evaluate you in 2020?  How did you find her?
22  A.  I looked up some people who did educational testing,
23  and I called her.
24  Q.  And then who is Dr. Miller?
25  A.  Dr. Miller is Dr. Wasserstein's close partner, and

LISA SCHMID, CCR, RMR
Official Court Reporter

143

1  she herself is also an educational psychologist.
2  Q.  Is Dr. Miller on the faculty at Mount Sinai?
3  A.  I am not sure.
4  Q.  Did you go to Mount Sinai for the testing?
5  A.  So Dr. Wasserstein's office, for which Dr. Miller is
6  associating partners with that office, was an office by
7  extension of Mount Sinai.  So I'm sorry I'm tripping on
8  words.  Is that the answer you're asking about?
9  Q.  Was it on the Mount Sinai campus or was it a private
10  office?
11  A.  It was a private office.
12  Q.  So I want to go back to the time in November of 2016,
13  when you were called in to speak to CAPP by Dean Wackett,
14  and you were informed that there were issues pertaining to
15  your academic marginality.  So you have that frame of
16  reference.
17    So at that period of time, I think you explained
18  that that was based on your performance on the
19  school-designed Shelf Exams that you had taken, is that
20  right?
21  A.  Yes.
22  Q.  And so your school is the one who designed those
23  tests and required you to take those tests?
24  A.  Not exactly.
25  Q.  Okay.  Well, how would you like to explain that?

LISA SCHMID, CCR, RMR
Official Court Reporter

144

1  A.  They're not school-designed tests.  They're questions
2  that were written by the National Board of Medical
3  Examiners that my school selected and decided to use, but
4  they're not the school's questions.
5  Q.  Okay.  Now I think we're on the same page, that your
6  school did not write the questions, but your school
7  selected the questions that it wanted to use in its tests?
8  A.  Yes.
9  Q.  Okay.  And your school set the passing and failing
10  grades, is that correct?
11  A.  Yes.
12  Q.  And at the time you were informed by Stony Brook that
13  you were experiencing academic difficulties, you had had
14  no involvement with NBME at that time, correct?  This is
15  back in November of 2016.
16  A.  Correct.
17  Q.  And then you were ultimately required to take a leave
18  of absence from school in 2016, is that correct?
19  A.  Yes.
20  Q.  And again, you had no involvement with NBME at that
21  time?
22  A.  Sorry.  Refresh my memory.  What time period are you
23  talking about?
24  Q.  December 2016.
25  A.  Correct.

LISA SCHMID, CCR, RMR
Official Court Reporter

145

1  Q.  And your school required you to either retake your
2  first -- first year and then the first semester of your
3  second year of classes or take the Step 1 exam in order to
4  continue in medical school?
5  A.  Yes.
6  Q.  And that was not NBME's decision or determination,
7  correct?
8  A.  Correct.
9  Q.  At the time you took the Step 1 exam in January of
10  2020, you had not taken medical school classes for three
11  years, is that correct?
12  A.  Three and-a-half, yes.
13  Q.  Okay.  And you had only completed a year and-a-half
14  of course work at your medical school, is that right?
15  A.  Yes.
16  Q.  And I think you described earlier that the Step 1
17  exam is really an exam at the point that you learned
18  during those first two years of medical school?
19  A.  I'm sorry.  What was your question?
20  Q.  I think you testified just earlier that the Step 1
21  exam is really a test of your performance -- of what you
22  learned those first two years of medical school?
23  A.  I don't remember saying those exact words, but if I
24  said that, what I mean is that the whole reason why the
25  school has you take the test at the end of the third year

LISA SCHMID, CCR, RMR
Official Court Reporter

**A-1006**

146

1  is because maybe there's a focus on the first year
2  and-a-half or two years of medical school, but there's
3  certainly a contribution that third year clerks should
4  have to allowing you to do better on that test, and
5  because it's related, that's why the school moved it to
6  the end of third year.
7  Q.  Okay.  So the end of third year is also an optimum
8  time to take the Step 1 exam?
9  A.  Everyone's different, but yes, I think.
10  Q.  Yeah.  I mean, you advocated on behalf of your
11  classmates, so that you could take the Step 1 exam at the
12  end of your third year of medical school?
13  A.  Yes.
14  Q.  And you completed your third year of medical school
15  in July of 2021?
16  A.  I guess it was July, because I can't remember if it
17  was June or July.
18  Q.  June or July of 2021.  Okay.
19         And you did not take the Step 1 exam at that
20  time?
21  A.  No.
22  Q.  How many -- you get four attempts to pass the Step 1
23  exam, correct?
24  A.  So I believe it's the, you know, I was reading the
25  updated guidance on the NBME's website.  If I'm not

LISA SCHMID, CCR, RMR
Official Court Reporter

147

1  mistaken, I think the NBME has revised their guidance to
2  only allow three attempts, and I also believe this differs
3  state-by-state.
4  Q.  Okay.  Well, I won't debate it with you, but it's
5  something more than one attempt, correct?  And something
6  more than two attempts?
7  A.  Yes.
8  Q.  Okay.  Let's talk about your evaluation with Doctors
9  Wasserstein and Miller.  So if I'm understanding this
10  correctly, the testing was done in August of 2020?  And if
11  you would like to look at -- this is -- the report is
12  Exhibit 37 in your book.  You don't have to do all this
13  from memory.
14  A.  You said 37, correct?
15  Q.  Yes.  So if you look at the first page there, it says
16  the dates of testing are August 8th and August 9th, 2020.
17  Does that look right?
18  A.  Yes.
19  Q.  And again, as your counsel pointed out, if you turn
20  to the last page, it says that the report was written in
21  December of 2020?
22  A.  That's what it says.
23  Q.  That's what it says.
24         But did you not receive the final report until
25  January of 2022?

LISA SCHMID, CCR, RMR
Official Court Reporter

148

1  A.  Correct.
2  Q.  And so there were various things that were delaying
3  the report, one of which, as I understand, was Dr.
4  Wasserstein got sick?
5  A.  (Nods head affirmatively.)
6  Q.  Was Dr. Miller also sick with COVID?
7  A.  I'm not aware.
8  Q.  And you were given a draft of the report to review
9  and comment on?
10  A.  Not to comment on, just to review.
11  Q.  Okay.  So not to make any changes?
12  A.  (Shakes head negatively.)
13  Q.  And were you given the draft of this report as
14  written in December 2020?
15  A.  Sorry.  I'm not catching what your specific question
16  is.
17  Q.  Well, the report says that it was written December
18  6th, 2020.  So were you given a draft to review before or
19  after that date?
20  A.  I don't remember exactly when I was given that, given
21  all the delays that happened.
22  Q.  Okay.  Was this the same version of the report that
23  you ultimately submitted to NBME?
24  A.  The draft?
25  Q.  Uh-hum (affirmative response).  Whatever you were

LISA SCHMID, CCR, RMR
Official Court Reporter

149

1  given?
2  A.  No.
3  Q.  There were changes?
4  A.  Well, the report wasn't finalized, so it wasn't
5  signed.
6  Q.  So but beyond the signature, was the content of the
7  report the same?
8  A.  Many points were.  There were small things such as
9  like a non-substantive change of like a factual error,
10  like the umbilical cord wasn't correctly reported as
11  wrapped around my neck, something of that nature.
12  Q.  And I think you mentioned that part of the delay in
13  getting this finalized is that you were busy in medical
14  school?
15  A.  That was a contributing factor.
16  Q.  Did you communicate to Doctors Wasserstein and Miller
17  the importance of getting this report, so that you could
18  get another request for testing accommodations into NBME?
19  A.  I did, but it was difficult to reach her.
20  Q.  When you submitted your request for accommodations
21  for 2017 and 2018, you relied on the 2013 evaluations from
22  Dr. Michels and Dr. Anderson, correct?
23  A.  Yes.
24  Q.  And NBME reviewed those letters.  They did not tell
25  you that they weren't reviewing your request because the

LISA SCHMID, CCR, RMR
Official Court Reporter

**A1007**

150

1   report was more than three years old, correct?
2   A.   I'm sorry.  Could you repeat the question, please?
3   Q.   NBME didn't state in its denial letters that it
4   disregarded those reports just because of the age of the
5   report?
6   A.   You know, I don't remember if it was that specific
7   report, but if you say so.  I know there was a report,
8   but -- that lead to the catalyst of needing to be tested
9   again, if that answers your question.
10              (Continued on the next page.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

LISA SCHMID, CCR, RMR
Official Court Reporter

151

1   CROSS-EXAMINATION (Cont'd.)
2   BY MS. MEW:
3   Q.   Okay.
4        You were represented by counsel with respect to
5   your accommodations request with the NBME as far back as
6   2018; is that correct?
7   A    I think it was around then.
8   Q    When Ms. Simon was representing you and you did not
9   pursue -- after NBME had denied your request multiple times
10  as you went through in your testimony, you did not pursue
11  any action at that time?
12  A    Correct.
13  Q    And then in May of 2020 you were also represented with
14  counsel and they were writing letters on your behalf to
15  Stony Brook with respect to your status, correct?
16  A    Correct.
17  Q    And you did not pursue any kind of legal action against
18  NBME at that time, correct?
19  A    Correct.
20  Q    Or have any further letters sent to NBME at that time?
21  A    I don't remember.
22  Q    It was Stony Brook's decision that you were required to
23  complete medical school by August 12th; is that correct?
24  A    No.  That position has changed on the time.
25  Q    Okay.

Frederick Guerino, CSR
Official Court Reporter

152

1   Q    Do you currently have a lawsuit pending against
2   Stony Brook?
3   A    Yes.
4   Q    And you had to bring that lawsuit because Stony Brook
5   was prepared to dismiss you, correct?
6   A    Yes.
7   Q    There's a stay if Stony Brook had not dismissed you,
8   that's their intention, that's why you had to bring a suit
9   against them?
10  A    Yes.
11  Q    If you look at -- I'm sorry.  Can you turn to Tab 53 in
12  Plaintiff's Exhibit.
13       Are you familiar with this letter?
14  A    In general, yes.
15  Q    This was written to your counsel, correct?
16  A    Yes.
17  Q    And your counsel never requested on your behalf that
18  the school allow you to remain enrolled so you can continue
19  to pursue requesting accommodations from NBME; is that
20  correct?
21  A    I didn't catch that.  One more time, please.
22  Q    You made a request through your counsel or the school
23  to allow you to remain enrolled to continue to pursue your
24  accommodations request from the NBME; is that correct?
25  A    Could you give me a quick moment to just review this.

Frederick Guerino, CSR
Official Court Reporter

153

1   Q    Absolutely.
2   A    Thank you.
3        (Pause)
4        Can you please repeat the question?
5   Q    Did your counsel make a request on your behalf for
6   Stony Brook to allow you to continue to remain enrolled
7   while you pursued your request for accommodations from NBME?
8   A    Just a moment, I'm sorry.
9        (Pause)
10       Yes.
11  Q    And did Stony Brook agree to that request?
12  A    No.
13       MS. MEW:  No further questions.  Thank you for
14  your patience.
15       THE COURT:  Anything else?
16       MS. VARGAS:  Your Honor, could we have a few
17  minutes?
18       THE COURT:  Yes.
19       You need more than five?
20       MS. VARGAS:  No.
21       THE COURT:  Okay.
22       (Pause)
23       THE COURT:  Did you want to do redirect?
24       MS. VARGAS:  No, your Honor.
25       THE COURT:  So we'll call your next witness.

Frederick Guerino, CSR
Official Court Reporter

**A-1008**

154

1    MS. VARGAS:  Yes.  She's actually in the restroom.
2    THE COURT:  Is the witness going to need the
3  notebooks, do you know?
4    MS. VARGAS:  I don't think so.
5    THE COURT:  Maybe we can just pile them somewhere.
6    (Pause)
7    THE COURT:  Do you want to call your next witness,
8  Ms. Vargas.
9    MS. VARGAS:  Yes.
10    The plaintiff calls Dr. Shelley Sampson.
11  S H E L L E Y    S A M P S O N,
12    called as a witness, having been first duly
13  sworn, testifies as follows:
14    THE COURT CLERK:  Please be seated.
15    Pull the microphone close and spell your name for
16  the record.
17    THE WITNESS:  Shelley Sampson, S-a-m-p-s-o-n.
18  DIRECT EXAMINATION
19  BY MS. VARGAS:
20  Q   Dr. Sampson, can you tell us what you do for work?
21  A   Well, I'm retired now.
22  Q   What did you do before you retired?
23  A   Dentistry.  I was a dentist, general dentist, for
24  35 years.
25  Q   How many children do you have?

Frederick Guerino, CSR
Official Court Reporter

155

1  A   Two.
2  Q   And is Robert the older or younger of the two?
3  A   The youngest.
4  Q   And your older child, is that a boy or a girl?
5  A   Boy.
6  Q   What is his name?
7  A   David.
8  Q   So, was there anything about Robert's birth -- notable
9  about Robert's birth?
10  A   Yes.
11  Q   Can you tell us what happened?
12  A   It was not an easy birth.  A week before I went to have
13  my Ceasarian section, the nurse showed me a picture that
14  they had taken inside me, and I looked at it and I said, do
15  you see what I'm seeing?  It was the hand holding the cord
16  from the neck with another cord around the neck.  And I said
17  to her, you must make sure the doctor sees this, this is not
18  good.
19    A week later it -- or almost a week later, I don't
20  remember exactly the date, but let's say a week later I had
21  the Ceasarian section, and the doctor commented to me right
22  after, well, it is a good thing you had the C-section
23  because this cord was wrapped around the neck and he would
24  not have survived or he would have cerebral palsy or another
25  disability if he had gone through the vaginal canal.

Frederick Guerino, CSR
Official Court Reporter

156

1  Q   So what can you tell me about Robert's early
2  development, let's say when he was four?
3  A   Well, I think it was three or four, thereabouts, Robert
4  was a severer stutterer.
5  Q   And did Robert receive any treatment for stuttering?
6  A   Oh, yes.
7  Q   What treatment did he receive?
8  A   He went to one, and
9  after the third lesson, or it was speech therapy, more
10  appropriately, I should say, I didn't see any difference.
11  It didn't seem organized to me.  It didn't seem like
12  anything was working.  So I got the name of someone else,
13  and she tested him and she had her associate work with him,
14  and I was there, too.  And it just seemed so organized and
15  it worked.
16  Q   And did you take any role in or what role, if any, did
17  you take in Robert's speech therapy?
18  A   Well, I took a role -- my whole family needed to take a
19  role, so we did.  We came in to learn what to do from the
20  speech therapists.  So I had to do homework with Robert every
21  day.  I did it in the evening while he was on the bed.  And
22  after we read a story, I would do the homework.  The speech
23  pathologist, therapist, taught me what to do, and I would
24  write out the homework and do it with him, even during
25  vacation time, and this went on for a few years.

Frederick Guerino, CSR
Official Court Reporter

157

1  Q   And then --
2  A   The purpose of the homework was to slow down the
3  speaking, so that he could hear the word, take it in,
4  process it, comprehend it.
5  Q   You mentioned -- you testified that your whole family
6  was involved.
7    Could you explain what you mean by that?
8  A   Yes.  The therapist said that it was very important for
9  the entire family to be in on this in that we spoke slowly.
10  And being that Robert was the youngest, we would try to get
11  a word in, the older one -- there's a big age difference, we
12  tried to take over, pretty much that was it.  So his slow
13  speaking -- should I give you an example?
14  Q   Sure.
15  A   Okay.
16    We are going to the store later, and then Robert
17  would have to repeat that with the same slow emphasis on the
18  first syllable and the first word.
19  Q   Did everyone in your family participate in some way in
20  speech therapy?
21  A   Well, they had to go and meet with the speech
22  therapist, and she explained to them what to do, how to do
23  it, so we were on board, yes, as a family.
24  Q   What about Robert's older brother, did he have a role
25  in speech therapy with Robert?

Frederick Guerino, CSR
Official Court Reporter

**A1009**

158

1    A    Well, yes.  He was told that he had to wait to give
2  Robert a chance to catch up and speak and could not over
3  take all of the conversation, and I think we were pretty
4  good at that.
5           I had a neighbor up the street tell me - like I
6  said this went on for a few years - Shelley, if you speak
7  any slower, I can't handle this.
8    Q    So then you said how many years would you estimate that
9  you did this speech work with Robert?
10   A    I would say two to three.
11   Q    And so by that point he was into elementary school,
12  right?
13   A    Yes, yes, he was.
14   Q    How would you describe Robert's learning in elementary
15  school?
16   A    Well, I don't know what he did in the classroom.  Of
17  course I wasn't there.  You mean what I saw at home?
18   Q    Yes?
19   A    Trouble focusing.  I would give directions and they
20  were not followed.  I was taught to give one direction, not
21  two or three.
22   Q    Who taught you that?
23   A    I think it was his speech pathologist, the therapist,
24  advised me to do this so he could process and hear me and
25  remember.  I used to do two to three commands at a time, and

*Frederick Guerino, CSR*
*Official Court Reporter*

159

1  I learned to restrain myself and just slowly do one and be
2  patient about it, and make sure he did that.  But he heard
3  me say one command, and I would actually sometimes wait and,
4  hmmm, did you do that?  To keep him on track, to keep him on
5  focus.
6    Q    What about his reading, what did you observe about his
7  reading in elementary school?
8    A    It's slow.  He had a hard time settling down to do what
9  he was supposed to do as far as reading.  I would ask him
10  questions, comprehension questions, review it, and go over
11  it again and again.
12   Q    Why did you go over it again and again?
13   A    So he could remember it.  Because if I would ask him a
14  question and I could see -- I could see he was thinking
15  about it.  So we would discuss it some more, and then he
16  would, you know, respond.  He would answer what I had asked
17  him about the topic or the sentence or the story or the
18  page.  We did a lot of reading.
19   Q    What if any role did you play in Robert's education in
20  elementary school?
21   A    I'm sorry, what role did I play?
22   Q    What role did you play in Robert's education in
23  elementary school?
24   A    Do you mean how much of a role?
25   Q    Well, you describe what your role was, please?

*Frederick Guerino, CSR*
*Official Court Reporter*

160

1    A    I would -- I would find out what his homework was, like
2  most parents do, and I would see to it that he did it.  I
3  spent a lot of time on his homework with him.
4    Q    You testified a few moments ago that you worked for 35
5  years as a dentist.  So was that a full-time job?
6    A    In the beginning it was full-time, yes.
7    Q    And during Robert's elementary years, when did you do
8  this work with him with his homework?
9    A    Well, in the evenings, in the evenings.
10   Q    And --
11   A    And on the weekends, whenever I could find the time.  I
12  made the time.  I just did it.  It had to be done, and I did
13  it.
14   Q    Was Robert able to do his homework independently in
15  elementary school?
16   A    In the very early years I don't remember too much
17  homework being sent home.  I think it was later on that
18  there was more homework.  But I'm just thinking of an
19  example.  With the times table, I think that was second
20  grade, okay, I guess it was early on, thinking about it, and
21  spelling, yes.  We spent a lot of time doing that.  Is that
22  what your question was?
23   Q    Yes.  So a lot of parents spend time doing spelling
24  with their kids or doing multiplication with their kids.  Is
25  that what you are describing what you observed other parents

*Frederick Guerino, CSR*
*Official Court Reporter*

161

1  doing with their kids?
2    A    I don't know exactly what other parents were doing.  I
3  can only tell you what I was doing.
4           He was struggling with the times table, with
5  spelling, so I devised lesson plans, if you want to call
6  them that.  I made up games to help him, to help him with
7  memory to recall.  They were pretty creative games with the
8  times table, but I made it fun.
9    Q    Could you tell me about the vegetable game?
10   A    Oh, the vegetable game.
11          Well, I was very big on -- even when we went
12  shopping early on when he was very young, I would saute
13  broccoli and carrots with a little soy sauce and chopped up
14  garlic, this is what I did for snacks.  So carrying that
15  forward, for example, when he was -- I don't know, when they
16  started spelling, first grade -- I can't remember, first
17  grade or second grade, I was using the chopping board in the
18  kitchen cutting fresh vegetables, red peppers, green
19  peppers, carrots, celery, whatever it was, into little
20  pieces, because we had a lot of spelling to go through, and
21  I knew he would be circling around he calls it the loop.  It
22  was just the way the house was.  He was circling the kitchen
23  and through the dining room, you know, back into the room,
24  and I said, okay, Robert, spell the word again.  I said it
25  very slowly, and if he got it right he got a little piece of

*Frederick Guerino, CSR*
*Official Court Reporter*

**A1010**

162

1  vegetable with a hummus stick, or whatever. And if he
2  didn't get it right I would say now try it again, sound it
3  out. He would go around thinking about it and come back in.
4  Q   Okay.
5          And then --
6  A   I helped him to be successful.
7  Q   Who is Patti, P-a-t-t-i, Alhofen?
8  A   She was in the district, a reading specialist.
9  Q   And how did you come in contact with Patti Alhofen?
10  A   One of the teachers suggested why don't I take him for
11  -- take him to the specialist for reading comprehension.
12  Q   Do you know about what grade that was?
13  A   I'm trying to remember. I think it was between -- I
14  want to say between fourth grade and fifth grade. It was in
15  the summer.
16  Q   Okay.
17          And the teacher that suggested this, was this
18  Robert's classroom teacher?
19  A   Yes.
20  Q   And was this at a public school?
21  A   This was public school, correct, yes.
22          MS. VARGAS: Your Honor, I'm actually going to
23  show her an exhibit.
24          May I approach and put it on the table?
25          THE COURT: Yes.

*Frederick Guerino, CSR*
*Official Court Reporter*

163

1  BY MS. VARGAS:
2  Q   Looking at Plaintiff's binder, please.
3          If we can turn to Tab 19. It says at the top
4  6/17/17, Dear NBME Accommodations.
5          Do you recognize this document?
6  A   Yes.
7  Q   What is it?
8  A   It is a letter my husband and I wrote to the National
9  Board of Medical Examiner's Accommodations.
10  Q   And turning to the second page of this exhibit. There's
11  been prior testimony about this list of tutors.
12          Can you tell me about how -- why did Robert go to
13  all of these tutors?
14  A   Why did ego to all of the tutors?
15  Q   Yes.
16  A   Because he required extra help.
17  Q   And is this list of tutors complete, as far as you
18  know?
19  A   There could have been more, but this is a fairly good
20  representation.
21          For example, in some areas it says 8th grade
22  through 11th grade math.
23  Q   And did Robert take any standardized tests, as far as
24  you know, during elementary school?
25  A   Yes, he did.

*Frederick Guerino, CSR*
*Official Court Reporter*

164

1  Q   Did you receive the results of those standardized
2  tests?
3  A   We did, yes.
4  Q   What, if any, reaction did you have to the results that
5  he received?
6  A   Oh, we were very surprised.
7  Q   Why is that?
8  A   Because it didn't make sense to us. He just was a
9  bright child, always bright, always curious, always wanting
10  to know. The score just didn't make sense to us.
11          I was just thinking of something to tell you.
12  Just give me a moment.
13          (Pause)
14          I forgot, sorry.
15  Q   Dr. Sampson, have you ever had any difficulties with
16  reading yourself?
17  A   Yes.
18  Q   Could you tell me about that?
19  A   Well, I also had to work very hard. I never completed
20  my tests, particularly standardized tests which would be the
21  SAT. In dental school we had a lot of tests. That was not
22  a standardized test, and it wasn't just the SAT before
23  dental school, and I couldn't finish the test. I would go
24  over the questions so many times, and I couldn't make sense
25  of them.

*Frederick Guerino, CSR*
*Official Court Reporter*

165

1          In my case - I don't know how this is with
2  Robert - but the print, the black print of the words would
3  almost come off the page. I didn't know why it was
4  happening. No one explained anything to me about this, and
5  so I didn't finish the tests, a lot of the tests.
6          I remember in dental school walking out of the
7  classroom and I would hear a lot of my classmates say, oh,
8  it was easy, I thought it was harder. I'm sinking down into
9  myself thinking it was not easy for me, I couldn't finish
10  it. I don't know what they are talking about. These other
11  students. But for them I understood it was easy. For me,
12  it was anything but.
13          I didn't know that I had a learning problem. I
14  just grew up thinking I wasn't that smart. I thought I was
15  smart, but all of the testing meant to me, gee, I'm really
16  not smart. So I tried harder. I studied for very long
17  hours and very hard.
18          Over the years, you know, you become wise. Seeing
19  Robert struggle, I saw my older son struggle, I started to
20  understand more and more. I don't think it is the case - at
21  least it wasn't in my case - that I just understood like
22  that what was happening. It was -- I had to evolve. I had
23  to evolve, because I was never given the diagnosis. My
24  parents didn't know about that.
25          My father would relate to me on several occasions

*Frederick Guerino, CSR*
*Official Court Reporter*

166

1    when I was older, don't worry about it.  Do the best you
2    can.  He, himself, had a learning deficit.  He didn't call
3    it a disability because back then they didn't know.
4         When I grew up in the 1950s, I didn't know about
5    that.  I don't think my parents knew about it at the time,
6    either.
7         MS. VARGAS:  No further questions.
8         THE COURT:  Okay.  Cross?
9         MS. MEW:  No questions, your Honor.
10        THE COURT:  Okay.  You are excused.  Thank you,
11   Dr. Sampson.
12        Next witness.
13        MS. VARGAS:  We actually were anticipating to call
14   Dr. Wasserstein first thing tomorrow morning.  She's not
15   available today.
16        THE COURT:  Oh, all right.  Okay.
17        THE WITNESS:  Excuse me, your Honor.
18        THE COURT:  Yes?
19        THE WITNESS:  I did think of one more thing.
20        THE COURT:  Unfortunately you have to wait for a
21   question.
22        Do you want to ask her more questions?
23        MS. VARGAS:  Sure.
24   BY MS. VARGAS:
25   Q    Was there something you wanted to say?

Frederick Guerino, CSR
Official Court Reporter

167

1    A    There was and I just forgot.
2         (Pause)
3         Oh.  So though my test scores in dental school
4    were not the highest -- actually at one point in dental
5    school I was in the bottom of my class.  I don't know if you
6    knew that, Robert, but I was in the bottom of my class
7    because of my testing results, I couldn't finish the test.
8         But my hand work, when we did clinical work, was
9    apparently quite good, so much so that one of the
10   instructors gave me extra credit on some crown and bridge
11   work that I had produced for a patient.
12        When I was in private practice, there was a
13   periodontist who once sent me a letter stating that they
14   don't normally send letters like this to dentists, but
15   whatever - the crown and bridge I had created for a patient
16   was superb, which made me feel very good, made me feel
17   validated, was in my head.  I knew what had to be done.  I
18   was being able to create it in the mouth, or by design,
19   before it went into the mouth, and as a result, you should
20   know your mother graduated in the top quarter of her class.
21   It was difficult, but I did.
22        THE COURT:  Thank you.
23        MS. VARGAS:  Thank you.
24        THE COURT:  You can step down now, Dr. Sampson.
25   You are going to do Dr. Wasserstein first thing

Frederick Guerino, CSR
Official Court Reporter

168

1    tomorrow?
2         MS. VARGAS:  Yes, your Honor.
3         What time?
4         THE COURT:  9:30.
5         Do you know if you would finish your witnesses
6    tomorrow?
7         MS. VARGAS:  Yes.
8         THE COURT:  So you should be ready to go, Ms. Mew.
9         MS. MEW:  Yes.
10        THE COURT:  You should have people tomorrow, too.
11   Anything else?
12        MR. WEINER:  There's one matter.  I appended Dr.
13   Wasserstein's CV.  It's part of the file record.
14        I can give you a Tab 25 that I have.
15        THE COURT:  Okay, that's fine.  That's good.  That
16   will be great.  Thank you.
17        Everything else good?  Thanks, everybody.  Thank
18   you.  See you tomorrow at 9:30.
19        (The Motion Hearing is adjourned until Wednesday,
20   October 12th at 9:30 a.m.)
21
22
23
24
25

Frederick Guerino, CSR
Official Court Reporter

169

1                    I N D E X
2    WITNESS                              PAGE
3
4    ANDREW LAM                           15
5    DIRECT EXAMINATION BY MS. VARGAS     15
6    CROSS-EXAMINATION                    26
7    BY MS. MEW                           26
8    REDIRECT EXAMINATION  BY MS. VARGAS  34
9    R O B E R T   S A M P S O N          36
10   DIRECT EXAMINATION  BY MS. VARGAS    36
11   CROSS-EXAMINATION BY MS. MEW         125
12   S H E L L E Y   S A M P S O N        154
13   DIRECT EXAMINATION   BY MS. VARGAS   154
14
15
16

18
19
20
21
22
23
24
25

LISA SCHMID, CCR, RMR
Official Court Reporter

**A1012**

1

'

**'17** [1] - 77:4

**1**

**1** [75] - 4:9, 4:15, 9:9, 11:25, 12:2, 12:22, 37:25, 38:16, 67:10, 72:2, 72:3, 72:5, 74:19, 74:20, 74:25, 75:1, 75:4, 75:18, 75:20, 76:1, 88:7, 97:4, 101:14, 101:16, 101:20, 101:22, 102:8, 102:10, 102:23, 103:9, 103:11, 103:14, 103:18, 103:21, 104:11, 104:15, 104:20, 104:23, 105:1, 105:3, 105:9, 105:20, 106:1, 106:10, 106:21, 107:1, 111:16, 112:19, 112:22, 113:1, 113:8, 116:13, 117:1, 119:17, 121:8, 123:6, 123:10, 123:12, 123:13, 123:18, 134:15, 134:21, 139:19, 139:23, 140:7, 145:3, 145:9, 145:16, 145:20, 146:8, 146:11, 146:19, 146:22
**10** [3] - 1:15, 80:19, 80:20
**10036** [1] - 1:22
**10A** [1] - 137:12
**10th** [1] - 96:2
**11** [4] - 1:7, 33:11, 83:17, 129:14
**1155** [1] - 1:22
**11th** [1] - 163:22
**12** [8] - 7:3, 27:4, 27:6, 41:8, 42:3, 42:20, 84:14, 135:5
**12/6/2020** [1] - 118:10
**125** [1] - 169:11
**12th** [4] - 96:16, 99:14, 151:23, 168:20
**13** [4] - 85:1, 117:5, 117:8, 135:12
**139** [1] - 133:18
**13th** [2] - 1:19, 88:2
**14** [4] - 85:12, 87:12,

87:13, 135:18
**14th** [1] - 100:14
**15** [8] - 9:14, 13:22, 45:1, 85:21, 114:8, 114:23, 169:4, 169:5
**154** [2] - 169:12, 169:13
**15th** [1] - 98:2
**16** [1] - 88:1
**16th** [1] - 29:11
**17** [2] - 89:1, 90:16
**18** [1] - 90:2
**18901** [1] - 1:18
**18th** [2] - 129:24, 138:19
**19** [4] - 90:18, 128:4, 129:8, 163:3
**1950s** [1] - 166:4
**1:30** [1] - 86:15
**1st** [3] - 93:13, 93:18, 121:4

**2**

**2** [3] - 33:7, 76:5, 117:21
**20** [6] - 7:2, 10:22, 40:7, 46:4, 49:12, 91:22
**20-foot** [1] - 55:18
**20/20** [1] - 66:4
**200** [1] - 132:10
**20002** [1] - 1:15
**20005** [1] - 1:20
**2004** [1] - 128:13
**2005** [3] - 85:17, 128:14, 135:20
**2007** [2] - 85:8, 132:6
**2008** [6] - 4:19, 132:6, 133:17, 136:12, 136:23, 137:6
**2009** [1] - 133:17
**2013** [15] - 6:3, 8:23, 16:2, 21:8, 29:11, 32:20, 32:24, 55:2, 56:4, 61:18, 84:3, 141:17, 149:21
**2014** [3] - 55:3, 84:5, 129:24
**2016** [10] - 80:21, 81:22, 83:7, 138:19, 143:12, 144:15, 144:18, 144:24
**2017** [14] - 28:8, 30:13, 79:1, 80:9, 81:23, 88:2, 89:2, 90:3, 93:13, 93:18, 95:8, 96:2, 134:3, 149:21
**2018** [11] - 96:16, 96:22, 97:14, 97:23,

98:2, 98:18, 99:14, 100:5, 100:14, 149:21, 151:6
**2019** [2] - 101:2, 101:8
**202** [1] - 1:17
**2020** [16] - 107:2, 107:5, 110:15, 112:12, 113:23, 118:11, 118:14, 121:12, 142:21, 145:10, 147:10, 147:16, 147:21, 148:14, 148:18, 151:13
**2021** [6] - 115:24, 139:6, 140:21, 141:9, 146:15, 146:18
**2022** [15] - 1:7, 2:1, 116:18, 117:5, 117:8, 117:21, 118:16, 119:4, 119:5, 119:12, 119:17, 121:4, 121:8, 121:13, 147:25
**21** [1] - 92:20
**213** [2] - 132:10, 133:7
**22** [3] - 1:3, 93:12, 122:1
**22nd** [4] - 1:22, 89:2, 90:3, 97:14
**23** [2] - 93:25, 104:11
**24** [4] - 48:16, 48:20, 94:19, 104:11
**244** [1] - 134:19
**25** [6] - 13:24, 40:16, 77:4, 93:4, 95:7, 168:14
**26** [3] - 95:25, 169:6, 169:7
**27** [8] - 59:4, 84:7, 84:19, 84:22, 96:15, 129:18, 129:19, 135:8
**28** [7] - 59:25, 80:21, 84:8, 84:9, 97:11, 129:18, 129:20
**29** [6] - 79:1, 80:8, 84:9, 97:25, 129:18
**291** [3] - 132:10, 132:11, 133:7

**3**

**3** [1] - 76:16
**3/27/2017** [1] - 78:14
**30** [2] - 46:4, 98:17
**31** [2] - 98:24, 99:5
**31A** [1] - 99:13

**32** [1] - 100:4
**33** [1] - 100:11
**34** [2] - 101:1, 169:8
**35** [6] - 116:19, 126:23, 127:2, 127:4, 154:24, 160:4
**36** [4] - 28:11, 117:7, 169:9, 169:10
**37** [3] - 117:23, 147:12, 147:14
**38** [1] - 119:16

**4**

**4** [1] - 77:3
**4.0** [1] - 116:12
**40** [5] - 4:12, 37:24, 38:7, 47:3, 60:4
**48** [1] - 17:15
**4th** [1] - 101:2

**5**

**5** [2] - 77:16, 127:3
**50** [3] - 16:23, 17:8, 137:21
**504** [1] - 126:8
**5120** [1] - 2:1
**5120(JMA** [1] - 1:3
**53** [1] - 152:11
**55-inch** [1] - 66:19

**6**

**6** [1] - 78:13
**6-17-17** [1] - 90:19
**6/17/17** [1] - 163:4
**60** [2] - 59:11, 131:14
**600** [1] - 1:15
**61** [2] - 134:4, 134:10
**6th** [3] - 95:8, 98:18, 148:18

**7**

**7** [1] - 79:1
**700** [1] - 1:19
**74th** [1] - 136:20
**75** [1] - 40:18
**78th** [1] - 135:15
**79** [1] - 130:1
**79th** [1] - 129:23
**7th** [1] - 100:5

**8**

**800** [1] - 1:19
**80th** [1] - 138:20
**84th** [3] - 29:12, 32:17, 137:1

**89th** [1] - 135:9
**8th** [6] - 83:7, 135:24, 136:2, 136:5, 147:16, 163:21

**9**

**9** [4] - 24:24, 29:17, 31:19, 80:7
**91st** [2] - 136:20, 137:2
**92nd** [1] - 137:3
**93rd** [2] - 136:21, 137:7
**94th** [1] - 137:8
**96** [1] - 137:8
**99** [1] - 1:17
**9:30** [4] - 1:8, 168:4, 168:18, 168:20
**9th** [2] - 136:2, 147:16

**A**

**A's** [2] - 127:23, 127:25
**a.m** [1] - 168:20
**AAMC** [1] - 83:19
**abilities** [2] - 20:12, 26:23
**ability** [3] - 13:20, 24:8, 61:7
**Ability** [1] - 86:8
**able** [52] - 5:22, 14:16, 17:19, 19:14, 20:8, 21:5, 21:25, 24:19, 32:8, 37:4, 37:7, 37:17, 39:13, 41:18, 42:5, 48:18, 50:16, 51:21, 52:3, 52:16, 52:17, 52:21, 53:9, 54:20, 56:1, 58:2, 61:10, 62:6, 62:18, 65:2, 68:25, 69:11, 73:23, 73:25, 74:5, 74:6, 75:12, 81:3, 103:8, 104:25, 109:22, 111:10, 117:3, 120:19, 123:14, 123:18, 123:20, 133:24, 135:22, 139:20, 160:14, 167:18
**absence** [1] - 144:18
**Absent** [1] - 4:16
**absolute** [3] - 69:10, 102:20, 122:9
**absolutely** [5] - 14:2, 61:9, 105:6, 121:16, 153:1
**absorbing** [1] - 120:3

**abstract** [1] - 120:25
**academic** [8] - 5:21, 13:1, 51:19, 81:2, 97:3, 129:2, 143:15, 144:13
**accelerated** [1] - 13:18
**accept** [1] - 9:23
**accepted** [3] - 63:25, 64:2, 116:8
**access** [2] - 5:17, 70:19
**accommodate** [2] - 70:5, 122:5
**accommodated** [4] - 70:4, 96:9, 98:11, 99:22
**accommodating** [1] - 41:24
**accommodation** [9] - 4:1, 9:25, 12:17, 12:18, 33:9, 83:11, 95:21, 126:14, 127:9
**Accommodations** [6] - 77:5, 79:15, 90:19, 117:9, 163:4, 163:9
**accommodations** [140] - 4:3, 4:9, 5:16, 5:18, 9:7, 9:10, 10:7, 10:12, 10:14, 11:1, 11:5, 12:14, 12:22, 13:14, 25:17, 38:1, 38:18, 38:20, 38:21, 38:24, 39:1, 39:2, 39:4, 42:19, 42:21, 47:12, 47:14, 47:17, 51:11, 51:12, 61:23, 62:21, 62:22, 62:25, 63:1, 63:3, 65:5, 65:11, 66:1, 66:6, 66:8, 67:13, 67:20, 69:20, 69:23, 70:13, 73:4, 73:8, 73:11, 73:16, 73:19, 73:20, 73:22, 75:2, 75:3, 75:4, 75:5, 75:25, 76:2, 76:14, 77:1, 77:11, 77:14, 78:11, 78:21, 78:22, 78:24, 79:10, 79:20, 80:5, 80:17, 81:6, 81:25, 83:4, 83:8, 83:10, 83:15, 84:12, 84:24, 85:10, 85:19, 87:21, 87:25, 88:10, 89:9, 93:11, 93:16, 93:22, 94:10, 95:2, 95:15, 96:14, 96:21, 97:5, 97:21, 98:16, 98:23, 99:8, 100:10,

100:19, 100:25, 101:7, 101:13, 101:20, 107:18, 109:22, 111:22, 112:15, 113:6, 113:8, 113:15, 113:18, 115:16, 116:15, 116:21, 116:25, 117:4, 117:14, 117:21, 119:12, 119:15, 119:21, 121:3, 121:8, 121:22, 121:24, 123:6, 123:7, 123:19, 126:11, 126:16, 127:6, 149:18, 149:20, 151:5, 152:19, 152:24, 153:7
**accomplished** [2] - 7:17, 11:16
**according** [1] - 128:22
**According** [1] - 128:24
**account** [2] - 78:7, 79:7
**accurate** [1] - 141:4
**accurately** [1] - 11:20
**achieve** [1] - 123:14
**achievement** [2] - 5:22, 11:21
**achieving** [1] - 12:15
**acquisition** [1] - 47:11
**ACT** [17] - 13:23, 84:15, 84:19, 84:21, 104:9, 105:16, 129:4, 129:6, 129:10, 130:7, 130:17, 130:18, 130:19, 130:24, 133:17, 133:23, 135:6
**act** [1] - 120:3
**Act** [2] - 4:20, 4:22
**action** [2] - 151:11, 151:17
**active** [1] - 40:3
**activities** [1] - 5:25
**activity** [1] - 13:8
**actual** [4] - 48:1, 48:9, 59:19, 72:14
**ad** [1] - 40:14
**ADA** [5] - 5:3, 5:10, 5:14, 8:13, 11:14, 11:18, 12:21
**ADAM** [1] - 1:23
**Adam** [2] - 2:7, 131:15, 131:20
**add** [1] - 115:21

**addition** [6] - 27:3, 43:14, 55:22, 67:12, 76:2, 113:18
**additional** [4] - 4:1, 76:3, 98:14, 114:1
**address** [3] - 84:15, 94:3, 97:12
**addressed** [5] - 88:2, 89:3, 94:21, 96:3, 96:16
**ADHD** [8] - 32:22, 77:22, 77:24, 78:8, 95:17, 95:19, 125:25, 126:5
**adjourned** [1] - 168:19
**adjustments** [1] - 2:23
**administer** [1] - 11:19
**administered** [3] - 11:20, 12:11, 94:17
**Administration** [1] - 62:23
**administration** [1] - 130:2
**administrations** [1] - 83:24
**admission** [1] - 54:21
**Admissions** [1] - 54:13
**admitting** [1] - 3:5
**advanced** [2] - 13:21, 127:18
**advantage** [1] - 66:12
**advised** [2] - 116:5, 158:24
**advocacy** [1] - 13:6
**advocate** [2] - 10:20, 39:12
**advocated** [1] - 146:10
**affirmatively** [3] - 127:12, 134:5, 148:5
**aforementioned** [2] - 90:9, 96:7
**afraid** [1] - 49:4
**African** [2] - 47:25, 52:2
**afternoon** [5] - 87:2, 87:3, 87:4, 125:6, 125:9
**afterwards** [1] - 122:13
**age** [3] - 66:5, 150:4, 157:11
**agencies** [1] - 9:20
**agency** [1] - 121:23
**ages** [1] - 8:20
**ago** [8] - 39:9, 44:7, 49:9, 51:10, 54:7, 57:1, 86:3, 160:4
**agree** [2] - 70:15,

153:11
**agreed** [1] - 70:3
**ahead** [3] - 43:11, 87:7, 107:16
**aid** [1] - 66:24
**aided** [1] - 1:25
**airplane** [1] - 42:24
**Alhofen** [2] - 162:7, 162:9
**Allison** [4] - 76:6, 94:16, 96:1, 96:7
**allotted** [2] - 6:11, 24:19
**allow** [5] - 110:14, 147:2, 152:18, 152:23, 153:6
**allowed** [5] - 29:24, 31:23, 49:5, 54:2, 72:25
**allowing** [2] - 113:1, 146:4
**allows** [1] - 64:16
**almost** [3] - 53:8, 155:19, 165:3
**aloud** [8] - 40:5, 45:16, 45:17, 45:19, 45:20, 45:22, 45:23, 46:2
**AM** [1] - 1:8
**ameliorative** [1] - 5:12
**amended** [2] - 4:19, 4:22
**amending** [1] - 5:14
**American** [1] - 112:2
**Americans** [2] - 4:19, 4:21
**Americas** [1] - 1:22
**amount** [14] - 10:8, 17:13, 17:16, 19:12, 20:3, 40:2, 41:16, 42:8, 51:18, 55:21, 55:22, 91:14, 104:22, 110:23
**analysis** [1] - 5:2
**and-a-half** [4] - 83:13, 145:12, 145:13, 146:2
**Anderson** [6] - 76:6, 94:16, 96:1, 96:8, 125:18, 149:22
**Andrew** [6] - 15:3, 15:10, 15:18, 80:9, 80:13, 80:22
**ANDREW** [2] - 15:13, 169:4
**Anne** [5] - 98:25, 99:1, 99:24, 100:12, 100:18
**annotate** [1] - 67:1
**answer** [23] - 23:14,

23:15, 24:3, 24:7, 24:15, 31:4, 53:21, 57:23, 58:25, 104:5, 104:9, 105:7, 106:18, 106:20, 106:22, 130:12, 131:1, 131:6, 131:9, 133:24, 139:20, 143:8, 159:16
**answered** [1] - 134:7
**answering** [1] - 41:17
**answers** [3] - 106:9, 106:10, 150:9
**anticipate** [1] - 142:6
**anticipating** [1] - 166:13
**AP** [10] - 13:21, 44:8, 44:11, 44:12, 44:14, 44:17, 44:19, 44:20, 44:22, 127:19
**apart** [1] - 120:18
**apartment** [2] - 55:14, 55:16
**apologize** [2] - 2:13, 33:12
**apparent** [1] - 69:4
**appeal** [35] - 89:8, 89:13, 89:14, 90:13, 90:14, 90:15, 92:7, 93:7, 93:24, 94:8, 94:12, 94:13, 94:16, 95:5, 95:23, 96:12, 97:21, 97:22, 98:14, 99:8, 100:1, 100:3, 100:18, 100:20, 109:5, 109:6, 109:7, 109:14, 109:16, 109:18, 109:19, 110:8, 110:9, 121:12
**appearances** [1] - 2:3
**appended** [1] - 168:12
**applicable** [1] - 103:20
**application** [8] - 10:6, 69:22, 76:2, 76:3, 113:19, 116:2, 116:5, 116:7
**applied** [8] - 59:11, 59:13, 63:24, 75:1, 101:13, 111:23, 116:14, 117:18
**applies** [1] - 105:25
**apply** [7] - 13:25, 31:5, 95:1, 97:4, 104:10, 104:17, 113:14
**appreciate** [1] - 2:14
**approach** [4] - 40:10, 132:20, 132:22, 162:24
**approaches** [1] - 40:3

**appropriately** [1] - 156:10
**approve** [1] - 111:22
**approved** [2] - 115:12, 122:12
**April** [5] - 117:5, 117:8, 117:21, 119:12, 138:19
**aptitude** [1] - 11:21
**area** [17] - 37:10, 38:22, 41:15, 50:11, 54:1, 54:6, 57:10, 57:12, 58:6, 58:7, 58:8, 63:11, 70:9, 70:23, 71:1, 115:1, 115:15
**areas** [8] - 37:15, 40:12, 53:23, 54:18, 55:24, 56:23, 91:13, 163:21
**argument** [1] - 18:13
**arguments** [1] - 109:16
**army** [1] - 39:16
**Aronson** [8] - 77:17, 77:23, 77:24, 78:3, 94:15, 95:8, 95:11, 99:14
**arrest** [2] - 142:2, 142:4
**article** [2] - 120:21, 121:1
**asleep** [1] - 43:21
**assembled** [2] - 95:1, 116:7
**assembling** [2] - 88:15, 89:25
**assessments** [1] - 9:22
**Assessments** [1] - 13:11
**assigned** [3] - 43:25, 57:4, 80:3
**assignment** [1] - 64:20
**assignments** [6] - 6:13, 6:17, 6:18, 17:24, 18:2, 43:18
**assistance** [2] - 10:3, 13:17
**assisting** [1] - 64:23
**associate** [1] - 156:13
**Associate** [1] - 116:3
**associating** [1] - 143:6
**assuming** [2] - 26:13, 138:4
**ATT** [1] - 60:5
**attached** [1] - 131:24
**attempt** [2] - 142:9,

147:5
**Attempt** [1] - 142:13
**attempts** [3] - 146:22, 147:2, 147:6
**attend** [1] - 27:1
**attending** [2] - 26:14, 140:19
**attention** [6] - 5:2, 40:6, 40:7, 45:24, 47:3, 47:7
**attorney** [3] - 26:4, 99:1
**attorneys** [1] - 125:7
**audio** [4] - 44:4, 52:8, 52:11, 66:14
**audio-based** [1] - 66:14
**August** [12] - 21:8, 29:11, 61:18, 93:13, 93:18, 96:2, 112:12, 113:23, 147:10, 147:16, 151:23
**available** [2] - 2:16, 71:10, 166:15
**Avenue** [1] - 1:22
**average** [1] - 19:4
**avoid** [1] - 51:14
**avoiding** [1] - 47:24
**aware** [2] - 29:14, 148:7
**awful** [1] - 65:17
**Azrack** [1] - 36:1
**AZRACK** [1] - 1:12

## B

**B's** [2] - 127:23, 127:25
**background** [2] - 23:5, 23:9
**bacteria** [1] - 67:6
**bad** [1] - 69:1
**baffling** [1] - 21:6
**Barkley** [2] - 33:15, 33:17
**Barron's** [1] - 55:11
**Based** [1] - 24:10
**based** [21] - 5:20, 9:11, 18:11, 41:10, 41:11, 51:22, 54:16, 54:17, 61:23, 63:8, 63:22, 66:14, 70:18, 74:11, 80:14, 104:15, 114:25, 115:13, 143:18
**basis** [4] - 65:25, 109:18, 109:19, 109:25
**bathroom** [1] - 35:13
**battery** [1] - 125:20

**beautiful** [1] - 64:24
**became** [1] - 69:1
**become** [2] - 123:21, 165:18
**bed** [1] - 156:21
**bedside** [1] - 120:4
**BEFORE** [1] - 1:12
**began** [3] - 83:4, 139:3, 141:17
**begin** [6] - 16:1, 64:9, 64:11, 64:16, 110:11, 110:12
**beginning** [12] - 20:24, 41:4, 44:21, 52:4, 61:2, 66:4, 123:23, 125:11, 126:1, 134:20, 135:5, 160:6
**behalf** [4] - 146:10, 151:14, 152:17, 153:5
**behavior** [1] - 33:3
**behind** [1] - 4:18
**belief** [1] - 112:6
**believes** [2] - 79:8, 98:11
**best** [12] - 11:19, 16:11, 44:16, 44:19, 45:4, 58:3, 59:16, 61:7, 91:17, 102:20, 112:9, 166:1
**better** [9] - 21:5, 39:11, 59:10, 71:18, 71:19, 130:1, 130:22, 142:3, 146:4
**between** [9] - 70:2, 73:21, 74:22, 97:7, 118:15, 122:3, 136:16, 162:13, 162:14
**beyond** [1] - 149:6
**Bible** [2] - 66:25, 67:3
**big** [5] - 81:13, 88:12, 114:13, 157:11, 161:11
**bigger** [2] - 25:10, 25:12
**biggest** [1] - 68:6
**binder** [11] - 24:25, 55:7, 75:15, 75:17, 121:25, 126:24, 128:4, 131:13, 132:23, 135:5, 163:2
**binders** [1] - 55:8
**biological** [2] - 27:21, 54:19
**birth** [3] - 155:8, 155:9, 155:12
**bit** [4] - 44:5, 44:9, 59:11, 72:8

**bizarre** [1] - 45:21
**black** [3] - 75:15, 75:17, 165:2
**blackboard** [1] - 39:21
**block** [6] - 104:1, 104:3, 106:2, 106:4
**blocks** [2] - 27:15, 27:25
**blurry** [2] - 25:11, 30:8
**BOARD** [1] - 1:7
**board** [3] - 39:21, 157:23, 161:17
**Board** [19] - 2:2, 4:7, 26:4, 68:4, 72:12, 75:2, 78:14, 85:12, 89:3, 90:25, 94:4, 94:21, 96:3, 97:13, 99:15, 100:13, 125:8, 144:2, 163:9
**body** [1] - 74:9
**bold** [1] - 95:17
**book** [6] - 36:25, 41:4, 44:3, 48:5, 48:7, 55:10, 55:23, 63:20, 67:2, 147:12
**books** [7] - 7:14, 43:25, 44:4, 55:6, 55:15, 55:19, 63:12
**bored** [1] - 47:1
**bottom** [4] - 79:22, 127:4, 167:5, 167:6
**bought** [1] - 55:19
**bound** [6] - 135:15, 136:4, 136:9, 136:19, 136:25, 137:7
**box** [4] - 57:20, 58:25, 81:24, 118:1
**boy** [2] - 155:4, 155:5
**brand** [1] - 113:19
**break** [4] - 35:13, 86:15, 87:11, 123:25
**breaks** [6] - 38:22, 74:6, 75:7, 115:1, 115:15, 115:19
**bridge** [2] - 167:10, 167:15
**brief** [3] - 2:11, 19:10, 22:8
**briefing** [1] - 3:4
**bright** [4] - 6:6, 8:2, 164:9
**brilliant** [2] - 47:3, 47:8
**brilliantly** [1] - 6:7
**bring** [4] - 47:9, 48:5, 152:4, 152:8
**broad** [1] - 4:24
**broccoli** [1] - 161:13
**Brook** [25] - 69:19,

70:14, 71:3, 74:13, 78:14, 78:21, 79:20, 80:20, 81:16, 83:4, 83:9, 98:1, 98:3, 107:6, 115:6, 115:17, 116:2, 117:19, 144:12, 151:15, 152:2, 152:4, 152:7, 153:6, 153:11
**Brook's** [1] - 151:22
**brother** [2] - 46:11, 157:24
**brought** [2] - 5:3, 122:17
**bucket** [1] - 105:11
**build** [1] - 67:8
**built** [1] - 53:5
**burden** [1] - 14:9
**bureaucracy** [3] - 62:11, 88:14, 88:15
**Business** [3] - 116:3, 116:6, 116:8
**business** [19] - 3:22, 36:22, 115:20, 115:22, 115:23, 116:11, 122:2, 139:3, 139:7, 139:11, 139:17, 139:22, 140:1, 140:5, 140:9, 140:12, 140:19, 140:25, 141:4
**busy** [1] - 149:13
**butter** [1] - 43:7
**BY** [36] - 1:16, 1:20, 1:23, 15:16, 17:5, 24:21, 25:13, 26:2, 28:18, 31:17, 32:16, 34:21, 36:16, 45:14, 53:13, 56:5, 60:8, 74:16, 83:2, 87:10, 109:2, 125:5, 132:5, 133:9, 134:13, 142:19, 151:2, 154:19, 163:1, 166:24, 169:5, 169:7, 169:8, 169:10, 169:11, 169:13

## C

**C-section** [1] - 155:22
**cable** [1] - 66:19
**calculation** [2] - 22:13, 69:5
**calculations** [4] - 19:21, 19:23, 22:17, 23:1

**Calculus** [1] - 52:20
**calendar** [1] - 2:15
**California** [2] - 89:21, 90:3
**California -Irvine** [1] - 89:21
**camera** [2] - 53:5, 53:8
**camps** [1] - 43:16
**campus** [1] - 143:9
**canal** [1] - 155:25
**candidate** [2] - 9:19, 9:21
**cannot** [6] - 14:11, 25:7, 30:2, 34:25, 113:16, 139:22
**capabilities** [1] - 8:20
**CAPP** [8] - 102:5, 107:5, 107:18, 109:8, 110:10, 110:21, 111:2, 143:13
**capture** [1] - 142:7
**capturing** [1] - 130:21
**card** [1] - 93:2
**cardiac** [3] - 142:2, 142:4, 142:7
**Cardiology** [1] - 138:18
**cards** [3] - 6:12, 10:18, 89:17
**care** [4] - 12:16, 37:6, 44:3, 91:8
**career** [2] - 4:17, 51:9
**careful** [1] - 22:11
**carefully** [5] - 29:25, 30:17, 30:22, 31:24, 105:14
**CAROLINE** [1] - 1:20
**Caroline** [3] - 2:7, 26:3, 125:7
**carrot** [1] - 43:6
**carrots** [2] - 161:13, 161:19
**carrying** [1] - 161:14
**cartoon** [3] - 66:14, 67:5
**cartoon -based** [1] - 66:14
**Case** [1] - 2:1
**case** [18] - 2:18, 2:21, 5:13, 8:2, 12:20, 13:3, 14:7, 14:21, 28:4, 65:12, 72:6, 80:3, 105:20, 110:19, 114:4, 165:1, 165:20, 165:21
**cases** [1] - 5:3
**catalyst** [2] - 60:24, 150:8

**catch** [3] - 122:1, 152:21, 158:2
**catching** [1] - 148:15
**Catherine** [1] - 100:12
**CAUSE** [1] - 1:11
**CCR** [1] - 1:24
**Ceasarian** [2] - 155:13, 155:21
**celery** [1] - 161:19
**cellist** [1] - 7:17
**cello** [6] - 7:22, 49:12, 49:14, 49:15, 49:24, 49:25
**cemented** [1] - 68:5
**center** [1] - 69:20
**Central** [1] - 1:5
**cerebral** [1] - 155:24
**certain** [7] - 5:15, 47:20, 47:21, 49:19, 68:8, 116:9, 121:21
**Certainly** [1] - 27:5
**certainly** [2] - 6:24, 146:3
**certification** [1] - 10:24
**Certification** [1] - 79:14
**chair** [1] - 7:19
**Chair** [1] - 111:6
**challenges** [2] - 6:16, 8:4, 11:3
**challenging** [1] - 44:14
**chance** [2] - 58:18, 158:2
**change** [2] - 142:8, 149:9
**changed** [2] - 127:10, 151:24
**changes** [3] - 118:24, 148:11, 149:3
**Changing** [1] - 142:20
**character** [1] - 65:17
**characterization** [1] - 130:13
**Charles** [2] - 2:4, 3:20
**CHARLES** [1] - 1:17
**charter** [1] - 120:10
**charts** [2] - 120:7, 120:8, 120:9
**check** [1] - 22:14
**checking** [1] - 23:1
**Chemistry** [1] - 52:20
**child** [4] - 7:17, 49:11, 155:4, 164:9
**childhood** [5] - 6:15, 10:18, 39:3, 92:10, 92:13
**Childhood** [1] - 33:15
**children** [7] - 6:23,

7:4, 7:9, 7:11, 7:19, 8:2, 154:25
**choice** [8] - 18:12, 29:6, 72:19, 106:7, 106:9, 106:10, 106:12, 123:5
**choices** [7] - 23:13, 23:14, 23:15, 106:15, 106:16, 106:22, 106:25
**choose** [1] - 36:23
**chopped** [1] - 161:13
**chopping** [1] - 161:17
**chose** [3] - 45:3, 48:4, 60:16
**Christopher** [2] - 78:19, 79:25
**circling** [2] - 161:21, 161:22
**Circuit** [1] - 12:9
**cited** [1] - 59:13
**Civil** [1] - 2:1
**CIVIL** [1] - 1:11
**claims** [1] - 99:21
**clarification** [8] - 16:9, 16:19, 23:7, 24:4, 26:22, 32:12, 84:20, 142:12
**clarify** [5] - 27:11, 27:13, 125:15, 129:12, 130:8
**class** [39] - 7:7, 34:2, 44:13, 44:15, 44:18, 44:19, 44:20, 44:21, 44:22, 45:7, 47:9, 47:24, 47:25, 48:4, 48:8, 48:9, 48:10, 48:11, 48:14, 49:5, 52:2, 53:24, 54:1, 67:17, 67:25, 68:2, 68:5, 68:7, 68:12, 71:16, 115:23, 139:13, 140:8, 140:16, 141:7, 167:5, 167:6, 167:20
**classes** [40] - 13:22, 38:8, 38:11, 38:14, 38:17, 39:13, 43:24, 44:8, 44:11, 44:14, 47:18, 47:20, 51:18, 51:23, 51:25, 52:2, 52:3, 52:20, 54:3, 56:11, 63:17, 67:24, 68:14, 69:13, 69:14, 97:9, 110:3, 110:6, 115:20, 116:10, 127:19, 127:23, 139:4, 139:10, 139:15, 140:20, 141:4, 145:3, 145:10

**classmates** [9] - 8:7, 15:24, 49:3, 56:24, 74:3, 109:21, 112:23, 146:11, 165:7
**classroom** [12] - 7:4, 39:19, 39:20, 41:19, 41:22, 44:25, 45:16, 46:3, 68:11, 158:16, 162:18, 165:7
**classrooms** [1] - 39:24
**clauses** [1] - 18:17
**clear** [6] - 5:5, 5:10, 8:13, 9:16, 14:9, 141:1
**CLERK** [2] - 36:9, 154:14
**clerks** [1] - 146:3
**clerkship** [3] - 72:6, 72:17, 110:12
**CliffNotes** [2] - 43:23, 44:1
**clinical** [16] - 37:12, 64:11, 68:12, 76:18, 110:12, 112:13, 112:17, 112:23, 114:12, 119:24, 120:1, 138:3, 140:23, 141:2, 167:8
**clock** [1] - 14:22
**Close** [2] - 136:15, 136:16
**close** [5] - 103:10, 123:21, 142:6, 142:25, 154:15
**closely** [3] - 10:11, 53:6, 92:17
**Cohen** [2] - 116:4, 116:5
**COIE** [2] - 1:19, 1:21
**collection** [1] - 135:18
**college** [21] - 4:5, 26:14, 26:20, 26:25, 47:12, 47:13, 51:10, 51:11, 51:13, 51:14, 52:3, 52:4, 52:23, 53:14, 56:3, 135:15, 136:4, 136:9, 136:19, 136:25, 137:7
**College** [5] - 54:13, 85:12, 116:2, 116:6, 116:7
**college -bound** [6] - 135:15, 136:4, 136:9, 136:19, 136:25, 137:7
**colloquially** [2] - 72:20, 129:9

**column** [1] - 97:12
**combined** [1] - 119:2
**comfortably** [1] - 17:7
**command** [1] - 159:3
**commands** [1] - 158:25
**comment** [2] - 148:9, 148:10
**commented** [1] - 155:21
**comments** [4] - 68:11, 89:16, 91:23, 92:4
**Committee** [5] - 102:5, 107:5, 107:18, 109:8, 111:3
**committee** [4] - 81:2, 81:14, 110:20, 111:7
**Committee 's** [1] - 110:10
**common** [2] - 48:24, 138:5
**communicate** [2] - 115:5, 149:16
**communicated** [1] - 115:10
**communication** [2] - 110:20, 115:11
**companies** [2] - 5:19, 102:13
**compare** [7] - 17:16, 35:2, 41:1, 59:19, 60:9, 66:22, 106:10
**compared** [7] - 13:8, 17:17, 51:23, 62:4, 136:18, 136:25, 137:6
**comparing** [7] - 26:17, 26:19, 26:23, 26:25, 52:10, 136:4, 136:5
**comparison** [1] - 135:14
**compassionate** [1] - 3:22
**compensatory** [2] - 21:16, 58:21
**competitive** [2] - 13:18, 127:21
**compilation** [1] - 94:25
**compile** [1] - 88:12
**compiling** [3] - 89:22, 90:10, 90:11
**complete** [9] - 6:10, 6:13, 17:19, 32:9, 37:23, 38:7, 91:16, 151:23, 163:17
**completed** [6] - 37:11, 37:20, 37:22, 145:13, 146:14, 164:19

4

LISA SCHMID, CCR, RMR
Official Court Reporter
A1016

12/29/2022 03:31:24 PM

completely [2] - 58:21, 65:2
completing [4] - 6:17, 17:24, 139:16, 141:2
completion [1] - 140:15
complicated [1] - 13:3
complied [1] - 5:4
Complies [1] - 129:16
components [1] - 67:24
composite [1] - 135:8
comprehend [2] - 13:20, 157:4
comprehended [1] - 18:25
comprehension [7] - 18:10, 20:22, 23:2, 29:24, 31:23, 159:10, 162:11
comprehensive [1] - 9:14
computer [1] - 52:13
Computer [1] - 1:25
Computer -aided [1] - 1:25
computerized [2] - 1:25, 107:14
concentration [1] - 13:20
Concern [2] - 77:18, 79:2
concern [1] - 90:4
concluded [5] - 3:25, 9:1, 9:5, 9:14, 114:24
concluding [1] - 130:11
conclusions [2] - 105:18, 114:22
concurrently [1] - 116:10
conditions [1] - 138:20
conducted [2] - 9:21, 14:8
Confers [1] - 86:13
confidential [2] - 72:25, 93:13
Confidential [1] - 76:18
confused [1] - 139:5
confusing [1] - 131:13
Congress [1] - 4:19
Congressional [1] - 5:14
connected [1] - 66:19
conscious [1] - 41:13
consider [4] - 5:19, 34:12, 60:23, 105:14

considered [1] - 129:9
considering [3] - 8:15, 11:12, 11:15
consisted [1] - 30:17
constantly [1] - 39:12
construed [1] - 4:23
Consultant [1] - 94:20
consultant [2] - 10:19, 25:20
consuming [2] - 55:25, 122:11
Cont'd [2] - 109:1, 151:1
contact [3] - 25:18, 25:20, 162:9
content [6] - 13:21, 22:3, 29:25, 31:24, 32:3, 149:6
context [1] - 5:9
continue [2] - 43:8, 145:4, 152:18, 152:23, 153:6
Continued [4] - 35:17, 86:19, 108:1, 150:10
continued [2] - 68:25, 82:3, 124:3
CONTINUED [1] - 87:9
Continuing [2] - 83:1, 125:1
contrary [1] - 13:10
contributing [1] - 149:15
contribution [1] - 146:3
conversation [1] - 158:3
conversations [1] - 63:6
cool [1] - 66:18
coordinator [1] - 80:2
cope [1] - 5:22
copied [1] - 22:15
copies [1] - 92:2
copy [4] - 19:20, 19:21, 19:24, 75:19
copying [2] - 22:12, 22:25
cord [6] - 118:23, 118:25, 149:10, 155:15, 155:16, 155:23
core [1] - 51:25
corner [4] - 67:2, 85:3, 89:3, 117:25
correct [59] - 2:12, 27:2, 27:20, 27:25, 29:7, 29:13, 30:15, 30:19, 57:13, 84:10, 85:24, 125:12, 125:22, 125:25,

126:6, 126:9, 126:12, 126:18, 126:24, 127:7, 127:13, 127:23, 128:1, 128:9, 129:19, 130:3, 135:6, 135:10, 135:16, 136:4, 136:21, 137:3, 137:17, 137:22, 138:21, 138:24, 139:8, 144:10, 144:14, 144:18, 145:7, 145:11, 146:23, 147:5, 147:14, 149:22, 150:1, 151:6, 151:12, 151:15, 151:16, 151:18, 151:19, 151:23, 152:5, 152:15, 152:20, 152:24, 162:21
Correct [12] - 26:9, 27:23, 29:8, 29:10, 125:23, 126:7, 126:10, 137:10, 144:16, 144:25, 145:8, 148:1
corrected [1] - 119:1
correctly [5] - 22:15, 61:5, 112:25, 147:10, 149:10
cost [1] - 112:9
costs [1] - 44:17
counsel [14] - 11:7, 109:13, 109:16, 121:9, 121:11, 121:13, 147:19, 151:4, 151:14, 152:15, 152:17, 152:22, 153:5
Counsel [1] - 2:3
count [1] - 88:18
countless [1] - 43:14
country [1] - 47:5
couple [5] - 23:21, 32:19, 48:13, 74:9, 87:13
course [12] - 10:6, 10:23, 13:19, 57:6, 67:16, 67:17, 122:25, 127:18, 129:2, 133:3, 145:14, 158:17
courses [3] - 13:21, 51:15, 51:22
court [2] - 16:10, 132:9
COURT [85] - 1:1, 2:6,

2:9, 2:11, 2:22, 2:25, 3:6, 3:9, 3:11, 3:15, 3:18, 12:4, 14:24, 15:11, 16:25, 24:14, 25:24, 31:9, 32:13, 34:16, 34:19, 35:7, 35:10, 35:14, 36:2, 36:4, 36:9, 36:14, 43:9, 43:11, 45:9, 45:12, 52:25, 53:3, 53:11, 56:3, 59:21, 59:25, 60:2, 60:5, 74:12, 86:14, 86:17, 87:2, 87:5, 107:11, 107:16, 123:25, 125:2, 131:16, 131:19, 131:22, 131:25, 132:2, 132:12, 132:14, 132:18, 132:21, 132:25, 133:2, 133:4, 134:10, 134:12, 142:16, 153:15, 153:18, 153:21, 153:23, 153:25, 154:2, 154:5, 154:7, 154:14, 162:25, 166:8, 166:10, 166:16, 166:18, 166:20, 167:22, 167:24, 168:4, 168:8, 168:10, 168:15
Court [12] - 1:24, 11:6, 14:22, 16:9, 16:19, 23:7, 24:4, 26:22, 32:12, 75:19, 84:20, 142:12
Courthouse [1] - 1:5
courtroom [1] - 36:1
COURTROOM [6] - 2:1, 15:5, 15:8, 25:3, 25:5, 25:9
cover [3] - 38:17, 55:18
coverage [1] - 4:24
covered [2] - 5:3, 125:15
COVID [1] - 148:6
covid [5] - 110:16, 110:18, 113:24, 118:17, 119:2
CPI [1] - 120:22
create [1] - 167:18
created [5] - 7:12, 9:8, 47:17, 122:14, 167:15
creating [1] - 40:10
creation [1] - 72:11

creative [1] - 161:7
credit [2] - 51:19, 167:10
credits [1] - 51:17
critical [3] - 136:20, 136:25, 137:8
cross [1] - 124:1, 166:8
Cross [2] - 25:25, 125:2
CROSS [5] - 26:1, 125:4, 151:1, 169:6, 169:11
cross-examination [1] - 124:1
Cross-examination [2] - 25:25, 125:2
CROSS-EXAMINATION [5] - 26:1, 125:4, 151:1, 169:6, 169:11
crown [2] - 167:10, 167:15
crucial [2] - 17:1, 58:16
crying [1] - 50:22
crystal [1] - 5:5
curious [1] - 164:9
current [3] - 36:19, 38:2, 38:5
Current [1] - 33:17
curriculum [1] - 13:18
customized [1] - 72:24
cut [2] - 27:12, 44:18
cutting [2] - 17:1, 161:18
CV [2] - 1:3, 168:13

**D**

Dad [2] - 43:13, 55:8
dad [1] - 102:14
daily [1] - 65:24
damage [1] - 122:14
dance [3] - 47:25, 48:2, 52:2
dancing [3] - 48:3, 48:4, 48:6
data [2] - 12:24, 93:9
date [10] - 77:4, 83:3, 110:5, 117:3, 118:16, 136:7, 140:5, 148:19, 155:20
dated [20] - 78:14, 79:1, 80:8, 80:21, 88:2, 89:2, 90:3, 90:18, 95:8, 96:1, 96:2, 96:16, 97:14,

98:1, 98:18, 100:5,
100:14, 101:2,
117:8, 119:16
**dates** [2] - 118:16,
147:16
**David** [1] - 155:7
**days** [4] - 2:16, 4:4,
7:6, 44:25
**daytime** [1] - 7:10
**DC** [2] - 1:15, 1:20
**de** [1] - 139:15
**deadlines** [1] - 62:16
**deal** [1] - 123:3
**dealt** [1] - 22:5
**Dean** [9] - 61:3, 61:4,
109:5, 109:7,
109:10, 111:2,
112:25, 116:4,
143:13
**dean** [1] - 21:9
**Dean's** [4] - 110:8,
110:9, 110:21,
112:22
**Dear** [6] - 78:14, 80:9,
80:21, 86:1, 90:19,
163:4
**deathly** [1] - 118:18
**debate** [1] - 147:4
**December** [10] - 28:8,
32:24, 83:7, 118:11,
118:14, 134:3,
144:24, 147:21,
148:14, 148:17
**decided** [1] - 144:3
**decision** [9] - 66:2,
74:21, 110:8, 110:9,
110:10, 110:21,
111:2, 145:6, 151:22
**declaration** [6] -
27:13, 27:18, 28:3,
131:20, 131:24,
134:17
**decoding** [1] - 22:8
**decrease** [1] - 51:18
**dedicated** [1] - 56:11
**dedication** [1] - 11:13
**defeats** [1] - 14:13
**defect** [1] - 14:14
**defendant** [1] - 1:19
**Defendant** [1] - 1:19
**defendants** [1] - 2:8
**deficit** [1] - 166:2
**definitely** [2] - 51:21,
66:3
**definition** [1] - 4:23
**degree** [7] - 3:22,
36:20, 38:3, 115:21,
115:23, 115:25,
116:8
**delay** [5] - 14:13,

120:14, 122:11,
140:8, 149:12
**delayed** [1] - 119:3
**delaying** [1] - 148:2
**delays** [3] - 110:20,
118:15, 148:21
**demand** [1] - 5:1
**demanding** [1] - 5:7
**demean** [1] - 65:17
**demonstrate** [2] -
4:15, 11:25, 12:2,
12:20, 13:7, 14:16,
24:12, 24:19, 49:25,
61:11, 97:6, 123:19
**demonstrating** [1] -
21:5
**Demotta** [5] - 71:2,
71:3, 79:3, 98:2,
98:14
**Demotta 's** [1] - 79:7
**denial** [10] - 88:6,
88:8, 93:19, 95:15,
96:20, 98:22, 99:21,
100:9, 119:21, 150:3
**denials** [1] - 101:10
**denied** [14] - 62:25,
87:25, 88:19, 88:23,
93:22, 96:14, 98:16,
100:3, 100:25,
101:7, 119:15,
121:3, 121:7, 151:9
**dental** [5] - 164:21,
164:23, 165:6,
167:3, 167:4
**dentist** [5] - 37:3,
43:10, 154:23, 160:5
**dentistry** [1] - 154:23
**dentists** [1] - 167:14
**deny** [1] - 14:22
**Department** [1] - 10:4
**DEPUTY** [6] - 2:1,
15:5, 15:8, 25:3,
25:5, 25:9
**describe** [6] - 58:4,
71:7, 104:4, 109:15,
158:14, 159:25
**described** [7] - 20:22,
30:13, 30:19, 38:24,
105:4, 138:15,
145:16
**describing** [4] - 10:22,
117:15, 128:5,
160:25
**design** [2] - 71:14,
167:18
**designed** [4] - 141:24,
143:19, 143:22,
144:1
**desk** [1] - 66:20
**despite** [9] - 4:6, 7:18,

17:13, 47:8, 60:25,
62:7, 65:9, 102:3,
107:14
**detailing** [1] - 11:2
**details** [4] - 24:2, 24:3,
24:5, 24:6
**determination** [3] -
5:10, 9:11, 145:6
**determine** [1] - 8:14
**determining** [1] - 4:25
**detrimental** [1] - 142:8
**Devastated** [1] - 88:9
**devastating** [1] -
88:21
**development** [2] -
40:10, 156:2
**device** [2] - 142:7,
142:10
**devices** [3] - 141:15,
141:18, 141:22
**devised** [1] - 161:5
**Dexedrine** [1] - 78:1
**diagnosed** [1] - 6:2
**diagnoses** [1] - 78:7
**diagnosis** [4] - 9:22,
24:2, 95:17, 165:23
**diagnostic** [2] - 13:1,
13:5
**dickory** [1] - 48:23
**difference** [7] - 37:18,
59:24, 72:22, 105:2,
105:21, 156:10,
157:11
**differences** [1] - 7:15
**different** [29] - 8:21,
20:12, 21:16, 37:12,
40:11, 44:23, 58:6,
61:23, 65:2, 67:7,
68:2, 71:14, 71:15,
79:19, 81:21, 87:14,
91:13, 92:4, 102:12,
102:13, 102:16,
103:20, 104:13,
104:17, 121:15,
121:16, 130:6,
137:25, 146:9
**differing** [1] - 8:20
**differs** [1] - 147:2
**difficult** [6] - 39:10,
44:5, 89:23, 97:2,
149:19, 167:21
**difficulties** [1] - 91:2,
117:15, 144:13,
164:15
**difficulty** [5] - 6:17,
18:15, 20:15, 26:17,
35:5
**digested** [1] - 55:20
**digitally** [1] - 52:9
**dill** [1] - 48:24

**dining** [1] - 161:23
**DIRECT** [8] - 15:15,
36:15, 87:9, 109:1,
154:18, 169:5,
169:10, 169:13
**direct** [2] - 5:6, 21:24
**Direct** [1] - 120:22
**directed** [1] - 74:18
**directing** [1] - 132:2
**direction** [1] - 158:20
**directions** [1] - 158:19
**directly** [3] - 36:10,
115:10, 116:6
**Director** [2] - 89:20,
100:12
**directs** [1] - 9:17
**disabilities** [22] - 3:23,
3:25, 5:9, 5:16, 5:20,
5:21, 6:2, 6:23, 9:4,
9:6, 11:23, 12:14,
20:20, 21:10, 46:6,
46:8, 46:21, 65:15,
71:12, 71:13, 77:22,
95:18
**Disabilities** [4] - 4:20,
4:22, 69:21, 70:14
**Disability** [6] - 25:15,
77:6, 78:15, 89:4,
89:20, 100:13
**disability** [35] - 4:7,
4:16, 4:23, 5:1, 5:6,
5:11, 6:4, 8:14, 8:24,
10:5, 10:13, 11:9,
12:1, 51:1, 61:22,
65:9, 65:13, 65:18,
65:19, 65:20, 70:4,
79:8, 80:2, 88:11,
91:7, 95:19, 98:10,
111:10, 111:11,
115:9, 125:17,
125:22, 155:25,
166:3
**disabled** [3] - 8:3,
11:17, 12:21
**disappoint** [1] - 112:7
**disappointed** [1] -
60:13
**discouraging** [1] -
20:25
**discovered** [2] -
29:23, 31:22
**discovery** [1] - 14:7
**discuss** [2] - 25:20,
159:15
**discussed** [3] - 87:20,
137:15, 141:13
**discussing** [3] -
12:25, 29:16
**dismal** [1] - 138:15
**dismally** [1] - 73:14

**dismiss** [1] - 152:5
**dismissal** [1] - 121:12
**dismissed** [2] - 102:6,
152:7
**disorder** [1] - 78:8
**dispute** [2] - 6:6, 14:5
**disregarded** [2] -
10:2, 150:4
**distinctly** [3] - 40:12,
55:16, 120:9
**distracters** [1] - 105:6
**district** [1] - 162:8
**DISTRICT** [3] - 1:1,
1:1, 1:12
**disturbing** [1] - 102:1
**divided** [1] - 102:24
**division** [1] - 40:13
**DNA** [1] - 112:1
**doctor** [16] - 36:24,
63:7, 64:16, 80:13,
114:3, 123:14,
123:21, 142:15,
155:17, 155:21
**doctorate** [1] - 114:5
**Doctors** [2] - 147:8,
149:16
**doctors** [1] - 114:17
**document** [85] - 6:12,
25:6, 25:14, 28:10,
76:8, 76:10, 76:20,
76:25, 77:7, 77:19,
78:10, 78:16, 79:4,
79:16, 79:19, 79:24,
80:4, 80:10, 80:16,
80:23, 81:1, 81:18,
81:21, 82:2, 83:6,
83:14, 83:18, 83:20,
83:25, 84:11, 84:16,
84:23, 85:1, 85:4,
85:9, 85:14, 85:18,
86:2, 86:4, 87:18,
88:3, 88:6, 89:1,
89:5, 90:6, 90:17,
90:21, 91:24, 92:9,
93:12, 93:15, 94:5,
94:8, 94:22, 95:4,
95:11, 96:4, 96:17,
97:15, 97:16, 97:18,
97:19, 97:23, 98:4,
98:14, 98:19, 99:4,
99:16, 99:23, 100:6,
100:15, 101:3,
101:12, 116:22,
117:2, 117:8,
117:10, 118:2,
118:9, 119:18,
133:20, 134:18,
135:7, 137:14, 163:5
**documentation** [6] -
9:24, 10:8, 65:9,

6

LISA SCHMID, CCR, RMR
Official Court Reporter
A1018
12/29/2022 03:31:24 PM

7

70:2, 70:3, 76:3
**documented** [1] -
81:12
**documenting** [1] - 4:8
**documents** [8] - 4:8,
87:20, 88:12, 89:23,
92:21, 92:24, 93:10,
127:1
**DOJ** [3] - 5:5, 9:17,
9:18
**done** [8] - 40:21,
60:15, 111:17,
122:18, 147:10,
160:12, 167:17
**dots** [3] - 53:7, 53:8,
53:9
**double** [8] - 9:15,
23:1, 38:21, 114:25,
115:12, 115:18,
137:24, 138:9
**double-checking** [1] -
23:1
**down** [13] - 22:14,
27:12, 28:21, 33:11,
45:7, 52:19, 66:15,
103:1, 129:22,
157:2, 159:8, 165:8,
167:24
**Doylestown** [1] - 1:18
**Dr** [66] - 8:19, 9:13,
10:15, 15:3, 25:1,
26:3, 31:20, 33:13,
34:14, 35:8, 56:18,
56:19, 56:21, 57:22,
60:24, 63:4, 77:23,
77:24, 78:3, 80:13,
90:9, 93:17, 94:13,
94:15, 94:16, 95:1,
95:10, 96:7, 96:21,
99:12, 105:3, 114:2,
114:11, 114:22,
114:24, 115:9,
115:12, 116:4,
116:5, 116:15,
116:17, 118:6,
118:17, 125:18,
130:5, 142:20,
142:24, 142:25,
143:2, 143:5, 148:3,
148:6, 149:22,
154:10, 154:20,
164:15, 166:11,
166:14, 167:24,
167:25, 168:12
**draft** [6] - 19:20,
118:20, 148:8,
148:13, 148:18,
148:24
**draining** [1] - 42:10
**drastic** [2] - 29:23,

31:22
**dreams** [2] - 102:3,
107:23
**Drew** [1] - 83:18
**drill** [1] - 39:15
**Drive** [1] - 1:17
**driven** [4] - 44:16,
127:13, 127:14
**due** [1] - 12:16
**duly** [3] - 15:13, 36:7,
154:12
**duration** [1] - 11:15
**During** [2] - 18:5,
20:12
**during** [42] - 6:10,
6:11, 7:2, 11:5,
17:23, 19:18, 24:19,
39:23, 41:18, 41:22,
41:25, 46:8, 50:20,
51:13, 52:23, 53:14,
63:17, 63:19, 68:13,
68:22, 68:24, 69:4,
70:10, 71:25, 72:25,
73:5, 73:9, 73:17,
73:18, 74:7, 111:18,
113:24, 119:9,
119:24, 137:16,
138:2, 138:7, 141:8,
145:18, 156:24,
160:7, 163:24
**duties** [1] - 12:10
**dyslexia** [3] - 21:10,
21:15, 50:25
**dyslexic** [1] - 8:1

# E

**ear** [1] - 45:23
**earliest** [1] - 4:3
**early** [11] - 73:18,
74:19, 74:20, 92:10,
92:13, 142:9,
142:13, 156:1,
160:16, 160:20,
161:12
**early-warn** [2] - 142:9,
142:13
**earned** [3] - 127:23,
127:25, 135:8
**earth** [1] - 107:25
**easier** [3] - 48:6, 92:3
**easiest** [1] - 48:19
**EASTERN** [1] - 1:1
**easy** [7] - 88:11,
113:20, 122:22,
155:12, 165:8,
165:9, 165:11
**ECF** [2] - 132:16,
133:19
**Ed** [1] - 94:20

**editions** [1] - 102:12
**education** [11] - 5:16,
7:3, 10:23, 40:10,
42:14, 42:20, 56:16,
71:14, 114:14,
159:19, 159:22
**educational** [15] -
10:18, 60:20, 61:21,
69:11, 69:25, 70:6,
76:11, 76:24, 94:17,
94:18, 113:20,
114:4, 118:5,
142:22, 143:1
**Educational** [1] -
94:20
**educators** [1] - 4:2
**effective** [1] - 102:18
**effects** [1] - 5:12
**efficient** [1] - 21:17
**effort** [4] - 6:8, 13:16,
102:4, 125:11
**efforts** [4] - 6:5, 17:23,
18:1, 66:11
**ego** [1] - 163:14
**Eight** [1] - 79:12
**eight** [5] - 84:4,
102:25, 103:2,
107:15, 131:19
**Eighth** [1] - 136:1
**either** [11] - 33:3,
71:25, 74:18,
105:11, 115:24,
139:5, 140:21,
142:10, 142:15,
145:1, 166:6
**elaborate** [1] - 102:21
**electronic** [1] - 103:1
**elementary** [21] - 4:4,
6:19, 16:7, 16:13,
20:12, 39:7, 39:8,
39:9, 125:12,
125:13, 125:14,
126:3, 126:17,
158:11, 158:14,
159:7, 159:20,
159:23, 160:7,
160:15, 163:24
**Elementary** [1] - 85:22
**eleventh** [1] - 14:21
**eliminating** [1] - 47:18
**emailed** [1] - 93:6
**embarrassed** [1] -
65:8
**embarrassing** [4] -
41:13, 46:3, 51:2,
111:7
**emergency** [4] - 14:3,
142:11, 142:14,
142:15
**emotionally** [1] -

102:1
**emphasis** [1] - 157:17
**employ** [1] - 21:25
**encountered** [1] -
20:13
**encouraged** [1] -
21:14
**end** [17] - 21:8, 41:3,
41:6, 45:2, 46:2,
50:22, 68:2, 68:18,
72:16, 74:4, 90:5,
116:14, 141:8,
145:25, 146:6,
146:7, 146:12
**ended** [1] - 15:25
**ending** [1] - 107:22
**endless** [1] - 7:12
**energy** [1] - 59:17
**engineer** [1] - 47:4
**english** [1] - 54:19
**English** [6] - 41:16,
43:24, 47:20, 47:24,
48:9, 48:10
**enjoy** [1] - 48:4
**enormity** [1] - 55:22
**enormously** [1] -
13:24
**enrolled** [4] - 139:7,
152:18, 152:23,
153:6
**ensure** [4] - 2:20,
11:19, 12:10, 12:17
**ensuring** [1] - 4:23
**entered** [1] - 39:5
**enters** [2] - 36:1,
142:4
**entire** [29] - 10:17,
22:1, 32:10, 32:15,
34:23, 36:24, 39:2,
39:25, 51:9, 53:1,
55:18, 58:8, 58:17,
74:9, 74:23, 88:18,
92:17, 107:23,
120:24, 121:25,
122:20, 123:14,
130:10, 131:1,
131:5, 131:9,
133:12, 134:8, 157:9
**entirely** [2] - 103:20,
104:13
**entirety** [3] - 72:1,
74:18, 133:25
**entities** [3] - 5:4, 9:23,
11:18
**entitled** [1] - 12:22
**equation** [3] - 19:20,
22:14, 22:25
**equations** [1] - 22:12
**error** [1] - 149:9
**errors** [2] - 19:25,

40:18
**especially** [5] - 18:16,
21:3, 51:2, 51:5,
63:7
**ESQ** [4] - 1:16, 1:17,
1:20, 1:23
**essay** [1] - 41:17
**essential** [1] - 58:21
**essentially** [1] - 72:19
**establish** [1] - 14:12
**estimate** [1] - 158:8
**evaluate** [3] - 3:24,
72:13, 142:21
**evaluated** [5] - 8:23,
21:12, 21:14,
125:16, 126:5
**evaluation** [11] - 62:3,
62:4, 69:17, 76:11,
76:23, 118:5,
122:22, 122:24,
125:22, 125:25,
147:8
**Evaluation** [2] - 76:19,
117:25
**evaluations** [2] - 13:1,
149:21
**evaluators** [1] - 33:1
**evening** [1] - 156:21
**evenings** [1] - 160:9
**eventually** [5] - 7:18,
20:19, 21:7, 45:5,
46:9
**everyday** [1] - 95:19
**everywhere** [1] - 7:16
**evidence** [10] - 3:5,
5:8, 10:5, 11:8,
13:10, 13:12, 92:13,
94:10, 94:11
**evolve** [2] - 165:22,
165:23
**exacerbated** [1] -
110:23
**exacerbates** [3] -
103:22, 103:23
**exact** [3] - 54:11,
141:10, 145:23
**exactly** [11] - 4:20,
9:9, 10:25, 18:20,
46:13, 57:24, 59:1,
143:24, 148:20,
155:20, 161:2
**exam** [60] - 13:21,
51:20, 58:3, 58:22,
60:15, 60:16, 62:19,
67:13, 67:17, 68:3,
68:4, 68:5, 68:6,
69:6, 72:12, 72:16,
72:19, 72:21, 73:13,
73:15, 74:1, 74:6,
74:7, 75:12, 83:7,

88:7, 101:23,
101:24, 102:1,
102:3, 102:4, 104:1,
104:7, 104:16,
104:24, 107:14,
107:15, 107:17,
107:19, 109:21,
109:23, 111:16,
114:25, 117:1,
121:20, 123:18,
130:24, 132:6,
134:15, 134:22,
139:23, 145:3,
145:9, 145:17,
145:21, 146:8,
146:11, 146:19,
146:23
**Exam** [2] - 4:11,
138:18
**Examination** [2] -
79:14, 116:21
**EXAMINATION** [15] -
15:15, 26:1, 34:20,
36:15, 87:9, 109:1,
125:4, 151:1,
154:18, 169:5,
169:6, 169:8,
169:10, 169:11,
169:13
**examination** [5] -
11:20, 12:10, 25:25,
124:1, 125:2
**examinations** [3] -
9:7, 9:8, 68:8
**examined** [1] - 9:1
**examinees** [3] - 12:11,
12:14, 12:19
**Examiner 's** [2] -
78:15, 163:9
**EXAMINERS** [1] - 1:8
**Examiners** [15] - 2:2,
4:7, 26:4, 68:4,
72:12, 89:4, 90:25,
94:4, 94:21, 96:3,
97:13, 99:15,
100:14, 125:8, 144:3
**examining** [2] - 10:9,
10:10
**example** [28] - 40:4,
40:12, 40:14, 42:23,
47:19, 47:21, 47:25,
50:9, 52:1, 52:12,
58:7, 58:10, 65:15,
65:20, 67:6, 68:1,
72:15, 72:18, 78:8,
110:21, 127:10,
128:13, 129:22,
138:18, 157:13,
160:19, 161:15,
163:21

**examples** [5] - 37:2,
59:2, 67:10, 95:18,
126:20
**Exams** [4] - 137:16,
138:4, 138:14,
143:19
**exams** [29] - 5:17,
24:12, 51:21, 53:14,
53:17, 67:16, 68:9,
69:12, 71:1, 72:9,
72:11, 72:23, 72:24,
73:4, 73:8, 73:12,
73:17, 74:12, 74:15,
81:4, 81:22, 81:24,
81:25, 130:25,
138:2, 138:6, 138:9,
138:11
**except** [1] - 49:17
**excessive** [1] - 8:16
**excuse** [2] - 111:13,
166:17
**excused** [2] - 35:7,
166:10
**exercises** [3] - 57:5,
57:6, 115:2
**exhausted** [1] - 45:2
**exhausting** [1] -
103:24
**Exhibit** [17] - 28:3,
29:17, 31:18, 33:7,
75:18, 127:2, 128:4,
129:14, 132:4,
132:15, 132:18,
132:21, 134:11,
135:5, 137:12,
147:12, 152:12
**exhibit** [6] - 24:24,
128:4, 128:7, 135:5,
162:23, 163:10
**exhibits** [7] - 3:3,
126:21, 126:25,
131:16, 131:24,
135:3, 137:13
**exist** [1] - 5:21
**expansion** [1] - 95:20
**expect** [1] - 139:17
**expected** [1] - 140:4
**expelled** [1] - 107:20
**expensive** [4] - 55:25,
62:12, 113:21,
122:10
**experience** [7] -
22:22, 34:22, 61:5,
64:14, 71:13, 74:2,
104:14
**experienced** [1] -
10:17
**experiences** [3] -
44:13, 47:6, 56:2
**experiencing** [1] -

144:13
**experimented** [1] -
52:5
**expert** [2] - 3:24,
89:25
**experts** [3] - 9:18,
10:9, 91:13
**expired** [1] - 113:9
**explain** [16] - 17:25,
21:20, 29:20, 31:10,
40:9, 52:6, 56:19,
67:22, 72:10,
113:11, 121:17,
141:19, 141:21,
141:22, 143:25,
157:7
**explained** [4] - 26:5,
143:17, 157:22,
165:4
**explaining** [2] - 99:21,
129:17
**explanation** [1] -
97:20
**expose** [1] - 122:20
**express** [1] - 4:22
**extended** [5] - 10:2,
12:2, 24:11, 24:17,
61:25
**extension** [1] - 143:7
**extensive** [7] - 5:1,
10:5, 40:1, 48:12,
91:14, 104:23,
110:20
**extensively** [2] -
46:12, 80:15
**extent** [4] - 4:15, 4:24,
11:22, 12:1, 64:24
**extra** [16] - 12:13,
29:24, 30:18, 31:23,
38:22, 42:1, 42:11,
70:17, 75:7, 115:1,
115:19, 123:9,
137:20, 137:21,
163:16, 167:10
**extraordinarily** [1] -
3:21
**extraordinary** [5] -
6:5, 10:8, 13:16,
17:23, 18:1
**extreme** [3] - 103:13,
103:14
**extremely** [9] - 42:17,
48:18, 50:10, 62:10,
69:4, 102:2, 111:7,
122:10, 122:11
**eyes** [1] - 64:25

## F

**face** [1] - 88:11

**facetious** [1] - 27:6
**fact** [2] - 74:2, 117:18
**facto** [1] - 139:15
**factor** [2] - 74:8,
149:15
**factual** [3] - 118:20,
118:24, 149:9
**faculty** [1] - 143:2
**fail** [1] - 107:12
**failed** [12] - 14:17,
47:8, 101:23,
101:24, 102:1,
102:4, 107:10,
107:17, 107:19,
109:24, 111:16,
121:21
**failing** [3] - 73:13,
138:15, 144:9
**failure** [1] - 69:10
**fair** [2] - 123:4, 130:13
**fairly** [3] - 12:11,
92:20, 163:19
**fairness** [1] - 12:19
**fall** [6] - 43:21, 73:17,
73:18, 73:20, 136:24
**familiar** [5] - 21:16,
21:21, 28:13, 33:4,
152:13
**familiarity** [1] - 9:19
**family** [12] - 12:8,
15:20, 46:5, 46:7,
46:9, 112:1, 112:6,
156:18, 157:5,
157:9, 157:19,
157:23
**fancy** [1] - 52:9
**far** [12] - 6:25, 20:15,
37:21, 73:5, 85:2,
104:23, 113:12,
125:12, 151:5,
159:9, 163:17,
163:23
**Farmer** [3] - 96:21,
99:12, 100:12
**fast** [2] - 7:14, 8:12
**faster** [1] - 120:12
**fatal** [1] - 14:14
**father** [5] - 8:9, 37:3,
55:19, 63:6, 165:25
**fathom** [1] - 74:22
**fault** [1] - 58:25
**favor** [1] - 4:24
**faxed** [1] - 118:20
**features** [1] - 67:7
**February** [4] - 16:2,
97:14, 97:23, 98:2
**fee** [1] - 113:19
**Feinberg** [1] - 92:23
**felt** [4] - 39:20, 41:13,
43:20, 74:21

**few** [12] - 8:7, 8:8,
16:18, 20:8, 44:7,
59:2, 64:4, 91:18,
153:16, 156:25,
158:6, 160:4
**fields** [1] - 37:12
**fifth** [1] - 162:14
**figure** [5] - 18:3,
18:20, 57:7, 69:2,
88:24
**figuring** [1] - 24:2
**file** [4] - 93:4, 93:6,
122:6, 168:13
**filed** [1] - 28:4
**filing** [2] - 132:9,
132:16
**fill** [3] - 32:21, 33:1,
51:24
**filled** [1] - 33:21
**final** [5] - 14:7, 48:14,
72:19, 122:9, 147:24
**finalized** [2] - 149:4,
149:13
**finally** [2] - 50:11,
119:3
**findings** [1] - 61:24
**Fine** [1] - 134:12
**fine** [3] - 129:11,
136:1, 168:15
**finger** [1] - 49:24
**finish** [25] - 41:17,
41:18, 41:21, 41:24,
42:2, 51:21, 53:18,
58:2, 58:18, 58:22,
68:25, 69:12, 73:15,
73:23, 74:1, 74:6,
75:12, 81:3, 103:7,
123:20, 164:23,
165:5, 165:9, 167:7,
168:5
**finished** [4] - 6:11,
32:25, 112:24, 121:2
**finishing** [4] - 54:3,
74:7, 123:21, 140:22
**first** [100] - 4:10, 6:20,
7:18, 10:16, 11:6,
14:25, 16:1, 21:22,
22:7, 23:11, 25:1,
28:10, 32:4, 36:7,
38:23, 39:1, 48:19,
55:2, 57:16, 58:11,
59:21, 60:23, 61:17,
62:6, 62:7, 62:8,
62:12, 63:17, 63:19,
64:1, 64:4, 64:8,
64:12, 66:24, 66:25,
67:19, 68:13, 69:14,
70:10, 72:22, 73:9,
73:10, 73:20, 74:18,
75:5, 75:6, 75:16,

LISA SCHMID, CCR, RMR
Official Court Reporter

A1020

12/29/2022 03:31:24 PM

75:20, 75:25, 76:13, 76:25, 77:13, 78:11, 78:23, 79:9, 80:4, 80:17, 81:5, 82:1, 83:8, 83:9, 83:15, 84:12, 84:24, 85:10, 85:19, 87:20, 87:24, 88:6, 88:10, 89:16, 90:12, 90:14, 90:15, 91:5, 92:21, 93:2, 95:14, 103:12, 114:14, 115:23, 120:15, 123:7, 135:19, 137:17, 137:19, 145:2, 145:18, 145:22, 146:1, 147:15, 154:12, 157:18, 161:16, 166:14, 167:25
**First** [1] - 103:21
**firsthand** [1] - 10:12
**fit** [1] - 62:14
**fits** [2] - 50:14, 50:21
**five** [12] - 7:6, 27:18, 34:11, 44:25, 105:23, 105:25, 106:12, 106:13, 106:25, 127:2, 127:4, 153:19
**fix** [1] - 37:19
**flexibility** [1] - 67:18
**flexible** [1] - 67:15
**Floor** [1] - 1:22
**flow** [1] - 22:9
**fly** [1] - 43:4
**focus** [8] - 6:16, 13:19, 43:21, 43:22, 64:21, 103:23, 146:1, 159:5
**focusing** [2] - 140:1, 158:19
**follow** [1] - 6:14
**followed** [1] - 158:20
**following** [1] - 29:6
**follows** [4] - 15:14, 36:8, 81:15, 154:13
**FOR** [1] - 1:11
**forced** [4] - 4:13, 109:20, 109:21, 122:3
**forever** [2] - 107:24, 120:11
**forgive** [1] - 85:22
**forgot** [2] - 164:14, 167:1
**forgotten** [2] - 18:22, 56:25
**Form** [1] - 33:18
**form** [4] - 28:7, 81:12,

126:14, 126:15
**formal** [11] - 3:5, 39:3, 39:4, 42:19, 51:11, 63:1, 67:20, 83:9, 83:11, 126:11, 126:13
**formative** [1] - 64:15
**formatted** [1] - 23:3
**former** [1] - 31:7
**forms** [1] - 62:16
**fortunate** [1] - 56:15
**forward** [5] - 22:13, 22:16, 109:16, 125:11, 161:15
**four** [11] - 6:5, 10:8, 23:15, 63:16, 66:21, 106:13, 106:25, 107:15, 146:22, 156:2, 156:3
**fourth** [2] - 38:6, 162:14
**fraction** [1] - 40:13
**fractions** [2] - 40:14, 102:25
**frame** [1] - 143:15
**French** [1] - 47:9
**frequently** [2] - 50:14, 53:18
**fresh** [2] - 117:15, 161:18
**Friday** [1] - 45:1
**friend/tutor** [2] - 33:19, 33:21
**friends** [4] - 33:24, 34:12, 39:10, 42:8
**front** [4] - 49:3, 50:1, 75:15, 75:18
**frustrated** [2] - 60:11, 60:17, 62:10
**frustrating** [1] - 20:25
**full** [8] - 32:3, 38:11, 55:15, 114:19, 114:20, 119:2, 160:5, 160:6
**full-time** [6] - 38:11, 114:19, 114:20, 119:2, 160:5, 160:6
**fun** [3] - 42:12, 65:14, 161:8
**functioning** [1] - 114:18
**funded** [1] - 56:16
**futile** [1] - 102:4
**future** [2] - 37:9, 123:1

## G

**gain** [1] - 54:21
**game** [3] - 42:24, 161:9, 161:10

**games** [5] - 7:12, 42:12, 43:12, 161:6, 161:7
**garlic** [1] - 161:14
**gather** [5] - 20:7, 24:8, 64:20, 64:21, 93:23
**gathered** [1] - 11:8
**geared** [1] - 43:16
**gears** [1] - 119:23
**gee** [1] - 165:15
**general** [5] - 13:9, 91:2, 142:15, 152:14, 154:23
**generally** [2] - 9:23, 104:2
**GI** [1] - 83:7
**gifted** [3] - 3:21, 11:17, 12:16
**girl** [1] - 155:4
**given** [9] - 102:23, 126:11, 148:8, 148:13, 148:18, 148:20, 149:1, 165:23
**glance** [1] - 81:9
**Goldberg** [1] - 93:17
**googling** [1] - 121:1
**GPA** [1] - 116:11
**grade** [20] - 86:7, 89:16, 93:2, 128:9, 128:14, 128:17, 128:23, 135:20, 135:24, 136:1, 136:2, 160:20, 161:16, 161:17, 162:12, 162:14, 163:21, 163:22
**graders** [1] - 136:5
**grades** [9] - 6:8, 6:9, 11:12, 11:14, 11:16, 91:23, 92:5, 92:10, 144:10
**graduate** [7] - 56:3, 110:14, 135:23, 139:17, 139:21, 139:22, 140:15
**graduated** [2] - 56:4, 167:20
**graduation** [2] - 4:5, 140:5
**grandfather** [2] - 46:19, 46:23
**grant** [1] - 12:13
**granted** [3] - 78:22, 97:20, 139:15
**great** [1] - 168:16
**Great** [1] - 15:4
**Green** [1] - 45:10
**green** [1] - 161:18
**greenish** [1] - 92:22

**greenish-yellow** [1] - 92:22
**greeting** [1] - 61:4
**grew** [2] - 165:14, 166:4
**ground** [1] - 50:9
**growing** [3] - 46:10, 46:13, 91:1
**guess** [11] - 17:1, 22:9, 57:19, 59:4, 60:23, 81:22, 109:13, 130:16, 131:25, 146:16, 160:20
**guessed** [1] - 57:19
**guessing** [2] - 58:20, 106:19
**guidance** [2] - 146:25, 147:1

## H

**half** [14] - 62:2, 66:15, 70:7, 70:10, 72:22, 74:23, 75:6, 75:8, 75:13, 83:13, 112:16, 145:12, 145:13, 146:2
**halfway** [1] - 131:14
**hallmarks** [1] - 7:15
**hallway** [2] - 55:17, 55:18
**hand** [6] - 15:5, 121:19, 121:23, 135:13, 155:15, 167:8
**handful** [1] - 16:21
**handle** [2] - 95:2, 158:7
**hands** [5] - 37:17, 40:3, 47:6, 51:15, 120:2
**hands-on** [4] - 40:3, 47:6, 51:15, 120:2
**hang** [1] - 34:6
**hard** [11] - 11:10, 11:11, 13:19, 20:25, 48:18, 57:24, 62:13, 65:24, 74:21, 74:22, 97:7, 102:2, 121:19, 159:8, 164:19, 165:17
**Hard** [1] - 127:17
**hard-won** [1] - 11:11
**harder** [5] - 7:8, 7:9, 106:24, 165:8, 165:16
**hardest** [2] - 69:9, 112:4
**hardship** [1] - 112:9

**harm** [3] - 14:13, 14:14, 14:17
**harsh** [1] - 111:8
**hated** [1] - 45:19
**HDMI** [1] - 66:19
**head** [9] - 21:11, 50:2, 65:21, 88:12, 127:12, 134:5, 148:5, 148:12, 167:17
**head-on** [1] - 88:12
**heading** [4] - 76:7, 77:4, 78:13, 94:19
**healthcare** [1] - 120:19
**hear** [8] - 8:18, 9:13, 16:10, 126:1, 141:14, 157:3, 158:24, 165:7
**heard** [5] - 56:18, 61:2, 125:10, 127:13, 159:2
**hearing** [11] - 2:17, 12:25, 69:2, 69:4, 71:22, 71:24, 71:25, 74:17, 111:3, 111:4, 111:18
**Hearing** [1] - 168:19
**HEARING** [1] - 1:11
**heart** [1] - 112:8
**heavy** [1] - 47:20
**Heedles** [2] - 78:19, 79:25
**heightened** [1] - 14:9
**held** [1] - 46:15
**help** [31] - 8:9, 26:7, 37:4, 39:11, 39:16, 42:16, 43:17, 46:17, 48:22, 49:1, 49:2, 51:6, 51:7, 52:18, 53:20, 56:15, 56:23, 58:1, 70:8, 73:22, 73:24, 78:9, 89:22, 91:6, 95:1, 130:6, 135:22, 142:14, 161:6, 163:16
**helped** [8] - 13:17, 26:7, 28:13, 43:23, 44:4, 44:5, 59:11, 162:6
**helpful** [2] - 42:2, 71:10
**helping** [1] - 102:18
**helps** [1] - 90:16
**heritage** [1] - 112:2
**herrings** [2] - 24:6, 105:4
**herself** [2] - 71:10, 143:1
**hickory** [2] - 48:23,

48:24

**high** [22] - 4:5, 5:17, 5:21, 7:4, 12:15, 13:18, 43:24, 44:7, 44:11, 45:9, 50:11, 126:3, 126:4, 126:18, 127:18, 127:21, 127:25, 128:19, 135:23, 136:13

**High** [1] - 45:10

**higher** [2] - 5:16, 59:18

**highest** [1] - 167:4

**himself** [3] - 8:8, 47:9, 166:2

**hindsight** [2] - 66:4, 122:16

**hired** [3] - 16:2, 16:18, 25:20

**historically** [1] - 5:15

**history** [5] - 13:1, 64:21, 112:1, 118:23

**hmmm** [1] - 159:4

**Hold** [2] - 25:9, 86:4

**holding** [2] - 130:23, 155:15

**home** [4] - 7:10, 39:25, 158:17, 160:17

**homework** [11] - 57:5, 156:20, 156:22, 156:24, 157:2, 160:1, 160:3, 160:8, 160:14, 160:17, 160:18

**honestly** [2] - 52:21, 54:8

**Honor** [25] - 2:10, 3:17, 12:6, 15:2, 24:13, 35:9, 35:12, 36:3, 56:4, 59:23, 60:3, 74:14, 87:8, 107:13, 125:3, 131:18, 131:23, 132:20, 133:5, 153:16, 153:24, 162:22, 166:9, 166:17, 168:2

**honor** [1] - 37:8

**HONORABLE** [1] - 1:12

**honors** [1] - 127:19

**Hooked** [1] - 43:13

**hope** [1] - 131:12

**hopeless** [1] - 88:20

**hopes** [2] - 102:3, 107:23

**hoping** [2] - 123:17, 123:18

**hospitalized** [1] - 118:18

**host** [1] - 6:22

**hour** [1] - 14:21

**hours** [24] - 7:5, 7:10, 8:10, 9:14, 10:16, 16:3, 16:4, 16:18, 16:21, 16:23, 17:9, 17:15, 18:2, 41:5, 45:1, 56:21, 57:8, 63:5, 102:15, 103:21, 114:8, 114:23, 165:17

**house** [4] - 42:25, 43:1, 43:4, 161:22

**housekeeping** [2] - 2:14, 3:2

**hum** [3] - 34:3, 128:15, 148:25

**Humanities** [1] - 53:24

**hummus** [1] - 162:1

**hundred** [6] - 8:20, 16:4, 55:8, 57:8, 60:2, 129:20

**hundreds** [7] - 8:10, 10:16, 16:7, 16:13, 40:4, 56:21, 63:5

**husband** [1] - 163:8

**I**

**ID** [1] - 83:19

**idea** [8] - 21:11, 45:20, 46:2, 50:16, 64:25, 65:22, 65:23, 142:1

**ideas** [2] - 36:25, 71:18

**identify** [2] - 126:16, 142:20

**idiosyncrasies** [3] - 46:20, 46:22, 46:24

**IEP** [1] - 126:8

**ill** [1] - 118:18

**illustrated** [1] - 67:5

**imagine** [1] - 81:11

**immediately** [1] - 72:2

**immersed** [1] - 8:8

**immigrants** [1] - 112:2

**impact** [5] - 5:23, 59:1, 60:9, 106:20, 110:16

**impacted** [1] - 58:20

**impacts** [1] - 110:18

**importance** [1] - 149:17

**important** [14] - 12:7, 12:8, 24:2, 24:7, 24:16, 52:20, 56:16, 61:6, 92:15, 105:2, 105:5, 105:12,

105:15, 157:8

**impressed** [1] - 61:12

**improper** [1] - 109:9

**improve** [2] - 18:4, 59:16

**improvement** [2] - 29:23, 31:22

**improving** [1] - 17:13

**in-person** [2] - 57:6, 63:10

**inability** [6] - 6:16, 7:23, 8:11

**inattention** [1] - 103:22

**inclined** [2] - 48:21, 49:10

**include** [1] - 92:19

**included** [5] - 89:14, 94:10, 98:7, 118:16

**including** [6] - 5:17, 9:7, 13:13, 20:12, 53:23, 102:23

**incorrectly** [1] - 19:24, 65:15

**increase** [2] - 58:2, 102:19

**independently** [5] - 6:14, 6:17, 160:14

**indicating** [1] - 101:6

**individual** [4] - 3:23, 5:1, 5:6, 5:22

**individual 's** [1] - 11:21

**individuals** [6] - 5:15, 12:15, 12:16, 13:25, 26:10, 130:2

**industry** [1] - 66:23

**inflexible** [1] - 41:23

**informal** [11] - 39:2, 42:11, 42:19, 42:21, 47:14, 47:17, 51:11, 51:12, 63:3, 66:6, 66:8

**information** [25] - 7:13, 9:17, 12:24, 13:4, 20:4, 23:5, 23:9, 23:25, 24:9, 25:18, 39:18, 55:21, 67:1, 76:4, 89:9, 89:11, 90:10, 90:11, 93:24, 94:9, 94:25, 104:22, 105:5, 105:25, 132:16

**informed** [2] - 120:19, 143:14, 144:12

**infrequently** [1] - 34:10

**injunction** [3] - 4:14, 4:16, 14:6

**Injunction** [1] - 3:4

**injunctive** [2] - 14:4, 14:23

**ink** [1] - 53:8

**inside** [1] - 155:14

**insisted** [1] - 102:16

**insofar** [1] - 114:15

**Instead** [1] - 11:10

**instead** [6] - 10:4, 21:23, 22:6, 22:12, 40:6, 49:17

**instruction** [1] - 57:8

**instructions** [2] - 6:15, 7:25

**instructor** [1] - 7:22

**instructors** [1] - 167:10

**instructs** [1] - 8:13

**instrument** [1] - 49:11

**insufficient** [1] - 92:13

**intake** [1] - 78:20

**intangible** [1] - 65:19

**integrate** [1] - 105:10

**integrity** [1] - 12:18

**intended** [1] - 141:23

**intensely** [1] - 8:6

**intention** [1] - 152:8

**interact** [1] - 65:2

**interacted** [1] - 8:22

**interaction** [1] - 71:5

**interactions** [1] - 71:6

**interconnecting** [1] - 18:18

**interesting** [1] - 46:20

**interests** [1] - 37:10

**internal** [2] - 72:15, 72:18

**internet** [1] - 55:9

**intervene** [1] - 142:3

**interventions** [1] - 6:4

**interview** [2] - 59:14, 70:2

**interviewed** [1] - 70:1

**intro** [1] - 105:18

**introduced** [2] - 64:12, 64:13

**intros** [1] - 105:18

**invited** [1] - 64:21

**involved** [4] - 30:21, 120:5, 134:24, 157:6

**involvement** [2] - 144:14, 144:20

**irreparable** [2] - 14:12, 14:17

**Irvine** [2] - 89:21, 90:3

**Islip** [1] - 1:5

**issues** [2] - 20:18, 46:10, 143:14

**item** [3] - 57:9

**injunctive** [2] - 14:4, 14:23

**ink** [1] - 53:8

**inside** [1] - 155:14

**J**

**J's** [1] - 139:6

**Jan** [8] - 89:13, 89:19, 89:20, 90:5, 90:9, 94:13, 94:20, 95:1

**Janet** [3] - 114:2, 114:11, 118:1

**January** [14] - 81:23, 96:16, 96:22, 101:2, 101:8, 101:17, 107:1, 107:4, 116:18, 118:16, 119:3, 119:5, 145:9, 147:25

**Jeanette** [1] - 9:13

**Jewish** [1] - 112:2

**Jewish -American** [1] - 112:2

**Jo** [6] - 98:25, 99:1, 99:24, 100:12, 100:18

**JOAN** [1] - 1:12

**job** [2] - 7:10, 160:5

**jobs** [1] - 123:1

**joint** [3] - 3:22, 36:20, 38:3, 115:21, 115:23, 115:25, 116:8

**journal** [1] - 120:21

**Journal** [1] - 120:21

**journey** [1] - 46:8

**Judge** [1] - 36:1

**JUDGE** [1] - 1:12

**judged** [2] - 6:8

**judgment** [1] - 109:8

**July** [8] - 115:24, 139:5, 140:21, 141:9, 146:15, 146:16, 146:17, 146:18

**June** [14] - 88:2, 89:2, 90:3, 99:14, 115:24, 119:17, 121:4, 121:8, 136:12, 139:5, 140:21, 141:8, 146:17, 146:18

**junior** [7] - 43:24, 126:3, 126:17, 128:19, 136:13, 136:16

**juniors** [1] - 135:15

**jury** [1] - 14:8

**Justice** [1] - 10:4

**K**

**keep** [6] - 47:7, 91:18, 103:3, 103:5, 159:4

LISA SCHMID, CCR, RMR
Official Court Reporter

12/29/2022 03:31:24 PM

**Keep** [1] - 33:12

**kept** [3] - 86:12, 91:5, 109:7

**kick** [1] - 111:15

**kicked** [1] - 109:25

**kids** [4] - 46:4, 160:24, 161:1

**kind** [19] - 6:24, 17:1, 21:6, 30:8, 39:14, 42:25, 46:22, 48:24, 53:4, 63:17, 77:25, 88:19, 102:15, 104:9, 112:1, 114:3, 120:16, 121:18, 151:17

**kinds** [2] - 8:15, 21:20

**kitchen** [2] - 161:18, 161:22

**knowledge** [16] - 4:15, 24:12, 50:8, 50:17, 54:15, 57:11, 59:19, 60:10, 70:22, 91:17, 97:6, 104:15, 104:18, 109:23, 121:25, 123:19

**knowledge-based** [1] - 104:15

**known** [3] - 55:10, 91:8, 122:16

**knows** [2] - 11:25, 12:2

**Kumon** [5] - 39:14, 40:8, 40:10, 40:22, 41:1

### L

**L-A-M** [1] - 15:10

**label** [3] - 8:5, 51:3, 58:12

**LAM** [2] - 15:13, 169:4

**Lam** [23] - 8:19, 10:15, 15:3, 15:10, 15:18, 25:1, 25:5, 26:3, 29:20, 31:20, 33:14, 34:14, 35:8, 56:18, 56:19, 56:21, 57:22, 60:24, 63:4, 80:9, 80:13, 105:4, 130:5

**landscape** [3] - 81:16, 83:17, 85:1

**landscape-printed** [1] - 83:17

**landscaped** [1] - 92:22

**language** [5] - 30:1, 47:10, 49:17, 49:20, 50:10

**Lantern** [1] - 1:17

**laptop** [1] - 66:19

**large** [1] - 110:24

**largely** [2] - 63:22, 103:19

**last** [25] - 4:12, 4:14, 17:3, 17:6, 23:8, 36:13, 40:19, 41:2, 41:12, 41:14, 51:19, 53:17, 54:3, 58:16, 67:13, 67:14, 67:17, 92:12, 117:2, 118:8, 118:9, 122:8, 141:6, 147:20

**lastly** [1] - 22:11

**law** [3] - 4:18, 9:16, 10:3

**lawsuit** [7] - 12:7, 122:6, 122:8, 122:17, 123:17, 152:1, 152:4

**lazy** [1] - 44:2

**lead** [1] - 150:8

**leaning** [1] - 37:13

**learn** [18] - 7:3, 7:9, 39:16, 39:17, 39:18, 40:21, 42:13, 42:17, 49:21, 52:16, 60:12, 61:7, 64:20, 102:18, 104:19, 120:24, 120:25, 156:19

**learned** [8] - 7:11, 49:13, 49:15, 104:19, 104:20, 145:17, 145:22, 159:1

**Learning** [2] - 71:4, 98:3

**learning** [53] - 3:25, 4:2, 5:9, 5:15, 5:20, 6:2, 6:3, 6:23, 7:15, 8:3, 8:24, 9:3, 9:6, 10:10, 11:3, 20:20, 21:9, 39:15, 39:22, 39:23, 39:24, 40:20, 42:22, 43:3, 44:24, 46:5, 46:7, 46:8, 46:10, 46:20, 50:25, 61:8, 61:9, 61:14, 61:22, 65:8, 65:20, 65:25, 66:13, 66:14, 71:12, 71:13, 77:22, 78:8, 79:8, 91:2, 95:18, 98:9, 125:17, 125:22, 158:14, 165:13, 166:2

**least** [5] - 48:16, 61:5, 106:24, 128:23, 165:21

**leave** [2] - 112:14, 144:17

**lecture** [8] - 52:13,

53:1, 53:11, 53:12, 61:2, 61:12, 63:22, 70:20

**lecture-based** [1] - 63:22

**lectures** [6] - 39:24, 52:16, 66:9, 66:11, 66:15, 102:14

**led** [1] - 110:19

**left** [6] - 37:23, 37:24, 38:7, 81:25, 94:3, 97:13

**legal** [1] - 151:17

**length** [2] - 40:25, 48:16

**lengthy** [1] - 104:3

**Lennon** [1] - 86:8

**less** [3] - 7:13, 34:10, 51:22

**lesson** [3] - 7:22, 156:9, 161:5

**lessons** [2] - 7:11, 50:22

**letter** [47] - 10:13, 10:15, 10:21, 25:15, 29:15, 29:16, 30:13, 52:14, 77:10, 78:3, 78:19, 78:23, 79:7, 79:9, 80:13, 81:5, 81:8, 81:15, 88:1, 89:13, 89:14, 90:9, 90:12, 90:24, 91:4, 91:20, 92:12, 94:2, 94:13, 94:14, 94:16, 94:19, 96:7, 96:8, 96:10, 97:11, 98:8, 98:17, 98:24, 99:19, 99:24, 100:9, 106:14, 128:5, 152:13, 163:8, 167:13

**letterhead** [15] - 80:7, 85:21, 88:2, 90:2, 95:7, 95:25, 96:15, 98:1, 98:18, 98:25, 100:4, 100:11, 101:1, 117:24, 119:16

**letters** [14] - 10:9, 10:10, 10:18, 10:19, 13:6, 19:22, 89:17, 91:23, 92:5, 149:24, 150:3, 151:14, 151:20, 167:14

**level** [2] - 11:21, 45:7

**libraries** [2] - 55:6, 55:7

**library** [3] - 43:17, 55:12, 63:11

**licensed** [2] - 76:17,

78:19

**Licensing** [3] - 4:10, 79:13, 116:20

**life** [19] - 5:24, 10:17, 13:8, 36:24, 37:1, 37:4, 39:2, 46:16, 56:1, 60:15, 91:9, 95:19, 107:22, 107:23, 107:25, 110:18, 112:4, 122:11, 122:21

**lifelong** [1] - 5:20

**lifetime** [1] - 8:5

**light** [1] - 91:7

**likelihood** [1] - 14:10

**likewise** [1] - 5:5

**limited** [2] - 5:24, 13:8

**Linda** [6] - 71:2, 71:3, 79:3, 79:7, 98:2, 98:14

**line** [6] - 23:8, 32:4, 33:17, 50:4, 95:14, 118:9

**lines** [7] - 48:13, 48:16, 48:20, 49:17, 49:18, 104:11, 111:21

**Lisa** [1] - 1:24

**list** [11] - 33:14, 89:15, 91:10, 91:16, 128:21, 128:22, 128:23, 128:24, 129:7, 163:11, 163:17

**listed** [4] - 129:7, 129:21, 133:18, 138:6

**listen** [6] - 44:4, 44:5, 49:22, 52:13, 66:16

**listened** [1] - 49:22

**listening** [1] - 66:11

**listing** [2] - 128:6, 137:15

**lists** [1] - 127:5

**literally** [1] - 44:23

**Littered** [1] - 6:15

**lived** [1] - 55:15

**lives** [1] - 141:25

**livescribe** [5] - 52:5, 52:7, 52:25, 54:9, 70:11

**LLP** [3] - 1:14, 1:19, 1:21

**load** [1] - 127:18

**lobotomized** [1] - 43:20

**location** [1] - 23:23

**longest** [4] - 16:22, 16:25, 17:8, 27:25

**look** [31] - 2:15, 23:11,

28:13, 29:15, 29:18, 32:4, 53:3, 53:6, 87:15, 118:9, 120:23, 120:25, 123:2, 126:20, 126:23, 128:3, 128:4, 129:14, 132:8, 132:16, 133:13, 133:18, 134:4, 135:4, 135:13, 136:7, 138:16, 147:11, 147:15, 147:17, 152:11

**looked** [4] - 32:7, 37:2, 142:22, 155:14

**looking** [11] - 11:11, 42:7, 50:3, 55:7, 74:10, 83:6, 83:25, 102:11, 132:10, 133:7, 163:2

**looks** [5] - 28:6, 95:17, 95:20, 128:7, 128:8

**loop** [2] - 42:25, 161:21

**lose** [1] - 14:2

**losing** [1] - 103:5

**lost** [3] - 7:23, 88:18, 132:12

**loudly** [1] - 17:7

**loved** [1] - 114:16

**lunch** [4] - 6:12, 41:25, 86:15, 87:11

**Lunch** [1] - 86:18

### M

**M.D** [2] - 77:17, 80:22

**ma'am** [1] - 3:15

**magic** [1] - 64:10

**mailed** [1] - 86:11

**maintain** [1] - 14:18

**major** [2] - 5:24, 13:8

**majority** [1] - 103:14

**man** [2] - 47:3, 55:10

**mandatory** [1] - 14:4

**Mandelesberg** [1] - 134:17

**MANDELSBERG** [1] - 1:23

**Mandelsberg** [4] - 2:7, 28:3, 131:15, 135:2

**Mandelsberg's** [1] - 131:20

**MANDLESBERG** [6] - 131:23, 132:1, 132:20, 132:23, 133:1, 133:3

**manner** [2] - 11:15, 120:4

**March** [4] - 77:4, 79:1, 80:8, 98:18

**marginality** [1] - 143:15

**marinating** [1] - 104:22

**mark** [1] - 103:1

**MARY** [1] - 1:16

**Mary** [2] - 2:4, 3:19

**match** [1] - 49:24

**material** [18] - 20:6, 20:7, 20:9, 24:18, 39:12, 40:21, 42:13, 42:16, 43:22, 44:24, 57:4, 59:20, 60:10, 60:12, 60:13, 63:8, 74:23

**materials** [4] - 55:23, 61:7, 87:24, 109:10

**math** [5] - 40:15, 136:20, 137:1, 137:8, 163:22

**Math** [1] - 41:15

**matter** [5] - 11:7, 69:7, 138:1, 138:2, 168:12

**matters** [2] - 2:14, 121:19

**maximum** [1] - 4:24

**MBA** [1] - 38:11

**MCAT** [88] - 8:6, 8:19, 9:1, 10:15, 15:25, 16:6, 16:12, 16:15, 16:17, 17:11, 17:17, 17:18, 17:22, 21:4, 22:18, 22:23, 23:15, 23:18, 24:18, 26:6, 26:7, 26:15, 26:24, 27:7, 27:20, 27:24, 28:7, 28:24, 29:7, 29:11, 30:14, 30:24, 31:1, 31:6, 32:10, 34:7, 35:1, 54:12, 54:13, 54:22, 55:1, 55:4, 55:5, 55:19, 55:23, 56:6, 56:8, 56:10, 56:20, 56:22, 57:2, 59:3, 62:5, 62:7, 62:15, 62:20, 62:22, 63:1, 63:3, 83:18, 83:19, 83:23, 83:24, 84:1, 103:17, 103:22, 104:7, 104:10, 104:16, 104:17, 104:19, 104:24, 105:16, 105:21, 106:9, 106:11, 106:24, 106:25, 129:13, 129:14, 130:2, 130:7, 130:15,

131:8, 134:3, 134:7, 134:14, 134:24

**MD** [2] - 95:8, 99:14

**mean** [30] - 17:25, 20:3, 27:5, 27:17, 41:10, 42:4, 50:1, 55:7, 56:10, 56:11, 57:22, 58:7, 58:23, 62:7, 65:13, 67:22, 74:12, 88:9, 104:13, 107:7, 121:18, 128:12, 130:20, 140:8, 140:11, 145:24, 146:10, 157:7, 158:17, 159:24

**meaning** [3] - 12:21, 57:17, 57:18

**means** [2] - 106:22, 106:23

**meant** [4] - 5:7, 31:11, 31:14, 165:15

**measure** [1] - 3:2

**measures** [2] - 5:12, 8:15

**mechanical** [1] - 47:4

**medical** [125] - 4:5, 4:12, 4:17, 5:8, 8:7, 9:5, 9:11, 10:11, 10:14, 10:19, 10:24, 12:15, 13:25, 14:18, 16:8, 16:14, 21:7, 26:14, 26:20, 27:1, 36:23, 37:10, 37:11, 37:20, 37:22, 37:23, 38:2, 38:5, 38:6, 38:8, 38:14, 38:17, 39:5, 39:6, 51:17, 54:16, 54:20, 54:21, 59:8, 59:12, 61:3, 63:13, 63:14, 63:16, 63:18, 63:19, 63:24, 63:25, 64:2, 64:5, 64:6, 64:21, 64:24, 65:4, 65:5, 66:6, 66:8, 66:24, 66:25, 67:17, 67:19, 68:13, 68:16, 68:20, 68:22, 68:24, 69:8, 70:10, 71:16, 71:18, 72:1, 72:13, 72:14, 73:5, 73:10, 73:17, 74:13, 74:15, 81:2, 89:25, 96:25, 98:10, 102:7, 102:16, 103:11, 107:20, 110:2, 110:5, 111:15, 112:11, 112:12, 114:14, 114:19, 115:20, 116:4,

118:19, 119:2, 120:18, 122:2, 123:14, 123:20, 137:17, 138:3, 138:7, 139:25, 140:9, 140:10, 140:20, 140:24, 141:3, 141:7, 141:10, 141:14, 142:14, 145:4, 145:10, 145:14, 145:18, 145:22, 146:2, 146:12, 146:14, 149:13, 151:23

**MEDICAL** [1] - 1:7

**Medical** [21] - 2:2, 4:7, 4:10, 26:4, 54:13, 68:4, 72:12, 78:15, 79:13, 89:4, 90:25, 94:4, 94:21, 96:3, 97:13, 99:15, 100:13, 116:20, 125:8, 144:2, 163:9

**medication** [2] - 77:24, 77:25

**Medicine** [12] - 61:3, 71:4, 79:21, 80:8, 80:21, 81:17, 83:5, 98:1, 98:3, 109:5, 120:21, 121:20

**medicine** [10] - 3:23, 36:22, 37:13, 65:1, 67:3, 72:16, 72:18, 110:13, 139:16

**meet** [9] - 14:9, 14:11, 55:24, 57:2, 71:9, 71:19, 119:7, 157:21

**meeting** [2] - 117:21, 119:9

**meetings** [2] - 110:20, 110:21

**megabyte** [1] - 93:4

**Mellville** [1] - 45:10

**membership** [1] - 43:15

**memorize** [1] - 48:15

**memorizing** [1] - 48:17

**memory** [7] - 42:6, 50:5, 67:9, 101:11, 144:22, 147:13, 161:7

**mentioned** [16] - 14:1, 27:10, 40:8, 44:7, 44:11, 46:19, 49:9, 51:13, 63:7, 71:22, 72:8, 72:9, 138:13, 140:18, 149:12, 157:5

**mentor** [1] - 71:17

**mentors** [1] - 71:16

**merits** [2] - 14:10, 59:1

**met** [5] - 9:21, 15:24, 34:2, 97:4, 125:6

**method** [2] - 39:14, 39:23

**methods** [1] - 66:14

**MEW** [35] - 1:20, 2:7, 2:13, 2:24, 3:1, 3:8, 3:10, 12:6, 24:13, 26:2, 28:16, 28:18, 31:17, 32:16, 34:14, 87:3, 125:3, 125:5, 131:17, 131:21, 132:4, 132:5, 132:13, 132:15, 133:5, 133:9, 134:11, 134:13, 142:19, 151:2, 153:13, 166:9, 168:9, 169:7, 169:11

**Mew** [8] - 2:7, 12:5, 26:3, 35:1, 86:13, 87:11, 125:7, 168:8

**Michaels** [1] - 76:17

**Michelle** [1] - 93:17

**Michels** [2] - 125:18, 149:22

**Micro** [2] - 67:4, 67:5

**micro** [1] - 53:7

**microorganisms** [2] - 67:6, 67:8

**microphone** [4] - 3:16, 36:10, 130:23, 154:15

**microscopic** [1] - 53:8

**Microsoft** [1] - 110:22

**middle** [1] - 33:13

**midnight** [1] - 14:22

**might** [16] - 2:18, 2:19, 21:23, 28:13, 28:21, 46:1, 62:8, 88:24, 91:17, 91:19, 104:3, 105:22, 135:22, 140:8, 142:6, 142:13

**mild** [1] - 20:18

**milestone** [1] - 114:13

**Miller** [7] - 142:24, 142:25, 143:2, 143:5, 147:9, 148:6, 149:16

**million** [1] - 13:23

**million-plus** [1] - 13:23

**mind** [5] - 16:11, 16:20, 17:6, 33:6, 44:15

**mindfulness** [1] -

115:2

**Minnesauke** [3] - 85:22, 85:23, 92:23

**minute** [3] - 18:19, 20:10, 123:25

**minutes** [3] - 35:14, 44:7, 153:17

**mischaracterizes** [1] - 31:7

**misinterpreted** [1] - 57:15

**misperceiving** [1] - 67:22

**missing** [1] - 88:24

**mistake** [1] - 84:9

**mistaken** [1] - 147:1

**mitigate** [2] - 5:23, 8:11

**mitigating** [3] - 5:12, 6:4, 8:15

**models** [2] - 36:25, 37:2

**Mom** [3] - 42:24, 43:1, 43:17

**mom** [1] - 86:12

**moment** [19] - 7:21, 25:1, 38:9, 49:9, 51:10, 52:11, 52:17, 53:10, 54:10, 78:4, 97:16, 101:12, 101:18, 102:8, 111:1, 119:23, 152:25, 153:8, 164:12

**moments** [1] - 160:4

**Monday** [1] - 45:1

**money** [3] - 42:15, 56:14, 122:13

**monitor** [1] - 66:20

**month** [1] - 71:9

**months** [5] - 8:8, 17:20, 17:21, 29:21, 55:6

**morning** [6] - 2:6, 8:18, 15:17, 26:3, 56:19, 166:14

**mortifying** [1] - 51:5

**Most** [3] - 16:18, 16:21, 17:19

**most** [16] - 13:9, 17:20, 18:10, 20:15, 37:7, 39:22, 41:16, 45:21, 48:11, 56:16, 61:6, 64:15, 103:11, 105:19, 123:2, 160:2

**mother** [4] - 7:10, 37:3, 43:10, 167:20

**Motion** [1] - 168:19

**motion** [2] - 14:3, 14:23

LISA SCHMID, CCR, RMR
Official Court Reporter

A1024

12/29/2022 03:31:24 PM

**MOTION** [1] - 1:11

**Mount** [4] - 143:2, 143:4, 143:7, 143:9

**mouth** [2] - 167:18, 167:19

**move** [1] - 18:21

**moved** [1] - 146:5

**moving** [2] - 19:9, 22:16

**MR** [8] - 25:4, 131:23, 132:1, 132:20, 132:23, 133:1, 133:3, 168:12

**MS** [87] - 2:4, 2:7, 2:10, 2:13, 2:24, 3:1, 3:8, 3:10, 3:13, 3:17, 3:19, 12:6, 15:2, 15:12, 15:16, 17:5, 24:13, 24:21, 25:13, 25:23, 26:2, 28:16, 28:18, 31:7, 31:17, 32:16, 34:14, 34:18, 34:21, 35:6, 35:11, 35:15, 36:3, 36:16, 45:14, 53:13, 56:5, 60:8, 74:16, 83:2, 86:13, 86:16, 87:3, 87:4, 87:8, 87:10, 109:2, 123:24, 125:3, 125:5, 131:17, 131:21, 132:4, 132:5, 132:13, 132:15, 133:5, 133:9, 134:11, 134:13, 142:19, 151:2, 153:13, 153:16, 153:20, 153:24, 154:1, 154:4, 154:9, 154:19, 162:22, 163:1, 166:7, 166:9, 166:13, 166:23, 166:24, 167:23, 168:2, 168:7, 168:9, 169:5, 169:7, 169:8, 169:10, 169:11, 169:13

**Mt** [1] - 117:24

**multiple** [31] - 8:10, 10:9, 18:12, 18:17, 19:19, 23:4, 23:11, 29:6, 46:24, 46:25, 47:2, 47:7, 50:24, 53:23, 55:23, 55:24, 57:2, 58:10, 60:14, 66:13, 66:17, 71:6, 72:19, 74:6, 95:18, 104:2, 106:7, 106:9, 106:10, 106:20, 151:9

**multiplication** [4] - 40:13, 42:23, 43:3, 160:24

**multitude** [3] - 62:16, 66:9, 76:4

**music** [15] - 7:20, 7:24, 49:16, 49:20, 50:1, 50:3, 50:4, 50:8, 50:9, 50:10, 50:13, 50:17, 50:18, 51:24

**musically** [2] - 48:21, 49:9

**must** [3] - 4:11, 14:12, 155:17

**N**

**name** [20] - 3:19, 9:3, 10:16, 15:9, 15:17, 36:11, 36:12, 36:13, 36:17, 47:4, 50:12, 59:2, 83:18, 85:2, 89:2, 131:14, 138:6, 154:15, 155:6, 156:12

**names** [1] - 91:11

**NATIONAL** [1] - 1:7

**National** [18] - 2:2, 4:7, 26:4, 68:3, 72:11, 75:2, 78:14, 89:3, 90:25, 94:3, 94:21, 96:3, 97:13, 99:15, 100:13, 125:8, 144:2, 163:8

**national** [1] - 136:19

**nature** [4] - 6:24, 54:14, 104:5, 149:11

**nauseam** [1] - 40:14

**NBME** [123] - 4:8, 9:8, 10:1, 10:2, 10:7, 11:1, 11:4, 11:7, 11:10, 12:9, 12:13, 12:16, 14:14, 24:22, 25:15, 25:18, 25:20, 29:17, 30:5, 33:8, 68:3, 68:6, 69:6, 72:11, 72:14, 72:21, 72:23, 73:3, 75:5, 76:25, 77:5, 77:10, 78:10, 78:24, 80:9, 80:14, 80:16, 81:6, 81:21, 81:24, 83:14, 84:11, 84:23, 85:9, 85:18, 86:10, 87:19, 87:24, 88:1, 88:6, 89:8, 90:19, 91:7, 91:20, 92:3, 92:7, 93:5, 93:7, 93:10, 93:13, 93:19, 94:9,

95:4, 95:22, 96:9, 96:10, 96:13, 96:15, 96:20, 97:23, 98:8, 98:12, 98:15, 98:17, 98:22, 99:8, 99:10, 99:11, 99:20, 99:24, 100:2, 100:3, 100:5, 100:9, 100:19, 100:21, 100:22, 100:24, 101:1, 101:6, 111:18, 111:21, 113:8, 113:15, 113:19, 116:15, 117:14, 117:20, 119:11, 119:14, 119:16, 121:3, 121:7, 121:9, 122:6, 126:15, 138:2, 144:14, 144:20, 147:1, 148:23, 149:18, 149:24, 150:3, 151:5, 151:9, 151:18, 151:20, 152:19, 152:24, 153:7, 163:4

**NBME's** [3] - 12:10, 145:6, 146:25

**NBME-created** [1] - 9:8

**NBME-hired** [1] - 25:20

**NBME/MBA** [1] - 38:3

**NE** [1] - 1:15

**near** [1] - 21:8

**necessarily** [1] - 32:2

**necessary** [3] - 9:12, 14:18, 93:23

**neck** [5] - 118:24, 149:11, 155:16, 155:23

**need** [32] - 2:23, 3:4, 4:3, 9:16, 10:12, 10:14, 37:5, 38:16, 38:18, 38:20, 38:21, 41:16, 54:19, 62:8, 65:11, 68:8, 69:10, 99:21, 101:10, 106:23, 112:19, 113:5, 121:24, 122:1, 123:3, 123:4, 123:9, 132:18, 139:19, 140:16, 153:19, 154:2

**needed** [31] - 7:13, 21:2, 39:2, 39:25, 40:21, 42:16, 45:17, 46:18, 47:2, 49:7, 55:11, 62:18, 62:19, 70:4, 70:25, 71:25,

75:3, 81:14, 88:24, 97:5, 97:7, 109:22, 109:24, 112:21, 114:24, 119:1, 120:14, 120:15, 120:24, 120:25, 156:18

**needing** [7] - 38:23, 39:1, 53:22, 54:9, 73:13, 74:23, 150:8

**needs** [6] - 4:1, 9:6, 9:15, 10:2, 12:2, 24:11

**negative** [1] - 5:23

**negatively** [1] - 148:12

**neighbor** [1] - 158:5

**nervous** [1] - 45:25

**neurologically** [1] - 5:20

**neurologically -
based** [1] - 5:20

**Neuropsychological** [1] - 117:25

**never** [10] - 9:21, 39:24, 106:17, 111:22, 123:13, 125:16, 126:5, 152:17, 164:19, 165:23

**NEW** [1] - 1:1

**new** [17] - 40:17, 89:9, 89:11, 90:10, 93:9, 93:10, 94:8, 94:10, 94:11, 94:25, 95:5, 95:22, 96:12, 113:20, 115:5, 116:25, 117:17

**New** [4] - 1:5, 1:22, 28:7

**next** [30] - 2:16, 18:21, 19:23, 28:15, 29:1, 35:10, 35:17, 43:7, 55:15, 59:14, 59:15, 64:17, 66:21, 82:3, 83:6, 86:19, 88:22, 90:1, 99:13, 101:11, 101:25, 106:4, 108:1, 116:13, 121:4, 124:3, 150:10, 153:25, 154:7, 166:12

**night** [2] - 45:2, 73:21

**nine** [2] - 33:10, 84:6

**NMSQT** [1] - 85:3

**non** [1] - 21:3, 118:24, 149:9

**non-substantive** [2] - 118:24, 149:9

**none** [7] - 42:8, 62:13, 64:1, 126:17, 127:6

**norm** [1] - 6:25

**normal** [3] - 42:7, 51:4, 57:18

**normally** [6] - 66:15, 104:3, 105:23, 106:2, 107:15, 167:14

**notable** [1] - 155:8

**notably** [1] - 11:5

**notations** [1] - 63:22

**note** [6] - 49:19, 52:10, 66:11, 70:8, 70:19, 115:14

**note-taking** [3] - 66:11, 70:19, 115:14

**notebook** [3] - 52:15, 53:6, 137:13

**notebooks** [2] - 126:20, 154:3

**noted** [1] - 4:3

**notes** [16] - 19:10, 22:8, 29:25, 30:18, 31:24, 32:3, 32:5, 49:15, 49:21, 52:3, 52:9, 52:16, 58:23, 66:16, 70:23, 120:11

**notetaking** [1] - 115:19

**nothing** [5] - 51:1, 57:24, 105:7, 111:8, 125:19

**noticed** [2] - 60:25, 118:25

**November** [5] - 80:21, 100:14, 137:6, 143:12, 144:15

**number** [8] - 29:5, 33:10, 43:14, 56:12, 83:19, 90:4, 131:19, 132:17

**Number** [1] - 126:23

**numbers** [3] - 19:22, 132:8, 132:9

**nurse** [1] - 155:13

**nutrition** [1] - 83:7

**NW** [1] - 1:19

**O**

**oath** [2] - 15:14, 87:6

**object** [1] - 5:2

**objected** [1] - 3:6

**Objection** [2] - 24:13, 31:7

**obligations** [1] - 5:4

**observations** [4] - 20:21, 24:10, 25:21, 80:14

**observe** [10] - 18:6, 18:8, 18:24, 19:6,

19:12, 19:17, 20:1, 64:23, 73:25, 159:6
**observed** [1] - 160:25
**obtain** [1] - 112:15
**obviously** [1] - 105:4
**occasionally** [1] - 106:3
**occasions** [3] - 41:2, 50:24, 165:25
**occupation** [1] - 36:19
**occupied** [1] - 47:8
**occupy** [1] - 47:2
**occurring** [1] - 120:20
**october** [1] - 1:7
**October** [3] - 81:22, 136:23, 168:20
**OF** [3] - 1:1, 1:7, 1:11
**office** [10] - 10:13, 13:12, 49:6, 119:6, 119:7, 143:5, 143:6, 143:10, 143:11
**Office** [2] - 70:14, 77:5
**officer** [1] - 115:9
**officially** [1] - 6:2
**often** [7] - 8:2, 19:8, 19:15, 19:21, 19:23, 57:19
**old** [2] - 6:5, 150:1
**older** [9] - 7:19, 113:16, 113:17, 155:2, 155:4, 157:11, 157:24, 165:19, 166:1
**Olga** [1] - 50:12
**once** [4] - 34:10, 43:5, 71:9, 167:13
**One** [2] - 23:22, 141:13
**one** [75] - 3:2, 5:24, 8:18, 15:25, 18:22, 19:23, 23:10, 23:23, 28:16, 29:22, 30:13, 33:1, 37:6, 40:6, 40:7, 42:25, 44:14, 45:23, 46:7, 48:20, 48:21, 55:13, 55:14, 57:6, 59:10, 64:3, 67:18, 74:3, 76:11, 78:22, 81:9, 91:23, 92:5, 92:11, 94:17, 104:2, 105:23, 106:2, 107:24, 111:11, 112:4, 119:22, 121:19, 122:3, 122:4, 122:12, 125:7, 127:9, 129:20, 130:9, 130:21, 133:16, 134:2, 137:5, 139:13,

140:8, 143:22, 147:5, 148:3, 152:21, 156:8, 157:11, 158:20, 159:1, 159:3, 162:10, 165:4, 166:19, 167:4, 167:9, 168:12
**one-on-one** [3] - 15:25, 40:6, 57:6
**ones** [2] - 42:9, 114:16
**ongoing** [1] - 141:17
**opened** [1] - 64:25
**opening** [4] - 2:11, 3:11, 3:13, 14:1
**opens** [1] - 122:25
**opinion** [4] - 24:11, 24:22, 64:9, 88:19
**opportunity** [5] - 11:25, 18:6, 18:24, 45:16, 46:17
**opt** [1] - 51:15
**optimum** [1] - 146:7
**option** [1] - 122:9
**options** [1] - 106:20
**order** [14] - 4:9, 4:11, 4:14, 12:1, 19:22, 44:20, 47:1, 52:18, 97:6, 113:18, 131:5, 131:9, 142:5, 145:3
**organized** [3] - 23:10, 156:11, 156:14
**originals** [1] - 92:2
**orthopedics** [1] - 37:13
**otherwise** [5] - 39:17, 68:11, 129:1, 140:10
**Otis** [1] - 86:8
**Otis-Lennon** [1] - 86:8
**outcome** [1] - 109:6
**outside** [6] - 6:25, 33:24, 34:7, 57:20, 58:25, 125:21
**overall** [2] - 19:1, 22:9
**overlap** [1] - 141:8
**Overruled** [2] - 24:14, 31:9
**overt** [1] - 65:14
**overwhelm** [1] - 62:16
**overwhelming** [1] - 13:9, 55:21
**owe** [1] - 61:10
**own** [5] - 11:2, 14:13, 62:15, 66:10, 104:14

## P

**PA** [1] - 1:18
**pace** [2] - 103:3, 103:5
**packet** [3] - 92:24,

93:7, 116:7
**PAGE** [1] - 169:2
**page** [49] - 28:10, 28:11, 28:15, 28:19, 29:1, 33:10, 35:17, 79:3, 82:3, 86:19, 87:12, 91:10, 92:21, 93:2, 93:12, 95:9, 95:10, 97:25, 108:1, 117:2, 118:8, 124:3, 127:2, 127:4, 128:7, 129:22, 132:8, 132:9, 132:10, 132:16, 133:7, 133:18, 134:4, 134:10, 134:19, 135:14, 136:12, 136:23, 137:6, 144:5, 147:15, 147:20, 150:10, 159:18, 163:10, 165:3
**Page** [1] - 33:11
**pages** [3] - 87:13, 90:4, 92:1
**paid** [1] - 70:20
**pain** [1] - 11:13
**painful** [12] - 7:13, 7:21, 40:19, 43:18, 43:19, 43:20, 47:18, 48:3, 88:11, 88:16, 89:23, 103:24
**painstakingly** [1] - 11:8
**painstakingly - gathered** [1] - 11:8
**paint** [1] - 67:7
**pair** [1] - 71:1
**palsy** [1] - 155:24
**pandemic** [1] - 113:24
**paper** [9] - 7:24, 27:12, 48:6, 48:7, 50:16, 50:18, 52:10, 53:6, 102:22
**papers** [5] - 12:12, 14:15, 19:21, 93:3, 141:13
**paragraph** [16] - 22:7, 23:10, 23:12, 23:24, 24:1, 27:18, 29:19, 29:20, 30:1, 31:25, 32:1, 32:3, 32:5, 32:6, 58:11, 58:15
**paragraphs** [4] - 18:12, 23:4, 23:11, 104:2
**parens** [1] - 33:18
**parent** [4] - 43:8, 89:17, 91:23, 92:5
**parents** [32] - 7:9, 9:2,

10:22, 37:1, 39:12, 40:1, 42:11, 42:13, 43:12, 43:17, 45:2, 46:11, 56:14, 56:15, 65:1, 86:1, 86:12, 89:14, 90:24, 91:4, 112:5, 125:16, 126:5, 128:5, 128:16, 128:21, 160:2, 160:23, 160:25, 161:2, 165:24, 166:5
**parents'** [1] - 129:7
**parse** [1] - 27:15
**parsing** [1] - 18:19
**part** [25] - 4:10, 12:9, 21:24, 31:4, 31:14, 33:8, 42:25, 44:17, 50:5, 58:17, 64:13, 64:24, 68:12, 73:18, 73:20, 104:12, 109:12, 110:24, 112:21, 114:18, 121:1, 126:15, 149:12, 168:13
**participate** [1] - 157:19
**participating** [1] - 15:3
**particular** [6] - 18:13, 21:24, 23:23, 37:15, 44:15, 99:11
**particularly** [3] - 88:16, 93:3, 164:20
**partly** [1] - 130:23
**partner** [1] - 142:25
**partners** [1] - 143:6
**parts** [3] - 17:2, 68:2, 104:25
**party** [1] - 70:21
**pass** [17] - 38:16, 59:14, 60:22, 68:13, 69:14, 103:11, 103:14, 107:12, 112:20, 112:21, 123:8, 123:9, 123:10, 123:12, 123:13, 138:11, 146:22
**passage** [33] - 18:11, 18:14, 19:15, 21:23, 21:24, 22:1, 22:6, 22:10, 28:20, 28:24, 29:2, 29:3, 29:21, 30:18, 31:14, 31:16, 32:10, 32:15, 34:23, 58:11, 58:12, 58:17, 105:22, 105:24, 105:25, 130:10, 131:1, 131:5, 131:9,

133:12, 133:24, 134:8
**passages** [5] - 18:16, 19:16, 27:14, 29:5, 130:10
**passed** [2] - 110:2, 110:5
**passing** [3] - 102:20, 139:1, 144:9
**past** [1] - 59:13
**patent** [1] - 141:19
**patented** [1] - 141:15
**patents** [2] - 47:3, 141:24
**pathologist** [2] - 156:23, 158:23
**patience** [2] - 7:23, 153:14
**patient** [11] - 64:17, 64:20, 110:4, 113:13, 120:7, 120:8, 120:9, 120:14, 159:2, 167:11, 167:15
**patients** [5] - 61:10, 64:13, 65:3, 114:15, 123:22
**pattern** [1] - 40:15
**Patti** [2] - 162:7, 162:9
**PATTI** [1] - 162:7
**pause** [8] - 78:6, 81:10, 153:3, 153:9, 153:22, 154:6, 164:13, 167:2
**paying** [2] - 45:24, 113:18
**peanut** [1] - 43:6
**pen** [13] - 52:5, 52:7, 52:25, 53:3, 53:5, 53:6, 53:7, 53:9, 53:10, 54:9, 70:11
**pending** [2] - 140:15, 152:1
**people** [26] - 13:9, 21:17, 21:22, 28:14, 37:4, 37:9, 45:21, 62:11, 65:13, 65:14, 65:15, 65:16, 65:20, 88:18, 91:11, 91:18, 92:16, 111:10, 121:25, 122:10, 122:23, 122:24, 122:3, 142:22, 168:10
**people's** [1] - 141:24
**peppers** [2] - 161:18, 161:19
**per** [1] - 106:2
**percent** [12] - 13:22, 13:24, 40:16, 40:18,

LISA SCHMID, CCR, RMR
Official Court Reporter

A1026

12/29/2022 03:31:24 PM

129:20, 130:1, 131:14, 136:20, 136:21, 137:21, 138:24

**percentage** [1] - 68:6

**percentile** [17] - 29:12, 32:17, 129:21, 129:23, 135:9, 135:14, 135:15, 136:3, 136:9, 137:1, 137:2, 137:3, 137:7, 137:8, 137:9, 138:20, 138:25

**percentile -ranked** [1] - 129:21

**perform** [3] - 7:18, 59:3, 121:22

**performance** [10] - 13:13, 71:23, 73:12, 81:3, 83:24, 135:14, 138:13, 138:15, 143:18, 145:21

**performed** [1] - 64:22

**perhaps** [6] - 22:25, 26:6, 120:24, 128:18, 130:10, 136:14

**perimeter** [2] - 142:7, 142:18

**perimeters** [1] - 142:9

**period** [6] - 44:6, 110:17, 140:18, 141:8, 143:17, 144:22

**periodical** [1] - 120:22

**periodontist** [1] - 167:13

**PERKINS** [2] - 1:19, 1:21

**permitted** [2] - 4:25, 97:9

**persecuted** [1] - 112:3

**persistence** [1] - 11:13

**person** [21] - 5:11, 19:5, 33:1, 34:22, 41:2, 41:12, 41:14, 51:4, 51:19, 53:17, 54:3, 57:6, 57:18, 60:23, 63:10, 67:13, 67:14, 78:20, 119:22, 142:9, 142:13

**person 's** [1] - 11:22

**Personal** [2] - 77:5, 117:9

**personal** [12] - 9:19, 11:2, 13:7, 24:10, 25:21, 74:2, 77:12, 77:13, 117:13,

117:17, 117:19, 117:20

**personally** [2] - 9:21, 56:9

**perspective** [5] - 91:1, 91:6, 92:15, 92:19, 98:10

**pertaining** [1] - 143:14

**Peruses** [7] - 86:4, 87:18, 90:17, 133:20, 134:18, 135:7, 137:14

**Perusing** [3] - 97:16, 101:12, 127:1

**Ph** [1] - 96:1

**Ph.D** [3] - 76:6, 76:17, 114:5

**phone** [3] - 63:9, 70:20, 71:11

**Phonics** [1] - 43:13

**Physical** [1] - 27:21

**physical** [2] - 54:19, 129:23

**physician** [1] - 15:20

**physics** [4] - 44:15, 44:18, 44:23, 54:18

**physiological** [1] - 142:8

**pick** [1] - 48:19

**picture** [1] - 155:13

**piece** [5] - 50:16, 52:9, 75:20, 98:7, 161:25

**pieces** [2] - 103:3, 161:20

**pile** [1] - 154:5

**piled** [1] - 102:3

**place** [6] - 39:23, 39:25, 74:22, 88:10, 97:7, 115:23

**plaintiff** [3] - 1:4, 2:5, 154:10

**Plaintiff** [3] - 1:14, 15:2, 35:11

**plaintiff's** [7] - 24:24, 126:21, 126:24, 126:25, 128:4, 135:4, 137:13

**Plaintiff's** [9] - 29:17, 31:18, 33:7, 75:17, 126:23, 129:14, 135:5, 152:12, 163:2

**plaintiffs** [1] - 2:17

**plan** [1] - 126:8

**planning** [2] - 26:13, 26:20

**plans** [1] - 161:5

**plastic** [1] - 37:14

**play** [11] - 2:20, 42:13, 43:12, 49:11, 49:13, 49:15, 49:19, 49:23,

159:19, 159:21, 159:22

**played** [2] - 49:12, 50:19

**player** [1] - 120:4

**plus** [1] - 13:23

**Plus** [1] - 84:15

**podium** [1] - 3:14

**poem** [9] - 48:13, 48:15, 48:20, 48:22, 48:23, 48:25, 49:1, 49:6, 49:8

**poems** [1] - 48:11

**poetry** [3] - 48:10, 48:11, 52:2

**point** [35] - 18:13, 23:23, 40:19, 41:12, 48:2, 48:19, 52:14, 59:10, 60:20, 69:1, 69:9, 69:17, 96:22, 97:3, 101:8, 101:14, 104:11, 109:17, 110:2, 110:22, 110:24, 112:11, 112:14, 113:6, 113:7, 113:17, 113:22, 114:10, 115:18, 115:21, 116:9, 145:17, 158:11, 167:4

**pointed** [4] - 12:12, 14:14, 87:12, 147:19

**points** [2] - 106:15, 149:8

**poor** [2] - 47:10, 81:2

**poorly** [2] - 50:10, 69:5

**population** [1] - 13:9

**portion** [2] - 22:4, 56:1

**position** [1] - 151:24

**positioning** [1] - 102:5

**positive** [1] - 68:11

**possible** [3] - 35:12, 58:3, 140:7

**possibly** [4] - 44:17, 55:20, 57:22, 59:17

**Powell** [1] - 12:9

**practice** [12] - 17:12, 24:20, 37:10, 37:16, 55:10, 57:4, 102:11, 102:24, 103:4, 120:5, 132:6, 167:12

**practitioner** [1] - 120:19

**precarious** [1] - 97:1

**precedence** [1] - 9:20

**preclinical** [1] - 64:8

**predictably** [1] - 109:23

**Preliminary** [1] - 3:4

**preliminary** [4] - 4:13, 14:4, 14:6, 14:23

**premedical** [1] - 63:20

**prep** [2] - 128:17, 129:10

**preparation** [2] - 8:16, 17:17

**preparations** [1] - 17:20

**prepare** [5] - 26:7, 28:14, 55:4, 74:20, 102:9

**prepared** [8] - 8:6, 8:7, 8:8, 55:5, 56:8, 102:10, 120:6, 152:5

**preparing** [10] - 17:18, 26:15, 26:24, 27:1, 27:7, 55:14, 56:10, 56:20, 75:1, 128:25

**prepping** [1] - 128:18

**prescient** [1] - 7:22

**prescribed** [1] - 78:9

**pressured** [2] - 74:5

**presumably** [1] - 30:25

**presume** [1] - 31:2

**pretty** [18] - 41:11, 41:14, 47:23, 48:12, 51:20, 54:15, 63:21, 67:24, 74:14, 88:12, 109:19, 120:2, 120:10, 122:22, 123:21, 157:12, 158:3, 161:7

**prevent** [1] - 4:20

**previous** [4] - 18:23, 89:10, 90:16, 113:8

**previously** [2] - 69:18, 72:13

**primarily** [2] - 19:16, 20:24

**primary** [3] - 5:2, 109:15, 127:5

**prime** [1] - 58:15

**Princeton** [1] - 55:10

**print** [2] - 165:2

**printed** [3] - 55:8, 81:16, 83:17

**prioritizing** [1] - 42:14

**priority** [1] - 2:25

**private** [3] - 143:9, 143:11, 167:12

**privately** [1] - 49:6

**privilege** [1] - 37:8

**problem** [5] - 27:14, 37:19, 74:7, 81:13, 165:13

**problems** [3] - 40:4, 40:11, 40:13

**proceed** [2] - 2:9,

15:11

**proceeding** [1] - 14:20

**Proceedings** [1] - 1:25

**process** [6] - 3:5, 12:19, 19:2, 27:15, 157:4, 158:24

**processing** [4] - 20:2, 20:3, 20:16, 24:8

**produced** [2] - 1:25, 167:11

**profession** [1] - 15:19

**professional** [2] - 8:25, 70:22

**professionally** [1] - 60:11

**professionals** [1] - 9:24

**professor** [4] - 49:2, 54:10, 72:24, 111:6

**professors** [1] - 53:18

**profound** [1] - 110:18

**program** [6] - 17:14, 54:21, 116:1, 116:12, 139:16, 139:18

**programs** [2] - 43:15, 43:16

**progress** [1] - 4:11

**project** [3] - 47:2, 48:14, 48:19

**projects** [4] - 46:25, 47:7, 51:16, 68:1

**promotions** [1] - 81:14

**pronounce** [1] - 85:23

**protect** [1] - 12:18

**prove** [1] - 65:10

**provide** [9] - 4:9, 9:25, 11:5, 14:6, 37:7, 70:15, 77:23, 80:16, 89:11

**provided** [14] - 4:6, 9:24, 10:24, 10:25, 13:4, 69:25, 70:16, 70:17, 91:13, 113:9, 114:1, 127:6, 128:22

**provides** [2] - 77:24, 96:8

**provision** [1] - 12:17

**PSAT** [4] - 85:3, 85:7, 85:8, 135:12

**psych** [1] - 76:11, 118:5, 122:22, 122:24

**psychiatric** [2] - 66:1, 69:24

**psychiatrist** [1] - 77:20, 94:15, 99:19

**Psychological** [2] -

76:19, 96:2
**psychological** [1] -
76:23
**psychologist** [9] -
61:22, 70:1, 70:6,
76:18, 76:24,
125:21, 125:24,
126:6, 143:1
**psychologist 's** [1] -
13:11
**psychologists** [2] -
94:17, 113:14
**psychology** [1] -
114:4
**public** [10] - 6:19,
27:3, 35:3, 45:12,
45:15, 122:21,
123:2, 162:20,
162:21
**pull** [2] - 28:3, 154:15
**purpose** [2] - 4:22,
157:2
**purposes** [1] - 121:15
**pursue** [6] - 13:17,
151:9, 151:10,
151:17, 152:19,
152:23
**pursued** [1] - 153:7
**pursuing** [1] - 14:13
**pushed** [1] - 102:6
**Put** [1] - 87:5
**put** [12] - 2:18, 2:21,
10:16, 13:15, 51:3,
61:1, 97:6, 109:16,
116:5, 123:15,
125:11, 162:24
**putting** [1] - 42:14

## Q

**qualified** [1] - 9:24
**quarter** [1] - 167:20
**questionnaire** [1] -
32:21
**questions** [58] - 8:12,
8:22, 12:3, 18:11,
19:13, 23:14, 23:22,
25:23, 29:2, 29:6,
30:22, 32:19, 33:2,
34:15, 35:6, 40:6,
40:11, 40:17, 41:6,
41:17, 63:21, 72:12,
72:19, 72:24, 72:25,
73:1, 73:2, 73:3,
102:11, 103:8,
105:1, 105:23,
106:1, 106:3, 120:6,
123:24, 130:7,
130:22, 131:2,
131:6, 131:10,

133:14, 133:24,
134:8, 134:21,
144:1, 144:4, 144:6,
144:7, 153:13,
159:10, 164:24,
166:7, 166:9, 166:22
**quick** [2] - 46:13,
152:25
**Quickly** [1] - 34:18
**quite** [1] - 167:9
**quizzes** [1] - 68:1
**quote** [2] - 5:15, 11:8
**quoted** [1] - 91:22

## R

**R-o-b-e-r-t** [1] - 36:13
**raise** [2] - 2:14, 15:5
**raised** [1] - 21:10
**raises** [1] - 11:10
**ran** [1] - 17:14
**range** [4] - 59:14,
82:1, 136:9, 136:19
**ranged** [1] - 73:13
**ranked** [1] - 129:21
**rare** [1] - 111:23
**rarely** [1] - 106:3
**rates** [1] - 136:3
**rather** [4] - 4:15,
11:22, 11:25, 23:10
**rating** [3] - 32:21,
33:3, 33:22
**raw** [2] - 129:19,
129:20
**reach** [3] - 110:23,
121:9, 149:19
**reaction** [1] - 20:21,
164:4
**read** [77] - 7:14, 7:20,
8:11, 9:18, 12:3,
13:20, 18:9, 18:25,
19:7, 19:8, 19:11,
19:14, 20:13, 21:22,
22:1, 22:3, 22:7,
25:7, 28:20, 29:1,
29:25, 31:15, 31:16,
31:20, 31:24, 32:1,
32:2, 40:5, 43:17,
43:19, 43:25, 44:1,
44:3, 45:16, 45:17,
45:20, 45:22, 45:23,
45:25, 46:2, 46:3,
48:5, 49:18, 50:13,
50:17, 57:16, 57:17,
58:16, 58:17, 70:1,
88:23, 92:3, 92:4,
103:8, 103:24,
104:5, 104:12,
105:9, 105:17,
105:18, 106:5,

106:23, 106:25,
120:7, 120:13,
120:15, 120:17,
120:23, 131:1,
131:5, 133:12,
133:13, 156:22
**reading** [94] - 6:20,
7:1, 7:4, 8:4, 8:22,
18:6, 18:10, 18:16,
19:2, 19:3, 19:13,
19:16, 20:17, 20:22,
21:23, 22:6, 23:2,
27:11, 27:14, 29:22,
29:24, 30:17, 30:21,
30:22, 31:3, 31:13,
31:23, 32:10, 32:15,
34:23, 35:2, 35:5,
39:11, 43:13, 43:16,
43:18, 43:22, 45:19,
45:21, 46:2, 47:22,
48:7, 48:12, 49:15,
49:21, 50:1, 50:3,
50:7, 55:12, 57:5,
58:2, 58:7, 58:8,
58:11, 58:12, 58:13,
91:12, 95:14,
103:23, 104:23,
104:25, 105:8,
105:15, 106:5,
106:22, 106:23,
119:25, 120:2,
120:5, 120:16,
120:20, 125:19,
130:10, 130:11,
130:24, 131:9,
133:22, 133:25,
134:8, 134:24,
136:20, 137:1,
137:8, 146:24,
159:6, 159:7, 159:9,
159:18, 162:8,
162:11, 164:16
**reads** [1] - 5:14
**Ready** [1] - 2:9
**ready** [3] - 17:21, 36:2,
168:8
**real** [1] - 13:12
**realize** [1] - 74:10
**really** [26] - 19:3, 24:2,
24:6, 39:9, 42:14,
44:16, 44:18, 45:21,
46:14, 48:2, 52:15,
52:19, 57:1, 64:12,
64:25, 88:10, 92:17,
101:19, 105:14,
107:24, 118:19,
120:4, 123:3,
145:17, 145:21,
165:15
**reams** [1] - 4:7

**reason** [12] - 17:10,
17:12, 38:12, 38:13,
38:14, 48:11, 54:11,
59:13, 60:24, 96:8,
139:14, 145:24
**reasoning** [12] -
27:21, 27:24, 28:12,
28:24, 29:7, 29:12,
30:14, 31:6, 32:7,
32:9, 134:6, 134:25
**reasons** [1] - 23:17
**rebutting** [1] - 99:20
**recalled** [1] - 19:7
**recalling** [1] - 54:11
**receive** [18] - 14:19,
37:25, 42:19, 61:25,
62:1, 63:1, 72:16,
73:4, 73:8, 107:17,
116:17, 118:11,
118:13, 119:5,
147:24, 156:5,
156:7, 164:1
**received** [19] - 6:25,
8:5, 9:9, 59:4, 73:10,
79:20, 81:24, 81:25,
83:8, 83:9, 83:12,
115:17, 115:18,
116:8, 116:18,
119:3, 126:16,
137:21, 164:5
**receiving** [6] - 6:3,
83:4, 137:24
**Recess** [1] - 35:16
**recess** [2] - 86:18,
124:2
**recite** [1] - 48:14
**recited** [1] - 49:6
**recognition** [2] -
40:16, 43:8
**recognize** [45] - 12:7,
25:14, 28:23, 75:22,
76:8, 76:20, 77:7,
77:19, 78:16, 79:4,
79:16, 80:10, 80:23,
81:18, 83:20, 84:16,
85:3, 85:14, 86:1,
87:16, 88:3, 89:4,
90:5, 90:21, 91:24,
92:24, 93:12, 94:5,
94:22, 95:11, 96:4,
96:17, 97:14, 98:4,
98:18, 99:4, 99:15,
100:6, 100:14,
101:3, 116:22,
117:10, 118:2,
119:18, 163:5
**recognized** [1] - 12:9
**recommend** [1] -
61:25
**recommendations** [2]

- 61:23, 115:14
**recommended** [1] -
62:1
**reconsidering** [1] -
109:7
**record** [15] - 2:3, 3:3,
12:24, 15:9, 29:25,
31:24, 36:11, 53:1,
53:9, 70:20, 122:21,
123:2, 141:1,
154:16, 168:13
**Record** [1] - 5:14
**recorded** [2] - 1:25,
66:9
**recording** [3] - 49:23,
52:9, 70:24
**records** [4] - 6:15,
13:5, 52:8, 114:17
**recreate** [1] - 58:9
**red** [3] - 24:6, 105:4,
161:18
**REDIRECT** [2] - 34:20,
169:8
**redirect** [1] - 153:23
**reduce** [1] - 93:6
**refer** [1] - 52:17
**reference** [1] - 134:16,
143:16
**referenced** [1] - 12:23
**references** [1] - 6:16
**referred** [1] - 6:20
**referring** [3] - 72:21,
137:16, 138:4
**reflect** [1] - 11:21
**reflecting** [1] - 11:22
**Refresh** [1] - 144:22
**refresh** [1] - 101:11
**refused** [1] - 11:4
**refuses** [1] - 4:8
**regard** [2] - 5:11,
107:5
**regarded** [1] - 63:20,
66:24
**Regardless** [1] - 92:14
**Regards** [1] - 94:4
**regret** [1] - 66:3
**regulations** [3] - 5:5,
10:3, 11:18
**rehearsing** [1] - 49:8
**reinforces** [1] - 95:16
**reinstated** [1] - 110:11
**rejected** [2] - 10:4,
93:11
**rejection** [1] - 93:16
**relate** [2] - 65:23,
165:25
**related** [2] - 121:16,
146:5
**relating** [1] - 29:2
**relation** [1] - 121:12

**release** [1] - 28:7

**relevance** [1] - 5:13

**relevant** [1] - 13:12

**relied** [1] - 149:21

**relief** [6] - 14:4, 14:7, 14:13, 14:19, 14:23, 122:17

**religion** [2] - 53:24, 54:5

**remain** [3] - 152:18, 152:23, 153:6

**remained** [1] - 34:9

**remaining** [1] - 139:13

**remediation** [1] - 97:3

**remember** [48] - 19:8, 30:11, 33:5, 33:23, 39:10, 40:12, 41:2, 41:5, 42:5, 42:22, 42:23, 44:12, 44:21, 47:10, 48:22, 50:11, 50:23, 53:18, 54:8, 55:13, 55:16, 56:24, 93:3, 106:11, 106:13, 106:14, 111:4, 111:5, 118:17, 118:22, 120:10, 128:12, 128:16, 145:23, 146:16, 148:20, 150:6, 151:21, 155:20, 158:25, 159:13, 160:16, 161:16, 162:13, 165:6

**remembered** [1] - 50:6

**remind** [2] - 33:20, 139:3

**repeat** [21] - 23:8, 32:23, 38:4, 38:25, 39:25, 44:10, 52:18, 60:7, 66:17, 68:19, 72:1, 73:14, 74:18, 121:5, 123:11, 127:24, 130:14, 130:20, 150:2, 153:4, 157:17

**repeated** [1] - 49:22

**repeatedly** [1] - 7:1

**repeating** [4] - 16:11, 16:20, 17:6, 40:21

**repetition** [1] - 7:12

**repetitious** [1] - 39:14

**replay** [1] - 52:12

**Report** [5] - 33:18, 76:7, 76:18, 84:16, 85:13

**report** [42] - 6:12, 10:18, 33:8, 66:1, 69:11, 70:7, 83:18, 83:23, 84:21, 85:7, 85:17, 89:17, 93:2, 116:15, 116:17, 116:18, 118:11, 118:13, 118:20, 118:25, 119:9, 119:11, 129:15, 135:6, 135:13, 135:19, 137:5, 147:11, 147:20, 147:24, 148:3, 148:8, 148:13, 148:17, 148:22, 149:4, 149:7, 149:17, 150:1, 150:5, 150:7

**reported** [1] - 149:10

**Reporter** [1] - 1:24

**reporter** [9] - 16:9, 16:10, 16:19, 23:7, 24:4, 26:22, 32:12, 84:20, 142:12

**Reports** [1] - 9:18

**reports** [8] - 10:9, 13:5, 87:13, 87:16, 113:13, 135:19, 150:4

**represent** [3] - 3:20, 60:18, 99:2

**representation** [1] - 163:20

**represented** [3] - 99:3, 151:4, 151:13

**representing** [1] - 151:8

**request** [64] - 4:19, 12:17, 25:16, 33:9, 62:21, 62:22, 62:24, 62:25, 65:4, 70:5, 75:4, 75:25, 76:13, 77:1, 77:14, 78:11, 78:23, 79:9, 80:4, 80:17, 81:5, 83:15, 84:12, 84:24, 85:10, 85:19, 87:21, 87:25, 89:8, 93:11, 93:16, 93:21, 94:9, 96:14, 96:20, 97:20, 98:16, 98:23, 100:10, 100:19, 100:25, 101:7, 113:18, 116:21, 116:25, 117:3, 117:14, 117:21, 119:12, 119:15, 119:21, 121:3, 121:7, 126:14, 149:18, 149:20, 149:25, 151:5, 151:9, 152:22, 152:24, 153:5, 153:7, 153:11

**requested** [7] - 17:24, 70:6, 70:13, 75:5, 75:6, 97:21, 152:17

**requesting** [1] - 11:1, 152:19

**requests** [5] - 70:25, 93:22, 122:12, 127:9, 127:11

**require** [3] - 5:8, 11:18, 48:12

**required** [8] - 7:5, 16:21, 77:11, 143:23, 144:17, 145:1, 151:22, 163:16

**requirement** [6] - 53:24, 54:15, 68:7, 113:15, 117:14, 120:2

**requirements** [6] - 47:20, 47:21, 47:22, 47:23, 48:16, 119:25

**requisite** [1] - 9:22

**rescue** [1] - 142:1

**research** [5] - 51:16, 51:17, 51:24, 120:17, 120:20

**resort** [1] - 4:14

**resource** [1] - 67:4

**resources** [6] - 42:15, 56:16, 59:17, 61:1, 62:17, 123:15

**respect** [2] - 151:4, 151:15

**respond** [6] - 19:3, 20:4, 20:9, 119:14, 130:6, 159:16

**response** [7] - 11:4, 14:15, 53:21, 95:15, 96:24, 98:22, 101:6

**response )** [3] - 34:3, 128:15, 148:25

**responsible** [1] - 114:15

**rest** [2] - 58:14, 67:25

**restrain** [1] - 159:1

**restroom** [1] - 154:1

**result** [5] - 62:24, 71:24, 101:22, 115:11, 167:19

**results** [15] - 11:20, 21:1, 37:18, 61:20, 61:21, 86:7, 86:8, 86:9, 86:12, 115:5, 115:10, 115:13, 164:1, 164:4, 167:7

**retain** [1] - 7:13

**retained** [4] - 109:13, 121:9, 121:11, 121:13

**retake** [1] - 145:1

**retaught** [2] - 40:2, 40:3

**reteaching** [1] - 7:11

**retired** [6] - 72:12, 73:1, 73:2, 73:3, 154:21, 154:22

**return** [1] - 112:11

**returned** [1] - 112:12

**revealing** [1] - 18:11

**reversal** [2] - 110:13, 112:22

**reversed** [3] - 109:8, 110:9, 111:2

**Review** [1] - 55:11

**review** [5] - 148:8, 148:10, 148:18, 152:25, 159:10

**reviewed** [2] - 69:24, 149:24

**reviewers** [1] - 9:20

**reviewing** [1] - 149:25

**revised** [1] - 147:1

**rewind** [2] - 52:18, 66:16

**rhyme** [2] - 48:23, 48:24

**rhymes** [1] - 48:21

**rhyming** [1] - 48:22

**rich** [1] - 67:8

**Richmond** [2] - 55:15, 55:16

**ridiculed** [1] - 65:12

**ridiculous** [2] - 42:12, 48:23

**rising** [1] - 57:8

**risks** [1] - 122:19

**RMR** [1] - 1:24

**ROBERT** [1] - 1:3

**Robert** [81] - 3:20, 6:1, 6:6, 6:25, 7:1, 7:8, 7:13, 7:17, 8:6, 8:8, 8:21, 8:23, 8:24, 9:1, 9:3, 9:15, 10:1, 10:17, 11:24, 15:21, 15:23, 16:1, 16:3, 16:5, 16:17, 16:22, 16:25, 17:8, 17:11, 17:17, 18:6, 18:9, 18:15, 18:24, 19:6, 19:12, 20:14, 20:15, 21:9, 21:11, 21:13, 21:25, 22:23, 23:18, 24:10, 24:11, 25:21, 29:23, 35:5, 35:11, 36:12, 36:18, 53:19, 83:18, 84:14, 85:2, 85:13, 94:2, 94:4, 96:16, 97:12, 100:5, 101:2, 119:17,

**Robert's** [20] - 6:12, 8:4, 8:19, 9:5, 10:5, 19:17, 20:1, 20:22, 25:16, 35:2, 155:8, 155:9, 156:1, 156:17, 157:24, 158:14, 159:19, 159:22, 160:7, 162:18

**rock** [2] - 74:22, 97:7

**role** [12] - 36:25, 37:2, 156:16, 156:18, 156:19, 157:24, 159:19, 159:21, 159:22, 159:24, 159:25

**roll** [1] - 105:11

**room** [9] - 51:20, 64:18, 64:19, 67:14, 70:9, 75:7, 142:15, 161:23

**rooms** [1] - 64:22

**root** [1] - 61:15

**rotation** [2] - 64:11, 141:3

**rotations** [8] - 37:12, 64:11, 112:13, 112:18, 112:24, 114:12, 138:3, 140:23

**round** [1] - 59:15

**routine** [1] - 114:16

**routinely** [1] - 6:11

**royal** [2] - 42:5

**rule** [2] - 50:9, 50:18

**run** [1] - 68:9

**running** [2] - 19:15, 57:14

155:2, 156:3, 156:5, 156:20, 157:10, 157:16, 157:25, 158:2, 158:9, 160:14, 161:24, 163:12, 163:23, 165:2, 165:19, 167:6

**S**

**S-a-m-p-s-o-n** [2] - 36:13, 154:17

**salient** [1] - 67:7

**sample** [7] - 32:7, 133:10, 133:17, 133:22, 134:3, 134:6

**Sampson** [58] - 2:2, 3:20, 3:21, 3:24, 4:6, 4:18, 4:21, 6:1, 10:1, 11:24, 12:8, 12:12, 12:20, 13:4, 13:15, 14:5, 14:8, 14:12,

14:15, 14:16, 15:21,
16:17, 26:18, 27:14,
29:11, 31:5, 32:20,
32:25, 33:2, 33:8,
33:24, 35:11, 36:5,
36:12, 36:18, 80:22,
83:19, 84:14, 85:2,
85:13, 87:6, 90:20,
94:3, 94:5, 96:16,
97:12, 100:5, 101:2,
119:17, 125:6,
154:10, 154:17,
154:20, 164:15,
166:11, 167:24

**SAMPSON** [1] - 1:3

**Sampson 's** [5] - 4:2,
4:16, 12:25, 14:23,
26:23

**sat** [1] - 7:18

**SAT** [24] - 13:23,
85:12, 85:17, 104:9,
105:16, 128:8,
128:11, 128:13,
128:16, 128:18,
128:22, 128:25,
129:5, 129:9, 130:7,
130:18, 131:4,
132:6, 133:11,
135:19, 135:20,
136:8, 164:21,
164:22

**satisfy** [2] - 47:22,
47:23

**sauce** [1] - 161:13

**saute** [1] - 161:12

**save** [2] - 30:4, 141:24

**saved** [1] - 122:13

**saw** [6] - 8:21, 10:12,
17:17, 26:18,
158:17, 165:19

**scale** [5] - 32:21, 33:3,
33:22, 60:2, 102:24

**Scale** [1] - 33:18

**Scales** [1] - 33:15

**scary** [1] - 97:1

**schedule** [3] - 51:22,
51:24, 62:14

**schedules** [1] - 71:15

**Schmid** [1] - 1:24

**school** [215] - 4:4, 4:5,
4:6, 4:12, 6:7, 6:12,
6:19, 6:20, 7:5, 7:11,
7:14, 8:7, 9:5, 9:11,
10:11, 10:14, 10:19,
10:24, 12:15, 13:5,
13:13, 13:18, 13:25,
14:18, 16:8, 16:13,
16:14, 20:12, 21:7,
26:21, 27:1, 27:3,
35:3, 36:23, 37:11,

37:20, 37:22, 37:23,
38:2, 38:5, 38:6,
38:17, 39:5, 39:6,
39:7, 39:8, 39:9,
39:17, 39:18, 41:25,
42:3, 42:17, 43:15,
43:24, 43:25, 44:7,
44:11, 44:22, 45:9,
45:12, 45:15, 50:12,
54:16, 54:21, 59:9,
61:3, 63:13, 63:14,
63:16, 63:18, 63:19,
64:5, 64:7, 64:24,
65:4, 65:5, 66:6, 66:7,
66:8, 66:24, 66:25,
67:10, 67:12, 67:17,
67:19, 68:7, 68:13,
68:17, 68:21, 68:23,
68:24, 69:1, 69:8,
69:11, 70:10, 70:20,
71:16, 71:18, 71:25,
72:1, 72:4, 72:14,
73:5, 73:10, 73:17,
74:15, 81:2, 81:13,
92:17, 92:18, 96:23,
96:25, 98:10, 102:7,
107:20, 109:5,
110:1, 110:3, 110:5,
110:11, 111:6,
111:15, 112:6,
112:11, 112:12,
114:10, 115:20,
115:22, 116:2,
116:4, 116:11,
119:2, 123:15,
123:20, 125:11,
125:12, 125:13,
125:14, 126:3,
126:4, 126:8,
126:12, 126:17,
126:18, 127:5,
127:19, 127:21,
127:25, 128:19,
135:23, 136:14,
137:17, 138:3,
138:7, 139:3, 139:7,
139:11, 139:16,
139:18, 139:22,
139:25, 140:1,
140:5, 140:9,
140:10, 140:12,
140:19, 140:20,
140:24, 140:25,
141:3, 141:4, 141:7,
141:10, 143:19,
143:22, 144:1,
144:3, 144:6, 144:9,
144:18, 145:1,
145:4, 145:10,
145:14, 145:18,
145:22, 145:25,

146:2, 146:5,
146:12, 146:14,
149:14, 151:23,
152:18, 152:22,
158:11, 158:15,
159:7, 159:20,
159:23, 160:15,
162:20, 162:21,
163:24, 164:21,
164:23, 165:6,
167:3, 167:5

**School** [10] - 45:10,
71:3, 79:21, 80:8,
80:20, 83:5, 85:22,
92:23, 98:3, 121:20

**school's** [6] - 66:10,
69:19, 80:2, 98:9,
102:5, 144:4

**school-designed** [2] -
143:19, 144:1

**schooling** [1] - 38:7

**schools** [8] - 54:20,
59:12, 63:24, 63:25,
64:2, 74:13, 116:10

**science** [4] - 51:17,
54:19, 63:8, 129:23

**Science** [2] - 54:2,
120:22

**science-based** [1] -
63:8

**sciences** [2] - 27:21,
27:22

**scientific** [1] - 5:8

**score** [41] - 13:22,
13:24, 29:14, 32:17,
58:19, 59:6, 59:7,
59:9, 59:16, 59:18,
59:19, 59:24, 60:14,
68:8, 83:18, 83:23,
84:1, 84:3, 84:5,
84:7, 84:19, 84:21,
85:7, 85:17, 87:13,
87:16, 129:14,
129:23, 135:6,
135:8, 135:12,
135:19, 136:3,
136:8, 137:1, 137:2,
139:1, 164:10

**Score** [1] - 85:13

**scored** [3] - 29:12,
32:18, 138:20

**scores** [27] - 11:12,
13:2, 13:6, 17:12,
33:14, 57:7, 59:13,
60:9, 60:11, 60:17,
81:23, 82:1, 83:20,
84:1, 84:10, 85:2,
129:13, 129:17,
129:19, 129:20,
129:21, 136:8,

136:13, 136:18,
136:24, 138:16,
167:3

**scratch** [1] - 102:22

**screen** [6] - 24:25,
25:4, 28:5, 28:17,
33:13, 66:20

**scroll** [3] - 28:17,
28:21, 33:10

**scrolling** [1] - 33:12

**search** [1] - 23:24

**seated** [3] - 36:9, 87:7,
154:14

**Second** [1] - 12:9

**second** [31] - 23:25,
55:2, 57:18, 57:19,
59:10, 62:20, 62:21,
62:22, 64:2, 64:6,
66:20, 68:16, 68:20,
68:22, 68:24, 69:15,
73:17, 79:3, 81:9,
86:3, 86:7, 90:19,
91:10, 95:9, 128:7,
135:21, 137:17,
145:3, 160:19,
161:17, 163:10

**secondary** [1] - 127:5

**seconds** [1] - 20:8

**section** [17] - 18:10,
27:24, 28:12, 29:7,
29:9, 29:13, 30:15,
31:6, 32:9, 58:18,
58:20, 102:25,
103:2, 134:25,
155:13, 155:21,
155:22

**Section** [1] - 126:8

**sections** [3] - 21:4,
27:20, 130:25

**see** [41] - 2:22, 7:24,
25:3, 25:5, 25:7,
25:8, 28:2, 28:6,
28:19, 28:20, 28:21,
30:1, 30:2, 30:7,
31:19, 33:13, 37:12,
37:19, 50:4, 61:14,
65:18, 72:25, 79:22,
83:6, 83:25, 88:25,
111:16, 121:10,
123:8, 125:21,
125:24, 129:18,
131:13, 138:23,
155:15, 156:10,
159:14, 160:2,
168:18

**seeing** [6] - 53:22,
74:2, 106:14, 120:2,
155:15, 165:18

**seek** [3] - 4:13, 62:17,
142:14

**seeking** [5] - 5:16,
9:10, 10:6, 10:13,
14:5

**seeks** [11] - 11:24,
14:7, 14:19, 16:9,
16:19, 23:7, 24:4,
26:22, 32:12, 84:20,
142:12

**seem** [5] - 13:2, 57:21,
88:20, 156:11

**sees** [1] - 155:17

**selected** [2] - 144:3,
144:7

**self** [1] - 41:13

**self-conscious** [1] -
41:13

**semester** [5] - 51:16,
69:15, 139:12,
140:16, 145:2

**semesters** [1] -
139:10

**send** [2] - 122:13,
167:14

**senior** [2] - 136:16,
136:24

**seniors** [5] - 136:4,
136:10, 136:19,
136:25, 137:7

**sense** [5] - 2:16, 58:8,
164:8, 164:10,
164:24

**sensitive** [1] - 122:25

**sent** [17] - 7:1, 64:18,
64:19, 80:13, 81:11,
91:20, 93:5, 93:7,
94:9, 98:12, 116:2,
116:6, 118:20,
126:14, 151:20,
160:17, 167:13

**sentence** [20] - 17:3,
17:6, 18:17, 18:20,
18:21, 18:23, 19:3,
19:9, 19:10, 20:10,
22:7, 23:12, 58:11,
58:13, 58:14, 58:16,
58:23, 130:11,
159:17

**sentences** [7] - 22:12,
27:15, 58:9, 104:2,
105:10, 105:17,
133:13

**separate** [11] - 38:22,
54:1, 54:5, 70:8,
70:9, 71:1, 75:7,
76:24, 114:25,
115:15, 121:19

**September** [3] - 95:8,
100:5, 129:24

**series** [3] - 29:2, 33:2,
55:5

LISA SCHMID, CCR, RMR
Official Court Reporter

A1030

19

**Serrantino** [8] - 89:13, 89:19, 89:20, 90:5, 90:10, 94:14, 94:20, 95:1

**service** [4] - 37:8, 70:8, 70:19, 70:21

**services** [1] - 115:19

**Services** [10] - 25:16, 69:21, 70:14, 77:6, 78:15, 80:9, 89:4, 89:21, 96:2, 100:13

**serving** [1] - 26:5

**session** [2] - 41:3, 103:4

**sessions** [5] - 18:5, 19:18, 20:2, 63:10, 63:11

**set** [2] - 123:22, 144:9

**setting** [1] - 73:1

**settling** [1] - 159:8

**setup** [1] - 66:18

**seven** [1] - 110:14

**several** [8] - 18:12, 47:14, 49:8, 50:22, 103:21, 105:22, 118:15, 165:25

**severe** [1] - 156:4

**severely** [1] - 5:18

**Shakes** [1] - 148:12

**shall** [1] - 9:23

**shared** [1] - 24:22

**sharp** [1] - 50:3

**shattering** [1] - 107:25

**shed** [1] - 91:7

**sheer** [2] - 47:8, 55:22

**Shelf** [4] - 137:16, 138:4, 138:14, 143:19

**shelf** [25] - 9:8, 55:18, 67:16, 68:3, 68:4, 68:5, 72:9, 72:11, 72:14, 72:15, 72:16, 72:20, 72:23, 73:4, 73:8, 73:12, 73:13, 73:16, 74:7, 74:12, 74:15, 81:4, 81:21, 81:24

**Shelley** [4] - 90:20, 154:10, 154:17, 158:6

**shelves** [1] - 55:17

**shocked** [1] - 51:7

**shopping** [1] - 161:12

**short** [2] - 48:1, 48:12

**shortcuts** [2] - 104:8, 105:24

**shot** [1] - 102:20

**show** [10] - 24:24, 33:6, 78:8, 81:25, 90:11, 92:16, 93:24,

**showcases** [1] - 81:11

**showed** [1] - 155:13

**showing** [6] - 14:9, 14:14, 21:11, 27:12, 136:3, 136:8

**shown** [1] - 37:4

**shows** [7] - 79:19, 81:21, 81:23, 82:1, 83:23, 134:20, 136:19

**sick** [3] - 37:6, 148:4, 148:6

**side** [1] - 135:13

**sides** [1] - 122:3

**signature** [2] - 79:22, 149:6

**signed** [13] - 79:3, 79:24, 80:9, 80:22, 90:5, 90:20, 93:17, 94:4, 95:10, 96:21, 98:2, 119:22, 149:5

**significant** [4] - 7:12, 18:15, 122:19, 142:8

**signs** [1] - 21:11

**similar** [6] - 20:18, 51:14, 104:9, 125:17, 130:17, 138:6

**Simon** [7] - 98:25, 99:1, 99:24, 100:12, 100:18, 151:8

**simple** [1] - 57:20, 57:21

**simply** [1] - 69:7

**simulated** [1] - 102:23

**simultaneously** [1] - 5:23

**Sinai** [5] - 117:24, 143:2, 143:4, 143:7, 143:9

**single** [7] - 7:6, 41:12, 55:10, 63:11, 102:25, 105:15, 117:18

**sinking** [1] - 165:8

**sits** [1] - 53:5

**situation** [3] - 58:3, 79:8, 142:11

**situations** [1] - 95:20

**six** [6] - 17:21, 91:24, 92:6, 92:11, 105:23, 106:1

**sixth** [1] - 89:16

**sizable** [1] - 106:2

**size** [1] - 93:6

**Sketchy** [2] - 67:4, 67:5

**skew** [1] - 51:22

**skip** [2] - 103:6, 104:25

**slew** [3] - 59:12, 63:23, 63:24

**slots** [1] - 62:13

**slow** [6] - 52:19, 66:15, 157:2, 157:12, 157:17, 159:8

**slower** [1] - 158:7

**slowest** [1] - 120:10

**slowly** [4] - 66:16, 157:9, 159:1, 161:25

**small** [3] - 48:7, 72:21, 149:8

**smart** [8] - 142:10, 142:16, 142:17, 142:18, 165:14, 165:15, 165:16

**snack** [1] - 43:9

**snacks** [1] - 161:14

**social** [1] - 78:20

**Social** [1] - 41:15

**socially** [1] - 34:6

**software** [1] - 66:10, 103:1

**someone** [14] - 4:25, 8:14, 11:17, 37:6, 37:19, 49:5, 51:2, 51:4, 57:21, 91:8, 111:25, 142:3, 142:6, 156:12

**sometimes** [10] - 41:6, 44:25, 45:17, 56:24, 57:16, 64:18, 65:16, 120:13, 129:9, 159:3

**Sometimes** [1] - 34:8

**somewhat** [2] - 20:24, 33:16

**somewhere** [1] - 154:5

**son** [1] - 165:19

**song** [2] - 49:23, 50:5

**soon** [1] - 140:7

**sooner** [1] - 122:7

**sorry** [35] - 2:13, 16:25, 23:8, 31:12, 31:19, 31:21, 32:23, 33:10, 33:11, 34:24, 38:3, 38:25, 60:7, 95:9, 97:25, 103:14, 107:7, 121:5, 123:11, 126:1, 127:3, 130:20, 131:17, 134:15, 135:24, 139:24, 140:11, 143:7, 145:19, 150:2, 152:11, 153:8, 159:21, 164:14

**Sorry** [9] - 16:10, 85:25, 127:24, 130:14, 133:5, 136:6, 140:1, 144:22, 148:15

**sort** [7] - 24:9, 28:23, 70:22, 92:22, 115:3, 132:9, 136:7

**sound** [2] - 27:5, 33:4, 49:24, 50:15, 162:2

**sounds** [1] - 50:5

**source** [1] - 67:2

**sources** [2] - 10:10, 66:23

**soy** [1] - 161:13

**Spanish** [1] - 43:3

**SparkNotes** [2] - 43:23, 44:1

**speaking** [6] - 31:13, 114:16, 115:12, 116:4, 157:3, 157:13

**special** [6] - 5:13, 6:3, 52:10, 64:14, 70:19, 71:13

**Specialist** [2] - 71:4, 98:3

**specialist** [7] - 6:20, 10:11, 98:9, 114:4, 125:19, 162:8, 162:11

**specialists** [5] - 4:2, 7:2, 39:11, 76:12, 91:12

**specialized** [1] - 52:7

**specific** [3] - 52:14, 148:15, 150:6

**specifically** [6] - 21:10, 57:2, 69:6, 72:14, 110:19, 129:4

**Specifically** [1] - 5:9

**specified** [1] - 4:21

**speech** [10] - 156:8, 156:9, 156:17, 156:20, 156:22, 157:20, 157:21, 157:25, 158:9, 158:23

**speed** [5] - 52:19, 58:2, 66:16, 102:19, 103:5

**spell** [4] - 15:8, 36:11, 154:15, 161:24

**spelling** [7] - 19:19, 19:25, 160:21, 160:23, 161:5, 161:16, 161:20

**spend** [10] - 7:10, 16:3, 16:16, 18:19, 40:16, 40:17, 41:1, 42:10, 102:15,

**spending** [2] - 41:5, 129:2

**spent** [18] - 8:10, 10:15, 16:7, 17:10, 17:14, 18:2, 19:13, 42:10, 56:10, 56:13, 56:14, 56:21, 59:17, 60:14, 63:4, 102:10, 160:3, 160:21

**spoken** [2] - 20:6, 46:11, 46:12, 54:10, 116:3, 134:14

**Spoken** [1] - 20:7

**spot** [1] - 52:14

**spring** [2] - 107:5, 121:11

**squad** [1] - 142:1

**squarely** [1] - 4:18

**stack** [4] - 88:12, 88:18, 92:21, 93:3

**staff** [1] - 49:18

**stakes** [1] - 5:17

**stand** [1] - 87:5

**standard** [4] - 5:7, 14:11, 138:17, 138:19

**standardized** [7] - 13:6, 13:13, 54:17, 163:23, 164:1, 164:20, 164:22

**Standardized** [1] - 10:21

**standing** [4] - 14:18, 140:10, 140:12, 141:11

**stands** [1] - 54:13

**start** [8] - 19:10, 35:13, 38:23, 39:1, 51:16, 128:11, 130:19, 134:19

**started** [13] - 22:2, 39:4, 42:21, 43:13, 44:22, 46:9, 65:4, 75:1, 128:8, 128:18, 161:16, 165:19

**starting** [3] - 128:22, 140:23, 141:4

**Starting** [1] - 140:25

**starts** [1] - 94:2

**State** [1] - 28:7

**state** [8] - 2:3, 15:8, 15:17, 36:11, 36:17, 147:3, 150:3

**state-by-state** [1] - 147:3

**Statement** [2] - 77:5, 117:9

**statement** [11] - 2:12, 3:12, 3:13, 14:2,

160:23

20

57:21, 77:12, 77:13, 117:13, 117:17, 117:19, 117:20
**statements** [2] - 11:2, 13:7
**STATES** [2] - 1:1, 1:12
**States** [7] - 1:5, 4:10, 54:16, 74:15, 79:13, 116:20, 135:9
**stating** [1] - 167:13
**statistical** [1] - 5:8
**status** [6] - 38:2, 38:5, 96:23, 114:9, 141:10, 151:15
**stay** [1] - 152:7
**STEIN** [1] - 1:14
**stem** [1] - 22:3
**stenography** [1] - 1:25
**step** [4] - 19:23, 22:16, 102:8, 167:24
**Step** [71] - 4:9, 4:15, 9:9, 11:25, 12:2, 12:22, 37:25, 38:16, 67:10, 72:2, 72:3, 72:5, 74:19, 74:20, 74:25, 75:1, 75:4, 76:1, 88:7, 97:4, 101:14, 101:16, 101:20, 101:22, 102:8, 102:10, 102:23, 103:9, 103:11, 103:14, 103:18, 103:21, 104:11, 104:15, 104:20, 104:23, 104:25, 105:3, 105:8, 105:20, 106:1, 106:10, 106:21, 107:1, 111:16, 112:19, 112:22, 113:1, 113:8, 116:13, 117:1, 123:6, 123:10, 123:12, 123:13, 123:18, 134:14, 134:15, 134:21, 139:19, 139:23, 140:6, 140:7, 145:3, 145:9, 145:16, 145:20, 146:8, 146:11, 146:19, 146:22
**steps** [1] - 14:17
**Steven** [1] - 90:20
**stick** [2] - 43:6, 162:1
**stiff** [1] - 48:15
**still** [17] - 17:21, 31:19, 42:1, 51:18, 51:19, 51:20, 51:25, 73:19, 75:12, 87:6,

110:13, 112:19, 112:21, 122:19, 122:20
**Stony** [26] - 69:19, 70:13, 71:3, 74:13, 78:14, 78:21, 79:20, 80:20, 81:16, 83:4, 83:8, 98:1, 98:3, 107:5, 115:5, 115:17, 116:2, 117:18, 144:12, 151:15, 151:22, 152:2, 152:4, 152:7, 153:6, 153:11
**stop** [2] - 68:18, 72:2
**store** [1] - 157:16
**stores** [1] - 10:21
**story** [3] - 67:7, 156:22, 159:17
**strategies** [8] - 8:17, 18:4, 21:17, 21:20, 22:23, 23:2, 23:18, 29:21, 58:1, 58:4, 58:21, 71:14, 103:17, 104:10, 130:6, 130:9
**strategy** [11] - 30:14, 30:17, 30:21, 30:25, 130:13, 130:17, 130:21, 130:25, 131:4, 131:8, 133:11
**Street** [2] - 1:15, 1:19
**street** [1] - 158:5
**stress** [1] - 123:1
**stressful** [1] - 56:1
**strives** [1] - 123:8
**strokes** [1] - 53:10
**struck** [2] - 14:22, 43:11
**struggle** [5] - 42:5, 65:22, 138:5, 165:19
**struggled** [4] - 6:7, 6:13, 6:14, 42:22
**struggles** [6] - 46:12, 61:8, 61:13, 68:24, 81:12, 125:10
**struggling** [5] - 18:22, 60:25, 69:6, 71:19, 161:4
**stuck** [1] - 74:21
**Student** [2] - 84:16, 85:13
**student** [24] - 3:22, 6:1, 16:5, 16:22, 17:1, 17:8, 21:24, 36:20, 38:3, 51:8, 56:9, 74:9, 89:25, 97:2, 114:19, 116:9, 118:19, 120:18, 122:2, 126:3, 126:4,

141:11
**student 's** [1] - 66:10
**students** [43] - 5:21, 8:20, 13:23, 16:6, 16:7, 16:12, 16:13, 16:15, 16:17, 16:21, 17:11, 17:15, 17:18, 17:19, 20:11, 20:16, 20:17, 26:6, 26:10, 26:11, 26:13, 26:20, 27:1, 27:3, 27:4, 27:7, 35:1, 35:3, 35:4, 39:22, 40:22, 40:25, 53:22, 56:6, 61:4, 66:24, 72:3, 72:5, 72:13, 73:25, 103:11, 103:14, 165:11
**studied** [1] - 165:16
**Studies** [1] - 41:15
**studies** [1] - 120:17
**study** [2] - 56:11, 71:15
**studying** [4] - 36:21, 60:14, 63:21, 66:18
**stuff** [2] - 93:5, 118:21
**stupid** [2] - 7:25, 50:24
**stutterer** [1] - 156:4
**stuttering** [1] - 156:5
**subject** [16] - 7:7, 40:12, 41:15, 53:23, 54:18, 55:24, 56:23, 57:9, 57:12, 58:6, 63:11, 69:6, 70:23, 91:13, 138:1, 138:2
**subjected** [1] - 123:4
**subjects** [2] - 16:14, 52:22
**submission** [1] - 93:5
**submit** [34] - 54:20, 65:25, 66:1, 69:10, 76:3, 76:13, 76:25, 77:13, 78:10, 78:23, 79:9, 80:4, 81:5, 81:8, 83:14, 84:11, 84:23, 85:9, 85:18, 86:9, 87:19, 88:17, 90:12, 92:7, 92:9, 94:12, 95:4, 95:22, 96:10, 97:22, 109:12, 117:20, 119:11
**submitted** [27] - 10:7, 10:8, 33:8, 66:3, 69:18, 69:19, 69:25, 87:23, 89:13, 89:17, 93:9, 96:12, 98:8, 98:13, 99:9, 99:11, 99:24, 100:1,

100:21, 100:22, 100:23, 109:10, 109:13, 117:4, 128:13, 148:23, 149:20
**substantially** [3] - 5:24, 13:8, 72:7
**substantive** [2] - 118:24, 149:9
**succeed** [2] - 13:21, 127:14
**success** [2] - 11:11, 14:10
**successful** [1] - 162:6
**successfully** [1] - 32:9
**suffer** [1] - 122:15
**suggested** [2] - 162:10, 162:17
**suit** [1] - 152:8
**Suite** [3] - 1:15, 1:17, 1:19
**summarize** [2] - 19:11, 111:12
**summary** [1] - 120:25
**summer** [4] - 6:21, 43:16, 121:13, 162:15
**superb** [1] - 167:16
**Supplemental** [1] - 76:7
**supplemented** [1] - 66:13
**supplied** [2] - 70:3, 89:9
**support** [6] - 5:19, 6:9, 10:15, 11:13, 25:16, 95:21
**supporting** [2] - 10:14, 93:23
**supportive** [1] - 42:18
**supports** [1] - 6:4
**supposed** [4] - 49:19, 50:6, 113:10, 159:9
**surface** [1] - 53:9
**surgeon** [3] - 8:9, 37:3, 64:23
**surgeries** [1] - 64:22
**surgery** [1] - 37:14
**surgical** [2] - 64:22, 72:15
**surprised** [1] - 164:6
**survived** [1] - 155:24
**suspected** [1] - 20:19
**Suzanne** [1] - 76:17
**sway** [1] - 111:14
**switching** [1] - 119:23
**sworn** [4] - 15:6, 15:13, 36:8, 154:13
**syllable** [1] - 157:18
**syllabus** [1] - 68:2,

68:7
**symbol** [1] - 49:19
**symbols** [2] - 49:18, 49:22
**Symptom** [2] - 33:15, 33:17
**symptoms** [1] - 32:22
**synced** [2] - 53:11, 53:12
**synonymous** [1] - 129:10
**system** [2] - 102:21, 142:5

**T**

**Tab** [52] - 24:24, 75:20, 76:5, 76:16, 77:3, 77:16, 78:13, 79:1, 79:12, 80:7, 80:19, 80:20, 81:15, 83:17, 84:14, 85:1, 85:12, 85:21, 87:12, 87:13, 88:1, 90:2, 90:18, 91:22, 93:25, 94:19, 95:7, 95:25, 96:15, 97:11, 97:25, 98:17, 98:24, 99:5, 100:4, 100:11, 101:1, 116:19, 117:7, 117:23, 119:16, 127:3, 127:4, 129:8, 133:16, 134:2, 134:16, 135:12, 135:18, 152:11, 163:3, 168:14
**tab** [8] - 75:16, 89:1, 90:16, 92:20, 99:13, 131:13, 133:16, 134:2
**tabbed** [1] - 132:19
**table** [5] - 136:8, 160:19, 161:4, 161:8, 162:24
**tables** [1] - 42:23
**tabs** [2] - 132:25, 133:1
**talented** [1] - 13:25
**tangible** [2] - 37:18, 65:17
**task** [1] - 89:22
**taught** [5] - 50:14, 51:8, 156:23, 158:20, 158:22
**taxing** [1] - 42:10
**teach** [5] - 42:16, 44:24, 55:9, 102:17
**teach-back** [1] - 102:17

**teacher** [16] - 6:20,
7:23, 39:20, 45:25,
46:1, 49:2, 49:25,
50:12, 50:13, 51:6,
68:1, 91:23, 92:23,
93:3, 162:17, 162:18
**teachers** [10] - 39:16,
41:23, 41:24, 41:25,
42:1, 67:14, 70:24,
92:4, 92:18, 162:10
**teachers'** [1] - 89:16
**teaching** [1] - 91:14
**team** [3] - 64:14,
114:18, 120:4
**teams** [1] - 110:22
**tech** [1] - 25:2
**technical** [3] - 10:3,
50:2, 72:21
**technically** [4] - 72:23,
97:2, 139:13, 139:14
**technique** [1] - 40:20
**ten** [7] - 16:6, 16:12,
26:6, 26:19, 26:25,
35:14, 123:25
**ten-minute** [1] -
123:25
**tenth** [4] - 128:8,
128:14, 128:17,
128:23
**termed** [1] - 11:7
**terms** [3] - 16:15,
116:13, 117:15
**terrible** [1] - 50:8
**test** [65] - 8:16, 8:22,
10:21, 12:19, 13:2,
13:5, 13:6, 17:12,
21:6, 24:20, 26:18,
28:13, 29:9, 29:13,
41:9, 41:10, 41:12,
41:21, 54:3, 54:5,
54:14, 54:15, 54:16,
54:17, 54:20, 55:2,
55:23, 57:4, 58:7,
58:8, 58:19, 61:14,
73:21, 73:23, 74:11,
86:9, 97:5, 102:19,
102:20, 102:24,
103:2, 103:4,
103:16, 104:18,
106:12, 106:16,
107:8, 107:9,
107:10, 114:9,
122:4, 123:8, 123:9,
132:7, 133:17,
133:22, 134:20,
136:7, 145:21,
145:25, 146:4,
164:22, 164:23,
167:3, 167:7
**Test** [3] - 54:14, 79:14,

86:8
**test-taking** [2] - 8:16,
103:16
**tested** [11] - 20:19,
46:7, 46:14, 60:10,
61:9, 62:6, 62:9,
66:5, 67:9, 150:8,
156:13
**testified** [19] - 10:25,
13:16, 15:13, 20:11,
38:18, 63:23, 64:4,
74:17, 84:7, 90:15,
103:16, 111:3,
112:17, 130:5,
130:15, 137:19,
145:20, 157:5, 160:4
**testifies** [2] - 36:8,
154:13
**testify** [1] - 23:18
**testimony** [12] - 31:3,
31:8, 32:8, 35:13,
106:6, 125:10,
127:14, 133:23,
134:7, 134:23,
151:10, 163:11
**Testing** [2] - 76:7,
96:2
**testing** [60] - 4:1, 5:18,
9:6, 9:14, 9:20, 9:23,
10:2, 11:18, 12:3,
12:13, 21:18, 24:12,
24:17, 33:8, 38:22,
46:8, 60:20, 60:24,
61:8, 61:16, 61:17,
61:20, 61:21, 62:12,
62:18, 69:11, 69:24,
70:1, 70:9, 76:12,
83:4, 83:12, 84:12,
86:7, 91:3, 94:18,
95:19, 104:7,
104:14, 113:16,
113:17, 113:20,
113:22, 113:23,
114:1, 114:6,
114:23, 114:25,
115:15, 116:21,
118:5, 121:23,
142:22, 143:4,
147:10, 147:16,
149:18, 165:15,
167:7
**testings** [1] - 102:12
**tests** [35] - 6:10, 6:11,
9:8, 9:10, 9:15,
11:19, 13:14, 19:16,
22:22, 41:8, 41:18,
51:15, 51:18, 68:25,
70:18, 94:18,
103:20, 104:13,
106:6, 125:20,

128:13, 137:20,
137:21, 143:23,
144:1, 144:7,
163:23, 164:2,
164:20, 164:21,
165:5
**text** [9] - 20:16, 22:4,
27:16, 27:18, 27:19,
27:25, 104:3, 106:2,
106:4
**textbooks** [2] - 63:21,
66:21
**THE** [109] - 1:12, 2:6,
2:9, 2:11, 2:22, 2:25,
3:6, 3:9, 3:11, 3:15,
3:18, 12:4, 14:24,
15:7, 15:10, 15:11,
16:25, 24:14, 25:7,
25:11, 25:24, 31:9,
32:13, 32:14, 34:16,
34:19, 35:7, 35:9,
35:10, 35:14, 36:2,
36:4, 36:9, 36:12,
36:14, 43:9, 43:10,
43:11, 45:9, 45:10,
45:12, 45:13, 52:25,
53:2, 53:3, 53:4,
53:11, 53:12, 56:3,
56:4, 59:21, 59:23,
59:25, 60:1, 60:2,
60:3, 60:5, 60:6,
74:12, 74:14, 86:14,
86:17, 87:2, 87:5,
107:11, 107:13,
107:16, 123:25,
125:2, 131:16,
131:19, 131:22,
131:25, 132:2,
132:12, 132:14,
132:18, 132:21,
132:25, 133:2,
133:4, 134:10,
134:12, 142:16,
142:17, 153:15,
153:18, 153:21,
153:23, 153:25,
154:2, 154:5, 154:7,
154:14, 154:17,
162:25, 166:8,
166:10, 166:16,
166:17, 166:18,
166:19, 166:20,
167:22, 167:24,
168:4, 168:8,
168:10, 168:15
**theory** [2] - 50:8, 50:9,
50:17
**therapist** [5] - 156:20,
156:23, 157:8,
157:22, 158:23

**therapists** [1] - 156:8
**therapy** [4] - 156:9,
156:17, 157:20,
157:25
**thereabouts** [1] -
156:3
**thick** [2] - 53:4, 92:21
**thinking** [9] - 20:8,
69:8, 159:14,
160:18, 160:20,
162:3, 164:11,
165:9, 165:14
**thinks** [2] - 32:5,
46:15
**third** [27] - 29:18,
29:20, 37:11, 64:9,
70:21, 72:6, 93:19,
95:10, 110:12,
112:12, 114:12,
116:14, 119:24,
120:1, 121:2, 138:2,
138:3, 138:7,
140:22, 141:2,
145:25, 146:3,
146:6, 146:7,
146:12, 146:14,
156:9
**third-party** [1] - 70:21
**Thomas** [4] - 77:17,
94:15, 95:8, 99:14
**thoughts** [1] - 95:20
**thousands** [2] - 53:7,
102:11
**three** [18] - 2:16, 7:5,
17:20, 27:20, 37:22,
43:2, 44:23, 112:16,
113:16, 113:17,
145:10, 147:2,
150:1, 156:3,
158:10, 158:21,
158:25
**Three** [1] - 145:12
**thrust** [1] - 109:15
**Thursday** [1] - 89:2
**tick** [2] - 103:1, 122:23
**time-based** [7] -
41:10, 41:11, 51:22,
54:17, 70:18, 74:11,
114:25
**time-pressured** [2] -
74:5
**timed** [2] - 51:15,
53:14
**timer** [1] - 102:25
**timers** [1] - 102:21
**timetable** [1] - 140:6
**tip** [1] - 53:6
**tired** [1] - 43:21
**today** [7] - 2:23, 11:24,
34:9, 125:6, 125:10,

141:14, 166:15
**together** [5] - 40:5,
56:21, 57:7, 63:8,
116:5
**tomorrow** [6] - 31:3,
166:14, 168:1,
168:6, 168:10,
168:18
**ton** [1] - 120:5
**took** [57] - 6:9, 11:13,
17:21, 19:1, 19:2,
19:3, 20:9, 29:11,
30:24, 31:1, 36:25,
39:25, 44:8, 44:11,
47:25, 48:8, 48:10,
48:11, 53:23, 55:2,
55:3, 56:6, 56:11,
59:22, 62:4, 62:20,
81:22, 87:11,
101:20, 102:8,
103:9, 107:7, 107:9,
107:10, 110:23,
110:24, 112:8,
114:7, 114:9,
114:11, 115:23,
120:11, 121:22,
126:5, 127:18,
128:25, 130:24,
131:4, 131:8,
135:20, 137:16,
138:19, 141:6,
145:9, 156:18
**tool** [1] - 52:21
**top** [25] - 13:22, 13:24,
62:15, 76:6, 76:17,
77:17, 78:13, 79:13,
80:20, 81:25, 85:13,
91:22, 93:13, 94:2,
94:20, 95:7, 95:25,
97:11, 116:20,
117:25, 132:8,
132:16, 133:19,
163:3, 167:20
**topic** [9] - 22:7, 58:9,
58:12, 71:12,
105:17, 122:25,
130:11, 133:13,
159:17
**topics** [4] - 58:10,
66:22, 102:16,
142:20
**total** [1] - 84:1
**touch** [1] - 34:9
**towards** [2] - 37:13,
51:22
**track** [5] - 14:2, 53:9,
91:18, 140:15, 159:4
**traditional** [2] - 17:14,
50:13
**train** [1] - 58:24

**training** [3] - 110:13,
119:24, 120:1
**transcribe** [1] - 70:23
**TRANSCRIPT** [1] -
1:11
**Transcript** [1] - 1:25
**Transcription** [1] -
1:25
**transform** [1] - 64:16
**transformative** [1] -
64:10
**transforms** [1] - 64:15
**treat** [3] - 77:21,
77:24, 123:22
**treating** [4] - 10:10,
77:20, 94:14, 99:19
**treatment** [5] - 9:22,
64:14, 77:23, 156:5,
156:7
**treats** [1] - 77:22
**trial** [1] - 14:8
**trials** [1] - 88:13
**tribulations** [1] -
88:13
**tricks** [1] - 104:8
**tried** [19] - 22:3, 48:19,
52:1, 56:23, 57:7,
57:10, 58:17, 59:15,
62:17, 74:20, 88:24,
93:21, 93:22,
102:19, 103:5,
103:6, 103:19,
157:12, 165:16
**trigger** [1] - 50:4
**tripping** [1] - 143:7
**trouble** [6] - 18:18,
39:15, 49:7, 54:10,
65:21, 158:19
**troubles** [1] - 10:17
**true** [1] - 8:4
**try** [29] - 19:20, 27:11,
29:18, 44:16, 44:19,
44:20, 44:23, 51:14,
51:17, 55:9, 58:2,
58:24, 58:25, 59:18,
65:10, 67:8, 71:14,
71:15, 71:17, 71:19,
75:2, 102:16,
102:19, 103:3,
112:4, 112:9, 121:9,
157:10, 162:2
**Try** [1] - 17:3
**trying** [18] - 8:11,
18:20, 18:23, 21:1,
29:21, 31:4, 33:21,
51:6, 54:7, 59:1,
69:9, 90:10, 90:11,
109:17, 112:14,
130:12, 162:13
**turn** [21] - 28:11,

28:15, 29:1, 31:18,
33:9, 75:16, 75:20,
117:2, 118:8,
129:13, 131:12,
132:8, 134:16,
135:12, 135:18,
136:12, 137:5,
137:12, 147:19,
152:11, 163:3
**turning** [32] - 76:5,
76:16, 77:3, 77:16,
78:13, 79:1, 79:12,
80:7, 80:19, 89:1,
90:2, 90:18, 91:10,
91:22, 92:20, 93:25,
94:11, 94:19, 95:7,
95:25, 96:15, 97:25,
98:17, 98:24, 99:13,
100:4, 116:19,
117:7, 117:23,
119:16, 136:23,
163:10
**Turning** [10] - 83:17,
84:14, 85:1, 85:12,
85:21, 88:1, 93:12,
97:11, 100:11, 101:1
**tutor** [6] - 9:1, 10:15,
26:6, 42:9, 63:10
**tutored** [17] - 8:19,
16:4, 16:5, 16:6,
16:12, 16:13, 16:22,
17:8, 20:11, 35:2,
35:3, 45:3, 56:25,
60:25, 129:4, 129:6
**tutoring** [23] - 6:25,
7:6, 8:16, 15:25,
16:1, 16:3, 16:7,
17:11, 18:5, 19:18,
20:2, 20:13, 32:25,
33:25, 34:7, 39:14,
42:12, 45:1, 80:15,
91:14, 128:8,
128:11, 128:22
**tutors** [32] - 6:22,
6:24, 7:2, 8:10, 8:19,
10:22, 10:23, 13:17,
39:16, 40:1, 40:5,
42:6, 42:8, 42:16,
43:15, 44:23, 52:23,
55:23, 56:12, 56:13,
56:15, 60:18, 63:6,
89:15, 91:12, 128:6,
163:11, 163:13,
163:14, 163:17
**Twenty** [2] - 84:4, 84:6
**Twenty-eight** [1] -
84:4
**Twenty-nine** [1] - 84:6
**twice** [2] - 54:25,
59:22

**two** [28] - 2:14, 8:9,
16:4, 41:5, 63:17,
63:19, 64:6, 64:8,
67:1, 67:24, 78:7,
92:1, 103:20,
104:21, 106:3,
121:19, 122:3,
126:20, 139:15,
145:18, 145:22,
146:2, 147:6, 155:1,
155:2, 158:10,
158:21, 158:25
**type** [4] - 32:21, 41:9,
53:22, 62:12
**typed** [1] - 92:2
**types** [3] - 79:19,
134:21
**typical** [2] - 28:23,
106:16
**typically** [5] - 63:15,
63:16, 63:20, 67:16,
72:3

## U

**Uh-hum** [3] - 34:3,
128:15, 148:25
**ultimately** [3] - 7:7,
144:17, 148:23
**umbilical** [3] - 118:23,
118:25, 149:10
**uncertain** [1] - 97:1
**uncomfortable** [3] -
48:3, 48:6, 51:5
**under** [5] - 5:3, 87:6,
136:7, 138:16,
138:19
**undercut** [1] - 5:18
**understood** [3] -
30:10, 165:11,
165:21
**unfair** [1] - 109:25
**unfortunately** [1] -
166:20
**unique** [1] - 113:15
**Unit** [1] - 138:18
**UNITED** [2] - 1:1, 1:12
**United** [7] - 1:5, 4:10,
54:16, 74:15, 79:13,
116:20, 135:9
**University** [14] -
15:24, 26:11, 26:19,
26:25, 47:19, 69:20,
71:3, 78:14, 78:21,
78:22, 79:20, 80:8,
89:21, 90:3
**university** [2] - 69:19,
80:2
**unless** [1] - 37:25
**unravel** [1] - 20:10

**unusual** [1] - 61:4
**up** [36] - 15:25, 24:25,
28:3, 28:4, 29:22,
31:19, 37:2, 45:4,
45:6, 46:10, 46:13,
50:4, 50:5, 52:19,
58:19, 65:22, 68:25,
71:15, 91:1, 103:5,
111:23, 111:24,
111:25, 112:3,
112:9, 120:20,
122:25, 123:2,
126:21, 142:22,
158:2, 158:5, 161:6,
161:13, 165:14,
166:4
**updated** [5] - 94:13,
94:14, 94:16, 96:8,
146:25
**uploaded** [1] - 70:21
**upper** [2] - 71:16, 89:3
**useful** [1] - 92:19
**uses** [1] - 11:10
**USMLE** [32] - 12:10,
22:20, 23:3, 23:10,
23:14, 23:19, 24:1,
25:17, 34:23, 34:24,
37:25, 38:16, 38:19,
67:10, 76:1, 79:14,
88:7, 102:23,
103:21, 103:25,
104:10, 104:15,
104:20, 104:23,
105:3, 105:20,
106:1, 106:14,
113:8, 116:21,
116:25, 139:19
**USMLEs** [3] - 22:24,
22:25, 23:22

## V

**vacation** [1] - 156:25
**vaginal** [1] - 155:25
**valid** [1] - 113:14
**validated** [1] - 167:17
**VARGAS** [55] - 1:14,
1:16, 2:4, 2:10, 3:13,
3:17, 3:19, 15:2,
15:12, 15:16, 17:5,
24:21, 25:13, 25:23,
31:7, 34:18, 34:21,
35:6, 35:11, 35:15,
36:3, 36:16, 45:14,
53:13, 56:5, 60:8,
74:16, 83:2, 86:13,
86:16, 87:4, 87:8,
87:10, 109:2,
123:24, 153:16,
153:20, 153:24,

154:1, 154:4, 154:9,
154:19, 162:22,
163:1, 166:7,
166:13, 166:23,
166:24, 167:23,
168:2, 168:7, 169:5,
169:8, 169:10,
169:23
**Vargas** [6] - 2:4, 3:19,
12:23, 29:16, 34:17,
154:8
**Vargas's** [1] - 14:1
**variety** [4] - 16:14,
102:14, 106:16,
122:10
**various** [4] - 29:21,
58:1, 62:15, 148:2
**vast** [2] - 103:13,
103:14
**vegetable** [5] - 43:6,
43:9, 161:9, 161:10,
162:1
**vegetables** [1] -
161:18
**verbal** [14] - 24:8,
27:16, 27:21, 27:24,
28:12, 28:24, 29:6,
29:12, 30:14, 31:5,
32:7, 32:9, 134:6,
134:24
**verified** [1] - 60:19
**versed** [1] - 71:12
**version** [1] - 148:22
**versus** [1] - 2:2
**video** [4] - 52:11,
63:10, 66:14, 102:14
**video-based** [1] -
66:14
**vignette** [2] - 104:1,
105:5
**vignettes** [3] - 103:25,
134:15, 134:21
**vigorously** [1] - 58:24
**Village** [1] - 45:11
**Virginia** [8] - 15:24,
26:11, 26:19, 26:25,
47:19, 55:14, 55:15,
80:8
**virtual** [1] - 110:22
**viruses** [1] - 67:6
**volume** [1] - 6:24
**Vyvanse** [1] - 78:1

## W

**Wackett** [2] - 80:22,
143:13
**wait** [3] - 158:1, 159:3,
166:20
**walk** [1] - 107:4

LISA SCHMID, CCR, RMR
Official Court Reporter

41034

**walking** [1] - 165:6
**Ward** [1] - 45:10
**warn** [2] - 142:9, 142:13
**warned** [1] - 122:9
**warranted** [1] - 12:18
**Washington** [2] - 1:15, 1:20
**Wasserstein** [18] - 9:13, 114:2, 114:12, 114:24, 115:9, 115:13, 116:16, 116:17, 118:1, 118:6, 118:17, 125:18, 142:20, 147:9, 148:4, 149:16, 166:14, 167:25
**Wasserstein 's** [4] - 114:22, 142:25, 143:5, 168:13
**watch** [4] - 52:12, 142:10, 142:16, 142:17
**ways** [2] - 8:11, 66:9
**weak** [1] - 65:16
**weakness** [1] - 88:15
**website** [2] - 70:22, 146:25
**Wednesday** [1] - 168:19
**week** [10] - 7:6, 40:19, 44:25, 55:25, 57:3, 62:8, 155:12, 155:19, 155:20
**weekends** [1] - 160:11
**weeks** [7] - 4:12, 8:7, 37:24, 38:7, 45:5, 49:8, 107:15
**weight** [1] - 13:10
**WEINER** [3] - 1:17, 25:4, 168:12
**Weiner** [2] - 2:4, 3:20
**wheelchairs** [1] - 65:16
**whereas** [3] - 104:20, 105:16, 106:1
**white** [1] - 39:21
**whiteboard** [1] - 102:22
**who've** [1] - 92:16
**whole** [11] - 19:15, 22:6, 28:21, 31:15, 31:16, 48:24, 91:9, 125:20, 145:24, 156:18, 157:5
**wide** [2] - 82:1, 106:15
**willing** [1] - 5:19
**wise** [1] - 165:18
**wish** [2] - 66:3, 66:5

**wished** [1] - 46:14
**withdraw** [1] - 7:7
**witness** [10] - 15:1, 25:1, 36:7, 124:1, 132:3, 153:25, 154:2, 154:7, 154:12, 166:12
**Witness** [1] - 15:6
**WITNESS** [25] - 15:7, 15:10, 25:7, 25:11, 32:14, 35:9, 36:12, 43:10, 45:10, 45:13, 53:2, 53:4, 53:12, 56:4, 59:23, 60:1, 60:3, 60:6, 74:14, 107:13, 142:17, 154:17, 166:17, 166:19, 169:2
**witnesses** [1] - 168:5
**won** [1] - 11:11
**wonderful** [1] - 37:7
**wondering** [1] - 2:19
**word** [7] - 45:23, 63:23, 105:15, 157:3, 157:11, 157:18, 161:24
**words** [8] - 11:2, 47:10, 49:17, 51:4, 52:19, 143:8, 145:23, 165:2
**worker** [2] - 78:20, 127:17
**world** [2] - 13:12, 111:12
**worry** [1] - 166:1
**wrapped** [3] - 118:23, 149:11, 155:23
**wrapping** [1] - 65:21
**write** [16] - 22:14, 32:2, 32:5, 39:21, 48:1, 48:5, 52:14, 52:16, 54:18, 58:23, 77:11, 91:4, 97:19, 120:12, 144:6, 156:24
**Writing** [1] - 84:15
**writing** [15] - 19:18, 20:23, 22:8, 30:11, 41:17, 47:22, 48:7, 48:13, 52:10, 52:13, 97:19, 136:21, 137:2, 137:9, 151:14
**written** [22] - 20:6, 20:9, 20:16, 27:17, 27:19, 27:25, 49:16, 50:18, 57:24, 76:23, 90:24, 98:8, 98:9, 100:18, 105:5, 113:14, 118:9, 144:2, 147:20,

148:14, 148:17, 152:15
**wrongfully** [2] - 65:13, 65:14
**wrote** [11] - 11:2, 25:15, 30:4, 77:10, 78:20, 88:23, 89:8, 99:20, 110:10, 117:13, 163:8

## X

**Xs** [1] - 81:24

## Y

**year** [54] - 13:23, 37:11, 38:6, 44:22, 55:15, 59:10, 64:9, 64:10, 64:15, 67:19, 68:13, 68:16, 68:20, 68:22, 68:24, 69:15, 70:10, 72:6, 72:22, 73:7, 73:9, 73:10, 73:17, 74:18, 74:23, 101:17, 104:21, 110:12, 112:13, 114:12, 116:14, 119:24, 120:1, 121:2, 135:22, 136:17, 136:24, 138:2, 138:3, 138:7, 140:22, 141:2, 145:2, 145:3, 145:13, 145:25, 146:1, 146:3, 146:6, 146:7, 146:12, 146:14
**years** [46] - 6:5, 8:9, 34:11, 37:20, 37:22, 49:12, 55:5, 56:10, 60:14, 60:15, 63:14, 63:16, 63:18, 63:19, 64:4, 64:6, 64:8, 67:1, 86:12, 87:14, 89:15, 91:15, 92:17, 102:10, 104:19, 104:21, 104:22, 110:14, 112:16, 113:16, 113:17, 123:15, 137:17, 145:11, 145:18, 145:22, 146:2, 150:1, 154:24, 156:25, 158:6, 158:8, 160:5, 160:7, 160:16, 165:18
**yelled** [1] - 7:25
**yellow** [1] - 92:22
**YORK** [1] - 1:1
**York** [4] - 1:5, 1:22,

28:7
**young** [1] - 161:12
**younger** [1] - 155:2
**youngest** [2] - 155:3, 157:10
**yourself** [7] - 22:18, 22:20, 61:10, 65:3, 112:7, 164:16
**yourselves** [1] - 34:12

## Z

**zoom** [2] - 15:3, 111:5

[Hearing Transcript pages 1-99]

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - - -X
ROBERT SAMPSON,               : 22 CV 5120(JMA)
                              :
         Plaintiff,           :
                              :
      -against-               : United States Courthouse
                              : Central Islip, New York
                              :
                              :
                              :
NATIONAL BOARD OF MEDICAL     : October 12, 2022
EXAMINERS,                    : 9:30 AM
                              :
         Defendant.           :
                              :
                              :
- - - - - - - - - - - - - - - -X
```

TRANSCRIPT OF CIVIL CAUSE FOR MOTION HEARING
BEFORE THE HONORABLE JOAN AZRACK
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S :

For the Plaintiff:    STEIN & VARGAS, LLP
                      10 G Street NE, Suite 600
                      Washington, DC 20002
                      BY: MARY VARGAS, ESQ.

                      CHARLES WEINER, ESQ.
                      99 Lantern Drive, Suite 202
                      Doylestown, PA 18901

For the Defendant:    PERKINS COIE, LLP
                      700 13th Street NW, Suite 800
                      Washington, DC 20005
                      BY:  CAROLINE MEW, ESQ.

                      PERKINS COIE, LLP
                      1155 Avenue of the Americas, 22nd Floor
                      New York, New York 10036
                      BY:  ADAM MANDELSBERG, ESQ.

Court Reporter:  Lisa Schmid, CCR, RMR

Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

LISA SCHMID, CCR, RMR

**A1036**

171

1    THE COURT: All right. Ready to go?
2    MR. WEINER: Yes, Your Honor.
3    THE COURT: I see you've called your witness.
4    MR. WEINER: (Nods head affirmatively.)
5    THE COURT: Okay.
6    COURTROOM DEPUTY: Ms. Wasserstein, please just
7    raise your right hand.
8    (Witness sworn.)
9    THE WITNESS: I do.
10   COURTROOM DEPUTY: Please state and spell your name
11   for the record.
12   THE WITNESS: Jeanette Wasserstein, Dr. Jeanette
13   Wasserstein, J-E-A-N-E-T-T-E, and W-A-S-S-E-R-S-T-E-I-N.
14   THE COURT: Okay. Whenever you're ready, Mr.
15   Weiner.
16   MR. WEINER: Thank you, Your Honor.
17   JEANETTE WASSERSTEIN, after having been duly sworn,
18   testified on her oath as follows:
19   DIRECT EXAMINATION
20   BY MR. WEINER:
21   Q    Dr. Wasserstein, can you state what your business address
22   is?
23   A    1160 Fifth Avenue, Suite 112 or 3, depending on which
24   year, New York, New York 10029.
25   Q    And where are you employed?

LISA SCHMID, CCR, RMR

172

1    A    I'm not employed by anybody. I'm self-employed.
2    Q    And what are you self-employed as?
3    A    I'm a board-certified neuropsychologist.
4    Q    And what is that?
5    A    I have board certifications, speciality certification in
6    the field of clinical neuropsychology, which is an area
7    within psychology that specializes in diagnosing and treating
8    and researching brain and behavior relationships.
9    (Court reporter seeks clarification.)
10   A    I'm a clinical neuropsychologist. I have board
11   certification in the area. It's a speciality area within
12   psychology that specializes in the evaluation of, diagnosis
13   and treatment and research regarding brain behavior
14   relationships, both born and acquired.
15   Q    Are you a licensed psychologist?
16   A    First, you have to be a licensed psychologist, and then
17   you become board certified.
18   Q    And how does one become board certified in
19   neuropsychology?
20   A    You have to have a lot of training, and you have to pass
21   a specialized training well beyond the clinical psychology Ph.
22   D. In neuropsychology.
23        And then you have to pass a very demanding licensing
24   specialities and you have to submit -- first, you submit your
25   credentials and education and have that approved, then you

LISA SCHMID, CCR, RMR

173

1    submit cases, then you'll have an oral exam where they test
2    you in all sorts of ways.
3    Q    Okay. And I'm just going to ask you and try to give you
4    a reminder for the court reporter's sake, if you could slow
5    down when you speak?
6    A    Yes, I will try.
7    Q    Okay. Can you discuss your educational background,
8    starting with college?
9    A    I have a B. A. In experimental psychology from Barnard
10   College of Columbia University. I have a Masters in
11   Developmental Psychology from Teachers College of Columbia
12   University. I have a Ph. D., in cognitive neuroscience from
13   City University.
14        I interned at Roosevelt Hospital, part of Columbia,
15   University, again.
16        I have been -- I did many years of supervised
17   clinical work in neuropsychology. I founded a program in
18   neuropsychology, and I got my credentials, my boards in
19   neuropsychology.
20   Q    Okay.
21   A    Also -- I also went to Yale Medical School and passed the
22   first half of the -- first third of the medical boards, but I
23   decided to stop.
24        (Court reporter seeks clarification.)
25   A    Myself. I stopped my education there. So I'm a third

LISA SCHMID, CCR, RMR

174

1    MD.
2    Q    Doctor, we're going to turn to an exhibit, which has
3    previously been marked as an exhibit in this matter, and it's
4    a copy of your CV.
5    THE COURT: Fifty-five?
6    MR. WEINER: Fifty-five? Yeah. I apologize.
7    THE WITNESS: Yeah.
8    BY MR. WEINER:
9    Q    Do you have a copy of that CV in front of you?
10   A    Yes, I do.
11   Q    Is this an accurate copy of your current curriculum
12   vitae?
13   A    It's accurate. It doesn't have things that I'm currently
14   writing up or under review, but it's accurate.
15   Q    Does it state your educational background, your training,
16   and your work experience?
17   A    Yes, it does.
18   Q    Does it also accurately list your presentations and
19   publications?
20   A    It's not exhaustive in presentations. I still have --
21   not all of them, and presentations and publication, as I said,
22   things that are either in prep or under review are not there,
23   but everything else that's published is there.
24   Q    Are all of your publications and presentations concerning
25   the area of clinical psychology or neuropsychology?

LISA SCHMID, CCR, RMR

A1037

175

1   A   Yes, they are.
2   Q   Have you published any articles or conducted any
3   presentations on learning disabilities or dyslexia?
4   A   Yes, I have.  I'm considered an international expert in
5   the diagnosis and treatment of adult LD and adult ADD.
6           My chapter -- there is a chapter in mind that just
7   came out in the most current edition in the *Textbook of*
8   *Clinical Neuropsychology,* as edited by Joel Morgan and Joseph
9   Ricker, which is dedicated to learning and attention disorders
10  across the lifespan.
11  Q   Dr. Wasserstein, could you point out in your CV some of
12  the other publications and articles that you've done in
13  connection with learning disabilities and dyslexia?
14  A   Well, most of my work is on Attention Deficit Disorder,
15  psychopathy, adults with ADHD.  There is a book that I edited
16  --
17  Q   Dr. Wasserstein, perhaps, since you've talked about ADHD,
18  you have also done articles and presentations on Attention
19  Deficit-Hyperactivity Disorder?
20  A   That's my main area of expertise, yes, but I do both.
21          So most my of publications are in Adult Attention
22  Deficit Disorder or related --
23          (Court reporter seeks clarification.)
24  A   Most of my publications have been related to Adult
25  Attention Deficit Disorders and related brain mechanisms.

LISA SCHMID, CCR, RMR

176

1   Q   And how does your work in the area of ADHD or Attention
2   Deficit-Hyperactivity Disorder concern the identification of
3   ADHD?
4   A   Yes.  I actually have a specific article that -- two
5   articles that are particularly well and highly cited.  One, I
6   wrote back in the early 2000s on the diagnosis of Adult ADD.
7   And the other one that I wrote also in the area of the early
8   2000s, on the general what is Adult ADHD.
9           So yes.  A lot of my stuff has to do with the
10  diagnosis of Adult ADHD.
11  Q   Can you describe your current practice, what type of
12  patients you see?
13  A   Most of my patients are adults -- and that's what I'm
14  known for -- with Attention Deficit Disorder and/or learning
15  disabilities, because they often coexist.  And I do both
16  diagnosis and treatment.  The treatment that -- my emphasis in
17  treatment is addressing executive dysfunction.  I don't
18  remediate dyslexia.  I'm not that type of therapist.
19  Q   Does your practice, in addition to identification of ADHD
20  and learning disabilities.  Do you provide any type of
21  treatment for individuals?
22  A   Oh, totally.  Totally.  Yes, I also in my work with
23  people with ADD and learning disabilities have emotional
24  reactions, either reactions to their struggles or parallel to,
25  so I treat depression and anxiety and other psychiatric

LISA SCHMID, CCR, RMR

177

1   conditions in this population.
2   Q   I have noticed from your report that you have Mount
3   Sinai's logo on it.  What is your association with Mount
4   Sinai?
5   A   Oh, I'm voluntary faculty.  I teach there and I do
6   research with them in psychiatry.
7   Q   And is that an Mount Sinai's medical school?
8   A   Yes, it is.  And I have a faculty appointment.
9   Q   Does your practice entail evaluating individuals for
10  disabilities in educational settings?
11  A   Very much.
12  Q   And what type of educational accommodations do you
13  evaluate for?
14  A   The whole spectrum.  High school, SATs, MCATs, LSATs,
15  GMATs, bar exam, medical boards, fellowship, the whole
16  educational spectrum.
17  Q   And when you say the medical boards, are you referring to
18  the United States Medical Licensing Examinations?
19  A   Yes.
20  Q   Can you estimate approximately how many patients you
21  evaluate on perhaps an annual basis?
22  A   I really can't.  I see lots of folks.  I don't keep
23  count.  I've been doing this since 1981.  So I've seen
24  hundreds, possibly thousands of folks over time, but I don't
25  keep track.  I don't keep count.

LISA SCHMID, CCR, RMR

178

1   Q   And in connection with your evaluations for individuals,
2   do you also write evaluation reports?
3   A   Routinely.
4   Q   And does that express both your findings and
5   recommendations?
6   A   Yes, it does.
7   Q   What is your role in conducting an evaluation of an
8   individual for academic accommodations?
9   A   My principle role is interview, case formulation,
10  direction of what the evaluation includes, data analysis, and
11  then report writing.
12          As is the case for many neuropsychologists
13  especially, those of us who have been around a long time, we
14  don't do much of the actual data collection.  We have usually
15  what are called psychometricians doing that.  I don't like to
16  rely on psychometricians because they are usually only MA
17  level.  I like to have licensed Ph. D.'s to help me and
18  typically people that I've worked with for many years and
19  trained.
20          So I conduct the evaluation.  I analyze the data.  I
21  write the report.  I collect some -- because I always want to
22  have some clinical, direct clinical experience with the
23  client -- some, but not all of the data.
24  Q   If an individual comes to you and says I have ADHD or a
25  learning disability, do you always identify a learning

LISA SCHMID, CCR, RMR

A1038

179

1  disability or ADHD?

2  A    Absolutely not.  They're coming to me for an evaluation.

3  I'm not a hired gun.  They come to me for my professional

4  opinion, and I give them my professional opinion.  So I have a

5  lot of them, told people not LD, not ADD.

6  Q    Have you had on occasion people who have come to you and

7  paid you for your services, how do they handle that?

8  A    Depends on the person.  Sometimes they're relieved to

9  understand what -- I just -- I don't say there is or isn't LD

10  and then leave it at that.  I mean, I tell them what I think

11  it is and I tell them how I think they should address it.  So

12  usually, people are thankful to hear the truth.

13       What I do do is, since the evaluation can be very

14  costly, I do a very, very in-depth history, and if you know

15  what you're doing, you can get a lot of information from a

16  history, and anticipate a lot of what you might find.

17       And based on the history, I've been known often to

18  tell people, I don't think you should be spending the money

19  for this full eval.  I don't think you're going to find that

20  we need to go that far.  Maybe we do a little narrower

21  evaluation or maybe you should go direct to this, that or the

22  other person.

23       So I will head them off at the pass and not always

24  do an evaluation based on the history.

25  Q    When conducting an evaluation and rendering a diagnosis,

LISA SCHMID, CCR, RMR

180

1  what criteria do you use?

2  A    The DSM.

3  Q    And what is DSM?

4  A    *Diagnostic and Statistical Manual* with the ADA, usually

5  DSM.  Sometimes the categories are emerging, like --

6       (Court reporter seeks clarification.)

7  A    Sometimes the categories are still emerging and not yet

8  in the DSM, something like the learning disability or learning

9  disability, NOS 1 in the DSM, but sometimes they used to use

10  nonverbal learning disability, which was not in the DSM, known

11  as NVLD.

12       So generally for report writing, I use diagnostic

13  guidelines and labels from the DSM.

14  Q    Dr. Wasserstein, we've heard you use the term "learning

15  disabilities."  Can you explain what a learning disability

16  with an impairment in reading is?

17  A    Learning disability is a concept that was originally

18  identified in reading, dyslexia.  And as it was characterized

19  then was an unexpected difficulty acquiring a skill that

20  otherwise is easy to learn, and one would expect in the

21  context of that individual to be able to do.  So it's

22  unexpected because of their aptitude, usually.

23       What it means is, disability not inability.  So it's

24  not that they can't learn to read.  They have difficulty

25  learning to read.  That's a reading disability.  There's other

LISA SCHMID, CCR, RMR

181

1  learning disabilities that are not specific to reading.

2       So people with reading disabilities can be very slow

3  in decoding words.  They can be weak and slow in understanding

4  what they've read.  It shows up in spelling, like delayed

5  inabilities.  Spelling and writing are affected by reading

6  disabilities.

7       So it's the various manifestations, difficulty in

8  struggling in the various manifestations of reading.  And one

9  of the -- in adulthood, when many people have already learned

10  to read, but they're still learning disabled, it shows up in

11  what's called a lack of automaticity.  They read slowly.  They

12  just don't read as automatically as other readers, what's

13  called neuro-typical folks do.

14  Q    Is -- are learning disabilities always identified during

15  childhood?

16  A    No.  People that come to me are often people who have

17  struggles in the grain.  So it's not just me.

18       But yeah, a substantial percentage are identified

19  into childhood.  Usually, the ones where it's kind of easy to

20  identify.  The ones where they compensate, they get tutoring,

21  it's not always identified in childhood.  I've identified it

22  in people who are 30 and 40.

23  Q    Is there any cure for learning disabilities?

24  A    No.  You do better.  You can learn, but the underlying

25  problem of neuropsychological deficit does not go away.

LISA SCHMID, CCR, RMR

182

1  Q    We have also discussed Attention Deficit-Hyperactivity

2  Disorder, and I'm going to refer to it from now on as ADHD.

3       What is ADHD?

4  A    Attention Deficit-Hyperactivity Disorder.

5  Q    Can you explain what that is?

6  A    Oh, it's not one thing.  It's actually many things.  But

7  the majority are neurodevelopmental disorders that are genetic

8  in nature.  There are many different genes that have been

9  associated with it, and it's not exhaustive.

10       So it's a neurodevelopmental problem, maldevelopment

11  in areas of the brain most typically, both of the kind of

12  frontal, and not related to that, usually genetic and it runs

13  in families.  You have cases of a similar clinical picture

14  that can be from brain damage, illness, head trauma later on

15  in life.

16  Q    And is there any cure for ADHD?

17  A    No.  Also not.  There are medicines that can treat it.

18  You can get the help for the executive function problems which

19  are often associated with it, but it's not curable.

20  Q    I also wanted to discuss your background.  Have you ever

21  testified in a case involving the National Board of Medical

22  Examiners?

23  A    Yes, I have.

24  Q    Do you know how many?

25  A    No, I don't keep count.

LISA SCHMID, CCR, RMR

A1039

183

1   Q    Have you testified on behalf of the NBME or on behalf of
2   an individual seeking accommodations?
3   A    I don't recall testifying on the behalf of the NBME, just
4   individuals seeking accommodations.
5   Q    Have you ever testified in a case on my behalf, other
6   than the present case?
7   A    I don't think so.
8   Q    Did you conduct an evaluation of Robert Sampson?
9   A    Yes, I did.
10  Q    And when did that occur?
11  A    2008, August 2008.  I'm sorry.  My apologies.  I did this
12  in August of 2020.
13  Q    Why did Mr. Sampson present himself for an evaluation?
14  A    He had had multiple rejections for extended time
15  accommodations on the Step Exam.  And his last evaluation was
16  kind of outdated.  It was from 2013.  So he wanted an updated
17  evaluation to address the concerns raised by the Board.
18       MS. MEW:  Your Honor, if I can just interrupt.  Can
19  you just identify the document that --
20       MR. WEINER:  I have the document.  I didn't realize
21  that was going on.
22  BY MR. WEINER:
23  Q    Did you prepare an evaluation report in connection with
24  your evaluation of Mr. Sampson?
25  A    Yes, I did.

LISA SCHMID, CCR, RMR

184

1   Q    And we're going to turn to Exhibit 37.  I'll bring it up
2   on our screen as well.
3   A    I don't see -- I don't have anything on the screen, on my
4   screen.  Am I seeing screen shots?
5       COURTROOM DEPUTY:  I'm sorry.  It should come up
6   now.
7
8   BY MR. WEINER:
9   Q    Do you also have the document in front of you, in case
10  it's not clear?
11  A    I have my own document, yeah.
12  Q    What were the dates of Mr. Sampson's evaluation?
13  A    On August 8th and 9th.
14  Q    Was anyone else involved in connection with this
15  evaluation?
16  A    Yes, Dr. K. Miller.
17  Q    Does having another person assist you with the
18  evaluation, is that contrary to any type of professional
19  standards in the neuropsychological field?
20  A    As I said earlier, it's actually a majority of the time,
21  people have psychometricians, but Kim is more than a
22  psychometrician.  She's a licensed and experienced clinical
23  psychologist in her own right.
24  Q    What is a psychometrician?
25  A    Psychometricians are people that have a masters in

LISA SCHMID, CCR, RMR

185

1   psychometrics, and what they are trained to do is test, to
2   score them -- to administer and score them.
3   Q    And can Kim Miller, what is her background?
4   A    Clinical psychology.  She actually teaches or taught
5   at --
6       (Court reporter seeks clarification.)
7   A    She taught --
8   Q    Can you speak slower?
9       (Court reporter seeks clarification.)
10  A    I don't recall which university, but she actually taught
11  neuropsychology at the Long Island University, but she doesn't
12  anymore.  She's moved to Georgia.
13  Q    Did Dr. Miller do testing in this matter?
14  A    She did most of the testing, yes, and scores.
15  Q    And Dr. Miller has a Ph.D. as well?
16  A    I believe she has a Psy.D.  It's a variation on a
17  doctorate in psychology.  It's just not strictly a Ph.D.
18  Q    Can you describe the process that you and Dr. Miller used
19  when preparing a report and conducting an evaluation?
20  A    Well, I prepared the report.  There's no question about
21  that.  It's entirely me.
22       I will refer -- I will see the patient, and take the
23  history, and then say, okay, this is somebody I want to do a
24  full evaluation on.
25       Then I'll speak to Dr. Miller about what the issues

LISA SCHMID, CCR, RMR

186

1   are, and what the batteries should consist of, and then we
2   decide which tests I'll do, and which tests she'll do,
3   although she does most them, and she actually schedules the
4   person.
5       I believe on this day, on the 8th, I saw him and she
6   started with him on the same day.  So we were more efficient.
7       Anyway, then she'll conduct the actual testing.
8   She'll score the material.  She'll create it, what I call an
9   appendix, a summary of all the scores, and then she and I will
10  go over it together, what observations she had.  We'll discuss
11  the case at length, and then I write it up.
12  Q    Were you involved in any of the testing or the history
13  taking that occurred in this particular matter?
14  A    I collected all the history, and I did some of the
15  testing, although, unfortunately, I really don't recall what I
16  did.
17       I got COVID in October of that year, a couple months
18  later.  And I was very sick.  I was hospitalized and frankly,
19  I almost died.
20       So I don't really remember the specifics, but in my
21  usual -- in my usual course of action, I do some of the data
22  collection.
23  Q    Did you render a diagnosis for Mr. Sampson in this
24  matter?
25  A    I did.

LISA SCHMID, CCR, RMR

**A 1040**

187

1  Q   What was the diagnosis or diagnoses.

2  A   Yeah, I give him several diagnoses.  I gave him ADHD

3  combined with the intensive type.  He was borderline --

4       (Court reporter seeks clarification.)

5       THE WITNESS:  I will try to speak more directly into

6  the mic, because it's up high, and I may be looking down.  I

7  apologize.

8  A   Yes.  I diagnosed him as having Attention Deficit

9  Disorder.  I wrote combined type, but it's really an attentive

10  type.  He was borderline.  He was unequivocally inattentive.

11  So that was an error.

12      And I gave him learning disabilities, several

13  specific learning disabilities:  Reading disorder -- and let

14  me see what else I wrote -- writing, spelling, and writing

15  specific to learning disability in reading and in writing, and

16  as I indicated before, the writing problems, especially

17  spelling, are almost always associated with reading disorders.

18      He also has motor writing problems on which, as is

19  often seen with ADD, which is not separate in the diagnosis,

20  but which actually can be separated clinically.

21      So I gave him those two diagnoses, and I also said

22  that he had clear deficits in executive functioning and in

23  learning, motor control, visual motor integration, and visual

24  information processing, but I didn't -- I didn't, I don't

25  believe, put it on the diagnostic label.

LISA SCHMID, CCR, RMR

188

1  Q   And so you just mentioned a couple things.  You said the

2  visual motor integration and visual processing.  For one

3  thing, does that mean he has problems with his eyesight?

4  A   No, it's all mental.

5  Q   Can you explain what a visual motor integration deficit

6  is?

7  A   Well, it's really visual perception and verbal

8  integration is separate, and in his case, they're separate.

9       His visual motor is not good.  His ability to

10  write -- well, draw, write words, graphic motor problems, his

11  handwriting is bad, more than the usual doctor's bad

12  handwriting.

13      And his visual -- his ability to understand and

14  process visual spatial information is relatively -- I don't

15  recall if he had what's called absolute or only relative

16  deficits.

17      Absent those, when we look at people's problems, we

18  compare them to themselves, and we compare them to the normal

19  distribution.  So the normal distribution is absolute

20  deficits, if it's just relative to yourself, it's a relative

21  deficit.  And let me go to my findings to refresh my memory

22  about whether the visual spatial stuff is actually relevant --

23  relative.

24      But in the course of all of the testing -- he had

25  two previous testings -- the visual spatial came up again and

LISA SCHMID, CCR, RMR

189

1  again and again.  So it's consistent.  Whether it's absolute

2  or relative, it's consistent, which is in and of itself very

3  --

4  Q   Doctor, can you discuss your process that you utilize

5  when you conduct an evaluation?

6  A   Well, first I do the history.  Well, first, let me

7  clarify what the questions are, then I collect the history,

8  the way things are manifested currently and the way they have

9  always manifested in the course of life, and then everything

10  else from the history.

11      And based on collecting the history and the

12  complaints, I already have in my mind a formulation of what I

13  am looking for and what I see.

14      Then I do the actual testing.  And the testing

15  consists of a standard neuropsych evaluation.  In this

16  context -- not in all context -- but in this context, has

17  what's called a psycho-educational evaluation, which is

18  looking at cognitive abilities and academic performance.

19  That's the psycho-ed part.

20      And then the neuropsychological evaluation, where

21  you look more specifically at discreet neuropsychological

22  functions, like memory, like attention --

23      (Court reporter seeks clarification.)

24  Q   Dr. Wasserstein, you just need to slow down.  We have a

25  court reporter here, please.

LISA SCHMID, CCR, RMR

190

1  A   Neuropsychological functions which include things like

2  memory, attention, language, executive function.

3  Q   Thank you.

4       Is that -- were you finished discussing the process

5  of your evaluation?

6  A   Oh, I'm sorry.  I'm going too slow.  I lost my thread.

7  I'm sorry.

8       And then after the discreet neuropsychological

9  functions, then we have to look at adaptive functions to some

10  extent, and emotional functioning, because when you see

11  cognitive problems or performance problems, you need to parse

12  out or evaluate to some extent what other things may be

13  contributing.

14      If somebody is deeply depressed, they may be

15  functioning poorly not because they have a neurocognitive

16  deficit, but because they're depressed.  We have to take a

17  fulsome psychiatric status of the person.

18  Q   And then I assume at some point, you synthesize this

19  information and you render a diagnosis?

20  A   Yes, I do.  That's what I do.  I take all that

21  information, chief complaint, history, record review when it's

22  possible as external input to the extent you can get it,

23  actual data collected, and synthesize it.

24  Q   And as part of the history, did you provide Mr. Sampson a

25  neuropsychological symptom survey?

LISA SCHMID, CCR, RMR

A1041

191

1   A    Well, I have a standard history from him and on that
2   standard history form, there's a section called symptom
3   survey.  And as much as we go to a written and do a symptom
4   survey, they go look at gastro, they'll look at GI symptoms
5   and respiratory symptoms and pulmonary, kidneys, different
6   systems that have possible problems.
7        And they'll be a list of symptoms and the patient
8   will be asked to check off this, that or the other.  It's the
9   same thing with the neurocognitive symptoms, look at problem
10  solving, memory, language, just all the different cognitive
11  symptoms -- systems, and then we have them check off.
12       Yeah, he did that.
13  Q    And if we go to your report at page one at -- on the
14  page, does that list Mr. Sampson's various symptoms?
15  A    Well, it doesn't list all of his symptoms he could have
16  endorsed.  In fact, he didn't endorse very many.  There are
17  tons that he could endorsed.
18  Q    At the top of page one, you wrote at Stony Brook
19  University with a history of having received time
20  accommodations throughout medical school, including on the
21  NBME Shelf Exams, why did you include that statement?
22  A    Because it is the reason for evaluation.
23  Q    Yes.
24  A    That's just where it was.  At that point, he was a third
25  year medical student who had time accommodations throughout

LISA SCHMID, CCR, RMR

192

1   medical school.
2        It's important actually.  That's where he was when I
3   saw him, but it's important if somebody's been lucky enough to
4   have his school give them accommodations, they don't generally
5   do it that easily.  And they had decided that he deserved it.
6   So it's just a fact.  An independent board had -- educational
7   board has decided that whatever he provided by the way of
8   proof was adequate.
9   Q    Is obtaining a proper history an important part of
10  conducting a neuropsychological evaluation?
11  A    It's essential.  I mean, I think it's one of the most
12  important parts.
13  Q    And what were your sources of Mr. Sampson's history?
14  A    Well, he filled out the history form.  I interviewed him
15  extensively.  In addition, I had a lot material that was
16  provided by him from multiple sources, from his parents, from
17  his learning specialist, from his tutors at the MCATs, and he
18  gave me records all the way back to the first grade.
19  Q    Compared to other matters that you have conducted
20  evaluations for, how would you characterize the -- both the
21  quality and quantitative nature of the history that you
22  received from Mr. Sampson?
23  A    Actually, his school records were surprisingly complete.
24  It's hard to get as much information from early schooling as I
25  got from him.

LISA SCHMID, CCR, RMR

193

1   Q    What about the other aspects of his history?
2   A    He gave me a good history.  You know, I had -- his
3   parents provided good information in written form, so I would
4   characterize it as a very good data source.
5   Q    And was Mr. Sampson a good historian?
6   A    As I'm recall, he was.  He had -- one way that he was
7   frustrating is that I gave him in the course of my
8   evaluation -- one of the things I gave is a -- I give forms
9   to -- for him to get to family members, parents or partners,
10  and it's hard, specifically that are meant to be given to
11  outside observers.
12       And despite asking him on multiple occasions to
13  return those, he didn't.  I don't know if he forgot to give it
14  to his parents, forgot to talk to his parents or his partner.
15  I don't really recall what the reason was, but it's not
16  uncommon with my ADD -- with my experience with ADDers, is I
17  often have to struggle to get that information.
18       In his case, as I had so many other sources of
19  ancillary information, I, you know, I wanted to get this done,
20  so I was okay.  But when I had nothing else, then it's really
21  a problem not to get that back, but it's very common not to
22  get it.
23       So yeah.  He was very good with the providing
24  information from collateral sources, with the exception of the
25  CAARS collateral, which for some reason, he never was able to

LISA SCHMID, CCR, RMR

194

1   get back to me.
2   Q    Page two of your report under the heading "Developmental
3   and Medical History"?
4   A    Yeah.
5   Q    You were wrote, Mr. Sampson also reported that as a
6   child, he had difficulty clearly hearing words, songs, often
7   misinterpreted them.  In high school, he had trouble learning
8   a foreign language because he could not discern diction.
9        Does that have any significance?
10  A    Absolutely.  Difficulties with certain -- with dyslexia.
11  I mean, there's two major threads for dyslexia, learning
12  disability and reading.  Historically, what's called
13  dysesthetic and dysphonetic.  Dysphonetic, meaning a problem
14  with phonemic processing.  And that's the most common one.
15  And dysesthetic, meaning an underlying problem with
16  visual-spatial processing, difficulty with the image.
17       When you have a difficulty discerning diction, that
18  implies problems with phonemic processing.  And that's the
19  most common problem with them, with dyslexia.
20       But as I said, both sources can exist, and in this
21  case --
22  Q    If you turn to page five of your report, you discussed
23  Mr. Sampson's educational history.  Can you discuss the early
24  findings that you received concerning his educational history?
25  A    Well, one thing is that he had started speech and

LISA SCHMID, CCR, RMR

**A-1042**

195

1  language young, relatively young and for a long time.  And as
2  I recall, he had stuttering problems.  Stuttering, while not
3  that uncommon, not that common, is extremely common among a
4  history of -- extremely common among dyslexics.  I think
5  something like 30 percent of stutterers are dyslexic,
6  whatever.  There's a strong association between stuttering and
7  dyslexia.  Not perfect, but they're strong.  So that was
8  developmentally.
9         He had problems learning to read.  You know, his mom
10  actually had to read to him.  I think he didn't get actual
11  tutors until fourth grade, and then he had tutors almost
12  continuously.
13        That's also another problem.  The dyslexia is often
14  unidentified until the third grade, surprisingly, sometimes
15  never, but something about the early years, I guess,
16  everybody's learning to read, so they cut them a lot of slack
17  in their struggles with reading.
18        Whereas after that point, kids have shifted over to
19  what's called reading to learn, rather than still learning to
20  read.  So he didn't really get the tutors until he was moved
21  into the reading to learn stage.
22        So anyway, so he had problems with reading, with
23  reading acquisition, with spelling, and the teachers also
24  reported problems with focusing and organization.  So those
25  are more ADD symptoms.

LISA SCHMID, CCR, RMR

196

1  Q    So one thing you mentioned was speech difficulties that
2  Mr. Sampson had.  Could you explain what you were advised
3  about that?
4  A    Well, that he had a severe stutter, and that he had took
5  speech and language therapy until the fourth grade or for four
6  years, from four to eight.  That's a long stint.  That's a
7  long stint, in my experience.
8  Q    What typically would be the amount of speech therapy an
9  individual who is a stutterer, what would they typically
10  receive?
11  A    Oh, I can't with authority opine on that.  I just know
12  that four years of speech and language therapy is a long time.
13  Q    And in connection with your review of documents, did you
14  also review his SAT scores?
15  A    Yeah, I reviewed his SAT scores.
16  Q    And if you look at page six of your report, do you report
17  those?
18  A    Yes, I do.
19  Q    And based on his scores, it appears that he had above
20  average scores on the SATs?
21  A    Yes.
22  Q    Does the fact that he had above average scores on the ACT
23  suggest that he cannot have a learning disability?
24  A    First of all, 74 is not above average, 74th percentile is
25  actually -- I'm just -- where he started, 74th percentile is

LISA SCHMID, CCR, RMR

197

1  right at the bottom of the average, high average.  So it's not
2  above average.  It's right -- so it's strong, but it's not
3  above average.
4         No.  And absolutely not.  Having normal range scores
5  does not rule out the existence of a learning disability,
6  especially since there's this concept called development
7  specialize, someone's gifted.  There are a couple of different
8  terms.
9         But what that concept is addressing is the existence
10  of people who are both very smart and LD.  And so they are
11  unusual in two different ways, one of which masks the other.
12  So if it's going in both directions.  So somebody with LD will
13  be seen with the fact that they're gifted, and somebody's
14  gifted      will be seen on the fact that they're LD.
15        This profile right here is really an early sign
16  that.  So because most of his scores are superior, only his
17  reading the first time is average, above average.
18  Q    You have used term "LD," just so we can clarify that
19  you're referring to learning disabilities?
20  A    Yes.  Learning differences, learning disabilities,
21  learning difficulty, all those things.
22  Q    In -- on page six further down on the page, you refer to
23  the two types of tutoring that Mr. Sampson received.  Can you
24  discuss that, what information you have about that?
25  A    Well, he started in tutoring from the third grade on in

LISA SCHMID, CCR, RMR

198

1  various forms.  He had private people who worked with special
2  programs.  It was very intensive intervention.  And
3  ultimately, his parents required actually that he tended to
4  have about or often brought up to ten hours a week of
5  tutoring.  That's a lot.
6         I have seen lots of kids in lots of years, with lots
7  of problems.  I really don't recall ever having anybody
8  getting ten hours a week of tutoring.  Two, three, maybe four.
9  You know, it's only so much you can ask of a child.
10  Q    Well, can this potentially be a situation where we have
11  high performing parents, they're both doctors, who are looking
12  to have their child get the very best and do the very best he
13  could do in school?  Is that this type of situation?
14  A    I have helped people with children's learning problems
15  for 30 years.  I have never seen anybody subject their child
16  electively, much less even needfully to ten hours of tutoring
17  a week beyond what they're already doing in school.
18        So my answer to that is, the long answer is saying,
19  no, I don't think so.
20  Q    And what is the significance of all this tutoring?
21  A    The kid needed a lot of help in order to perform and
22  function as well as he did.
23  Q    And if you'd turn to page seven of your report?
24  A    Yes.
25  Q    Towards the top, you have a discussion there regarding

LISA SCHMID, CCR, RMR

A 1043

199

1  the shelf exams that Mr. Sampson had taken.  Can you discuss
2  the significance of this?
3  A    Well, he struggled with the shelf exams.  All medical
4  students have to take them at the end of -- I don't really
5  recall which -- when they take it, but it's in their clinical
6  rotations.
7        And most medical students pass them.  They're not
8  designed to be evaluating in a very competitive way people's
9  ability to master the material.  It is meant to assure, to my
10 knowledge, a certain minimal competence, and most students
11 pass it, and he struggled for many of them, and he had to
12 repeat them, and had to be -- what's called remediated,
13 whatever that involved, in order to pass them.
14       He ultimately, when he was given extra time, was
15 able to pass them or when he did the remediation in some
16 cases, but it was a struggle and it shouldn't be.
17 Q    And further down, you indicate, with this extra time, he
18 was able to complete these exams for the first time, and
19 demonstrate the true extent of his knowledge.  He passed three
20 exams on the first attempt with scores ranging from 74th
21 percentile to 95th.
22 A    A lot has changed.
23 Q    And what does that suggest to you?
24 A    Well, when he was -- had to work with the normal amount
25 of time, he simply couldn't read the questions, couldn't get

200

1  through the information, and predict, which is what a report
2  is doing.  He couldn't get through it.
3        When he was given an adequate extension of time, he
4  was able to read at the pace that he reads, finish the
5  questions, and answer them as well and demonstrate what he
6  really knew.
7        That also suggests he probably knew the information
8  in the first place, but he couldn't get through the questions.
9  If you can't get through the questions, you can't answer the
10 questions, you can't pass the exam.
11 Q    And in connection with your evaluation, did you also
12 review the reports of other professionals?
13 A    Yes, I did.  Two other professionals.
14 Q    And at the bottom of page seven is your discussion of
15 Dr. Michels?
16 A    Yes.
17 Q    Can you discuss what you had reviewed that was
18 significant from Dr. Michels' report?
19 A    Well, Dr. Michels said that he was -- her testing in WAIS
20 and ultimately, her numbers are very similar to the ones I
21 got, and she said he was very, very smart -- very, very smart.
22 His verbal comprehension was more than 99 percentile.
23       So this is -- I have to pause for a moment and just
24 say we don't see this number very often.  It's extremely -- as
25 it says, it's more than the 99 percentile.

201

1  Q    I'm sorry, Dr. Wasserstein.  What numbers are you
2  referring to?
3  A    His IQ numbers, his numbers on the verbal comprehension.
4  Q    Can you speak to them being specifically and where you're
5  referring to that?
6  A    Well, it's starts -- the labels says WAIS-IV at the
7  bottom of page seven, but the actual numbers are on page
8  eight, and you see -- she doesn't -- I don't think she even
9  recorded his verbal full scale IQ because when he had this
10 degree of variability -- and notice, everything is better.
11       So it's important.  Variability is extremely
12 important, even when you're talking in an intact range,
13 because it tells you something is really off, and you have to
14 interpret the numbers differently.  And that is conventional
15 standard in instruction and psychological test interpretation.
16       And in this case, his scores, his scores, his IQ
17 scores ranged from average in his pretextual reasoning, which
18 means his ability to process visual-spatial information.
19 Overall, that's how he got the problem wasn't, but the score
20 he got was average.
21       And his verbal comprehension was 141, which is more
22 than the 99th percentile.
23       So she discerned what I ultimately discerned again,
24 and enormous difference between how he thought in language and
25 how he thought in images and words and spaces.

202

1        And she also said when you have that, you can't talk
2  about full scale IQ because that degree of variability makes
3  many numbers meaningless.
4  Q    Doctor --
5  A    So I noticed that, she noticed that, so I noticed he is
6  very smart.  He is verbally gifted.  He has relatively
7  consistent spatial stuff, and she on his Nelson-Denny --
8  Q    Before we go onto that, Doctor, in talking about in the
9  IQ test, do a lot of people have a discrepancy in their IQ?
10 A    Nobody's even.  And there are statistical perimeters and
11 probabilities for different degrees of discrepancy.  This
12 degree of discrepancy occurs in less than one percent of the
13 population.
14 Q    And when you say less than one percent of the population,
15 are you referring to the general population?
16 A    The general population of people out there that the norms
17 are based on, this degree of discrepancy is extraordinarily
18 rare.
19 Q    Functionally, what does that mean for Mr. Sampson?
20 A    In my report, I call it a metaphorical limp.  In a
21 very -- it could be a 6'4" person, and one leg is like what
22 you expect in a person who is a 6'4", and the other one is a
23 clubbed foot, and it might be the length that someone gets
24 from somebody who's 5'10", which is still a pretty tall
25 person, but you've got to be bigger, and you can't do much.

**A1044**

203

1  So everything you do -- you can't shoot baskets if you're 6'4"
2  and one leg is, you know, a club foot.
3      It's an intellectual limp which disrupts unified
4  functioning significantly. That's on a very surface level.
5      In addition, you don't know how a person got, I
6  mean, the clubbed foot is bad not just because the club foot
7  is shorter than the other, but it doesn't function as well.
8      So even though he had a perceptual reasoning of 105,
9  she found other evidence of underlying visual-spatial
10 processing deficits, and as I believe, which means he got 105,
11 this average score differently than most average people would
12 get that score. He had to use a lot of detours even to get
13 there.
14 Q   In addition to the IQ testing, what other testing did
15 Dr. Michels report about that you reviewed?
16 A   Well, she did a psych. So she did the psycho part, which
17 is IQ, and she did some educational achievements. She did
18 some Woodcock-Johnson, and some Nelson-Denny, and some SATA.
19 She actually did a lot of neuropsych, as well, not much, but
20 some.
21 Q   So if you look at page eight, Woodcock-Johnson, is that a
22 test that's ordinarily administered by educational
23 psychologists?
24 A   Yes. It's commonly -- she's giving broad reading scores.
25 They are pretty good broad reading scores. So it consists of

LISA SCHMID, CCR, RMR

204

1  component tests that I don't remember what the -- I would have
2  to look at her report to see if she gave me the component
3  tests, but that's kind of some of the scores.
4      The full scale IQ, I don't recall she went into it,
5  and generally, Woodcock-Johnson is a well-regarded test, but
6  it's not as demanding as other tests that we have, like the
7  Nelson-Denny or the SATA.
8  Q   So the Nelson-Denny reading test, is that a test that
9  you're familiar with?
10 A   Yes, I have.
11 Q   Can you explain how that test is administered?
12 A   Yes. It's a silent reading test that's more like what
13 reading and more advanced the whole is. On the
14 Woodcock-Johnson, they have you read sentences, at most a
15 paragraph, a short paragraph or two.
16     On the Nelson-Denny, it's long passages that are
17 usually at least a page, sometimes two pages, many paragraphs.
18 The reading level is more demanding. So just the content that
19 they're asked to read is more demanding and longer.
20 Q   And is the Nelson-Denny reading test a timed test under
21 standard measures?
22 A   Yes. The Woodcock-Johnson has timed and untimed
23 components, the broad reading score, which consists of both
24 timed and untimed components. The Nelson-Denny is only timed.
25 Q   The time component of the Woodcock-Johnson is three

LISA SCHMID, CCR, RMR

205

1  minutes, is that correct?
2  A   I don't recall, but it's not very long.
3  Q   And the time component in the Nelson-Denny reading test,
4  how long is that?
5  A   Overall, you're given like 20 minutes to read three to
6  five passages. I don't remember how many.
7      So you are given -- you have to not only read a
8  bunch of things over time, but you have to plan how you
9  distribute your time, and you also have to allocate some of
10 that time for the answer.
11     So there's a fair amount of executive planning
12 involved in the Nelson-Denny, and there is basically none in
13 the Woodcock-Johnson. And the reading demand is just more
14 intensive.
15 Q   And the number of questions on the Nelson-Denny. There
16 are 38 questions?
17 A   I believe so.
18 Q   And how did Mr. Sampson perform on the Nelson-Denny when
19 Dr. Michels had administered it?
20 A   She doesn't give, as I recall, how many questions he was
21 able to answer under unusual time constraints, indicating the
22 time pass, which is a kind of standard extended time
23 accommodation, just --
24     (Court reporter seeks clarification.)
25 A   Okay. Let me just start over again. The question was

LISA SCHMID, CCR, RMR

206

1  how did he do on time, extended time, I believe?
2  Q   No. My question was how did he perform on the
3  Nelson-Denny reading test that Dr. Michels administered?
4  A   She gave it to him on the standard time of 20 minutes,
5  and then she allowed 32 minutes, which is a little bit more
6  than time and-a-half. And when he did standard time, he
7  earned 16th percentile score, meaning out of a hundred people,
8  82 of them would do better than him.
9      When he was given time and-a-half, a little bit more
10 than time and-a-half, he was at the 64th percentile, which is
11 more or less dead average. Out of a hundred people, 36 would
12 do better than him.
13     So the extra time in enabled him to perform way
14 better, but still significantly below the 99th percentile that
15 would be expected in somebody with a verbal comprehension in
16 the more than 99th percentile.
17     This is just statistical probability. This is what
18 the empirical information out there says, absent a reading
19 disability, somebody who was in the 99th percentile in verbal
20 comprehension should be performing in above average and even
21 superior ranges on the comprehension measures.
22     (Continued on the next page.)
23
24
25

LISA SCHMID, CCR, RMR

A 1045

207

1    Q    What were Dr. Michael's conclusions?

2    A    She concluded that he had non-verbal learning

3    disability, which is one that I told you is not -- or did

4    she call it -- she gave him a non-specified mental disorder,

5    visual spatial memory, visual spatial processing.  She also

6    said he had a learning disability and dyslexia and he had a

7    reading disability.  So she diagnoses both the non-specific

8    development and she diagnosed him as having dyslexia.

9    Q    Did she make any recommendation with respect to

10   accommodations?

11   A    Extended time for testing.  Something that you do for

12   dyslexic people all of the time.  Access to notes, taped

13   books, books on tape, tutoring.  So it's kind of the

14   standard recommendations that we give for dyslexic people.

15   Q    Did you also have occasion to review a report from

16   Dr. Anderson?

17   A    Yeah.  Mr. Sampson wanted to look at the possibility of

18   an attention disorder.

19   Q    If you look at the bottom of page eight going into page

20   nine, does that summarize your review of Dr. Anderson's

21   report?

22   A    Hold on, I think I may have read Dr. Anderson's

23   conclusions.  Let me just take a moment to look at what I

24   was reading.  Dr. Michaels concluded -- yeah, LD NOS, right.

25   So she said he had LD NOS: non-specific learning disability.

ToniAnn Lucatorto, RPR, RMR, CRR

Official Court Reporter

208

1    She did not call him dyslexic.  She just said he had a

2    significant weakness and requiring visual spatial skills

3    that affect his academic performance to particular reading.

4    So she did not diagnose him as having dyslexia, she

5    diagnosed him as having LD NOS, effecting visual processing

6    and she recommended extended time and audio books, which is

7    what we do for dyslexic students.  We give them books.

8    Q    Let me go back to my prior question.

9         Did you also have occasion to review

10   Dr. Anderson's evaluation report in connection with your

11   evaluation?

12   A    My apologies.  Yes, after he saw Dr. Michaels a couple

13   months later, he went to Dr. Anderson because he wanted to

14   look further at the issue of attention disorder.

15   Q    On page 8, 9 that's where you report your summary of

16   Dr. Anderson's report?

17   A    Yes.

18   Q    There's a reference there to the SATA, which is the

19   Scholastic Achievement Test for Adults?

20   A    Yeah.

21   Q    Right.  Are you familiar with the SATA?

22   A    Yes, I am.

23   Q    Have you administered it yourself?

24   A    Yes, I have.

25   Q    Can you explain what that is?

ToniAnn Lucatorto, RPR, RMR, CRR

Official Court Reporter

209

1    A    It's a scholastic ability test that's meant for adults.

2    It's a good measure.  I don't always use it.  It's a good

3    measure.

4    Q    Does it test for reading --

5    A    It tests for reading, math, writing.  All of the

6    evidence.

7    Q    Can you describe the reading measures on the SATA?

8    A    It's very much like the Nelson-Denny, and that's

9    probably why -- I mean, the Nelson-Denny is more frequently

10   used.  They use the Nelson-Denny because it's the go-to

11   test.  The SATA you use as a secondary measure.  So because

12   he recently did the Nelson-Denny, she gave him the SATA.

13   I'm guessing.  It's like the Nelson-Denny in that it's got

14   passages, you have a certain amount of time, you have to

15   divide up your time between the different passages and the

16   need to answer questions.  It differs from the Nelson-Denny

17   in that the norms are based predominantly on age because the

18   SATA is used more for older adults.  Whereas the

19   Nelson-Denny, the norms are based on academic achievement

20   because it was used mainly for people that were still in

21   school.

22   Q    So the Nelson-Denny used grade norms where SATA uses

23   age norms?

24   A    Yes.  So there's a bunch of reasons.  I think the main

25   reason she gave him the SATA as opposed to the Nelson-Denny

ToniAnn Lucatorto, RPR, RMR, CRR

Official Court Reporter

210

1    is because only a few months before he did the Nelson-Denny.

2    You don't want to the have the possibility of practice

3    study, so she gave him a different test.

4    Q    When Mr. Sampson -- in Dr. Anderson's report when

5    Mr. Sampson had taken the SATA, how many questions was he

6    able to attempt under standard time?

7    A    Two thirds of the items.  Actually, that's with extra

8    time.  I don't recall if she said -- he only completed --

9    Q    If you can look at page 8 and 9 of the report.

10   A    Half.  He was able to do half.  So that's consistent

11   with what he reported having happened to him on the shelf

12   exam.  He just couldn't get the information in the time

13   allotted.

14   Q    In your experience in administering the SATA, is that

15   unusual for an individual to only answer half of the

16   questions under standard time?

17   A    If you're dyslexic, it's not unusual.  If you're not

18   dyslexic, the standard time has been developed because

19   majority of people can get through all the information in

20   the standard time, that's how they come up with the standard

21   time.  So dyslexic people cannot get through.  Non-dyslexic

22   people can.

23   Q    And in Mr. Sampson's case, he did not get through the

24   exam, correct?

25   A    Correct.

ToniAnn Lucatorto, RPR, RMR, CRR

Official Court Reporter

A-1046

211

1  Q    On the reading comprehension score on standard time on
2  the SATA, what was his score?
3  A    25th percentile, which is in lower average ranges.  The
4  bound of lower average and average.  And again, I'm
5  emphasizing that in somebody who has 99 plus percentile
6  verbal comprehension index, you would expect at least above
7  average.  And more like superior to very superior.  So it's
8  in the normal range, the low end of normal, but it is
9  marginally weak.
10 Q    By scoring in the 25th percentile, how -- of the
11 population, how much of the population did better than he?
12 A    Two points here.  I think -- 75 out of the 100 people.
13 75 out of 100 people would have done better than him.
14 Q    And that's the general population?
15 A    Of the general population, yes.  So the vast majority
16 out of 100 -- well of the majority out of 100 people would
17 have done better than him.  But what's also important here
18 is he did as well as he did only finishing half.  So that
19 means he did well on the path that he was able to -- again,
20 that's the marker for the exceptional.  A very, very bright
21 person.
22 Q    And if you review the rest of page nine of your report,
23 was there anything else significant that Dr. Anderson had
24 identified in her report?
25 A    Well, it's important that when you gave time and a

ToniAnn Lucatorto, RPR, RMR, CRR
Official Court Reporter

212

1  half, he performed in line of his expectations for his
2  aptitude.  He earned the superior score that we would expect
3  him to get, and even then he only the completed two thirds
4  of the items.  So his reading comprehension was
5  extraordinary, he just couldn't get to read.  Anything else
6  that was raised.  Complex figure was not good.  Visual --
7  Q    What is the complex figure?
8  A    You're asked to copy what's called the complex figure.
9  It's a human figure consisting of lines and circles.
10 Q    What assessment is that?
11 A    It's a neuro-psychological measure that --
12 Q    I'm sorry, can you identify the name?
13 A    Rey Ostrich Complex Figure Test.  On page nine where it
14 says the scores, one of them in the middle is called Rey
15 Ostrich Complex Figure Test, RCFT.
16 Q    Is that an assessment you're familiar with?
17 A    Very familiar with.
18 Q    What is the significance of these findings?
19 A    It's a complicated measure.  It measures a lot of
20 different things.  It indicates problems with visual memory
21 and executive functions.  And possibly motor output.  And
22 taken in the context of the other scores that are provided
23 here, this data needs to be interpreted contextually.  His
24 picture recognition score of the Woodcock Johnson was very
25 weak at 16 percentile.  So that, in combination with the Rey

ToniAnn Lucatorto, RPR, RMR, CRR
Official Court Reporter

213

1  figures, the Rey Complex Figure results, it means there's a
2  visual memory problem.  And his trail-making test, which is
3  below that, part B, which is requiring a shift mentally
4  between different -- is also weak at the below average.  So
5  that in combination with the Rey means problems with
6  executive function.  I'm sorry, this is like -- there's a
7  whole knowledge base involved in how to interpret neuropsych
8  tests.  So these data says visual memory problem and
9  definitely executive functional problem with shifting and
10 possibly problems with motor control.
11 Q    Do any of these assessments have any relationship to
12 taking an exam such as the USMLE?
13 A    Yeah.  Well, first of all, they say there's a bunch of
14 underlying neurocognitive deficits.  And wherever you have
15 neurocognitive deficits, you have roadblocks.  And people
16 need to do detours in order to get to wherever they're
17 going.  So, if nothing else, this profile means they do
18 things more slowly, intellectually because they're not
19 traveling the usual roads.  More specifically, regarding
20 reading, what we know is that his reading is very, very
21 slow.  And we know that his visual memory is very, very
22 weak.  And reading requires a lot of visual memory.  So if
23 your visual memory is weak, you're going to read more slowly
24 because you just don't have the drive that I talked about
25 earlier.  You just aren't reading words as quickly as the

ToniAnn Lucatorto, RPR, RMR, CRR
Official Court Reporter

214

1  usual person does, as the neuro-typical person does.  So you
2  can read, but it takes more time and it's more effort.  And
3  if you're very, very smart, you can probably get to
4  somewhere in the average range, but you're not getting there
5  in the way that the average person does.  So that's a big,
6  long-winded, yes.  It indicates he's going to have problems
7  reading exam questions that require a lot of dense reading.
8  And he's going to do it slowly and it's going to take him
9  more time.
10 Q    On the following page, page 10, there's a test there
11 referred to as the Stroop Color and Word Test?
12 A    Yes.
13 Q    How did Dr. Anderson report on Mr. Sampson's
14 performance?
15 A    This is actually interesting because he ends up having
16 a low score on interference.  That means difficulty with
17 inventory control.  That his documentation of difficulty
18 with innovation.  Because he's not doing well with his
19 interference.  He's having difficulty inhibiting his
20 response to being told not to respond.  That's just the
21 nature of the test.  The Stoop Color Word on the
22 interference dimension -- it's measuring your ability to
23 control, to inhibit your behavior.
24 Q    How is that measured?  How do they determine the
25 interference?

ToniAnn Lucatorto, RPR, RMR, CRR
Official Court Reporter

**A1047**

215

1   A   Darn.  You have to read words.  So you're just reading
2   the word quickly.  You have to read colors, you have to do
3   that quickly, and you can see he reads words high average in
4   color.  He just labels colors very well.  But the color word
5   -- if you notice, the color word is average.  So it's in the
6   normal range too, but the color word is when the word is
7   written in a different color.  So the word red is written in
8   yellow.  And the word green might be written in blue.  And
9   what you're required to do is ignore the color and read.  So
10  that's an inhibitory response.  You have to inhibit your
11  response.  Might be the other way, I always get it
12  backwards.  But you're supposed to ignore one and read the
13  other.  And that's where he only got an average score.  Now,
14  again, it's an average score, but it means his interference
15  control is below average.  So here actually have a
16  qualitative calculation of the difference between what would
17  have been expected based on his words and his colors ability
18  and when you combine the two.  So it's relative.  It's a
19  psychometric calculation of a relative difference that's
20  below expectations.  Bottom line his inhibitory control as
21  measured by the interference score is below average.  He's
22  got a problem with innovation.  So that's relevant ADD
23  because some models of ADD, in particular, Dr. Barkley's
24  back then, emphasize the importance of the inability to
25  inhibit responses.  There is no one measure for ADD, but the

*ToniAnn Lucatorto, RPR, RMR, CRR*
*Official Court Reporter*

216

1   interference dimension of the Stroop is one of the measures
2   one would look at.  Performance-based measure rather than
3   the scale.
4   Q   Then on pages 10, 11, and 12 of your report, you go
5   through and summarize a number of different letters and
6   reports that you have reviewed?
7   A   Yes.  I just wanted to underline, again.  So this
8   doctor found empirical evidence for ADHD in his own data --
9   in her own data set.  Even though the scale she used did not
10  show it, but it's there in the data which is very important.
11  The other things that I looked at, letters from his treating
12  psychiatrist, letter from somebody in the education group.
13  Support group at Stony Brook, another person at Stony Brook.
14  Yes.  These are --
15  Q   And these were all part of your history that you had
16  considered when making a diagnosis and recommendation?
17  A   Information, yes.
18  Q   So we have a letter here, and this is on page 10, that
19  you summarized from a Dr. Aronson.  What type of doctor is
20  Dr. Aronson?
21  A   Psychiatrist.  Treating psychiatrist.
22  Q   What type of treatment was Dr. Aronson providing?
23  A   His training is ADD.
24  Q   And did he make any recommendations?
25  A   He medicated him with stimulants, which is what one

*ToniAnn Lucatorto, RPR, RMR, CRR*
*Official Court Reporter*

217

1   gives people with ADHD.
2   Q   How long has Dr. Aronson been treating Mr. Sampson?
3   A   At the time of this letter, he had been treating him
4   for two years.
5   Q   And the date goes back to 2015?
6   A   Yes.  He had been seeing him since November 2015, and
7   this letter was written in March of 2017.
8   Q   And dexedrine, what type of medication is that?
9   A   It's a stimulant.
10  Q   Is that a controlled substance?
11  A   Yes, it is.
12  Q   Do you need a prescription for that?
13  A   You need a prescription.  And even then the
14  prescription is closely monitored.
15  Q   A prescription like that, a psychologist would not be
16  able to prescribe such a medication?
17  A   No.
18  Q   In fact, are you aware how often one needs to go to a
19  medical doctor in order to receive that type of
20  prescription?
21  A   I think it's once a month.
22  Q   If you turn to page 13 of your report, doctor.  Does
23  this list the various assessments and the test that you had
24  administered or that had been administered?
25  A   Under my supervision or direct administration, all of

*ToniAnn Lucatorto, RPR, RMR, CRR*
*Official Court Reporter*

218

1   those are my tests.
2   Q   So if we turn to page 14 of your evaluation under the
3   heading performance and symptom validity, can you explain
4   what that is?
5   A   Oh, that's very important.  We always want to know
6   whether we're getting a good effort on the part of -- a
7   valid and good effort on the part of the person that we're
8   examining because otherwise how can you interpret the data?
9   You want to make sure you're getting reliable data that's
10  accurate and the person's best effort.  We do that in any
11  case.  We're mindful of the validity.  When it's high stakes
12  testing or forensic testing, when we're going, addressing
13  the question of accommodations, it becomes even more
14  important that you formally assess the motivation and the
15  symptom validity of the person.  So that's why I have a lot
16  of measures here.  Some of them are freestanding.  Meaning,
17  it's a test that, in and of itself, only measures
18  motivation.  And others are imbedded.  Meaning, they're part
19  of the other test but some people don't know.  They don't
20  have any reason to suspect their accuracy is being assessed.
21  It's embedded and it allows you to take pulses of motivation
22  and effort throughout the evaluation.  So different tests
23  have these embedded validity issues so you can measure over
24  the course of the whole evaluation how are you getting it.
25  Q   Is the symptom validity test to assess whether or not

*ToniAnn Lucatorto, RPR, RMR, CRR*
*Official Court Reporter*

**A1048**

219

1  an individual is either malingering or not being candid with
2  their answers?
3  A   It's one of the things that get assessed.  You can also
4  be assessing if the person is just too obvious to be giving
5  you interpretable information.  So it's designed to assess
6  all of the sources of possible validity.
7  Q   What were the findings of the symptom validity test
8  with respect to Mr. Sampson?
9  A   They were all valid on all of the measures, and
10  according to the guidelines in the field, they don't all
11  have to be valid.  You know, even if you have one or two or
12  even three that are invalid, that does not invalidate the
13  evaluation.  So a beautiful valid on everything profile like
14  we have here, makes one even more confident that you're
15  getting accurate information.
16  Q   And what does that suggest to you that he had all valid
17  symptom validity assessments?
18  A   That he was trying hard and giving us his best efforts,
19  and we could trust the findings.
20  Q   Did you also -- was there also an IQ test administered?
21  A   Yes.  Let's give it another minute for this to stop.
22  Yeah, I gave the Wechsler for the WAIS score.
23  Q   And the WAIS score refers for the Wechsler Adult
24  Intelligence Scale?
25  A   Correct.

220

1  Q   That's an IQ test or test of abilities?
2  A   Yes.  It's the most commonly used.
3  Q   And the results of that is contained at the bottom of
4  page 14?
5  A   And the top of page 15.
6  Q   Can you describe the results?
7  A   Can you repeat your question, please.
8  Q   Can you explain what the results were of the WAIS?
9  A   Well, this was amazingly similar to the results that
10  were collected in 2013.  They were almost identical with the
11  exception of his verbal comprehension, which was still at
12  the 99th percentile.  But lower than the one he got in 2013.
13  A little bit fluctuation is not notable.  It happens.  You
14  can't get exactly the same test score on all tests all the
15  time.  So it was very similar.  He was exceptional in his
16  verbal reasoning.  His perception was average, but close to
17  three standard deviations below what he got on the verbal.
18  Which is, again, I think I actually --
19  Q   So just to be specific there.  You're referring to on
20  the verbal comprehension index, which is VCI, he scored a
21  standard score of 134, which is in the 99th percentile; is
22  that correct?
23  A   Correct.
24  Q   And then on the Perceptional Reasoning Index, which is
25  PRI, he had a standard score of 102, which is in the

221

1  55th percentile?
2  A   Correct.
3  Q   Is that what you mean when there's a discrepancy?
4  A   Yes.  But that discrepancy is seen in only 1.2 percent
5  of the normal population.  It's that rare.
6  Q   So are you saying compared to most people in the
7  general population, he fits in this one percentile?
8  A   Yes.  Compared to most people in the population.  The
9  degree of distance between his right leg and left leg exists
10  -- 99 percent of people do not have that.
11  Q   And if you go on page 15, you -- going over to page 16,
12  you also administered several tests of achievement?
13  A   I just want to say he has a lot of lopsidedness.
14  The one that's most dramatic is the one between his verbal
15  and his performance.  But even the distance between his
16  processing speed and his perception reasoning is infrequent
17  and uncommon.  So he's got a very internally -- the man is
18  brilliant, but he's extremely unbalanced inside.  So it's
19  hard to get the parts to work together well.
20  Q   So going to my prior question.  The academic
21  achievement, is that reflected on pages 15 and 16 of your
22  report?
23  A   Yes.
24  Q   So at the bottom of page 15, you're referring to the
25  Woodcock Johnson Test of Achievement?

222

1  A   Yes.
2  Q   So you administered one subtest, which is the sentence
3  reading fluency test.  What type of reading is involved with
4  that?
5  A   Really low level.  You're just reading sentences, short
6  sentences.  A bird flies, a fish sings.  And many, many
7  sentences with that level of complexity.  And the task is
8  just to say, does a bird fly; yes or no.  Does a fish sing;
9  yes or, no.  A level of complexity is very, very minimal and
10  it's asking you to quickly read sentences very quickly.
11  Read sentences, simple sentences, and make judgments.  So
12  his score, it's okay.  It's 112.  It's the 70th percentile,
13  but it's one and a half standard deviations below what we
14  would expect for somebody with a verbal IQ of the
15  99 percentile.
16  Q   And that particular assessment, it's timed but it's
17  only timed for three minutes?
18  A   Yes.  It's just looking at speed of reading and
19  understanding at a low level.
20  Q   And then on the next page, there are some other reading
21  assessments?
22  A   Again, I have to emphasize that in all of these, the
23  most important, in my analysis and any analysis where we're
24  looking at the doubly exceptional people is the Z score,
25  which is all the way on the right.  And that is the

**A1049**

223

1  difference between what is expected for the aptitude and
2  what the actual score is. And it's a standard statistical
3  transformation, which allows you make comparisons,
4  statistically, between the two.
5  Q    So --
6  A    So anything --
7  Q    Going to the reading tests that were administered on
8  page 16, the -- the WIAT was administered?
9  A    Yes.
10 Q    And that is the Wechsler Individual Achievement Test?
11 A    Correct.
12 Q    And there's a word reading assessment there. Is that a
13 -- that's just reading words?
14 A    That's reading words --
15 Q    That's not reading sentences or paragraphs?
16 A    Simple decoding.
17 Q    The pseudo decoding, what does that subtest do? Is
18 that just real words?
19 A    It's not real words. It's using the phonetic analysis.
20 And you can see he does way worse on the pseudo word
21 encoding than he does on the word encoding. Either one is
22 average better. But he's much weaker on the pseudo word,
23 which is an echo or shadow of what was once a phonetic,
24 dyslexic process. So he's learned. He's a smart guy and he
25 learned to read, but it still shows up in the relative

ToniAnn Lucatorto, RPR, RMR, CRR
Official Court Reporter

224

1  discrepancy.
2  Q    What would enable a person that's dyslexic at a younger
3  age to be able to perform, for example, here on reading
4  comprehension, the 45th percentile?
5  A    10 hours of tutoring on a weekly basis over a lifetime.
6  Q    By the way, the reading comprehension of the WIAT, is
7  that a timed assessment?
8  A    I believe it's untimed. I looked at it. It's untimed
9  and it's not very demanding. And he gets an average score
10 of the 45th percentile. But again, it's two and a half
11 standard deviations below what we would expect his
12 intelligence.
13 Q    And the oral reading fluency. That's reading out loud?
14 A    Yes. And it was timed.
15 Q    And that is timed. But that's a short timed test
16 similar to the Woodcock-Johnson reading fluency test?
17 A    Yes.
18 Q    And on this particular assessment, it has a subtest for
19 the oral reading rate?
20 A    Yeah. And again, if you look all the way over on the
21 right and you see that minus 2.3 number, that means that
22 he's two -- close to three standard deviations below what we
23 would expect for his aptitude in speed with which he would
24 use this very simple stuff.
25 Q    It appears that you also, during the course of the

ToniAnn Lucatorto, RPR, RMR, CRR
Official Court Reporter

225

1  evaluation, administered the Nelson-Denny reading test?
2  A    Yes.
3  Q    This is the same test that Dr. Michaels had
4  administered?
5  A    Yeah. I don't know if this is version J or H. I think
6  there's two different versions, but it's basically the same
7  test.
8  Q    So this is the test where there's a number of passages
9  and 38 questions and it's standard time for 20 minutes?
10 A    Correct.
11 Q    Within the 20 minutes, how many questions did
12 Mr. Sampson attempt?
13 A    In the first -- in the 20 minutes he did 12 out of 38.
14 Q    Is that significant to you?
15 A    In and of itself, absolutely. If the guy is giving me
16 valid efforts, which measures indicate he was, then despite
17 his valid effort, he was only able to get through 12 out of
18 38 items. That, in and of itself, is like screaming
19 dyslexia or something that's getting in the way of reading.
20 Q    It appears he scored in the first percentile?
21 A    Yes.
22 Q    That's based on a grade 16 norm, correct?
23 A    Yeah. He's a college graduate, so I compared it to
24 people that have graduated college.
25 Q    But notwithstanding that, if you look at the grade

ToniAnn Lucatorto, RPR, RMR, CRR
Official Court Reporter

226

1  equivalency, what does that indicate?
2  A    I guess it means that the students in the 7th grade
3  would only get would be able to answer 12 out of the 38.
4  But not really a valid comparison because most 7th graders
5  wouldn't be able to answer all 38 and maybe be able to read
6  all of it and answer all 38 and, you know, get 12 correct,
7  maybe. In his case, he answered 12 and he got 12 correct.
8  That's, again, different. It's qualitatively different than
9  the average 7th grader. I'm try to emphasize this. That
10 people with brain damage, brain dysfunction, can get to
11 similar goals, but they do it in a different way.
12 Q    The -- were you also administering the Nelson-Denny
13 reading test with extended time?
14 A    Yeah. What I did is rather than do this random time
15 and a half that people pulled out of their hat, I said,
16 okay, let's see what he can do when he's allowed to take as
17 much time he needs. How well does he do, how much time does
18 he take. He took basically double time and he did in line
19 with his aptitude. In other words: when he was allowed to
20 take the time that he needed to take, he performed at the
21 level that he should be able to perform, given his ability.
22 That is what's called leveling the playing field. When you
23 level the playing field, he shows us his stuff.
24 Q    So according to this report, it appears that he was
25 given an additional 54 and a half minutes and in that 54 and

ToniAnn Lucatorto, RPR, RMR, CRR
Official Court Reporter

**A1050**

227

1  a half minutes he was able to complete all 38 items?
2  A   Yes.  He answered 37 of those 38 correctly.
3      THE COURT:  We're going to -- we're not taking the
4  long break at 11:30 because I moved my sentencing to 12:30.
5  So we can have a lunch break uninterrupted.  We're going to
6  take a ten-minute break now and then we'll go until 12:30.
7      (A recess was taken at this time.)
8      THE COURT:  Okay, we're back, doctor.
9  CROSS EXAMINATION
10 BY MR. WEINER:
11 Q   Dr. Wasserstein, on your report from pages 17 through
12 22, those are a series of neuro-psychological assessments
13 that you had administered?
14 A   Yes.
15 Q   On pages 17 through 22 of your report, are those
16 neuro-psychological assessments that were administered in
17 the evaluation of Mr. Sampson?
18 A   Yes.  Yes.
19 Q   So if we turn to page 19, there's an assessment there
20 called the Wisconsin Card Sort Test?
21 A   Yes.
22 Q   That particular assessment, can you explain how that's
23 administered?
24 A   That's a computer administered visual stimuli executive
25 function test where people are shown shapes in different

228

1  colors and asked to sort them.  And the sorting rule changes
2  over the course of the evaluation.  And the only way the
3  person gets that information about the sorting rule is
4  they're told correct or incorrect.  And what it's looking at
5  is the ability in which the person can come up with new
6  rules for sorting, and ability with which the person can use
7  the feedback that they're providing, and shift between the
8  different rules.  So the shifting concept formation, and
9  feedback in the processing.  And it's all visual.
10 Q   How did Mr. Sampson perform on this particular measure?
11 A   Poorly.  His scores -- his lowest scores were low
12 average, but low average is a problem on this measure.  He
13 had a lot of errors.  He was at the 21st percentile, meaning
14 that 79 out of 100 people would have done better than him.
15 Similarly, he made errors at the same rate for severation.
16 Meaning, that he stuck with the rule and the shift and
17 errors of non-conservative.  Meaning, that he just didn't
18 process usual -- he just didn't get it.  He didn't get the
19 feedback.  So he was weak.  He was not grossly impaired, but
20 he was very weak in his ability to implement these visually
21 processed executive functions.
22 Q   How is the particular difficulties that Mr. Sampson
23 demonstrated on this assessment, how is that relevant to an
24 assessment like the USMLE?
25 A   Well, let me answer that question and also say as a

229

1  side, the Wisconsin Card Sort is one of the measures that's
2  not 100 percent, but it's considered a good, performance
3  based measure of ADD.  In terms of the reading thing, again
4  it's visual processing.  It's speed with which he can shift
5  between one mental set and another from the visual database.
6  It's just general accuracy of his ability to use visual
7  information rapidly and correctly.
8  Q   And on page 20 you also report on the results of the
9  California Verbal Learning Test.  Can you explain what that
10 is?
11 A   That's a list-learning, it's a verbal list-learning
12 measure.  So he's given a bunch of random words and they're
13 read to him and his job is to recall them, repeat them back.
14 And one thing is on list B, he does badly.  So he has what's
15 called proactive interference.  He's actually at the 7th
16 percentile for that.  That's a deficit.  Meaning that all
17 information gets in the way of retrieving new information.
18 He's just slow.  Even verbally, pulling facts out of his
19 head.  And he's got difficulty in coding verbal information
20 rapidly.  So the California Learning Test tells us that he
21 has both visual memory and learning problems.  Both visually
22 and auditorally.  So both for visual information and
23 linguistic information he has problems encoding and
24 retrieving.
25 Q   So the California Learning Test, those assess both

230

1  visual information and auditory information?
2  A   I'm sorry.  I was looking at the Rey Complex Figure,
3  which is right below.  The California is auditory.  The Rey,
4  the Rey Complex Figure --
5  Q   Let's stick with the California Verbal Learning Test.
6  That's strictly auditory?
7  A   Strictly auditory.
8  Q   How is -- since that's auditory, it's not written, how
9  does that have any relationship with the USMLE?
10 A   Well, it speaks to yet another underlying neuropsych
11 deficit which provides a roadblock in his ability to
12 retrieve information and to do things more slowly.  In this
13 case, his ability to retrieve, kind of, random words.
14 Random verbal information.  And on the USMLE, there's a lot
15 of retrieval of that of words and verbal information.
16 Doesn't mean he can't do it, I have to emphasize that.  It
17 just means that he does it more slowly.
18 Q   And then we'll move on to the Rey.  I'll call it the
19 Rey Ostrich Complex Figure.  Can you -- that's the
20 assessment you previously described?
21 A   Yes.  That the other doctor used.  I forget if it was
22 Dr. Michaels or Dr. Anderson.
23 Q   How did Mr. Sampson perform this time?
24 A   Consistently impaired.  He had impaired scores.
25 Q   And how does this particular assessment have any

A1051

231

1   relationship with the skills needed for the USMLE?
2   A   Again, he chose another roadblock. In this case, the
3   retrieval of complex information and medical information. A
4   lot of it is complex and visual in nature. Doesn't mean,
5   again, I'm emphasizing again, doesn't mean he can't. It
6   means that he does it with greater difficulty. Takes
7   longer.
8   Q   Then on page 22, there were several measures of social
9   and emotional function that you administered?
10  A   Yeah. I also gave a PAI, which I don't report here,
11  but which was unremarkable. Basically all of the social,
12  emotional measures he was fine.
13  Q   So on the -- what is the PAI?
14  A   Personality Assessment Inventory. So it's looking at
15  things beyond anxiety and depression. Looking at
16  schizophrenia, psychosis, personality disorders, and all
17  many possible psychiatric disorders.
18          (Continued on the next page.)
19
20
21
22
23
24
25

232

1   BY MR. WEINER (Cont'd):
2   Q   And on that, what were the results of the PAI?
3   A   Healthy, healthy, healthy.
4   Q   And that looks at disorders like anxiety, depression?
5   A   Well, the BPI and APA targets anxiety and depression.
6          The PAI does anxiety depression and everything
7   else.
8   Q   Further down you have the CAARS or the C-A-R-R-S,
9   what does that stand for?
10  A   Conners' Adult ADHA Rating Scale.
11  Q   What is that used for?
12  A   It's used for assessment, quantitative attention of
13  symptoms related to attention deficit disorder and what's
14  neat about the CAARS is that it provides norms for every
15  single item by age and sex -- I think just by age -- no,
16  sex too.
17          So compared to other 30 year old men, he
18  endorses the same number and difficulty level with
19  attention or memory or control. It allows quantitative
20  assessment and a developmental assessment because most of
21  the DSM is very crude. It's designed for kids up to 18,
22  the questions.
23          Whereas, the CAARS translates the same questions
24  to more adult manifestations and looks at how normal,
25  typical adults answer those type of questions and adjust

233

1   to that.
2   Q   The CAARS is a newer measure?
3   A   Yes, it is.
4   Q   And what were the results of that measure?
5   A   And I very carefully have to emphasize I went over
6   every item with him.
7          He had clinically significant problems in all
8   those areas, in all DSM-IV attention, in all the DSM-IV
9   hyperactive symptoms. He also was at risk in terms of
10  emotional liability and definitely had big problems in
11  terms of self-confidence and I went through every item
12  with him because I wanted to double-check because I know
13  in the past he didn't endorse these kind of items on other
14  questionnaires and I asked him about that and he said it
15  in the past he was just denying that he didn't want to
16  look at it.
17  Q   Did you provide a diagnosis in connection with your
18  evaluation?
19  A   Yes.
20          I diagnosed him as having attention deficit
21  hyperactivity disorder. Mistakenly I characterized it as
22  combined, probably because of this, but based on the other
23  one it's borderline, and I also gave him a specific
24  learning disability in reading and in written expression.
25          Was there anything else? No. I think that's

234

1   what I did.
2   Q   Is your diagnosis of ADHD consistent with the
3   criteria set forth in the DSM-V?
4   A   Unequivocally.
5   Q   And what particular measures signify to you that he
6   met that criteria?
7   A   It's no one measure.
8          The way I indicated in my chapter that's so
9   heavily cited in the diagnosis of ADHD in adults it's
10  everything. It's the history. It's the results of the
11  findings. It's the input from collaterals and all of
12  these converged here.
13  Q   Did you rely solely upon self-report in making the
14  determination that Mr. Sampson has ADHD?
15  A   Unequivocally not.
16  Q   What else did you rely upon?
17  A   I relied on the history.
18          I relied on the multiple evaluations. Remember
19  I found problems with inhibitory control in one of the
20  previous evaluations and I relied on my own data, the
21  scales, the inquiry, the attention test, the executive
22  function performance test. You find more frequently -- in
23  adults you more frequently are going to find with
24  executive functioning in adult neuropsychological
25  assessment battery than you will find problems in

**A1052**

235

1  sustained retention, but we found problems in sustained.
2  It was consistently a problem for him in the trail making
3  testing.
4       So both historically in testing and currently in
5  my own testing, and historically in teacher reports and
6  educational performance, it's been there all along.
7  Q.  Had any other professional diagnosed Mr. Sampson with
8  ADHD prior to you?
9  A.  The treating psychiatrist, the guy who wrote the
10 script for stimulus.
11 Q.  That's the person who's been treating him since 2015?
12 A.  Correct.
13 Q.  Dr. Michels and Dr. Anderson did not find ADHD, is
14 that correct?
15 A.  They did not find those.
16      I think both of them found attention issues but
17 they attributed it to other things.  They just think --
18 they didn't think he met criteria but they did not spell
19 out why he did not.
20 Q.  How is it possible that two other evaluating
21 psychologists do not find ADHD but you did?
22 A.  Unfortunately, the diagnosis of ADHD in adults is
23 often missed by both psychiatrists and psychologists.
24      It's easy to miss, especially if the person
25 himself is denying it, which is the case here.  He was for

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

236

1  many years.
2  Q.  How do you know that?
3  A.  Because he told me.
4       His family, the culture was you weren't learning
5  disabled.  You weren't attention deficit disorder.  You
6  didn't do that sort of thing.  It was bad.
7  Q.  You also indicated that you diagnosed a learning
8  disorder based on reading.
9       Was that consistent with the diagnostic criteria
10 in the DSM?
11 A.  Yeah.
12 Q.  And what particular measures were you relying upon in
13 making that diagnosis?
14 A.  Well, his low performance on standardized reading
15 measures, in the case of Nelson-Denny it was absolutely
16 low and in the case of all of the scores they were
17 relatively low, unexpected, it's a relative deficit which
18 is -- there is argument about whether that's appropriate.
19      There's no resolution.  Most states still
20 accept, the vast majority of states accept the
21 discrepancy, the standard for diagnosis and that's where
22 it started.
23 Q.  Does Mr. Sampson have substantial impairments?
24 A.  Unequivocally.
25 Q.  And what are they?

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

237

1  A.  He reads at an absurdly slow rate and, as a
2  consequence of that, he cannot do what most people can do
3  that requires reading under usual time demands.
4       This translates into difficulty at school
5  historically and presently difficulty on tests.  I doubt
6  if it's a big deal when filling out forms unless there is
7  a big line behind him and people are complaining.
8       So his ability to do reading related things is
9  profoundly compromised.  As an ADDer, his ability to
10 function efficiently and well in work setting is
11 compromised and slow, relative to others.
12 Q.  Do these particular conditions, these comorbid
13 conditions, what impact do they have operating together?
14 A.  I was going to say just concentrating, doing things
15 that require concentration and attention on teachers,
16 colleagues, coworkers apparently have often said to him
17 you are not paying attention.  Do I need to repeat myself.
18 So it affects social interaction.
19      Could you repeat your question.
20 Q.  The combination of these two impairments, do they
21 operate separately or do they act in concert with each
22 other?
23 A.  They are absolutely in concert.
24 Q.  Okay.
25 A.  Sometimes they operate separately, you know, and

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

238

1  sometimes they operate in concert when both are required.
2  Q.  Did you make any recommendations regarding what type
3  of accommodations Mr. Sampson should have on the USMLE?
4  A.  Well, there's no question that he requires extended
5  time.
6       The usual accommodation of time and a half will
7  be helpful, but based on my empirical observation, he
8  probably needs double time.  So he needs extended time.
9  If he can get things in the form of books on tape, if he
10 has to learn things, that would be good.  Whatever he can
11 have in the way of assistance with regards to reading and
12 writing, being allowed to use a computer if he requests a
13 computer for exams, would be good as well.
14      If he wants, it would probably be good for him
15 to separate exams over time and a longer break because he
16 has to work twice as hard to do what others do and that is
17 twice as tiring.  So he needs breaks.
18      MR. WEINER:  That's all the questions I have,
19 your Honor.
20      THE COURT:  Okay.
21      Cross-examination.
22 CROSS-EXAMINATION
23 BY MS. MEW:
24 Q.  Good morning, Dr. Wasserstein.  I'm Caroline Mew.
25 I'm one of the lawyers for the National Board of Medical

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

**A1053**

239

1  Examiners.
2         I believe you testified that you are on the
3  faculty of the Mount Sinai School of Medicine in the
4  department of psychiatry.
5         Is that correct?
6  A.  I'm voluntary faculty, yes.
7  Q.  Then are you also the director of the central nervous
8  system support?
9  A.  The thing is -- the central nervous support system,
10 yep.
11 Q.  Is that your private --
12 A.  That's my private practice.
13 Q.  Okay.  Thank you.
14        And you provide neuropsychological evaluations
15 and other services through that private practice?
16 A.  Correct.
17 Q.  Do you also provide neuropsychological evaluations as
18 part of your work on the voluntary faculty position at
19 Mount Sinai?
20 A.  I supervise.
21 Q.  Okay.
22 A.  I don't do the actual testing there.
23        I supervise other people's evaluations.
24 Q.  Is Dr. Miller, who co-signed the report with you, is
25 she affiliated with Mount Sinai or was she?

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

240

1  A.  She was.  That's how I met her.
2         She was one of my supervisees.
3  Q.  And I just want to make sure, I think you covered
4  this in your direct --
5  A.  I just closed the door.
6  Q.  I know.  I wanted to wait for you.
7  A.  Okay.
8  Q.  But just to make sure I'm clear, when you evaluated
9  Mr. Sampson, you conducted the initial interview.
10        Is that correct?
11 A.  Correct.
12 Q.  And then Dr. Miller administered the test or most of
13 the test, is that right?
14 A.  Correct.
15 Q.  But you may have administered some of them?
16 A.  I usual administer some of them.
17        I really don't recall which ones I administered.
18 As I said, I was sick afterwards.  So the details are not
19 as clear as I would like them to be.
20 Q.  I understand.
21        Are there any tests that you routinely like to
22 be the one that you administer them?
23 A.  I routinely like to do the D-KEFS, but I really don't
24 recall.
25        But I don't necessarily do only the D-KEFS.

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

241

1  Sometimes I only want to do or sometimes I say I want to
2  do that.  It's really a question of formation because you
3  are there and you are trying to get things done in a fixed
4  time.
5  Q.  Understood.
6         And I think I also understand you are no longer
7  working with Dr. Miller.  She moved to Georgia.
8         Is that right?
9  A.  She's abandoned me, yes.
10 Q.  Do you know if she is still working as a
11 psychologist?
12 A.  Yes, she is.
13 Q.  I wanted to talk about timing a little bit.
14        Mr. Sampson's testing from your report it looks
15 like it was conducted on two consecutive days, correct,
16 August 8th and August 9th?
17        I'm looking at the first page of your report if
18 you would like to reference.
19 A.  Okay.
20 Q.  If you turn to page 25 of your report, so the very
21 end, it states that it was written on December 6, 2020?
22 A.  I never write my reports right after I do the
23 testing.
24        I certainly didn't do it right after I was
25 hospitalized in October and, quite frankly, that is

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

242

1  amazing for me to have a report written so quickly.
2  Q.  Understand.
3         I just wanted to make sure I understood what
4  that date signifies.  As of December 6, 2020, the report
5  was prepared -- was it final as of that date?
6  A.  To my mind it was final.
7         I think subsequently Mr. Sampson contacted me
8  and wanted to make some minor factual corrections, which
9  is not -- not unheard of or uncommon.  There's always
10 factual errors, minor ones in these voluminous history
11 noted tests.
12        At some later point, I don't recall when it was,
13 we met and we corrected those, but it didn't change the
14 report.
15 Q.  So at some point prior to December 6, 2020, had you
16 provided, like, a draft to Mr. Sampson?
17 A.  No.
18 Q.  Did you provide him your written report on December
19 6, 2020?
20 A.  I gave it to him at some point subsequent to that.
21        I put the day when I finished the report in the
22 report and then at some subsequent point I gave it to him,
23 and I do not recall if I mailed it or emailed it or what,
24 but he got the report.
25        And then he read it and he found some factual

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

243

1  errors and at some other subsequent point during that
2  COVID year we met and corrected those facts.
3  Q.  I'm sorry.  I know you tried to explain this, but I
4  want to make sure I'm clear.
5      Do you have any general sense of when you would
6  have sent the report to Mr. Sampson after you initially
7  prepared it?
8  A.  At that time.
9  Q.  At that time.  Okay.
10  A.  That time.
11  Q.  Do you have any sense of when you met with him in
12  person to go over the report?
13  A.  It was afterwards.
14      It was the course of the year.  It was a while.
15  It was sometime in '21.
16  Q.  Did you know Mr. Sampson before he came in to be
17  evaluated in August of 2020?
18  A.  No.
19  Q.  And then did you have any ongoing treatment
20  relationship with him after the August 2020 testing?
21  A.  No.
22  Q.  I believe you discussed the importance of obtaining
23  collateral information when you are assessing someone for
24  ADHD.
25      Is that correct?

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

244

1  A.  It's something that is encouraged.
2      I personally don't think it's essential, but it
3  is something we try to get.
4  Q.  I looked on your website, Dr. Wasserstein, and you
5  have an article listed there, diagnostic issues for
6  adolescents and adults with ADHD.
7      Is that familiar to you?
8  A.  Yes, I have -- yeah.
9  Q.  On page 538 of that article you write:
10      Sometimes people overreport because they are
11  motivated to get the diagnosis in order to secure academic
12  accommodations, provide an explanation for their
13  dysfunction, or generally be symptom magnifiers of
14  response --
15  A.  If --
16  Q.  -- it is helpful to have additional input from a
17  collateral reporter, such as a spouse or parent to be
18  given the scales.
19      Do you remember writing that?
20  A.  Of course.
21      I mean, it is helpful.
22  Q.  Okay.
23      So here you gave Mr. Sampson the CAARS scales,
24  is that correct, CAARS?
25  A.  Yes.

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

245

1  Q.  And you asked him to provide a set of those scales
2  to it sounds like his parents or maybe a friend or a
3  significant other.
4      Is that right?
5  A.  I believe I gave it mainly for his partner.
6      Although, I really don't recall.  I probably
7  gave it to both.
8  Q.  But you were looking for some kind of collateral
9  source of information through the CAARS scales
10  specifically?
11  A.  It was not the only source of collateral.
12      But it was one of the sources of collateral
13  information that I was seeking, yes.
14  Q.  And then you gave that to Mr. Sampson but he did not
15  return any of the collateral source information to you,
16  from the CAARS scales?
17  A.  From the CAARS scales, correct.
18  Q.  And in her 2013 evaluation of Mr. Sampson,
19  Dr. Anderson obtained collateral source scales for
20  Mr. Sampson, correct?
21  A.  I believe so, yes.
22  Q.  From his parents and from his girlfriend and from his
23  tutor.
24      Does that sound familiar to you?
25  A.  Yes.

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

246

1  Q.  And when those individuals filled out the CAARS
2  scales, none of them endorsed clinically significant level
3  of ADHD symptoms, is that right?
4  A.  They used the Barkley's scale, not the CAARS scale.
5  Q.  Oh.
6  A.  That doesn't matter because I don't know if the
7  Barkley's scale has validity measures embedded and, yes,
8  they did not indicate symptoms.
9  Q.  Thank you.  I'm sorry.
10      You are right.  They were the Barkley's scales.
11  I apologize for that.
12  A.  And I looked up to Barkley enormously.
13      I don't believe that particular scale has
14  embedded validity measures.
15  Q.  Who is Dr. Barkley?
16  A.  He's a major expert in adult -- attention deficit
17  disorder.
18      He's a colleague of Dr. Murphy's, actually.
19  Q.  Your evaluation report, and we talked about this, you
20  talked about this a bit in your direct, your evaluation
21  report includes an educational history for Mr. Sampson, is
22  that right?
23  A.  Right.
24  Q.  And you agree that an individual's performance in
25  school, academic performance in school is relevant to your

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

247

1  analysis, is that correct?
2  A.   Absolutely.
3  Q.   And you also address Mr. Sampson's standardized test
4  scores for the SAT and the ACT as part of your evaluation.
5       Is that correct?
6  A.   I do, yes.
7  Q.   And those are also appropriate to look to when you
8  are assessing someone for ADHD or LD?
9  A.   Correct.
10 Q.   There was a difference in Mr. Sampson's performance
11 on the Nelson-Denny test between 2013, when he took it
12 with Dr. Anderson and then in 2020 when he took it with
13 your office.
14      Is that correct?
15 A.   There was some difference.
16      It's extremely unlikely, as I said in my
17 previous direct testimony, to get exactly the same scores.
18 It's more common to have some difference and there was
19 some difference.  But both performances were weak or
20 impaired.
21 Q.   Thank you.
22      MS. MEW:  I don't have any other questions.
23      THE COURT:  Anything else?
24      MR. WEINER:  No, your Honor.
25      THE COURT:  Thank you, Dr. Wasserstein.

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

248

1       You can go about your day.  Thank you.
2       MR. WEINER:  Thank you.
3       THE WITNESS:  Okey-dokey.
4       THE COURT:  Thank you.
5       Who's next?  We have until 12:30.
6       MS. VARGAS:  We have no further witnesses, your
7  Honor.
8       THE COURT:  Okay.
9       Who do you have here?
10      MS. MEW:  Well, your Honor, we might need five
11 minutes, just to figure out the best order.
12      We have someone who we were calling remotely and
13 we were planning on putting him on first.
14      THE COURT:  Okay.
15      MS. MEW:  But I didn't think we would be
16 finishing with their direct.
17      THE COURT:  Let's see if we can get him and we
18 can do at least a half hour.
19      MS. MEW:  Okay.
20      THE COURT:  Thank you.
21      (Recess.)
22      THE COURT:  Okay.  Be seated.
23      Okay, Mr. Mandelsberg.  You are on.
24      MR. MANDELSBERG:  Defendant calls Dr. Marc
25 Kroopnick.

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

249

1       THE CLERK:  Dr. Kroopnick, please raise your
2  hand.
3  MARC KROOPNICK,
4       having been duly sworn, was examined
5       and testified as follows:
6       THE CLERK:  Please state and spell your name for
7  the record.
8       THE WITNESS:  Mark Kroopnick, M-A-R-C,
9  K-R-O-O-P-N-I-C-K.
10      THE COURT:  Go ahead.
11      MR. MANDELSBERG:  Your Honor, for purposes of
12 this examination it may be helpful to have the binder that
13 we handed up yesterday of defendant's exhibits.
14      THE COURT:  Which binder, the big binder?
15      MR. MANDELSBERG:  It's a big one, labeled
16 defendant's hearing exhibits.
17      THE COURT:  Got it.
18      MR. MANDELSBERG:  Perfect.
19 DIRECT EXAMINATION
20 BY MR. MANDELSBERG:
21 Q.   Dr. Kroopnick, what's your current job title?
22 A.   Director of MCAT development and psychometrics with
23 the Association of American Medical Colleges.
24 Q.   Did you say the MCAT?
25 A.   Yes.

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

250

1  Q.   Can you spell that for the benefit of the court
2  reporter?
3  A.   MCAT, M-C-A-T.
4  Q.   And what is that?
5  A.   Medical College Admission Test.
6  Q.   And you referred to AAMC.
7       What is AAMC?
8  A.   The Association of American Medical Colleges.
9  Q.   And what is that organization?
10 A.   It is an association of medical schools and teaching
11 hospitals that works to improve the health for all.
12 Q.   How long have you worked at AAMC?
13 A.   I have been at AAMC for a little bit over 15 years.
14 Q.   Have you held any prior roles at the organization?
15 A.   Yes.
16      I was an analyst, a manager, and now a director,
17 in a director role.
18 Q.   And before you were at AAMC, did you hold any other
19 positions in any other organizations?
20 A.   Yes.
21      For one year I worked as a civilian employee for
22 the United States Navy at the Naval Inventory Control
23 Point as an operations research analyst.
24 Q.   And, Dr. Kroopnick, what are your current
25 responsibilities in your role as director of development

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

**A1056**

251

1  and psychometrics at the MCAT?
2      THE COURT:  Would you just move the microphone
3  so you are speaking closer.
4  BY MR. MANDELSBERG:
5  Q.  Did you hear me, Dr. Kroopnick?
6  A.  I did.
7      In my role I oversee question development as
8  well as operational scoring and analysis.
9  Q.  When you say question development, are you referring
10 to the questions that appear on the MCAT exam?
11 A.  Correct.
12 Q.  Are you familiar with the contents and format of the
13 MCAT exam?
14 A.  I am.
15 Q.  Are you familiar with the contents and format of the
16 exam as it was administered in 2013 and 2014?
17 A.  I am.
18 Q.  What is the MCAT used to evaluate?
19 A.  Sure.
20     So it is used by largely admissions officers at
21 medical schools to better understand an applicant's
22 academic credentials and proficiency, so that they can
23 assess his or her ability to learn in medical school.
24     And it is one piece of lots of evidence that
25 admissions officers consider.

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

252

1  Q.  Is it fair to say that most examinees who take the
2  MCAT are applying to medical school?
3  A.  That's fair to say that.
4  Q.  Is the MCAT a standardized test?
5  A.  It is.
6  Q.  How was the MCAT administered in 2013 and 2014?
7  A.  It was administered as a multiple choice exam on the
8  computer.
9  Q.  Was that a timed exam?
10 A.  It was a timed exam.
11 Q.  In 2013 and 2014 when the plaintiff in this case,
12 Robert Sampson, took the MCAT exam, what were the scored
13 subjects that appeared on that test?
14 A.  There were three sections, physical sciences, verbal
15 reasoning and biological sciences.
16 Q.  Dr. Kroopnick, I'm going to refer you to exhibits
17 which I believe that you have beside you, and first we are
18 going to look to Exhibit A to the Mandelsberg declaration.
19     Please let me know when you have that in front
20 of you.
21     (There was a pause in the proceedings.)
22 BY MR. MANDELSBERG:
23 Q.  The first page of the document should read excerpts
24 from MCAT essentials for 2014 and January 2015.
25     Do you have that document in front of you,

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

253

1  Dr. Kroopnick?
2  A.  I do.
3  Q.  Are you familiar with this document?
4  A.  I am.
5  Q.  What is it?
6  A.  It is a guide for individuals that were planning to
7  take the exam in 2014-2015.
8      It describes the content on the exam as well as
9  some of the logistical components of registering for and
10 taking the exam.
11 Q.  Was this MCAT essentials document available to all
12 examinees for the 2014 administrations of the MCAT?
13 A.  Yes.
14 Q.  Dr. Kroopnick, I note that the document makes
15 reference to 2014 and January 2015.
16     Was there a similar MCAT essentials document
17 that was available to those who took the MCAT
18 administrations in 2013?
19 A.  Yes.
20 Q.  I'd like to refer you to if you look at the top of
21 the page it will be page seven of 291.
22 A.  Yes.
23 Q.  Do you see a chart that reads exam overview?
24 A.  Yes.
25 Q.  Do the time allocations reflected in that exam

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

254

1  overview chart reflect the standard time allocations for
2  all of the MCAT administrations in 2013 and 2014?
3  A.  Yes.
4  Q.  I'll refer you now to Exhibit B to the Mandelsberg
5  declaration, the document whose title reads, excerpts from
6  second edition, the official guide to the MCAT exam.
7      Do you have that document, Dr. Kroopnick?
8  A.  I do.
9  Q.  Are you familiar with the document?
10 A.  Yes.
11 Q.  What is it?
12 A.  It was largely a test preparation research --
13 resource for examinees.
14     As you can see on the front cover it includes
15 lots of questions and solutions, as well as some data
16 about examination performance.
17 Q.  And was this official guide to the MCAT exam also
18 available to all examinees who took an administration of
19 the exam in either 2013 or 2014?
20 A.  It was available to them, yes.
21 Q.  I'd like to refer to page 16 of 291 on the top of the
22 page.
23     Please let me know when you are there.
24     (There was a pause in the proceedings.)
25 A.  Yep.  I'm there.

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

255

1    Q.    About halfway down the page there is a header that
2    reads verbal reasoning, 60 minutes.
3          Do you see that?
4    A.    I do.
5    Q.    What does that signify, Dr. Kroopnick?
6    A.    That signifies that the individual taking the exam
7    has 60 minutes to complete that section.
8    Q.    Was that the case for standard administrations of the
9    MCAT in 2013 and 2014?
10   A.    It was.
11   Q.    I'd like to refer you underneath the heading, the
12   guide reads, the verbal reasoning or VR section, evaluates
13   your ability to understand, evaluate and apply information
14   and arguments presented in writing.
15         Does that -- do you agree that that -- with that
16   characterization of the verbal reasoning section of the
17   MCAT exam as it was administered in 2013 and 2014?
18         (There was a pause in the proceedings.)
19   BY MR. MANDELSBERG:
20   Q.    I didn't hear you, Dr. Kroopnick.
21   A.    Sorry.  I accidentally muted.
22         Yes, I do.
23   Q.    So would a successful test-taker on the verbal
24   reasoning section need to understand the information
25   presented?

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

256

1    A.    Absolutely.
2    Q.    Would a successful test-taker need to evaluate that
3    information?
4    A.    Yes.
5    Q.    And would a successful verbal reasoning test-taker
6    also have to apply that information and arguments?
7    A.    It would.
8    Q.    Dr. Kroopnick, I have some questions about the format
9    of the exam as it was administered in 2013 and 2014.
10         How many passages appeared on the verbal
11   reasoning section on administrations of the MCAT exam
12   during that period?
13   A.    Seven.
14   Q.    And how long, approximately, was each passage on
15   those administrations of the test?
16   A.    Approximately 600 words.
17   Q.    I'll refer you to Exhibit C to the Mandelsberg
18   declaration, title page reads, MCAT release form for the
19   State of New York, form administered on January 23, 2015.
20         Please let me know when you are there.
21         (There was a pause in the proceedings.)
22   A.    I'm there.
23   Q.    Are you familiar with this document, Dr. Kroopnick?
24   A.    Yes.
25   Q.    What is it?

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

257

1    A.    It is a test form that we -- AAMC released in
2    compliance with I think New York's truth in testing law.
3          We are required to release a form once every
4    four years.
5    Q.    And so help me out.
6          Were the questions that are reflected in this
7    document actual MCAT test questions that were administered
8    to examinees?
9    A.    They were.
10   Q.    Are the questions that appear in Exhibit C consistent
11   in terms of content and format with those that would have
12   appeared on MCAT administrations in 2013 and 2014?
13   A.    Yes.
14   Q.    I'd like you to turn to page 60 of 291.  We are still
15   in Exhibit C.
16         Please let me know when you are there.  The
17   header on the page is verbal reasoning and underneath it
18   questions 43 to 75.
19   A.    I'm there.
20   Q.    I'm going to read to you the direction that appears
21   on the page.
22         There are six passages in the verbal reasoning
23   test.  Each passage is followed by several questions.
24   After reading a passage, select the one best answer to
25   each question.  If you are not certain of an answer,

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

258

1    eliminate the alternatives that you know to be incorrect
2    and then select an answer from the remaining alternatives.
3    Indicate your selection by clicking on the answer bubble
4    next to it.
5          Dr. Kroopnick, would these have been
6    substantially the same directions that would have
7    accompanied a verbal reasoning section that was
8    administered on the MCAT in 2013 or 2014?
9    A.    They would be substantially the same.
10         The one --
11   Q.    And -- sorry, go ahead, Dr. Kroopnick.
12   A.    I just need to note that while there are seven
13   passages on the verbal reasoning section, only six are
14   scored and that's why six is referenced in this document.
15   Q.    I understand.  Thank you for pointing that out.
16         To put a finer point, were test-takers to whom
17   the MCAT was administered in 2013 or 2014 also instructed
18   to answer the best answer to each question only after
19   reading a passage?
20   A.    Yes.
21   Q.    I'd like you to turn to the next page, page 61 of
22   291.
23         Do you see the header passage one and then in
24   parentheses questions 43 to 47?
25   A.    Yes.

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

A1058

259

1  Q.  What does that signify?

2  A.  That signifies that questions 43 to 47 are based on

3  the content in passage one.

4  Q.  So, put another way, do each of questions 43 to 47

5  relate to passage one?

6  A.  Yes.

7  Q.  Would a successful examinee need to read and

8  understand passage one in order to answer questions 43 to

9  47?

10 A.  Yes.

11      Questions 43 to 47 will rely -- will require an

12 examinee to demonstrate their understanding of passage

13 one, as well as to critically reason about the content in

14 passage one.

15 Q.  I'll ask you to turn to the next page, page 62 of

16 291.

17      Take a look at question 43 together.  Question

18 43 reads:

19      Which of the author's assertions is most

20 susceptible to empirical verification or repudiation?

21      Dr. Kroopnick, is it possible for a successful

22 test-taker to answer this question without reading and

23 understanding passage one?

24 A.  That would be extremely unlikely.

25 Q.  And I'll ask you to also look at question 44.  It

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER

Official Court Reporter

260

1  reads:

2      Which view expressed by the author is most

3  important for readers to share if they are to be convinced

4  of the merits of the passage argument?

5      Would it be possible for a successful test-taker

6  to answer that question without reading and understanding

7  passage one?

8  A.  Again, very unlikely.

9  Q.  You can put away the exhibit.

10      Dr. Kroopnick, approximately how many

11 individuals took the MCAT in 2013 and 2014?

12 A.  Probably about 90,000 or so per year.

13 Q.  I'd like to turn --

14      MR. MANDELSBERG:  Your Honor, apologies.  This

15 will be a different binder.

16      This will be Plaintiff Exhibit 11, the MCAT

17 score report for Robert Sampson.

18 BY MR. MANDELSBERG:

19 Q.  Dr. Kroopnick, please let me know when you are there.

20 A.  I have it in front of me.

21 Q.  Okay.

22      Are you familiar with an MCAT score report?

23 A.  Yes.

24 Q.  Does Plaintiff Exhibit 11 reflect an MCAT score

25 report as it would appear in reflecting exam

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER

Official Court Reporter

261

1  administrations in 2013 and 2014?

2  A.  Yes.

3  Q.  I'd like to focus on the exam dates.  The first

4  column on the left notes September 18, 2014 entry and an

5  August 16, 2013 entry.

6      Dr. Kroopnick, what do those two entries under

7  the column exam date reflect?

8  A.  They indicate dates the examinee took and scored

9  their exam.

10 Q.  So does this indicate that the examinee in question,

11 Robert Sampson, took the exam twice?

12 A.  Yes.

13 Q.  And I'd like to look at the second column from the

14 left, total score.

15      What does that reflect, Dr. Kroopnick?

16 A.  That is the sum of his scores on the three sections

17 of the exam: verbal reasoning, physical sciences and

18 biological sciences.

19 Q.  So if I'm looking at a total score 29, for instance,

20 for the exam dated September 2014, I'm taking the sum of

21 ten, nine, and ten, his scores on each of the subsections.

22 A.  Correct.

23 Q.  Now, is that out of a hundred, Dr. Kroopnick?

24 A.  No.

25      Each section is scored on a one through 15

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER

Official Court Reporter

262

1  scale.  So the total score can range from three to 45.

2  Q.  And that was the scoring scale -- you are describing

3  the scoring scale as it existed in 2013 and 2014?

4  A.  Correct.

5  Q.  I'd like to look and to shift two columns to the

6  right to a column that reads percentile rank of score.

7      What does that signify?

8  A.  That signifies how the examinee scored relative to

9  others who took the exam.

10 Q.  Okay.

11      So help me out, Dr. Kroopnick.  What does it

12 mean that on September 18, 2014, Mr. Sampson scored in the

13 73rd percentile rank of score?

14 A.  That means that he scored equal to or better than 73

15 percent of others that took the exam.

16 Q.  If I look down to the August 16, 2013 exam date, I

17 notice a percentile rank of score in the verbal reasoning

18 section of 84 percent.

19      What does that signify?

20 A.  That signifies that he scored equal to or better than

21 84 percent of others that took the exam.

22      Said another way, he scored in the top 16

23 percent of others that took the exam.

24 Q.  Dr. Kroopnick, in your opinion, is it possible for an

25 examinee to score in the 84th percentile in verbal

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER

Official Court Reporter

A1059

263

1 reasoning without reading and understanding the passages
2 preceding the test questions?
3 A. I don't think so.
4 Q. And in your opinion, Dr. Kroopnick, could an examinee
5 score in the 84th percentile in verbal reasoning by
6 reading only the prompt and the questions and then
7 searching in the passages for information to answer those
8 questions?
9 A. I don't think so.
10 Q. In order to succeed on the MCAT, does an examinee
11 need to be able to apply the knowledge and analytical
12 skills that are called for in each section?
13 A. They do.
14 Q. And in order to score in the 84th percentile on the
15 MCAT's verbal reasoning section, does an examinee need to
16 possess the ability to read and comprehend content in a
17 limited amount of time?
18 A. Yes, that's my expectation.
19 Q. And in order to score in the 84th percentile on the
20 MCAT's verbal reasoning section, would an examinee need to
21 be able to focus and concentrate while testing?
22 A. Yes.
23 Q. Thank you, Dr. Kroopnick.
24    MR. MANDELSBERG: I have no further questions at
25 this time.
PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

264

1 CROSS-EXAMINATION
2 BY MS. VARGAS
3 Q. Good morning, Dr. Kroopnick. My name is Mary Vargas
4 and I'm an attorney representing Robert Sampson, who is a
5 medical student.
6    You have never met Robert Sampson, correct?
7 A. I have never met Robert Sampson.
8 Q. You have never performed a neuropsychological exam of
9 Robert Sampson, correct?
10 A. I have not.
11 Q. You have never observed Robert Sampson try to read,
12 have you?
13 A. I have not.
14 Q. You don't know what strategies Robert Sampson uses to
15 read, do you?
16 A. I do not.
17 Q. You don't know what strategies Robert Sampson uses on
18 tests, do you?
19 A. I do not.
20 Q. You haven't observed the hard work that Robert
21 Sampson had to put in in order to overcome learning
22 disabilities that he's been diagnosed with, right?
23 A. Correct.
24 Q. You haven't observed the work that Robert Sampson had
25 to do with a reading specialist in elementary school, have
PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

265

1 you?
2 A. No.
3 Q. You haven't observed the work that Robert Sampson had
4 to do with tutors who read out loud the reading material
5 for him so he can learn the material, right?
6 A. Correct.
7 Q. You haven't observed the work that Robert Sampson had
8 to do with a learning specialist in medical school to
9 compensate for his learning disabilities, right?
10 A. Right.
11 Q. You do not evaluate individuals for learning
12 disabilities, correct?
13 A. Correct.
14 Q. You are not an expert in the diagnosis of learning
15 disabilities or ADHD, right?
16 A. Correct.
17 Q. And the MCAT is not designed as a diagnostic test of
18 disability, is it?
19 A. It's not designed for that purpose.
20 Q. The Department of Justice has expressly rejected
21 reliance on test scores as a determining factor in whether
22 an individual has a disability.
23    Right?
24 A. I am not familiar with Department of Justice
25 guidelines.
PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

266

1 Q. So in your work with the AAMC, you are not familiar
2 with the Title III regulations implementing the ADA
3 amendments act?
4 A. My scope of work is not directly related to that.
5 Q. You don't do any work in -- professional work with
6 individuals focused on disability, do you?
7 A. That is not my focus, correct.
8 Q. So you don't know how people with disabilities take
9 tests, do you?
10 A. Correct.
11 Q. The Department of Justice explained that reliance on
12 test scores to determine disability is, quote,
13 inconsistent with congressional intent, didn't it?
14    MR. MANDELSBERG: Objection.
15    THE COURT: Overruled.
16    MR. MANDELSBERG: Lacks foundation.
17    THE COURT: You can answer.
18 BY MS. VARGAS:
19 A. Do you know?
20 A. Can you repeat that question.
21 Q. Well, let me ask it this way.
22    Do you know anything about the regulations that
23 impose requirements on testing entities in regard to
24 testing of individuals with disabilities?
25 A. I am not an expert in those regulations.
PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

**A-1060**

267

1   Q.   Test scores can reflect mitigating measures that an
2   individual employs during a test, right?
3   A.   Can you say that one more time, please.
4   Q.   Test scores can reflect the mitigating measures that
5   an individual employs during a test, right?
6   A.   Test scores reflect an individual's performance or
7   standing on what the test is trying to measure.
8   Q.   This isn't a test, though, that people come in and
9   take cold, is it, without any preparation?
10  A.   I would say generally that is not the case.
11  Q.   Some people prepare for this test for a few weeks and
12  some people prepare for this test for a few months.
13       Correct?
14  A.   That is reasonable, it seems.
15  Q.   Would you be surprised to hear that a student
16  prepared for two years for the test?
17  A.   I would not necessarily be surprised.
18  Q.   So students who put in more preparation for the MCATs
19  tend to perform better, don't they?
20  A.   I have never -- I don't know.
21  Q.   Do you know anything about the Department of Justice
22  regulations about reliance on test scores in determining
23  need for disability -- need for accommodations?
24  A.   I am not familiar with guidelines for evaluating
25  individuals for accommodations.

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

268

1   Q.   Attending an MCAT prep course can improve a student's
2   MCAT scores, can't it?
3   A.   I would expect that it could.
4   Q.   And the reason for this is because there are
5   test-taking strategies that are taught to students in MCAT
6   prep classes.
7        Right?
8   A.   I have never seen an MCAT prep course curriculum, but
9   that sounds like it could be reasonable.
10  Q.   It's true, isn't it, that minority students generally
11  are underrepresented in medical school, right?
12  A.   I think that is true.
13  Q.   And one of the reasons for this is that minority
14  students tend to have lower MCAT scores, correct?
15  A.   Minority students on average score lower than
16  majority students on MCAT, that's correct, on average.
17  Q.   And one of the reasons why minority students perform
18  less well on the MCAT is because minority students are
19  less likely to be able to afford extensive test
20  preparation, correct?
21  A.   To the extent that minority -- to the extent that
22  that's related to SES and financial resources, that would
23  be true.
24       THE COURT:  Ms. Vargas we have to break because
25  I have to do a sentencing.

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

269

1        MS. VARGAS:  Okay.
2        THE COURT:  Unfortunately we are going to have
3   to interrupt his testimony, but we'll see you back here at
4   1:45.
5        MS. VARGAS:  Thank you.
6        THE COURT:  Okay.
7   Thank you.
8        (Luncheon recess.)
9        (Continued on next page.)

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

270

1        A F T E R N O O N   S E S S I O N.
2   CROSS EXAMINATION
3   BY MS. VARGAS:
4   Q.   Dr. Kroopnick, I have to ask you.  During our lunch
5   break, did you communicate with counsel for the NBME?
6   A.   No.
7   Q.   The MCAT typically has 4 or 5 answer options,
8   correct?
9   A.   Four.
10  Q.   Four answer options.
11       And unlike the MCAT, the USMLE can have up to
12  even 11 or 12 answer options, correct?
13  A.   I'm not familiar with the NBME.
14  Q.   On the MCAT, there is, most of the time, one vignette
15  for multiple questions, correct?
16  A.   Yes.
17  Q.   Do you know that the USMLE has a vignette for each
18  question?
19       MR.:  Objection.  He testified he is not
20  familiar with the USMLE.
21       THE COURT:  Sustained.
22  Q.   MCAT questions sometimes point a test taker to
23  something like, say, what did Mr. So and so say in the
24  passage.  So you can scan for that name and then read that
25  part of the question, correct?

ToniAnn Lucatorto, RPR, RMR, CRR
Official Court Reporter

271

1  A.  Can you say that one more time, please?
2  Q.  Sure.
3       MCAT questions sometime direct the test taker to
4  a certain part of the passage to see, for example, what a
5  particular person said in that part of the passage, right.
6  A.  It's true that an MCAT question may direct someone to
7  part of the passage.
8  Q.  For someone who has scored higher than
9  99th percentile on intelligence testing, wouldn't you
10  expect them to get an MCAT result that was higher than a
11  28 or 29?
12  A.  I don't know in this -- the way that -- I don't know
13  what intelligence test you're referring to or what
14  intervention the person had to prepare for the MCAT exam.
15  Q.  Because interventions for the MCAT exam can make a
16  difference in performance; can't they?
17  A.  Like taking required coursework.
18  Q.  But also like having tutors, right?
19  A.  I would think any study mechanism would help you --
20  could help you achieve a higher score.
21  Q.  And a score of 28 on the MCAT is generally considered
22  a score that's not really good enough to get into medical
23  school, isn't it?
24  A.  I don't think I could say that.
25  Q.  Are you aware that Mr. Sampson applied to medical

ToniAnn Lucatorto, RPR, RMR, CRR
Official Court Reporter

272

1  school with a score of 28 and was accepted nowhere?
2  A.  I believe I was aware that he was accepted to medical
3  school.
4  Q.  Are you aware that with a score of 29, despite
5  applying to multiple medical schools, he only got into one
6  school?
7  A.  I was not aware of that.
8  Q.  Accommodations are given so that -- on tests like the
9  MCAT so that students, test takers, can demonstrate their
10  knowledge rather than demonstrating the limits imposed by
11  their disability, right?
12  A.  My understanding of accommodations is to put everyone
13  on an equal playing field.
14  Q.  And it's an important part of your job working in
15  psychometrics for the MCAT to maintain the reputation and
16  credibility of the MCAT as a test that medical school
17  admission counselors should rely on, right?
18  A.  That's correct.
19  Q.  So it wouldn't really be good for the MCAT for you to
20  say in court that students don't have to read the
21  questions in order to get the answers on the MCAT, right?
22  A.  The design of the exam is for passage based questions
23  for an examinee to engage the passage for understanding
24  and analysis, so they are positioned for success on the
25  questions.

ToniAnn Lucatorto, RPR, RMR, CRR
Official Court Reporter

273

1  Q.  I certainly understand that a lot of work goes into
2  designing the questions, but I'm asking a different
3  question.  I'm asking:  Wouldn't it be damaging to the
4  standing of the MCAT for MCAT employees to testify in
5  court that it's possible to not read all of the questions
6  or all of the passages and still get correct answers,
7  right?  It wouldn't look good?
8  A.  I don't think I can speak to an individual's strategy
9  for answering a question.
10       MS. VARGAS:  Thank you.  No further questions.
11       THE COURT:  Anything else.
12       MR.:  No redirect.  Thank you, your Honor.
13       MS. MEW:  Your Honor, defendants call Dr.
14  Benjamin Lovett to the stand.
15       COURTROOM DEPUTY:  Raise your right hand.  Do
16  you solemnly swear to tell the truth, the whole truth, and
17  nothing but the truth so help you God?
18       THE WITNESS:  Yes.
19       COURTROOM DEPUTY:  State and spell your name for
20  the record.
21       THE WITNESS:  Benjamin Lovett.  B-E-N-J-A-M-I-N.
22  L-O-V-E-T-T.
23  DIRECT EXAMINATION
24  BY MS. MEW:
25  Q.  Good afternoon, Dr. Lovett.  If you could please

ToniAnn Lucatorto, RPR, RMR, CRR
Official Court Reporter

274

1  state your name for the record.
2  A.  Benjamin Lovett.
3  Q.  Are you an external consultant for NBME?
4  A.  Yes.
5  Q.  Briefly, can you explain what you do in that role?
6  A.  The National Board of Medical Examiners sends me
7  files, applications of folks that are seeking
8  accommodations on the USMLE.  And I review the
9  documentation and I offer opinions, conclusions about
10  whether it shows evidence of disorders, evidence of
11  substantial limitations and major life activities, and
12  evidence of accommodation needs.
13  Q.  And I believe you might have just answered my
14  question, but what questions are put to you by NBME when
15  they send you a file?
16  A.  It really is those three things.  So when I review a
17  file when someone is seeking accommodations, first I look
18  to see whether or not there's sufficient evidence that the
19  clinical criteria are met for various disorders.  If so,
20  then I move to really ask whether or not there's
21  substantial evidence that the person is substantially
22  limited in one or more major life activities that are
23  relevant to the request.  And then, finally, I look to see
24  if there's evidence of specific accommodation needs.
25  Normally, the accommodations that are being sought.

ToniAnn Lucatorto, RPR, RMR, CRR
Official Court Reporter

**A1062**

275

1  Q.  If you look at the larger binder that says
2  defendant's exhibits, you'll see a tab that has
3  declaration of Benjamin Lovett.  If you could find that
4  and turn to it.
5       Do you see your declaration there?
6  A.  Yes.
7  Q.  This is the declaration that we submitted as NBME
8  opposition to the preliminary injunction?  Is that your
9  understanding, at least?
10 A.  Yes.
11 Q.  Can you briefly explain what Exhibits 2 through 5 to
12 your declaration are?
13 A.  Let's see.  Exhibit 2 is my review of Mr. Sampson's
14 initial accommodation request.  Exhibit 3 is a review of
15 the reconsideration request.  And then Exhibit 4 a review
16 of the second request for reconsideration.  And then
17 Exhibit 5 is a review of the third reconsideration
18 request.
19 Q.  And then if you would please turn to Exhibit 1 of
20 your declaration.
21 A.  Yeah, I'm there.
22 Q.  Is this your CV?
23 A.  Yes.
24 Q.  Can you just briefly explain your educational
25 background?

ToniAnn Lucatorto, RPR, RMR, CRR
Official Court Reporter

276

1  A.  Yes.  I have a PhD in school psychology from Syracuse
2  University.  Before that, I earned masters degree in
3  psychology in Syracuse.  And before that, a bachelor's
4  degree in psychology in Penn State state.
5  Q.  Where do you currently work?
6  A.  Teachers College, Columbia University.
7  Q.  Where is your position there?
8  A.  I'm an associate professor of psychology and
9  education.
10 Q.  Do you have any particular specialties?
11 A.  School psychology broadly, and then within that,
12 psychological assessment.  Particularly
13 neuro-developmental disorders, learning disabilities,
14 ADHD, similar types of problems.
15 Q.  What are your primary job responsibilities as a
16 professor?
17 A.  As a professor teaching, obviously graduate training
18 in particular at Teachers College by conducting research.
19 And then service to the profession and the community.  So
20 service would involve things like giving talks, presenting
21 at conferences, doing trainings for the community.  Things
22 like that.
23 Q.  I would like to just explore those three things,
24 briefly.  I think you said research, we'll take that
25 first.

ToniAnn Lucatorto, RPR, RMR, CRR
Official Court Reporter

277

1       If you look at Exhibit 1, pages 2 through 10, is
2  this a listing of your publications, works in progress,
3  including publications in peer review journals?
4  A.  Yes.
5  Q.  And focusing specifically on your peer review journal
6  articles, does any of this research pertain to learning
7  disabilities or ADHD?
8  A.  Yeah, I would say that's the most common topics that
9  they're on, especially in recent years.  Things related
10 and relevant to learning disabilities and ADHD.
11 Q.  Have you written any books?
12 A.  I have.  I've written three books.
13 Q.  Any books related to testing accommodations or
14 learning disabilities or ADHD?
15 A.  Yes.  The first book is Testing Accommodations For
16 Students With Disabilities.
17 Q.  Did you publish that?
18 A.  I published that.  It was published by the American
19 Psychological Association Press, the APA Press.
20 Q.  And then I think you mentioned activities that
21 constitute service to the profession.  Can you briefly
22 explain what you do in that area?
23 A.  Services in some way is the broadest area of what
24 professors do.  It includes things like reviewing articles
25 for journals.  So I serve as a peer reviewer.  Giving

ToniAnn Lucatorto, RPR, RMR, CRR
Official Court Reporter

278

1  talks, invited talks to different groups, professional
2  associations, outreach work with schools.  Things like
3  that would all be under service.  In addition to committee
4  service at the University.
5  Q.  And if we turn to page 11 in your CV at Exhibit 1, it
6  looks like page 11 to 14, does this give a list of talks
7  you've been invited to give?
8  A.  Yes.  It's a selection from all of the talks that
9  I've given.
10 Q.  What kinds of groups are you giving talks to?
11 A.  It varies.  I get requests from schools, I get
12 requests from programs for assisting students with
13 disabilities that go beyond individual schools.  I get
14 requests from testing agencies.  At times, it's within the
15 university requesting one.  So it varies.
16 Q.  And then if you turn to page 20 of your CV, looks
17 like this is a listing of your editorial review work.  Can
18 you explain what that is?
19 A.  Yeah.  So the way peer review journals work is that
20 when an author submits a manuscript, it gets sent to --
21 typically, anonymously sent to a few people who are asked
22 to judge its quality and to ensure that the conclusions
23 follow from the methods to the design of the research.
24 And so I do that for several journals.  I'm on the
25 editorial board of a few.  So that means they send me

ToniAnn Lucatorto, RPR, RMR, CRR
Official Court Reporter

**A1063**

279

1 articles regularly and then for other journals, they might
2 ask me to just look at something because it's in my
3 specialty area.
4 Q. I think the third category of your work as a
5 professor is graduate training and teaching.
6 If you look at pages 18 through 20 of your CV,
7 is this -- does this show an accurate listing of courses
8 that you have taught?
9 A. Yes.
10 Q. Do any of these courses relate to ADHD or LD?
11 A. Yes. I cover the criteria and assessment techniques
12 for ADHD and learning disabilities different ways. So one
13 of the courses: individual psychological testing two, has
14 a focus at one point on ADHD. Learning disabilities are
15 covered in individual psychological testing one. And
16 also, actually in the law and ethics course, because
17 special education classification of learning disabilities
18 is covered there.
19 Q. It sounds like you're teaching classes on how to
20 assess for LD and ADHD; is that correct?
21 A. Definitely. We cover techniques for that, the
22 criteria. Those sorts of things.
23 Q. Are you a licensed psychologist?
24 A. Yes.
25 Q. What does it mean to be a licensed psychologist?

ToniAnn Lucatorto, RPR, RMR, CRR
Official Court Reporter

280

1 A. To be a licensed psychologist in New York State, you
2 need to have background in really three things. First is
3 education. You need graduate training, a lot of advanced
4 graduate courses in different areas of psychology.
5 The second thing you need is experience. So you
6 have supervised experience, thousands of hours working in
7 various clinical and school settings in my case. And then
8 finally, you pass a licensure exam.
9 Q. Do you see any clients as part of your work?
10 A. I do. I --
11 Q. Go ahead.
12 A. I can extend. I see clients for psychotherapy and
13 counseling related to test anxiety.
14 Q. And are you currently, personally, involved with
15 diagnostic evaluation?
16 A. I don't perform the testing, but I supervise it in
17 our on-campus clinic.
18 Q. Are you generally familiar with the diagnostic tests
19 that were administered to Mr. Sampson by Dr. Michels,
20 Dr. Anderson, and Dr. Wasserstein and Miller?
21 A. Yes.
22 Q. I understand that you also serve as a consultant for
23 testing entities, correct?
24 A. Yes.
25 Q. Is your work for other testing entities similar to

ToniAnn Lucatorto, RPR, RMR, CRR
Official Court Reporter

281

1 the work that you do for NBME?
2 A. Generally, yes. I'm sent files and prepare written
3 reports with my opinions and conclusions.
4 Q. How long have you been serving as a consultant?
5 A. I started in 2010.
6 MS. MEW: Your Honor, NBME offers Dr. Lovett as
7 an expert witness in the evaluation and diagnosis of
8 individuals with learning individuals, ADHD, as well as
9 the provision of disability-based accommodations in
10 testing and academic environments and research related to
11 this topic.
12 MR. WEINER: I'll reserve any questioning for
13 cross-examination, your Honor.
14 THE COURT: All right.
15 Q. What is the process when you're given a file to
16 review for NBME?
17 A. For NBME, I receive an e-mail and it just tells me
18 that there's a file there for me to review at a secure
19 website. I log into the website and download files,
20 review them related to the request. Then I upload -- at
21 the same site, I upload my report about those.
22 Q. Are you paid for your reviews for testing
23 accommodation requests?
24 A. Yes.
25 Q. How much?

ToniAnn Lucatorto, RPR, RMR, CRR
Official Court Reporter

282

1 A. For NBME, I'm paid $200 an hour for my time for
2 reviewing requests.
3 Q. And you're now serving as an expert witness in the
4 litigation. Are you being paid for your time to testify
5 in the litigation?
6 A. Yes.
7 Q. How much?
8 A. For testifying away from home, it will be $1,000 for
9 a half day or $2,000 for a whole day.
10 Q. When you review requests for testing accommodations
11 for the USMLE, do you meet with the examinee in person?
12 A. No.
13 Q. How are you able to assess whether the individual has
14 a disability or should receive testing accommodations when
15 you have not personally evaluated the candidate?
16 A. I review all of the evidence available on the file:
17 that includes statements from the examinee or candidate
18 who is requesting accommodations. It typically also
19 involves diagnostic evaluations from folks who have
20 evaluated in-person the examinee, and also lots of other
21 evidence that's also there.
22 Q. And we talked before about exhibits 2 through 5 to
23 your declaration. Did you previously review Mr. Sampson's
24 requests for accommodations on this Step 1 exam?
25 A. Yes.

ToniAnn Lucatorto, RPR, RMR, CRR
Official Court Reporter

**A-1064**

283

1  Q.  I understand that you reviewed his initial request
2  and then also, three subsequent questions for
3  reconsideration, correct?
4  A.  Yes.
5  Q.  How do you approach a file when you are reconsidering
6  a request that you previously reviewed?
7  A.  I try to give every reconsideration the same chance
8  as the initial one, certainly.  I do go to my report
9  usually from the first evaluation of the file, just to,
10 sort of, see to get back into it mentally.  Often, in the
11 first evaluation and my first report, I've noticed there
12 are certain things that are missing, I'm often looking for
13 those.  So I look to see what the new documents are, and I
14 usually give them an even closer look after reviewing the
15 earlier documents.
16 Q.  Just generally speaking, Dr. Lovett, what
17 recommendations did you provide to NBME with respect to
18 your review of Mr. Sampson's request in 2017, 2018?
19 A.  I concluded there was insufficient evidence of any
20 relevant disorders, disabilities, or accommodation needs
21 related to those three requests that I mentioned earlier.
22 Q.  If you look at Exhibit 5 to your declaration, when
23 was the date of your last review for NBME?
24 A.  I wrote my report on the three reconsideration
25 requests on July 12, 2018.

ToniAnn Lucatorto, RPR, RMR, CRR
Official Court Reporter

284

1  Q.  And then as part of this litigation, is it your
2  understanding that you've been provided the other
3  documentation that Mr. Sampson submitted to NBME in
4  support of later accommodation requests?
5  A.  Yes.
6  Q.  Has that additional information changed your ultimate
7  opinion with regard to Mr. Sampson's request for testing
8  accommodations?
9  A.  No.
10 Q.  Looking specifically now to Mr. Sampson's request for
11 accommodations.  In his complaint, Mr. Sampson alleges
12 that he is limited by a specific learning disorder with
13 impairment in reading and Attention Deficit Hyperactivity
14 Disorder, which we've been referring to as commonly
15 referred to as ADHD.
16     Can you briefly explain the diagnostic criteria
17 of ADHD?
18 A.  Sure.  To have ADHD, someone has to have very high
19 levels of symptoms.  So symptoms of inattention, like
20 being distracted easily, hyperactivity, impulsiveness,
21 interrupting people, those sorts of things.  And everyone
22 has those, to some degree.  To have ADHD, the first
23 criterion is you have to have those much more frequently,
24 much more severely than a typical person of your age.
25 That's the first criterion.

ToniAnn Lucatorto, RPR, RMR, CRR
Official Court Reporter

285

1      In addition, the symptoms have to start early,
2  before age 12.  They have be present across multiple
3  settings.  So for children, that's home and school.  For
4  adults it's usually more variant.  Work, home, school; if
5  someone is still in education.  The symptoms also have to
6  cause functional impairment limitations in real world
7  settings.  Social, occupational, academic performance.
8  And the symptoms can't be due to something else.  They
9  can't be better explained by anxiety or something like
10 that.
11 Q.  Can you also briefly explain the diagnostic features
12 of a specific learning disorder with impairment in
13 reading?
14 A.  Sure.  Individuals who have learning disabilities
15 affecting reading have trouble in usually acquiring
16 reading skills.  They show deficits both on standardized
17 tests and in real world settings on measures of reading.
18 And again, the problems can't be caused or better
19 explained by something else.
20 Q.  And those are neurodevelopment disorders; is that
21 correct?
22 A.  Yes.  That's how they're classified.
23 Q.  And what does that mean?
24 A.  It means that they are present early in life.  Things
25 that would onset in childhood, and typically, there would

ToniAnn Lucatorto, RPR, RMR, CRR
Official Court Reporter

286

1  be ample evidence of them earlier in life.
2      THE COURT:  Who would be showing these signs?
3      THE WITNESS:  It depends on the disorder.  For
4  ADHD, we who expect a preschooler to be showing signs
5  often of hyperactivity or impulsiveness, even compared to
6  other preschoolers.  We expect 2, 3, 4-year olds to be
7  that way to begin with.  But if someone has ADHD,
8  typically they're very difficult to control if they have
9  the hyperactive and impulsive symptoms.  Often, you can
10 ask questions about how that child is compared to other
11 family members, like extended family, relatives.  This is
12 a child who has often caused a lot of problems in those
13 sorts of settings.  Disruptive behavior, those sorts of
14 things.  When the child goes to school, that's where we
15 see the inattention come in because the child has to stay
16 focused for a period of time, and it's extremely difficult
17 for them and they're not able to do that.  They're not
18 able to pay attention for a period of time.  So
19 absolutely.
20 Q.  Dr. Lovett, what are you looking for to that point --
21 let me ask you two questions.
22     First, these are neurodevelopment disorders and
23 so there needs to be impairment in childhood.  But you
24 could be diagnosed later in life with learning
25 disabilities or ADHD; is that correct?

ToniAnn Lucatorto, RPR, RMR, CRR
Official Court Reporter

287

1  **A.**    Yeah, absolutely.  I mean you can certainly have a
2  valid initial diagnosis, even in adulthood.
3  **Q.**    So when you're doing that, how do you assess the
4  childhood part of it?  The neurodevelopment part?
5  **A.**    The best way is with records of childhood.  So,
6  again, people can be validly diagnosed with ADHD for the
7  first time at 20, or 30, or even older, but the symptoms,
8  the problems associated with those disorders would have
9  been present in childhood.  So we're able to usually look
10  at historical records to see clear evidence of that.
11  There's a paper trail.
12  **Q.**    What are you looking for in that paper trail?
13  **A.**    Again, it depends on the disorder and the case of
14  ADHD.  We often want to see teacher narrative report cards
15  that show repeated problems with those sorts of things.
16  Distractibility, impulsive behavior, those sorts of
17  symptoms.  In the case of learning disabilities, we would
18  expect one in childhood to have difficulty on -- well,
19  first of all, in the classroom.  So it measures report
20  cards showing reading or whatever the academic skill is.
21  The grades would be low.  You would expect to see on group
22  administered standardized achievement tests that are taken
23  as a class, low scores, those types of things.  Even if
24  the person was not formally diagnosed as a child.
25  **Q.**    When you were talking about preschool aged students,

ToniAnn Lucatorto, RPR, RMR, CRR
Official Court Reporter

288

1  you were, sort of, saying there's some characteristics
2  that all children have this because they're younger.
3        When you're looking at, you know, some early
4  school age records, what are you looking for, you know, to
5  show, sort of, impairment-level symptoms?
6  **A.**    What I'm looking for is consistent evidence.  Someone
7  who only shows a report from a teacher in a marking period
8  of disorganized work or something like that would not be
9  sufficient evidence for me, generally.  Depending on
10  whatever else is in the file.  Instead, you would see
11  repeated evidence of this.
12  **Q.**    We're going to turn to Mr. Sampson's diagnostic
13  evaluations, but I wanted to address something before we
14  get started there.  When we're looking at the scores of
15  the diagnostic test, we see reference to average, below
16  average, above average.  Can you explain what does that
17  mean when we're looking at these tests?
18  **A.**    Sure.  Every test may have a slightly different
19  reference range for what constitutes average, but the most
20  common one that we see is the scores between the 25th and
21  the 74th percentile are average.  So that would be the
22  middle 50 percent of the population, the middle half of
23  the population.  If the score is below the 25th
24  percentile, then the person would be in the bottom corner,
25  and then within that there are further gradations.  If the

ToniAnn Lucatorto, RPR, RMR, CRR
Official Court Reporter

289

1  score is above the 75th or at the 75th percentile or
2  above, then the person would be in the top quarter of the
3  population.  So average, most commonly, is that middle 50
4  percent.
5  **Q.**    How does that compare to most people?
6  **A.**    That would mean most people or almost most people in
7  the general population, if that's the comparisons group
8  for the scores.
9  **Q.**    For that average range?
10  **A.**    Yes.
11  **Q.**    If you would always turn to Plaintiff's Exhibit 3.
12  **A.**    That's in this --
13  **Q.**    I'm sorry, that's the other binder.
14        Do you recognize this document?
15  **A.**    Yes.
16  **Q.**    What is this?
17  **A.**    This is a report from an evaluation conducted by
18  Dr. Michaels on Mr. Sampson in August 2013.
19  **Q.**    Did you review this report as part of your review of
20  Mr. Sampson file?
21  **A.**    Yes.
22  **Q.**    Did Dr. Michaels administer any reading assessments
23  to Mr. Sampson?
24  **A.**    Yes.  There were reading assessments from the
25  Woodcock Johnson Test of Achievement, as well as the

ToniAnn Lucatorto, RPR, RMR, CRR
Official Court Reporter

290

1  Nelson-Denny reading test.
2  **Q.**    Let's talk about the Nelson-Denny reading test first.
3  And I'm going to ask you, if you don't mind, Dr. Lovett,
4  to tell me which page you're looking at?
5  **A.**    The scores are on page six from the Nelson-Denny.
6  **Q.**    What is the Nelson-Denny?
7  **A.**    The Nelson-Denny reading test has a few parts, but
8  it's one of the more common ways of assessing reading
9  skills in adults.  It was developed for high school and
10  college-age folks, but it's often used for assessing
11  adults and often used in reading disability assessments.
12  **Q.**    What does the reading comprehension part of the test
13  measure?
14  **A.**    The reading comprehension part of the form that
15  Mr. Sampson was given has seven different passages on it.
16  The first one is longer.  It's about a page long single
17  spaced and the rest of them are about half a page single
18  space.  And each passage is followed by several multiple
19  choice questions.  So the examinee is asked to read each
20  passage and then answer the questions to demonstrate
21  comprehension.
22  **Q.**    What does the reading rate test measure?
23  **A.**    The reading rate test is a little unusual.  So it's
24  actually part of the comprehension measure.  So one minute
25  into the comprehension test, one minute into reading the

ToniAnn Lucatorto, RPR, RMR, CRR
Official Court Reporter

291

1  first passage, the examinee is stopped and asked to say
2  where they are at that moment. One minute in. So they
3  have been reading silently and they're asked where are you
4  after one minute?
5  　　　　THE COURT: Are they told ahead of time that
6  they're going to be asked where they are at one minute?
7  　　　　THE WITNESS: Typically, I do believe the
8  instructions do say that, officially. Although, the
9  Nelson-Denny is one of those tests that I've seen people
10  sometimes break administration for. It was designed also
11  to be given in group settings. But I do believe that's in
12  the official instructions, the warning.
13  Q. If you have taken the test before, you might also
14  know that you will be given that warning?
15  A. Perhaps.
16  Q. Are there any limits to the use of the Nelson-Denny
17  test or its scores?
18  A. Yeah, the Nelson-Denny has a great advantage which is
19  that the format of the comprehension test, the passages
20  followed by the questions are really similar to the format
21  of high stakes exams. So that's great about the
22  Nelson-Denny. It also has a couple of limitations, and
23  that's why it has to be used really carefully. One of the
24  limitations is that it compares people to educational
25  norms, not age norms. So folks that are at the college

292

1  level or above, they're only being compared to other
2  people in higher education settings. So you're already
3  looking at a group that's already somewhat above average
4  relative to the general population because they're in
5  college or they're a senior in college in the first place.
6  And some folks never reach that level. So the norms are
7  one limitation. The way that's often addressed is by
8  choosing one of the educational norm groups as a proxy for
9  the general population. And commonly grade 13 norms as
10  they're called, first-year college student norms, are used
11  that way as a general population proxy group.
12  　　　　So that's one limitation, that's how it's often
13  dealt with. The second limitation is the reading rate
14  measure. So remember, the person that's been reading for
15  a minute silently, they're asked to indicate where they
16  are, the test manual shows that that's a really unreliable
17  way of measuring reading speeds. So the reliability
18  coefficient for the score that it generates is below
19  accepted standards. So the reading rate score, whether
20  it's high or low, to me, is not very meaningful.
21  Q. And just so I understand correctly. That's not
22  something from your own research, that's from the test
23  manual itself?
24  A. Yes. The reliability coefficient for the forms that
25  Mr. Sampson took is .68. And so for a diagnostic testing,

293

1  you want for reliability at least .8 or above. It's well
2  below what you would expect. So the reading rate measure,
3  if someone scores high on it, that doesn't to me indicate
4  that they're a great reader. And if they score low on it,
5  it doesn't indicate to me that they're not. The
6  comprehension measure though, if it's interpreted
7  properly, can be really useful.
8  Q. So recognizing the limitations that you mention, how
9  did Mr. Sampson perform on the reading rate part of the
10  Nelson-Denny during Dr. Michaels 2014 evaluation?
11  A. So relative to the general population proxy group
12  that I mentioned, grade 13 or first-year college student
13  norms, Mr. Sampson would, sort of, be in the average
14  range. Relative to the college seniors that he was being
15  compared to, graduating college seniors, he was a little
16  bit below the average range. On the comprehension
17  measure, under a standard time limit of 20 minutes.
18  Q. How did Mr. Sampson perform -- I'm sorry, I might
19  have lost track. You were just talking about the reading
20  rate, right?
21  A. Just comprehension.
22  Q. Just comprehension.
23  　　　　So then going back. How did he do on the
24  reading rate test?
25  A. Also on the reading rate test, if he had been

294

1  compared to the general population proxy group, the score
2  would be in the average range. Compared to graduating
3  college seniors, it was one point below the average range.
4  Q. And I believe you said the other reading test, the
5  reading assessment administered, was the Woodcock Johnson
6  Test of Achievement?
7  A. Yes. There were several reading measures from that.
8  Q. We're still looking page six of the report; is that
9  right?
10  A. Yes.
11  Q. What does the Woodcock Johnson measure?
12  A. The Woodcock Johnson is a lengthy battery that
13  measures reading, math, and writing skills, and some
14  associated for academic achievement.
15  Q. Is this a commonly administered test?
16  A. Yes. Very common.
17  Q. How did Mr. Sampson perform?
18  A. He was given four measures under the broad area of
19  reading. So one subtest: letter, word identification. He
20  had to read increasingly complex words aloud. His
21  performance was above the average range. On the reading
22  fluency measure, he had to read sentences, simple
23  sentences. Say whether each sentence was true or false to
24  demonstrate comprehension, and that was under severe time
25  pressure. And his performance was above the average

**A1067**

295

1  range. The passage comprehension subtest, he had to read
2  passages and fill in missing words to show his
3  comprehension. His performance was in the average range.
4  And then there's a final reading measure, it's related to
5  reading. He was asked to read fake words, like the
6  letters Z, E, B, you would pronounce Zeb. So on that
7  measure, his performance was above the average range.
8  Q.   Did Dr. Michaels administer any other tests to
9  Mr. Sampson?
10  A.   Yes. There were several other tests given.
11  Q.   Just to move along. How does Mr. Sampson's
12  performance on these other tests, when we're talking about
13  average, below average, above average?
14  A.   Well, one of the tests was a standard IQ measure, the
15  Wechsler Adult Intelligence Scale. All of his scores were
16  in the average range or above. Another was from the
17  Woodcock Johnson Test of Cognitive Ability. It's really
18  similar to the Woodcock Johnson Test of Achievement, but
19  it measures intelligence instead of academic skills. All
20  of his scores there were in the average range or above.
21  He was administered the test of written language. He had
22  to compose an essay basically, and the essay was scored
23  for various things. And the scores are described as above
24  average here.
25  Q.   Did Mr. Sampson have any below average scores on any

ToniAnn Lucatorto, RPR, RMR, CRR
Official Court Reporter

296

1  of the assessments discussed in Dr. Michels' report?
2  A.   Not relative to general population expectations.
3  Q.   Is the exclusion you're making from that the
4  Nelson-Denny?
5  A.   Right. Just on the Nelson-Denny when compared to
6  graduating college seniors. But with that exception, if
7  that's corrected for by using appropriate norms, no.
8  Q.   Did Dr. Michaels also review historical reports from
9  Mr. Sampson?
10  A.   Yes. Absolutely. So there's evidence of performance
11  both in high school and college, as well as performance on
12  the SAT, the ACT, and also some childhood measures of
13  ability and achievement.
14  Q.   Is this an appropriate part of the diagnostic
15  evaluation?
16  A.   Yes, absolutely. It's a critical part of evaluating
17  neurodevelopmental disorders. When I mentioned earlier
18  that if you don't get to see the person as a child, how
19  would you know childhood onset? Again, historical records
20  are the best way of doing that.
21  Q.   Why not just rely on the report that the client is
22  giving you about their childhood?
23  A.   We have a lot of research showing that people's
24  recollections are often not accurate, even if they're
25  trying to be as accurate and honest as possible. It's

ToniAnn Lucatorto, RPR, RMR, CRR
Official Court Reporter

297

1  very difficult for people to remember back to childhood in
2  a way to really compare them in that fashion.
3  Q.   Then it looks like Dr. Michels also had behavioral
4  observations in her report?
5  A.   Yes.
6  Q.   Is that also part of the standard assessment when you
7  reviewed this information?
8  A.   Definitely.
9  Q.   Did Dr. Michels make any diagnosis?
10  A.   Yes. Dr. Michels diagnosed learning disabilities not
11  otherwise specified.
12  Q.   What is the nature of this diagnosis?
13  A.   Learning disabilities not otherwise is an unusual
14  category. There are no detailed diagnostic criteria for
15  it. The not otherwise specified part means that the
16  person does not meet the full criteria for any specific
17  learning disorder. But the clinician, the diagnostician
18  feels that there's a problem in that area. And in
19  Dr. Michels' case, it looks though she did write the
20  disparity between a verbal and visual spatial reasoning,
21  that might have been what led to that diagnosis. But it
22  was clear to her that the full criteria were not met for
23  any specific learning disabilities, apparently.
24  Q.   Did she diagnose him with a reading disorder?
25  A.   No.

ToniAnn Lucatorto, RPR, RMR, CRR
Official Court Reporter

298

1  Q.   Did Dr. Michels diagnose Mr. Sampson with ADHD?
2  A.   No.
3  Q.   Can you tell from her report whether she evaluated
4  him for those?
5  A.   It doesn't look like there was any comprehensive
6  evaluation of ADHD. She noted, I believe in the
7  behavioral observations a little bit about attention.
8  That's typical to put there. 1but there was no
9  comprehensive evaluation of ADHD. There doesn't appear to
10  have been concern about it at that point.
11  Q.   If you'll now turn to Plaintiff's Exhibit 2.
12  A.   Okay, I'm there.
13  Q.   Do you recognize this report?
14  A.   Yes. I also reviewed this.
15  Q.   Is this a report from Dr. Anderson from 2013?
16  A.   Yes.
17  Q.   And I believe you just said this, but did you review
18  this report as part of Mr. Sampson's request for testing
19  accommodations?
20  A.   Yes.
21  Q.   Going through Dr. Anderson's report. Did she obtain
22  background information regarding Mr. Sampson?
23  A.   Yes. She notes high school and college performance,
24  and also national standardize testing scores.
25  Q.   Was it appropriate for her to look at this

ToniAnn Lucatorto, RPR, RMR, CRR
Official Court Reporter

A-1068

299

1  information?
2  A.   Yes.  Again, that's critical evidence when evaluating
3  neurodevelopmental disorders.
4  Q.   Can you tell whether she reviewed any records as part
5  of her analysis?
6  A.   The fact that there are specifics leads me to believe
7  that she did.  She mentions available school records.  So
8  I would say yes.
9  Q.   Did Dr. Anderson administer any assessment of
10 Mr. Sampson's reading ability?
11 A.   Yes.  She gave the Scholastic Abilities Test For
12 Adults.  The part of it that measures reading
13 comprehension.
14 Q.   How did Mr. Sampson perform on this test?
15 A.   His performance on that test was on the average range
16 on standard time.  So no additional time on a time measure
17 of reading comprehension.
18 Q.   And I believe he was also given extended time on this
19 test; is that right?
20 A.   Yes.  The SATA, the Scholastic Ability Test for
21 Adults doesn't have any norms for extra time.  But he was
22 given extra time, and his performance was compared to
23 people who did not get extra time.
24 Q.   Have you done any research, Dr. Lovett, on the impact
25 of extra time on people's performance on tests?

ToniAnn Lucatorto, RPR, RMR, CRR
Official Court Reporter

300

1  A.   Yes.  A lot of my research has been on extended time
2  accommodations.
3  Q.   Is it both for disabled and non-disabled individuals?
4  A.   Yes.  I include both with and without disabilities.
5  Q.   What does that research show?
6  A.   There's probably no question that there's been more
7  research and accommodations research on the effects of
8  extended time accommodations.  There have been several
9  reviews of just that which were written by various
10 scholars.  The research consistently shows that on timed
11 tests, and timed pressured tests, people tend to do better
12 with more time; whether or not they have a disability.  I
13 think it's often common sense, but on a time limited
14 measure under timed pressure, people do better if that
15 time pressure is reduced if more time is given.  Whether
16 or not there's a disability present, there's a tendency
17 for that.
18 Q.   Is the ability to perform better with extra time
19 indicative of an impairment or disability?
20 A.   No, research shows that folks with and without
21 disabilities improve on time limited test, or tend to with
22 additional time.  So the fact that someone improves would
23 not be an indication of disability.
24 Q.   Did Dr. Anderson assess Mr. Sampson for ADHD?
25 A.   Yes.  There were a number of standard questions

ToniAnn Lucatorto, RPR, RMR, CRR
Official Court Reporter

301

1  structured of rating scales and symptoms that she
2  administered.
3  Q.   Can you just explain what -- first, which rating
4  scale did she use?
5  A.   So on page nine, there's a list of 6 rating scales,
6  essentially.  They all are from the Barkley scales.  So
7  the Barkley scales include the official symptoms of ADHD
8  from the official clinical manual, the DSM.  And the
9  respondent, the person filling out the scale, is asked
10 about whether the person in question displays each of
11 those symptoms.  Never, really, sometimes, often, very
12 often, that kind of thing.
13 Q.   What did these rating scales show for Mr. Sampson?
14 A.   So some of the scales asks respondents whether
15 Mr. Sampson was showing average, below average, above
16 average symptom levels at the time of the evaluation.
17 That's the current symptom scale.  So at the time in 2013
18 and during the evaluation was he showing any.  All of the
19 people that filled them out: he, himself, his girlfriend,
20 his friend/tutor all reported there were no significant
21 symptoms in the area of ADHD.
22      THE COURT:  What page are you on?
23      THE WITNESS:  Page nine, your Honor.
24 A.   So that was for the current symptom scale.  In
25 addition, Dr. Anderson asked Mr. Sampson and each of his

ToniAnn Lucatorto, RPR, RMR, CRR
Official Court Reporter

302

1  parents whether symptoms were present in childhood.  For
2  those ratings, Mr. Sampson reported having had significant
3  inattention symptoms, but neither parent reported
4  significant symptoms in any area of ADHD.  So, again, for
5  current symptoms, no one was reporting that he currently,
6  at the time of the evaluation, had significant ADHD
7  symptoms.  And when asked about childhood systems, he did
8  self-report them, he apparently recalled them, but no one
9  who competed the scales described him as having had them.
10 Neither of his parents did.
11 Q.   Did Dr. Anderson administer any test of cognitive
12 ability?
13 A.   Yes.  The Woodcock Johnson Test of Cognitive
14 Abilities, parts of it were administered.  So there wasn't
15 a general IQ test, I believe, but there were scores from
16 this measure of specific cognitive abilities.
17 Q.   What did these scores show?
18 A.   Almost all of them were in the average range.  So
19 various measure of visual spatial skills, memory, and
20 attention.  The exception was on subtest called picture
21 recognition where Mr. Sampson had to remember pictures he
22 was shown and match them to see whether he recalled things
23 he was shown previously.  That score was in the low
24 average range.
25 Q.   Does that particular test measure skills or

ToniAnn Lucatorto, RPR, RMR, CRR
Official Court Reporter

A-1069

303

1  performance that would be relevant to accessing the USMLE?
2  A.    I don't believe so.  Certainly not relative to much
3  other evidence or much other data from the diagnostic
4  testing that's much more similar in format to the USMLE.
5  Q.    Did Dr. Anderson administer any test of academic
6  ability to Mr. Sampson?
7  A.    Yes, I mentioned the reading measure from the SATA.
8  The Scholastic Abilities Test for Adults.  I don't think
9  there was anything else.  Technically, one of the Woodcock
10  Johnson Tests, spelling of sounds, counts as an
11  achievement test.  But that was where he was asked to
12  spell out fake words.  Again, it's a fake word test to
13  show phonetic skills.
14  Q.    Dr. Lovett, you discussed the picture recognition
15  test as one place where Mr. Sampson had some below average
16  scores.  Did Dr. Anderson report any below average scores
17  on any other tests?
18  A.    Yes.  There were a few neuropsychological measures
19  given, and there were below average scores there.
20  Q.    Which tests are you referring to there?
21  A.    So on page nine, there's mention of the Rey Complex
22  Figure Test and Recognition Trial.  So here, again,
23  Mr. Sampson was shown a complex figure, had to copy it.
24  Then the drawing was removed that he had made and he was
25  asked to draw from memory at a couple points in time.  And

ToniAnn Lucatorto, RPR, RMR, CRR
Official Court Reporter

304

1  was later asked whether various things he was shown
2  visually were part of that figure.  And on some those
3  parts, his performance was below the average range on the
4  memory measures.
5  Q.    Dr. Lovett, could you turn to -- I'm sorry, can you
6  look at Exhibit 6 to your declaration?
7  A.    Yes.  I'm there.
8  Q.    Can you tell me what that is?
9  A.    This is the Rey Complex Figure.  This is the standard
10  Rey Complex Figure stimulus.
11  Q.    So again, so I understand it.  Someone is shown that
12  figure.
13  A.    So someone is shown this figure, has to copy it.  The
14  picture is sitting there as the person copies it.  Then,
15  as soon as the copy is done, the copy is removed, the
16  stimulus is removed, and the person has to draw it again
17  from memory.  Then, after about a half hour of more
18  neuropsychological testing, the person is asked again.
19  Remember that figure that I showed you, can you draw it
20  again.
21        THE COURT:  You have to draw it a third time
22  with a time period in between?
23        THE WITNESS:  Yes.
24        THE COURT:  This figure.
25        THE WITNESS:  Yes.

ToniAnn Lucatorto, RPR, RMR, CRR
Official Court Reporter

305

1  Q.    And it's not a resting time, right?  You're doing
2  other things in those 30 minutes?
3  A.    Exactly.  The goal is to interrupt the process so the
4  person can't be thinking about the figure.
5  Q.    Then I believe you mentioned the trail making test?
6  A.    I haven't yet, but that's also on page nine.  And
7  that was also a measure where one of the scores was below
8  the average range.  So there, Mr. Sampson was asked to
9  connect dots that had letters and numbers and he had to
10  follow a certain rule to connect the dots.  And then on
11  page ten, there was another measure given, the Stroop
12  Color and Word Test.  And one of the scores there was
13  below average.  So that involved having to shift back and
14  forth between reading words that were in different colors
15  versus recording the color that the word was written in.
16  Q.    In your opinion, Dr. Lovett, is Mr. Sampson's below
17  average performance on any the particular tests; the
18  Stroop, the trail making, the Rey Complex Figures Test,
19  relevant to his ability to access the Step One of the
20  USMLE?
21  A.    No.  The format of these tests are so unusual, so
22  unlike almost anything people have to do academically, I
23  would say, but particularly the Step one exam, the step
24  one exam doesn't require these skills, as far as I've
25  seen.  And again, in Mr. Sampson's case, we do have

ToniAnn Lucatorto, RPR, RMR, CRR
Official Court Reporter

306

1  evidence from much more relevant tests.
2  Q.    Do they indicate that he has a reading disorder?
3  A.    No.  These tests would not be measures of reading
4  skills in any significant way.
5  Q.    Did Dr. Anderson make any diagnosis?  And you might
6  look at page seven of the report.
7        THE COURT:  Page 7 of whose report?
8        MS. MEW:  Dr. Anderson Exhibit 2.
9  A.    Yes.  Two diagnosis were made.  Unspecified
10  neurodevelopmental disorder and visual spatial memory and
11  visual spatial processing.  And then specific learning
12  disorder with impairment in reading: AKA dyslexia.
13  Reading fluency, word reading accuracy, and spelling.
14  Q.    So going to the first diagnosis.  What is unspecified
15  neurodevelopmental disorder, visual spatial memory, visual
16  spatial processing?
17  A.    So unspecified neurodevelopmental disorder is the new
18  name for learning disorder not otherwise specified.  Both
19  things had been diagnosed in August of the same year.
20  It's essentially updated.  So just like learning disorder
21  not otherwise specified, it's a category that's applied
22  when someone does not meet the full criteria for any
23  particular specific disorders.  In that area.  So that's
24  what unspecified neurodevelopmental disorder means.  And
25  Dr. Anderson was further adding that it seemed to be in

ToniAnn Lucatorto, RPR, RMR, CRR
Official Court Reporter

A-1070

307

1    the areas related to visual processing and visual things.
2    So she felt as though there was a problem in that area,
3    but didn't feel that it rose to the full criteria of any
4    particular disorder. So that would be unspecified
5    developmental disorder.
6    Q.    With respect to the diagnosis of specific learning
7    disorder with impairment in reading dyslexia, reading
8    fluency, word reading accuracy, and spelling, in your
9    opinion, is this diagnosis supported by the information
10   and data reported in her evaluation?
11   A.    No. At times, there's really very little evidence
12   that's relevant on the point. At other times, there is
13   evidence that would go against those disorders. I
14   believe.
15   Q.    Can you explain in more detail what you mean?
16   A.    So if we look, again, at the diagnostic tests that
17   were given, we don't have any regular spelling tests which
18   is to say tests where Mr. Sampson was asked to spell
19   regular, actual English words. So it was odd to see a
20   diagnosis with spelling disorder. In fact, the one
21   spelling test that was given, spelling of sounds, the fake
22   words, his score was in the average range. So I was
23   surprised to see that. With regard to reading, the only
24   significant reading measure that Dr. Anderson gave was the
25   Scholastic Abilities Tests for Adult. And without any

308

1    additional time, Mr. Sampson's score was in the average
2    range again. So that also struck me as unusual. For
3    unspecified neurodevelopmental disorder, there's not
4    really a way to say whether the criteria is met because
5    there are no detailed criteria. Again, it's at the
6    clinicians discretion therein to make an unspecified
7    diagnosis.
8    Q.    I believe there was a specific reference to reading
9    fluency in the diagnosis. Were there any tests
10   administered that measured word reading accuracy?
11   A.    Well, word reading accuracy was measured by the
12   Stroop Color Word Test. It's not necessarily designed as
13   a reading measure, but the person does need to read things
14   as quickly as possible, and on that test, Mr. Sampson's
15   score was above average.
16   Q.    How about the reading fluency aspect?
17   A.    Well, because the Stroop word part is timed, that
18   would be an indirect indicator of fluency because the
19   reading comprehension measure from the Scholastic
20   Abilities tests for adults is also timed, that would also
21   be -- even though it's not called fluency, it requires
22   accurate and fluent comprehension.
23   Q.    Did Dr. Anderson diagnose Mr. Sampson with ADHD?
24   A.    No.
25   Q.    Does her report explain why not?

309

1    A.    The report mentions that Robert does appear to be
2    experiencing attention problems, but his testing results
3    and history supply little evidence that these problems are
4    the result of ADHD. So there's a mention of not having
5    symptoms that would be expected. Yeah.
6    Q.    And before we move away entirely from Dr. Anderson's
7    evaluation, if you can -- kind of. You might need to hold
8    your place or not, but if you can turn to tab 37, which is
9    the report from Dr. Wasserstein. If you could
10   particularly look at page 23 of this report.
11   A.    Okay.
12   Q.    The first full paragraph last sentence,
13   Dr. Wasserstein writes, in depth testing of reading
14   comprehension an reading speed on the subsequent
15   evaluation performed by Dr. Anderson, demonstrated not
16   only relative weakness in speed of reading and reading
17   comprehension, but also showed absolute weaknesses
18   compared to same age peers under regularly timed
19   conditions. And that's underscored.
20         Do you agree with Dr. Wasserstein's
21   characterization of Dr. Anderson's evaluation?
22   A.    No. Unfortunately, I have to disagree. The evidence
23   of Dr. Anderson's report clearly shows average range
24   scores in the only measures that were given of reading
25   skills. Average or above average. If you count the

310

1    Stroop word score as reading individual words.
2    Q.    And you can stay now at Plaintiff's Exhibit 37. I
3    understand this report postdates the review that you did
4    of Mr. Sampson's earlier request for testing
5    accommodations; is that right?
6    A.    Yes.
7    Q.    This is for the record, Dr. Wasserstein's 2020
8    neuropsychological evaluation report?
9    A.    Dr. Wasserstein and Dr. Miller.
10   Q.    Yes. I might, for shorthand times, refer to it as
11   Dr. Wasserstein, but I do understand it's for both.
12         Have you reviewed this evaluation now in the
13   context of this lawsuit?
14   A.    Yes.
15   Q.    Let's talk about the assessment measures utilized by
16   Dr. Wasserstein and Dr. Miller, if you could look at page
17   13 of this report. So the first category is symptom
18   validity and there are seven test measures. Can you
19   explain what these tests are?
20   A.    Symptom Validity Tests are designed to measure some
21   aspect of effort or motivation, or honesty during the
22   assessment to see whether or not you can trust other
23   measures in the battery.
24   Q.    And what was Mr. Sampson's performance on this
25   symptom validity test?

A-1071

311

1   **A.**     The scores aren't given, but they're all reported to
2   have been valid.  I should note that symptom validity
3   tests vary in terms what of they ask the examinee to do.
4   So these are not measures of, say, reading speeds or
5   anything like that.  Most are measures of memory related
6   skills.
7   **Q.**     And I have just a quick question.  If you look the
8   second test listed under the symptom validity test, which
9   is the WAIS IV reliable digit span test, can you explain
10  what this is?  That particular test?
11  **A.**     Yes.  So most of the measures listed under symptom
12  validity tests here are actually parts of other measures
13  that are designed to measure other things.  So the WAIS IV
14  reliable digit span comes from the IQ test, the WAIS.  And
15  research has shown that some people who might not be
16  putting forth enough effort will get a low score on this
17  reliable digit span measure.  So you can calculate it
18  based on how someone did on the IQ test.  And it's the
19  same with the next measure, the CVLT-II recognition, and
20  the same with all of the measures after the that.  And the
21  TOMM, the T-O-M-M, is the only standalone measure that I
22  see here.
23  **Q.**     And the TOMM is -- what is the TOMM?
24  **A.**     The TOMM, the Test of Memory Malingering, is a
25  measure of memory.  So someone sees pictures and sees

ToniAnn Lucatorto, RPR, RMR, CRR
Official Court Reporter

312

1   other sets of pictures and is asked to indicate which
2   pictures they saw before and which they didn't.  And so
3   research has shown that people who do poorly on this test
4   are unlikely to have genuine problems.  You actually have
5   a 50 percent chance of getting things right just by
6   chance, by probability.  If someone does worse than that,
7   significantly worse than that, it's likely that they might
8   be intentionally getting wrong answers.
9   **Q.**     I want to go back to my point about the WAIS IV
10  reliable digit span test.  Like, that's just that part of
11  the WAIS is the symptom validity test, but the WAIS score
12  itself is a broader test, correct?
13  **A.**     The WAIS is an IQ test and one of the subtests on it
14  is the digit span test.  So the examiner reads a series of
15  numbers to the examinee.  The examinee has to repeat them
16  back in the order in which they hear them.  There's a
17  second part where they hear more series of numbers and the
18  examinee has to repeat them in reverse order of what they
19  heard.  Based on their scores on the individual items on
20  that sub test, you can calculate a supplemental score
21  called the reliable digit span.  And that's what
22  Dr. Wasserstein and Miller appear to have done.
23  **Q.**     If you look down, there's another category of
24  aptitude and academic skills test.  Can you generally
25  describe what this group of tests is?

ToniAnn Lucatorto, RPR, RMR, CRR
Official Court Reporter

313

1   **A.**     Yes.  There's an IQ test that I've mentioned, the
2   WAIS.  The remaining items in that list or remaining tests
3   in that list are measures of academic skills.  Achievement
4   tests is another name for them.  Reading, math, writing
5   skills.
6   **Q.**     How did Mr. Sampson perform on these tests of
7   aptitude and academic skills?
8   **A.**     On the IQ test, the measure of aptitude, the WAIS IV,
9   all of his scores were in the average range or above.
10  With regard to academic achievement or academic skills on
11  the Woodcock Johnson IV, he was measured in terms of his
12  timed reading, timed writing, and timed math skills.  On
13  page 15, the report shows his scores on sentence reading
14  fluency, sentence writing fluency, math fluency.  He had
15  to read sentences as quickly as he could, compose them,
16  write them as quickly as he could, and perform simple math
17  problems as quickly as he could.  On all of those sub
18  tests, his score was above the average range.  He was also
19  given additional reading measures.  So on the WIAT, he was
20  compared to age peers on several different measures of
21  reading.  And all of his scores were in the average range
22  or above on measures where he had to read increasingly
23  complex and obscure words aloud, read fake words, read
24  passages and show comprehension of them, and read aloud
25  under timed conditions.  He was also given the

ToniAnn Lucatorto, RPR, RMR, CRR
Official Court Reporter

314

1   Nelson-Denny as another measure of reading.  And we've
2   talked about that.  From the 2013 evaluation, the
3   Nelson-Denny, here, the results were very surprising in
4   that he performed much worse than he had in 2013.  So his
5   scores on the Nelson-Denny reading test were very low this
6   time in 2020.
7        (Continued on the next page.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

ToniAnn Lucatorto, RPR, RMR, CRR
Official Court Reporter

**A1072**

315

1  (Continuing.)
2  BY MS. MEW:
3  Q.  Were they lower both in terms of rate and
4  comprehension?
5  A.  Yes, both the rate and the comprehension scores were
6  much lower.
7  Q.  Was there any explanation in Dr. Wasserstein's report
8  for the difference in scores or the change in scores on
9  the Nelson-Denny between 2013 and 2020?
10  A.  I don't believe so.  (Peruses document.)
11      No, I don't see.
12  Q.  How would you treat the score on the Nelson-Denny,
13  given the difference in the scores from 2013 to 2020?
14  A.  When someone drops in terms of their reading skills
15  as much as Mr. Sampson did apparently on this one test
16  between 2013 and 2020, if the score drop were valid, it
17  indicated a genuine decrease, marked decrease in reading
18  skills, I would expect to see some explanation of that,
19  something like a head injury or something else that would
20  really reduce someone's cognitive abilities and their
21  academic skills.
22      In this case, not only was there no report of
23  such a problem, but the problem was isolated, the decline
24  was isolated to the Nelson-Denny.  So the only performance
25  measure at least that showed this really serious decline

LISA SCHMID, CCR, RMR
Official Court Reporter

316

1  was the Nelson-Denny.  So to me, even though I don't know
2  the reason why, I can't take the scores from the 2020
3  Nelson-Denny as valid.
4      And I should note, even though Dr. Wasserstein
5  and Dr. Miller administered validity measures, again, they
6  weren't reading-based.  They weren't measuring reading
7  speed or timed reading or anything like that.
8      So to me, the validity tests that were
9  administered, symptom validity tests aren't sufficient to
10  show that the Nelson-Denny score was valid.  In fact, we
11  have some reason to believe that it's not.  The steep
12  decline between 2013 and 2020 is extremely unusual, and
13  apparently without explanation.
14  Q.  And I believe there was also the Scholastic Ability
15  Test for Adults?  It's referenced in the list.
16  A.  Let's see.  I see on 13, the Scholastic Abilities
17  Test for Adults listed, but I'm having trouble finding it
18  in the tables, if it was actually given.
19      Sometimes an evaluator has a set list of things
20  that are always mentioned in their report, but they may
21  forget to take something out if it wasn't given.
22      I don't see the Scholastic Abilities Test for
23  Adults here, at least not in the tables.  I don't recall
24  that being given in this evaluation, from when I reviewed
25  this report.

LISA SCHMID, CCR, RMR
Official Court Reporter

317

1  Q.  Okay.  Moving ahead then, the next group of tests are
2  under the heading "Neuropsychological Functions."
3  Generally speaking, what are these tests measuring?
4  A.  The idea behind neuropsychological tests is to
5  isolate different cognitive abilities:  Memory, attention,
6  language, that sort of thing.  So neuropsychological tests
7  generally are designed to do that, even to separate out
8  verbal memory from visual memory.
9      They were originally designed to diagnose people
10  who had different sorts of structural brain injuries
11  before we had imaging, to be able to detect them.
12      And so based on someone's performance on these
13  tests you could actually tell exactly where the injury
14  might be because their performance was only low on a test
15  of visual memory or something like that.
16  Q.  And again, just looking broadly across this category
17  of tests, how did Mr. Sampson perform?
18  A.  His performance on the neuropsychological tests was
19  variable.  So some of the scores were in the average range
20  or above.  Other scores were slightly below average or
21  occasionally worse than that.
22  Q.  Let's go through and address each one, starting with
23  the Integrated Visual and Auditory CPT.  What is this
24  test?
25      THE COURT:  What page are you on?

LISA SCHMID, CCR, RMR
Official Court Reporter

318

1      MS. MEW:  So the listing of them is on 13.
2      THE COURT:  Right.
3      MS. MEW:  And then let me see.  Page 17, Your
4  Honor.
5      THE COURT:  Thank you.  Got it.
6      THE WITNESS:  Okay.  Seventeen.  I'm there.
7  A.  So the Integrated Visual and Auditory CPT is a
8  computer-based test where the examinee has to follow
9  certain rules about when to press a computer key,
10  typically.  They have to respond to different stimuli that
11  are presented both visually and also through hearing.
12  There are times when they're told not to respond.  There
13  are times when they're told to respond, and they have to
14  follow those rules.
15      So it's often given to measure both attention
16  and impulsiveness.
17  BY MS. MEW:
18  Q.  So is this part of an evaluation for ADHD?
19  A.  It's often a part of that.  There are a number of
20  things that can cause someone to get low scores on a CPT,
21  but it is associated with ADHD.
22  Q.  And what did Mr. Sampson's results on the IVA-CPT
23  show?
24  A.  His performance was variable, so on measures of
25  impulsiveness, his scores were below the average range,

LISA SCHMID, CCR, RMR
Official Court Reporter

A1073

319

1  suggesting deficits there.
2      On one of the attention measures, his score was
3  low. On the other attention measures, his score was --
4  his scores were above average. So there was variability.
5  Q.  Dr. Lovett, if you'll turn to page 18 in Dr.
6  Wasserstein's report, in the kind of middle of the page,
7  the paragraph right above the heading "Executive." It
8  reads, this performance-based attention task indicates
9  that Mr. Sampson's response control is problematic in both
10 modalities leading to deficits in his sustained attention,
11 especially visual. Given such severely impaired sustained
12 visual attention, his reading comprehension is likely to
13 be impacted, especially during lengthy standardized exams.
14     Do you have any response to that statement or
15 opinion on that statement, I should say?
16 A.  Yeah. I don't see performance on this computerized
17 test, where you have to press a key according to different
18 rules as related to reading comprehension.
19     But in Mr. Sampson's case, there's not even a
20 reason to speculate about that relationship because
21 there's a whole history of performance on real world
22 reading comprehension measures, including some lengthy
23 standardized exams.
24 Q.  If you'll then look on -- sorry -- pages eight to
25 19 -- eighteen to 19, I'm sorry. Dr. Wasserstein

                LISA SCHMID, CCR, RMR
                Official Court Reporter

320

1  discusses Mr. Sampson's performance on the Delis-Kaplan
2  Executive Functioning System or D-KEFS, the Wisconsin Card
3  Sort Task, and the Rey-Osterrieth. And we have previously
4  discussed the Rey-Osterrieth, which was the complex
5  drawing.
6      Can you explain what the D-KEFS and Wisconsin
7  Card Sorting Task measure?
8  A.  Sure. They are thought to measure executive
9  function, which is the ability to plan, organize, plan
10 ahead, inhibit your responses when you're not supposed to
11 respond, those kinds of things.
12     So the Delis-Kaplan Executive Function System is
13 actually a battery. It's a bunch of different tests
14 measuring different aspects of that. In fact, we have
15 seen some of these in the 2013 evaluations as well. The
16 Trail Making Test, the Color Word Interference Test. The
17 Stroop was the earlier name for that.
18     So that is the Delis-Kaplan.
19 Q.  And how did Mr. Sampson perform on the Delis-Kaplan?
20 A.  On all of the scores from all of the different parts
21 of the Delis-Kaplan, his performance was in the average
22 range or above.
23 Q.  And then the Wisconsin Card Sorting Task, what does
24 this measure?
25 A.  It's also thought to measure executive function. The

                LISA SCHMID, CCR, RMR
                Official Court Reporter

321

1  person has to sort cards according to a rule. So the
2  cards have shapes of different colors and different
3  numbers of shapes.
4      First, color might be the way to sort the cards.
5  Then the shape might be the way to sort the cards. And
6  the person is only told that they are sorting them
7  correctly or incorrectly. And the rules keep changing.
8  So the test measures whether the person sticks with the
9  old rule, discovers the new rule, those sorts of things.
10     THE COURT:  Are those rules given to the person
11 or is it in writing?
12     THE WITNESS:  It's actually visual, so I believe
13 that Dr. Wasserstein mentioned that it was
14 computer-administered, which is one way to do the
15 Wisconsin Card Sorting Task. You can also get the giant
16 pack of cards.
17 BY MS. MEW:
18 Q.  And how -- what was Mr. Sampson's performance on the
19 Wisconsin Card Sorting Task?
20 A.  It was variability. The scores were -- I apologize.
21 I should say the scores were generally in the average
22 range or just below it.
23     So some of the scores on the Wisconsin Card
24 Sorting Test don't get very specific. They just tell you
25 that the person is not showing any significant deficit,

                LISA SCHMID, CCR, RMR
                Official Court Reporter

322

1  and that's where it says, WNL in the final column, Within
2  Normal Limits.
3      When there were specific scores generated, they
4  were between 88 and 96, where 100 is average. So his
5  performance would be in the average range or just below
6  it.
7  Q.  And again, we have talked about the Rey Complex
8  Figure Test, what it measures. What was Mr. Sampson's
9  performance on that test in his 2020 assessment?
10 A.  So this particular score from the Rey-Osterrieth
11 Complex Figure, which was based on how he copied the
12 figure, how accurately and the process he used, the score
13 was within normal limits. It was not grossly impaired.
14 Q.  If you turn to page 20 of Plaintiff's Exhibit 37,
15 under the heading "Learning and Memory Function, what is
16 Dr. Wasserstein -- what are Dr. Wasserstein and Miller
17 assessing in this category?
18 A.  First, they used the Wechsler Memory Scale IV, and
19 they used a part of it where Mr. Sampson heard a story and
20 had to show that he remembered things from the story.
21     Then they administered the California Verbal
22 Learning Test II, he heard lists of words and had to show
23 that he remembered the words from those lists.
24 Q.  And it looks like these are tests of auditory memory,
25 is that right?

                LISA SCHMID, CCR, RMR
                Official Court Reporter

**A1074**

323

1    A.    Yes.  Both of those are auditory memory measures.

2    Q.    And what did the results of these tests show?

3    A.    The Wechsler Memory Scale scores were all average or

4  above.  The California Verbal Learning Test scores were

5  variable.  Some were below the average range.  Others were

6  in the average range.

7    Q.    And then at the bottom of page 20 under the heading

8  "Visual Memory," what assessments are discussed?

9    A.    The Rey-Osterrieth Complex Figure, which we have

10  already mentioned a couple of times, these scores from it

11  in this section of the report looked at memory as opposed

12  to copying the figure.

13          And then the Wechsler Memory Scale IV has

14  another part that's about remembering what you saw and

15  drawing -- reproducing it.

16   Q.    And so what did these -- the results of these

17  assessments show?

18   A.    The Rey-Osterrieth Complex Figure memory scores were

19  below the average range.  The Wechsler Memory Scale visual

20  memory scores were in the average range or above.

21   Q.    And then if you look at the last full paragraph on

22  the page, we're here on page 20, three sentences --

23  beginning three sentences in, Dr. Wasserstein writes,

24  these scores represent the relative and absolute weakness

25  in visual memory when compared to same-aged peers.  This

LISA SCHMID, CCR, RMR

Official Court Reporter

324

1  pattern reflects disrupted storage and suggests that Mr.

2  Sampson has difficulty transferring visual information

3  from short-term memory to long-term memory.  These

4  compounded issues likely contribute to his reading

5  comprehension difficulties.

6          Do you have any opinion on this statement?

7    A.    With regard to the final sentence that these would

8  contribute to reading comprehension difficulties, again, I

9  don't think we have valid evidence of reading

10  comprehension difficulties in the first place.  I think

11  there's a lot of evidence against those.

12          So I don't necessarily see a relationship

13  between those visual memory scores and reading

14  comprehension though, either.  These are memory tests that

15  measure figures.  Complex figures, things like that,

16  drawings, I wouldn't expect that to translate to reading

17  comprehension anyway.

18          But again, in Mr. Sampson's case, there's not a

19  need for speculating about whether these unusual sort of

20  unrealistic tasks would affect reading comprehension.  We

21  have lots of evidence related to reading comprehension

22  directly to examine.

23   Q.    And what is that direct evidence that you're talking

24  about?

25   A.    We have diagnostic testing of reading comprehension

LISA SCHMID, CCR, RMR

Official Court Reporter

325

1  skills from multiple evaluations, as well as real world

2  measures of reading comprehension from standardized tests

3  throughout his life.

4    Q.    Then if we can just skip up to page 20, because I

5  think page 19 is -- yeah, page -- sorry, page 22.

6          This discusses the Purdue Pegboard Test.  And

7  what does this test measure?

8    A.    On the Purdue Pegboard, the individual needs to put

9  pegs in holes as quickly as possible, first with their

10  dominant hand -- in Mr. Sampson's case, his right hand.

11  He was right- handed -- and then as quickly as possible

12  with the other hand, the nondominant hand.

13   Q.    And so again, just to bring all this together, did

14  you take into account Mr. Sampson's performance on these

15  various neuropsych tests when you were reviewing his file?

16   A.    Absolutely.  I consider all of the evidence.  I

17  weighed it based on its relevance, because I certainly

18  considered all of the evidence in the file and considered

19  all of these neuropsychological test scores.

20   Q.    If your opinion, does his performance on the

21  neuropsych measures, how do they inform your analysis of

22  his ability to access Step 1 of the USMLE?

23   A.    Unfortunately, I couldn't find that there was

24  sufficient evidence from the neuropsychological testing of

25  a need for accommodations on the Step 1 exam.

LISA SCHMID, CCR, RMR

Official Court Reporter

326

1    Q.    And I believe you've previously testified that's

2  because you're looking to the more direct evidence?

3    A.    Again, I considered the indirect evidence in many

4  forms as well, including neuropsychological test scores.

5  You have to consider all of the evidence in the file as a

6  whole.

7          But I was not able to find from these

8  neuropsychological test scores that there was sufficient

9  evidence based on them of a need for accommodations on the

10  USMLE Step 1 exam.

11   Q.    And then just very quickly, if you would turn back to

12  page 13.

13   A.    (Peruses document.)

14   Q.    There are four tests of emotional functioning listed.

15  Can you explain what these tests are measuring?

16   A.    Yeah.  Tests that are listed here as measuring

17  emotional functioning measured different psychological or

18  psychiatric disorders.

19          So the Beck Anxiety, the Beck Depression

20  Inventory, they are self-report measures of symptoms of

21  anxiety and depression.

22          The CAARS, the Connors' Adult ADHD Rating Scale

23  that's -- in this case, a self-report version was used, so

24  that was Mr. Sampson's reports of how he perceived his

25  ADHD symptoms.

LISA SCHMID, CCR, RMR

Official Court Reporter

327

1    And then the Personality Assessment Inventory is
2    broader. It also is based on self-reporting, but it looks
3    at anxiety, depression, anger, all kinds of things.
4    Q.   Focusing on the CAARS Scale for ADHD, what did Mr.
5    Sampson's performance -- what did his scores on the CAARS
6    scales show?
7    A.   All of his scores on the CAARS are clinically
8    significant or almost clinically significant.
9         So he reported having extremely high levels of
10   ADHD symptoms, particularly the official ADHD symptoms
11   from the DSM, the Diagnostic Manual. His scores were
12   extremely, extremely high.
13   Q.   Were there any other -- did anyone else fill out the
14   CAARS scales for Mr. Sampson, any other collateral
15   informants?
16   A.   During the Wasserstein and Miller evaluation, I don't
17   believe so, no.
18   Q.   And how does Mr. Sampson's rating of his symptoms on
19   the CAARS scales in 2020 compare to his rating of his
20   current symptoms through the Barkley Scales that were
21   administered in 2013?
22   A.   They are vastly different. In 2013, there were
23   apparently no significant symptoms in any area of ADHD
24   that Mr. Sampson described having at the time of the
25   evaluation in 2013.

LISA SCHMID, CCR, RMR
Official Court Reporter

328

1         In 2020, there were self-descriptions that would
2    represent extremely severe, profound problems in the area
3    of ADHD.
4    Q.   Dr. Lovett, there's been some discussion that Mr.
5    Sampson having uneven performance across his diagnostic
6    assessments. Do you -- is that something that you look at
7    when you're reviewing an assessment?
8    A.   Well, when you look at a set of diagnostic test
9    scores, variability or unevenness is something that will
10   present itself, but variability on its own is not evidence
11   of a clinical disorder or of anything related to a
12   disability.
13        So we have lot of research showing that it is
14   typical for healthy nondisabled people in the population
15   to show that variability. One recent study that come out
16   showing that graduate students, so a similar population
17   probably to medical students, over 90 percent showed
18   enough variability that they had at least one score below
19   the 16th percentile on a neuropsych battery, even though
20   overall, they performed very well.
21        So showing variability is typical. It's common.
22   It's healthy. Variability per se is not an indication of
23   disorder or disability.
24   Q.   Moving away from the diagnostic evaluations, are you
25   familiar with letters from Dr. Aronson that are in the

LISA SCHMID, CCR, RMR
Official Court Reporter

329

1    file?
2    A.   Yes.
3    Q.   What did those letters -- how did those letters weigh
4    into your analysis?
5    A.   Well, as I recall, Dr. Aronson offered, you know,
6    very strong statements in terms of claiming that ADHD was
7    present, and the diagnostic criteria were met, but there
8    wasn't really data, detailed evidence supporting those
9    claims. So I recall from my reviews that there were
10   strong statements, but I don't recall seeing data that
11   really backed those up.
12   Q.   Did Dr. Aronson -- did Dr. Aronson report prescribing
13   medications to Mr. Sampson for ADHD?
14   A.   I believe medication was noted. I would have to go
15   look at the letters again.
16   Q.   Does having medication, prescribed medication for
17   ADHD, is that itself indicative of having ADHD?
18   A.   It's indirect evidence that someone feels ADHD is
19   present. In Mr. Sampson's case, we know that there are
20   folks who are saying ADHD is present.
21        The fact that medication was prescribed doesn't
22   really, to me, go beyond showing that a diagnostician, a
23   clinician felt that ADHD was there.
24   Q.   And if we could just backtrack for a minute, Dr.
25   Lovett. I think I need to go back. We'll go back to Dr.

LISA SCHMID, CCR, RMR
Official Court Reporter

330

1    Wasserstein's report, to page 24. Did Dr. Wasserstein
2    make any diagnoses?
3    A.   Yes. So diagnoses were made. You can see in the
4    kind of middle paragraph that starts with the words "taken
5    together."
6         About halfway through, you see a mention he
7    meets criteria for a DSM-V diagnosis of specific learning
8    disorder with impairment in reading, reading fluency, and
9    reading comprehension, as well as impairment in written
10   expression, spelling and handwriting. Based on the
11   current test results and prior history and diagnosis, Mr.
12   Sampson also meets criteria for Attention
13   Deficit-Hyperactivity Disorder, combined presentation, end
14   quote.
15   Q.   Starting with the diagnosis of specific learning
16   disorder with impairment in reading, reading fluency, and
17   reading comprehension, in your opinion, is this diagnosis
18   supported by the data and information in the evaluation?
19   A.   No. So Mr. Sampson has scored generally in the
20   average range and above on measures of reading, the
21   exception being the Nelson-Denny, where he's been compared
22   to above-average groups, that is graduating college
23   seniors, and even then, it was the 2020 evaluation with
24   Doctors Wasserstein and Miller that showed a decline in
25   the Nelson-Denny score that doesn't strike me as plausible

LISA SCHMID, CCR, RMR
Official Court Reporter

A1076

331

1  if it were valid.

2  Q.   And then how about the diagnosis of an impairment in

3  written expression?  Is that supported by the data and

4  information in the evaluation, in your opinion?

5  A.   No.  So Dr. Wasserstein and Dr. Miller mentioned

6  spelling, and I believe that only one measure of spelling

7  was given.  So that is on page 17.  And Mr. Sampson's

8  score was in the average range on that measure of

9  spelling.  I was surprised to see that.

10  Q.   In any event, is an impairment in written expression

11  going to be relevant to Mr. Sampson taking the Step 1

12  exam?

13  A.   No.  The Step 1 exam, the person is responding to

14  multiple choice questions.  They are not composing a

15  significant amount of text.

16  Q.   And is the ADHD combined-type diagnosis in your

17  opinion supported by the data and information in the

18  evaluation?

19  A.   I don't believe so, no.  Mr. Sampson did report

20  extremely high levels of ADHD symptoms in that evaluation,

21  but that has to be taken as part of the evidence that's in

22  the file as a whole.

23      Doctors Wasserstein and Miller mentioned the

24  prior evaluations.  They were clearly aware of them.  And

25  so considering the evidence as a whole, I would say no.

332

1  Q.   Okay.  So moving away from the diagnostic

2  evaluations, we've spoken about the different scores.  Is

3  this the only part of assessing someone for a diagnosis or

4  a disability?

5  A.   No, not just diagnostic testing.  As I mentioned

6  earlier, the historical records are very important, and

7  particularly in the cases of ADHD and learning

8  disabilities, interviews, observations, other things that

9  we've mentioned before.

10  Q.   In looking at the historical record -- and I believe

11  you've talked about read world performance -- what other

12  information are you looking for?

13  A.   I looked at Mr. Sampson's performance on the PSAT,

14  the SAT, the ACT, the MCAT, so standardized admissions

15  tests and similar things.  I looked at reports of

16  performance in childhood, both in school and also on

17  standardized achievement and ability tests, among other

18  things.

19  Q.   Let's start with childhood.  What information did you

20  see in the record regarding Mr. Sampson's -- that you

21  found relevant to assessing Mr. Sampson's performance and

22  abilities in childhood?

23  A.   One thing in Dr. Michels' evaluation, I believe, she

24  mentions specific scores from childhood, and some of them

25  were in the area of reading.  So I found those to be

333

1  especially useful, because if someone has a learning

2  disability in reading, I would expect to see evidence of

3  poor reading in childhood.

4      And so, it appeared that Mr. Sampson had been

5  given both a diagnostic reading test.  I recall it being

6  at age ten.  And also took a group-administered test of

7  reading skills around the same time -- in 5th grade, I

8  believe.

9  Q.   Let's look at Dr. Michels' report just for that

10  reference.  So that's Plaintiff's Exhibit 3.

11  A.   I'm there.  It's on page two.

12  Q.   Thank you.  I was going to say, you might find it

13  more quickly than me.

14      So are we looking at the last full paragraph on

15  page two?

16  A.   Yes.  Results of a reading assessment -- I'm

17  quoting -- results of a reading assessment at age ten with

18  the Woodcock Reading Mastery Test suggests that his

19  reading scales were just on grade level and weaker than

20  his ability level, end quote.  And then you see the

21  specific grade equivalent scores from the different parts

22  of the Woodcock Reading Mastery Test.

23      So that's an individually-administered

24  diagnostic test of reading skills.  And so we see that the

25  performance was at grade level.  He was preforming as he

334

1  should for someone in his grade level in reading skills.

2      In addition, he took the TerraNova.  Probably

3  the whole school or at least the whole grade was given the

4  TerraNova.  That's a group-administered class-wide or

5  school-wide test of achievement.  And his reading score

6  was at the 59th percentile, so in the average range.

7  Q.   And I believe there's a score report in the record

8  for the OLSAT.

9  A.   Yes.

10      (Court reporter seeks clarification.)

11  Q.   Dr. Lovett, could you spell it?

12  A.   Sure.  OLSAT is the abbreviation.

13      And that's basically an IQ test, but for group

14  administration.  Typically, the teacher or a proctor can

15  give this as a rough estimate of IQ to the whole class.

16  It's actually typically a multiple choice version of an IQ

17  test.

18      And on that test, there were two scores listed,

19  one for verbal ability.  And so for that, Mr. Sampson's

20  score was above the average range.  For nonverbal ability,

21  it was in the average range.

22  Q.   In addition to those particular test scores, did you

23  look at other information relevant to Mr. Sampson's

24  childhood and his performance in childhood?

25  A.   Yes.  There were a number of report cards and school

**A1077**

335

1  reports that were submitted. They weren't all complete.
2  Some of them were photocopies or images of parts of the
3  report card, but I look at everything that was sent that I
4  could.
5       Sometimes they mentioned reading as one of the
6  skills was assessed or evaluated in childhood. There was
7  not, to me, significant consistent evidence of any reading
8  problems there.
9  Q.  How about ADHD-related issues?
10 A.  I did not see what struck me as clinically
11 significant levels. There was mention at times of a need
12 to improve attention or signs of disorganization that were
13 present but improving.
14      It's not that those report cards would rule out
15 the possibility of ADHD, but there wasn't, to me,
16 significant enough evidence in those report cards to show
17 it.
18 Q.  And just so that we have it for the record, if you'll
19 turn to tab 21?
20 A.  Yes.
21 Q.  Does this look like the report card records that you
22 reviewed?
23 A.  Yes. Uh-hum (affirmative response).
24 Q.  And I believe you also then spoke of standardized
25 test performance on tests like the SAT and the ACT, is

LISA SCHMID, CCR, RMR
Official Court Reporter

336

1  that correct?
2  A.  Yes. Absolutely. That's another way of looking both
3  at accommodation needs, as well as looking at academic
4  skills like reading.
5  Q.  Are tests like the ACT, SAT, the MCAT, are these
6  diagnostic tests?
7  A.  The tests weren't designed to diagnose disabilities,
8  but they give scores that are very useful when performing
9  an assessment, and that's why evaluators report them as
10 part of the history.
11      So even though they're not designed as clinical
12 measures, the diagnostic criteria, the official clinical
13 criteria for disorders mention that the person has to be
14 affected in the real world, including academic or
15 educational settings.
16      So they're very useful when doing an assessment.
17 They're not, you know, developed initially for diagnostic
18 purposes, but a diagnosis of reading disability is
19 supposed to indicate poor reading skills. Someone who has
20 poor reading skills should generally be doing poorly on
21 real world measures of reading, such as those from the
22 SAT, ACT, PSAT and the MCAT verbal reasoning as well.
23 Q.  And I believe you've mentioned this, but did all of
24 Mr. Sampson's evaluators also review his standardized test
25 performance as part of their evaluation?

LISA SCHMID, CCR, RMR
Official Court Reporter

337

1  A.  Yes. All three mentioned at least the standardized
2  test scores, and some listed all of them or listed many of
3  them.
4  Q.  If you'll turn to Plaintiff's Exhibit 13, how did Mr.
5  Sampson perform on the PSAT?
6  A.  On the PSAT, Mr. Sampson's reading score was in the
7  average range, the 50th percentile. His mathematics score
8  was above the average range, the 80th percentile. His
9  writing score was above the average range at the 86th
10 percentile.
11 Q.  Oh, I see. I was always looking at the scores, but
12 the percentiles, I see what you're referring to, that
13 second box below.
14      And these are compared to other -- who are these
15 percentiles comparing him to?
16 A.  So these were compared to other high school juniors,
17 and you can see at the top, it says, Grade 11. So he was
18 a junior at the time. It was a fair comparison.
19 Q.  If you turn to Plaintiff's Exhibit 14?
20 A.  Yes.
21 Q.  Did you review these SAT scores as part of your
22 review?
23 A.  Yes.
24 Q.  Looking at the first report from May 2005, I think
25 that Mr. Sampson testified he may have been in ninth grade

LISA SCHMID, CCR, RMR
Official Court Reporter

338

1  when he took the test.
2       How do you use a score like this on the SAT at
3  this period of time?
4  A.  Well, the SAT is designed for folks who are applying
5  to college. And so if someone has to take the test
6  earlier for a different reason, we wouldn't use that as a
7  fair comparison to the norms.
8       They're being compared typically to
9  college-bound high school seniors. It says actually
10 exactly that, college- bound seniors, so we wouldn't call
11 that a fair comparison, but the rest of the SAT scores
12 that I reviewed were close enough.
13 Q.  And how was Mr. Sampson's performance on the other
14 three SAT administrations?
15 A.  So on the other three SAT administrations, in
16 June 2008, his reading score compared to national norms
17 was in the 74th percentile. That would be in the average
18 range. His math score was at the 91st percentile, above
19 the average range. His writing score was at the 93rd
20 percentile, above the average range.
21      He takes the test in October 2008 on the next
22 page, and all the national scores are above the average
23 range, based on a comparison to college-bound seniors
24 taking the test nationwide. His reading score is at the
25 84th percentile, math at the 91st, writing at the 92nd.

LISA SCHMID, CCR, RMR
Official Court Reporter

**A1078**

339

1    Takes it again the following month. Now all of
2  the three scores are in the top ten percent nationally:
3  93rd, 96th, 94th percentile nationally.
4  Q.  Dr. Lovett, are you familiar with the Medical College
5  Admission Test or the MCAT?
6  A.  I am.
7  Q.  Is the MCAT a diagnostic test?
8  A.  Like the SAT, it was designed as a test to be used
9  for admission selection.
10    And so if it's used carefully, it can also be an
11 indicator of academic skills more generally.  It can also
12 be used to indicate deficits or the lack of deficits in
13 test access skills, the skills that you need to be able to
14 participate in a test in its standard format without
15 accommodations.
16    So although the MCAT certainly was not designed
17 to diagnose any disability, it can provide useful
18 information in many cases about someone's accommodation
19 needs and can even provide relevant evidence of academic
20 skills.
21 Q.  If you'd turn to Tab 11, Plaintiff's Exhibit 11?
22 A.  (Peruses document.)
23    Yes.  I'm there.
24 Q.  How did Mr. Sampson perform on the MCAT?
25 A.  He took the MCAT twice.  Both times, all of the

LISA SCHMID, CCR, RMR
Official Court Reporter

340

1  section scores were in the average range or above.
2  Q.  And how does the cohort of individuals taking the
3  MCAT compare to most people in the general population?
4  A.  Most people who are taking the MCAT, as I understand
5  it, are applying to medical school.  So rather than being
6  compared to other people in the general population, Mr.
7  Sampson was being compared to other medical school
8  applicants.
9    So if the scores are in the 60th, 70th
10 percentile or somewhere around there compared to other
11 medical school applicants, we would expect him to be at
12 least that high compared to the general population.
13    Only a tiny fraction of the population is
14 applying to medical school, taking the MCAT, and it's not
15 a random sample certainly from the population.  It's folks
16 who tend to have higher academic skills.
17 Q.  Dr. Lovett, Mr. Sampson has testified, as has his
18 mother, that his results on these standardized tests came
19 only after extraordinary effort and extensive work with
20 tutors.
21    Did you see similar information about that in
22 the file when you were reviewing the file?
23 A.  I did, yes.
24 Q.  And did you take that into account in your
25 assessment?

LISA SCHMID, CCR, RMR
Official Court Reporter

341

1  A.  Absolutely.  It's important to understand that
2  tutoring and test preparation can have significant effects
3  on scores, but only when they're sufficiently intensive
4  that they actually are improving someone's academic
5  skills.
6    So we have a lot of research on the effects of
7  test preparation.  It's a common misconception that people
8  learn a few tricks that, variable to them, do much better
9  on the test without actually changing their skills while
10 they're still not actually skilled in the ways that the
11 test is designed to measure.  The research that we have
12 shows that even after test preparation, these scores are
13 still valid.  They are still valid for measuring what
14 they're designed to measure.
15    So if extraordinary efforts -- and I have no
16 reason to doubt that extraordinary efforts or great deal
17 of tutoring and test preparation was present here -- if it
18 was, those factors appear to have a genuinely raised Mr.
19 Sampson's academic skills because certainly after them, we
20 have a consistent record of real word settings of
21 standardized test scores that were in the average range or
22 above, starting even in childhood.
23 Q.  But do we have a picture of what his test performance
24 and skills were before there was the extensive tutoring?
25 A.  The closest that I would say we have is the 5th Grade

LISA SCHMID, CCR, RMR
Official Court Reporter

342

1  scores on the reading measures.
2    So in Dr. Michels' evaluation, we have looked at
3  the performance on the Woodcock Reading Mastery Test and
4  the TerraNova, both individually-administered and
5  group-administered reading tests showed average range
6  reading scores.
7    That's the earliest that I know that would have
8  been prior to at least a great deal of the tutoring and
9  test prep, and those two tests, the Woodcock Reading
10 Mastery Test and the TerraNova, I have not generally
11 thought of those as being things people are studying for.
12 The Woodcock Reading Mastery Test is a secure diagnostic
13 test.
14 Q.  Is there other information in the record from which
15 you can assess how Mr. Sampson's relevant skills are,
16 absent the tutoring?
17 A.  The only other thing prior to a lot of the tutoring
18 would be performance in school.  So that would be one
19 indication.  Again, we don't have great comprehensive,
20 full report cards, but from the evidence that I reviewed,
21 I wasn't finding evidence of any significant or consistent
22 weaknesses there.
23 Q.  When you are reviewing a file and someone is
24 explaining that they are working much harder then other
25 people to obtain -- to obtain results, how do you -- how

LISA SCHMID, CCR, RMR
Official Court Reporter

A-1079

343

1  do you view this information in the context of the entire
2  file?
3  A.   I think it's always important to understand someone's
4  perspective, their honest perceptions sort of of
5  themselves and how they're doing.  It's hard to quantify
6  effort in an objective way, and it's hard for any of us to
7  know how much effort other people are putting forth.
8       So it's something that I certainly consider
9  someone's perspective, but it's hard to spend as much time
10  or give it as much weight when it's something that's
11  really hard to quantify.  In addition, when it comes to
12  determining not disability status, but accommodation
13  needs, I do consider how the person is actually doing.
14       If Mr. Sampson put forth great effort -- and
15  again, I have no reason to doubt that he didn't -- in
16  medical school, he has had to do a lot of very difficult
17  things, and I don't doubt that they require a tremendous
18  amount of effort, but he's been able to do many thing
19  leading up to that point, certainly at least leading up to
20  medical school.  I don't doubt it was through great
21  effort.
22       But, to me, it's hard to quantify how much
23  effort someone put forth.  And if he's put forth more
24  effort than others, at times, he's done better than I
25  would expect the average person in the general population

LISA SCHMID, CCR, RMR
Official Court Reporter

344

1  to do, doing very well in college, et cetera.
2  Q.   Is there any research on the point about measuring
3  your -- I guess put your amount of effort compared to
4  someone else or how that's perceived?
5  A.   People definitely tend to overestimate the amount of
6  work that they put forth relative to others.  I'm not
7  familiar with research on students rating whether they --
8  there's not a great of deal of research that I know of on
9  whether students rate if they're working harder.
10       I'm familiar with research on students'
11  perception of their lives, and particularly college
12  students.  And I was actually involved with one study that
13  looked at this.  College students tend to expect that they
14  are the only one who is inside studying on a Friday night
15  instead of out having fun because they're alone when
16  they're studying.  And so they're not seeing everyone else
17  who's doing that, and things like that.
18       So people do more generally tend to overestimate
19  their work relative to others.  For instance, there's
20  research looking at couples who are in relationships,
21  asking each one to estimate what proportion of the
22  housework they do.  The sum of the estimates across two
23  people is usually about 150 percent or something like
24  that.  People tend to overestimate their work.
25  Q.   Do Mr. Sampson's diagnostic reading test scores also

LISA SCHMID, CCR, RMR
Official Court Reporter

345

1  help sort of show or measure how his performance would be
2  with or without the tutoring?
3  A.   Well, the diagnostic testing that was done after the
4  tutoring, it's hard to say.  The diagnostic testing that
5  was done in fifth grade or around age ten was at least
6  prior to most of the intensive tutoring and test prep.
7  Q.   And again, those test results were in the average
8  range?
9  A.   Yes.  Consistently across individual and
10  group-administered measures of reading.
11  Q.   Is working hard to obtain excellent results
12  indicative of an impairment?
13  A.   No, not at all.
14  Q.   And do you understand from the file that you reviewed
15  or from other information that's been part of the
16  litigation that Mr. Sampson is having difficulties in
17  medical school?
18  A.   I do.  I saw a list of test scores that came from
19  medical school, and some of the scores were below I think
20  the mastery criterion.
21  Q.   And does that -- how does that play into your
22  analysis and your assessment of the file?
23  A.   Well, again, I certainly consider it along with
24  everything else in the file.  So the way I could generally
25  describe Mr. Sampson's trajectory academically is doing

LISA SCHMID, CCR, RMR
Official Court Reporter

346

1  well in high school, at least by reported information;
2  doing well on college admissions tests; doing well in
3  college; doing well on the MCAT; and then medical school,
4  running into at least some difficulties from the evidence
5  that I've reviewed.
6       So if someone is performing well up until
7  medical school on all real world measures and up to that
8  point, that doesn't, to me, suggest any difficulties
9  relative to the general population in terms of that.
10  Q.   Mr. Sampson is receiving accommodations in medical
11  school.  You were aware of that from the file?
12  A.   Yes.  Absolutely.
13  Q.   And how did that play into your analysis?
14  A.   It definitely is something I give substantial weight
15  to.  It's important to consider any history of
16  accommodations.  And a history of accommodations can be
17  helpful indirect evidence of accommodation needs.  It's
18  weighed along with everything else that I consider.
19       In cases where I found that there is sufficient
20  evidence of disability, I often look to the prior -- I
21  always look at the prior history of accommodations, and I
22  often find it really helpful at specifying which
23  accommodations are needed.
24       So it has a lot of uses, and I certainly
25  considered it in this case.

LISA SCHMID, CCR, RMR
Official Court Reporter

A-1080

347

1  Q.  There is information in the record, too, about Mr.
2  Sampson's stuttering as a child and receiving
3  speech/language therapy.  How did that play into your
4  analysis?
5  A.  Again, I certainly considered those reports.  I have
6  no reason to doubt that.
7       In my experience working in schools, it's not
8  uncommon for children -- especially boys -- to have early
9  speech and language problems that do benefit from
10  services, and not to have further learning problems.
11  Q.  Just stepping back a little bit, Dr. Lovett, what is
12  your general approach when you are reviewing a file for
13  testing accommodations?
14  A.  When I receive a file, what I typically do is go
15  through it in order of the files or portions or pages that
16  are sent to me.  I will take notes summarizing all
17  of the relevant facts as I go.
18       I start with the application form where the
19  person is reporting their history of accommodations,
20  reporting what diagnoses they believe are present or what
21  has been diagnosed, and also what accommodations they are
22  seeking on the test, and then I move through all of the
23  other evidence, diagnostic evaluations commonly,
24  historical records, and the like.
25  Q.  And what is your mindset when you're reviewing all of

LISA SCHMID, CCR, RMR
Official Court Reporter

348

1  that information?
2  A.  Well, typically, the application form sets me up for
3  a particular mindset in the sense of I'm looking for
4  things that support what's in the application.
5       So the application form, which is in NBME files,
6  it's almost always followed by a personal statement, those
7  documents are letting me know what to look.
8       If the application form and the personal
9  statement are about ADHD and learning disabilities, I'm
10  looking for specific evidence that would relate to those.
11  If there is a mention of specific learning disorder in
12  reading, I know what I'm looking for in terms of low
13  reading scores among other evidence, to take an example.
14       THE COURT:  Do you have much more?  Because it
15  might be a good time for a ten-minute afternoon break?
16       MS. MEW:  I'm almost done, Your Honor.
17       THE COURT:  Well, then I'll let you finish, then
18  we'll take a break before cross.
19  BY MS. MEW:
20  Q.  Dr. Lovett, I understand that you're taking at face
21  value Mr. Sampson's report of his effort and the work that
22  he has done when he has been in school and doing tests.
23       Do you have an objective way to gauge that or
24  how that compares to other people based on the information
25  you have?

LISA SCHMID, CCR, RMR
Official Court Reporter

349

1  A.  No.  What I'm taking at face value, what I trust is
2  in an absolute sense, that Mr. Sampson has put forth a
3  great deal of effort, and also been the benefit -- the
4  beneficiary of tutoring and test preparation services,
5  that those have been received, and that itself constitutes
6  a lot of time that someone is putting in.  And I don't
7  doubt any of that.
8  Q.  But do you know how it would compare to any other
9  person who is preparing for the Step 1 or who is in
10  medical school or otherwise?
11  A.  I'm not familiar with statistics on how common
12  various amounts of test preparation are, but anytime you
13  try to compare someone's preparation or effort to other
14  people, there's another problem that crops up, and that
15  is, you don't know how the person would have performed
16  without those efforts or without that preparation.
17       So if someone consistently goes to test prep for
18  the SAT, you often don't know what they would have -- how
19  they would have performed without that.
20       The same way in school, if someone is receiving
21  tutoring, you would need very detailed reports that I have
22  not been provided here that would show before and after
23  tutoring or the precise effects of those things.
24       And when someone has had a lot of tutoring, a
25  lot of test preparation, it's particularly difficult to

LISA SCHMID, CCR, RMR
Official Court Reporter

350

1  sat what would have happened, the counterfactual, what
2  would have happened without that test preparation, without
3  that tutoring.
4       So that's why it's not really possible to make
5  that comparison with any precision.
6  Q.  Dr. Lovett, based on all the information that you
7  have reviewed, what is your opinion on Mr. Sampson's
8  request for testing accommodations on Step 1 of the USMLE?
9  A.  Unfortunately, I don't believe that there is
10  sufficient evidence of accommodation needs on the Step 1
11  exam.
12  Q.  And why, in terms of the three questions that you
13  were asked to answer?
14  A.  Yeah.  So in terms of the disorders, I don't believe
15  that there is sufficient evidence of ADHD or learning
16  disabilities.  I don't believe that there is sufficient
17  evidence of substantial limitations in relevant major life
18  activities compared to most people in the general
19  population or that, again, there are accommodations needs
20  relative to that standard.
21       MS. MEW:  I have no more questions.
22       Thank you, Dr. Lovett.
23       THE COURT:  All right.  We're going to take a
24  ten-minute break, and then we'll come back on cross.
25       MS. VARGAS:  Thank you.

LISA SCHMID, CCR, RMR
Official Court Reporter

**A-1081**

351

1      (Recess.)
2      THE COURT: All right. Please be seated.
3      Scheduling? How many more witnesses do you
4  have?
5      MS. MEW: One more witness, Your Honor.
6      THE COURT: One more witness? Okay. Great.
7  All right.
8      Cross-examination?
9      MR. WEINER: Thank you, Your Honor.
10  CROSS-EXAMINATION
11  BY MR. WEINER:
12  Q.  Good afternoon, Dr. Lovett.
13  A.  Good afternoon.
14  Q.  I'm Charles Weiner. We've met before. I'm
15  representing the plaintiff, Mr. Sampson in this matter. I
16  have a few questions.
17      So one of the things that you were talking about
18  before the break were the test scores that Mr. Sampson
19  received before he started receiving tutoring?
20  A.  I think it's before the bulk of the tutoring at
21  least. So fifth grade, age ten. So there may have been
22  some before that, but I think the bulk of it was after.
23  Q.  So the one was the Woodcock Reading Mastery Test?
24  A.  Yes.
25  Q.  All right. Are you familiar with that test?

352

1  A.  Yes.
2  Q.  Okay. That's not a timed assessment, is that
3  correct?
4  A.  The components of it, many are not timed. I would
5  have to take a look at the full list, but many of them are
6  untimed.
7  Q.  And the OLSAT, that is not a timed assessment, is
8  that correct?
9  A.  That ability test, I couldn't say about the time
10  limit on that.
11  Q.  And the TerraNova test was not at that time a timed
12  assessment, is that correct?
13  A.  I couldn't speak to the time limits of that time.
14      THE COURT: Doctor, the microphone moves. You
15  can move that whole apparatus closer to you. Thank you.
16      THE WITNESS: Sure.
17  BY MR. WEINER:
18  Q.  And one of the things that you had spoken about was
19  applying real world observations, and when you do that,
20  you're looking at scores on SAT exams, correct?
21  A.  Yes. Real world data like that is part of what I
22  exam.
23  Q.  And you're also looking at scores on MCAT, is that
24  correct?
25  A.  Yes.

353

1  Q.  All right. And you're aware that Congress when it
2  passed the regulations for Title III, had indicated that
3  that's -- that that type of evidence has very little
4  value, has very little relevance in making and determining
5  whether a person has a disability?
6  A.  I know that there have been statements about that are
7  due to age performance or outcomes are relevant. I would
8  need to see the exact wording to speak to what you've
9  mentioned.
10  Q.  In terms of your own professional experience, do you
11  do evaluations yourself of individuals?
12  A.  I don't administer tests myself, no.
13  Q.  So, am I correct that you do not administer the WAIS?
14  A.  I have. I don't at the current time as part of my
15  responsibilities.
16  Q.  And you don't administer the Woodcock-Johnson to
17  individuals, is that correct?
18  A.  Not clinically. I do for research and training
19  purposes.
20  Q.  But in terms of having an actual patient in a
21  clinical setting, you do not administer that particular
22  assessment?
23  A.  No, not for clinical evaluations. I supervise it.
24  Q.  And am I correct that you don't have a clinical
25  practice on the side of your own experience at work?

354

1  A.  I do. It's focused, again, on counseling and
2  psychotherapy for test anxiety, and it also relates to my
3  consulting in schools.
4  Q.  But one in which you are doing assessments of
5  individuals with disabilities seeking accommodations in
6  higher education?
7  A.  No.
8  Q.  When you are teaching your students to conduct an
9  evaluation, do you suggest to them that they should take
10  the -- make evaluations from -- that they should
11  administer a Woodcock-Johnson to their client and have
12  them take it home?
13  A.  No.
14  Q.  They would need to be there in front of the person
15  and interact with the person, is that correct?
16  A.  Generally, yes.
17  Q.  And would that be the same thing for the Wechsler
18  Adult Intelligence Scale? You wouldn't suggest that the
19  individual -- just tell your patient to take it home and
20  fill it out?
21  A.  No.
22  Q.  You need interaction between the clinician and the
23  patient when conducting that particular assessment,
24  correct?
25  A.  Yes, generally.

**A1082**

355

1  Q.   All right.  And the same would be true with
2  achievement testing such as Woodcock-Johnson, or the WIAT
3  which we have discussed earlier?
4  A.   Yes.
5  Q.   And same thing with the Nelson-Denny?  You would not
6  just send that home and tell the person to fill it out and
7  bring it back, correct?
8  A.   Yes, I wouldn't do that.
9  Q.   And the SATA as well, you would agree with that?
10 A.   I apologize.  The last one?
11 Q.   The SATA or the SATA as well?
12 A.   Yes.  I wouldn't do that either with the SATA.
13 Q.   And I would imagine you wouldn't teach any of your
14 students to do that?
15 A.   No.
16 Q.   All right.  And that's because there are some
17 prominence to conducting an evaluation and the
18 face-to-face interaction between the evaluator and the
19 patient, correct?
20 A.   Well, I would say the primary reason is that the
21 measures are designed to be given under standardized
22 conditions.  And so if someone took them home, I wouldn't
23 know what the conditions would be.
24 Q.   And having the clinician there conducting the
25 evaluation creates that standardization, correct?

LISA SCHMID, CCR, RMR
Official Court Reporter

356

1  A.   That's one way to ensure that the conditions are met.
2  Q.   And in terms of your involvement with Mr. Sampson in
3  this case, you have never evaluated him yourself, correct?
4  A.   Correct.
5  Q.   You have never had an opportunity to administer any
6  type of assessment, correct?
7  A.   Correct.
8  Q.   And you haven't even spoken with him on the phone,
9  correct?
10 A.   Correct.
11 Q.   The first time you have had any encounter with Mr.
12 Sampson is here in this courtroom scene here, correct?
13 A.   Today, yes.
14 Q.   And it's fair to say that you've never had an
15 opportunity to observe the condition, manner, duration
16 with which Mr. Sampson performs any mayor life activities,
17 correct?
18 A.   Observed directly?  No.
19 Q.   And you have not had an opportunity to observe the
20 condition, manner, duration with which Mr. Sampson reads,
21 correct?
22 A.   Observed directly?  No.
23 Q.   And you have never had an opportunity to observe the
24 condition, manner, duration with which Mr. Sampson thinks,
25 correct?

LISA SCHMID, CCR, RMR
Official Court Reporter

357

1  A.   Correct.
2  Q.   And you have never had an opportunity to observe the
3  condition, manner or duration with which Mr. Sampson
4  concentrates, correct?
5  A.   Again, through direct observation?  No.
6  Q.   You have been a consultant for the NBME for
7  approximately ten to 15 years, is that correct?
8  A.   Yes, twelve, I think.
9  Q.   And they actually give you a contract, is that
10 correct?
11 A.   Yes.
12 Q.   And that contract, they renew it every few years,
13 correct?
14 A.   Every year.
15 Q.   All right.  And you also are a consultant for the
16 National Board of Osteopathic Medical Examiners, is that
17 correct?
18 A.   Yes.
19 Q.   And that's the osteopathic counterpart of the NBME,
20 correct?
21 A.   Exactly.
22 Q.   And I'll refer to the National Board of the
23 Osteopathic Medical Examiners as the NBOME, is that fair?
24 A.   Yes.
25 Q.   You have been a consultant for them between ten and

LISA SCHMID, CCR, RMR
Official Court Reporter

358

1  15 years, correct?
2  A.   Yes.
3  Q.   And you do similar reviews, correct?
4  A.   Yes.
5  Q.   And you also been a consultant for the New York State
6  board Of Medical Examiners -- the bar examiners?
7  A.   Yes, the law examiners.
8  Q.   The law examiners.  Excuse me.
9       You've been a consultant for them for quite a
10 number of years as well?
11 A.   Yes.  Probably less, but maybe at least five,
12 certainly.
13 Q.   And you have also been a consultant for the National
14 Board of Surgical Testing?  I forgot the official name.
15 A.   I think once many years ago.  The American Board of
16 Surgery, I believe.
17 Q.   And you do reviews for other testing entities?
18 A.   Currently, I do.  I work with the Law School
19 Admissions Council, the National Conference of Bar
20 Examiners.  Those are the ones that occur to me now, or at
21 least I would say at lest in the past year, I have
22 reviewed files for.
23 Q.   And it's fair to say that you've never been -- you
24 have never done an evaluation for an individual who is
25 seeking accommodations on any type of higher education

LISA SCHMID, CCR, RMR
Official Court Reporter

**A-1083**

359

1  test?
2  A.   Oh, no.  I definitely have done evaluations in the
3  past.
4  Q.   And you have submitted them to a testing entity for
5  accommodations on behalf of an individual?
6  A.   I have never submitted any paperwork as a clinician,
7  no.  I assume that the clients have.
8  Q.   But not to any of the ones that you are a consultant
9  for?
10  A.   No.
11  Q.   You've previously testified several times or
12  submitted declarations on behalf of the National Board of
13  Medical Examiners, is that correct?
14  A.   Yes, at least a couple of times.
15  Q.   Once such case would be the *Berger versus National*
16  *Board of Medical Examiners*?
17  A.   Yes.
18  Q.   All right.  And we met at that time in Cincinnati,
19  correct?
20  A.   Yes.
21  Q.   And in that case, the judge had determined that
22  plaintiff met its burden to have a preliminary injunction
23  granted?
24  A.   That's my understanding.
25  Q.   Okay.  You also testified in the *Ramsay versus*

LISA SCHMID, CCR, RMR
Official Court Reporter

360

1  *National Board of Medical Examiners* case, is that correct?
2  A.   Yes.
3  Q.   All right.  And in that case, the judge had
4  determined that plaintiff met her burden of having a
5  preliminary injunction granted, is that correct?
6  A.   That's what I understand.
7  Q.   And even in the *Bibber versus National Board of*
8  *Osteopathic Medical Examiners*, you testified in that case,
9  correct?
10  A.   I did.
11  Q.   And while the judge did not grant the preliminary
12  injunction in that matter, you had testified that
13  plaintiff did not have dyslexia, correct?
14  A.   I found insufficient evidence of dyslexia.
15  Q.   The judge didn't agree with you on that point, did
16  he?
17  A.   No.
18  Q.   Do you have a sense of how often you recommend
19  denials to the National Board of Medical Examiners?
20  A.   No.  I don't keep track of it, and at times, I don't
21  even submit a recommendation for or against or make a
22  conclusion that's firm that there is or isn't sufficient
23  evidence.
24  Q.   When you do receive a file from the National Board of
25  Medical Examiners, is the file -- well, I'll call it

LISA SCHMID, CCR, RMR
Official Court Reporter

361

1  complete, in that it has a neuropsychological or
2  psychological evaluation appended to it?
3  A.   I would say in most of the cases, there is one.
4  Q.   And very often, when reviewing matters on behalf
5  of -- on behalf of the National Board of Medical
6  Examiners, it also will have proof that the individual has
7  received accommodations either in medical or school or
8  before, correct?
9  A.   Often.
10  Q.   All right.  And then some of the other documentation
11  that Mr. Sampson has submitted, that type of documentation
12  is there, correct?
13  A.   Yes.
14       I should say if I may, the neuropsychological
15  evaluation sometimes, it's not neuropsychological per se,
16  but some type of diagnostic evaluation is common.
17  Q.   They would not submit any file to you which did not
18  have a psychological and neuropsychological evaluation, is
19  that correct.
20  A.   I honestly don't know what their process is for
21  what's sufficient to send out.
22  Q.   I suppose what I'm trying to understand, you are
23  reviewing an opinion from someone else who has recommended
24  accommodations in the matters that you review on behalf of
25  the NBME?

LISA SCHMID, CCR, RMR
Official Court Reporter

362

1  A.   Typically in the files that I see, there is some type
2  of recommendation.
3       (Continued on the next page.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

LISA SCHMID, CCR, RMR
Official Court Reporter

**A1084**

363

BY MR. WEINER (Cont'd):

1 Q. And when you do these reviews, you don't keep track
2 on how many times you recommend a denial of accommodation?
3 A. No.
4     The only thing I track at all is the number of
5 hours spent for billing.
6 Q. Do you understand what the purpose of the Americans
7 with Disabilities Act is?
8 A. I believe it's to help individuals with disabilities
9 access various things in employment and other arenas of
10 life.
11 Q. I believe it's actually to end discrimination against
12 people with disabilities.
13 A. I would agree with you and include that there as
14 well.
15 Q. And if that's the purpose of it, why is it not
16 important for you to look at how many times you are
17 recommending denials of people submitting requests for
18 accommodations?
19 A. I don't believe it's relevant if I hold each file to
20 the same standard.
21     Another reason is that I don't understand -- the
22 way I understand it, I'm not receiving a representative
23 set of things from the NBME. There are some files that,
24 as I understand it, they are able to grant on their own.

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

364

1 Q. Do you know if the NBME has ever taken a study or
2 review of how often you suggest denials of accommodations?
3 A. No.
4     They certainly haven't shared anything with me
5 if they have.
6 Q. I have done -- received documentation from the
7 National Board of Osteopathic Medical Examiners which
8 shows you recommended denials to them roughly 80 percent
9 of the time.
10     Do you have any reason to disbelieve that
11 particular figure?
12 A. No.
13     I haven't seen that data, but I don't have any
14 reason to --
15 Q. I mean, is it fair to say from your own perspective,
16 you are recommending denying accommodations to a testing
17 entity more often than you are recommending approving?
18 A. In the NBOME's case I trust the data that you are
19 describing for the purposes of today, certainly.
20 Q. Do you believe that data would be any differently for
21 the National Board of Medical Examiners?
22 A. I couldn't say.
23     They are somewhat different populations in terms
24 of who is in DO versus MD programs, but I really couldn't
25 say for sure about the NBME.

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

365

1 Q. Is it fair to say that once again you recommend
2 denying accommodations for individuals seeking
3 accommodations on the USMLEs?
4 A. At times I certainly do conclude that there is
5 insufficient evidence of a need for accommodations on the
6 USMLE.
7 Q. One of the things we had talked about earlier is --
8 and it applied to the SATA, and on Dr. Anderson's
9 evaluation, Mr. Sampson had scored in the 25th percentile,
10 correct?
11 A. That's what I recall, yes.
12 Q. And that is based on an age norm, correct?
13 A. Yes.
14 Q. So he performed in the 25th percentile compared to
15 other people his age, correct?
16 A. Yes.
17 Q. And what that also means is that 75 percent of
18 individuals his age performed better, correct?
19 A. Approximately that, yes.
20 Q. And under your scenario, you have said that that's
21 within the average range, and that does not reflect
22 disability.
23     Correct?
24 A. Well, yes.
25     But it wasn't me who determined the average

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

366

1 range, again. So setting the 25th percentile to the 74th
2 percentile was the average range is the most common
3 standard that I'm familiar with in test manuals and also
4 in authorities in psychometrics.
5 Q. Are you applying a psychometric determination to a
6 legal determination which is most people in the general
7 population?
8 A. I think the two map onto each other.
9     As a psychologist, any time that I'm doing any
10 work that involves legal or forensic standards, I look to
11 psychometrics if assessment is the area to better make
12 those judgments.
13 Q. Are you applying a cutoff?
14 A. Well, there's not a rigid cutoff in the sense of the
15 overall file.
16     But I certainly consider the range in which the
17 test scores fall.
18 Q. And you don't consider the fact that on the SATA, for
19 example, that 75 percent of the people perform better than
20 Mr. Sampson, that most people in the general population
21 did better than he?
22 A. Well, I mean, using that logic, if someone got a
23 score at the --
24 Q. I'm asking my question.
25     75 percent of the people in the general

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

A1085

367

1  population, you don't consider that to be most people in
2  the general population?
3  A.    Yes.
4        So most people, 75 percent would be most people.
5  Again, there's a lot of evidence in this case.  The SATA
6  is only one piece of data.
7  Q.    And one of your problems with Dr. Aronson's reporting
8  on ADHD is that he didn't provide any type of data?
9  A.    What I recall, I haven't reviewed those letters in a
10 while, but what I recall from my reviews is that
11 Dr. Aronson had very clearly affirmed that Mr. Sampson met
12 the DSM criteria for ADHD.
13       But I certainly don't recall there being
14 sufficient evidence in my opinion to draw that conclusion.
15 But I would have to review the letters again to say much
16 more.
17 Q.    One of the things -- and if it would be helpful, you
18 can turn to Dr. Aronson's letter at tab 25.
19 A.    Sure.
20 Q.    In the plaintiff's book.
21 A.    Sure.
22 Q.    I think there's two letters that he submitted, one's
23 at 25 --
24 A.    I'm there at 25.
25 Q.    Okay.

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

368

1        Is one of the things that you recall from
2  Dr. Aronson's reporting -- and I don't know if it's in
3  that letter or the earlier one -- is that he was
4  prescribing Dexedrine?
5  A.    Again, I do recall that there was mention of
6  medication.
7        But I would need to reread the letters to know
8  where.
9  Q.    Dexedrine is a controlled substance, correct?
10 A.    It is.
11 Q.    And it's used to treat ADHD, is that correct?
12 A.    Yes.
13 Q.    And Dr. Aronson is a medical doctor, correct?
14 A.    Yes.
15 Q.    He's, in fact, a psychiatrist?
16 A.    Yes, that's my recollection.
17 Q.    And psychiatrists are specifically trained and go to
18 residency programs for training in psychiatry?
19 A.    Yes.
20 Q.    And they are permitted and licensed to be able to
21 prescribe medications such as Dexedrine?
22 A.    Yes.
23 Q.    You don't have any of that type of experience or
24 licensure, correct?
25 A.    No.

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

369

1        In New York State psychologists cannot
2  prescribe.
3  Q.    By the way, are you a board certified
4  neuropsychologist?
5  A.    No.
6  Q.    Under tab five, I believe that's where Dr. Aronson
7  indicates that he was prescribing Dexedrine?
8  A.    Yes, I see that.
9  Q.    Do you have any reason to believe that Dr. Aronson
10 would prescribe a drug for an individual with ADHD who
11 doesn't have ADHD?
12 A.    I don't doubt if Dr. Aronson reported that
13 Mr. Sampson has ADHD that Dr. Aronson was being honest and
14 reporting what he believed.
15 Q.    I believe in Defense Exhibit -- there is a tab for --
16 under your name, and there is a declaration that you
17 submitted.
18       If you would, could you turn to paragraph 41.
19       (There was a pause in the proceedings.)
20 A.    I'm there.
21 Q.    In the second sentence you say, in a September 17
22 letter, Dr. Aronson listed five symptoms of ADHD and made
23 a partial review of the criteria for the disorder.
24       Did I read that correctly?
25 A.    Yes.

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

370

1  Q.    What do you mean by a partial review?
2  A.    When I spoke earlier on direct examination, I
3  mentioned that there were five different criteria for
4  ADHD, having very high symptom levels, the symptoms would
5  need to be reviewed, the early onset, the fact that they
6  are present across settings, the fact that they impair
7  some sort of real-world functioning, and that they are not
8  better explained by something else.
9        So my guess is if I made that statement I would
10 have to go back to the letter, but either some of those
11 five were missing, at least one of those five were
12 missing, or at least one of those five were not treated in
13 sufficient detail.
14 Q.    And so if we go to Dr. Aronson's letter at tab 25 in
15 plaintiff's book.
16 A.    Yes.  I'm there.
17 Q.    There is a whole area there where it says Mr. Sampson
18 meets DSM-IV and I think you pointed out in a footnote he
19 must have meant DSM-V?
20 A.    I presume.
21 Q.    Criteria for ADHD and below that is a list of
22 criteria.
23 A.    Yes.
24 Q.    And there's five criteria there, correct?
25 A.    The DSM-V has five criteria.

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

**A-1086**

371

1  Q. Yes.

2       But -- Dr. Aronson outlines that five criteria

3  that is being met.

4  A. I'll read that now just to check, if I may.

5  Q. Yes.

6  A. I can just kind of talk through it, if I may.

7       Dr. Aronson writes that -- about Mr. Sampson --

8  his symptoms persisted for at least six months to a degree

9  that is inconsistent with developmental level, I assume he

10 meant level, and that negatively impacts directly on

11 social and academic occupational activities.

12       And then it looks as though there is a mention

13 of specific symptoms, difficulty sustaining attention,

14 does not follow through on instructions, fails to finish

15 things, difficulty organizing tasks and activities,

16 avoids, dislikes or is reluctant to engage in tasks that

17 require sustained mental efforts, easily distracted by

18 extraneous stimuli, and on the next page, attention,

19 concentration, processing speed, recall retention are

20 severely impaired.

21       Let's see. So of the five that I have

22 mentioned, I'm looking to see if there is evidence of

23 childhood onset reviewed. That's the first thing that I

24 notice here. So that may have been what I meant by a

25 partial review.

372

1  Q. Are you done answering?

2  A. I think so.

3       I haven't read everything word for word, but

4  that's the first thing that I noticed that may not be

5  there fully reviewed. I see mention of at least three of

6  the other criteria so far.

7  Q. And in connection with this letter, Dr. Aronson

8  indicates that he's been treating Mr. Sampson since 2015,

9  correct?

10 A. Yes.

11 Q. So between 2015 and 2017, given the fact that he's

12 prescribing a controlled substance, he would have had a

13 good amount of contact with Mr. Sampson, presumably,

14 correct?

15 A. I don't know.

16       It's quite possible.

17 Q. I mean, one cannot prescribe a controlled substance

18 without seeing the patient on a frequent basis, correct?

19       Is that outside your expertise?

20 A. Yes.

21 Q. My apologies.

22 A. It's okay.

23 Q. Can you explain how a gifted student might show a

24 deficit on a standardized exam such as the SAT or MCAT?

25 A. So by deficit are you assuming the gifted student has

373

1  a disability?

2  Q. Yes.

3  A. Okay.

4       And just to be clear, what sort of disability --

5  Mr. Sampson has a few diagnoses.

6  Q. Well, let's say ADHD.

7       How would a gifted student with ADHD be able to

8  show that he is substantially impaired if you are

9  reviewing SAT or MCAT test results?

10 A. Well, the SAT or MCAT results again I would take as

11 both indirect evidence of accommodation need as well as

12 evidence of some of the academic skills that those tests

13 are designed to measure.

14       If someone were gifted but they, nonetheless,

15 performed poorly on those tests, particularly the SAT

16 because of the more general population comparison, that

17 would be some evidence of accommodation needs.

18 Q. But if they scored within the average range or above

19 average range, that would be a person who you would

20 suggest does not have a disability.

21 A. Generally.

22       I consider all evidence in the file, but I

23 wouldn't consider that to be evidence of accommodation

24 need in itself.

25 Q. And the same would be true for an individual with a

374

1  learning disability based on reading, correct?

2  A. Yes.

3  Q. We had talked about earlier the diagnosis that

4  Dr. Anderson had provided, and one of them was unspecified

5  neurodevelopmental disorder.

6  A. Yes.

7  Q. And you had mentioned that there is, I guess, some

8  leeway for a clinician to use their judgment to provide a

9  diagnosis, correct?

10 A. Well, yes.

11       There are no detailed criteria for it.

12 Q. Well, is that what the DSM says or does the DSM say

13 they meet some of the criteria of a disability but not all

14 of it?

15 A. What I recall is that it says someone doesn't meet

16 the full criteria but the clinician nonetheless feels that

17 there is a problem in the area, or something to that

18 effect.

19 Q. So it gives some leeway, some latitude to a clinician

20 to make a diagnosis?

21 A. Yes, that diagnostic category is based on a

22 clinician's discretion.

23 Q. But it is a diagnosis contained in the DSM?

24 A. It is definitely a label in the DSM.

25 Q. And just because it has a term like unspecified

A1087

375

1  doesn't mean it doesn't exist, is that fair to say?
2  A.  No.
3      It's because it has so much leeway it's not as
4  meaningful as a category with detailed criteria for
5  membership.
6  Q.  So in your analysis, you are looking for a detailed
7  criteria for one to meet a diagnosis?
8  A.  Well, yes.
9      But in cases like Mr. Sampson's where there are
10 some categories that don't have those criteria, it just
11 means they have to go more into detail of the evidence of
12 deficits and substantial limitations.  When someone has an
13 unspecified diagnosis or an -- not specified diagnosis, I
14 certainly don't view that as the end of the road.  It's
15 not as if that is a file that doesn't have sufficient
16 evidence.
17     It just means we have to do a more detailed look
18 at the precise data and the file and we don't have
19 separate criteria for the diagnostic category to compare
20 them to, if that makes sense.
21 Q.  In Dr. Michel's report, which is contained in tab
22 three of plaintiff's exhibit book, and if you turn to page
23 six, please.
24 A.  Yes.  I'm there.
25 Q.  So the Nelson-Denny reporting there, that does not

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

376

1  contain any type of either scaled score or standard score?
2  A.  No.
3      All I see are the percentiles.
4  Q.  It doesn't provide the raw score, is that correct?
5  A.  Certainly not in the table, and I don't believe
6  elsewhere.
7  Q.  So we don't really know in this reporting how many of
8  the 38 questions Mr. Sampson attempted?
9  A.  That's correct.
10 Q.  And one can score a low score like a 16th percentile
11 because they did not answer all 38 questions.
12     Is that correct?
13 A.  Yes.
14 Q.  And I suppose there's two ways that one can score a
15 16th percentile; either they answer many of the 38
16 questions but answered many of them wrong, that would be
17 one way.
18     Correct?
19 A.  Yes.
20     Any score other than a perfect score is some mix
21 of incorrect or not attempted items.
22 Q.  And so in this particular reporting, unfortunately we
23 don't really know how many of the 38 questions Mr. Sampson
24 attempted, correct?
25 A.  Correct.

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

377

1  Q.  And if, for example, he answered 16 or 17, attempted
2  16 or 17 questions and answered them all correctly, that
3  might have given him a 16th percentile, correct?
4  A.  I would have to check the data, but it's certainly
5  possible to get a score that is not perfect and a 16th
6  percentile score compared to graduating college seniors by
7  not answering a certain number of items.
8  Q.  And if we go to Dr. Wasserstein's report, which is
9  located as tab 37, and go to page 16, please.
10 A.  Yes.  I'm there.
11 Q.  And in Dr. Wasserstein's report, did she actually
12 provide that type of data, that he attempted 12 and he
13 answered correctly 12.
14     Correct?
15 A.  Yes.
16 Q.  And we also have the standard score of 168?
17 A.  Yes.
18 Q.  So while you have indicated that there is a big
19 difference between Dr. Michel's scoring and
20 Dr. Wasserstein's scoring, you are basing that only upon
21 the percentile, correct?
22 A.  No.
23     So I actually used the Nelson-Denny manual to
24 equate the Michel's percentile score to other types of
25 scores.

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

378

1  Q.  So what type -- I'm assuming, then, you got the
2  standard score?
3  A.  Yes.
4  Q.  Does the standard score tell you anything about how
5  many he attempted and how many he got correct?
6  A.  No.
7      It does allow me to make comparisons about the
8  decline, but it does not show me how many items were
9  attempted, correct.
10 Q.  And if we look at Dr. Anderson's report, she
11 administered -- at tab two -- she administered the SATA?
12 A.  Yes.
13 Q.  And if we go to her reporting of that --
14 A.  It's page nine, I believe.
15 Q.  Thank you.
16 A.  Sure.  Sure.
17 Q.  It's actually on an earlier page, I believe.
18 A.  Oh, you want the narrative.
19 Q.  Here it is.
20 A.  The table's on page nine.
21 Q.  I believe what I was trying to find is her reporting
22 on how many questions on the SATA he answered or were
23 attempted.
24 A.  Oh.
25     I see there is a narrative about the SATA on

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

A-1088

1 page four.

2 Q.  Your eyes work more quickly than me because I thought

3 I had it there.

4       Here it is.  Yes.  In your review of that

5 paragraph under the standard administration of the SATA,

6 he answered only half the questions, is that correct?

7 A.  Yes.

8 Q.  And when administered additional time he was able to

9 answer two thirds of the questions, correct?

10 A.  Yes.

11 Q.  That pattern of answering only half the questions

12 under standard time, that's similar to the pattern that

13 occurred with Dr. Wasserstein, isn't it?

14 A.  It is.

15       MR. WEINER:  I have no further questions.

16 Thank you.

17       THE COURT:  Anything else?

18       MS. MEW:  Your Honor, may I have five or ten

19 minutes to decide on redirect?

20       THE COURT:  To decide about redirect?

21       MS. MEW:  Yes.

22       THE COURT:  Five minutes.

23       MS. MEW:  Thank you.

24       (Recess.)

25       THE COURT:  Okay.

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER

Official Court Reporter

1       Yes?  No?  Maybe?

2       MS. MEW:  Yes, your Honor.  Thank you.

3       THE COURT:  Okay.

4 REDIRECT EXAMINATION

5 BY MS. MEW:

6 Q.  Dr. Lovett, I believe you testified before that the

7 DSM, part of the diagnostic criteria for both LD and ADHD,

8 requires you to look to real-world evidence.

9       Is that correct?

10 A.  Both the LD and ADHD criteria require problems in

11 real-world functioning.

12 Q.  Thank you.

13       So would that include looking at standardized

14 tests?

15 A.  Absolutely.

16 Q.  And did Mr. Sampson's evaluators look at standardized

17 tests?

18 A.  Yes.

19       All three of the diagnostic, full diagnostic

20 evaluations reviewed them.

21 Q.  Are your opinions with respect to your review of

22 Mr. Sampson's file based solely on his performance on

23 standardized tests?

24 A.  No, not at all.

25       They are one type of evidence and Mr. Sampson's

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER

Official Court Reporter

1 file contains many different types.

2 Q.  You were asked about the number of requests you may

3 grant or deny.

4       Do you review each request -- is there some kind

5 of scale?  Are you trying to deny more?  Is there some

6 metric there that you are using?

7 A.  No.

8       I try to review each file according to the same

9 criteria.  I mentioned three questions earlier.  So in the

10 case of clinical diagnosis I'm using the DSM or other

11 clinical standards.  If those aren't available or if they

12 are met I move on to ask whether or not they are

13 substantial limitations relative to most people in the

14 general population.  So I'm looking for evidence in that

15 in various ways.

16       And then I look to see if there's evidence of

17 accommodation needs again.  Whether that's one percent or

18 another percent of the files that I review, it could be

19 50, it could be 80, it could be 20.  I use those criteria.

20 Q.  There was some additional discussion about sort of

21 the ranges for average scores and can you just explain,

22 there's -- I'm going to tell you just to get the frame of

23 reference, but sort of low average, average, high average

24 and sort of how that is distributed across the sample, if

25 that makes sense?

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER

Official Court Reporter

1 A.  Yes.

2       So what's typical, the standard ranges for

3 psychological tests, neuropsychological tests, place the

4 average range between the 25th and the 74th percentiles.

5       The low average range is between the 9th and the

6 24th percentile.

7 Q.  And then there would be an above average range?

8 A.  Right.

9       So the high average range would be standard

10 scores between 110 and 120, so that would go from the 75th

11 percentile to, I think, the 91st percentile.

12 Q.  And then how is that -- again, sort -- and maybe this

13 isn't a thing, but how is that distributed?

14       Is it an bell curve or is it something else?

15 A.  It's a bell curve for most tests.

16       We expect something close to a so-called normal

17 distribution.  So the average range is the middle 50

18 percent of the population, if that's the comparison sample

19 that the test was developed on.

20 Q.  Are there reasons other than an impairment why

21 someone may not answer some of the questions on a test?

22 A.  Absolutely.  Some people have different work styles

23 when they take an exam.

24       It may also have to do with whether or not

25 someone is wanting to work slowly or quickly, things like

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER

Official Court Reporter

383

1    that. It could be, you know, how they approach the items.
2    It may have nothing to do with an impairment or disability
3    of any kind.
4         MS. MEW: I do not have any other questions.
5         THE COURT: Anything else?
6         MR. WEINER: Nothing further, your Honor.
7         THE COURT: You are excused.
8         Your next witness.
9         MS. MEW: We are going to call Dr. Murphy. He's
10   just waiting out in the hall.
11        THE COURT: Great.
12        (There was a pause in the proceedings.)
13        THE CLERK: Just please remain standing and
14   raise your right hand.
15   KEVIN MURPHY,
16        having been duly sworn, was examined
17        and testified as follows:
18        THE CLERK: You can be seated.
19        Please state and spell your name for the record
20   and speak into the microphone.
21        THE WITNESS: Kevin Murphy, K-E-V-I-N,
22   M-U-R-P-H-Y.
23   DIRECT EXAMINATION
24   BY MS. MEW:
25   Q.   Good afternoon, Dr. Murphy.

384

1    A.   Good afternoon.
2    Q.   If you will look in the larger binder, the one to
3    your left, and there should be a tab with your name on it.
4    A.   Yes.
5    Q.   If you could kind of flip to that tab and you should
6    see your declaration in this matter.
7    A.   Yes.
8    Q.   Will you please turn to Exhibit 3 to your
9    declaration, so behind tab three.
10   A.   Okay.
11   Q.   Is this a copy of your current CV?
12   A.   Yes, it is.
13   Q.   Except I redacted out some of your personal
14   information.
15        What is your educational background, Dr. Murphy?
16   A.   I have a bachelor's degree from Boston College, a
17   master's degree in counseling psychology from Florida
18   State University, and a Ph.D. in counseling psychology
19   from University of Connecticut.
20   Q.   Are you a licensed psychologist?
21   A.   Yes.
22   Q.   Do you have a particular specialty?
23   A.   Yes.
24   Q.   What is that?
25   A.   The assessment and treatment of adult ADHD.

385

1    Q.   How long have you been doing work in the area of
2    ADHD?
3    A.   I have been specifically with ADHD probably 30 years.
4    Q.   Have you ever evaluated individuals for ADHD?
5    A.   Yes.
6    Q.   What ages?
7    A.   Mostly I do adults, but I do adolescents as well.
8         Youngest ages I would agree to see would be 16.
9    Q.   Over the course of your career, how many clinical
10   evaluations do you think you have performed?
11   A.   Hard to know for sure, but I would guess
12   approximately, over the course of my career, approximately
13   3,000.
14   Q.   Have you done any teaching in the area of ADHD?
15   A.   Yes.
16   Q.   What is that?
17   A.   Well, I have done classes for the medical students at
18   the University of Massachusetts medical school, and I have
19   done a lot of talks and presentations on the subject of
20   adult ADHD.
21        I also taught at Assumption College, an ADHD
22   seminar for the graduate students at Assumption College.
23   Q.   And have you done any research in the area of ADHD?
24   A.   Yes.
25   Q.   Is this reflected -- if you will turn to page four of

386

1    your CV, beginning on page four.
2    A.   Okay.
3    Q.   Is this a reflection of your publications in the
4    area?
5    A.   Yes.
6         There are probably a few more that I haven't put
7    in there that were more recent, but that's generally a
8    good idea.
9    Q.   There was a reference during Dr. Wasserstein's
10   testimony to Dr. Russell Barkley.
11        Who is that?
12   A.   Dr. Russell Barkley is a leading expert on ADHD and
13   internationally known and he was my mentor and I have
14   worked with him for many years at U-Mass.
15        He recruited me to run his adolescent ADHD grant
16   back when I was a young graduate student finishing my
17   Ph.D. Then I stayed affiliated with him for many years at
18   U-Mass.
19   Q.   And what kind of work were you doing with
20   Dr. Barkley?
21   A.   We ran -- I ran a research clinic with him.
22        We decided back in the day, back in the early
23   '90s when adult ADHD wasn't well known and he had run a
24   leading child clinic of ADHD, that we would expand and
25   start our own adult ADHD clinic.

**A1090**

387

1    So he targeted me as the person to do that and
2  that was back in, I believe, 1992 and I, again, worked
3  with him. It was primarily a research clinic, but we also
4  treated people and when we came in and I did evaluations
5  we collected data at the same time.
6    So in the interest of trying to advance the
7  scientific knowledge of adult ADHD over the course of our
8  years in trying to see patients, not just treating them,
9  but doing research with them as well.
10 Q.  Have you contributed to any books in this area?
11 A.  Yes.
12 Q.  Anything in particular?
13 A.  Well, yes.
14   One book that we did was before we did -- the
15 other book I'll talk about in a minute -- was we created a
16 clinical workbook for clinicians to use in both the
17 childhood and adult assessments for ADHD and that workbook
18 was very successful and very -- used very often in the
19 field. It included all of the assessment tools that we
20 used at our clinic for the assessment of children and
21 adults with ADHD.
22   Later on, I helped coauthor with him, with
23 Dr. Barkley and Mary Ellen Fisher a book -- textbook
24 entitled ADHD in Adults: What the science says. And that
25 book was basically a total research book looking at and

388

1  exploring two major studies. One was a longitudinal study
2  that was done in Milwaukee with Mary Ellen Fisher and
3  Dr. Barkley, and that was a study that diagnosed children
4  with ADHD roughly between the ages of five and ten.
5    And then followed them for almost 30 years
6  beyond that to look at the natural history of the disorder
7  and what happened to these kids that were diagnosed early
8  and continued on into their adult lives. We looked --
9  that was a major part of the book.
10   And then the other part of the book was the
11 study I did in Worcester, Massachusetts with him and that
12 was more the assessment of adults coming in to our clinic
13 and being diagnosed for the first time as adults and we
14 looked at impairments and the natural history of what
15 happened to those adults in their earlier life and then
16 going forward. It was a science-based book with data
17 collection on those two major studies.
18   And I think what that book really accomplished,
19 it was -- prior to that book, ADHD was thought to be, you
20 know, it was kind of thought to be a relatively benign
21 disorder that was kind of a boutique thing. There was not
22 a lot of credibility to it as a bona fide clinical
23 disorder and as a result of our book and, you know, the
24 major finding of our book was it showed just how impairing
25 this condition is in adult functioning. It was one of the

389

1  most powerful things about the book was that it not only
2  had a regular control group of normal people, but we also
3  had a clinical control group of adults with other
4  psychiatric disorders, including things like anxiety,
5  depression, substance abuse, various mood disorders.
6    And we compared our findings across groups and
7  we found that ADHD was the most impairing condition that
8  we studied and that especially untreated it can result in
9  a great deal of disruption in people's lives. And we
10 studied variables that had never been studied before,
11 looking not only at academic functioning, vocational
12 functioning, social functioning, marital functioning,
13 things like, you know, we tracked driving a motor vehicle,
14 driving variables. We looked at teen pregnancies,
15 sexually transmitted diseases, parenting ability, debt
16 management, impulsive spending, even things like lifestyle
17 parameters around things like lipid profiles, diet and
18 things like that.
19   So it was a comprehensive look at many variables
20 and it turned out to be that ADHD was extraordinarily
21 problematic and I think people got a lot more respect for
22 the condition and what can be the outcome of ADHD if it's
23 not properly evaluated and treated.
24 Q.  Thank you, Dr. Murphy.
25   We'll move on, but I just wanted to quickly ask

390

1  you about what is the children and adults with attention
2  deficit hyperactivity disorder group or C-H-A-D-D?
3  A.  CHADD is an advocacy group that has been around for
4  years, and it's a group that is a support group and an
5  educational group for parents -- it used to start out as
6  just parents with -- of kids with ADHD.
7    And then it later grew into parents and then
8  patients and adults who had it as well, and it's a
9  well-known group and they run a conference every year and
10 they ask for, you know, we would routinely speak at those
11 conferences and share scientific findings and they -- over
12 time, you know, I was elected to their hall of fame based
13 on my work in adult ADHD.
14 Q.  In addition to the other work that you described,
15 your teaching work, your research work, your clinical
16 work, have you also served as a reviewer for testing, for
17 standardized testing entities of testing accommodation
18 requests?
19 A.  Yes, I have.
20 Q.  How long have you been doing this kind of work?
21 A.  Approximately I'd say probably 28, maybe 28 years,
22 around that.
23 Q.  What are some of the other organizations you work
24 with?
25 A.  The other organizations I work with?

391

1  Q.  Examples.
2  A.  I do a lot of work for National Board of Medical
3  Examiners, the National Board of Osteopathic Medical
4  Examiners.
5      I work for various state bar exam committees
6  where I would review documentation for applicants
7  requesting accommodations for the bar exam. I have worked
8  for the chiropractic boards, nursing boards, crane
9  operator boards. There is a lot of different smaller
10 boards that sometimes request help for a particular case
11 and they want an evaluation of the documentation.
12 Q.  And when you review these documentations, will you
13 also review -- sometimes review for LD as part of your
14 analysis for learning disabilities?
15 A.  Yes.
16     They coincide often with ADHD. So I would have
17 to review often on the basis of LD as well.
18 Q.  And you are familiar with the diagnostic criteria and
19 application for LD?
20 A.  Yes, I am.
21     I am not -- I don't do research in the area of
22 LD. ADHD is my specialty, but I am aware generally of
23 learning disabilities as well.
24     MS. MEW:  NBME offers Dr. Murphy as an expert
25 witness in the evaluation and diagnosis of individuals

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

392

1  with ADHD, learning disabilities, with respect to research
2  on ADHD, as well as the provision of disability based
3  testing accommodation.
4      THE COURT:  Unless you have a voir dire I'm
5  going to accept him.
6      MR. WEINER:  I don't have any voir dire.
7      THE COURT:  Received.
8      Go ahead.
9  BY MS. MEW:
10 Q.  Dr. Murphy, if you will turn to Exhibit 1 -- let me
11 back up.
12     Were you asked by NBME to review a request for
13 testing accommodations by Mr. Robert Sampson?
14 A.  Yes.
15 Q.  If you turn to tab one in your declaration, do you
16 recognize this document?
17 A.  I think I'm in the wrong place.
18     (There was a pause in the proceedings.)
19 BY MS. MEW:
20 Q.  I'm sorry, I --
21 A.  I have it.
22 Q.  And just to be clear it's Exhibit 1 to your
23 declaration because we have a lot of different tabs going
24 on, but you are there.
25 A.  Is it Exhibit 1?

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

393

1  Q.  Yes.
2      It should be the November 26, 2018 letter.
3  A.  Yes.
4  Q.  Can you tell me what this is?
5  A.  This is a report that I provided to the national
6  board after reviewing documentation they had sent to me on
7  Mr. Sampson.
8  Q.  And then if you turn to Exhibit 2, which is just the
9  next tab.
10 A.  Yes.
11 Q.  This should be a letter dated May 9, 2022.
12 A.  Yes, that's correct.
13 Q.  And were you asked to review a later request for
14 testing accommodations by Mr. Robert Sampson?
15 A.  Yes, I was.
16 Q.  Is this your report to NBME from your review?
17 A.  They -- yes.
18     This is my second report to the NBME based on
19 additional documentation that had been sent.
20 Q.  Did the opinions expressed in these two reports
21 remain your opinions today?
22 A.  Yes.
23 Q.  Are you paid for your review of testing accommodation
24 requests for NBME?
25 A.  Yes, I am.

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

394

1  Q.  How much are you paid for your review?
2  A.  The rate is $225 per hour.
3  Q.  Are you paid the same whether you recommend that a
4  request be denied or granted?
5  A.  Yes.
6  Q.  And then if we turn just back to the top of the tab
7  there is your declaration.
8  A.  Which tab is that?
9  Q.  Still the tab behind your name, just looking behind
10 your name there.
11     Do you see your declaration?
12 A.  Yes.
13 Q.  Do you still agree today with the opinions expressed
14 in this declaration?
15 A.  I do.
16 Q.  We'll focus on more details, but just to begin, what
17 was your overall conclusion and opinion with respect to
18 Mr. Sampson's request for testing accommodations on step
19 one of the USMLE?
20 A.  After reading all the documentation, I felt that the
21 documentation did not adequately substantiate a diagnosis
22 of ADHD, or the learning disabilities that were indicated
23 as well.
24     The documentation did not substantiate a chronic
25 and pervasive pattern of impairment that is consistent

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

**A-1092**

395

1  with ADHD. That the documentation did not rise to the
2  level of a disability under the ADHD's designation, and
3  that the documentation did not support that Mr. Sampson
4  had an impairment that would prevent him from having equal
5  access to the Step 1 exam.
6  Q.   From your perspective, and from the research and all
7  the work and the clinical work you have done, what would
8  you describe is the basic features of ADHD?
9  A.   ADHD is a developmental disorder of attention,
10  self-regulation, self-control, executive functioning.
11        It is a disorder that causes a great deal of
12  disruption and impairment in people's lives, and when I
13  look at documentation such as this, what I'm trying to
14  look at is to try to -- and I do this in a very consistent
15  and kind of the same way every time. I'm looking for
16  evidence of -- to meet the criteria for the disorder,
17  including a childhood onset of symptoms and impairment, a
18  chronic and pervasive pattern of developmentally deviant
19  impairment over time and across situations and multiple
20  areas of functioning, and the developmentally deviant part
21  of this is very important.
22        And I'm looking at childhood onset, and I'm
23  looking at pervasive impact, that it impacts people in
24  multiple life areas, not in one minority slice of life. A
25  lot of clinicians don't really understand that and they

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

396

1  assign a diagnosis based on impairment in one minor area.
2  So I'm looking at the totality of the documentation to see
3  to what extent ADHD is affecting multiple areas of
4  functioning.
5        And I also look at it in the sense of trying to
6  look at if there's been an adequate attempt to try to rule
7  out other possible reasons for the symptoms that would --
8  might alternatively explain the difficulties rather than
9  ADHD.
10  Q.   Focusing on Mr. Sampson's file, what evidence of
11  childhood onset did you see?
12  A.   I saw essentially no evidence of childhood onset that
13  I found to be persuasive. I didn't see any evidence of
14  childhood onset, and the reason for that is -- there's a
15  number of reasons for that.
16        Number one is, first of all, he didn't receive a
17  diagnosis of ADHD until his second year of medical school.
18        Secondly, usually with ADHD there is early
19  problems that are noticeable, that are developmentally
20  deviant that cause great concern for parents, teachers.
21  There's usually attempts at remediation for these
22  problems, and there's a long history, many times, of
23  attempts at treatment and remediation.
24        So when I looked at his documentation, I saw
25  things like he got -- always had a history of good grades.

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

397

1  He never had any attempts at -- no referrals for any kind
2  of assessments or treatment in his early life. He had no
3  behavioral problems or self-control problems. He, despite
4  his reported symptoms, did well academically. He
5  continued to get good grades and good behavior throughout
6  his childhood.
7        He made no attempt at in requesting or needing
8  any kind of accommodations until he got to medical school.
9        So he got -- if you look at the course of his
10  childhood even through his adult functioning, he performed
11  very, very well. The only evidence that I saw that was in
12  the record earlier in terms of his childhood was there
13  were some teacher comments that were as part of his
14  documentation, and the teacher comments were relating
15  mostly to things like he needed to reread material, might
16  have been disorganized, had some inattention, needed
17  things repeated. And my view of that was, first of all,
18  the teacher comments were pretty few and far between.
19        Secondly, there were many more positive teacher
20  comments than there were negative ones showing that he had
21  done very well for himself, that he was improving in
22  reading and writing, that he was a pleasure to have in
23  class, that he was doing well overall. The, quote,
24  negative teacher comments were counterbalanced by many
25  more positive ones.

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

398

1        And then, importantly, the teacher comments -- I
2  saw no evidence that they persisted into his adult life.
3  So these comments, you typically -- in a kid with ADHD you
4  typically see that these issues would continue on into
5  adolescence and into adult functioning and continue to
6  cause problems. The only comments that we ever saw were
7  in early elementary school and then they just went away
8  and there was no continuation of them, and part of the
9  reason I don't think that they continued to be problematic
10  was not only that they didn't persist in terms of any
11  comments in high school or junior high that was part of
12  the record, but that he continued to go on and had no
13  treatment, no 504 plans, no IEPs, no effort to formal
14  intervention for any kind of problems.
15        I think the record also indicated that, you
16  know, that his parents didn't really think there was an
17  issue because he was doing well in school, and that they
18  didn't feel that there was a huge problem because of that.
19  And then he continued to get excellent grades. When he
20  goes to high school and goes back to high school and takes
21  advanced placement in classes and gets As and Bs with no
22  comments and then he goes to college and graduational
23  competitive college with a 3.4 grade point average, again,
24  without accommodations, without treatment, anything like
25  that.

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

**A1093**

399

1    And then you look at over the course of his
2    life, his test scores on every standardized test he took
3    were very strong.  His SAT scores were in the high average
4    to superior range every time he took them.  Even going
5    back to his childhood in elementary school, there were
6    indications in the records that he took a couple of
7    standardized achievement tests in elementary school, one
8    being the TerraNova reading test, the TerraNova
9    achievement test and he scored in the 59th percentile in
10   that reading test.
11       And then there was the Woodcock reading mastery
12   test and he was, quote, on grade level with that.  He was
13   on grade level.  He was within the average range.  He
14   continued to do very well academically.  He scored very
15   well on the PSAT.  His lowest scored in there was reading
16   at the 52nd percentile, which is quite solid in the
17   average range.  He scored 89th percentile on his ACT
18   composite.  Again, the SATs and the MCATs he did very well
19   at the 67th percentile in the MCATs.
20       So when you take it all together and you look at
21   the totality of those records, and including, by the way,
22   I want to make one other point on the teacher comments and
23   the report cards that were provided, many times you will
24   see on report cards kids with ADHD, even if they are very
25   bright, you will see that they do well with grades, but

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

400

1    then you would see ratings on citizenship and behavior and
2    work habits and things like that that show difficulty and
3    problems and below average kind of scores.
4        And on all of the citizenship and behavioral
5    sorts of ratings on his early report cards, there were
6    none that were below average.  Everything was satisfactory
7    or the rating scale of one, two, three, four, five, where
8    three was satisfactory, four was above average and five
9    was very good, you had threes, fours and fives.  There was
10   no developmentally deviant behavior, work habits,
11   problems.  His standardized tests were fine.  He was
12   getting good grades.  The negative teacher comments did
13   not appear to persist as evidenced by the achievement that
14   he did going forward, again, without treatment, without
15   accommodations, without any kind of formal assistance.
16       So that to me was strong evidence that his
17   functioning was quite intact, that there was no
18   developmental deviance for the same age peers, no evidence
19   of a disability.  And then, when he continued on, you
20   know, into -- and you look at other variables that go
21   along with ADHD in terms of the pervasive impact, things
22   like social functioning, vocational functioning, there's
23   no evidence in the record that I could see that there was
24   any developmentally deviant significant problems in those
25   domains either.

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

401

1    Let's take a look at socially, for example.
2    He -- what I saw on the records, he seemed to get along
3    with peers.  He seemed to -- there was no efforts at
4    trying to indicate that he needed any in terms of
5    medication for that or social skills training or anything
6    that was problematic.  He was -- Dr. -- I think it was
7    Dr. Michel's report when she discussed his entrance into
8    the University of Virginia, she indicated that he
9    flourished socially and academically at the University of
10   Virginia.
11       His clerkship evaluation showed that he was
12   doing very, very well, was collegial, was punctual, got
13   along with everybody, that he had no performance problems,
14   that he wrote good notes, that he -- his write-ups were
15   outstanding, that he on his own would do extra reading to
16   read up on his patients and present that to his groups,
17   that he had a strong breadth of reading knowledge.
18       So when I look at the totality of his life in
19   terms of really good functioning, good standardized test
20   scores, absence of formal treatment, great vocational
21   kinds of evaluations, I saw really a high functioning
22   impressive young man who was doing pretty well for
23   himself, and I did not see evidence of a disabling
24   condition or a disability in the area of ADHD or disorder
25   of written expression and, not only that, but if you look

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

402

1    at the scores on not just standardized tests but
2    achievement testing scores as well, things like the WIAT,
3    the Woodcock-Johnson, his written expression scores were
4    all in the above average to superior ranges.  Hid reading
5    scores were all at least average, mostly higher than that.
6        It's really unusual to have somebody score as
7    high as he does on these achievement tests, not have any
8    treatment, and only have a few low test scores and a large
9    number of neuropsychological tests battery and have that
10   be evidence of a disability.
11       The other thing that I was looking --
12       THE COURT:  I'm going to have to interrupt you
13   because it's 5:15 so we have to break.
14       Let's reconvene at 9 a.m. because then maybe we
15   can wrap by shortly after 10, depending on how things go,
16   but 9 a.m.
17       MS. MEW:  Thank you.
18       THE COURT:  I'm sorry, Doctor.
19       THE WITNESS:  That's fine.
20       MS. VARGAS:  Your Honor, could we instruct the
21   witness that he cannot communicate with counsel between
22   now and tomorrow morning?
23       THE COURT:  Yes.
24       Do you have a problem with that?
25       MS. MEW:  That's no problem at all.

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

A1094

403

1          On logistics, so he can get back to the hotel
2    and here, is that okay?
3          THE COURT:  Because you are taking him to the
4    hotel?
5          MS. MEW:  He has his own car.
6          You are on your own, Dr. Murphy, to get yourself
7    back to the hotel.
8          THE WITNESS:  That's fine.
9          MS. MEW:  And get yourself some dinner and get
10   yourself back to court tomorrow.
11         THE COURT:  And please find your way back.
12         THE WITNESS:  I promise.
13         THE COURT:  I'll see you at 9 o'clock tomorrow
14   morning.
15         THE WITNESS:  Thank you.
16         MS. MEW:  Thank you.
17         THE COURT:  Thanks, everyone.
18         (The hearing was adjourned until Thursday,
19   October 13, 2022, at 9 a.m.)
20
21
22
23
24
25

            PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
                      Official Court Reporter

404

1                   I N D E X
2    WITNESS                           PAGE
3
4    JEANETTE WASSERSTEIN              171
5    DIRECT EXAMINATION BY MR. WEINER  171
6    cROSS EXAMINATION BY MR. WEINER   227
7    CROSS-EXAMINATION BY MS. MEW      238
8    MARC KROOPNICK                    249
9    DIRECT EXAMINATION BY MR.
10   MANDELSBERG                       249
11   CROSS EXAMINATION BY MS. VARGAS   270
12   DIRECT EXAMINATION BY MS.  MEW    273
13   CROSS-EXAMINATION BY MR. WEINER   351
14   REDIRECT EXAMINATION BY MS. MEW   380
15   KEVIN MURPHY                      383
16   DIRECT EXAMINATION BY MS. MEW     383
17
18
19
20
21
22
23
24
25

                   LISA SCHMID, CCR, RMR
                   Official Court Reporter

**A1095**

## $

**$1,000** [1] - 282:8
**$2,000** [1] - 282:9
**$200** [1] - 282:1
**$225** [1] - 394:2

## '

**'21** [1] - 243:15
**'90S** [1] - 386:23

## 1

**1** [17] - 180:9, 275:19, 277:1, 278:5, 282:24, 325:22, 325:25, 326:10, 331:11, 331:13, 349:9, 350:8, 350:10, 392:10, 392:22, 392:25, 395:5
**1.2** [1] - 221:4
**10** [7] - 170:15, 214:10, 216:4, 216:18, 224:5, 277:1, 402:15
**100** [7] - 211:12, 211:13, 211:16, 228:14, 229:2, 322:4
**10029** [1] - 171:24
**10036** [1] - 170:22
**102** [1] - 220:25
**105** [2] - 203:8, 203:10
**11** [9] - 216:4, 260:16, 260:24, 270:12, 278:5, 278:6, 337:17, 339:21
**110** [1] - 382:10
**112** [2] - 171:23, 222:12
**1155** [1] - 170:22
**1160** [1] - 171:23
**11:30** [1] - 227:4
**12** [13] - 170:7, 216:4, 225:13, 225:17, 226:3, 226:6, 226:7, 270:12, 283:25, 285:2, 377:12, 377:13
**120** [1] - 382:10
**12:30** [3] - 227:4, 227:6, 248:5
**13** [9] - 217:22, 292:9, 293:12, 310:17, 316:16, 318:1, 326:12, 337:4, 403:19
**134** [1] - 220:21

**13TH** [1] - 170:19
**14** [4] - 218:2, 220:4, 278:6, 337:19
**141** [1] - 201:21
**15** [9] - 220:5, 221:11, 221:21, 221:24, 250:13, 261:25, 313:13, 357:7, 358:1
**150** [1] - 344:23
**16** [13] - 212:25, 221:11, 221:21, 223:8, 225:22, 254:21, 261:5, 262:16, 262:22, 377:1, 377:2, 377:9, 385:8
**168** [1] - 377:16
**16TH** [6] - 206:7, 328:19, 376:10, 376:15, 377:3, 377:5
**17** [7] - 227:11, 227:15, 318:3, 331:7, 369:21, 377:1, 377:2
**171** [2] - 404:4, 404:5
**18** [5] - 232:21, 261:4, 262:12, 279:6, 319:5
**18901** [1] - 170:18
**19** [4] - 227:19, 319:25, 325:5
**1981** [1] - 177:23
**1992** [1] - 387:2
**1:45** [1] - 269:4
**1BUT** [1] - 298:8

## 2

**2** [8] - 275:11, 275:13, 277:1, 282:22, 286:6, 298:11, 306:8, 393:8
**2.3** [1] - 224:21
**20** [15] - 205:5, 206:4, 225:9, 225:11, 225:13, 229:8, 278:16, 279:6, 287:7, 293:17, 322:14, 323:7, 323:22, 325:4, 381:19
**20002** [1] - 170:15
**20005** [1] - 170:20
**2000S** [2] - 176:6, 176:8
**2005** [1] - 337:24
**2008** [4] - 183:11, 338:16, 338:21
**2010** [1] - 281:5
**2013** [35] - 183:16, 220:10, 220:12,

245:18, 247:11, 251:16, 252:6, 252:11, 253:18, 254:2, 254:19, 255:9, 255:17, 256:9, 257:12, 258:8, 258:17, 260:11, 261:1, 261:5, 262:3, 262:16, 289:18, 298:15, 301:17, 314:2, 314:4, 315:9, 315:13, 315:16, 316:12, 320:15, 327:21, 327:22, 327:25
**2014** [21] - 251:16, 252:6, 252:11, 252:24, 253:12, 253:15, 254:2, 254:19, 255:9, 255:17, 257:12, 258:8, 258:17, 260:11, 261:1, 261:4, 261:20, 262:3, 262:12, 293:10
**2014-2015** [1] - 253:7
**2015** [17] - 217:5, 217:6, 235:11, 252:24, 253:15, 256:19, 372:8, 372:11
**2017** [3] - 217:7, 283:18, 372:11
**2018** [3] - 283:18, 283:25, 393:2
**202** [1] - 170:17
**2020** [19] - 183:12, 241:21, 242:4, 242:15, 242:19, 243:17, 243:20, 247:12, 310:7, 314:6, 315:9, 315:13, 315:16, 316:2, 316:12, 322:9, 327:19, 328:1, 330:23
**2022** [3] - 170:7, 393:11, 403:19
**21** [1] - 335:19
**21ST** [1] - 228:13
**22** [5] - 170:3, 227:12, 227:15, 231:8, 325:5
**227** [1] - 404:6
**22ND** [1] - 170:22
**23** [2] - 256:19, 309:10
**238** [1] - 404:7
**24** [1] - 330:1
**249** [2] - 404:8, 404:10

**24TH** [1] - 382:6
**25** [5] - 241:20, 367:18, 367:23, 367:24, 370:14
**25TH** [8] - 211:3, 211:10, 288:20, 288:23, 365:9, 365:14, 366:1, 382:4
**26** [1] - 393:2
**270** [1] - 404:11
**273** [1] - 404:12
**28** [5] - 271:11, 271:21, 272:1, 390:21
**29** [3] - 261:19, 271:11, 272:4
**291** [5] - 253:21, 254:21, 257:14, 258:22, 259:16

## 3

**3** [6] - 171:23, 275:14, 286:6, 289:11, 333:10, 384:8
**3,000** [1] - 385:13
**3.4** [1] - 398:23
**30** [6] - 181:22, 195:5, 198:15, 232:17, 287:7, 305:2, 385:3, 388:5
**32** [1] - 206:5
**351** [1] - 404:13
**36** [1] - 206:11
**37** [6] - 184:1, 227:2, 309:8, 310:2, 322:14, 377:9
**38** [13] - 205:16, 225:9, 225:13, 225:18, 226:3, 226:5, 226:6, 227:1, 227:2, 376:8, 376:11, 376:15, 376:23
**380** [1] - 404:14
**383** [2] - 404:15, 404:16

## 4

**4** [2] - 270:7, 275:15
**4-YEAR** [1] - 286:6
**40** [1] - 181:22
**41** [1] - 369:18
**43** [8] - 257:18, 258:24, 259:2, 259:4, 259:8, 259:11, 259:17, 259:18
**44** [1] - 259:25
**45** [1] - 262:1

**45TH** [2] - 224:4, 224:10
**47** [5] - 258:24, 259:2, 259:4, 259:9, 259:11

## 5

**5** [5] - 270:7, 275:11, 275:17, 282:22, 283:22
**5'10** [1] - 202:24
**50** [5] - 288:22, 289:3, 312:5, 381:19, 382:17
**504** [1] - 398:13
**50TH** [1] - 337:7
**5120(JMA** [1] - 170:3
**52ND** [1] - 399:16
**538** [1] - 244:9
**54** [2] - 226:25
**55TH** [1] - 221:1
**59TH** [2] - 334:6, 399:9
**5:15** [1] - 402:13
**5TH** [2] - 333:7, 341:25

## 6

**6** [6] - 241:21, 242:4, 242:15, 242:19, 301:5, 304:6
**6'4** [3] - 202:21, 202:22, 203:1
**60** [3] - 255:2, 255:7, 257:14
**600** [2] - 170:15, 256:16
**60TH** [1] - 340:9
**61** [1] - 258:21
**62** [1] - 259:15
**64TH** [1] - 206:10
**67TH** [1] - 399:19
**68** [1] - 292:25

## 7

**7** [1] - 306:7
**700** [1] - 170:19
**70TH** [2] - 222:12, 340:9
**73** [1] - 262:14
**73RD** [1] - 262:13
**74** [1] - 196:24
**74TH** [7] - 196:24, 196:25, 199:20, 288:21, 338:17, 366:1, 382:4
**75** [7] - 211:12, 211:13, 257:18,

LISA SCHMID, CCR, RMR
Official Court Reporter

A1096

365:17, 366:19, 366:25, 367:4
**75TH** [3] - 289:1, 382:10
**79** [1] - 228:14
**7TH** [4] - 226:2, 226:4, 226:9, 229:15

## 8

**8** [3] - 208:15, 210:9, 293:1
**80** [2] - 364:8, 381:19
**800** [1] - 170:19
**80TH** [1] - 337:8
**82** [1] - 206:8
**84** [2] - 262:18, 262:21
**84TH** [5] - 262:25, 263:5, 263:14, 263:19, 338:25
**86TH** [1] - 337:9
**88** [1] - 322:4
**89TH** [1] - 399:17
**8TH** [3] - 184:13, 186:5, 241:16

## 9

**9** [7] - 208:15, 210:9, 393:11, 402:14, 402:16, 403:13, 403:19
**90** [1] - 328:17
**90,000** [1] - 260:12
**91ST** [3] - 338:18, 338:25, 382:11
**92ND** [1] - 338:25
**93RD** [2] - 338:19, 339:3
**94TH** [1] - 339:3
**95TH** [1] - 199:21
**96** [1] - 322:4
**96TH** [1] - 339:3
**99** [6] - 170:17, 200:22, 200:25, 211:5, 221:10, 222:15
**99TH** [7] - 201:22, 206:14, 206:16, 206:19, 220:12, 220:21, 271:9
**9:30** [1] - 170:8
**9TH** [3] - 184:13, 241:16, 382:5

## A

**A.M** [3] - 402:14, 402:16, 403:19
**AAMC** [7] - 250:6,

250:7, 250:12, 250:13, 250:18, 257:1, 266:1
**ABANDONED** [1] - 241:9
**ABBREVIATION** [1] - 334:12
**ABILITIES** [7] - 299:11, 302:14, 303:8, 307:25, 308:20, 316:16, 316:22
**ABILITIES** [6] - 189:18, 220:1, 302:16, 315:20, 317:5, 332:22
**ABILITY** [33] - 188:9, 188:13, 199:9, 201:18, 209:1, 214:22, 215:17, 226:21, 228:5, 228:6, 228:20, 229:6, 230:11, 230:13, 237:8, 237:9, 251:23, 255:13, 263:16, 296:13, 299:10, 300:18, 302:12, 303:6, 305:19, 320:9, 325:22, 332:17, 333:20, 334:19, 334:20, 352:9, 389:15
**ABILITY** [3] - 295:17, 299:20, 316:14
**ABLE** [32] - 180:21, 193:25, 199:15, 199:18, 200:4, 205:21, 210:6, 210:10, 211:19, 217:16, 224:3, 225:17, 226:3, 226:5, 226:21, 227:1, 263:11, 263:21, 268:19, 282:13, 286:17, 286:18, 287:9, 317:11, 326:7, 339:13, 343:18, 363:25, 368:20, 373:7, 379:8
**ABOVE-AVERAGE** [1] - 330:22
**ABSENCE** [1] - 401:20
**ABSENT** [2] - 206:18, 342:16
**ABSENT** [1] - 188:17
**ABSOLUTE** [6] - 188:15, 188:19, 189:1, 309:17,

323:24, 349:2
**ABSOLUTELY** [12] - 197:4, 225:15, 236:15, 237:23, 247:2, 256:1, 286:19, 287:1, 296:10, 296:16, 380:15, 382:22
**ABSOLUTELY** [6] - 179:2, 194:10, 325:16, 336:2, 341:1, 346:12
**ABSURDLY** [1] - 237:1
**ABUSE** [1] - 389:5
**ACADEMIC** [30] - 178:8, 189:18, 208:3, 209:19, 221:20, 244:11, 246:25, 251:22, 281:10, 285:7, 287:20, 294:14, 295:19, 303:5, 312:24, 313:3, 313:7, 313:10, 315:21, 336:3, 336:14, 339:11, 339:19, 340:16, 341:4, 341:19, 371:11, 373:12, 389:11
**ACADEMICALLY** [5] - 305:22, 345:25, 397:4, 399:14, 401:9
**ACCEPT** [3] - 236:20, 392:5
**ACCEPTED** [3] - 272:1, 272:2, 292:19
**ACCESS** [6] - 207:12, 305:19, 325:22, 339:13, 363:10, 395:5
**ACCESSING** [1] - 303:1
**ACCIDENTALLY** [1] - 255:21
**ACCOMMODATION** [22] - 205:23, 238:6, 274:12, 274:24, 275:14, 281:23, 283:20, 284:4, 336:3, 339:18, 343:12, 346:17, 350:10, 350:19, 363:3, 373:11, 373:17, 373:23, 381:17, 390:17, 392:3, 393:23
**ACCOMMODATIONS** [1] - 277:15

**ACCOMMODATIONS** [62] - 177:12, 178:8, 183:2, 183:4, 183:15, 191:20, 191:25, 192:4, 207:10, 218:13, 238:3, 244:12, 267:23, 267:25, 272:8, 272:12, 274:8, 274:17, 274:25, 277:13, 281:9, 282:10, 282:14, 282:18, 282:24, 284:8, 284:11, 298:19, 300:2, 300:7, 300:8, 310:5, 325:25, 326:9, 339:15, 346:10, 346:16, 346:21, 346:23, 347:13, 347:19, 347:21, 350:8, 354:5, 358:25, 359:5, 361:7, 361:24, 363:19, 364:2, 364:16, 365:2, 365:3, 365:5, 391:7, 392:13, 393:14, 394:18, 397:8, 398:24, 400:15
**ACCOMPANIED** [1] - 258:7
**ACCOMPLISHED** [1] - 388:18
**ACCORDING** [5] - 219:10, 226:24, 319:17, 321:1, 381:8
**ACCOUNT** [2] - 325:14, 340:24
**ACCURACY** [6] - 218:20, 229:6, 306:13, 307:8, 308:10, 308:11
**ACCURATE** [9] - 174:11, 174:13, 174:14, 218:10, 219:15, 279:7, 296:24, 296:25, 308:22
**ACCURATELY** [2] - 174:18, 322:12
**ACHIEVE** [1] - 271:20
**ACHIEVEMENT** [6] - 208:19, 221:25, 223:10, 289:25, 294:6, 295:18
**ACHIEVEMENT** [17] - 209:19, 221:12, 221:21, 287:22,

294:14, 296:13, 303:11, 313:3, 313:10, 332:17, 334:5, 355:2, 399:7, 399:9, 400:13, 402:2, 402:7
**ACHIEVEMENTS** [1] - 203:17
**ACQUIRED** [1] - 172:14
**ACQUIRING** [2] - 180:19, 285:15
**ACQUISITION** [1] - 195:23
**ACT** [2] - 237:21, 266:3
**ACT** [1] - 363:8
**ACT** [8] - 196:22, 247:4, 296:12, 332:14, 335:25, 336:5, 336:22, 399:17
**ACTION** [1] - 186:21
**ACTIVITIES** [7] - 274:11, 274:22, 277:20, 350:18, 356:16, 371:11, 371:15
**ACTUAL** [11] - 178:14, 186:7, 189:14, 190:23, 195:10, 201:7, 223:2, 239:22, 257:7, 307:19, 353:20
**ADA** [2] - 180:4, 266:2
**ADAM** [1] - 170:23
**ADAPTIVE** [1] - 190:9
**ADD** [12] - 175:5, 176:6, 176:23, 179:5, 187:19, 193:16, 195:25, 215:22, 215:23, 215:25, 216:23, 229:3
**ADDER** [1] - 237:9
**ADDERS** [1] - 193:16
**ADDING** [1] - 306:25
**ADDITION** [11] - 176:19, 192:15, 203:5, 203:14, 278:3, 285:1, 301:25, 334:2, 334:22, 343:11, 390:14
**ADDITIONAL** [10] - 226:25, 244:16, 284:6, 299:16, 300:22, 308:1, 313:19, 379:8, 381:20, 393:19

**ADDRESS** [6] - 171:21, 179:11, 183:17, 247:3, 288:13, 317:22

**ADDRESSED** [1] - 292:7

**ADDRESSING** [3] - 176:17, 197:9, 218:12

**ADEQUATE** [3] - 192:8, 200:3, 396:6

**ADEQUATELY** [1] - 394:21

**ADHA** [1] - 232:10

**ADHD** [131] - 175:15, 175:17, 176:1, 176:3, 176:8, 176:10, 176:19, 178:24, 179:1, 182:2, 182:3, 182:16, 187:2, 216:8, 217:1, 234:2, 234:9, 234:14, 235:8, 235:13, 235:21, 235:22, 243:24, 244:6, 246:3, 247:8, 265:15, 276:14, 277:7, 277:10, 277:14, 279:10, 279:12, 279:14, 279:20, 281:8, 284:15, 284:17, 284:18, 284:22, 286:4, 286:7, 286:25, 287:6, 287:14, 298:1, 298:6, 298:9, 300:24, 301:7, 301:21, 302:4, 302:6, 308:23, 309:4, 318:18, 318:21, 326:22, 326:25, 327:4, 327:10, 327:23, 328:3, 329:6, 329:13, 329:17, 329:18, 329:20, 329:23, 331:16, 331:20, 332:7, 335:9, 335:15, 348:9, 350:15, 367:8, 367:12, 368:11, 369:10, 369:11, 369:13, 369:22, 370:4, 370:21, 373:6, 373:7, 380:7, 380:10, 384:25, 385:2, 385:3, 385:4,

385:14, 385:20, 385:21, 385:23, 386:12, 386:15, 386:23, 386:24, 386:25, 387:7, 387:17, 387:21, 387:24, 388:4, 388:19, 389:7, 389:20, 389:22, 390:6, 390:13, 391:16, 391:22, 392:1, 392:2, 394:22, 395:1, 395:8, 395:9, 396:3, 396:9, 396:17, 396:18, 398:3, 399:24, 400:21, 401:24

**ADHD'S** [1] - 395:2

**ADHD-RELATED** [1] - 335:9

**ADJOURNED** [1] - 403:18

**ADJUST** [1] - 232:25

**ADMINISTER** [14] - 185:2, 240:16, 240:22, 289:22, 295:8, 299:9, 302:11, 303:5, 353:12, 353:13, 353:16, 353:21, 354:11, 356:5

**ADMINISTERED** [53] - 203:22, 204:11, 205:19, 206:3, 208:23, 217:24, 219:20, 221:12, 222:2, 223:7, 223:8, 225:1, 225:4, 227:13, 227:16, 227:23, 227:24, 231:9, 240:12, 240:15, 240:17, 251:16, 252:6, 252:7, 255:17, 256:9, 256:19, 257:7, 258:8, 258:17, 280:19, 287:22, 294:5, 294:15, 295:21, 301:2, 302:14, 308:10, 316:5, 316:9, 321:14, 322:21, 327:21, 333:6, 333:23, 334:4, 342:4, 342:5, 345:10, 378:11, 379:8

**ADMINISTERING** [2] - 210:14, 226:12

**ADMINISTRATION** [5] - 217:25, 254:18, 291:10, 334:14, 379:5

**ADMINISTRATIONS** [10] - 253:12, 253:18, 254:2, 255:8, 256:11, 256:15, 257:12, 261:1, 338:14, 338:15

**ADMISSION** [2] - 272:17, 339:9

**ADMISSION** [2] - 250:5, 339:5

**ADMISSIONS** [1] - 358:19

**ADMISSIONS** [4] - 251:20, 251:25, 332:14, 346:2

**ADOLESCENCE** [1] - 398:5

**ADOLESCENT** [1] - 386:15

**ADOLESCENTS** [2] - 244:6, 385:7

**ADULT** [17] - 175:5, 232:24, 234:24, 246:16, 384:25, 385:20, 386:23, 386:25, 387:7, 387:17, 388:8, 388:25, 390:13, 397:10, 398:2, 398:5

**ADULT** [11] - 175:21, 175:24, 176:6, 176:8, 176:10, 219:23, 232:10, 295:15, 307:25, 326:22, 354:18

**ADULTHOOD** [2] - 181:9, 287:2

**ADULTS** [8] - 208:19, 299:12, 299:21, 303:8, 316:15, 316:17, 316:23, 387:24

**ADULTS** [21] - 175:15, 176:13, 209:1, 209:18, 232:25, 234:9, 234:23, 235:22, 244:6, 285:4, 290:9, 290:11, 308:20, 385:7, 387:21, 388:12, 388:13, 388:15, 389:3, 390:1, 390:8

**ADVANCE** [1] - 387:6

**ADVANCED** [3] - 204:13, 280:3,

398:21

**ADVANTAGE** [1] - 291:18

**ADVISED** [1] - 196:2

**ADVOCACY** [1] - 390:3

**AFFECT** [2] - 208:3, 324:20

**AFFECTED** [2] - 181:5, 336:14

**AFFECTING** [2] - 285:15, 396:3

**AFFECTS** [1] - 237:18

**AFFILIATED** [2] - 239:25, 386:17

**AFFIRMATIVELY** [1] - 171:4

**AFFIRMED** [1] - 367:11

**AFFORD** [1] - 268:19

**AFTERNOON** [6] - 273:25, 348:15, 351:12, 351:13, 383:25, 384:1

**AFTERWARDS** [2] - 240:18, 243:13

**AGE** [21] - 209:17, 209:23, 224:3, 232:15, 284:24, 285:2, 288:4, 290:10, 291:25, 309:18, 313:20, 333:6, 333:17, 345:5, 351:21, 353:7, 365:12, 365:15, 365:18, 400:18

**AGED** [2] - 287:25, 323:25

**AGENCIES** [1] - 278:14

**AGES** [3] - 385:6, 385:8, 388:4

**AGO** [1] - 358:15

**AGREE** [8] - 246:24, 255:15, 309:20, 355:9, 360:15, 363:14, 385:8, 394:13

**AHEAD** [7] - 249:10, 258:11, 280:11, 291:5, 317:1, 320:10, 392:8

**AIDED** [1] - 170:25

**AKA** [1] - 306:12

**ALLEGES** [1] - 284:11

**ALLOCATE** [1] - 205:9

**ALLOCATIONS** [1] - 253:25, 254:1

**ALLOTTED** [1] -

210:13

**ALLOW** [1] - 378:7

**ALLOWED** [4] - 206:5, 226:16, 226:19, 238:12

**ALLOWS** [3] - 218:21, 223:3, 232:19

**ALMOST** [11] - 186:19, 187:17, 195:11, 220:10, 289:6, 302:18, 305:22, 327:8, 346:8, 348:16, 388:5

**ALONE** [1] - 344:15

**ALOUD** [3] - 294:20, 313:23, 313:24

**ALTERNATIVELY** [1] - 396:8

**ALTERNATIVES** [2] - 258:1, 258:2

**AM** [1] - 170:8

**AMAZING** [1] - 242:1

**AMAZINGLY** [1] - 220:9

**AMENDMENTS** [1] - 266:3

**AMERICAN** [4] - 249:23, 250:8, 277:18, 358:15

**AMERICANS** [1] - 363:7

**AMERICAS** [1] - 170:22

**AMOUNT** [10] - 196:8, 199:24, 205:11, 209:14, 263:17, 331:15, 343:18, 344:3, 344:5, 372:13

**AMOUNTS** [1] - 349:12

**AMPLE** [1] - 286:1

**ANALYSIS** [15] - 178:10, 222:23, 223:19, 247:1, 251:8, 272:24, 299:5, 325:21, 329:4, 345:22, 346:13, 347:4, 375:6, 391:14

**ANALYST** [2] - 250:16, 250:23

**ANALYTICAL** [1] - 263:11

**ANALYZE** [1] - 178:20

**ANCILLARY** [1] - 193:19

**AND-A-HALF** [3] - 206:6, 206:9, 206:10

**ANDERSON** [23] - 207:16, 208:13,

211:23, 214:13, 230:22, 235:13, 245:19, 247:12, 280:20, 298:15, 299:9, 300:24, 301:25, 302:11, 303:5, 303:16, 306:5, 306:8, 306:25, 307:24, 308:23, 309:15, 374:4

**ANDERSON 'S** [11] - 207:20, 207:22, 208:10, 208:16, 210:4, 298:21, 309:6, 309:21, 309:23, 365:8, 378:10

**ANGER** [1] - 327:3

**ANNUAL** [1] - 177:21

**ANONYMOUSLY** [1] - 278:21

**ANSWER** [33] - 198:18, 200:5, 200:9, 205:10, 205:21, 209:16, 210:15, 226:3, 226:5, 226:6, 228:25, 232:25, 257:24, 257:25, 258:2, 258:3, 258:18, 259:8, 259:22, 260:6, 263:7, 266:17, 270:7, 270:10, 270:12, 290:20, 350:13, 376:11, 376:15, 379:9, 382:21

**ANSWERED** [9] - 226:7, 227:2, 274:13, 376:16, 377:1, 377:2, 377:13, 378:22, 379:6

**ANSWERING** [4] - 273:9, 372:1, 377:7, 379:11

**ANSWERS** [4] - 219:2, 272:21, 273:6, 312:8

**ANTICIPATE** [1] - 179:16

**ANXIETY** [11] - 176:25, 231:15, 232:4, 232:5, 232:6, 280:13, 285:9, 326:21, 327:3, 354:2, 389:4

**ANXIETY** [1] - 326:19

**ANYTIME** [1] - 349:12

**ANYWAY** [2] - 195:22, 324:17

**ANYWAY** [1] - 186:7

**APA** [2] - 232:5, 277:19

**APOLOGIES** [4] - 183:11, 208:12, 260:14, 372:21

**APOLOGIZE** [5] - 174:6, 187:7, 246:11, 321:20, 355:10

**APPARATUS** [1] - 352:15

**APPEAR** [8] - 251:10, 257:10, 260:25, 298:9, 309:1, 312:22, 341:18, 400:13

**APPEARED** [4] - 252:13, 256:10, 257:12, 333:4

**APPENDED** [1] - 361:2

**APPENDIX** [1] - 186:9

**APPLICANT 'S** [1] - 251:21

**APPLICANTS** [3] - 340:8, 340:11, 391:6

**APPLICATION** [6] - 347:18, 348:2, 348:4, 348:5, 348:8, 391:19

**APPLICATIONS** [1] - 274:7

**APPLIED** [3] - 271:25, 306:21, 365:8

**APPLY** [3] - 255:13, 256:6, 263:11

**APPLYING** [8] - 252:2, 272:5, 338:4, 340:5, 340:14, 352:19, 366:5, 366:13

**APPOINTMENT** [1] - 177:8

**APPROACH** [3] - 283:5, 347:12, 383:1

**APPROPRIATE** [5] - 236:18, 247:7, 296:7, 296:14, 298:25

**APPROVED** [1] - 172:25

**APPROVING** [1] - 364:17

**APTITUDE** [8] - 180:22, 212:2, 223:1, 224:23, 226:19, 312:24, 313:7, 313:8

**AREA** [30] - 172:6, 172:11, 174:25, 175:20, 176:1, 176:7, 277:22, 277:23, 279:3, 294:18, 297:18, 301:21, 302:4, 306:23, 307:2, 327:23, 328:2, 332:25, 366:11, 370:17, 374:17, 385:1, 385:14, 385:23, 386:4, 387:10, 391:21, 396:1, 401:24

**AREAS** [7] - 182:11, 233:8, 280:4, 307:1, 395:20, 395:24, 396:3

**ARENAS** [1] - 363:10

**ARGUMENT** [2] - 236:18, 260:4

**ARGUMENTS** [2] - 255:14, 256:6

**ARONSON** [17] - 216:19, 216:20, 216:22, 328:25, 329:5, 329:12, 367:11, 368:13, 369:6, 369:9, 369:12, 369:13, 369:22, 371:2, 371:7, 372:7

**ARONSON** [1] - 217:2

**ARONSON 'S** [4] - 367:7, 367:18, 368:2, 370:14

**ARTICLE** [3] - 176:4, 244:5, 244:9

**ARTICLES** [7] - 175:2, 175:12, 175:18, 176:5, 277:6, 277:24, 279:1

**ASPECT** [2] - 308:16, 310:21

**ASPECTS** [2] - 193:1, 320:14

**ASSERTIONS** [1] - 259:19

**ASSESS** [10] - 218:14, 218:25, 219:5, 229:25, 251:23, 279:20, 282:13, 287:3, 300:24, 342:15

**ASSESSED** [3] - 218:20, 219:3, 335:6

**ASSESSING** [8] - 219:4, 243:23, 247:8, 290:8,

290:10, 322:17, 332:3, 332:21

**ASSESSMENT** [42] - 212:10, 212:16, 222:16, 223:12, 224:7, 224:18, 227:19, 227:22, 228:23, 228:24, 230:20, 230:25, 232:12, 232:20, 234:25, 276:12, 279:11, 294:5, 297:6, 299:9, 310:15, 310:22, 322:9, 328:7, 333:16, 333:17, 336:9, 336:16, 340:25, 345:22, 352:2, 352:7, 352:12, 353:22, 354:23, 356:6, 366:11, 384:25, 387:19, 387:20, 388:12

**ASSESSMENT** [2] - 231:14, 327:1

**ASSESSMENTS** [16] - 213:11, 217:23, 219:17, 222:21, 227:12, 227:16, 289:22, 289:24, 290:11, 296:1, 323:8, 323:17, 328:6, 354:4, 387:17, 397:2

**ASSIGN** [1] - 396:1

**ASSIST** [1] - 184:17

**ASSISTANCE** [2] - 238:11, 400:15

**ASSISTING** [1] - 278:12

**ASSOCIATE** [1] - 276:8

**ASSOCIATED** [6] - 182:9, 182:19, 187:17, 287:8, 294:14, 318:21

**ASSOCIATION** [3] - 177:3, 195:6, 250:10

**ASSOCIATION** [3] - 249:23, 250:8, 277:19

**ASSOCIATIONS** [1] - 278:2

**ASSUME** [3] - 190:18, 359:7, 371:9

**ASSUMING** [2] - 372:25, 378:1

**ASSUMPTION** [2] - 385:21, 385:22

**ASSURE** [1] - 199:9

**ATTEMPT** [5] - 199:20, 210:6, 225:12, 396:6, 397:7

**ATTEMPTED** [8] - 376:8, 376:21, 376:24, 377:1, 377:12, 378:5, 378:9, 378:23

**ATTEMPTS** [3] - 396:21, 396:23, 397:1

**ATTENDING** [1] - 268:1

**ATTENTION** [32] - 175:9, 189:22, 190:2, 207:18, 208:14, 232:12, 232:13, 232:19, 233:8, 233:20, 234:21, 235:16, 236:5, 237:15, 237:17, 246:16, 286:18, 298:7, 302:20, 309:2, 317:5, 318:15, 319:2, 319:3, 319:8, 319:10, 319:12, 335:12, 371:13, 371:18, 390:1, 395:9

**ATTENTION** [11] - 175:14, 175:18, 175:21, 175:25, 176:1, 176:14, 182:1, 182:4, 187:8, 284:13, 330:12

**ATTENTIVE** [1] - 187:9

**ATTORNEY** [1] - 264:4

**ATTRIBUTED** [1] - 235:17

**AUDIO** [1] - 208:6

**AUDITORALLY** [1] - 229:22

**AUDITORY** [2] - 317:23, 318:7

**AUDITORY** [1] - 230:1, 230:3, 230:6, 230:7, 230:8, 322:24, 323:1

**AUGUST** [11] - 183:11, 183:12, 184:13, 241:16, 243:17, 243:20, 261:5, 262:16, 289:18, 306:19

**AUTHOR** [2] - 260:2, 278:20

**AUTHOR 'S** [1] -

5

259:19
**AUTHORITIES** [1] - 366:4
**AUTHORITY** [1] - 196:11
**AUTOMATICALLY** [1] - 181:12
**AUTOMATICITY** [1] - 181:11
**AVAILABLE** [7] - 253:11, 253:17, 254:18, 254:20, 282:16, 299:7, 381:11
**AVENUE** [2] - 170:22, 171:23
**AVERAGE** [135] - 196:20, 196:22, 196:24, 197:1, 197:2, 197:3, 197:17, 201:17, 201:20, 203:11, 206:11, 206:20, 211:3, 211:4, 211:7, 213:4, 214:4, 214:5, 215:3, 215:5, 215:13, 215:14, 215:15, 215:21, 220:16, 223:22, 224:9, 226:9, 228:12, 268:15, 268:16, 288:15, 288:16, 288:19, 288:21, 289:3, 289:9, 292:3, 293:13, 293:16, 294:2, 294:3, 294:21, 294:25, 295:3, 295:7, 295:13, 295:16, 295:20, 295:24, 295:25, 299:15, 301:15, 301:16, 302:18, 302:24, 303:15, 303:16, 303:19, 304:3, 305:8, 305:13, 305:17, 307:22, 308:1, 308:15, 309:23, 309:25, 313:9, 313:18, 313:21, 317:19, 317:20, 318:25, 319:4, 320:21, 321:21, 322:4, 322:5, 323:3, 323:5, 323:6, 323:19, 323:20, 330:20, 330:22, 331:8, 334:6, 334:20,
334:21, 337:7, 337:8, 337:9, 338:17, 338:19, 338:20, 338:22, 340:1, 341:21, 342:5, 343:25, 345:7, 365:21, 365:25, 366:2, 373:18, 373:19, 381:21, 381:23, 382:4, 382:5, 382:7, 382:9, 382:17, 398:23, 399:3, 399:13, 399:17, 400:3, 400:6, 400:8, 402:4, 402:5
**AVOIDS** [1] - 371:16
**AWARE** [9] - 217:18, 271:25, 272:2, 272:4, 272:7, 331:24, 346:11, 353:1, 391:22
**AZRACK** [1] - 170:12

## B

**B-E-N-J-A-M-I-N** [1] - 273:21
**BACHELOR 'S** [2] - 276:3, 384:16
**BACKED** [1] - 329:11
**BACKGROUND** [8] - 173:7, 174:15, 182:20, 185:3, 275:25, 280:2, 298:22, 384:15
**BACKTRACK** [1] - 329:24
**BACKWARDS** [1] - 215:12
**BAD** [4] - 188:11, 203:6, 236:6
**BADLY** [1] - 229:14
**BAR** [1] - 358:19
**BAR** [4] - 177:15, 358:6, 391:5, 391:7
**BARKLEY** [2] - 386:20, 388:3
**BARKLEY** [8] - 246:12, 246:15, 301:6, 301:7, 327:20, 386:10, 386:12, 387:23
**BARKLEY 'S** [1] - 215:23
**BARKLEY'S** [3] - 246:4, 246:7, 246:10
**BARNARD** [1] - 173:9
**BASE** [1] - 213:7
**BASED** [1] - 330:10
**BASED** [39] - 179:17, 179:24, 189:11, 196:19, 202:17, 209:17, 209:19, 215:17, 216:2, 225:22, 229:3, 233:22, 236:8, 238:7, 259:2, 272:22, 281:9, 311:18, 312:19, 316:6, 317:12, 318:8, 319:8, 322:11, 325:17, 326:9, 327:2, 338:23, 348:24, 350:6, 365:12, 374:1, 374:21, 380:22, 388:16, 390:12, 392:2, 393:18, 396:1
**BASIC** [1] - 395:8
**BASING** [1] - 377:20
**BASIS** [4] - 177:21, 224:5, 372:18, 391:17
**BASKETS** [1] - 203:1
**BATTERIES** [1] - 186:1
**BATTERY** [6] - 234:25, 294:12, 310:23, 320:13, 328:19, 402:9
**BEAUTIFUL** [1] - 219:13
**BECK** [2] - 326:19
**BECOME** [2] - 172:17, 172:18
**BECOMES** [1] - 218:13
**BEFORE** [1] - 170:12
**BEGIN** [2] - 286:7, 394:16
**BEGINNING** [2] - 323:23, 386:1
**BEHALF** [9] - 183:1, 183:3, 183:5, 359:5, 359:12, 361:4, 361:5, 361:24
**BEHAVIOR** [8] - 172:8, 172:13, 214:23, 286:13, 287:16, 397:5, 400:1, 400:10
**BEHAVIORAL** [4] - 297:3, 298:7, 397:3, 400:4
**BEHIND** [5] - 237:7, 317:4, 384:9, 394:9
**BELL** [2] - 382:14, 382:15
**BELOW** [39] - 206:14, 213:3, 213:4, 215:15, 215:20, 215:21, 220:17, 222:13, 224:11, 224:22, 230:3, 288:15, 288:23, 292:18, 293:2, 293:16, 294:3, 295:13, 295:25, 301:15, 303:15, 303:16, 303:19, 304:3, 305:7, 305:13, 305:16, 317:20, 318:25, 321:22, 322:5, 323:5, 323:19, 328:18, 337:13, 345:19, 370:21, 400:3, 400:6
**BENEFICIARY** [1] - 349:4
**BENEFIT** [3] - 250:1, 347:9, 349:3
**BENIGN** [1] - 388:20
**BENJAMIN** [4] - 273:14, 273:21, 274:2, 275:3
**BERGER** [1] - 359:15
**BESIDE** [1] - 252:17
**BEST** [9] - 198:12, 218:10, 219:18, 248:11, 257:24, 258:18, 287:5, 296:20
**BETTER** [26] - 181:24, 201:10, 206:8, 206:12, 206:14, 211:11, 211:13, 211:17, 223:22, 228:14, 251:21, 262:14, 262:20, 267:19, 285:9, 285:18, 300:11, 300:14, 300:18, 341:8, 343:24, 365:18, 366:11, 366:19, 366:21, 370:8
**BETWEEN** [33] - 195:6, 201:24, 209:15, 213:4, 215:16, 221:9, 221:14, 221:15, 223:1, 223:4, 228:7, 229:5, 247:11, 288:20, 297:20, 304:22, 305:14, 315:9, 315:16, 316:12, 322:4,
324:13, 354:22, 355:18, 357:25, 372:11, 377:19, 382:4, 382:5, 382:10, 388:4, 397:18, 402:21
**BEYOND** [4] - 172:21, 198:17, 231:15, 278:13, 329:22, 388:6
**BIBBER** [1] - 360:7
**BIG** [7] - 214:5, 233:10, 237:6, 237:7, 249:14, 249:15, 377:18
**BIGGER** [1] - 202:25
**BILLING** [1] - 363:6
**BINDER** [7] - 249:12, 249:14, 260:15, 275:1, 289:13, 384:2
**BIOLOGICAL** [2] - 252:15, 261:18
**BIRD** [2] - 222:6, 222:8
**BIT** [9] - 206:5, 206:9, 220:13, 241:13, 246:20, 250:13, 293:16, 298:7, 347:11
**BLUE** [1] - 215:8
**BOARD** [1] - 170:7
**BOARD** [19] - 182:21, 183:17, 238:25, 274:6, 357:16, 357:22, 358:14, 358:15, 359:12, 359:16, 360:1, 360:7, 360:19, 360:24, 361:5, 364:7, 364:21, 391:2, 391:3
**BOARD** [11] - 172:3, 172:5, 172:10, 172:17, 172:18, 192:6, 192:7, 278:25, 358:6, 369:3, 393:6
**BOARD-CERTIFIED** [1] - 172:3
**BOARDS** [8] - 173:18, 173:22, 177:15, 177:17, 391:8, 391:9, 391:10
**BONA** [1] - 388:22
**BOOK** [18] - 175:15, 277:15, 367:20, 370:15, 375:22, 387:14, 387:15, 387:23, 387:25, 388:9, 388:10,

388:16, 388:18, 388:19, 388:23, 388:24, 389:1
**BOOKS** [9] - 207:13, 208:6, 208:7, 238:9, 277:11, 277:12, 277:13, 387:10
**BORDERLINE** [3] - 187:3, 187:10, 233:23
**BORN** [1] - 172:14
**BOSTON** [1] - 384:16
**BOTTOM** [9] - 197:1, 200:14, 201:7, 207:19, 215:20, 220:3, 221:24, 288:24, 323:7
**BOUND** [4] - 211:4, 338:9, 338:10, 338:23
**BOUTIQUE** [1] - 388:21
**BOX** [1] - 337:13
**BOYS** [1] - 347:8
**BPI** [1] - 232:5
**BRAIN** [8] - 172:8, 172:13, 175:25, 182:11, 182:14, 226:10, 317:10
**BREADTH** [1] - 401:17
**BREAK** [12] - 227:4, 227:5, 227:6, 238:15, 268:24, 270:5, 291:10, 348:15, 348:18, 350:24, 351:18, 402:13
**BREAKS** [1] - 238:17
**BRIEFLY** [7] - 274:5, 275:11, 275:24, 276:24, 277:21, 284:16, 285:11
**BRIGHT** [2] - 211:20, 399:25
**BRILLIANT** [1] - 221:18
**BRING** [3] - 184:1, 325:13, 355:7
**BROAD** [4] - 203:24, 203:25, 204:23, 294:18
**BROADER** [2] - 312:12, 327:2
**BROADEST** [1] - 277:23
**BROADLY** [2] - 276:11, 317:16
**BROOK** [3] - 191:18, 216:13
**BROUGHT** [1] - 198:4

**BS** [1] - 398:21
**BUBBLE** [1] - 258:3
**BULK** [2] - 351:20, 351:22
**BUNCH** [5] - 205:8, 209:24, 213:13, 229:12, 320:13
**BURDEN** [2] - 359:22, 360:4
**BUSINESS** [1] - 171:21
**BY** [39] - 170:16, 170:20, 170:23, 171:20, 174:8, 183:22, 184:8, 227:10, 232:1, 238:23, 249:20, 251:4, 252:22, 255:19, 260:18, 264:2, 266:18, 270:3, 273:24, 315:2, 318:17, 321:17, 348:19, 351:11, 352:17, 363:1, 380:5, 383:24, 392:9, 392:19, 404:5, 404:6, 404:7, 404:9, 404:11, 404:12, 404:13, 404:14, 404:16

## C

**CAARS** [18] - 193:25, 232:8, 232:14, 232:23, 233:2, 244:23, 244:24, 245:9, 245:16, 245:17, 246:1, 246:4, 326:22, 327:4, 327:5, 327:7, 327:14, 327:19
**CALCULATE** [2] - 311:17, 312:20
**CALCULATION** [2] - 215:16, 215:19
**CALIFORNIA** [7] - 229:9, 229:20, 229:25, 230:3, 230:5, 322:21, 323:4
**CAMPUS** [1] - 280:17
**CANDID** [1] - 219:1
**CANDIDATE** [2] - 282:15, 282:17
**CANNOT** [6] - 196:23, 210:21, 237:2, 369:1, 372:17, 402:21
**CAR** [1] - 403:5

**CARD** [2] - 335:3, 335:21
**CARD** [8] - 227:20, 229:1, 320:2, 320:7, 320:23, 321:15, 321:19, 321:23
**CARDS** [14] - 287:14, 287:20, 321:1, 321:2, 321:4, 321:5, 321:16, 334:25, 335:14, 335:16, 342:20, 399:23, 399:24, 400:5
**CAREER** [2] - 385:9, 385:12
**CAREFULLY** [3] - 233:5, 291:23, 339:10
**CAROLINE** [1] - 238:24
**CAROLINE** [1] - 170:20
**CARRS** [1] - 232:8
**CASE** [44] - 178:9, 178:12, 182:21, 183:5, 183:6, 184:9, 186:11, 188:8, 193:18, 194:21, 201:16, 210:23, 218:11, 226:7, 230:13, 231:2, 235:25, 236:15, 236:16, 252:11, 255:8, 267:10, 280:7, 287:13, 287:17, 297:19, 305:25, 315:22, 319:19, 324:18, 325:10, 326:23, 329:19, 346:25, 356:3, 359:15, 359:21, 360:1, 360:3, 360:8, 364:18, 367:5, 381:10, 391:10
**CASES** [8] - 173:1, 182:13, 199:16, 332:7, 339:18, 346:19, 361:3, 375:9
**CATEGORIES** [3] - 180:5, 180:7, 375:10
**CATEGORY** [10] - 279:4, 297:14, 306:21, 310:17, 312:23, 317:16, 322:17, 374:21, 375:4, 375:19
**CAUSE** [1] - 170:11
**CAUSED** [2] - 285:18, 286:12

**CAUSES** [1] - 395:11
**CCR** [1] - 170:24
**CENTRAL** [2] - 239:7, 239:9
**CENTRAL** [1] - 170:5
**CERTAIN** [9] - 194:10, 199:10, 209:14, 257:25, 271:4, 283:12, 305:10, 318:9, 377:7
**CERTAINLY** [23] - 241:24, 273:1, 283:8, 287:1, 303:2, 325:17, 339:16, 340:15, 341:19, 343:8, 343:19, 345:23, 346:24, 347:5, 358:12, 364:4, 364:19, 365:4, 366:16, 367:13, 375:14, 376:5, 377:4
**CERTIFICATION** [2] - 172:5, 172:11
**CERTIFICATIONS** [1] - 172:5
**CERTIFIED** [4] - 172:3, 172:17, 172:18, 369:3
**CETERA** [1] - 344:1
**CHADD** [2] - 390:2, 390:3
**CHANCE** [3] - 283:7, 312:5, 312:6
**CHANGE** [2] - 242:13, 315:8
**CHANGED** [2] - 199:22, 284:6
**CHANGES** [1] - 228:1
**CHANGING** [2] - 321:7, 341:9
**CHAPTER** [3] - 175:6, 234:8
**CHARACTERISTICS** [1] - 288:1
**CHARACTERIZATION** [2] - 255:16, 309:21
**CHARACTERIZE** [2] - 192:20, 193:4
**CHARACTERIZED** [2] - 180:18, 233:21
**CHARLES** [1] - 170:17
**CHARLES** [1] - 351:14
**CHART** [2] - 253:23, 254:1
**CHECK** [5] - 191:8, 191:11, 233:12, 371:4, 377:4
**CHIEF** [1] - 190:21

**CHILD** [12] - 194:6, 198:9, 198:12, 198:15, 286:10, 286:12, 286:14, 286:15, 287:24, 296:18, 347:2, 386:24
**CHILDHOOD** [35] - 181:15, 181:19, 181:21, 285:25, 286:23, 287:4, 287:5, 287:9, 287:18, 296:12, 296:19, 296:22, 297:1, 302:1, 302:7, 332:16, 332:19, 332:22, 332:24, 333:3, 334:24, 335:6, 341:22, 371:23, 387:17, 395:17, 395:22, 396:11, 396:12, 396:14, 397:6, 397:10, 397:12, 399:5
**CHILDREN** [6] - 285:3, 288:2, 347:8, 387:20, 388:3, 390:1
**CHILDREN 'S** [1] - 198:14
**CHIROPRACTIC** [1] - 391:8
**CHOICE** [4] - 252:7, 290:19, 331:14, 334:16
**CHOOSING** [1] - 292:8
**CHOSE** [1] - 231:2
**CHRONIC** [2] - 394:24, 395:18
**CINCINNATI** [1] - 359:18
**CIRCLES** [1] - 212:9
**CITED** [2] - 176:5, 234:9
**CITIZENSHIP** [2] - 400:1, 400:4
**CITY** [1] - 173:13
**CIVIL** [1] - 170:11
**CIVILIAN** [1] - 250:21
**CLAIMING** [1] - 329:6
**CLAIMS** [1] - 329:9
**CLARIFICATION** [10] - 172:9, 173:24, 175:23, 180:6, 185:6, 185:9, 187:4, 189:23, 205:24, 334:10
**CLARIFY** [2] - 189:7, 197:18

**CLASS** [4] - 287:23, 334:4, 334:15, 397:23

**CLASS-WIDE** [1] - 334:4

**CLASSES** [4] - 268:6, 279:19, 385:17, 398:21

**CLASSIFICATION** [1] - 279:17

**CLASSIFIED** [1] - 285:22

**CLASSROOM** [1] - 287:19

**CLEAR** [9] - 184:10, 187:22, 240:8, 240:19, 243:4, 287:10, 297:22, 373:4, 392:22

**CLEARLY** [4] - 194:6, 309:23, 331:24, 367:11

**CLERK** [4] - 249:1, 249:6, 383:13, 383:18

**CLERKSHIP** [1] - 401:11

**CLICKING** [1] - 258:3

**CLIENT** [3] - 178:23, 296:21, 354:11

**CLIENTS** [3] - 280:9, 280:12, 359:7

**CLINIC** [7] - 280:17, 386:21, 386:24, 386:25, 387:3, 387:20, 388:12

**CLINICAL** [27] - 172:6, 172:10, 172:21, 173:17, 174:25, 178:22, 182:13, 184:22, 199:5, 274:19, 280:7, 301:8, 328:11, 336:11, 336:12, 353:21, 353:23, 353:24, 381:10, 381:11, 385:9, 387:16, 388:22, 389:3, 390:15, 395:7

**CLINICAL** [2] - 175:8, 185:4

**CLINICALLY** [7] - 187:20, 233:7, 246:2, 327:7, 327:8, 335:10, 353:18

**CLINICIAN** [8] - 297:17, 329:23, 354:22, 355:24, 359:6, 374:8, 374:16, 374:19

**CLINICIAN 'S** [1] - 374:22

**CLINICIANS** [3] - 308:6, 387:16, 395:25

**CLOSE** [4] - 220:16, 224:22, 338:12, 382:16

**CLOSED** [1] - 240:5

**CLOSELY** [1] - 217:14

**CLOSER** [2] - 251:3, 283:14, 352:15

**CLOSEST** [1] - 341:25

**CLUB** [2] - 203:2, 203:6

**CLUBBED** [2] - 202:23, 203:6

**CO** [1] - 239:24

**CO-SIGNED** [1] - 239:24

**COAUTHOR** [1] - 387:22

**CODING** [1] - 229:19

**COEFFICIENT** [2] - 292:18, 292:24

**COEXIST** [1] - 176:15

**COGNITIVE** [2] - 295:17, 302:13

**COGNITIVE** [8] - 173:12, 189:18, 190:11, 191:10, 302:11, 302:16, 315:20, 317:5

**COHORT** [1] - 340:2

**COIE** [2] - 170:19, 170:21

**COINCIDE** [1] - 391:16

**COLD** [1] - 267:9

**COLLATERAL** [10] - 193:24, 193:25, 243:23, 244:17, 245:8, 245:11, 245:12, 245:15, 245:19, 327:14

**COLLATERALS** [1] - 234:11

**COLLEAGUE** [1] - 246:18

**COLLEAGUES** [1] - 237:16

**COLLECT** [2] - 178:21, 189:7

**COLLECTED** [4] - 186:14, 190:23, 220:10, 387:5

**COLLECTING** [1] - 189:11

**COLLECTION** [3] - 178:14, 186:22,

388:17

**COLLEGE** [27] - 173:8, 225:23, 225:24, 290:10, 291:25, 292:5, 292:10, 293:12, 293:14, 293:15, 294:3, 296:6, 296:11, 298:23, 330:22, 338:5, 338:9, 338:10, 338:23, 344:1, 344:11, 346:2, 346:3, 377:6, 398:22, 398:23

**COLLEGE** [10] - 173:10, 173:11, 250:5, 276:6, 276:18, 339:4, 344:13, 384:16, 385:21, 385:22

**COLLEGE -AGE** [1] - 290:10

**COLLEGE -BOUND** [2] - 338:9, 338:23

**COLLEGES** [2] - 249:23, 250:8

**COLLEGIAL** [1] - 401:12

**COLOR** [8] - 215:4, 215:5, 215:6, 215:7, 215:9, 305:15, 321:4

**COLOR** [5] - 214:11, 214:21, 305:12, 308:12, 320:16

**COLORS** [6] - 215:2, 215:4, 215:17, 228:1, 305:14, 321:2

**COLUMBIA** [4] - 173:10, 173:11, 173:14, 276:6

**COLUMN** [5] - 261:4, 261:7, 261:13, 262:6, 322:1

**COLUMNS** [1] - 262:5

**COMBINATION** [3] - 212:25, 213:5, 237:20

**COMBINE** [1] - 215:18

**COMBINED** [5] - 187:3, 187:9, 233:22, 330:13, 331:16

**COMBINED -TYPE** [1] - 331:16

**COMING** [2] - 179:2, 388:12

**COMMENTS** [12] - 397:13, 397:14, 397:18, 397:20,

397:24, 398:1, 398:3, 398:6, 398:11, 398:22, 399:22, 400:12

**COMMITTEE** [1] - 278:3

**COMMITTEES** [1] - 391:5

**COMMON** [17] - 193:21, 194:14, 194:19, 195:3, 195:4, 247:18, 277:8, 288:20, 290:8, 294:16, 300:13, 328:21, 341:7, 349:11, 361:16, 366:2

**COMMONLY** [7] - 203:24, 220:2, 284:14, 289:3, 292:9, 294:15, 347:23

**COMMUNICATE** [2] - 270:5, 402:21

**COMMUNITY** [2] - 276:19, 276:21

**COMORBID** [1] - 237:12

**COMPARE** [9] - 188:18, 289:5, 297:2, 327:19, 340:3, 349:8, 349:13, 375:19

**COMPARED** [29] - 221:6, 221:8, 225:23, 232:17, 286:5, 286:10, 292:1, 293:15, 294:1, 294:2, 296:5, 299:22, 309:18, 313:20, 323:25, 330:21, 337:14, 337:16, 338:8, 338:16, 340:6, 340:7, 340:10, 340:12, 344:3, 350:18, 365:14, 377:6, 389:6

**COMPARED** [1] - 192:19

**COMPARES** [2] - 291:24, 348:24

**COMPARING** [1] - 337:15

**COMPARISON** [8] - 226:4, 337:18, 338:7, 338:11, 338:23, 350:5, 373:16, 382:18

**COMPARISONS** [3] -

223:3, 289:7, 378:7

**COMPENSATE** [2] - 181:20, 265:9

**COMPETED** [1] - 302:9

**COMPETENCE** [1] - 199:10

**COMPETITIVE** [2] - 199:8, 398:23

**COMPLAINING** [1] - 237:7

**COMPLAINT** [2] - 190:21, 284:11

**COMPLAINTS** [1] - 189:12

**COMPLETE** [6] - 192:23, 199:18, 227:1, 255:7, 335:1, 361:1

**COMPLETED** [2] - 210:8, 212:3

**COMPLEX** [9] - 212:6, 212:7, 212:8, 231:3, 231:4, 294:20, 303:23, 313:23, 320:4

**COMPLEX** [15] - 212:13, 212:15, 213:1, 230:2, 230:4, 230:19, 303:21, 304:9, 304:10, 305:18, 322:7, 322:11, 323:9, 323:18, 324:15

**COMPLEXITY** [2] - 222:7, 222:9

**COMPLIANCE** [1] - 257:2

**COMPLICATED** [1] - 212:19

**COMPONENT** [4] - 204:1, 204:2, 204:25, 205:3

**COMPONENTS** [4] - 204:23, 204:24, 253:9, 352:4

**COMPOSE** [2] - 295:22, 313:15

**COMPOSING** [1] - 331:14

**COMPOSITE** [1] - 399:18

**COMPOUNDED** [1] - 324:4

**COMPREHEND** [1] - 263:16

**COMPREHENSION** [49] - 200:22, 201:3, 201:21, 206:15, 206:20, 206:21,

211:1, 211:6, 212:4, 220:11, 220:20, 224:4, 224:6, 290:12, 290:14, 290:21, 290:24, 290:25, 291:19, 293:6, 293:16, 293:21, 293:22, 294:24, 295:1, 295:3, 299:13, 299:17, 308:19, 308:22, 309:14, 309:17, 313:24, 315:4, 315:5, 319:12, 319:18, 319:22, 324:5, 324:8, 324:10, 324:14, 324:17, 324:20, 324:21, 324:25, 325:2, 330:9, 330:17
**COMPREHENSIVE** [4] - 298:5, 298:9, 342:19, 389:19
**COMPROMISED** [2] - 237:9, 237:11
**COMPUTER** [1] - 170:25
**COMPUTER** [7] - 227:24, 238:12, 238:13, 252:8, 318:8, 318:9, 321:14
**COMPUTER - ADMINISTERED** [1] - 321:14
**COMPUTER -AIDED** [1] - 170:25
**COMPUTER -BASED** [1] - 318:8
**COMPUTERIZED** [2] - 170:25, 319:16
**CONCENTRATE** [1] - 263:21
**CONCENTRATES** [1] - 357:4
**CONCENTRATING** [1] - 237:14
**CONCENTRATION** - 237:15, 371:19
**CONCEPT** [4] - 180:17, 197:6, 197:9, 228:8
**CONCERN** [3] - 176:2, 298:10, 396:20
**CONCERNING** [2] - 174:24, 194:24
**CONCERNS** [1] - 183:17
**CONCERT** [3] - 237:21, 237:23,

238:1
**CONCLUDE** [1] - 365:4
**CONCLUDED** [3] - 207:2, 207:24, 283:19
**CONCLUSION** [3] - 360:22, 367:14, 394:17
**CONCLUSIONS** [5] - 207:1, 207:23, 274:9, 278:22, 281:3
**CONDITION** [8] - 356:15, 356:20, 356:24, 357:3, 388:25, 389:7, 389:22, 401:24
**CONDITIONS** [8] - 177:1, 237:12, 237:13, 309:19, 313:25, 355:22, 355:23, 356:1
**CONDUCT** [5] - 178:20, 183:8, 186:7, 189:5, 354:8
**CONDUCTED** [5] - 175:2, 192:19, 240:9, 241:15, 289:17
**CONDUCTING** [8] - 178:7, 179:25, 185:19, 192:10, 276:18, 354:23, 355:17, 355:24
**CONFERENCE** [1] - 390:9
**CONFERENCE** [1] - 358:19
**CONFERENCES** [2] - 276:21, 390:11
**CONFIDENCE** [1] - 233:11
**CONFIDENT** [1] - 219:14
**CONGRESS** [1] - 353:1
**CONGRESSIONAL** [1] - 266:13
**CONNECT** [2] - 305:9, 305:10
**CONNECTICUT** [1] - 384:19
**CONNECTION** [9] - 175:13, 178:1, 183:23, 184:14, 196:13, 200:11, 208:10, 233:17, 372:7
**CONNERS** [1] - 232:10

**CONNORS'** [1] - 326:22
**CONSECUTIVE** [1] - 241:15
**CONSEQUENCE** [1] - 237:2
**CONSERVATIVE** [1] - 228:17
**CONSIDER** [13] - 251:25, 325:16, 326:5, 343:8, 343:13, 345:23, 346:15, 346:18, 366:16, 366:18, 367:1, 373:22, 373:23
**CONSIDERED** [9] - 175:4, 216:16, 229:2, 271:21, 325:18, 326:3, 346:25, 347:5
**CONSIDERING** [1] - 331:25
**CONSIST** [1] - 186:1
**CONSISTENT** [13] - 189:1, 189:2, 202:7, 210:10, 234:2, 236:9, 257:10, 288:6, 335:7, 341:20, 342:21, 394:25, 395:14
**CONSISTENTLY** [4] - 230:24, 235:2, 300:10, 349:17
**CONSISTENTLY** [1] - 345:9
**CONSISTING** [1] - 212:9
**CONSISTS** [3] - 189:15, 203:25, 204:23
**CONSTITUTE** [1] - 277:21
**CONSTITUTES** [2] - 288:19, 349:5
**CONSTRAINTS** [1] - 205:21
**CONSULTANT** [10] - 274:3, 280:22, 281:4, 357:6, 357:15, 357:25, 358:5, 358:9, 358:13, 359:8
**CONSULTING** [1] - 354:3
**CONT'D** [2] - 232:1, 363:1
**CONTACT** [1] - 372:13
**CONTACTED** [1] - 242:7

**CONTAIN** [1] - 376:1
**CONTAINED** [3] - 220:3, 374:23, 375:21
**CONTAINS** [1] - 381:1
**CONTENT** [6] - 204:18, 253:8, 257:11, 259:3, 259:13, 263:16
**CONTENTS** [2] - 251:12, 251:15
**CONTEXT** [7] - 180:21, 189:16, 212:22, 310:13, 343:1
**CONTEXTUALLY** [1] - 212:23
**CONTINUATION** - 398:8
**CONTINUE** [2] - 398:4, 398:5
**CONTINUED** [7] - 388:8, 397:5, 398:9, 398:12, 398:19, 399:14, 400:19
**CONTINUED** [5] - 206:22, 231:18, 269:9, 314:7, 362:3
**CONTINUING** [1] - 315:1
**CONTINUOUSLY** [1] - 195:12
**CONTRACT** [2] - 357:9, 357:12
**CONTRARY** [1] - 184:18
**CONTRIBUTE** [2] - 324:4, 324:8
**CONTRIBUTED** [1] - 387:10
**CONTRIBUTING** [1] - 190:13
**CONTROL** [14] - 187:23, 213:10, 214:17, 214:23, 215:15, 215:20, 232:19, 234:19, 286:8, 319:9, 389:2, 389:3, 395:10, 397:3
**CONTROL** [1] - 250:22
**CONTROLLED** [4] - 217:10, 368:9, 372:12, 372:17
**CONVENTIONAL** [1] - 201:14
**CONVERGED** [1] - 234:12
**CONVINCED** [1] - 260:3

**COPIED** [1] - 322:11
**COPIES** [1] - 304:14
**COPY** [9] - 174:4, 174:9, 174:11, 212:8, 303:23, 304:13, 304:15, 384:11
**COPYING** [1] - 323:12
**CORNER** [1] - 288:24
**CORRECT** [125] - 205:1, 210:24, 210:25, 219:25, 220:22, 220:23, 221:2, 223:11, 225:10, 225:22, 226:6, 226:7, 228:4, 235:12, 235:14, 239:5, 239:16, 240:10, 240:11, 240:14, 241:15, 243:25, 244:24, 245:17, 245:20, 247:1, 247:5, 247:9, 247:14, 251:11, 261:22, 262:4, 264:6, 264:9, 264:23, 265:6, 265:12, 265:13, 265:16, 266:7, 266:10, 267:13, 268:14, 268:16, 268:20, 270:8, 270:12, 270:15, 270:25, 272:18, 273:6, 279:20, 280:23, 283:3, 285:21, 286:25, 312:12, 336:1, 352:3, 352:8, 352:12, 352:20, 352:24, 353:13, 353:17, 353:24, 354:15, 354:24, 355:7, 355:19, 355:25, 356:3, 356:6, 356:9, 356:12, 356:17, 356:21, 356:25, 357:4, 357:7, 357:10, 357:13, 357:17, 357:20, 358:1, 358:3, 359:13, 359:19, 360:1, 360:5, 360:9, 360:13, 361:8, 361:12, 361:19, 365:10, 365:12, 365:15, 365:18, 365:23, 368:9, 368:11, 368:13,

8

368:24, 370:24, 372:9, 372:14, 372:18, 374:1, 374:9, 376:4, 376:9, 376:12, 376:18, 376:24, 376:25, 377:3, 377:14, 377:21, 378:5, 378:9, 379:6, 379:9, 380:9, 393:12

**CORRECT** [4] - 356:4, 356:7, 356:10, 357:1

**CORRECTED** [3] - 242:13, 243:2, 296:7

**CORRECTIONS** [1] - 242:8

**CORRECTLY** [7] - 227:2, 229:7, 292:21, 321:7, 369:24, 377:2, 377:13

**COSTLY** [1] - 179:14

**COUNCIL** [1] - 358:19

**COUNSEL** [2] - 270:5, 402:21

**COUNSELING** [4] - 280:13, 354:1, 384:17, 384:18

**COUNSELORS** [1] - 272:17

**COUNT** [4] - 177:23, 177:25, 182:25, 309:25

**COUNTERBALANCE D** [1] - 397:24

**COUNTERFACTUAL** [1] - 350:1

**COUNTERPART** [1] - 357:19

**COUNTS** [1] - 303:10

**COUPLE** [9] - 186:17, 188:1, 197:7, 208:12, 291:22, 303:25, 323:10, 359:14, 399:6

**COUPLES** [1] - 344:20

**COURSE** [17] - 186:21, 188:24, 189:9, 193:7, 218:24, 224:25, 228:2, 243:14, 244:20, 268:1, 268:8, 279:16, 385:9, 385:12, 387:7, 397:9, 399:1

**COURSES** [4] - 279:7, 279:10, 279:13, 280:4

**COURSEWORK** [1] - 271:17

**COURT** [62] - 170:1, 171:1, 171:3, 171:5, 171:14, 174:5, 227:3, 227:8, 238:20, 247:23, 247:25, 248:4, 248:8, 248:14, 248:17, 248:20, 248:22, 249:10, 249:14, 249:17, 251:2, 266:15, 266:17, 268:24, 269:2, 269:6, 270:21, 273:11, 281:14, 286:2, 291:5, 301:22, 304:21, 304:24, 306:7, 317:25, 318:2, 318:5, 321:10, 348:14, 348:17, 350:23, 351:2, 351:6, 352:14, 379:17, 379:20, 379:22, 379:25, 380:3, 383:5, 383:7, 383:11, 392:4, 392:7, 402:12, 402:18, 402:23, 403:3, 403:11, 403:13, 403:17

**COURT** [6] - 173:4, 189:25, 250:1, 272:20, 273:5, 403:10

**COURT** [11] - 170:24, 172:9, 173:24, 175:23, 180:6, 185:6, 185:9, 187:4, 189:23, 205:24, 334:10

**COURTHOUSE** [1] - 170:5

**COURTROOM** [5] - 171:6, 171:10, 184:5, 273:15, 273:19

**COURTROOM** [1] - 356:12

**COVER** [3] - 254:14, 279:11, 279:21

**COVERED** [3] - 240:3, 279:15, 279:18

**COVID** [2] - 186:17, 243:2

**COWORKERS** [1] - 237:16

**CPT** [4] - 317:23, 318:7, 318:20, 318:22

**CRANE** [1] - 391:8

**CREATE** [1] - 186:8

**CREATED** [1] - 387:15

**CREATES** [1] - 355:25

**CREDENTIALS** [3] - 172:25, 173:18, 251:22

**CREDIBILITY** [2] - 272:16, 388:22

**CRITERIA** [43] - 180:1, 234:3, 234:6, 235:18, 236:9, 274:19, 279:11, 279:22, 284:16, 297:14, 297:16, 297:22, 306:22, 307:3, 308:4, 308:5, 329:7, 330:7, 330:12, 336:12, 336:13, 367:12, 369:23, 370:3, 370:21, 370:22, 370:24, 370:25, 371:2, 372:6, 374:11, 374:13, 374:16, 375:4, 375:7, 375:10, 375:19, 380:7, 380:10, 381:9, 381:19, 391:18, 395:16

**CRITERION** [3] - 284:23, 284:25, 345:20

**CRITICAL** [2] - 296:16, 299:2

**CRITICALLY** [1] - 259:13

**CROPS** [1] - 349:14

**CROSS** [6] - 227:9, 238:21, 281:13, 348:18, 350:24, 404:6

**CROSS** [7] - 238:22, 264:1, 270:2, 351:10, 404:7, 404:11, 404:13

**CROSS** [1] - 351:8

**CROSS-EXAMINATION** [2] - 238:21, 281:13

**CROSS-EXAMINATION** [1] - 351:8

**CROSS-EXAMINATION** [5] - 238:22, 264:1, 351:10, 404:7, 404:13

**CRUDE** [1] - 232:21

**CULTURE** [1] - 236:4

**CURABLE** [1] - 182:19

**CURE** [2] - 181:23, 182:16

**CURRENT** [12] - 174:11, 175:7, 176:11, 249:21, 250:24, 301:17, 301:24, 302:5, 327:20, 330:11, 353:14, 384:11

**CURRICULUM** [2] - 174:11, 268:8

**CURVE** [2] - 382:14, 382:15

**CUT** [1] - 195:16

**CUTOFF** [2] - 366:13, 366:14

**CV** [10] - 170:3, 174:4, 174:9, 175:11, 275:22, 278:5, 278:16, 279:6, 384:11, 386:1

**CVLT** [1] - 311:19

**CVLT-II** [1] - 311:19

## D

**D-KEFS** [4] - 240:23, 240:25, 320:2, 320:6

**D.'S** [1] - 178:17

**DAMAGE** [2] - 182:14, 226:10

**DAMAGING** [1] - 273:3

**DARN** [1] - 215:1

**DATA** [34] - 178:10, 178:14, 178:20, 178:23, 186:21, 190:23, 193:4, 212:23, 213:8, 216:8, 216:9, 216:10, 218:8, 218:9, 234:20, 254:15, 303:3, 307:10, 329:8, 329:10, 330:18, 331:3, 331:17, 352:21, 364:13, 364:18, 364:20, 367:6, 367:8, 375:18, 377:4, 377:12, 387:5, 388:16

**DATABASE** [1] - 229:5

**DATE** [6] - 217:5, 242:4, 242:5, 261:7, 262:16, 283:23

**DATED** [2] - 261:20,

393:11

**DATES** [3] - 184:12, 261:3, 261:8

**DAYS** [1] - 241:15

**DC** [2] - 170:15, 170:20

**DEAD** [1] - 206:11

**DEAL** [7] - 237:6, 341:16, 342:8, 344:8, 349:3, 389:9, 395:11

**DEALT** [1] - 292:13

**DEBT** [1] - 389:15

**DECEMBER** [4] - 241:21, 242:4, 242:15, 242:18

**DECIDE** [3] - 186:2, 379:19, 379:20

**DECIDED** [4] - 173:23, 192:5, 192:7, 386:22

**DECLARATION** [19] - 252:18, 254:5, 256:18, 275:3, 275:5, 275:7, 275:12, 275:20, 282:23, 283:22, 304:6, 369:16, 384:6, 384:9, 392:15, 392:23, 394:7, 394:11, 394:14

**DECLARATIONS** [1] - 359:12

**DECLINE** [5] - 315:23, 315:25, 316:12, 330:24, 378:8

**DECODING** [3] - 181:3, 223:16, 223:17

**DECREASE** [2] - 315:17

**DEDICATED** [1] - 175:9

**DEEPLY** [1] - 190:14

**DEFENDANT** [2] - 170:9, 248:24

**DEFENDANT** [1] - 170:19

**DEFENDANT 'S** [3] - 249:13, 249:16, 275:2

**DEFENDANTS** [1] - 273:13

**DEFENSE** [1] - 369:15

**DEFICIT** [11] - 175:14, 175:19, 175:22, 175:25, 176:2, 176:14, 182:1, 182:4, 187:8, 284:13, 330:13

DEFICIT [15] - 181:25, 188:5, 188:21, 190:16, 229:16, 230:11, 232:13, 233:20, 236:5, 236:17, 246:16, 321:25, 372:24, 372:25, 390:2

DEFICIT - HYPERACTIVITY [5] - 175:19, 176:2, 182:1, 182:4, 330:13

DEFICITS [12] - 187:22, 188:16, 188:20, 203:10, 213:14, 213:15, 285:16, 319:1, 319:10, 339:12, 375:12

DEFINITELY [8] - 213:9, 233:10, 279:21, 297:8, 344:5, 346:14, 359:2, 374:24

DEGREE [11] - 201:10, 202:2, 202:12, 202:17, 221:9, 276:2, 276:4, 284:22, 371:8, 384:16, 384:17

DEGREES [1] - 202:11

DELAYED [1] - 181:4

DELIS [5] - 320:1, 320:12, 320:18, 320:19, 320:21

DELIS-KAPLAN [5] - 320:1, 320:12, 320:18, 320:19, 320:21

DEMAND [1] - 205:13

DEMANDING [5] - 172:23, 204:6, 204:18, 204:19, 224:9

DEMANDS [1] - 237:3

DEMONSTRATE [6] - 199:19, 200:5, 259:12, 272:9, 290:20, 294:24

DEMONSTRATED [2] - 228:23, 309:15

DEMONSTRATING [1] - 272:10

DENIAL [1] - 363:3

DENIALS [4] - 360:19, 363:18, 364:2, 364:8

DENIED [1] - 394:4

DENNY [52] - 202:7, 203:18, 204:7,

204:8, 204:16, 204:20, 204:24, 205:3, 205:12, 205:15, 205:18, 206:3, 209:8, 209:9, 209:10, 209:12, 209:13, 209:16, 209:19, 209:22, 209:25, 210:1, 225:1, 226:12, 236:15, 247:11, 290:1, 290:2, 290:5, 290:6, 290:7, 291:9, 291:16, 291:18, 291:22, 293:10, 296:4, 296:5, 314:1, 314:3, 314:5, 315:9, 315:12, 315:24, 316:1, 316:3, 316:10, 330:21, 330:25, 355:5, 375:25, 377:23

DENSE [1] - 214:7

DENY [2] - 381:3, 381:5

DENYING [4] - 233:15, 235:25, 364:16, 365:2

DEPARTMENT [4] - 265:20, 265:24, 266:11, 267:21

DEPARTMENT [1] - 239:4

DEPRESSED [2] - 190:14, 190:16

DEPRESSION [8] - 176:25, 231:15, 232:4, 232:5, 232:6, 326:21, 327:3, 389:5

DEPRESSION [1] - 326:19

DEPTH [2] - 179:14, 309:13

DEPUTY [5] - 171:6, 171:10, 184:5, 273:15, 273:19

DESCRIBE [7] - 176:11, 185:18, 209:7, 220:6, 312:25, 345:25, 395:8

DESCRIBED [5] - 230:20, 295:23, 302:9, 327:24, 390:14

DESCRIBES [1] - 253:8

DESCRIBING [2] - 262:2, 364:19

DESCRIPTIONS [1] -

328:1

DESERVED [1] - 192:5

DESIGN [2] - 272:22, 278:23

DESIGNATION [1] - 395:2

DESIGNED [20] - 199:8, 219:5, 232:21, 265:17, 265:19, 291:10, 308:12, 310:20, 311:13, 317:7, 317:9, 336:7, 336:11, 338:4, 339:8, 339:16, 341:11, 341:14, 355:21, 373:13

DESIGNING [1] - 273:2

DESPITE [4] - 193:12, 225:16, 272:4, 397:3

DETAIL [3] - 307:15, 370:13, 375:11

DETAILED [8] - 297:14, 308:5, 329:8, 349:21, 374:11, 375:4, 375:6, 375:17

DETAILS [2] - 240:18, 394:16

DETECT [1] - 317:11

DETERMINATION [3] - 234:14, 366:5, 366:6

DETERMINE [2] - 214:24, 266:12

DETERMINED [3] - 359:21, 360:4, 365:25

DETERMINING [4] - 265:21, 267:22, 343:12, 353:4

DETOURS [2] - 203:12, 213:16

DEVELOPED [4] - 210:18, 290:9, 336:17, 382:19

DEVELOPMENT [6] - 197:6, 207:8, 249:22, 250:25, 251:7, 251:9

DEVELOPMENTAL [6] - 232:20, 276:13, 307:5, 371:9, 395:9, 400:18

DEVELOPMENTAL [2] - 173:11, 194:2

DEVELOPMENTALLY [6] - 195:8, 395:18,

395:20, 396:19, 400:10, 400:24

DEVIANCE [1] - 400:18

DEVIANT [5] - 395:18, 395:20, 396:20, 400:10, 400:24

DEVIATIONS [4] - 220:17, 222:13, 224:11, 224:22

DEXEDRINE [4] - 368:4, 368:9, 368:21, 369:7

DEXEDRINE [1] - 217:8

DIAGNOSE [7] - 208:4, 297:24, 298:1, 308:23, 317:9, 336:7, 339:17

DIAGNOSED [16] - 187:8, 207:8, 208:5, 233:20, 235:7, 236:7, 264:22, 286:24, 287:6, 287:24, 297:10, 306:19, 347:21, 388:3, 388:7, 388:13

DIAGNOSES [8] - 187:1, 187:2, 187:21, 207:7, 330:2, 330:3, 347:20, 373:5

DIAGNOSING [1] - 172:7

DIAGNOSIS [52] - 172:12, 175:5, 176:6, 176:10, 176:16, 179:25, 186:23, 187:1, 187:19, 190:19, 216:16, 233:17, 234:2, 234:9, 235:22, 236:13, 236:21, 244:11, 265:14, 281:7, 287:2, 297:9, 297:12, 297:21, 306:5, 306:9, 306:14, 307:6, 307:9, 307:20, 308:7, 308:9, 330:7, 330:11, 330:15, 330:17, 331:2, 331:16, 332:3, 336:18, 374:3, 374:9, 374:20, 374:23, 375:7, 375:13, 381:10, 391:25, 394:21, 396:1, 396:17

DIAGNOSTIC [2] - 180:4, 327:11

DIAGNOSTIC [42] - 180:12, 187:25, 236:9, 244:5, 265:17, 280:15, 280:18, 282:19, 284:16, 285:11, 288:12, 288:15, 292:25, 296:14, 297:14, 303:3, 307:16, 324:25, 328:5, 328:8, 328:24, 329:7, 332:1, 332:5, 333:5, 333:24, 336:6, 336:12, 336:17, 339:7, 342:12, 344:25, 345:3, 345:4, 347:23, 361:16, 374:21, 375:19, 380:7, 380:19, 391:18

DIAGNOSTICIAN [2] - 297:17, 329:22

DICTION [2] - 194:8, 194:17

DIED [1] - 186:19

DIET [1] - 389:17

DIFFERENCE [12] - 201:24, 215:16, 215:19, 223:1, 247:10, 247:15, 247:18, 247:19, 271:16, 315:8, 315:13, 377:19

DIFFERENCES [1] - 197:20

DIFFERENT [48] - 182:8, 191:5, 191:10, 197:7, 197:11, 202:11, 209:15, 210:3, 212:20, 213:4, 215:7, 216:5, 218:22, 225:6, 226:8, 226:11, 227:25, 228:8, 260:15, 273:2, 278:1, 279:12, 280:4, 288:18, 290:15, 305:14, 313:20, 317:5, 317:10, 318:10, 319:17, 320:13, 320:14, 320:20, 321:2, 326:17, 327:22, 332:2, 333:21, 338:6, 364:23, 370:3,

381:1, 382:22, 391:9, 392:23

**DIFFERENTLY** [3] - 201:14, 203:11, 364:20

**DIFFERS** [1] - 209:16

**DIFFICULT** [5] - 286:8, 286:16, 297:1, 343:16, 349:25

**DIFFICULTIES** [1] - 194:10

**DIFFICULTIES** [9] - 196:1, 228:22, 324:5, 324:8, 324:10, 345:16, 346:4, 346:8, 396:8

**DIFFICULTY** [20] - 180:19, 180:24, 181:7, 194:6, 194:16, 194:17, 197:21, 214:16, 214:17, 214:19, 229:19, 231:6, 232:18, 237:4, 237:5, 287:18, 324:2, 371:13, 371:15, 400:2

**DIGIT** [6] - 311:9, 311:14, 311:17, 312:10, 312:14, 312:21

**DIMENSION** [2] - 214:22, 216:1

**DINNER** [1] - 403:9

**DIRE** [2] - 392:4, 392:6

**DIRECT** [8] - 171:19, 249:19, 273:23, 383:23, 404:5, 404:9, 404:12, 404:16

**DIRECT** [13] - 178:22, 179:21, 217:25, 240:4, 246:20, 247:17, 248:16, 271:3, 271:6, 324:23, 326:2, 357:5, 370:2

**DIRECTION** [2] - 178:10, 257:20

**DIRECTIONS** [2] - 197:12, 258:6

**DIRECTLY** [6] - 187:5, 266:4, 324:22, 356:18, 356:22, 371:10

**DIRECTOR** [5] - 239:7, 249:22, 250:16, 250:17,

250:25

**DISABILITIES** [2] - 277:16, 363:8

**DISABILITIES** [50] - 175:3, 175:13, 176:15, 176:20, 176:23, 177:10, 180:15, 181:1, 181:2, 181:6, 181:14, 181:23, 187:12, 187:13, 197:19, 197:20, 264:22, 265:9, 265:12, 265:15, 266:8, 266:24, 276:13, 277:7, 277:10, 277:14, 278:13, 279:12, 279:14, 279:17, 283:20, 285:14, 286:25, 287:17, 297:10, 297:13, 297:23, 300:4, 300:21, 332:8, 336:7, 348:9, 350:16, 354:5, 363:9, 363:13, 391:14, 391:23, 392:1, 394:22

**DISABILITY** [53] - 178:25, 179:1, 180:8, 180:9, 180:10, 180:15, 180:17, 180:23, 180:25, 187:15, 194:12, 196:23, 197:5, 206:19, 207:3, 207:6, 207:7, 207:25, 233:24, 265:18, 265:22, 266:6, 266:12, 267:23, 272:11, 281:9, 282:14, 290:11, 300:12, 300:16, 300:19, 300:23, 328:12, 328:23, 332:4, 333:2, 336:18, 339:17, 343:12, 346:20, 353:5, 365:22, 373:1, 373:4, 373:20, 374:1, 374:13, 383:2, 392:2, 395:2, 400:19, 401:24, 402:10

**DISABILITY -BASED** [1] - 281:9

**DISABLED** [4] - 181:10, 236:5, 300:3

**DISABLING** [1] - 401:23

**DISAGREE** [1] - 309:22

**DISBELIEVE** [1] - 364:10

**DISCERN** [1] - 194:8

**DISCERNED** [2] - 201:23

**DISCERNING** [1] - 194:17

**DISCOVERS** [1] - 321:9

**DISCREET** [2] - 189:21, 190:8

**DISCREPANCY** [8] - 202:9, 202:11, 202:12, 202:17, 221:3, 221:4, 224:1, 236:21

**DISCRETION** [2] - 308:6, 374:22

**DISCRIMINATION** [1] - 363:12

**DISCUSS** [8] - 173:7, 182:20, 186:10, 189:4, 194:23, 197:24, 199:1, 200:17

**DISCUSSED** [9] - 182:1, 194:22, 243:22, 296:1, 303:14, 320:4, 323:8, 355:3, 401:7

**DISCUSSES** [2] - 320:1, 325:6

**DISCUSSING** [1] - 190:4

**DISCUSSION** [4] - 198:25, 200:14, 328:4, 381:20

**DISEASES** [1] - 389:15

**DISLIKES** [1] - 371:16

**DISORDER** [10] - 175:14, 175:19, 175:22, 176:2, 176:14, 182:2, 182:4, 187:9, 284:14, 330:13

**DISORDER** [43] - 187:13, 207:4, 207:18, 208:14, 232:13, 233:21, 236:5, 236:8, 246:17, 284:12, 285:12, 286:3, 287:13, 297:17, 297:24, 306:2, 306:10, 306:12,

306:15, 306:17, 306:18, 306:20, 306:24, 307:4, 307:5, 307:7, 307:20, 308:3, 328:11, 328:23, 330:8, 330:16, 348:11, 369:23, 374:5, 388:6, 388:21, 388:23, 390:2, 395:9, 395:11, 395:16, 401:24

**DISORDERS** [22] - 175:9, 182:7, 187:17, 231:16, 231:17, 232:4, 274:10, 274:19, 276:13, 283:20, 285:20, 286:22, 287:8, 296:17, 299:3, 306:23, 307:13, 326:18, 336:13, 350:14, 389:4, 389:5

**DISORDERS** [1] - 175:25

**DISORGANIZATION** [1] - 335:12

**DISORGANIZED** [2] - 288:8, 397:16

**DISPARITY** [1] - 297:20

**DISPLAYS** [1] - 301:10

**DISRUPTED** [1] - 324:1

**DISRUPTION** [2] - 389:9, 395:12

**DISRUPTIVE** [1] - 286:13

**DISRUPTS** [1] - 203:3

**DISTANCE** [2] - 221:9, 221:15

**DISTRACTED** [2] - 284:20, 371:17

**DISTRACTIBILITY** [1] - 287:16

**DISTRIBUTE** [1] - 205:9

**DISTRIBUTED** [2] - 381:24, 382:13

**DISTRIBUTION** [3] - 188:19, 382:17

**DISTRICT** [3] - 170:1, 170:1, 170:12

**DIVIDE** [1] - 209:15

**DO** [1] - 364:24

**DOCTOR** [7] - 216:8, 216:19, 217:19,

217:22, 227:8, 230:21, 368:13

**DOCTOR** [6] - 174:2, 189:4, 202:4, 202:8, 352:14, 402:18

**DOCTOR'S** [1] - 188:11

**DOCTORATE** [1] - 185:17

**DOCTORS** [1] - 198:11

**DOCTORS** [2] - 330:24, 331:23

**DOCUMENT** [21] - 183:19, 183:20, 184:9, 184:11, 252:23, 252:25, 253:3, 253:11, 253:14, 253:16, 254:5, 254:7, 254:9, 256:23, 257:7, 258:14, 289:14, 315:10, 326:13, 339:22, 392:16

**DOCUMENTATION** [19] - 214:17, 274:9, 284:3, 361:10, 361:11, 364:6, 391:6, 391:11, 393:6, 393:19, 394:20, 394:21, 394:24, 395:1, 395:3, 395:13, 396:2, 396:24, 397:14

**DOCUMENTATIONS** [1] - 391:12

**DOCUMENTS** [4] - 196:13, 283:13, 283:15, 348:7

**DOKEY** [1] - 248:3

**DOMAINS** [1] - 400:25

**DOMINANT** [1] - 325:10

**DONE** [26] - 175:12, 175:18, 193:19, 211:13, 211:17, 228:14, 241:3, 299:24, 304:15, 312:22, 343:24, 345:3, 345:5, 348:16, 348:22, 358:24, 359:2, 364:6, 372:1, 385:14, 385:17, 385:19, 385:23, 388:2, 395:7, 397:21

**DOOR** [1] - 240:5

**DOTS** [2] - 305:9, 305:10

**DOUBLE** [3] - 226:18, 233:12, 238:8

**DOUBLE -CHECK** [1] - 233:12

**DOUBLY** [1] - 222:24

**DOUBT** [8] - 237:5, 341:16, 343:15, 343:17, 343:20, 347:6, 349:7, 369:12

**DOWN** [9] - 173:5, 187:6, 189:24, 197:22, 199:17, 232:8, 255:1, 262:16, 312:23

**DOWNLOAD** [1] - 281:19

**DOYLESTOWN** [1] - 170:18

**DR** [199] - 171:12, 171:21, 175:11, 175:17, 180:14, 184:16, 185:13, 185:15, 185:18, 185:25, 189:24, 200:15, 200:18, 200:19, 201:1, 203:15, 205:19, 206:3, 207:1, 207:16, 207:20, 207:22, 207:24, 208:10, 208:12, 208:13, 208:16, 210:4, 211:23, 214:13, 215:23, 216:19, 216:20, 216:22, 217:2, 225:3, 227:11, 230:22, 235:13, 238:24, 239:24, 240:12, 241:7, 244:4, 245:19, 246:15, 246:18, 247:12, 247:25, 248:24, 249:1, 249:21, 250:24, 251:5, 252:16, 253:1, 253:14, 254:7, 255:5, 255:20, 256:8, 256:23, 258:5, 258:11, 259:21, 260:10, 260:19, 261:6, 261:15, 261:23, 262:11, 262:24, 263:4, 263:23, 264:3, 270:4, 273:13, 273:25, 280:19, 280:20, 281:6, 283:16, 286:20,

289:18, 289:22, 290:3, 293:10, 295:8, 296:1, 296:8, 297:3, 297:9, 297:10, 297:19, 298:1, 298:15, 298:21, 299:9, 299:24, 300:24, 301:25, 302:11, 303:5, 303:14, 303:16, 304:5, 305:16, 306:5, 306:8, 306:25, 307:24, 308:23, 309:6, 309:9, 309:13, 309:15, 309:20, 309:21, 309:23, 310:7, 310:9, 310:11, 310:16, 312:22, 315:7, 316:4, 316:5, 319:5, 319:25, 321:13, 322:16, 323:23, 328:4, 328:25, 329:5, 329:12, 329:24, 329:25, 330:1, 331:5, 332:23, 333:9, 334:11, 339:4, 340:17, 342:2, 347:11, 348:20, 350:6, 350:22, 351:12, 365:8, 367:7, 367:11, 367:18, 368:2, 368:13, 369:6, 369:9, 369:12, 369:13, 369:22, 370:14, 371:2, 371:7, 372:7, 374:4, 375:21, 377:8, 377:11, 377:19, 377:20, 378:10, 379:13, 380:6, 383:9, 383:25, 384:15, 386:9, 386:10, 386:12, 386:20, 387:23, 388:3, 389:24, 391:24, 392:10, 401:6, 401:7, 403:6

**DRAFT** [1] - 242:16

**DRAMATIC** [1] - 221:14

**DRAW** [6] - 188:10, 303:25, 304:16, 304:19, 304:21, 367:14

**DRAWING** [3] - 303:24, 320:5,

323:15

**DRAWINGS** [1] - 324:16

**DRIVE** [1] - 170:17

**DRIVE** [1] - 213:24

**DRIVING** [2] - 389:13, 389:14

**DROP** [1] - 315:16

**DROPS** [1] - 315:14

**DRUG** [1] - 369:10

**DSM** [25] - 180:2, 180:3, 180:5, 180:8, 180:9, 180:10, 180:13, 232:21, 233:8, 234:3, 236:10, 301:8, 327:11, 330:7, 367:12, 370:18, 370:19, 370:25, 374:12, 374:23, 374:24, 380:7, 381:10

**DSM-IV** [1] - 233:8, 370:18

**DSM-V** [4] - 234:3, 330:7, 370:19, 370:25

**DUE** [2] - 285:8, 353:7

**DULY** [3] - 171:17, 249:4, 383:16

**DURATION** [4] - 356:15, 356:20, 356:24, 357:3

**DURING** [1] - 327:16

**DURING** [12] - 181:14, 224:25, 243:1, 256:12, 267:2, 267:5, 270:4, 293:10, 301:18, 310:21, 319:13, 386:9

**DYSESTHETIC** [2] - 194:13, 194:15

**DYSFUNCTION** [3] - 176:17, 226:10, 244:13

**DYSLEXIA** [17] - 175:3, 175:13, 176:18, 180:18, 194:10, 194:11, 194:19, 195:7, 195:13, 207:6, 207:8, 208:4, 225:19, 306:12, 307:7, 360:13, 360:14

**DYSLEXIC** [11] - 195:5, 207:12, 207:14, 208:1, 208:7, 210:17,

210:18, 210:21, 223:24, 224:2

**DYSLEXICS** [1] - 195:4

**DYSPHONETIC** [1] - 194:13

**DYSPHONETIC** [1] - 194:13

---

**E**

**E-MAIL** [1] - 281:17

**EARLIEST** [1] - 342:7

**EARLY** [17] - 176:6, 176:7, 192:24, 194:23, 195:15, 197:15, 285:1, 285:24, 288:3, 347:8, 370:5, 386:22, 388:7, 396:18, 397:2, 398:7, 400:5

**EARNED** [3] - 206:7, 212:2, 276:2

**EASILY** [3] - 192:5, 284:20, 371:17

**EASTERN** [1] - 170:1

**EASY** [3] - 180:20, 181:19, 235:24

**ECHO** [1] - 223:23

**ED** [1] - 189:19

**EDITED** [2] - 175:8, 175:15

**EDITION** [2] - 175:7, 254:6

**EDITORIAL** [2] - 278:17, 278:25

**EDUCATION** [10] - 172:25, 173:25, 216:12, 276:9, 279:17, 280:3, 285:5, 292:2, 354:6, 358:25

**EDUCATIONAL** [19] - 173:7, 174:15, 177:10, 177:12, 177:16, 189:17, 192:6, 194:23, 194:24, 203:17, 203:22, 235:6, 246:21, 275:24, 291:24, 292:8, 336:15, 384:15, 390:5

**EFFECT** [1] - 374:18

**EFFECTING** [1] - 208:5

**EFFECTS** [4] - 300:7, 341:2, 341:6, 349:23

**EFFICIENT** [1] - 186:6

**EFFICIENTLY** [1] - 237:10

**EFFORT** [21] - 214:2, 218:6, 218:7, 218:10, 218:22, 225:17, 310:21, 311:16, 340:19, 343:6, 343:7, 343:14, 343:18, 343:21, 343:23, 343:24, 344:3, 348:21, 349:3, 349:13, 398:13

**EFFORTS** [7] - 219:18, 225:16, 341:15, 341:16, 349:16, 371:17, 401:3

**EIGHT** [5] - 196:6, 201:8, 203:21, 207:19, 319:24

**EIGHTEEN** [1] - 319:25

**EITHER** [12] - 174:22, 176:24, 219:1, 223:21, 254:19, 324:14, 355:12, 361:7, 370:10, 376:1, 376:15, 400:25

**ELECTED** [1] - 390:12

**ELECTIVELY** [1] - 198:16

**ELEMENTARY** [4] - 264:25, 398:7, 399:5, 399:7

**ELIMINATE** [1] - 258:1

**ELLEN** [2] - 387:23, 388:2

**ELSEWHERE** [1] - 376:6

**EMAILED** [1] - 242:23

**EMBEDDED** [4] - 218:21, 218:23, 246:7, 246:14

**EMERGING** [2] - 180:5, 180:7

**EMOTIONAL** [7] - 176:23, 190:10, 231:9, 231:12, 233:10, 326:14, 326:17

**EMPHASIS** [1] - 176:16

**EMPHASIZE** [5] - 215:24, 222:22, 226:9, 230:16, 233:5

**EMPHASIZING** [2] - 211:5, 231:5

**EMPIRICAL** [4] -

206:18, 216:8, 238:7, 259:20

**EMPLOYED** [4] - 171:25, 172:1, 172:2

**EMPLOYEE** [1] - 250:21

**EMPLOYEES** [1] - 273:4

**EMPLOYMENT** [1] - 363:10

**EMPLOYS** [2] - 267:2, 267:5

**ENABLE** [1] - 224:2

**ENABLED** [1] - 206:13

**ENCODING** [3] - 223:21, 229:23

**ENCOUNTER** [1] - 356:11

**ENCOURAGED** [1] - 244:1

**END** [7] - 199:4, 211:8, 241:21, 330:13, 333:20, 363:12, 375:14

**ENDORSE** [2] - 191:16, 233:13

**ENDORSED** [3] - 191:16, 191:17, 246:2

**ENDORSES** [1] - 232:18

**ENDS** [1] - 214:15

**ENGAGE** [2] - 272:23, 371:16

**ENGLISH** [1] - 307:19

**ENORMOUS** [1] - 201:24

**ENORMOUSLY** [1] - 246:12

**ENSURE** [2] - 278:22, 356:1

**ENTAIL** [1] - 177:9

**ENTIRE** [1] - 343:1

**ENTIRELY** [2] - 185:21, 309:6

**ENTITIES** [5] - 266:23, 280:23, 280:25, 358:17, 390:17

**ENTITLED** [1] - 387:24

**ENTITY** [2] - 359:4, 364:17

**ENTRANCE** [1] - 401:7

**ENTRIES** [1] - 261:6

**ENTRY** [2] - 261:4, 261:5

**ENVIRONMENTS** [1] - 281:10

**EQUAL** [4] - 262:14, 262:20, 272:13,

395:4

**EQUATE** [1] - 377:24

**EQUIVALENCY** [1] - 226:1

**EQUIVALENT** [1] - 333:21

**ERROR** [1] - 187:11

**ERRORS** [5] - 228:13, 228:15, 228:17, 242:10, 243:1

**ESPECIALLY** [10] - 178:13, 187:16, 197:6, 235:24, 277:9, 319:11, 319:13, 333:1, 347:8, 389:8

**ESQ** [4] - 170:16, 170:17, 170:20, 170:23

**ESSAY** [2] - 295:22

**ESSENTIAL** [2] - 192:11, 244:2

**ESSENTIALLY** [3] - 301:6, 306:20, 396:12

**ESSENTIALS** [3] - 252:24, 253:11, 253:16

**ESTIMATE** [3] - 177:20, 334:15, 344:21

**ESTIMATES** [1] - 344:22

**ET** [1] - 344:1

**ETHICS** [1] - 279:16

**EVAL** [1] - 179:19

**EVALUATE** [7] - 177:13, 177:21, 190:12, 251:18, 255:13, 256:2, 265:11

**EVALUATED** [9] - 240:8, 243:17, 282:15, 282:20, 298:3, 335:6, 356:3, 385:4, 389:23

**EVALUATES** [1] - 255:12

**EVALUATING** [6] - 177:9, 199:8, 235:20, 267:24, 296:16, 299:2

**EVALUATION** [87] - 172:12, 178:2, 178:7, 178:10, 178:20, 179:2, 179:13, 179:21, 179:24, 179:25, 183:8, 183:13, 183:15, 183:17,

183:23, 183:24, 184:12, 184:15, 184:18, 185:19, 185:24, 189:5, 189:15, 189:17, 189:20, 190:5, 191:22, 192:10, 193:8, 200:11, 208:10, 208:11, 218:2, 218:22, 218:24, 219:13, 225:1, 227:17, 228:2, 233:18, 245:18, 246:19, 246:20, 247:4, 280:15, 281:7, 283:9, 283:11, 289:17, 293:10, 296:15, 298:6, 298:9, 301:16, 301:18, 302:6, 307:10, 309:7, 309:15, 309:21, 310:8, 310:12, 314:2, 316:24, 318:18, 327:16, 327:25, 330:18, 330:23, 331:4, 331:18, 331:20, 332:23, 336:25, 342:2, 354:9, 355:17, 355:25, 358:24, 361:2, 361:15, 361:16, 361:18, 365:9, 391:11, 391:25, 401:11

**EVALUATIONS** [23] - 178:1, 192:20, 234:18, 234:20, 239:14, 239:17, 239:23, 282:19, 288:13, 320:15, 325:1, 328:24, 331:24, 332:2, 347:23, 353:11, 353:23, 354:10, 359:2, 380:20, 385:10, 387:4, 401:21

**EVALUATOR** [2] - 316:19, 355:18

**EVALUATORS** [3] - 336:9, 336:24, 380:16

**EVENT** [1] - 331:10

**EVIDENCE** [86] - 203:9, 209:6, 216:8, 251:24, 274:10, 274:12, 274:18,

274:21, 274:24, 282:16, 282:21, 283:19, 286:1, 287:10, 288:6, 288:9, 288:11, 296:10, 299:2, 303:3, 306:1, 307:11, 307:13, 309:3, 309:22, 324:9, 324:11, 324:21, 324:23, 325:16, 325:18, 325:24, 326:2, 326:3, 326:5, 326:9, 328:10, 329:8, 329:18, 331:21, 331:25, 333:2, 335:7, 335:16, 339:19, 342:20, 342:21, 346:4, 346:17, 346:20, 347:23, 348:10, 348:13, 350:10, 350:15, 350:17, 353:3, 360:14, 360:23, 365:5, 367:5, 367:14, 371:22, 373:11, 373:12, 373:17, 373:22, 373:23, 375:11, 375:16, 380:8, 380:25, 381:14, 381:16, 395:16, 396:10, 396:12, 396:13, 397:11, 398:2, 400:16, 400:18, 400:23, 401:23, 402:10

**EVIDENCED** [1] - 400:13

**EXACT** [1] - 353:8

**EXACTLY** [5] - 220:14, 247:17, 305:3, 317:13, 338:10

**EXACTLY** [1] - 357:21

**EXAM** [57] - 173:1, 177:15, 200:10, 210:12, 210:24, 213:12, 214:7, 251:10, 251:13, 251:16, 252:7, 252:9, 252:10, 252:12, 253:7, 253:8, 253:10, 253:23, 253:25, 254:6, 254:17, 254:19, 255:6, 255:17, 256:9,

256:11, 260:25, 261:3, 261:7, 261:9, 261:11, 261:17, 261:20, 262:9, 262:15, 262:16, 262:21, 262:23, 264:8, 271:14, 271:15, 272:22, 280:8, 282:24, 305:23, 305:24, 325:25, 326:10, 331:12, 331:13, 350:11, 352:22, 372:24, 382:23, 391:5, 391:7, 395:5

**EXAM** [1] - 183:15

**EXAMINATION** [6] - 238:21, 249:12, 254:16, 281:13, 351:8, 370:2

**EXAMINATION** [19] - 171:19, 227:9, 238:22, 249:19, 264:1, 270:2, 273:23, 351:10, 380:4, 383:23, 404:5, 404:6, 404:7, 404:9, 404:11, 404:12, 404:13, 404:14, 404:16

**EXAMINATIONS** [1] - 177:18

**EXAMINE** [1] - 324:22

**EXAMINED** [2] - 249:4, 383:16

**EXAMINEE** [21] - 259:7, 259:12, 261:8, 261:10, 262:8, 262:25, 263:4, 263:10, 263:15, 263:20, 272:23, 282:11, 282:17, 282:20, 290:19, 291:1, 311:3, 312:15, 312:18, 318:8

**EXAMINEES** [5] - 252:1, 253:12, 254:13, 254:18, 257:8

**EXAMINER** [1] - 312:14

**EXAMINERS** [1] - 170:8

**EXAMINERS** [18] - 182:22, 239:1, 274:6, 357:16, 357:23, 358:6, 358:20, 359:13, 359:16, 360:1,

LISA SCHMID, CCR, RMR
Official Court Reporter

A1108

360:8, 360:19, 360:25, 361:6, 364:7, 364:21, 391:3, 391:4
**EXAMINERS** [3] - 358:6, 358:7, 358:8
**EXAMINING** [1] - 218:8
**EXAMPLE** [6] - 224:3, 271:4, 348:13, 366:19, 377:1, 401:1
**EXAMPLES** [1] - 391:1
**EXAMS** [1] - 191:21
**EXAMS** [10] - 199:1, 199:3, 199:18, 199:20, 238:13, 238:15, 291:21, 319:13, 319:23, 352:20
**EXCELLENT** [2] - 345:11, 398:19
**EXCEPT** [1] - 384:13
**EXCEPTION** [5] - 193:24, 220:11, 296:6, 302:20, 330:21
**EXCEPTIONAL** [3] - 211:20, 220:15, 222:24
**EXCERPTS** [2] - 252:23, 254:5
**EXCLUSION** [1] - 296:3
**EXCUSE** [1] - 358:8
**EXCUSED** [1] - 383:7
**EXECUTIVE** [3] - 319:7, 320:2, 320:12
**EXECUTIVE** [15] - 176:17, 182:18, 187:22, 190:2, 205:11, 212:21, 213:6, 213:9, 227:24, 228:21, 234:21, 234:24, 320:8, 320:25, 395:10
**EXHAUSTIVE** [2] - 174:20, 182:9
**EXHIBIT** [32] - 184:1, 252:18, 254:4, 256:17, 257:10, 257:15, 260:16, 260:24, 275:13, 275:14, 275:15, 275:17, 275:19, 277:1, 278:5, 283:22, 289:11, 298:11, 304:6, 306:8, 310:2,

322:14, 333:10, 337:4, 337:19, 339:21, 369:15, 384:8, 392:10, 392:22, 392:25, 393:8
**EXHIBIT** [4] - 174:2, 174:3, 260:9, 375:22
**EXHIBITS** [1] - 275:11
**EXHIBITS** [5] - 249:13, 249:16, 252:16, 275:2, 282:22
**EXIST** [2] - 194:20, 375:1
**EXISTED** [1] - 262:3
**EXISTENCE** [2] - 197:5, 197:9
**EXISTS** [1] - 221:9
**EXPAND** [1] - 386:24
**EXPECT** [21] - 180:20, 202:22, 211:6, 212:2, 222:14, 224:11, 224:23, 268:3, 271:10, 286:4, 286:6, 287:18, 287:21, 293:2, 315:18, 324:16, 333:2, 340:11, 343:25, 344:13, 382:16
**EXPECTATION** [1] - 263:18
**EXPECTATIONS** [3] - 212:1, 215:20, 296:2
**EXPECTED** [4] - 206:15, 215:17, 223:1, 309:5
**EXPERIENCE** [11] - 174:16, 178:22, 193:16, 196:7, 210:14, 280:5, 280:6, 347:7, 353:10, 353:25, 368:23
**EXPERIENCED** [1] - 184:22
**EXPERIENCING** [1] - 309:2
**EXPERIMENTAL** [1] - 173:9
**EXPERT** [8] - 175:4, 246:16, 265:14, 266:25, 281:7, 282:3, 386:12, 391:24
**EXPERTISE** [2] - 175:20, 372:19
**EXPLAIN** [29] - 180:15, 182:5, 188:5, 196:2,

204:11, 208:25, 218:3, 220:8, 227:22, 229:9, 243:3, 274:5, 275:11, 275:24, 277:22, 278:18, 284:16, 285:11, 288:16, 301:3, 307:15, 308:25, 310:19, 311:9, 320:6, 326:15, 372:23, 381:21, 396:8
**EXPLAINED** [4] - 266:11, 285:9, 285:19, 370:8
**EXPLAINING** [1] - 342:24
**EXPLANATION** [4] - 244:12, 315:7, 315:18, 316:13
**EXPLORE** [1] - 276:23
**EXPLORING** [1] - 388:1
**EXPRESS** [1] - 178:4
**EXPRESSED** [3] - 260:2, 393:20, 394:13
**EXPRESSION** [6] - 233:24, 330:10, 331:3, 331:10, 401:25, 402:3
**EXPRESSLY** [1] - 265:20
**EXTEND** [1] - 280:12
**EXTENDED** [12] - 183:14, 205:22, 206:1, 207:11, 208:6, 226:13, 238:4, 238:8, 286:11, 299:18, 300:1, 300:8
**EXTENSION** [1] - 200:3
**EXTENSIVE** [3] - 268:19, 340:19, 341:24
**EXTENSIVELY** [1] - 192:15
**EXTENT** [7] - 190:10, 190:12, 190:22, 199:19, 268:21, 396:3
**EXTERNAL** [2] - 190:22, 274:3
**EXTRA** [10] - 199:14, 199:17, 206:13, 210:7, 299:21, 299:22, 299:23, 299:25, 300:18,

401:15
**EXTRANEOUS** [1] - 371:18
**EXTRAORDINARILY** [2] - 202:17, 389:20
**EXTRAORDINARY** [4] - 212:5, 340:19, 341:15, 341:16
**EXTREMELY** [14] - 195:3, 195:4, 200:24, 201:11, 221:18, 247:16, 259:24, 286:16, 316:12, 327:9, 327:12, 328:2, 331:20
**EYES** [1] - 379:2
**EYESIGHT** [1] - 188:3

## F

**FACE** [4] - 348:20, 349:1, 355:18
**FACE-TO-FACE** [1] - 355:18
**FACT** [17] - 191:16, 192:6, 196:22, 197:13, 197:14, 217:18, 299:6, 300:22, 307:20, 316:10, 320:14, 329:21, 366:18, 368:15, 370:5, 370:6, 372:11
**FACTOR** [1] - 265:21
**FACTORS** [1] - 341:18
**FACTS** [3] - 229:18, 243:2, 347:17
**FACTUAL** [3] - 242:8, 242:10, 242:25
**FACULTY** [5] - 177:5, 177:8, 239:3, 239:6, 239:18
**FAILS** [1] - 371:14
**FAIR** [12] - 205:11, 252:1, 252:3, 337:18, 338:7, 338:11, 356:14, 357:23, 358:23, 364:15, 365:1, 375:1
**FAKE** [5] - 295:5, 303:12, 307:21, 313:23
**FALL** [1] - 366:17
**FALSE** [1] - 294:23
**FAME** [1] - 390:12
**FAMILIAR** [5] - 204:9, 208:21, 212:16, 212:17, 244:7, 245:24, 251:12,

251:15, 253:3, 254:9, 256:23, 260:22, 265:24, 266:1, 267:24, 270:13, 270:20, 280:18, 328:25, 339:4, 344:7, 344:10, 349:11, 351:25, 366:3, 391:18
**FAMILIES** [1] - 182:13
**FAMILY** [4] - 193:9, 236:4, 286:11
**FAR** [4] - 179:20, 305:24, 372:6, 397:18
**FASHION** [1] - 297:2
**FEATURES** [2] - 285:11, 395:8
**FEEDBACK** [3] - 228:7, 228:9, 228:19
**FELLOWSHIP** [1] - 177:15
**FELT** [3] - 307:2, 329:23, 394:20
**FEW** [14] - 210:1, 267:11, 267:12, 278:21, 278:25, 290:7, 303:18, 341:8, 351:16, 357:12, 373:5, 386:6, 397:18, 402:8
**FIDE** [1] - 388:22
**FIELD** [7] - 172:6, 184:19, 219:10, 226:22, 226:23, 272:13, 387:19
**FIFTH** [2] - 345:5, 351:21
**FIFTH** [1] - 171:23
**FIFTY** [2] - 174:5, 174:6
**FIFTY-FIVE** [2] - 174:5, 174:6
**FIGURE** [15] - 212:6, 212:7, 212:8, 212:9, 248:11, 303:23, 304:2, 304:12, 304:13, 304:19, 304:24, 305:4, 322:12, 323:12, 364:11
**FIGURE** [13] - 212:13, 212:15, 213:1, 230:2, 230:4, 230:19, 303:22, 304:9, 304:10, 322:8, 322:11, 323:9, 323:18
**FIGURES** [1] - 305:18

**FIGURES** [3] - 213:1, 324:15

**FILE** [36] - 274:15, 274:17, 281:15, 281:18, 282:16, 283:5, 283:9, 288:10, 289:20, 325:15, 325:18, 326:5, 329:1, 331:22, 340:22, 342:23, 343:2, 345:14, 345:22, 345:24, 346:11, 347:12, 347:14, 360:24, 360:25, 361:17, 363:20, 366:15, 373:22, 375:15, 375:18, 380:22, 381:1, 381:8, 396:10

**FILES** [9] - 274:7, 281:2, 281:19, 347:15, 348:5, 358:22, 362:1, 363:24, 381:18

**FILL** [4] - 295:2, 327:13, 354:20, 355:6

**FILLED** [3] - 192:14, 246:1, 301:19

**FILLING** [1] - 237:6, 301:9

**FINAL** [5] - 242:5, 242:6, 295:4, 322:1, 324:7

**FINALLY** [2] - 274:23, 280:8

**FINANCIAL** [1] - 268:22

**FINDINGS** [9] - 178:4, 188:21, 194:24, 212:18, 219:7, 219:19, 234:11, 389:6, 390:11

**FINE** [4] - 231:12, 400:11, 402:19, 403:8

**FINER** [1] - 258:16

**FINISH** [3] - 200:4, 348:17, 371:14

**FINISHED** [2] - 190:4, 242:21

**FINISHING** [3] - 211:18, 248:16, 386:16

**FIRM** [1] - 360:22

**FIRST** [4] - 172:16, 196:24, 321:4, 322:18

**FIRST** [49] - 172:24,

173:22, 189:6, 192:18, 197:17, 199:18, 199:20, 200:8, 213:13, 225:13, 225:20, 241:17, 248:13, 252:17, 252:23, 261:3, 274:17, 276:25, 277:15, 280:2, 283:9, 283:11, 284:22, 284:25, 286:22, 287:7, 287:19, 290:2, 290:16, 291:1, 292:5, 292:10, 293:12, 301:3, 306:14, 309:12, 310:17, 324:10, 325:9, 337:24, 356:11, 371:23, 372:4, 388:13, 396:16, 397:17

**FIRST-YEAR** [2] - 292:10, 293:12

**FISH** [2] - 222:6, 222:8

**FISHER** [2] - 387:23, 388:2

**FITS** [1] - 221:7

**FIVE** [21] - 174:5, 174:6, 194:22, 205:6, 248:10, 358:11, 369:6, 369:22, 370:3, 370:11, 370:12, 370:24, 370:25, 371:2, 371:21, 379:18, 379:22, 388:4, 400:7, 400:8

**FIVES** [1] - 400:9

**FIXED** [1] - 241:3

**FLIES** [1] - 222:6

**FLIP** [1] - 384:5

**FLOOR** [1] - 170:22

**FLORIDA** [1] - 384:17

**FLOURISHED** [1] - 401:9

**FLUCTUATION** [1] - 220:13

**FLUENCY** [15] - 222:3, 224:13, 224:16, 294:22, 306:13, 307:8, 308:9, 308:16, 308:18, 308:21, 313:14, 330:8, 330:16

**FLUENT** [1] - 308:22

**FLY** [1] - 222:8

**FOCUS** [5] - 261:3, 263:21, 266:7,

279:14, 394:16

**FOCUSED** [3] - 266:6, 286:16, 354:1

**FOCUSING** [1] - 327:4

**FOCUSING** [3] - 195:24, 277:5, 396:10

**FOLKS** [12] - 177:22, 177:24, 181:13, 274:7, 282:19, 290:10, 291:25, 292:6, 300:20, 329:20, 338:4, 340:15

**FOLLOW** [5] - 278:23, 305:10, 318:8, 318:14, 371:14

**FOLLOWED** [5] - 257:23, 290:18, 291:20, 348:6, 388:5

**FOLLOWING** [2] - 214:10, 339:1

**FOLLOWS** [3] - 171:18, 249:5, 383:17

**FOOT** [4] - 202:23, 203:2, 203:6

**FOOTNOTE** [1] - 370:18

**FOR** [1] - 170:11

**FOREIGN** [1] - 194:8

**FORENSIC** [2] - 218:12, 366:10

**FORGET** [2] - 230:21, 316:21

**FORGOT** [3] - 193:13, 193:14, 358:14

**FORM** [13] - 191:2, 192:14, 193:3, 238:9, 256:18, 256:19, 257:1, 257:3, 290:14, 347:18, 348:2, 348:5, 348:8

**FORMAL** [3] - 398:13, 400:15, 401:20

**FORMALLY** [2] - 218:14, 287:24

**FORMAT** [9] - 251:12, 251:15, 256:8, 257:11, 291:19, 291:20, 303:4, 305:21, 339:14

**FORMATION** [2] - 228:8, 241:2

**FORMS** [5] - 193:8, 198:1, 237:6, 292:24, 326:4

**FORMULATION** [2] - 178:9, 189:12

**FORTH** [9] - 234:3, 305:14, 311:16, 343:7, 343:14, 343:23, 344:6, 349:2

**FORWARD** [2] - 388:16, 400:14

**FOUNDATION** [1] - 266:16

**FOUNDED** [1] - 173:17

**FOUR** [14] - 196:5, 196:6, 196:12, 198:8, 257:4, 270:9, 270:10, 294:18, 326:14, 379:1, 385:25, 386:1, 400:7, 400:8

**FOURS** [1] - 400:9

**FOURTH** [2] - 195:11, 196:5

**FRACTION** [1] - 340:13

**FRAME** [1] - 381:22

**FRANKLY** [2] - 186:18, 241:25

**FREESTANDING** [1] - 218:16

**FREQUENT** [1] - 372:18

**FREQUENTLY** [4] - 209:9, 234:22, 234:23, 284:23

**FRIDAY** [1] - 344:14

**FRIEND** [1] - 245:2

**FRIEND/TUTOR** [1] - 301:20

**FRONT** [7] - 174:9, 184:9, 252:19, 252:25, 254:14, 260:20, 354:14

**FRONTAL** [1] - 182:12

**FRUSTRATING** [1] - 193:7

**FULL** [16] - 179:19, 185:24, 201:9, 202:2, 204:4, 297:16, 297:22, 306:22, 307:3, 309:12, 323:21, 333:14, 342:20, 352:5, 374:16, 380:19

**FULLY** [1] - 372:5

**FULSOME** [1] - 190:17

**FUN** [1] - 344:15

**FUNCTION** [2] - 320:12, 322:15

**FUNCTION** [11] - 182:18, 190:2,

198:22, 203:7, 213:6, 227:25, 231:9, 234:22, 237:10, 320:9, 320:25

**FUNCTIONAL** [2] - 213:9, 285:6

**FUNCTIONALLY** [1] - 202:19

**FUNCTIONING** [1] - 320:2

**FUNCTIONING** [24] - 187:22, 190:10, 190:15, 203:4, 234:24, 326:14, 326:17, 370:7, 380:11, 388:25, 389:11, 389:12, 395:10, 395:20, 396:4, 397:10, 398:5, 400:17, 400:22, 401:19, 401:21

**FUNCTIONS** [6] - 189:22, 190:1, 190:9, 212:21, 228:21

**FUNCTIONS** [1] - 317:2

**G**

**GASTRO** [1] - 191:4

**GAUGE** [1] - 348:23

**GENERAL** [29] - 176:8, 202:15, 202:16, 211:14, 211:15, 221:7, 229:6, 243:5, 289:7, 292:4, 292:9, 292:11, 293:11, 294:1, 296:2, 302:15, 340:3, 340:6, 340:12, 343:25, 346:9, 347:12, 350:18, 366:6, 366:20, 366:25, 367:2, 373:16, 381:14

**GENERALLY** [24] - 180:12, 192:4, 204:5, 244:13, 267:10, 268:10, 271:21, 280:18, 281:2, 283:16, 288:9, 312:24, 317:7, 321:21, 330:19, 336:20, 339:11, 342:10, 344:18, 345:24,

354:25, 373:21,
386:7, 391:22

**GENERALLY** [2] -
317:3, 354:16

**GENERATED** [1] -
322:3

**GENERATES** [1] -
292:18

**GENES** [1] - 182:8

**GENETIC** [2] - 182:7,
182:12

**GENUINE** [2] - 312:4,
315:17

**GENUINELY** [1] -
341:18

**GEORGIA** [2] -
185:12, 241:7

**GI** [1] - 191:4

**GIANT** [1] - 321:15

**GIFTED** [8] - 197:7,
197:13, 197:14,
202:6, 372:23,
372:25, 373:7,
373:14

**GIRLFRIEND** [2] -
245:22, 301:19

**GIVEN** [41] - 193:10,
199:14, 200:3,
205:5, 205:7, 206:9,
226:21, 226:25,
229:12, 244:18,
272:8, 278:9,
281:15, 290:15,
291:11, 291:14,
294:18, 295:10,
299:18, 299:22,
300:15, 303:19,
305:11, 307:17,
307:21, 309:24,
311:1, 313:19,
313:25, 315:13,
316:18, 316:21,
316:24, 318:15,
321:10, 331:7,
333:5, 334:3,
355:21, 372:11,
377:3

**GIVEN** [1] - 319:11

**GMATS** [1] - 177:15

**GO-TO** [1] - 209:10

**GOAL** [1] - 305:3

**GOALS** [1] - 226:11

**GOD** [1] - 273:17

**GRADATIONS** [1] -
288:25

**GRADE** [2] - 337:17,
341:25

**GRADE** [23] - 192:18,
195:11, 195:14,
196:5, 197:25,

209:22, 225:22,
225:25, 226:2,
292:9, 293:12,
333:7, 333:19,
333:21, 333:25,
334:1, 334:3,
337:25, 345:5,
351:21, 398:23,
399:12, 399:13

**GRADER** [1] - 226:9

**GRADERS** [1] - 226:4

**GRADES** [6] - 287:21,
396:25, 397:5,
398:19, 399:25,
400:12

**GRADUATE** [8] -
225:23, 276:17,
279:5, 280:3, 280:4,
328:16, 385:22,
386:16

**GRADUATED** [1] -
225:24

**GRADUATING** [5] -
293:15, 294:2,
296:6, 330:22, 377:6

**GRADUATIONAL** [1] -
398:22

**GRAIN** [1] - 181:17

**GRANT** [4] - 360:11,
363:25, 381:3,
386:15

**GRANTED** [3] -
359:23, 360:5, 394:4

**GRAPHIC** [1] - 188:10

**GREAT** [1] - 351:6

**GREAT** [15] - 291:18,
291:21, 293:4,
341:16, 342:8,
342:19, 343:14,
343:20, 344:8,
349:3, 383:11,
389:9, 395:11,
396:20, 401:20

**GREATER** [1] - 231:6

**GREEN** [1] - 215:8

**GREW** [1] - 390:7

**GROSSLY** [2] -
228:19, 322:13

**GROUP** [24] - 216:12,
216:13, 287:21,
289:7, 291:11,
292:3, 292:11,
293:11, 294:1,
312:25, 317:1,
333:6, 334:4,
334:13, 342:5,
345:10, 389:2,
389:3, 390:2, 390:3,
390:4, 390:5, 390:9

**GROUP-**

**ADMINISTERED** [4] -
333:6, 334:4, 342:5,
345:10

**GROUPS** [6] - 278:1,
278:10, 292:8,
330:22, 389:6,
401:16

**GUESS** [6] - 195:15,
226:2, 344:3, 370:9,
374:7, 385:11

**GUESSING** [1] -
209:13

**GUIDE** [4] - 253:6,
254:6, 254:17,
255:12

**GUIDELINES** [4] -
180:13, 219:10,
265:25, 267:24

**GUN** [1] - 179:3

**GUY** [3] - 223:24,
225:15, 235:9

---

# H

**HABITS** [2] - 400:2,
400:10

**HALF** [22] - 173:22,
206:6, 206:9,
206:10, 210:10,
210:15, 211:18,
212:1, 222:13,
224:10, 226:15,
226:25, 227:1,
238:6, 248:18,
282:9, 288:22,
290:17, 304:17,
379:6, 379:11

**HALFWAY** [2] - 255:1,
330:6

**HALL** [2] - 383:10,
390:12

**HAND** [8] - 171:7,
249:2, 273:15,
325:10, 325:12,
383:14

**HANDED** [2] - 249:13,
325:11

**HANDLE** [1] - 179:7

**HANDWRITING** [3] -
188:11, 188:12,
330:10

**HARD** [14] - 192:24,
193:10, 219:18,
221:19, 238:16,
264:20, 343:5,
343:6, 343:9,
343:11, 343:22,
345:4, 345:11,
385:11

**HARDER** [2] - 342:24,

344:9

**HAT** [1] - 226:15

**HEAD** [5] - 171:4,
179:23, 182:14,
229:19, 315:19

**HEADER** [3] - 255:1,
257:17, 258:23

**HEADING** [7] - 194:2,
218:3, 255:11,
317:2, 319:7,
322:15, 323:7

**HEALTH** [1] - 250:11

**HEALTHY** [5] - 232:3,
328:14, 328:22

**HEAR** [6] - 179:12,
251:5, 255:20,
267:15, 312:16,
312:17

**HEARD** [4] - 180:14,
312:19, 322:19,
322:22

**HEARING** [1] - 170:11

**HEARING** [4] - 194:6,
249:16, 318:11,
403:18

**HEAVILY** [1] - 234:9

**HELD** [1] - 250:14

**HELP** [11] - 178:17,
182:18, 198:21,
257:5, 262:11,
271:19, 271:20,
273:17, 345:1,
363:9, 391:10

**HELPED** [2] - 198:14,
387:22

**HELPFUL** [7] - 238:7,
244:16, 244:21,
249:12, 346:17,
346:22, 367:17

**HID** [1] - 402:4

**HIGH** [1] - 177:14

**HIGH** [30] - 187:6,
194:7, 197:1,
198:11, 215:3,
218:11, 284:18,
290:9, 291:21,
292:20, 293:3,
296:11, 298:23,
327:9, 327:12,
331:20, 337:16,
338:9, 340:12,
346:1, 370:4,
381:23, 382:9,
398:11, 398:20,
399:3, 401:21, 402:7

**HIGHER** [8] - 271:8,
271:10, 271:20,
292:2, 340:16,
354:6, 358:25, 402:5

**HIGHLY** [1] - 176:5

**HIMSELF** [5] - 183:13,
235:25, 301:19,
397:21, 401:23

**HIRED** [1] - 179:3

**HISTORIAN** [1] -
193:5

**HISTORICAL** [6] -
287:10, 296:8,
296:19, 332:6,
332:10, 347:24

**HISTORICALLY** [1] -
194:12

**HISTORICALLY** [3] -
235:4, 235:5, 237:5

**HISTORY** [1] - 194:3

**HISTORY** [42] -
179:14, 179:16,
179:17, 179:24,
185:23, 186:12,
186:14, 189:6,
189:7, 189:10,
189:11, 190:21,
190:24, 191:1,
191:2, 191:19,
192:9, 192:13,
192:14, 192:21,
193:1, 193:2,
194:23, 194:24,
195:4, 216:15,
234:10, 234:17,
242:10, 246:21,
309:3, 319:21,
330:11, 336:10,
346:15, 346:16,
346:21, 347:19,
388:6, 388:14,
396:22, 396:25

**HOLD** [4] - 207:22,
250:18, 309:7,
363:20

**HOLES** [1] - 325:9

**HOME** [7] - 282:8,
285:3, 285:4,
354:12, 354:19,
355:6, 355:22

**HONEST** [3] - 296:25,
343:4, 369:13

**HONESTLY** [1] -
361:20

**HONESTY** [1] - 310:21

**HONOR** [22] - 171:2,
171:16, 183:18,
238:19, 247:24,
248:7, 248:10,
249:11, 260:14,
273:12, 273:13,
281:6, 281:13,
301:23, 318:4,
348:16, 351:5,
351:9, 379:18,

380:2, 383:6, 402:20
**HONORABLE** [1] -
170:12
**HOSPITAL** [1] -
173:14
**HOSPITALIZED** [2] -
186:18, 241:25
**HOSPITALS** [1] -
250:11
**HOTEL** [3] - 403:1,
403:4, 403:7
**HOUR** [4] - 248:18,
282:1, 304:17, 394:2
**HOURS** [6] - 198:4,
198:8, 198:16,
224:5, 280:6, 363:6
**HOUSEWORK** [1] -
344:22
**HUGE** [1] - 398:18
**HUM** [1] - 335:23
**HUMAN** [1] - 212:9
**HUNDRED** [3] - 206:7,
206:11, 261:23
**HUNDREDS** [1] -
177:24
**HYPERACTIVE** [2] -
233:9, 286:9
**HYPERACTIVITY** [6] -
175:19, 176:2,
182:1, 182:4,
284:13, 330:13
**HYPERACTIVITY** [4] -
233:21, 284:20,
286:5, 390:2

---

## I

**IDEA** [2] - 317:4, 386:8
**IDENTICAL** [1] -
220:10
**IDENTIFICATION** [3] -
176:2, 176:19,
294:19
**IDENTIFIED** [6] -
180:18, 181:14,
181:18, 181:21,
211:24
**IDENTIFY** [4] - 178:25,
181:20, 183:19,
212:12
**IEPS** [1] - 398:13
**IGNORE** [2] - 215:9,
215:12
**II** [2] - 311:19, 322:22
**III** [2] - 266:2, 353:2
**ILLNESS** [1] - 182:14
**IMAGE** [1] - 194:16
**IMAGES** [2] - 201:25,
335:2
**IMAGINE** [1] - 355:13

**IMAGING** [1] - 317:11
**IMBEDDED** [1] -
218:18
**IMPACT** [4] - 237:13,
299:24, 395:23,
400:21
**IMPACTED** [1] -
319:13
**IMPACTS** [2] - 371:10,
395:23
**IMPAIR** [1] - 370:6
**IMPAIRED** [8] -
228:19, 230:24,
247:20, 319:11,
322:13, 371:20,
373:8
**IMPAIRING** [2] -
388:24, 389:7
**IMPAIRMENT** [23] -
180:16, 284:13,
285:6, 285:12,
286:23, 288:5,
300:19, 306:12,
307:7, 330:8, 330:9,
330:16, 331:2,
331:10, 345:12,
382:20, 383:2,
394:25, 395:4,
395:12, 395:17,
395:19, 396:1
**IMPAIRMENT -LEVEL**
[1] - 288:5
**IMPAIRMENTS** [3] -
236:23, 237:20,
388:14
**IMPLEMENT** [1] -
228:20
**IMPLEMENTING** [1] -
266:2
**IMPLIES** [1] - 194:18
**IMPORTANCE** [2] -
215:24, 243:22
**IMPORTANT** [20] -
192:2, 192:3, 192:9,
192:12, 201:11,
201:12, 211:17,
211:25, 216:10,
218:5, 218:14,
222:23, 260:3,
272:14, 332:6,
341:1, 343:3,
346:15, 363:17,
395:21
**IMPORTANTLY** [1] -
398:1
**IMPOSE** [1] - 266:23
**IMPOSED** [1] - 272:10
**IMPRESSIVE** [1] -
401:22
**IMPROVE** [4] -

250:11, 268:1,
300:21, 335:12
**IMPROVES** [1] -
300:22
**IMPROVING** [3] -
335:13, 341:4,
397:21
**IMPULSIVE** [3] -
286:9, 287:16,
389:16
**IMPULSIVENESS** [4] -
284:20, 286:5,
318:16, 318:25
**IN-DEPTH** [1] - 179:14
**IN-PERSON** [1] -
282:20
**INABILITIES** [1] -
181:5
**INABILITY** [2] -
180:23, 215:24
**INATTENTION** [4] -
284:19, 286:15,
302:3, 397:16
**INATTENTIVE** [1] -
187:10
**INCLUDE** [6] - 190:1,
191:21, 300:4,
301:7, 363:14,
380:13
**INCLUDED** [1] -
387:19
**INCLUDES** [5] -
178:10, 246:21,
254:14, 277:24,
282:17
**INCLUDING** [8] -
191:20, 277:3,
319:22, 326:4,
336:14, 389:4,
395:17, 399:21
**INCONSISTENT** [2] -
266:13, 371:9
**INCORRECT** [3] -
228:4, 258:1, 376:21
**INCORRECTLY** [1] -
321:7
**INCREASINGLY** [2] -
294:20, 313:22
**INDEPENDENT** [1] -
192:6
**INDEX** [2] - 211:6,
220:20
**INDEX** [1] - 220:24
**INDICATE** [15] -
199:17, 225:16,
226:1, 246:8, 258:3,
261:8, 261:10,
292:15, 293:3,
293:5, 306:2, 312:1,
336:19, 339:12,

401:4
**INDICATED** [9] -
187:16, 234:8,
236:7, 315:17,
353:2, 377:18,
394:22, 398:15,
401:8
**INDICATES** [5] -
212:20, 214:6,
319:8, 369:7, 372:8
**INDICATING** [1] -
205:21
**INDICATION** [3] -
300:23, 328:22,
342:19
**INDICATIONS** [1] -
399:6
**INDICATIVE** [3] -
300:19, 329:17,
345:12
**INDICATOR** [2] -
308:18, 339:11
**INDIRECT** [5] -
308:18, 326:3,
329:18, 346:17,
373:11
**INDIVIDUAL** [1] -
223:10
**INDIVIDUAL** [25] -
178:8, 178:24,
180:21, 183:2,
196:9, 210:15,
219:1, 255:6,
265:22, 267:2,
267:5, 278:13,
279:13, 279:15,
282:13, 310:1,
312:19, 325:8,
345:9, 354:19,
358:24, 359:5,
361:6, 369:10,
373:25
**INDIVIDUAL 'S** [3] -
246:24, 267:6, 273:8
**INDIVIDUALLY** [2] -
333:23, 342:4
**INDIVIDUALLY -
ADMINISTERED** [2] -
333:23, 342:4
**INDIVIDUALS** [24] -
176:21, 177:9,
178:1, 183:4, 246:1,
253:6, 260:11,
265:11, 266:6,
266:24, 267:25,
281:8, 285:14,
300:3, 340:2,
353:11, 353:17,
354:5, 363:9, 365:2,
365:18, 385:4,

391:25
**INFORM** [1] - 325:21
**INFORMANTS** [1] -
327:15
**INFORMATION** [66] -
179:15, 187:24,
188:14, 190:19,
190:21, 192:24,
193:3, 193:17,
193:19, 193:24,
197:24, 200:1,
200:7, 201:18,
206:18, 210:12,
210:19, 216:17,
219:5, 219:15,
228:3, 229:7,
229:17, 229:19,
229:22, 229:23,
230:1, 230:12,
230:14, 230:15,
231:3, 243:23,
245:9, 245:13,
245:15, 255:13,
255:24, 256:3,
256:6, 263:7, 284:6,
297:7, 298:22,
299:1, 307:9, 324:2,
330:18, 331:4,
331:17, 332:12,
332:19, 334:23,
339:18, 340:21,
342:14, 343:1,
345:15, 346:1,
347:1, 348:1,
348:24, 350:6,
384:14
**INFREQUENT** [1] -
221:16
**INHIBIT** [4] - 214:23,
215:10, 215:25,
320:10
**INHIBITING** [1] -
214:19
**INHIBITORY** [3] -
215:10, 215:20,
234:19
**INITIAL** [5] - 240:9,
275:14, 283:1,
283:8, 287:2
**INJUNCTION** [4] -
275:8, 359:22,
360:5, 360:12
**INJURIES** [1] - 317:10
**INJURY** [2] - 315:19,
317:13
**INNOVATION** [2] -
214:18, 215:22
**INPUT** [3] - 190:22,
234:11, 244:16
**INQUIRY** [1] - 234:21

**INSIDE** [2] - 221:18, 344:14

**INSTANCE** [2] - 261:19, 344:19

**INSTEAD** [3] - 288:10, 295:19, 344:15

**INSTRUCT** [1] - 402:20

**INSTRUCTED** [1] - 258:17

**INSTRUCTION** [1] - 201:15

**INSTRUCTIONS** [3] - 291:8, 291:12, 371:14

**INSUFFICIENT** [3] - 283:19, 360:14, 365:5

**INTACT** [2] - 201:12, 400:17

**INTEGRATED** [2] - 317:23, 318:7

**INTEGRATION** [4] - 187:23, 188:2, 188:5, 188:8

**INTELLECTUAL** [1] - 203:3

**INTELLECTUALLY** [1] - 213:18

**INTELLIGENCE** [3] - 219:24, 295:15, 354:18

**INTELLIGENCE** [4] - 224:12, 271:9, 271:13, 295:19

**INTENSIVE** [5] - 187:3, 198:2, 205:14, 341:3, 345:6

**INTENT** [1] - 266:13

**INTENTIONALLY** [1] - 312:8

**INTERACT** [1] - 354:15

**INTERACTION** [3] - 237:18, 354:22, 355:18

**INTEREST** [1] - 387:6

**INTERESTING** [1] - 214:15

**INTERFERENCE** [1] - 320:16

**INTERFERENCE** [8] - 214:16, 214:19, 214:22, 214:25, 215:14, 215:21, 216:1, 229:15

**INTERNALLY** [1] - 221:17

**INTERNATIONAL** [1] - 175:4

**INTERNATIONALLY** [1] - 386:13

**INTERNED** [1] - 173:14

**INTERPRET** [3] - 201:14, 213:7, 218:8

**INTERPRETABLE** [1] - 219:5

**INTERPRETATION** [1] - 201:15

**INTERPRETED** [2] - 212:23, 293:6

**INTERRUPT** [4] - 183:18, 269:3, 305:3, 402:12

**INTERRUPTING** [1] - 284:21

**INTERVENTION** [3] - 198:2, 271:14, 398:14

**INTERVENTIONS** [1] - 271:15

**INTERVIEW** [2] - 178:9, 240:9

**INTERVIEWED** [1] - 192:14

**INTERVIEWS** [1] - 332:8

**INVALID** [1] - 219:12

**INVALIDATE** [1] - 219:12

**INVENTORY** [4] - 231:14, 250:22, 326:20, 327:1

**INVENTORY** [1] - 214:17

**INVITED** [2] - 278:1, 278:7

**INVOLVE** [1] - 276:20

**INVOLVED** [9] - 184:14, 186:12, 199:13, 205:12, 213:7, 222:3, 280:14, 305:13, 344:12

**INVOLVEMENT** [1] - 356:2

**INVOLVES** [2] - 282:19, 366:10

**INVOLVING** [1] - 182:21

**IQ** [22] - 201:3, 201:9, 201:16, 202:2, 202:9, 203:14, 203:17, 204:4, 219:20, 220:1, 222:14, 295:14, 302:15, 311:14, 311:18, 312:13, 313:1, 313:8,

334:13, 334:15, 334:16

**ISLAND** [1] - 185:11

**ISLIP** [1] - 170:5

**ISOLATE** [1] - 317:5

**ISOLATED** [2] - 315:23, 315:24

**ISSUE** [2] - 208:14, 398:17

**ISSUES** [7] - 185:25, 218:23, 235:16, 244:5, 324:4, 335:9, 398:4

**ITEM** [3] - 232:15, 233:6, 233:11

**ITEMS** [11] - 210:7, 212:4, 225:18, 227:1, 233:13, 312:19, 313:2, 376:21, 377:7, 378:8, 383:1

**ITSELF** [10] - 189:2, 218:17, 225:15, 225:18, 292:23, 312:12, 328:10, 329:17, 349:5, 373:24

**IV** [11] - 201:6, 233:8, 311:9, 311:13, 312:9, 313:8, 313:11, 322:18, 323:13, 370:18

**IVA** [1] - 318:22

**IVA-CPT** [1] - 318:22

---

### J

**JANUARY** [3] - 252:24, 253:15, 256:19

**JEANETTE** [2] - 171:12

**JEANETTE** [3] - 171:13, 171:17, 404:4

**JOAN** [1] - 170:12

**JOB** [4] - 229:13, 249:21, 272:14, 276:15

**JOEL** [1] - 175:8

**JOHNSON** [23] - 203:18, 203:21, 204:5, 204:14, 204:22, 204:25, 205:13, 212:24, 221:25, 224:16, 289:25, 294:5, 294:11, 294:12, 295:17, 295:18, 302:13, 303:10,

313:11, 353:16, 354:11, 355:2, 402:3

**JOSEPH** [1] - 175:8

**JOURNAL** [1] - 277:5

**JOURNALS** [5] - 277:3, 277:25, 278:19, 278:24, 279:1

**JUDGE** [1] - 170:12

**JUDGE** [5] - 278:22, 359:21, 360:3, 360:11, 360:15

**JUDGMENT** [1] - 374:8

**JUDGMENTS** [2] - 222:11, 366:12

**JULY** [1] - 283:25

**JUNE** [1] - 338:16

**JUNIOR** [2] - 337:18, 398:11

**JUNIORS** [1] - 337:16

**JUSTICE** [2] - 265:20, 265:24, 266:11, 267:21

---

### K

**K-R-O-O-P-N-I-C-K** [1] - 249:9

**KAPLAN** [5] - 320:1, 320:12, 320:18, 320:19, 320:21

**KEEP** [7] - 177:22, 177:25, 182:25, 321:7, 360:20, 363:2

**KEFS** [4] - 240:23, 240:25, 320:2, 320:6

**KEVIN** [5] - 383:15, 383:21, 404:15

**KEVIN** [1] - 383:21

**KEY** [2] - 318:9, 319:17

**KID** [2] - 198:21, 398:3

**KIDNEYS** [1] - 191:5

**KIDS** [6] - 195:18, 198:6, 232:21, 388:7, 390:6, 399:24

**KIM** [2] - 184:21, 185:3

**KIND** [27] - 181:19, 182:11, 183:16, 204:3, 205:22, 207:13, 230:13, 233:13, 245:8, 301:12, 309:7, 319:6, 330:4, 371:6, 381:4, 383:3, 384:5, 386:19, 388:20, 388:21, 390:20, 395:15, 397:1, 397:8, 398:14,

400:3, 400:15

**KINDS** [4] - 278:10, 320:11, 327:3, 401:21

**KNOWLEDGE** [7] - 199:10, 199:19, 213:7, 263:11, 272:10, 387:7, 401:17

**KNOWN** [6] - 176:14, 179:17, 180:10, 386:13, 386:23, 390:9

**KROOPNICK** [27] - 248:25, 249:1, 249:8, 249:21, 250:24, 251:5, 252:16, 253:1, 253:14, 254:7, 255:5, 255:20, 256:8, 256:23, 258:5, 258:11, 259:21, 260:10, 260:19, 261:6, 261:15, 261:23, 262:11, 262:24, 263:4, 263:23, 264:3

**KROOPNICK** [1] - 270:4

**KROOPNICK** [2] - 249:3, 404:8

---

### L

**L-O-V-E-T-T** [1] - 273:22

**LABEL** [2] - 187:25, 374:24

**LABELED** [1] - 249:15

**LABELS** [3] - 180:13, 201:6, 215:4

**LACK** [2] - 181:11, 339:12

**LACKS** [1] - 266:16

**LANGUAGE** [10] - 190:2, 191:10, 194:8, 195:1, 196:5, 196:12, 201:24, 295:21, 317:6, 347:9

**LANTERN** [1] - 170:17

**LARGE** [1] - 402:8

**LARGELY** [1] - 251:20, 254:12

**LARGER** [2] - 275:1, 384:2

**LAST** [6] - 183:15, 283:23, 309:12, 323:21, 333:14, 355:10

**LATITUDE** [1] -

374:19

**LAW** [4] - 257:2, 279:16, 358:7, 358:8

**LAW** [1] - 358:18

**LAWSUIT** [1] - 310:13

**LAWYERS** [1] - 238:25

**LD** [19] - 175:5, 179:5, 179:9, 197:10, 197:12, 197:14, 197:18, 207:24, 207:25, 208:5, 247:8, 279:10, 279:20, 380:7, 380:10, 391:13, 391:17, 391:19, 391:22

**LEADING** [5] - 319:10, 343:19, 386:12, 386:24

**LEADS** [1] - 299:6

**LEARN** [9] - 180:20, 180:24, 181:24, 195:19, 195:21, 238:10, 251:23, 265:5, 341:8

**LEARNED** [3] - 181:9, 223:24, 223:25

**LEARNING** [9] - 180:17, 197:20, 229:9, 229:20, 229:25, 230:5, 322:15, 322:22, 323:4

**LEARNING** [82] - 175:3, 175:9, 175:13, 176:14, 176:20, 176:23, 178:25, 180:8, 180:10, 180:14, 180:15, 180:25, 181:1, 181:10, 181:14, 181:23, 187:12, 187:13, 187:15, 187:23, 192:17, 194:7, 194:11, 195:9, 195:16, 195:19, 196:23, 197:5, 197:19, 197:20, 197:21, 198:14, 207:2, 207:6, 207:25, 229:11, 229:21, 233:24, 236:4, 236:7, 264:21, 265:8, 265:9, 265:11, 265:14, 276:13, 277:6, 277:10, 277:14, 279:12,

279:14, 279:17, 281:8, 284:12, 285:12, 285:14, 286:24, 287:17, 297:10, 297:13, 297:17, 297:23, 306:11, 306:18, 306:20, 307:6, 330:7, 330:15, 332:7, 333:1, 347:10, 348:9, 348:11, 350:15, 374:1, 391:14, 391:23, 392:1, 394:22

**LEAST** [25] - 204:17, 211:6, 248:18, 275:9, 293:1, 315:25, 316:23, 328:18, 334:3, 337:1, 340:12, 342:8, 343:19, 345:5, 346:1, 346:4, 351:21, 358:11, 358:21, 359:14, 370:11, 370:12, 371:8, 372:5, 402:5

**LEAVE** [1] - 179:10

**LED** [1] - 297:21

**LEEWAY** [3] - 374:8, 374:19, 375:3

**LEFT** [4] - 221:9, 261:4, 261:14, 384:3

**LEG** [4] - 202:21, 203:2, 221:9

**LEGAL** [2] - 366:6, 366:10

**LENGTH** [2] - 186:11, 202:23

**LENGTHY** [3] - 294:12, 319:13, 319:22

**LESS** [7] - 198:16, 202:12, 202:14, 206:11, 268:18, 268:19, 358:11

**LEST** [1] - 358:21

**LETTER** [5] - 216:12, 216:18, 217:3, 217:7, 294:19, 367:18, 368:3, 369:22, 370:10, 370:14, 372:7, 393:2, 393:11

**LETTERS** [12] - 216:5, 216:11, 295:6, 305:9, 328:25, 329:3, 329:15, 367:9, 367:15, 367:22, 368:7

**LETTING** [1] - 348:7

**LEVEL** [23] - 178:17, 203:4, 204:18, 222:5, 222:7, 222:9, 222:19, 226:21, 226:23, 232:18, 246:2, 288:5, 292:1, 292:6, 333:19, 333:20, 333:25, 334:1, 371:9, 371:10, 395:2, 399:12, 399:13

**LEVELING** [1] - 226:22

**LEVELS** [6] - 284:19, 301:16, 322:9, 331:20, 335:11, 370:4

**LIABILITY** [1] - 233:10

**LICENSED** [9] - 172:15, 172:16, 178:17, 184:22, 279:23, 279:25, 280:1, 368:20, 384:20

**LICENSING** [1] - 177:18

**LICENSING** [1] - 172:23

**LICENSURE** [2] - 280:8, 368:24

**LIFE** [18] - 182:15, 189:9, 274:11, 274:22, 285:24, 286:1, 286:24, 325:3, 350:17, 356:16, 363:11, 388:15, 395:24, 397:2, 398:2, 399:2, 401:18

**LIFESPAN** [1] - 175:10

**LIFESTYLE** [1] - 389:16

**LIFETIME** [1] - 224:5

**LIKELY** [4] - 268:19, 312:7, 319:12, 324:4

**LIMIT** [2] - 293:17, 352:10

**LIMITATION** [3] - 292:7, 292:12, 292:13

**LIMITATIONS** [8] - 274:11, 285:6, 291:22, 291:24, 293:8, 350:17, 375:12, 381:13

**LIMITED** [5] - 263:17, 274:22, 284:12, 300:13, 300:21

**LIMITS** [4] - 272:10, 291:16, 322:13, 352:13

**LIMITS** [1] - 322:2

**LIMP** [2] - 202:20, 203:3

**LINE** [4] - 212:1, 215:20, 226:18, 237:7

**LINES** [1] - 212:9

**LINGUISTIC** [1] - 229:23

**LIPID** [1] - 389:17

**LISA** [1] - 170:24

**LIST** [17] - 174:18, 191:7, 191:14, 191:15, 217:23, 229:11, 229:14, 278:6, 301:5, 313:2, 313:3, 316:15, 316:19, 345:18, 352:5, 370:21

**LIST-LEARNING** [2] - 229:11

**LISTED** [10] - 244:5, 311:8, 311:11, 316:17, 326:14, 326:16, 334:18, 337:2, 369:22

**LISTING** [4] - 277:2, 278:17, 279:7, 318:1

**LISTS** [2] - 322:22, 322:23

**LITIGATION** [4] - 282:4, 282:5, 284:1, 345:16

**LIVES** [4] - 344:11, 388:8, 389:9, 395:12

**LLP** [3] - 170:14, 170:19, 170:21

**LOCATED** [1] - 377:9

**LOG** [1] - 281:19

**LOGIC** [1] - 366:22

**LOGISTICAL** [1] - 253:9

**LOGISTICS** [1] - 403:1

**LOGO** [1] - 177:3

**LONG-TERM** [1] - 324:3

**LONG-WINDED** [1] - 214:6

**LONGITUDINAL** [1] - 388:1

**LOOK** [80] - 188:17, 189:21, 190:9, 191:4, 191:9, 196:16, 203:21, 204:2, 207:17, 207:19, 207:23, 208:14, 210:9,

216:2, 224:20, 225:25, 233:16, 247:7, 252:18, 253:20, 259:17, 259:25, 261:13, 262:5, 262:16, 273:7, 274:17, 274:23, 275:1, 277:1, 279:2, 279:6, 283:13, 283:14, 283:22, 287:9, 298:5, 298:25, 304:6, 306:6, 307:16, 309:10, 310:16, 311:7, 312:23, 319:24, 323:21, 328:6, 328:8, 329:15, 333:9, 334:23, 335:3, 335:21, 346:20, 346:21, 348:7, 352:5, 363:17, 366:10, 375:17, 378:10, 380:8, 380:16, 381:16, 384:2, 388:6, 389:19, 395:13, 395:14, 396:5, 396:6, 397:9, 399:1, 399:20, 400:20, 401:1, 401:18, 401:25

**LOOKED** [13] - 216:11, 224:8, 244:4, 246:12, 323:11, 332:13, 332:15, 342:2, 344:13, 388:8, 388:14, 389:14, 396:24

**LOOKING** [1] - 337:24

**LOOKING** [51] - 187:6, 189:13, 189:18, 198:11, 222:18, 222:24, 228:4, 230:2, 231:14, 231:15, 241:17, 245:8, 261:19, 283:12, 284:10, 286:20, 287:12, 288:3, 288:4, 288:6, 288:14, 288:17, 290:4, 292:3, 294:8, 317:16, 326:2, 332:10, 332:12, 333:14, 336:2, 336:3, 337:11, 344:20, 348:3, 348:10, 348:12, 352:20, 352:23, 371:22, 375:6,

LISA SCHMID, CCR, RMR
Official Court Reporter

A1114

380:13, 381:14, 387:25, 389:11, 394:9, 395:15, 395:22, 395:23, 396:2, 402:11

**LOOKS** [10] - 232:4, 232:24, 241:14, 278:6, 278:16, 297:3, 297:19, 322:24, 327:2, 371:12

**LOPSIDEDNESS** [1] - 221:13

**LOST** [2] - 190:6, 293:19

**LOUD** [2] - 224:13, 265:4

**LOVETT** [24] - 273:14, 273:21, 273:25, 274:2, 275:3, 283:16, 286:20, 290:3, 299:24, 303:14, 304:5, 305:16, 319:5, 328:4, 329:25, 334:11, 339:4, 340:17, 347:11, 348:20, 350:6, 350:22, 351:12, 380:6

**LOVETT** [1] - 281:6

**LOW** [24] - 211:8, 214:16, 222:5, 222:19, 228:11, 228:12, 236:14, 236:16, 236:17, 287:21, 287:23, 292:20, 293:4, 302:23, 311:16, 314:5, 317:14, 318:20, 319:3, 348:12, 376:10, 381:23, 382:5, 402:8

**LOWER** [7] - 211:3, 211:4, 220:12, 268:14, 268:15, 315:3, 315:6

**LOWEST** [2] - 228:11, 399:15

**LSATS** [1] - 177:14

**LUCKY** [1] - 192:3

**LUNCH** [2] - 227:5, 270:4

**LUNCHEON** [1] - 269:8

## M

**M-C-A-T** [1] - 250:3

**M-U-R-P-H-Y** [1] -

383:22

**MA** [1] - 178:16

**MAGNIFIERS** [1] - 244:13

**MAIL** [1] - 281:17

**MAILED** [1] - 242:23

**MAIN** [2] - 175:20, 209:24

**MAINTAIN** [1] - 272:15

**MAJOR** [9] - 194:11, 246:16, 274:11, 274:22, 350:17, 388:1, 388:9, 388:17, 388:24

**MAJORITY** [7] - 182:7, 184:20, 210:19, 211:15, 211:16, 236:20, 268:16

**MALDEVELOPMENT** [1] - 182:10

**MALINGERING** [1] - 311:24

**MALINGERING** [1] - 219:1

**MAN** [2] - 221:17, 401:22

**MANAGEMENT** [1] - 389:16

**MANAGER** [1] - 250:16

**MANDELSBERG** [15] - 170:23, 248:24, 249:11, 249:15, 249:18, 249:20, 251:4, 252:22, 255:19, 260:14, 260:18, 263:24, 266:14, 266:16, 404:10

**MANDELSBERG** [4] - 248:23, 252:18, 254:4, 256:17

**MANIFESTATIONS** [3] - 181:7, 181:8, 232:24

**MANIFESTED** [2] - 189:8, 189:9

**MANNER** [4] - 356:15, 356:20, 356:24, 357:3

**MANUAL** [2] - 180:4, 327:11

**MANUAL** [4] - 292:16, 292:23, 301:8, 377:23

**MANUALS** [1] - 366:3

**MANUSCRIPT** [1] - 278:20

**MAP** [1] - 366:8

**MARC** [1] - 248:24

**MARC** [3] - 249:3, 249:8, 404:8

**MARCH** [1] - 217:7

**MARGINALLY** [1] - 211:9

**MARITAL** [1] - 389:12

**MARK** [1] - 249:8

**MARKED** [2] - 174:3, 315:17

**MARKER** [1] - 211:20

**MARKING** [1] - 288:7

**MARY** [3] - 264:3, 387:23, 388:2

**MARY** [1] - 170:16

**MASKS** [1] - 197:11

**MASS** [2] - 386:14, 386:18

**MASSACHUSETTS** [2] - 385:18, 388:11

**MASTER** [1] - 199:9

**MASTER'S** [1] - 384:17

**MASTERS** [2] - 184:25, 276:2

**MASTERS** [1] - 173:10

**MASTERY** [6] - 333:18, 333:22, 342:3, 342:10, 342:12, 351:23

**MASTERY** [2] - 345:20, 399:11

**MATCH** [1] - 302:22

**MATERIAL** [6] - 186:8, 192:15, 199:9, 265:4, 265:5, 397:15

**MATH** [8] - 209:5, 294:13, 313:4, 313:12, 313:14, 313:16, 338:18, 338:25

**MATHEMATICS** [1] - 337:7

**MATTER** [8] - 174:3, 185:13, 186:13, 186:24, 246:6, 351:15, 360:12, 384:6

**MATTERS** [3] - 192:19, 361:4, 361:24

**MAYOR** [1] - 356:16

**MCAT** [73] - 249:22, 249:24, 250:3, 251:1, 251:10, 251:13, 251:18, 252:2, 252:4, 252:6, 252:12, 252:24, 253:11, 253:12, 253:16, 253:17, 254:2, 254:6,

254:17, 255:9, 255:17, 256:11, 256:18, 257:7, 257:12, 258:8, 258:17, 260:11, 260:16, 260:22, 260:24, 263:10, 265:17, 268:1, 268:2, 268:5, 268:8, 268:14, 268:16, 268:18, 270:7, 270:11, 270:14, 270:22, 271:3, 271:6, 271:10, 271:14, 271:15, 271:21, 272:9, 272:15, 272:16, 272:19, 272:21, 273:4, 332:14, 336:5, 336:22, 339:5, 339:7, 339:16, 339:24, 339:25, 340:3, 340:4, 340:14, 346:3, 352:23, 372:24, 373:9, 373:10

**MCAT'S** [2] - 263:15, 263:20

**MCATS** [5] - 177:14, 192:17, 267:18, 399:18, 399:19

**MD** [2] - 174:1, 364:24

**MEAN** [24] - 179:10, 188:3, 192:11, 194:11, 202:19, 203:6, 209:9, 221:3, 230:16, 231:4, 231:5, 244:21, 262:12, 279:25, 285:23, 287:1, 288:17, 289:6, 307:15, 364:15, 366:22, 370:1, 372:17, 375:1

**MEANING** [9] - 194:13, 194:15, 206:7, 218:16, 218:18, 228:13, 228:16, 228:17, 229:16

**MEANINGFUL** [2] - 292:20, 375:4

**MEANINGLESS** [1] - 202:3

**MEANS** [21] - 180:23, 201:18, 203:10, 211:19, 213:1, 213:5, 213:17, 214:16, 215:14,

224:21, 226:2, 230:17, 231:6, 262:14, 278:25, 285:24, 297:15, 306:24, 365:17, 375:11, 375:17

**MEANT** [6] - 193:10, 199:9, 209:1, 370:19, 371:10, 371:24

**MEASURE** [61] - 209:2, 209:3, 209:11, 212:11, 212:19, 215:25, 216:2, 218:23, 228:10, 228:12, 229:3, 229:12, 233:2, 233:4, 234:7, 267:7, 290:13, 290:22, 290:24, 292:14, 293:2, 293:6, 293:17, 294:11, 294:22, 295:4, 295:7, 295:14, 299:16, 300:14, 302:16, 302:19, 302:25, 303:7, 305:7, 305:11, 307:24, 308:13, 308:19, 310:20, 311:13, 311:17, 311:19, 311:21, 311:25, 313:8, 314:1, 315:25, 318:15, 320:7, 320:8, 320:24, 320:25, 324:15, 325:7, 331:6, 331:8, 341:11, 341:14, 345:1, 373:13

**MEASURED** [6] - 214:24, 215:21, 308:10, 308:11, 313:11, 326:17

**MEASURES** [61] - 204:21, 206:21, 209:7, 212:19, 216:1, 218:16, 218:17, 219:9, 225:16, 229:1, 231:8, 231:12, 234:5, 236:12, 236:15, 246:7, 246:14, 267:1, 267:4, 285:17, 287:19, 294:7, 294:13, 294:18, 295:19, 296:12, 299:12, 303:18, 304:4, 306:3,

309:24, 310:15,
310:18, 310:23,
311:4, 311:5,
311:11, 311:12,
311:20, 313:3,
313:19, 313:20,
313:22, 316:5,
318:24, 319:2,
319:3, 319:22,
321:8, 322:8, 323:1,
325:2, 325:21,
326:20, 330:20,
336:12, 336:21,
342:1, 345:10,
346:7, 355:21
**MEASURING** [9] -
214:22, 292:17,
316:6, 317:3,
320:14, 326:15,
326:16, 341:13,
344:2
**MECHANISM** [1] -
271:19
**MECHANISMS** [1] -
175:25
**MEDICAL** [1] - 170:7
**MEDICAL** [23] -
173:21, 177:18,
182:21, 194:3,
238:25, 249:23,
250:8, 274:6, 339:4,
357:16, 357:23,
358:6, 359:13,
359:16, 360:1,
360:8, 360:19,
360:25, 361:5,
364:7, 364:21,
391:2, 391:3
**MEDICAL** [43] -
173:22, 177:7,
177:15, 177:17,
191:20, 191:25,
192:1, 199:3, 199:7,
217:19, 231:3,
250:5, 250:10,
251:21, 251:23,
252:2, 264:5, 265:8,
268:11, 271:22,
271:25, 272:2,
272:5, 272:16,
328:17, 340:5,
340:7, 340:11,
340:14, 343:16,
343:20, 345:17,
345:19, 346:3,
346:7, 346:10,
349:10, 361:7,
368:13, 385:17,
385:18, 396:17,
397:8

**MEDICATED** [1] -
216:25
**MEDICATION** [8] -
217:8, 217:16,
329:14, 329:16,
329:21, 368:6, 401:5
**MEDICATIONS** [2] -
329:13, 368:21
**MEDICINE** [1] - 239:3
**MEDICINES** [1] -
182:17
**MEET** [7] - 282:11,
297:16, 306:22,
374:13, 374:15,
375:7, 395:16
**MEETS** [3] - 330:7,
330:12, 370:18
**MEMBERS** [2] - 193:9,
286:11
**MEMBERSHIP** [1] -
375:5
**MEMORY** [34] -
188:21, 189:22,
190:2, 191:10,
207:5, 212:20,
213:2, 213:8,
213:21, 213:22,
213:23, 229:21,
232:19, 302:19,
303:25, 304:4,
304:17, 306:10,
306:15, 311:5,
311:25, 317:8,
317:15, 322:24,
323:1, 323:11,
323:18, 323:20,
323:25, 324:3,
324:13, 324:14
**MEMORY** [8] - 311:24,
317:5, 322:15,
322:18, 323:3,
323:8, 323:13,
323:19
**MEN** [1] - 232:17
**MENTAL** [4] - 188:4,
207:4, 229:5, 371:17
**MENTALLY** [2] -
213:3, 283:10
**MENTION** [10] - 293:8,
303:21, 309:4,
330:6, 335:11,
336:13, 348:11,
368:5, 371:12, 372:5
**MENTIONED** [24] -
188:1, 196:1,
277:20, 283:21,
293:12, 296:17,
303:7, 305:5, 313:1,
316:20, 321:13,
323:10, 331:5,

331:23, 332:5,
332:9, 335:5,
336:23, 337:1,
353:9, 370:3,
371:22, 374:7, 381:9
**MENTIONS** [3] -
299:7, 309:1, 332:24
**MENTOR** [1] - 386:13
**MERITS** [1] - 260:4
**MET** [20] - 234:6,
235:18, 240:1,
242:13, 243:2,
243:11, 264:6,
264:7, 274:19,
297:22, 308:4,
329:7, 351:14,
356:1, 359:18,
359:22, 360:4,
367:11, 371:3,
381:12
**METAPHORICAL** [1] -
202:20
**METHODS** [1] -
278:23
**METRIC** [1] - 381:6
**MEW** [40] - 170:20,
183:18, 238:23,
247:22, 248:10,
248:15, 248:19,
273:13, 273:24,
281:6, 306:8, 315:2,
318:1, 318:3,
318:17, 321:17,
348:16, 348:19,
350:21, 351:5,
379:18, 379:21,
379:23, 380:2,
380:5, 383:4, 383:9,
383:24, 391:24,
392:9, 392:19,
402:17, 402:25,
403:5, 403:9,
403:16, 404:7,
404:12, 404:14,
404:16
**MEW** [1] - 238:24
**MIC** [1] - 187:6
**MICHAEL'S** [1] - 207:1
**MICHAELS** [9] -
207:24, 208:12,
225:3, 230:22,
289:18, 289:22,
293:10, 295:8, 296:8
**MICHEL'S** [4] -
375:21, 377:19,
377:24, 401:7
**MICHELS** [11] -
200:15, 200:19,
203:15, 205:19,
206:3, 235:13,

280:19, 297:3,
297:9, 297:10, 298:1
**MICHELS'** [6] -
200:18, 296:1,
297:19, 332:23,
333:9, 342:2
**MICROPHONE** [3] -
251:2, 352:14,
383:20
**MIDDLE** [7] - 212:14,
288:22, 289:3,
319:6, 330:4, 382:17
**MIGHT** [24] - 179:16,
202:23, 215:8,
215:11, 248:10,
274:13, 279:1,
291:13, 293:18,
297:21, 306:5,
309:7, 310:10,
311:15, 312:7,
317:14, 321:4,
321:5, 333:12,
348:15, 372:23,
377:3, 396:8, 397:15
**MILLER** [14] - 184:16,
185:3, 185:13,
185:15, 185:18,
185:25, 280:20,
312:22, 316:5,
322:16, 327:16,
330:24, 331:5,
331:23
**MILLER** [5] - 239:24,
240:12, 241:7,
310:9, 310:16
**MILWAUKEE** [1] -
388:2
**MIND** [4] - 175:6,
189:12, 242:6, 290:3
**MINDFUL** [1] - 218:11
**MINDSET** [2] - 347:25,
348:3
**MINIMAL** [2] - 199:10,
222:9
**MINOR** [3] - 242:8,
242:10, 396:1
**MINORITY** [7] -
268:10, 268:13,
268:15, 268:17,
268:18, 268:21,
395:24
**MINUS** [1] - 224:21
**MINUTE** [12] - 219:21,
227:6, 290:24,
290:25, 291:2,
291:4, 291:6,
292:15, 329:24,
348:15, 350:24,
387:15
**MINUTES** [17] - 205:1,

205:5, 206:4, 206:5,
222:17, 225:9,
225:11, 225:13,
226:25, 227:1,
248:11, 255:2,
255:7, 293:17,
305:2, 379:19,
379:22
**MISCONCEPTION** [1]
- 341:7
**MISINTERPRETED** [1]
- 194:7
**MISS** [1] - 235:24
**MISSED** [1] - 235:23
**MISSING** [4] - 283:12,
295:2, 370:11,
370:12
**MISTAKENLY** [1] -
233:21
**MITIGATING** [2] -
267:1, 267:4
**MIX** [1] - 376:20
**MODALITIES** [1] -
319:10
**MODELS** [1] - 215:23
**MOM** [1] - 195:9
**MOMENT** [3] - 200:23,
207:23, 291:2
**MONEY** [1] - 179:18
**MONITORED** [1] -
217:14
**MONTH** [2] - 217:21,
339:1
**MONTHS** [5] - 186:17,
208:13, 210:11,
267:12, 371:8
**MOOD** [1] - 389:5
**MORGAN** [1] - 175:8
**MORNING** [4] -
238:24, 264:3,
402:22, 403:14
**MOST** [50] - 175:7,
175:14, 175:21,
182:11, 185:14,
186:3, 192:11,
194:14, 194:19,
197:16, 199:7,
199:10, 203:11,
204:14, 220:2,
221:6, 221:8,
221:14, 222:23,
226:4, 232:20,
236:19, 237:2,
240:12, 252:1,
259:19, 260:2,
270:14, 277:8,
288:19, 289:3,
289:5, 289:6, 311:5,
311:11, 340:3,
345:6, 350:18,

LISA SCHMID, CCR, RMR
Official Court Reporter

A1116

361:3, 366:2, 366:6, 366:20, 367:1, 367:4, 381:13, 382:15, 389:1, 389:7

**MOST** [3] - 175:24, 176:13, 340:4

**MOSTLY** [3] - 385:7, 397:15, 402:5

**MOTHER** [1] - 340:18

**MOTION** [1] - 170:11

**MOTIVATED** [1] - 244:11

**MOTIVATION** [4] - 218:14, 218:18, 218:21, 310:21

**MOTOR** [10] - 187:18, 187:23, 188:2, 188:5, 188:9, 188:10, 212:21, 213:10, 389:13

**MOUNT** [6] - 177:2, 177:3, 177:7, 239:3, 239:19, 239:25

**MOVE** [9] - 230:18, 251:2, 274:20, 295:11, 309:6, 347:22, 352:15, 381:12, 389:25

**MOVED** [4] - 185:12, 195:20, 227:4, 241:7

**MOVES** [1] - 352:14

**MOVING** [2] - 317:1, 328:24

**MOVING** [1] - 332:1

**MR** [41] - 171:2, 171:4, 171:16, 171:20, 174:6, 174:8, 183:20, 183:22, 184:8, 227:10, 232:1, 238:18, 247:24, 248:2, 248:24, 249:11, 249:15, 249:18, 249:20, 251:4, 252:22, 255:19, 260:14, 260:18, 263:24, 266:14, 266:16, 270:19, 273:12, 281:12, 351:9, 351:11, 352:17, 363:1, 379:15, 383:6, 392:6, 404:5, 404:6, 404:9, 404:13

**MS** [49] - 183:18, 238:23, 247:22, 248:6, 248:10, 248:15, 248:19, 264:2, 266:18, 269:1, 269:5, 270:3,

273:10, 273:13, 273:24, 281:6, 306:8, 315:2, 318:1, 318:3, 318:17, 321:17, 348:16, 348:19, 350:21, 350:25, 351:5, 379:18, 379:21, 379:23, 380:2, 380:5, 383:4, 383:9, 383:24, 391:24, 392:9, 392:19, 402:17, 402:20, 402:25, 403:5, 403:9, 403:16, 404:7, 404:11, 404:12, 404:14, 404:16

**MULTIPLE** [15] - 183:14, 192:16, 193:12, 234:18, 252:7, 270:15, 272:5, 285:2, 290:18, 325:1, 331:14, 334:16, 395:19, 395:24, 396:3

**MURPHY** [8] - 383:9, 383:21, 383:25, 384:15, 389:24, 391:24, 392:10, 403:6

**MURPHY** [2] - 383:15, 404:15

**MURPHY'S** [1] - 246:18

**MUST** [1] - 370:19

**MUTED** [1] - 255:21

# N

**NAME** [16] - 171:10, 212:12, 249:6, 264:3, 270:24, 273:19, 274:1, 306:18, 313:4, 320:17, 358:14, 369:16, 383:19, 384:3, 394:9, 394:10

**NARRATIVE** [3] - 287:14, 378:18, 378:25

**NARROWER** [1] - 179:20

**NATIONAL** [18] - 182:21, 238:25, 274:6, 357:16, 357:22, 358:13, 358:19, 359:12, 359:15, 360:1,

360:7, 360:19, 360:24, 361:5, 364:7, 364:21, 391:2, 391:3

**NATIONAL** [1] - 170:7

**NATIONAL** [4] - 298:24, 338:16, 338:22, 393:5

**NATIONALLY** [2] - 339:2, 339:3

**NATIONWIDE** [1] - 338:24

**NATURAL** [2] - 388:6, 388:14

**NATURE** [5] - 182:8, 192:21, 214:21, 231:4, 297:12

**NAVAL** [1] - 250:22

**NAVY** [1] - 250:22

**NBME** [28] - 183:1, 183:3, 191:21, 270:5, 270:13, 274:3, 274:14, 275:7, 281:1, 281:6, 281:16, 281:17, 282:1, 283:17, 283:23, 284:3, 348:5, 357:6, 357:19, 361:25, 363:24, 364:1, 364:25, 391:24, 392:12, 393:16, 393:18, 393:24

**NBOME** [1] - 357:23

**NBOME'S** [1] - 364:18

**NE** [1] - 170:15

**NEAT** [1] - 232:14

**NECESSARILY** [4] - 240:25, 267:17, 308:12, 324:12

**NEED** [38] - 179:20, 189:24, 190:11, 209:16, 213:16, 217:12, 217:13, 237:17, 248:10, 255:24, 256:2, 258:12, 259:7, 263:11, 263:15, 263:20, 267:23, 280:2, 280:3, 280:5, 308:13, 309:7, 324:19, 325:25, 326:9, 329:25, 335:11, 339:13, 349:21, 353:8, 354:14, 354:22, 365:5, 368:7, 370:5, 373:11, 373:24

**NEEDED** [7] - 198:21, 226:20, 231:1,

346:23, 397:15, 397:16, 401:4

**NEEDFULLY** [1] - 198:16

**NEEDING** [1] - 397:7

**NEEDS** [19] - 212:23, 217:18, 226:17, 238:8, 238:17, 274:12, 274:24, 283:20, 286:23, 325:8, 336:3, 339:19, 343:13, 346:17, 350:10, 350:19, 373:17, 381:17

**NEGATIVE** [3] - 397:20, 397:24, 400:12

**NEGATIVELY** [1] - 371:10

**NELSON** [52] - 202:7, 203:18, 204:7, 204:8, 204:16, 204:20, 204:24, 205:3, 205:12, 205:15, 205:18, 206:3, 209:8, 209:9, 209:10, 209:12, 209:13, 209:16, 209:19, 209:22, 209:25, 210:1, 225:1, 226:12, 236:15, 247:11, 290:1, 290:2, 290:5, 290:6, 290:7, 291:9, 291:16, 291:18, 291:22, 293:10, 296:4, 296:5, 314:1, 314:3, 314:5, 315:9, 315:12, 315:24, 316:1, 316:3, 316:10, 330:21, 330:25, 355:5, 375:25, 377:23

**NELSON-DENNY** [52] - 202:7, 203:18, 204:7, 204:8, 204:16, 204:20, 204:24, 205:3, 205:12, 205:15, 205:18, 206:3, 209:8, 209:9, 209:10, 209:12, 209:13, 209:16, 209:19, 209:22, 209:25, 225:1, 226:12, 236:15, 247:11, 290:1, 290:2, 290:5, 290:6, 290:7, 291:9,

291:16, 291:18, 291:22, 293:10, 296:4, 296:5, 314:1, 314:3, 314:5, 315:9, 315:12, 315:24, 316:1, 316:3, 316:10, 330:21, 330:25, 355:5, 375:25, 377:23

**NERVOUS** [2] - 239:7, 239:9

**NEURO** [6] - 181:13, 212:11, 214:1, 227:12, 227:16, 276:13

**NEURO-DEVELOPMENTAL** [1] - 276:13

**NEURO-PSYCHOLOGICAL** [3] - 212:11, 227:12, 227:16

**NEURO-TYPICAL** [2] - 181:13, 214:1

**NEUROCOGNITIVE** [4] - 190:15, 191:9, 213:14, 213:15

**NEURODEVELOPMENT** [3] - 285:20, 286:22, 287:4

**NEURODEVELOPMENTAL** [10] - 182:7, 182:10, 296:17, 299:3, 306:10, 306:15, 306:17, 306:24, 308:3, 374:5

**NEUROPSYCH** [7] - 189:15, 203:19, 213:7, 230:10, 325:15, 325:21, 328:19

**NEUROPSYCHOLOGICAL** [2] - 190:1, 317:2

**NEUROPSYCHOLOGICAL** [27] - 181:25, 184:19, 189:20, 189:21, 190:8, 190:25, 192:10, 234:24, 239:14, 239:17, 264:8, 303:18, 304:18, 310:8, 317:4, 317:6, 317:18, 325:19, 325:24, 326:4, 326:8, 361:1, 361:14, 361:15, 361:18, 382:3, 402:9

**NEUROPSYCHOLOGIST** [3] - 172:3,

172:10, 369:4
**NEUROPSYCHOLO
GISTS** [1] - 178:12
**NEUROPSYCHOLO
GY** [8] - 172:6,
172:19, 172:22,
173:17, 173:18,
173:19, 174:25,
185:11
**NEUROPSYCHOLO
GY** [1] - 175:8
**NEUROSCIENCE** [1] -
173:12
**NEVER** [21] - 193:25,
195:15, 198:15,
241:22, 264:6,
264:8, 264:11,
267:20, 268:8,
292:6, 301:11,
356:3, 356:5,
356:14, 356:23,
357:2, 358:23,
358:24, 359:6,
389:10, 397:1
**NEW** [5] - 228:5,
229:17, 283:13,
306:17, 321:9
**NEW** [1] - 170:1
**NEW** [10] - 170:5,
170:22, 171:24,
256:19, 257:2,
280:1, 358:5, 369:1
**NEWER** [1] - 233:2
**NEXT** [16] - 206:22,
222:20, 231:18,
248:5, 258:4,
258:21, 259:15,
269:9, 311:19,
314:7, 317:1,
338:21, 362:3,
371:18, 383:8, 393:9
**NIGHT** [1] - 344:14
**NINE** [10] - 207:20,
211:22, 212:13,
261:21, 301:5,
301:23, 303:21,
305:6, 378:14,
378:20
**NINTH** [1] - 337:25
**NOBODY 'S** [1] -
202:10
**NON** [7] - 207:2,
207:4, 207:7,
207:25, 210:21,
228:17, 300:3
**NON-
CONSERVATIVE** [1]
- 228:17
**NON-DISABLED** [1] -
300:3

**NON-DYSLEXIC** [1] -
210:21
**NON-SPECIFIC** [2] -
207:7, 207:25
**NON-SPECIFIED** [1] -
207:4
**NON-VERBAL** [1] -
207:2
**NONDISABLED** [1] -
328:14
**NONDOMINANT** [1] -
325:12
**NONE** [3] - 205:12,
246:2, 400:6
**NONETHELESS** [1] -
373:14, 374:16
**NONVERBAL** [2] -
180:10, 334:20
**NORM** [3] - 225:22,
292:8, 365:12
**NORMAL** [12] -
188:18, 188:19,
197:4, 199:24,
211:8, 215:6, 221:5,
232:24, 322:13,
382:16, 389:2
**NORMAL** [1] - 322:2
**NORMALLY** [1] -
274:25
**NORMS** [16] - 202:16,
209:17, 209:19,
209:22, 209:23,
232:14, 291:25,
292:6, 292:9,
292:10, 293:13,
296:7, 299:21,
338:7, 338:16
**NOS** [4] - 180:9,
207:24, 207:25,
208:5
**NOTABLE** [1] - 220:13
**NOTE** [4] - 253:14,
258:12, 311:2, 316:4
**NOTED** [3] - 242:11,
298:6, 329:14
**NOTES** [5] - 207:12,
261:4, 298:23,
347:16, 401:14
**NOTHING** [5] -
193:20, 213:17,
273:17, 383:2, 383:6
**NOTICE** [4] - 201:10,
215:5, 262:17,
371:24
**NOTICEABLE** [1] -
396:19
**NOTICED** [6] - 177:2,
202:5, 283:11, 372:4
**NOTWITHSTANDING**
[1] - 225:25

**NOVEMBER** [2] -
217:6, 393:2
**NOWHERE** [1] - 272:1
**NUMBER** [16] -
200:24, 205:15,
216:5, 224:21,
225:8, 232:18,
300:25, 318:19,
334:25, 358:10,
363:5, 377:7, 381:2,
396:15, 396:16,
402:9
**NUMBERS** [11] -
200:20, 201:1,
201:3, 201:7,
201:14, 202:3,
305:9, 312:15,
312:17, 321:3
**NURSING** [1] - 391:8
**NVLD** [1] - 180:11
**NW** [1] - 170:19

## O

**O'CLOCK** [1] - 403:13
**OATH** [1] - 171:18
**OBJECTION** [2] -
266:14, 270:19
**OBJECTIVE** [2] -
343:6, 348:23
**OBSCURE** [1] -
313:23
**OBSERVATION** [2] -
238:7, 357:5
**OBSERVATIONS** [5] -
186:10, 297:4,
298:7, 332:8, 352:19
**OBSERVE** [4] -
356:15, 356:19,
356:23, 357:2
**OBSERVED** [5] -
264:11, 264:20,
264:24, 265:3, 265:7
**OBSERVED** [2] -
356:18, 356:22
**OBSERVERS** [1] -
193:11
**OBTAIN** [4] - 298:21,
342:25, 345:11
**OBTAINED** [1] -
245:19
**OBTAINING** [2] -
192:9, 243:22
**OBVIOUS** [1] - 219:4
**OBVIOUSLY** [1] -
276:17
**OCCASION** [3] -
179:6, 207:15, 208:9
**OCCASIONALLY** [1] -
317:21

**OCCASIONS** [1] -
193:12
**OCCUPATIONAL** [2] -
285:7, 371:11
**OCCUR** [2] - 183:10,
358:20
**OCCURRED** [2] -
186:13, 379:13
**OCCURS** [1] - 202:12
**OCTOBER** [4] -
186:17, 241:25,
338:21, 403:19
**OCTOBER** [1] - 170:7
**ODD** [1] - 307:19
**OF** [3] - 170:1, 170:7,
170:11
**OFFER** [1] - 274:9
**OFFERED** [1] - 329:5
**OFFERS** [2] - 281:6,
391:24
**OFFICE** [1] - 247:13
**OFFICERS** [2] -
251:20, 251:25
**OFFICIAL** [8] - 254:6,
254:17, 291:12,
301:7, 301:8,
327:10, 336:12,
358:14
**OFFICIALLY** [1] -
291:8
**OFTEN** [40] - 176:15,
179:17, 181:16,
182:19, 187:19,
193:17, 194:6,
195:13, 198:4,
200:24, 217:18,
235:23, 237:16,
283:10, 283:12,
286:5, 286:9,
286:12, 287:14,
290:10, 290:11,
292:7, 292:12,
296:24, 300:13,
301:11, 301:12,
318:15, 318:19,
346:20, 346:22,
347:16, 349:18,
360:18, 361:4,
364:2, 364:17,
387:18, 391:16,
391:17
**OFTEN** [1] - 361:9
**OKEY** [1] - 248:3
**OKEY-DOKEY** [1] -
248:3
**OLD** [2] - 232:17,
321:9
**OLDER** [2] - 209:18,
287:7
**OLDS** [1] - 286:6

**OLSAT** [3] - 334:8,
334:12, 352:7
**ON-CAMPUS** [1] -
280:17
**ONCE** [5] - 217:21,
223:23, 257:3,
358:15, 365:1
**ONCE** [1] - 359:15
**ONE** [148] - 172:18,
176:7, 180:20,
181:8, 182:6, 188:2,
191:13, 191:18,
192:11, 193:6,
193:8, 194:14,
194:25, 196:1,
197:11, 202:12,
202:14, 202:21,
202:22, 203:2,
207:3, 212:14,
215:12, 215:25,
216:1, 216:2,
216:25, 217:18,
219:3, 219:11,
219:14, 220:12,
221:7, 221:14,
222:2, 222:13,
223:21, 229:1,
229:5, 229:14,
233:23, 234:7,
234:19, 238:25,
240:2, 240:22,
245:12, 249:15,
250:21, 251:24,
257:24, 258:10,
258:23, 259:3,
259:5, 259:8,
259:13, 259:14,
259:23, 260:7,
261:25, 267:3,
268:13, 268:17,
270:14, 271:1,
272:5, 274:22,
278:15, 279:12,
279:14, 279:15,
283:8, 287:18,
288:20, 290:8,
290:16, 290:24,
290:25, 291:2,
291:4, 291:6, 291:9,
291:23, 292:7,
292:8, 292:12,
294:3, 294:19,
295:14, 302:5,
302:8, 303:9,
303:15, 305:7,
305:12, 305:23,
305:24, 307:20,
312:13, 315:15,
317:22, 319:2,
321:14, 328:18,

331:6, 334:19, 335:5, 342:18, 344:12, 344:14, 344:21, 351:17, 351:23, 352:18, 354:4, 355:10, 356:1, 361:3, 365:7, 367:6, 367:7, 367:17, 368:1, 368:3, 370:11, 370:12, 372:17, 374:4, 375:7, 376:10, 376:14, 376:17, 380:25, 381:17, 384:2, 387:14, 388:1, 388:25, 392:15, 394:19, 395:24, 396:1, 396:16, 399:7, 399:22, 400:7

**ONE** [6] - 176:5, 305:19, 328:15, 332:23, 351:5, 351:6

**ONE'S** [1] - 367:22

**ONES** [9] - 181:19, 181:20, 200:20, 240:17, 242:10, 358:20, 359:8, 397:20, 397:25

**ONGOING** [1] - 243:19

**ONSET** [9] - 285:25, 296:19, 370:5, 371:23, 395:17, 395:22, 396:11, 396:12, 396:14

**OPERATE** [3] - 237:21, 237:25, 238:1

**OPERATING** [1] - 237:13

**OPERATIONAL** [1] - 251:8

**OPERATIONS** [1] - 250:23

**OPERATOR** [1] - 391:9

**OPINE** [1] - 196:11

**OPINION** [17] - 179:4, 262:24, 263:4, 284:7, 305:16, 307:9, 319:15, 324:6, 325:20, 330:17, 331:4, 331:17, 350:7, 361:23, 367:14, 394:17

**OPINIONS** [6] - 274:9, 281:3, 380:21, 393:20, 393:21, 394:13

**OPPORTUNITY** [5] - 356:5, 356:15, 356:19, 356:23, 357:2

**OPPOSED** [2] - 209:25, 323:11

**OPPOSITION** [1] - 275:8

**OPTIONS** [3] - 270:7, 270:10, 270:12

**ORAL** [3] - 173:1, 224:13, 224:19

**ORDER** [15] - 198:21, 199:13, 213:16, 217:19, 244:11, 248:11, 259:8, 263:10, 263:14, 263:19, 264:21, 272:21, 312:16, 312:18, 347:15

**ORDINARILY** [1] - 203:22

**ORGANIZATION** [3] - 195:24, 250:9, 250:14

**ORGANIZATIONS** [3] - 250:19, 390:23, 390:25

**ORGANIZE** [1] - 320:9

**ORGANIZING** [1] - 371:15

**ORIGINALLY** [2] - 180:17, 317:9

**OSTEOPATHIC** [5] - 357:16, 357:23, 360:8, 364:7, 391:3

**OSTEOPATHIC** [1] - 357:19

**OSTERRIETH** [5] - 320:3, 320:4, 322:10, 323:9, 323:18

**OSTRICH** [3] - 212:13, 212:15, 230:19

**OTHERWISE** [8] - 180:20, 218:8, 297:11, 297:13, 297:15, 306:18, 306:21, 349:10

**OUTCOME** [1] - 389:22

**OUTCOMES** [1] - 353:7

**OUTDATED** [1] - 183:16

**OUTLINES** [1] - 371:2

**OUTPUT** [1] - 212:21

**OUTREACH** [1] - 278:2

**OUTSIDE** [2] - 193:11,

372:19

**OUTSTANDING** [1] - 401:15

**OVERALL** [4] - 328:20, 366:15, 394:17, 397:23

**OVERALL** [2] - 201:19, 205:5

**OVERCOME** [1] - 264:21

**OVERESTIMATE** [3] - 344:5, 344:18, 344:24

**OVERREPORT** [1] - 244:10

**OVERRULED** [1] - 266:15

**OVERSEE** [1] - 251:7

**OVERVIEW** [2] - 253:23, 254:1

**OWN** [16] - 184:11, 184:23, 216:8, 216:9, 234:20, 235:5, 292:22, 328:10, 353:10, 353:25, 363:25, 364:15, 386:25, 401:15, 403:5, 403:6

---

# P

**PA** [1] - 170:18

**PACE** [1] - 200:4

**PACK** [1] - 321:16

**PAGE** [101] - 191:13, 191:14, 191:18, 194:22, 196:16, 197:22, 198:23, 200:14, 201:7, 203:21, 204:17, 206:22, 207:19, 208:15, 210:9, 211:22, 212:13, 214:10, 216:18, 217:22, 218:2, 220:4, 220:5, 221:11, 221:24, 222:20, 223:8, 227:19, 229:8, 231:8, 231:18, 241:17, 241:20, 244:9, 252:23, 253:21, 254:21, 254:22, 255:1, 256:18, 257:14, 257:17, 257:21, 258:21, 259:15, 269:9, 278:5, 278:6, 278:16, 290:4, 290:5, 290:16,

290:17, 294:8, 301:5, 301:22, 301:23, 303:21, 305:6, 305:11, 306:6, 306:7, 309:10, 310:16, 313:13, 314:7, 317:25, 319:5, 319:6, 322:14, 323:7, 323:22, 325:4, 325:5, 326:12, 330:1, 331:7, 333:11, 333:15, 338:22, 362:3, 371:18, 375:22, 377:9, 378:14, 378:17, 378:20, 379:1, 385:25, 386:1

**PAGE** [1] - 404:2

**PAGE** [2] - 194:2, 318:3

**PAGES** [9] - 204:17, 216:4, 221:21, 227:11, 227:15, 277:1, 279:6, 319:24, 347:15

**PAI** [4] - 231:10, 231:13, 232:2, 232:6

**PAID** [7] - 179:7, 281:22, 282:1, 282:4, 393:23, 394:1, 394:3

**PAPER** [2] - 287:11, 287:12

**PAPERWORK** [1] - 359:6

**PARAGRAPH** [9] - 204:15, 309:12, 319:7, 323:21, 330:4, 333:14, 369:18, 379:5

**PARAGRAPHS** [2] - 204:17, 223:15

**PARALLEL** [1] - 176:24

**PARAMETERS** [1] - 389:17

**PARENT** [2] - 244:17, 302:3

**PARENTHESES** [1] - 258:24

**PARENTING** [1] - 389:15

**PARENTS** [16] - 192:16, 193:3, 193:9, 193:14, 198:3, 198:11, 245:2, 245:22, 302:1, 302:10,

390:5, 390:6, 390:7, 396:20, 398:16

**PARSE** [1] - 190:11

**PART** [57] - 173:14, 189:19, 190:24, 192:9, 203:16, 213:3, 216:15, 218:6, 218:7, 218:18, 239:18, 247:4, 270:25, 271:4, 271:5, 271:7, 272:14, 280:9, 284:1, 287:4, 289:19, 290:12, 290:14, 290:24, 293:9, 296:14, 296:16, 297:6, 297:15, 298:18, 299:4, 299:12, 304:2, 308:17, 312:10, 312:17, 318:18, 318:19, 322:19, 323:14, 331:21, 332:3, 336:10, 336:25, 337:21, 345:15, 352:21, 353:14, 380:7, 388:9, 388:10, 391:13, 395:20, 397:13, 398:8, 398:11

**PARTIAL** [3] - 369:23, 370:1, 371:25

**PARTICIPATE** [1] - 339:14

**PARTICULAR** [31] - 186:13, 208:3, 215:23, 222:16, 224:18, 227:22, 228:10, 228:22, 230:25, 234:5, 236:12, 237:12, 246:13, 271:5, 276:10, 276:18, 302:25, 305:17, 306:23, 307:4, 311:10, 322:10, 334:22, 348:3, 353:21, 354:23, 364:11, 376:22, 384:22, 387:12, 391:10

**PARTICULARLY** [9] - 176:5, 276:12, 305:23, 309:10, 327:10, 332:7, 344:11, 349:25, 373:15

**PARTNER** [2] - 193:14, 245:5

**PARTNERS** [1] - 193:9

**PARTS** [9] - 192:12, 221:19, 290:7, 302:14, 304:3, 311:12, 320:20, 333:21, 335:2

**PASS** [10] - 172:20, 172:23, 179:23, 199:7, 199:11, 199:13, 199:15, 200:10, 205:22, 280:8

**PASSAGE** [23] - 256:14, 257:23, 257:24, 258:19, 258:23, 259:3, 259:5, 259:8, 259:12, 259:14, 259:23, 260:4, 260:7, 270:24, 271:4, 271:5, 271:7, 272:22, 272:23, 290:18, 290:20, 291:1, 295:1

**PASSAGES** [15] - 204:16, 205:6, 209:14, 209:15, 225:8, 256:10, 257:22, 258:13, 263:1, 263:7, 273:6, 290:15, 291:19, 295:2, 313:24

**PASSED** [3] - 173:21, 199:19, 353:2

**PAST** [4] - 233:13, 233:15, 358:21, 359:3

**PATH** [1] - 211:19

**PATIENT** [7] - 185:22, 191:7, 353:20, 354:19, 354:23, 355:19, 372:18

**PATIENTS** [6] - 176:12, 176:13, 177:20, 387:8, 390:8, 401:16

**PATTERN** [5] - 324:1, 379:11, 379:12, 394:25, 395:18

**PAUSE** [8] - 200:23, 252:21, 254:24, 255:18, 256:21, 369:19, 383:12, 392:18

**PAY** [1] - 286:18

**PAYING** [1] - 237:17

**PEER** [4] - 277:3, 277:5, 277:25, 278:19

**PEERS** [5] - 309:18, 313:20, 323:25, 400:18, 401:3

**PEGBOARD** [2] - 325:6, 325:8

**PEGS** [1] - 325:9

**PENN** [1] - 276:4

**PEOPLE** [3] - 181:16, 344:5, 344:24

**PEOPLE** [95] - 176:23, 178:18, 179:5, 179:6, 179:12, 179:18, 181:2, 181:9, 181:16, 181:22, 184:21, 184:25, 197:10, 198:1, 198:14, 202:9, 202:16, 203:11, 206:7, 206:11, 207:12, 207:14, 209:20, 210:19, 210:21, 210:22, 211:12, 211:13, 211:16, 213:15, 217:1, 218:19, 221:6, 221:8, 221:10, 222:24, 225:24, 226:10, 226:15, 227:25, 228:14, 237:2, 237:7, 244:10, 266:8, 267:8, 267:11, 267:12, 278:21, 284:21, 287:6, 289:5, 289:6, 291:9, 291:24, 292:2, 297:1, 299:23, 300:11, 300:14, 301:19, 305:22, 311:15, 312:3, 317:9, 328:14, 340:3, 340:4, 340:6, 341:7, 342:11, 342:25, 343:7, 344:18, 344:23, 348:24, 349:14, 350:18, 363:13, 363:18, 365:15, 366:6, 366:19, 366:20, 366:25, 367:1, 367:4, 381:13, 382:22, 387:4, 389:2, 389:21, 395:23

**PEOPLE'S** [7] - 188:17, 199:8, 239:23, 296:23, 299:25, 389:9, 395:12

**PER** [4] - 260:12, 328:22, 361:15, 394:2

**PERCEIVED** [2] - 326:24, 344:4

**PERCENT** [24] - 195:5, 202:12, 202:14, 221:4, 221:10, 229:2, 262:15, 262:18, 262:21, 262:23, 288:22, 289:4, 312:5, 328:17, 339:2, 344:23, 364:8, 365:17, 366:19, 366:25, 367:4, 381:17, 381:18, 382:18

**PERCENTAGE** [1] - 181:18

**PERCENTILE** [65] - 196:24, 196:25, 199:21, 200:22, 200:25, 201:22, 206:7, 206:10, 206:14, 206:16, 206:19, 211:3, 211:5, 211:10, 212:25, 220:12, 220:21, 221:1, 221:7, 222:12, 222:15, 224:4, 224:10, 225:20, 228:13, 229:16, 262:6, 262:13, 262:17, 262:25, 263:5, 263:14, 263:19, 271:9, 288:21, 288:24, 289:1, 328:19, 334:6, 337:7, 337:8, 337:10, 338:17, 338:18, 338:20, 338:25, 339:3, 340:10, 365:9, 365:14, 366:1, 366:2, 376:10, 376:15, 377:3, 377:6, 377:21, 377:24, 382:6, 382:11, 399:9, 399:16, 399:17, 399:19

**PERCENTILES** [4] - 337:12, 337:15, 376:3, 382:4

**PERCEPTION** [4] - 188:7, 220:16, 221:16, 344:11

**PERCEPTIONAL** [1] -

220:24

**PERCEPTIONS** [1] - 343:4

**PERCEPTUAL** [1] - 203:8

**PERFECT** [4] - 195:7, 249:18, 376:20, 377:5

**PERFORM** [23] - 198:21, 205:18, 206:2, 206:13, 224:3, 226:21, 228:10, 230:23, 267:19, 268:17, 280:16, 293:9, 293:18, 294:17, 299:14, 300:18, 313:6, 313:16, 317:17, 320:19, 337:5, 339:24, 366:19

**PERFORMANCE** [66] - 189:18, 190:11, 208:3, 214:14, 216:2, 218:3, 221:15, 229:2, 234:22, 235:6, 236:14, 246:24, 246:25, 247:10, 254:16, 267:6, 271:16, 285:7, 294:21, 294:25, 295:3, 295:7, 295:12, 296:10, 296:11, 298:23, 299:15, 299:22, 299:25, 303:1, 304:3, 305:17, 310:24, 315:24, 317:12, 317:14, 317:18, 318:24, 319:8, 319:16, 319:21, 320:1, 320:21, 321:18, 322:5, 322:9, 325:14, 325:20, 327:5, 328:5, 332:11, 332:13, 332:16, 332:21, 333:25, 334:24, 335:25, 336:25, 338:13, 341:23, 342:3, 342:18, 345:1, 353:7, 380:22, 401:13

**PERFORMANCE - BASED** [2] - 216:2, 319:8

**PERFORMANCES** [1] - 247:19

**PERFORMED** [13] - 212:1, 226:20, 264:8, 309:15, 314:4, 328:20, 349:15, 349:19, 365:14, 365:18, 373:15, 385:10, 397:10

**PERFORMING** [4] - 198:11, 206:20, 336:8, 346:6

**PERFORMS** [1] - 356:16

**PERHAPS** [3] - 175:17, 177:21, 291:15

**PERIMETERS** [1] - 202:10

**PERIOD** [6] - 256:12, 286:16, 286:18, 288:7, 304:22, 338:3

**PERKINS** [2] - 170:19, 170:21

**PERMITTED** [1] - 368:20

**PERSIST** [2] - 398:10, 400:13

**PERSISTED** [2] - 371:8, 398:2

**PERSON** [61] - 179:8, 179:22, 184:17, 186:4, 190:17, 202:21, 202:22, 202:25, 203:5, 211:21, 214:1, 214:5, 216:13, 218:7, 218:15, 219:4, 224:2, 228:3, 228:5, 228:6, 235:11, 235:24, 243:12, 271:5, 271:14, 274:21, 282:11, 282:20, 284:24, 287:24, 288:24, 289:2, 292:14, 296:18, 297:16, 301:9, 301:10, 304:14, 304:16, 304:18, 305:4, 308:13, 321:1, 321:6, 321:8, 321:10, 321:25, 331:13, 336:13, 343:13, 343:25, 347:19, 349:9, 349:15, 353:5, 354:14, 354:15, 355:6, 373:19, 387:1

**PERSON'S** [1] - 218:10

PERSONAL [3] - 348:6, 348:8, 384:13

PERSONALITY [1] - 327:1

PERSONALITY [2] - 231:14, 231:16

PERSONALLY [3] - 244:2, 280:14, 282:15

PERSPECTIVE [4] - 343:4, 343:9, 364:15, 395:6

PERSUASIVE [1] - 396:13

PERTAIN [1] - 277:6

PERUSES [3] - 315:10, 326:13, 339:22

PERVASIVE [4] - 394:25, 395:18, 395:23, 400:21

PH [3] - 172:21, 173:12, 178:17

PH.D [4] - 185:15, 185:17, 384:18, 386:17

PHD [1] - 276:1

PHONE [1] - 356:8

PHONEMIC [2] - 194:14, 194:18

PHONETIC [3] - 223:19, 223:23, 303:13

PHOTOCOPIES [1] - 335:2

PHYSICAL [2] - 252:14, 261:17

PICTURE [6] - 182:13, 212:24, 302:20, 303:14, 304:14, 341:23

PICTURES [4] - 302:21, 311:25, 312:1, 312:2

PIECE [2] - 251:24, 367:6

PLACE [7] - 200:8, 292:5, 303:15, 309:8, 324:10, 382:3, 392:17

PLACEMENT [1] - 398:21

PLAINTIFF [6] - 170:4, 252:11, 351:15, 359:22, 360:4, 360:13

PLAINTIFF [1] - 170:14, 260:16, 260:24

PLAINTIFF 'S [3] -

367:20, 370:15, 375:22

PLAINTIFF 'S [8] - 289:11, 298:11, 310:2, 322:14, 333:10, 337:4, 337:19, 339:21

PLAN [3] - 205:8, 320:9

PLANNING [3] - 205:11, 248:13, 253:6

PLANS [1] - 398:13

PLAUSIBLE [1] - 330:25

PLAY [3] - 345:21, 346:13, 347:3

PLAYING [3] - 226:22, 226:23, 272:13

PLEASURE [1] - 397:22

PLUS [1] - 211:5

POINT [23] - 175:11, 190:18, 191:24, 195:18, 242:12, 242:15, 242:20, 242:22, 243:1, 258:16, 270:22, 279:14, 286:20, 294:3, 298:10, 307:12, 312:9, 343:19, 344:2, 346:8, 360:15, 398:23, 399:22

POINT [1] - 250:23

POINTED [1] - 370:18

POINTING [1] - 258:15

POINTS [2] - 211:12, 303:25

POOR [3] - 333:3, 336:19, 336:20

POORLY [5] - 190:15, 228:11, 312:3, 336:20, 373:15

POPULATION [39] - 177:1, 202:13, 202:14, 202:15, 202:16, 211:11, 211:14, 211:15, 221:5, 221:7, 221:8, 288:22, 288:23, 289:3, 289:7, 292:4, 292:9, 292:11, 293:11, 294:1, 296:2, 328:14, 328:16, 340:3, 340:6, 340:12, 340:13, 340:15, 343:25, 346:9, 350:19, 366:7,

366:20, 367:1, 367:2, 373:16, 381:14, 382:18

POPULATIONS [1] - 364:23

PORTIONS [1] - 347:15

POSITION [2] - 239:18, 276:7

POSITIONED [1] - 272:24

POSITIONS [1] - 250:19

POSITIVE [2] - 397:19, 397:25

POSSESS [1] - 263:16

POSSIBILITY [3] - 207:17, 210:2, 335:15

POSSIBLE [17] - 190:22, 191:6, 219:6, 231:17, 235:20, 259:21, 260:5, 262:24, 273:5, 296:25, 308:14, 325:9, 325:11, 350:4, 372:16, 377:5, 396:7

POSSIBLY [1] - 177:24, 212:21, 213:10

POSTDATES [1] - 310:3

POTENTIALLY [1] - 198:10

POWERFUL [1] - 389:1

PRACTICE [7] - 176:11, 176:19, 177:9, 210:2, 239:12, 239:15, 353:25

PRECEDING [1] - 263:2

PRECISE [2] - 349:23, 375:18

PRECISION [1] - 350:5

PREDICT [1] - 200:1

PREDOMINANTLY [1] - 209:17

PREFORMING [1] - 333:25

PREGNANCIES [1] - 389:14

PRELIMINARY [4] - 275:8, 359:22, 360:5, 360:11

PREP [7] - 174:22, 268:1, 268:6, 268:8,

342:9, 345:6, 349:17

PREPARATION [14] - 254:12, 267:9, 267:18, 268:20, 341:2, 341:7, 341:12, 341:17, 349:4, 349:12, 349:13, 349:16, 349:25, 350:2

PREPARE [5] - 183:23, 267:11, 267:12, 271:14, 281:2

PREPARED [4] - 185:20, 242:5, 243:7, 267:16

PREPARING [2] - 185:19, 349:9

PRESCHOOL [1] - 287:25

PRESCHOOLER [1] - 286:4

PRESCHOOLERS [1] - 286:6

PRESCRIBE [5] - 217:16, 368:21, 369:2, 369:10, 372:17

PRESCRIBED [2] - 329:16, 329:21

PRESCRIBING [4] - 329:12, 368:4, 369:7, 372:12

PRESCRIPTION [5] - 217:12, 217:13, 217:14, 217:15, 217:20

PRESENT [16] - 183:6, 183:13, 285:2, 285:24, 287:9, 300:16, 302:1, 328:10, 329:7, 329:19, 329:20, 335:13, 341:17, 347:20, 370:6, 401:16

PRESENTATION [1] - 330:13

PRESENTATIONS [7] - 174:18, 174:20, 174:21, 174:24, 175:3, 175:18, 385:19

PRESEN TED [3] - 255:14, 255:25, 318:11

PRESENTING [1] - 276:20

PRESENTLY [1] - 237:5

PRESS [2] - 318:9, 319:17

PRESS [2] - 277:19

PRESSURE [3] - 294:25, 300:14, 300:15

PRESSURED [1] - 300:11

PRESUMABLY [1] - 372:13

PRESUME [1] - 370:20

PRETEXTUAL [1] - 201:17

PRETTY [4] - 202:24, 203:25, 397:18, 401:22

PREVENT [1] - 395:4

PREVIOUS [3] - 188:25, 234:20, 247:17

PREVIOUSLY [8] - 174:3, 230:20, 282:23, 283:6, 302:23, 320:3, 326:1, 359:11

PRI [1] - 220:25

PRIMARILY [1] - 387:3

PRIMARY [2] - 276:15, 355:20

PRINCIPLE [1] - 178:9

PRIVATE [4] - 198:1, 239:11, 239:12, 239:15

PROACTIVE [1] - 229:15

PROBABILITIES [1] - 202:11

PROBABILITY [2] - 206:17, 312:6

PROBLEM [24] - 181:25, 182:10, 191:9, 193:21, 194:13, 194:15, 194:19, 195:13, 201:19, 213:2, 213:8, 213:9, 215:22, 228:12, 235:2, 297:18, 307:2, 315:23, 349:14, 374:17, 398:18, 402:24, 402:25

PROBLEMATIC [4] - 319:9, 389:21, 398:9, 401:6

PROBLEMS [52] - 182:18, 187:16, 187:18, 188:3,

188:10, 188:17, 190:11, 191:6, 194:18, 195:2, 195:9, 195:22, 195:24, 198:7, 198:14, 212:20, 213:5, 213:10, 214:6, 229:21, 229:23, 233:7, 233:10, 234:19, 234:25, 235:1, 276:14, 285:18, 286:12, 287:8, 287:15, 309:2, 309:3, 312:4, 313:17, 328:2, 335:8, 347:9, 347:10, 367:7, 380:10, 396:19, 396:22, 397:3, 398:6, 398:14, 400:3, 400:11, 400:24, 401:13

**PROCEEDINGS** [1] - 170:25

**PROCEEDINGS** [7] - 252:21, 254:24, 255:18, 256:21, 369:19, 383:12, 392:18

**PROCESS** [11] - 185:18, 188:14, 189:4, 190:4, 201:18, 223:24, 228:18, 281:15, 305:3, 322:12, 361:20

**PROCESSED** [1] - 228:21

**PROCESSING** [15] - 187:24, 188:2, 194:14, 194:16, 194:18, 203:10, 207:5, 208:5, 221:16, 228:9, 229:4, 306:11, 306:16, 307:1, 371:19

**PROCTOR** [1] - 334:14

**PRODUCED** [1] - 170:25

**PROFESSION** [2] - 276:19, 277:21

**PROFESSIONAL** [7] - 179:3, 179:4, 184:18, 235:7, 266:5, 278:1, 353:10

**PROFESSIONALS** [2] - 200:12, 200:13

**PROFESSOR** [4] - 276:8, 276:16, 276:17, 279:5

**PROFESSORS** [1] - 277:24

**PROFICIENCY** [1] - 251:22

**PROFILE** [3] - 197:15, 213:17, 219:13

**PROFILES** [1] - 389:17

**PROFOUND** [1] - 328:2

**PROFOUNDLY** [1] - 237:9

**PROGRAM** [1] - 173:17

**PROGRAMS** [4] - 198:2, 278:12, 364:24, 368:18

**PROGRESS** [1] - 277:2

**PROMINENCE** [1] - 355:17

**PROMISE** [1] - 403:12

**PROMPT** [1] - 263:6

**PRONOUNCE** [1] - 295:6

**PROOF** [2] - 192:8, 361:6

**PROPER** [1] - 192:9

**PROPERLY** [2] - 293:7, 389:23

**PROPORTION** [1] - 344:21

**PROVIDE** [15] - 176:20, 190:24, 233:17, 239:14, 239:17, 242:18, 244:12, 245:1, 283:17, 339:17, 339:19, 367:8, 374:8, 376:4, 377:12

**PROVIDED** [10] - 192:7, 192:16, 193:3, 212:22, 242:16, 284:2, 349:22, 374:4, 393:5, 399:23

**PROVIDES** [2] - 230:11, 232:14

**PROVIDING** [3] - 193:23, 216:22, 228:7

**PROVISION** [2] - 281:9, 392:2

**PROXY** [4] - 292:8, 292:11, 293:11, 294:1

**PSAT** [5] - 332:13,

336:22, 337:5, 337:6, 399:15

**PSEUDO** [1] - 223:17, 223:20, 223:22

**PSY.D** [1] - 185:16

**PSYCH** [1] - 203:16

**PSYCHIATRIC** [5] - 176:25, 190:17, 231:17, 326:18, 389:4

**PSYCHIATRIST** [5] - 216:12, 216:21, 235:9, 368:15

**PSYCHIATRISTS** [2] - 235:23, 368:17

**PSYCHIATRY** [3] - 177:6, 239:4, 368:18

**PSYCHO** [3] - 189:17, 189:19, 203:16

**PSYCHO-ED** [1] - 189:19

**PSYCHO-EDUCATIONAL** [1] - 189:17

**PSYCHOLOGICAL** [11] - 201:15, 212:11, 227:12, 227:16, 276:12, 279:13, 279:15, 326:17, 361:2, 361:18, 382:3

**PSYCHOLOGICAL** [1] - 277:19

**PSYCHOLOGIST** [10] - 172:15, 172:16, 184:23, 217:15, 241:11, 279:23, 279:25, 280:1, 366:9, 384:20

**PSYCHOLOGISTS** [4] - 203:23, 235:21, 235:23, 369:1

**PSYCHOLOGY** [1] - 173:11

**PSYCHOLOGY** [15] - 172:7, 172:12, 172:21, 173:9, 174:25, 185:4, 185:17, 276:1, 276:3, 276:4, 276:8, 276:11, 280:4, 384:17, 384:18

**PSYCHOMETICS** [1] - 272:15

**PSYCHOMETRIC** [2] - 215:19, 366:5

**PSYCHOMETRICIAN** [2] - 184:22, 184:24

**PSYCHOMETRICIANS** [3] - 178:15, 178:16, 184:21

**PSYCHOMETRICIANS** [1] - 184:25

**PSYCHOMETRICS** [5] - 185:1, 249:22, 251:1, 366:4, 366:11

**PSYCHOPATHY** [1] - 175:15

**PSYCHOSIS** [1] - 231:16

**PSYCHOTHERAPY** [2] - 280:12, 354:2

**PUBLICATION** [1] - 174:21

**PUBLICATIONS** [8] - 174:19, 174:24, 175:12, 175:21, 175:24, 277:2, 277:3, 386:3

**PUBLISH** [1] - 277:17

**PUBLISHED** [4] - 174:23, 175:2, 277:18

**PULLED** [1] - 226:15

**PULLING** [1] - 229:18

**PULMONARY** [1] - 191:5

**PULSES** [1] - 218:21

**PUNCTUAL** [1] - 401:12

**PURDUE** [2] - 325:6, 325:8

**PURPOSE** [3] - 265:19, 363:7, 363:16

**PURPOSES** [4] - 249:11, 336:18, 353:19, 364:19

**PUT** [18] - 187:25, 242:21, 258:16, 259:4, 260:9, 264:21, 267:18, 272:12, 274:14, 298:8, 325:8, 343:14, 343:23, 344:3, 344:6, 349:2, 386:6

**PUTTING** [4] - 248:13, 311:16, 343:7, 349:6

**Q**

**QUALITATIVE** [1] - 215:16

**QUALITATIVELY** [1] - 226:8

**QUALITY** [2] - 192:21, 278:22

**QUANTIFY** [1] - 343:5, 343:11, 343:22

**QUANTITATIVE** [3] -

192:21, 232:12, 232:19

**QUARTER** [1] - 289:2

**QUESTIONING** [1] - 281:12

**QUESTIONNAIRES** [1] - 233:14

**QUESTIONS** [71] - 189:7, 199:25, 200:5, 200:8, 200:9, 200:10, 205:15, 205:16, 205:20, 209:16, 210:5, 210:16, 214:7, 225:9, 225:11, 232:22, 232:23, 232:25, 238:18, 247:22, 251:10, 254:15, 256:8, 257:6, 257:7, 257:10, 257:18, 257:23, 258:24, 259:2, 259:4, 259:8, 259:11, 263:2, 263:6, 263:8, 263:24, 270:15, 270:22, 271:3, 272:21, 272:22, 272:25, 273:2, 273:5, 273:10, 274:14, 283:2, 286:10, 286:21, 290:19, 290:20, 291:20, 300:25, 331:14, 350:12, 350:21, 351:16, 376:8, 376:11, 376:16, 376:23, 377:2, 378:22, 379:6, 379:9, 379:11, 379:15, 381:9, 382:21, 383:4

**QUICK** [1] - 311:7

**QUICKLY** [17] - 213:25, 215:2, 215:3, 222:10, 242:1, 308:14, 313:15, 313:16, 313:17, 325:9, 325:11, 326:11, 333:13, 379:2, 382:25, 389:25

**QUITE** [5] - 241:25, 358:9, 372:16, 399:16, 400:17

**QUOTE** [5] - 266:12, 330:14, 333:20, 397:23, 399:12

**QUOTING** [1] - 333:17

# R

**RAISE** [4] - 171:7,
249:1, 273:15,
383:14
**RAISED** [3] - 183:17,
212:6, 341:18
**RAMSAY** [1] - 359:25
**RAN** [2] - 386:21
**RANDOM** [5] - 226:14,
229:12, 230:13,
230:14, 340:15
**RANGE** [68] - 197:4,
201:12, 211:8,
214:4, 215:6, 262:1,
288:19, 289:9,
293:14, 293:16,
294:2, 294:3,
294:21, 295:1,
295:3, 295:7,
295:16, 295:20,
299:15, 302:18,
302:24, 304:3,
305:8, 307:22,
308:2, 309:23,
313:9, 313:18,
313:21, 317:19,
318:25, 320:22,
321:22, 322:5,
323:5, 323:6,
323:19, 323:20,
330:20, 331:8,
334:6, 334:20,
334:21, 337:7,
337:8, 337:9,
338:18, 338:19,
338:20, 338:23,
340:1, 341:21,
342:5, 345:8,
365:21, 366:1,
366:2, 366:16,
373:18, 373:19,
382:4, 382:5, 382:7,
382:9, 382:17,
399:4, 399:13,
399:17
**RANGED** [1] - 201:17
**RANGES** [5] - 206:21,
211:3, 381:21,
382:2, 402:4
**RANGING** [1] - 199:20
**RANK** [3] - 262:6,
262:13, 262:17
**RAPIDLY** [2] - 229:7,
229:20
**RARE** [2] - 202:18,
221:5
**RATE** [16] - 224:19,
228:15, 237:1,
290:22, 290:23,

292:13, 292:19,
293:2, 293:9,
293:20, 293:24,
293:25, 315:3,
315:5, 344:9, 394:2
**RATHER** [6] - 195:19,
216:2, 226:14,
272:10, 340:5, 396:8
**RATING** [2] - 232:10,
326:22
**RATING** [8] - 301:1,
301:3, 301:5,
301:13, 327:18,
327:19, 344:7, 400:7
**RATINGS** [3] - 302:2,
400:1, 400:5
**RAW** [1] - 376:4
**RCFT** [1] - 212:15
**REACH** [1] - 292:6
**REACTIONS** [1] -
176:24
**READ** [56] - 180:24,
180:25, 181:4,
181:10, 181:11,
181:12, 195:9,
195:10, 195:16,
195:20, 199:25,
200:4, 204:14,
204:19, 205:5,
205:7, 207:22,
212:5, 213:23,
214:2, 215:1, 215:2,
215:9, 215:12,
222:10, 222:11,
223:25, 226:5,
229:13, 242:25,
252:23, 257:20,
259:7, 263:16,
264:11, 264:15,
265:4, 270:24,
272:20, 273:5,
290:19, 294:20,
294:22, 295:1,
295:5, 308:13,
313:15, 313:22,
313:23, 313:24,
332:11, 369:24,
371:4, 372:3, 401:16
**READER** [1] - 293:4
**READERS** [2] -
181:12, 260:3
**READING** [7] - 187:13,
333:18, 333:22,
342:3, 342:9,
342:12, 351:23
**READING** [211] -
180:16, 180:18,
180:25, 181:1,
181:2, 181:5, 181:8,
187:15, 187:17,

194:12, 195:17,
195:19, 195:21,
195:22, 195:23,
197:17, 203:24,
203:25, 204:8,
204:12, 204:13,
204:18, 204:20,
204:23, 205:3,
205:13, 206:3,
206:18, 207:7,
207:24, 208:3,
209:4, 209:5, 209:7,
211:1, 212:4,
213:20, 213:22,
213:25, 214:7,
215:1, 222:3, 222:5,
222:18, 222:20,
223:7, 223:12,
223:13, 223:14,
223:15, 224:3,
224:6, 224:13,
224:16, 224:19,
225:1, 225:19,
226:13, 229:3,
233:24, 236:8,
236:14, 237:3,
237:8, 238:11,
257:24, 258:19,
259:22, 260:6,
263:1, 263:6,
264:25, 265:4,
284:13, 285:13,
285:15, 285:16,
285:17, 287:20,
289:22, 289:24,
290:1, 290:2, 290:7,
290:8, 290:11,
290:12, 290:14,
290:22, 290:23,
290:25, 291:3,
292:13, 292:14,
292:17, 292:19,
293:2, 293:9,
293:19, 293:24,
293:25, 294:4,
294:5, 294:7,
294:13, 294:19,
294:21, 295:4,
295:5, 297:24,
299:10, 299:12,
299:17, 303:7,
305:14, 306:2,
306:3, 306:12,
306:13, 307:7,
307:8, 307:23,
307:24, 308:8,
308:10, 308:11,
308:13, 308:16,
308:19, 309:13,
309:14, 309:16,
309:24, 310:1,

311:4, 313:4,
313:12, 313:13,
313:19, 313:21,
314:1, 314:5,
315:14, 315:17,
316:6, 316:7,
319:12, 319:18,
319:22, 324:4,
324:8, 324:9,
324:13, 324:16,
324:20, 324:21,
324:25, 325:2,
330:8, 330:9,
330:16, 330:17,
330:20, 332:25,
333:2, 333:3, 333:5,
333:7, 333:16,
333:17, 333:19,
333:24, 334:1,
334:5, 335:5, 335:7,
336:4, 336:18,
336:19, 336:20,
336:21, 337:6,
338:16, 338:24,
342:1, 342:5, 342:6,
344:25, 345:10,
348:12, 348:13,
374:1, 394:20,
397:22, 399:8,
399:10, 399:11,
399:15, 401:15,
401:17, 402:4
**READING -BASED** [1]
- 316:6
**READS** [14] - 200:4,
215:3, 237:1,
253:23, 254:5,
255:2, 255:12,
256:18, 259:18,
260:1, 262:6,
312:14, 319:8,
356:20
**READY** [1] - 171:1
**READY** [1] - 171:14
**REAL** [14] - 223:18,
223:19, 285:6,
285:17, 319:21,
325:1, 336:14,
336:21, 341:20,
346:7, 352:19,
370:7, 380:8, 380:11
**REAL** [1] - 352:21
**REAL-WORLD** [3] -
370:7, 380:8, 380:11
**REALIZE** [1] - 183:20
**REALLY** [50] - 177:22,
186:15, 186:20,
187:9, 188:7,
193:15, 193:20,
195:20, 197:15,

198:7, 199:4, 200:6,
201:13, 222:5,
226:4, 240:17,
240:23, 241:2,
245:6, 271:22,
272:19, 274:16,
274:20, 280:2,
291:20, 291:23,
292:16, 293:7,
295:17, 297:2,
301:11, 307:11,
308:4, 315:20,
315:25, 329:8,
329:11, 329:22,
343:11, 346:22,
350:4, 364:24,
376:7, 376:23,
388:18, 395:25,
398:16, 401:19,
401:21, 402:6
**REASON** [21] -
191:22, 193:15,
193:25, 209:25,
218:20, 259:13,
268:4, 316:2,
316:11, 319:20,
338:6, 341:16,
343:15, 347:6,
355:20, 363:22,
364:10, 364:14,
369:9, 396:14, 398:9
**REASONABLE** [2] -
267:14, 268:9
**REASONING** [1] -
220:24
**REASONING** [23] -
201:17, 203:8,
220:16, 221:16,
252:15, 255:2,
255:12, 255:16,
255:24, 256:5,
256:11, 257:17,
257:22, 258:7,
258:13, 261:17,
262:17, 263:1,
263:5, 263:15,
263:20, 297:20,
336:22
**REASONS** [6] -
209:24, 268:13,
268:17, 382:20,
396:7, 396:15
**RECALLED** [2] -
302:8, 302:22
**RECEIVE** [7] - 196:10,
217:19, 281:17,
282:14, 347:14,
360:24, 396:16
**RECEIVED** [8] -
191:19, 192:22,

194:24, 197:23, 349:5, 351:19, 361:7, 364:6
**RECEIVED** [1] - 392:7
**RECEIVING** [5] - 346:10, 347:2, 349:20, 351:19, 363:23
**RECENT** [3] - 277:9, 328:15, 386:7
**RECENTLY** [1] - 209:12
**RECESS** [2] - 227:7, 269:8
**RECESS** [3] - 248:21, 351:1, 379:24
**RECOGNITION** [1] - 303:22
**RECOGNITION** [4] - 212:24, 302:21, 303:14, 311:19
**RECOGNIZE** [3] - 289:14, 298:13, 392:16
**RECOGNIZING** [1] - 293:8
**RECOLLECTION** [1] - 368:16
**RECOLLECTIONS** [1] - 296:24
**RECOMMEND** [4] - 360:18, 363:3, 365:1, 394:3
**RECOMMENDATION** [4] - 207:9, 216:16, 360:21, 362:2
**RECOMMENDATIONS** [5] - 178:5, 207:14, 216:24, 238:2, 283:17
**RECOMMENDED** [3] - 208:6, 361:23, 364:8
**RECOMMENDING** [1] - 363:18, 364:16, 364:17
**RECONSIDERATION** [6] - 275:15, 275:16, 275:17, 283:3, 283:7, 283:24
**RECONSIDERING** [1] - 283:5
**RECONVENE** [1] - 402:14
**RECORD** [18] - 171:11, 190:21, 249:7, 273:20, 274:1, 310:7, 332:10, 332:20, 334:7, 335:18, 341:20, 342:14,

347:1, 383:19, 397:12, 398:12, 398:15, 400:23
**RECORDED** [2] - 170:25, 201:9
**RECORDING** [1] - 305:15
**RECORDS** [14] - 192:18, 192:23, 287:5, 287:10, 288:4, 296:19, 299:4, 299:7, 332:6, 335:21, 347:24, 399:6, 399:21, 401:2
**RECRUITED** [1] - 386:15
**RED** [1] - 215:7
**REDACTED** [1] - 384:13
**REDIRECT** [3] - 273:12, 379:19, 379:20
**REDIRECT** [2] - 380:4, 404:14
**REDUCE** [1] - 315:20
**REDUCED** [1] - 300:15
**REFER** [11] - 182:2, 185:22, 197:22, 252:16, 253:20, 254:4, 254:21, 255:11, 256:17, 310:10, 357:22
**REFERENCE** [9] - 208:18, 241:18, 253:15, 288:15, 288:19, 308:8, 333:10, 381:23, 386:9
**REFERENCED** [2] - 258:14, 316:15
**REFERRALS** [1] - 397:1
**REFERRED** [3] - 214:11, 250:6, 284:15
**REFERRING** [12] - 177:17, 197:19, 201:2, 201:5, 202:15, 220:19, 221:24, 251:9, 271:13, 284:14, 303:20, 337:12
**REFERS** [1] - 219:23
**REFLECT** [8] - 254:1, 260:24, 261:7, 261:15, 267:1, 267:4, 267:6, 365:21
**REFLECTED** [4] - 221:21, 253:25,

257:6, 385:25
**REFLECTING** [1] - 260:25
**REFLECTION** [1] - 386:3
**REFLECTS** [1] - 324:1
**REFRESH** [1] - 188:21
**REGARD** [5] - 266:23, 284:7, 307:23, 313:10, 324:7
**REGARDED** [1] - 204:5
**REGARDING** [6] - 172:13, 198:25, 213:19, 238:2, 298:22, 332:20
**REGARDS** [1] - 238:11
**REGISTERING** [1] - 253:9
**REGULAR** [3] - 307:17, 307:19, 389:2
**REGULARLY** [2] - 279:1, 309:18
**REGULATION** [1] - 395:10
**REGULATIONS** [5] - 266:2, 266:22, 266:25, 267:22, 353:2
**REJECTED** [1] - 265:20
**REJECTIONS** [1] - 183:14
**RELATE** [3] - 259:5, 279:10, 348:10
**RELATED** [21] - 175:22, 175:24, 175:25, 182:12, 232:13, 237:8, 266:4, 268:22, 277:9, 277:13, 280:13, 281:10, 281:20, 283:21, 295:4, 307:1, 311:5, 319:18, 324:21, 328:11, 335:9
**RELATES** [1] - 354:2
**RELATING** [1] - 397:14
**RELATIONSHIP** [6] - 213:11, 230:9, 231:1, 243:20, 319:20, 324:12
**RELATIONSHIPS** [3] - 172:8, 172:14, 344:20
**RELATIVE** [23] - 188:15, 188:20,

188:23, 189:2, 215:18, 215:19, 223:25, 236:17, 237:11, 262:8, 292:4, 293:11, 293:14, 296:2, 303:2, 309:16, 323:24, 344:6, 344:19, 346:9, 350:20, 381:13
**RELATIVELY** [5] - 188:14, 195:1, 202:6, 236:17, 388:20
**RELATIVES** [1] - 286:11
**RELEASE** [2] - 256:18, 257:3
**RELEASED** [1] - 257:1
**RELEVANCE** [2] - 325:17, 353:4
**RELEVANT** [20] - 188:22, 215:22, 228:23, 246:25, 274:23, 277:10, 283:20, 303:1, 305:19, 306:1, 307:12, 331:11, 332:21, 334:23, 339:19, 342:15, 347:17, 350:17, 353:7, 363:20
**RELIABILITY** [3] - 292:17, 292:24, 293:1
**RELIABLE** [6] - 218:9, 311:9, 311:14, 311:17, 312:10, 312:21
**RELIANCE** [3] - 265:21, 266:11, 267:22
**RELIED** [3] - 234:17, 234:18, 234:20
**RELIEVED** [1] - 179:8
**RELUCTANT** [1] - 371:16
**RELY** [6] - 178:16, 234:13, 234:16, 259:11, 272:17, 296:21
**RELYING** [1] - 236:12
**REMAIN** [2] - 383:13, 393:21
**REMAINING** [3] - 258:2, 313:2
**REMEDIATE** [1] - 176:18
**REMEDIATED** [1] - 199:12

**REMEDIATION** [3] - 199:15, 396:21, 396:23
**REMEMBER** [9] - 186:20, 204:1, 205:6, 234:18, 244:19, 292:14, 297:1, 302:21, 304:19
**REMEMBERED** [2] - 322:20, 322:23
**REMEMBERING** [1] - 323:14
**REMINDER** [1] - 173:4
**REMOTELY** [1] - 248:12
**REMOVED** [3] - 303:24, 304:15, 304:16
**RENDER** [2] - 186:23, 190:19
**RENDERING** [1] - 179:25
**RENEW** [1] - 357:12
**REPEAT** [8] - 199:12, 220:7, 229:13, 237:17, 237:19, 266:20, 312:15, 312:18
**REPEATED** [3] - 287:15, 288:11, 397:17
**REPORT** [119] - 177:2, 178:11, 178:21, 180:12, 183:23, 185:19, 185:20, 191:13, 194:2, 194:22, 196:16, 198:23, 200:1, 200:18, 202:20, 203:15, 204:2, 207:15, 207:21, 208:10, 208:15, 208:16, 210:4, 210:9, 211:22, 211:24, 214:13, 216:4, 217:22, 221:22, 226:24, 227:15, 229:8, 231:10, 234:13, 239:24, 241:14, 241:17, 241:20, 242:1, 242:4, 242:14, 242:18, 242:21, 242:22, 242:24, 243:6, 243:12, 246:19, 246:21, 260:17, 260:22, 260:25, 281:21,

283:8, 283:11, 283:24, 287:14, 287:19, 288:7, 289:17, 289:19, 294:8, 296:1, 296:21, 297:4, 298:3, 298:13, 298:15, 298:18, 298:21, 302:8, 303:16, 306:6, 306:7, 308:25, 309:1, 309:9, 309:10, 309:23, 310:3, 310:8, 310:17, 313:13, 315:7, 315:22, 316:20, 316:25, 319:6, 323:11, 326:20, 326:23, 329:12, 330:1, 331:19, 333:9, 334:7, 334:25, 335:3, 335:14, 335:16, 335:21, 336:9, 337:24, 342:20, 348:21, 375:21, 377:8, 377:11, 378:10, 393:5, 393:16, 393:18, 399:23, 399:24, 400:5, 401:7

**REPORTED** [12] - 194:5, 195:24, 210:11, 301:20, 302:2, 302:3, 307:10, 311:1, 327:9, 346:1, 369:12, 397:4

**REPORTER** [1] - 170:24

**REPORTER** [13] - 172:9, 173:24, 175:23, 180:6, 185:6, 185:9, 187:4, 189:23, 189:25, 205:24, 244:17, 250:2, 334:10

**REPORTER 'S** [1] - 173:4

**REPORTING** [12] - 302:5, 327:2, 347:19, 347:20, 367:7, 368:2, 369:14, 375:25, 376:7, 376:22, 378:13, 378:21

**REPORTS** [13] - 178:2, 200:12, 216:6, 235:5, 241:22, 281:3,

296:8, 326:24, 332:15, 335:1, 347:5, 349:21, 393:20

**REPRESENT** [2] - 323:24, 328:2

**REPRESENTATIVE** [1] - 363:23

**REPRESENTING** [2] - 264:4, 351:15

**REPRODUCING** [1] - 323:15

**REPUDIATION** [1] - 259:20

**REPUTATION** [1] - 272:15

**REQUEST** [20] - 274:23, 275:14, 275:15, 275:16, 275:18, 281:20, 283:1, 283:6, 283:18, 284:7, 284:10, 298:18, 310:4, 350:8, 381:4, 391:10, 392:12, 393:13, 394:4, 394:18

**REQUESTING** [4] - 278:15, 282:18, 391:7, 397:7

**REQUESTS** [15] - 238:12, 278:11, 278:12, 278:14, 281:23, 282:2, 282:10, 282:24, 283:21, 283:25, 284:4, 363:18, 381:2, 390:18, 393:24

**REQUIRE** [7] - 214:7, 237:15, 259:11, 305:24, 343:17, 371:17, 380:10

**REQUIRED** [5] - 198:3, 215:9, 238:1, 257:3, 271:17

**REQUIREMENTS** [1] - 266:23

**REQUIRES** [5] - 213:22, 237:3, 238:4, 308:21, 380:8

**REQUIRING** [2] - 208:2, 213:3

**REREAD** [2] - 368:7, 397:15

**RESEARCH** [38] - 172:13, 177:6, 250:23, 254:12, 276:18, 276:24, 277:6, 278:23,

281:10, 292:22, 296:23, 299:24, 300:1, 300:5, 300:7, 300:10, 300:20, 311:15, 312:3, 328:13, 341:6, 341:11, 344:2, 344:7, 344:8, 344:10, 344:20, 353:18, 385:23, 386:21, 387:3, 387:9, 387:25, 390:15, 391:21, 392:1, 395:6

**RESEARCHING** [1] - 172:8

**RESERVE** [1] - 281:12

**RESIDENCY** [1] - 368:18

**RESOLUTION** [1] - 236:19

**RESOURCE** [1] - 254:13

**RESOURCES** [1] - 268:22

**RESPECT** [8] - 207:9, 219:8, 283:17, 307:6, 380:21, 389:21, 392:1, 394:17

**RESPIRATORY** [1] - 191:5

**RESPOND** [5] - 214:20, 318:10, 318:12, 318:13, 320:11

**RESPONDENT** [1] - 301:9

**RESPONDENTS** [1] - 301:14

**RESPONDING** [1] - 331:13

**RESPONSE** [6] - 214:20, 215:10, 215:11, 244:14, 319:9, 319:14

**RESPONSE )** [1] - 335:23

**RESPONSES** [2] - 215:25, 320:10

**RESPONSIBILITIES** [3] - 250:25, 276:15, 353:15

**REST** [3] - 211:22, 290:17, 338:11

**RESTING** [1] - 305:1

**RESULT** [4] - 271:10, 309:4, 388:23, 389:8

**RESULTS** [1] - 333:16

**RESULTS** [22] - 213:1,

220:3, 220:6, 220:8, 220:9, 229:8, 232:2, 233:4, 234:10, 309:2, 314:3, 318:22, 323:2, 323:16, 330:11, 333:17, 340:18, 342:25, 345:7, 345:11, 373:9, 373:10

**RETENTION** [2] - 235:1, 371:19

**RETRIEVAL** [2] - 230:15, 231:3

**RETRIEVE** [2] - 230:12, 230:13

**RETRIEVING** [2] - 229:17, 229:24

**RETURN** [2] - 193:13, 245:15

**REVERSE** [1] - 312:18

**REVIEW** [57] - 174:14, 174:22, 190:21, 196:13, 196:14, 200:12, 207:15, 207:20, 208:9, 211:22, 274:8, 274:16, 275:13, 275:14, 275:15, 275:17, 277:3, 277:5, 278:17, 278:19, 281:16, 281:18, 281:20, 282:10, 282:16, 282:23, 283:18, 283:23, 289:19, 296:8, 298:17, 310:3, 336:24, 337:21, 337:22, 361:24, 364:2, 367:15, 369:23, 370:1, 371:25, 379:4, 380:21, 381:4, 381:8, 381:18, 391:6, 391:12, 391:13, 391:17, 392:12, 393:13, 393:16, 393:23, 394:1

**REVIEWED** [23] - 196:15, 200:17, 203:15, 216:6, 283:1, 283:6, 297:7, 298:14, 299:4, 310:12, 316:24, 335:22, 338:12, 342:20, 345:14, 346:5, 350:7, 358:22, 367:9, 370:5, 371:23,

372:5, 380:20

**REVIEWER** [2] - 277:25, 390:16

**REVIEWING** [13] - 277:24, 282:2, 283:14, 325:15, 328:7, 340:22, 342:23, 347:12, 347:25, 361:4, 361:23, 373:9, 393:6

**REVIEWS** [7] - 281:22, 300:9, 329:9, 358:3, 358:17, 363:2, 367:10

**REY** [1] - 212:13

**REY** [19] - 212:14, 212:25, 213:1, 213:5, 230:2, 230:3, 230:4, 230:18, 230:19, 303:21, 304:9, 304:10, 305:18, 320:3, 320:4, 322:7, 322:10, 323:9, 323:18

**REY-OSTERRIETH** [5] - 320:3, 320:4, 322:10, 323:9, 323:18

**RICKER** [1] - 175:9

**RIGID** [1] - 366:14

**RISE** [1] - 395:1

**RISK** [1] - 233:9

**RMR** [1] - 170:24

**ROAD** [1] - 375:14

**ROADBLOCK** [2] - 230:11, 231:2

**ROADBLOCKS** [1] - 213:15

**ROADS** [1] - 213:19

**ROBERT** [1] - 170:3

**ROBERT** [18] - 183:8, 252:12, 260:17, 261:11, 264:4, 264:6, 264:7, 264:9, 264:11, 264:14, 264:17, 264:20, 264:24, 265:3, 265:7, 309:1, 392:13, 393:14

**ROLE** [6] - 178:7, 178:9, 250:17, 250:25, 251:7, 274:5

**ROLES** [1] - 250:14

**ROOSEVELT** [1] - 173:14

**ROSE** [1] - 307:3

**ROTATIONS** [1] - 199:6

**ROUGH** [1] - 334:15
**ROUGHLY** [2] - 364:8, 388:4
**ROUTINELY** [3] - 240:21, 240:23, 390:10
**ROUTINELY** [1] - 178:3
**RULE** [10] - 197:5, 228:1, 228:3, 228:16, 305:10, 321:1, 321:9, 335:14, 396:6
**RULES** [7] - 228:6, 228:8, 318:9, 318:14, 319:18, 321:7, 321:10
**RUN** [3] - 386:15, 386:23, 390:9
**RUNNING** [1] - 346:4
**RUNS** [1] - 182:12
**RUSSELL** [2] - 386:10, 386:12

**S**

**SAKE** [1] - 173:4
**SAME-AGED** [1] - 323:25
**SAMPLE** [3] - 340:15, 381:24, 382:18
**SAMPSON** [1] - 170:3
**SAMPSON** [6] - 210:4, 217:2, 219:8, 289:18, 300:24, 301:15
**SAMPSON** [125] - 183:8, 183:13, 183:24, 186:23, 190:24, 192:22, 193:5, 194:5, 196:2, 197:23, 199:1, 202:19, 205:18, 207:17, 210:5, 225:12, 227:17, 228:10, 228:22, 230:23, 234:14, 235:7, 236:23, 238:3, 240:9, 242:7, 242:16, 243:6, 243:16, 244:23, 245:14, 245:18, 245:20, 246:21, 252:12, 260:17, 261:11, 262:12, 264:4, 264:6, 264:7, 264:9, 264:11, 264:14, 264:17, 264:21, 264:24, 265:3, 265:7,

271:25, 280:19, 284:3, 284:11, 289:20, 289:23, 290:15, 292:25, 293:9, 293:13, 293:18, 294:17, 295:9, 295:25, 296:9, 298:1, 298:22, 299:14, 301:13, 301:25, 302:2, 302:21, 303:6, 303:15, 303:23, 305:8, 307:18, 308:23, 313:6, 315:15, 317:17, 320:19, 322:19, 324:2, 327:14, 327:24, 328:5, 329:13, 330:12, 330:19, 331:11, 331:19, 333:4, 337:5, 337:25, 339:24, 340:7, 340:17, 343:14, 345:16, 346:10, 349:2, 351:15, 351:18, 356:2, 356:12, 356:16, 356:20, 356:24, 357:3, 361:11, 365:9, 366:20, 367:11, 369:13, 370:17, 371:7, 372:8, 372:13, 373:5, 376:8, 376:23, 392:13, 393:7, 393:14, 395:3
**SAMPSON'S** [59] - 184:12, 191:14, 192:13, 194:23, 210:23, 214:13, 241:14, 247:3, 247:10, 275:13, 282:23, 283:18, 284:7, 284:10, 288:12, 295:11, 298:18, 299:10, 305:16, 305:25, 308:1, 308:14, 310:4, 310:24, 318:22, 319:9, 319:19, 320:1, 321:18, 322:8, 324:18, 325:10, 325:14, 326:24, 327:5, 327:18, 329:19, 331:7, 332:13, 332:20, 332:21, 334:19, 334:23, 336:24,

337:6, 338:13, 341:19, 342:15, 344:25, 345:25, 347:2, 348:21, 350:7, 375:9, 380:16, 380:22, 380:25, 394:18, 396:10
**SAT** [1] - 350:1
**SAT** [22] - 196:14, 196:15, 247:4, 296:12, 332:14, 335:25, 336:5, 336:22, 337:21, 338:2, 338:4, 338:11, 338:14, 338:15, 339:8, 349:18, 352:20, 372:24, 373:9, 373:10, 373:15, 399:3
**SATA** [26] - 203:18, 204:7, 208:18, 208:21, 209:7, 209:11, 209:12, 209:18, 209:22, 209:25, 210:5, 210:14, 211:2, 299:20, 303:7, 355:9, 355:11, 355:12, 365:8, 366:18, 367:5, 378:11, 378:22, 378:25, 379:5
**SATISFACTORY** [2] - 400:6, 400:8
**SATS** [3] - 177:14, 196:20, 399:18
**SAW** [13] - 186:5, 192:3, 208:12, 312:2, 323:14, 345:18, 396:12, 396:24, 397:11, 398:2, 398:6, 401:2, 401:21
**SCALE** [10] - 219:24, 232:10, 295:15, 322:18, 323:3, 323:13, 323:19, 326:22, 327:4, 354:18
**SCALE** [18] - 201:9, 202:2, 204:4, 216:3, 216:9, 246:4, 246:7, 246:13, 262:1, 262:2, 262:3, 301:4, 301:9, 301:17, 301:24, 381:5, 400:7
**SCALED** [1] - 376:1
**SCALES** [1] - 327:20

**SCALES** [21] - 234:21, 244:18, 244:23, 245:1, 245:9, 245:16, 245:17, 245:19, 246:2, 246:10, 301:1, 301:5, 301:6, 301:7, 301:13, 301:14, 302:9, 327:6, 327:14, 327:19, 333:19
**SCAN** [1] - 270:24
**SCENARIO** [1] - 365:20
**SCENE** [1] - 356:12
**SCHEDULES** [1] - 186:3
**SCHEDULING** [1] - 351:3
**SCHIZOPHRENIA** [1] - 231:16
**SCHMID** [1] - 170:24
**SCHOLARS** [1] - 300:10
**SCHOLASTIC** [9] - 208:19, 299:11, 299:20, 303:8, 307:25, 308:19, 316:14, 316:16, 316:22
**SCHOLASTIC** [1] - 209:1
**SCHOOL** [67] - 177:7, 177:14, 191:20, 192:1, 192:4, 192:23, 194:7, 198:13, 198:17, 209:21, 237:4, 246:25, 251:23, 252:2, 264:25, 265:8, 268:11, 271:23, 272:1, 272:3, 272:6, 272:16, 276:1, 276:11, 280:7, 285:3, 285:4, 286:14, 288:4, 290:9, 296:11, 298:23, 299:7, 332:16, 334:3, 334:5, 334:25, 337:16, 338:9, 340:5, 340:7, 340:11, 340:14, 342:18, 343:16, 343:20, 345:17, 345:19, 346:1, 346:3, 346:7, 346:11, 348:22, 349:10, 349:20,

361:7, 385:18, 396:17, 397:8, 398:7, 398:11, 398:17, 398:20, 399:5, 399:7
**SCHOOL** [3] - 173:21, 239:3, 358:18
**SCHOOL-WIDE** [1] - 334:5
**SCHOOLING** [1] - 192:24
**SCHOOLS** [8] - 250:10, 251:21, 272:5, 278:2, 278:11, 278:13, 347:7, 354:3
**SCIENCE** [2] - 387:24, 388:16
**SCIENCE-BASED** [1] - 388:16
**SCIENCES** [4] - 252:14, 252:15, 261:17, 261:18
**SCIENTIFIC** [2] - 387:7, 390:11
**SCOPE** [1] - 266:4
**SCORE** [96] - 185:2, 186:8, 201:19, 203:11, 203:12, 204:23, 206:7, 211:1, 211:2, 212:2, 212:24, 214:16, 215:13, 215:14, 215:21, 219:22, 219:23, 220:14, 220:21, 220:25, 223:2, 224:9, 260:17, 260:22, 260:24, 261:14, 261:19, 262:1, 262:6, 262:13, 262:17, 262:25, 263:5, 263:14, 263:19, 268:15, 271:20, 271:21, 271:22, 272:1, 272:4, 288:23, 289:1, 292:18, 292:19, 293:4, 294:1, 302:23, 307:22, 308:1, 308:15, 310:1, 311:16, 312:11, 312:20, 313:18, 315:12, 315:16, 316:10, 319:2, 319:3, 322:10, 322:12, 328:18, 330:25, 331:8,

334:5, 334:7, 334:20, 337:6, 337:7, 337:9, 338:2, 338:16, 338:18, 338:19, 338:24, 366:23, 376:1, 376:4, 376:10, 376:14, 376:20, 377:5, 377:6, 377:16, 377:24, 378:2, 378:4, 402:6

**SCORED** [20] - 220:20, 225:20, 252:12, 258:14, 261:8, 261:25, 262:8, 262:12, 262:14, 262:20, 262:22, 271:8, 295:22, 330:19, 365:9, 373:18, 399:9, 399:14, 399:15, 399:17

**SCORES** [128] - 185:14, 186:9, 196:14, 196:15, 196:19, 196:20, 196:22, 197:4, 197:16, 199:20, 201:16, 201:17, 203:24, 203:25, 204:3, 212:14, 212:22, 228:11, 230:24, 236:16, 247:4, 247:17, 261:16, 261:21, 265:21, 266:12, 267:1, 267:4, 267:6, 267:22, 268:2, 268:14, 287:23, 288:14, 288:20, 289:8, 290:5, 291:17, 293:3, 295:15, 295:20, 295:23, 295:25, 298:24, 302:15, 302:17, 303:16, 303:19, 305:7, 305:12, 309:24, 311:1, 312:19, 313:9, 313:13, 313:21, 314:5, 315:5, 315:8, 315:13, 316:2, 317:19, 317:20, 318:20, 318:25, 319:4, 320:20, 321:20, 321:21, 321:23, 322:3, 323:3, 323:4, 323:10, 323:18, 323:20, 323:24,

324:13, 325:19, 326:4, 326:8, 327:5, 327:7, 327:11, 328:9, 332:2, 332:24, 333:21, 334:18, 334:22, 336:8, 337:2, 337:11, 337:21, 338:11, 338:22, 339:2, 340:1, 340:9, 341:3, 341:12, 341:21, 342:1, 342:6, 344:25, 345:18, 345:19, 348:13, 351:18, 352:20, 352:23, 366:17, 377:25, 381:21, 382:10, 399:2, 399:3, 400:3, 401:20, 402:1, 402:2, 402:3, 402:5, 402:8

**SCORING** [6] - 211:10, 251:8, 262:2, 262:3, 377:19, 377:20

**SCREAMING** [1] - 225:18

**SCREEN** [4] - 184:2, 184:3, 184:4

**SCRIPT** [1] - 235:10

**SE** [2] - 328:22, 361:15

**SEARCHING** [1] - 263:7

**SEATED** [3] - 248:22, 351:2, 383:18

**SECOND** [11] - 254:6, 261:13, 275:16, 280:5, 292:13, 311:8, 312:17, 337:13, 369:21, 393:18, 396:17

**SECONDARY** [1] - 209:11

**SECONDLY** [2] - 396:18, 397:19

**SECTION** [15] - 191:2, 255:7, 255:12, 255:16, 255:24, 256:11, 258:7, 258:13, 261:25, 262:18, 263:12, 263:15, 263:20, 323:11, 340:1

**SECTIONS** [2] - 252:14, 261:16

**SECURE** [3] - 244:11, 281:18, 342:12

**SEE** [87] - 171:3,

176:12, 177:22, 184:3, 185:22, 187:14, 189:13, 190:10, 200:24, 201:8, 204:2, 215:3, 223:20, 224:21, 226:16, 248:17, 253:23, 254:14, 255:3, 258:23, 269:3, 271:4, 274:18, 274:23, 275:2, 275:5, 275:13, 280:9, 280:12, 283:10, 283:13, 286:15, 287:10, 287:14, 287:21, 288:10, 288:15, 288:20, 296:18, 302:22, 307:19, 307:23, 310:22, 311:22, 315:11, 315:18, 316:16, 316:22, 318:3, 319:16, 324:12, 330:3, 330:6, 331:9, 332:20, 333:2, 333:20, 333:24, 335:10, 337:11, 337:12, 337:17, 340:21, 353:8, 362:1, 369:8, 371:21, 371:22, 372:5, 376:3, 378:25, 381:16, 384:6, 385:8, 387:8, 394:11, 396:2, 396:11, 396:13, 398:4, 399:24, 399:25, 400:1, 400:23, 401:23, 403:13

**SEEING** [5] - 184:4, 217:6, 329:10, 344:16, 372:18

**SEEKING** [9] - 183:2, 183:4, 245:13, 274:7, 274:17, 347:22, 354:5, 358:25, 365:2

**SEEKS** [10] - 172:9, 173:24, 175:23, 180:6, 185:6, 185:9, 187:4, 189:23, 205:24, 334:10

**SEES** [2] - 311:25

**SELECT** [2] - 257:24, 258:2

**SELECTION** [3] - 258:3, 278:8, 339:9

**SELF** [12] - 172:1, 172:2, 233:11, 234:13, 302:8, 326:20, 326:23, 327:2, 328:1, 395:10, 397:3

**SELF-CONFIDENCE** [1] - 233:11

**SELF-CONTROL** [2] - 395:10, 397:3

**SELF-DESCRIPTIONS** [1] - 328:1

**SELF-EMPLOYED** [2] - 172:1, 172:2

**SELF-REGULATION** [1] - 395:10

**SELF-REPORT** [4] - 234:13, 302:8, 326:20, 326:23

**SELF-REPORTING** [1] - 327:2

**SEMINAR** [1] - 385:22

**SEND** [4] - 274:15, 278:25, 355:6, 361:21

**SENDS** [1] - 274:6

**SENIOR** [1] - 292:5

**SENIORS** [9] - 293:14, 293:15, 294:3, 296:6, 330:23, 338:9, 338:10, 338:23, 377:6

**SENSE** [10] - 243:5, 243:11, 300:13, 348:3, 349:2, 360:18, 366:14, 375:20, 381:25, 396:5

**SENT** [8] - 243:6, 278:20, 278:21, 281:2, 335:3, 347:16, 393:6, 393:19

**SENTENCE** [7] - 222:2, 294:23, 309:12, 313:13, 313:14, 324:7, 369:21

**SENTENCES** [13] - 204:14, 222:5, 222:6, 222:7, 222:10, 222:11, 223:15, 294:22, 294:23, 313:15, 323:22, 323:23

**SENTENCING** [2] - 227:4, 268:25

**SEPARATE** [6] - 187:19, 188:8,

238:15, 317:7, 375:19

**SEPARATED** [1] - 187:20

**SEPARATELY** [2] - 237:21, 237:25

**SEPTEMBER** [4] - 261:4, 261:20, 262:12, 369:21

**SERIES** [3] - 227:12, 312:14, 312:17

**SERIOUS** [1] - 315:25

**SERVE** [2] - 277:25, 280:22

**SERVED** [1] - 390:16

**SERVICE** [5] - 276:19, 276:20, 277:21, 278:3, 278:4

**SERVICES** [5] - 179:7, 239:15, 277:23, 347:10, 349:4

**SERVING** [2] - 281:4, 282:3

**SES** [1] - 268:22

**SET** [7] - 216:9, 229:5, 234:3, 245:1, 316:19, 328:8, 363:24

**SETS** [2] - 312:1, 348:2

**SETTING** [3] - 237:10, 353:21, 366:1

**SETTINGS** [11] - 177:10, 280:7, 285:3, 285:7, 285:17, 286:13, 291:11, 292:2, 336:15, 341:20, 370:6

**SEVEN** [9] - 198:23, 200:14, 201:7, 253:21, 256:13, 258:12, 290:15, 306:6, 310:18

**SEVENTEEN** [1] - 318:6

**SEVERAL** [12] - 187:2, 187:12, 221:12, 231:8, 257:23, 278:24, 290:18, 294:7, 295:10, 300:8, 313:20, 359:11

**SEVERATION** [1] - 228:15

**SEVERE** [3] - 196:4, 294:24, 328:2

**SEVERELY** [3] - 284:24, 319:11, 371:20

**SEX** [2] - 232:15, 232:16

**SEXUALLY** [1] - 389:15

**SHADOW** [1] - 223:23

**SHAPE** [1] - 321:5

**SHAPES** [3] - 227:25, 321:2, 321:3

**SHARE** [2] - 260:3, 390:11

**SHARED** [1] - 364:4

**SHELF** [1] - 191:21

**SHELF** [3] - 199:1, 199:3, 210:11

**SHIFT** [6] - 213:3, 228:7, 228:16, 229:4, 262:5, 305:13

**SHIFTED** [1] - 195:18

**SHIFTING** [2] - 213:9, 228:8

**SHOOT** [1] - 203:1

**SHORT** [4] - 204:15, 222:5, 224:15, 324:3

**SHORT-TERM** [1] - 324:3

**SHORTER** [1] - 203:7

**SHORTHAND** [1] - 310:10

**SHORTLY** [1] - 402:15

**SHOTS** [1] - 184:4

**SHOW** [26] - 216:10, 279:7, 285:16, 287:15, 288:5, 295:2, 300:5, 301:13, 302:17, 303:13, 313:24, 316:10, 318:23, 322:20, 322:22, 323:2, 323:17, 327:6, 328:15, 335:16, 345:1, 349:22, 372:23, 373:8, 378:8, 400:2

**SHOWED** [8] - 304:19, 309:17, 315:25, 328:17, 330:24, 342:5, 388:24, 401:11

**SHOWING** [12] - 286:2, 286:4, 287:20, 296:23, 301:15, 301:18, 321:25, 328:13, 328:16, 328:21, 329:22, 397:20

**SHOWN** [9] - 227:25, 302:22, 302:23, 303:23, 304:1, 304:11, 304:13, 311:15, 312:3

**SHOWS** [13] - 181:4, 181:10, 223:25, 226:23, 274:10, 288:7, 292:16, 300:10, 300:20, 309:23, 313:13, 341:12, 364:8

**SICK** [2] - 186:18, 240:18

**SIDE** [2] - 229:1, 353:25

**SIGN** [1] - 197:15

**SIGNED** [1] - 239:24

**SIGNIFICANCE** [4] - 194:9, 198:20, 199:2, 212:18

**SIGNIFICANT** [24] - 200:18, 208:2, 211:23, 225:14, 233:7, 245:3, 246:2, 301:20, 302:2, 302:4, 302:6, 306:4, 307:24, 321:25, 327:8, 327:23, 331:15, 335:7, 335:11, 335:16, 341:2, 342:21, 400:24

**SIGNIFICANTLY** [3] - 203:4, 206:14, 312:7

**SIGNIFIES** [5] - 242:4, 255:6, 259:2, 262:8, 262:20

**SIGNIFY** [5] - 234:5, 255:5, 259:1, 262:7, 262:19

**SIGNS** [3] - 286:2, 286:4, 335:12

**SILENT** [1] - 204:12

**SILENTLY** [2] - 291:3, 292:15

**SIMILAR** [17] - 182:13, 200:20, 220:9, 220:15, 224:16, 226:11, 253:16, 276:14, 280:25, 291:20, 295:18, 303:4, 328:16, 332:15, 340:21, 358:3, 379:12

**SIMILARLY** [1] - 228:15

**SIMPLE** [5] - 222:11, 223:16, 224:24, 294:22, 313:16

**SIMPLY** [1] - 199:25

**SINAI** [4] - 177:4, 239:3, 239:19, 239:25

**SINAI'S** [2] - 177:3,

177:7

**SING** [1] - 222:8

**SINGLE** [3] - 232:15, 290:16, 290:17

**SINGS** [1] - 222:6

**SITE** [1] - 281:21

**SITTING** [1] - 304:14

**SITUATION** [2] - 198:10, 198:13

**SITUATIONS** [1] - 395:19

**SIX** [9] - 196:16, 197:22, 257:22, 258:13, 258:14, 290:5, 294:8, 371:8, 375:23

**SKILL** [1] - 180:19, 287:20

**SKILLED** [1] - 341:10

**SKILLS** [43] - 208:2, 231:1, 263:12, 285:16, 290:9, 294:13, 295:19, 302:19, 302:25, 303:13, 305:24, 306:4, 309:25, 311:6, 312:24, 313:3, 313:5, 313:7, 313:10, 313:12, 315:14, 315:18, 315:21, 325:1, 333:7, 333:24, 334:1, 335:6, 336:4, 336:19, 336:20, 339:11, 339:13, 339:20, 340:16, 341:5, 341:9, 341:19, 341:24, 342:15, 373:12, 401:5

**SKIP** [1] - 325:4

**SLACK** [1] - 195:16

**SLICE** [1] - 395:24

**SLIGHTLY** [2] - 288:18, 317:20

**SLOW** [9] - 173:4, 181:2, 181:3, 189:24, 190:6, 213:21, 229:18, 237:1, 237:11

**SLOWER** [1] - 185:8

**SLOWLY** [7] - 181:11, 213:18, 213:23, 214:8, 230:12, 230:17, 382:25

**SMALLER** [1] - 391:9

**SMART** [9] - 197:10, 200:21, 202:6, 214:3, 223:24

**SO-CALLED** [1] -

382:16

**SOCIAL** [8] - 231:8, 231:11, 237:18, 285:7, 371:11, 389:12, 400:22, 401:5

**SOCIALLY** [2] - 401:1, 401:9

**SOLELY** [1] - 234:13, 380:22

**SOLEMLY** [1] - 273:16

**SOLID** [1] - 399:16

**SOLUTIONS** [1] - 254:15

**SOLVING** [1] - 191:10

**SOMEONE** [1] - 336:19

**SOMEONE** [42] - 202:23, 243:23, 247:8, 248:12, 271:6, 271:8, 274:17, 284:18, 285:5, 286:7, 288:6, 293:3, 300:22, 304:11, 304:13, 306:22, 311:18, 311:25, 312:6, 315:14, 318:20, 329:18, 332:3, 333:1, 334:1, 338:5, 342:23, 343:23, 344:4, 346:6, 349:6, 349:17, 349:20, 349:24, 355:22, 361:23, 366:22, 373:14, 374:15, 375:12, 382:21, 382:25

**SOMETIME** [2] - 243:15, 271:3

**SOMETIMES** [5] - 179:8, 180:5, 180:7, 316:19, 335:5

**SOMETIMES** [14] - 180:9, 195:14, 204:17, 237:25, 238:1, 241:1, 244:10, 270:22, 291:10, 301:11, 361:15, 391:10, 391:13

**SOMEWHAT** [2] - 292:3, 364:23

**SOMEWHERE** [2] - 214:4, 340:10

**SONGS** [1] - 194:6

**SOON** [1] - 304:15

**SORRY** [20] - 183:11, 184:5, 190:6, 190:7, 201:1, 212:12,

213:6, 230:2, 243:3, 246:9, 255:21, 258:11, 289:13, 293:18, 304:5, 319:24, 319:25, 325:5, 392:20, 402:18

**SORT** [2] - 227:20, 229:1, 320:3

**SORT** [19] - 228:1, 236:6, 283:10, 288:1, 288:5, 293:13, 317:6, 321:1, 321:4, 321:5, 324:19, 343:4, 345:1, 370:7, 373:4, 381:20, 381:23, 381:24, 382:12

**SORTING** [5] - 320:7, 320:23, 321:15, 321:19, 321:24

**SORTING** [1] - 228:1, 228:3, 228:6, 321:6

**SORTS** [10] - 173:2, 279:22, 284:21, 286:13, 287:15, 287:16, 317:10, 321:9, 400:5

**SOUGHT** [1] - 274:25

**SOUND** [1] - 245:24

**SOUNDS** [5] - 245:2, 268:9, 279:19, 303:10, 307:21

**SOURCE** [5] - 193:4, 245:9, 245:11, 245:15, 245:19

**SOURCES** [7] - 192:13, 192:16, 193:18, 193:24, 194:20, 219:6, 245:12

**SPACE** [1] - 290:18

**SPACED** [1] - 290:17

**SPACES** [1] - 201:25

**SPAN** [6] - 311:9, 311:14, 311:17, 312:10, 312:14, 312:21

**SPATIAL** [16] - 188:14, 188:22, 188:25, 194:16, 201:18, 202:7, 203:9, 207:5, 208:2, 297:20, 302:19, 306:10, 306:11, 306:15, 306:16

**SPEAKING** [3] - 251:3, 283:16, 317:3

**SPEAKS** [1] - 230:10

**SPECIAL** [2] - 198:1,

279:17

SPECIALIST [3] - 192:17, 264:25, 265:8

SPECIALITIES [1] - 172:24

SPECIALITY [2] - 172:5, 172:11

SPECIALIZE [1] - 197:7

SPECIALIZED [1] - 172:21

SPECIALIZES [2] - 172:7, 172:12

SPECIALTIES [1] - 276:10

SPECIALTY [3] - 279:3, 384:22, 391:22

SPECIFIC [27] - 176:4, 181:1, 187:13, 187:15, 207:7, 207:25, 220:19, 233:23, 274:24, 284:12, 285:12, 297:16, 297:23, 302:16, 306:11, 306:23, 307:6, 308:8, 321:24, 322:3, 330:7, 330:15, 332:24, 333:21, 348:10, 348:11, 371:13

SPECIFICALLY [9] - 189:21, 193:10, 201:4, 213:19, 245:10, 277:5, 284:10, 368:17, 385:3

SPECIFICS [2] - 186:20, 299:6

SPECIFIED [6] - 207:4, 297:11, 297:15, 306:18, 306:21, 375:13

SPECIFYING [1] - 346:22

SPECTRUM [2] - 177:14, 177:16

SPECULATE [1] - 319:20

SPECULATING [1] - 324:19

SPEECH [6] - 194:25, 196:1, 196:5, 196:8, 196:12, 347:9

SPEECH / LANGUAGE [1] - 347:3

SPEED [8] - 221:16,

---

222:18, 224:23, 229:4, 309:14, 309:16, 316:7, 371:19

SPEEDS [2] - 292:17, 311:4

SPELL [9] - 171:10, 235:18, 249:6, 250:1, 273:19, 303:12, 307:18, 334:11, 383:19

SPELLING [15] - 181:4, 187:14, 187:17, 195:23, 303:10, 306:13, 307:8, 307:17, 307:20, 307:21, 330:10, 331:6, 331:9

SPELLING [1] - 181:5

SPEND [1] - 343:9

SPENDING [2] - 179:18, 389:16

SPENT [1] - 363:6

SPOKEN [3] - 332:2, 352:18, 356:8

SPOUSE [1] - 244:17

STAGE [1] - 195:21

STAKES [2] - 218:11, 291:21

STAND [2] - 232:9, 273:14

STANDALONE [1] - 311:21

STANDARD [44] - 189:15, 191:1, 191:2, 201:15, 204:21, 205:22, 206:4, 206:6, 207:14, 210:6, 210:16, 210:18, 210:20, 211:1, 220:17, 220:21, 220:25, 222:13, 223:2, 224:11, 224:22, 225:9, 236:21, 254:1, 255:8, 293:17, 295:14, 297:6, 299:16, 300:25, 304:9, 339:14, 350:20, 363:21, 366:3, 376:1, 377:16, 378:2, 378:4, 379:5, 379:12, 382:2, 382:9

STANDARDIZATION [1] - 355:25

STANDARDIZE [1] - 298:24

STANDARDIZED [26]

---

- 236:14, 247:3, 252:4, 285:16, 287:22, 319:13, 319:23, 325:2, 332:14, 332:17, 335:24, 336:24, 337:1, 340:18, 341:21, 355:21, 372:24, 380:13, 380:16, 380:23, 390:17, 399:2, 399:7, 400:11, 401:19, 402:1

STANDARDS [4] - 184:19, 292:19, 366:10, 381:11

STANDING [3] - 267:7, 273:4, 383:13

START [6] - 205:25, 285:1, 332:19, 347:18, 386:25, 390:5

STARTED [8] - 186:6, 194:25, 196:25, 197:25, 236:22, 281:5, 288:14, 351:19

STARTING [3] - 173:8, 317:22, 341:22

STARTING [1] - 330:15

STARTS [2] - 201:6, 330:4

STATE [9] - 171:10, 171:21, 174:15, 249:6, 273:19, 274:1, 276:4, 383:19, 391:5

STATE [6] - 256:19, 276:4, 280:1, 358:5, 369:1, 384:18

STATEMENT [7] - 191:21, 319:14, 319:15, 324:6, 348:6, 348:9, 370:9

STATEMENTS [4] - 282:17, 329:6, 329:10, 353:6

STATES [3] - 236:19, 236:20, 241:21

STATES [2] - 170:1, 170:12

STATES [3] - 170:5, 177:18, 250:22

STATISTICAL [3] - 202:10, 206:17, 223:2

STATISTICAL [1] - 180:4

STATISTICALLY [1] -

---

223:4

STATISTICS [1] - 349:11

STATUS [2] - 190:17, 343:12

STAY [2] - 286:15, 310:2

STAYED [1] - 386:17

STEEP [1] - 316:11

STEIN [1] - 170:14

STENOGRAPHY [1] - 170:25

STEP [2] - 305:23, 394:18

STEP [13] - 183:15, 282:24, 305:19, 305:23, 325:22, 325:25, 326:10, 331:11, 331:13, 349:9, 350:8, 350:10, 395:5

STEPPING [1] - 347:11

STICK [1] - 230:5

STICKS [1] - 321:8

STILL [20] - 174:20, 180:7, 181:10, 195:19, 202:24, 206:14, 209:20, 220:11, 223:25, 236:19, 241:10, 257:14, 273:6, 285:5, 294:8, 341:10, 341:13, 394:9, 394:13

STIMULANT [1] - 217:9

STIMULANTS [1] - 216:25

STIMULI [3] - 227:24, 318:10, 371:18

STIMULUS [3] - 235:10, 304:10, 304:16

STINT [2] - 196:6, 196:7

STONY [3] - 191:18, 216:13

STOOP [1] - 214:21

STOP [2] - 173:23, 219:21

STOPPED [2] - 173:25, 291:1

STORAGE [1] - 324:1

STORY [2] - 322:19, 322:20

STRATEGIES [3] - 264:14, 264:17, 268:5

STRATEGY [1] - 273:8

---

STREET [2] - 170:15, 170:19

STRICTLY [3] - 185:17, 230:6, 230:7

STRIKE [1] - 330:25

STRONG [8] - 195:6, 195:7, 197:2, 329:6, 329:10, 399:3, 400:16, 401:17

STROOP [8] - 214:11, 216:1, 305:11, 305:18, 308:12, 308:17, 310:1, 320:17

STRUCK [2] - 308:2, 335:10

STRUCTURAL [1] - 317:10

STRUCTURED [1] - 301:1

STRUGGLE [2] - 193:17, 199:16

STRUGGLED [2] - 199:3, 199:11

STRUGGLES [3] - 176:24, 181:17, 195:17

STRUGGLING [1] - 181:8

STUCK [1] - 228:16

STUDENT [9] - 191:25, 264:5, 267:15, 292:10, 293:12, 372:23, 372:25, 373:7, 386:16

STUDENT'S [1] - 268:1

STUDENTS [27] - 199:4, 199:7, 199:10, 208:7, 226:2, 267:18, 268:5, 268:10, 268:14, 268:15, 268:16, 268:17, 268:18, 272:9, 272:20, 278:12, 287:25, 328:16, 328:17, 344:7, 344:9, 344:12, 344:13, 354:8, 355:14, 385:17, 385:22

STUDENTS [1] - 277:16

STUDENTS' [1] - 344:10

STUDIED [3] - 389:8, 389:10

STUDIES [2] - 388:1,

388:17

**STUDY** [8] - 210:3, 271:19, 328:15, 344:12, 364:1, 388:1, 388:3, 388:11

**STUDYING** [3] - 342:11, 344:14, 344:16

**STUFF** [5] - 176:9, 188:22, 202:7, 224:24, 226:23

**STUTTER** [1] - 196:4

**STUTTERER** [1] - 196:9

**STUTTERERS** [1] - 195:5

**STUTTERING** [3] - 195:2, 195:6, 347:2

**STUTTERING** [1] - 195:2

**STYLES** [1] - 382:22

**SUB** [2] - 312:20, 313:17

**SUBJECT** [2] - 198:15, 385:19

**SUBJECTS** [1] - 252:13

**SUBMIT** [5] - 172:24, 173:1, 360:21, 361:17

**SUBMITS** [1] - 278:20

**SUBMITTED** [9] - 275:7, 284:3, 335:1, 359:4, 359:6, 359:12, 361:11, 367:22, 369:17

**SUBMITTING** [1] - 363:18

**SUBSECTIONS** [1] - 261:21

**SUBSEQUENT** [5] - 242:20, 242:22, 243:1, 283:2, 309:14

**SUBSEQUENTLY** [1] - 242:7

**SUBSTANCE** [5] - 217:10, 368:9, 372:12, 372:17, 389:5

**SUBSTANTIAL** [8] - 181:18, 236:23, 274:11, 274:21, 346:14, 350:17, 375:12, 381:13

**SUBSTANTIALLY** [4] - 258:6, 258:9, 274:21, 373:8

**SUBSTANTIATE** [2] - 394:21, 394:24

**SUBTEST** [6] - 222:2,

223:17, 224:18, 294:19, 295:1, 302:20

**SUBTESTS** [1] - 312:13

**SUCCEED** [1] - 263:10

**SUCCESS** [1] - 272:24

**SUCCESSFUL** [7] - 255:23, 256:2, 256:5, 259:7, 259:21, 260:5, 387:18

**SUFFICIENT** [14] - 274:18, 288:9, 316:9, 325:24, 326:8, 346:19, 350:10, 350:15, 350:16, 360:22, 361:21, 367:14, 370:13, 375:15

**SUFFICIENTLY** [1] - 341:3

**SUGGEST** [8] - 196:23, 199:23, 219:16, 346:8, 354:9, 354:18, 364:2, 373:20

**SUGGESTING** [1] - 319:1

**SUGGESTS** [3] - 200:7, 324:1, 333:18

**SUITE** [4] - 170:15, 170:17, 170:19, 171:23

**SUM** [3] - 261:16, 261:20, 344:22

**SUMMARIZE** [2] - 207:20, 216:5

**SUMMARIZED** [1] - 216:19

**SUMMARIZING** [1] - 347:16

**SUMMARY** [2] - 186:9, 208:15

**SUPERIOR** [7] - 197:16, 206:21, 211:7, 212:2, 399:4, 402:4

**SUPERVISE** [4] - 239:20, 239:23, 280:16, 353:23

**SUPERVISED** [2] - 173:16, 280:6

**SUPERVISEES** [1] - 240:2

**SUPERVISION** [1] - 217:25

**SUPPLEMENTAL** [1] - 312:20

**SUPPLY** [1] - 309:3

**SUPPORT** [7] - 216:13, 239:8, 239:9, 284:4, 348:4, 390:4, 395:3

**SUPPORTED** [4] - 307:9, 330:18, 331:3, 331:17

**SUPPORTING** [1] - 329:8

**SUPPOSE** [2] - 361:22, 376:14

**SUPPOSED** [3] - 215:12, 320:10, 336:19

**SURFACE** [1] - 203:4

**SURGERY** [1] - 358:16

**SURGICAL** [1] - 358:14

**SURPRISED** [4] - 267:15, 267:17, 307:23, 331:9

**SURPRISING** [1] - 314:3

**SURPRISINGLY** [2] - 192:23, 195:14

**SURVEY** [3] - 190:25, 191:3, 191:4

**SUSCEPTIBLE** [1] - 259:20

**SUSPECT** [1] - 218:20

**SUSTAINED** [6] - 235:1, 270:21, 319:10, 319:11, 371:17

**SUSTAINING** [1] - 371:13

**SWEAR** [1] - 273:16

**SWORN** [4] - 171:8, 171:17, 249:4, 383:16

**SYMPTOM** [1] - 310:20

**SYMPTOM** [20] - 190:25, 191:2, 191:3, 218:3, 218:15, 218:25, 219:7, 219:17, 244:13, 301:16, 301:17, 301:24, 310:17, 310:25, 311:2, 311:8, 311:11, 312:11, 316:9, 370:4

**SYMPTOMS** [46] - 191:4, 191:5, 191:7, 191:9, 191:11, 191:14, 191:15, 195:25, 232:13, 233:9, 246:3, 246:8,

284:19, 285:1, 285:5, 285:8, 286:9, 287:7, 287:17, 288:5, 301:1, 301:7, 301:11, 301:21, 302:1, 302:3, 302:4, 302:5, 302:7, 309:5, 326:20, 326:25, 327:10, 327:18, 327:20, 327:23, 331:20, 369:22, 370:4, 371:8, 371:13, 395:17, 396:7, 397:4

**SYNTHESIZE** [2] - 190:18, 190:23

**SYRACUSE** [2] - 276:1, 276:3

**SYSTEM** [2] - 239:8, 239:9

**SYSTEM** [2] - 320:2, 320:12

**SYSTEMS** [3] - 191:6, 191:11, 302:7

## T

**TAB** [18] - 275:2, 309:8, 335:19, 367:18, 369:6, 369:15, 370:14, 375:21, 377:9, 378:11, 384:3, 384:5, 384:9, 392:15, 393:9, 394:6, 394:8, 394:9

**TAB** [1] - 339:21

**TABLE** [1] - 376:5

**TABLE'S** [1] - 378:20

**TABLES** [2] - 316:18, 316:23

**TABS** [1] - 392:23

**TAKER** [7] - 255:23, 256:2, 256:5, 259:22, 260:5, 270:22, 271:3

**TAKERS** [2] - 258:16, 272:9

**TALKS** [7] - 276:20, 278:1, 278:6, 278:8, 278:10, 385:19

**TALL** [1] - 202:24

**TAPE** [2] - 207:13, 238:9

**TAPED** [1] - 207:12

**TARGETED** [1] - 387:1

**TARGETS** [1] - 232:5

**TASK** [5] - 320:3, 320:7, 320:23,

321:15, 321:19

**TASK** [2] - 222:7, 319:8

**TASKS** [3] - 324:20, 371:15, 371:16

**TAUGHT** [6] - 185:4, 185:7, 185:10, 268:5, 279:8, 385:21

**TEACH** [2] - 177:5, 355:13

**TEACHER** [12] - 235:5, 287:14, 288:7, 334:14, 397:13, 397:14, 397:18, 397:19, 397:24, 398:1, 399:22, 400:12

**TEACHERS** [4] - 195:23, 237:15, 276:6, 396:20

**TEACHERS** [2] - 173:11, 276:18

**TEACHES** [1] - 185:4

**TEACHING** [7] - 250:10, 276:17, 279:5, 279:19, 354:8, 385:14, 390:15

**TECHNICALLY** [1] - 303:9

**TECHNIQUES** [2] - 279:11, 279:21

**TEEN** [1] - 389:14

**TEN** [18] - 198:4, 198:8, 198:16, 227:6, 261:21, 305:11, 333:6, 333:17, 339:2, 345:5, 348:15, 350:24, 351:21, 357:7, 357:25, 379:18, 388:4

**TEN-MINUTE** [3] - 227:6, 348:15, 350:24

**TEND** [9] - 267:19, 268:14, 300:11, 300:21, 340:16, 344:5, 344:13, 344:18, 344:24

**TENDED** [1] - 198:3

**TENDENCY** [1] - 300:16

**TERM** [5] - 180:14, 197:18, 324:3, 374:25

**TERMS** [23] - 197:8, 229:3, 233:9, 233:11, 257:11, 311:3, 313:11,

315:3, 315:14, 329:6, 346:9, 348:12, 350:12, 350:14, 353:10, 353:20, 356:2, 364:23, 397:12, 398:10, 400:21, 401:4, 401:19

**TERRANOVA** [7] - 334:2, 334:4, 342:4, 342:10, 352:11, 399:8

**TEST** [42] - 208:19, 212:13, 212:15, 214:11, 221:25, 223:10, 227:20, 229:9, 229:20, 229:25, 230:5, 250:5, 289:25, 294:6, 295:17, 295:18, 299:11, 299:20, 302:13, 303:8, 303:22, 305:12, 305:18, 308:12, 311:24, 316:15, 316:17, 316:22, 320:16, 321:24, 322:8, 322:22, 323:4, 325:6, 333:18, 333:22, 339:5, 342:3, 342:10, 342:12, 351:23

**TEST** [204] - 173:1, 185:1, 201:15, 202:9, 203:22, 204:5, 204:8, 204:11, 204:12, 204:20, 205:3, 206:3, 209:1, 209:4, 209:11, 210:3, 213:2, 214:10, 214:21, 217:23, 218:17, 218:19, 218:25, 219:7, 219:20, 220:1, 220:14, 222:3, 224:15, 224:16, 225:1, 225:3, 225:7, 225:8, 226:13, 227:25, 234:21, 234:22, 240:12, 240:13, 247:3, 247:11, 252:4, 252:13, 254:12, 255:23, 256:2, 256:5, 256:15, 257:1, 257:7, 257:23, 258:16, 259:22, 260:5, 263:2, 265:17,

265:21, 266:12, 267:1, 267:2, 267:4, 267:5, 267:6, 267:7, 267:8, 267:11, 267:12, 267:16, 267:22, 268:5, 268:19, 270:22, 271:3, 271:13, 272:9, 272:16, 280:13, 288:15, 288:18, 290:1, 290:2, 290:7, 290:12, 290:22, 290:23, 290:25, 291:13, 291:17, 291:19, 292:16, 292:22, 293:24, 293:25, 294:4, 294:15, 295:21, 299:14, 299:15, 299:19, 300:21, 302:11, 302:15, 302:25, 303:5, 303:11, 303:12, 303:15, 305:5, 307:21, 308:14, 310:18, 310:25, 311:8, 311:9, 311:10, 311:14, 311:18, 312:3, 312:10, 312:11, 312:12, 312:13, 312:14, 312:20, 312:24, 313:1, 313:8, 314:5, 315:15, 317:14, 317:24, 318:8, 319:17, 321:8, 322:9, 325:7, 325:19, 326:4, 326:8, 328:8, 330:11, 333:5, 333:6, 333:24, 334:5, 334:13, 334:17, 334:18, 334:22, 335:25, 336:24, 337:2, 338:1, 338:5, 338:21, 338:24, 339:7, 339:8, 339:13, 339:14, 341:2, 341:7, 341:9, 341:11, 341:12, 341:17, 341:21, 341:23, 342:9, 342:13, 344:25, 345:6, 345:7, 345:18, 347:22, 349:4, 349:12, 349:17, 349:25, 350:2, 351:18,

351:25, 352:9, 352:11, 354:2, 359:1, 366:3, 366:17, 373:9, 382:19, 382:21, 399:2, 399:8, 399:9, 399:10, 399:12, 401:19, 402:8

**TEST-TAKER** [5] - 255:23, 256:2, 256:5, 259:22, 260:5

**TEST-TAKERS** [1] - 258:16

**TEST-TAKING** [1] - 268:5

**TESTIFIED** [16] - 171:18, 182:21, 183:1, 183:5, 239:2, 249:5, 270:19, 326:1, 337:25, 340:17, 359:11, 359:25, 360:8, 360:12, 380:6, 383:17

**TESTIFY** [2] - 273:4, 282:4

**TESTIFYING** [2] - 183:3, 282:8

**TESTIMONY** [3] - 247:17, 269:3, 386:10

**TESTING** [66] - 185:13, 185:14, 186:7, 186:12, 186:15, 188:24, 189:14, 200:19, 203:14, 207:11, 218:12, 235:3, 235:4, 235:5, 239:22, 241:14, 241:23, 243:20, 257:2, 263:21, 266:23, 266:24, 271:9, 277:13, 278:14, 279:13, 279:15, 280:16, 280:23, 280:25, 281:10, 281:22, 282:10, 282:14, 284:7, 292:25, 298:18, 298:24, 303:4, 304:18, 309:2, 309:13, 310:4, 324:25, 325:24, 332:5, 345:3, 345:4, 347:13, 350:8, 355:2, 358:17, 359:4, 364:16, 390:16, 390:17,

392:3, 392:13, 393:14, 393:23, 394:18, 402:2

**TESTING** [2] - 277:15, 358:14

**TESTINGS** [1] - 188:25

**TESTS** [4] - 303:10, 307:25, 310:20, 326:16

**TESTS** [91] - 186:2, 204:1, 204:3, 204:6, 209:5, 213:8, 218:1, 218:22, 220:14, 221:12, 223:7, 237:5, 240:21, 242:11, 264:18, 266:9, 272:8, 280:18, 285:17, 287:22, 288:17, 291:9, 295:8, 295:10, 295:12, 295:14, 299:25, 300:11, 303:17, 303:20, 305:17, 305:21, 306:1, 306:3, 307:16, 307:17, 307:18, 308:9, 308:20, 310:19, 311:3, 311:12, 312:25, 313:2, 313:4, 313:6, 313:18, 316:8, 316:9, 317:1, 317:3, 317:4, 317:6, 317:13, 317:17, 317:18, 320:13, 322:24, 323:2, 324:14, 325:2, 325:15, 326:14, 326:15, 332:15, 332:17, 335:25, 336:5, 336:6, 336:7, 340:18, 342:5, 342:9, 346:2, 348:22, 353:12, 373:12, 373:15, 380:14, 380:17, 380:23, 382:3, 382:15, 399:7, 400:11, 402:1, 402:7, 402:9

**TEXT** [1] - 331:15

**TEXTBOOK** [1] - 387:23

**TEXTBOOK** [1] - 175:7

**THANKFUL** [1] - 179:12

**THE** [87] - 170:12,

171:1, 171:3, 171:5, 171:9, 171:12, 171:14, 174:5, 174:7, 187:5, 227:3, 227:8, 238:20, 247:23, 247:25, 248:3, 248:4, 248:8, 248:14, 248:17, 248:20, 248:22, 249:1, 249:6, 249:8, 249:10, 249:14, 249:17, 251:2, 266:15, 266:17, 268:24, 269:2, 269:6, 270:21, 273:11, 273:18, 273:21, 281:14, 286:2, 286:3, 291:5, 291:7, 301:22, 301:23, 304:21, 304:23, 304:24, 304:25, 306:7, 317:25, 318:2, 318:5, 318:6, 321:10, 321:12, 348:14, 348:17, 350:23, 351:2, 351:6, 352:14, 352:16, 379:17, 379:20, 379:22, 379:25, 380:3, 383:5, 383:7, 383:11, 383:13, 383:18, 383:21, 392:4, 392:7, 402:12, 402:18, 402:19, 402:23, 403:3, 403:8, 403:11, 403:12, 403:13, 403:15, 403:17

**THEMSELVES** [2] - 188:18, 343:5

**THERAPIST** [1] - 176:18

**THERAPY** [4] - 196:5, 196:8, 196:12, 347:3

**THEREIN** [1] - 308:6

**THEY'VE** [1] - 181:4

**THINKING** [1] - 305:4

**THINKS** [1] - 356:24

**THIRD** [8] - 173:22, 173:25, 191:24, 195:14, 197:25, 275:17, 279:4, 304:21

**THIRDS** [3] - 210:7, 212:3, 379:9

**THOUSANDS** [2] - 177:24, 280:6

THREAD [1] - 190:6
THREADS [1] - 194:11
THREE [32] - 198:8,
199:19, 204:25,
205:5, 219:12,
220:17, 222:17,
224:22, 252:14,
261:16, 262:1,
274:16, 276:23,
277:12, 280:2,
283:2, 283:21,
283:24, 323:22,
323:23, 337:1,
338:14, 338:15,
339:2, 350:12,
372:5, 375:22,
380:19, 381:9,
384:9, 400:7, 400:8
THREES [1] - 400:9
THROUGHOUT [5] -
191:20, 191:25,
218:22, 325:3, 397:5
THURSDAY [1] -
403:18
TIMED [27] - 204:20,
204:22, 204:24,
222:16, 222:17,
224:7, 224:14,
224:15, 252:9,
252:10, 300:10,
300:11, 300:14,
308:17, 308:20,
309:18, 313:12,
313:25, 316:7,
352:2, 352:4, 352:7,
352:11
TIMING [1] - 241:13
TINY [1] - 340:13
TIRING [1] - 238:17
TITLE [3] - 249:21,
254:5, 256:18
TITLE [2] - 266:2,
353:2
TODAY [1] - 356:13
TODAY [3] - 364:19,
393:21, 394:13
TOGETHER [7] -
186:10, 221:19,
237:13, 259:17,
325:13, 330:5,
399:20
TOMM [5] - 311:21,
311:23, 311:24
TOMORROW [3] -
402:22, 403:10,
403:13
TONS [1] - 191:17
TOOK [23] - 196:4,
226:18, 247:11,
247:12, 252:12,

253:17, 254:18,
260:11, 261:8,
261:11, 262:9,
262:15, 262:21,
262:23, 292:25,
333:6, 334:2, 338:1,
339:25, 355:22,
399:2, 399:4, 399:6
TOOLS [1] - 387:19
TOP [10] - 191:18,
198:25, 220:5,
253:20, 254:21,
262:22, 289:2,
337:17, 339:2, 394:6
TOPIC [1] - 281:11
TOPICS [1] - 277:8
TOTAL [4] - 261:14,
261:19, 262:1,
387:25
TOTALITY [3] - 396:2,
399:21, 401:18
TOTALLY [1] - 176:22
TOTALLY [1] - 176:22
TOWARDS [1] -
198:25
TRACK [5] - 177:25,
293:19, 360:20,
363:2, 363:5
TRACKED [1] - 389:13
TRAIL [6] - 213:2,
235:2, 287:11,
287:12, 305:5,
305:18
TRAIL [1] - 320:16
TRAIL-MAKING [1] -
213:2
TRAINED [3] - 178:19,
185:1, 368:17
TRAINING [10] -
172:20, 172:21,
174:15, 216:23,
276:17, 279:5,
280:3, 353:18,
368:18, 401:5
TRAININGS [1] -
276:21
TRAJECTORY [1] -
345:25
TRANSCRIPT [1] -
170:25
TRANSCRIPT [1] -
170:11
TRANSCRIPTION [1] -
170:25
TRANSFERRING [1] -
324:2
TRANSFORMATION
[1] - 223:3
TRANSLATE [1] -
324:16

TRANSLATES [2] -
232:23, 237:4
TRANSMITTED [1] -
389:15
TRAUMA [1] - 182:14
TRAVELING [1] -
213:19
TREAT [4] - 176:25,
182:17, 315:12,
368:11
TREATED [3] -
370:12, 387:4,
389:23
TREATING [9] - 172:7,
216:11, 216:21,
217:2, 217:3, 235:9,
235:11, 372:8, 387:8
TREATMENT [16] -
172:13, 175:5,
176:16, 176:17,
176:21, 216:22,
243:19, 384:25,
396:23, 397:2,
398:13, 398:24,
400:14, 401:20,
402:8
TREMENDOUS [1] -
343:17
TRIAL [1] - 303:22
TRICKS [1] - 341:8
TRIED [1] - 243:3
TROUBLE [3] - 194:7,
285:15, 316:17
TRUE [8] - 199:19,
268:10, 268:12,
268:23, 271:6,
294:23, 355:1,
373:25
TRUST [4] - 219:19,
310:22, 349:1,
364:18
TRUTH [5] - 179:12,
257:2, 273:16,
273:17
TRY [11] - 173:3,
173:6, 187:5, 226:9,
244:3, 264:11,
283:7, 349:13,
381:8, 395:14, 396:6
TRYING [12] - 219:18,
241:3, 267:7,
296:25, 361:22,
378:21, 381:5,
387:6, 387:8,
395:13, 396:5, 401:4
TURN [37] - 174:2,
184:1, 194:22,
198:23, 217:22,
218:2, 227:19,
241:20, 257:14,

258:21, 259:15,
260:13, 275:4,
275:19, 278:5,
278:16, 288:12,
289:11, 298:11,
304:5, 309:8, 319:5,
322:14, 326:11,
335:19, 337:4,
337:19, 339:21,
367:18, 369:18,
375:22, 384:8,
385:25, 392:10,
392:15, 393:8, 394:6
TURNED [1] - 389:20
TUTOR [1] - 245:23
TUTORING [25] -
181:20, 197:23,
197:25, 198:5,
198:8, 198:16,
198:20, 207:13,
224:5, 341:2,
341:17, 341:24,
342:8, 342:16,
342:17, 345:2,
345:4, 345:6, 349:4,
349:21, 349:23,
349:24, 350:3,
351:19, 351:20
TUTORS [7] - 192:17,
195:11, 195:20,
265:4, 271:18,
340:20
TWELVE [1] - 357:8
TWICE [4] - 238:16,
238:17, 261:11,
339:25
TWO [2] - 198:8,
200:13
TWO [42] - 176:4,
187:21, 188:25,
194:2, 194:11,
197:11, 197:23,
204:15, 204:17,
210:7, 211:12,
212:3, 215:18,
217:4, 219:11,
223:4, 224:10,
224:22, 225:6,
235:20, 237:20,
241:15, 261:6,
262:5, 267:16,
279:13, 286:21,
306:9, 333:11,
333:15, 334:18,
342:9, 344:22,
366:8, 367:22,
376:14, 378:11,
379:9, 388:1,
388:17, 393:20,
400:7

TYPE [29] - 176:11,
176:18, 176:20,
177:12, 184:18,
187:3, 187:9,
187:10, 198:13,
216:19, 216:22,
217:8, 217:19,
222:3, 232:25,
238:2, 331:16,
353:3, 356:6,
358:25, 361:11,
361:16, 362:1,
367:8, 368:23,
376:1, 377:12,
378:1, 380:25
TYPES [1] - 197:23,
276:14, 287:23,
377:24, 381:1
TYPICAL [8] - 181:13,
214:1, 232:25,
284:24, 298:8,
328:14, 328:21,
382:2
TYPICALLY [17] -
178:18, 182:11,
196:8, 196:9, 270:7,
278:21, 282:18,
285:25, 286:8,
291:7, 318:10,
334:16, 338:8,
347:14, 348:2,
398:3, 398:4
TYPICALLY [2] -
334:14, 362:1

## U

U-MASS [2] - 386:14,
386:18
UH-HUM [1] - 335:23
ULTIMATE [1] - 284:6
ULTIMATELY [4] -
198:3, 199:14,
200:20, 201:23
UNBALANCED [1] -
221:18
UNCOMMON [5] -
193:16, 195:3,
221:17, 242:9, 347:8
UNDER [30] - 174:14,
174:22, 194:2,
204:20, 205:21,
210:6, 210:16,
217:25, 218:2,
237:3, 261:6, 278:3,
293:17, 294:18,
294:24, 300:14,
309:18, 311:8,
311:11, 313:25,
317:2, 322:15,

LISA SCHMID, CCR, RMR
Official Court Reporter

A1132

12/29/2022 03:43:11 PM

38

323:7, 355:21,
365:20, 369:6,
369:16, 379:5,
379:12, 395:2
**UNDERLINE** [1] -
216:7
**UNDERLYING** [5] -
181:24, 194:15,
203:9, 213:14,
230:10
**UNDERNEATH** [2] -
255:11, 257:17
**UNDERREPRESENT
ED** [1] - 268:11
**UNDERSCORED** [1] -
309:19
**UNDERSTOOD** [2] -
241:5, 242:3
**UNEQUIVOCALLY** [4]
- 187:10, 234:4,
234:15, 236:24
**UNEVEN** [1] - 328:5
**UNEVENNESS** [1] -
328:9
**UNEXPECTED** [3] -
180:19, 180:22,
236:17
**UNFORTUNATELY**
[5] - 186:15, 235:22,
269:2, 309:22,
376:22
**UNFORTUNATELY**
[2] - 325:23, 350:9
**UNHEARD** [1] - 242:9
**UNIDENTIFIED** [1] -
195:14
**UNIFIED** [1] - 203:3
**UNINTERRUPTED** [1]
- 227:5
**UNITED** [2] - 170:1,
170:12
**UNITED** [3] - 170:5,
177:18, 250:22
**UNIVERSITY** [14] -
173:10, 173:12,
173:13, 173:15,
185:11, 191:19,
276:2, 276:6, 278:4,
384:18, 384:19,
385:18, 401:8, 401:9
**UNIVERSITY** [2] -
185:10, 278:15
**UNLESS** [2] - 237:6,
392:4
**UNLIKE** [2] - 270:11,
305:22
**UNLIKELY** [4] -
247:16, 259:24,
260:8, 312:4
**UNREALISTIC** [1] -

324:20
**UNRELIABLE** [1] -
292:16
**UNREMARKABLE** [1]
- 231:11
**UNSPECIFIED** [10] -
306:9, 306:14,
306:17, 306:24,
307:4, 308:3, 308:6,
374:4, 374:25,
375:13
**UNTIMED** [5] - 204:22,
204:24, 224:8, 352:6
**UNTREATED** [1] -
389:8
**UNUSUAL** [11] -
197:11, 205:21,
210:15, 210:17,
290:23, 297:13,
305:21, 308:2,
316:12, 324:19,
402:6
**UP** [28] - 174:14,
181:4, 181:10,
184:1, 184:5,
186:11, 187:6,
188:25, 198:4,
209:15, 210:20,
214:15, 223:25,
228:5, 232:21,
246:12, 249:13,
270:11, 325:4,
329:11, 343:19,
346:6, 346:7, 348:2,
349:14, 392:11,
401:16
**UPDATED** [2] -
183:16, 306:20
**UPLOAD** [2] - 281:20,
281:21
**UPS** [1] - 401:14
**USEFUL** [5] - 293:7,
333:1, 336:8,
336:16, 339:17
**USES** [4] - 209:22,
264:14, 264:17,
346:24
**USMLE** [19] - 213:12,
228:24, 230:9,
230:14, 231:1,
238:3, 270:11,
270:17, 270:20,
274:8, 282:11,
303:1, 303:4,
305:20, 325:22,
326:10, 350:8,
365:6, 394:19
**USMLES** [1] - 365:3
**USUAL** [9] - 186:21,
188:11, 213:19,

214:1, 228:18,
237:3, 238:6, 240:16
**UTILIZE** [1] - 189:4
**UTILIZED** [1] - 310:15

## V

**VALID** [17] - 218:7,
219:9, 219:11,
219:13, 219:16,
225:16, 225:17,
226:4, 287:2, 311:2,
315:16, 316:3,
316:10, 324:9,
331:1, 341:13
**VALIDITY** [1] - 310:20
**VALIDITY** [19] - 218:3,
218:11, 218:15,
218:23, 218:25,
219:6, 219:7,
219:17, 246:7,
246:14, 310:18,
310:25, 311:2,
311:8, 311:12,
312:11, 316:5,
316:8, 316:9
**VALIDLY** [1] - 287:6
**VALUE** [3] - 348:21,
349:1, 353:4
**VARGAS** [12] -
170:14, 170:16,
248:6, 264:2,
266:18, 269:1,
269:5, 270:3,
273:10, 350:25,
402:20, 404:11
**VARGAS** [2] - 264:3,
268:24
**VARIABILITY** [9] -
201:10, 202:2,
319:4, 321:20,
328:9, 328:10,
328:15, 328:18,
328:21
**VARIABILITY** [2] -
201:11, 328:22
**VARIABLE** [4] -
317:19, 318:24,
323:5, 341:8
**VARIABLES** [4] -
389:10, 389:14,
389:19, 400:20
**VARIANT** [1] - 285:4
**VARIATION** [1] -
185:16
**VARIES** [2] - 278:11,
278:15
**VARIOUS** [17] - 181:7,
181:8, 191:14,
198:1, 217:23,

274:19, 280:7,
295:23, 300:9,
302:19, 304:1,
325:15, 349:12,
363:10, 381:15,
389:5, 391:5
**VARY** [1] - 311:3
**VAST** [2] - 211:15,
236:20
**VASTLY** [1] - 327:22
**VCI** [1] - 220:20
**VEHICLE** [1] - 389:13
**VERBAL** [4] - 229:9,
230:5, 322:1, 323:4
**VERBAL** [40] - 188:7,
200:22, 201:3,
201:9, 201:21,
206:15, 206:19,
207:2, 211:6,
220:11, 220:16,
220:17, 220:20,
221:14, 222:14,
229:11, 229:19,
230:14, 230:15,
252:14, 255:2,
255:12, 255:16,
255:23, 256:5,
256:10, 257:17,
257:22, 258:7,
258:13, 261:17,
262:17, 262:25,
263:5, 263:15,
263:20, 297:20,
317:8, 334:19,
336:22
**VERBALLY** [2] -
202:6, 229:18
**VERIFICATION** [1] -
259:20
**VERSION** [3] - 225:5,
326:23, 334:16
**VERSIONS** [1] - 225:6
**VERSUS** [5] - 305:15,
359:15, 359:25,
360:7, 364:24
**VIEW** [4] - 260:2,
343:1, 375:14,
397:17
**VIGNETTE** [2] -
270:14, 270:17
**VIRGINIA** [2] - 401:8,
401:10
**VISUAL** [50] - 187:23,
188:2, 188:5, 188:7,
188:9, 188:13,
188:14, 188:22,
188:25, 194:16,
201:18, 203:9,
207:5, 208:2, 208:5,
212:20, 213:2,

213:8, 213:21,
213:22, 213:23,
227:24, 228:9,
229:4, 229:5, 229:6,
229:21, 229:22,
230:1, 231:4,
297:20, 302:19,
306:10, 306:11,
306:15, 307:1,
317:8, 317:15,
319:11, 319:12,
321:12, 323:19,
323:25, 324:2,
324:13
**VISUAL** [4] - 212:6,
317:23, 318:7, 323:8
**VISUAL -SPATIAL** [3] -
194:16, 201:18,
203:9
**VISUALLY** [4] -
228:20, 229:21,
304:2, 318:11
**VITAE** [1] - 174:12
**VOCATIONAL** [3] -
389:11, 400:22,
401:20
**VOIR** [2] - 392:4,
392:6
**VOLUMINOUS** [1] -
242:10
**VOLUNTARY** [3] -
177:5, 239:6, 239:18
**VR** [1] - 255:12

## W

**W-A-S-S-E-R-S-T-E-I
-N** [1] - 171:13
**WAIS** [15] - 200:19,
201:6, 219:22,
219:23, 220:8,
311:9, 311:13,
311:14, 312:9,
312:11, 312:13,
313:2, 313:8, 353:13
**WAIS-IV** [1] - 201:6
**WAIT** [1] - 240:6
**WAITING** [1] - 383:10
**WANTS** [1] - 238:14
**WARNING** [2] -
291:12, 291:14
**WASHINGTON** [2] -
170:15, 170:20
**WASSERSTEIN** [29] -
171:6, 171:12,
171:13, 171:21,
175:11, 175:17,
180:14, 189:24,
201:1, 227:11,
280:20, 309:9,

309:13, 310:9,
310:11, 310:16,
312:22, 316:4,
319:25, 321:13,
322:16, 323:23,
327:16, 330:1,
330:24, 331:5,
331:23, 379:13

**WASSERSTEIN** [3] -
238:24, 244:4,
247:25

**WASSERSTEIN** [2] -
171:17, 404:4

**WASSERSTEIN 'S** [9] -
309:20, 310:7,
315:7, 319:6, 330:1,
377:8, 377:11,
377:20, 386:9

**WAYS** [7] - 173:2,
197:11, 279:12,
290:8, 341:10,
376:14, 381:15

**WEAK** [9] - 181:3,
211:9, 212:25,
213:4, 213:22,
213:23, 228:19,
228:20, 247:19

**WEAKER** [2] - 223:22,
333:19

**WEAKNESS** [3] -
208:2, 309:16,
323:24

**WEAKNESSES** [2] -
309:17, 342:22

**WEBSITE** [3] - 244:4,
281:19

**WECHSLER** [9] -
219:22, 219:23,
223:10, 295:15,
322:18, 323:3,
323:13, 323:19,
354:17

**WEEK** [3] - 198:4,
198:8, 198:17

**WEEKLY** [1] - 224:5

**WEEKS** [1] - 267:11

**WEIGH** [1] - 329:3

**WEIGHED** [2] -
325:17, 346:18

**WEIGHT** [2] - 343:10,
346:14

**WEINER** [26] - 170:17,
171:2, 171:4,
171:16, 171:20,
174:6, 174:8,
183:20, 183:22,
184:8, 227:10,
232:1, 238:18,
247:24, 248:2,
281:12, 351:9,

351:11, 352:17,
363:1, 379:15,
383:6, 392:6, 404:5,
404:6, 404:13

**WEINER** [2] - 171:15,
351:14

**WELL-KNOWN** [1] -
390:9

**WELL-REGARDED**
[1] - 204:5

**WHEREAS** [2] -
209:18, 232:23

**WHEREAS** [1] -
195:18

**WHOLE** [16] - 177:14,
177:15, 204:13,
213:7, 218:24,
273:16, 282:9,
319:21, 326:6,
331:22, 331:25,
334:3, 334:15,
352:15, 370:17

**WIAT** [5] - 223:8,
224:6, 313:19,
355:2, 402:2

**WIDE** [2] - 334:4,
334:5

**WINDED** [1] - 214:6

**WISCONSIN** [8] -
227:20, 229:1,
320:2, 320:6,
320:23, 321:15,
321:19, 321:23

**WITNESS** [8] - 171:3,
281:7, 282:3, 351:5,
351:6, 383:8,
391:25, 402:21

**WITNESS** [1] - 171:8

**WITNESS** [22] - 171:9,
171:12, 174:7,
187:5, 248:3, 249:8,
273:18, 273:21,
286:3, 291:7,
301:23, 304:23,
304:25, 318:6,
321:12, 352:16,
383:21, 402:19,
403:8, 403:12,
403:15, 404:2

**WITNESSES** [2] -
248:6, 351:3

**WNL** [1] - 322:1

**WOODCOCK** [30] -
203:18, 203:21,
204:5, 204:14,
204:22, 204:25,
205:13, 212:24,
221:25, 224:16,
289:25, 294:5,
294:11, 294:12,

295:17, 295:18,
302:13, 303:9,
313:11, 333:18,
333:22, 342:3,
342:9, 342:12,
351:23, 353:16,
354:11, 355:2,
399:11, 402:3

**WOODCOCK -
JOHNSON** [12] -
203:18, 203:21,
204:5, 204:14,
204:22, 204:25,
205:13, 224:16,
353:16, 354:11,
355:2, 402:3

**WORCESTER** [1] -
388:11

**WORD** [23] - 215:2,
215:4, 215:5, 215:6,
215:7, 215:8,
223:12, 223:20,
223:21, 223:22,
294:19, 303:12,
305:15, 306:13,
307:8, 308:10,
308:11, 308:17,
310:1, 341:20, 372:3

**WORD** [5] - 214:11,
214:21, 305:12,
308:12, 320:16

**WORDING** [1] - 353:8

**WORDS** [30] - 181:3,
188:10, 194:6,
201:25, 213:25,
215:1, 215:3,
215:17, 223:13,
223:14, 223:18,
223:19, 226:19,
229:12, 230:13,
230:15, 256:16,
294:20, 295:2,
295:5, 303:12,
305:14, 307:19,
307:22, 310:1,
313:23, 322:22,
322:23, 330:4

**WORKBOOK** [2] -
387:16, 387:17

**WORKS** [2] - 250:11,
277:2

**WORLD** [13] - 285:6,
285:17, 319:21,
325:1, 332:11,
336:14, 336:21,
346:7, 352:19,
352:21, 370:7,
380:8, 380:11

**WORSE** [5] - 223:20,
312:6, 312:7, 314:4,

317:21

**WRAP** [1] - 402:15

**WRITE** [10] - 178:2,
178:21, 186:11,
188:10, 241:22,
244:9, 297:19,
313:16, 401:14

**WRITE-UPS** [1] -
401:14

**WRITES** [3] - 309:13,
323:23, 371:7

**WRITING** [22] -
174:14, 178:11,
180:12, 181:5,
187:14, 187:15,
187:16, 187:18,
209:5, 238:12,
244:19, 255:14,
294:13, 313:4,
313:12, 313:14,
321:11, 337:9,
338:19, 338:25,
397:22

**WRITTEN** [22] - 191:3,
193:3, 215:7, 215:8,
217:7, 230:8,
233:24, 241:21,
242:1, 242:18,
277:11, 277:12,
281:2, 295:21,
300:9, 305:15,
330:9, 331:3,
331:10, 401:25,
402:3

**WROTE** [9] - 176:6,
176:7, 187:9,
187:14, 191:18,
194:5, 235:9,
283:24, 401:14

**Y**

**YALE** [1] - 173:21

**YEAR** [15] - 171:24,
186:17, 191:25,
232:17, 243:2,
243:14, 250:21,
260:12, 292:10,
293:12, 306:19,
357:14, 358:21,
390:9, 396:17

**YEARS** [25] - 173:16,
178:18, 195:15,
196:6, 196:12,
198:6, 198:15,
217:4, 236:1,
250:13, 257:4,
267:16, 277:9,
357:7, 357:12,
358:1, 358:10,

358:15, 385:3,
386:14, 386:17,
387:8, 388:5, 390:4,
390:21

**YELLOW** [1] - 215:8

**YES,I** [1] - 393:25

**YESTERDAY** [1] -
249:13

**YORK** [1] - 170:1

**YORK** [9] - 170:5,
170:22, 171:24,
256:19, 280:1,
358:5, 369:1

**YORK'S** [1] - 257:2

**YOUNG** [4] - 195:1,
386:16, 401:22

**YOUNGER** [2] - 224:2,
288:2

**YOUNGEST** [1] -
385:8

**YOURSELF** [7] -
188:20, 208:23,
353:11, 356:3,
403:6, 403:9, 403:10

**Z**

**ZEB** [1] - 295:6

LISA SCHMID, CCR, RMR
Official Court Reporter

A1134

[Hearing Transcript pages 1-24]                    405

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X
ROBERT SAMPSON,                    : 22 CV 5120(JMA)
                                   :
          Plaintiff,               :
                                   :
     -against-                     : United States Courthouse
                                   : Central Islip, New York
                                   :
                                   :
                                   :
NATIONAL BOARD OF MEDICAL          : October 13, 2022
EXAMINERS,                         : 9:30 AM
                                   :
          Defendant.               :
                                   :
                                   :
- - - - - - - - - - - - - - - -X

TRANSCRIPT OF CIVIL CAUSE FOR MOTION HEARING
BEFORE THE HONORABLE JOAN AZRACK
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S :

For the Plaintiff:    STEIN & VARGAS, LLP
                      10 G Street NE, Suite 600
                      Washington, DC 20002
                      BY: MARY VARGAS, ESQ.

                      CHARLES WEINER, ESQ.
                      99 Lantern Drive, Suite 202
                      Doylestown, PA 18901

For the Defendant:    PERKINS COIE, LLP
                      700 13th Street NW, Suite 800
                      Washington, DC 20005
                      BY:  CAROLINE MEW, ESQ.

                      PERKINS COIE, LLP
                      1155 Avenue of the Americas, 22nd Floor
                      New York, New York 10036
                      BY:  ADAM MANDELSBERG, ESQ.

          Court Reporter:  Lisa Schmid, CCR, RMR

Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

LISA SCHMID, CCR, RMR

**A1135**

406

1    THE COURT:  Please be seated.  Good morning.
2    You can come up, Doctor.
3    Okay.  How's everybody this morning?  Thank you
4 for being on time.
5    You're still under oath.  You may be seated.
6    THE WITNESS:  Yes.
7    THE COURT:  Okay.  Go ahead.
8    KEVIN MURPHY, after having been previously
9 sworn, testified on his oath as follows:
10 DIRECT EXAMINATION(CONTINUED)
11 BY MS. MEW:
12   Q.   Good morning, Dr. Murphy.  When we broke yesterday
13 afternoon, you were discussing -- just to reorient us -- I
14 believe you were discussing Mr. Sampson's record relative
15 to the diagnostic criteria of ADHD, what you recall, and
16 when we broke, I think there was something else you wanted
17 to add.  Would you like to say that now?
18   A.   Yes.  One other thing I would like to add about that
19 was a lot has been made about tutoring that Mr. Sampson
20 participated in.
21    And one of the things that I was looking for and
22 looked for in a situation like that is, usually when
23 tutoring happens, there's some antecedents before the
24 tutoring that show evidence of problems and learning
25 issues and difficulties in school that would give rise to

LISA SCHMID, CCR, RMR
Official Court Reporter

407

1 an evaluation or a teacher saying something's wrong here.
2    I didn't see any objective documentation or data
3 that would point to a need for tutoring.  It seemed to me
4 that the tutoring was -- instead of tutoring to try to fix
5 something that was deficient, it was more a choice to how
6 to help to optimize or improve his performance from
7 already satisfactory levels to probably even better.
8    MS. MEW:  Thank you, Dr. Murphy.  I have no
9 other questions, Your Honor.
10    THE COURT:  Okay.  All right.
11    With that, cross-examination?
12 CROSS-EXAMINATION
13 BY MR. WEINER:
14   Q.   Good morning, Dr. Murphy.  I'm Charles Weiner and I
15 represent Mr. Sampson.
16   A.   How are you?
17   Q.   Okay.  In your role as a consultant for the National
18 Board of Medical Examiners, you're merely making
19 recommendations as to whether or not to approve or deny
20 accommodations, correct?
21   A.   That is correct.
22   Q.   You are not the decision maker, correct?
23   A.   That's correct.
24   Q.   And neither is Dr. Lovett, correct?
25   A.   Correct.

LISA SCHMID, CCR, RMR
Official Court Reporter

408

1    Q.   And by the way, did you speak with Dr. Lovett after
2 your testimony yesterday?
3    A.   Not -- I said hello, but not about the case, no.
4    Q.   The ultimate decision maker in these -- in
5 determining whether or not an accommodation should be
6 approved or not approved is the National Board of Medical
7 Examiners, correct?
8    A.   That is correct.
9    Q.   And I suppose it is the National Board of Medical
10 Examiners who can choose whether or not to disregard your
11 recommendation, correct?
12    A.   Correct.
13    Q.   And the same would be true for Dr. Lovett.  They can
14 choose to disregard Dr. Lovett's recommendations?
15    A.   Yes.
16    Q.   And in this particular case, the NBME would be the
17 party that would choose whether or not to accept your
18 recommendation or accept the recommendations of Mr.
19 Sampson's evaluators, correct?
20    A.   Correct.
21    Q.   And it's NBME that made the decision to deny Mr.
22 Sampson's accommodations, correct?
23    A.   Correct.
24    Q.   That wasn't you, correct?
25    A.   That's correct.

LISA SCHMID, CCR, RMR
Official Court Reporter

409

1    Q.   And in fact, they made a decision to not -- deny his
2 request for accommodations seven times?
3    A.   Yes, that -- yes.
4    Q.   And it's NBME that could have accepted the
5 documentation and the recommendations of his qualified
6 professionals in approving the request for accommodations,
7 correct?
8    A.   I didn't hear the first part.  Could you repeat that
9 again?
10    Q.   It's the NBME, not you --
11    A.   Right.
12    Q.   -- that can accept the documentation from Mr.
13 Sampson's qualified professionals to approve his
14 accommodations, correct?
15    A.   That's correct, yes.
16    Q.   And it's the NBME that could have given precedential
17 weight to Mr. Sampson's qualified professionals who
18 evaluated him to your recommendations, correct?
19    A.   Yes.
20    Q.   And it's the NBME that could have given considerable
21 weight to the fact that he's received accommodations at
22 Stony Brook Medical School and on the NBME Shelf Exams in
23 approving his accommodations rather than not giving it
24 considerable weight, correct?
25    A.   Correct.

LISA SCHMID, CCR, RMR
Official Court Reporter

**A1136**

410

1  Q.   Now, I noticed that you had been sitting in this
2  hearing room since the start that this hearing occurred,
3  is that correct?
4  A.   Yes.
5  Q.   And you are here, I presume, as being a consultant or
6  part of the defense team, is that correct?
7  A.   Yes.  Let me just clarify.
8       My role in this whole -- in this for the Board
9  is to review documentation.  And they asked me to review
10 the documentation to determine in my judgment whether the
11 documentation is sufficient to substantiate the diagnosis,
12 and whether the person's documentation shows a magnitude
13 of impairment that would rise to the level of a
14 disability, and if so, what accommodations would be
15 reasonable and appropriate to the situation.
16      So that's all I'm doing is looking at
17 documentation and making a recommendation.
18 Q.   Understood.
19      I was wondering about your role in the
20 courtroom.  You were here since the start of the court.
21 I'm assuming you were providing some assistance to the
22 defense team in terms of what was being testified to and
23 that type of issue.  And I'm not asking for specifics.
24 I'm just wondering what -- your role in the courtroom from
25 the day that you entered here.

LISA SCHMID, CCR, RMR
Official Court Reporter

411

1       MS. MEW:  Your Honor, I object.
2       Dr. Murphy is also serving an expert, as an
3  expert to us in our litigation, in the litigation matters.
4  So I think we're getting into privileged areas here.
5       THE COURT:  Not as it relates to this case.
6  I'll permit it as it relates to this case.
7       MR. WEINER:  Yeah.  I was just wondering about
8  the role in the courtroom.
9       MS. MEW:  Okay.
10 BY MR. WEINER:
11 Q.   It was just a simple question.  You were here in the
12 courtroom.  Was your role to be part of the defense team
13 and offer consultation for that?
14 A.   Mostly just observing.
15 Q.   And in terms of your observing, you're the last
16 witness for the NBME, is that correct?
17 A.   That's my understanding.  I believe so.
18 Q.   So someone from the NBME, the decision maker in this
19 matter, is not here to testify, is that correct?
20 A.   Yes.
21 Q.   Dr. Murphy, when you reviewed this matter the first
22 time, that was obviously before litigation, correct?
23 A.   Correct.
24 Q.   When you reviewed this matter for the first time, the
25 documentation you were given had the four prior denials

LISA SCHMID, CCR, RMR
Official Court Reporter

412

1  that were recommended by Dr. Lovett in the package, is
2  that correct?
3  A.   I don't believe so.  When I got the case -- my
4  recollection is when I got the case, there had been two
5  previous denials.  I got it on the third appeal.
6  Q.   Okay.
7  A.   And did you mention Dr. Lovett?
8  Q.   Yes.
9  A.   I never saw any documentation or reports from Dr.
10 Lovett.
11 Q.   All right.  So but you were aware of the two prior
12 denials, correct?
13 A.   Yes.
14 Q.   So you were aware of what NBME's position was at the
15 time that you received the documentation, correct?
16 A.   Yes.
17 Q.   And then you received it a second time, and that was
18 after -- that was -- by that time, it was the -- would
19 have been the fifth or sixth denial?
20 A.   Fourth, I believe.
21 Q.   Fourth?  Okay.  So you received it two times in a
22 row?
23 A.   Yes.
24 Q.   All right.  And so you were, once again, aware -- I
25 have reviewed this before and I've previously recommended

LISA SCHMID, CCR, RMR
Official Court Reporter

413

1  a denial, is that --
2  A.   Yes.
3  Q.   -- what occurred when you had reviewed it?
4  A.   Yes, and then they asked me to review additional
5  documentation that had been submitted.
6  Q.   And my understanding is that you have been a
7  consultant for the National Board of Medical Examiners
8  since 1991?
9  A.   Wouldn't be '91.  At the earliest, it was a right
10 after the ADA was signed into law.  I think it was '92.
11 Q.   So at a minimum, 28 to 25 years, is that a fair
12 statement?
13 A.   Yes.
14 Q.   And do you also receive a contract from them on an
15 annual basis or semi-annual basis?
16 A.   Yes.
17 Q.   And you have also been a consultant in a similar
18 capacity with the National Board of Osteopathic Medical
19 Examiners, is that correct?
20 A.   That's correct.
21 Q.   And on a similar basis, you do reviews and make
22 recommendations regarding accommodations, correct?
23 A.   Yes.
24 Q.   And you also do similar reviews on behalf of quite a
25 number of other testing entities, is that correct?

LISA SCHMID, CCR, RMR
Official Court Reporter

**A1137**

414

1   A.   Yes.
2   Q.   And is it fair to say that a number of testing
3   entities are familiar with your type of work, correct?
4   A.   Yes.
5   Q.   Have you ever conducted a review on behalf of an
6   individual seeking an accommodation on any high stakes
7   exam?
8   A.   A review?
9   Q.   I'm sorry. Have you ever done an evaluation for an
10  individual who was seeking accommodations on a high stakes
11  exam?
12  A.   Yes.
13  Q.   For what examination was that?
14  A.   Well, I've done -- I don't know how many over the
15  years, but I would guess I have done evaluations of people
16  seeking SAT accommodations, for bar exam accommodations,
17  and there might have been one or two for the National
18  Board, but if I get a case from the National Board, I
19  typically don't do it for conflict of interest reasons.
20  They're rare, and I usually tell the patient that I won't
21  do it.
22  Q.   The request for reviews that you receive from the
23  National Board of Medical Examiners or the National Board
24  of Osteopathic Medical Examiners, they typically involve
25  individuals who assert that they have either Attention

LISA SCHMID, CCR, RMR
Official Court Reporter

415

1   Deficit-Hyperactivity Disorder and/or a learning disorder,
2   correct?
3   A.   Yes.
4   Q.   Okay. And from now forward, I'm going to refer to
5   Attention Deficit-Hyperactivity Disorder as ADHD.
6   A.   That's fine. Sure.
7   Q.   And I may even refer to a learning disability as LD.
8   Is that okay?
9   A.   Sure.
10  Q.   Doctor, have you ever done a study of the amount of
11  either recommended approval of accommodations or the
12  amount of recommended denial of accommodations that you
13  have done over the years?
14  A.   You mean a count?
15  Q.   Yes. Do you ever look at how often you recommend
16  denials?
17  A.   I don't keep track, no.
18  Q.   You've never kept track of that?
19  A.   No.
20  Q.   Are you aware if the National Board of Medical
21  Examiners has ever done a study or review to see how often
22  you've recommended denials?
23  A.   I'm not aware of that.
24  Q.   How many cases do you receive on a typical basis from
25  the National Board of Medical Examiners?

LISA SCHMID, CCR, RMR
Official Court Reporter

416

1   A.   It varies each year. This year has been the fewest
2   of any year I have worked. It's hard to -- I have to
3   guess. I have to probably think about maybe I would
4   guess -- per year, you're asking?
5   Q.   Yes.
6   A.   I would guess maybe three a month. So maybe between
7   36 and 40 cases a year.
8   Q.   Okay.
9   A.   Something like that, on average.
10  Q.   And is that strictly the National Board of Medical
11  Examiners sending you about 40 cases a year?
12  A.   I get other cases from other jurisdictions as well.
13  Q.   All right. I'm just -- when you say other
14  jurisdictions --
15  A.   Like bar exam.
16  Q.   Right. I'm strictly referring to the National Board
17  of Medical Examiners. About how many cases do you get
18  from them on an annual basis?
19  A.   Maybe 36. That's a guess. I don't count. I'm
20  thinking about per month. Somewhere between -- probably
21  somewhere between 36 and 50 maybe.
22       You know, years, I might have a little bit more.
23  I don't keep track. It's hard to know for sure. There
24  are months that go by, I don't get a case and then I might
25  get two in a week or I might get another one. So it's

LISA SCHMID, CCR, RMR
Official Court Reporter

417

1   very variable.
2   Q.   Do you receive more from the National Board of
3   Medical Examiners than you do from the National Board of
4   Osteopathic Medical Examiners?
5   A.   Yes.
6   Q.   So about how many accommodation requests based on LD
7   or ADHD have you denied this year -- have you recommended
8   a denial this year?
9   A.   This year?
10  Q.   Yes.
11  A.   I would have to go back and look. I don't know. I
12  can't recall.
13  Q.   Do you recall if you even approved -- recommended an
14  approval on any?
15  A.   I would think so, because I recommend approval
16  relatively frequently.
17  Q.   So I do have records, and I would imagine the manner
18  in which you conduct a review for the National Board of
19  Medical Examiners is the same as the reviews you do for
20  the National Board of Osteopathic Medical Examiners? Is
21  that a fair statement?
22  A.   The same type of review, you mean?
23  Q.   Yes, sir.
24  A.   Right. That's true.
25  Q.   And I would imagine the amount of times you

LISA SCHMID, CCR, RMR
Official Court Reporter

A1138

418

1  recommended an approval and recommended denials would be
2  no different for the National Board of Osteopathic Medical
3  Examiners and the National Board of Medical Examiners?  Is
4  that fair to say?
5  A.   That it would be different?  The rates would be
6  different?  Is that what you're asking?
7  Q.   No, I'm asking if they would be roughly the same.
8  A.   Perhaps roughly.
9  Q.   Okay.
10 A.   It's hard to know exactly.
11 Q.   So I have records that I obtained from the National
12 Board of Osteopathic Medical Examiners, which reflects
13 that in 2020, you received nine referrals from them.
14 A.   In 2020?
15 Q.   Yes.  That was from the National Board of Osteopathic
16 Medical Examiners.  You received nine, and you recommended
17 nine denials.
18      For 2019, you received 14 referrals from the
19 National Board of Osteopathic Medical Examiners, and you
20 recommended 13 denials.
21      In 2018, you received 13 referrals from the
22 National Board of Osteopathic Medical Examiners, and you
23 recommended 12 denials.
24      And in 2017, you had 20 referrals, and you
25 recommended 17 denials.

LISA SCHMID, CCR, RMR
Official Court Reporter

419

1      Does that comport with your recollection?
2  A.   You know, on the face of it, I would guess about
3  ninety percent, you know, denial rate, 85 to ninety
4  percent is what I would have guessed.
5  Q.   And that really shouldn't be any different for the
6  National Board of Medical Examiners.  You're dealing with
7  a very similar student population, correct?
8  A.   Similar.
9  Q.   Am I correct that the DSM does not require one to be
10 diagnosed at childhood?
11 A.   What do you mean by childhood?
12 Q.   Well, I'm just wondering.  Does the DSM make a
13 requirement that you have to be diagnosed with ADHD at
14 childhood?
15 A.   You don't have to be diagnosed, but the symptoms have
16 to be present starting in childhood.
17 Q.   Can you turn to Plaintiff's Exhibit 50, please?
18 A.   Fifty?
19 Q.   Yes, please.
20 A.   (Peruses document.)  Okay.
21 Q.   And I think the criterion that I'm looking at is on
22 the second page of Exhibit 50.  It would be Criterion B.
23 A.   Excuse me one second.  (Peruses document.)
24      Okay.
25 Q.   And Criterion B says, several inattentive or

LISA SCHMID, CCR, RMR
Official Court Reporter

420

1  hyperactive impulsive symptoms were present prior to the
2  age of 12 years.  Did I read that correctly?
3  A.   Yes.
4  Q.   And that is the criterion -- the only criterion with
5  respect to the age of onset for ADHD, correct?
6  A.   Yes.
7      THE COURT:  What page are you on were you
8  saying?
9      MR. WEINER:  I'm sorry.  Tab 50.  It was on the
10 second page, and it's next to B.
11      THE COURT:  I see.
12 BY MR. WEINER:
13 Q.   And one can be diagnosed for the very first time with
14 ADHD as an adult, correct?
15 A.   Correct.
16 Q.   And I think you had mentioned that you ran an adult
17 clinic yourself?
18 A.   Yes.
19 Q.   And did people come to your clinic as adults for the
20 very first time and were diagnosed with ADHD?
21 A.   Sometimes.  Sometimes, yes.
22 Q.   And are there circumstances where individuals are
23 often not diagnosed at an earlier age because they were in
24 denial?
25 A.   I suppose that's possible.

LISA SCHMID, CCR, RMR
Official Court Reporter

421

1  Q.   I mean, people don't like to admit to what may be
2  potential mental deficiencies, correct?
3  A.   Yes.  That's true.
4  Q.   And same thing with parents.  That's pretty common
5  with parents of children.  They're in denial that their
6  children might have some type of mental defect, is that
7  correct?
8  A.   Yes.
9  Q.   And they don't want their children to be labeled,
10 correct?
11 A.   Correct.
12 Q.   And they don't want their children to be stigmatized,
13 correct?
14 A.   Correct.
15 Q.   And they don't want their children to be medicated,
16 isn't that correct?
17 A.   Certainly -- often.
18 Q.   Is ADHD -- and I don't mean to say it's a spectrum
19 disorder, but there is a spectrum of manifestations of the
20 disorder, is that correct?
21 A.   Yes.
22 Q.   And on the one end was the type of person who you
23 were referring to, who has financial problems, who loses
24 their job, gets in car accidents, has trouble with the
25 law.  That's the most extreme spectrum of the disorder,

LISA SCHMID, CCR, RMR
Official Court Reporter

422

1  correct?
2  **A.**  Well, there's -- yeah.  It goes -- the range is from,
3  you know, subclinical to very severe, everything in
4  between.
5  **Q.**  Okay.  One can go to college and still have ADHD,
6  correct?
7  **A.**  Correct.
8  **Q.**  And one can even go to graduate school and still have
9  ADHD, correct?
10  **A.**  Correct.
11  **Q.**  And it's not antithetical that one can go to medical
12  school and have ADHD, correct?
13  **A.**  Correct.
14  **Q.**  In fact, there may be even some famous doctors out
15  there, like Dr. John Holloway, correct?  He has ADHD.
16  **A.**  Are you referring to Dr. Hallowell?
17  **Q.**  Dr. Hallowell.  Excuse me.
18  **A.**  Yes.
19  **Q.**  And his colleague, Dr. John Ratey, he also has ADHD,
20  correct?
21  **A.**  Correct.
22  **Q.**  And it was Edward Hallowell.  I'm sorry.  I got the
23  two names mixed up.
24      And with respect to learning disabilities, one
25  doesn't have to be diagnosed as a child, at childhood,

LISA SCHMID, CCR, RMR
Official Court Reporter

423

1  to be diagnosed with learning disorder, correct?
2  **A.**  Right.  You don't have to be diagnosed, correct.
3  **Q.**  And if you'd turn to Exhibit 49?
4  **A.**  Forty-nine?
5  **Q.**  Exhibit 49, that is the pages from the DSM concerning
6  specific learning disorder.  Would you agree with that?
7  **A.**  Yes.
8  **Q.**  And on the second page of Exhibit 49, I'm looking at
9  Criterion C.
10  **A.**  Okay.
11  **Q.**  And it says, the learning difficulties begin during
12  school-aged years, but may not become fully manifest until
13  the demand for those affected academic skills exceed the
14  individual's limited capacities, e. g., as in times tests,
15  reading, or writing lengthy complex reports for a tight
16  deadline, excessively heavy academic loads.
17      That particular provision of the DSM
18  encapsulates individuals who may be adults not diagnosed
19  at the time of childhood, correct?
20  **A.**  Correct.
21  **Q.**  Dr. Murphy, you never evaluated Mr. Sampson, correct?
22  **A.**  I have not.
23  **Q.**  You've never spoke with Mr. Sampson, correct?
24  **A.**  Correct.
25  **Q.**  You've never administered any particular assessment

LISA SCHMID, CCR, RMR
Official Court Reporter

424

1  of achievement to him, correct?
2  **A.**  Correct.
3  **Q.**  You've never administered any tests of ability to
4  him, correct?
5  **A.**  Correct.
6  **Q.**  You've never been able to observe the condition,
7  manner, duration with which he performs any type of
8  academic functions, correct?
9  **A.**  Correct.
10  **Q.**  Nor have you been able to observe the condition,
11  manner, duration with which he performs any major life
12  activities, correct?
13  **A.**  Correct.
14  **Q.**  And in your clinic, the people who would come to your
15  clinic, would you render a diagnosis without ever seeing
16  them?
17  **A.**  In my clinic?
18  **Q.**  Yes.
19  **A.**  No.
20  **Q.**  You wouldn't -- they wouldn't call you up at their
21  home from phone and say, what do you think?  Do I have an
22  ADHD?  You wouldn't make a diagnosis based on that, would
23  you?
24  **A.**  No.
25  **Q.**  Dr. Murphy, there is I think defense exhibit?  Is

LISA SCHMID, CCR, RMR
Official Court Reporter

425

1  that up there as well?
2  **A.**  A binder?
3  **Q.**  A binder?
4  **A.**  Yes.
5  **Q.**  And then there should be a tab with your name on it?
6  **A.**  Yes.  I'm there.
7  **Q.**  Okay.  So very good.
8      So can you turn to paragraph ten?
9  **A.**  (Complies.)
10      Okay.
11  **Q.**  So in paragraph ten, you wrote, "The diagnosis of
12  ADHD depends on evidence of significant developmentally
13  deviant impairment that has a childhood onset."
14      Is that your understanding of the requirements
15  of the DSM?
16  **A.**  Yes.
17  **Q.**  And so deviant impairment is part of that?
18  **A.**  Developmentally deviant impairment.
19  **Q.**  And I noticed when I read your declaration, you used
20  that word "deviant" impairment or "deviant" problems
21  throughout your declaration.  Did you know that?
22  **A.**  Well, not deviant.  Developmentally deviant.  In
23  other words, the purpose of that is, we have to compare
24  kids' and adults' performance to same-aged peers.  So --
25  **Q.**  But what I'm wondering is the term itself.  I'm just

LISA SCHMID, CCR, RMR
Official Court Reporter

**A1140**

426

1  asking about the term itself that you have in your
2  declaration. You wrote "deviant" impairment or "deviant"
3  problems. That's the term you used, correct?
4  A.  Yes.
5  Q.  To describe the condition, right?
6  A.  Yes.
7  Q.  And you used that a lot. In fact, I counted in your
8  declaration that you used it ten times. Are you aware of
9  that?
10 A.  No.
11 Q.  So if we turn to paragraph 14. So paragraph, you
12 wrote, "Resulting in developmentally deviant real world
13 impairment."
14       And if we go to paragraph 26 -- by the way, did
15 I read that correctly?
16 A.  On 14?
17 Q.  Yes.
18 A.  I'll try to see where.
19 Q.  It's at the ultimate line.
20 A.  Yes.
21 Q.  And then if you go to paragraph 26, and starting at
22 actually on page nine at the bottom, as discussed above,
23 it is a neurodevelopmental disorder with childhood onset
24 that typically results in a chronic and pervasive pattern,
25 developmentally deviant impairment, and academic, social,

LISA SCHMID, CCR, RMR
Official Court Reporter

427

1  vocational, et cetera, et cetera.
2       Did I read that correctly?
3  A.  Yes.
4  Q.  And in paragraph 29, again, halfway down it says, she
5  did not show a pattern of developmentally deviant real
6  world functional impairment consistent with a diagnosis.
7       Did I read that correctly?
8  A.  Yes.
9  Q.  And paragraph 30. This would go onto page 14 and
10 midway down. And midway through -- down it says, these
11 facts and the facts that has no history of developmentally
12 deviant problems with written expression.
13       Did I read that correctly?
14 A.  Where are you on?
15 Q.  I'm sorry. It's midway down on page 14.
16 A.  Oh, 14? (Peruses document.)
17 
18 Q.  Okay. And we go to paragraph 33. Here, you actually
19 used deviant twice. You wrote on 33, as noted above, ADHD
20 by definition starts in childhood as causes
21 developmentally deviant chronic and pervasive impairment
22 in multiple domains of functioning.
23       And then further down it says, there is
24 insufficient evidence that Mr. Sampson was experiencing a
25 magnitude of developmentally deviant symptoms.

LISA SCHMID, CCR, RMR
Official Court Reporter

428

1       Did I read that correctly?
2  A.  Yes.
3  Q.  And 39, you used it again. Here once again, you are
4  referring to a history or magnitude of developmentally
5  deviant pervasive impairment in school.
6       And at 40, again, you once again refer to
7  developmentally deviant functional impairment.
8       Did I read that correctly in paragraph 40?
9  A.  Yes.
10 Q.  And then finally in paragraph 44, last line, you once
11 again talk about showing developmentally deviant
12 impairment.
13       So I'd like you to go back to Tab 51 in
14 plaintiff's book to the DSM.
15 A.  Fifty or 51?
16 Q.  Perhaps I meant 50. Yes, 50. I'm sorry.
17       And in looking through the criterion -- and this
18 is on Tab 50. This is the criterion, the complete
19 criterion for ADHD as set forth in the DSM, is that
20 correct?
21 A.  Yes.
22 Q.  I don't see the word "deviant" in the DSM criteria at
23 all. Does it exist in the DSM?
24 A.  (No response.)
25 Q.  I'm asking if it --

LISA SCHMID, CCR, RMR
Official Court Reporter

429

1  A.  If the word exists in there?
2  Q.  Is the word in there?
3  A.  No.
4  Q.  And even in the commentary that exists after --
5  A.  I'm sorry. I didn't hear that.
6  Q.  There's commentary. So if you turn to pages three
7  and beyond, that's the commentary that's contained in the
8  DSM.
9       Even in there, there's no word "deviant" in
10 there or even "deviance." Is that accurate?
11 A.  There is words of developmental problems. In other
12 words, this is a disorder of developmental problems. In
13 other words, not anybody could get this. There has to be
14 deviance compared to same-aged peers. There has to be a
15 difference to make the diagnosis credible.
16       So the spirit of what I'm doing here and what I
17 do in my practice, what I do in evaluating these cases is
18 to look for real impairment, look for evidence of real
19 problems that people are having.
20       And we know from research on ADHD that ADHD is a
21 very impairing disorder, and it causes a lot of problems
22 for people, and people aren't happy to have it. And it's
23 difficult to treat.
24 Q.  Understand, Dr. Murphy.
25 A.  So I try to identify and point out where the

LISA SCHMID, CCR, RMR
Official Court Reporter

**A1141**

430

1 pervasive problems are, and to what extent they're
2 impacting people.
3        So if you don't have that, you don't have any --
4 there is no credibility to the diagnosis.
5 Q.   I understand that, Doctor. I wasn't asking about how
6 you perceive. I was asking what's contained in the DSM.
7        Nowhere in the DSM does it require deviance. It
8 doesn't use the word "deviant," correct?
9 A.   Correct.
10 Q.   And in fact, if we go back to Criterion C, which is a
11 lot of the time you used developmental deviance, it says,
12 some symptoms or several symptoms of inattention, correct?
13 A.   Correct.
14 Q.   And is it your belief that under -- and by the way,
15 when you've done these reviews and consultation on behalf
16 of the NBME, you're not just looking at whether or not
17 there's a proper diagnosis under the DSM, but you're also
18 making comments regarding whether or not person has a
19 disability under the Americans with Disabilities Act,
20 correct?
21 A.   That's correct.
22 Q.   And in your interpretation of that -- so first off,
23 the DSM, it sounds like from what you were talking about,
24 has some very strict standards to meet the definition of
25 ADHD, correct?

LISA SCHMID, CCR, RMR
Official Court Reporter

432

1 who have ADHD, and continues to cause disruptive problems
2 in their lives across many different domains.
3        And it is something that can be managed, and we
4 try to identify proper treatments to help people deal with
5 and manage it, cope with disorders. There's no cure for
6 it.
7        But it is something that is very problematic for
8 people, and there's a lot of angst with a person who has
9 it. Their parents are concerned. Their teachers say a
10 lot of things about them.
11       When they get older into adulthood, the stakes
12 get higher, and then you begin to see impairment in things
13 like jobs and marriages and money management, and just
14 doing life. People with ADHD, a neurodevelopmental
15 disorder of ADHD don't do life very well.
16       They -- Dr. Barkley sometimes refers to another
17 definition of ADHD as a disorder of the scutwork of daily
18 life.
19       THE COURT:   Excuse me. It's a narrative. This
20 is a, you know, you should ask a question and he gives an
21 answer. It's not a question and then a ten-minute
22 narrative.
23       MS. MEW:   Of course, Your Honor.
24       THE WITNESS:   Okay. I'm sorry.
25 BY MS. MEW:

LISA SCHMID, CCR, RMR
Official Court Reporter

431

1 A.   Yes.
2 Q.   All right. And then in terms of beyond those strict
3 standards to meet the definition of ADHD, you then have to
4 show that one has a disability under the Americans with
5 Disabilities Act, correct?
6 A.   Yes, that's correct.
7 Q.   So there's the second hurdle that a person seeking
8 accommodations on the ADA must achieve in order for you to
9 recommend accommodations, correct?
10 A.   That's correct.
11       MR. WEINER:   I have no further questions.
12       THE COURT:   Okay.
13       Anything else?
14 REDIRECT EXAMINATION
15 BY MS. MEW:
16 Q.   Dr. Murphy, is ADHD a neurodevelopmental disorder?
17 A.   Yes.
18 Q.   What does that mean?
19 A.   It means that it's a disorder that is defined by
20 starting early in life, typically in early childhood, and
21 it causes problems in people's functioning that is
22 different from same-aged peers, in the words that I used,
23 developmentally deviant, and it persists overtime.
24       And children go into adolescence and into adults
25 and this disorder continues for the lion's share of people

LISA SCHMID, CCR, RMR
Official Court Reporter

433

1 Q.   Have you --
2       THE COURT:   He answered it.
3       MS. MEW:   Yes. Thank you, Your Honor.
4       THE COURT:   Next question?
5       MS. MEW:   That's it, Your Honor. I have no more
6 questions. Thank you.
7       THE COURT:   You're excused. Thank you, Doctor.
8       Okay. Anyone else, Ms. Mew? Anybody else?
9       MR. MANDLESBERG:   Your Honor, we have no further
10 witnesses, but we do have a piece of housekeeping, if I
11 may?
12       THE COURT:   Yes. Sure.
13       MR. MANDLESBERG:   Your Honor, I just want to
14 clarify at this point that all the declarations that were
15 submitted in connection with the motion and any exhibits
16 that were attached thereto are deemed admitted into the
17 record.
18       THE COURT:   Yes.
19       MR. MANDLESBERG:   And then secondly, defendant's
20 additional Exhibits 6 and 7 were introduced during the
21 cross-examination of the plaintiff, Mr. Sampson, but not
22 formally offered at that point.
23       THE COURT:   Okay.
24       MR. MANDLESBERG:   For the sake of the record and
25 clarity, we move admission at this time of both

LISA SCHMID, CCR, RMR
Official Court Reporter

**A1142**

434

1  defendant's additional Exhibits 6 and 7.
2       THE COURT:  Any objection to 6 and 7?
3       MS. VARGAS:  Could we just have a moment, Your
4  Honor?
5       THE COURT:  Sure.
6       MS. VARGAS:  (Peruses documents.)
7       We have no objection.
8       THE COURT:  Okay.  Six and 7 are admitted.
9       Anything else?
10  (Defense Exhibits 6 and 7 were received in evidence.)
11       MR. MANDLESBERG:  Nothing else for defendants,
12  Your Honor.  Thank you.
13       THE COURT:  Anything else?
14       MS. VARGAS:  Well, if this is the appropriate
15  time to address which of plaintiffs exhibits are admitted?
16       THE COURT:  Yes.
17       MS. VARGAS:  Okay.  So I believe it's through --
18  sorry, Your Honor.  If we could have admitted Exhibits 1
19  through 38, which are the requests for accommodations and
20  the denials; Exhibit 49, which was the DSM-V Specific
21  Learning Disorder pages; Exhibit 50, which is the DSM-V
22  ADHD information; and Exhibit 55, which is Dr.
23  Wasserstein's CV.
24       THE COURT:  Any objection?
25       MS. MEW:  No objection, Your Honor.

LISA SCHMID, CCR, RMR
Official Court Reporter

435

1       THE COURT:  Okay.  They're received.
2  (Plaintiff's Exhibits 1-38, 49, 50, 55 were received in
3       evidence.)
4       THE COURT:  All right.  Good.
5       So I have two things to raise.  One, when is the
6  next Step 1 given?
7       MS. MEW:  Your Honor, they're continuously
8  offered.  You register for a period of time.  I believe
9  it's about three months.  And then you schedule within
10  that period.
11       THE COURT:  So it's rolling on a three-month
12  basis?
13       MS. MEW:  Yes.
14       THE COURT:  All right.
15       MS. VARGAS:  Your Honor, may I address one more
16  point to that?
17       THE COURT:  Yes.
18       MS. VARGAS:  Medical students all receive a
19  dedicated study period.
20       THE COURT:  You can sit.
21       Go ahead.
22       MS. VARGAS:  Medical students all receive a
23  dedicated study period before they take the exam.  So Mr.
24  Sampson would be seeking that dedicated study period like
25  all other students have, and then take the exam.

LISA SCHMID, CCR, RMR
Official Court Reporter

436

1       THE COURT:  And is that dedicated study period a
2  certain period of time?
3       MS. VARGAS:  Typically, it's ten to 12 weeks.
4  Obviously, for Mr. Sampson, he reads slower.  It takes
5  more preparation.  So I think ideally, he would have more
6  like 16 weeks.  And then take the Step 1 immediately after
7  that.
8       THE COURT:  And then is the dedicated step
9  period something that schools allocate?
10       MS. VARGAS:  The schools build that into a
11  students's schedule, so they're taking no other classes.
12       THE COURT:  Got it.
13       MS. VARGAS:  And Mr. Sampson is currently taking
14  a full business school docket through December.
15       THE COURT:  Okay.  Got it.
16       All right.  So I do not think, based on the
17  excellent advocacy and the full record that I'm going to
18  need findings of fact or -- well, I am going to need
19  findings of fact and conclusions of law.
20       And I'm sorry to put you under time constraints,
21  but I want to do this.  I want to move along on this.  So
22  I'd like simultaneous findings of fact and conclusions of
23  law by close of business Monday, October 31st.  Okay?
24       Is there anything else?
25       MS. VARGAS:  Your Honor, may we do closing

LISA SCHMID, CCR, RMR
Official Court Reporter

437

1  arguments?
2       THE COURT:  Yes.  You have ten minutes each.
3       MS. VARGAS:  Thank you.
4       When Robert Sampson was asked by defense counsel
5  on Tuesday about the lifesaving medical devices he
6  invented and for which he received patents, for a moment,
7  he lit up from the inside, and he said things that,
8  frankly, I didn't fully understand about an advanced
9  warning system to avert cardiac events and save lives.
10       And after hours of listening to him testify
11  about a lifetime of what was hard for him and how he
12  struggled, we had a glimpse into the brilliance of this
13  student, the promise of this student, and it is profoundly
14  in the public interest that a student like Robert have an
15  opportunity to read the questions on Step 1, so that he
16  can show what he knows, rather than the limits of his
17  disability.
18       This is not only what the public interest
19  demands.  This is what the law requires.  The law directs
20  that whether a person is disabled should not demand
21  extensive analysis.  And I'm quite certain that a
22  three-day federal court hearing is very demanding
23  analysis.
24       The law says that it should not even require
25  medical, statistical or scientific evidence.  The law

LISA SCHMID, CCR, RMR
Official Court Reporter

**A1143**

438

1  demands that the NBME defer to evaluations by qualified
2  professionals who evaluated the student. The law demands
3  that for students who are learning disabled, the NBME not
4  look at outcomes or standardized test scores, but at the
5  time, manner, and duration of the effort devoted to
6  obtaining those scores.
7      *The Congressional Record* particularly noted the
8  importance of not relying on outcomes, such as test scores
9  and grades for students who are twice exceptional:
10  Learning disabled and gifted.
11      Because in addition to the reality that there is
12  a whole industry designed to teach all students
13  test-taking strategies to improve their scores, the MCAT,
14  the SAT and the ACT, they do not diagnose learning
15  disabilities. Students with learning disabilities and
16  especially twice exceptional students who utilize
17  mitigating measures such as extensive preparation, tutors,
18  and test-taking strategies can perform well enough to get
19  into medical school on these tests, but they cannot show
20  the true extent of their knowledge, and that is literally
21  the whole point of the Americans with Disabilities Act.
22      There can be no doubt, listening to Robert's
23  testimony, to the testimony of his mother and his MCAT
24  tutor, reading the letters of support and evaluations
25  submitted with his NBME requests, that Robert has worked

LISA SCHMID, CCR, RMR
Official Court Reporter

439

1  harder to get where he is than most of us have.
2      And that he learns differently, and that he
3  reads slowly, and that he struggles with memory of what he
4  has read, and comprehension of what he has read. There
5  can also be no doubt that extraordinary effort was
6  required to get him to this place where he is 40 weeks
7  away from finishing medical school.
8      What kind of world is it where a student like
9  this devotes a decade or more to becoming a doctor, giving
10  every fiber of his heart and all of the hours in his days
11  to overcoming his learning challenges, and rather than
12  seeing him, the NBME uses that commitment and perseverance
13  and dedication against him, a testing entity that at its
14  fundamental core does not believe you can be both learning
15  disabled and gifted, a testing entity that at its core
16  does not believe you can be both learning disabled and a
17  doctor.
18      And that they use his hard-won success because
19  he worked too hard, because he overcame too much, because
20  he succeeded despite his disability.
21      And Robert Sampson this week has opened up his
22  life for examination here. In being forced to file this
23  lawsuit, he leaves a trail of deeply personal information
24  in the public record, in essence, giving up his legal
25  right not to disclose his disabilities, and he risks his

LISA SCHMID, CCR, RMR
Official Court Reporter

440

1  future employment and opportunities.
2      He shared the things he has spent a lifetime
3  trying to mitigate, and trying to hide. He provided
4  contemporaneous evidence from people who observed him on
5  an extended basis throughout his life, and who all advised
6  the NBME that he needs extended time.
7      He submitted evidence of real world impairment.
8  And it is impossible to believe that you can walk up to
9  any human being on any street corner in the United States
10  and ask them, is the MCAT real world? It is not.
11      Evidence that his grades and his test scores
12  were the result of mitigating measures, measures that in
13  determining whether he has a disability or not, the law
14  requires us to discount, to take away.
15      On the other hand, it is notable that the NBME
16  has bared nothing, has risked nothing. They have not
17  called a single employee to testify. They have not called
18  a single person who made the decision seven times to deny
19  him accommodations. They have not called a single person
20  who wrote one of those seven letters that crushed his
21  potential and his opportunities.
22      Instead, it hid behind its hired consultants who
23  have never met Sampson, who have never evaluated Mr.
24  Sampson, who have been trained by its counsel to misapply
25  the Americans with Disabilities Act Amendment Act, who are

LISA SCHMID, CCR, RMR
Official Court Reporter

441

1  part of a small group of testing consultants who have
2  built their careers around denying accommodations for
3  testing entities, and some of whom, for example, Dr.
4  Lovett, have repeatedly had their opinions discredited by
5  federal courts in similar cases, for example, in the
6  *Ramsay* case, in the *Berger* case, and even in the *Bibber*
7  case.
8      It is also notable the credentials of the people
9  who told the NBME and who have told the Court that he has
10  these disabilities and he requires accommodations, the
11  only board-certified psychologist who we have heard from
12  is Dr. Wasserstein.
13      The only treating source who has dedicatedly
14  supported his need for accommodations, writing multiple
15  long letters -- and if you know how physicians write
16  letters, they are not long -- his treating source of many
17  years, clinical psychiatrist, Dr. Aronson, wrote letters
18  detailing specifically why he found and how he found the
19  disabilities that he did, and the treatment he was
20  provided -- providing, actually providing to Robert based
21  on those diagnoses.
22      Robert Sampson has worked his whole life to
23  become a doctor. He is both gifted and an individual with
24  disabilities.
25      The law promises him a chance to show what he

LISA SCHMID, CCR, RMR
Official Court Reporter

**A1144**

442

1  knows on Step 1, and that is all he seeks today, contrary
2  to what defense counsel said in their opening.  In his
3  Motion for a Preliminary Injunction, Mr. Sampson has only
4  sought accommodations for Step 1, what he needs to take
5  immediately to finish -- to proceed and finish medical
6  school.
7        He did not in his Motion for a Preliminary
8  Injunction seek the Court to order that he receives
9  accommodations on Step 2 or 3 or any of the other relief
10 he has sought, although certainly, I think there is
11 sufficient evidence we have seen this week to establish he
12 would be entitled to those accommodations and that relief.
13 But he leaves that for another day.
14        Given the clear law supporting Robert Sampson's
15 claim, the substantial evidence of disability he has
16 provided, the fact that he stands on the precipice of
17 losing everything he has worked for because he was judged
18 on the basis of his disability rather than the basis of
19 his knowledge and merit, and the public interest in
20 allowing this gifted and compassionate medical student to
21 complete the education he fought so hard to access, we ask
22 this Court to grant a Preliminary Injunction requiring the
23 NBME to comply with federal law, and to provide the
24 accommodations, the testing accommodations that Mr.
25 Sampson's evaluators and his medical school concluded he

LISA SCHMID, CCR, RMR
Official Court Reporter

443

1  needs.
2        THE COURT:  Thank you.
3        Ms. Mew?
4        MS. MEW:  Thank you, Your Honor.
5        This hearing is primarily focused on the
6  question of whether Mr. Sampson is substantially limited
7  in a major life activity relative to taking the Step 1
8  examination compared to most people in the general
9  population.
10       The testimony elicited at the hearing and the
11 record in the case must be evaluated under the heightened
12 standards applicable to Mr. Sampson's Motion for a
13 Mandatory Preliminary Injunction.  Has he shown a clear
14 likelihood of success on the merits?  The answer to this
15 question is a resounding no.
16       Mr. Sampson emphasizes regulatory and
17 legislative history language stating that the
18 determination of whether an individual with a disability
19 should not demand extensive analysis.  But this directive
20 does not expand the scope of the ADA beyond the terms of
21 the statute.  And the statute requires a showing of
22 substantial limitation.
23       Mr. Sampson also emphasizes regulatory language
24 stating that the comparison of an individual's performance
25 of a major life activity to the performance of the same

LISA SCHMID, CCR, RMR
Official Court Reporter

444

1  activity by most people in the general population usually
2  will not require scientific medical or statistical
3  evidence.
4        But Mr. Sampson relies on neuropsychological
5  reports and testimony of Dr. Wasserstein in support of his
6  motion.  So any argument that scientific, medical or
7  statistical evidence should not be considered is inapt,
8  and the regulation in any event, does not prohibit the use
9  of such information.
10       NBME agrees that other evidence, including
11 objective evidence of an individual's actual performance
12 relative to most people in the general population is very
13 important in assessing impairment and disability.  This is
14 the real world evidence that is both required by the DSM,
15 and highly probative to measuring actual limitation
16 relative to most people.
17       As Dr. Murphy has explained, individuals who are
18 impaired by ADHD and learning disabilities and individuals
19 who are substantially limited compared to most people have
20 a paper trail showing chronic and a pervasive pattern of
21 difficulties over time and in multiple settings.
22       Mr. Sampson's paper trail does not reflect such
23 difficulties.  The report cards and teacher comments and
24 the record, the standardized test scores, the diagnostic
25 testing, the comments of Mr. Sampson's supervisors during

LISA SCHMID, CCR, RMR
Official Court Reporter

445

1  his clinical rotations, and other historical data in the
2  record point to an individual who both as a child and as
3  an adult has been functioning very well.
4        Mr. Sampson's personal statements are very
5  important, and there's been a lot of testimony regarding
6  his drive to succeed, and reliance on scores of tutors in
7  order to do so.
8        But there's a subjective perception built into
9  that.  As Dr. Lovett explained yesterday, it's hard to
10 measure the impact of these measures.  It's hard to
11 measure that because there's not a lot of information to
12 show how Mr. Sampson would have performed without.  And
13 the information that's there, particularly in his early
14 childhood records and scores reflect performance that is
15 as strong or stronger than most people in the general
16 population.
17       Mr. Sampson continues to urge deference to his
18 evaluators, but nothing in the ADA or in the DOJ
19 regulations require NBME to blindly defer to his
20 evaluators' conclusions.
21       I wanted to briefly read -- there's a box at the
22 end of the 2015 Technical Assistance to Testing Entities
23 that Mr. Sampson has referred to in his papers, that
24 contains some of the guidance talking about deferral to
25 consultants -- the people who evaluated an individual.

LISA SCHMID, CCR, RMR
Official Court Reporter

A1145

446

1    This box states in part, the department's
2 guidance documents, including this guidance, do not
3 establish legally-enforceable responsibilities beyond what
4 is required by the terms of the applicable statutes,
5 regulations or binding judicial precedent.  And the
6 regulations state that a diagnosis is not enough.  A
7 diagnosis alone is not a disability.  Again, it's
8 substantial limitation compared to most people in the
9 general population.
10    Mr. Sampson also discusses his evaluators who
11 have personally observed him, but those observations can
12 also be recorded and described and reviewed and analyzed
13 by others.  That's exactly what happened with Dr.
14 Wasserstein's evaluation.  Dr. Miller administered the
15 assessments, and Dr. Wasserstein analyzed the results.
16    Mr. Sampson's effort to downplay his performance
17 on other high stakes standardized tests such as the SAT,
18 ACT, and the MCAT is unjustified, given the direct
19 relevance of this information to an assessment of
20 functional limitations in real world settings as required
21 by the DSM, and its direct relevance in assessing
22 substantial limitation.
23    Indeed, it's difficult to comprehend how prior
24 standardized test performance is not key evidence here,
25 where Mr. Sampson claims to be substantially limited in a

LISA SCHMID, CCR, RMR
Official Court Reporter

447

1 major life activity that he describes as taking
2 standardized tests.
3    When Mr. Sampson took the PSAT, the ACT, the SAT
4 and the MCAT, he had to show up on test day and read the
5 questions.  He had to think.  He had to concentrate.  He
6 had to process information.  And he had every incentive to
7 perform his best.
8    And in that situation, he was not substantially
9 limited compared to most people.  Quite the opposite.  He
10 performed better than most of his test-taking cohorts,
11 including the selective group of people who are taking the
12 MCAT exam.
13    The data and information may show some
14 weaknesses for Mr. Sampson, but that's relative to his
15 high IQ, not most people in the general population.  As
16 NBME experts had explained, everyone has relative
17 weaknesses.  This does not make Mr. Sampson disabled.  It
18 makes him human, someone less than perfect, but not
19 substantially limited.
20    *Wright versus NBME*, a recent decision out of the
21 District of Colorado that's cited in our papers is
22 informative here, not for the direct facts.  There's no
23 case-by-case comparison because each of these are
24 individually determined.  But it's a similar -- it's a
25 similar setup, and what the court said I think is

LISA SCHMID, CCR, RMR
Official Court Reporter

448

1 important.
2    There, the medical -- the plaintiff was a
3 medical student who took Step 3 of the USMLE twice, and
4 did not pass on either attempt.  He then sought testing
5 accommodations.
6    Mr. Wright obtained a diagnostic evaluation and
7 was diagnosed with specific learning disorder with
8 impairment in reading comprehension.  He requested
9 accommodations on Step 3, and his request was denied.
10    He took Step 3 another time without
11 accommodations and did not pass.  He then completed a one
12 year masters program in which he received testing
13 accommodations.  He sought another evaluation.  This time,
14 the same evaluator diagnosed him with specific learning
15 disability and ADHD.
16    He sought testing accommodations again, and his
17 request was denied, and then he filed a Motion for
18 Preliminary Injunction, seeking the same kind of mandatory
19 preliminary relief Mr. Sampson seeks in this case.
20    The Court denied the motion.  On the question of
21 likelihood of success on the merits, the Court found while
22 Mr. Wright has provided evidence showing that his
23 conditions likely make reading, studying and taking tests
24 like the USMLE more difficult for him than for most others
25 seeking to become doctors, the evidence does not support

LISA SCHMID, CCR, RMR
Official Court Reporter

449

1 the conclusion that he is substantially limited in
2 comparison to the general population.  And since it is the
3 latter rather than the former that is required to
4 establish disability under the ADA, he is not likely to
5 succeed on his claim.
6    This holding is entirely consistent with the
7 Second Circuit's admonition in *BC versus Mount Vernon
8 School District*, 837 F. 3d 152.
9    There, the court explained not every impairment
10 that affects an individual's major life activities is a
11 substantially limiting impairment.  The Second Circuit
12 cautioned that a court must be careful to distinguish
13 impairments which merely affect major life activities from
14 those that substantial limit those activities.
15    I reread the *BC versus Mount Vernon* case last
16 night, and while the issue of what constitute an
17 ADA-defined disability was before the court in a different
18 context in that case, the basic point was that the Second
19 Circuit would not assume that a class of plaintiffs who
20 were receiving special education services and special
21 classes in high school under the Individuals with
22 Disabilities in Education Act were necessarily also
23 disabled within the meaning of the ADA.
24    I think the case is an important reminder that
25 the substantial limitation standard has real meaning, and

LISA SCHMID, CCR, RMR
Official Court Reporter

450

1  also helps place the issues in this case in a much broader
2  context.
3      A preliminary injunction in any context is a
4  drastic and extraordinary remedy.  The Supreme Court tells
5  us that.
6      Mr. Sampson's requested injunction is even more
7  drastic because it's a Mandatory Preliminary Injunction
8  that would provide him with all the relief he seeks.
9      Yes, he is saying it's only with respect to Step
10 1, but that's it.  That's the relief for that test.  He
11 simply has not and cannot make the showing of success on
12 the merits to justify the relief he seeks.
13     And while the bulk of the testimony this week
14 was focused on the disability analysis, a fundamental
15 question on this Motion for Preliminary Injunction is
16 whether Mr. Sampson has made a strong showing of
17 irreparable harm, absent mandatory preliminary injunctive
18 relief.  He has not.
19     If you look back at his Motion for Preliminary
20 Injunction, it states, Sampson moves this Court for a
21 Preliminary Injunction, requiring the NBME to provide
22 double testing time over two days, and extended breaks on
23 Step 1 of the USMLE, as required by the Americans with
24 Disabilities Act and Section 504 of the Rehabilitation
25 Act.  Absent such relief, Sampson will be dismissed from

LISA SCHMID, CCR, RMR
Official Court Reporter

451

1  medical school and his medical career will be over.
2      The evidence has shown that this statement is
3  simply not correct.  At points in the past, Mr. Sampson
4  needed to take and pass Step 1 to remain enrolled in
5  medical school, but that is no longer the case.  Stony
6  Brook has unequivocally stated that it is dismissing Mr.
7  Sampson because he will not be graduating in seven years.
8      But even if you put that aside and say Mr.
9  Sampson did need to take and pass the Step 1 exam to
10 remain enrolled in medical school, he still is not
11 entitled to mandatory preliminary injunctive relief.
12     First, there is the delay.  Mr. Sampson provided
13 no justifiable reason for waiting until August of 2022 to
14 bring a lawsuit against NBME based on a request for
15 testing accommodations that was first denied back in 2017.
16 He was represented by counsel in 2018.  He was represented
17 by counsel in 2020.
18     Second, Mr. Sampson could have taken the Step 1
19 exam at any time between January 2020 and now.  He assumes
20 that he will not pass because he failed the first time,
21 but he took the test after only completing a year
22 and-a-half of medical school, and after having been on
23 leave of absence from medical school for over three years.
24 The rest of his peers only had to take the Step 1 exam
25 after completing three years of medical school.

LISA SCHMID, CCR, RMR
Official Court Reporter

452

1      It's speculative.  It's entirely speculative
2  that Mr. Sampson would fail the test without
3  accommodations, particularly now that he has completed
4  three years of medical school.
5      NBME gains nothing when it denies a request for
6  testing accommodations beyond assuring itself that it is
7  administering the exam in a fair and equitable manner to
8  all examinees and is protecting the integrity of the
9  scores.
10     And while this specific lawsuit is about Mr.
11 Sampson's and his individual situations, the arguments
12 being made by Mr. Sampson as applied to the facts of this
13 case have broader implications, both for NBME's mission
14 and the public interest.
15     None of the preliminary junction factors weigh
16 in favor of Mr. Sampson, and his Motion for a Preliminary
17 Injunction should be denied.
18     THE COURT:  Thank you.  Thank you.  Thank you,
19 all.  I look forward to your submissions.  Thank you.
20     MS. MEW:  Thank you.
21     MS. VARGAS:  Your Honor, if I could ask a
22 question about the findings of fact?
23     THE COURT:  Yes.
24     MS. VARGAS:  Is there a page limit that you
25 would request for that?

LISA SCHMID, CCR, RMR
Official Court Reporter

453

1      THE COURT:  No.  It but just try to be
2  efficient.
3      MS. VARGAS:  Thank you.
4      THE COURT:  Thank you.
5      (Proceedings concluded.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

LISA SCHMID, CCR, RMR
Official Court Reporter

A1147

454

1
2  KEVIN MURPHY                          406
3  DIRECT EXAMINATION(CONTINUED)406
4  BY MS. MEW
5  CROSS-EXAMINATION                     407
6  BY MR. WEINER
7  REDIRECT EXAMINATION                  431
8  BY MS. MEW
9
10
11  Plaintiff's Exhibits 1-38, 49, 50, 55  435
12
13
14  Defense Exhibits 6 and 7              434
15
16
17
18
19
20
21
22
23
24
25

LISA SCHMID, CCR, RMR
Official Court Reporter

**A1148**

**'**

**'91** [1] - 413:9
**'92** [1] - 413:10

**1**

**1** [13] - 434:18, 435:6, 436:6, 437:15, 442:1, 442:4, 443:7, 450:10, 450:23, 451:4, 451:9, 451:18, 451:24
**1-38** [2] - 435:2, 454:11
**10** [1] - 405:15
**10036** [1] - 405:22
**1155** [1] - 405:22
**12** [3] - 418:23, 420:2, 436:3
**13** [3] - 405:7, 418:20, 418:21
**13th** [1] - 405:19
**14** [6] - 418:18, 426:11, 426:16, 427:9, 427:15, 427:16
**152** [1] - 449:8
**16** [1] - 436:6
**17** [1] - 418:25
**18901** [1] - 405:18
**1991** [1] - 413:8

**2**

**2** [1] - 442:9
**20** [1] - 418:24
**20002** [1] - 405:15
**20005** [1] - 405:20
**2015** [1] - 445:22
**2017** [2] - 418:24, 451:15
**2018** [2] - 418:21, 451:16
**2019** [1] - 418:18
**202** [1] - 405:17
**2020** [4] - 418:13, 418:14, 451:17, 451:19
**2022** [2] - 405:7, 451:13
**22** [1] - 405:3
**22nd** [1] - 405:22
**25** [1] - 413:11
**26** [2] - 426:14, 426:21
**28** [1] - 413:11
**29** [1] - 427:4

**3**

**3** [4] - 442:9, 448:3, 448:9, 448:10
**30** [1] - 427:9
**31st** [1] - 436:23
**33** [2] - 427:18, 427:19
**36** [3] - 416:7, 416:19, 416:21
**38** [1] - 434:19
**39** [1] - 428:3
**3d** [1] - 449:8

**4**

**40** [5] - 416:7, 416:11, 428:6, 428:8, 439:6
**406** [2] - 454:2, 454:3
**407** [1] - 454:5
**431** [1] - 454:7
**434** [1] - 454:14
**435** [1] - 454:11
**44** [1] - 428:10
**49** [6] - 423:3, 423:5, 423:8, 434:20, 435:2, 454:11

**5**

**50** [10] - 416:21, 419:17, 419:22, 420:9, 428:16, 428:18, 434:21, 435:2, 454:11
**504** [1] - 450:24
**51** [2] - 428:13, 428:15
**5120(JMA** [1] - 405:3
**55** [3] - 434:22, 435:2, 454:11

**6**

**6** [5] - 433:20, 434:1, 434:2, 434:10, 454:14
**600** [1] - 405:15

**7**

**7** [6] - 433:20, 434:1, 434:2, 434:8, 434:10, 454:14
**700** [1] - 405:19

**8**

**800** [1] - 405:19
**837** [1] - 449:8
**85** [1] - 419:3

**9**

**99** [1] - 405:17
**9:30** [1] - 405:8

**A**

**ability** [1] - 424:3
**able** [2] - 424:6, 424:10
**absence** [1] - 451:23
**absent** [1] - 450:17
**Absent** [1] - 450:25
**academic** [4] - 423:13, 423:16, 424:8, 426:25
**accept** [3] - 408:17, 408:18, 409:12
**accepted** [1] - 409:4
**access** [1] - 442:21
**accidents** [1] - 421:24
**accommodation** [3] - 408:5, 414:6, 417:6
**accommodations** [34] - 407:20, 408:22, 409:2, 409:6, 409:14, 409:21, 409:23, 410:14, 413:22, 414:10, 414:16, 415:11, 415:12, 431:8, 431:9, 434:19, 440:19, 441:2, 441:10, 441:14, 442:4, 442:9, 442:12, 442:24, 448:5, 448:9, 448:11, 448:13, 448:16, 451:15, 452:3, 452:6
**accurate** [1] - 429:10
**achieve** [1] - 431:8
**achievement** [1] - 424:1
**act** [1] - 444:7
**ACT** [3] - 438:14, 446:18, 447:3
**Act** [8] - 430:19, 431:5, 438:21, 440:25, 449:22, 450:24, 450:25
**activities** [4] - 424:12, 449:10, 449:13, 449:14
**activity** [4] - 443:7, 443:25, 444:1, 447:1
**actual** [2] - 444:11, 444:15
**ADA** [7] - 413:10, 431:8, 443:20,

**A**

445:18, 449:4, 449:17, 449:23
**ADA-defined** [1] - 449:17
**ADAM** [1] - 405:23
**add** [2] - 406:17, 406:18
**addition** [1] - 438:11
**additional** [3] - 413:4, 433:20, 434:1
**address** [2] - 434:15, 435:15
**ADHD** [29] - 406:15, 415:5, 417:7, 419:13, 420:5, 420:14, 420:20, 421:18, 422:5, 422:9, 422:12, 422:15, 422:19, 424:22, 425:12, 427:19, 428:19, 429:20, 430:25, 431:3, 431:16, 432:1, 432:14, 432:15, 432:17, 434:22, 444:18, 448:15
**administered** [3] - 423:25, 424:3, 446:14
**administering** [1] - 452:7
**admission** [1] - 433:25
**admit** [1] - 421:1
**admitted** [4] - 433:16, 434:8, 434:15, 434:18
**admonition** [1] - 449:7
**adolescence** [1] - 431:24
**adult** [3] - 420:14, 420:16, 445:3
**adulthood** [1] - 432:11
**adults** [3] - 420:19, 423:18, 431:24
**adults'** [1] - 425:24
**advanced** [1] - 437:8
**advised** [1] - 440:5
**advocacy** [1] - 436:17
**affect** [1] - 449:13
**affected** [1] - 423:13
**affects** [1] - 449:10
**afternoon** [1] - 406:13
**age** [3] - 420:2, 420:5, 420:23
**aged** [4] - 423:12, 425:24, 429:14, 431:22
**agree** [1] - 423:6

**A**

**agrees** [1] - 444:10
**ahead** [2] - 406:7, 435:21
**aided** [1] - 405:25
**allocate** [1] - 436:9
**allowing** [1] - 442:20
**alone** [1] - 446:7
**AM** [1] - 405:8
**Amendment** [1] - 440:25
**Americans** [3] - 430:19, 431:4, 438:21, 440:25, 450:23
**Americas** [1] - 405:22
**amount** [3] - 415:10, 415:12, 417:25
**analysis** [4] - 437:21, 437:23, 443:19, 450:14
**analyzed** [2] - 446:12, 446:15
**and-a-half** [1] - 451:22
**angst** [1] - 432:8
**annual** [2] - 413:15, 416:18
**answer** [2] - 432:21, 443:14
**answered** [1] - 433:2
**antecedents** [1] - 406:23
**antithetical** [1] - 422:11
**appeal** [1] - 412:5
**applicable** [2] - 443:12, 446:4
**applied** [1] - 452:12
**appropriate** [2] - 410:15, 434:14
**approval** [4] - 415:11, 417:14, 417:15, 418:1
**approve** [2] - 407:19, 409:13
**approved** [3] - 408:6, 417:13
**approving** [2] - 409:6, 409:23
**areas** [1] - 411:4
**argument** [1] - 444:6
**arguments** [2] - 437:1, 452:11
**Aronson** [1] - 441:17
**aside** [1] - 451:8
**assert** [1] - 414:25
**assessing** [2] - 444:13, 446:21
**assessment** [2] - 423:25, 446:19
**assessments** [1] -

446:15
**assistance** [1] - 410:21
**Assistance** [1] - 445:22
**assume** [1] - 449:19
**assumes** [1] - 451:19
**assuming** [1] - 410:21
**assuring** [1] - 452:6
**attached** [1] - 433:16
**attempt** [1] - 448:4
**Attention** [2] - 414:25, 415:5
**August** [1] - 451:13
**Avenue** [1] - 405:22
**average** [1] - 416:9
**avert** [1] - 437:9
**aware** [6] - 412:11, 412:14, 412:24, 415:20, 415:23, 426:8
**AZRACK** [1] - 405:12

**B**

**bar** [2] - 414:16, 416:15
**bared** [1] - 440:16
**Barkley** [1] - 432:16
**based** [5] - 417:6, 424:22, 436:16, 441:20, 451:14
**basic** [1] - 449:18
**basis** [9] - 413:15, 413:21, 415:24, 416:18, 435:12, 440:5, 442:18
**BC** [2] - 449:7, 449:15
**become** [3] - 423:12, 441:23, 448:25
**becoming** [1] - 439:9
**BEFORE** [1] - 405:12
**begin** [2] - 423:11, 432:12
**behalf** [3] - 413:24, 414:5, 430:15
**behind** [1] - 440:22
**belief** [1] - 430:14
**Berger** [1] - 441:6
**best** [1] - 447:7
**better** [2] - 407:7, 447:10
**between** [5] - 416:6, 416:20, 416:21, 422:4, 451:19
**beyond** [5] - 429:7, 431:2, 443:20, 446:3, 452:6
**Bibber** [1] - 441:6
**binder** [2] - 425:2,

425:3
**binding** [1] - 446:5
**bit** [1] - 416:22
**blindly** [1] - 445:19
**Board** [25] - 407:18, 408:6, 408:9, 410:8, 413:7, 413:18, 414:18, 414:23, 415:20, 415:25, 416:10, 416:16, 417:2, 417:3, 417:18, 417:20, 418:2, 418:3, 418:12, 418:15, 418:19, 418:22, 419:6
**BOARD** [1] - 405:7
**board** [1] - 441:11
**board-certified** [1] - 441:11
**book** [1] - 428:14
**bottom** [1] - 426:22
**box** [2] - 445:21, 446:1
**breaks** [1] - 450:22
**briefly** [1] - 445:21
**brilliance** [1] - 437:12
**bring** [1] - 451:14
**broader** [2] - 450:1, 452:13
**broke** [2] - 406:12, 406:16
**Brook** [2] - 409:22, 451:6
**build** [1] - 436:10
**built** [2] - 441:2, 445:8
**bulk** [1] - 450:13
**business** [2] - 436:14, 436:23
**BY** [12] - 405:16, 405:20, 405:23, 406:11, 407:13, 411:10, 420:12, 431:15, 432:25, 454:4, 454:6, 454:8

**C**

**cannot** [2] - 438:19, 450:11
**capacities** [1] - 423:14
**capacity** [1] - 413:18
**car** [1] - 421:24
**cardiac** [1] - 437:9
**cards** [1] - 444:23
**career** [1] - 451:1
**careers** [1] - 441:2
**careful** [1] - 449:12
**CAROLINE** [1] - 405:20
**case** [21] - 408:3,

408:16, 411:5, 411:6, 412:3, 412:4, 414:18, 416:24, 441:6, 441:7, 443:11, 447:23, 448:19, 449:15, 449:18, 449:24, 450:1, 451:5, 452:13
**case-by-case** [1] - 447:23
**cases** [7] - 415:24, 416:7, 416:11, 416:12, 416:17, 429:17, 441:5
**CAUSE** [1] - 405:11
**causes** [3] - 427:20, 429:21, 431:21
**cautioned** [1] - 449:12
**CCR** [1] - 405:24
**Central** [1] - 405:5
**certain** [2] - 436:2, 437:21
**certainly** [1] - 442:10
**Certainly** [1] - 421:17
**certified** [1] - 441:11
**cetera** [1] - 427:1
**challenges** [1] - 439:11
**chance** [1] - 441:25
**Charles** [1] - 407:14
**CHARLES** [1] - 405:17
**child** [2] - 422:25, 445:2
**childhood** [11] - 419:10, 419:11, 419:14, 419:16, 422:25, 423:19, 425:13, 426:23, 427:20, 431:20, 445:14
**children** [6] - 421:5, 421:6, 421:9, 421:12, 421:15, 431:24
**choice** [1] - 407:5
**choose** [3] - 408:10, 408:14, 408:17
**chronic** [3] - 426:24, 427:21, 444:20
**Circuit** [2] - 449:11, 449:19
**Circuit's** [1] - 449:7
**circumstances** [1] - 420:22
**cited** [1] - 447:21
**CIVIL** [1] - 405:11
**claim** [2] - 442:15, 449:5
**claims** [1] - 446:25
**clarify** [1] - 410:7,

433:14
**clarity** [1] - 433:25
**class** [1] - 449:19
**classes** [2] - 436:11, 449:21
**clear** [2] - 442:14, 443:13
**clinic** [5] - 420:17, 420:19, 424:14, 424:15, 424:17
**clinical** [2] - 441:17, 445:1
**close** [1] - 436:23
**closing** [1] - 436:25
**cohorts** [1] - 447:10
**COIE** [2] - 405:19, 405:21
**colleague** [1] - 422:19
**college** [1] - 422:5
**Colorado** [1] - 447:21
**commentary** [3] - 429:4, 429:6, 429:7
**comments** [3] - 430:18, 444:23, 444:25
**commitment** [1] - 439:12
**common** [1] - 421:4
**compare** [1] - 425:23
**compared** [5] - 429:14, 443:8, 444:19, 446:8, 447:9
**comparison** [3] - 443:24, 447:23, 449:2
**compassionate** [1] - 442:20
**complete** [2] - 428:18, 442:21
**completed** [2] - 448:11, 452:3
**completing** [2] - 451:21, 451:25
**complex** [1] - 423:15
**Complies** [1] - 425:9
**comply** [1] - 442:23
**comport** [1] - 419:1
**comprehend** [1] - 446:23
**comprehension** [2] - 439:4, 448:8
**Computer** [1] - 405:25
**Computer-aided** [1] - 405:25
**computerized** [1] - 405:25
**concentrate** [1] - 447:5
**concerned** [1] - 432:9
**concerning** [1] - 423:5

**concluded** [2] - 442:25, 453:5
**conclusion** [1] - 449:1
**conclusions** [3] - 436:19, 436:22, 445:20
**condition** [3] - 424:6, 424:10, 426:5
**conditions** [1] - 448:23
**conduct** [1] - 417:18
**conducted** [1] - 414:5
**conflict** [1] - 414:19
**Congressional** [1] - 438:7
**connection** [1] - 433:15
**considerable** [2] - 409:20, 409:24
**considered** [1] - 444:7
**consistent** [2] - 427:6, 449:6
**constitute** [1] - 449:16
**constraints** [1] - 436:20
**consultant** [4] - 407:17, 410:5, 413:7, 413:17
**consultants** [3] - 440:22, 441:1, 445:25
**consultation** [2] - 411:13, 430:15
**contained** [2] - 429:7, 430:6
**contains** [1] - 445:24
**contemporaneous** [1] - 440:4
**context** [3] - 449:18, 450:2, 450:3
**continues** [3] - 431:25, 432:1, 445:17
**continuously** [1] - 435:7
**contract** [1] - 413:14
**contrary** [1] - 442:1
**cope** [1] - 432:5
**core** [2] - 439:14, 439:15
**corner** [1] - 440:9
**correct** [68] - 407:20, 407:21, 407:22, 407:23, 407:24, 408:7, 408:8, 408:11, 408:19, 408:22, 408:24, 408:25, 409:7, 409:14, 409:15, 409:18, 409:24,

410:3, 410:6, 411:16, 411:19, 411:22, 412:2, 412:12, 412:15, 413:19, 413:20, 413:22, 413:25, 414:3, 415:2, 419:7, 419:9, 420:5, 420:14, 421:2, 421:7, 421:10, 421:13, 421:16, 421:20, 422:1, 422:6, 422:9, 422:12, 422:15, 422:20, 423:1, 423:2, 423:19, 423:21, 423:23, 424:1, 424:4, 424:8, 424:12, 426:3, 428:20, 430:8, 430:12, 430:20, 430:21, 430:25, 431:5, 431:6, 431:9, 431:10, 451:3

**Correct** [21] - 407:25, 408:12, 408:20, 408:23, 409:25, 411:23, 420:15, 421:11, 421:14, 422:7, 422:10, 422:13, 422:21, 423:20, 423:24, 424:2, 424:5, 424:9, 424:13, 430:9, 430:13

**correctly** [7] - 420:2, 426:15, 427:2, 427:7, 427:13, 428:1, 428:8

**counsel** [5] - 437:4, 440:24, 442:2, 451:16, 451:17

**count** [2] - 415:14, 416:19

**counted** [1] - 426:7

**course** [1] - 432:23

**COURT** [37] - 405:1, 406:1, 406:7, 407:10, 411:5, 420:7, 420:11, 431:12, 432:19, 433:2, 433:4, 433:7, 433:12, 433:18, 433:23, 434:2, 434:5, 434:8, 434:13, 434:16, 434:24, 435:1, 435:4, 435:11, 435:14, 435:17, 435:20, 436:1,

436:8, 436:12, 436:15, 437:2, 443:2, 452:18, 452:23, 453:1, 453:4

**court** [6] - 410:20, 437:22, 447:25, 449:9, 449:12, 449:17

**Court** [8] - 405:24, 441:9, 442:8, 442:22, 448:20, 448:21, 450:4, 450:20

**Courthouse** [1] - 405:5

**courtroom** [4] - 410:20, 410:24, 411:8, 411:12

**courts** [1] - 441:5

**credentials** [1] - 441:8

**credibility** [1] - 430:4

**credible** [1] - 429:15

**criteria** [2] - 406:15, 428:22

**criterion** [6] - 419:21, 420:4, 428:17, 428:18, 428:19

**Criterion** [4] - 419:22, 419:25, 423:9, 430:10

**cross** [2] - 407:11, 433:21

**CROSS** [2] - 407:12, 454:5

**cross-examination** [2] - 407:11, 433:21

**CROSS-EXAMINATION** [2] - 407:12, 454:5

**crushed** [1] - 440:20

**cure** [1] - 432:5

**CV** [2] - 405:3, 434:23

**D**

**daily** [1] - 432:17

**data** [3] - 407:2, 445:1, 447:13

**days** [2] - 439:10, 450:22

**DC** [2] - 405:15, 405:20

**deadline** [1] - 423:16

**deal** [1] - 432:4

**dealing** [1] - 419:6

**decade** [1] - 439:9

**December** [1] - 436:14

**decision** [7] - 407:22, 408:4, 408:21, 409:1, 411:18,

440:18, 447:20

**declaration** [4] - 425:19, 425:21, 426:2, 426:8

**declarations** [1] - 433:14

**dedicated** [5] - 435:19, 435:23, 435:24, 436:1, 436:8

**dedicatedly** [1] - 441:13

**dedication** [1] - 439:13

**deemed** [1] - 433:16

**deeply** [1] - 439:23

**defect** [1] - 421:6

**defendant** [1] - 405:9

**Defendant** [1] - 405:19

**defendant 's** [2] - 433:19, 434:1

**defendants** [1] - 434:11

**defense** [6] - 410:6, 410:22, 411:12, 424:25, 437:4, 442:2

**Defense** [2] - 434:10, 454:14

**defer** [2] - 438:1, 445:19

**deference** [1] - 445:17

**deferral** [1] - 445:24

**deficiencies** [1] - 421:2

**deficient** [1] - 407:5

**Deficit** [2] - 415:1, 415:5

**Deficit-Hyperactivity** [2] - 415:1, 415:5

**defined** [2] - 431:19, 449:17

**definition** [4] - 427:20, 430:24, 431:3, 432:17

**delay** [1] - 451:12

**demand** [3] - 423:13, 437:20, 443:19

**demanding** [1] - 437:22

**demands** [3] - 437:19, 438:1, 438:2

**denial** [7] - 412:19, 413:1, 415:12, 417:8, 419:3, 420:24, 421:5

**denials** [11] - 411:25, 412:5, 412:12, 415:16, 415:22, 418:1, 418:17, 418:20, 418:23,

418:25, 434:20

**denied** [6] - 417:7, 448:9, 448:17, 448:20, 451:15, 452:17

**denies** [1] - 452:5

**deny** [4] - 407:19, 408:21, 409:1, 440:18

**denying** [1] - 441:2

**department 's** [1] - 446:1

**describe** [1] - 426:5

**described** [1] - 446:12

**describes** [1] - 447:1

**designed** [1] - 438:12

**despite** [1] - 439:20

**detailing** [1] - 441:18

**determination** [1] - 443:18

**determine** [1] - 410:10

**determined** [1] - 447:24

**determining** [2] - 408:5, 440:13

**developmental** [3] - 429:11, 429:12, 430:11

**developmentally** [11] - 425:12, 426:12, 426:25, 427:5, 427:11, 427:21, 427:25, 428:4, 428:7, 428:11, 431:23

**Developmentally** [2] - 425:18, 425:22

**deviance** [4] - 429:10, 429:14, 430:7, 430:11

**deviant** [23] - 425:13, 425:17, 425:18, 425:20, 425:22, 426:2, 426:12, 426:25, 427:5, 427:12, 427:19, 427:21, 427:25, 428:5, 428:7, 428:11, 428:22, 429:9, 430:8, 431:23

**devices** [1] - 437:5

**devoted** [1] - 438:5

**devotes** [1] - 439:9

**diagnose** [1] - 438:14

**diagnosed** [12] - 419:10, 419:13, 419:15, 420:13, 420:20, 420:23, 422:25, 423:1, 423:2, 423:18,

448:7, 448:14

**diagnoses** [1] - 441:21

**diagnosis** [10] - 410:11, 424:15, 424:22, 425:11, 427:6, 429:15, 430:4, 430:17, 446:6, 446:7

**diagnostic** [3] - 406:15, 444:24, 448:6

**difference** [1] - 429:15

**different** [7] - 418:2, 418:5, 418:6, 419:5, 431:22, 432:2, 449:17

**differently** [1] - 439:2

**difficult** [3] - 429:23, 446:23, 448:24

**difficulties** [4] - 406:25, 423:11, 444:21, 444:23

**DIRECT** [2] - 406:10, 454:3

**direct** [3] - 446:18, 446:21, 447:22

**directive** [1] - 443:19

**directs** [1] - 437:19

**Disabilities** [6] - 430:19, 431:5, 438:21, 440:25, 449:22, 450:24

**disabilities** [8] - 422:24, 438:15, 439:25, 441:10, 441:19, 441:24, 444:18

**disability** [16] - 410:14, 415:7, 430:19, 431:4, 437:17, 439:20, 440:13, 442:15, 442:18, 443:18, 444:13, 446:7, 448:15, 449:4, 449:17, 450:14

**disabled** [7] - 437:20, 438:3, 438:10, 439:15, 439:16, 447:17, 449:23

**disclose** [1] - 439:25

**discount** [1] - 440:14

**discredited** [1] - 441:4

**discussed** [1] - 426:22

**discusses** [1] - 446:10

**discussing** [2] - 406:13, 406:14

**dismissed** [1] -

450:25
**dismissing** [1] - 451:6
**Disorder** [3] - 415:1, 415:5, 434:21
**disorder** [15] - 415:1, 421:19, 421:20, 421:25, 423:1, 423:6, 426:23, 429:12, 429:21, 431:16, 431:19, 431:25, 432:15, 432:17, 448:7
**disorders** [1] - 432:5
**disregard** [2] - 408:10, 408:14
**disruptive** [1] - 432:1
**distinguish** [1] - 449:12
**District** [2] - 447:21, 449:8
**DISTRICT** [3] - 405:1, 405:1, 405:12
**docket** [1] - 436:14
**doctor** [3] - 439:9, 439:17, 441:23
**Doctor** [4] - 406:2, 415:10, 430:5, 433:7
**doctors** [2] - 422:14, 448:25
**document** [3] - 419:20, 419:23, 427:16
**documentation** [12] - 407:2, 409:5, 409:12, 410:9, 410:10, 410:11, 410:12, 410:17, 411:25, 412:9, 412:15, 413:5
**documents** [2] - 434:6, 446:2
**DOJ** [1] - 445:18
**domains** [2] - 427:22, 432:2
**done** [7] - 414:9, 414:14, 414:15, 415:10, 415:13, 415:21, 430:15
**double** [1] - 450:22
**doubt** [2] - 438:22, 439:5
**down** [5] - 427:4, 427:10, 427:15, 427:23
**downplay** [1] - 446:16
**Doylestown** [1] - 405:18
**Dr** [31] - 406:12, 407:8, 407:14, 407:24, 408:1, 408:13,

408:14, 411:2, 411:21, 412:1, 412:7, 412:9, 422:15, 422:16, 422:17, 422:19, 423:21, 424:25, 429:24, 431:16, 432:16, 434:22, 441:3, 441:12, 441:17, 444:5, 444:17, 445:9, 446:13, 446:14, 446:15
**drastic** [2] - 450:4, 450:7
**Drive** [1] - 405:17
**drive** [1] - 445:6
**DSM** [18] - 419:9, 419:12, 423:5, 423:17, 425:15, 428:14, 428:19, 428:22, 428:23, 429:8, 430:6, 430:7, 430:17, 430:23, 434:20, 434:21, 444:14, 446:21
**DSM-V** [2] - 434:20, 434:21
**duration** [3] - 424:7, 424:11, 438:5
**during** [3] - 423:11, 433:20, 444:25

## E

**earliest** [1] - 413:9
**early** [3] - 431:20, 445:13
**EASTERN** [1] - 405:1
**education** [2] - 442:21, 449:20
**Education** [1] - 449:22
**Edward** [1] - 422:22
**efficient** [1] - 453:2
**effort** [3] - 438:5, 439:5, 446:16
**either** [4] - 407:24, 414:25, 415:11, 448:4
**elicited** [1] - 443:10
**emphasizes** [2] - 443:16, 443:23
**employee** [1] - 440:17
**employment** [1] - 440:1
**encapsulates** [1] - 423:18
**end** [2] - 421:22, 445:22
**enforceable** [1] -

446:3
**enrolled** [2] - 451:4, 451:10
**entered** [1] - 410:25
**entirely** [2] - 449:6, 452:1
**entities** [3] - 413:25, 414:3, 441:3
**Entities** [1] - 445:22
**entitled** [2] - 442:12, 451:11
**entity** [2] - 439:13, 439:15
**equitable** [1] - 452:7
**especially** [1] - 438:16
**ESQ** [4] - 405:16, 405:17, 405:20, 405:23
**essence** [1] - 439:24
**establish** [3] - 442:11, 446:3, 449:4
**et** [2] - 427:1
**evaluated** [6] - 409:18, 423:21, 438:2, 440:23, 443:11, 445:25
**evaluating** [1] - 429:17
**evaluation** [5] - 407:1, 414:9, 446:14, 448:6, 448:13
**evaluations** [3] - 414:15, 438:1, 438:24
**evaluator** [1] - 448:14
**evaluators** [4] - 408:19, 442:25, 445:18, 446:10
**evaluators'** [1] - 445:20
**event** [1] - 444:8
**events** [1] - 437:9
**Evidence** [1] - 440:11
**evidence** [20] - 406:24, 425:12, 427:24, 429:18, 434:10, 435:3, 437:25, 440:4, 440:7, 442:11, 442:15, 444:3, 444:7, 444:10, 444:11, 444:14, 446:24, 448:22, 448:25, 451:2
**exactly** [2] - 418:10, 446:13
**exam** [11] - 414:7, 414:11, 414:16, 416:15, 435:23, 435:25, 447:12,

451:9, 451:19, 451:24, 452:7
**examination** [5] - 407:11, 414:13, 433:21, 439:22, 443:8
**EXAMINATION** [4] - 407:12, 431:14, 454:5, 454:7
**EXAMINATION ( CONTINUED** [2] - 406:10, 454:3
**examinees** [1] - 452:8
**EXAMINERS** [1] - 405:8
**Examiners** [22] - 407:18, 408:7, 408:10, 413:7, 413:19, 414:23, 414:24, 415:21, 415:25, 416:11, 416:17, 417:3, 417:4, 417:19, 417:20, 418:3, 418:12, 418:16, 418:19, 418:22, 419:6
**example** [2] - 441:3, 441:5
**Exams** [1] - 409:22
**exceed** [1] - 423:13
**excellent** [1] - 436:17
**exceptional** [2] - 438:9, 438:16
**excessively** [1] - 423:16
**Excuse** [3] - 419:23, 422:17, 432:19
**excused** [1] - 433:7
**exhibit** [1] - 424:25
**Exhibit** [8] - 419:17, 419:22, 423:3, 423:5, 423:8, 434:20, 434:21, 434:22
**Exhibits** [7] - 433:20, 434:1, 434:10, 434:18, 435:2, 454:11, 454:14
**exhibits** [2] - 433:15, 434:15
**exist** [1] - 428:23
**exists** [2] - 429:1, 429:4
**expand** [1] - 443:20
**experiencing** [1] - 427:24
**expert** [2] - 411:2, 411:3
**experts** [1] - 447:16

**explained** [4] - 444:17, 445:9, 447:16, 449:9
**expression** [1] - 427:12
**extended** [3] - 440:5, 440:6, 450:22
**extensive** [3] - 437:21, 438:17, 443:19
**extent** [2] - 430:1, 438:20
**extraordinary** [2] - 439:5, 450:4
**extreme** [1] - 421:25

## F

**face** [1] - 419:2
**fact** [10] - 409:1, 409:21, 422:14, 426:7, 430:10, 436:18, 436:19, 436:22, 442:16, 452:22
**factors** [1] - 452:15
**facts** [4] - 427:11, 447:22, 452:12
**fail** [1] - 452:2
**failed** [1] - 451:20
**fair** [5] - 413:11, 414:2, 417:21, 418:4, 452:7
**familiar** [1] - 414:3
**famous** [1] - 422:14
**favor** [1] - 452:16
**federal** [3] - 437:22, 441:5, 442:23
**fewest** [1] - 416:1
**fiber** [1] - 439:10
**fifth** [1] - 412:19
**Fifty** [2] - 419:18, 428:15
**file** [1] - 439:22
**filed** [1] - 448:17
**finally** [1] - 428:10
**financial** [1] - 421:23
**findings** [4] - 436:18, 436:19, 436:22, 452:22
**fine** [1] - 415:6
**finish** [2] - 442:5
**finishing** [1] - 439:7
**first** [8] - 409:8, 411:21, 411:24, 413:20, 420:20, 430:22, 451:15, 451:20
**First** [1] - 451:12
**fix** [1] - 407:4
**Floor** [1] - 405:22

**focused** [2] - 443:5, 450:14
**follows** [1] - 406:9
**FOR** [1] - 405:11
**forced** [1] - 439:22
**formally** [1] - 433:22
**former** [1] - 449:3
**forth** [1] - 428:19
**Forty** [1] - 423:4
**Forty-nine** [1] - 423:4
**forward** [2] - 415:4, 452:19
**fought** [1] - 442:21
**four** [1] - 411:25
**Fourth** [1] - 412:20, 412:21
**frankly** [1] - 437:8
**frequently** [1] - 417:16
**full** [2] - 436:14, 436:17
**fully** [2] - 423:12, 437:8
**functional** [3] - 427:6, 428:7, 446:20
**functioning** [3] - 427:22, 431:21, 445:3
**functions** [1] - 424:8
**fundamental** [2] - 439:14, 450:14
**future** [1] - 440:1

**G**

**gains** [1] - 452:5
**general** [7] - 443:8, 444:1, 444:12, 445:15, 446:9, 447:15, 449:2
**gifted** [4] - 438:10, 439:15, 441:23, 442:20
**given** [5] - 409:16, 409:20, 411:25, 435:6, 446:18
**Given** [1] - 442:14
**glimpse** [1] - 437:12
**grades** [2] - 438:9, 440:11
**graduate** [1] - 422:8
**graduating** [1] - 451:7
**grant** [1] - 442:22
**group** [2] - 441:1, 447:11
**guess** [6] - 414:15, 416:3, 416:4, 416:6, 416:19, 419:2
**guessed** [1] - 419:4
**guidance** [3] - 445:24, 446:2

**H**

**half** [1] - 451:22
**halfway** [1] - 427:4
**Hallowell** [3] - 422:16, 422:17, 422:22
**hand** [1] - 440:15
**happy** [1] - 429:22
**hard** [9] - 416:2, 416:23, 418:10, 437:11, 439:18, 439:19, 442:21, 445:9, 445:10
**hard-won** [1] - 439:18
**harder** [1] - 439:1
**harm** [1] - 450:17
**hear** [2] - 409:8, 429:5
**heard** [1] - 441:11
**HEARING** [1] - 405:11
**hearing** [5] - 410:2, 437:22, 443:5, 443:10
**heart** [1] - 439:10
**heavy** [1] - 423:16
**heightened** [1] - 443:11
**hello** [1] - 408:3
**help** [2] - 407:6, 432:4
**helps** [1] - 450:1
**hid** [1] - 440:22
**hide** [1] - 440:3
**high** [5] - 414:6, 414:10, 446:17, 447:15, 449:21
**higher** [1] - 432:12
**highly** [1] - 444:15
**hired** [1] - 440:22
**historical** [1] - 445:1
**history** [3] - 427:11, 428:4, 443:17
**holding** [1] - 449:6
**Holloway** [1] - 422:15
**home** [1] - 424:21
**Honor** [16] - 407:9, 411:1, 432:23, 433:3, 433:5, 433:9, 433:13, 434:4, 434:12, 434:18, 434:25, 435:7, 435:15, 436:25, 443:4, 452:21
**HONORABLE** [1] - 405:12
**hours** [2] - 437:10, 439:10
**housekeeping** [1] - 433:10
**human** [2] - 440:9, 447:18
**hurdle** [1] - 431:7

**hyperactive** [1] - 420:1
**Hyperactivity** [2] - 415:1, 415:5

**I**

**ideally** [1] - 436:5
**identify** [2] - 429:25, 432:4
**imagine** [2] - 417:17, 417:25
**immediately** [2] - 436:6, 442:5
**impact** [1] - 445:10
**impacting** [1] - 430:2
**impaired** [1] - 444:18
**impairing** [1] - 429:21
**impairment** [20] - 410:13, 425:13, 425:17, 425:18, 425:20, 426:2, 426:13, 426:25, 427:6, 427:21, 428:5, 428:7, 428:12, 429:18, 432:12, 440:7, 444:13, 448:8, 449:9, 449:11
**impairments** [1] - 449:13
**implications** [1] - 452:13
**importance** [1] - 438:8
**important** [4] - 444:13, 445:5, 448:1, 449:24
**impossible** [1] - 440:8
**improve** [2] - 407:6, 438:13
**impulsive** [1] - 420:1
**inattention** [1] - 430:12
**inattentive** [1] - 419:25
**incentive** [1] - 447:6
**including** [3] - 444:10, 446:2, 447:11
**Indeed** [1] - 446:23
**individual** [7] - 414:6, 414:10, 441:23, 443:18, 445:2, 445:25, 452:11
**individual 's** [4] - 423:14, 443:24, 444:11, 449:10
**individually** [1] - 447:24
**individuals** [5] - 414:25, 420:22,

423:18, 444:17, 444:18
**Individuals** [1] - 449:21
**industry** [1] - 438:12
**information** [8] - 434:22, 439:23, 444:9, 445:11, 445:13, 446:19, 447:6, 447:13
**informative** [1] - 447:22
**injunction** [2] - 450:3, 450:6
**Injunction** [10] - 442:3, 442:8, 442:22, 443:13, 448:18, 450:7, 450:15, 450:20, 450:21, 452:17
**injunctive** [2] - 450:17, 451:11
**inside** [1] - 437:7
**instead** [1] - 407:4
**Instead** [1] - 440:22
**insufficient** [1] - 427:24
**integrity** [1] - 452:8
**interest** [5] - 414:19, 437:14, 437:18, 442:19, 452:14
**interpretation** [1] - 430:22
**introduced** [1] - 433:20
**invented** [1] - 437:6
**involve** [1] - 414:24
**IQ** [1] - 447:15
**irreparable** [2] - 450:17
**Islip** [1] - 405:5
**issue** [2] - 410:23, 449:16
**issues** [2] - 406:25, 450:1
**itself** [3] - 425:25, 426:1, 452:6

**J**

**January** [1] - 451:19
**JOAN** [1] - 405:12
**job** [1] - 421:24
**jobs** [1] - 432:13
**John** [2] - 422:15, 422:19
**JUDGE** [1] - 405:12
**judged** [1] - 442:17
**judgment** [1] - 410:10
**judicial** [1] - 446:5

**junction** [1] - 452:15
**jurisdictions** [2] - 416:12, 416:14
**justifiable** [1] - 451:13
**justify** [1] - 450:12

**K**

**keep** [2] - 415:17, 416:23
**kept** [1] - 415:18
**KEVIN** [2] - 406:8, 454:2
**key** [1] - 446:24
**kids'** [1] - 425:24
**kind** [2] - 439:8, 448:18
**knowledge** [2] - 438:20, 442:19
**knows** [2] - 437:16, 442:1

**L**

**labeled** [1] - 421:9
**language** [2] - 443:17, 443:23
**Lantern** [1] - 405:17
**last** [3] - 411:15, 428:10, 449:15
**latter** [1] - 449:3
**law** [13] - 413:10, 421:25, 436:19, 436:23, 437:19, 437:24, 437:25, 438:2, 440:13, 441:25, 442:14, 442:23
**lawsuit** [3] - 439:23, 451:14, 452:10
**LD** [2] - 415:7, 417:6
**Learning** [1] - 434:21, 438:10
**learning** [16] - 406:24, 415:1, 415:7, 422:24, 423:1, 423:6, 423:11, 438:3, 438:14, 438:15, 439:11, 439:14, 439:16, 444:18, 448:7, 448:14
**learns** [1] - 439:2
**leave** [1] - 451:23
**leaves** [1] - 439:23, 442:13
**legal** [1] - 439:24
**legally** [1] - 446:3
**legally-enforceable** [1] - 446:3

6

legislative [1] - 443:17
lengthy [1] - 423:15
less [1] - 447:18
letters [5] - 438:24,
 440:20, 441:15,
 441:16, 441:17
level [1] - 410:13
levels [1] - 407:7
life [13] - 424:11,
 431:20, 432:14,
 432:15, 432:18,
 439:22, 440:5,
 441:22, 443:7,
 443:25, 447:1,
 449:10, 449:13
lifesaving [1] - 437:5
lifetime [2] - 437:11,
 440:2
likelihood [2] -
 443:14, 448:21
likely [2] - 448:23,
 449:4
limit [2] - 449:14,
 452:24
limitation [5] - 443:22,
 444:15, 446:8,
 446:22, 449:25
limitations [1] -
 446:20
limited [7] - 423:14,
 443:6, 444:19,
 446:25, 447:9,
 447:19, 449:1
limiting [1] - 449:11
limits [1] - 437:16
line [2] - 426:19,
 428:10
lion's [1] - 431:25
Lisa [1] - 405:24
listening [2] - 437:10,
 438:22
lit [1] - 437:7
literally [1] - 438:20
litigation [3] - 411:3,
 411:22
lives [2] - 432:2, 437:9
LLP [3] - 405:14,
 405:19, 405:21
loads [1] - 423:16
look [7] - 415:15,
 417:11, 429:18,
 438:4, 450:19,
 452:19
looked [1] - 406:22
looking [6] - 406:21,
 410:16, 419:21,
 423:8, 428:17,
 430:16
loses [1] - 421:23
losing [1] - 442:17

Lovett [8] - 407:24,
 408:1, 408:13,
 412:1, 412:7,
 412:10, 441:4, 445:9
Lovett's [1] - 408:14

M

magnitude [3] -
 410:12, 427:25,
 428:4
major [6] - 424:11,
 443:7, 443:25,
 447:1, 449:10,
 449:13
maker [3] - 407:22,
 408:4, 411:18
manage [1] - 432:5
managed [1] - 432:3
management [1] -
 432:13
mandatory [3] -
 448:18, 450:17,
 451:11
Mandatory [2] -
 443:13, 450:7
MANDELSBERG [1] -
 405:23
MANDLESBERG [5] -
 433:9, 433:13,
 433:19, 433:24,
 434:11
manifest [1] - 423:12
manifestations [1] -
 421:19
manner [5] - 417:17,
 424:7, 424:11,
 438:5, 452:7
marriages [1] - 432:13
MARY [1] - 405:16
masters [1] - 448:12
matter [3] - 411:19,
 411:21, 411:24
matters [1] - 411:3
MCAT [6] - 438:13,
 438:23, 440:10,
 446:18, 447:4,
 447:12
mean [6] - 415:14,
 417:22, 419:11,
 421:1, 421:18,
 431:18
meaning [2] - 449:23,
 449:25
means [1] - 431:19
meant [1] - 428:16
measure [2] - 445:10,
 445:11
measures [4] -
 438:17, 440:12,

445:10
measuring [1] -
 444:15
Medical [25] - 407:18,
 408:6, 408:9,
 409:22, 413:7,
 413:18, 414:23,
 414:24, 415:20,
 415:25, 416:10,
 416:17, 417:3,
 417:4, 417:19,
 417:20, 418:2,
 418:3, 418:12,
 418:16, 418:19,
 418:22, 419:6,
 435:18, 435:22
medical [20] - 422:11,
 437:5, 437:25,
 438:19, 439:7,
 442:5, 442:20,
 442:25, 444:2,
 444:6, 448:2, 448:3,
 451:1, 451:5,
 451:10, 451:22,
 451:23, 451:25,
 452:4
MEDICAL [1] - 405:7
medicated [1] -
 421:15
meet [2] - 430:24,
 431:3
memory [1] - 439:3
mental [2] - 421:2,
 421:6
mention [1] - 412:7
mentioned [1] -
 420:16
merely [2] - 407:18,
 449:13
merit [1] - 442:19
merits [3] - 443:14,
 448:21, 450:12
met [1] - 440:23
Mew [3] - 433:8, 443:3
MEW [17] - 405:20,
 406:11, 407:8,
 411:1, 411:9,
 431:15, 432:23,
 432:25, 433:3,
 433:5, 434:25,
 435:7, 435:13,
 443:4, 452:20,
 454:4, 454:8
midway [3] - 427:10,
 427:15
might [5] - 414:17,
 416:22, 416:24,
 416:25, 421:6
Miller [1] - 446:14
minimum [1] - 413:11

minute [1] - 432:21
minutes [1] - 437:2
misapply [1] - 440:24
mission [1] - 452:13
mitigate [1] - 440:3
mitigating [2] -
 438:17, 440:12
mixed [1] - 422:23
moment [2] - 434:3,
 437:6
Monday [1] - 436:23
money [1] - 432:13
month [3] - 416:6,
 416:20, 435:11
months [2] - 416:24,
 435:9
morning [4] - 406:1,
 406:3, 406:12,
 407:14
most [13] - 421:25,
 439:1, 443:8, 444:1,
 444:12, 444:16,
 444:19, 445:15,
 446:8, 447:9,
 447:10, 447:15,
 448:24
Mostly [1] - 411:14
mother [1] - 438:23
Motion [7] - 442:3,
 442:7, 443:12,
 448:17, 450:15,
 450:19, 452:16
motion [3] - 433:15,
 444:6, 448:20
MOTION [1] - 405:11
Mount [2] - 449:7,
 449:15
move [2] - 433:25,
 436:21
moves [1] - 450:20
MR [12] - 407:13,
 411:7, 411:10,
 420:9, 420:12,
 431:11, 433:9,
 433:13, 433:19,
 433:24, 434:11,
 454:6
MS [31] - 406:11,
 407:8, 411:1, 411:9,
 431:15, 432:23,
 432:25, 433:3,
 433:5, 434:3, 434:6,
 434:14, 434:17,
 434:25, 435:7,
 435:13, 435:15,
 435:18, 435:22,
 436:3, 436:10,
 436:13, 436:25,
 437:3, 443:4,
 452:20, 452:21,

452:24, 453:3,
 454:4, 454:8
multiple [3] - 427:22,
 441:14, 444:21
MURPHY [2] - 406:8,
 454:2
Murphy [10] - 406:12,
 407:8, 407:14,
 411:2, 411:21,
 423:21, 424:25,
 429:24, 431:16,
 444:17
must [3] - 431:8,
 443:11, 449:12

N

name [1] - 425:5
names [1] - 422:23
narrative [2] - 432:19,
 432:22
NATIONAL [1] - 405:7
National [24] - 407:17,
 408:6, 408:9, 413:7,
 413:18, 414:17,
 414:18, 414:23,
 415:20, 415:25,
 416:10, 416:16,
 417:2, 417:3,
 417:18, 417:20,
 418:2, 418:3,
 418:11, 418:15,
 418:19, 418:22,
 419:6
NBME [25] - 408:16,
 408:21, 409:4,
 409:10, 409:16,
 409:20, 409:22,
 411:16, 411:18,
 430:16, 438:1,
 438:3, 438:25,
 439:12, 440:6,
 440:15, 441:9,
 442:23, 444:10,
 445:19, 447:16,
 447:20, 450:21,
 451:14, 452:5
NBME's [2] - 412:14,
 452:13
NE [1] - 405:15
necessarily [1] -
 449:22
need [5] - 407:3,
 436:18, 441:14,
 451:9
needed [1] - 451:4
needs [3] - 440:6,
 442:4, 443:1
neurodevelopmental
 [3] - 426:23, 431:16,

432:14
**neuropsychological**
[1] - 444:4
**never** [9] - 412:9,
415:18, 423:21,
423:23, 423:25,
424:3, 424:6, 440:23
**NEW** [1] - 405:1
**New** [3] - 405:5,
405:22
**Next** [1] - 433:4
**next** [2] - 420:10,
435:6
**night** [1] - 449:16
**nine** [5] - 418:13,
418:16, 418:17,
423:4, 426:22
**ninety** [2] - 419:3
**None** [1] - 452:15
**notable** [2] - 440:15,
441:8
**noted** [2] - 427:19,
438:7
**nothing** [4] - 440:16,
445:18, 452:5
**Nothing** [1] - 434:11
**noticed** [2] - 410:1,
425:19
**Nowhere** [1] - 430:7
**number** [2] - 413:25,
414:2
**NW** [1] - 405:19

## O

**oath** [2] - 406:5, 406:9
**object** [1] - 411:1
**objection** [4] - 434:2,
434:7, 434:24,
434:25
**objective** [2] - 407:2,
444:11
**observations** [1] -
446:11
**observe** [2] - 424:6,
424:10
**observed** [2] - 440:4,
446:11
**observing** [2] -
411:14, 411:15
**obtained** [2] - 418:11,
448:6
**obtaining** [1] - 438:6
**Obviously** [1] - 436:4
**obviously** [1] - 411:22
**occurred** [2] - 410:2,
413:3
**october** [1] - 405:7
**October** [1] - 436:23
**OF** [3] - 405:1, 405:7,

405:11
**offer** [1] - 411:13
**offered** [2] - 433:22,
435:8
**often** [4] - 415:15,
415:21, 420:23,
421:17
**older** [1] - 432:11
**once** [4] - 412:24,
428:3, 428:6, 428:10
**One** [3] - 406:18,
422:5, 435:5
**one** [14] - 406:21,
414:17, 416:25,
419:9, 419:23,
420:13, 421:22,
422:8, 422:11,
422:24, 431:4,
435:15, 440:20,
448:11
**onset** [3] - 420:5,
425:13, 426:23
**opened** [1] - 439:21
**opening** [1] - 442:2
**opinions** [1] - 441:4
**opportunities** [2] -
440:1, 440:21
**opportunity** [1] -
437:15
**opposite** [1] - 447:9
**optimize** [1] - 407:6
**order** [3] - 431:8,
442:8, 445:7
**Osteopathic** [9] -
413:18, 414:24,
417:4, 417:20,
418:2, 418:12,
418:15, 418:19,
418:22
**outcomes** [2] - 438:4,
438:8
**overcame** [1] - 439:19
**overcoming** [1] -
439:11
**overtime** [1] - 431:23

## P

**PA** [1] - 405:18
**package** [1] - 412:1
**page** [8] - 419:22,
420:7, 420:10,
423:8, 426:22,
427:9, 427:15,
452:24
**pages** [3] - 423:5,
429:6, 434:21
**paper** [2] - 444:20,
444:22
**papers** [2] - 445:23,

447:21
**paragraph** [11] -
425:8, 425:11,
426:11, 426:14,
426:21, 427:4,
427:9, 427:18,
428:8, 428:10
**parents** [2] - 421:4,
421:5, 432:9
**part** [6] - 409:8, 410:6,
411:12, 425:17,
441:1, 446:1
**participated** [1] -
406:20
**particular** [3] - 408:16,
423:17, 423:25
**particularly** [3] -
438:7, 445:13, 453:3
**party** [1] - 408:17
**pass** [5] - 448:4,
448:11, 451:4,
451:9, 451:20
**past** [1] - 451:3
**patents** [1] - 437:6
**patient** [1] - 414:20
**pattern** [3] - 426:24,
427:5, 444:20
**peers** [4] - 425:24,
429:14, 431:22,
451:24
**People** [1] - 432:14
**people** [24] - 414:15,
420:19, 421:1,
424:14, 429:19,
429:22, 430:2,
431:25, 432:4,
432:8, 440:4, 441:8,
443:8, 444:1,
444:12, 444:16,
444:19, 445:3,
445:25, 446:8,
447:9, 447:11,
447:15
**people's** [1] - 431:21
**per** [2] - 416:4, 416:20
**perceive** [1] - 430:6
**percent** [2] - 419:3,
419:4
**perceptive** [1] - 445:8
**perfect** [1] - 447:18
**perform** [2] - 438:18,
447:7
**performance** [8] -
407:6, 425:24,
443:24, 443:25,
444:11, 445:14,
446:16, 446:24
**performed** [2] -
445:12, 447:10
**performs** [1] - 424:7,

424:11
**Perhaps** [2] - 418:8,
428:16
**period** [8] - 435:8,
435:10, 435:19,
435:23, 435:24,
436:1, 436:2, 436:9
**PERKINS** [2] - 405:19,
405:21
**permit** [1] - 411:6
**perseverance** [1] -
439:12
**persists** [1] - 431:23
**person** [7] - 421:22,
430:18, 431:7,
432:8, 437:20,
440:18, 440:19
**person's** [1] - 410:12
**personal** [2] - 439:23,
445:4
**personally** [1] -
446:11
**Peruses** [4] - 419:20,
419:23, 427:16,
434:6
**pervasive** [5] - 426:24,
427:21, 428:5,
430:1, 444:20
**phone** [1] - 424:21
**physicians** [1] -
441:15
**piece** [1] - 433:10
**place** [2] - 439:6,
450:1
**plaintiff** [3] - 405:4,
433:21, 448:2
**Plaintiff** [1] - 405:14
**plaintiff's** [1] - 428:14
**Plaintiff's** [3] - 419:17,
435:2, 454:11
**plaintiffs** [2] - 434:15,
449:19
**point** [8] - 407:3,
429:25, 433:14,
433:22, 435:16,
438:21, 445:2,
449:18
**points** [1] - 451:3
**population** [8] - 419:7,
443:9, 444:1,
444:12, 445:16,
446:9, 447:15, 449:2
**position** [1] - 412:14
**possible** [1] - 420:25
**potential** [2] - 421:2,
440:21
**practice** [1] - 429:17
**precedent** [1] - 446:5
**precedential** [1] -
409:16

**precipice** [1] - 442:16
**preliminary** [5] -
448:19, 450:3,
450:17, 451:11,
452:15
**Preliminary** [10] -
442:3, 442:7,
442:22, 443:13,
448:18, 450:7,
450:15, 450:19,
450:21, 452:16
**preparation** [2] -
436:5, 438:17
**present** [2] - 419:16,
420:1
**presume** [1] - 410:5
**pretty** [1] - 421:4
**previous** [1] - 412:5
**previously** [2] - 406:8,
412:25
**primarily** [1] - 443:5
**privileged** [1] - 411:4
**probative** [1] - 444:15
**problematic** [1] -
432:7
**problems** [12] -
406:24, 421:23,
425:20, 426:3,
427:12, 429:11,
429:12, 429:19,
429:21, 430:1,
431:21, 432:1
**proceed** [1] - 442:5
**Proceedings** [2] -
405:25, 453:5
**process** [1] - 447:6
**produced** [1] - 405:25
**professionals** [4] -
409:6, 409:13,
409:17, 438:2
**profoundly** [1] -
437:13
**program** [1] - 448:12
**prohibit** [1] - 444:8
**promise** [1] - 437:13
**promises** [1] - 441:25
**proper** [2] - 430:17,
432:4
**protecting** [1] - 452:8
**provide** [3] - 442:23,
450:8, 450:21
**provided** [5] - 440:3,
441:20, 442:16,
448:22, 451:12
**providing** [3] - 410:21,
441:20
**provision** [1] - 423:17
**PSAT** [1] - 447:3
**psychiatrist** [1] -
441:17

psychologist [1] - 441:11
public [5] - 437:14, 437:18, 439:24, 442:19, 452:14
purpose [1] - 425:23
put [2] - 436:20, 451:8

## Q

qualified [4] - 409:5, 409:13, 409:17, 438:1
questions [5] - 407:9, 431:11, 433:6, 437:15, 447:5
quite [2] - 413:24, 437:21
Quite [1] - 447:9

## R

raise [1] - 435:5
Ramsay [1] - 441:6
ran [1] - 420:16
range [1] - 422:2
rare [1] - 414:20
rate [1] - 419:3
rates [1] - 418:5
Ratey [1] - 422:19
rather [5] - 409:23, 437:16, 439:11, 442:18, 449:3
read [13] - 420:2, 425:19, 426:15, 427:2, 427:7, 427:13, 428:1, 428:8, 437:15, 439:4, 445:21, 447:4
reading [4] - 423:15, 438:24, 448:8, 448:23
reads [2] - 436:4, 439:3
real [9] - 426:12, 427:5, 429:18, 440:7, 440:10, 444:14, 446:20, 449:25
reality [1] - 438:11
really [1] - 419:5
reason [1] - 451:13
reasonable [1] - 410:15
reasons [1] - 414:19
receive [6] - 413:14, 414:22, 415:24, 417:2, 435:18, 435:22
received [13] - 409:21,

412:15, 412:17, 412:21, 418:13, 418:16, 418:18, 418:21, 434:10, 435:1, 435:2, 437:6, 448:12
receives [1] - 442:8
receiving [1] - 449:20
recent [1] - 447:20
recollection [2] - 412:4, 419:1
recommend [3] - 415:15, 417:15, 431:9
recommendation [3] - 408:11, 408:18, 410:17
recommendations [6] - 407:19, 408:14, 408:18, 409:5, 409:18, 413:22
recommended [13] - 412:1, 412:25, 415:11, 415:12, 415:22, 417:7, 417:13, 418:1, 418:16, 418:20, 418:23, 418:25
Record [1] - 438:7
record [8] - 406:14, 433:17, 433:24, 436:17, 439:24, 443:11, 444:24, 445:2
recorded [2] - 405:25, 446:12
records [3] - 417:17, 418:11, 445:14
REDIRECT [2] - 431:14, 454:7
refer [3] - 415:4, 415:7, 428:6
referrals [4] - 418:13, 418:18, 418:21, 418:24
referred [1] - 445:23
referring [4] - 416:16, 421:23, 422:16, 428:4
refers [1] - 432:16
reflect [2] - 444:22, 445:14
reflects [1] - 418:12
regarding [3] - 413:22, 430:18, 445:5
register [1] - 435:8
regulation [1] - 444:8
regulations [3] - 445:19, 446:5, 446:6

regulatory [2] - 443:16, 443:23
Rehabilitation [1] - 450:24
relates [2] - 411:5, 411:6
relative [6] - 406:14, 443:7, 444:12, 444:16, 447:14, 447:16
relatively [1] - 417:16
relevance [2] - 446:19, 446:21
reliance [1] - 445:6
relief [9] - 442:9, 442:12, 448:19, 450:8, 450:10, 450:12, 450:18, 450:25, 451:11
relies [1] - 444:4
relying [1] - 438:8
remain [2] - 451:4, 451:10
remedy [1] - 450:4
reminder [1] - 449:24
render [1] - 424:15
reorient [1] - 406:13
repeat [1] - 409:8
repeatedly [1] - 441:4
report [1] - 444:23
Reporter [1] - 405:24
reports [3] - 412:9, 423:15, 444:5
represent [1] - 407:15
represented [2] - 451:16
request [8] - 409:2, 409:6, 414:22, 448:9, 448:17, 451:14, 452:5, 452:25
requested [2] - 448:8, 450:6
requests [3] - 417:6, 434:19, 438:25
require [1] - 419:9, 430:7, 437:24, 444:2, 445:19
required [6] - 439:6, 444:14, 446:4, 446:20, 449:3, 450:23
requirement [1] - 419:13
requirements [1] - 425:14
requires [4] - 437:19, 440:14, 441:10, 443:21
requiring [2] - 442:22,

450:21
reread [1] - 449:15
research [1] - 429:20
resounding [1] - 443:15
respect [3] - 420:5, 422:24, 450:9
response [1] - 428:24
responsibilities [1] - 446:3
rest [1] - 451:24
result [1] - 440:12
Resulting [1] - 426:12
results [2] - 426:24, 446:15
review [8] - 410:9, 413:4, 414:5, 414:8, 415:21, 417:18, 417:22
reviewed [5] - 411:21, 411:24, 412:25, 413:3, 446:12
reviews [5] - 413:21, 413:24, 414:22, 417:19, 430:15
rise [2] - 406:25, 410:13
risked [1] - 440:16
risks [1] - 439:25
RMR [1] - 405:24
ROBERT [1] - 405:3
Robert [7] - 437:4, 437:14, 438:25, 439:21, 441:20, 441:22, 442:14
Robert's [1] - 438:22
role [1] - 407:17, 410:8, 410:19, 410:24, 411:8, 411:12
rolling [1] - 435:11
room [1] - 410:2
rotations [1] - 445:1
roughly [2] - 418:7, 418:8
row [1] - 412:22

## S

sake [1] - 433:24
same-aged [3] - 425:24, 429:14, 431:22
Sampson [39] - 406:19, 407:15, 423:21, 423:23, 427:24, 433:21, 435:24, 436:4, 436:13, 437:4, 439:21, 440:23,

440:24, 441:22, 442:3, 443:6, 443:16, 443:23, 444:4, 445:12, 445:17, 445:23, 446:10, 446:25, 447:3, 447:14, 447:17, 448:19, 450:16, 450:20, 450:25, 451:3, 451:7, 451:9, 451:12, 451:18, 452:2, 452:12, 452:16
SAMPSON [1] - 405:3
Sampson 's [14] - 406:14, 408:19, 408:22, 409:13, 409:17, 442:14, 442:25, 443:12, 444:22, 444:25, 445:4, 446:16, 450:6, 452:11
SAT [4] - 414:16, 438:14, 446:17, 447:3
satisfactory [1] - 407:7
save [1] - 437:9
saw [1] - 412:9
schedule [2] - 435:9, 436:11
Schmid [1] - 405:24
school [18] - 406:25, 422:8, 422:12, 423:12, 428:5, 436:14, 438:19, 439:7, 442:6, 442:25, 449:21, 451:1, 451:5, 451:10, 451:22, 451:23, 451:25, 452:4
School [2] - 409:22, 449:8
school-aged [1] - 423:12
schools [2] - 436:9, 436:10
scientific [3] - 437:25, 444:2, 444:6
scope [1] - 443:20
scores [9] - 438:4, 438:6, 438:8, 438:13, 440:11, 444:24, 445:6, 445:14, 452:9
scutwork [1] - 432:17
seated [2] - 406:1, 406:5

9

**second** [6] - 412:17, 419:22, 419:23, 420:10, 423:8, 431:7
**Second** [4] - 449:7, 449:11, 449:18, 451:18
**secondly** [1] - 433:19
**Section** [1] - 450:24
**see** [6] - 407:2, 415:21, 420:11, 426:18, 428:22, 432:12
**seeing** [2] - 424:15, 439:12
**seek** [1] - 442:8
**seeking** [7] - 414:6, 414:10, 414:16, 431:7, 435:24, 448:18, 448:25
**seeks** [4] - 442:1, 448:19, 450:8, 450:12
**selective** [1] - 447:11
**semi** [1] - 413:15
**semi-annual** [1] - 413:15
**sending** [1] - 416:11
**services** [1] - 449:20
**serving** [1] - 411:2
**set** [1] - 428:19
**settings** [2] - 444:21, 446:20
**setup** [1] - 447:25
**seven** [4] - 409:2, 440:18, 440:20, 451:7
**several** [2] - 419:25, 430:12
**severe** [1] - 422:3
**share** [1] - 431:25
**shared** [1] - 440:2
**Shelf** [1] - 409:22
**show** [9] - 406:24, 427:5, 431:4, 437:16, 438:19, 441:25, 445:12, 447:4, 447:13
**showing** [6] - 428:11, 443:21, 444:20, 448:22, 450:11, 450:16
**shown** [2] - 443:13, 451:2
**shows** [1] - 410:12
**signed** [1] - 413:10
**significant** [1] - 425:12
**Similar** [1] - 419:8
**similar** [7] - 413:17, 413:21, 413:24,

419:7, 441:5, 447:24, 447:25
**simple** [1] - 411:11
**simply** [2] - 450:11, 451:3
**simultaneous** [1] - 436:22
**single** [3] - 440:17, 440:18, 440:19
**sit** [1] - 435:20
**sitting** [1] - 410:1
**situation** [3] - 406:22, 410:15, 447:8
**situations** [1] - 452:11
**Six** [1] - 434:8
**sixth** [1] - 412:19
**skills** [1] - 423:13
**slower** [1] - 436:4
**slowly** [1] - 439:3
**small** [1] - 441:1
**social** [1] - 426:25
**someone** [2] - 411:18, 447:18
**something 's** [1] - 407:1
**Sometimes** [2] - 420:21
**sometimes** [1] - 432:16
**Somewhere** [1] - 416:20
**somewhere** [1] - 416:21
**sorry** [9] - 414:9, 420:9, 422:22, 427:15, 428:16, 429:5, 432:24, 434:18, 436:20
**sought** [5] - 442:4, 442:10, 448:4, 448:13, 448:16
**sounds** [1] - 430:23
**source** [2] - 441:13, 441:16
**special** [1] - 449:20
**Specific** [1] - 434:20
**specific** [4] - 423:6, 448:7, 448:14, 452:10
**specifically** [1] - 441:18
**specifics** [1] - 410:23
**spectrum** [3] - 421:18, 421:19, 421:25
**speculative** [2] - 452:1
**spent** [1] - 440:2
**spirit** [1] - 429:16
**stakes** [4] - 414:6, 414:10, 432:11, 446:17

**standard** [1] - 449:25
**standardized** [5] - 438:4, 444:24, 446:17, 446:24, 447:2
**standards** [3] - 430:24, 431:3, 443:12
**stands** [1] - 442:16
**start** [2] - 410:2, 410:20
**starting** [3] - 419:16, 426:21, 431:20
**starts** [1] - 427:20
**state** [1] - 446:6
**statement** [3] - 413:12, 417:21, 451:2
**statements** [1] - 445:4
**STATES** [2] - 405:1, 405:12
**states** [2] - 446:1, 450:20
**States** [2] - 405:5, 440:9
**stating** [2] - 443:17, 443:24
**statistical** [3] - 437:25, 444:2, 444:7
**statute** [1] - 443:21
**statutes** [1] - 446:4
**STEIN** [1] - 405:14
**stenography** [1] - 405:25
**Step** [16] - 435:6, 436:6, 437:15, 442:1, 442:4, 442:9, 443:7, 448:3, 448:9, 448:10, 450:9, 450:23, 451:4, 451:9, 451:18, 451:24
**step** [1] - 436:8
**stigmatized** [1] - 421:12
**still** [4] - 406:5, 422:5, 422:8, 451:10
**Stony** [2] - 409:22, 451:5
**strategies** [2] - 438:13, 438:18
**Street** [2] - 405:15, 405:19
**street** [1] - 440:9
**strict** [2] - 430:24, 431:2
**strictly** [2] - 416:10, 416:16
**strong** [2] - 445:15, 450:16

**stronger** [1] - 445:15
**struggled** [1] - 437:12
**struggles** [1] - 439:3
**student** [8] - 419:7, 437:13, 437:14, 438:2, 439:8, 442:20, 448:3
**students** [7] - 435:18, 435:22, 435:25, 438:3, 438:9, 438:12, 438:16
**Students** [1] - 438:15
**students 's** [1] - 436:11
**study** [6] - 415:10, 415:21, 435:19, 435:23, 435:24, 436:1
**studying** [1] - 448:23
**subclinical** [1] - 422:3
**subjective** [1] - 445:8
**submissions** [1] - 452:19
**submitted** [4] - 413:5, 433:15, 438:25, 440:7
**substantial** [6] - 442:15, 443:22, 446:8, 446:22, 449:14, 449:25
**substantially** [7] - 443:6, 444:19, 446:25, 447:8, 447:19, 449:1, 449:11
**substantiate** [1] - 410:11
**succeed** [2] - 445:6, 449:5
**succeeded** [1] - 439:20
**success** [4] - 439:18, 443:14, 448:21, 450:11
**sufficient** [2] - 410:11, 442:11
**Suite** [3] - 405:15, 405:17, 405:19
**supervisors** [1] - 444:25
**support** [3] - 438:24, 444:5, 448:25
**supported** [1] - 441:14
**supporting** [1] - 442:14
**suppose** [2] - 408:9, 420:25
**Supreme** [1] - 450:4
**sworn** [1] - 406:9

**symptoms** [5] - 419:15, 420:1, 427:25, 430:12
**system** [1] - 437:9

---

**T**

---

**tab** [1] - 425:5
**Tab** [3] - 420:9, 428:13, 428:18
**teach** [1] - 438:12
**teacher** [2] - 407:1, 444:23
**teachers** [1] - 432:9
**team** [3] - 410:6, 410:22, 411:12
**Technical** [1] - 445:22
**ten** [6] - 425:8, 425:11, 426:8, 432:21, 436:3, 437:2
**ten-minute** [1] - 432:21
**term** [3] - 425:25, 426:1, 426:3
**terms** [5] - 410:22, 411:15, 431:2, 443:20, 446:4
**test** [12] - 438:4, 438:8, 438:13, 438:18, 440:11, 444:24, 446:24, 447:4, 447:10, 450:10, 451:21, 452:2
**test-taking** [3] - 438:13, 438:18, 447:10
**testified** [2] - 406:9, 410:22
**testify** [3] - 411:19, 437:10, 440:17
**testimony** [7] - 408:2, 438:23, 443:10, 444:5, 445:5, 450:13
**testing** [14] - 413:25, 414:2, 439:13, 439:15, 441:1, 441:3, 442:24, 444:25, 448:4, 448:12, 448:16, 450:22, 451:15, 452:6
**Testing** [1] - 445:22
**tests** [6] - 423:14, 424:3, 438:19, 446:17, 447:2, 448:23
**THE** [39] - 405:12, 406:1, 406:6, 406:7, 407:10, 411:5,

420:7, 420:11,
431:12, 432:19,
432:24, 433:2,
433:4, 433:7,
433:12, 433:18,
433:23, 434:2,
434:5, 434:8,
434:13, 434:16,
434:24, 435:1,
435:4, 435:11,
435:14, 435:17,
435:20, 436:1,
436:8, 436:12,
436:15, 437:2,
443:2, 452:18,
452:23, 453:1, 453:4
**thereto** [1] - 433:16
**thinking** [1] - 416:20
**third** [1] - 412:5
**three** [8] - 416:6,
429:6, 435:9,
435:11, 437:22,
451:23, 451:25,
452:4
**three-day** [1] - 437:22
**three-month** [1] -
435:11
**throughout** [2] -
425:21, 440:5
**tight** [1] - 423:15
**today** [1] - 442:1
**took** [4] - 447:3,
448:3, 448:10,
451:21
**track** [3] - 415:17,
415:18, 416:23
**trail** [3] - 439:23,
444:20, 444:22
**trained** [1] - 440:24
**Transcript** [1] - 405:25
**TRANSCRIPT** [1] -
405:11
**Transcription** [1] -
405:25
**treat** [1] - 429:23
**treating** [2] - 441:13,
441:16
**treatment** [1] - 441:19
**treatments** [1] - 432:4
**trouble** [1] - 421:24
**true** [4] - 408:13,
417:24, 421:3,
438:20
**try** [5] - 407:4, 426:18,
429:25, 432:4, 453:1
**trying** [2] - 440:3
**Tuesday** [1] - 437:5
**turn** [5] - 419:17,
423:3, 425:8,
426:11, 429:6

**tutor** [1] - 438:24
**tutoring** [6] - 406:19,
406:23, 406:24,
407:3, 407:4
**tutors** [2] - 438:17,
445:6
**twice** [4] - 427:19,
438:9, 438:16, 448:3
**two** [8] - 412:4,
412:11, 412:21,
414:17, 416:25,
422:23, 435:5,
450:22
**type** [6] - 410:23,
414:3, 417:22,
421:6, 421:22, 424:7
**typical** [1] - 415:24
**Typically** [1] - 436:3
**typically** [4] - 414:19,
414:24, 426:24,
431:20

**U**

**ultimate** [2] - 408:4,
426:19
**under** [9] - 406:5,
430:14, 430:17,
430:19, 431:4,
436:20, 443:11,
449:4, 449:21
**Understood** [1] -
410:18
**unequivocally** [1] -
451:6
**UNITED** [2] - 405:1,
405:12
**United** [2] - 405:5,
440:9
**unjustified** [1] -
446:18
**up** [9] - 406:2, 422:23,
424:20, 425:1,
437:7, 439:21,
439:24, 440:8, 447:4
**urge** [1] - 445:17
**uses** [1] - 439:12
**USMLE** [3] - 448:3,
448:24, 450:23
**utilize** [1] - 438:16

**V**

**VARGAS** [17] -
405:14, 405:16,
434:3, 434:6,
434:14, 434:17,
435:15, 435:18,
435:22, 436:3,
436:10, 436:13,

436:25, 437:3,
452:21, 452:24,
453:3
**variable** [1] - 417:1
**varies** [1] - 416:1
**Vernon** [2] - 449:7,
449:15
**versus** [3] - 447:20,
449:7, 449:15
**vocational** [1] - 427:1

**W**

**waiting** [1] - 451:13
**walk** [1] - 440:8
**warning** [1] - 437:9
**Washington** [2] -
405:15, 405:20
**Wasserstein** [3] -
441:12, 444:5,
446:15
**Wasserstein 's** [2] -
434:23, 446:14
**weaknesses** [2] -
447:14, 447:17
**week** [4] - 416:25,
439:21, 442:11,
450:13
**weeks** [3] - 436:3,
436:6, 439:6
**weigh** [1] - 452:15
**weight** [3] - 409:17,
409:21, 409:24
**WEINER** [8] - 405:17,
407:13, 411:7,
411:10, 420:9,
420:12, 431:11,
454:6
**Weiner** [1] - 407:14
**whole** [4] - 410:8,
438:12, 438:21,
441:22
**witness** [1] - 411:16
**WITNESS** [2] - 406:6,
432:24
**witnesses** [1] - 433:10
**won** [1] - 439:18
**wondering** [5] -
410:19, 410:24,
411:7, 419:12,
425:25
**word** [6] - 425:20,
428:22, 429:1,
429:2, 429:9, 430:8
**words** [5] - 425:23,
429:11, 429:12,
429:13, 431:22
**world** [7] - 426:12,
427:6, 439:8, 440:7,
440:10, 444:14,

446:20
**Wright** [3] - 447:20,
448:6, 448:22
**write** [1] - 441:15
**writing** [2] - 423:15,
441:14
**written** [1] - 427:12
**wrote** [6] - 425:11,
426:2, 426:12,
427:19, 440:20,
441:17

**Y**

**year** [11] - 416:1,
416:2, 416:4, 416:7,
416:11, 417:7,
417:8, 417:9,
448:12, 451:21
**years** [11] - 413:11,
414:15, 415:13,
416:22, 420:2,
423:12, 441:17,
451:7, 451:23,
451:25, 452:4
**yesterday** [3] -
406:12, 408:2, 445:9
**YORK** [1] - 405:1
**York** [3] - 405:5,
405:22
**yourself** [1] - 420:17

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

ROBERT SAMPSON,

        Plaintiff,

        v.

NATIONAL BOARD OF MEDICAL
EXAMINERS,

        Defendant.

Civil Action No. 2:22-cv-05120-JMA-AYS

## NOTICE OF APPEAL

Notice is hereby given that defendant National Board of Medical Examiners appeals under 28 U.S.C. § 1292(a)(1) to the United States Court of Appeals for the Second Circuit from the docket Order and Memorandum and Order (Doc. No. 46) of this Court entered on December 2, 2022, granting plaintiff Robert Sampson's motion for a preliminary injunction (Doc. No. 16).

**A1159**

Dated: December 30, 2022

Respectfully submitted,

 */s/ Caroline M. Mew*
Caroline M. Mew (*pro hac vice*)
Perkins Coie LLP
700 13th St. NW, Suite 800
Washington, DC 20005
Telephone:  +1.202.654.1767
Facsimile:  +1.202.654.6211
CMew@perkinscoie.com

Adam R. Mandelsberg, Bar No. 065532013
Perkins Coie LLP
1155 Avenue of the Americas, 22nd Floor
New York, New York 10036-2711
Telephone: +1.212.261.6867
Facsimile: +1.212.399.8067
AMandelsberg@perkinscoie.com

Attorneys for Defendant

**A1160**

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 30, 2022, a copy of the foregoing Notice of Appeal

was electronically filed through the Court's CM/ECF system, which will serve a copy of the

document on the following counsel of record:

Charles Weiner
Law Office of Charles Weiner
99 Lantern Drive
Suite 202
Doylestown, PA 18901
(267) 685-6311
charles@charleweinerlaw.com

Michael S. Stein
Mary Caroline Vargas
Stein & Vargas LLP
10 G Street NE
Suite 600
Washington, DC 20002
(202) 248-5092
Michael.stein@steinvargas.com
Mary.vargas@steinvargas.com

*/s/ Caroline M. Mew*
Caroline M. Mew (*pro hac vice*)
Perkins Coie LLP
700 13th St. NW, Suite 800
Washington, DC 20005
Telephone: +1.202.654.1767
Facsimile: +1.202.654.6211
CMew@perkinscoie.com

**A1161**