Case 23-3, Document 45-2, 01/31/2023, 3461369, Page1 of 108

Circle

**Student** Robert Simpson

**School** Minnesauke

**Teacher** Diane Eugene

| Social and Work Habits | | Achievement |
|---|---|---|
| Always | 5 | Outstanding |
| Most of the Time | 4 | Very Good |
| Part of the Time | 3 | Satisfactory |
| With Support | 2 | Inconsistent |
| Not Observed Yet | 1 | Unsatisfactory |

| AL AND WORK HABITS | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| s organizational skills | 4 | | | |
| ges time constructively | 4 | | | |
| etes homework | 4 | | | |
| es neat and legible work | 3 | | | |
| ndependently | 4 | | | |
| es class activities | 4 | | | |
| written directions | 4 | | | |
| school prepared | 4 | | | |
| peratively | 4 | | | |
| sideration for others | 4 | | | |
| ggestions for improvement | 4 | | | |
| | 4 | | | |
| flicts with peers | 4 | | | |
| hority | 4 | | | |
| erty | 4 | | | |

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| ately | 5 | | | |
| rstanding of math concepts | 5 | | | |
| of problem solving strategies | 4 | | | |

The language arts curriculum is comprised of four areas: reading, writing, listening, and speaking. Listed below are the expected behaviors for students in grades four and five. For your reference, a more comprehensive list of the language arts achievement levels can be found on the back of the report card.

| READING | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Reads and understands grade-appropriate material | 4 | | | |
| Reads silently for sustained periods | 4 | | | |
| Selects appropriate books independently | 4 | | | |
| Uses reading strategies to construct meaning | 3 | | | |
| Is developing an awareness of genres and authors | 3 | | | |
| Attempts to acquire, interpret, evaluate, and apply information | 3 | | | |

| WRITING | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Expresses ideas in an organized manner | 3 | | | |
| Expresses ideas coherently | 3 | | | |
| Uses appropriate vocabulary | 3 | | | |
| Demonstrates sentence variety | 3 | | | |
| Applies knowledge of punctuation and capitalization | 3 | | | |
| Spelling | 3 | | | |
| Formal Spelling | 5 | | | |

| SPEAKING AND LISTENING | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Participates in class activities | 4 | | | |
| Expresses ideas clearly | 4 | | | |
| Responds appropriately with class activities | 4 | | | |
| Follows directions | 4 | | | |

| SOCIAL STUDIES | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Displays knowledge of content | 4 | | | |
| Demonstrates understanding of concepts | 4 | | | |

| Grading for Special Areas | |
|---|---|
| E | = Excellent |
| VG | = Very Good |
| G | = Good |
| S | = Satisfactory |
| NI | = Needs Improvement |

2nd Report

| ART | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Effort | | | | |
| Achievement | | | | |

| MUSIC | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Effort | | | | |
| Achievement | | | | |

3rd Report

| HEALTH | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Effort | | | | |
| Achievement | | | | |

**1st Report Comments** Robert is a very capable fourth grader. He is inquisitive and well-informed. He especially likes math and science activities. Robert is especially pleased about being a math team captain because he is very good at math. He enjoyed our trip to the pond and studying pond water under the microscope.

Robert's test averages for this quarter are as follows. reading 83%, math 95%, spelling 97%, social studies 91% and science 95%. He needs to put written assignments because the quality of his work. He writing on every written assi

4th Repo

A862



Case 23-3, Document 45-2, 01/31/2023, 3461369, Page2 of 108

| | | Effort | | | 1 | 2 | 3 | 4 |
|---|---|---|---|---|---|---|---|---|
| | | Achievement | | | | | | |

**1st Report Comments** Robert is a very capable fourth grader. He is inquisitive and well-informed. He especially likes math and science activities. Robert is especially pleased about being a math team captain because he is very good at math. He enjoyed our trip to the pond and studying pond water under the microscope.

**4th Report Comments**

Robert's test averages for this quarter are as follows: reading 83%, math 95%, spelling 97%, social studies 91% and science 95%. He needs to put more effort into written assignments because he needs to improve the quality of his work. He should also use cursive writing on every written assignment.

**Parent/Teacher Conference: Date** 11-13-00

*Shelley Kamp*

**Parent's Signature**

| ATTENDANCE | 1 | 2 | 3 | 4 | TOTAL |
|---|---|---|---|---|---|
| Absent | 0 | | | | |
| Late | 2 | | | | |

A863

## Robert Sampson

### First Quarter Report

Robert is adjusting to the many responsibilities and organizational aspects associated with being a fifth grade student. He is making new friends and shows interests and displays knowledge in a variety of subject areas.

Robert exhibits academic strength in many areas, and displays this through his participation in all class discussions. His input is valuable and comes from a unique perspective. Although he is always an active participant, he frequently fails to listen to directions the first time, and needs them to be repeated. Robert can also act impulsively on occasions, drawing attention to himself in ways that are not positive.

Among the areas to work on this year are his organizational skills and his writing skills. Robert often generates a product that is hard to decipher, because of his handwriting and the lack in organization. In the upcoming months, we will be focusing on these topics, as well as his behavior. Robert has the potential to be an outstanding student, and I feel confident he will accomplish these goals this year.

### Second Quarter Report

Robert is showing improvement in many areas. He is becoming more organized in the classroom and now keeps an immaculate desk. He continues to participate in all discussions and is beginning to use his listening skills to his advantage. The frequency of his appropriate behaviors has increased and I feel that these improvements will continue.

Robert has also tried to improve his handwriting and in most cases it is more legible than on previous occasions. Although Robert's handwriting is improving he still needs to organize how he writes more effectively. His writing at times lacks organization which makes it difficult for him to understand what he has written. As Robert learns more note-taking and summarizing skills, he will learn to use methods to help him document information and his own thoughts more effectively. This will be an area of focus for Robert in the upcoming months. I am pleased with Robert's progress and I look forward to seeing how these improvements will enable him to demonstrate his true potential.

### Third Quarter Report

Robert continues to excel in many academic areas, especially in mathematics. I am pleased with his desire to complete extra work. He has a particular talent for the study of fractions. Robert's writing is consistently improving as he is taking his time and organizing his thoughts before he begins a draft.

I would like for Robert to continue developing his listening skills. He appears at times to be confused with directions or questions that are presented during class. This will allow him to interact more effectively with his classmates. I predict these

improvements would allow him to feel more confident in his social interactions with peers.

## Fourth Quarter Report

I am pleased by Robert's progress this year, both academically and socially. He has demonstrated a commitment to improving his academic performance and has developed better work habits and organizational skills. I encourage Robert to continue concentrating on his organizational skills as they are necessary for his future academic success.

dent: Robert Sampson

ool: Minnesuuke

cher: Mrs. Tarpinian/Mrs. DeSimone

Parents

the tiny ... interpret your child's achievement in
... areas student progress is indicated in two
... achievement ... reflecting achievement for that quarter
... Scores in the year where attention is needed.
nols that the ... of an 'x' means that the
is performing ... grade level.

| - 100 | C+ = 75 - 79 |
| 94 | C = 70 - 74 |
| 89 | D+ = 68-69 |
| 84 | D = 65 - 67 |

...nts at right

/wor BTS

| | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| egible work | | x | x | |
| ...tivities | | | | |
| ...ly | | x | x | |
| ...ctions | | | | |
| ...repared | | | | |
| ...ity | | | | |
| ...o for others | | | | |
| s for improvement | | | | |
| | | | | |
| ...ith peers | | | | |
| | | | | |
| | | | | |
| ps, charts, and graphs | | | | |
| m a variety of sources | | | | |

## MATHEMATICS

| ACHIEVEMENT | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Computes accurately | A+ | A | A | |
| Demonstrates an understanding of concept | | | | |
| Uses a variety of problem solving strategies | | | | |

| SCIENCE | | | | |
|---|---|---|---|---|
| ACHIEVEMENT | 1 | 2 | 3 | 4 |
| ...ledge of content | | | A+ | |
| Demonstrates an understanding of concept | | | | |

## SOCIAL STUDIES

| ACHIEVEMENT | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Displays knowledge of content | | A+ | B+ | |
| Demonstrates an understanding of concept | | | | |

## LANGUAGE ARTS

The language arts curriculum is comprised of four areas: reading,
writing, listening, and speaking. Listed below each achievement
grade are the expected behaviors for students in sixth grade in the
language arts program. For your reference, a more
comprehensive list of language arts achievement levels can be
found on the back of the report card.

| ACHIEVEMENT | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Shows an interest in literature and reading | A | A | B+ | |
| Knowledge of literary elements, authors, and genres | | | | |
| Applies a variety of reading strategies | | | | |
| Acquires, inte..., and evaluates information | | | | |
| Expresses ideas logically and coherently | | | | |
| Uses varied sentence structure | | | | |
| Uses varied language | | | | |
| Applies mechanics | | | | |
| Spe... | | | X | |
| Listening | | | | |
| Speaking | | | | |

### Grading for Special Areas

E = Excellent
VG = Very Good

TV = Technology/assessment

ART
+
...urist

| | VS | |
| VG | |

Effort
Achievement
Health

| | 2 | 3 | 4 |
|---|---|---|---|
| E | | |

1st Report...

Robert ... ...ent work in all subject
areas. ... is well prepared for weekly tests
and quizzes and completes all assignments
thoroughly and on time. Robert loves reading.
His desire to read the Narnia series in its
entirety is indicative of his high level of
commitment to his work. He is a diligent
student, careful in his daily assignments and
conscientious about his project choices. I am
very happy to have Robert among my students
this year. He is a pleasure to have in class
and I enjoy working with him very much.



### 2nd Report Comments

Robert is an intelligent sixth grader. He contributes his ideas
during class instruction, collaborative peer... and
group discussions. His reasoning ability and ...
...wledge enable him to interact with understanding and
...ce. However, he is less self-assured and productive...
...pendent work periods. He consistently seeks...
...t before self-initiating a task or asking for peer...
...tedly distracted and often does not begin...
...continue to encourage Robert...
... assertive behavior. He is...
... handling writing assignments...
... Robert's good-nature and...
... his outstanding computer...

...bert's lowered grades in Social Studies and
Language Arts are a result of his incompletion of
required assignments particularly the Greek Study
Review packet and his memoir book. Through the ...
Grades. His distractions during work time at the
Technology Center have interfered with his
performance and completion of his work. I believe it
would be in Robert's best interest if he planned his
work schedule, utilized his time productively and
avoided peer interruptions. I look forward to hearing
Robert's future achievements.

### 4th Report Comments

Absent
...le

Case 23-3, Document 45-2, 01/31/2023, 3461369, Page5 of 108

A866

## 2nd Report Comments

He contribute his ideas notes and fund of

Robert is an intelligent sixth grader. He contribute his during class instruction, collaborative peer notes and group discussions. His reasoning ability and fund of knowledge enable him to interact with understanding and confidence. However, he is less self-assured and productive during independent work periods. He consistently seeks support before self-initiating a task or asking for peer help. He is easily distracted and often does not begin his work following continue to encourage Robert to demonstrating interest maintain attentive behavior. He is at the Computer Lab, in handling writing assignments helpfulness. He is even appreciate Robert's good-nature and for his outstanding computer

### 3rd Report Comments

Robert's lowered grades in Social Studies and Language Arts are a result of his incompletion of required assignments particularly the Greek Study Review packet and his memoir book, Through the Grades. His distractions during work time at the Technology Center have interfered with his performance and completion of his work. I believe it would be in Robert's best interest if he planned his work schedule, utilized his time productively and avoided peer interruptions. I look forward to hearing of Robert's future achievements.

VG
VG

| | 2 | 3 | 4 |
|---|---|---|---|
| | E | | |
| | E | | |

in all subject
weekly tests
assignments

Case 23-3, Document 45-2, 01/31/2023, 3461369, Page6 of 108



National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104-3102

215-590-9500 phone
www.nbme.org

**<u>Confidential</u>**

August 1, 2017

Robert D. Sampson
11 Whitford Rd.
Stony Brook, NY 11790

RE: USMLE Step 1                                    USMLE ID#: 5-385-624-1

Dear Mr. Sampson:

We have thoroughly reviewed your request for reconsideration of our decision regarding test accommodations for the United States Medical Licensing Examination (USMLE) Step 1. We conducted an individualized review of your request and supporting documentation in accordance with the guidelines set forth in the Americans with Disabilities Act (ADA).

NBME carefully considers all evidence in determining whether an individual is substantially limited within the meaning of the ADA, including information contained in the individual's personal statement; professional evaluation reports; letters from advocates; and objective documentation such as school records and scores obtained on standardized tests taken with and without accommodations. Supporting documentation submitted from qualified professionals is a necessary part of any request for accommodations and is thoroughly reviewed by the NBME. Though not required to defer to the conclusions or recommendations of an applicant's supporting professional(s), we give considerable weight to the recommendation of qualified professionals made in accordance with generally accepted diagnostic criteria and supported by reasonable documentation.

Included with your current submission is a June 22, 2017 letter from Jan D. Serrantino, Ed.D., Director of the Disability Services Center at UC Irvine, which you state "*should serve as the unifying document of my appeal.*" Dr. Serrantino writes that you contacted her for advice and support with your appeal, and refers to your originally submitted documentation as well as the supplemental information supplied with your reconsideration request. She recommends 50% extended time on all USMLE Step exams on the basis of reading and neurodevelopmental disabilities. Dr. Serrantino states that although you are able to read at the level of an average person, reading "*as well as the 'average person' is not congruent with* [your] *overall ability… and the level of reading ability required to obtain the medical knowledge needed to become a physician.*" She references your "*Verbal IQ of 141*" and states, "*The discrepancy between his ability and reading (and writing) achievement clearly necessitates the need for accommodation.*"

Her conclusions and recommendations notwithstanding, currently validated theories and empirical research do not support using a discrepancy model as the basis of a diagnosis or rationale for accommodations. Average range academic skills, no matter how discrepant from one's IQ or other

**A868**

scores, are Average nonetheless and do not demonstrate impaired functioning that limits a major life activity. Overall, the documentation submitted to date reveals consistent evidence of intact cognitive and academic functioning relative to most people, and does not demonstrate that standard testing time is a barrier to your access to the USMLE.

The ADA defines disability as a physical or mental impairment that substantially limits one or more major life activities as compared to most people in the general population. Accommodations are provided when there is clear documentation of functional impairment as compared to most people and a rationale to demonstrate that the requested accommodation is appropriate to the setting and circumstance.

Our thorough review of all of your documentation found no new substantive information or evidence that alters our original decision communicated in my June 13, 2017 letter. Therefore, I must inform you that we are unable to provide you with the requested accommodations.

Sincerely,

Michelle M. Goldberg, Ph.D.
Manager, Disability Services

Robert D. Sampson
11 Whitford Rd
Stony Brook, NY 11790

National Board of Medical Examiners
Disability Services
3750 Market Street
Philadelphia, PA 19104-3102

RE: USMLE Step 1 Accommodations Communication from NBME on August 1, 2017

NBME Disability Services:

I am writing in response to your denial of my reasonable accommodations request for the USMLE Step 1 and to appeal the decision written by Michelle M. Goldberg, Ph.D. on August 1 2017.

I am appealing Michelle Goldberg Ph.D.'s decision because the documentation that I originally submitted fully supported my request for 50% additional time on the USMLE Step 1 based on the Americans with Disabilities Act (ADA) and clear communications published by the United States Department of Justice (DOJ) which further clarifies the rights of the disabled. I strongly disagree with the NBME's denial of my reasonable accommodations and respectfully request an alternate evaluator at the NBME to review my documentation. Herein, I have submitted new evidence that strongly supports my need for these accommodations.

To further assist the NBME in reaching a decision that complies with the ADA and grants test takers equal access to your exam, I am providing additional evidence for my 50% additional time accommodations request. The following resources are provided within this PDF which should be vitally considered:

- Updated appeal letter from Jan Serrantino, E.D. dated 10/9/17
- Updated appeal letter from Thomas Aronson M.D. reinforcing my need for my covered disability under the ADA dated 9/6/17.
- Updated appeal letter from Allison Anderson, Ph.D. dated 8/10/17. Dr. Anderson was one of the clinical psychologists who conducted an extensive educational battery on me, and she has taken the time to respond to the NBME regarding my need for the aforementioned accommodations.

The updated appeal letter written by Jan Sarrantino, E.D. should serve as the unifying document of my appeal.

The denial I have received from the NBME goes against the decisions that **several** qualified professional evaluators have all agreed on that I have a demonstrated need for 50% additional time on the USMLE Step 1 exam. As someone who struggles with my disability, the denial of accomidations actually causes me harm and unfairly disadvantages me. The process to prove my disability has been severely burdensome to the point that one might question if the NBME has a mission to deny as many qualified disabilities under the ADA as possible—lest a powerless student turn to society's law and order to uphold their plight and level the playing field. I respectfully remind NBME Disability Services that sometimes mistakes happen, but the ultimate mistake would be to deny me of my reasonable accommodations again. My disability is reasonable to accommodate and this issue is easily fixable.

I am a medical student who very much wants to take your exam, but it must not be in a way that forces me to be discriminated against for having a disability. I understand the NBME has a review process for evaluating a disability, but in my case, the facts are clear, the professional opinions I have submitted are **unanimous** and **numerous**, and I respectfully ask that the NBME reverses its decision to deny my accommodations.

Regards,
Robert Sampson
*Robert Sampson*
Stony Brook University School of Medicine
USMLE ID#: 5-385-624-1

**A870**

**Jan Serrantino, Ed.D.**
Educational Consultant
11 Telliz, Rancho Santa Margarita, California 92688
jserrant@uci.edu

National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104-3102

October 9, 2017

To Whom It May Concern:

Re: Robert Drew Sampson          USMLE ID# 5-385-624-1

I am writing today to challenge the findings presented to Mr. Robert Drew Sampson in letters written by Michelle M. Goldberg, Ph.D. Manager Disability Services, dated June 13, 2017 and August 1, 2017.

In her letters Ms. Goldberg states that she made a thorough review of all evaluations/assessments and supporting documentation and asserts several reasons  (numbered below) for denying USMLE Step 1 Exam accommodations.

**1.  Dr. Goldberg questions how Dr. Aronson made the diagnosis of ADHD; how key criteria for ADHD was met and why evaluators did not reach the same conclusion (See letter from Dr. Aronson dated September 6, 2017).**
In his letter of support for the approval of accommodations for Mr. Sampson, Dr. Aronson, MD clearly identifies how the diagnosis of ADHD was made, how key criteria was met and why the earlier evaluations did not reach the same conclusion. Dr. Aronson, MD. writes, in the excerpt below, how ADHD specifically affects Mr. Sampson.

Mr. Sampson's attention, concentration, processing speed, and recall/retention are  severely impaired both in reading and visual comprehension. In everyday life Mr. Sampson finds that he needs to read and re-read the same material numerous times in order to comprehend it. This process is often interrupted by intrusive anxiety that disrupts his ability to comprehend new material, slowing his ability to learn (Page 1).

**2.**  In her denial letters, Dr. Goldberg writes the following reasons for denial of disability related accommodation.  **"Documentation does not show a record of chronic and pervasive problems managing daily demands for attention, organization, behavioral regulation, or executive functioning during your**

**A871**

**development or currently, not does it demonstrate a developmental history of problems with reading or learning that impacted your academic functioning or limited a major life activity." (June 13, 2017) "Overall, the documentation submitted to date reveals consistent evidence of intact cognitive and academic functioning relative to most people and does not demonstrate that standard testing time is a barrier to your access to USMLE." (August 1, 2017)**

**Reading deficits that impact access to the Step 1 exam:**

Three professionals disagree with the above statement. Their conclusion is based on the two completed psychoeducational evaluations in August and December of 2013. The following, **below-average person range**, subset scores were part of Mr. Sampson's evaluation and demonstrate his impairment in reading:

| | |
|---|---|
| Nelson Denny Reading Test Comprehension<br>under standard time limits (low-below average range) | **16th percentile** |
| Scholastic Abilities Test for Adults (SATA)<br>under standard time (low average) | **25th percentile** |

Mr. Sampson showed market improvement (into the average range) when provided extended time. Mr. Sampson was able to read the entire passage and therefore fully access, process, interpret and respond to the questions on the exam. The NBME has argued, "There is a body of research showing that individuals with and without disabilities may earn higher scores with extended time. Achieving higher scores with additional testing time is neither evidence of impaired functioning nor a justification for test accommodations for the USMLE." In this argument you cite Lewandowski et al., "*Effects of Extended Time Allotments on Reading Comprehension Performance of College Students With and Without Learning Disabilities*," J. OF PSYCHOEDUCATIONAL ASSESSMENT 31(3) 326-336 (2013). At the same time the evaluators at the NBME have cited poor psychometrics on the Nelson-Denny in several of their denials. This evaluator and the student's support team find irony in the above statements as the paper you cited uses the Nelson-Denny to measure reading comprehension and touts the strong psychometric qualities of the assessment and its use in multiple studies looking at reading for students with learning disabilities (see below).

Accordingly we submit Mr. Sampson's Nelson Denny scores as evidence of significant impairment in reading and presume given the psychometric properties and the assessments wide spread use in the literature to evaluate reading comprehension that the NBME will accept the Nelson Denny as evidence of this students impaired reading.

"The main measure used in this study is a modified version of the reading comprehension sub- test of the Nelson–Denny Reading Test (NDRT; Brown,

**A872**

Fishco, & Hanna, 1993). The NDRT has two parallel forms, G and H. Each reading comprehension form consists of seven passages, accompanied by 38 multiple-choice questions. These questions are both factual and inferential in nature. According to the NDRT technical manual, the Nelson–Denny reading comprehension subtest has alternate forms **reliability of 0.81 and an internal consistency of 0.88** for forms G and H. This test has been used in dozens of studies with poor and LD readers, including many most of the reading studies on extended time." (Page 329)

**Visual Deficits that impact access to the Step 1**

In addition to below-average reading scores, it is important to note that Mr. Sampson has <u>extensive difficulties with visual processing and recall</u>.  Mr. Sampson showed low/below average scores, when compared to a normative sample (the average person) same-aged peers across a variety of visual recall and recognition tasks.

| | |
|---|---|
| Woodcock-Johnson III Test of Cognitive Abilities Picture Recognition | **16th percentile** |
| | |
| Rey Complex Figure Test and Recognition Trial, Immediate | **14th percentile** |
| Rey Complex Figure Test and Recognition Trial Delayed | **5th percentile** |
| Rey Complex Figure Test and Recognition Test Recognition trials | **4th percentile** |

According to the USMLE website the Step exam includes <u>visual images</u>:

<u>http://www.usmle.org/step-1/#question-formats</u>
"A portion of the questions involves interpretation of graphic or pictorial materials"

Mr. Sampson is severely impaired on the recall of visual images and requires additional time to process and interpret any graphic or pictorial materials. Given the format of some questions on the NBME that draw on visual skills he will absolutely experience a barrier to this exam under standard time conditions.

There were clear deficits that limit Mr. Sampson in reading comprehension and visual identification and recall.  When comparing someone to the average person standard you are comparing his or her performance to the sample population norm. In your letter you assert that Mr. Sampson needs to perform below *the average person standard* - **in all of the areas bulleted above he is below average per your guidelines.**

The NBME uses the average person standard to make determinations about accommodations on the Step 1. When doing so, standard scores are evaluated in the context of population from which they are normed. Scores within the 25th-75th percentile on these assessments are considered within the normative range. For Mr.

Sampson, several of his Standard Scores fall **far below the 'average range'** and when compared to the average person he is quite disabled in specific tasks.

The more salient data however, are the chronic and pervasive barriers to taking the USMLE Step exams Mr. Sampson experiences as a result of these documented deficits. Mr. Sampson explained the following in his personal statement.

> I had to spend an inordinate amount of time and energy on reading the same paragraph over and over again; used a parent to read aloud to him, feared being called upon to read aloud in class, able to word-call but not comprehend when reading aloud in class; avoided reading in junior high and high school; did not read for pleasure; relied on Sparknotes and Cliff Notes to complete reading because reading was such a laborious and painful exercise; difficulty remembering what was read when he did read; required extensive 1:1 tutoring to pass courses from junior high through college; unable to learn to read music – played by ear."

When an individual displays this much difficulty comprehending reading material (observation, scores and testimony), it clearly demonstrates a disability and need for the reasonable accommodation of 50% extended time and extra breaks.

Further, the Department of Justice Guidance on Testing Accommodations states that: A substantial limitation of a major life activity may be based on the extent to which the impairment affects the condition, manner, or duration in which the individual performs the major like activity (in Mr. Sampson's case, Reading Comprehension). To be substantially limited in a major life activity does not require that the person be unable to perform the activity, it may be useful to consider the length of time an individuals takes to preform the activity compared to most people in the population.

**Mr. Sampson is an individual with a substantial limitation in the major life activity of reading – a critical function required for completing the USMLE exams.**

Under regulations implementing title II of the ADA, public entities offering examinations must ensure that their exams do not provide qualified persons with disabilities with aids, benefits, or services that are not effective in affording equal opportunity obtain the same result, to gain the same benefit or to reach the same level of achievement as that provided to others, 28 C.F.R. § 35/130(b)(l)(iii), and may not administer a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability. 28 C.F.R. § 35.130 (b)(6). Both title II and III regulations also require public and private testing entities to provide modifications and auxiliary aids and services for individuals with disabilities unless the entity can demonstrate an applicable

defense. . In addition testing agencies cannot use **evidence of past student success** to discount a student's eligibility for services, nor accommodation approval. We believe that individuals who achieve a high level of academic achievement **can** be considered individuals with disabilities under the ADA

_____28 C.F.R § 35.130 (b)(7), 35.160 (b), 35.164; (b)(7), 28 C.F.R §§ 36.309(b)(l)(iv-vi), (b)(2), 36.309(b)(3).

### 4. "Research does not support using a discrepancy model as the basis of diagnosis (of a learning disability) or rational for accommodations.

Ms. Goldberg does not cite any research to support this claim, nor does she mention that the majority of states still rely on the discrepancy model when making diagnosis in the K-12 system, while only 21 states use the cognitive processing deficit model (Fiorello, Hale, & Snyder, 2006).

Several states allow assessment personnel to use a "research-based alternative eligibility method" when determining SLD eligibility. Of the fifty states, twenty-one (N = 21) allow for the use of an alternative method of eligibility, generally by determining if a student exhibits a pattern of strengths and weaknesses and/or examining specific areas of cognitive processes that interfere with learning.

Dr. Michels, Ph.D., Dr. Anderson, Ph.D. and Dr. Aronson M.D. have, and continue to meet with Mr. Sampson. They met with him on multiple occasions and thoroughly examined him. They concur that Mr. Robert Sampson exhibits deficits that substantially impair specific areas of cognitive processes that interfere with learning.

According to Dr. Michels, Ph.D. the difference between Robert's verbal and non-verbal reasoning abilities is significant, occurring in less than 1% of the population. "…Math was strong but Robert did not demonstrate an intuitive sense of how to solve some basic problems. Reading and writing scores were variable and scores were an unusual mix. The disparity between his verbal and visual/special reasoning abilities is quite significant and likely to underlie the unevenness evident in his academic profile, both in current achievement testing and his school record. (Dr. Michel's report, page 9)

Regardless of the model (Discrepancy vs. cognitive processing deficit) selected to determine a learning disability, the data included in the documentation provided by Mr. Sampson supports either model and is evidence of his impairment and performance abilities when compared to the average person standard; therefore, mention of the discrepancy model is not relevant nor a valid reason for denial of this students' request.

_____

**A875**

Fiorello, C.A., Hale, J.B., & Snyder, L.E. (2006) *Cognitive hypothesis testing and response to intervention for children with reading problems.* Psychology in the Schools, 43, 835-853.

As you are aware the Regulations to implement titles II and III of the ADA Amendments clarify the intent of the ADAAA and provide concrete examples-several that are applicable to high stakes testing agencies and high stakes testing environments (like medical school). These regulations are intended to be applied to medical education and to the USMLE Step 1. In particular that testing agencies cannot use **evidence of past student success** to discount a student's eligibility for services, nor accommodation approval. We believe that individuals who achieve a high level of academic achievement **can** be considered individuals with disabilities under the ADA

It is our professional opinion as an institution (including Mr. Sampson's faculty and his evaluators) that when reviewed under the lens of the ADA-As amended, the Department of Justice Regulations Mr. Sampson is a student with a disability that **requires** accommodations on the NBME to fully access the exam. The student has provided irrefutable evidence that his reading is impaired (16th percentile) in a manner that severely impacts his functioning. Extreme deficits in visual processing (16th, 14th, 5th and 4th percentile) are additional proof of disability using the average person standard. In addition, the effects of his co-morbid presentation of ADHD, and the subsequent functional limitations, further impair Mr. Sampson's functioning.

On June 13, 2017, Michele M. Goldberg Ph.D. wrote a letter denying Mr. Sampson's request for accommodations on USMLE. Mr. Sampson submitted a letter requesting reconsideration of that decision on June 22, 2017. Unfortunately, for Mr. Sampson, the same person conducted the review. The very nature of an appeal process is to have a review by another authority. There appears to be a direct conflict of interest in having the same person conduct a review/appeal.

Mr. Robert Drew Sampson does not have full access to the vignette style questions nor the text and images included in the USMLE exams. Based on his documented disability he is unable to access, interpret and respond to questions within the amount of time allotted. Therefore he requires 150% extended time, over 2 days to adequately access this exam.

It is my sincere hope that after re-evaluating Mr. Robert Drew Sampson's application, reviewing the additional documentation and clarifications provided, that the NBME will agree to provide Mr. Sampson an equal experience.

Sincerely,

Jan Serrantino

**Thomas A. Aronson, M.D.**
**2 Brooksite Drive Suite 220**
**Smithtown, New York 11787**
**Phone: 265-0909**
**Fax: 265-0757**

September 6, 2017

Re: Robert Sampson
DOB: 4/5/1991

To Whom It May Concern:

This letter is in response to a denial of accommodations and equal access to the USMLE Step 1 for my patient Robert Sampson. Robert has been under my consistent psychiatric care since November 4, 2015. He is severely impacted by his learning disabilities (specifically his reading speed and comprehension) and ADHD that when coupled with the reading comprehension significantly impacts his overall functioning.

I noted significant improvement in my letter dated March 29, 2017; however, this improvement was predicated on his access to reasonable accommodations. The Stony Brook University Medical School appropriately accommodates Robert. Without these accommodations, he would not be improved in his ability to process information and would remain impaired (more than the average person) when attempting to read, process and interpret information presented in long dense passages (like the Step 1 exam) under time constraints.

**Mr.Sampson meets the DSM IV criteria for ADHD:**

His symptoms have persisted for at least 6 months to a degree that is inconsistent with developmental lever and that negatively impacts directly on social and academic/occupational activities:

He often has difficulty sustaining attention in tasks (e.g., has difficulty remaining focused during lectures, conversations, or lengthy reading).

He often does not follow through on instructions and fails to finish schoolwork, chores, or duties in the workplace (e.g., starts tasks but quickly loses focus and is easily sidetracked).

