# 23-3

## United States Court of Appeals for the Second Circuit

Robert Sampson,
*Plaintiff-Appellee*,

v.

National Board of Medical Examiners,
*Defendant-Appellant*.

**On Appeal from the United States District Court
for the Eastern District of New York, No. 22-cv-5120**

––––––––––––––––––––––––

**BRIEF OF APPELLEE ROBERT SAMPSON**

––––––––––––––––––––––––

CHARLES WEINER
LAW OFFICES OF
CHARLES WEINER
99 Lantern Drive, Suite 202
Doylestown, PA 18901
Tel.: (267) 685-6311

MARY C. VARGAS
MICHAEL S. STEIN
STEIN & VARGAS, LLP
10 G Street NE, Suite 600
Washington, DC 20002
Tel.: (240) 793-3185

*Counsel for Plaintiff-Appellee*

**Table of Contents**

Table of Authorities ...................................................................................iv

Statement of the Issues............................................................................1

Statement of the Case..............................................................................2

    A.    Robert Sampson ....................................................................2

    B.    Diagnosis with Learning Disabilities and ADHD................5

    C.    Sampson Starts Medical School...........................................6

    D.    Sampson Seeks Accommodations from NBME ..................8

    E.    Sampson Continues His Medical Education .........................9

    F.    Sampson Undergoes Additional Comprehensive Educational Testing ...............................................................................9

    G.    Sampson Again Seeks Accommodations from NBME ......11

    H.    Preliminary Injunction Hearing.........................................11

    I.    District Court Grants Preliminary Injunction.....................13

Summary of Argument ...........................................................................15

Argument.................................................................................................17

I.    The District Court's Factual Determinations Are Subject to Deferential Review ...............................................................................................17

    A.    The Court's Factual Findings Are Well-Supported by the Record.....18

        1.    Sampson demonstrated difficulties with reading and attention throughout his life ...................................................18

        2.    Sampson has an extensive history of formal and informal accommodations.......................................................21

i

3.      Sampson relied on mitigating measures to minimize reading during standardized examinations such that standardized test outcomes masked the extent of his disabilities.........................22

B.     The District Court Reasonably Chose To Credit the Conclusions of Psychologists Who Evaluated Sampson in Person ............................23

C.     NBME's Claims About Disability Overdiagnoses Have No Application to the District Court's Credibility Determinations..........29

II.     The District Court Correctly Granted a Preliminary Injunction ..................31

A.     The District Court Correctly Held that Sampson Demonstrated Irreparable Harm ...................................................................................32

B.     The District Court Correctly Held that Sampson Is Substantially Likely To Prevail on the Merits ..........................................................36

1.      The District Court's Holding that Sampson Is Substantially Likely to Establish Disability Is Supported by Ample Evidence....................................................................................39

2.      The District Court Appropriately Considered the Totality of the Circumstances in Determining that Sampson Has Disabilities ............................................................................43

3.      DOJ Regulatory Guidance Further Supports the District Court's Decision To Credit the Conclusions of Sampson's Evaluating Professionals ......................................................................45

4.      NBME May Not Rely on Sampson's History of Using Mitigating Measures to Achieve Academic Success................51

C.     The District Court Correctly Held that the Balance of Hardships Tips Sharply in Sampson's Favor ..............................................................54

D.     The District Court Correctly Held that the Public Interest Supports Granting a Preliminary Injunction.....................................................56

III.     Conclusion .......................................................................................................58

Certificate of Compliance ..........................................................59

Certificate of Service ...............................................................60

## Table of Authorities

**Cases**

*Alleyne v. N.Y. State Educ. Dep't*,
    516 F.3d 96 (2d Cir. 2008) ................................................................17

*Anderson v. Bessemer City*,
    470 U.S. 564 (1985) ........................................................ 17, 18, 23

*Baer v. Nat'l Bd. of Med. Exam'rs*,
    392 F. Supp. 2d 42 (D. Mass. 2005) ............................................ 33, 34

*Bach v. Law Sch. Admissions Council, Inc.*,
    1:13-CV-888, 2014 U.S. Dist. LEXIS 124632 (M.D.N.C. Feb. 4, 2014) ..... 34, 57

*Bartlett v. N.Y. State Bd. of Law Exam'rs*,
    No. 93 CIV 4986, 2001 U.S. Dist. LEXIS 11926
    (S.D.N.Y. Aug. 15, 2001) ............................................................ 52, 53

*Benisek v. Lamone*,
    138 S. Ct. 1942 (2018) ..................................................................34

*Berger v. Nat'l Bd. of Med. Exam'rs*,
    Case No. 1:19-cv-99, 2019 U.S. Dist. LEXIS 145666
    (S.D. Ohio Aug. 27, 2019) ............................... 24, 46, 50, 52, 53

*Black v. Nat'l Bd. of Med. Exam'rs*,
    281 F. Supp. 3d 1247 (M.D. Fla. 2017) ............................................52

*Black & Decker Disability Plan v. Nord*,
    538 U.S. 822 (2003) ....................................................................48

*Bragdon v. Abbott*,
    524 U.S. 624 (1998) ....................................................................46

*Campbell v. Lamar Inst. of Tech.*,
    842 F.3d 375 (5th Cir. 2016) .........................................................57

*Doherty v. Nat'l Bd. of Med. Exam'rs*,
    791 F. App'x 462 (5th Cir. 2019) .................................................................. 41, 42

*Enyart v. Nat'l Conf. of Bar Exam'rs*,
    630 F.3d 1153 (9th Cir. 2011) ...................................................................... 33, 37

*Fernandez v. Zoni Language Centers, Inc.*,
    858 F.3d 45 (2d Cir. 2017) ....................................................................47

*Guzzo v. Cristofano*,
    719 F.3d 100 (2d Cir. 2013) ....................................................................18

*Halo v. Yale Health Plan, Dir. of Benefits & Records, Yale Univ.*,
    819 F.3d 42 (2d Cir. 2016) ....................................................................47

*Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs*,
    870 F. Supp. 2d 607 (S.D. Ind. 2012) .......................................................... 28, 52

*J.D. v. Colonial Williamsburg Found.*,
    925 F.3d 663 (4th Cir. 2019) ....................................................................37

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019)........................................................................... 47, 48

*Monowise Ltd. v. Ozy Media, Inc.*,
    17-CV-8028 (JMF), 2018 U.S. Dist. LEXIS 75312  (S.D.N.Y. May 3, 2018) ...34

*New York v. Actavis PLC*,
    787 F.3d 638 (2d Cir. 2015) ....................................................................31

*Pazer v. N.Y. State Bd. of Bar Exam'rs*,
    849 F. Supp. 284 (S.D.N.Y. 1994).............................................................34

*Picard v. Fairfield Greenwich Ltd.*,
    762 F.3d 199 (2d Cir. 2014) ....................................................................18

*Powell v. NBME*,
    364 F.3d 79 (2d Cir. 2004) ....................................................................56

*Ramsay v. Nat'l Bd. of Med. Exam'rs*,
  Civ. A. No. 19-CV-2002, 2019 U.S. Dist. LEXIS 222782
  (E.D. Pa. Dec. 30, 2019)......................................................................... 24, 40, 50

*Ramsay v. Nat'l Bd. of Med. Exam'rs*,
  968 F.3d 251 (3d Cir. 2020), *cert. denied*, 141 S. Ct. 1517 (2021) ............ *passim*

*Rawdin v. American Bd. of Pediatrics*,
  582 F. App'x 114 (3d Cir. 2014).........................................................56

*Rothberg v. Law Sch. Admission Council*,
  102 F. App'x 122 (10th Cir. 2004)......................................................55

*Rush v. Nat'l Bd. of Med. Exam'rs*,
  268 F. Supp. 2d 673 (N.D. Tex. 2003)................................................24

*Talk Am., Inc. v. Mich. Bell Tel. Co.*,
  564 U.S. 50 (2011) ............................................................................47

*Valles v. ACT, Inc.*,
  Civ. A. No. 4:22-CV-568, 2022 U.S. Dist. LEXIS 125769 (E.D. Tex. July 15,
  2022)...............................................................................................52

*Wright v. Nat'l Bd. of Med. Exam'rs*,
  Case No. 21-cv-02319-DDD-NYW, 2021 U.S. Dist. LEXIS 211275
  (D. Colo. Oct. 15, 2021) ................................................................ 34, 35, 50, 52

**Statutes**

42 U.S.C. § 12101(a)(7)........................................................................57

42 U.S.C. § 12101(a)(8)........................................................................30

42 U.S.C. § 12102(1)(A)........................................................................37

42 U.S.C. § 12102(2)(A)........................................................................37

42 U.S.C. § 12102(4)(A)........................................................................38

42 U.S.C. §12102(4)(E)(i)(IV) ...............................................................39

vi

42 U.S.C. § 12182 .......................................................................49

42 U.S.C. § 12186(b) ..............................................................46

42 U.S.C. § 12188(b) ..............................................................46

42 U.S.C. § 12189 ............................................... 36, 48, 49, 56

42 U.S.C. § 12206(c) ...............................................................46

ADA Amendments Act, Pub. L. No. 110-325 ..................... 29, 33, 38, 44

**Rules**

Fed. R. Civ. P. 26(d)(1) ............................................................50

Fed. R. Civ. P. 52(a)(6) ...........................................................17

**Regulations**

28 C.F.R. § 36.101(b) ..............................................................38

28 C.F.R. § 36.105(a)(2)(i) ......................................................38

28 C.F.R. § 36.105(b)(2) .........................................................37

28 C.F.R. § 36.105(d)(1)(i) ......................................................38

28 C.F.R. § 36.105(d)(1)(ii) .....................................................38

28 C.F.R. § 36.105(d)(1)(v) .....................................................37

28 C.F.R. § 36.105(d)(1)(vi) .............................................. 39, 46

28 C.F.R. § 36.105(d)(1)(vii) ............................................. 38, 43

28 C.F.R. § 36.105(d)(3)(i) ......................................................51

28 C.F.R. § 36.105(d)(3)(iii) .............................................. 37, 51

28 C.F.R. § 36.309(b)(1)(i) .......................................................... 37, 49, 55

28 C.F.R. § 36.309(b)(1)(v) ........................................................ 39, 40, 42

28 C.F.R. § 36.309(b)(2) .................................................................... 37

Amendment of Americans with Disabilities Act Title II and Title III Regulations
    To Implement ADA Amendments Act of 2008, 81 Fed. Reg. 53,204 (Aug. 11,
    2016) ................................................................................... 53, 54

Nondiscrimination on the Basis of Disability by Public Accommodations and in
    Commercial Facilities, 73 Fed. Reg. 34,508 (June 17, 2008) ............................ 47

Nondiscrimination on the Basis of Disability by Public Accommodations and in
    Commercial Facilities, 75 Fed. Reg. 56,236 (Sept. 15, 2010) .................... *passim*

**Other Authorities**

154 Cong. Rec. H8286 (daily ed. Sept. 17, 2008) .................................................. 39

H.R. Rep. No. 101-485(III) (1990), reprinted in 1990 U.S.C.C.A.N. 445 ....... 56, 57

Allyson Harrison, Attention Deficit Disorders, Learning Disorders, and Other
    Incentivized Diagnoses—Special Issue for Psychologists, 15 PSYCHOLOGICAL
    INJURY & LAW 227 (2022) ........................................................... 30, 31

Robert Mapou, *Have We Loosened the Definition of Disability? The Effects of
    Changes in the Law and Its Interpretation on Clinical Practice*, 15
    PSYCHOLOGICAL INJURY & LAW 307 (2022). ..................................................... 29

Kristina H. Petersen, *et al.*, *Impact of USMLE Step-1 Accommodation Denial on
    US Medical Schools: A National Survey*, PLoS ONE, April 14, 2022,
    https://doi.org/10.1371/journal.pone.0266685 .................................................... 57

United States Medical Licensing Examination, Performance Data,
    https://www.usmle.org/performance-data ............................................................ 33

## Statement of the Issues

Plaintiff-Appellee Robert Sampson is twice exceptional. He is both an extraordinarily gifted medical student 40 weeks away from graduation from medical school and a person with learning disabilities and ADHD. Sampson has a lifelong history of struggling with reading and attention and has been referred repeatedly to learning specialists. Every expert to have administered neuropsychological evaluations to Sampson concluded that he needs extended time as a testing accommodation. Sampson's medical school also determined that Sampson is disabled and provides him with accommodations, including double (100%) time for examinations.

