# 23-3

In The
# United States Court Of Appeals For The Second Circuit

**ROBERT SAMPSON,**

*Plaintiff - Appellee,*

**v.**

**NATIONAL BOARD OF MEDICAL EXAMINERS,**

*Defendant - Appellant.*

Appeal from the United States District Court
for the Eastern District of New York, No. 22-cv-5120

———————

**BRIEF OF ASSOCIATION FOR HIGHER EDUCATION AND DISABILITY;
ASSOCIATION OF LATE DEAFENED ADULTS; COALITION FOR DISABILITY
ACCESS IN HEALTH SCIENCE EDUCATION; THE COELHO CENTER FOR
DISABILITY LAW, POLICY, AND INNOVATION; DISABILITY LAW & POLICY
PROGRAM, SYRACUSE UNIVERSITY; DISABILITY RIGHTS BAR ASSOCIATION;
DISABILITY RIGHTS CALIFORNIA; DISABILITY RIGHTS CONNECTICUT;
DISABILITY RIGHTS MARYLAND; DISABILITY RIGHTS NEW YORK;
EVERYONE READING, INC.; LEARNING DISABILITIES ASSOCIATION OF
AMERICA; THE NATIONAL ASSOCIATION OF THE DEAF;
NATIONAL ASSOCIATION FOR RIGHTS PROTECTION AND
ADVOCACY; AND NATIONAL DISABILITY RIGHTS NETWORK
AS *AMICI CURIAE* IN SUPPORT OF APPELLEE**

———————

**John J. Korzen, Director**
**WAKE FOREST UNIVERSITY SCHOOL OF LAW**
**APPELLATE ADVOCACY CLINIC**
**P.O. Box 7206**
**Winston-Salem, North Carolina 27109**
**(336) 758-5832**

*Counsel for Amici Curiae*

*Gibson*Moore Appellate Services, LLC
206 East Cary Street ♦ P.O. Box 1460 (23218) ♦ Richmond, VA 23219
804-249-7770 ♦ www.gibsonmoore.net

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1(a) and 29(a)(4)(A), all amici curiae herein state that they are nonprofit corporations; they have no parent corporations; no publicly traded corporation owns ten percent or more of their stock; and there is no publicly owned corporation with a financial interest in the outcome of the proceeding.

# TABLE OF CONTENTS

**Page:**

CORPORATE DISCLOSURE STATEMENT ..........................................................i

TABLE OF CONTENTS............................................................................ ii

TABLE OF AUTHORITIES ................................................................... iii

IDENTITY OF AMICI CURIAE ..........................................................1

INTRODUCTION ................................................................................9

ARGUMENT ......................................................................................9

    I.     History and Definition of Twice Exceptionalism ................................9

    II.    The Importance of In-Person Assessments ........................................14

    III.   Mitigating Measures Do Not Eliminate One's Disability...................20

CONCLUSION ...................................................................................23

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ....................................24

CERTIFICATE OF FILING AND SERVICE .......................................................25

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*D.S. By & Through M.S. v. Trumbull Bd. of Educ.*,
  975 F.3d 152 (2d Cir. 2020) ..........................................................................17

*Henrietta D. v. Bloomberg*,
  331 F.3d 261 (2d Cir. 2003) ..........................................................................15

*Kisor v. Wilkie*,
  139 S. Ct. 2400 (2019)....................................................................................14

*Ramsay v. Nat'l Bd. of Med. Exam'rs*,
  968 F.3d 251 (3d Cir. 2020) ..........................................................................15

*Sutton v. United Air Lines, Inc.*,
  527 U.S. 471 (1999).........................................................................................22

*Taylor v. Vermont Dep't of Educ.*,
  313 F.3d 768 (2d Cir. 2002) ..........................................................................17

**Statutes:**

42 U.S.C. §§ 10801-51 ........................................................................................8

42 U.S.C. §§ 12101 *et seq.*..................................................................................8

42 U.S.C. § 12101(a) ..........................................................................................22

42 U.S.C. § 12102(4)(E)(i) ................................................................20, 21, 22

Conn. Gen. Stat. § 46a-10a ...............................................................................4

**Regulations:**

28 C.F.R. § 36.105(d)(1)(i) ...............................................................................17

28 C.F.R. § 36.105(d)(1)(vi) .............................................................................14

28 C.F.R. § 36.309(b)(1)(iv) ....................................................................16

28 C.F.R. § 36.309(b)(1)(v)–(vi) ...........................................................16

28 C.F.R. pt. 36 ..............................................................................15, 16

**Other Authorities:**

154 Cong. Rec. 19,435 (2008) ................................................................23

ADA Amendments Act of 2008 (ADAAA) (Pub. L. 110-325) ...............8

C. Meisgeier, C. Meisgeier, & D. Werblo, *Factors Compounding the Handicapping of Some Gifted Children*,
Gifted Child Q., 1978 .........................................................................10

