# No. 23-3

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

*ROBERT SAMPSON,*

*Plaintiff-Appellee,*

*v.*

*NATIONAL BOARD OF MEDICAL EXAMINERS,*

*Defendant-Appellant.*

On Appeal from the United States District Court for the Eastern
District of New York, Case No. 22-CV-05120-JMA

**REPLY BRIEF OF DEFENDANT-APPELLANT
NATIONAL BOARD OF MEDICAL EXAMINERS**

Robert A. Burgoyne
Caroline M. Mew
PERKINS COIE LLP
700 13th St. N.W., Ste. 800
Washington, DC 20005-3960
Telephone: 202.654.1744

Attorneys for
Defendant-Appellant
NATIONAL BOARD OF
MEDICAL EXAMINERS

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ..................................................................1

ARGUMENT .......................................................................2

    I.    There was no threat of imminent, non-speculative injury. ................................................................2

    II.    The district court erred in finding a likelihood of success when there is no evidence that Plaintiff is substantially limited. ...............................................7

        A.    Plaintiff mischaracterizes the record as showing substantial limitation compared to most people...................................................7

        B.    Plaintiff's criticism of NBME's experts is unfounded....................................................11

        C.    The district court and Plaintiff improperly rely on agency guidance to support giving deference to Plaintiff's evaluator. ................19

        D.    Plaintiff is not substantially limited compared to most people in the general population....................................................22

    III.    NBME will suffer greater harm from an improper preliminary injunction than Plaintiff would suffer from waiting for a final resolution on the merits. .........................28

    IV.    The public interest does not favor the award of mandatory preliminary injunctive relief .............................29

CONCLUSION ..................................................................29

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Anderson v. City of Bessemer City, N.C.*,
   470 U.S. 564 (1985) ................................................................. 18

*B.C. v. Mount Vernon Sch. Dist.*,
   837 F.3d 152 (2d Cir. 2016) ................................................ 23, 24, 27

*Baer v. NBME*,
   392 F. Supp. 2d 42 (D. Mass. 2005) ......................................... 6

*Bartlett v. N.Y. State Bd. of Law Exam'rs*,
   226 F.3d 69 (2d Cir. 2000) ................................................... 22

*Bibber v. Nat'l Bd. of Osteopathic Med. Exam'rs*,
   2016 WL 1404157 (E.D. Pa. 2016) .................................... 13, 26

*Black & Decker Disability Plan v. Nord*,
   538 U.S. 822 (2018) ............................................................. 20

*Black v. Nat'l Bd. of Med. Exam'rs*,
   281 F. Supp. 3d 1247 (M.D. Fla. 2017) .......................... 13, 26

*Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs*,
   870 F. Supp.2d 607 (S.D. Ind. 2012) .............................. 13, 26

*In re O.M.*,
   __A.3d__, 2023 WL 2344296 (Vt. Mar. 3, 2023) ................. 24

*Kisor v. Wilkie*,
   139 S. Ct. 2400 (2019) ................................................... 19, 20

*Locurto v. Giuliani*,
   447 F.3d 159 (2d Cir. 2006) ............................................... 18

*Palmer v. Asarco Inc.*,
   510 F. Supp. 2d 519 (N.D. Okla. 2007) ............................... 13

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Perez v. Mortgage Bankers Ass'n*,
575 U.S. 92 (2015) ................................................................. 19

*Powell v. Nat'l Bd. of Med. Exam'rs*,
364 F.3d 79 (2d Cir. 2004) ................................................... 28

*Ramsay v. Nat'l Bd. of Med. Exam'rs,*
968 F.3d 251 (3d Cir. 2020) ............................................... 3, 4

*Rothberg v. Law Sch. Admission Council*,
102 F. App'x 122 (10th Cir. 2004) ....................................... 28

*Valles v. ACT, Inc.*,
2022 WL 2789900 (E.D. Tex. 2022) ................................. 13, 26

*Wright v. Nat'l Bd. of Med. Exam'rs*,
2021 WL 5028463 (D. Colo. 2021) ................................... 13, 26

STATUTES

42 U.S.C. § 12102(4)(E)(i)(iv) ..................................................... 27

REGULATIONS

28 C.F.R. § 36.105 ........................................................................ 25

75 Fed. Reg. 56,236 (Sep. 15, 2010) ..................................... 20, 21

81 Fed. Reg. 53,204 (Aug. 11, 2016) .......................................... 27

OTHER AUTHORITIES

Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2948.1
(3d ed.) ...................................................................................... 6

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

C. Lerner, '"Accommodations' for the Learning Disabled: A
   Level Playing Field or Affirmative Action for Elites,"
   57 Vand. L. Rev. 1043 (2004)................................................................26

M. Gordon *et al.*, "The LD Label for Relatively Well-
   Functioning Students:  A Critical Analysis," 32 J. of
   Learning Disabilities 485 (1999)........................................................26

## INTRODUCTION

The central issue on appeal is whether testing agencies and courts must conclude that an ADA plaintiff is "disabled" if he and his supporting professionals say so—even if the statutory legal standard of "substantial limitation compared to most people" has not been met. Tellingly, Plaintiff's framing of the issues on appeal makes no reference to this governing standard. Opp. 2. The reason is clear: overwhelming evidence, including diagnostic reports from his own evaluators, shows that Plaintiff is not substantially limited in his ability to read or concentrate as compared to most people in the general population.

The district court nevertheless concluded that Plaintiff "established that he is disabled within the meaning of the ADA, by virtue of his diagnosed Specific Learning Disorder ... and ADHD." SPA38. Reviewing this conclusion under the applicable *de novo* standard, the Court should reverse. And because Plaintiff did not show that he is disabled under the ADA, he did not meet his burden of showing a clear likelihood of success on the merits of his ADA claim.