He often has difficulty organizing tasks and activities (e.g., difficulty managing sequential tasks; difficulty keeping materials and belongings in order; messy, disorganized work; has poor time management; fails to meet deadlines.

He often avoids, dislikes, or is reluctant to engage in tasks that require sustained mental effort (e.g., schoolwork, for older adolescents and adults, preparing reports, completing forms, reviewing lengthy papers).

He is often easily distracted by extraneous stimuli (for older adolescents and adults, may include unrelated thoughts).

**A877**

Mr. Sampson's attention, concentration, processing speed, and recall/retention are severely impaired both in reading and visual comprehension. In everyday like Mr. Sampson finds that he needs to read and re-read the same material numerous times in order to comprehend new material, slowing his ability to learn.

Robert is, and remains, substantially limited in major life activities of everyday life. His ADHD is just one of the factors contributing to his impairment and to the barrier to the Step 1 exam. When a student presents with a learning disability and ADHD, the result is exponential impairment from the cumulative effects of the co-morbidities. Decreased neurocognitive performance in individuals with Attention Deficit Hyperactivity Disorder and learning disability is well documented in the research literature and can have significant impacts on performance.

For Example:

Robert has difficulty fully accessing examinations and reading materials due to a highly impaired reading speed so he reads at a slower rate. The slow rate is interrupted by intrusive thoughts or gaps in attention caused by the ADHD. Now Robert is not only reading more slowly, there are significant gaps in processing the information he is able to read as a result of his inattention. Not only is he going slowly, he is missing key pieces along the way. Historically he has addressed these academic disabilities by taking extra time in reading and preparation and by approaching learning differently, for example learning to play the cello by ear vs. by reading music.

My diagnosis was developed through direct clinical assessment over several visits. I am an MD and I specialize in the treatment of individuals with ADHD. ADHD is a clinical diagnosis made over several visits triangulating patient self-reported symptoms and impact with key data points from a multitude of sources.

Moreover, Mr. Sampson experiences loss of educational access when he must read for content and visually process and recall information seen or read under timed and untimed conditions. His ADHD exacerbates and compounds these learning disabilities.

Mr. Sampson requires accommodations to fully access the NBME step exam. Given his learning disability, with associated concentration impairment, as well as very slow processing speed highlight the need for multiple breaks to provide opportunities for cognitive re-focus. I am strongly endorsing an appropriate accommodations of time and one half on the NBME exam with additional breaks over a period of two days.

Taken together, the aforementioned impairment require self-monitoring, and cognitive breaks. Therefore, I endorse the use of extra breaks to allow Robert to access these mitigating strategies.

By allowing Mr. Sampson extra time, over two days you remove the barrier caused by a timed exam and allow time to compensate for his reduced processing and concentration that result from the anxiety, ADHD and his learning disability.

It is my professional opinion that my patient, Mr. Sampson, is currently and profoundly disabled in that cannot concentrate and read efficiently. Mr. Sampson meets the requirements of a person with a disability covered un the ADA and Section 504 of the Rehabilitation Act. The only way to mitigate the barriers of your exam is to provide extended time and extra breaks over two days.

I fully support Mr.Sampson's appeal for accommodations and hope that the NBME will consider his

**A878**

case with the same level of care Mr. Sampson has shown in addressing these concerns.

Sincerely,

Thomas A. Aronson, MD
Associate Professor Clinical Psychiatry,
SUNY at Stony Brook

TAA:ts

Allison Anderson, Ph.D.
1928 Arlington Blvd Suite 107
Charlottesville, VA  22903

Phone: 434-806-6510
E-mail address:
aandersonphd@gmail.com

**Psychological Testing Services**

August 10, 2017

National Board of Medical Examiners
3750 Market Street
Philadelphia, PA  19104-3102

Dear National Board of Medical Examiners,

I am writing at the request of Mr. Robert Sampson who was recently denied extended time testing accommodations for the United States Medical Licensing Examination (USMLE) Step 1 exam. I would like to clarify for the NBME a few things from Mr. Sampson's psychoeducational evaluation reports and history that are referred to in his denial letter. I am aware that both diagnosis and disability determination for learning disorders need to rest on three considerations: psychoeducational test results, history of functional impairment, and current functional impairment. I will address the first two of these areas, leaving the third to be addressed by his current providers.

Mr. Sampson completed two psychoeducational evaluations in August and December of 2013. The first evaluation by Dr. Suzanne Michels was comprehensive. As you are aware, consideration of standard errors in measurement dictates that test scores should be considered as a range rather than as absolute cutoffs. Accordingly, it is important to note from my evaluation that:

- Mr. Sampson's Nelson Denny Reading Test Comprehension score under standard time limits was in the *low-below average range* at the 16th percentile.
- Mr. Sampson's score on the Reading Comprehension subtest of the Scholastic Abilities Test for Adults (SATA) was in the *low average range*, with his range of possible true scores (95% confidence level) falling in the below average to average range (9th-50th percentile).
- With both the NDRT and SATA reading comprehension scores, Mr. Sampson showed marked improvement to the average-above average range when given extended time.

In addition to reading scores, it is important to note that Mr. Sampson has difficulties with visual recall. According to the USMLE website, the Step 1 exam includes visual images. A need to check and recheck images in order to answer questions will impair Mr. Sampson's access to the test under the time allotted. For instance, in my evaluation Mr. Sampson showed:

- Mildly-moderately impaired scores compared to same-aged peers on the Rey Complex Figure Test and Recognition Trial immediate, delayed, and recognition trials, 14th, 5th, and 4th percentiles respectively.

**A880**

- Low-below average, 16th percentile performance on the Woodcock-Johnson III Tests of Cognitive Abilities Picture Recognition subtest.

There were clear deficits that limit Mr. Sampson. When comparing someone to the average person standard you are comparing their performance to the population that the instrument was normed on. In your letter you say Mr. Sampson needs to be below *the average person standard* - **in the areas bulleted above he is below average.**

Both Dr. Michels and I documented a history of functional impairment and additional supports that Mr. Sampson has needed since elementary school in order to maintain a high level of academic achievement. Dr. Michels reported that Mr. Sampson's mother "provided a great deal of reading enrichment and guidance" (P. 2, Michels report), and that writing was more difficult for Mr. Sampson compared to math. Dr. Michels noted that Mr. Sampson also needed tutors in high school, and continued to struggle with reading comprehension. In my report, I noted that Mr. Sampson's "national standardized testing scores were inconsistent, ranging from low-below average to above average. Reading scores were typically weaker than other areas" (P. 1 Anderson supplemental testing report).

**Both Dr. Michels and I agree that there is a clear record of consistent academic struggles experienced by Mr. Sampson, beginning in elementary school years through the present time.**

In sum, I believe the aggregate of Mr. Sampson's information shows history and psychoeducational testing results indicating that he will not have equal access to the text and images included on the UMSLE Step 1 exam. Therefore, this student should be allotted 1.5 extended time over two days to adequately access this exam.

This letter has been provided to Mr. Sampson to forward to the NBME as needed. With appropriate releases obtained, please let me know if I can provide any additional information in support of Mr. Sampson's request.

Sincerely,

Allison E. Anderson, Ph.D.
Clinical Psychologist
VA License # 0810003072

**A881**



National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104-3102

215-590-9500 phone
www.nbme.org

**<u>Confidential</u>**

January 12, 2018

Robert D. Sampson
11 Whitford Rd.
Stony Brook, NY 11790

RE: USMLE Step 1                     USMLE ID#: 5-385-624-1

Dear Mr. Sampson:

We have thoroughly reviewed your recent request for reconsideration of our decision regarding test accommodations for the United States Medical Licensing Examination (USMLE) Step 1. We conducted an individualized review of your request and all submitted supporting documentation in accordance with the guidelines set forth in the Americans with Disabilities Act (ADA).

The NBME provides reasonable and appropriate test accommodations to examinees who provide supporting documentation that shows that they have a disability within the meaning of the ADA.
The ADA defines disability as a physical or mental impairment that substantially limits one or more major life activities as compared to most people in the general population. A diagnostic label, in and of itself, does not establish coverage under the ADA, nor does prior receipt of accommodations for a particular activity guarantee that identical accommodations are indicated or will be available in all future settings and circumstances.

Though not required to defer to the conclusions or recommendations of an applicant's supporting professional(s), we carefully consider the recommendation of qualified professionals made in accordance with generally accepted diagnostic criteria and supported by reasonable documentation.
Accommodations are provided when there is clear documentation of functional impairment and a rationale to demonstrate that the requested accommodation is appropriate to the setting and circumstance. Your documentation does not demonstrate that standard testing time is a barrier to your access to the USMLE. The records provided reveal a consistent history of unimpaired performances on timed standardized tests when compared to appropriate national normative samples.

Our thorough review of the supplemental documentation provided found no new substantive information or evidence that alters our decision communicated in our June 13 and August 1, 2017 letters. Therefore, after a thorough review of all of your documentation, I must inform you that we are unable to provide you with the requested accommodations.

Sincerely,

*Catherine Farmer*

Catherine Farmer, Psy.D.
Director, Disability Services
ADA Compliance Officer, Testing Programs

**A882**

Robert Sampson
11 Whitford Rd
Stony Brook, NY 11790

National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104-3102

February 22, 2018

To Whom It May Concern:

Re: Robert Drew Sampson          USMLE ID# 5-385-624-1

I am writing to request an explanation as to why I am not being granted disability related accommodations on the USMLE Step 1 exam. I am recognized as an individual with a disability and require accommodations in my program at Stony Brook University School of Medicine. My many health care professionals and Stony Brook University Disability Services and Medical School have determined that I am an individual with a disability and require disability related accommodations. They know my performance with and without accommodation. My school, health care professionals and I have provided NBME with overly burdensome, yet comprehensive documentation that complies with the guidelines posted on the USMLE website. I also have provided supplemental letters from my health care providers and evaluators and the former director of Disability Services from the University of California, Irvine.

As I looked over everything that I have submitted to you I found the following items that make it difficult for me to understand why you continue to deny my requested accommodations. I found a number of points that were your reasons for denial and that professional and historical evidence was provided to counter your reasons. I would like to present these confusing points below.

On June 13, 2017 you denied my request for test accommodations based on the following points.

**NMBE Point 1: "*However, no further detail was provided about our functioning and no information at all was provided about how the diagnosis of "ADD" was made in 2015, how you meet key diagnostic criteria for ADHD, or why your evaluators did not reach the same diagnostic conclusion during their assessments in 2013.*"**

**I provided the following evidence to NBME that satisfied Point 1 in a letter from Dr. Aronson dated September 6, 2017 and Dr. Jan Serrantino dated October 9, 2017**

**A883**

In his letter of support for the approval of accommodations for Mr. Sampson, Dr. Aronson, MD clearly identifies how the diagnosis of ADHD was made, how key criteria was met and why the earlier evaluations did not reach the same conclusion. Dr. Aronson, MD. writes, in the excerpt below, how ADHD specifically affects Mr. Sampson.  See excerpts from the letter below.

**Mr. Sampson meets the DSM IV criteria for ADHD:**

His symptoms have persisted for at least 6 months to a degree that is inconsistent with developmental level and that negatively impacts directly on social and academic/occupational activities:

He often has difficulty sustaining attention in tasks (e.g., has difficulty remaining focused during lectures, conversations, or lengthy reading).

He often does not follow through on instructions and fails to finish schoolwork, chores, or duties in the workplace (e.g., starts tasks but quickly loses focus and is easily sidetracked).
He often has difficulty organizing tasks and activities (e.g., difficulty managing sequential tasks; difficulty keeping materials and belongings in order; messy, disorganized work; has poor time management; fails to meet deadlines).

He often avoids, dislikes, or is reluctant to engage in tasks that require sustained mental effort (e.g., schoolwork; for older adolescents and adults, preparing reports, completing forms, reviewing lengthy papers).

He is often easily distracted by extraneous stimuli (for older adolescents and adults, may include unrelated thoughts).

Mr. Sampson's attention, concentration, processing speed, and recall/retention are severely impaired both in reading and visual comprehension. In everyday life Mr. Sampson finds that he needs to read and re-read the same material numerous times in order to comprehend it. This process is often interrupted by intrusive anxiety that disrupts his ability to comprehend new material, slowing his ability to learn.

Robert is, and remains, substantially limited in major life activities of everyday life. His ADHD is just one of the factors contributing to his impairment and to the barrier to the Step 1 exam. When a student presents with a learning disability and ADHD, the result is exponential impairment from the cumulative effects of the co-morbidities. Decreased neurocognitive performance in individuals with attention deficit hyperactivity disorder and learning disability is well documented in the research literature and can have significant impacts on performance.

For example:

Robert has difficulty fully accessing examinations and reading materials due to a highly impaired reading speed so he reads at a slower rate. The slow rate is interrupted by intrusive thoughts or gaps in attention caused by the ADHD. Now Robert is not only reading more slowly, there are significant gaps in processing the information he is able to read as a result of his inattention. Not

**A884**

only is he going slowly, he is missing key pieces along the way. Historically he has addressed these academic disabilities by taking extra time in reading and preparation and by approaching learning differently, for example learning to play the cello by ear vs. by reading music.

**How the diagnosis was reached**

My diagnosis was developed through direct clinical assessment over several visits. I am an MD and I specialize in the treatment of individuals with ADHD. ADHD is a clinical diagnosis made over several visits triangulating patient self-reported symptoms and impact with key data points from a multitude of sources.

Moreover, Mr. Sampson experiences loss of educational access when he must read for content and visually process and recall information seen or read under timed and untimed conditions. His ADHD exacerbates and compounds these learning disabilities.

Mr. Sampson requires accommodations to fully access the NBME step exam. Given his learning disability, with associated concentration impairment, as well as very slow processing speed highlight the need for multiple breaks to provide opportunities for cognitive re-focus. I am strongly endorsing an appropriate accommodation of time and one half on the NBME exam with additional breaks over a period of two days.

Taken together, the aforementioned impairments require self-monitoring, and cognitive breaks. Therefore, I endorse the use of extra breaks to allow Robert to access these mitigating strategies.

By allowing Mr. Sampson extra time, extra over two days you remove the barrier caused by a timed exam and allow time to compensate for his reduced processing and concentration that result from the anxiety, ADHD and his learning disability.

It is my professional opinion that my patient, Mr. Sampson, is currently and profoundly disabled in that cannot concentrate and read efficiently. Mr. Sampson meets the requirements of a person with a disability covered under the ADA and section 504 of the rehabilitation act. The only way to mitigate the barriers of your exam is to provide extended time and extra breaks over two days.

I fully support Mr. Sampson appeal for accommodation and hope that the NBME will consider his case with the same level of care Mr. Sampson has shown in addressing these concerns.

**NBME Point 2:** *"Despite these statements (from Stony Brook University Learning Specialist regarding difficulties with reading skills and reading speed that impact your ability to complete exams within standard time limits) your evaluators conclude in your 2013 performances on a range of cognitive and academic tasks, including reading/passage comprehension, reading fluency, spelling, perceptual reason, visual special thinking and processing seed were well within the range of average functioning."*

**I provided information to counter Point 2 in an October 9, 2017 Letter from Dr. Jan Serrantino and in a letter submitted by Christopher Heedles, LMSW and dated 3/27/2017.**

"Robert's Dyslexia learning disability…substantially limits his reading ability, reading speed on a daily bases when he is compared to an average individual in the general population. His learning disability is the reason he routinely runs out of time on exams and generally takes longer to think through ideas presented to him both on exams and outside of the classroom." – Christopher Heedles, LMSW

Three health care professionals disagree with Point 2. Their conclusion is based on the two completed psychoeducational evaluations in August and December of 2013. The following, **below-average person range**, subset scores were part of Mr. Sampson's evaluation and demonstrate his impairment in reading:

Nelson Denny Reading Test Comprehension **16th percentile**
under standard time limits (low-below average range)

Scholastic Abilities Test for Adults (SATA) **25th percentile**
under standard time (low average)

Mr. Sampson showed market improvement (into the average range) when provided extended time. Mr. Sampson was able to read the entire passage and therefore fully access, process, interpret and respond to the questions on the exam.

The NBME has argued, "There is a body of research showing that individuals with and without disabilities may earn higher scores with extended time. Achieving higher scores with additional testing time is neither evidence of impaired functioning nor a justification for test accommodations for the USMLE." In this argument you cite Lewandowski et al., "*Effects of Extended Time Allotments on Reading Comprehension Performance of College Students With and Without Learning Disabilities*," J. OF PSYCHOEDUCATIONAL ASSESSMENT 31(3) 326-336 (2013). At the same time the evaluators at the NBME have cited poor psychometrics on the Nelson-Denny in several of their denials. This evaluator and the student's support team find irony in the above statements as the paper you cited uses the Nelson-Denny to measure reading comprehension and touts the strong psychometric qualities of the assessment and its use in multiple studies looking at reading for students with learning disabilities (see below).

Accordingly we submit Mr. Sampson's Nelson Denny scores as evidence of significant impairment in reading and presume given the psychometric properties and the assessments wide spread use in the literature to evaluate reading comprehension that the NBME will accept the Nelson Denny as evidence of this students impaired reading.

"The main measure used in this study is a modified version of the reading comprehension sub- test of the Nelson−Denny Reading Test (NDRT; Brown, Fishco, & Hanna, 1993). The NDRT has two parallel forms, G and H. Each reading comprehension form consists of seven passages, accompanied by 38 multiple-choice questions. These questions are both factual and inferential in nature. According to the NDRT technical manual, the Nelson−Denny reading comprehension subtest has alternate forms **reliability of 0.81 and an internal consistency of 0.88** for forms G and H. This test has been used in dozens of studies with poor and LD readers, including many most of the reading studies on extended time." (Page 329)

**A886**

In addition to below-average reading scores, it is important to note that Mr. Sampson has <u>extensive difficulties with visual processing and recall</u>.  Mr. Sampson showed low/below average scores, when compared to a normative sample (the average person) same-aged peers across a variety of visual recall and recognition tasks.

| | |
|---|---|
| Woodcock-Johnson III Test of Cognitive Abilities Picture Recognition | **16th percentile** |
| Rey Complex Figure Test and Recognition Trial, Immediate | **14th percentile** |
| Rey Complex Figure Test and Recognition Trial Delayed | **5th percentile** |
| Rey Complex Figure Test and Recognition Test Recognition trials | **4th percentile** |

According to the USMLE website the Step exam includes <u>visual images</u>:

http://www.usmle.org/step-1/#question-formats
"A portion of the questions involves interpretation of graphic or pictorial materials"

Mr. Sampson is severely impaired on the recall of visual images and requires additional time to process and interpret any graphic or pictorial materials. Given the format of some questions on the NBME that draw on visual skills he will absolutely experience a barrier to this exam under standard time conditions.

There were clear deficits that limit Mr. Sampson in reading comprehension and visual identification and recall.  When comparing someone to the average person standard you are comparing his or her performance to the sample population norm. In your letter you assert that Mr. Sampson needs to perform below *the average person standard* - **in all of the areas bulleted above he is below average per your guidelines.**

<u>The NBME uses the average person standard to make determinations about accommodations on the Step 1. When doing so, standard scores are evaluated in the context of population from which they are normed. Scores within the 25th-75th</u> percentile on these assessments are considered within the normative range. For Mr. Sampson, several of his Standard Scores fall **far below the 'average range'** and when compared to the average person he is quite disabled in specific tasks.

The more salient data however, are the chronic and pervasive barriers to taking the USMLE Step exams Mr. Sampson experiences as a result of these documented deficits.  Mr. Sampson explained the following in his personal statement.

> *I had to spend an inordinate amount of time and energy on reading the same paragraph over and over again; used a parent to read aloud to him, feared being called upon to read aloud in class, able to word-call but not comprehend when reading aloud in class; avoided reading in junior high and high school; did not read for pleasure; relied on Sparknotes and Cliff Notes to complete reading because reading was such a laborious and painful exercise; difficulty remembering what was read when he did read; required extensive 1:1 tutoring to pass courses from junior high through college; unable to learn to read music – played by ear."*

**A887**

When an individual displays this much difficulty comprehending reading material (observation, scores and testimony), it clearly demonstrates a disability and need for the reasonable accommodation of 50% extended time and extra breaks.

Further, the Department of Justice Guidance on Testing Accommodations states that: A substantial limitation of a major life activity may be based on the extent to which the impairment affects the condition, manner, or duration in which the individual performs the major like activity (in Mr. Sampson's case, Reading Comprehension).  To be substantially limited in a major life activity does not require that the person be unable to perform the activity, it may be useful to consider the length of time an individuals takes to preform the activity compared to most people in the population.

**Mr. Sampson is an individual with a substantial limitation in the major  life activity of reading – a critical function required for completing the        USMLE exams.**

Under regulations implementing title II of the ADA, public entities offering examinations must ensure that their exams do not provide qualified persons with disabilities with aids, benefits, or services that are not effective in affording equal opportunity obtain the same result, to gain the same benefit or to reach the same level of achievement as that provided to others, 28 C.F.R. § 35/130(b)(l)(iii), and may not administer a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability. 28  C.F.R. § 35.130 (b)(6). Both title II and III regulations also require public and private testing entities to provide modifications and auxiliary aids and services for individuals with disabilities unless the entity can demonstrate an applicable defense. . In addition testing agencies cannot use **evidence of past student success** to discount a student's eligibility for services, nor accommodation approval. We believe that individuals who achieve a high level of academic achievement **can** be considered individuals with disabilities under the ADA

_____28 C.F.R § 35.130 (b)(7), 35.160 (b), 35.164; (b)(7), 28 C.F.R §§ 36.309(b)(l)(iv-vi), (b)(2), 36.309(b)(3).

**NBME Point 3:  "*The documentation you provided does not show a record of chronic and pervasive problems managing daily demands for attention, organization, behavioral regulation or executive functioning during your development or currently, nor does it demonstrate a developmental history of problems with reading or learning that impacted your academic functioning or limited a major life activity.*"**

**Counter to Point 3:**  I identified numerous examples, since grade school of academic support in my Personal Statement, in the letter from Steven and Shelley Sampson (parents), and in the reports from evaluators.  These were summarized in a letter from Dr. Jan Serrantino.

I absolutely had difficulties all throughout school and articulated this in my application. Below are just a few examples of excerpts from my Personal Statement and a summary from Dr. Serrantino.

- Speaking:

**A888**

- o "The roots of my learning disability began in early childhood. I was diagnosed as a severe stutterer at the age of four. This language disability significantly affected my verbal communication, and tended to isolate me from peers. I experienced anxiety and frustration when I had no idea how long it would take to relay a simple thought. At times, my speech was so disrupted that people around me did not have the patience to wait."
  (NBME Disability Application Personal statement, Robert Sampson)
- Reading:
  - o "Whenever we were given assigned reading, I had to spend an inordinate amount of time and energy on reading the same paragraph over and over again. When I was in elementary school, my mother used to read aloud to me while I followed along. When we read aloud in class, I used to shun being called on to read aloud (even though I otherwise enjoyed participating in my classes) because on top of some lingering stuttering, I was quite scared that I would mispronounce or see a word that my classmates would all know, but I did not. Even more so, I did not want to be called on because for some reason, even if I tried to pay attention to the words that came out of my mouth or tried to pay attention to the words I read on the page as I read aloud, I would have essentially no memory of what I just read. It was as if my speaking was interfering with my reading process (or vise versa)."
- Time management, organization, and executive function:
  - o "I was privately taught for two years, but I found practicing extremely tiresome, and while I loved the sound of the instrument, I found practicing beyond boring—despite my mom's "motherly" and constant reminder that I had to practice. For some reason, I could hardly bring myself to do it, as the practice exhausted me to an extreme degree."
- Mult-lobal brain processing and physical coordination:
  - o "In particular, I distinctly remember struggling with the fact that two hands in piano not only were playing separate notes at the same time, but their rhythm was different. Even after repetitiously practicing to try to build up a muscle memory in each hand for how the song went, I couldn't play songs that needed two hands to play at the same time. If I would focus on the right hand, my left hand would struggle to not follow, and when I'd switch my attention to the left hand to get it to play its rhythm, my right hand would stop. Other times, both hands would play the same notes and I couldn't separate their actions. It was very frustrating, and so I stopped."
- Reading and Visuospatial:
  - o "I took private lessons and learned under the "Suzuki method," which is a rote method of learning that involves listening to a recorded take of a performance over and over again by a professional, and playing the song on your cello with the printed music in front of you. However, when I'd follow the printed music, I can tell you that I wasn't really "reading" the music. In fact, no one had really taught me to read the music, and I had no real idea if I was playing an F# or a B flat. I also did not know what the

first note on the page was supposed to sound like until my teacher played it for me or I heard the recording. What I did know was that once I knew what one note sounded like, if on the sheet of music the relative height of the next note was higher or lower, then I would know to make the pitch of the note higher or lower on my cello. I basically read by relative comparison without ever having a formal musical understanding of what the notes specifically stood for"

- Following directions and attention:
  - "My private teacher had changed and this teacher did not use the Suzuki method, but rather taught with conventional music theory. When we first met, she was perplexed and could not understand how someone who could make such a great sound had no knowledge at all about music theory. She was mortified by some of the most basic music reading mistakes I would make, but more importantly, she would tell me what mistake I made, and ask me to do it again, and then I would make the same mistake, maybe four or five times in a row. I didn't do this disrespectfully, but I might do something that I thought she wanted, but it wasn't what she meant at all. I would continually misunderstand a lot of the things she'd tell me to complete, and it would take me multiple tries just to do what she asked for once…. One day, during one of my lessons, I continued to make reading comprehension mistakes from the musical composition when I read the notes, and finally my teacher stormed out of the room yelling, "I can't teach him, he has to have a learning disability, he's trying to listen to me but he's just not doing it!""

- Misc difficulties in college:
  - "I had difficulty remembering names of people and places, a childhood history of reading and spelling difficulties, slow reading abilities, inability to comprehend while reading aloud, and suffered extreme fatigue when reading even short periods of time no matter what the subject matter. Throughout college, I continued to receive extensive tutoring and my preparation for examinations became even more arduous. In an attempt to better capture the content of my lectures, I even recorded them and re-reviewed them at a later time."

- Reading speed, processing time to read sentence and review figures/pictures, and anxiety:
  - "For the first 1.5 years of my medical school curriculum (the pre-clinical part of my education for which Step 1 assesses) I struggled immensely, particularly with NBME shelf exams, which my school uses to evaluate students after each subject block as a final exam. For essentially all of my NBME exams I took, I ran out of time, and I had to rush through the second half of each exam while sometimes not even having enough time to fill in random bubbles at the end of the exam…By the halfway mark, it would be anxiety provoking to realize that I would have to nearly guess on every other question in order to finish on time. All the while, I had also been silently meditating to myself for a few minutes before each exam started that I had to push myself and finish on time. I then tried to divide

**A890**

the test into 8ths, but no matter how many times I cut the test into virtual fractions, I still had the same problem—I couldn't finish the exams no matter how hard I pushed myself to read through the question. My reading through the vignettes was way too slow, and it took me considerable time to cross examine the choices on the test with the stem of the question. Time was so much of an issue, that even on a 2.5 hr NBME final shelf exam, I knew that if I even considered running to the bathroom, which just takes five minutes, it would be entirely impossible for me to finish the exam…. I ended up failing multiple NBME exams and having to remediate them (all under normal time conditions) in order to pass classes repeatedly, even though I had, otherwise, done well in the rest of the class. In all cases, had my performance been based on the clinical interactions, homeworks and quizzes with very little time constraint, I would have excelled. Consistently, being unable to timely finish NBME shelf exams in medical school made it intensely difficult to pass classes, and I had a routine pattern of initially failing a class just due to failing the NBME shelf exam alone."

- Chronic marginality and impacts:
  - "However, in November 2016, I was summoned to the academic review board of my medical school for what they defined as "chronic marginality" and that I exhibited "marginal performance" through the pre-clinical phase of the curriculum. My school defines a student to have marginal performance when a student has either failed or come very close to failing <u>multiple</u> NBME subject exams, or the courses themselves on their first attempt. The point of this administrative label is to identify students who are substantially underperforming the academic expectations of the school and who are in need of an intervention to fix a major learning or education issue. However, the problem was not actually my knowledge base, but my inability to showcase it on timed NBME exams which had generated all of my marginality points for failing, despite otherwise doing well in each class as a whole.

Mr. Sampson has submitted new documentation supporting an extensive history of classroom and personal difficulties, interventions and informal accommodations as a result of the comment made by Michelle Goldberg, Ph.D. stating that "The documentation you provided does not show a record of chronic or development over a long period of time." Mr. Sampson was clinically diagnosed with a learning disability and neurodevelopmental disorder in August of 2013. However, from a very early age, it was clear from parents and teachers that he was experiencing difficulty in the academic environment. Teacher comments from early report cards portray ADHD criteria and (submitted by Mr. Sampson in this appeal) document, from as early as first grade his difficulty with executive functioning skills, articulation and reading and writing which provide further evidence of ADHD symptoms. At the same time the teachers were commenting on his less than satisfactory executive functioning skills, they recognized his exceptional ability. Like most public and private schools during the time Mr. Sampson attended, children who demonstrated giftedness or exceptional ability were not considered in need of special education resources. Generally speaking, their difficulties were often viewed as a child's lack of effort or

interference because of behavioral problems or that he was doing well enough. Mr. Sampson's parents recognized that their son needed support and, at their own expense provided years of individualized speech therapy and regular tutoring. As a result, their son was able to keep up and excel in some areas. Had the school, teacher or parents known, special education resources could have been requested in which the same exact services would have been provided during the school day via Speech and Language Program Specialists and Resource Specialist Teachers. The National Center for Learning Disabilities recognizes and advocates for the personalized education of students with learning disabilities – exactly what Mr. Sampson's parents provided as informal, but highly necessary accommodations (record of informal accommodations submitted by Mr. Sampson's parents in this appeal).

During middle and high school, Mr. Sampson's need for individualized support increased dramatically, presumable due to the extensive amount of reading that is required of students at this time in their educational careers. The attached supporting documents from Steven and Shelley Sampson outline the extensive tutoring required for Mr. Sampson to succeed in school. This history of informal accommodation is important when determining effective reasonable accommodations for higher education, graduate schools and professional education. The Section 504 Interactive Process requires disability providers to consider these types of resources when determining what accommodations will be approved.

**NBME Point 4** *"Research does not support using a discrepancy model as the basis of diagnosis (of a learning disability) or rational for accommodations.*

**Counter Response to Point 4:**
Dr. Serrantino's letter, dated October 9, 2017, responded to Point 4. See the except below.

Ms. Goldberg does not cite any research to support this claim, nor does she mention that the majority of states still rely on the discrepancy model when making diagnosis in the K-12 system, while only 21 states use the cognitive processing deficit model (Fiorello, Hale, & Snyder, 2006).

Several states allow assessment personnel to use a "research-based alternative eligibility method" when determining SLD eligibility. Of the fifty states, twenty-one (N = 21) allow for the use of an alternative method of eligibility, generally by determining if a student exhibits a pattern of strengths and weaknesses and/or examining specific areas of cognitive processes that interfere with learning.