The National Board of Medical Examiners ("NBME") administers a three-part examination called the United States Medical Licensing Examination ("USMLE"). Before Sampson can begin the final 40 weeks of medical school, he must take and pass the first part of the USMLE, called Step 1. NBME, contrary to the recommendations of Sampson's evaluators and his medical school, has refused to provide Sampson with necessary accommodations for Step 1.

If Sampson fails the test without accommodations, he will be dismissed from medical school and will not be eligible to retake Step 1. Consequently, Sampson sought a preliminary injunction seeking the same testing accommodations that his

1

medical school provides for examinations.  The District Court granted the preliminary injunction, and NBME now appeals.

With Sampson's entire future hanging in the balance, this appeal presents the following issues:

1. Are the District Court's factual findings supported by the record, including its findings that Sampson has a lifelong history of severe reading and attention impairments, a history of formal and informal accommodations, and used mitigating measures on standardized examinations?

2. Did the District Court act within its discretion in granting a preliminary injunction requiring NBME to provide Sampson with the same accommodations as his medical school, given Sampson's lifelong history of struggles with reading and attention, history of receiving accommodations, and use of mitigating measures?

**Statement of the Case**

**A.    Robert Sampson**

Robert Sampson is an extraordinarily gifted medical student who is just 40 weeks away from completing his medical degree.  Already, Sampson has invented two life-saving medical systems for which he was awarded U.S. patents.  A1005-

1006 (141:13-142:18).[1]  Medical school preceptors who observed Sampson's care of patients describe him as intelligent, impressive, extremely dedicated, selfless, empathetic, showing integrity, and demonstrating knowledge above that expected for his level of training.  A40-42.

Just as Sampson's gifts are evident, his disabilities are equally evident. Sampson is a person with learning disabilities (dyslexia) and Attention Deficit Hyperactivity Disorder (ADHD).  A939:23-24 (Wasserstein Report).  From his earliest childhood, Sampson has worked harder and longer than others to learn, relying on support from reading specialists, his family, and tutors who read aloud to him what he struggled to read on his own.

As early as the age of 3 or 4, Sampson was diagnosed with severe stuttering, a diagnosis that is common during the developmental period among people later diagnosed with dyslexia.  A1009 (156:3-156:25); A1042-43 (194:22-195:8); A1043 (196:4-12).  He underwent lengthy and intense intervention therapy that required his entire family to slow their speech to allow longer processing time for Sampson.  A1009 (156:3-158:10).

Sampson's grade school records are replete with mention of difficulties with reading, attention, focus, organization, inability to complete assignments in a

---

[1] "A" cites are to the Joint Appendix.  Cites to sealed portions of the Joint Appendix additionally have a dash and page cite (*e.g.*, A939-23).  "SPA" cites are to the Special Appendix.

timely manner, and difficulty with comprehension.  A993 (91:22-93:6); A790-91 at ¶ 14; A850-51; A852-67.  He was twice referred by his public school to a reading specialist.  A993 (90:18-91:15); A1011 (162:7-21); A788 at ¶ 4; A848-49.

Sampson's reading has always been slow as compared to most people in the general population and he experiences challenges with comprehension of what he reads.  A975 (18:15-23); A975 (19:1-16).  Consequently, all the way back to his earliest education, Sampson was not able to complete tests during the time allotted.  He had to read and reread information frequently to comprehend it.  A939-5; A1043 (195:4-25).  Even in elementary school, he routinely had to finish tests at lunch or after school that other students finished during class.  A980 (41:18-42:2).  He particularly hated having to read aloud in school because after reading aloud, he would be asked questions about what he had just read, and he would be unable to recall.  A981-82 (45:19-46:4).

Likewise, Sampson's writing has always been replete with hallmarks of learning disabilities including reversal of letters and copying numbers and letters in the wrong order.  A975 (19:19-25).  Despite being an accomplished cellist, Sampson was unable to read music.  A982-83 (49:21-51:9).

As a high school student, Sampson required intensive tutoring that was both different in volume and nature from the tutoring children without disabilities typically receive.  Tutors provided written information through oral means to help

Sampson overcome his disabilities.  A981 (43:14-22); A981 (44:20-45:8); A1043 (197:25-198:22).

In college, Sampson mitigated his disabilities in a multitude of ways, including recording lectures, relying on audiobooks, using a Livescribe pen which linked audio recordings of lectures to notes and diagrams made during class, working with tutors who verbally engaged and discussed material with him, and by avoiding classes with heavy reading and timed tests.  A983 (51:14-53:12). Professors informally accommodated Sampson in providing extended testing time because they saw he knew the material but struggled to show his knowledge on timed tests. As he had been throughout his life, he was routinely the last person in the room trying to complete tests that other students readily finished with time to spare.

### B. Diagnosis with Learning Disabilities and ADHD

It was when Sampson was preparing to take the Medical College Admissions Test ("MCAT") that Dr. Andrew Lam, a tutor who spent hundreds of hours working with him, saw his struggles with reading, comprehension, speed, and focus first-hand and recommended a psychological evaluation.  A793-794 at ¶¶ 3-9. Dr. Lam directly observed that Sampson has substantial impairment in reading and comprehension as compared to most people in the general population. A974 (15:18-20); A974 (16:4); A974 (16:12-14); A975 (20:15-20); A979 (35:1-5);

A985 (60:19-61:15). He observed that Sampson reversed numbers and forget information he had just read. A975 (19:6-25); A793-94 at ¶¶ 5-6.

Dr. Lam worked with Sampson to develop test-taking strategies to ameliorate the impact of his observable impairments. These mitigating measures included reading question prompts and topic sentences, decoding language via notes, and reading *only* those portions of the text that question prompts directed him to, without reading the entire passage. A975 (19:8-11); A975 (21:16-24); A976 (22:2-17); A985 (58:4-22).

With Dr. Lam's encouragement, Sampson obtained educational testing in 2013, with results confirming what Dr. Lam suspected—that Sampson had learning disabilities and needed testing accommodations. A985-986 (61:15-62:1); *see also* A810-1-810-10 (neuropsychological evaluation by Dr. Suzanne Michels); A809-1-809-11 (neuropsychological evaluation by Dr. Allison Anderson); A1046 (207:16-208:7). Sampson also began seeing a psychiatrist, Dr. Thomas Aronson, who prescribed him medication for ADHD. A820, A877-879.

### C. Sampson Starts Medical School

Sampson began medical school at Stony Brook University ("Stony Brook"), initially relying on the mitigation strategies that had worked for him in the past.

Sampson did not initially receive extended time as a formal accommodation on shelf exams which consist of retired NBME questions. A988 (72:9-73:3).

6

Sampson could not read all the questions within the time allotted and was always the only one of his classmates who did not complete shelf exams. A988-989 (73:24-74:11).

Sampson requested formal accommodations from his medical school's disability office. A987 (69:4-21). Stony Brook reviewed the results of his comprehensive educational testing, personally interviewed Sampson, and concluded that he has disabilities. A987-988 (69:17-70:4). Stony Brook approved Sampson for note-taking services, 50% extended testing time, and a separate testing area. A988 (70:1-71:20); A821; A822-823. With 50% extended time, Sampson was able to read more of the questions though still did not have time to complete all the questions. A988-989 (73:8-74:11).

Stony Brook also referred Sampson to Linda DeMotta, a learning specialist at Stony Brook for students with disabilities. DeMotta personally observed Sampson read in slow and labored manner and struggle with comprehension and focus. A988 (71:2-20); A822-23; A897.

Even though Sampson passed all of his classes during the first year and a half of medical school, a Stony Brook committee looked at his performance on shelf examinations before he began receiving testing accommodations, and required him to either repeat the entirety of his medical education, or take Step 1 of the USMLE earlier than his peers. A988 (71:25-72:7).

7

### D. Sampson Seeks Accommodations from NBME

To comply with his medical school's directive, Sampson applied for accommodations for Step 1. A989 (74:16-75:13). NBME admits that it provides extended time to students it deems disabled. SPA9; A69-70 at ¶¶ 7-8.

Although Sampson submitted substantial documentation of disability, including comprehensive neuropsychological evaluations, certification of disability from his medical school, and letters from learning specialists who observed his challenges with reading and attention, NBME repeatedly denied Sampson's requests for accommodation. In January 2020, Sampson was forced to take Step 1 without accommodations. A995 (101:14-23).

Sampson prepared extensively using multiple mitigating strategies as he had for examinations through his education. He did thousands of practice questions, watched video lectures, and attempted time-saving measures he had utilized on the MCAT, but despite extraordinary effort, Sampson was unable to read many of the questions without extended time and consequently failed Step 1. A60, A996-97 (102:8-107:10); SPA13. The same strategies that Sampson had been able to employ on the SAT, ACT, and MCAT to reduce the amount of text to read do not work on the USMLE. A60; A976 (22:21-24:9); A979 (34:22-25). For instance, while MCAT questions have only four answer choices, USMLE questions can have as many as eleven answer choices significantly reducing the chances that a

8

guess when time runs out would result in a correct answer and requiring reading all answer choices.  A997 (106:9-25); A1061 (270:7-9).  Further, the MCAT has one vignette for multiple questions, while the USMLE has vignettes for most questions. A1061 (270:14-16); A1062 (271:3-7).