C.J. Maker, *Providing Programs for the Gifted Handicapped* (1977) ....................10

Findings and Purposes of Pub. L. 110–325 ............................................22

*High Expectations—and Frustrations: Stories of Twice Exceptional Students Desperately Seeking Support*, ADDitude (Jan. 27, 2023),
https://www.additudemag.com/high-expectations-twice-exceptional-students/ .............................................................. 13, 18-19

Joel Elkind, *The Gifted Child With Learning Disabilities*,
Gifted Child Q., 1973..........................................................................10

Linda E. Brody & Carol J. Mills, *Gifted Children with Learning Disabilities: A Review of the Issues*,
30 J. Learning Disabilities 282 (1997).........................................19, 20

Linda Lee Baird, *How to Support Your Twice-Exceptional Child*,
U.S. News & World Rep. (Apr. 20, 2022, 9:58 AM),
https://www.usnews.com/education/k12/articles/how-to-support-your-twice-exceptional-child....................................................13

iv

Linda Lee Baird, *How to Support Your Twice-Exceptional Child: Kids Who Are Both Gifted and Have a Learning Disability May Struggle to Get All Their Needs Met at School.*, U.S. News & World Rep. (Apr. 20, 2022, 9:58 AM), https://www.usnews.com/education/k12/articles/how-to-support-your-twice-exceptional-child ...................................................................................18

Lois Baldwin et al., *Twice-Exceptional Learners*,
  Gifted Child Today, Oct. 2015 .............................................................10, 11, 12

Nondiscrimination on the Basis of Disability by
Public Accommodations and in Commercial Facilities,
  73 Fed. Reg. 34,539 (June 17, 2008)...................................................16

Nondiscrimination on the Basis of Disability by
Public Accommodations and in Commercial Facilities,
  75 Fed. Reg. 56236-01 (Sept. 15, 2010)..............................................15

*Policy Brief Series: Righting the Am. with Disabilities Act – No. 11, The Role of Mitigating Measures in the Narrowing of the Am. with Disabilities Act's Coverage*, Nat'l Council on Disability (Mar. 17, 2003), https://ncd.gov/publications/2003/March172003 ............................................. 20-21

Susannah Price, *Invisible Victims: Combatting the Consequences of the College Admissions Scandal for Learning-Disabled Students*,
  54 Colum. J.L. & Soc. Probs. 461, 494 (2021)............................................22, 23

Teresa Currivan, *Can We Accurately Test Twice-Exceptional Children?*, Help My Child Thrive: Blog, https://helpmychildthrive.com/can-we-accurately-test-twice-exceptional-children/ (last visited Feb. 28, 2023)................19

*Twice Exceptional: Definition, Characteristics & Identification*, Davidson Inst. (May 31, 2021), https://www.davidsongifted.org/gifted-blog/twice-exceptional-definition-characteristics-identification/..........*passim*

Victor Goertzel & Mildred George Goertzel,
  *Cradles of Eminence* (2d ed. 1962) ................................................................10

Walter Keenan et al., *Impact of the Americans With Disabilities Act Amendments Act on Documentation for Students with Disabilities in Transition to College: Implications for Practitioners*, 57, https://journals.sagepub.com/doi/pdf/10.1177/2165143418809691 ......................21

# IDENTITY OF AMICI CURIAE[1]

Both parties have consented to the filing of this brief.

The identities and interests of the amici curiae are as follows:

**Association for Higher Education and Disability** ("AHEAD") is a national nonprofit association representing over 5,000 members who are actively engaged in service provision, consultation and training, and policy development to create just and equitable higher education experiences for disabled individuals on college campuses throughout the country. AHEAD promotes disability accessibility across the field of higher education and beyond by developing and sharing relevant knowledge; strategically engaging in actions that enhance higher educational professionals' effectiveness; and advocating on behalf of its membership, their institutions, their work, and those they serve, ensuring full, effective participation by individuals with disabilities in every aspect of the postsecondary experience. AHEAD affirms that the enforcement of federal and state disability rights laws is fundamental to full participation in education and advancement for disabled people.

---

[1] No party's counsel authored this brief in whole or in part; no party and no party's counsel contributed money intended to fund the preparation or submission of this brief; and no person other than the amici curiae, their members, or their counsel contributed money that was intended to fund the preparation or submission of this brief.