The district court also erred in concluding Plaintiff was likely to suffer imminent and non-speculative irreparable harm absent a preliminary injunction. Plaintiff claimed that urgent action was needed so that he could take Step 1 and thus avoid dismissal from medical school. Subsequent events, however, have confirmed the claimed urgency did not exist. Plaintiff disclosed after the preliminary injunction hearing

that he did not plan to actually take the Step 1 exam until he finished his business school classes and had an opportunity to study for sixteen weeks. He is not planning to test until mid-May, Opp. 36 n.20, more than eight months after he filed his preliminary injunction request.

No one disagrees that Plaintiff is an impressive and hard-working individual; his desire to become a doctor is compelling. He failed, however, to establish entitlement to the extraordinary remedy of a mandatory preliminary injunction.

## ARGUMENT

### I.  There was no threat of imminent, non-speculative injury.

Plaintiff bends the record in his attempt to salvage the district court's flawed irreparable harm analysis.[1] Plaintiff argues he "will be dismissed from medical school if he fails [Step 1] again …." Opp. 32 (citing SPA 22 n.8). But Plaintiff—who most recently spent a year and half taking business school classes, A1005 (39:3-9), A1143 (436:13-14)—faces dismissal from medical school *because he failed to complete his degree in seven years*. Even the district court recognized this. SPA21-22 ("Stony Brook has informed Sampson that he faces termination because he has not completed his studies within seven years.").

---

[1] After insisting that the district court's findings of irreparable harm "are well supported by the record," Opp. 32, Plaintiff provided only two record cites, *id.* 32-36, both to his lawyer's colloquy with the court explaining that he would not even begin studying for Step 1 until he completed his business school courses at the end of December 2022 and would need 3 to 4 months of study time after that. *Id.* 36 and n.19 (citing A1143 (435:18-436:14)).

Contrary to Plaintiff's argument, Opp. 32-33, this case is not like *Ramsay v. NBME*, where a "letter from [the plaintiff's medical school] provided a basis for the District Court to conclude that she would be dismissed from the medical school if she did not pass Step 1." 968 F.3d 251, 262 n.15 (3d Cir. 2020). Stony Brook's April 2022 letter to Plaintiff says something quite different. A801; A1008 (153:5-12). That is why Plaintiff sued Stony Brook and sought a preliminary injunction in *that* case to prevent his dismissal. *Sampson v. Stony Brook Univ.*, No. 2:22-cv-4490 (E.D.N.Y), Dkt. 2.

The district court inexplicably put the Stony Brook case on the back burner, asked Stony Brook to voluntarily postpone its dismissal decision, and scheduled expedited briefing on Plaintiff's request for a mandatory preliminary injunction against NBME, before even hearing from NBME in response to Plaintiff's pre-motion letter. *See* Dkt. 8 (Plaintiff's Sept. 6, 2022 letter requesting motion conference) *and* Sept. 8, 2022 Minute Order (setting briefing schedule).

Given this backdrop, it is not surprising that the district court could not identify any actual irreparable harm tied to Plaintiff's status in medical school in its preliminary injunction order, merely suggesting in a footnote, with no record support, that "even if Sampson were to prevail in his lawsuit against Stony Brook, he still could not proceed with his medical studies without taking and passing Step 1." SPA22 n.8.

On top of its mistaken premise that Plaintiff faced imminent irreparable harm, the district court speculated "it is likely that [Plaintiff] will again fail Step 1 if he takes the exam without accommodations." SPA21. Plaintiff reiterates this unfounded prediction, claiming he would "likely fail" Step 1 without accommodations and that NBME "mistakenly downplay[s] the fact that Sampson already tried and failed Step 1 without accommodations," Opp. 14, 33, again citing *Ramsay* notwithstanding its very different facts. Ms. Ramsay attempted Step 1 on schedule in her third year of medical school. 968 F.3d at 254. Plaintiff took Step 1 early in his medical school studies—after completing only three semesters—and following a three-year leave of absence. A1006-A1007 (145:9-146:17). Indeed, in a letter to Stony Brook, Plaintiff's counsel noted that Plaintiff was significantly disadvantaged by having to take Step 1 after only three semesters, unlike other Stony Brook students who received "additional learning before taking Step 1." A799 n.3. Plaintiff similarly stated that the best time to take Step 1 is after the third year of medical school. A1007 (146:7-13). The district court's conclusion that he would fail if he tested again without accommodations, now that he has completed three years of medical school, was pure speculation.

Plaintiff's insistence that he will also suffer irreparable harm because he will be delayed in pursuing his medical education continues to ring hollow in light of his own significant delay in seeking court relief.

-4-

NBME is not "quibbling" with a "factual determination" that Plaintiff no longer needed to pursue court relief after he was readmitted to medical school in 2020. Opp. 34. The district court fundamentally erred in concluding that Plaintiff could sit back until he had an "immediate" need for accommodations before seeking judicial relief. SPA23. Plaintiff has had a live dispute with NBME regarding accommodations on Step 1 **since 2017**. When he restarted medical school classes in 2020, he knew he would have to take Step 1 at the end of the school year and that NBME already denied his accommodation requests numerous times. As Stony Brook itself explained: "Since 2017 Plaintiff has been seeking a time-limit accommodation from the NBME for a national test he was required to pass before continuing his studies … and he has known since at least May 2020 that he would need to seek judicial relief against the NBME, but he did not [do so] until August 29, 2022, even though his deadline to complete his [medical] studies … was August 12, 2022." *Sampson v. Stony Brook*, *supra*, Dkt. 13 pp. 12-13.[2] Plaintiff should not be permitted to wait until the eleventh hour to seek court relief and then claim a need for an expedited, mandatory preliminary injunction.

---

[2] Plaintiff says that filing a lawsuit is not a "straightforward process," Opp. 35 n.18, but he was represented at least as early as 2018 by an attorney who has litigated similar cases, A74-A75, ¶¶ 24, 27, and by his current litigation counsel at least as early as 2020, A799.