Dr. Michels, Ph.D., Dr. Anderson, Ph.D. and Dr. Aronson M.D. have, and continue to meet with Mr. Sampson. They met with him on multiple occasions and thoroughly examined him. They concur that Mr. Robert Sampson exhibits deficits that substantially impair specific areas of cognitive processes that interfere with learning.

According to Dr. Michels, Ph.D. the difference between Robert's verbal and non-verbal reasoning abilities is significant, occurring in less than 1% of the population. "...Math was strong but Robert did not demonstrate an intuitive sense of how to solve some basic problems. Reading and writing scores were variable and scores were an unusual mix. The

**A892**

disparity between his verbal and visual/special reasoning abilities is quite significant and likely to underlie the unevenness evident in his academic profile, both in current achievement testing and his school record. (Dr. Michel's report, page 9)

Regardless of the model (Discrepancy vs. cognitive processing deficit) selected to determine a learning disability, the data included in the documentation provided by Mr. Sampson supports either model and is evidence of his impairment and performance abilities when compared to the average person standard; therefore, mention of the discrepancy model is not relevant nor a valid reason for denial of this students' request.

---

Fiorello, C.A., Hale, J.B., & Snyder, L.E. (2006) *Cognitive hypothesis testing and response to intervention for children with reading problems.* Psychology in the Schools, 43, 835-853.

As you are aware the Regulations to implement titles II and III of the ADA Amendments clarify the intent of the ADAAA and provide concrete examples-several that are applicable to high stakes testing agencies and high stakes environments (like medical school). These regulations are intended to be applied to medical education and to the USMLE Step 1. In particular that testing agencies cannot use **evidence of past student success** to discount a student's eligibility for services, nor accommodation approval. We believe that individuals who achieve a high level of academic achievement **can** be considered individuals with disabilities under the ADA.

**NBME Point 5** *"Your documentation does not demonstrate a substantial limitation in a major life activity as compared to most people or that the requested accommodations are an appropriate modification of your USMLE Step 1 test administration."*

**Counter to Point 5:** I provided multiple examples of how my life is substantially impaired in my personal statement, as well as in statements by others. One excerpt from my personal statement is below, but multiple other examples were listed above in my response to counter point 4.

- Write/Spelling/Phoneme-audio-visual-spatial processing:
  - "In terms of writing, my handwriting was always a problem. Many of my teachers would hand back work to me and say they couldn't grade it because they couldn't read anything I said. It was possible for me to write somewhat neater, but the effort it required for me to write legibly would massively slow down my writing to the point that writing itself became a burden (and it also made it hard to complete written essays on timed exams). What also made writing difficult for me was that I knew my spelling was exceptionally poor. Almost any word that had double letters (like "ll"), words that could be said with different characters that produce similar phonemes (-tion vs -sion, e.g. station vs vision), or words that had silent letters in them (lam<u>b</u>, com<u>b</u>, <u>k</u>nife) would all cause spelling errors. I recall that every time I would come across attempting to write one of these words, I would have to pause, and it would hit me that not only was I not

**A893**

sure how to spell the word, but I was embarrassed someone would call out what might seem like incompetence"

You are likely aware that someone with ADHD, as compared to most people in the general population, takes longer to complete major life activities such as reading, writing, concentrating, or learning, in duration limited settings.  Again, according to the DOJ Guidance on 28 CFR Section 36.309 when an applicant's documentation demonstrates a consistent history of a diagnosis of a disability that is prepared by a [qualified] professional who made an individualized determination of the applicant there is little need for further inquiry and generally testing entities should grant the requested accommodation.  Mr. Sampson may not have a long history of documented disability; however, he does have an extensive documented history of academic and personal difficulty via personal report, parent report, teacher comments on report cards, testimony from clinical and non-clinical professionals who have worked with or observed Robert in college and medical school, and other documents.  These academic difficulties were supported or informally accommodated by extensive tutoring and resources (see parent list of educational supports). Allison Anderson, Ph.D. diagnosed Mr. Sampson with 315.9 Unspecified Neurodevelopmental Disorder, visual-spatial memory, visual-spatial processing. David A. Porter, MA, LADC discusses NDD below

        The symptoms cause distress, and impair functioning in social, educational/occupational, or other major areas of functioning. The diagnosis can be assigned when the clinician decides not to specify the reason the diagnostic criteria are unmet, or if there is insufficient information available at the time of the evaluation to make a more specific diagnosis. NDD consists of a range of disorders such as ADHD, Asperger's/Autism, OCD… (The American Psychiatric Association, in 2013)

With regard to your assertion that I am not a person with a disability because I was able to score well on the SAT/MCAT, I offer that I dedicated more than one year's additional study time, supplementary to the standard three years of prerequisite science course requirements, with the sole purpose of studying for this exam. It took me 3-4 times as long to learn and retain the vast amount of information tested in the MCAT. As well, a 29 is not a score indicative of my knowledge. Indeed, I consistently ran out of time on the practice exams and on the actual MCAT. This score, while noted as above average in your denial, is actually below that of my actual potential.

Furthermore, the Department of Justice has very clearly stated that, "***A person with a history of academic success may still be a person with a disability who is entitled to testing accommodations under the ADA.  A history of academic success does not mean that a person does not have a disability that requires testing accommodations.  For example, someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in one or more of the major life activities of reading, writing, speaking, or learning, because of the additional time or effort he or she must spend to read, write, speak, or learn compared to most people in the general population***." Just because I earned a particular score on a standardized exam does not suggest that I do not have a reading disability.

**NMBE Point 6  *"Your documentation does not demonstrate that standard testing time is a barrier to your access to the USMLE. The records provided***

*reveal a consistent history of unimpaired performances on timed standardized tests when compared to appropriate national normative samples."*

**Counter to Point 6:** The following counter to Point 6 was provided to NBME in a letter from Dr. Jan Serrantino dated October 9, 2017, and in supplemental letters provided by Dr. Aronson and Dr. Anderson.

<u>Chronic and pervasive academic problems of significantly impaired reading</u>

| | |
|---|---|
| Nelson Denny Reading Test Comprehension under standard time limits (low-below average range) | **16th percentile** |
| Scholastic Abilities Test for Adults (SATA) under standard time (low average) | **25th percentile** |
| <u>Visual deficits</u> Woodcock-Johnson III Test of Cognitive Abilities Picture Recognition | **16th percentile** |
| Rey Complex Figure Test and Recognition Trial, Immediate | **14th percentile** |
| Rey Complex Figure Test and Recognition Trial Delayed | **5th percentile** |
| Rey Complex Figure Test and Recognition Test Recognition trials | **4th percentile** |

In addition, Ms. Farmer did not respond to the supplemental letters from my current health care providers or the health care professionals who have met with me multiple times and under comprehensive conditions. These medical professionals have had the opportunity to me with me face-to-face. In addition, Stony Brook Medical School Staff and The Disability Services personnel have extensive personal knowledge of my need for disability and it seems as though their expertise and observation has not been recognized by NBME.

I do not have full access to the vignette style questions nor the text and images included in the USMLE exams. I am unable to access, interpret and respond to questions within the amount of time allotted. I require 150% extended time, over 2 days to adequately access this exam.

Finally, on January 12, 2018, I received a vague emailed letter from Catherine Farmer, Psy. In her letter she denied for my request for disability related accommodations for Step 1. Ms. Farmer did not acknowledge or respond to any of the evidence of my disability. She states, that the qualified professionals who spent numerous hours evaluating me, and the Stony Brook staff who are constantly observing me "...did not demonstrate that standard testing time is a barrier to your access to USMLE." **Ms. Farmer's vague denial is troublesome and I believe that** USMLE is creating a barrier to me and all individuals with disabilities, creating burdensome processes and denying equal access for a student, me, who has a clear and obvious disability to STEP 1 and, as a result, is hindering my educational program.

**A895**

Summary:

I have provided clear evidence of my long history of disability that is documented in line with your requirements. You have been provided counter points to each of your reasons for denial. Stony Brook is also providing an additional letter that I am attaching with my letter.

I am requesting reconsideration of your decision.  I am requesting 50% extended time, extra breaks, testing over two days in a private room.  I am prepared to continue with this process using all the resources, legal and medical, available to me. Stony Brook Medicine is fully supporting this appeal. I respectfully request your thoughtful reconsideration of this appeal.

It is imperative that I receive my accommodations and I await a speedy response to my letter.

Sincerely,


Robert Sampson

*[signature]*

**A896**



February 15, 2018

To Whom It May Concern:

I am disappointed that the NBME review committee has once again denied accommodations for Robert Sampson for his sitting of the USMLE Step 1 exam. As I had noted in my previous letter dated March 29, 2017, I am professionally trained and qualified to comment on my observations of the manifestations of Robert's disabilities in reading, writing, managing time, memory organization and other academic and life activities. Robert meets the criteria, through our disabilities services office and according the guidelines of the ADA, for appropriate testing accommodations.

Dr. Jan Serrantino has been working with Robert because of her expertise in advocating with your organization on behalf of students requesting accommodations. She has advised Robert as he compiled the accompanying detailed document addressing the points you have made in denying Robert his accommodations.

I will reiterate one more point of my own:

In her letter dated January 12, 2018, Catherine Farmer, Psy. D., wrote: "The records provided reveal a consistent history of unimpaired performances on timed standardized tests when compared to national normative samples." However, the records do not show this at all. The records show that sometime prior to medical school, Robert, after studying and practicing well beyond the average time for most students, figured out a way to perform adequately enough under standard testing conditions on two entrance exams that test broad knowledge and aptitude. In medical school, that is not what the record shows at all. The medical school record of his standardized exams consistently shows failing exam scores under standard testing conditions and passing scores under accommodated testing conditions. Clearly Robert requires the time extension to gain access to the exam. Not all standardized exams are equal and the USMLE Step exams in particular require reading skills, interpretation, synthesis, integration and pattern recognition well beyond any skills required on the college entrance exams. Moreover, USMLE Step exams will require Robert to interpret images from histology and gross pathology as well as graphs and charts, all of which will test his disabilities directly.

As the Learning Specialist at Stony Brook Medical School, I fully support the accompanying document and I support another appeal from Robert for his accommodations.

Sincerely,

Linda De Motta
Learning Specialist
Stony Brook School of Medicine



NBME®

National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104-3102

215-590-9500 phone
www.nbme.org

<u>**Confidential**</u>

March 6, 2018


Robert D. Sampson
11 Whitford Rd
Stony Brook, NY 11790

RE: USMLE Step 1                    USMLE ID#: 5-385-624-1

Dear Mr. Sampson:

We are in receipt of your recent request for an explanation as to why you are not being granted disability related accommodations on the USMLE Step 1. You write in you February 22, 2018 letter addressed To Whom It May Concern, *"My school, health care professionals and I provided NBME with overly burdensome, yet comprehensive documentation that complies with the guidelines posted on the USMLE website. I also have provided supplemental letters from my health care providers and evaluators and the former director of Disability Services from the University of California, Irvine…on January 12, 2018, I received a vague emailed letter from Catherine Farmer, Psy [sic]…Ms. Farmer did not acknowledge or respond to any of the evidence of my disability. She states, that the qualified professionals who spent numerous hours evaluating me, and the Stony Brook staff who are constantly observe me '…did not demonstrate that standard testing time is a barrier to your access to USMLE.'* ***Ms. Farmer's vague denial is troublesome and I believe that USMLE is creating a barrier to me and all individuals with disabilities, creating burdensome processes and denying equal access for a student, me, who has a clear and obvious disability to STEP 1 and, as a result, hindering my educational program*** (emphasis original). *I have provided clear evidence of my long history of disability that is documented in line with your requirements. You have been provided counter points to each of your reasons for denial. Stoney Brook is also providing an additional letter that I am attaching with my letter. I am requesting reconsideration of your decision. I am requesting 50% extended time, extra breaks, testing over two days in a private room.*

Please be assured that each and every document submitted in support of your April 3, 2017 request for accommodations, and subsequent requests for reconsideration received on June 26, 2017 and November 30, 2017, have been thoroughly reviewed. We endeavor to communicate our decisions as clearly and thoroughly as possible. I regret that you found my January 12, 2018 communication to be vague or that you expected a point by point, document by document response. Dr. Goldberg's June and August 2017 letters are quite detailed and complete with regard to how your documentation does not support the diagnostic conclusions of Drs. Michels, Anderson, and Aronson or demonstrate the presence of a disabling condition within the meaning of the ADA.

In a September 6, 2017 letter written in support of your appeal for accommodations, Dr. Aronson asserts that you are "severely impacted" by learning disabilities (specifically reading speed and

**A898**

Robert D. Sampson                                                          USMLE ID#: 5-385-624-1
March 6, 2018                                                                                    Page 2

comprehension) and ADHD.  He writes, *"My diagnosis was developed through direct clinical assessment over several visits...ADHD is a clinical diagnosis made over several visits triangulating patient self-reported symptoms and impact with key data points from a multitude of sources."*  Dr. Aronson does not acknowledge that your August 2013 evaluation did not identify any concerns about attention, concentration, impulsivity, hyperactivity, or executive functioning.  To the contrary, Dr. Michels states in her 2013 report that you gave a high level of effort and focus during the assessment and observed, *"When stressed, his style can become somewhat obsessive, and he appears prone to overthinking minute details...Robert is likely to experience more anxiety than is necessary in some situations. During testing, Robert put forth a high level of effort on all tasks, even asking to review all of his responses on some untimed tasks. He did not necessarily work more slowly than is typical, but his need to check his responses led to longer than average testing times."*

Dr. Aronson does not address Dr. Anderson's December 2013 evaluation report in which she describes your responses to standardized ratings of current and childhood ADHD symptoms, as well as the responses of various informants.  While you endorsed clinically significant levels of childhood symptoms, neither of your parents did.  Regarding current symptoms, Dr. Anderson writes, *"...Robert did not rate himself as having significant levels of inattentiveness compared to responses typical of individuals with ADHD. Nor did he see himself has having problems with impulse control, or physical restlessness compared to others his age...Similarly, neither Robert's friend and tutor, nor his girlfriend rated him as having significant levels of problems in any area typically associated with ADHD...Robert does appear to be experiencing attention problems, but his testing results and history supply little evidence that these problems are the result of ADHD."*

Dr. Aronson makes other assertions that are directly contradicted by objective evidence. For instance, he refers to your information processing speed as 'very slow.' When measured directly, your processing speed is not slow or even below average range. In 2013, your Processing Speed Index on the *Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-IV)* is Above Average range, better than 93% of national sample of same age peers.  Furthermore, your Cognitive Fluency Index and Broad Reading are Above Average range, better than 75-80% of a national sample of same age peers.

In her August 10, 2017 letter, Dr. Anderson writes, *"Mr. Sampson's Nelson Denny Reading Test Comprehension score under standard time limits was in the low-below average range at the 16th percentile. Mr. Sampson's score on the Reading Comprehension subtest of the Scholastic Abilities Test for Adults (SATA) was in the low average range...With both the NDRT and SATA reading comprehension scores, Mr. Sampson showed marked improvement to the average-above average range when given extended time...Both Dr. Michels and I agree that there is a clear record of consistent academic struggles experienced by Mr. Sampson, beginning in elementary school years through the present time."*

Dr. Anderson's conclusions notwithstanding, the *Nelson-Denny Reading Test (NDRT)* percentile scores reported by your evaluator compare your performance to a select group of about 500 college educated individuals. *NDRT* scale scores are derived from the pooled standardization sample of approximately 8000 individuals, a group whose aggregate characteristics more closely resemble the average person from the general population, the appropriate frame-of-reference when assessing disability under the ADA. Your *NDRT* comprehension scale score of 208 obtained under standard time conditions is Average range compared to the pooled standardization sample, where the mean is 200 and the standard deviation is 25.  Although Dr. Anderson characterizes your *Scholastic Abilities Test for Adults (SATA)* Reading Comprehension score as 'low average range,' you reportedly earned

Robert D. Sampson                                                                    USMLE ID#: 5-385-624-1
March 6, 2018                                                                                              Page 3

a standard score of 8 under standard time conditions.  According to the *SATA Examiner's Manual* (1991), standard scores of 8-12 are described as Average range.  Furthermore, the *SATA Examiner's Manual* (1991) states *"…two subtests impose time limits even when testing individually. Examinees are given 15 minutes to complete as many items as thy can in Reading Comprehension. They are also limited to 15 minutes for Writing Comprehension."*  There is no extended time administration for the *SATA* and the validity of any inferences drawn from such a nonstandard administration are unclear. Most importantly, there is a body of research which shows that many people, with and without disabilities, score higher on tasks when given more time.

Dr. Serrantino's October 9, 2017 advocacy letter cites test data from your 2013 evaluations but offers no new performance data or information to support her opinions. She repeats and restates many of the same conclusions made by Drs. Michels, Anderson, and Aronson which have been addressed elsewhere in this and prior letters.  While she and Dr. Anderson cite below average range performances on a few isolated subtests as evidence of "severe impairment" on the recall of visual images, these tests are not at all like Step 1. When viewed within the context of your history of Average to Above Average range performances on academic achievement tasks that require visual memory, impaired range scores on the *Rey Complex Figure Test* are largely irrelevant with respect to your real-world functioning. For example, under standard conditions you earned SAT scores of Verbal 680, Math 720, and Writing 680 in November 2008, better than 93-96% of a national sample of college-bound seniors.  In 2013 and 2014, you earned MCAT Total Scores of 28 and 29 under standard conditions, better than 67-73% of a highly select group of medical school applicants.  These data provide substantial evidence *against* a conclusion that standard time conditions present a barrier to your access to Step 1.

In a February 5, 2018 letter addressed To Whom It May Concern, Linda De Motta Learning Specialist at Stoney Brook School of Medicine writes,  *"I am professionally trained and qualified to comment on my observations of the manifestations of Robert's disabilities in reading, writing, managing time, memory organization and other academic and life activities. Robert meets the criteria, through our disabilities services office and according [sic] the guidelines of the ADA, for appropriate testing accommodations…the records show that sometime prior to medical school, Robert, after studying and practicing well beyond the average time for most students, figured out a way to perform adequately enough under standard testing conditions on two entrance exams that test broad knowledge and aptitude. In medical school that is not what the record shows at all. The medical school record of his standardized exams consistently shows failing exam scores under standard testing conditions and passing scores under accommodated testing conditions. Clearly Robert requires the time extension to gain access to the exam."*

Ms. De Motta's advocacy letter, while well-intentioned, is inconsistent with the medical school records that you provided to us in April, 2017.  According to a document entitled *NBME Shelf Exam Score Report for Robert Sampson Generated on 3/28/17*, you obtained a passing score (65%  or higher) on 11 exams taken under standard conditions from October 2015 through November  2016, and failed seven (7) exams taken under standard conditions during that time period.

Accommodations are intended to provide access to the USMLE testing program for individuals with a documented disability as defined by the ADA. A diagnostic label, in and of itself, does not establish coverage under the ADA, nor does prior receipt of accommodations for a particular activity guarantee that identical accommodations are indicated or will be available in all future settings and

Robert D. Sampson                                          USMLE ID#: 5-385-624-1
March 6, 2018                                                              Page 4

circumstances. The ADA defines disability as a physical or mental impairment that substantially limits one or more major life activities as compared to most people in the general population.

Your documentation does not demonstrate that you are currently substantially limited in a major life activity as compared to most people. It does, however, provide considerable compelling evidence against a conclusion that you are disabled within the meaning of the ADA and that standard testing time is a barrier to your access to the USMLE.

Your recent submission found no new substantive information or evidence that alters our decision communicated in my January 12, 2018 letter. Therefore, after a thorough review of all of your documentation, I must inform you that we are unable to provide you with the requested accommodations.

Sincerely,

*Catherine Farmer*

Catherine Farmer, Psy.D.
Director, Disability Services
ADA Compliance Officer, Testing Programs

**A901**

# JO ANNE SIMON, P.C.

356 Fulton Street, 3rd Floor
Brooklyn, New York 11201
www.joannesimon.com

(718) 852-3528 (V/TTY)                                          Admitted NY & NJ Bars
(718) 875-5728 (FAX)

June 29, 2018

**Via e-mail to cfarmer@nbme.org and disabilityservices@nbme.org**

Catherine Farmer, Psy.D.
Director of Disability Services
National Board of Medical Examiners
3750 Market Street
Philadelphia, Pennsylvania 19104-3102

**Re:     Robert Sampson/ USMLE ID#: 5-385-624-1**
**         Disability Accommodations for USMLE STEP 1**

Dear Dr. Farmer:

We represent Robert Sampson, an individual with disabilities protected by the Americans with Disabilities Act, as amended, 42 U.S.C. §12101, *et seq*. (hereinafter "ADA"), the New York State Human Rights Law, N.Y. Exec. L. § 290, *et seq*. (hereinafter "NYSHRL"), a whose request for 50% extended test time for the USMLE Step 1 has been denied by the National Board of Medical Examiners (hereinafter "the NBME"). By and through this letter from counsel Mr. Sampson seeks a reversal of the NBME's discriminatory decision.

As will be explained in greater detail below, the documentation submitted in support of Mr. Sampson's prior requests for accommodations was more than sufficient to demonstrate disability, protection by the aforementioned civil rights laws, and his present and continuing need for, and entitlement to, the extended test time that he requested. The record clearly demonstrates that Mr. Sampson's prior request for extended time accommodations should have been approved. Nevertheless, we enclose herewith additional documentation for the NBME's consideration. We are confident that upon review of the entire record, the NBME will permit Mr. Sampson to sit for the USMLE with the 50% extended time accommodations that are needed to best ensure that his scores *accurately* reflect his knowledge of the subject matter being tested.

**Mr. Sampson Is An Individual With Disabilities Entitled To The Protection Of The Law And The 100% Extended Test Time That He Has Requested.**

An individual has a disability within the meaning of the ADA if that individual suffers a physical or mental impairment that substantially limits one or more of the individual's major life activities or major bodily functions. 42 U.S.C. §12102(2)(A). Major life activities include

**A902**

activities such as reading, writing, concentrating, thinking, learning, processing information, sleeping, working, and test-taking,[1] and major bodily functions include the operation of the brain. The legislative history of the ADA confirms that the definition of who is protected is to be construed liberally.[2] Case law prior to the 2008 amendments did not require either a failure to achieve or below average scores.[3]

Several clinicians have diagnosed Mr. Sampson with learning disabilities, including dyslexia, and attention deficit/hyperactivity disorder (ADHD). The record demonstrates that Mr. Sampson's constellation of impairments continues to impose substantial limitations on his ability to perform the aforementioned major life activities under standard time constraints and conditions. Mr. Sampson is undoubtedly protected by the ADA and entitled to the 50% extended time and a separate room that he has requested from the NBME.[4]

---

[1] *See* 29 C.F.R. § 1630.2 (i). *See also* Doe v. Samuel Merritt University, 2013 WL 428637, at *5-6 (N.D.Cal., Feb. 1, 2013):

> [In] Bartlett v. N.Y. State Bd. of Law Examiners (*internal citations omitted*)… [t]hen–Judge Sotomayor found that test-taking met the EEOC's definition of "major life activities," which at the time was defined as "those basic activities that the average person in the general population can perform with little or no difficulty." Id. (quoting 29 C.F.R. Pt. 1630, App. § 1630.2(i) (1991)) (*internal quotation marks omitted*). She reasoned that while test-taking "could arguably not be 'basic[,]' ... in the modern era, where test-taking begins in the first grade, and standardized tests are a regular and often life-altering occurrence thereafter, both in school and at work, I find test-taking is within the ambit of 'major life activity.' " Id. Since 1997, the central role of test-taking in our society has only increased…*Given the state of the case law, the recent directives of Congress, and the importance of test-taking in our society, the Court finds that Plaintiff has, at a minimum, raised "serious questions" as to whether test-taking is a major life activity under the ADA* (*emphasis added.*)

Arguably, the role of test-taking in our society has only grown in the years since Justice Sotomayor held that test taking was a major life activity in Bartlett v. NY Bd. of Law Examiners, 970 F.Supp.1094, 1117 (S.D.N.Y.1997).

---

[2] *See* 42 U.S.C. § 12102(a)(4).

[3] 2 Cong. Rec. H8291 (Sept.17, 2008) *see also* Bartlett v. N.Y. Bd. of Law Examiners, 2001 WL 930792 (S.D.N.Y. Aug 15, 2001) (hereinafter Bartlett VI); Root v. Ga. Bd. of Veterinary Medicine 114 F.Supp.2d 1324 (N.D. Ga. 2000) *rev'd on other grounds*, No. 00-14751 (11th Cir. 2001); Heiko v. Colombo Savings Bank, 434 F.3d 249 (4th Cir. 2006); Capobianco v. City of N.Y. & NYC Department of Sanitation, 422 F.3d 47 (2d Cir. 2005); Lawson v. CSX Transp., Inc., 245 F.3d 916 (7th Cir. 2001); Fraser v. Goodale, 342 F.3d 1032 (9th Cir. 2004).

[4] As a New York resident, Mr. Sampson is also protected by the NYSHRL. The United States Court of Appeals for the Second Circuit has held that claims alleging discrimination under the NYCHRL are to be reviewed more liberally in comparison to those claims brought under federal discrimination laws, and even those under the NYSHRL. *See* Vargas v. Morgan Stanley, *et al.*, No. 10–4043–cv, 2011 WL 4001036, at *2 (2d Cir. Sept. 9, 2011). *See also* Hoffman v. Parade Publications, 15 N.Y.3d 285, 289, 291(2010) ("The law declares, among other things, that "prejudice, intolerance, bigotry, and discrimination ... threaten the rights and proper privileges of [the city's] inhabitants," and that "[i]n the city of New York ... there is no greater danger to the health, morals, safety and welfare of the city and its inhabitants than the existence of groups prejudiced against one another ... because of their actual or perceived differences… The law declares that the State of New York "has the responsibility to act to assure that every individual within [New York State] is afforded an equal opportunity to enjoy a full and productive life," and that failure to afford equal opportunity "threatens the peace, order, health, safety and general welfare of the state and its inhabitants" (Executive Law § 290 [3])"). The NYSHRL prohibits discrimination by "places of public

2

To date, the documentation submitted in support of Mr. Sampson's request for USMLE accommodations has included the following:

1. A request for accommodations dated 4/1/17;

2. A detailed personal statement dated March 25, 2017 that described his lifelong and current struggles with reading, writing, concentrating, speaking, learning, processing information, working, and taking tests. In his statement, Mr. Sampson discusses his lengthy developmental history of speech and language disorder (stuttering), secondary anxiety and frustration, extensive speech therapy; history of reading difficulties which were frustrating, confounding and exhausting, describing his need to re-read extensively, his reading so slowly that his mother needed to read aloud to him in elementary school so as to keep up with his homework. Mr. Sampson, like many people with reading disabilities, hated being called on to read in class because of his stutter and his tendency to misread words and read in a halting manner, which led to his not understanding what he read because it was so slow. His reading and writing - then as now - demanded concerted, conscious effort (in other words these skills were not automatic as they are in most people); his poor handwriting required a slow, deliberate approach to be marginally legible, with his teachers often returning work because they couldn't read it. He described how he has always avoided reading for pleasure – because the process is so arduous; but for years he assumed everyone struggled, until he finally realized he was in denial about his limitations. Mr. Sampson described years of therapies and tutoring; good musician, could not play piano numbers where the left and right hand needed to play together; not unlike many learning disabled people, he could play music well by ear, but was never able to read music. He also described how Dr. Andrew Lam, his MCAT tutor, observed his struggles and advised him to have an evaluation for learning disabilities, which he did, first seeing Dr. Suzanne Michels and then Dr. Allison Anderson. Nevertheless, Mr. Sampson was embarrassed by his disabilities, and was intimidated by what he felt was the school's reticence to be encouraging of disability accommodations, so he initially hid them from his fellow students and the administration. However, his previously adequate compensatory techniques were no longer sufficient for the volume of material in medical school and he began failing, finding himself in some jeopardy with the Committee on Academic and Professional Progress, which formally reviewed his "chronic marginality." Once he began using accommodations in medical school and on Shelf exams, he began passing with high marks.

3. The report of an August 26, 2013 evaluation by Suzanne Michels, Ph.D. Dr. Michels conducted a comprehensive psychological evaluation of Mr. Sampson's skills and abilities, including a detailed clinical history, and diagnosed Mr. Sampson as having a

---

accommodation," which the statute defines very broadly, excluding only those entities that are deemed public or distinctly private. *See* New York State Human Rights Law, NY Exec L § 292 (9). *See also* D'Amico v. Commodities Exchange, Inc., 652 N.Y.S.2d 294 (N.Y. App. Div. 1997) (holding that an entity is a "public accommodation" if it "supplies a service to the public… routinely accepts qualified applicants and places no subjective limits on the number of persons eligible…) *and* U.S. Power Squadrons v. New York State Human Rights Appeal Board, 59 N.Y.2d 401 (N.Y.1983) (finding that an entity was a "public accommodation" subject to the NYSHRL because it "encourage[d] and solicit[ed] public participation in their programs…"). In addition to injunctive relief, violations of NYSHRL may be remedied by compensatory damages. *See* New York State Human Rights Law, NY Exec L § 290 (3), § 291 (2), § 292 (21) (McKinney's 2001).

Learning Disorder – Not Otherwise Specified (DSM-IV 315.9). Dr. Michels notes that Mr. Sampson's performance on the Nelson Denny Reading Test was persuasive in that his low 16th percentile reading comprehension score "was low due entirely to slowness, as Robert made no errors on these items. When given an extra 12 minutes, to complete this task, Robert earned a score at the 64th percentile." Given his accuracy, it is clear that he didn't complete the 38-item test within the 60% time parameter that is the extended time norms on the NDRT and his 64th percentile score with extended time also reflected, not his ability, but his disability. Noting that Mr. Sampson has a very superior Verbal Comprehension Index, with a barely average Perceptual Reasoning Index, a discrepancy present in 0.4% of the population, and with a long history of early language problems and difficulties with reading and visual perception, she made her diagnosis and recommended that he be given 50% extra time for test taking.

4. The report of a December 16, 2013 evaluation by Allison Anderson, Ph.D., who examined other areas of functioning, including a clinical interview, several neuropsychological tests and ADHD checklists. Dr. Anderson administered subtests form the Woodcock-Johnson Tests of Cognitive Ability and ascertained that Mr. Sampson struggled with aspects of visual and visuospatial recall and retrieval, both with and without cues, scoring in the impaired range on several measures of visuospatial recognition and memory which affects his reading and writing and impacts, for example his ability to recall the spelling of regular and irregular words, which in turn affects reading and writing. On another measure of timed reading comprehension, the SATA, Mr. Sampson completed only half the items within the standard time parameter, and only 2/3 of the items when given 50% more time. Clearly, slowness is a major factor for him in taking tests. Consistent with his experience of slowness in reading and writing, Mr. Sampson scored below average on the "two tests tap[ing] visuomotor processing speed in less (visually) structured tasks than those given by Dr. Michels." On the Rey Complex Figure Test (RCFT) copy trial, he performed at the 2nd - 5th percentile and on the Trailmaking test, part B, he scored only at the 12th percentile, Dr. Anderson noting that because of his confusion, she had to restart the exam, causing the 12th percentile score to be artificially high. Dr. Anderson observed his distractibility and noted that Mr. Sampson shared with her his concerns with struggling to maintain effort, his distractibility, forgetfulness and difficulty following through on tasks. Similarly, on the Stroop Color Word Test, Mr. Sampson did well enough without distraction (Word), but consistent with his distractibility, he performed poorly when confronted with interference. Dr. Anderson diagnosed Mr. Sampson with dyslexia (DSM 315.00) and Unspecified Neurodevelopmental Disorder (DSM 315.9) (f/k/a LD-NOS above). She did not make a diagnosis of ADHD at that time. Dr. Anderson recommended 50% additional time for tests.