### E.  Sampson Continues His Medical Education

Although Stony Brook initially informed Sampson it was expelling him because he had not passed Step 1, Sampson's counsel advised Stony Brook that such expulsion would be discriminating against Sampson on the basis of disability. A996 (102:1-7); A997-998 (107:4-110:14).  Stony Brook reversed its decision and permitted Sampson to continue into his third year of medical school and take Step 1 at the completion of his third year—the same time that the rest of his classmates were required to take Step 1.  A997-98 (109:7-110:14); A998 (112:12-13); A998 (112:19-113:3).

Sampson excelled in his third year of medical school, earning stellar performance reviews that spoke of both his dedication to patients and his advanced knowledge.  A29 at ¶ 2; A40-42. Sampson also earned a 4.0 in graduate business school classes as a joint-degree student. A999 (116:11-12).

### F.  Sampson Undergoes Additional Comprehensive Educational Testing

Meanwhile, even as the world shut down due to Covid-19, Sampson underwent additional, comprehensive testing from a board-certified

9

neuropsychologist because the NBME requires testing be less than three years old. A998-99 (113:15-114:5); A1000 (118:13-18); A1037 (172:3). Dr. Wasserstein is a highly respected neuropsychologist with more than three decades of experience working with individuals with learning disabilities and ADHD. A1037 (172:2–173:2); A1037-38 (174:9–176:10); A1038 (177:2–25); A960-969.

In addition to reviewing Sampson's prior neuropsychological and psychological evaluations and taking a comprehensive history, Dr. Wasserstein and her associate personally administered an extensive 15-hour battery of assessments. A939-2-10; A939-13-14; A1040 (185:20-186:19). Dr. Wasserstein diagnosed Sampson with a learning disorder in reading (dyslexia) and ADHD. A1052 (233:20–24); A939-22-24. Dr. Wasserstein noted underlying neurocognitive deficits that caused Sampson to read "very, very slow[ly]". A1047 (212:18-214:9). Based on her comprehensive evaluation, Dr. Wasserstein concluded that Sampson needs double time, a separate exam room, and extra breaks. A1053 (238:2–17); A939-25.

Even before Dr. Wasserstein's report was issued, Stony Brook's disability services spoke with Dr. Wasserstein about her observations and conclusions. Based on these conversations as well as the observations of its own learning specialist, Stony Brook granted Sampson double time on examinations, extra breaks, note-taking services, and a separate testing area. A999 (114:24-115:20).

10

With these accommodations in place, Sampson finally had enough time to read all of the questions on shelf examinations, ensuring that the resulting scores accurately reflected the extent of his medical knowledge. A999 (115:9-15).

### G. Sampson Again Seeks Accommodations from NBME

The pandemic delayed the final issuance of Sampson's written evaluation with Dr. Wasserstein almost dying from Covid-19. A1000 (118:1-21); A1040 (186:12-19). Once the evaluation was issued, Sampson submitted a renewed request to NBME for accommodations. A998-99 (116:20-117:5); A929-938; A939-1-25; A1000 (119:11-13). By this point, Sampson had provided NBME with a substantial amount of evidence documenting his disabilities and need for accommodations, including letters from a treating psychiatrist of many years, learning specialists, evaluators going back almost a decade, doctors, and his medical school all documenting his need for extended time.

On June 1, 2022, contrary to the conclusions of Sampson's medical school and every examining and treating source, NBME again denied Sampson's request. A1000 (119:14-15); A940-941. Shortly thereafter, Sampson filed suit. A1; A1001 (122:8-123:5).

### H. Preliminary Injunction Hearing

Sampson is at imminent risk of dismissal from medical school despite having passed all his medical school classes. A998 (110:5-7); A1000-1001

11

(121:18-123:16); A1008 (152:4-10). He cannot proceed in medical school without taking Step 1. A978 (38:16-17). If he fails the test without accommodations, he will be dismissed. A38 at ¶ 43. Once dismissed, he is no longer eligible to take the Step 1 examination. A76-77 at ¶ 34 (McGeehan Decl.). He would no longer be able to become a doctor—a dream that he has worked towards his entire life. A38 at ¶ 44; A979 (36:24-37:9); A1001 (123:12-16).

Based on his medical school's stated intention of dismissing Sampson in August 2022, and NBME's final refusal to provide any accommodations, Sampson sought a preliminary injunction limited to Step 1, requesting the same accommodations that his medical school provides him. A1001 (123:18-23).

The Court held a three-day evidentiary hearing. SPA19. At hearing, Sampson laid his most private battles bare for examination offering testimony about the challenges he spent a lifetime trying to mitigate and hide. Dr. Lam testified about his personal observations of Sampson during more than 200 hours of tutoring that Sampson's reading challenges were the most notable from among the hundreds of students of all ages and abilities he had personally tutored. Dr. Wasserstein testified extensively about the results of her comprehensive evaluation and how Sampson's reading and attention were impaired as compared to the general population. Finally, Sampson's mother, Shelley Sampson, offered

12

emotional testimony about the extraordinary intervention and support Sampson required as a child from teachers, learning specialists, and tutors.

NBME did not call a single decisionmaker or employee to explain the basis of its decision to deny Sampson's requests for accommodations.[2]  A1136 (407:17–409:25); A1137 (411:18-20).  Instead, NBME offered the testimony of two long-time consultants, Benjamin Lovett and Kevin Murphy, neither of whom made the decision to deny Sampson accommodations.  A1136 (407:17-25).[3]  Unlike Dr. Wasserstein, neither Lovett nor Murphy hold board certification.  A1086 (369:3–5); A225; A301-302.  Moreover, Lovett does not do any clinical evaluations or diagnostic assessments.  A1082 (353:10–354:7).  Neither Lovett, Murphy, nor any other NBME consultant has ever met with, spoken to, interviewed, or evaluated Sampson.  A1083 (356:2-357:7), A1140 (423:21-424:13).

## I.  District Court Grants Preliminary Injunction

Following a three-day evidentiary hearing, the District Court granted the preliminary injunction.

---

[2] By not calling any NBME decisionmakers as witnesses, NBME avoided subjecting itself to cross-examination.

[3] NBME submitted declarations from additional consultants it opted not to call as witnesses, some of whom stated in their declarations that they had not had sufficient time to review Sampson's file before offering their opinions.  A433 ¶ 7, A434 ¶ 8 (Flanagan Decl.).

13

The District Court held that Sampson could demonstrate irreparable harm. SPA20-24.  The District Court noted that since Sampson already failed Step 1 without accommodations, he will likely fail again without accommodations and be dismissed from medical school and his "medical career will effectively end." SPA22.  Delays pending trial on the merits "would continue to deprive Sampson of his opportunity to pursue is medical training." SPA22.

The District Court held that Sampson was substantially likely to prevail under the Americans with Disabilities Act.  SPA24-39.  The District Court found that Sampson has a lifelong history of severe reading and attention impairments and has relied on formal and informal accommodations to overcome these disabilities.  SPA27-29, 34-35.  The District Court further found that Sampson used mitigating measures on standardized examinations.  SPA28, 35-38.  The District Court also credited Dr. Wasserstein's conclusions, based on "the entire body of evidence", that Sampson is substantially impaired compared to most individuals in the general population.  SPA29-30.  The District Court found unpersuasive the conclusions of NBME's consultants who did not personally evaluate Sampson, employed too exacting a standard for disability, and relied on erroneous factual assumptions.  SPA30-39.

The District Court held that the balance of hardships favors Sampson because unless he has a fair opportunity take the test with accommodations, he

14

risks imminent dismissal from medical school. SPA39-40. Finally, the District Court held that the public interest favors giving Sampson the same opportunity as individuals without disabilities to demonstrate his knowledge of medicine. SPA40-41.

## Summary of Argument

Sampson wholeheartedly agrees with NBME's proposition that the Step 1 examination be administered fairly. Department of Justice regulations require NBME to provide accommodations to "best ensure" that Step 1 scores measure the extent of Sampson's medical knowledge rather than the extent of his disabilities. Testing accommodations will ensure that Sampson is able to read all the questions. He must still answer the same questions as individuals without disabilities and his answers will be scored the same way. Absent preliminary injunction, Sampson would suffer irreparable harm in being dismissed from medical school and no longer being able to retake Step 1.

The District Court's factual findings confirmed what Sampson's educators have long known about him—that he has severe reading and attention disabilities. The District Court made the key factual findings that Robert Sampson has a life-long history of struggling with reading and attention, has a history of formal and informal accommodations, and has employed mitigating measures on standardized examinations such that the scores on those examinations do not reflect the true

extent of his disabilities or his knowledge. The District Court acted well within its discretion in its straightforward application of the law to these facts and finding that Sampson is substantially likely to prevail on his claim under the Americans with Disabilities Act.

The District Court appropriately made credibility determinations, including its finding that Sampson's evaluating psychologist—Dr. Wasserstein—was more persuasive than that of NBME's consultants. The District Court noted that Dr. Wasserstein considered the "entire body of evidence" including personal observations of Sampson. The District Court noted that NBME's consultants relied on incorrect factual assumptions not borne out by the record and applied too exacting a disability standard in scrutinizing Sampson's profile. The District Court's giving greater weight to Dr. Wasserstein's conclusions accords with Department of Justice ("DOJ") regulatory guidance noting that the conclusions of evaluating professionals should be given greater weight because such professionals have the opportunity to conduct in-person evaluations which are particularly critical in diagnosing learning disabilities and to gather more information as part of the individualized assessment that the ADA requires.

Since all Sampson requests is a fair opportunity to demonstrate his medical knowledge and it costs NBME nothing to provide Sampson with that opportunity,

16

the District Court acted well within its discretion in finding that the balance of hardships and public interest strongly favor a preliminary injunction.

## Argument

## I. The District Court's Factual Determinations Are Subject to Deferential Review

This Court's review of a grant of preliminary injunction is the deferential abuse of discretion standard. *E.g.*, *Alleyne v. N.Y. State Educ. Dep't*, 516 F.3d 96, 100 (2d Cir. 2008).

Fed. R. Civ. P. 52(a)(6) provides, "Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." Rule 52(a) was authoritatively construed by the United States Supreme Court in *Anderson v. Bessemer City,* 470 U.S. 564 (1985):

> This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently. The reviewing court oversteps the bounds of its duty under Rule 52(a) if it undertakes to duplicate the role of the lower court. "In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues *de novo*." *If the district court's account of the evidence is plausible in light of the record viewed in its entirety,* the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact*, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.*

17

*Id.* at 573-74 (emphases added and citation omitted).[4]

## A. The Court's Factual Findings Are Well-Supported by the Record

The District Court held a three-day hearing and found that Sampson has had a lifelong struggle with reading and attention disabilities, has a history of accommodations, and has used mitigating measures on standardized examinations. NBME challenges these factual findings, but cannot meet its burden of demonstrating clear error given the wealth of evidence supporting the District Court's findings.