**The Association of Late Deafened Adults** ("ALDA") is a nationwide non-profit membership organization incorporated in Illinois, comprised largely of people who lost some or all of their hearing after having acquired spoken language. As part of its mission to empower its members, ALDA has actively invoked federal and state disability-rights laws to expand access to public life, and is therefore opposed to decisions that can eliminate any of those available legal tools.

**Coalition for Disability Access in Health Science Education** is a not-for-profit organization whose mission is to develop, advance and disseminate leading practices to facilitate access and opportunity for people with disabilities in health science education. Its members strive to provide leadership for innovative practices, scholarship and education; being a change agent for equity, justice and inclusion; and facilitating collaborative and diverse learning community of health science faculty, staff and administrators.

**The Coelho Center for Disability Law, Policy, and Innovation** collaborates with the disability community to cultivate leadership and advocate innovative approaches to advance the lives of people with disabilities. The Center was founded in 2018 by Tony Coelho, primary congressional sponsor of the Americans with Disabilities Act. Central to the Center's mission is increasing the pipeline of

2

disabled individuals to go to law school and enter the legal profession. The Center advocates for more accessible institutions for higher education.

**Disability Law and Policy Program of Syracuse University College of Law**

The award-winning Disability Law and Policy Program ("DLPP") is the most extensive disability law school program in the United States. The DLPP offers a joint degree in law and disability studies, as well as clinics, externships, and disability law courses for students enrolled in our J.D., LL.M., and S.J.D. programs. The DLPP recruits students with disabilities and is committed to support their success within law school and as they enter the legal profession.

**The Disability Rights Bar Association** ("DRBA") was started by a group of disability rights counsel, law professors, legal nonprofits, and advocacy groups who share a commitment to effective legal representation of individuals with disabilities. Members of DRBA commonly believe that the fundamental civil rights of people with disabilities are inadequately represented in our society and that litigation and other legal advocacy strategies play a highly effective and necessary role in enforcing and advancing the rights of people with disabilities. DRBA strongly supports Plaintiff's case because Congress enacted the ADA to end the use of stereotypes about individuals with disabilities that prevent them from participating fully in society. DRBA regularly participates as amicus curiae in

cases like this to eliminate the perpetuation of harmful stereotypes, such as NBME's refusal to recognize that twice exceptional students may need accommodations to participate fully in the educational process.

**Disability Rights California** ("DRC") is the non-profit Protection and Advocacy agency mandated under state and federal law to advance the legal rights of Californians with disabilities. DRC was established in 1978 and is the largest disability rights legal advocacy organization in the nation. DRC works to ensure people with disabilities have access to necessary services and supports that enable them to live in the community, including access to education. In 2021 alone, DRC assisted more than 21,000 Californians with disabilities, and supports the mission to provide equitable access for disabled individuals to pursue professional careers.

**Disability Rights Connecticut** ("DRCT") is an independent non-profit organization that has been designated as Connecticut's protection and advocacy system. Conn. Gen. Stat. § 46a-10a. DRCT's mission is to advocate for the human, civil, and legal rights of people with disabilities in Connecticut. As the protection and advocacy system for the State of Connecticut, DRCT provides free legal services to advocate and protect the rights of people with disabilities throughout the state. DRCT has extensive experience successfully representing individuals

with disabilities on a wide range of disability rights issues including disability discrimination.

**Disability Rights Maryland** ("DRM") is a non-profit agency established under federal law to protect, advocate for, and advance the rights of Marylanders with disabilities. DRM is the designated Protection and Advocacy System for Maryland and works in partnership with people with disabilities to create a society that values people with all disabilities and supports their rights to full inclusion in their communities. Disability Rights Maryland has an interest in this case because its outcome will affect the ability of individuals with disabilities to obtain accommodations necessary to permit them to equally participate in education and professional training with their peers.

**Disability Rights New York** ("DRNY") is the federally authorized Protection & Advocacy System for people with disabilities in New York. DRNY has an interest in pursuing legal remedies for individuals with disabilities who face discrimination. DRNY provides free legal services to advance and protect the rights of people with disabilities throughout New York State, including impact litigation to achieve systemic reform. DRNY provides these services under federally-funded mandates established by Congress to protect and advocate for the

rights, safety, and autonomy of people with disabilities. DRNY's work in the area of disability discrimination includes successful systemic litigation.

**Everyone Reading, Inc.** (formerly known as the New York Branch of the International Dyslexia Association) is a not-for-profit organization that provides public information, referrals, training, and support to professionals, families, and affected individuals regarding the impacts to and treatment of people with dyslexia and related learning disorders. Its members believe in targeted educational interventions and the provision of accommodations for students with dyslexia and related learning disorders at all levels of education, including access to high-stakes standardized tests, such as those used for admissions, certification, and licensing purposes.