Finally, Plaintiff misses the point in arguing that NBME did not "object" to his "request" for a dedicated study period and supposedly knew he could not begin studying for Step 1 until he completed business school. Opp. 35-36. Plaintiff's post-testimony revelation, through counsel, that actual testing was months away, A1143 (435:15-436:14), was not a point for objection. It was a blatant admission that there was never a threat of *imminent* harm justifying expedited preliminary injunctive relief. *See Baer v. NBME*, 392 F. Supp. 2d 42, 49 (D. Mass. 2005) (finding no irreparable harm where plaintiff speculated about whether she would pass the test without accommodations, failed to timely pursue relief, and failed to show a risk of *imminent* harm given options for testing at a later date).[3] The district court should have reacted to that belated disclosure by denying the requested injunction. *See* Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.) ("[I]f a trial on the merits can be conducted before the injury would occur there is no need for interlocutory relief.").

---

[3] The fact that *Baer* pre-dates the ADAAA, Opp. 33 n.12, is irrelevant to the question of irreparable harm.

II.   **The district court erred in finding a likelihood of success when there is no evidence that Plaintiff is substantially limited.**

A.   **Plaintiff mischaracterizes the record as showing substantial limitation compared to most people.**

NBME demonstrated in its opening brief that the district court's foundational conclusion—"Sampson's parents, teachers, tutors, and psychological evaluators have all noted that, as a result of his impairment, he experiences more difficulty with reading and concentration as compared to most people in the general population," SPA27—is unsupported and wrong, Br. 47-48. In his appellate brief, Plaintiff amplifies the district court's error by repeatedly proclaiming—in the absence of evidentiary support—that he is substantially limited compared to most others.

According to Plaintiff, "[f]rom his earliest childhood, [he] has worked harder and longer than others …." Opp. 3. There is no support for this assertion and Plaintiff cites nothing.[4] Plaintiff similarly insists that his "reading has always been slow as compared to most people in the general population," Opp. 4, but he cites only the testimony of a friend who tutored him in college on the challenging medical school admission test.[5] At the same time, Plaintiff ignores evidence reflecting unimpaired reading during elementary school, A and B grades in junior

---

[4] "People tend to overestimate the amount of work they put forth relative to others." A1080 (344:5-6) (discussing research).

[5] "Most people" do not attend college, much less attempt the Medical College Admission Test. A214 ¶27.

high and in high school in honors and AP classes,[6] and excellent scores as compared to other test-takers on reading-intensive standardized tests taken under standard time conditions. Br. 10-15. Plaintiff argues this educational record was only possible through "extensive tutoring" that was "different in volume and nature" from tutoring that others received. Opp. 4. Putting aside the complete lack of foundation for this opinion, it is inconsistent with what Plaintiff reported to his own evaluator, Dr. Michels, in 2013, when he described an "extremely competitive" school environment which led to "widespread use of tutoring," including, in his case, tutoring "to remain in the highest math classes," A810-2.

Other stretches of the record include Plaintiff's statement that he "was referred to learning specialists in elementary school, in high school, and again in medical school." Opp. 19; *see also* Opp. 4 ("He was twice referred by his public school to a reading specialist."); Opp. 26 ("Dr. Wasserstein's conclusions are corroborated by the 'real-world' experiences of Sampson growing up with a reading impairment so severe that his schools referred him to reading specialists."); Opp. 54 ("Sampson has such difficulties with reading that his schools have repeatedly referred him to specialists."). This is not what the record

---

[6] AP classes are college-level courses and exams that students can take in high school. *See* "What is AP?" *at* https://apstudents.collegeboard.org/what-is-ap.

shows. Plaintiff's mother testified that *one* teacher in elementary school recommended he work with a reading specialist on reading comprehension, which he then did over the summer. A788 ¶4; A1011 (162:7-15). There is no evidence of any school-based referrals to reading specialists in elementary school, middle school, high school, or college. Plaintiff did not have an Individualized Education Program (IEP), Section 504 plan, or any other school-based interventions or services. A1002 (126:8-10); A809-1. He did not receive formal accommodations in elementary school, middle school, high school, or college. A84-A85; A122-A123. In short, the evidence does not support his asserted "lifelong history of severe reading and attention impairments." Opp. 2.

Plaintiff emphasizes his stuttering and receipt of speech therapy as a young child, Opp. 3, but neither of his first two evaluators treated this as significant, A809-1 ("He was described as a severe stutterer, but this was corrected through speech therapy in elementary school."); A810-1 ("As a young child, he was a severe stutterer, but this issue resolved in his early elementary school years."), and his third evaluator, Dr. Wasserstein, did not draw any connection between the childhood stuttering and Plaintiff's current functioning in her evaluation report, A939-5; A939-23. Childhood stuttering "is a common occurrence, particularly in boys …." A216 ¶32; *see also* A321 ¶19 ("Having a speech-language impairment in articulation does not prevent an individual from being able to learn to read normally or fluently....").

Plaintiff's description of his grade school records being "replete with mention of difficulties with reading" and attention issues, Opp. 3-4, is yet another characterization contradicted by the record. A852-A867; *see also* A318-319 ¶¶12-15. Plaintiff's reading grades in elementary school were average to above average. A852-A867 (showing reading scores ranging from 3 to 5+ on a scale of 1 to five). His first-grade teacher reported that "Robert enjoys reading books," A852, his fourth-grade teacher reported he "is a very capable fourth grader" with reading scores in the 83rd percentile, A862, and his sixth-grade teacher reported that "Robert loves reading" and "[h]is desire to read the Narnia series in its entirety is indicative of his high level of commitment to his work," A866. Consistent with those reports, his mother did not mention any reading or attentions issues when she wrote to his school regarding his fifth-grade placement, stating instead that his "major problem [was] dealing with the social interactions and acceptances by his peers." A860-61.