5. A letter from Thomas Aronson, MD, dated March 29, 2017 confirming his treatment of Mr. Sampson for learning disabilities and ADHD since November 2015 and saw no sign of change in his disability presentation in those years. He noted, among other things, that Mr. Sampson was substantially limited in the major life activities in and out of the classroom: that he avoided reading, had difficulty finishing tests on time, and difficulty completing tasks. He notes that for Mr. Sampson, "it is painful and agonizingly slow to read." For most people, it is not painful or agonizingly slow to read. Dr. Aronson recommended 50% extended time.

4

**A905**

6.  Letter dated March 29, 2017 from University of Virginia tutor Andrew Lam, MD, confirming that Mr. Sampson demonstrated reading and writing behaviors consistent with symptoms of learning disabilities at the time Dr. Lam tutored him at the University of Virginia. Dr. Lam wrote: "Robert would take substantially longer to read than the average person… it was challenging for him to parse and understand in the short time he was allotted," and "after unraveling one sentence would often forget its meaning as he struggled with the next." He also had difficulty when manipulating equations and spelling, … occasionally write letters or numbers in the wrong order" Dr. Lam encouraged Mr. Sampson to seek a learning disability evaluation. Dr. Lam notes however, that Mr. Sampson experienced a "drastic improvement" when given some additional "time to carefully read and record notes about the content of each paragraph." He confirms that Mr. Sampson needs extended time on the USMLE and states that Mr. Sampson's "lower-than-average reading speed really poses a significant handicap."

7.  March 29, 2017 letter from Stony Brook learning specialist Linda DeMotta supporting Mr. Sampson's request for extended time based on her experience and her work directly with him – "Robert has a slow reading rate and poor visuospatial processing such that he will avoid reading because the reading process is both exhausting and painful. His dyslexia intrudes upon his ability to complete his exams on time, and this… extends to other academic tasks, such as writing papers or completing dissections in the anatomy lab." Together with Mr. Sampson, she worked with him to find other resources through which he could more readily learn, such as videos, hands-on interactions, discussions, and drawings and notes that while he has worked very hard to work around his disabilities, and with "accommodations to give him time to decode, process and organize his thoughts," Mr. Sampson needs 50% extended time on the USMLE because he "cannot control the circumstances of time, task, and location during an exam."

8.  March 27, 2017 letter from Christopher Heedles, LMSW, Supportive Education Counselor at Stony Brook DSS office who states that it is imperative that Mr. Sampson be given 50% extended time on the USMLE;

9.  Certificate of Prior Test Accommodations dated 3/27/17 signed by Christopher Heedles;

10. Report of NBME Shelf Exam scores, dated 3/29/17 from Stony Brook University Medicine;

11. Letter from Andrew Wackett, MD, Associate Dean of Student Affairs to Robert Sampson regarding meeting with the Committee on Academic and Professional Progress to discuss Mr. Sampson's "academic marginality";

12. MCAT score report of 1/31/15;

13. June 2008 ACT score report;

14. 2007 PSAT score report (reading score of 480);

15. 2005 and 2008 SAT score reports;

16. Second grade school report of the administration of the Otis-Lennon School Ability Test (OLSAT) of May 28, 1999 and clearly demonstrating slowness in his reading, completing only 37 of 60 items on the test;

Despite having received the above documentation, by letter dated June 13, 2017, the NBME informed Mr. Sampson that his request for accommodations was denied.  The NBME's letter stated, in part that Dr. Aronson did not sufficiently explain how he went about making his diagnosis or explain why Dr. Michels and Dr. Anderson did not also diagnose ADHD and stated that despite the direct observations of those who have examined and worked most closely with Mr. Sampson, that his scores were all "well within the average range of functioning."  The NBME also stated that "the documentation you provided does not show a record of chronic or pervasive problems managing daily demands for attention, organization, behavioural regulation or executive functioning during your development or currently, nor does it demonstrate a history of problems with reading or learning that impacted your academic functioning or limited a major life activity."

That, of course, is not true (scores in the 16th or 12th or 4th percentile are hardly within the average range, let alone "well within" the average range). Nor is his 16th percentile performance on the Nelson Denny reading comprehension test belied by the below average range reading speed calculation at the 24th percentile. The letter proceeds to lecture about the "persistent and impairing difficulties that interfere with functioning" normally attendant learning disabilities. Assuming arguendo that this is true and required by law, Mr. Sampson's lengthy personal statement and the clinical evaluations by his clinicians demonstrates just that.  Neither his ability to achieve given his extremely superior verbal comprehension abilities, nor his achievements negate his having a disability for which extended time accommodations are needed. The ADA is founded on the principal that people with disabilities can and should achieve and where needed should be provided with accommodations such as those requested by Mr. Sampson. Instead, the NBME's letter recites platitudes that are inaccurate as a matter of law and science and in any event, are inapplicable to Mr. Sampson's presentation of disability.  It is clear from the NBME's denial letter that it believes it is entitled to either ignore the findings of clinicians who have actually evaluated the applicant or to re-diagnose him *in absentia.* Neither is true.

By letter dated June 22, 2017. Mr. Sampson sought a reversal of the NBME's denial of his request for accommodations and attached the following:

17. A letter of appeal by Jan Serrantino, Ed.D., an experienced clinician, teacher, and disability services provider, pointing out in great detail how Mr. Sampson's history and symptoms of learning disabilities were entirely consistent with the science and the law, and demonstrated compellingly how Mr. Sampson's documentation is consistent with the exercise of his legal rights.  Dr. Serrantino also discusses the below referenced letter from Mr. Sampson's parents, and the demonstration in his early education of the difficulties he continues to present in connection with his reading and writing abilities.

18. A letter dated June 17, 2017 from Mr. Sampson's parents, Shelley Sampson and Steven Sampson detailing the significant levels of language and reading therapy and tutoring they provided their son from the age of four (4) through high school, including relevant comments from student

report cards from grades 1-6. It is hard to see how much more developmental such evidence could be.

By letter dated August 1, 2017, the NBME denied Mr. Sampson's appeal. In it the NBME argues that "currently validated theories and empirical research do not support using a discrepancy model as the basis of a diagnosis or rationale for accommodations," citing no such research.  In fact, no such "validated theories" or "empirical research" exists. Despite reports of its death for decades, the discrepancy model remains the hallmark indicator of the presence of learning disabilities. One should be careful to not confuse discrepancy formula with discrepancy model. See, Bartlett v NY Bd of Law Examiners, *supra,* and letter from Jan Serrantino, Ed.D. referenced below. The NBME's letter also argued that there is "no developmental history of problems with reading or learning that impacted your academic functioning or a major life activity[,]" and that the documentation shows "consistent evidence of intact cognitive and academic functioning relative to most people."  Neither is true.

Nevertheless, by undated letter, Mr. Sampson appealed again on November 30, 2017 and attached additional information, including:

19. A letter from Jan Serrantino, Ed.D. dated 10/9/17, further refuting the NBME's rationale for denial, including specific reference to scores in the impaired range. She refuted the NBME's arguments above as they are simply misstatements of the record, and points out for example, that the Step 1 involves more than just reading.  She notes that Mr. Sampson's very significant visual processing and visual recall problems as well as his visuospatial deficits can greatly disadvantage him on the USMLE, because Step 1 also "involves interpretation of graphic or pictorial materials."  She details how the standard the NBME appears to be using is wholly inconsistent with the field and the law because the NBME has essentially required below average functioning,[5] despite the fact that Congress has explicitly stated that is not the standard under the ADA. In addition, she refutes a study on which the NBME appears to be relying in connection with whether accommodations improve everyone's performance. Dr. Aronson also discusses this study in Exhibit A.

20. A letter dated 9/6/17 from Mr. Sampson's psychiatrist, Thomas Aronson, MD detailing how, consistent with the DSM and accepted practice, he arrived at the diagnosis of Mr. Sampson as having ADHD, and why that was not clear to his psychologists.  Dr. Aronson specializes in the treatment of individuals with ADHD and clarifies that contrary to the demands of the NBME, ADHD is a clinical diagnosis made over time, it is not made on the basis of neuropsychological or psychological testing alone, nor do such test results negate a proper clinical diagnosis;[6]

---

[5] "In practical terms, Dr. Flanagan is attempting to do the same thing that I found "seriously infirm" in the first trial--setting a cut-off for the existence of disability. *Bartlett I,* 970 F.Supp. at 1113. In fact, Dr. Flanagan's suggested cut-off-- below the 16th percentile--is even more conservative than Dr. Vellutino's cut- off--below the 30th percentile. To the extent that I found a cut-off of the 30th percentile on tests like the Woodcock and the WRAT to be under-inclusive..., I find a 16th percentile cut-off to be even more problematic." Bartlett VI at 41.
[6] Noted ADHD expert Russell Barkley agrees. In a series of articles in the New York Times in February 2011, he responded to readers' questions about ADHD:

21. A letter from Allison Anderson, Ph.D. dated 8/10/17 responding to the NBME's denial and highlighting his below average results on the NDRT and low average results on the SATA, both of which markedly improved with extended time.

Nevertheless, the NBME again denied his appeal by letter dated January 12, 2018, this time restating certain inaccurate statements made previously and again asserting a "history of unimpaired performances on time standardized testing when compared to appropriate normative samples." This is not true and alludes to the NBME's oft repeated but utter misuse of the pooled sample of the standardization sample of the Nelson Denny which has no properties consistent with its use in clinical assessment and which the NBME knows has no such properties.

22. Mr. Sampson once again appealed, refuting the rationales advanced by the NBME for its denial of Mr. Sampson's application and attaching a further discussion by Jan Serrantino, Ed.D. regarding, *inter alia,* the research cited by the NBME; and

23. A February 2018 letter from Stony Brook University learning specialist Linda De Motta, refuting the above January 12, 2018 statement by NBME Director of Disability Services, Catherine Farmer, Psy.D., regarding the alleged "unimpaired" performance of Mr. Sampson.

The NBME's March 6, 2018 denial again repeats the previously stated flawed rationales and trots out again the long disproven legal arguments, including those centered around the pooled sample of the NDRT standardization sample, suggesting that the NBME intentionally failed to thoroughly review Mr. Sampson's records, since it is apparent that the reports/letters from Mr. Sampson's clinicians – precisely the documentation the NBME requires from applicants – were either deliberately misconstrued or ignored for well over a year.

---

Q. Neuropsychologists do thorough evaluations that can result in a diagnosis of A.D.H.D. with any of a combination of inattention, hyperactivity, impulsivity. There's a lot more to a decent evaluation than questionnaires. And there can be a lot more going on with "attention" problems than garden-variety A.D.H.D.
*GrammyofWanda, Maine*

A. Dr. Barkley responds: While neuropsychological testing may have some value for other learning disabilities or evaluating the extent of cognitive impairment from brain injuries, it is of little or no value in making the diagnosis of A.D.H.D. Interviews with the patient and family, rating scales, the history of the patient and the use of diagnostic criteria from the Diagnostic and Statistical Manual, along with the professional's expert knowledge of differential diagnosis of disorders, are all essential parts to an evaluation.

The only testing that may be needed in such cases is to rule out limited intelligence or learning disabilities as possible coexisting problems that could explain some of the performance difficulties the person may be having in school settings. *Otherwise, there are no psychological, medical or neurological tests that are useful for diagnosing A.D.H.D. (Emphasis added).*

https://consults.blogs.nytimes.com/2011/02/15/when-the-diagnosis-is-a-d-h-d/

**The NBME's decision is fully inconsistent with the law and accepted psychological practice. Nevertheless, we offer the following additional documentation for the NBME's consideration:**

Attached hereto as Exhibit A is a letter from Thomas Aronson, MD, dated June 12, 2018 refuting the NBME's rationale for denial and its assertion that extended time would benefit test takers without disabilities. Dr. Aronson writes of the studies on which the NBME relies,

> You referenced "a body of research" which shows that many people with and without disabilities score higher on tasks when given more time. I am familiar with this literature (e.g. Lewandowski et al, Effects of Extended Time Allotments on Reading Comprehension Performance of College Students With and Without Learning Disabilities, J Psyched Assess 31(3) 326-336, 2013). The literature is limited by small N's, questionable generalizability (e.g. use of college undergraduates, a modified Nelson-Denny Reading Test), atypical baseline characteristics (e.g. the ADHD group performed the same as the typical group on reading comprehension), and unexpected findings such that those without LD's benefited more from extended time than those with LD's. I should point out that Mr. Sampson has been diagnosed since 2013 with both LD (dyslexia) and ADD (inattentive type). There are no studies that I am aware of that have looked at the effect of accommodations in persons with both disorders.
>
> I am troubled by the legalistic hair splitting that "a diagnostic label, in and of itself, does not establish coverage under the ADA….The ADA defines disability as a physical or mental impairment that substantially limits one or more major life activities as compared to most people in the general population." The issue here is that his cognitive deficits do in fact limit him (for example, reading, concentrating, writing, test taking) in his pursuit of a medical degree as substantiated by several properly qualified, credentialed clinicians who conducted individualized assessments of Mr. Sampson. The proper clinical basis of comparison for his disability is the reading behaviors of most people in the general population. Most people do not have widely discrepant cognitive profiles (VCI = 141; PRI = 102), let alone a 2½ standard deviation discrepancy. Most people read with automaticity. Most people don't get exhausted from reading. Most high school students can complete a NDRT within standard time; Mr. Sampson completed only half of the items, and even with 50% extended time, only completed ⅔ of the items, suggesting that double time might be more efficacious. His LD and ADD affect his ability to read, reading speed, writing, concentration, and test taking.

See Exhibit A. Moreover, while the NBME relies on the asserted conclusions of this poorly designed study, the authors themselves point clearly to the limitations of their study and the structure of the Step 1 exam. For one thing, the fact that non-disabled test takers improved with extended time (the stimulus having been calibrated to force examinees not to be able to finish) is unremarkable. What is entirely consistent and proves the need for accommodation is the fact that the LD examinees completed fewer items than the non-LD population. Where the non-LD subjects improved with extended time, so did the LD subjects – only they did not improve as

9

**A910**

much as the non-LD subjects, *because they needed more time;* the authors' stated conclusion is inaccurate.

The study's authors concede however, that test makers should move towards universal design and to do so, the NBME must determine what constructs are important to be measured and proceed to empirically determine what relevance speed has, if any, to the substantive constructs on which the test should be validated. The authors demonstrate that the USMLE has not been validated, that speed is not a construct that is even attempted to be measured, and in the authors' minds at the outset is a predetermination that accommodations are granted arbitrarily, and therefore unfairly. That however can only be laid at the doorstep of the NBME whose policies say one thing (require extensive proof of disability) while its practices say quite another because the evidence is ignored and the judgment of administrative personnel is substituted for that of the clinicians doing the actual individualized assessment.

**Nevertheless, the record is clear and so is the law:** "[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." 29 C.F.R. §1630.2(j)(1)(ii). However, here the record clearly demonstrates that Mr. Sampson's impairments significantly and, often severely, restrict his ability to read, comprehend, learn, concentrate, process information, write, sleep, work, and take tests.

The U.S. Supreme Court's rulings that previously limited protection under the ADA in a manner in which the NBME intentionally seeks to do here, were rejected by Congress ten (10) years ago.[7] Moreover, rulings by lower and appellate courts that relied on those Supreme Court cases, including two cases in which the NBME had successfully defended the claims of plaintiffs who had been denied accommodations were explicitly rejected as well.[8] The ADA Amendments Act "restore[d] the commonsense, meaningful definition of what 'disability' means . . . so [disabled individuals] get the same rights and opportunities that everybody else is guaranteed in this country under the law."[9] The ADA mandates that "the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations, and… whether an individual's impairment is a disability under the ADA should *not* demand extensive analysis." 42 U.S.C. §12101 (b)(5) (emphasis added). The record clearly demonstrates that by refusing to provide Mr. Sampson the 50% extended time accommodations

---

[7] "Too many individuals with documented learning disabilities…are denied access to easily administered and often low-cost accommodations that would make the critical difference in allowing them to demonstrate their knowledge" on standardized examinations. 154 Cong.Rec. H 8286, 8296 (Sept. 17, 2008). The Supreme Court has held that "[t]he Act addresses substantial limitations, not utter inabilities… In the end, the disability definition does not turn on personal choice. When significant limitations result from the impairment, the definition is met even if the difficulties are not insurmountable." Bragdon v. Abbott, 524 U.S. 624, 641 (1998).

[8] In colloquy on the floor of the United States House of Representatives, Representative Fortney "Pete" Stark and House Education Committee Chair George Miller unequivocally rejected Price v. Board of Medical Examiners, 966 F.Supp. 419 (S.D. W.Va. 1997), Gonzalez v. National Board of Medical Examiners, 225 F.3d 620 (6th Cir. 2000), and Wong v. Regents of University of California, 410 F.3d 1052 (9th Cir. 2005), as being inconsistent with the ADA's intent. *See* 2 Cong. Rec. H 8286, 8291 (Sept. 17, 2008).

[9] 2 Cong. Rec. 8291 (Sept. 17, 2008).

10

**A911**

that he currently needs, the NBME has failed to satisfy its legal obligations. The law prohibits the NBME from engaging in extensive analysis and using Mr. Sampson's competent outcomes to discredit the impacts of his disabilities or his need for the accommodations requested, yet that is precisely what it has done.

In Peters v. University of Cincinnati College of Medicine, 2012 WL 3878601 at *6 (S.D.Ohio), the plaintiff was *first* diagnosed with disabilities (ADHD) in medical school and the court nevertheless found that:

> Plaintiff has adduced evidence showing that ADD affects the learning processes in such a way that someone with ADD cannot perform at the level that might be otherwise expected and that it causes problems with focus, attention, organization and inhibitory control. Specific to Plaintiff, the evidence put forth shows that Plaintiff's ADD affected her ability to learn and retain new information and that she struggled more than the average person with organizing her thoughts and registering information. In short, the record supports a finding that Plaintiff is substantially limited in her ability to learn because of her ADD. The facts that she graduated from Middlebury with a dual degree and that she was able to succeed in part in medical school do not change the Court's decision, as these facts merely indicate that she was able to achieve some measure of success despite her disability-they do not speak to her learning ability as compared with the average person. The only evidence in the record that speaks to that is Dr. Krikorian's assessment, which supports a finding of disability. *Defendant's rationale-that anyone who has had some modicum of academic success cannot be found to have a disability that affects learning-flies in the face of Congress' directives and the relevant implementing regulations.* The Court cannot endorse Defendant's rationale, and Defendant has presented no compelling or controlling reason why the Court must.

Pursuant to 29 C.F.R. § 1630.2(j)(4)(iii) "… the focus is on how a major life activity is substantially limited, and not on what outcomes an individual can achieve." (Emphasis added). *See also* NPRM, 79 Fed. Reg. 4839-4862. The federal guidance clarifies further, stating that:

> [c]ondition, manner, or duration may also suggest the amount of time or effort[10] an individual has to expend when performing a

---

[10] In Bartlett VI at 51, Justice Sotomayor, ruling under the narrower pre-ADA Amendments Act standard articulated in Sutton v United Airlines, 527 U.S. 471 (1999), held of a plaintiff who was not formally diagnosed until the age of 40:

> I find that plaintiff is an individual with a disability as defined by the ADA and Section 504. With respect to the specific questions before me on remand, I find that when considering both the positive and negative effects of the mitigating measures which plaintiff employs, plaintiff is substantially limited in the major life activity of reading when compared to most people by her slow reading rate and by the fatigue caused by her lack of automaticity.

major life activity because of the effects of an impairment, *even if the individual is able to achieve the same or similar result as someone without the impairment.*

Appendix to Part 1630—Interpretive Guidance on Title I, 29 C.F.R. Part 1630) (emphasis added).[11]  *See also* NPRM, 79 Fed. Reg. 4839-4862.  In order to accurately read, comprehend written material, and write, Mr. Sampson must work slower and more carefully than most people.  He must reread several times and contend with external and internal distractions that most people will never face.

<u>Considerable Weight Must Be Given To Mr. Sampson's History of Formal and Informal Accommodations</u>.

The Title III regulations governing entities such as the NBME require that "considerable weight" be given to past accommodations, modifications and services.  28 C.F.R. § 36.309(b)(1)(v).  The processes of reading, comprehending, processing information, writing, working, and taking exams are incredibly laborious and time-consuming for Mr. Sampson.  The record demonstrates that even before his symptoms of learning disabilities and ADHD were formally diagnosed while in medical school, he required extended time and indeed used it informally, as evidenced by his history of preferring to take "paper courses" over exam based courses, and the fact that his mother read his text books and assignments to him because he would otherwise not be able to get through the material with his labored reading and need to re-read repeatedly – a common symptom of those with dyslexia. Similarly, his parents were able to provide him with many therapies and other work arounds, including the heavy use of tutors and supplemental/remedial instruction in middle school, high school, and college. The law clearly intended for an individual with Mr. Sampson's profile and pattern of cognitive strengths and weaknesses to be protected by the law.[12]  It is imperative that his request for USMLE accommodations be granted in full.

---

Similarly, Mr. Sampson has consistently reflected on the exhaustion caused by his reading disability, and that evidence is in entirely in keeping with the law.

[11] *See* also "Dear Colleague Letter", dated January 19, 2012, http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201109.html.

[12] A member of Congress – and an original sponsor of the ADA – stated:

> We never expected that the people with disabilities who work to mitigate their conditions would have their efforts held against them, but the courts did exactly that. Those narrow rulings, which will be changed by this legislation, have closed the door of opportunity for millions of Americans.  We're here today to bring those millions of our fellow citizens back to where they belong—where we want them, where we need them, under the protection of the ADA. . . .We make it clear that those who manage to mitigate their disabilities can still be subject to discrimination; we know that intuitively and practically.  This legislation says we know it legislatively.  And we recognize that those regarded as having a disability are equally at risk and deserve to be equally protected.

<u>Id</u>. at H8296.  (Remarks made by U.S. Representative Steny Hoyer.)

Additionally, it is irrational and improper for the NBME to use Mr. Sampson's performance on prior standardized exams taken in high school and/or college to dismiss his current need for extended time accommodations for Step 1. As the NBME must know, the Step exams are nothing like the MCAT in terms of length (half day vs. full day), the length and complexity of the passages and questions, and the fund of knowledge being assessed. The Step 1 is a different, more complexly constructed and much longer test that he has taken previously in his career. In addition, it is required to engage in the practice of medicine. The MCAT is an admissions test, drawing more on memorization than the active cognitive engagement of the in-depth medical and scientific knowledge of the USMLE. Moreover, as Mr. Sampson and his doctors explain, his disabling symptoms are such that compensatory strategies (re-reading, using readers, working around the clock) have met a road block as he progressed through medical school. This experience is not unusual and, in fact, should be expected for someone with Mr. Sampson's symptoms because the nature and extent of the work in medical school is such that he runs out of hours in the day – no amount of compensatory techniques can cut down on the time-consuming nature of what it takes for him to read, write and study on par with most adults, which precludes his having sufficient time for the compressed nature of the medical school reading, writing, studying and test-taking load. Indeed, prior to using accommodations, he performed so poorly on shelf exams that he was in academic jeopardy.

<u>The NBME Must Defer to the Conclusions and Recommendations of Mr. Sampson's Clinicians</u>.

The NBME's refusal to defer to the informed observations and recommendations of Mr. Sampson's highly competent clinicians is a clear violation of the law.[13] The federal enforcement guidance states:

> **Testing entities should defer to documentation from a qualified professional who has made an individualized assessment of the candidate that supports the need for the requested testing accommodations.** Qualified professionals are licensed or otherwise properly credentialed and possess expertise in the disability for which modifications or accommodations are sought. Candidates who submit documentation (such as reports, evaluations, or letters) that is based on careful consideration of the candidate by a qualified professional should not be required by testing entities to submit additional documentation. A testing entity should generally accept such documentation and provide the recommended testing accommodation without further inquiry.

---

[13] Courts have found that entities such as the NBME are not entitled to deference in determining whether an applicant is disabled or what accommodations are necessary to provide equal access. The NBME has no inherent expertise in this regard, and thus its determination is entitled to little, if any, weight. This is especially true where, as here, the record is substantial and establishes a consistent pattern of significant limitation. Courts have held that even for state agencies, which are often accorded a certain level of deference, hiring an "expert consultant" does not accord its determinations any greater deference. *See* <u>Badgett v. Law School Admissions Council</u>, 4:99-CV-0103-M (N.D. Tex. May 25, 2000). As the Second Circuit in <u>Bartlett IV</u> stated, "where deference is due . . . it is not because of the fact finder's status . . . but because of [its] inherent expertise on 'technical matters foreign to the experience of most courts.'" 156 F.3d at 327 (quoting <u>N.Y. Ass'n for Retarded Children v. Carey</u>, 612 F.2d 644, 650 (2d Cir. 1979)).

13

**A914**

> **Reports from qualified professionals who have evaluated the candidate <u>should take precedence</u> over reports from testing entity reviewers who have never conducted the requisite assessment of the candidate for diagnosis and treatment.   This is especially important for individuals with learning disabilities because face-to-face interaction is a critical component of an accurate evaluation, diagnosis, and determination of appropriate testing accommodations.**
>
> **A qualified professional's decision not to provide results from a specific test or evaluation instrument should not preclude approval of a request for testing accommodations where the documentation provided by the candidate, in its entirety, demonstrates that the candidate has a disability and needs a requested testing accommodation**… [if a clinician] recommends the candidate receive double time on standardized exams based on a personal evaluation of the candidate, a testing entity should provide the candidate with double time.  This is true even if the qualified professional does not include every test or subtest score preferred by the testing entity in the psychoeducational or neuropsychological report.[14] (*Emphasis added.*)

Indeed, the importance of clinical evaluation is echoed by well-known researchers and scholars who specialize in cognitive disabilities.[15]  In an article regarding the proper weight to be given to psychological testing published in *American Psychologist,* the authors warn that "[l]ike a stethoscope, a blood pressure gauge, or an MRI scan, a psychological test is a dumb tool, and the worth of the tool cannot be separated from the sophistication of the clinician who draws his inferences from it and then communicates with patients and other professionals."[16] Congress supported this rationale when it amended the ADA in 2008.  *See* 42 U.S.C. § 12102 *and* 2 Cong. Rec. H8286, 8291 (Sept. 17, 2008).   The NBME's conclusory rejection of the findings and recommendations of Mr. Sampson's several doctors is precisely the type of practice that the ADA prohibits.

Additionally, even under the more restrictive standard articulated in <u>Sutton</u>, *supra* and <u>Toyota</u>, 534 U.S. 184 (2002), the court in <u>Bartlett VI</u> reconfirmed Bartlett's entitlements to double time based on the Plaintiff's testimony and recommendations of her expert witnesses. The court also cited to plaintiff's own life experience as the *best gauge* of the amount of extended time she required, ultimately granting double time on the New York State Bar Exam, despite the fact that none of Bartlett's psychometric scores were below the average range (unlike Mr. Sampson's), and despite the fact that Bartlett's dyslexia was not diagnosed until age 40 after she had already completed her Ph.D. in Educational Administration.  <u>Bartlett VI</u>, at 45.  Dr. Sally

---

[14] http://www.ada.gov/regs2014/testing_accommodations.html (Emphasis in original).

[15] See, fn 6, *supra.*

[16] *See* <u>American Psychologist</u>, February 2001, "Psychological Testing and Psychological Assessment--A Review of Evidence and Issues" by Meyer, Gregory J., et al., 128-165, at 153-154.

Shaywitz has written: "[e]xtra time on examinations is a necessity. The amount of time cannot be determined from testing… The only valid gauge is the person's own life experience. *There is absolutely no test that can provide this information*."[17] Like Bartlett's, Mr. Sampson's life experience is entirely in keeping with the law and accepted practice. It is essential that he be properly accommodated with the 50% extended time accommodation that he has requested.

In <u>Argenyi v. Creighton University</u>, Nos. 11–3336, 11–3461, 2013 WL 149803 (C.A.8. Jan 15, 2013), the United States Court of Appeals for the 8th Circuit found that Plaintiff Argenyi's allegations of disability discrimination against his school were supported where his school refused to grant his requests for accommodation, and pointed to Argenyi's clinicians, and urged the school "to consider Argenyi's specific requests, explaining that Argenyi 'is the best person to judge what [assistance may be necessary] since no one else can really understand'" the impact of his disabilities. <u>Id</u>. at 4.[18] Indeed, the same is true for Mr. Sampson and his clinicians.

In <u>Bonnette v. District of Columbia Court of Appeals</u>, 2011 WL 2714896 (D.D.C. July 13, 2011), where plaintiff Bonnette provided the Court with declarations from experts who evaluated her personally and whose professional opinion is that Bonnette would be disadvantaged without the requested testing accommodations, the United States District Court for the District of Columbia found that forcing an individual to take a standardized exam without the accommodations that she requires is discriminatory and "is itself a form of irreparable injury."

Here, the NBME possesses an abundance of documentation from several qualified professionals who assert that Mr. Sampson will be unfairly disadvantaged without the 50% extended time that he has requested for Step 1. If the NBME refuses to reverse its decision and grant Mr. Sampson the testing accommodations that he has requested, he will suffer irreparable injury and will be denied an equal opportunity to fully and accurately demonstrate his knowledge and ability on the USMLE, his right under the pertinent laws.

<u>The NBME Must Provide Mr. Sampson Those Testing Modifications That Would Best Ensure Equality of Opportunity on The USMLE – 50% Extended Time.</u>

As discussed above, the law prohibits the NBME from discriminating against persons with disabilities, including offering examinations in a manner that is not equally accessible to persons with disabilities. 28 C.F.R. § 36.309(b)(1)(i) mandates that:

> [a]ny private entity offering an examination covered by this section must assure that – (i) The examination is selected and administered **so as to best ensure that**, when the examination is administered to an individual with a disability… the examination results accurately reflect the individual´s aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual´s [impairment]. (*Emphasis added.*)

---

[17]Shaywitz, at 322 and 336 (Alfred A. Knopf 2003) (emphasis added).

[18] Remanded for trial, a jury found that Creighton had violated Argenyi's civil rights.

15

**A916**

In <u>Jones v. National Conference of Bar Examiners</u>, No. 5:11-cv-174. 2011 WL 3321507 (D. Vt. Aug. 2, 2011), the District Court found that the Department of Justice's Title III regulations were entitled to deference under U.S. Supreme Court's decision in <u>Chevron v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837 (1984).