### 1. Sampson demonstrated difficulties with reading and attention throughout his life.

The District Court's factual finding that Sampson has a lifelong history of reading and attention disabilities is amply supported by the record:

o Sampson was referred to a speech pathologist by the time he was four years old, and the specialist advised his family to speak more slowly to

---

[4] NBME argues that it is entitled to *de novo* review whether Sampson is substantially limited in a major life activity. As this Court's precedents have made clear, however, this Court reviews "essentially factual questions for clear error" and all that receives *de novo* review is "whether the relevant facts satisfy the legal standard." *Guzzo v. Cristofano*, 719 F.3d 100, 109 (2d Cir. 2013); *see also Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199, 206 (2d Cir. 2014) (explaining that this Court "review[s] the factual findings underlying a legal determination for clear error only") (citations omitted). Since NBME challenges the District Court's factual determinations, this Court reviews those factual findings for clear error.

18

afford him more processing time.  SPA2; A1009-10 (156:6-158:4); A1043 (196:4-12).

o   Sampson's elementary school records "reflect difficulties with attention, focus, organization, and timely completion of assignments".  SPA2; A993 (91:22-93:6); A790-91 at ¶ 14; A850-A867.

o   Sampson's early elementary school teachers documented working with him to stay on task and work faster, but his fifth and sixth grade teachers reported that he still remained confused by questions and directions in class and his lack of focus interfered with task completion.  SPA2-3; A850-51.

o   Sampson was referred to learning specialists in elementary school, in high school, and again in medical school.  SPA4; A788 at ¶ 4; A822-23; A897; A988 (71:2-20); A1011 (162:7-21).

o   Sampson testified credibly that reading was "painful" for him and that when he was asked to read out loud in school, "he could not answer his teachers' questions about the material because he 'would have no idea what [he] just read.'"  SPA3; SPA 10; A981-A982 (43:12-22, 45:18-24, 46:2-3).

o   Sampson struggled to learn foreign languages, to hear words of songs, and to read music—struggles all common in students later diagnosed

19

with learning disabilities—such that his cello teacher "asked [him] if [he] was stupid on multiple occasions," and "asked [him] if he [had] dyslexia . . . [and] a learning disability." SPA3; A983 (50:22-51:1); A939-2.

o In college, Sampson avoided classes with substantial reading and writing requirements and "simply did not read text books or other books". SPA4; A30-31 at ¶ 9.

o Dr. Lam, Sampson's MCAT tutor, observed Sampson "reverse letters and numbers, and otherwise miswrite numbers" and struggle with sentences with multiple clauses, only to forget the previous sentence as soon as he moved on to the next sentence. SPA27-28; A793-794 at ¶¶ 5-6.

o Out of the hundreds of elementary, middle, high school, and college students Dr. Lam had worked with, he said Sampson "by far…had the most difficulty…when it came to processing written text and reading." SPA28; A974-975 (16:3-4, 16:10-14, 20:11-20).

o The learning specialist Sampson's medical school assigned to work with him and who witnessed his reading first-hand noted that Sampson "has a slow reading rate and poor visuospatial processing such that he will avoid reading because the reading process is both painful and exhausting" and

that his "dyslexia substantially impairs his reading skills, test taking skills, time management skills, and memory." SPA28; A57-58.

**2. Sampson has an extensive history of formal and informal accommodations.**

o Throughout his education, Sampson's teachers allowed him extra time to take timed exams during lunch or after school, though, as described, he was still unable to finish the exams with this additional time. SPA3; A980 (41:11-25).

o Sampson relied on audiobooks and recordings of classroom material. He also relied on an army of tutors who along with his mother read written material aloud to him. SPA4; A980 (39:16-17), A981 (43:12-44:6), A30 at ¶ 8, A848-49.

o In college, Sampson recorded lectures using a Livescribe pen, which synced lecture audio with his own notes, allowing him to later "refer back to what was said at that moment and repeat it many times." SPA4; A983 (52:3-22).

o Sampson's medical school provided formal accommodations including extended testing time, notetakers, and support from a learning specialist. SPA18; A999 (115:9-12).

o Sampson received extended time on NBME shelf exams in medical school. SPA29; A999 (115:11-15).

21

**3. Sampson relied on mitigating measures to minimize reading during standardized examinations such that standardized test outcomes masked the extent of his disabilities.**

o   As described, *supra*, Sampson relied on mitigating measures such as tutors who read out loud to him, Livescribe pens, and was informally granted extended time on tests throughout his schooling.  SPA4; A30-31 at ¶¶ 8-10; A848-49, A983 (52:3-22); A980 (39:16-17, 41:11-25); A981 (43:12-44:6).

o   Sampson developed various test taking strategies to mitigate his reading impairments.  On the SAT and the ACT sections that required answering questions about passages, Sampson read the answer prompt and the answer choices and answered without reading the preceding material if at all possible.  SPA5; A1003 (130:5-131:7, 133:10-15); A31-32 at ¶ 11.

o   For the MCAT, Sampson relied on more than 200 hours of tutoring from Dr. Lam, who taught him strategies for minimizing reading while taking the MCAT. SPA5, A974 (15:23-16:4), A986 (63:1-10), A848-849.

Given the abundance of evidence supporting the District Court's factual findings, NBME cannot meet its high burden of establishing that the District Court's findings are clearly erroneous.

22

**B. The District Court Reasonably Chose To Credit the Conclusions of Psychologists Who Evaluated Sampson in Person**

NBME also challenges the District Court's decision to credit the expert testimony of Dr. Wasserstein who concluded, on the basis of the totality of the data, including her personal observations, that Sampson has impaired reading speed and attention and as a result needs 100% extended time. The District Court acted well within its discretion in listening to the witnesses testify and concluding that Dr. Wasserstein is more credible than NBME's consultants. As the Supreme Court has explained, when "there [are] two permissible views of the evidence," "the factfinder's choice between them cannot be clearly erroneous." *Anderson,* 470 U.S. at 574.

The District Court noted that Dr. Wasserstein, with the assistance of Dr. Miller, "spent 15 hours evaluating Sampson in person and prepared an exhaustive evaluation analyzing his psychometric scores" that accounted for her and Dr. Miller's personal observations of Sampson. SPA29. A trained professional who not only reviews all the records but also evaluates the subject in person will by definition have a more complete picture than another professional who simply reviews records, and the District Court did not clearly err in deciding to credit Dr. Wasserstein's conclusions after having heard her testify. The District Court also noted NBME's consultants did not challenge Dr. Wasserstein's administration or scoring of the evaluations. SPA30, n.13.

23

NBME claims that its own consultants should have been given greater weight because they were purportedly "independent" and "thorough" in their review of the record. The record, however, shows that neither is the case. First, the consultants are not "independent" but consultants who NBME repeatedly hires to testify on its behalf in litigation, and district courts throughout the country have repeatedly found their conclusions not credible.[5] In according little weight to these consultants, courts have recognized NBME's consultants for what they are— consultants unfamiliar with the specifics of the cases at issue.[6]

NBME further errs in describing its own consultants as experts who "thoroughly" reviewed the record. For instance, NBME consultant Flanagan twice admitted in her affidavit that she did not have adequate time to review Sampson's file. A433 ¶ 7, A434 ¶ 8 (Flanagan Decl.). Moreover, the NBME consultants' statements are rife with factual inaccuracies and glaring omissions. The

---

[5] *See, e.g.*, *Ramsay v. Nat'l Bd. of Med. Exam'rs*, Civ. A. No. 19-CV-2002, 2019 U.S. Dist. LEXIS 222782, at *50-51 (E.D. Pa. Dec. 30, 2019) (finding not persuasive the testimony of Benjamin Lovett); *Berger v. Nat'l Bd. of Med. Exam'rs*, Case No. 1:19-cv-99, 2019 U.S. Dist. LEXIS 145666, at *74 n.6 (S.D. Ohio Aug. 27, 2019) (finding not credible the testimony of Samuel Ortiz); *Rush v. Nat'l Bd. of Med. Exam'rs*, 268 F. Supp. 2d 673, 677 n.1 (N.D. Tex. 2003) (rejecting conclusions of Dawn Flanagan, Joseph Bernier, and Samuel Ortiz).

[6] Two of NBME's consultants, Joseph Bernier and Dawn Flanagan, were retained to offer affidavits at the preliminary injunction stage and played no role whatsoever during NBME's review of Sampson's requests for accommodations. These two individuals also did not testify at the hearing and were not subject to cross-examination.

24

consultants assert, for instance, that Sampson had no history of accommodations prior to medical school.  As described *supra*, there is a wealth of evidence supporting this history of accommodations Sampson received, and the District Court acted within its discretion in giving less weight to the conclusions of NBME's consultants who assumed incorrect facts.

NBME's consultants did not evaluate Sampson in person and therefore lack the keen insights that Dr. Wasserstein and her associate gleaned from observing him in person.  For instance, during his evaluation Sampson made errors of visual perception such mistaking the "+" character for "x".  A939-17.  In contrast, the NBME's consultants, having never met or observed Sampson, are unable to offer detailed observations and conclusions.  The District Court therefore had ample reason to find less persuasive the conclusions of NBME' consultants.

The District Court also noted that NBME and its consultants "place too much emphasis on Sampson's academic and test-taking outcomes, without accounting for the mitigating measures he employed to achieve those outcomes." SPA35.  As described, *supra*, the District Court chose to credit the testimony of witnesses who testified that Sampson employed mitigating measures such as test-taking strategies to minimize the amount of reading necessary to do well on the ACT and MCAT.  *See, e.g.*, SPA38 (crediting the testimony of Dr. Lam, an MCAT

tutor).  The District Court appropriately found less persuasive the conclusions of NBME's consultants who relied on incorrect factual assumptions.

The District Court also acted well within its discretion in crediting Dr. Wasserstein's interpretation of the psychometric testing over that of NBME consultants.  The District Court noted that Dr. Wasserstein did not rely on any single test but rather on "multiple measures" in concluding based on the totality of the data that Sampson's reading and concentration abilities are substantially limited compared to most people in the general population.  SPA32.  Dr. Wasserstein's conclusions are corroborated by the "real-world" experiences of Sampson growing up with a reading impairment so severe that his schools referred him to reading specialists.