## Learning Disabilities Association of America

The Learning Disabilities Association of America ("LDA") is a membership-based, non-profit organization of parents, educators, adults with LD, professionals, and academic researchers with 35 state affiliates and members in every state and territory. Established in 1963 as a grassroots movement, LDA's mission is to create opportunities for success for all individuals affected by learning disabilities through support, education, and advocacy.

**The National Association of the Deaf** ("NAD"), founded in 1880 by deaf and hard of hearing leaders, is the oldest national civil rights organization in the United States. The NAD is a nonprofit that has as its mission to preserve, protect, and promote the civil, human, and linguistic rights of 48 million deaf and hard of hearing people in this country. The NAD is supported by affiliated state organizations in 49 states and the District of Columbia as well as affiliated nonprofits serving various demographics within the deaf and hard of hearing community. Led by deaf and hard of hearing people on its Board and staff leadership, the NAD is dedicated to ensuring equal access in every aspect of life: health care and mental health services, education, employment, entertainment, personal autonomy, voting rights, access to professional services, legal and court access, technology, and telecommunications.

**National Association for Rights Protection and Advocacy**

The National Association of Rights Protection and Advocacy ("NARPA") was formed in 1981 to provide support and education for advocates working in the mental health arena. It monitors developing trends in mental health law and identifies systemic issues and alternative strategies in mental health service delivery on a national scale. Members are attorneys, people with psychiatric histories, mental health professionals and administrators, academics, and non-legal advocates – with many people in roles that overlap. Central to NARPA's mission

7

is the promotion of those policies and strategies that represent the preferred options of people who have been diagnosed with mental disabilities. Approximately 40% of NARPA's members are current or former patients of the mental health system. NARPA members were key advocates for the passage of Federal legislation such as the Americans with Disabilities Act (ADA) (42 U.S.C. §§ 12101 et seq.), the ADA Amendments Act of 2008 (ADAAA) (Pub. L. 110-325), and the Protection and Advocacy for Individuals with Mental Illness (PAIMI) Act of 1986 (42 U.S.C. §§ 10801-51).

**The National Disability Rights Network** ("NDRN") is the non-profit membership organization for the federally mandated Protection and Advocacy (P&A) and Client Assistance Program (CAP) agencies for individuals with disabilities. The P&A and CAP agencies were established by the United States Congress to protect the rights of people with disabilities and their families through legal support, advocacy, referral, and education. There are P&As and CAPs in all 50 states, the District of Columbia, Puerto Rico, and the U.S. Territories (American Samoa, Guam, Northern Mariana Islands, and the US Virgin Islands), and there is a P&A and CAP affiliated with the Native American Consortium, which includes the Hopi, Navajo, and San Juan Southern Paiute Nations in the Four Corners region of the Southwest. Collectively, the P&A and CAP agencies are the largest provider of legally based advocacy services to people with disabilities in the U.S.

**INTRODUCTION**

This case is important in part because Plaintiff Robert Sampson belongs to the class of individuals who are "twice exceptional," *see* Brief of Appellee at 1, which means he is both intellectually gifted and simultaneously has disabilities that require accommodation. Though Defendant NBME acknowledges that Mr. Sampson is a "gifted student," *see* Brief of Defendant-Appellant at 10, NBME impliedly argues that "high-achieving individuals cannot also have learning disabilities." *See* Brief of Appellee at 56 n.27. Amici disagree. Amici contend that individuals can be both intellectually gifted and simultaneously have disabilities that require accommodation, a condition known as twice exceptionalism.

Part I of this brief describes the history of twice exceptionalism being accepted as a diagnosis and its definition. Part II explains the importance of assessing such individuals in person. Part III discusses how the use of mitigating measures does not negate a disability diagnosis.

**ARGUMENT**

**I.    History and Definition of Twice Exceptionalism**

Broadly, "[t]he term 'twice exceptional' . . . refers to intellectually gifted children who have one or more learning disabilities such as dyslexia, ADHD, or autism spectrum disorder." *Twice Exceptional: Definition, Characteristics & Identification*, Davidson Inst. (May 31, 2021),

9

https://www.davidsongifted.org/gifted-blog/twice-exceptional-definition-characteristics-identification/.

Approximately 426,000 American children between the ages of three and twenty-one are twice exceptional. *Twice Exceptional: Definition, Characteristics & Identification*, *supra*. While understanding of the condition has improved over the past century, scientific literature began recognizing that individuals could both possess special talents and disabilities as early as the 1920s. *See* Lois Baldwin et al., *Twice-Exceptional Learners*, Gifted Child Today, Oct. 2015, at 206.