Plaintiff cannot bolster the district court's inaccurate findings by simply repeating characterizations that are unsupported by the record.

**B.      Plaintiff's criticism of NBME's experts is unfounded.**

Plaintiff argues that the statements of NBME's experts "are rife with factual inaccuracies and glaring omissions," Opp. 24,[7] and points specifically to their assertion that Plaintiff had no history of accommodations prior to medical school as one such "factual inaccuracy," *id.* at 25. But NBME's experts relied on exactly what Plaintiff told NBME when he applied for accommodations. A806-A807. Plaintiff's accommodation request forms report "none" for accommodations provided in college, high school, middle school, and elementary school and "none" for accommodations provided on the PSAT, SAT, and ACT. A806-A807; A932-A933. Although Plaintiff now says that teachers allowed him extra time to take exams during lunch or after school as an "informal accommodation" and that NBME's evaluators overlooked this information, Opp. 21, 24-25, he made no mention of this supposed "informal accommodation" in his accommodation request forms, A802-A808, A929-A933, or in his personal statements to NBME, A811-A819; A935-A938. This

---

[7] Plaintiff says that "some" of NBME's external consultants "stated in their declarations that they had not had sufficient time to review Sampson's file before offering their opinions." Opp. 13 n.3. However, of the five experts who provided testimony on NBME's behalf, Dr. Flanagan was the only one who noted that she had not had time to review all the relevant information. She was asked to review Plaintiff's records in the brief period of time provided under the district court's expedited briefing schedule. Based upon that review, she was not prepared to opine on whether Plaintiff's diagnoses were warranted, A429 ¶7, but she opined without qualification that Plaintiff is not substantially limited in his ability to read or concentrate as compared to most people in the general population, saying this is "not a close case." A429 ¶¶5-6.

"informal accommodation" also is not mentioned in the reports of his psychological evaluators. A809-1; A810-2; A939-5—A939-6.

While NBME evaluators plainly cannot consider information that Plaintiff never provided to NBME in the first place, it is also worth noting that Plaintiff's emerging discussion of "informal accommodations" expands each time it is retold. Plaintiff now describes teachers allowing him extra time to take tests during lunch or after school as an "informal accommodation" he received "throughout his education." Opp. 21.[8] In his lengthy personal statements to NBME in 2017 and 2022, however, he made no mention of receiving such accommodations at any stage in his educational history. A811-A819; A935-A938. And at the hearing, he said only that he could not "always" finish tests during class time and, with no specifics as to when or how often this actually happened, "[s]ome teachers were more accommodating and I would finish after school or during lunch." A980-A981 (41:21-42:2).

The same is true with regard to Plaintiff's alleged use of "test-taking strategies to reduce the amount of reading on examinations…." Opp. 54; *see id.* at 6. Plaintiff never suggested in his personal statements to NBME that he earned his very high scores on the MCAT, SAT and ACT without reading all the passages. A811-A819; A935-A938. There was also no discussion of his use of such strategies in any of his

---

[8] Plaintiff also refers to this as a "mitigating measure" that was provided "throughout his schooling." Opp. 22.

psychological evaluations. A809-1; A810-2; A939-6. And Plaintiff's friend and MCAT tutor reported to NBME something quite different— that Plaintiff's test-taking strategy for the MCAT involved "*carefully read[ing]* and record[ing] notes about *the content of each paragraph*" when reading passages on the test. A825 (emphasis added). It was only at the preliminary injunction hearing that Andrew Lam shifted to describing a test-taking strategy that did *not* involve Plaintiff reading the entire passage on the test. A975 (21:16-22:10); A978 (30:13-32:18). It is disingenuous for Plaintiff (and clear error for the district court, SPA34-38) to criticize NBME and NBME's experts for not considering "informal accommodations" and "mitigating measures" that Plaintiff never reported to NBME in support of his testing accommodation requests and that are not supported by the record in any event.[9]

---

[9] Plaintiff's criticism of NBME's external experts based on the outcome of other cases in which they testified, Opp. 24, is misguided. Those experts have testified in numerous cases where courts agreed that the plaintiff did not demonstrate a disability or the need for testing accommodations. *See, e.g., Valles v. ACT,* 2022 WL 2789900 (E.D. Tex. 2022) (Dr. Murphy, ECF 7-4); *Wright v. NBME*, 2021 WL 5028463 (D. Colo. 2021) (Dr. Murphy, ECF 11-31); *Black v. NBME*, 281 F. Supp. 3d 1247 (M.D. Fla. 2017) (Dr. Murphy, ECF 11-33); *Bibber v. Nat'l Bd. of Osteopathic Med. Exam'rs,* 2016 WL 1404157 (E.D. Pa. 2016) (Drs. Lovett and Bernier); *Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs,* 870 F. Supp.2d 607 (S.D. Ind. 2012) (Drs. Bernier and Murphy); *see also Silverman v. NBME*, No. 2:16-cv-3686 (D.S.C. 2016) (Dr. Lovett (ECF 14-4)) (denying preliminary injunction motion without written opinion (ECF No. 26)). On the other side of the coin, a court excluded testimony by Plaintiff's expert, Dr. Wasserstein, that an individual's ADHD was caused by lead exposure because it lacked scientific support. *Palmer v. Asarco Inc.*, 510 F. Supp. 2d 519, 531 (N.D. Okla. 2007).

Likewise unsupported is Plaintiff's suggestion that Step 1 is a different kind of multiple-choice exam than the other high-stakes standardized exams he has taken. Opp. 8-9. A comparison of questions on the reading-intensive MCAT, ACT, and SAT to questions on Step 1 refutes that suggestion. Br. 13-15.