Mr. Sampson has a long history of needing (and receiving, often informally) extended time accommodations for exams and readers, but *even if* he had not previously received the requested accommodations at all, the law states that there exists no such requirement. For example, in <u>Enyart v. National Conference of Bar Examiners</u>, 630 F.3d 1153, 1162 (9th Cir. 2011), *cert. denied*, No. 10-1304, 2011 WL 4536525 (U.S. Oct. 3, 2011),[19] the Court, in applying Title III's "best ensure" standard, found that providing a disabled individual an equal opportunity to demonstrate their knowledge and abilities to the same degree as non-disabled individuals may require that a testing entity provide testing modifications that were never provided for in-school examinations.

The NBME is mandated to assure that the USMLE is administered so as to *best ensure* that Mr. Sampson's scores accurately measure his knowledge of the tested subject matter. Indeed, the record and the law clearly demonstrate that this obligation can only be satisfied if Mr. Sampson's disabilities are accommodated with 50% extended test time.

**CONCLUSION**

Mr. Sampson's accommodation request is entirely reasonable given the current impacts of his longstanding learning and attention deficits. The extended time accommodations that Mr. Sampson seeks would not fundamentally alter the USMLE. There can be no other legally acceptable reason for denial of accommodations. By granting Mr. Sampson's request, the NBME will not be giving him any advantage over his fellow test-takers, but will instead be leveling the playing field so that he can accurately demonstrate his knowledge of the information being tested in precisely the manner envisioned by the federal, state, and local laws protecting the rights of individuals with disabilities. We look forward to hearing from you promptly.

Very truly yours,

Jo Anne Simon

cc:    Robert Sampson

---

[19] *See also* <u>Elder v. Nat'l Conference of Bar Examiners</u>, No. C 11-00199 SI, 2011 WL 672662 (N.D. Cal. Feb. 16, 2011). It is important to note that the district court in <u>Enyart</u> held that the defendant's refusal to provide the specialized computer access was also not reasonable.

16

**A917**

Thomas A. Aronson, MD
220 Lake Avenue, Ste. 220
St. James, NY 11780
631-265-0909

June 12, 2018

National Board of Medical Examiners
Disability Services
3750 Market Street
Philadelphia, PA 19104-3102

Re: Robert Drew Sampson, USMLE ID#: 5-385-624-1

To Whom It May Concern:

I am writing in regards to your denials of the testing accommodations request by my patient, Robert Sampson, for the USMLE STEP I. I have already written two letters in support of Mr. Sampson, most recently September 6, 2017. I have reviewed support letters from Jan Serrantino, Ed.D., Linda DeMotta, Learning Specialist, Dr. Anderson's and Dr. Michel's neuropsychological reports, Mr. Sampson's parents' review of teachers' comments and tutors, three appeal letters by Mr. Sampson, and the three letters of denial by Catherine Farmer, Psy. D. and Michelle M. Goldberg, Ph.D. I will try not to rehash the points argued in the documents above, and limit my comments to the most recent denial letter of March 6, 2018.

You referenced "a body of research" which shows that many people with and without disabilities score higher on tasks when given more time. I am familiar with this literature (e.g. Lewandowski et al, Effects of Extended Time Allotments on Reading Comprehension Performance of College Students With and Without Learning Disabilities, J Psychoed Assess 31(3) 326-336, 2013). The literature is limited by small N's, questionable generalizability (e.g. use of college undergraduates, a modified Nelson-Denny Reading Test), atypical baseline characteristics (e.g. the ADHD group performed the same as the typical group on reading comprehension), and unexpected findings such that those without LD's benefited more from extended time than those with LD's. I should point out that Mr. Sampson has been diagnosed since 2013 with both LD (dyslexia) and ADD (inattentive type). There are no studies that I am aware of that have looked at the effect of accommodations in persons with both disorders.

As a medical student, he is now dealing with an altogether different level of cognitive demands than the subjects in the mentioned body of research. Your denial letter argues that because his SATA and NDRT scores fall within the average range without accommodations he is not disabled according to the ADA. First, such "low average" scores are not average for most adults, let alone a medical student. He floundered during his first year in medical school. As Linda De Motta argued, "the medical school record of his standardized exams consistently shows failing exam scores under standard testing conditions and passing scores under accommodated testing conditions." The addition of Vyvanse also certainly helped.

I am troubled by the legalistic hair splitting that "a diagnostic label, in and of itself, does not establish coverage under the ADA....The ADA defines disability as a physical or mental impairment that substantially limits one or more major life activities as compared to most people in the general population." The issue here is that his cognitive deficits do in fact limit him (for example, reading, concentrating, writing, test taking) in his pursuit of a medical degree as substantiated by several

**A918**

properly qualified, credentialed clinicians who conducted individualized assessments of Mr. Sampson. The proper clinical basis of comparison for his "disability" is the reading behaviors of most people in the general population. Most people do not have widely discrepant cognitive profiles (VCI = 141; PRI = 102), let alone a 2½ standard deviation discrepancy. Most people read with automaticity. Most people don't get exhausted from reading. Most high school students can complete a NDRT within standard time; Mr. Sampson completed only half of the items, and even with 50% extended time, only completed ⅔ of the items, suggesting that double time might be more efficacious. His LD and ADD affect his ability to read, reading speed, writing, concentration, and test taking. He was able to get by in high school and college due to his very high intelligence, motivation, and time consuming compensatory strategies (re-reading, working extra hours, tutoring); hence, he was diagnosed relatively late in his academic career. The amount of material to read and master in medical school is at another level. It was first in medical school that he began to academically fail due to his "disabilities," where his time-consuming compensatory strategies met their match – he simply ran out of hours in the day.

All that Mr. Sampson asks is for the NBME provide him with the same accommodations provided by Stony Brook Medical School, which have allowed him to succeed there. Is that really too much to ask?

Sincerely,

Thomas A. Aronson, MD
Associate Professor of Clinical Psychiatry, SUNY at Stony Brook



National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104-3102

215-590-9500 phone
www.nbme.org

**<u>Confidential</u>**

September 7, 2018


**<u>Via E-mail to</u> rds911@gmail.com**
Robert D. Sampson
11 Whitford Rd
Stony Brook, NY 11790

RE: USMLE Step 1                          USMLE ID#: 5-385-624-1

Dear Mr. Sampson:

We have thoroughly reviewed the documentation provided in support of your request for test accommodations for the United States Medical Licensing Examination (USMLE) Step 1. We conducted an individualized review of your request in accordance with the guidelines set forth in the amended Americans with Disabilities Act (ADA).

You report the basis of your request to be Specific Learning Disorder with impairment in reading (dyslexia), reading fluency, word reading accuracy, spelling and Unspecified Neurodevelopmental Disorder, visuospatial memory, visuospatial processing diagnosed in 2013 and Attention Deficit/Hyperactivity Disorder (ADHD) diagnosed in 2015. In your personal statement you report having early speech problems, difficulty reading, poor handwriting, and difficulty spelling. You write, *"I welcomed 4th year level undergraduate course work and masters level classes routinely because not only did I enjoy them more, but the exams were easier for me even though the level of detail and rigor of the material was far greater. The assessments were often project based, not timed, an instead of recalling factoids, they required either creative thought, or the synthesis of ideas...Until medical school, I attempted to continue to do it on my own without accommodations. But medical school exams were even longer in both length of words themselves and the length of the questions and answer choices than I had encountered before. These long vignettes took considerably longer for me to read and exacerbated my weaknesses; I would always run out of time on tests, often being the last person in the exam room when time was called...When my school confronted me about my scores on timed NBME shelf exams (despite doing very well in the rest of the course), I finally realized that „trying my best" wasnot enough. I needed to use the testing accommodations that were granted to me. With accommodations, I was finally able to finish tests, and the result was immediate: I wasn't failing my exams anymore."*

In a February 15, 2018 letter addressed To Whom It May Concern, Linda De Motta, Learning Specialist, Stony Brook School of Medicine writes, *"The records show that sometime prior to medical school, Robert, after studying and practicing well beyond the average time for most students, figured out a way to perform adequately enough under standard testing conditions on two entrance exams that test broad knowledge and aptitude. In medical school, that is not what the record shows at all. The medical school record of his standardized exams consistently shows failing exam scores under standard testing conditions and passing scores under accommodated testing conditions."* Attempts to understate your performances on standardized tests notwithstanding, the records provided show that your performances on every administration of the PSAT, SAT, ACT, and MCAT that you took under standard conditions

**A920**

are well within the Average range compared to the appropriate reference group. These data do not demonstrate impairments that limit any major life activity.

In a June 2018 letter addressed to the NBME, Thomas A. Aronson, M.D. writes, *"As a medical student, he is now dealing with an altogether different level of cognitive demands than the subjects in the mentioned body of research…He floundered during his first year of medical school. As Linda De Motta argued, ,the medical school record of his standardized exams consistently shows failing exam scores under standard testing conditions and passing scores under accommodated testing conditions…" The issue here is that his cognitive deficits do in fact limit him (for example, reading, concentrating, writing, test taking) in his pursuit of a medical degree as substantiated by several properly qualified, credentialed clinicians who conducted individualized assessments of Mr. Sampson…The amount of material to read and master in medical school is at another level. It was first in medical school that he began to academically fail due to his ,,disabilities," where his time-consuming compensatory strategies met their match – he simply ran out of hours in the day."*

The documentation provided to date shows that on standardized rating scales, you and other raters describe levels of ADHD symptom that are in the normal range, rather than the clinical range. Furthermore, you have consistently performed in the average range and above on standardized tests of academic skills taken without accommodations. These data do not demonstrate cognitive deficits or impaired reading, concentrating, writing, or even test taking.

Accommodations are intended to provide access to the USMLE testing program for individuals with a documented disability as defined by the ADA. A diagnostic label, in and of itself, does not establish coverage under the ADA, nor does prior receipt of accommodations for a particular activity guarantee that identical accommodations are indicated or will be available in all future settings and circumstances. The ADA defines disability as a physical or mental impairment that substantially limits one or more major life activities compared to most people in the general population.

Accommodations are provided when there is clear documentation of functional impairment and a rationale to demonstrate that the requested accommodation is appropriate to the setting and circumstance. Your documentation does not demonstrate a substantial limitation in a major life activity as compared to most people or that the requested accommodations are an appropriate modification of your USMLE Step 1 test administration. Therefore, after a thorough review of all of your documentation, I must inform you that we are unable to provide you with the requested accommodations.

We will advise Applicant Services to process your exam application without test accommodations. You may inquire at usmlereg@nbme.org or call Applicant Services directly at (215) 590-9700 with any questions about your scheduling permit.

Sincerely,

Catherine Farmer, Psy.D.
Director, Disability Services
ADA Compliance Officer, Testing Programs

C: Jo Anne Simon, Esquire to JoAnne@joannesimon.com

**A921**

# JO ANNE SIMON, P.C.

356 Fulton Street, 3rd Floor
Brooklyn, New York 11201
www.joannesimon.com

(718) 852-3528 (V/TTY)                                                                    Admitted NY & NJ Bars
(718) 875-5728 (FAX)

November 14, 2018

**Via e-mail to cfarmer@nbme.org and disabilityservices@nbme.org**

Catherine Farmer, Psy.D.
Director of Disability Services
National Board of Medical Examiners
3750 Market Street
Philadelphia, Pennsylvania 19104-3102

**Re:    Robert Sampson/ USMLE ID#: 5-385-624-1**
**Disability Accommodations for USMLE STEP 1**

Dear Dr. Farmer:

We are in receipt of your letter dated September 7, 2018 denying once again Robert
Sampson's request for testing accommodations on the Step 1 of the United States Medical
Licensing Exam (USMLE) in violation od the Americans with Disabilities Act, as amended, 42
U.S.C. §12101, *et seq*. (hereinafter "ADA"), and the New York State Human Rights Law, N.Y.
Exec. L. § 290, *et seq*. (hereinafter "NYSHRL"). We request a reversal of the NBME's latest
discriminatory decision.

As noted previously, the documentation submitted in support of Mr. Sampson's requests
for accommodations was more than sufficient to demonstrate disability, protection by the
aforementioned civil rights laws, and his present and continuing need for, and entitlement to, the
extended test time that he requested.  The record clearly demonstrates that Mr. Sampson's prior
requests for extended time accommodations should have been approved. Nevertheless, by letter
dated June 28 we enclosed additional documentation and requested a review of the entire record
and a decision to provide 50% extended time accommodation that is needed to best ensure that
his scores accurately reflect his knowledge of the subject matter being tested, *his right under the*
*applicable laws.*

An individual has a disability within the meaning of the ADA if that individual suffers a
physical or mental impairment that substantially limits one or more of the individual's major life
activities or major bodily functions.  42 U.S.C. §12102(2)(A). Major life activities include
activities such as reading, writing, concentrating, thinking, learning, processing information,
sleeping, working, and test-taking,[1] and major bodily functions include the operation of the brain.

---

[1] *See* 29 C.F.R. § 1630.2 (i).

**A922**

The legislative history confirms that the protections of the ADA are to be construed liberally.[2] Case law and regulations are consistent with this liberal construction, including case law prior to the 2008 amendments.[3]

Your response indicates not an analysis of the clinical information submitted by his clinicians in accordance with the NBME's extensive documentation requirements, but rather generalized suspicion and a deliberate attempt to paint Mr. Sampson as illegitimately seeking accommodations.  For example, you quote Mr. Sampson's description of 4th year undergraduate exams being easier as they were "often project based, not timed" and "required. . . creative thought or synthesis of ideas" as if this were inconsistent with his having disabilities, when his description clearly goes to the issue of time. Further, after quoting the medical school's learning specialist discussing Mr. Sampson's compensatory strategies for managing his disabilities by over-preparing for basic admissions exams and confirming his having failed standardized medical school tests taken under timed conditions, but  passing those same tests when provided with 50% extended  time, you state, "Attempts to understate your performances on standardized tests notwithstanding, the records provided show that your performances on every administration of the PSAT, SAT, ACT, and MCAT that you took under standard conditions are well within the Average range compared to the appropriate reference group. These data do not demonstrate impairments that limit any major life activity."

That however, is <u>not</u> the standard under the law. Major life activities include activities such as reading, writing, concentrating, thinking, learning, processing information, sleeping, working, and test-taking,[4] and major bodily functions include the operation of the brain. Mr. Sampson has demonstrated substantial limitations in several major life activities. Throughout his education, he has used many tutors and specialists to assist him in extensive preparation – all consistent with the nature and extent of his disabilities. *Moreover, despite your not-so-veiled assertions otherwise, nothing that Mr. Sampson or his clinicians has said regarding his disabilities is inconsistent with his having said disabilities, or his need for the extended time he has requested on the USMLE.*[5] Quite the opposite, the evidence all points to his need for the accommodations he has requested on the USMLE, the only test for which the NBME is responsible for providing

---

[2] *See* 42 U.S.C. § 12102(a)(4).

[3] 2 Cong. Rec. H8291 (Sept.17, 2008) *see also* Bartlett v. N.Y. Bd. of Law Examiners, 2001 WL 930792 (S.D.N.Y. Aug 15, 2001) (hereinafter Bartlett VI); Root v. Ga. Bd. of Veterinary Medicine 114 F.Supp.2d 1324 (N.D. Ga. 2000) *rev'd on other grounds*, No. 00-14751 (11th Cir. 2001); Heiko v. Colombo Savings Bank, 434 F.3d 249 (4th Cir. 2006); Capobianco v. City of N.Y. & NYC Department of Sanitation, 422 F.3d 47 (2d Cir. 2005); Lawson v. CSX Transp., Inc., 245 F.3d 916 (7th Cir. 2001); Fraser v. Goodale, 342 F.3d 1032 (9th Cir. 2004).

[4] *See* 29 C.F.R. § 1630.2 (i).

[5] The NBME appears not to have engaged in the required individualized analysis of Mr. Sampson's request for accommodations, but rather appears to have taken pains to substitute its own view of disability and accessibility, notably failing to explicitly refute the multiple examples of substantial limitations to major life activities that   Mr. Sampson has described in his personal statement, and further described by his clinicians. The NBME has only made disconcertingly vague statements calling into question Mr. Sampson's disabilities, and further fails to rebut Mr. Sampson's claim. The NBME's continual failure to specify any specific reason for disqualifying Mr. Sampson's (and his experts') multiple examples of substantial limitations in major life activities just adds hardship and stress, exacerbating Mr. Sampson's documented disabilities.

2

accommodations.[6] Indeed, even while misstating the legal standard, your letter nevertheless states that accommodations are to be provided "appropriate to the setting and the circumstance," and that is all that Mr. Sampson has requested: accommodations for the USMLE – a test like no other he has taken – so that he can take it under conditions that best ensure his ability to demonstrate his knowledge of the material being tested – his right under the law.

The NBME's reliance on outdated statutory interpretations rejected by Congress in the 2008 Amendments to the ADA in order to buttress its decision is particularly disingenuous given that the NBME was the successful defendant in two of the cases Congress later unequivocally rejected as inconsistent with the ADA's intent: Price v. Board of Medical Examiners, 966 F.Supp. 419 (S.D. W.Va. 1997) and Gonzalez v. National Board of Medical Examiners, 225 F.3d 620 (6th Cir. 2000). See 2 Cong. Rec. H 8286, 8291 (Sept. 17, 2008). The NBME knows that what it is doing here is a violation of the law. It must reverse course now and provide Mr. Sampson with the accommodations he has requested, accommodations similar to those the NBME has provided for other similarly situated and similarly disabled test takers.

The regulatory language and the seminal case in this area indicate quite clearly that average scores or grades do not obviate the presence of disability or the legitimate need for accommodations.[7] See also "Dear Colleague Letter", dated January 19, 2012, http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201109.html.[8] Moreover, Mr. Sampson has a longstanding history of disability, including an Individualized Education Plan (IEP) provided under federal and state special education laws and years of additional tutoring to assist him in his studies and the development of compensatory techniques. Like many young people with dyslexia, his parents read his assignments to him because he would never have been able to read them fluently enough to get through his homework – classic evidence of the presence of a learning disability. Evidence of each of these facts was provided previously. Your correspondence indicates a dismissiveness of the evidence which you try to support by the cherry picking of scores, and a substitution of NBME's unqualified judgment that he does not have a disability. The NBME is not entitled to ignore the clinical reports and diagnostic impressions of his psychiatrist and psychologists who have personally examined him numerous times.

The record amply demonstrates that Mr. Sampson's constellation of impairments continues to impose substantial limitations on his ability to perform the aforementioned major life activities under standard time constraints and conditions. Mr. Sampson is undoubtedly

---

[6] Your characterization of scores being average is not true. Scores in the 16th or 12th or 4th percentile are hardly within the average range, let alone "well within" the average range, as you have stated. Nor is Mr. Sampson's 16th percentile performance on the Nelson Denny Reading Test belied by the below average range reading speed calculation at the 24th percentile.

[7] See Appendix to Part 1630—Interpretive Guidance on Title I, 29 CFR Part 1630) ("This does not mean that disability cannot be shown where an impairment, such as a learning disability, is clinically diagnosed based in part on a disparity between an individual's aptitude and that individual's actual versus expected achievement, taking into account the person's chronological age, measured intelligence, and age-appropriate education.")

[8] See, "Questions and Answers on the ADA Amendments Act of 2008 for Students with Disabilities Attending Public Elementary and Secondary Schools," http://www2.ed.gov/about/offices/list/ocr/docs/dcl-504faq-201109.html.

protected by the ADA and state laws protecting him from disability discrimination;[9] he is entitled to the 50% extended time and a separate room that he has requested from the NBME.

**As stated previously, the record is clear and so is the law:** "[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." 29 C.F.R. §1630.2(j)(1)(ii). However, here the record clearly demonstrates that Mr. Sampson's impairments significantly and, often severely, restrict his ability to read, comprehend, learn, concentrate, process information, write, sleep, work, and take tests. Pursuant to 29 C.F.R. § 1630.2(j)(4)(iii) "… the focus is on how a major life activity is substantially limited, and not on what outcomes an individual can achieve." (Emphasis added). Federal guidance clarifies further, stating that:

> [c]ondition, manner, or duration may also suggest the amount of time or effort[10] an individual has to expend when performing a major life activity because of the effects of an impairment, *even if the individual is able to achieve the same or similar result as someone without the impairment.*

Appendix to Part 1630—Interpretive Guidance on Title I, 29 C.F.R. Part 1630) (emphasis added).[11]

Additionally, it is irrational and improper for the NBME to use Mr. Sampson's performance on prior standardized exams taken in high school and/or college to dismiss his current need for extended time accommodations for Step 1, let alone insinuate that those performances would somehow be more relevant to whether accommodations are needed on the USMLE than medical school exams, including the NBME-created shelf exams, of which Mr.

---

[9] As Dr. Aronson stated in his letter submitted on June 28, 2018, "The proper clinical basis of comparison for his disability is the reading behaviors of most people in the general population. Most people do not have widely discrepant cognitive profiles (VCI = 141; PRI = 102), let alone a 2½ standard deviation discrepancy. Most people read with automaticity. Most people don't get exhausted from reading. Most high school students can complete a NDRT within standard time; Mr. Sampson completed only half of the items, and even with 50% extended time, only completed ⅔ of the items, suggesting that double time might be more efficacious. His LD and ADD affect his ability to read, reading speed, writing, concentration, and test taking."

[10] In <u>Bartlett VI</u> at 51, Justice Sotomayor, ruling under the narrower pre-ADA Amendments Act standard articulated in <u>Sutton v United Airlines</u>, 527 U.S. 471 (1999), held of a plaintiff who was not formally diagnosed until the age of 40:

> I find that plaintiff is an individual with a disability as defined by the ADA and Section 504. With respect to the specific questions before me on remand, I find that when considering both the positive and negative effects of the mitigating measures which plaintiff employs, plaintiff is substantially limited in the major life activity of reading when compared to most people by her slow reading rate and by the fatigue caused by her lack of automaticity.

Similarly, Mr. Sampson has consistently reflected on the exhaustion caused by his reading disability, and that evidence is entirely in keeping with the law.

[11] *See* also "Dear Colleague Letter", dated January 19, 2012, http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201109.html.

4

**A925**

Sampson failed seven (7) taken before securing accommodations from his school – only passing them after 50% extended time was provided by his medical school.

The NBME's refusal to defer to the informed observations and recommendations of Mr. Sampson's highly competent clinicians is a clear violation of the law.[12]  The federal enforcement guidance states: "Testing entities should defer to documentation from a qualified professional who has made an individualized assessment of the candidate that supports the need for the requested testing accommodations. . . Reports from qualified professionals who have evaluated the candidate should take precedence over reports from testing entity reviewers who have never conducted the requisite assessment of the candidate for diagnosis and treatment.[13] (*Emphasis added.*)

In Argenyi v. Creighton University, Nos. 11–3336, 11–3461, 2013 WL 149803 (C.A.8. Jan 15, 2013), the United States Court of Appeals for the 8th Circuit found that Plaintiff Argenyi's allegations of disability discrimination against his school were supported where his school refused to grant his requests for accommodation, and pointed to Argenyi's clinicians, and urged the school "to consider Argenyi's specific requests, explaining that Argenyi 'is the best person to judge what [assistance may be necessary] since no one else can really understand'" the impact of his disabilities.  Id. at 4.[14]  Indeed, the same is true for Mr. Sampson and his clinicians.

## CONCLUSION

Mr. Sampson's accommodation request is entirely reasonable given the current impacts of his longstanding learning and attention deficits.  The extended time accommodations that Mr. Sampson seeks would not fundamentally alter the USMLE.  There can be no other legally acceptable reason for denial of accommodations.  We urge you to re-address this matter and provide the requested accommodations forthwith.

Very truly yours,

Jo Anne Simon

cc:    Robert Sampson
        U.S. Department of Justice,
          Disability Rights Section

---

[12] Courts have found that entities such as the NBME are not entitled to deference in determining whether an applicant is disabled or what accommodations are necessary to provide equal access.  The NBME has no inherent expertise in this regard, and thus its determination is entitled to little, if any, weight. As the Second Circuit in Bartlett IV stated, "where deference is due . . . it is not because of the fact finder's status . . . but because of [its] inherent expertise on 'technical matters foreign to the experience of most courts.'" 156 F.3d at 327 (quoting N.Y. Ass'n for Retarded Children v. Carey, 612 F.2d 644, 650 (2d Cir. 1979)).

[13] http://www.ada.gov/regs2014/testing_accommodations.html (Emphasis in original).

[14] Remanded for trial, a jury found that Creighton had violated Argenyi's civil rights.

5

**A926**



National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104-3102

215-590-9500 phone
www.nbme.org

**<u>Confidential</u>**

January 4, 2019

**<u>Via E-mail to</u> <u>rds911@gmail.com</u>**
Robert D. Sampson
11 Whitford Rd
Stony Brook, NY 11790

RE: USMLE Step 1                    USMLE ID#: 5-385-624-1

Dear Mr. Sampson:

We have thoroughly reviewed your request for reconsideration of our decision regarding test accommodations for the United States Medical Licensing Examination (USMLE) Step 1. We conducted an individualized review of your request and supporting documentation in accordance with the guidelines set forth in the Americans with Disabilities Act (ADA).

In a November 14, 2018 letter, your attorney, Ms. Jo Anne Simon, writes, *"Mr. Sampson's accommodation request is entirely reasonable given the current impacts of his longstanding learning and attention deficits. The extended time accommodations that Mr. Sampson seeks would not fundamentally alter the USMLE. There can be no other legally acceptable reason for denial of accommodations."*

Accommodations are intended to provide access to the USMLE testing program for individuals with a documented disability as defined by the ADA. The ADA defines disability as a physical or mental impairment that substantially limits one or more major life activities compared to most people in the general population.

The NBME carefully considers all evidence in determining whether an individual is substantially limited within the meaning of the ADA and what, if any, accommodations are appropriate to the particular Step exam context. Submitted documentation including the individual's personal statements; letters from advocates; reports of evaluations; and objective information such as school records and scores obtained on high stakes tests taken with and without accommodations are thoroughly reviewed.

Supporting documentation submitted from qualified professionals is a necessary part of any request for accommodations and is carefully reviewed by the NBME. Though not required to defer to the conclusions or recommendations of an applicant's supporting professional, we carefully consider the recommendation of qualified professionals made in accordance with generally accepted diagnostic criteria and supported by reasonable documentation.

**A927**

According to the *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5)*, the hallmark of a learning disability is difficulty in the development and acquisition of basic academic skills particularly during the period of time in which these skills are first taught in early elementary school. Developmental reading difficulties were not reported by your evaluators and there is no indication that you struggled in your efforts to learn to read during the time in which you were taught to read. The complete absence of reading difficulties in elementary school strongly belies the presence of a learning disorder in the area of reading.

Likewise, it is necessary to establish a childhood onset of developmentally deviant symptoms/impairment to receive the ADHD diagnosis as an adult. Beyond self/parent report and testimonials, your documentation provides no objective evidence of clinically significant real world functional impairment in academic, work, social, daily adaptive, or executive functioning relative to most people in the general population.

Ms. Simon's November 14, 2018 letter requesting reconsideration provided no new substantive information or evidence that alters our decision communicated in my letters dated September 7, 2018 and March 6, 2018. Once again, our thorough review found that your documentation does not demonstrate a substantial limitation in a major life activity as compared to most people or that additional testing time is an appropriate modification of your USMLE Step 1 test administration.

Sincerely,

*Catherine Farmer*

Catherine Farmer, Psy.D.
Director, Disability Services
ADA Compliance Officer, Testing Programs

C: Jo Anne Simon JoAnne@joannesimon.com

**A928**

**United States Medical Licensing Examination® (USMLE®)**

## REQUEST FOR TEST ACCOMMODATIONS
*Use this form if you are requesting accommodations on the USMLE for the first time.*

**The National Board of Medical Examiners® (NBME®) processes requests for test accommodations on behalf of the USMLE program**

If you have a documented disability covered under the Americans with Disabilities Act (ADA), you must notify the USMLE in writing <u>each time</u> you apply for a Step examination for which you require test accommodations. Submitting this form constitutes your official notification.

• Review the USMLE Guidelines for Test Accommodations at www.usmle.org/test-accommodations/ for a detailed description of how to document a need for accommodations.

• Complete all sections of this request form; submit the form and all required documentation to Disability Services. In order to begin processing your request, you must have a completed registration for the USMLE Step exam for which you are requesting accommodations.

• NBME will acknowledge receipt of your request by e-mail and audit your submission for completeness. If you do not receive an e-mail acknowledgement within two business days of submitting your request, please contact Disability Services at 215-590-9700 or disabilityservices@nbme.org. You may be asked to submit additional documentation to complete your request.

• **Requests are processed in the order in which they are received. Processing cannot begin until sufficient information is received by NBME and your Step exam registration is complete. Allow at least 60 business days for processing of your request.**

• The outcome of our review will not be released via telephone. All official communications regarding your request will be made in writing. If you wish to modify or withdraw a request for test accommodations, contact Disability Services by e-mail at disabilityservices@nbme.org or by telephone at 215-590-9700.

As explained in the Guidelines to Request Test Accommodations (www.usmle.org/test-accommodations/), you MUST provide supporting documentation verifying your current functional impairment.

<u>**Submit**</u> the following with this form:

✓ A **personal statement** describing your disability and its impact on your daily life and educational functioning.
✓ A completed **Certification of Prior Test Accommodations** form if you received test accommodations in medical school/residency.
✓ A **complete and comprehensive evaluation** from a qualified professional documenting your disability.

✓ **Supporting documentation** such as academic records; score transcripts for previous standardized exams; verification of prior academic/test accommodations; relevant medical records; previous psycho-educational evaluations; faculty or supervisor feedback; job performance evaluations; clerkship/clinical course evaluations; etc.

USMLE® Request for Test Accommodations

## Section A: Exam Information

Place a check next to the examination(s) for which you are **currently registered** *and* requesting test accommodations: (Check all that apply)

[✓] Step 1

[ ] Step 2 CK (Clinical Knowledge)

[ ] Step 3*

*Please be aware that additional test time for Step 3 may involve 3 to 5 days of testing, depending on the requested accommodation (See Section C2).