For instance, NBME misinterprets the import of Sampson's results on the Scholastic Abilities Test for Adults ("SATA"), a timed reading exam based on age norms.  As the District Court observed, Sampson was able to complete only half of the questions—not uncommon for persons with dyslexia—and scored in the 25th percentile, worse than three quarters of the general population.  SPA16.  The District Court appropriately exercised discretion in crediting Dr. Wasserstein's explanation that Sampson's inability to read all of the questions on this test is

evidence that he has a reading impairment that prevents him from demonstrating the true extent of his academic abilities.[7]

NBME also errs in looking at select psychometric results in isolation without considering how Sampson's brain functions as a whole. The District Court appropriately credited Dr. Wasserstein's testimony that the degree of discrepancy between Sampson's intellectual gifts and his substantial limitations as shown by psychometric testing is "extraordinarily rare" and occurs in less than one percent of the general population. SPA15. In looking at the disabling effect of these discrepancies, the District Court appropriately relied on DOJ guidance stating that disability can be can "clinically diagnosed based in part on a disparity between an individual's aptitude and that individual's actual versus expected achievement, taking into account the person's chronological age, measured intelligence, and age-

---

[7] NBME singles out the Nelson-Denny Reading Test for allegedly using an inappropriate reference group. On this test, Sampson was able to complete only 12 of 38 questions, placing him in the bottom first percentile compared to college seniors. SPA16. When Sampson was given the opportunity to read all 38 questions, he answered 37 questions correctly. SPA16. Dr. Wasserstein testified that, based on her expertise administering psychometric testing to thousands of individuals over 31 years, this result "scream[s] dyslexia". SPA13, 16. The District Court, however, focused on "multiple measures" "[a]side from Sampson's NDRT scores" in concluding that Sampson has disabilities. SPA32.

appropriate education." SPA33 n.14; *see also Ramsay*, 968 F.3d at 258 (quoting regulatory guidance).[8]

As Dr. Wasserstein explained at the hearing, a student who has a rare pattern of extreme discrepancies across areas of intellectual function will have "an intellectual limp which disrupts unified functioning significantly" resulting in learning disabilities. A1045 (203:3-4). As Dr. Wasserstein further explained, Sampson's "intellectual limp" is the equivalent of a 6'4" person having one leg that fits a person who is 5'10"—although the shorter leg is still longer than that of the average person, the difference in leg length is so pronounced that the person will be substantially limited in walking. A1044-45 (202:20-203:2). In this manner, Sampson's discordant intellectual functioning means that he "can read, but it takes more time and it's more effort . . . And he's going to do it slowly and it's going to take him more time." A1047 (214:1-9).[9]

---

[8] NBME relies on *Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 870 F. Supp. 2d 607, 620 (S.D. Ind. 2012), which overlooks this DOJ regulatory guidance. As *Healy* itself acknowledged, "very large" discrepancies can indicate disability. *Id.* at 615. As described, Sampson's discrepancies are found in less than 1% of the population.

[9] Because the difference across scores causes an "intellectual limp" that impairs overall functioning, NBME errs in describing such discrepancies as an "internal referent." The real-world significance is a limp that results in Sampson reading much more slowly than the general population, as evidenced by Sampson's lifelong struggles with reading.

The District Court acted well within its discretion in crediting Dr. Wasserstein's conclusions as more persuasive and consistent with Sampson's lifelong struggles with reading and attention, history of accommodations, and use of mitigating measures.

### C. NBME's Claims About Disability Overdiagnoses Have No Application to the District Court's Credibility Determinations

A major theory running through NBME's brief is that there exists (as NBME sees it) a "crisis" in which too many people are being diagnosed with disabilities. NBME has offered no evidence whatsoever that the facts of *this* case were in any way influenced by the "crisis" that NBME imagines it is fighting. NBME's reliance on an article questioning whether the ADA "loosened" too much the definition of disability[10] is misplaced given that when Congress amended in the ADA in 2008, it was specifically concerned with the opposite problem of the definition of disability being too strict. *See, e.g.*, ADA Amendments Act, Pub. L. No. 110-325, § 2(b)(5).

The NBME consultants' definitions of disability are inappropriately strict to the point of absurdity. For instance, Murphy believes that to have ADHD, a person must be "deviant" even though the DSM contains no such criteria. A951-58;

---

[10] *See* NBME Br. at 55 (citing Robert Mapou, *Have We Loosened the Definition of Disability? The Effects of Changes in the Law and Its Interpretation on Clinical Practice*, 15 PSYCHOLOGICAL INJURY & LAW 307 (2022)).

29

A1140-1142 (425:11-430:9). The suggestion that people with ADHD must be

"deviant" instead propagates the prejudice that the ADA was enacted to eradicate.

*E.g.*, 42 U.S.C. § 12101(a)(8).

Based on inappropriately strict definitions of disability, NBME's two

consultants who testified at the hearing recommend denying the vast majority of

requests for accommodations. Lovett recommends denial 80% of the time, while

Murphy recommends denial 85-90% of the time. A1085 (364:6-25) (Lovett);

A1138-39 (415:24-419:8) (Murphy). Further, Lovett and Murphy both admitted

that when they review motions for reconsideration, they "peek" to see whether

NBME had previously denied the applicant's requests for accommodation. By

repeatedly submitting Sampson's request for accommodations to the same

consultants who have a penchant for recommending denial of accommodations

requests and who were aware of the prior recommendations of denials in this case,

NBME utilized a process that was inclined from the outset to reject Sampson's

requests for accommodations.[11]

---

[11] NBME's cited articles lamenting purported overdiagnoses cite its
consultants in this case. Lovett, for instance, is cited frequently for the proposition
that there is an epidemic of over-diagnoses sweeping the psychology profession.
*E.g.*, Allyson Harrison, *Attention Deficit Disorders, Learning Disorders, and Other
Incentivized Diagnoses—Special Issue for Psychologists*, 15 PSYCHOLOGICAL
INJURY & LAW 227, 231 (2022) (citing Lovett for the proposition that
psychologists are motivated to over-diagnose disability). Yet as Harrison
acknowledges, only a small minority (14%) of clinicians "admitted that they would

In this case, the District Court carefully considered all of the evidence in the course of a three-day hearing, and found credible Sampson's experiences as an individual with severe reading and attention disabilities. In finding credible Dr. Wasserstein's conclusions, the District Court observed that Sampson was specifically subjected to testing that ruled out malingering during the neuropsychological evaluations. SPA16 n.5. In light of the District Court's credibility determinations, NBME's speculation about overdiagnoses in general has no place in this case.

## II. The District Court Correctly Granted a Preliminary Injunction

The District Court correctly applied the standard for preliminary injunctions. A party seeking a preliminary injunction must establish: "(1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; and (3) that a preliminary injunction is in the public interest." *New York v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (quotation marks omitted).

---

bend the rules or ignore published diagnostic criteria in order to help their clients obtain academic accommodations in post-secondary education." *Id.* at 230.

Here, the District Court heard Dr. Wasserstein testify and judged her to be credible, in line with Harrison's observation that the overwhelming majority of evaluating professionals are honest.

NBME errs in asserting that a higher standard applies on the mistaken ground that the preliminary injunction in this case grants substantially all the relief sought in this case. The preliminary injunction at issue in this appeal deals only with Step 1, which Sampson must take during the pendency of this litigation in order to remain in medical school. On remand, the parties still need to litigate accommodations for the subsequent Steps Sampson must pass before he can become licensed to practice medicine.

## A. The District Court Correctly Held that Sampson Demonstrated Irreparable Harm

NBME merely relitigates the factual record in arguing that there is no irreparable harm. Since, as described *supra*, the District Court's factual findings are subject to the "clearly erroneous" standard and the District Court's findings are well-supported by the record, NBME's factual arguments are without merit.

As the District Court found, Sampson will be dismissed from medical school if he fails again without accommodations in place. SPA 22 n.8. Since only currently enrolled medical students are eligible to take Step 1, dismissal will preclude Sampson from being able to take Step 1 again, and the injunctive relief sought would become moot.

Directly on point is *Ramsay v. Nat'l Bd. of Med. Exam'rs*, 968 F.3d 251 (3d Cir. 2020), *cert. denied*, 141 S. Ct. 1517 (2021). As in this case, the medical student in that case stood to be dismissed from medical school if she did not pass

the Step examination on her next attempt. The Third Circuit held that this circumstance constituted irreparable harm and jeopardized the student's "opportunity to pursue her chosen profession." *Id.* at 262-63 (citing *Enyart v. Nat'l Conf. of Bar Exam'rs*, 630 F.3d 1153, 1165-66 (9th Cir. 2011)). NBME ignored this case law in its discussion of irreparable harm.[12]

NBME also mistakenly downplays the fact that Sampson already tried and failed Step 1 without accommodations.[13] *Ramsay* is again on point. In that case, the Third Circuit affirmed the district court's holding that the fact that the medical student had already failed Step 1 without accommodations was strong evidence that the student was likely to fail again without accommodations. *Id.* at 262. Similarly, in this case, as the District Court found, Sampson has already failed Step

---

[12] NBME instead pointed to a district court case in which the judge speculated that the student could pass without accommodations. *Baer v. Nat'l Bd. of Med. Exam'rs*, 392 F. Supp. 2d 42, 49 (D. Mass. 2005). The judge had previously determined, however, that the student was not disabled. *See id.* at 48. *Baer* predated the ADA Amendments Act of 2008, which Congress enacted in response to erroneously strict judicial definitions of disability. *See, e.g.*, Pub. L. No. 110-325, § 2(b)(5).

[13] Medical students without disabilities typically do not struggle to pass Step 1 as demonstrated by NBME performance data showing that 96-98% of first-time test takers from US/Canadian schools passed the exam. United States Medical Licensing Examination, Performance Data, *at* https://www.usmle.org/performance-data (last viewed Feb. 22, 2023).

1 without accommodations and is therefore likely to fail again without necessary accommodations.[14]

NBME mistakenly discounts Sampson's previous failure on the ground that he has since taken additional semesters of medical school. NBME's argument overlooks that when Sampson failed the first time, he did not have the time to read all the questions. Whether Sampson has the time to read all the questions is not dependent on how many semesters of medical school he has under his belt but rather on whether he has necessary testing accommodations.

NBME also mistakenly argues that Sampson waited too long to file a lawsuit.[15] Here again NBME quibbles with the District Court's factual determination that after Stony Brook no longer required Sampson to take Step 1

---

[14] NBME relies on inapposite unreported cases where the plaintiff could retake the test even if he or she failed without accommodations. *Wright v. Nat'l Bd. of Med. Exam'rs*, Case No. 21-cv-02319-DDD-NYW, 2021 U.S. Dist. LEXIS 211275, at *25 (D. Colo. Oct. 15, 2021) (plaintiff could retake examination if he failed without accommodations); *Bach v. Law Sch. Admissions Council, Inc.*, 1:13-CV-888, 2014 U.S. Dist. LEXIS 124632, at *6 (M.D.N.C. Feb. 4, 2014) (plaintiff could take the LSAT multiple times).

[15] For this proposition, NBME cited factually inapposite cases. *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) (gerrymandering case in which plaintiffs waited until after three elections to bring challenge); *Baer*, 392 F. Supp. 2d at 49 (plaintiff waited until three weeks before examination to seek preliminary injunction); *Monowise Ltd. v. Ozy Media, Inc.*, 17-CV-8028 (JMF), 2018 U.S. Dist. LEXIS 75312, at *4-5 (S.D.N.Y. May 3, 2018) (plaintiff waited to bring suit until after defendant used trademark at festival); *Pazer v. N.Y. State Bd. of Bar Exam'rs*, 849 F. Supp. 284, 285-86, 287-88 (S.D.N.Y. 1994) (plaintiff waited until two weeks before the bar examination to seek preliminary injunction).

earlier than the rest of his classmates, Sampson no longer had any reason at that point in time to retake Step 1.[16]  As the District Court found, Sampson returned to medical school, applied for accommodations, and then brought this lawsuit shortly after NBME rejected his next request for accommodations in June 2022.