By the 1960s and 70s, larger studies were conducted, and data began to clearly establish that children can be both gifted and disabled. *See* Victor Goertzel & Mildred George Goertzel, *Cradles of Eminence* (2d ed. 1962) (examining the childhoods of 300 gifted adults and finding a considerable number disliked school, had done poorly in school, and struggled with conventional learning methods); Joel Elkind, *The Gifted Child With Learning Disabilities*, Gifted Child Q., 1973, at 45–47 (finding that children can suffer from a learning disability while being gifted); C.J. Maker, *Providing Programs for the Gifted Handicapped* (1977) (describing individuals as both cognitively disabled but extraordinarily gifted and talented); C. Meisgeier, C. Meisgeier, & D. Werblo, *Factors Compounding the Handicapping of Some Gifted Children*, Gifted Child Q., 1978, at 325–31 (acknowledging that

10

disabled students with gifts needed both advanced educational programming and additional accommodations and support).

By the late 1970s, the literature moved on from the debate of whether twice exceptionalism occurs in children—decidedly answering the question in the affirmative. *See* Baldwin, *supra*, at 210. By then, it was generally accepted that as a result of their disabilities twice exceptional children typically "think and process information differently[,]" and often "struggle with what other kids do easily." *Twice Exceptional: Definition, Characteristics & Identification*, *supra*.

From 1975 through 2000, researchers shifted their emphasis toward crafting guidelines and definitions to aid in identifying twice exceptional individuals, discussing and educating regarding the implications of twice exceptionalism, and creating non-profit, governmental, and school programs to support these individuals achieve educational success. *See* Baldwin, *supra*, at 209–10.

In 2004, the federal government, formally recognized twice exceptionalism when it reauthorized the Individuals with Disabilities Educational Improvement Act ("IDEA") and listed twice exceptional students as eligible to receive services. *See id.* at 210. Similarly, during the 2000s, many states began promulgating guidelines for identifying and serving twice-exceptional students, likely spurred to action by the continually improving literature base. *Id.* at 210–11.

In 2013, the National Twice-Exceptional Community of Practice ("N2eCOP"), and the National Association of School Psychologists, along with stakeholders from twenty-six public, private, and educational organizations, came together for a national summit in 2013. *Id.* at 211–12. The summit resulted in the following definition:

> Twice exceptional individuals evidence exceptional ability and disability, which results in a unique set of circumstances. Their exceptional ability may dominate, hiding their disability; their disability may dominate, hiding their exceptional ability; each may mask the other so that neither is recognized or addressed. 2e students, who may perform below, at, or above grade level require the following:
>
> - Specialized methods of identification that consider the possible interaction of the exceptionalities,
>
> - Enriched/advanced educational opportunities that develop the child's interests, gifts, and talents while also meeting the child[']s learnings needs,
>
> - Simultaneous supports that ensure the child's academic success and social-emotional well-being, such as accommodations, therapeutic interventions, and specialized instruction, and
>
> Working successfully with this unique population requires specialized academic training and ongoing professional development.

*Id.* at 212–13.

Unfortunately, while there have been improvements in identifying twice exceptional children, they remain "among the most under-identified and underserved population[s] in schools." *Twice Exceptional: Definition, Characteristics & Identification*, *supra*. They remain under-identified and

underserved as a direct result of the masking function identified by N2eCOP. *High Expectations—and Frustrations: Stories of Twice Exceptional Students Desperately Seeking Support*, ADDitude (Jan. 27, 2023), https://www.additudemag.com/high-expectations-twice-exceptional-students/.

Often, an early indicator of twice exceptionalism is when a child displays "large differences in abilities, testing high in one subject and average or below in others[.]" Linda Lee Baird, *How to Support Your Twice-Exceptional Child*, U.S. NEWS & WORLD REP. (Apr. 20, 2022, 9:58 AM), https://www.usnews.com/education/k12/articles/how-to-support-your-twice-exceptional-child. Specifically, twice exceptional children might demonstrate "[o]utstanding critical thinking and problem-solving skills[,]" but struggle "with reading and writing due to cognitive processing deficits." *Twice Exceptional: Definition, Characteristics & Identification*, *supra*. Even after parents identify hallmarks of twice exceptionalism in their children, it is "common for families of 2e students to consult with multiple experts in order [for the students] to fully be identified as 2e." Linda Lee Baird, *supra*.