Plaintiff touts the benefits of an in-person evaluation and argues this is a basis to credit Dr. Wasserstein's opinions over those of NBME's experts. Opp. 23. However, Dr. Wasserstein's associate administered most (if not all) of the diagnostic assessments to Plaintiff, and Dr. Wasserstein could not recall which tests (if any) she administered. A1040 (185:18-186:16; 240:11-18; *see also* A1038 (178:12-14) ("As is the case for many neuropsychologists especially, those of us who have been around a long time, we don't do much of the actual data collection."). Thus, the district court's finding that "Dr. Wasserstein, with the assistance of Dr. Miller, 'spent 15 hours evaluating Sampson in person,'" Opp. 23 (quoting SPA29), is not accurate. Likewise, the district court's repeated references to Dr. Wasserstein "administer[ing]" various tests and neuropsychological assessments, SPA16-17 (referring to the WAIS-IV, the Nelson Denny (NDRT), and other unspecified "neuropsychological assessments") is inaccurate. Plaintiff's argument that the district court properly credited Dr. Wasserstein's conclusions because "[a] trained professional who not only reviews all the records but also evaluates the subject in person will by definition have a more complete picture than

-14-

another professional who simply reviews records," Opp. 23, is inconsistent with the record.

Similarly, while Plaintiff argues that NBME's experts missed out on supposedly "keen insights" that were available to Dr. Wasserstein and her associate after observing Plaintiff in person—specifically, Sampson's "errors of visual perception [in] mistaking the '+' character for 'x'," Opp. 25—this "insight" was noted in Dr. Wasserstein's written report, A939-17, and NBME's experts could therefore take this "insight" into account based upon the testing conducted by Dr. Wasserstein's associate, just as Dr. Wasserstein did in formulating her opinions.[10]

NBME's expert consultants who reviewed Plaintiff's accommodation requests as part of NBME's decision-making process (Drs. Murphy, Lovett, and Ortiz) considered *all* the data and information provided in support of his requests, as reflected in their written reports and testimony. *See, e.g.,* A206-A223; A248-A265; A276-A298; A314-A315 ¶¶3-4; A391-A403. The same is true of Dr. Bernier. A504-A423. Plaintiff's argument that Dr. Wasserstein relied on the "totality of the data" and

---

[10] This is reflected in Dr. Murphy's declaration: "[E]ven though Mr. Sampson had WIAT scores in the 'Very Superior' range (99th percentile) in Match Problem Solving and in the Superior Range (97th percentile) in Numerical Operations, Dr. Wasserstein nevertheless indicated he exhibits 'visual misperceptions' on these tests and 'sometimes misinterpreted' a plus sign '+' as a multiplication sign 'x' 'suggesting vulnerable processing and/or inattention'. This at best is illogical and certainly does not provide a persuasive basis for suggesting impaired visual processing functioning." A282 ¶31.

NBME's experts did not, Opp. 26-27, simply is not borne out by the record.

Even where Plaintiff focuses on the results of one diagnostic test, his argument is contradicted by the record. Plaintiff claims that "NBME misinterprets the import of Sampson's results on the [SATA]," Opp. 26, but it is the *district court* that misinterpreted the import of Sampson's results on the SATA. As NBME showed in its opening brief, the district court inaccurately treated Plaintiff's SATA score as "below average." Br. 51-52 and n.19.

Plaintiff's argument that "[t]he NBME consultants' definitions of disability are inappropriately strict to the point of absurdity" is equally unfounded. Opp. 29. Plaintiff's only example is Dr. Murphy's discussion of ADHD diagnostic criteria, which Plaintiff mischaracterizes as stating that "a person must be 'deviant'" in order to have ADHD. *Id.* What Dr. Murphy actually said is that individuals with ADHD typically have a "longstanding history of developmentally deviant functional impairment"—*i.e.*, their functioning has deviated from developmental norms over the course of their lives. *See* A286 ¶40; *see also* A272 ¶14. Far from being "absurd," this statement accurately reflects something that a qualified professional should look for when evaluating whether someone has ADHD.

ADHD diagnostic criteria are set out in the Diagnostic and Statistical Manual of Mental Disorders (DSM). A270 ¶9; A1039 (179:25-180:4)

(Dr. Wasserstein). The DSM requires "[a] ***persistent pattern*** of inattention and/or hyperactivity-impulsivity that ***interferes with functioning or development***." A951 (emphases added). This is the "essential feature" of ADHD. A953. As the DSM-5 explains:

> ADHD is associated with reduced school performance and academic attainment, social rejection, and, in adults, poorer occupational performance, attainment, attendance, and higher probability of unemployment as well as elevated interpersonal conflict.…

A955. The DSM may not use the phrase "developmentally deviant," but Dr. Murphy's shorthand reference to the expected functional limitations of an individual with ADHD is entirely consistent with the diagnostic criteria (which Plaintiff does not meet, as at least one and perhaps two of his own evaluating professionals concluded, A809-7, A810-9).[11]

Finally, there is nothing in the record to show that NBME's external experts apply an "inappropriately strict definition of disability." Opp. 30. Plaintiff points to a misguided line of questioning where his counsel asked Dr. Lovett and Dr. Murphy about unspecified "documentation" from a *different* testing entity that supposedly showed the rate at which

---

[11] Dr. Murphy's understanding of the diagnostic criteria for ADHD cannot seriously be questioned. He has conducted approximately 3,000 clinical evaluations for ADHD, A1090 (385:9-13); been involved in ADHD research, teaching, and clinical practice for decades, A1090-A1091 (385:23-389:23); serves as an independent expert for numerous entities, including the New York Board of Law Examiners, A269 ¶6; and has been elected to the hall of fame for CHADD (Children and Adults with Attention-Deficit/Hyperactivity Disorder), an advocacy group for individuals with ADHD, A1091 (389:25-390:13).