## Section B: Biographical Information
**Please type or print.**

**B1.** Name: <u>Sampson</u>                    <u>Robert</u>                    <u>D</u>
         Last                                    First                        Middle Initial

**B2.** Date of Birth: <u>04/05/1991</u>

**B3.** USMLE # <u>5</u> - <u>3</u> <u>8</u> <u>5</u> - <u>6</u> <u>2</u> <u>4</u> - <u>1</u> (required)

**B4.** Address:
<u>4118 43rd St Apt 2B</u>
Street
<u>Sunnyside</u>                        <u>NY</u>                <u>11104</u>
City                                State/Province        Zip/Postal Code
<u>USA</u>
Country
<u>631-833-4418</u>
Preferred Telephone Number
<u>rds911@gmail.com</u>
E-mail address

**B5.** Medical School Name: <u>Stony Brook University School of Medicine</u>

Country of Medical School: <u>USA</u>          Date of Medical School Graduation: <u>05/23</u>

**USMLE® Request for Test Accommodations**

## Section C: Accommodations Information

**C1.** Do you require wheelchair access at the examination facility? ☐ Yes ☑ No
If yes, please indicate the number of inches required from the bottom of the table to the floor: _____

**C2.**    **Step 1, Step 2 CK, or Step 3** (computer-based examinations)

Check the appropriate box to indicate the accommodations you are requesting for the exam(s) for which you are currently registered:

**STEP 1: Check ONLY ONE box**
**Additional Break Time**                **Additional Testing Time**
☐ Additional break time **over 1 day**         ☐ 25% Additional test time (Time and 1/4) **over 2 days**

☐ Additional break time **over 2 days**        ☐ 50% Additional test time (Time and 1/2) **over 2 days**

                              ☐ 100% Additional test time (Double time) **over 2 days**

☐ Additional break time **and** 50% Additional test time (Time and 1/2) **over 2 days**

**STEP 2 CK: Check ONLY ONE box**
**Additional Break Time**                **Additional Testing Time**
☐ Additional break time **over 2 days**        ☐ 25% Additional test time (Time and 1/4) **over 2 days**

                              ☐ 50% Additional test time (Time and 1/2) **over 2 days**

                              ☐ 100% Additional test time (Double time) **over 2 days**

☐ Additional break time **and** 50% Additional test time (Time and 1/2) **over 2 days**

**STEP 3: Check ONLY ONE box**
**Additional Break Time**                **Additional Testing Time**
☐ Additional break time **over 4 days**        ☐ 25% Additional test time (Time and 1/4) **over 3 days**

                              ☐ 50% Additional test time (Time and 1/2) **over 4 days**

                              ☐ 100% Additional test time (Double time) **over 5 days**

☐ Additional break time **and** 50% Additional test time (Time and 1/2) **over 4 days**

**Describe** any other accommodation(s) you are requesting for **Step 1**, **Step 2 CK**, or **Step 3**.
Additional break time and 100% Additional test time (Double time) _____

_____

_____

_____

USMLE® Request for Test Accommodations

## Section D: Information About Your Impairment

**D1.** List the **specific DSM/ICD diagnostic code(s) and disability** for which you are requesting accommodations and report the year that it was **first** diagnosed.

| DIAGNOSTIC CODE | DISABILITY | YEAR DIAGNOSED |
|---|---|---|
| 315.00 | Specific Learning Disorder with impairment in reading (dyslexia), reading fluency, word reading accuracy, spelling. | 2013 |
| 315.9 | Unspecified Neurodevelopmental Disorder, visuospatial memory, visuospatial processing. | 2013 |
| F90.2 | Attention Deficit hyperactivity dissorder, predominantly inattentive. | 2015 |
| 315.2 | Specific Learning Disorder with impairment in written expression (spelling and handwriting) | 2020 |
| | | |

## D2. Personal Statement

 **Attach a signed and dated personal statement describing your impairment(s) and how a major life activity is substantially limited.** The personal statement is your opportunity to tell us how your physical or mental impairment(s) substantially limits your current functioning in a major life activity and how the standard examination conditions are insufficient for your needs. In your own words, describe the impact of your disability on your daily life (do not confine your statement to standardized test performance) and provide a rationale for why the specific accommodation(s) you are requesting are necessary in the context of this examination.

## Section E: Accommodation History

Relevant copies were previously provided to NBME

### E1. Standardized Examinations

 **Attach copies of your score report(s) for any previous standardized examination taken.**

 **If accommodations were provided, attach official documentation from each testing agency confirming the test accommodations they provided.**

List the accommodations received for previous standardized examinations such as college, graduate, or professional school admissions tests and professional licensure or certification examinations (if no accommodations were provided, write NONE).

| | | DATE(S) ADMINISTERED | ACCOMMODATION(S) PROVIDED |
|---|---|---|---|
| ☐ | SAT®, ACT® | PSAT   Fall '07 (PSAT), 5/05, 6/08, 6/08, 10/08, 11/08 | NONE |
| ☐ | MCAT® | 8/13, 9/14 | NONE |
| ☐ | GRE® | | |
| ☐ | GMAT® | | |
| ☐ | LSAT® | | |
| ☐ | DAT® | | |
| ☐ | COMLEX® | | |
| ✓ | Other (specify) | 2X time on NBME shelf exams: 10/15/20, 10/16/20, 1/8/21, 2/26/21, 4/9/21, 5/28/21, 7/9/21 1.5X time on NBME shelf exams: 12/8/16, 12/16/16, 1/13/17, all others previously (since 10/6/16) under standard time conditions. | |

**USMLE® Request for Test Accommodations**

**E2. Postsecondary Education**

[Relevant copies were previously provided to NBME]

List each school and all formal accommodations you receive/received, and the dates accommodations were provided:

- **Attach copies of official records from each school(s) confirming the accommodations they provided.**

- **If you receive/received accommodations in <u>medical school and/or residency,</u> have the appropriate official at your medical school/residency complete the <u>USMLE Certification of Prior Test Accommodations</u> form available at www.usmle.org/test-accommodations/forms.html.**

| | SCHOOL | ACCOMMODATIONS PROVIDED | DATES PROVIDED |
|---|---|---|---|
| **Medical/Graduate/ Professional School** | Stony Brook University School of Medicine | 2X Time on exams 1.5X Time on exams | Oct '20—>Current Nov '16—>Oct '20 |
| | Stony Brook University College of Business | 2X Time on exams | July '21—>Current |
| | | | |
| | | | |
| **Undergraduate School** | University of Virginia | NONE | |
| | | | |

**E3. Primary and Secondary School**

[Relevant copies were previously provided to NBME]

List each school and all formal accommodations you received, and the dates accommodations were provided:

- **Attach copies of official records from each school listed confirming the accommodations they provided.**

| | SCHOOL | ACCOMMODATIONS PROVIDED | DATES PROVIDED |
|---|---|---|---|
| **High School** | Ward Melville High School | NONE | |
| | | | |
| **Middle School** | Paul J Gelinas JHS | NONE | |
| | | | |
| **Elementary School** | Minnesauke Elementary School | NONE | |
| | | | |

**A933**

USMLE® Request for Test Accommodations

## Section F:   Certification and Authorization

To the best of my knowledge and belief, the information recorded on this request form is true and accurate.  I understand that my request for accommodations, including this form and all supporting documentation, must be received by the NBME sufficiently in advance of my anticipated test date in order to provide adequate time to evaluate and process my request.

I acknowledge and agree that any information submitted by me or on my behalf may be used by the USMLE program for the following purposes:

- Evaluating my eligibility for accommodations.  When appropriate, my information may be disclosed to qualified independent reviewers for this purpose.
- Conducting research.  Any disclosure of my information by the USMLE program will not contain information that could be used to identify me individually; information that is presented in research publications will be reported only in the aggregate.

I authorize the National Board of Medical Examiners (NBME) to contact the entities identified in this request form, and the professionals identified in the documentation I am submitting in connection with it, to obtain further information.  I authorize such entities and professionals to provide NBME with all requested further information.

I further understand that the USMLE reserves the right to take action, as described in the Bulletin of Information, if it determines that false information or false statements have been presented on this request form or in connection with my request for test accommodations.

Name (print): ___Robert Sampson_____

Signature: ___*Robert Sampson*_____  Date:___4/13/22_____

### Submitting Your Completed Request Form and Supporting Documentation:
**(Do Not Send duplicate documents and Do Not Send by multiple methods as this will delay processing)**

- **Due to business restrictions in Philadelphia because of COVID-19 please submit your request form and supporting documentation via E-mail or Fax.**
- **Requests sent to us via mail may be delayed.**
- **E-mail: Maximum file size is 15 MB (including text in body of email, headers and all attachments). Files larger than 15 MB may require separate emails. All attachments must be in PDF format. Please scan your documents into as few PDF's as possible. Photographs of Personal Items may be in digital format such as JPEGs/JPGs. We are not able to access embedded links.**
- **Fax or Mail: Submit your completed request form and supporting documents to the address below once you register for your exam.**
- **DO NOT bind, staple, paper clip, or tab documents as this may delay processing.**

**Disability Services
NBME
3750 Market Street
Philadelphia, PA 19104-3190
Telephone: (215) 590-9700
Facsimile: (215) 590-9422
E-mail: disabilityservices@nbme.org**

4/13/22

Personal Statement for Accommodations

When I first requested that the National Board of Medical Examiners (NBME) provide the accommodations that my doctors and specialists had determined were necessary, the NBME denied my request and the consequences were profound. On a practical level, I ultimately had to take Step 1 without the accommodations that I need. Without the accommodations my specialists had found necessary, I was unable to pass Step 1. Since that time, I have undergone additional, comprehensive testing. This testing confirms my prior diagnoses of Specific Learning Disorders with impairment in reading, reading fluency, word reading accuracy, and spelling, Attention Deficit Hyperactivity Disorder, and Otherwise Unspecified Neurodevelopmental Disorder in visuospatial memory and processing. This testing also diagnosed additional impairment, specifically Specific Learning Disorder in written expression. New testing concluded, as had past testing, that I require extended time in order to have access to examinations. Based on this new testing, my medical school which had previously been providing 1.5x, began providing double time for all examinations, including shelf exams.

While all of these diagnoses surely have meaning to experts in terms of my need for accommodations, to me they give labels for what has always been true. For as long as I can remember, I have struggled to read, to perform tasks in a timely manner, and to maintain attention.  Everyday tasks that others take for granted have always been harder for me than they were for others. When I was in nursery school, I remember not being able to finish my words (severely stuttering) and getting frustrated with the pronunciation of words as my family tried to provide early intervention for my speech problems. I didn't understand how my peers weren't struggling with the same problems.

When I was in elementary school, the teacher would tell us to read a certain part of a page silently to ourselves in class, and I would always be nervous because I never was able to read the part the rest of the class was able to read within the allotted time. Also, I was embarrassed to read aloud in class because when my teacher would ask me what I thought about what I read, I knew I had just read the passage, but it seemed that by reading aloud, I had no working knowledge of what I had just read. I would need to re-read silently (multiple times) to myself to answer any questions. In addition, my handwriting was described as atrocious by my teachers, and I would routinely have to re-write my assignments because my teachers could not read my writing. They thought I was being lazy or sloppy with my writing, but this was not the case. My handwriting lacked structure and often switched between cursive and print sometimes even mid word. My spelling was also so poor to the point that I had to avoid many words when writing class essays because I was not sure how to spell the word and instead would choose words I could spell. This negatively impacted the quality of my writing and my ability to communicate my thoughts accurately.

In junior high school and high school, I continued to struggle with reading and writing in a way that my peers did not. Although I was working as hard or harder than my peers, I simply could not read assigned books because it took me too long to read the full text and to derive meaning.

**A935**

The struggle to read was exhausting, and I compensated by relying on summaries, spark notes, and significant intervention by subject matter tutors.

Whereas in elementary school we had few timed tests, in junior high school and high school, exams were timed and I routinely was mocked for being the last person to finish an exam because it took me more time (often not finishing), and for asking the most questions. In class, on tests, and in just about any environment (home, exploring, research, etc.) I would ask many more questions than a typical person. Part of this was because I was curious, but it became clearer to me as I got older that I did not make the same definite connections between thoughts that other people were making. Some of my teachers used to joke that I had no common sense when I asked apparently self-evident questions, but I think the truth was that I didn't seem to have the same schemas of information that other peers had. Their brain seemed to "get it" faster, and seemed to apply context much better.

I am so grateful that I with significant private intervention including tutors, I was able to learn. I am proud of the hours every day I spent with tutors just to learn material, it was embarrassing that this degree of intervention was necessary. People told me I was smart and yet I was slower than all the other students in my class in reading and processing information. I wasn't able to focus in class long enough to learn, so material had to be repeated multiple times verbally with a private tutor one-on-one later.

What I knew about my weaknesses lead me to select a university that was more laid back, and the schedule was such that I had more time to study and take tests with a more hands on environment. In college I avoided any large lecture hall style class that had tightly timed multiple-choice format exams, and opted for open ended, less time restrictive round table discussion classes, or classes that involved hands-on research. I would routinely run out of time on timed multiple-choice tests, scoring poorly, but I would find success if the exam was open-ended and paper based, or necessitated a discussion of the procedures I learned. I would go as far as to frequent project-based classes that had no exams. I welcomed 4th year level undergraduate course work and masters level classes routinely because not only did I enjoy them more, but despite the greater rigor, I was able to demonstrate what I knew rather than the limits imposed by my disabilities. The assessments were often project based, not timed, and instead of recalling factoids, they required either creative thought, or the synthesis of ideas.

I have a great deal of difficulty remembering words in order, even for things I have been reciting since early childhood. For example, I can't remember the order of the words in the Pledge of Allegiance, something which is not even very long, and I've said it thousands of times. I can only "remember" them if I am part of a group reciting it. The same holds true for the brief weekly religious prayers with which I was raised.

The way I process events and recall them is different than others. For a gap year between college and medical school, I volunteered as an Emergency Medical Technician (EMT). My biggest struggle with the job was actually the written report I had to compose at the end of each rescue mission. While I had a good memory of what happened, I remembered the events as they happened sequentially in time, like a tape recording, and this is how I wrote my reports. However, my team leaders needed me to write reports following a specific standardized order of

topics that had to be addressed (for example, chief complaint, history of present illness, past medical history, etc). I was the only one in my rescue squad who struggled with this because they were using topics and themes to group the memories, not time. It was arduous and very time consuming for me, thus I took significantly longer to finish my reports.

On a given day, the way I take in most of my information is by watching online videos, watching the news on tv, and normally hearing information presented in the form of a debate where I can form opinions and actively consider the argument in my head. In that way I can avoid as much as possible the continuous re-reading that I must do in order to understand what I have read.

For the most part, I do not read, unless there is no way around it. In classes, this meant reading very short summaries in cliffs notes and spark notes (which still was tedious and difficult for me because I have to continuously read and re-read). In order to do what classmates could do, I had to rely on tutors who socratically asked me about the plot and character development, because my disabilities make learning from written materials extraordinarily difficult. I must read and reread to derive meaning and maintain a working memory of the main idea of sentences and paragraphs. It's an exhausting process for me to string together sentences. It isn't for most people. Because of this problem, to prepare for exams, I had to place much greater emphasis on doing practice questions rather than reading primary source materials to learn.

It is interesting to note that when I read, I actually need to hear the words in my head being said, which significantly slows me down, but it allows me to understand what I am reading. I cannot simply look at the words and "read" them to myself silently as most other people do.

Similarly, I learned music by avoiding reading entirely. I learned it by ear (sound), and I listened over and over again how something was supposed to sound.

Often if asked to do a chore/favor, I'll listen, but most of the time I will end up forgetting and needing to be reminded 2-3 times. It's very embarrassing because it is beyond what is normal for my peers. To cope, I write down everything I need to do on a list that I keep on my cellphone with activated reminders. Otherwise I will get distracted and forget. This has caused me in the past to forget appointments, miss deadlines, forget about engagements with friends, and forget to timely renew things like my DMV registration.

Compensatory techniques and medication have helped me but they have not made my challenges with attention disappear. The techniques I have had to rely on to derive meaning and use written materials are time consuming.

While I knew all of this, I was also embarrassed by it. When I entered medical school I did not seek the accommodations that I needed until it became clear I was not able to demonstrate my knowledge on medical school exams, which were longer in both length of words themselves and the length of the questions and answer choices than I had encountered before. These long vignettes took considerably longer for me to read and exacerbated my weaknesses; I would always run out of time on tests, often being the last person in the exam room when time was called. When my school confronted me about my scores on timed NBME shelf exams (despite doing very well in the rest of the course), I finally realized that "trying my best" was not enough.

**A937**

I needed to use the testing accommodations that specialists had determined I needed. With accommodations, the result was immediate: I wasn't failing my exams anymore.

When I progressed to 3rd year clinical clerkships, I got the updated learning testing at Mount Sinai that indicated I required doubled time on timed exams. For the Step 2 style vignettes in shelf exams it turned out that I needed every bit of this time to be able to finish my exams. I continued to use double time in my joint degree MBA program with the College of Business at Stony Brook and required that extra time to be able to finish all timed exams.

In fact, for business school, in addition to the additional time on exams that I required, I made use of note taking software, and a private tutor for certain classes such as accounting, because I wasn't able to absorb the information fast enough after hearing it in lecture.

In hindsight, I wish I had been tested for learning disabilities and used accommodations earlier. While hard work has helped make me who I am, it is a double-edged sword that caused me to struggle for so many years. I learned the hard way that extra "grit," and copious tutors were no match for my core problems of dyslexia and ADHD. It does not seem fair to hold my history of grit, determination and numerous tutors against me. They helped me get around some impacts of my disabilities, but they did not obviate them.

Because the USMLE Step 1 is a vignette based multiple choice exam, this style of exam exacerbates the impacts of both my low reading speed and my slow processing speed forcing me to leave large sections of the exam either unanswered, or guessed on. I need at 2X additional time, hence my request for 2X additional time on the Step 1 exam. I know this is needed because when multiple other interventions were tried, either informally or formally, 2X extra time is the only intervention that has been shown to alleviate the impacts of my reading and attentional disabilities. With 2X extended time, I was able to show what I knew and I did well. Time didn't give me knowledge I didn't have; it allowed me to show what I knew.

In the end, it is incredibly painful to ask for accommodations, but without extended time I simply cannot access the examination and show my knowledge. My learning disorders, processing disorders and ADHD together prevent me from having access without the double time that comprehensive, independent testing concluded that I need. I am hopeful the NBME will not overlook the numerous skilled professionals who have independently evaluated me and treated me and have reached this same conclusion.

Best,

Robert Sampson

*[signature]*

**A938**

SEALED

2020 Wasserstein Evaluation,
Sampson Hearing Ex. 37



**Highly Confidential**

June 1, 2022

Robert D. Sampson
4118 43rd St., Apt 2 B
Sunnyside, NY 11104

RE: USMLE Step 1                                           USMLE ID#: 5-385-624-1

Dear Robert D. Sampson:

We have thoroughly reviewed the documentation you provided in support of your request for test accommodations on the United States Medical Licensing Examination (USMLE) Step 1. We conducted an individualized review of your request in accordance with the guidelines set forth in the amended Americans with Disabilities Act (ADA).

You have requested 100% additional test time (double time) and additional break time on the basis of Specific Learning Disorder with impairment in reading (dyslexia), reading fluency, word reading accuracy, spelling, and Unspecified Neurodevelopmental Disorder, visuospatial memory, visuospatial processing diagnosed in 2013; Attention-Deficit/Hyperactivity Disorder, predominantly inattentive (ADHD) diagnosed in 2015; and Specific Learning Disorder with impairment in written expression diagnosed in 2020. You previously submitted initial and reconsideration requests for accommodations for Step 1 on the basis of these disorders and in our June 13, 2017, August 1, 2017, January 12, 2018, March 6, 2018, September 7, 2018, and January 4, 2019 letters addressed to you, we explained that your documentation did not demonstrate a substantial limitation in a major life activity as compared to most people or that the requested accommodations were an appropriate modification of your test administration.

You write in your April 13, 2022 Personal Statement for Accommodations, "*New testing concluded, as had past testing, that I require extended time in order to have access to examinations. Based on this new testing, my medical school which had previously been providing 1.5x, began providing double time for all examinations, including shelf exams…Because the USMLE Step 1 is a vignette based multiple choice exam, this style of exam exacerbates the impacts of both my low reading speed and my slow processing speed forcing me to leave large sections of the exam either unanswered, or guessed on. I need at 2X additional time, hence my request for 2X additional time on the Step 1 exam.*" We note the accommodations your medical school has elected to provide to you. While NBME gives considerable weight to documentation of past and present accommodations, the fact that you have previously received a particular accommodation in other contexts is not, in itself, a sufficient demonstration of your need for accommodations on the USMLE.

Received in support of your current request was an August 2020 report of Neuropsychological Evaluation by Jeanette Wasserstein, Ph.D. and Kim Miller, Ph.D. who write, "*Robert Sampson is a 3rd year medical student at Renaissance School of Medicine at Stony Brook University with a history of having received time accommodations throughout medical school, including on the NBME shelf exams. Mr. Sampson is currently requesting an updated neuropsychological evaluation as part of his appeal to the National Board of Medical Examiners' (NBME) regarding their past decisions to deny him accommodations on the USMLE Step Exams. Mr. Sampson's initial application was denied in June 2017. Thereafter he appealed this decision multiple time and received his 4th denial letter in March 2018…Given his significant reading comprehension difficulties, he meets criteria for a DSM-5 diagnosis of Specific Learning Disorder with impairment in reading (reading fluency*

and reading comprehension), as well as impairment in written expression (spelling and handwriting). Based on current test results and prior history and diagnosis, Mr. Sampson also meets criteria for Attention Deficit/Hyperactivity Disorder, Combined Presentation." Your evaluators provide recommendations writing, "For testing, standardized or in class, extended time is warranted. Currently, double time is strongly advised because of his significantly slowed reading fluency and because he has found even with time and half [sic] he is often not able to finish Step exams."

We carefully reviewed and considered the information and recommendations presented by your evaluators, as well as the entirety of your submission for accommodations. Regardless of the assigned diagnoses, there is insufficient evidence to support a need for accommodations to access the USMLE. Your most recent 2020 performances on a range of relevant cognitive and academic achievement tasks, including Processing Speed, Working Memory, Logical Memory, Perceptual Reasoning, Executive Functions, Spelling , Essay Composition, Sentence Composition, Sentence Writing Fluency, Word Reading, Pseudoword Decoding, Reading Comprehension, Oral Reading Fluency, Oral Reading Accuracy, Oral Reading Rate, and Sentence Reading Fluency, are all largely within the Average to Superior range of functioning (under timed and untimed conditions) and not indicative of an impairment that substantially limits you in comparison to most people in the general population. While we note your reported below average scores on two select reading related tasks (Reading Rate and Reading Comprehension) on the Nelson-Denny Reading Test, these scores are inconsistent with your prior performance on your 2013 evaluation as well as your history of unimpaired performances on real-world high stakes standardized tests taken without accommodations. You report that you did not receive accommodations in any academic setting, up to medical school, or for any standardized testing including the PSAT, SAT, ACT, and MCAT. Taken altogether, your documentation does not demonstrate that standard test timing is a barrier to your access to the USMLE.

Accommodations are intended to ensure that individuals with a documented disability as defined by the Americans with Disabilities Act (ADA) can take the USMLE exams in an accessible place and manner. A diagnostic label, in and of itself, does not establish coverage under the ADA, nor does prior receipt of accommodations for a particular activity guarantee that identical accommodations are indicated or will be available in all future settings and circumstances. The ADA defines disability as a physical or mental impairment that substantially limits a person's ability to perform one or more major life activities, as compared to most people in the general population. Therefore, not every impairment will constitute a disability.

Your documentation does not demonstrate that the requested accommodations are an appropriate modification of your USMLE Step 1 test administration. Therefore, after a thorough review of all of your documentation, I must inform you that we are unable to provide you with the requested accommodations. We will process your USMLE Step 1 exam application without test accommodations at this time. You may inquire at usmlereg@nbme.org or call Applicant Services directly at (215) 590-9700 with any questions about your scheduling permit.

Please monitor the Prometric website at www.prometric.com/corona-virus-update for up-to-date information and test center procedures related to the impact of the coronavirus (COVID-19) pandemic.

Sincerely,

Disability Services

the specific reason that the presentation does not meet the criteria for attention-deficit/ hyperactivity disorder or any specific neurodevelopmental disorder. This is done by recording "other specified attention-deficit/hyperactivity disorder" followed by the specific reason (e.g., "with insufficient inattention symptoms").

# Unspecified Attention-Deficit/ Hyperactivity Disorder

## 314.01 (F90.9)

This category applies to presentations in which symptoms characteristic of attention-deficit/hyperactivity disorder that cause clinically significant distress or impairment in social, occupational, or other important areas of functioning predominate but do not meet the full criteria for attention-deficit/hyperactivity disorder or any of the disorders in the neurodevelopmental disorders diagnostic class. The unspecified attention-deficit/hyperactivity disorder category is used in situations in which the clinician chooses *not* to specify the reason that the criteria are not met for attention-deficit/hyperactivity disorder or for a specific neurodevelopmental disorder, and includes presentations in which there is insufficient information to make a more specific diagnosis.

# Specific Learning Disorder

## Specific Learning Disorder

### Diagnostic Criteria

A. Difficulties learning and using academic skills, as indicated by the presence of at least one of the following symptoms that have persisted for at least 6 months, despite the provision of interventions that target those difficulties:

1. Inaccurate or slow and effortful word reading (e.g., reads single words aloud incorrectly or slowly and hesitantly, frequently guesses words, has difficulty sounding out words).
2. Difficulty understanding the meaning of what is read (e.g., may read text accurately but not understand the sequence, relationships, inferences, or deeper meanings of what is read).
3. Difficulties with spelling (e.g., may add, omit, or substitute vowels or consonants).
4. Difficulties with written expression (e.g., makes multiple grammatical or punctuation errors within sentences; employs poor paragraph organization; written expression of ideas lacks clarity).
5. Difficulties mastering number sense, number facts, or calculation (e.g., has poor understanding of numbers, their magnitude, and relationships; counts on fingers to add single-digit numbers instead of recalling the math fact as peers do; gets lost in the midst of arithmetic computation and may switch procedures).
6. Difficulties with mathematical reasoning (e.g., has severe difficulty applying mathematical concepts, facts, or procedures to solve quantitative problems).

**A942**

B. The affected academic skills are substantially and quantifiably below those expected
   for the individual's chronological age, and cause significant interference with academic
   or occupational performance, or with activities of daily living, as confirmed by individu-
   ally administered standardized achievement measures and comprehensive clinical
   assessment. For individuals age 17 years and older, a documented history of impairing
   learning difficulties may be substituted for the standardized assessment.

C. The learning difficulties begin during school-age years but may not become fully man-
   ifest until the demands for those affected academic skills exceed the individual's lim-
   ited capacities (e.g., as in timed tests, reading or writing lengthy complex reports for a
   tight deadline, excessively heavy academic loads).

D. The learning difficulties are not better accounted for by intellectual disabilities, uncor-
   rected visual or auditory acuity, other mental or neurological disorders, psychosocial
   adversity, lack of proficiency in the language of academic instruction, or inadequate
   educational instruction.

**Note:** The four diagnostic criteria are to be met based on a clinical synthesis of the indi-
vidual's history (developmental, medical, family, educational), school reports, and psycho-
educational assessment.

**Coding note:** Specify all academic domains and subskills that are impaired. When more
than one domain is impaired, each one should be coded individually according to the fol-
lowing specifiers.

*Specify* if:

### 315.00 (F81.0) With impairment in reading:

Word reading accuracy
Reading rate or fluency
Reading comprehension

**Note:** *Dyslexia* is an alternative term used to refer to a pattern of learning difficulties
characterized by problems with accurate or fluent word recognition, poor decoding,
and poor spelling abilities. If dyslexia is used to specify this particular pattern of dif-
ficulties, it is important also to specify any additional difficulties that are present,
such as difficulties with reading comprehension or math reasoning.

### 315.2 (F81.81) With impairment in written expression:

Spelling accuracy
Grammar and punctuation accuracy
Clarity or organization of written expression

### 315.1 (F81.2) With impairment in mathematics:

Number sense
Memorization of arithmetic facts
Accurate or fluent calculation
Accurate math reasoning

**Note:** *Dyscalculia* is an alternative term used to refer to a pattern of difficulties char-
acterized by problems processing numerical information, learning arithmetic facts,
and performing accurate or fluent calculations. If dyscalculia is used to specify this
particular pattern of mathematic difficulties, it is important also to specify any addi-
tional difficulties that are present, such as difficulties with math reasoning or word rea-
soning accuracy.

*Specify* current severity:

**Mild:** Some difficulties learning skills in one or two academic domains, but of mild enough
severity that the individual may be able to compensate or function well when provided with
appropriate accommodations or support services, especially during the school years.

**A945**

**Moderate:** Marked difficulties learning skills in one or more academic domains, so that the individual is unlikely to become proficient without some intervals of intensive and specialized teaching during the school years. Some accommodations or supportive services at least part of the day at school, in the workplace, or at home may be needed to complete activities accurately and efficiently.

**Severe:** Severe difficulties learning skills, affecting several academic domains, so that the individual is unlikely to learn those skills without ongoing intensive individualized and specialized teaching for most of the school years. Even with an array of appropriate accommodations or services at home, at school, or in the workplace, the individual may not be able to complete all activities efficiently.

## Recording Procedures

Each impaired academic domain and subskill of specific learning disorder should be recorded. Because of ICD coding requirements, impairments in reading, impairments in written expression, and impairments in mathematics, with their corresponding impairments in subskills, must be coded separately. For example, impairments in reading and mathematics and impairments in the subskills of reading rate or fluency, reading comprehension, accurate or fluent calculation, and accurate math reasoning would be coded and recorded as 315.00 (F81.0) specific learning disorder with impairment in reading, with impairment in reading rate or fluency and impairment in reading comprehension; 315.1 (F81.2) specific learning disorder with impairment in mathematics, with impairment in accurate or fluent calculation and impairment in accurate math reasoning.

## Diagnostic Features

Specific learning disorder is a neurodevelopmental disorder with a biological origin that is the basis for abnormalities at a cognitive level that are associated with the behavioral signs of the disorder. The biological origin includes an interaction of genetic, epigenetic, and environmental factors, which affect the brain's ability to perceive or process verbal or nonverbal information efficiently and accurately.

One essential feature of specific learning disorder is persistent difficulties learning keystone academic skills (Criterion A), with onset during the years of formal schooling (i.e., the developmental period). Key academic skills include reading of single words accurately and fluently, reading comprehension, written expression and spelling, arithmetic calculation, and mathematical reasoning (solving mathematical problems). In contrast to talking or walking, which are acquired developmental milestones that emerge with brain maturation, academic skills (e.g., reading, spelling, writing, mathematics) have to be taught and learned explicitly. Specific learning disorder disrupts the normal pattern of learning academic skills; it is not simply a consequence of lack of opportunity of learning or inadequate instruction. Difficulties mastering these key academic skills may also impede learning in other academic subjects (e.g., history, science, social studies), but those problems are attributable to difficulties learning the underlying academic skills. Difficulties learning to map letters with the sounds of one's language—to read printed words (often called *dyslexia*)—is one of the most common manifestations of specific learning disorder. The learning difficulties manifest as a range of observable, descriptive behaviors or symptoms (as listed in Criteria A1–A6). These clinical symptoms may be observed, probed by means of the clinical interview, or ascertained from school reports, rating scales, or descriptions in previous educational or psychological assessments. The learning difficulties are persistent, not transitory. In children and adolescents, *persistence* is defined as restricted progress in learning (i.e., no evidence that the individual is catching up with classmates) for at least 6 months despite the provision of extra help at home or school. For example, difficulties learning to read single words that do not fully or rapidly remit with the provision of instruction in phonological skills or word identification strategies may indicate a specific

learning disorder. Evidence of persistent learning difficulties may be derived from cumulative school reports, portfolios of the child's evaluated work, curriculum-based measures, or clinical interview. In adults, persistent difficulty refers to ongoing difficulties in literacy or numeracy skills that manifest during childhood or adolescence, as indicated by cumulative evidence from school reports, evaluated portfolios of work, or previous assessments.