NBME also relitigates the facts in arguing that Sampson cannot demonstrate irreparable harm because he also seeks a preliminary injunction against Stony Brook.  NBME ignores the fact that in the companion case of *Sampson v. Stony Brook Univ., et al.*, No. 22-CV-4490 (E.D.N.Y.), the District Court entered an order staying Sampson's status as a student.  SPA19.[17]  The only thing standing in the way of Sampson taking Step 1 with accommodations and resuming his medical studies is NBME's refusal to provide accommodations.[18]

NBME now complains, though it did not object at hearing, that Sampson requested a dedicated study period to prepare for Step 1. NBME completely

---

[16] This factual point distinguishes *Wright*, 2021 U.S. Dist. LEXIS 211275, in which the plaintiff sought a preliminary injunction after four years of repeatedly failing Step 3 of the USMLE and still had numerous opportunities to retake the test.  *Id.* at *26-27.

[17] Since Sampson's status as a student is stayed pending his retaking Step 1 with accommodations, NBME's argument that he must graduate within seven years is moot.

[18] Implicit in NBME's argument that Sampson should have filed this lawsuit sooner is the assumption that it is a simple and straightforward process for individuals with disabilities to file lawsuits.  In reality, as NBME knows, litigation is an expensive endeavor.  Sampson filed this lawsuit only after exhausting all other possibilities.

ignores the fact that, as the parties discussed with the District Court at the preliminary injunction hearing, Stony Brook medical students are given dedicated study periods to prepare for Step 1, during which time they take no classes. A1143 (435:18-436:14).[19] The District Court acted well within its discretion in granting the preliminary injunction knowing that Sampson would then, like any other medical student, need a dedicated study time when he was not taking classes to prepare for the examination.[20]

### B. The District Court Correctly Held that Sampson Is Substantially Likely To Prevail on the Merits

The District Court correctly held that Sampson is substantially likely to prevail on the merits based on the facts it found following a three-day hearing.

Title III of the ADA requires that testing entities such as NBME offer examinations in an accessible "manner" to individuals with disabilities. 42 U.S.C. § 12189. Examinations must be "administered so as to best ensure" that the examination results accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure," rather than the

---

[19] NBME was also aware that Sampson could not start a dedicated study period until after December 2022 because he was taking business classes during the fall semester. A1143 (436:8-14).

[20] Further proof of the reasonableness of Sampson's request for a study period is that his medical school agreed to this request. *See Sampson v. Stony Brook Univ., et al.*, No. 2:22-cv-04490 (E.D.N.Y.) [Doc. No. 21] (indicating that the medical school will permit Sampson to take Step 1 on or about May 15, 2023).

extent of the individual's disability. 28 C.F.R. § 36.309(b)(1)(i).[21]  Required

modifications "may include changes in the length of time permitted for completion

of the examination and adaptation of the manner in which the examination is

given." *Id.* § 36.309(b)(2).  NBME does not dispute that it can readily provide the

requested accommodations—it challenges only whether Sampson has disabilities.

An individual has a disability if he or she has "a physical or mental

impairment that substantially limits one or more major life activities."  42 U.S.C.

§ 12102(1)(A).  The term "physical or mental impairment" includes ADHD and

"dyslexia and other specific learning disabilities."  28 C.F.R. § 36.105(b)(2); *see

also, e.g.*, *Ramsay*, 968 F.3d at 257.  Major life activities include reading and

concentrating.  42 U.S.C. § 12102(2)(A).

An impairment meets the definition of disability "if it substantially limits the

ability of an individual to perform a major life activity as compared to most people

in the general population."  28 C.F.R. § 36.105(d)(1)(v); *Ramsay*, 968 F.3d at 257

(citing *J.D. v. Colonial Williamsburg Found.*, 925 F.3d 663, 670 (4th Cir. 2019)).

In determining whether an individual has a disability, "the focus is on how a major

life activity is substantially limited, and not on what outcomes an individual can

achieve" despite the disability.  28 C.F.R. § 36.105(d)(3)(iii).

---

[21] This "best ensures" standard is distinct from the "reasonable
accommodation" standard used in the employment discrimination context.  *E.g.*,
*Enyart*, 630 F.3d at 1162.

The test whether an individual has a disability "should not demand extensive analysis." *E.g.*, *Ramsay*, 968 F.3d at 258 (citing 28 C.F.R. § 36.105(d)(1)(ii)). Congress has explained that in amending the ADA, it wished to ensure that "the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations, and to convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." Pub. L. No. 110-325, § 2(b)(5); *see also* 28 C.F.R. § 36.105(d)(1)(ii) (incorporating this language into regulations). Congress specifically rejected Supreme Court decisions requiring that the ADA be "interpreted strictly to create a demanding standard for qualifying as disabled" and creating an "inappropriately high level of limitation necessary to obtain coverage under the ADA." Pub. L. No. 110-325, § 2(b)(4), (5). Accordingly, the definition of disability is "construed in favor of broad coverage" and "to the maximum extent permitted." 42 U.S.C. § 12102(4)(A); 28 C.F.R. § 36.101(b); 28 C.F.R. § 36.105(a)(2)(i). The term "substantially limits" is "not meant to be a demanding standard," 28 C.F.R. § 36.105(d)(1)(i), and "usually will not require scientific, medical, or statistical evidence," *id.* § 36.105(d)(1)(vii).

The amended ADA further makes clear that in the determination whether a person has a disability should be made "without regard to the ameliorative effects of mitigating measures" such as "learned behavioral or adaptive neurological

38

modifications." 42 U.S.C. §12102(4)(E)(i)(IV).  As noted in the Congressional

Record:

> Historically, certain individuals with learning disabilities seeking
> accommodations in higher education—including high stakes exams—
> have seen their access to testing accommodations severely undercut
> by testing companies not willing to consider and support that learning
> disabilities are neurologically based, lifelong disabilities that may
> exist in students with high academic achievement because the
> individual has been able to cope and mitigate the negative impact
> while simultaneously being substantially limited in one or more life
> activities.

154 Cong. Rec. H8286, 8296 (daily ed. Sept. 17, 2008).

## 1. The District Court's Holding that Sampson Is Substantially Likely to Establish Disability Is Supported by Ample Evidence

Whether a person has a disability "requires an individualized assessment."

*Ramsay*, 968 F.3d at 260 (quoting 28 C.F.R. § 36.105(d)(1)(vi)).  In the course of

conducting such individualized assessment, testing entities must "give[]

considerable weight to documentation of past modifications, accommodations, or

auxiliary aids and services received in similar testing situations" when

"considering requests" for accommodations.  28 C.F.R. § 36.309(b)(1)(v); *see also,*

*e.g.*, *Ramsay*, 968 F.3d at 259 (quoting regulation).  Courts also consider other

factors such as personal struggles as a result of disability and the results of

neuropsychological testing.  *See, e.g.*, *Ramsay*, 968 F.3d at 258.  Accordingly, the

District Court appropriately considered all of the evidence in the record in the

course of finding that Sampson is an individual with disabilities.

39

In *Ramsay*, the Third Circuit affirmed the district court's approach in considering the totality of the medical student's profile in holding that she is an individual with a disability. The medical student had a history of informal accommodations growing up to compensate for her learning disabilities and did not undergo neuropsychological testing until she was already in college, and only then was formally diagnosed with dyslexia and ADHD. 968 F.3d at 254, 262 & nn.7, 14. Due to the medical student's belated diagnosis, she did not receive testing accommodations on standardized examinations growing up or on the MCAT. *See id*. at 254. In medical school, she received double time on exams. *Ramsay*, 2019 U.S. Dist. LEXIS 222782, at *4. On the basis of this record, the Third Circuit affirmed the grant of preliminary injunction. 968 F.3d at 263.

Like the medical student in *Ramsay*, Sampson has lifelong history of struggling with disabilities, receiving formal and informal accommodations, and using mitigating measures on standardized examinations. Sampson's need for accommodations in medical school on shelf examinations—retired NBME questions—is highly relevant to his need for accommodations on the actual NBME examinations. As the District Court found, Sampson needs extended time on these shelf examinations to read the questions, and with this extended time, his scores reflect his knowledge of medicine rather than the extent of his disabilities. SPA9, 29, 35.

40

NBME erroneously argues that the District Court may not consider Sampson's past history of accommodations. NBME's argument conflicts with the DOJ regulations, discussed *supra*, stating that "considerable weight" should be given to such a history of accommodations. 28 C.F.R. § 36.309(b)(1)(v); *see also Ramsay*, 968 F.3d at 259 (citing regulation). In guidance accompanying the publishing of this rule, DOJ explained that its "history of enforcement in this area has demonstrated that a recent history of past accommodations is critical to an understanding of the applicant's disability and the appropriateness of testing accommodations." Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities, 75 Fed. Reg. 56,236, 56,298 (Sept. 15, 2010).

NBME mistakenly argues that the unreported decision *Doherty v. Nat'l Bd. of Med. Exam'rs*, 791 F. App'x 462 (5th Cir. 2019), is to the contrary. *Doherty* evaluated the student's past history of accommodations in the course of holding that the medical student had "presented no evidence that [her medical school] found her to be disabled under the ADA when it provided her with accommodations or that her past accommodations established that she is disabled under the ADA." 791 F. App'x at 466. *Doherty* is readily distinguishable because Sampson's medical school determined that he has disabilities, and the District

41

Court also found persuasive the totality of the circumstances indicating that

Sampson has disabilities, when such evidence was lacking in *Doherty*.

NBME seeks to have it both ways, arguing that those portions of Sampson's

history demonstrating accommodations do not count, and then, arguing—contrary

to the factual record—that Sampson has *no* history of accommodations and that

this means he is not an individual with disabilities.  NBME, for instance, argues

that Sampson is not an individual with disabilities simply because he did not have

an Individualized Education Plan (IEP) or section 504 plan while growing up.  As

DOJ, however, stated in the course of promulgating § 36.309(b)(1)(v):

> Indeed, it is recommended that testing entities must consider the
> entirety of an applicant's history to determine whether that history,
> even without the context of a IEP or Section 504 Plan, indicates a
> need for accommodations. In addition, many students with learning
> disabilities have made use of informal, but effective accommodations.
> For example, such students often receive undocumented
> accommodations such as time to complete tests after school or at
> lunchtime, or being graded on content and not form or spelling of
> written work.

75 Fed. Reg. 56,298.  In NBME's brief, there is no mention of the reading

specialists that Sampson was referred to as a child, no detailed discussion of

his history of informal accommodations, no mention of the mitigating

measures he used, and no mention that Stony Brook independently found

disability and provided accommodations which included not only extended

time on examinations but also a referral to a learning specialist.  The District

42

Court did not commit clear error in considering these essential facts and incorporating them into its detailed opinion.