Experts in the field have developed several strategies and tips for identifying twice-exceptionalism, including:

- Take a multi-dimensional approach to identifying twice-exceptional students and consider using both written tests and behavioral assessments

13

- Use both formal and informal assessments

- Separate out test scores on IQ tests; most 2e children are inconsistent performers with uneven skills and asynchronous development

- Reduce qualifying cut off scores to account for learning differences or disabilities

- Consider oral questioning instead of formal written testing if the student experiences difficulties with processing details

- Extend the time available for the student to demonstrate their knowledge

- Use assessment procedures that accommodate language and cultural differences to avoid bias in the identification process

*Twice Exceptional: Definition, Characteristics & Identification*, *supra*.

## II.   The Importance of In-Person Assessments

It has long been recognized that the best practice to identify individuals with disabilities is to have them assessed in person. The United States Department of Justice ("DOJ"), which is tasked with implementing regulations to carry out the purposes of the Americans with Disabilities Act ("ADA"), has recognized the importance of "individualized assessment." 28 C.F.R. § 36.105(d)(1)(vi).

The DOJ's position should be afforded deference because the DOJ is the agency that Congress gave authority to interpret the ADA, the position implicates the agency's substantive expertise, and the position reflects the fair and considered judgment of the agency. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2413-17 (2019). This

14

court has fully recognized the DOJ's authority and directed courts within the

Circuit, "In interpreting the statutory terms look to the views of the Justice

Department, which was charged by Congress with issuing regulations." *Henrietta*

*D. v. Bloomberg*, 331 F.3d 261, 273-74 (2d Cir. 2003).

The DOJ has described the purpose behind its mandate of an individualized

assessment:

> The Department's intention in using this term is to ensure that
> documentation provided on behalf of a testing candidate is not only
> provided by a qualified professional, but also reflects that the qualified
> professional has individually and personally evaluated the candidate as
> opposed to simply considering scores from a review of documents. This
> is particularly important in the learning disabilities context, where
> proper diagnosis requires face-to-face evaluation. Reports from experts
> who have personal familiarity with the candidate should take
> precedence over those from, for example, reviewers for testing
> agencies, who have never personally met the candidate or conducted
> the requisite assessments for diagnosis and treatment.

Nondiscrimination on the Basis of Disability by Public Accommodations and in

Commercial Facilities, 75 Fed. Reg. 56236-01 (Sept. 15, 2010) (to be codified at

28 C.F.R. pt. 36). In interpreting this regulation, the Third Circuit reasoned, "Such

[individualized] assessments benefit from the reports of professionals who know or

have personally examined the individual." *Ramsay v. Nat'l Bd. of Med. Exam'rs*,

968 F.3d 251, 260 (3d Cir. 2020).

The DOJ first stated that "[g]enerally, a testing entity should accept without

further inquiry documentation provided by a qualified professional who has made

an individualized assessment of the applicant," in the preamble to the Notice of Proposed Rulemaking ("NPRM") in 2008. Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities, 73 Fed. Reg. 34,539 (June 17, 2008) (to be codified at 28 C.F.R. pt. 36). At that time, the DOJ proposed adding part (iv) because "the Department has discovered that the requests made by testing entities for documentation regarding the existence of an individual's disability and her or his need for a modification or an auxiliary aid or service are often inappropriate or burdensome." *Id.*

Part (iv) provides, "[a]ny request for documentation, if such documentation is required, is reasonable and limited to the need for the modification, accommodation, or auxiliary aid or service requested." 28 C.F.R. § 36.309(b)(1)(iv). After two years and considering public comments, the final 2010 regulations also added parts (v) and (vi), which further detail how examiners should evaluate requests for accommodation. 28 C.F.R. § 36.309(b)(1)(v)–(vi).

While amici agree with Defendant NBME that the DOJ guidelines do not "require *de facto* disability findings based on the recommendations of an examinee's professional[,]" amici disagree that "[t]he guidance is entitled to no deference." Brief of Defendant-Appellant at 59–60. Instead, amici agree with Plaintiff Sampson that "as the Supreme Court has stated, DOJ's interpretations of Title III are entitled to deference because DOJ is charged with issuing

16

implementing regulations, issuing technical guidance, and enforcing the statute."

Brief of Appellee at 46. Unlike the case cited by NBME in which this Court

determined that an interpretation at issue "ignore[d] the plain language of the

statute and regulations," here, the DOJ is explaining the plain language of its

regulation by defining "individualized assessment." *D.S. By & Through M.S. v.

Trumbull Bd. of Educ.*, 975 F.3d 152, 167 (2d Cir. 2020). This Court has

recognized, "An agency's consistent interpretation of its regulations is to be given

controlling weight unless plainly erroneous or inconsistent with the regulation."