-17-

they recommended denial of requests submitted to that entity. This extra-record information did not relate to NBME and is irrelevant in any event. As Dr. Lovett explained, the "denial" rate of external reviewers tells us little, given that each file is individually reviewed on its own merit, and NBME may grant requests that are never sent out for external review in the first place. A1085 (363:16-25).[12]

Because NBME's experts did not misconstrue the factual record and did not apply improper diagnostic or legal standards in assessing whether Plaintiff was properly diagnosed or is disabled within the meaning of the ADA, as Plaintiff asserts, there was no basis for the court to presumptively credit Dr. Wasserstein's opinions over those of NBME's experts. Plaintiff repeatedly couches this as a "credibility" determination, Opp. 16, 23, 29, 31, 45, 60, but Plaintiff cannot "insulate [the district court's] findings from review by denominating them credibility determinations," where documents and other objective evidence contradict those findings. *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985); *see also Locurto v. Giuliani,* 447 F.3d 159, 181 (2d Cir. 2006) ("Although Rule 52(a) demands great deference to a trial court's factual findings in general, and to its credibility determinations

---

[12] Plaintiff criticizes NBME for not calling an NBME employee to testify at the hearing, suggesting that NBME wanted to avoid cross-examination. Opp. 13. However, NBME's Dr. McGeehan provided a declaration addressing each of Plaintiff's requests, A68-78, and Plaintiff was free to call her as a witness. Indeed, he listed Dr. McGeehan as a hearing witness but chose not to call her. Dkt. 34.

-18-

in particular, we have not hesitated to find clear error 'where the court has failed to synthesize the evidence in a manner that accounts for conflicting evidence or the gaps in a party's evidentiary presentation.'"). Dr. Wasserstein's conclusions are refuted by compelling contrary evidence and should not have been credited, much less presumptively so, over the opinions of well-qualified experts.

### C. The district court and Plaintiff improperly rely on agency guidance to support giving deference to Plaintiff's evaluator.

Plaintiff and *amici* concede that courts are not required to "automatically defer to the conclusions of evaluating professionals[.]" Opp. 50; Amici Br. 16. Yet they fall back on DOJ guidance to argue that the district court properly gave Dr. Wasserstein's conclusions greater weight, simply because she conducted an in-person evaluation of Plaintiff. Opp. 45-48; Amici Br. 14-20.[13]

NBME has explained why DOJ's guidance has no application here. Br. 58-62. As a matter of law, DOJ's guidance is not legally binding, *see Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96-97 (2015), and in the absence of any regulatory ambiguity, it is also not entitled to any deference, *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019).

---

[13] Dr. Michels also evaluated Plaintiff in-person, but Plaintiff does not advocate deferring to her conclusions, presumably because she did not diagnose Plaintiff with a reading disorder or ADHD. Likewise, although Dr. Anderson evaluated Plaintiff in-person, Plaintiff does not advocate deferring to her conclusions, presumably because she concluded he does not have ADHD.

Plaintiff's and *amici*'s arguments in response to *Kisor* are incorrect. They cite *Kisor* to urge deference to the DOJ guidance because it purportedly "implicates DOJ's expertise," Opp. 48; *see also* Amici Br. 14, but they are relying on a factor that is evaluated only *after* finding that a regulation is ambiguous. *See Kisor*, 139 S. Ct. 2415-18.[14] There has been no such finding here. Plaintiff also misreads *Kisor* to suggest that agency guidance should be consulted when "'carefully consider[ing] the text, structure, history, and purpose of a regulation'," Opp. 47 n.23, but this is exactly the opposite of what the Supreme Court in instructed in *Kisor*, *see* 139 S. Ct. at 2415.

Even if it were to apply, DOJ's guidance does not help Plaintiff. DOJ suggests that reports from "experts who have personal familiarity with the candidate" should take precedence over those from reviewers for testing entities, "who have never personally met the candidate or conducted the requisite assessments for diagnosis and treatment." 75 Fed. Reg. at 56,297; *see also* Amici Br. at 15. But any "personal familiarity" Dr. Wasserstein has with Plaintiff is limited to his one-time visit for the purpose of obtaining a report that would support testing accommodations. She did not know him before her evaluation and has had no treatment relationship with him since. A1055 (243:16-21). And Dr.

---

[14] Plaintiff also confuses regulations and non-binding agency guidance in his attempt to distinguish *Black & Decker v. Nord*. Opp. 48. As with ERISA, neither the ADA nor any implementing regulation requires deference to a plaintiff's evaluator.

Wasserstein was not the one who "conducted the requisite assessments"—it was her "associate," who reported test scores back to Dr. Wasserstein—just as Dr. Wasserstein reported those scores to NBME. *See supra* at 14-15.

The DOJ (an agency of lawyers, not psychologists), opines in its guidance that a "proper diagnosis" of learning disabilities "requires face-to-face evaluation," 75 Fed. Reg. at 56,297, but Dr. Wasserstein explained that "for many neuropsychologists especially, those of us who have been around a long time, we don't do much of the actual data collection. We have usually what are called psychometricians for doing that." (178:12-15); *see also* A208 ¶12 ("This task is often delegated to a trained technician."); A270 ¶7 ("The practice of reviewing supporting documentation and providing an opinion based upon that documentation is well established and professionally sound....").

Finally, and as previously explained, even under the DOJ guidance, there is no basis to "defer" to the conclusions of an examinee's evaluator unless the documentation "supports the need for the requested testing accommodation." 75 Fed. Reg. at 56,297; *see also* Amici Br. 16 (agreeing that the DOJ guidelines do not "require *de facto* disability findings based on the recommendations of an examinee's professional"). Plaintiff's documentation does not support the need for accommodations because, at a minimum, it does not support a finding that he is substan-

tially limited in his ability to read or concentrate as compared to most people (*see infra*).