A second key feature is that the individual's performance of the affected academic skills is well below average for age (Criterion B). One robust clinical indicator of difficulties learning academic skills is low academic achievement for age or average achievement that is sustainable only by extraordinarily high levels of effort or support. In children, the low academic skills cause significant interference in school performance (as indicated by school reports and teacher's grades or ratings). Another clinical indicator, particularly in adults, is avoidance of activities that require the academic skills. Also in adulthood, low academic skills interfere with occupational performance or everyday activities requiring those skills (as indicated by self-report or report by others). However, this criterion also requires psychometric evidence from an individually administered, psychometrically sound and culturally appropriate test of academic achievement that is norm-referenced or criterion-referenced. Academic skills are distributed along a continuum, so there is no natural cutpoint that can be used to differentiate individuals with and without specific learning disorder. Thus, any threshold used to specify what constitutes significantly low academic achievement (e.g., academic skills well below age expectation) is to a large extent arbitrary. Low achievement scores on one or more standardized tests or subtests within an academic domain (i.e., at least 1.5 standard deviations [SD] below the population mean for age, which translates to a standard score of 78 or less, which is below the 7th percentile) are needed for the greatest diagnostic certainty. However, precise scores will vary according to the particular standardized tests that are used. On the basis of clinical judgment, a more lenient threshold may be used (e.g., 1.0–2.5 SD below the population mean for age), when learning difficulties are supported by converging evidence from clinical assessment, academic history, school reports, or test scores. Moreover, since standardized tests are not available in all languages, the diagnosis may then be based in part on clinical judgment of scores on available test measures.

A third core feature is that the learning difficulties are readily apparent in the early school years in most individuals (Criterion C). However, in others, the learning difficulties may not manifest fully until later school years, by which time learning demands have increased and exceed the individual's limited capacities.

Another key diagnostic feature is that the learning difficulties are considered "specific," for four reasons. First, they are not attributable to intellectual disabilities (intellectual disability [intellectual developmental disorder]); global developmental delay; hearing or vision disorders, or neurological or motor disorders) (Criterion D). Specific learning disorder affects learning in individuals who otherwise demonstrate normal levels of intellectual functioning (generally estimated by an IQ score of greater than about 70 [±5 points allowing for measurement error]). The phrase "unexpected academic underachievement" is often cited as the defining characteristic of specific learning disorder in that the specific learning disabilities are not part of a more general learning difficulty as manifested in intellectual disability or global developmental delay. Specific learning disorder may also occur in individuals identified as intellectually "gifted." These individuals may be able to sustain apparently adequate academic functioning by using compensatory strategies, extraordinarily high effort, or support, until the learning demands or assessment procedures (e.g., timed tests) pose barriers to their demonstrating their learning or accomplishing required tasks. Second, the learning difficulty cannot be attributed to more general external factors, such as economic or environmental disadvantage, chronic absenteeism, or lack of education as typically provided in the individual's community context. Third, the learning difficulty cannot be attributed to a neurological (e.g., pediatric stroke) or motor disorders or to vision or hearing disorders, which are often associated with problems learning academic skills but are distinguishable by presence of neurological signs.

Finally, the learning difficulty may be restricted to one academic skill or domain (e.g., reading single words, retrieving or calculating number facts).

Comprehensive assessment is required. Specific learning disorder can only be diagnosed after formal education starts but can be diagnosed at any point afterward in children, adolescents, or adults, providing there is evidence of onset during the years of formal schooling (i.e., the developmental period). No single data source is sufficient for a diagnosis of specific learning disorder. Rather, specific learning disorder is a clinical diagnosis based on a synthesis of the individual's medical, developmental, educational, and family history; the history of the learning difficulty, including its previous and current manifestation; the impact of the difficulty on academic, occupational, or social functioning; previous or current school reports; portfolios of work requiring academic skills; curriculum-based assessments; and previous or current scores from individual standardized tests of academic achievement. If an intellectual, sensory, neurological, or motor disorder is suspected, then the clinical assessment for specific learning disorder should also include methods appropriate for these disorders. Thus, comprehensive assessment will involve professionals with expertise in specific learning disorder and psychological/cognitive assessment. Since specific learning disorder typically persists into adulthood, reassessment is rarely necessary, unless indicated by marked changes in the learning difficulties (amelioration or worsening) or requested for specific purposes.

## Associated Features Supporting Diagnosis

Specific learning disorder is frequently but not invariably preceded, in preschool years, by delays in attention, language, or motor skills that may persist and co-occur with specific learning disorder. An uneven profile of abilities is common, such as above-average abilities in drawing, design, and other visuospatial abilities, but slow, effortful, and inaccurate reading and poor reading comprehension and written expression. Individuals with specific learning disorder typically (but not invariably) exhibit poor performance on psychological tests of cognitive processing. However, it remains unclear whether these cognitive abnormalities are the cause, correlate, or consequence of the learning difficulties. Also, although cognitive deficits associated with difficulties learning to read words are well documented, those associated with other manifestations of specific learning disorder (e.g., reading comprehension, arithmetic computation, written expression) are underspecified or unknown. Moreover, individuals with similar behavioral symptoms or test scores are found to have a variety of cognitive deficits, and many of these processing deficits are also found in other neurodevelopmental disorders (e.g., attention-deficit/hyperactivity disorder [ADHD], autistic spectrum disorder, communication disorders, developmental coordination disorder). Thus, assessment of cognitive processing deficits is not required for diagnostic assessment. Specific learning disorder is associated with increased risk for suicidal ideation and suicide attempts in children, adolescents, and adults.

There are no known biological markers of specific learning disorder. As a group, individuals with the disorder show circumscribed alterations in cognitive processing and brain structure and function. Genetic differences are also evident at the group level. But cognitive testing, neuroimaging, or genetic testing are not useful for diagnosis at this time.

## Prevalence

The prevalence of specific learning disorder across the academic domains of reading, writing, and mathematics is 5%–15% among school-age children across different languages and cultures. Prevalence in adults is unknown but appears to be approximately 4%.

## Development and Course

Onset, recognition, and diagnosis of specific learning disorder usually occurs during the elementary school years when children are required to learn to read, spell, write, and learn

mathematics. However, precursors such as language delays or deficits, difficulties in rhyming or counting, or difficulties with fine motor skills required for writing commonly occur in early childhood before the start of formal schooling. Manifestations may be behavioral (e.g., a reluctance to engage in learning; oppositional behavior). Specific learning disorder is lifelong, but the course and clinical expression are variable, in part depending on the interactions among the task demands of the environment, the range and severity of the individual's learning difficulties, the individual's learning abilities, comorbidity, and the available support systems and intervention. Nonetheless, problems with reading fluency and comprehension, spelling, written expression, and numeracy skills in everyday life typically persist into adulthood.

Changes in manifestation of symptoms occur with age, so that an individual may have a persistent or shifting array of learning difficulties across the lifespan.

Examples of symptoms that may be observed among preschool-age children include a lack of interest in playing games with language sounds (e.g., repetition, rhyming), and they may have trouble learning nursery rhymes. Preschool children with specific learning disorder may frequently use baby talk, mispronounce words, and have trouble remembering names of letters, numbers, or days of the week. They may fail to recognize letters in their own names and have trouble learning to count. Kindergarten-age children with specific learning disorder may be unable to recognize and write letters, may be unable to write their own names, or may use invented spelling. They may have trouble breaking down spoken words into syllables (e.g., "cowboy" into "cow" and "boy") and trouble recognizing words that rhyme (e.g., cat, bat, hat). Kindergarten-age children also may have trouble connecting letters with their sounds (e.g., letter b makes the sound /b/) and may be unable to recognize phonemes (e.g., do not know which in a set of words [e.g., dog, man, car] starts with the same sound as "cat").

Specific learning disorder in elementary school–age children typically manifests as marked difficulty learning letter-sound correspondence (particularly in English-speaking children), fluent word decoding, spelling, or math facts; reading aloud is slow, inaccurate, and effortful, and some children struggle to understand the magnitude that a spoken or written number represents. Children in primary grades (grades 1–3) may continue to have problems recognizing and manipulating phonemes, be unable to read common one-syllable words (such as mat or top), and be unable recognize common irregularly spelled words (e.g., said, two). They may commit reading errors that indicate problems in connecting sounds and letters (e.g., "big" for "got") and have difficulty sequencing numbers and letters. Children in grades 1-3 also may have difficulty remembering number facts or arithmetic procedures for adding, subtracting, and so forth, and may complain that reading or arithmetic is hard and avoid doing it. Children with specific learning disorder in the middle grades (grades 4–6) may mispronounce or skip parts of long, multisyllable words (e.g., say "conible" for "convertible," "aminal" for "animal") and confuse words that sound alike (e.g., "tornado" for "volcano"). They may have trouble remembering dates, names, and telephone numbers and may have trouble completing homework or tests on time. Children in the middle grades also may have poor comprehension with or without slow, effortful, and inaccurate reading, and they may have trouble reading small function words (e.g., that, the, an, in). They may have very poor spelling and poor written work. They may get the first part of a word correctly, then guess wildly (e.g., read "clover" as "clock"), and may express fear of reading aloud or refuse to read aloud.

By contrast, adolescents may have mastered word decoding, but reading remains slow and effortful, and they are likely to show marked problems in reading comprehension and written expression (including poor spelling) and poor mastery of math facts or mathematical problem solving. During adolescence and into adulthood, individuals with specific learning disorder may continue to make numerous spelling mistakes and read single words and connected text slowly and with much effort, with trouble pronouncing multisyllable words. They may frequently need to reread material to understand or get the main point and have trouble making inferences from written text. Adolescents and adults may

avoid activities that demand reading or arithmetic (reading for pleasure, reading instructions). Adults with specific learning disorder have ongoing spelling problems, slow and effortful reading, or problems making important inferences from numerical information in work-related written documents. They may avoid both leisure and work-related activities that demand reading or writing or use alternative approaches to access print (e.g., text-to-speech/speech-to-text software, audiobooks, audiovisual media).

An alternative clinical expression is that of circumscribed learning difficulties that persist across the lifespan, such as an inability to master the basic sense of number (e.g., to know which of a pair of numbers or dots represents the larger magnitude), or lack of proficiency in word identification or spelling. Avoidance of or reluctance to engage in activities requiring academic skills is common in children, adolescents, and adults. Episodes of severe anxiety or anxiety disorders, including somatic complaints or panic attacks, are common across the lifespan and accompany both the circumscribed and the broader expression of learning difficulties.

## Risk and Prognostic Factors

**Environmental.** Prematurity or very low birth weight increases the risk for specific learning disorder, as does prenatal exposure to nicotine.

**Genetic and physiological.** Specific learning disorder appears to aggregate in families, particularly when affecting reading, mathematics, and spelling. The relative risk of specific learning disorder in reading or mathematics is substantially higher (e.g., 4–8 times and 5–10 times higher, respectively) in first-degree relatives of individuals with these learning difficulties compared with those without them. Family history of reading difficulties (dyslexia) and parental literacy skills predict literacy problems or specific learning disorder in offspring, indicating the combined role of genetic and environmental factors.

There is high heritability for both reading ability and reading disability in alphabetic and nonalphabetic languages, including high heritability for most manifestations of learning abilities and disabilities (e.g., heritability estimate values greater than 0.6). Covariation between various manifestations of learning difficulties is high, suggesting that genes related to one presentation are highly correlated with genes related to another manifestation.

**Course modifiers.** Marked problems with inattentive behavior in preschool years is predictive of later difficulties in reading and mathematics (but not necessarily specific learning disorder) and nonresponse to effective academic interventions. Delay or disorders in speech or language, or impaired cognitive processing (e.g., phonological awareness, working memory, rapid serial naming) in preschool years, predicts later specific learning disorder in reading and written expression. Comorbidity with ADHD is predictive of worse mental health outcome than that associated with specific learning disorder without ADHD. Systematic, intensive, individualized instruction, using evidence-based interventions, may improve or ameliorate the learning difficulties in some individuals or promote the use of compensatory strategies in others, thereby mitigating the otherwise poor outcomes.

## Culture-Related Diagnostic Issues

Specific learning disorder occurs across languages, cultures, races, and socioeconomic conditions but may vary in its manifestation according to the nature of the spoken and written symbol systems and cultural and educational practices. For example, the cognitive processing requirements of reading and of working with numbers vary greatly across orthographies. In the English language, the observable hallmark clinical symptom of difficulties learning to read is inaccurate and slow reading of single words; in other alphabetic languages that have more direct mapping between sounds and letters (e.g., Spanish, German) and in non-alphabetic languages (e.g., Chinese, Japanese), the hallmark feature is

slow but accurate reading. In English-language learners, assessment should include consideration of whether the source of reading difficulties is a limited proficiency with English or a specific learning disorder. Risk factors for specific learning disorder in English-language learners include a family history of specific learning disorder or language delay in the native language, as well as learning difficulties in English and failure to catch up with peers. If there is suspicion of cultural or language differences (e.g., as in an English-language learner), the assessment needs to take into account the individual's language proficiency in his or her first or native language as well as in the second language (in this example, English). Also, assessment should consider the linguistic and cultural context in which the individual is living, as well as his or her educational and learning history in the original culture and language.

## Gender-Related Diagnostic Issues

Specific learning disorder is more common in males than in females (ratios range from about 2:1 to 3:1) and cannot be attributed to factors such as ascertainment bias, definitional or measurement variation, language, race, or socioeconomic status.

## Functional Consequences of Specific Learning Disorder

Specific learning disorder can have negative functional consequences across the lifespan, including lower academic attainment, higher rates of high school dropout, lower rates of postsecondary education, high levels of psychological distress and poorer overall mental health, higher rates of unemployment and under-employment, and lower incomes. School dropout and co-occurring depressive symptoms increase the risk for poor mental health outcomes, including suicidality, whereas high levels of social or emotional support predict better mental health outcomes.

## Differential Diagnosis

**Normal variations in academic attainment.** Specific learning disorder is distinguished from normal variations in academic attainment due to external factors (e.g., lack of educational opportunity, consistently poor instruction, learning in a second language), because the learning difficulties persist in the presence of adequate educational opportunity and exposure to the same instruction as the peer group, and competency in the language of instruction, even when it is different from one's primary spoken language.

**Intellectual disability (intellectual developmental disorder).** Specific learning disorder differs from general learning difficulties associated with intellectual disability, because the learning difficulties occur in the presence of normal levels of intellectual functioning (i.e., IQ score of at least 70 ± 5). If intellectual disability is present, specific learning disorder can be diagnosed only when the learning difficulties are in excess of those usually associated with the intellectual disability.

**Learning difficulties due to neurological or sensory disorders.** Specific learning disorder is distinguished from learning difficulties due to neurological or sensory disorders (e.g., pediatric stroke, traumatic brain injury, hearing impairment, vision impairment), because in these cases there are abnormal findings on neurological examination.

**Neurocognitive disorders.** Specific learning disorder is distinguished from learning problems associated with neurodegenerative cognitive disorders, because in specific learning disorder the clinical expression of specific learning difficulties occurs during the developmental period, and the difficulties do not manifest as a marked decline from a former state.

**Attention-deficit/hyperactivity disorder.**  Specific learning disorder is distinguished from the poor academic performance associated with ADHD, because in the latter condition the problems may not necessarily reflect specific difficulties in learning academic skills but rather may reflect difficulties in performing those skills. However, the co-occurrence of specific learning disorder and ADHD is more frequent than expected by chance. If criteria for both disorders are met, both diagnoses can be given.

**Psychotic disorders.**  Specific learning disorder is distinguished from the academic and cognitive-processing difficulties associated with schizophrenia or psychosis, because with these disorders there is a decline (often rapid) in these functional domains.

## Comorbidity

Specific learning disorder commonly co-occurs with neurodevelopmental (e.g., ADHD, communication disorders, developmental coordination disorder, autistic spectrum disorder) or other mental disorders (e.g., anxiety disorders, depressive and bipolar disorders). These comorbidities do not necessarily exclude the diagnosis specific learning disorder but may make testing and differential diagnosis more difficult, because each of the co-occurring disorders independently interferes with the execution of activities of daily living, including learning. Thus, clinical judgment is required to attribute such impairment to learning difficulties. If there is an indication that another diagnosis could account for the difficulties learning keystone academic skills described in Criterion A, specific learning disorder should not be diagnosed.

# Motor Disorders

# Developmental Coordination Disorder

Diagnostic Criteria                                                    **315.4 (F82)**

A. The acquisition and execution of coordinated motor skills is substantially below that ex-
   pected given the individual's chronological age and opportunity for skill learning and
   use. Difficulties are manifested as clumsiness (e.g., dropping or bumping into objects)
   as well as slowness and inaccuracy of performance of motor skills (e.g., catching an
   object, using scissors or cutlery, handwriting, riding a bike, or participating in sports).
B. The motor skills deficit in Criterion A significantly and persistently interferes with activ-
   ities of daily living appropriate to chronological age (e.g., self-care and self-mainte-
   nance) and impacts academic/school productivity, prevocational and vocational
   activities, leisure, and play.
C. Onset of symptoms is in the early developmental period.
D. The motor skills deficits are not better explained by intellectual disability (intellectual devel-
   opmental disorder) or visual impairment and are not attributable to a neurological condi-
   tion affecting movement (e.g., cerebral palsy, muscular dystrophy, degenerative disorder).

## Diagnostic Features

The diagnosis of developmental coordination disorder is made by a clinical synthesis of the history (developmental and medical), physical examination, school or workplace report, and individual assessment using psychometrically sound and culturally appropriate standardized tests. The manifestation of impaired skills requiring motor coordination (Criterion A) varies

disorders, and other comorbid diagnoses. Among individuals who are nonverbal or have language deficits, observable signs such as changes in sleep or eating and increases in challenging behavior should trigger an evaluation for anxiety or depression. Specific learning difficulties (literacy and numeracy) are common, as is developmental coordination disorder. Medical conditions commonly associated with autism spectrum disorder should be noted under the "associated with a known medical/genetic or environmental/acquired condition" specifier. Such medical conditions include epilepsy, sleep problems, and constipation. Avoidant-restrictive food intake disorder is a fairly frequent presenting feature of autism spectrum disorder, and extreme and narrow food preferences may persist.

# Attention-Deficit/Hyperactivity Disorder

## Attention-Deficit/Hyperactivity Disorder

### Diagnostic Criteria

A. A persistent pattern of inattention and/or hyperactivity-impulsivity that interferes with functioning or development, as characterized by (1) and/or (2):

1. **Inattention:** Six (or more) of the following symptoms have persisted for at least 6 months to a degree that is inconsistent with developmental level and that negatively impacts directly on social and academic/occupational activities:
   **Note:** The symptoms are not solely a manifestation of oppositional behavior, defiance, hostility, or failure to understand tasks or instructions. For older adolescents and adults (age 17 and older), at least five symptoms are required.

   a. Often fails to give close attention to details or makes careless mistakes in schoolwork, at work, or during other activities (e.g., overlooks or misses details, work is inaccurate).

   b. Often has difficulty sustaining attention in tasks or play activities (e.g., has difficulty remaining focused during lectures, conversations, or lengthy reading).

   c. Often does not seem to listen when spoken to directly (e.g., mind seems elsewhere, even in the absence of any obvious distraction).

   d. Often does not follow through on instructions and fails to finish schoolwork, chores, or duties in the workplace (e.g., starts tasks but quickly loses focus and is easily sidetracked).

   e. Often has difficulty organizing tasks and activities (e.g., difficulty managing sequential tasks; difficulty keeping materials and belongings in order; messy, disorganized work; has poor time management; fails to meet deadlines).

   f. Often avoids, dislikes, or is reluctant to engage in tasks that require sustained mental effort (e.g., schoolwork or homework; for older adolescents and adults, preparing reports, completing forms, reviewing lengthy papers).

   g. Often loses things necessary for tasks or activities (e.g., school materials, pencils, books, tools, wallets, keys, paperwork, eyeglasses, mobile telephones).

   h. Is often easily distracted by extraneous stimuli (for older adolescents and adults, may include unrelated thoughts).

   i. Is often forgetful in daily activities (e.g., doing chores, running errands; for older adolescents and adults, returning calls, paying bills, keeping appointments).

2. **Hyperactivity and impulsivity:** Six (or more) of the following symptoms have persisted for at least 6 months to a degree that is inconsistent with developmental level and that negatively impacts directly on social and academic/occupational activities: **Note:** The symptoms are not solely a manifestation of oppositional behavior, defiance, hostility, or a failure to understand tasks or instructions. For older adolescents and adults (age 17 and older), at least five symptoms are required.

   a. Often fidgets with or taps hands or feet or squirms in seat.
   b. Often leaves seat in situations when remaining seated is expected (e.g., leaves his or her place in the classroom, in the office or other workplace, or in other situations that require remaining in place).
   c. Often runs about or climbs in situations where it is inappropriate. (**Note:** In adolescents or adults, may be limited to feeling restless.)
   d. Often unable to play or engage in leisure activities quietly.
   e. Is often "on the go," acting as if "driven by a motor" (e.g., is unable to be or uncomfortable being still for extended time, as in restaurants, meetings; may be experienced by others as being restless or difficult to keep up with).
   f. Often talks excessively.
   g. Often blurts out an answer before a question has been completed (e.g., completes people's sentences; cannot wait for turn in conversation).
   h. Often has difficulty waiting his or her turn (e.g., while waiting in line).
   i. Often interrupts or intrudes on others (e.g., butts into conversations, games, or activities; may start using other people's things without asking or receiving permission; for adolescents and adults, may intrude into or take over what others are doing).

B. Several inattentive or hyperactive-impulsive symptoms were present prior to age 12 years.

C. Several inattentive or hyperactive-impulsive symptoms are present in two or more settings (e.g., at home, school, or work; with friends or relatives; in other activities).

D. There is clear evidence that the symptoms interfere with, or reduce the quality of, social, academic, or occupational functioning.

E. The symptoms do not occur exclusively during the course of schizophrenia or another psychotic disorder and are not better explained by another mental disorder (e.g., mood disorder, anxiety disorder, dissociative disorder, personality disorder, substance intoxication or withdrawal).

*Specify* whether:

**314.01 (F90.2) Combined presentation:** If both Criterion A1 (inattention) and Criterion A2 (hyperactivity-impulsivity) are met for the past 6 months.

**314.00 (F90.0) Predominantly inattentive presentation:** If Criterion A1 (inattention) is met but Criterion A2 (hyperactivity-impulsivity) is not met for the past 6 months.

**314.01 (F90.1) Predominantly hyperactive/impulsive presentation:** If Criterion A2 (hyperactivity-impulsivity) is met and Criterion A1 (inattention) is not met for the past 6 months.

*Specify* if:

**In partial remission:** When full criteria were previously met, fewer than the full criteria have been met for the past 6 months, and the symptoms still result in impairment in social, academic, or occupational functioning.

*Specify* current severity:

**Mild:** Few, if any, symptoms in excess of those required to make the diagnosis are present, and symptoms result in no more than minor impairments in social or occupational functioning.

**Moderate:** Symptoms or functional impairment between "mild" and "severe" are present.

**Severe:** Many symptoms in excess of those required to make the diagnosis, or several symptoms that are particularly severe, are present, or the symptoms result in marked impairment in social or occupational functioning.

## Diagnostic Features

The essential feature of attention-deficit/hyperactivity disorder (ADHD) is a persistent pattern of inattention and/or hyperactivity-impulsivity that interferes with functioning or development. *Inattention* manifests behaviorally in ADHD as wandering off task, lacking persistence, having difficulty sustaining focus, and being disorganized and is not due to defiance or lack of comprehension. *Hyperactivity* refers to excessive motor activity (such as a child running about) when it is not appropriate, or excessive fidgeting, tapping, or talkativeness. In adults, hyperactivity may manifest as extreme restlessness or wearing others out with their activity. *Impulsivity* refers to hasty actions that occur in the moment without forethought and that have high potential for harm to the individual (e.g., darting into the street without looking). Impulsivity may reflect a desire for immediate rewards or an inability to delay gratification. Impulsive behaviors may manifest as social intrusiveness (e.g., interrupting others excessively) and/or as making important decisions without consideration of long-term consequences (e.g., taking a job without adequate information).

ADHD begins in childhood. The requirement that several symptoms be present before age 12 years conveys the importance of a substantial clinical presentation during childhood. At the same time, an earlier age at onset is not specified because of difficulties in establishing precise childhood onset retrospectively. Adult recall of childhood symptoms tends to be unreliable, and it is beneficial to obtain ancillary information.

Manifestations of the disorder must be present in more than one setting (e.g., home and school, work). Confirmation of substantial symptoms across settings typically cannot be done accurately without consulting informants who have seen the individual in those settings. Typically, symptoms vary depending on context within a given setting. Signs of the disorder may be minimal or absent when the individual is receiving frequent rewards for appropriate behavior, is under close supervision, is in a novel setting, is engaged in especially interesting activities, has consistent external stimulation (e.g., via electronic screens), or is interacting in one-on-one situations (e.g., the clinician's office).

## Associated Features Supporting Diagnosis

Mild delays in language, motor, or social development are not specific to ADHD but often co-occur. Associated features may include low frustration tolerance, irritability, or mood lability. Even in the absence of a specific learning disorder, academic or work performance is often impaired. Inattentive behavior is associated with various underlying cognitive processes, and individuals with ADHD may exhibit cognitive problems on tests of attention, executive function, or memory, although these tests are not sufficiently sensitive or specific to serve as diagnostic indices. By early adulthood, ADHD is associated with an increased risk of suicide attempt, primarily when comorbid with mood, conduct, or substance use disorders.

No biological marker is diagnostic for ADHD. As a group, compared with peers, children with ADHD display increased slow wave electroencephalograms, reduced total brain volume on magnetic resonance imaging, and possibly a delay in posterior to anterior cortical maturation, but these findings are not diagnostic. In the uncommon cases where there is a known genetic cause (e.g., Fragile X syndrome, 22q11 deletion syndrome), the ADHD presentation should still be diagnosed.

## Prevalence

Population surveys suggest that ADHD occurs in most cultures in about 5% of children and about 2.5% of adults.

**A953**

## Development and Course

Many parents first observe excessive motor activity when the child is a toddler, but symptoms are difficult to distinguish from highly variable normative behaviors before age 4 years. ADHD is most often identified during elementary school years, and inattention becomes more prominent and impairing. The disorder is relatively stable through early adolescence, but some individuals have a worsened course with development of antisocial behaviors. In most individuals with ADHD, symptoms of motoric hyperactivity become less obvious in adolescence and adulthood, but difficulties with restlessness, inattention, poor planning, and impulsivity persist. A substantial proportion of children with ADHD remain relatively impaired into adulthood.

In preschool, the main manifestation is hyperactivity. Inattention becomes more prominent during elementary school. During adolescence, signs of hyperactivity (e.g., running and climbing) are less common and may be confined to fidgetiness or an inner feeling of jitteriness, restlessness, or impatience. In adulthood, along with inattention and restlessness, impulsivity may remain problematic even when hyperactivity has diminished.

## Risk and Prognostic Factors

**Temperamental.**   ADHD is associated with reduced behavioral inhibition, effortful control, or constraint; negative emotionality; and/or elevated novelty seeking. These traits may predispose some children to ADHD but are not specific to the disorder.

**Environmental.**   Very low birth weight (less than 1,500 grams) conveys a two- to threefold risk for ADHD, but most children with low birth weight do not develop ADHD. Although ADHD is correlated with smoking during pregnancy, some of this association reflects common genetic risk. A minority of cases may be related to reactions to aspects of diet. There may be a history of child abuse, neglect, multiple foster placements, neurotoxin exposure (e.g., lead), infections (e.g., encephalitis), or alcohol exposure in utero. Exposure to environmental toxicants has been correlated with subsequent ADHD, but it is not known whether these associations are causal.

**Genetic and physiological.**   ADHD is elevated in the first-degree biological relatives of individuals with ADHD. The heritability of ADHD is substantial. While specific genes have been correlated with ADHD, they are neither necessary nor sufficient causal factors. Visual and hearing impairments, metabolic abnormalities, sleep disorders, nutritional deficiencies, and epilepsy should be considered as possible influences on ADHD symptoms.

ADHD is not associated with specific physical features, although rates of minor physical anomalies (e.g., hypertelorism, highly arched palate, low-set ears) may be relatively elevated. Subtle motor delays and other neurological soft signs may occur. (Note that marked co-occurring clumsiness and motor delays should be coded separately [e.g., developmental coordination disorder].)

**Course modifiers.**   Family interaction patterns in early childhood are unlikely to cause ADHD but may influence its course or contribute to secondary development of conduct problems.

## Culture-Related Diagnostic Issues

Differences in ADHD prevalence rates across regions appear attributable mainly to different diagnostic and methodological practices. However, there also may be cultural variation in attitudes toward or interpretations of children's behaviors. Clinical identification rates in the United States for African American and Latino populations tend to be lower than for Caucasian populations. Informant symptom ratings may be influenced by cultural group of the child and the informant, suggesting that culturally appropriate practices are relevant in assessing ADHD.

**A954**

## Gender-Related Diagnostic Issues

ADHD is more frequent in males than in females in the general population, with a ratio of approximately 2:1 in children and 1.6:1 in adults. Females are more likely than males to present primarily with inattentive features.

## Functional Consequences of Attention-Deficit/Hyperactivity Disorder

ADHD is associated with reduced school performance and academic attainment, social rejection, and, in adults, poorer occupational performance, attainment, attendance, and higher probability of unemployment as well as elevated interpersonal conflict. Children with ADHD are significantly more likely than their peers without ADHD to develop conduct disorder in adolescence and antisocial personality disorder in adulthood, consequently increasing the likelihood for substance use disorders and incarceration. The risk of subsequent substance use disorders is elevated, especially when conduct disorder or antisocial personality disorder develops. Individuals with ADHD are more likely than peers to be injured. Traffic accidents and violations are more frequent in drivers with ADHD. There may be an elevated likelihood of obesity among individuals with ADHD.

Inadequate or variable self-application to tasks that require sustained effort is often interpreted by others as laziness, irresponsibility, or failure to cooperate. Family relationships may be characterized by discord and negative interactions. Peer relationships are often disrupted by peer rejection, neglect, or teasing of the individual with ADHD. On average, individuals with ADHD obtain less schooling, have poorer vocational achievement, and have reduced intellectual scores than their peers, although there is great variability. In its severe form, the disorder is markedly impairing, affecting social, familial, and scholastic/occupational adjustment.

Academic deficits, school-related problems, and peer neglect tend to be most associated with elevated symptoms of inattention, whereas peer rejection and, to a lesser extent, accidental injury are most salient with marked symptoms of hyperactivity or impulsivity.

## Differential Diagnosis

**Oppositional defiant disorder.**   Individuals with oppositional defiant disorder may resist work or school tasks that require self-application because they resist conforming to others' demands. Their behavior is characterized by negativity, hostility, and defiance. These symptoms must be differentiated from aversion to school or mentally demanding tasks due to difficulty in sustaining mental effort, forgetting instructions, and impulsivity in individuals with ADHD. Complicating the differential diagnosis is the fact that some individuals with ADHD may develop secondary oppositional attitudes toward such tasks and devalue their importance.