## 2. The District Court Appropriately Considered the Totality of the Circumstances in Determining that Sampson Has Disabilities

As described *supra*, Congress intended for the term "disability" to be construed to the maximum extent consistent with broad coverage and the DOJ has stated that proof "usually will not require scientific, medical, or statistical evidence." 28 C.F.R. § 36.105(d)(1)(vii). In light of the record showing that Sampson had such severe impairments that he was repeatedly referred to specialists, including a speech pathologist, two reading specialists, and a learning specialist, that he relies on audio-based accommodations in lieu of reading, and that he receives extra time to complete tests, the District Court did not need to go further in concluding that Sampson met the low threshold for establishing that he is an individual with disabilities.

Sampson nonetheless underwent comprehensive neuropsychological testing that confirms what those around him have long known—that he has severe reading impairments.[22] While NBME quibbles with the neuropsychological testing, its consultants do not challenge the evaluators' competency in administering or

---

[22] NBME attempts to manufacture disagreement among these three professionals by noting that they each used slightly different diagnostic labels to say the same thing: that Sampson clearly has reading disabilities and needs testing accommodations.

43

scoring the evaluations.  The NBME consultants instead single out only certain tests for misplaced criticism, lodging no objection to the rest, and ignoring the numerous instances where Sampson placed in the bottom quartile, *i.e.*, worse than three-quarters of the general population.  In nitpicking at the results, NBME inappropriately seeks to restore the judicially exacting standard of disability which the ADAAA was expressly enacted to reject, *see, e.g.*, Pub. L. No. 110-325, § 2(b).  Further highlighting the inappropriateness of NBME's scrutiny of Sampson's requests for accommodations, one of NBME's own consultants even acknowledged that there is "mixed evidence" whether Sampson has disabilities. A419 at ¶ 37. When Sampson has a lifelong history of disabilities, using accommodations and mitigating measures, and extensive neuropsychological testing demonstrates severe impairments, there is no need to go further under the ADA.

NBME's heightened focus on select tests to the exclusion of others misses the forest for the trees: the neuropsychological testing, taken as a whole, paint a comprehensive picture of Sampson as an individual with disabilities.  The evaluators did not treat any one psychometric test as dispositive—rather, it was the consistent pattern that emerged across multiple tests, that led Sampson's evaluators to conclude that he has disabilities, and the District Court did not abuse its discretion in looking at the totality of the evidence in reaching this same

44

conclusion on its own.  As described *supra*, NBME cannot meet its heavy burden in relitigating the District Court's determination that Dr. Wasserstein was a credible expert witness.

The District Court appropriately considered the totality of the circumstances in finding that, based on Sampson's life-long struggles with reading and attention, his history of accommodations, use of mitigating measures, and neuropsychological testing, he is an individual with disabilities.

### 3. DOJ Regulatory Guidance Further Supports the District Court's Decision To Credit the Conclusions of Sampson's Evaluating Professionals

After the District Court heard Dr. Wasserstein testify and judged her credible, the District Court noted that its determination that she was persuasive accorded with regulatory guidance stating that in-person evaluations are more insightful and therefore should receive more weight.  As NBME acknowledges, when DOJ promulgated regulations following the ADAAA, the DOJ explicitly stated in the preamble to the regulations that:

> Reports from experts who have personal familiarity with the candidate should take precedence over those from, for example, reviewers for testing agencies, who have never personally met the candidate or conducted the requisite assessments for diagnosis and treatment.

75 Fed. Reg. 56,297.  DOJ further explained that "when testing entities receive documentation provided by a qualified professional who has made an

individualized assessment of an applicant that supports the need for the

modification, accommodation, or aid requested, they shall generally accept such

documentation and provide the accommodation." *Id.*

In *Ramsay*, the Third Circuit explained that DOJ's guidance was well-

founded, noting that DOJ regulations "require[] an individualized assessment" in

the course of making disability determinations. 968 F.3d 251, 260 (3rd Cir. 2020)

(quoting 28 C.F.R. § 36.105(d)(1)(vi)). The Third Circuit explained that "[s]uch

assessments benefit from the reports of professionals who know or have personally

examined the individual" and have had the opportunity to "evaluate the

individual's behavior, effort, and candor." *Id.* (citing preamble); *see also, e.g.*,

*Berger*, 2019 U.S. Dist. LEXIS 145666, at *73-74 (finding evaluating professional

persuasive consistent with regulatory guidance giving greater weight to reports

from experts with personal familiarity with the candidate).

NBME does not dispute the meaning of this extensive regulatory guidance.

Rather, NBME asserts that the guidance is without the force of law and therefore

should be ignored. However, as the Supreme Court has stated, DOJ's

interpretations of Title III are entitled to deference because DOJ is charged with

issuing implementing regulations, issuing technical guidance, and enforcing the

statute. *Bragdon v. Abbott,* 524 U.S. 624, 646 (1998) (citing 42 U.S.C.

§§ 12186(b), 12188(b), 12206(c)).

46

DOJ's determination that testing entities should generally accept the conclusions of evaluating professionals is in a detailed preamble to a rule that followed extensive notice-and-comment rulemaking. 75 Fed. Reg. at 56,297. This Court has repeatedly held that the preamble is relevant to the interpretation and application of regulations. *E.g.*, *Fernandez v. Zoni Language Centers, Inc.*, 858 F.3d 45, 50 (2d Cir. 2017) (citing *Halo v. Yale Health Plan, Dir. of Benefits & Records, Yale Univ.*, 819 F.3d 42, 52 (2d Cir. 2016)).[23]

In promulgating the preamble, DOJ solicited and received extensive comments following a notice of proposed rulemaking in which DOJ proposed requiring that testing entities generally "accept without further inquiry documentation provided by a qualified professional who has made an individualized assessment of the applicant." Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities, 73 Fed. Reg. 34,508, 34,539 (June 17, 2008). Testing entities filed "lengthy comments" objecting to this proposed preamble, and DOJ carefully considered these comments as well as others, including from organizations representing individuals with

---

[23] NBME erroneously argues that this Court's precedents giving weight to the preamble are no longer good law following *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019). *Kisor* reaffirmed the importance of "carefully consider[ing] the text, structure, history, and purpose of a regulation" when constructing a regulation. *Id.* at 2415. The Supreme Court itself has looked to the preamble in interpreting regulations. *See, e.g.*, *Talk Am., Inc. v. Mich. Bell Tel. Co.*, 564 U.S. 50, 60-62 (2011) (relying on FCC guidance accompanying promulgation of rule).

47

disabilities, in deciding to maintain this requirement. 75 Fed. Reg. 56,297. DOJ

explained that it "relied on its history of enforcement efforts, research, and body of

knowledge of testing and modifications, accommodations, and aids" in

promulgating the preamble. 75 Fed. Reg. 56,296. Since the preamble implicates

DOJ's substantive expertise, it is entitled to deference. *Kisor*, 139 S. Ct. at 2417

("Administrative knowledge and experience largely account for the presumption

that Congress delegates interpretive lawmaking power to the agency.") (citation

and quotation marks omitted).

NBME further errs in relying on *Black & Decker Disability Plan v. Nord*,

538 U.S. 822 (2003), for the proposition that this Court should disregard DOJ's

guidance. In *Nord*, the Supreme Court held that ERISA does not require plan

administrators to defer to the conclusions of treating physicians. 538 U.S. at 829.

As the Supreme Court noted, however, ERISA has no statutory or regulatory

guidance requiring such deference; the Ninth Circuit's then-existing requirement

that plan administrators defer to treating physicians was a judge-made rule. *Id.* at

829-32. In this case, as noted, DOJ has spoken and has determined that testing

entities should defer to the conclusions of professionals who conducted in-person

evaluations.

NBME misses the mark with its complaints that DOJ has issued guidance

specific to testing entities. Testing entities are subject to 42 U.S.C. § 12189, which

48

does not govern other places of public accommodation instead subject only to 42 U.S.C. § 12182. Testing entities must offer examinations in an accessible manner and must do so in a way that "best ensures" that the examination results measure what is being tested, rather than the extent of disability. 42 U.S.C. § 12189; 28 C.F.R. § 36.309(b)(1)(i). Further, the testing accommodations context remains one of the few contexts post-ADAAA in which covered entities regularly dispute disability, and as a consequence, DOJ has needed to issue additional guidance. *E.g.*, 75 Fed. Reg. 56,296, 56,298 (referencing DOJ's history of enforcement in testing cases).

Further, the DOJ regulatory guidance does not change the definition of disability in the testing context and NBME, like any other entity subject to Title III, has the opportunity to present evidence refuting disability. In this case, NBME chose not to conduct an independent evaluation of Sampson or obtain any other new evidence. NBME instead simply chose not to believe the conclusions of Sampson's medical school or its learning specialist, or the conclusions of any professional who personally observed the extent of Sampson's disabilities. NBME also had the opportunity to put on evidence at the preliminary injunction hearing, and was unable to persuade the District Court to its view of the facts.[24]

---

[24] NBME mistakenly asserts that Sampson "largely controlled the record" when the parties had an equal opportunity to submit evidence to the District Court. Most documents at the hearing were documents that Sampson had previously

49

Further, as the District Court itself made clear, it did not defer to Dr.

Wasserstein simply because she had evaluated Sampson in person.  Rather, the

District Court considered "all the evidence in the record" in finding Dr.

Wasserstein's conclusions more persuasive than those of the NBME's consultants.

SPA34.  As NBME itself points out, courts do not automatically defer to the

conclusions of evaluating professionals; as with any other expert testimony, courts

make credibility determinations and weigh the evidence in deciding whether to

credit such testimony.  *Compare, e.g.*, *Ramsay*, 2019 U.S. Dist. LEXIS 222782, at

*50-51 (finding persuasive such testimony); *Berger*, 2019 U.S. Dist. LEXIS

145666, at *73-74 (same), *with, e.g.*, *Wright*, 2021 U.S. Dist. LEXIS 211275, at

*20-21 (declining to credit such testimony).  Whether or not the District Court was

required to give greater weight to Dr. Wasserstein, it chose to do so of its own

volition because that was where the weight of the evidence lay, particularly when

NBME's consultants made numerous erroneous factual assumptions that the

District Court found unsupported by the record.  The District Court acted well

within its discretion in finding that the neuropsychological testing confirmed

---

submitted to the NBME.  NBME also submitted affidavits and other documents
from consultants, including consultants retained for litigation, that Sampson had
not seen prior to litigation.

     NBME also complains that discovery has not yet occurred.  NBME,
however, did not seek expedited discovery pursuant to Fed. R. Civ. P. 26(d)(1)
even though it did so in *Ramsay v. Nat'l Bd. of Med. Exam'rs*, Case No. 2:19-cv-
02002 [Doc. No. 11] (filed Aug. 5, 2019).

Sampson's own history of difficulties, receiving interventions, and using mitigating measures.