*Taylor v. Vermont Dep't of Educ.*, 313 F.3d 768, 780 (2d Cir. 2002).

Here, the DOJ's interpretation of what constitutes an "individualized

assessment" is not plainly erroneous or inconsistent with the purpose of the

regulation to "be construed broadly in favor of expansive coverage, to the

maximum extent permitted by the terms of the ADA." 28 C.F.R. § 36.105(d)(1)(i).

By stating that determinations from those who have personally examined an

individual should take precedence over those who have merely read reports, the

DOJ ensures not only that the expert who had the opportunity to gather and

observe all pertinent details receives priority, but also that individuals who are

disabled, but whose symptoms may not be apparent on paper, are covered.

Therefore, the DOJ's interpretation deserves controlling weight.

The DOJ has established that in-person evaluation is "particularly important in the learning disabilities context," and that importance is only compounded when the individual is twice exceptional because being both gifted and disabled can lead to misdiagnosis. *Twice Exceptional: Definition, Characteristics & Identification*, *supra* ("Oftentimes, multiple classification in giftedness and disability can complicate proper identification and lead to a misdiagnosis."); Linda Lee Baird, *How to Support Your Twice-Exceptional Child: Kids Who Are Both Gifted and Have a Learning Disability May Struggle to Get All Their Needs Met at School.*, U.S. News & World Rep. (Apr. 20, 2022, 9:58 AM), https://www.usnews.com/ education/k12/articles/how-to-support-your-twice-exceptional-child ("Twice-exceptional children commonly experience either a *missed diagnosis*, where their gifted abilities mask underlying academic challenges, or a *misdiagnosis*, where behavior or learning differences mask their academic talents . . . . Others may present as neurotypical, . . . 'because the masking is working so well' that both the giftedness and the disability remain unnoticed.").

The Davidson Institute has explained that diagnosing an individual who is twice exceptional "is often a complicated process and requires the unique ability to assess and identify the two areas of exceptionality." *Twice Exceptional: Definition, Characteristics & Identification*, *supra*; *see also High Expectations — and*

18

*Frustrations: Stories of Twice Exceptional Students Desperately Seeking Support*,

*supra* (noting that identifying twice exceptionalism is "confusing [to] teachers,

parents, and clinicians alike"). Because the process for clinicians to recognize that

an individual is twice exceptional is already complicated, it will be moreso if the

clinician does not meet with the individual in person. It would be much more

difficult for clinicians to correctly identify a twice exceptional individual if they

only rely on reports rather than examining the individual personally.

Isolated test scores can be particularly misleading with respect to twice

exceptional students because of the way their gifts and disabilities interact. Teresa

Currivan, *Can We Accurately Test Twice-Exceptional Children?*, Help My Child

Thrive: Blog, https://helpmychildthrive.com/can-we-accurately-test-twice-

exceptional-children/ (last visited Feb. 28, 2023) ("Because many 2e children

struggle with overlapping strengths and challenges, it's important for the tester to

understand these and to be able to discern the varying components and how they

impact the child's ability to function, both in the test itself and at school and in the

world . . . .").

Compounding the challenge of identifying individuals who qualify as twice

exceptional is the fact that giftedness and disability do not present in the same way

in these individuals. Linda E. Brody & Carol J. Mills, *Gifted Children with

Learning Disabilities: A Review of the Issues*, 30 J. Learning Disabilities 282, 285

(1997) ("It is clear that we are dealing with a very heterogeneous group of students who represent all types of intellectual giftedness and academic talents, in combination with various forms of learning disabilities."). Some researchers recommend that "[a] complete assessment," which includes "behavioral observations" along with intelligence and cognitive processing tests, is needed to identify twice exceptional people. *Id.* at 287. Because those who are twice exceptional can manifest a range of abilities and symptoms, clinicians need to assess individuals in person to accurately diagnose those individuals. Simply reading reports or looking at scores on individual assessments in isolation is insufficient due to the variety and complexity of the factors involved and the ways those individuals adapt to their surroundings, making their behavior appear more neurotypical.

## III. Mitigating Measures Do Not Eliminate One's Disability

Determining whether an impairment substantially limits a major life activity of someone must be done "without regard to the ameliorative effects of mitigating measures" the person may use. 42 U.S.C. § 12102(4)(E)(i) (2009). Individuals with disabilities often use mitigating measures to "ameliorate the impact of [an] impairment." *Policy Brief Series: Righting the Am. with Disabilities Act – No. 11, The Role of Mitigating Measures in the Narrowing of the Am. with Disabilities Act's Coverage*, Nat'l Council on Disability (Mar. 17, 2003),

https://ncd.gov/publications/2003/March172003. The Americans with Disabilities Act Amendments Act of 2008 ("ADAAA") explicitly recognized several mitigating measures, including—but not limited to—hearing aids, prosthetics, and "learned behavioral or adaptive neurological modifications." 42 U.S.C. § 12102(4)(E)(i) (2009).