The district court's reliance on DOJ guidance to give greater weight to the conclusions of Dr. Wasserstein, SPA33-34, constitutes clear error of law and fact.

### D. Plaintiff is not substantially limited compared to most people in the general population.

Plaintiff attempts to insulate the district court's erroneous conclusion that he is substantially limited compared to most people by characterizing it as a factual finding. Opp. 18 n.4. It is not. In order to conclude that Plaintiff is "disabled" under the ADA, the district court was required it to apply the facts to the law, and its disability determination is reviewed *de novo*. Br. 32. This Court expressly so held in a directly analogous case. *Bartlett v. N.Y. State Bd. of Law Exam'rs*, 226 F.3d 69, 80 (2d Cir. 2000). For Plaintiff to suggest otherwise is surprising and wrong.

Plaintiff urges a "totality of the circumstances" approach to assessing whether he has a disability, Opp. 43, but then argues that the district court only needed to consider four factors to determine he is substantially limited in the major life activities of reading and concentrating: (1) his referral to a speech pathologist for stuttering issues when he was a child; (2) his purported referral to "two reading specialists, and a learning specialist;" (3) his reliance on "audio-based accom-

modations in lieu of reading"; and (4) his current receipt of extra time on tests in medical school. Opp. 43.

This Court has firmly rejected the proposition that an ADA disability can be presumed based on prior receipt of special education services. In *B.C. v. Mount Vernon Sch. Dist.*, the Court held that an individual who has a "disability" under the Individuals with Disabilities in Education Act (IDEA) does not "categorically" qualify as "an individual with a 'disability' under the ADA," because, unlike the IDEA, the ADA "asks whether an impairment 'substantially limits' a major life activity." 837 F.3d 152, 155, 159 (2d Cir. 2016). To hold that a finding of disability under the IDEA automatically establishes a disability under the ADA would improperly read "the ADA's substantial limitation requirement, which [this Court has] consistently enforced, out of that statute...." *Id.* at 159-60.

It is not surprising that Plaintiff entirely ignores the Court's *B.C.* decision. Its reasoning significantly undercuts Plaintiff's arguments, the arguments of the *amici*, and the district court's analysis, all of which posit that Plaintiff's purported "lifelong" history of receiving informal accommodations and using "mitigating measures" show he is substantially limited in his ability to read and concentrate as compared to most people. If anything, Plaintiff's argument is even less compelling than that of the plaintiffs in the *B.C.* case, because he asks the Court to conclude that he is disabled under the ADA based on little more than anec-

-23-

dotal reports of alleged "informal accommodations". Unlike the plaintiffs in *B.C.*, he had no IEP and did not receive any formal accommodations at any point from kindergarten through college. *See supra* at 9. He first received formal accommodations in his second year of medical school, and his receipt of those accommodations does not compel the provision of accommodations on the USMLE. *See* Br. 49-51; *In re O.M.*, __A.3d__, 2023 WL 2344296, *5 (Vt. Mar. 3, 2023) (receipt of accommodations in law school and on the LSAT did not automatically entitle plaintiff to accommodations on the bar exam).

Perhaps recognizing the problems with his first line of argument, Plaintiff falls back on his psychological testing, but he noticeably avoids discussing what that testing actually shows and provides few if any record citations for his conclusory assertions. Opp. 43-44. It bears repeating:

> Across all three of his psychological evaluations, '[c]linical evaluation of [Plaintiff's] intellectual functioning did not indicate substantially limited cognition when compared to the general population.' A410 ¶19. To the contrary, his intelligence testing reflects 'superior functioning and superior overall facility for learning and reasoning.' A 411 ¶ 20. Likewise, '[e]very time that [Plaintiff's] academic skills have been measured against age peers on diagnostic tests, his skills have been in the average range or above, including on measures that were timed.'" A209-A210 ¶ 17; *see also* A412-A413 ¶ 23.

Br. 17-18; *see also id.* 18-24.

Plaintiff admits that Dr. Wasserstein diagnosed him based on a "discrepancy" between his own "intellectual gifts" and the results of his

psychometric testing. Opp. 27. He then argues that the district court "appropriately relied on DOJ guidance stating that ***disability*** can be 'clinically diagnosed based in part on a disparity'" between aptitude and achievement. *Id.* (emphasis added). But Plaintiff's loose reference to "disability" improperly conflates two different concepts. Plaintiff was "diagnosed" with a ***learning*** disability (more accurately referred to as a learning disorder under the DSM) based on a discrepancy between his high intellectual functioning and his actual academic functioning, which is still at least average if not above average. Regardless of whether this was a proper basis for a learning disorder diagnosis,[15] it is well-established that a diagnosed impairment alone is not enough to show a disability within the meaning of the ADA. "An impairment is a disability within the meaning of this part if it substantially limits the ability of an individual to perform a major life activity as compared to most people.… [N]ot every impairment will constitute a disability within the meaning of this section." *See* 28 C.F.R. § 36.105(v). Thus, *amici*'s lengthy discussion of "twice exceptional" individuals, Amici Br. 9-14, does not address the critical issue in Plaintiff's ADA lawsuit: whether he is substantially limited as compared to most people, not relative to

---

[15] As Dr. Wasserstein herself noted, there is difference of opinion about whether it is appropriate to diagnose learning disorders in reading based on relative deficits. A1053 (236:17-22).

his own "gifted" traits.[16] Here, despite any "metaphorical limp," Plaintiff's reading abilities—as measured by his own evaluators—are ***not*** substantially limited compared to most people. A209-A217 ¶¶15-34; A221-A223 ¶¶45-49; A287 ¶¶41-42; A315 ¶6; A407-A413 ¶¶8-23; A416-A419 ¶¶25-34; A435 ¶¶10-11.