**Intermittent explosive disorder.**   ADHD and intermittent explosive disorder share high levels of impulsive behavior. However, individuals with intermittent explosive disorder show serious aggression toward others, which is not characteristic of ADHD, and they do not experience problems with sustaining attention as seen in ADHD. In addition, intermittent explosive disorder is rare in childhood. Intermittent explosive disorder may be diagnosed in the presence of ADHD.

**Other neurodevelopmental disorders.**   The increased motoric activity that may occur in ADHD must be distinguished from the repetitive motor behavior that characterizes stereotypic movement disorder and some cases of autism spectrum disorder. In stereotypic movement disorder, the motoric behavior is generally fixed and repetitive (e.g., body rocking, self-biting), whereas the fidgetiness and restlessness in ADHD are typically generalized and not characterized by repetitive stereotypic movements. In Tourette's disorder,

**A955**

frequent multiple tics can be mistaken for the generalized fidgetiness of ADHD. Prolonged observation may be needed to differentiate fidgetiness from bouts of multiple tics.

**Specific learning disorder.**   Children with specific learning disorder may appear inattentive because of frustration, lack of interest, or limited ability. However, inattention in individuals with a specific learning disorder who do not have ADHD is not impairing outside of academic work.

**Intellectual disability (intellectual developmental disorder).**   Symptoms of ADHD are common among children placed in academic settings that are inappropriate to their intellectual ability. In such cases, the symptoms are not evident during non-academic tasks. A diagnosis of ADHD in intellectual disability requires that inattention or hyperactivity be excessive for mental age.

**Autism spectrum disorder.**   Individuals with ADHD and those with autism spectrum disorder exhibit inattention, social dysfunction, and difficult-to-manage behavior. The social dysfunction and peer rejection seen in individuals with ADHD must be distinguished from the social disengagement, isolation, and indifference to facial and tonal communication cues seen in individuals with autism spectrum disorder. Children with autism spectrum disorder may display tantrums because of an inability to tolerate a change from their expected course of events. In contrast, children with ADHD may misbehave or have a tantrum during a major transition because of impulsivity or poor self-control.

**Reactive attachment disorder.**   Children with reactive attachment disorder may show social disinhibition, but not the full ADHD symptom cluster, and display other features such as a lack of enduring relationships that are not characteristic of ADHD.

**Anxiety disorders.**   ADHD shares symptoms of inattention with anxiety disorders. Individuals with ADHD are inattentive because of their attraction to external stimuli, new activities, or preoccupation with enjoyable activities. This is distinguished from the inattention due to worry and rumination seen in anxiety disorders. Restlessness might be seen in anxiety disorders. However, in ADHD, the symptom is not associated with worry and rumination.

**Depressive disorders.**   Individuals with depressive disorders may present with inability to concentrate. However, poor concentration in mood disorders becomes prominent only during a depressive episode.

**Bipolar disorder.**   Individuals with bipolar disorder may have increased activity, poor concentration, and increased impulsivity, but these features are episodic, occurring several days at a time. In bipolar disorder, increased impulsivity or inattention is accompanied by elevated mood, grandiosity, and other specific bipolar features. Children with ADHD may show significant changes in mood within the same day; such lability is distinct from a manic episode, which must last 4 or more days to be a clinical indicator of bipolar disorder, even in children. Bipolar disorder is rare in preadolescents, even when severe irritability and anger are prominent, whereas ADHD is common among children and adolescents who display excessive anger and irritability.

**Disruptive mood dysregulation disorder.**   Disruptive mood dysregulation disorder is characterized by pervasive irritability, and intolerance of frustration, but impulsiveness and disorganized attention are not essential features. However, most children and adolescents with the disorder have symptoms that also meet criteria for ADHD, which is diagnosed separately.

**Substance use disorders.**   Differentiating ADHD from substance use disorders may be problematic if the first presentation of ADHD symptoms follows the onset of abuse or frequent use. Clear evidence of ADHD before substance misuse from informants or previous records may be essential for differential diagnosis.

**Personality disorders.** In adolescents and adults, it may be difficult to distinguish ADHD from borderline, narcissistic, and other personality disorders. All these disorders tend to share the features of disorganization, social intrusiveness, emotional dysregulation, and cognitive dysregulation. However, ADHD is not characterized by fear of abandonment, self-injury, extreme ambivalence, or other features of personality disorder. It may take extended clinical observation, informant interview, or detailed history to distinguish impulsive, socially intrusive, or inappropriate behavior from narcissistic, aggressive, or domineering behavior to make this differential diagnosis.

**Psychotic disorders.** ADHD is not diagnosed if the symptoms of inattention and hyperactivity occur exclusively during the course of a psychotic disorder.

**Medication-induced symptoms of ADHD.** Symptoms of inattention, hyperactivity, or impulsivity attributable to the use of medication (e.g., bronchodilators, isoniazid, neuroleptics [resulting in akathisia], thyroid replacement medication) are diagnosed as other specified or unspecified other (or unknown) substance–related disorders.

**Neurocognitive disorders.** Early major neurocognitive disorder (dementia) and/or mild neurocognitive disorder are not known to be associated with ADHD but may present with similar clinical features. These conditions are distinguished from ADHD by their late onset.

## Comorbidity

In clinical settings, comorbid disorders are frequent in individuals whose symptoms meet criteria for ADHD. In the general population, oppositional defiant disorder co-occurs with ADHD in approximately half of children with the combined presentation and about a quarter with the predominantly inattentive presentation. Conduct disorder co-occurs in about a quarter of children or adolescents with the combined presentation, depending on age and setting. Most children and adolescents with disruptive mood dysregulation disorder have symptoms that also meet criteria for ADHD; a lesser percentage of children with ADHD have symptoms that meet criteria for disruptive mood dysregulation disorder. Specific learning disorder commonly co-occurs with ADHD. Anxiety disorders and major depressive disorder occur in a minority of individuals with ADHD but more often than in the general population. Intermittent explosive disorder occurs in a minority of adults with ADHD, but at rates above population levels. Although substance use disorders are relatively more frequent among adults with ADHD in the general population, the disorders are present in only a minority of adults with ADHD. In adults, antisocial and other personality disorders may co-occur with ADHD. Other disorders that may co-occur with ADHD include obsessive-compulsive disorder, tic disorders, and autism spectrum disorder.

# Other Specified Attention-Deficit/ Hyperactivity Disorder

### 314.01 (F90.8)

This category applies to presentations in which symptoms characteristic of attention-deficit/hyperactivity disorder that cause clinically significant distress or impairment in social, occupational or other important areas of functioning predominate but do not meet the full criteria for attention-deficit/hyperactivity disorder or any of the disorders in the neurodevelopmental disorders diagnostic class. The other specified attention-deficit/hyperactivity disorder category is used in situations in which the clinician chooses to communicate

the specific reason that the presentation does not meet the criteria for attention-deficit/ hyperactivity disorder or any specific neurodevelopmental disorder. This is done by recording "other specified attention-deficit/hyperactivity disorder" followed by the specific reason (e.g., "with insufficient inattention symptoms").

# Unspecified Attention-Deficit/ Hyperactivity Disorder

## 314.01 (F90.9)

This category applies to presentations in which symptoms characteristic of attention-deficit/hyperactivity disorder that cause clinically significant distress or impairment in social, occupational, or other important areas of functioning predominate but do not meet the full criteria for attention-deficit/hyperactivity disorder or any of the disorders in the neurodevelopmental disorders diagnostic class. The unspecified attention-deficit/hyperactivity disorder category is used in situations in which the clinician chooses *not* to specify the reason that the criteria are not met for attention-deficit/hyperactivity disorder or for a specific neurodevelopmental disorder, and includes presentations in which there is insufficient information to make a more specific diagnosis.

# Specific Learning Disorder

# Specific Learning Disorder

## Diagnostic Criteria

A. Difficulties learning and using academic skills, as indicated by the presence of at least one of the following symptoms that have persisted for at least 6 months, despite the provision of interventions that target those difficulties:

1. Inaccurate or slow and effortful word reading (e.g., reads single words aloud incorrectly or slowly and hesitantly, frequently guesses words, has difficulty sounding out words).
2. Difficulty understanding the meaning of what is read (e.g., may read text accurately but not understand the sequence, relationships, inferences, or deeper meanings of what is read).
3. Difficulties with spelling (e.g., may add, omit, or substitute vowels or consonants).
4. Difficulties with written expression (e.g., makes multiple grammatical or punctuation errors within sentences; employs poor paragraph organization; written expression of ideas lacks clarity).
5. Difficulties mastering number sense, number facts, or calculation (e.g., has poor understanding of numbers, their magnitude, and relationships; counts on fingers to add single-digit numbers instead of recalling the math fact as peers do; gets lost in the midst of arithmetic computation and may switch procedures).
6. Difficulties with mathematical reasoning (e.g., has severe difficulty applying mathematical concepts, facts, or procedures to solve quantitative problems).

# EXHIBIT 2-A

## Jeanette Wasserstein, PhD. ABPP-Cn

### CURRICULUM VITAE

EDUCATION:

- 1988   Yale University School of Medicine,
  Post-doctoral studies in Medicine
- 1981   *Ph.D.*  Cognitive Neuropsychology, City University of New York
- 1976   *M.A.* Developmental Psychology,
  Teachers College of Columbia University
- 1972   *B.A.* Psychology, *cum laude*, Barnard College of Columbia University

LICENSURE:  Psychologist, New York State No. 007457, 1982

BOARD CERTIFICATION:  American Board of Professional Psychology,
- Clinical Neuropsychology (ABPP-Cn), 2010

PROFESSIONAL EXPERIENCE:

Selected Academic Appointments:

1996-Current   *Assistant Clinical Professor*, Department of Psychiatry,
                    The Mount Sinai School of Medicine:
- Co-investigator/Therapist for NIMH study of cognitive/behavioral treatment of ADHD in adults (2006-2000).
- Supervision and teaching in Division of Clinical Neuroscience (1996-ongoing).
- *Voluntary Faculty* in the School Problem Center (1993-1996) and Holocaust Clinic (1996-1997).

1993-2005    *Adjunct Faculty*, Graduate Department of Neuropsychology, Queens
                    College, City University of New York:  Supervision of doctoral
                    and post-doctoral candidates.

1992-2001    *Faculty Member*, The Institute for Child, Adolescent and Family Studies
                    (ICAFS):  Lecture series in basic neuropsychology.

1982-1986    *Lecturer*, Department of Neurosurgery, The Mount Sinai School of
                    Medicine:  Neuroscience research and supervision of house staff.

1980-1984    *Assistant Professor*, Graduate Faculty, Department of Psychology
(Adjunct-1986)         (Clinical Division), The New School for Social Research:
- Director of neuropsychology program
- Created graduate training program and supervised multiple dissertations

1

**A960**

<u>Selected Clinical Positions</u>:

| | |
|---|---|
| 1989-Current | *Co-Director*, Comprehensive Neuropsychological Services (CNS): Group private practice: Neuropsychological evaluations/consultations, psychotherapy with the cognitively compromised and their families (preschool through adult). |
| 1989-1990 1981-1986 | *Attending Psychologist*, City Hospital Center at Elmhurst, Department of Psychiatry: Neuropsychology lecture series and supervision (child through adult). |
| 1985-1986 | *Psychologist*, Health Related Facility of New York Foundling Hospital: Resource to facility for children with multiple handicaps: Psychological testing, staff development, consultation to nursing staff and special school regarding unique management needs (infant through preschool). |
| 1979-1980 | *Learning Disabilities Counselor*, Psychological Center of City College: Neuropsychological evaluations of adults with school failure and suspected learning disability. |
| 1977-1978 | *Psychology Intern*, Department of Psychiatry, Roosevelt Hospital (APA): Inpatients and outpatient therapies and assessment (child and adult). |
| 1971 | *Behavior Therapist*, Dare School, New York: Behavior modification with autistic children. Applied Behavior Analysis (ABA) techniques. |

ACTIVE PROFESSIONAL ORGANIZATIONS
- *American Psychological Association (APA)*, Neuropsychology Division
- *American Professional Society for ADHD and Related Disorders (APSARD)*
- *International Neuropsychological Society*, *(INS)*
- *National Academy of Neuropsychology, (NAN)*
- *New York Society for Neuropsychology (NYNG)*

PROFESSIONAL ACTIVITIES
<i>Editorial Activities</i>

- <u>*Journal of Attention Disorders,*</u> Editorial Panel (2019-current)
- <u>*Journal of the American Academy of Psychoanalysis,*</u> Editorial Panel (2001-2011)
- <u>*The Clinical Neuropsychologist (TCN)*</u>, Guest Reviewer (2014)
- <u>*Perceptual and Motor Skills,*</u> Special Reader (2001)
- <u>*Journal of the International Neuropsychological Society*</u>, Guest Reviewer, Book Review Panel (1998-current)
- <u>*Journal of Cognitive Psychotherapy,*</u> Guest Reviewer /Book Review Panel (1997)

2

**A961**

*General*

- The American Professional Society of ADHD and Related Disorders (APSARD),
  Member Education Committee (2016-current),
  Co-Chair Psychologist Sub-Committee (2017-current)
- The ADHD Report, Advisory Board Member (2012-current)
- National Association of Neuropsychology (NAN). Member Professional
  Activities and Information Committee (PAIC) (2006-2010)
- New York Neuropsychology Group, Conference Chairperson, *Learning
  Disabilities Across the Lifespan: A Neuropsychological Perspective* (2001)
- New York Psychological Society, Member, Psychopharmacology Task Force
  (1996-1998)
- New York Neuropsychology Group, Conference Chairperson, *Adult Attention
  Deficit Disorder* (1995)
- New York Neuropsychological Group, Board Member (1995-2007)
- International Neuropsychological Society, Member, Conference Program
  Committee (1993)

BIBLIOGRAPHY

*Original peer review articles*

**Wasserstein J**, Zappulla R, Rosen J, Gerstman L (1984). Evidence for Differentiation of
Right Hemisphere Visual-Perceptual Functions. *Brain and Cognition*, 3 (1), 51-57.

**Wasserstein J**, Zappulla R, Rosen J, Gerstman L (1987). In Search of Closure:
Subjective Contour Illusions and Gestalt Completion Tasks. *Brain and Cognition*,
6, 1 – 14.

Bellas DN, Novelly RA, Eskinzai B, **Wasserstein J**, (1988). The Nature of Unilateral
Neglect in the Olfactory Sensory System. *Neuropsychologia*, 26(1), 45 – 52.

Bellas DN, Novelly RA, Eskinzai B, **Wasserstein J**, (1988). Unilateral Displacement
In the Olfactory Sense: A Manifestation of the Unilateral Neglect Syndrome.
*Cortex*, 24, 267 – 275.

Barr WB, Jaffe J, **Wasserstein J**, Michelson WJ, Stein BM (1989). Regional
Distribution of Cerebral Arteriovenous Malformations: Interactions with Sex
and Handedness. *Archives of Neurology*, 46, 410 – 412.

Raskin SA, Borad JC, **Wasserstein J**, Bodis – Wollner I, Coscia L, Yahr MD (1990).
Visuospatial Orientation in Parkinson's Disease. *International Journal of
Neuroscience*, 51, 9 – 18.

Barr WB, Goldberg E, **Wasserstein J**, Novelly RA (1990). Amnesia Following
Unilateral Temporal Lobectomy. *Neuropsychologia*, 28(3), 243 – 255.

3

Imber, M.L., Shapley, R., **Wasserstein, J**., and Hirsch, J. (1998). fMRI investigation of regions activated by multiple illusory contours and Street figures. *Investigative Ophthalmology and Visual Science*, **39**, S861

**Wasserstein J** & Stefanatos GA (2000). The Right Hemisphere and Psychopathology. In: Neuroscience and Psychoanalysis, Special edition of *The Journal of American Academy of Psychoanalysis*, 28 (2), 371 – 393.

Wender PH, Wolfe L, **Wasserstein J** (2001). Adults with ADHD: An Overview. In: Adult Attention Deficit Disorder: Brain Mechanisms and Life Outcomes, J. Wasserstein, L. Wolf & F. LeFever (Eds.) *Annals of the New York Academy of Sciences*, 931, 1 – 16.

Stefanatos GA & **Wasserstein J** (2001). Attention Deficit/Hyperactivity Disorder as Right Hemisphere Syndrome: A Review and neuropsychological Case Studies. In: Adult Attention Deficit Disorder: Brain mechanisms and Life Outcomes, J. Wasserstein, L. Wolf & F. LeFever (Eds.) *Annals of the New York Academy of Sciences*, 931, 172-195.

**Wasserstein J** & Lynn A (2001). Metacognitive Remediation: Treating Executive Function Deficits via Executive Functions. In: Adult Attention Deficit Disorder: Brain Mechanisms and Life Outcomes, J. Wasserstein, L. Wolf & F. LeFever (Eds.) *Annals of the New York Academy of Sciences*, 931, 376-384.

Wolf L & **Wasserstein J** (2001). Adult ADHD: Concluding Thoughts. In: Adult Attention Deficit Disorder: Brain Mechanisms and Life Outcomes, J. Wasserstein, L. Wolf & F. LeFever (Eds.) *Annals of the New York Academy of Sciences*, 931, 396-408.

**Wasserstein J,** Wasserstein A, & Wolf L (2001). Attention Deficit Disorder in Adults. *ERIC Digest*, National Library of Education.

Stefanatos GA, Kinsbourne M, **Wasserstein J** (2002). Acquired Epileptiform Aphasia:A Dimensional View of Landau-Kleffner Syndrome and the Relation to Regressive Autistic Spectrum Disorders. *Child Neuropsychology, 8(3), 195-228.*

**Wasserstein J** (2002). Gestalt Concept of Closure: A Construct without Closure. *Perceptual and Motor Skills*, 95, 963-964.

**Wasserstein J**, Barr W, Zappulla R, & Rock D (2004). Facial Closure: Interrelationship with Facial Discrimination, Other Closure Tests and Subjective Contour Illusions. *Neuropsychologia, 42, 158-163.*

4

**A963**

**Wasserstein J**, (2005). Diagnostic Issues for Adolescents and Adults with ADHD. *J. of Clinical Psychology,* 61 (5), 535-547.

Solanto MV, Marks DJ, Mitchell K, **Wasserstein J** & Kofman MD (2008). Development of a New Psychosocial Treatment for Adults with AD/HD. Journal of Attention Disorders. *Journal of Attention Disorders*, 11 (6), 728-736.

Solanto MV, Marks DJ, **Wasserstein J**, Mitchell K, Abikoff H, Alvir JM, & Kofman MD (2010). Efficacy of meta-cognitive therapy (MCT) for adult ADHD. *American Journal of Psychiatry*, 167(8), 958-968.

Solanto MV, Marks DJ, & **Wasserstein J** (2011). Development of a Cognitive-Behavioral Treatment for Adult ADHD. *The ADHD Report, The Guilford Press*, 19 (1).

Solanto MV, **Wasserstein J**, Marks DJ & Mitchell K (2011). Diagnosis of ADHD in Adults: What is the Appropriate DSM-5 Symptom Threshold for Hyperactivity-Impulsivity? *Journal of Attention Disorders.*

**Wasserstein J.** & Stefanatos GA (2016), Re-Examining ADHD as Corticostriatal Disorder: Implications for Understanding Common Comorbidities. The ADHD Report, The Guilford Press, 24 (4).

*Chapters and books*

**Wasserstein J** (1987). Neuropsychological Input in Patient Care. In: *Acute, Chronic and Terminal Care in Neurosurgery*. Post C (Ed). The Foundation of Thanatology Series, NY.

**Wasserstein J**, Wolfe L, LeFever F (Eds) (2001). *Adult Attention Deficit Disorder: Brain Mechanisms and Life Outcomes*. Annals of the New York Academy of Sciences, Volume 931. The New York Academy of Sciences, New York, NY.

**Wasserstein J**, Wolfe L, Solanto, M, Marks D & Simkowitz, P (2008), Adult Attention Deficit Hyperactivity Disorder: Basic and Clinical Issues. In: *Textbook of Clinical Neuropsychology, 2nd Edition*. JE Morgan and JH Ricker (Eds). Psychology Press: Taylor & Francis Group, New York, NY.

**Wasserstein, J** & Denckla, MB (2009). Learning disabilities and Attention-Deficit/Hyperactivity Disorder in Adults: Overlap with Executive Dysfunction. In: *Attention Deficit Disorders and Comorbidities in Children, Adolescents and Adults*. T. Brown (Ed). APA Press.

5

**A964**

Wolfe L, Schreiber H, **Wasserstein J** (Eds) (2010) *Adult Learning Disorders*, Contemporary Issues. Psychology Press: Taylor & Francis Group, New York, NY.

Solanto M, Marks D, & **Wasserstein J** (2011). Diagnostic Evaluation of ADHD in Adults. In: *Cognitive-Behavioral Therapy for Adult ADHD*: Guilford Press.

Solanto M, Marks D, & **Wasserstein J** (2011). How to Be a Successful Therapist: A Guide to Substance and Style. In: *Cognitive-Behavioral Therapy for Adult ADHD*: Guilford Press.

Solanto M, Marks D, **Wasserstein J** & Mitchell K (2011). Profiles of Patient Response to the Treatment: Tailoring Therapy to Individual Cases. In: *Cognitive-Behavioral Therapy for Adult ADHD*: Guilford Press.

**Wasserstein J**, Solanto M & Marks D (2011). Modifying the Treatment for Use in Individual Therapy. In: *Cognitive-Behavioral Therapy for Adult ADHD*: Guilford Press.

**Wasserstein J**, Stefanatos GA, Mapou R, Elia J, Frank Y. (2018). Neurodevelopmental Disorders of Attention and Learning: ADHD and LD across the Lifespan: *Textbook of Clinical Neuropsychology, 2nd Edition*. JE Morgan and JH Ricker (Eds). Psychology Press: Taylor & Francis Group, New York, NY.

*Reviews and editorial*

**Wasserstein J** (1998). Psychostimulants: Treating ADHD. *NYSPA Notebook*, Nov/Dec, 20.

**Wasserstein J** (1999). Neuropsychiatry: The Second Edition of a Classic Text. Review of Neuropsychological Assessment of Neuropsychiatric Disorders (2nd ed.). I Grant and KM Adams (Eds.). 1996. *Journal of the International Neuropsychological Society*, 5(3), 268-269.

**Wasserstein J** (2000). Review of ADHD and the Nature of Self-control. RA Barkley, 1997. *Journal of Cognitive Psychotherapy*, 14 (1), 111-113.

**Wasserstein J**, (2004). Review of The Neuropsychology of Emotion. J.C. Borod (Ed.), 2000. *The Journal of the American Academy of Psychoanalysis, 32(2).*

**Wasserstein J**, (2004). ADHD and Comorbidities: A Valuable Resource with Profound Implications. Review of Attention-Deficit Disorders and Comorbidities in Children, Adolescents, and Adults. T.E. Brown (Ed), (2000*). Contemporary Psychology: APA Review of Books*, 49 (5), 642-645.

Solanto MV, **Wasserstein J** & Marks, D (2011). Response to Wells and Fisher Letter. Psychiatry Online.

*Abstracts*

**Wasserstein J**, Borod JC, Bodis – Wolner I, Goldstein Y, Yahr M (1987). Visual – Perceptual Deficits in Parkinson's Disease. *Journal of Clinical and Experimental Neuropsychology*, 9 (1), 65.

**Wasserstein J**, Healy J, Sorman P, Bemporad S, Zappulla J and Rosen (1995). Effects of Frontal Lobe Pathology on Nonsocial and Social Cognition. *The Clinical Neuropsychologist*, 9, 277.

Imber ML, Shapley R, **Wasserstein J**, Hirsch J (1998). FMRI Investigation of Regions Activated by Multiple Illusory Contours and Street Figures. *Investigative Ophthalmology and Visual Science, 39,* 61.

Deutsch GK, **Wasserstein J**, Zapulla R (1998). Neuropsychological Performance in Cogans' Syndrome. *Journal of Neuropsychiatry and Clinical Neurosciences,* 9(4), 677.

**Wasserstein J,** Findler MN, Liegner KB (2001). Neuropsychological and SPECT Findings in Lyme Disease. *Journal of Neuropsychiatry and Clinical Neuroscience*, 13(1), 136.

**Wasserstein J**, Stefanatos GA & Findler M (2002). ADHD Adults and the Right Executive: Implications of Differential Performance on Verbal and Design Fluency. *Journal of the International Neuropsychological Society,* 8 (2), 309.

**Wasserstein J** & Stefanatos GA (2003). Erb's/Klumpky's Palsy: A Marker For Possible Encephalopathy? *Journal of the International Neuropsychology Society*, 8 (2), 262*.*

SELECTED INVITED TALKS

Wasserstein. *Interpreting Standardized Perceptual Tests.*
3rd International Conference in Neuroscience and Education, Teachers College of Columbia University, 1981.

**Wasserstein J**. *Closing in on the Right Hemisphere.* Colloquium presented to:
- National Institute of Mental Health (NIMH), June 1982
- Boston Veterans Administration Hospital, April 1982
- Developmental Psychology Department of Teachers College, December 1982.

**Wasserstein J**. *The Brain and Psychopathology.* Chairperson of Symposium Annual New York State Psychological Association Convention, April 1984.

**Wasserstein J**. *Right Hemisphere Learning Disorders: Anterior to Posterior Gradient.* Northeast Conference on Learning Disabilities and Mental Health, November 1992.

**Wasserstein J**. *Frontal Lobe Pathology and Social Cognition.* Colloquium presented to Graduate Department of Experimental Cognition, City College, March 1995

**Wasserstein J**. *Organization and the Brain.* Presented to: National Association of Professional Organizers (NAPO), 1997 Children and Adults with Attention Deficit Disorder (CHADD) of New York City, 1997.

**Wasserstein J**. *Adult Attention Deficit Disorder.* Colloquium presented to: Albert Ellis Institute. Feb. 1998

**Wasserstein, J.** *Metacognitive Remediation in Adult ADHD.*
- National Institute of Drug Abusers (NIDA), NIH, June 2003
  In house symposium: Developing Behavioral Treatments for Drug Abusers with Cognitive Impairments.
- NYU Student Affairs Conference, June 2006

Solanto MV and **Wasserstein J**. "Do Stimulants Impair Creativity?" Children and Adults with ADD (CHADD) of New York City, November 20, 2006.

Solanto MV and **Wasserstein J.** "Social and family communication in ADHD." Children and Adults with ADD (CHADD) of Nassau County, March 10, 2008.

**Wasserstein, J.** & Solanto, M. Symposium: Adult ADHD- a Multifaceted Approach to Assessment and Intervention. Mid-year Meeting of the International Neuropsychological Society (INS), June 2012
- *Diagnosis of ADHD in Adults: Appropriate Symptom Threshold and the Role of Executive Functioning Measurement.*
- *Nonpharmacological Treatment of Executive Dysfunction in Adults with ADHD*

**Wasserstein, J.** *The Story of 'Closure' 1981-2004.* Presented at Annual Gator Behavioral Neuroscience Meeting, 2/2014

8

**A967**

**Wasserstein, J.** *Outside the Pill Box: what Does Neuropsychological Evaluation Add to Evaluation and Treatment of ADHD?* Presented at Annual APSARD Meeting, 2018

**Wasserstein, J.** *Estrogen and Cognition: Possible Mechanism for Adult Onset ADHD.* Presented at Annual Gator Behavioral Neuroscience Meeting, 2/2019

SELECTED CONFERENCE PRESENTATIONS

**Wasserstein J**, Weiss E, Rosen J, Gerstman L, Costa L. *Re-examination of Gestalt Completion Tests: Implications for Right Hemisphere Assessment.* International Neuropsychological Society Meeting, 1979.

**Wasserstein J**, Thompson AL, Sorman P, Barr W. *Age Related Changes in Closure Tests: Right Hemisphere Aging or Decline in Low Spatial Frequency Perception?* European International Neuropsychological Society Meeting,1982.

**Wasserstein J**, Zappulla R, Rosen J, Thompson AL. *Facial Closure: Interrelationships with Facial Discrimination, Object Closure and Subjective Contour Illusion Perception.* International Neuropsychological Meeting, 1983.

Sorman P, **Wasserstein J**, Zappulla R. *Cerebral Correlates of Cognitive Regression and Parallels with Schizophrenic Thought Processes.* International Neuropsychological Society Meeting,1983.

Davidoff JB, **Wasserstein J**, Wilson B. *Discrimination in a Case of Visual Agnosia.* International Neuropsychological Society Meeting,1983.

Lynn A, Rosen J, Gerstman L, Baumann J, **Wasserstein J**. *Semantic and Prototypicality Judgments in Normal and Dysphonetic Dyslexic Children.* Eastern Psychological Association Meeting, Fall 1986.

**Wasserstein J**, Healy J, Sorman P, Bemporad J, Zappulla R, Rosen J. *Effects of Frontal Lobe Pathology on Nonsocial and Social Cognition:* American Psychological Association Meeting,1995.

Imber ML, Shapley R, **Wasserstein J**, Hirsch J. *fMRI Investigation of Regions Activated By Multiple Illusory Contours and Street Figures*, Association of Research in Vision and Ophthalmology Meeting, 1998.

Barr WB, Zaroff C, **Wasserstein J.** *Validation of a Short Form of the Ruff Figural Fluency Test*, National Academy of Neuropsychology Meeting, 2002.

Solanto MV, Marks DJ, Mitchell K, **Wasserstein J** & Kofman, MD. *Development of a Meta-Cognitive Therapy for Adults with AD/HD.* Presented

9

at the 41st annual meeting of the Association for Behavioral and Cognitive Therapies, Philadelphia, PA, 2007.

**Wasserstein J**, Solanto MV, Marks DJ, Mitchell K.  *Diagnosis of ADHD in Adults: What is the Appropriate Symptom Threshold?*  Presented at the 38th Annual Meeting of the International Neuropsychological Society, Acapulco, Mexico. 2010.

Solanto, MV, Marks, D, **Wasserstein, J**, Mitchell, K, Abikoff, H, Alvir, JMJ, & Kofman, M. *Cognitive-Behavioral Treatment of Adult ADHD:  Targeting Executive Dysfunction.* Presented at the 3rd International Congress on ADHD: From Childhood to Adult Disease.  Berlin, Germany, 2011

WORKSHOPS

**Wasserstein J** and Brown T. *Adult Attention Deficit Disorder:  New Research and Typical Presentations*, Continuing Education Course.  International Neuropsychological Society Meeting, 1999.

**Wasserstein J.**  *Nonverbal Learning Disabilities in Adulthood*.  NY State Psychiatric Institute.  Understanding NVLD:  Assessment and Intervention Through the Lifespan, June, 2002.

Solanto MV, **Wasserstein J**.  *A New Cognitive-Behavioral Treatment to Enhance Executive Function in Adults*.  Presented at the 23rd Annual CHADD International Conference, Orlando, FL, November 2011.

10