### 4. NBME May Not Rely on Sampson's History of Using Mitigating Measures to Achieve Academic Success

NBME errs in pointing to Sampson's history of academic success as proof that he is not disabled. ADA regulations specifically caution against such reliance on outcomes, explaining that "the focus is on how a major life activity is substantially limited, and not on what outcomes an individual can achieve." 28 C.F.R. § 36.105(d)(3)(iii); *see also id.* § 36.105(d)(3)(i) (focusing the inquiry instead on the condition, manner, and duration that it took to perform major life activities such as reading). The regulations further state, in direct opposition to NBME's argument:

> For example, someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in one or more major life activities, including, but not limited to, reading, writing, speaking, or learning because of the additional time or effort he or she must spend to read, write, speak, or learn compared to most people in the general population.

*Id.* § 36.105(d)(3)(iii); *Ramsay*, 968 F.3d at 260 (quoting regulation).

NBME ignores cases such as *Ramsay* in which the plaintiff was found to have a disability, with the stellar academic performance reflecting the student's use of mitigating measures. *See, e.g.*, 968 F.3d at 257 n.7 (holding that the district could "consider and discount that [plaintiff] compensated for her very weak

reading and writing abilities by devoting more effort to her assignments than most students"); *see also, e.g.*, *Berger*, 2019 U.S. Dist. LEXIS 145666, at \*68-70 (noting student's use of compensatory strategies).

NBME instead relies on several cases in which courts noted a student's academic success in the course of ruling against the student. In those cases, however, the students' academic success was dispositive only in the absence of any evidence of disability.[25] As then-Judge Sotomayor noted, "A definition of disability based on outcomes alone, particularly in the context of learning disabilities, would prevent a court from finding a disability in the case of any individual . . . who is extremely bright and hardworking, and who uses alternative routes to achieve academic success," a result that would be inconsistent with the goals of the ADA. *Bartlett v. N.Y. State Bd. of Law Exam'rs*, No. 93 CIV 4986,

---

[25] In none of NBME's cited cases was there a significant history of accommodations, use of mitigating measures, or neuropsychological testing that the district court found compelling. *Valles v. ACT, Inc.*, Civ. A. No. 4:22-CV-568, 2022 U.S. Dist. LEXIS 125769, at \*7-11 (E.D. Tex. July 15, 2022) (plaintiff's physician had not suspected learning disabilities, unsupportive neuropsychological testing, no discussion of history of accommodations); *Wright*, 2021 U.S. Dist. LEXIS 211275, at \*14-22 (limited history of accommodations; unsupportive psychological testing); *Black v. Nat'l Bd. of Med. Exam'rs*, 281 F. Supp. 3d 1247, 1249-52 (M.D. Fla. 2017) (no history of accommodations, unsupportive neuropsychological testing); *Healy*, 870 F. Supp. 2d at 617-21 (unsupportive neuropsychological testing, no evidence of use of mitigating measures on standardized examinations).

2001 U.S. Dist. LEXIS 11926, at *122 (S.D.N.Y. Aug. 15, 2001); *see also Berger*,

2019 U.S. Dist. LEXIS 145666, at *65-66 (quoting *Bartlett*).

NBME also argues, contrary to DOJ guidance, that Sampson's scores on the

ACT, SAT, and MCAT mean that he is somehow not a person with a disability.

DOJ expressly rejected the practice of testing entities such as NBME relying on

standardized tests as a determining factor in deciding whether an individual has a

disability, explaining that relying on testing performance has limited relevance and

value with respect to disproving disability. As DOJ stated in the course of

promulgating regulations implementing the ADAAA:

> Organizations representing testing and educational entities asked the
> Department to add regulatory language indicating that testing-related
> outcomes, such as grades and test scores, are relevant to disability
> determinations under the ADA. The Department has considered this
> proposal and declines to adopt it because it is inconsistent with
> congressional intent. . . . Congress specifically stated that the
> outcome an individual with a disability is able to achieve is not
> determinative of whether that individual has a physical or mental
> impairment that substantially limits a major life activity.

Amendment of Americans with Disabilities Act Title II and Title III Regulations

To Implement ADA Amendments Act of 2008, 81 Fed. Reg. 53,204, 53,237 (Aug.

11, 2016).

NBME's brief is sprinkled with references to the "real world" by which it

means standardized test scores. NBME's own consultants admit that such tests are

not used to diagnose learning disabilities or ADHD.  A1060 (265:17-19)

(Kroopnick) A1079 (339:7-20) (Lovett).  Further, DOJ has stated that it

> does not agree with the assertions made by testing and educational
> entities that evidence of testing and grades is objective and, therefore,
> should be weighted more heavily, while evidence of self-mitigating
> measures, informal accommodations, or recently provided
> accommodations or modifications is inherently subjective and should
> be afforded less consideration.

81 Fed. Reg. 53,237.  In the "real world" that is everyday life, Sampson has such

difficulties with reading that his schools have repeatedly referred him to

specialists.

Since, as described *supra*, there is a wealth of evidence supporting

Sampson's history of accommodations and use of mitigating measures such as test-

taking strategies to reduce the amount of reading on examinations, the District

Court had ample basis for its factual findings that Sampson used mitigating

measures to achieve academic success despite having severe reading and attention

disabilities.

### C. The District Court Correctly Held that the Balance of Hardships Tips Sharply in Sampson's Favor

The District Court correctly held that balance of hardships strongly weighs

in favor of granting a preliminary injunction requiring NBME to grant Sampson

the same testing accommodations he has had in medical school.

54

NBME admits that its refusal to provide accommodations to Sampson has

nothing to do with logistics or cost. NBME Br. at 69. NBME has also offered no

evidence whatsoever in support of its proposition that permitting Sampson to take

the test with accommodations will somehow result in abstract harms to society at

large. Rather, the record shows that Sampson's medical school provides extended

time on identical testing. With these testing accommodations, Sampson

demonstrated his knowledge of medicine, and then went on to earn stellar reviews

during his third-year rotations.[26]

Sampson agrees wholeheartedly with the proposition that Step 1 should be

fairly administered. As described, DOJ regulations require NBME to provide

testing accommodations to "best ensure" that the examinations measure a student's

knowledge of medicine rather than the extent of his disabilities. 28 C.F.R.

§ 36.309(b)(1)(i). As the Third Circuit observed in *Ramsay*, granting an injunction

to a medical student gives that student "only the opportunity to move forward" in

their medical careers if they pass with appropriate accommodations. 968 F.3d at

263 (quotation marks omitted). Sampson must still answer the same questions as

---

[26] Since Sampson must also pass two additional Steps in order to become licensed, and the preliminary injunction does not address those subsequent Steps, this distinguishes *Rothberg v. Law Sch. Admission Council*, 102 F. App'x 122, 126 (10th Cir. 2004), in which a student could moot the case by taking the LSAT with accommodations pursuant to a preliminary injunction and then enrolling in law school.

others who take the question in standard time, and his answers will still be graded in the same way. When NBME provides necessary accommodations, this inspires confidence in the accuracy of its scores as truly measuring knowledge rather than disability. In this manner, NBME will fulfill its role in assessing whether Sampson possesses the requisite knowledge to become a physician.[27]

Sampson's career hangs in the balance. As noted above, if he does not pass Step 1, he will no longer be able to attend medical school or even take the subsequent Step examinations. For this reason, the balance of hardships tips strongly in favor of granting a preliminary injunction.

### D. The District Court Correctly Held that the Public Interest Supports Granting a Preliminary Injunction

The District Court correctly held that the enforcement of the ADA is in the public interest. *Ramsay*, 968 F.3d at 263. Congress enacted 42 U.S.C. § 12189 "to assure that persons with disabilities are not foreclosed from educational, professional or trade opportunities because an examination or course is conducted in an inaccessible site or without an accommodation." *Rawdin v. American Bd. of Pediatrics*, 582 F. App'x 114, 118 (3d Cir. 2014) (quoting H.R. Rep. No. 101-

---

[27] NBME cites *Powell v. NBME,* 364 F.3d 79, 88-89 (2d Cir. 2004), a pre-ADAAA case, but *Powell* does not address whether the time requirement of Step 1 has anything to do with measuring a student's knowledge or ability. In *Powell,* the Court found that the plaintiff was not "qualified" because of a prior history of academic difficulties, *id.* at 87, whereas in the case at bar, NBME essentially claims that high-achieving individuals cannot also have learning disabilities.

485(III), at 68-69 (1990), reprinted in 1990 U.S.C.C.A.N. 445, 491-92). When

testing entities deny accommodations to students who need them, not just the

student but the public as a whole suffers, including medical schools that have

invested resources and may be disincentivized to support such students in the

future. Kristina H. Petersen, *et al.*, *Impact of USMLE Step-1 Accommodation*

*Denial on US Medical Schools: A National Survey*, PLoS ONE, April 14, 2022, *at*

https://doi.org/10.1371/journal.pone.0266685.

NBME ignores this clear legislative purpose and instead claims without

evidence that providing Sampson with extended time will be "unfair" to other

students. NBME has not and cannot explain how it is unfair to allow Sampson the

same opportunity as other individuals without disabilities to read and answer *all* of

the questions, particularly given that the test is knowledge-based and does not

purport to measure reading speed.[28] As the District Court appropriately held, the

public interest favors ensuring he has a fair opportunity to demonstrate his

knowledge. 42 U.S.C. § 12101(a)(7) (ADA enacted to provide "equality of

opportunity" for individuals with disabilities).

---

[28] NBME's reliance on *Bach*, 2014 U.S. Dist. LEXIS 124632, is misplaced
because that case held only that the public interest did not weigh in favor of
granting injunction to a student not likely to prevail on the merits. *Id.* at *3-5, 7-8.
NBME's other cited case, *Campbell v. Lamar Inst. of Tech.*, 842 F.3d 375 (5th Cir.
2016), was not a preliminary injunction case and merely held, following a fact-
intensive inquiry, that it was not reasonable for a student to have extra study time
and take a different test than his peers. *Id.* at 381.

## III. Conclusion

The District Court correctly granted the preliminary injunction based on its factual findings which are not clearly erroneous. Since the District Court acted well within its discretion, this Court should affirm.

Respectfully submitted,

_s/Mary C. Vargas_
Mary C. Vargas
Michael S. Stein
STEIN & VARGAS, LLP
10 G Street NE, Suite 600
Washington, DC 20002
Tel.: (240) 793-3185

Charles Weiner
LAW OFFICES OF
CHARLES WEINER
99 Lantern Drive, Suite 202
Doylestown, PA 18901
Tel.: (267) 685-6311

_Counsel for Plaintiff-Appellee_

February 24, 2023

**Certificate of Compliance**

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, I hereby certify that according to the word count feature of Microsoft Word, the brief contains 12,982 words, excluding the parts of the brief exempted by Rule 32(f), and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1 as the font is Times New Roman, 14 point.

 /s/ Mary Vargas

**Certificate of Service**

I hereby certify that I electronically filed the Brief for Appellee by using the CM/ECF system on February 24, 2023.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

 /s/ Mary Vargas

60