Importantly, although the use of mitigating measures may reduce or remove "the *impact* of [an] impairment," it does not eliminate the disability itself. Walter Keenan et al., *Impact of the Americans With Disabilities Act Amendments Act on Documentation for Students with Disabilities in Transition to College: Implications for Practitioners*, 57, https://journals.sagepub.com/doi/pdf/10.1177/2165143418809691 (emphasis added). For instance, while "the ability of a student with ADHD to concentrate and stay on task may improve with medication," the condition itself will persist. *Id.* This fact bolsters Plaintiff's contention that "NBME errs in pointing to Sampson's history of academic success as proof that he is not disabled." Brief of Appellee at 51. Sampson's effective implementation of mitigating measures has resulted in his academic success, but it has not removed his disability altogether.

Despite the limited relief obtainable by mitigating measures, many individuals were barred from ADA coverage due to the Supreme Court's conclusion that such measures should be considered when determining whether a

person qualified as "disabled" under that statute. *See Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999). That approach, however, contravened public policy and ultimately prompted Congress to enact the ADAAA. Indeed, the ADAAA's legislative history notes that "the holdings of the Supreme Court in *Sutton v. United Air Lines, Inc.,* . . . and its companion cases have narrowed the broad scope of protection intended to be afforded by the ADA, thus eliminating protection for many individuals whom Congress intended to protect." 42 U.S.C. § 12101(a) note (Findings and Purposes of Pub. L. 110–325). For this reason, the ADAAA explicitly states that "[t]he determination of whether an impairment substantially limits a major life activity shall be made *without regard to the ameliorative effects of mitigating measures*." 42 U.S.C. § 12102(4)(E)(i) (2009) (emphasis added).

Similarly, an individual's use of mitigating measures cannot constitute a basis for denying accommodations. *See* Susannah Price, *Invisible Victims: Combatting the Consequences of the College Admissions Scandal for Learning-Disabled Students*, 54 Colum. J.L. & Soc. Probs. 461, 494 (2021) (emphasizing that "a student who has lessened the impact of her learning disability through certain adaptive strategies should not be denied the right to an accommodation that will further alleviate the impact of her disability"). Such denials would essentially punish individuals who have learned how to cope with their disability while also preventing them from showing their true knowledge and capability. *Id.*

Further, such a penalty contravenes the broad scope of the ADAAA. *See, e.g.*, 154 Cong. Rec. 19,435 (2008) (statement by Rep. Miller that "[t]he ADA Amendments Act ensures that students with physical and mental impairments . . . will have access to the accommodations and to the modifications they need to successfully pursue an education"). It is also illogical "to say that an individual falls within a law's intended scope of protection but at the same time is not entitled to that law's stipulated remedies." Price, *supra*, at 495. For these reasons, if a person can demonstrate that he or she has a covered disability, then reasonable accommodations should be available regardless of whether mitigating measures can lessen the effects of the disability.

In this case, Plaintiff Sampson has demonstrated that he has a covered disability and that Defendant NBME failed to reasonably accommodate him.

## CONCLUSION

Based on the points made herein and in the Brief of Appellee, Amici Curiae recommend that this Court affirm the District Court's preliminary injunction.

This the 3rd day of March 2023.

/s/ *John J. Korzen*
John J. Korzen, Director
Wake Forest University School of Law
Appellate Advocacy Clinic
P.O. Box 7206
Winston-Salem, North Carolina 27109
(336) 758-5832

*Counsel for Amici Curiae*

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**

1.      This brief complies with the type-volume limitation because:

this brief contains <u>4,767</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

this brief has been prepared in a proportional spaced typeface using <u>Microsoft Word</u> in <u>14-point Times New Roman</u>.

This the 3rd day of March 2023.

/s/ *John J. Korzen*
John J. Korzen, Director
Wake Forest University School of Law
Appellate Advocacy Clinic
P.O. Box 7206
Winston-Salem, North Carolina 27109
(336) 758-5832

*Counsel for Amici Curiae*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on March 3, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

This the 3rd day of March 2023.

/s/ *John J. Korzen*
John J. Korzen, Director
Wake Forest University School of Law
Appellate Advocacy Clinic
P.O. Box 7206
Winston-Salem, North Carolina 27109
(336) 758-5832

*Counsel for Amici Curiae*