Again contrary to his proposed "totality of circumstances" approach, Plaintiff ignores important parts of the record that are highly relevant to determining whether he is substantially limited compared to most people, including his academic and standardized testing history. Instead, Plaintiff insists that his admitted "history of academic success" cannot be considered because it was all the result of "mitigating measures." Opp. 51-54.[17] The plaintiff in *Bibber v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 2016 WL 1404157 (E.D. Pa. 2016), made a similar argument. The court found, however, that "Bibber has not presented sufficient evidence to show how the reading strategies she has utilized

---

[16] S*ee* M. Gordon *et al*., "The LD Label for Relatively Well-Functioning Students: A Critical Analysis," 32 J. of Learning Disabilities 485 (1999); *see also* C. Lerner, "'Accommodations' for the Learning Disabled: A Level Playing Field or Affirmative Action for Elites," 57 Vand. L. Rev. 1043 (2004).

[17] Plaintiff claims that cases where courts looked to examinees' academic success are distinguishable, because "the students' academic success [in those cases] was dispositive only in the absence of any evidence of disability." Opp. 52 n.25. That is not accurate. In *Valles*, *Wright*, *Black*, and *Healy*, the examinees all offered evidence of their alleged disability, including reports from evaluating professionals who diagnosed them with ADHD and/or learning disorders.

for years improve her reading so significantly that without them she would be substantially limited when compared to the general population." *Id.* *9. The same reasoning applies here—even more so given the holes and inconsistencies in the record with regard to Plaintiff's claimed use of "mitigating measures." *See supra* at 7-10.[18]

"[I]n assessing whether a plaintiff has a disability, [this Court has] been careful to distinguish impairments which merely *affect* major life activities from those that *substantially limit* those activities." *B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d at 160 (citation omitted). Plaintiff did not demonstrate a clear likelihood of success in showing that he is *substantially limited* in his ability to read or concentrate as compared to most people, and the district court's preliminary injunction should be vacated on this basis.

---

[18] *Amici* argue that "if a person can demonstrate that he or she has a covered disability, then reasonable accommodations should be available regardless of whether mitigating measures can lessen the effects of the disability." Amici Br. 23. This is not correct. Although mitigating measures such as "learned behavioral or adaptive neurological modifications" should not be considered in determining whether someone is disabled within the meaning of the ADA, 42 U.S.C. § 12102(4)(E)(i)(iv), the impact of any mitigating measures can be taken into account in determining whether accommodations are necessary, as DOJ itself has recognized. *See* 81 Fed. Reg. 53,204, 53,232 (Aug. 11, 2016) (agreeing that ameliorative effects of mitigating measures may be considered in determining whether testing accommodations are warranted).

**III.    NBME will suffer greater harm from an improper preliminary injunction than Plaintiff would suffer from waiting for a final resolution on the merits.**

Plaintiff, like the district court, fails to account for the harm to NBME if he is awarded unwarranted testing accommodations. Plaintiff claims that *Rothberg v. Law Sch. Admission Council*, 102 F. App'x 122, 126 (10th Cir. 2004), is distinguishable because he only sought a preliminary injunction with respect to Step 1 examination and he still must take Step 2 CK and Step 3, so his testing with accommodations would not moot the case. Opp. 55 n.26. That is a distinction without a difference. The district court's preliminary injunction awarded Plaintiff double time on Step 1, and the results of that accommodated exam will be reported to third parties. That is the harm NBME seeks to avoid, and as to which *Rothberg* is squarely on point.

Likewise misguided is Plaintiff's passing attempt, in a footnote, to dismiss this Court's decision in *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 88-89 (2d Cir. 2004). NBME did not cite *Powell* to support an argument that Plaintiff is not otherwise qualified to be a doctor, so Plaintiff cannot sidestep *Powell* on that basis, or because *Powell* was "a pre-ADAAA case." *See* Opp. 56 n.27. NBME cited *Powell* because the Court recognized in that case that unwarranted accommodations on the USMLE provide an "unfair advantage" and also jeopardize the reliability of USMLE scores, which are important interests. *See* Br. 69-70. The Court's analysis in this regard was not based on how the ADA was in-

terpreted prior to being amended and instead reflected a sound recognition that multiple interests are implicated when accommodations are requested on the USMLE, all of which NBME attempts to balance though consistent application of its accommodation policies.

## IV. The public interest does not favor the award of mandatory preliminary injunctive relief.

Plaintiff's argument that "enforcement of the ADA is in the public interest" misses the point relative to a preliminary injunction that provides mandatory relief. There was no showing that Plaintiff needed emergency relief to obtain injunctive relief that he can obtain, if he prevails, on a full record after discovery and trial. Given the public interest in the fair administration of medical licensing examinations, mandatory preliminary injunctive relief should not be lightly ordered and was not warranted in this case this case.

## CONCLUSION

The Court should vacate the preliminary injunction.

Respectfully submitted,

/s/ *Robert A. Burgoyne*
Robert A. Burgoyne, #366757
Caroline Mew, #467354
PERKINS COIE LLP
700 13th Street N.W., Ste. 800
Washington, DC 20005-3960
Telephone: 202.654.1744

*Counsel for Defendant-Appellant*

March 10, 2023

-29-

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Second Circuit Local Rule 32.1(a)(4) because it contains 5,859 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f). I further certify that the brief complies with the typeface and type-style requirements of Rule 32(a)(5)-(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook and Palatino Linotype fonts.

Dated:          March 10, 2023
                Washington, D.C.


                            /s/ *Robert A. Burgoyne*
                            Robert A. Burgoyne

## CERTIFICATE OF SERVICE

I certify that on March 10, 2023, I electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Second Circuit using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished through the CM/ECF system.

Date:      March 10, 2023
           Washington, D.C.

                            */s/ Robert A. Burgoyne*
                            Robert A. Burgoyne